**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| KEVIN BURBIGE and ZIYANG NIE, Individually and On Behalf of All Others Similarly Situated,<br><br>       Plaintiffs,<br><br> v.<br><br>ATI PHYSICAL THERAPY, INC. f/k/a FORTRESS VALUE ACQUISITION CORP. II, LABEED DIAB, JOSEPH JORDAN, ANDREW A. MCKNIGHT, JOSHUA A. PACK, MARC FURSTEIN, LESLEE COWEN, AARON F. HOOD, CARMEN A. POLICY, RAKEFET RUSSAK-AMINOACH, and SUNIL GULATI,<br><br>       Defendants. | Case No. 1:21-CV-04349<br><br>**OMNIBUS OPPOSITION TO THE ATI DEFENDANTS' AND MR. MCKNIGHT'S AND THE FVAC DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ................................................................................. 1

II.    FACTUAL BACKGROUND ................................................................................... 4

     A.     FVAC Incorporated as a SPAC in 2019 and Merged with ATI in 2021 ................ 4

     B.     Unbeknownst to Investors, ATI Experienced a Massive Increase in Attrition During Late 2020 and 2021 ................................................................................ 5

     C.     The Company Knowingly Misled Investors about ATI's Attrition Rate in 2021 .. 7

     D.     When Investors Learned the Truth about the Company's Attrition and Clinic Opening Figures, ATI's Stock Price Dropped Precipitously ................................ 10

III.   STANDARD ON MOTION TO DISMISS ......................................................... 11

IV.   ARGUMENT .......................................................................................................... 11

     A.     DEFENDANTS DO NOT MEANINGFULLY CONTEST THAT LEAD PLAINTIFFS' SECTION 14 CLAIM BASED ON CERTAIN MISLEADING STATEMENTS SURVIVES ............................................................................. 11

     B.     LEAD PLAINTIFFS ADEQUATELY PLEAD NUMEROUS ACTIONABLE MISSTATEMENTS AND OMISSIONS FOR ALL CLAIMS ............................ 14

         1.     Hypothetical Risk Statements ................................................................ 15

         2.     Comparative Statements about Retention Rates ..................................... 15

         3.     Statements of Present State of Clinics .................................................... 16

         4.     Statements Valuing Goodwill/Trade Name ............................................ 19

         5.     Omission of Known Trend of High Attrition .......................................... 21

     C.     LEAD PLAINTIFFS ADEQUATELY PLEAD SCIENTER FOR THEIR SECTION 10(B) CLAIMS .................................................................................. 22

         1.     Multiple Former ATI Employees Confirm Defendants' Direct Knowledge of Severe Attrition and Support a Strong Inference of Scienter .............. 24

         2.     The Central Importance of Physical Therapists to the Company's Operations and the Magnitude of the Company's Attrition Further Support a Strong Inference of Scienter .................................................................. 30

         3.     Suspiciously Timed Departures of Key Employees Immediately Following Revelation of the Company's Attrition Misstatements Further Support a Strong Inference of Scienter .................................................................. 31

         4.     The SEC Is Investigating the Company's Disclosures, Which Further Supports a Strong Inference of Scienter .................................................. 32

     D.     LEAD PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION FOR THEIR SECTION 10(B) CLAIM .................................................................................. 32

E.      PLAINTIFFS HAVE PROPERLY PLEADED VIOLATIONS UNDER
        SECTION 20(A) ................................................................................................ 35

V.      CONCLUSION .......................................................................................................... 35

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **AC** | Consolidated Amended Class Action Complaint (February 8, 2022) [Dkt. 58] |
| **Amended Complaint** | Consolidated Amended Class Action Complaint (February 8, 2022) [Dkt. 58] |
| **ATI** | ATI Physical Therapy, Inc. |
| **ATI Individual Defendants** | ATI, Labeed Diab, Joseph Jordan and Andrew McKnight |
| **Class** | (As defined in ¶ 29 of the Amended Complaint) |
| **Class Period** | (As defined in ¶ 1 of the Amended Complaint) |
| **Company** | ATI Physical Therapy, Inc. |
| **Comparative Statements about Retention Rates** | The following statements in AC ¶¶ 123, 129, 138, 139, 143, 152, 167:<br>• "the Company . . . has a 'very high retention" and "low turnover'"<br>• "historically been able to realize high retention rates across [the] organization"<br>• "favorable clinician retention rates"<br>• "attractive recruiting and retention capabilities"<br>• "strong retention" of physical therapy clinicians<br>• "high retention"<br>• "significant labor savings through a more productive staffing model" |
| **Defendants** | ATI, ATI Individual Defendants, FVAC Defendants |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **FVAC Defendants** | Joshua Pack, Marc Furstein, Leslee Cowen, Aaron Hood, Carmen Policy, Rakefet Russak-Aminoach, and Sunil Gulati |
| **FVAC Mem.** | Memorandum of Law in Support of Mr. McKnight's and the FVAC Defendants' Motion to Dismiss the Amended Complaint [Dkt. 72] |
| **FVAC Motion** | Mr. McKnight's and the FVAC Defendants' Motion to Dismiss the Amended Complaint [Dkt. 72] |
| **Defs.' Mot. or Defs.' Mem.** | Memorandum of Law in Support of the ATI Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint [Dkt. 69] |
| **Motion(s)** | ATI Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint [Dkt. 69] and Mr. McKnight's and the FVAC Defendants' Motion to Dismiss the Amended Complaint [Dkt. 71] |
| **Plaintiffs** | Phoenix Insurance Company Ltd.; Phoenix Pension & Provident Funds; City of Melbourne Firefighters' Retirement System |
| **Registration Statement or RS** | (defined in AC ¶ 171) |
| **SEC** | United States Securities and Exchange Commission |
| **Section 10(b)** | Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) |

| Section 14(a) | Securities Exchange Act of 1934, 15 U.S.C. § 78j(n) |
|---|---|
| Section 20(a) | Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) |
| SPAC | special purpose acquisition company |
| Hypothetical Risk Statements | The following statements in AC ¶¶ 92, 131, 145, 154:<br><br>• "The Company's facilities face competition for experienced physical therapists and other clinical providers that may increase labor costs and reduce profitability."<br><br>• "If the Company cannot recruit and retain its base of experienced and clinically skilled therapists and other clinical providers, management and support personnel, its business may decrease and its revenues may decline."<br><br>• "The Company may also experience increases in its labor costs, primarily due to higher wages and greater benefits required to attract and retain qualified healthcare personnel, and such increases may adversely affect the Company's profitability."<br><br>• "while the Company attempts to manage overall labor costs in the most efficient way, its efforts to manage them may have limited effectiveness and may lead to increased turnover and other challenges." |
| Statements of Present State of Clinics | The following statements in AC ¶¶ 161, 163:<br><br>• ATI was "on track to achieve our de novo development targets"<br><br>• "the Company continues to match its clinical staffing levels accordingly" |
| Statements Valuing Goodwill/Trade Name | The following statements in AC ¶¶ 165, 171:<br><br>• the "Goodwill" of "Wilco Holdco, Inc." (ATI) was $1,330,085,000<br><br>• the "Trade name and other intangible assets, net" of "Wilco Holdco, Inc." (ATI) was $644,934,000 |

iv

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AnchorBank, FSB v. Hofer*,
649 F.3d 610 (7th Cir. 2011) ...............................................................................................32

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).............................................................................................................21

*Beck v. Dobrowski*,
559 F.3d 680 (7th Cir. 2009) ...............................................................................................11

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...............................................................................................13

*City of Livonia Emple. Ret. Sys. v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ...............................................................................................22

*City of Sterling Heights Gen. Emples. Ret. Sys. v. Hospira, Inc.*,
No. 11 C 8332, 2013 U.S. Dist. LEXIS 19156 (N.D. Ill. Feb. 13, 2013) ...............................11

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
No. 20-3258, 2021 U.S. App. LEXIS 23654 (7th Cir. Aug. 10, 2021) .............................15, 16

*City of Warren Police and Fire Ret. Sys. V. Zebra Techs. Corp.*,
2020 WL 6118571 (N.D. Ill. Oct 16, 2020)..........................................................................25

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021)....................................................................................................29

*Crespo v. Colvin*,
824 F.3d 667 (7th Cir. 2016) ...............................................................................................13

*Dura Pharms., Inc., v. Broudo*,
544 U.S. 336 (2005)........................................................................................................32, 34

*Fryman v. Atlas Fin. Holdings, Inc.*,
No. 18-cv-01640, 2022 U.S. Dist. LEXIS 70597 (N.D. Ill. Apr. 18, 2022)......................15, 32

*Gallagher v. Abbott Labs.*,
269 F.3d 806 (7th Cir. 2001) ...............................................................................................20

*Hughes v. Huron Consulting Grp., Inc.*,
733 F. Supp. 2d 943 (N.D. Ill. 2010) ....................................................................................11

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ...............................................................................13

*In re Daou Systems, Inc.*,
  411 F.3d 1006 (9th Cir. 2005) .........................................................................25

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)..............................................................30

*In re Mylan N.V. Sec. Litig.*,
  No. 16-CV-7926 (JPO), 2018 U.S. Dist. LEXIS 52084 (S.D.N.Y. Mar. 28,
  2018) .................................................................................................................12

*In re Sears, Roebuck & Co. Sec. Litig.*,
  291 F. Supp. 2d 722 (N.D. Ill. 2003) ...............................................................29

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)..........................................................12, 19

*Khoja v. Orexigen Therapeutics Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...........................................................................13

*Kuebler v. Vectren Corp.*,
  13 F.4th 631 (7th Cir. 2021) ...............................................................11, 12, 14

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ...........................................................................11

*Lowry v. RTI Surgical Holdings, Inc.*,
  532 F. Supp. 3d 652 (N.D. Ill. 2021) ...............................................................31

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) (reversed on other grounds) ...............................16, 22

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...................................................................... *passim*

*Marks v. CDW Comp. Ctrs., Inc.*,
  122 F.3d 363 (7th Cir. 1997) ...........................................................................16

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)............................................................................................22

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..............................................................................25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)......................................................................................19, 20

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
   895 F.3d 933 (7th Cir. 2018) ...................................................................................25

*Ray v. Citigroup Glob. Markets, Inc.*,
   482 F.3d 991 (7th Cir. 2007) ...................................................................................32

*Ross v. Career Educ. Corp.*,
   No. 12 C 276, 2012 U.S. Dist. LEXIS 155037 (N.D. Ill. Oct. 30, 2012) ...............30

*S. Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...................................................................................29

*Set Capital LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021)................................................................................26, 28

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)................................................................................20, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).................................................................................................22

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
   No. 19 C 3648, 2020 U.S. Dist. LEXIS 18727 (N.D. Ill. Feb. 5, 2020)...........20, 21

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020) .......................................................................18

*White v. United Airlines, Inc.*,
   987 F.3d 616 (7th Cir. 2021) ..............................................................................11, 13

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...................................................................................30

**Statutes**

15 U.S.C.S. § 78u-5 ..........................................................................................................18

15 U.S.C. § 78j(b).................................................................................................... *passim*

15 U.S.C. § 78n....................................................................................................................2

15 U.S.C. § 78t(b)..............................................................................................................34

15 U.S.C. § 78u-5(i)(1) ......................................................................................................17

18 U.S.C. § 1514A(a) .........................................................................................................25

**Rules**

Rule 8(a)(2) ...................................................................................................................32

Rule 9(b) ......................................................................................................................32

Rule 12(b)(6)................................................................................................................15

## I.  PRELIMINARY STATEMENT

This federal securities class action arises from Defendants' misrepresentations to investors concerning ATI—one of the nation's largest providers of outpatient physical therapy services.  On June 17, 2021, ATI became a publicly traded company through a merger with FVAC, a "blank check" or special purpose acquisition company ("SPAC").  In July 2021, less than two months after going public, the Company shocked the market when it publicly admitted that it was suffering from severe attrition among its physical therapists, which forced a material reduction in its revenue and adjusted EBITDA expectations.  This news caused ATI's stock price to decline precipitously, sparked massive losses in shareholder value and inspired securities analysts to note that "management credibility has been damaged."  ATI suddenly terminated both its Chief Human Resources Officer and its Chief Executive Officer and then had to take hundreds of millions of dollars in impairment charges.  Next, after disclosing on October 19, 2021 that projected revenue and EBITDA had even further eroded, the Company announced that it was under investigation by the SEC.

Throughout the Class Period, in the Proxy Statement and other public statements, Defendants repeatedly misled investors about the core of ATI's business—its retention of therapists to provide physical therapy services to patients.  These misrepresentations and omissions took five general forms.  *First*, ATI presented therapist retention problems as a hypothetical risk, stating for example, that its business *may* suffer *if* it were unable to retain physical therapists.  In reality, when these statements were made, the Company *already* was suffering from severe therapist retention problems that *already* were impacting its business.  *Second*, Defendants touted ATI's "very high retention" and its "low turnover" of therapists, which represented to investors that its retention rates compared favorably to that of other industry participants.  In fact, the opposite was true.  ATI was suffering from severe attrition, and, by comparison, its retention rate

1

was *less than half* that of the industry average, as confirmed by multiple former ATI employees cited in the Complaint. *Third*, ATI told investors that it was currently matching its staffing to meet customer needs, when in fact, ATI at the time was unable to staff its clinics adequately. *Fourth*, ATI grossly overstated the value of its goodwill and other intangible assets. *Fifth*, ATI omitted to inform investors of the known, material trend that the Company's retention rate was only half that of the industry average.

Through these misstatements and omissions, Defendants violated multiple provisions of the federal securities laws. *First*, Defendants violated Section 14 of the Exchange Act simply by making the above materially misleading statements in ATI's Proxy Statement filed to solicit votes for the Merger. Plaintiffs' Section 14 claim is not a claim for fraud—it has no mental element and so does not require any allegations of scienter. This claim should proceed to discovery because the unrebutted facts pled in the Complaint establish that Defendants misled investors regarding the severe therapist attrition that ATI was suffering throughout the Class Period. Indeed, as set forth below, Defendants fail even to raise any legally cognizable argument for dismissing Plaintiffs' Section 14 claims based on their statements presenting retention problems as a mere hypothetical risk. As such, these claims *must* proceed into discovery regardless of the remainder of Defendants' motions. The facts alleged in the Complaint equally establish that Defendants' other statements were misleading, including the facts supplied by multiple former ATI employees who confirmed first-hand that ATI was being plagued by severe attrition throughout the Class Period.

*Second*, and no less clearly, Defendants violated the anti-fraud protections of Section 10(b) of the Exchange Act by *knowingly* deceiving ATI investors. The allegations of scienter set forth in the Complaint give rise to an overwhelming inference that Defendants were fully aware of their Company's abysmal attrition rate through multiple presentations, meetings, reports and data

2

showing the massive attrition impacting the Company throughout the Class Period. At a minimum, Defendants were severely reckless in disregarding the constant drumbeat of information they received directly showing that ATI was suffering from material therapist attrition. Multiple former ATI employees recounted that Defendants routinely viewed presentations containing monthly updates of the Company's attrition rates and openly discussed these attrition rates at Company meetings, including in response to questioning from these former employees. Moreover, providing physical therapists was the core of ATI's business, which further solidifies the strong inference that Defendants were aware of the Company's inability to retain those therapists. When the facts alleged in the Complaint are taken as true, as required at this early stage, there is no innocent inference that is equally compelling as—far less *more* compelling than (as it must be to for Defendants' argument to prevail here)—the inference that Defendants were well aware of ATI's severe attrition among the ranks of its physical therapists.

In the face of these facts, which again are the subject of an ongoing SEC investigation, Defendants claim that no investors could have been misled by their statements and that their actions were so indisputably proper that dismissal at the pleading stage is warranted. Defendants are wrong. The truth is that Defendants do not raise a single compelling argument for dismissing any of this important, well-pleaded case.

As an initial matter, Defendants fail to raise any legally cognizable argument for dismissing Plaintiffs' Section 14 claims based on one set of Defendants' misstatements, those that presented retention problems as a mere hypothetical risk when they were already plaguing the Company. Accordingly, those Section 14 claims, which encompass the central factual matters at issue, must proceed to discovery regardless of Defendants' Motions. Defendants' arguments against the remaining claims fare no better. They follow a standard script for dismissal motions in securities

3

class actions by improperly challenging the credibility of multiple former ATI employees, inappropriately disputing the facts alleged in the Complaint and otherwise outright ignoring the facts and the law. None of Defendants' misguided arguments warrants dismissal. The Complaint carefully details misstatements and omissions that are misleading in light of Defendants' concealment of ATI's rampant attrition. Likewise, the Complaint includes rare, highly compelling allegations of scienter from numerous former ATI employees who explained that Defendants routinely were presented the Company's severe therapist attrition rate and regularly spoke about these rates at all-hands ATI meetings. The inference of scienter is overwhelming and more than sufficient to pass muster at the pleading stage.

The Court should deny Defendants' Motions.

## II.     FACTUAL BACKGROUND

### A.     FVAC Incorporated as a SPAC in 2019 and Merged with ATI in 2021

ATI is a physical therapy provider, with principal offices in Bolingbrook, Illinois. AC ¶ 46. FVAC was incorporated in Delaware in June 2020, as a special purpose acquisition company ("SPAC") formed for the purpose of effecting a merger or other business combination with one or more businesses. AC ¶ 47

In recent years, SPACs have become magnets for fraud, which has caused concern among U.S. regulators and investors. AC ¶ 48. For example, the SEC has criticized SPACs because of their apparent tendency to encourage fraud. AC ¶ 48. The perceived prospect of lower risk for securities law liability for company misstatements entices SPACs to take liberties that other publicly traded companies would not in their disclosures, and so encourages SPACs to mislead the investing public. AC ¶ 49.

4

FVAC completed its initial public offering (the "IPO") on August 14, 2020. AC ¶ 52. On October 2, 2020, shares of FVAC's Class A common stock and its public warrants began trading separately on the NYSE under the ticker symbols "FAII" and "FAII WS," respectively. AC ¶ 52.

ATI incorporated in Delaware on June 10, 2020, less than one month before FVAC filed its registration materials with the SEC on July 24, 2020. AC ¶ 55. According to Defendant McKnight, FVAC "followed ATI for a long time, having been an investor in the credit for over ten years." AC ¶ 54.

On February 22, 2021, ATI and FVAC announced a proposed merger that would take ATI public. AC ¶ 58. On May 14, 2021, FVAC filed its definitive proxy statement with the SEC, soliciting votes in favor of the Merger. AC ¶ 60. On June 17, 2021, ATI completed the Merger with FVAC, and shares of the combined Company's common stock began trading on the NYSE under the ticker symbol "ATIP." AC ¶ 63.

### B. Unbeknownst to Investors, ATI Experienced a Massive Increase in Attrition During Late 2020 and 2021

As a provider of rehabilitation services, the Company's recruitment and retention of enough physical therapists to meet patient demand is vital to the success and growth of its business. AC ¶ 64. Prior to late 2020, the Company's physical therapist attrition rate hovered at or around 20%, and the average attrition rate for clinical staff and physical therapists in ATI's industry is less than 20%. AC ¶ 66. According to the National Healthcare Retention & RN Staffing Report, the annual average turnover rate for physical therapists is 10.7%. AC ¶ 66. Similarly, according to an academic study of the industry-wide turnover rates for physical therapists, 16% of physical therapists changed jobs each year and 2% left their jobs and were not working or were retired. AC ¶ 66. According to FE-3, prior to late 2020 and the COVID-19 pandemic, the attrition rate

among physical therapy clinicians hovered around 20%, which FE-3 understood to be the "industry average." AC ¶ 68.

Beginning in or around November 2020 and into early 2021, the Company's attrition rate among physical therapists roughly doubled to 41%, as confirmed by multiple former employees. AC ¶¶ 7, 65-66, 68, 76-77, 79-81. As such, unbeknownst to investors, ATI suffered from a very high attrition rate—more than double the industry average—throughout the Class Period.

For example, according to FE-5, a former ATI employee who worked as a Sales Director for certain of ATI's clinics from March 2016 through March 2021, the Company's attrition rate for physical therapists reached around 40% in 2020 and remained around 40% through at least March 2021 when FE-5 left the Company. AC ¶ 77. FE-1, a former ATI employee who served as a Talent Acquisition Specialist from May 2019 to September 2021, likewise has confirmed that the Company experienced an attrition rate of approximately 40% in late-2020 and early-2021. AC ¶ 79. FE-1 knew this information from weekly reports distributed to her and others by Brian Emerson, ATI's Director of Talent Acquisition, throughout 2020 and 2021. AC ¶ 79. Former ATI physical therapists told FE-1 that they were leaving the Company because their jobs had become demanding, more dangerous, and undercompensated. AC ¶ 80. Former ATI Employee 2 ("FE-2") also confirmed that the Company's attrition rate for clinical staff and physical therapists was 41% in late-2020 and 2021. AC ¶ 81. FE-2 was employed by the Company as a Talent Acquisition Coordinator from October 2020 to August 2021, in the Company's Human Resources department at the Company's Bolingbrook headquarters. AC ¶ 81. A former senior financial analyst ("FE-4"), who also worked at ATI's Bolingbrook headquarters, stated that the attrition was "ridiculous" and had reached 41% by the end of 2020. AC ¶ 7.

6

**C.** **The Company Knowingly Misled Investors about ATI's Attrition Rate in 2021**

Despite experiencing severe attrition rates—over twice the industry average—Defendants repeatedly represented to investors that ATI's staff *retention* was high for the industry. AC ¶ 89. As explained below and detailed in the Complaint, Part VI, Defendants made five categories of misstatements and omissions. AC ¶¶ 123-172. *First*, Defendants made statements purporting to warn investors of a hypothetical possibility that the Company would suffer increased attrition, when in fact that reality already had materialized. *Id*. *Second*, Defendants repeatedly made comparative statements about their retention of employees, stating that their retention was "very high" and that the Company enjoyed "low turnover," when in fact, the Company's attrition rate was twice the industry average, so the Company's retention rate objectively was not "very high." *Id*. *Third*, the Company made statements about the present state of its clinics, including that it was continuing to match its clinical staffing levels according to visit volume, and that it was presently on track to achieve the Company's development target of 90 new clinic openings. *Id*. *Fourth*, the Company vastly overstated the value of its goodwill and trade name due to its refusal to publicly recognize its severe attrition problem. *Id*. *Finally*, the Company omitted the known trend that it was experiencing a rate of attrition more than twice the industry average. *Id*.

Defendants knew about the Company's high attrition rate and the problems the Company was experiencing as a result of it. Multiple former employees confirmed that the Individual Defendants were aware of, and routinely discussed, the Company's attrition problems at all-hands meetings, and received monthly and weekly reports showing attrition rates among physical therapists throughout the Class Period. AC ¶¶ 98-104, 183.

***Defendants Knew of High Attrition from Regular Meetings and Calls***. Defendants, including specifically Defendants Diab and Jordan, were aware of and discussed the Company's

attrition problem at Company meetings. AC ¶¶ 99-100. According to FE-1, each quarter the Company would hold "all-hands" meetings at the Company's headquarters, attended by Diab, Jordan, and other Company officers and directors. AC ¶¶ 99. At these quarterly meetings, "all the leaders talked about attrition," including but not limited to Defendant Diab, who would discuss the Company's attrition numbers and the need to recruit and retain clinicians to support the Company's growth. AC ¶ 100. At these meetings, FE-1 and several clinicians, sales representatives, and managers expressly complained to Diab, Jordan and other executives about the Company's attrition problem, and these executives would respond that the Company was working on the problem. AC ¶ 100.

Similarly, FE-6 reported having monthly calls with ATI's Chief Operating Officer, Ray Wahl, around the end of 2020 or beginning of 2021 where Wahl started saying that the Company needed to do everything in its power to hold onto people because employees were leaving at an alarming rate. AC ¶ 83. According to FE-2, yet another key employee, the Chief Human Resources Officer Cedric Coco, expressly acknowledged ATI's retention troubles at an HR department lunch event in either November/December 2020 or January/February 2021. AC ¶ 80.

***Defendants Knew of High Attrition from Multiple Regular Reports***. The Complaint likewise makes clear that the Company's attrition numbers were presented to the executive leadership, including Defendants Diab and Jordan, as well as the Board of Directors, each month. AC ¶¶ 103-04. For example, FE-4 prepared monthly slide decks for executive leadership, including Diab and Jordan, featuring a "Monthly Scorecard" with a chart including a trend line that detailed the high attrition rates among physical therapists. AC ¶ 104. According to FE-4, attrition climbed "throughout the whole year in 2020." AC ¶ 104. These slides, including Monthly Scorecard featuring the attrition rate among physical therapists, were presented to Defendants Diab

8

and Jordan, the Board of Directors, and other executives. AC ¶ 103. Numerous former employees stated that ATI's attrition rate for clinical staff, including physical therapists, reached approximately 40% by late 2020 and remained at around 40% through mid-2021. *See, e.g.*, AC ¶¶ 76, 79, 81. According to FE-1, the Company's officers and directors, including Defendants, were sent weekly and/or monthly reports that detailed the attrition rate among physical therapists. AC ¶¶ 79, 99. FE-1 explained that these reports were highly detailed and, for example, included information such as the number of therapist terminations and resignations and how long each had been at the company for each ATI clinic location. AC ¶ 99.

*Defendants Knew of High Attrition from ATI's Centralized Staffing Database*. In addition, beyond being directly presented the attrition figures in routine reports and expressly discussing the Company's attrition problems at all-hands meetings, Defendants had complete access at all relevant times to the Company's attrition figures, including through a centralized database to which Defendants had access that tracked the high attrition rates, including by tracking clinician staffing. AC ¶¶ 101-02. Indeed, FE-7 confirmed that the Company's chief executives had ready access to attrition numbers and were able to look them up on demand during calls that FE-7 attended. AC ¶ 84. Likewise, FE-1 reported that Defendants tracked attrition and data on potential new hires in a centralized database to which the ATI Individual Defendants and the FVAC Defendants had access and from which they requested information. AC ¶ 101. Confirming the same, Defendants themselves touted in SEC filings that ATI maintained "[r]obust, national systems to manage, track and optimize clinician staffing." AC ¶ 102.

Additional facts further make clear that Defendants were fully aware of the Company's attrition problem. The core of ATI's business was providing physical therapists, so the Company's leadership must have known that the supply of the Company's core product decreased by half.

9

AC ¶ 46. The Company fired Chief Human Resources Officer Coco immediately before, and Defendant Diab immediately after, the Company announced that it was suffering from severe attrition. AC ¶¶ 112, 116. These terminations suggest that the Company found them culpable, and so knowledgeable, about the Company's attrition problem. Finally, the SEC has launched an investigation into the Company's disclosures concerning its attrition, which further supports the likelihood that Defendants made knowing violations of the securities laws. AC ¶ 122.

### D. When Investors Learned the Truth about the Company's Attrition and Clinic Opening Figures, ATI's Stock Price Dropped Precipitously

The truth began to emerge before the market opened on July 26, 2021, less than two months after the Merger closed, when ATI drastically reduced its adjusted EBITDA guidance from $119 million to a range of $60 to $70 million and revealed that it could only open between 55 and 65 new clinics in 2021—far short of the 90 clinics it had told investors it would open. AC ¶¶ 10, 111-13. The Company attributed its guidance cut to significant attrition among its physical therapists, which prevented it from meeting patient demand. *Id.* As a result of these disclosures, over two trading days the Company's share price fell by a staggering 62.48%, or $4.52 per share. AC ¶¶ 11, 112. Analysts were shocked and specifically commented that ATI needed to "regain[] the trust of investors" and "build back its credibility," including through "better and more transparent communications with investors." AC ¶¶ 12, 114-15. Shortly thereafter, Defendant Diab was terminated by the Board. AC ¶¶ 13, 116. The Company also admitted that the value of the Company's trade name and other intangible assets was overstated, by approximately $433 million and $34 million respectively, when the Company announced impairment charges in these amounts. AC ¶¶ 14, 111.

Then, on October 19, 2021, after the close of trading, the Company announced that it had to reduce its revenue guidance further to a range of $620 to $630 million (from $640 to $670

10

million) and reduce its adjusted EBITDA guidance to a range of $40 to $44 million (from $60 to $70 million) due to "lower visit volume," which ATI expressly linked to the need to "invest[] in our field sales force" to "driv[e] visit growth." AC ¶¶ 15, 118. As a result of these post-market-day disclosures on October 19, 2021, the price of ATI stock declined by 21.64% on the next trading day, October 20, 2021, from $3.65 per share to $2.86 per share, on unusually heavy trading volume. AC ¶ 16, 119. Again, analysts were taken by surprise. AC ¶¶ 120-21.

Collectively, on these three trading days, the Company's disclosures wiped out hundreds of millions of dollars' worth of shareholder value. AC ¶ 11.

### III.     STANDARD ON MOTION TO DISMISS

Motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). On a motion to dismiss, the Court "accept[s] all well-pleaded facts as true and draw[s] all reasonable inferences in the plaintiff's favor. *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021). In considering a motion to dismiss, courts merely test the sufficiency of the allegations. *Hughes v. Huron Consulting Grp., Inc.*, 733 F. Supp. 2d 943, 946 (N.D. Ill. 2010). A motion to dismiss may not be used to dispute the well-pleaded allegations of the complaint, assess credibility, or evaluate evidence. *See, e.g.*, *City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira, Inc.*, No. 11-cv-8332, 2013 WL 566805, at *37-38 (N.D. Ill. Feb. 13, 2013).

### IV.     ARGUMENT

#### A.     DEFENDANTS DO NOT MEANINGFULLY CONTEST THAT LEAD PLAINTIFFS' SECTION 14 CLAIM BASED ON CERTAIN MISLEADING STATEMENTS SURVIVES

To state a claim under Section 14(a), a plaintiff must allege: (i) that the proxy statement contained a material misstatement or omission that (ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction. *Kuebler v. Vectren*

11

*Corp.*, 13 F.4th 631, 637 (7th Cir. 2021). Section 14(a) does not require any state of mind. *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("There is no required state of mind for a violation of section 14(a)"). Because Section 14 does not require any state of mind, the PSLRA does not impose heightened pleading standards on pleading any state of mind for Section 14(a) claims (negligence, scienter or otherwise). *Id*. The PSLRA requires only that "Plaintiffs . . . identify each statement alleged to have been misleading, the reason why each statement was misleading, and all relevant facts supporting that conclusion." *Kuebler*, 13 F.4th at 638.

As detailed below, Defendants made five categories of false and misleading statements. As a threshold matter, Defendants have failed to raise any legally cognizable argument for dismissing claims based on the first of these categories, namely, Defendants' statements that presented certain risks faced by the Company as hypothetical. *See* "Hypothetical Risk Statements" (defined in Table of Abbreviations); *see also* AC ¶¶ 92, 131, 145, 154. In these Statements, Defendants repeatedly presented problems with ATI's therapist retention as hypothetical future possibilities. For example, Defendants stated "*[i]f* the Company cannot recruit and retain its base of . . . therapists" its business "*may*" decline and it "*may*" face "increased turnover and other challenges." *E.g.*, AC ¶ 131. However, as the Complaint alleges in detail based on numerous sources, the Company's business *already was* facing severe therapist retention problems—the Company's attrition rate had reached 40%, *twice* the industry average—and this increased attrition *already was* impacting the Company's income and expansion plans. AC ¶¶ 7-8, 65-66, 68, 77, 79, 81, 110, 162.

These Hypothetical Risk Statements were misleading because they presented the Company's therapist retention problems and the associated business declines as merely possible future events, when in fact they already had occurred. Courts have broadly recognized such

12

misleading statements to be actionable. *See In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926, 2018 WL 1595985, at \*28-29 (S.D.N.Y. Mar. 28, 2018) (quoting *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (finding risk statements that presented events that had already occurred as hypothetical possibilities to be misleading; stating "risk disclosures that 'speak entirely of as-yet unrealized risks and contingencies' and do not 'alert the reader that some of these risks may already have come to fruition' can mislead reasonable investors.") (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-87 (9th Cir. 2008)); *Khoja v. Orexigen Therapeutics Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018) (telling investors that data "might change" is misleading when the speaker knows the data was "likely to change.").

Defendants address these statements only in a cursory footnote. *See* Defs.' Mem. 13 n.7. There, Defendants assert, in conclusory fashion, that the Complaint fails adequately to allege that the Hypothetical Risk Statements are misleading because "Plaintiffs have not established that ATI's attrition rate was, in fact, materially greater than the average in the industry . . . ." Defs.' Mem. 13 n.7. Despite their promise to provide more support "below," Defendants offer no further support for this assertion in their brief. Defendants' conclusory assertion is at best an "undeveloped argument," so Defendants have waived it. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"). In any event, Defendants' assertion is demonstrably wrong: Defendants simply ignore the clear allegations in the Complaint, from multiple former ATI employees, that ATI's attrition rate was twice the industry average. AC ¶¶ 7, 65-66, 68, 77, 79,

13

81. Defendants cannot meet their burden on this motion by disregarding the detailed facts alleged in the Complaint, which must be accepted as true. *White*, 987 F.3d at 620 (7th Cir. 2021).

Further, Defendants do not dispute that the Hypothetical Risk Statements "(ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction."[1] *Kuebler*, 13 F.4th at 637. Accordingly, as Defendants have provided no legally cognizable argument for dismissing Plaintiffs' Section 14(a) claims based on Defendants' Hypothetical Risk Statements, these claims at a minimum must proceed to discovery.

As explained below, Plaintiffs remaining claims likewise easily survive Defendants' motions to dismiss. Plaintiffs' Section 14(a) claims based on the remaining misleading statements at issue survive because those remaining statements are likewise actionable. *See infra*, Part IV(B). Plaintiffs' Section 10(b) claims survive because they are also based on these actionable misstatements, and because ample allegations collectively give rise to an inference of scienter that is overwhelming, *see infra*, Part IV(C).

**B.     LEAD PLAINTIFFS ADEQUATELY PLEAD NUMEROUS ACTIONABLE MISSTATEMENTS AND OMISSIONS FOR ALL CLAIMS**

The first element of Plaintiffs' claims that Defendants challenge is an element of Plaintiffs' Section 14(a) and Section 10(b) claims alike: a false or misleading statement or omission.[2] Defendants' misleading statements and omissions may be grouped into the following five categories. (1) Hypothetical Risk Statements; (2) Comparative Statements about Retention Rates;

---

[1] Defendants argue that the Complaint's allegations concerning the October 19, 2021 corrective disclosures do not adequately plead loss causation under Section 10(b) (they are wrong, as explained *infra* in Part IV(D)), but Defendants make no mention of causation for the purposes of Section 14(a). In any event, Defendants concede that loss causation has been adequately pleaded, even for the purposes of Section 10(b), with respect to the July 26, 2021 drop.

[2] Defendants do not challenge the materiality of the statements alleged to be false and misleading in the Complaint.

14

(3) Statements of Present State of Clinics; (4) Statements Valuing Goodwill/Trade Name; and (5) Omission of Known Trend of High Attrition.

### 1. Hypothetical Risk Statements

As explained above, *supra* Part IV(A), Defendants' Hypothetical Risk Statements are adequately alleged to be misleading.

### 2. Comparative Statements about Retention Rates

Throughout the Class Period, Defendants repeatedly stated, for example, that ATI had "very high retention" and "low turnover" ("Comparative Statements about Retention Rates") (defined in Table of Abbreviations). *See* AC ¶¶ 6, 123, 129, 138, 139, 143, 152, 167. These statements were objectively false when made because they directly implied that ATI's numerical retention rates were above average—a falsifiable statement—when in fact the opposite was true. These Statements, which contain comparative adjectives, were inherently comparative, and the only entities that could coherently serve as the point of comparison in these comparisons were ATI's industry competitors. Accordingly, investors would have understood these statements to be comparing the retention rates of ATI to the average retention rate in the physical therapy industry, and to be asserting that ATI's were higher than the industry average. In fact, as alleged in the Complaint, ATI's attrition rate when these Statements were made was approximately 40%, more than twice the industry average of less than 20%. Accordingly, these statements were objectively false and misleading.

Defendants argue that these Comparative Statements about Retention Rates are merely "puffery" and therefore inactionable. Defs.' Mem. 10-11. Not so. Statements amount to puffery only when they do not contain any proposition that is objectively falsifiable: statements may be considered puffery only if they "do not make any concrete assertion" and "cannot be called false." *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 596 (7th Cir. Aug. 10,

15

2021). Often "courts decline to decide if statements constitute puffery when reviewing a Rule 12(b)(6) motion to dismiss." *Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-cv-01640, 2022 WL 1136577, at *55-56 (N.D. Ill. Apr. 18, 2022). This is because "[a]ssessment of materiality is generally 'for the trier of fact; thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss.'" *Marks v. CDW Comp. Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997).

Defendants' Comparative Statements about Retention Rates cannot constitute puffery because they "make . . . concrete assertions" that ATI's retention rate is higher than the industry average. *Zebra Techs.*, 8 F.4th at 596. These Statements objectively "can[] be called false" because, in fact, the rate of attrition at ATI was twice the industry average, so ATI's retention rate was not "very high" compared to the industry—it was in fact lower. *Id.*; *see Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (reversed on other grounds) ("it is misleading to describe a decline as equivalent to a continued growth rate"). While Defendants cite to cases in which courts have found various statements to be inactionable puffery, Defs.' Mem. 10-11, not one of those statements contained a concrete assertion that was objectively falsifiable. In contrast, Defendants' Comparative Statements about Retention Rates clearly meet this standard.

### 3. Statements of Present State of Clinics

Defendants also repeatedly misrepresented the present state of ATI's clinics by making statements, for example, that ATI "continues to match its clinical staffing levels accordingly [according to visit volumes]" and that ATI was "on track to achieve our de novo development targets for [2021]" of 14 clinic openings ("Statements of Present State of Clinics") (defined in Table of Abbreviations). AC ¶¶ 161, 163. Statements to investors that a Company is "continuing" to achieve, and "on track" in achieving, specified goals are misleading if, as here, the Company was not continuing to achieve those goals at the time of the misstatement. *See Tellabs, Inc.*, 437

16

F.3d at 597 (statements that "[w]e're still seeing that product continue to maintain its growth rate" and statement "still going strong" found actionable). Here, as alleged extensively in the Complaint, ATI was failing to match its clinical staffing levels to accommodate visit volumes. AC ¶¶ 8, 65-66, 68, 77, 79, 81, 93, 164. Likewise, ATI lacked sufficient human resources to open the 14 de novo clinics it said it would open in 2021. AC ¶¶ 110, 162. Accordingly, ATI's statements to the contrary were false and misleading.[3]

Defendants argue that these misleading statements are forward-looking and, therefore, are immunized by the safe harbor provision of the PSLRA. Defs.' Mem. 12-14 (citing 15 U.S.C. § 78u-5(i)(1)). They assert that (1) the statements were identified as forward-looking and accompanied by "meaningful cautionary language" and (2) that the statements were not made with "actual knowledge" that they were false or misleading. *Id*. Defendants are wrong on both accounts.

*First*, Defendants' Statements of Present State of Clinics were not wholly forward-looking statements. A Company's statements about the ongoing, continuing state of its business operations are a mixed present/future statements about (i) the current state of the business and (ii) the future continuation of that business. The law is clear that "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008). For example, the statement that a company's business is "still going strong," is a statement "both that current sales were strong and that they would continue to be so," and "the element of prediction in saying that sales are 'still

---

[3] Relatedly, Defendants published financial projections, including revenues and adjusted EBITDA, and projected new clinic opening numbers that could not possibly be met given the reality of severe attrition at ATI. AC ¶¶ 94, 105-110, 125-26, 133-34, 141-42, 147-48, 156-57, 161, 169-70, 227. These fanciful projections were revealed as misleading when the Company eventually had to reduce its previously issued revenue guidance and adjusted EBTIDA and lower its estimate for new clinic openings. AC ¶¶ 10, 111.

going strong' does not entitle [the company] to a safe harbor with regard to the statement's representation concerning current sales." *Id*.; *see W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc*., 495 F. Supp. 3d 622, 655 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022) (statements that company was experiencing "ongoing growth" were "representations about present facts based on present information").

Here, Defendants' statement that ATI "continues to match its clinical staffing levels" to customer demand was in part a statement of present fact about ATI's current status in matching its clinical staffing level. That statement was false because at the time, ATI was failing to staff its clinics adequately due to the Company's severe attrition rate. AC ¶¶ 8, 93.

Defendants argue that their filings identified statements containing the verb "continue" as forward-looking, Defs.' Mem. 13, but a Company's mere characterization of statements as forward-looking does not entitle them to safe-harbor protection. The PSLRA defines which statements count as "forward-looking," and statements of present fact, including the present fact proposition in mixed present/future statements, are not included within that statutory definition, regardless of Defendants' self-serving characterizations. *See* 15 U.S.C.S. § 78u-5; *Tellabs*, 513 F.3d at 705. Under any other rule, Defendants could simply claim that all statements in their SEC filings were forward-looking and so protect all of their statements of present fact from scrutiny.

*Second*, Defendants argue that their Statements of Present State of Clinics were "accompanied by meaningful cautionary language." Defs.' Mem. 13. As the present fact portions of these Statements were not forward looking, those portions are not protected under the PSLRA, regardless of any meaningful cautionary language. *Tellabs*, 513 F.3d at 705. In any event, the

18

only purportedly "meaningful cautionary language" that Defendants identify is contained in Defendants' Statements of Hypothetical Risk, and as explained above, this purported cautionary language was itself misleading. Cautionary language that itself misleads investors about the state of a Company cannot be meaningfully cautionary. *See In re Van der Moolen*, 405 F. Supp. 2d at 400 ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."). It is well established that "cautionary language cannot be 'meaningful' if it is misleading in light of historical fact[s] that were established at the time the statement was made." *In re Harman Int'l, Indus. Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015); *see Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("[B]espeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away").

*Third*, Defendants argue that Plaintiffs have failed to allege that their Statements of Present State of Clinics were made with actual knowledge that they were false or misleading. Defs.' Mem. 14. As these Statements were in part statements of present fact, the PSLRA safe-harbor provision does not apply to those parts, so Plaintiffs need not show that Defendants made them with actual knowledge of their falsity to avoid the application of that provision. In any event, Defendants *did* make these Statements with actual knowledge of their falsity, as explained in detail in Part IV(C) below.

### 4. Statements Valuing Goodwill/Trade Name

At multiple points during the Class Period, Defendants overstated the value of the "Goodwill" of the Company, and the value of the Company's trade name and other intangible

assets, by approximately $433 million and $34 million respectively ("Statements Valuing Goodwill/Trade Name") (defined in Table of Abbreviations). AC ¶¶ 165, 171. As set forth in the Complaint, Defendants eventually admitted that ATI's previously reported Goodwill and intangible asset figures were incorrect when the Company had to take hundreds of millions worth of impairment charges. AC ¶¶ 14, 117.

Unable to defend these statements as being correct, Defendants instead argue that they are not actionable because they are statements of opinion, and according to Defendants, the Complaint fails to plead an actionable statement of opinion under *Omnicare*. Defs.' Mem. 14-16. Defendants are wrong. Under *Omnicare*, an opinion statement must "fairly align[] with the information in the [speaker's] possession at the time. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Defendants are liable if they "omit[] material facts about the[ir] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id*.

Here, Defendants' statements of the value of the Company's goodwill, trade name and other intangible assets did not "fairly align[] with the information" in Defendants' possession. *Id*. As explained below, *infra* Part IV(C), the Complaint extensively alleges that Defendants were well aware that the Company's attrition rate had doubled since 2020 and was materially impacting the Company's business, which includes the Company's intangible assets. Nevertheless, Defendants "omit[ed] [these] "material facts about . . . their knowledge concerning" the Company's intangible asset valuations, and "those facts conflict[ed] with what a reasonable investor would take from the statement itself," namely, that the Company's intangible assets were not vastly overvalued or likely to be imminently impaired. *See Omnicare*, 575 U.S. 175 at 189.

20

### 5. Omission of Known Trend of High Attrition

Under Regulation S-K, Item 303(a)(3)(ii), "registration statements and annual 10-K reports must reveal "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Gallagher v. Abbott Lab'y*, 269 F.3d 806, 810 (7th Cir. 2001). The omission of a trend required to be disclosed under Item 303(a)(3) may constitute an actionable omission for the purposes of the federal securities laws, including Sections 10(b) and 14(a) of the Exchange Act. *See, e.g.*, *Twin Master Fund, Ltd. v. Akorn, Inc.*, No. 19 C 3648, 2020 WL 564222, at *19 (N.D. Ill. Feb. 5, 2020); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 104, 108 (2d Cir. 2015). Courts in this Circuit have applied a two-prong test, following the Second Circuit's approach, to determine whether an omission of a condition that violates Item 303's duty to disclose is actionable as securities fraud: "(1) does Item 303 require disclosure of the condition; and if so, then (2) does the omission meet the *Basic* materiality standard?" *Twin Master Fund, Ltd. v. Akorn, Inc.*, No. 19 C 3648, 2020 WL 564222, at *7 (N.D. Ill. Feb. 5, 2020) (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 104, 108 (2d Cir. 2015)). In turn, an omitted fact is material under *Basic* if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Here, Regulation S-K, Item 303(a)(3)(ii) required Defendants to disclose in numerous filings the trend, well known to Defendants, that the Company's attrition rate had risen to over 40%, more than twice the industry average. *See* AC ¶¶ 124, 128, 135, 140, 149, 158. Item 303 required this disclosure because this trend had had, and reasonably was expected to have, a material unfavorable impact on the Company's business, including its net sales, revenues and income. AC ¶¶ 8, 111. Defendants do not, and cannot, dispute that this trend, which ultimately caused the

21

Company dramatically to revise its financial outlook, AC ¶ 111, was highly material to investors, AC ¶¶ 114-15.

Defendants argue that this trend was not "known" to Defendants, and so was not a "known trend" requiring disclosure under Regulation S-K, Item 303.[4]  Defs.' Mem. 17-18.  As explained below, *infra* Part VI, this trend was well known to Defendants and indeed the Company at large.

*  *  *

For these reasons, the Complaint adequately alleges that Defendants made materially false and misleading statements.  As noted above, that is all that is required for Plaintiffs' claims under Section 14(a) to be sustained, as Defendants do not dispute the elements of Plaintiffs' Section 14(a) claims other than falsity, and as explained above, Defendants' challenges to the element of falsity fail.  Indeed, Defendants fail even to raise a legally cognizable challenge to the falsity of their Statements of Hypothetical Risk.  *See supra* Part IV(A).  Accordingly, Plaintiffs' Section 14(a) claims should proceed to discovery.

### C. LEAD PLAINTIFFS ADEQUATELY PLEAD SCIENTER FOR THEIR SECTION 10(B) CLAIMS

The second element of Plaintiffs' claims that Defendants challenge is an element only of Plaintiffs' Section 10(b) claims:  scienter.  "Scienter may be alleged adequately either by alleging that Defendants "either knew the statement was false or w[ere] reckless in disregarding a substantial risk of its being false."  *City of Livonia Emps. Ret. Sys. v. Boeing Co.*, 711 F.3d 754,

---

[4] Defendants also argue that Plaintiffs have failed to plead an Item 303 violation, apparently because the Complaint does not provide a citation to the Regulation S-K Item 303(a)(3)(ii). Defs.' Mem. 17 n.12. The Compliant repeatedly alleges that Defendants "w[ere] required to disclose, but omitted, that the known trend that it was suffering [high] attrition rates . . . was likely to have, and did have, a material impact on the Company's performance." *See, e.g.*, ¶ 140. This language, which largely quotes from Regulation S-K Item 303(a)(3)(ii) verbatim, clearly put Defendants on notice that Plaintiffs were basing their securities violation on an underlying violation of Regulation S-K Item 303(a)(3)(ii)—indeed, Defendants admit as much by arguing against such a violation. In any event, if the Court finds that Plaintiffs must include a citation sentence in the Complaint citing Regulation S-K Item 303(a)(3)(ii), such an amendment presumably could be made without inviting an additional round of dismissal motion practice.

22

756 (7th Cir. 2013). Plaintiffs have pleaded a "strong inference" of scienter if they "'plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). In making this determination, the Court must consider "all the allegations holistically." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). The inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre,' or even 'the most plausible of competing inferences'"; instead, the inquiry is simply: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. Defendants acted with the required scienter if they spoke in disregard of a risk of falsity that was " 'so obvious that [they] must have been aware of it.'" *Tellabs*, 513 F.3d at 704. "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Id*.

Here, the inference that Defendants knew their misleading statements were false—or, at minimum, were severely reckless in disregarding the risk of falsity—is overwhelming and at least as likely as any opposing inference. As explained below, numerous allegations support this strong inference: (1) statements from numerous former ATI employees attest to Defendants' receipt of weekly reports detailing attrition figures and Defendants' own discussion of severe attrition rates at all-hands meetings; (2) ATI's core business of providing access to physical therapists was directly impacted by therapist attrition, and the Company's statement, in effect, that its attrition rate was less than half of what it actually was was "dramatically" false; (3) Defendant Diab (the Company's former CEO) and the Company's Chief Human Resources officer were suspiciously terminated from the Company soon after the Company's misstatements about its attrition rates

23

came to light; and (4) the SEC has launched an investigation into whether the Company's conduct violated federal securities laws.

### 1. Multiple Former ATI Employees Confirm Defendants' Direct Knowledge of Severe Attrition and Support a Strong Inference of Scienter

Former ATI employees confirm that the Individual Defendants were aware of, and routinely discussed, the Company's attrition problems at all-hands meetings, and received monthly reports showing attrition rates among physical therapists throughout the Class Period  *See, e.g.*, AC ¶¶ 99-104.

***Defendants Knew of High Attrition from Regular Meetings and Calls***.  The Complaint makes clear that the Defendants, including specifically Defendants Diab and Jordan, were aware of and discussed the Company's attrition problem at Company meetings.  AC ¶¶ 99-100. According to FE-1, each quarter the Company would hold "all-hands" meetings at the Company's headquarters, attended by Diab, Jordan, and other Company officers and directors (which included Defendant McKnight).  *Id*.  At these quarterly meetings, "all the leaders talked about attrition," including but not limited to Defendant Diab, who would discuss the Company's attrition numbers and the need to recruit and retain clinicians to support the Company's growth.  AC ¶ 100.  Also at these meetings, FE-1 and several clinicians, sales representatives, and managers expressly complained to Diab, Jordan and other executives about the Company's attrition problem, and these executives would respond that the Company was working on the problem.  *Id*.  Indeed, FE-1 explained that she specifically discussed attrition problems with Defendants Diab and Jordan.  *Id*. Similarly, FE-6 reported having monthly calls with ATI's Chief Operating Officer, Ray Wahl, around the end of 2020 or beginning of 2021 where Wahl started saying that the Company needed to do everything in its power to hold onto people because employees were leaving at an alarming rate.  AC ¶ 83.  According to FE-2, yet another high-ranking officer, former Chief Human

Resources Officer Cedric Coco, expressly acknowledged ATI's retention troubles at an HR department lunch event in either November/December 2020 or January/February 2021.  AC ¶ 80.

*Defendants Knew of High Attrition from Multiple Reports*.  The Complaint likewise makes clear that the Company's attrition numbers were presented to the executive leadership, including Defendants Diab and Jordan, as well as the Board of Directors, including Defendant McKnight, each month.   AC ¶¶ 103-04.   FE-4 prepared monthly slide decks for executive leadership, including Diab and Jordan, featuring a "Monthly Scorecard" with a chart including a trend line that detailed the attrition rates among physical therapists.  AC ¶ 104.  According to FE-4, attrition climbed "throughout the whole year in 2020."  *Id*.  These slides, including a Monthly Scorecard featuring the attrition rate among physical therapists, were presented to Defendants Diab and Jordan, the Board of Directors (including Defendant McKnight), and other executives. AC ¶ 103.  Numerous former employees stated that ATI's attrition rate for clinical staff, including physical therapists, reached approximately 40% by late 2020 and remained at around 40% through mid-2021.  *See, e.g.*, AC ¶¶ 76, 79, 81.  According to FE-1, the Company's officers and directors, including Defendants, were also sent weekly report that detailed the attrition rate among physical therapists.  AC ¶ 99.

*Defendants Knew of High Attrition from ATI's Centralized Staffing Database*.   In addition, Defendants had complete access at all relevant times to the Company's attrition figures, including through a centralized database to which Defendants had access that tracked the high attrition rates, including by tracking clinician staffing.  AC ¶¶ 101-02.  For example, both FE-7 and FE-1 discussed the Company's centralized database that tracked attrition data.  AC ¶¶ 84, 101. Indeed, Defendants themselves touted in SEC filings that ATI maintained "[r]obust, national systems to manage, track and optimize clinician staffing." ¶ 102.

25

In the face of these detailed factual allegations, Defendants argue that reliance on former employees' statements is an insufficient basis on which to plead scienter under Seventh Circuit law. Defs.' Mem. 21-25. Defendants are wrong. The law is clear that where, as here, "[t]he confidential sources listed in the complaint . . . are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify," such sources may serve as the basis for pleading scienter adequately. *Tellabs*, 513 F.3d at 712; *see City of Warren Police and Fire Ret. Sys. V. Zebra Techs. Corp*., 2020 WL 6118571, at *7 (N.D. Ill. Oct 16, 2020) (cited by Defendants) (confidential witnesses "must be described with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged'").[5] Other circuits likewise permit confidential witness statements where the employee's job is adequately described. *See, e.g.*, *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005) (reversing in part dismissal where plaintiffs relied on confidential information from current employees and provided sufficient detail); *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000) (plaintiffs did not need to identify confidential sources in complaint).

Here, the Complaint gives a complete "description of the[] jobs" of each of the former employees, including their job description, dates of employment, and reporting chain, and so provides more than sufficient information to show that each former employee was "in a position

---

[5] Continuing to permit confidential witness statements is essential to preserve the effectiveness of the securities laws given that employees and former employees would otherwise be highly reluctant to provide information exposing violations. "[I]nformation provided voluntarily by current or former employees may be helpful or even essential for plaintiffs trying to allege fraud, and especially fraudulent scienter, with sufficient particularity." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp*., 895 F.3d 933, 943 (7th Cir. 2018) (citing *Tellabs*, 513 F.3d at 711). "[S]uch current or former employees often ask for confidentiality, at least as long as it can be maintained legally. The securities laws provide employees with protection against retaliation for providing information about suspected securities fraud, but the statute is relatively narrow. Also, the prospect of a right to file a lawsuit offers only limited comfort to employees who might risk their jobs by helping others pursue a lawsuit against their employer." *Id.* at 943 n.1.

26

to know at first hand the facts to which they are prepared to testify." *Tellabs*, 513 F.3d at 712. To take only one example from the many cited in the Complaint, FE-1 was a talent acquisition coordinator who worked at the Bolingbrook, Illinois headquarters from May 2019 to September 2021 and reported to Keri Novelli-Ammons, who reported to Brian Emerson, who reported to Defendant Diab. AC ¶ 72. FE-1 was therefore in a position, for example, to attend "all-hands" meetings during the relevant time period and to know what Defendants discussed at those meetings. AC ¶ 100.

Defendants also argue that the Complaint alleges merely that they had access to information contradicting their public statements, and according to Defendants, mere access to such information is insufficient to support a strong inference of scienter.[6] Defs.' Mem. 23. While access to information certainly *can* support a strong inference of scienter,[7] in any event, the Complaint does not allege that Defendants merely had access to information contradicting their public statements. Rather, the Complaint clearly alleges that Defendants routinely *viewed* attrition data contradicting their public statements when that data was directly presented to them in person and routinely *discussed* such attrition data at Company meetings. *See, e.g.*, AC ¶¶ 100, 103-04. For example, as explained above, the Complaint alleges that Defendants were presented monthly

---

[6] Defendants also argue that Plaintiffs' allegations regarding motive and opportunity are insufficient. Defs.' Mem at 19-20. As a threshold matter, the law is clear that Plaintiffs are not required to allege motive at all to allege scienter adequately. *Gogo, Inc.*, 2021 WL 1608342 at *8 ("Plaintiff does not need to allege any motive" and "plaintiff succeeds in making allegations that permit a strong inference of scienter even without allegations that directly establish a clear motive . . . ."). Here, where the Complaint gives rise to an overwhelming inference of Defendants' conscious misbehavior or recklessness, motive allegations are wholly unnecessary to establish scienter. In any event, the Complaint explains that Defendants Diab and Jordan were able to secure lucrative new employment agreements in connection with the Merger—agreements that included massive payouts upon termination, bonuses and immediate vesting of equity awards. AC ¶ 61. These profitable new employment deals provided concrete and personal benefits to Diab and Jordan that are sufficient to establish motive.

[7] *See, e.g.*, *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 79 (2d Cir. 2021) (allegations that defendants "had access to information suggesting that their public statements were not accurate" "tend to support a culpable inference" of scienter for purposes of Section 10(b)).

27

slide decks that contained the Company's attrition rates. AC ¶¶ 103-04. The Complaint further alleges that Defendants, including Defendants Diab and Jordan, routinely discussed the Company's attrition problem at all-hands Company meetings and answered questions about it. AC ¶ 100. Accordingly, the Complaint does not allege merely that Defendants had access information contradicting their public statements (which would suffice in any event)—it alleges that Defendants routinely viewed such information and demonstrated their knowledge of the problem that information presented at Company meetings.

Defendants also argue that the Complaint fails to allege "the specific attrition information purportedly presented" in the reports presented to Defendants, and fails to allege that the reports were presented "directly to Defendants Diab and Jordan." Defs.' Mem. 24. Defendants are mistaken on both accounts. The Complaint alleges that "FE-4 prepared" "monthly slide decks" "for executive leadership, including Diab and Jordan" which "featured a 'Monthly Scorecard'" with a chart including a trend line that detailed the attrition rates among physical therapists." AC ¶ 104. The Complaint further alleges that "[t]he attrition rate among physical therapists was presented to Jordan, the Board of Directors, and other executives." The Complaint repeatedly alleges that ATI's attrition rate for clinical staff, including physical therapists, reached approximately 40% by late 2020 and remained at around 40% through mid-2021. *See, e.g.*, AC ¶¶ 76, 79, 81. Accordingly, the Complaint alleges that a specific document titled a "Monthly Scorecard" was prepared each month by FE-4, presented monthly to executive leadership,

28

including Diab and Jordan, and contained the attrition rates among physical therapists, which accordingly to multiple sources was approximately 40% during the relevant time period.[8]

In the FVAC Motion, McKnight and the FVAC Defendants argue that Plaintiffs have failed adequately to plead McKnight's scienter because after the Merger of FVAC and ATI, McKnight "was only an outside director."[9]  FVAC Mem. at 9.

As with the other Defendants, the allegations in the Complaint give rise to an overwhelming inference of McKnight's scienter.  Indeed, multiple former employees confirmed McKnight's direct knowledge of the severe attrition at ATI.  For example, FE-4 confirmed that she personally prepared slide decks presented to the Company's Board of Directors, which included McKnight, that detailed ATI's attrition rate. AC ¶¶ 103-04.  These materials included a "Monthly Scorecard" of 2-3 pages with a graph showing the attrition rate by month. AC ¶¶ 9, 104. Additionally, according to FE-1, the Company's officers and directors, which again included McKnight, received an internally distributed weekly report that detailed ATI's attrition rate and even specifically discussed attrition at quarterly "all-hands" meetings.  AC ¶¶ 99-100.  While Defendants attempt to minimize McKnight's role by labelling him an "outside director," FVAC

---

[8] If Defendants mean to argue that the Complaint does not allege that the attrition rate contained in these monthly reports was 41%, Defendants are again mistaken—the Complaint alleges that the monthly reports contained the Company's attrition rates, including for the final quarter of 2020, *see* AC ¶ 104, and elsewhere alleges that the Company's attrition rates, including for the final quarter of 2020, were 41%, *see, e.g.*, AC ¶¶ 76, 79, 81.  Likewise, to the extent Defendants mean to argue that the Complaint fails to allege that FE-4 was operating the slide-deck during the presentations (and so fails to allege that the FE-4 "presented any of these reports directly to Mr. Diab or Mr. Jordan"), Defendants' argument again misses the mark—FE-4, who personally prepared the monthly reports "for executive leadership," was clearly in a position to know to whom the reports were presented.  AC ¶ 104.

[9] Defendants also argue that there is no basis to infer McKnight's knowledge or recklessness of ATI's severe attrition pre-Merger, when he purportedly had "no connection to the company."  FVAC Mem. 8-9.  Yet as Defendants concede, discussions regarding a potential transaction began in November 2020 and that FVAC and ATI entered into a confidentiality agreement on December 13, 2020.  *Id.* at 6, 10.  This confidentiality agreement gave McKnight direct access to ATI's nonpublic information, including its severe attrition rates which was set forth in multiple regularly prepared reports and contained in a centralized staffing database. AC ¶¶ 9, 99-104.  As noted above, such access to information is sufficient to plead scienter.  *Credit Suisse Grp. AG*, 996 F.3d at 79 (2d Cir. 2021).

29

Mem. at 8, they do not, and cannot, dispute the well-pled allegations that McKnight was present at these meetings and viewed these materials. These allegations more than suffice to plead McKnight's scienter.

### 2. The Central Importance of Physical Therapists to the Company's Operations and the Magnitude of the Company's Attrition Further Support a Strong Inference of Scienter

The core operations doctrine further supports a strong inference of scienter in this case. This doctrine holds that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance." *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003). A corollary to this doctrine was articulated by the Seventh Circuit in *Tellabs*, 513 F.3d 702, 710:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*See also S. Ferry LP v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) (scienter is adequately pled where the facts are of such prominence that it would be absurd to assume that management would not know about them); *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 16 (1st Cir. 2021) (inferring scienter where the misrepresentations concerned the company's most important product).

Here, Defendants, all of whom were high ranking officers, "can be assumed to [have] know[n] of facts 'critical to a business's core operations . . . that would affect [ATI's] performance." *In re Sears*, 291 F. Supp. 2d at 727. These facts certainly included the fact that the Company's attrition rate was twice that of the industry average, and so was limiting the Company's ability to meet its financial targets and to expand at the rate it had expected to grow. AC ¶¶ 65-66, 68, 77, 79, 81. Likewise, statements such as "[ATI is] on track to achieve our de novo

30

development targets" of 90 clinic openings" are so dramatic that the statement would have been approved by corporate officials knowledgeable about the Company's attrition problem. *See Tellabs*, 513 F.3d at 710.

Relatedly, Defendants repeatedly discussed ATI's attrition rate in public statements throughout the Class Period. *See, e.g.*, AC ¶¶ 89-96, 123, 138-39. Investors are entitled to assume that Defendants were informed about the subjects on which they spoke publicly. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (remarking it was "highly improbable" that defendant, who publicly described company's finances, did not inquire into basis for those statements). Indeed, it would be the height of recklessness for Defendants, including Diab, Jordan and McKnight, repeatedly to tout ATI's retention in public filings if they did *not* make any inquiry into the basis for those statements.

### 3. Suspiciously Timed Departures of Key Employees Immediately Following Revelation of the Company's Attrition Misstatements Further Support a Strong Inference of Scienter

The abrupt terminations of employees who were responsible for the Company's attrition problems—Defendant Diab and Chief Human Resources Officer Cedric Coco—further supports a strong inference of scienter. AC ¶¶ 112, 116. After the Merger, Coco and Diab were suddenly terminated. *Id*. Where a termination or resignation occurs immediately around the time of disclosure of misstatements, courts in this District have found that "the timing of [the] resignation lends weight to a finding of scienter." *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012). Indeed, Defendants own authority recognizes that "resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009). When a company fires an employee for failing to address a problem the employee should have addressed, the company admits that the employee knew, or was culpable

31

for not knowing, about that problem. Otherwise, the employee would be blameless, and terminating the employee for that reason would be nonsensical.

Here, on July 23, 2021—just over one month after the Merger—the Company terminated Coco after "enter[ing] into a mutual release," and on August 7, 2021, Diab was terminated by the Board of Directors. AC ¶¶ 112, 116. The Company did not advise its employees of these terminations in advance. AC ¶ 185. These sudden terminations provide additional support for a strong inference of scienter because they suggest that Coco and Diab knew about the Company's attrition problem and failed adequately to act on it.

### 4. The SEC Is Investigating the Company's Disclosures, Which Further Supports a Strong Inference of Scienter

The SEC is currently investigating ATI for violations of federal securities laws relating to the Company's July 26, 2021 Form 8-K, in which the Company announced that its business was suffering from severe attrition. AC ¶ 186. Contrary to Defendants' assertion, Defs.' Mem. 26, SEC investigations provide additional support for an inference of scienter in the Seventh Circuit. *See e.g., Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021) ("[T]he fact that the SEC and RTI's internal audit committee initiated an investigation into RTI's revenue recognition practices and internal controls provides additional support for finding that scienter has been adequately pleaded.")

### D. LEAD PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION FOR THEIR SECTION 10(B) CLAIM

The final element of Plaintiffs' claims that Defendants challenge is loss causation, and they challenge this element only with respect Plaintiffs' Section 10(b) claim and only with respect to the October 19, 2021 corrective disclosure. The Complaint straightforwardly pleads that Defendants' misstatements and omissions caused Plaintiffs' losses. AC ¶¶ 111-22, 176-81. In the Seventh Circuit, pleading loss causation imposes only a minimal burden on Plaintiffs. "Plaintiffs

are not required to plead facts showing economic loss or causation; they must merely 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-cv-01640, 2022 WL 1136577, at *32 (N.D. Ill. Apr. 18, 2022) (citing *Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 347 (2005)); *see Ray v. Citigroup Glob. Markets, Inc.*, 482 F.3d 991, 994-95 (7th Cir. 2007) (analyzing loss causation requirement and noting that a plaintiff must be able to plead that "the defendant's actions had something to do with the drop in value" of the stock); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 618 (7th Cir. 2011) (plaintiffs need only plead that "the defendant is at least one plausible cause of the economic loss"). The bar for pleading loss causation is minimal because, even for Section 10(b), "loss causation . . . is not subject to the heightened Rule 9(b) pleading standard." *Fryman*, 2022 WL 1136577 at *32. Accordingly, "loss causation is subject to the pleading standards of Rule 8(a)(2), which requires only 'a short and plain statement of the claim showing the pleader is entitled to relief.' *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

The Complaint more than satisfies this minimal pleading standard for loss causation by alleging that the truth about the Company's misrepresentations was disclosed over two dates. On July 26, 2021, ATI disclosed that "the acceleration of attrition among [its] therapists . . . prevented [the Company] from being able to meet the demand," and accordingly, reduced its 2021 earnings guidance by approximately half. AC ¶ 111. The Company also disclosed that "in response to the accelerated attrition," it was lowering its estimate for new clinic openings from 90 to 55 to 65," and that the forecast constituted a "triggering event that require[d] further analysis with respect to potential impairment to goodwill and trade name intangible assets." *Id*.

Likewise, on October 19, 2021, the Company further reduced its 2021 earnings guidance by approximately one-third due to "lower visit volume," which ATI expressly linked to the need

33

to "invest[] in our field sales force" to "driv[e] visit growth." AC ¶ 15. The Company further disclosed that it was attempting to "restor[e] FTEs [full-time equivalent clinicians] with ATI hiring roughly 2 clinicians for every 1 departure in August and September 2021 compared to our second quarter 2021 ratio of approximately 1-to-1." AC ¶ 118. Through these disclosures, the Company revealed a severe attrition problem, the extent of that problem, and the extent to which that problem was devastating its business.

Defendants do not (and cannot) argue that Plaintiffs have failed altogether to plead loss causation. Rather, as noted above, Defendants argue only that Plaintiffs have failed adequately to allege loss causation with respect to the October 19, 2021 disclosure date (not with respect to the July 26, 2021 disclosure date), and only with respect to Section 10(b) (not with respect to Section 14).

Defendants argue that Plaintiffs have not adequately pleaded loss causation under Section 10(b) with respect to the October 19, 2021 disclosure because, according to Defendants, the disclosure did not "reveal[] *anything* about the alleged fraud."[10] Defs.' Mem. 28. Defendants are mistaken. *First*, the October 19, 2021 disclosure revealed that the Company was further revising downwards its earnings estimate for 2021, and so revealed that the magnitude of the impact of the Company's fraud, which consisted in large part in the concealment of its attrition rate, was greater than the Company previously had disclosed. Indeed, even taking the Company at its word, the revision was due in part to "lower visit volume," which ATI expressly linked to the need to

---

[10] Defendants also argue that because FVAC's share price hovered around $10, then dropped to a price of $7.42 after the consummation of the business combination, Defendants' misstatements about ATI's attrition did not artificially inflate the price of the stock. Defs.' Mem. 27-28 n.27. Defendants' argument fails here as well. The Company's misstatements about ATI's attrition inflated the stock to a price higher than it would otherwise have been. Thus, while the price of FVAC fell to a price of $7.42 after the business combination, the price would have fallen further had investors known that the truth about the Company's attrition figures. Indeed, that is exactly what happened on July 26 and October 19, 2021. AC ¶¶ 113, 119.

34

"invest[] in our field sales force." AC ¶ 15. That is, the Company itself linked the reason for the Company's revised earnings estimate to a lack of employees.

*Second*, while the Company previously had reported, on July 26, 2021, that attrition among therapists had accelerated, on October 19, 2021 investors learned that the Company was having to hire two clinicians for every clinician that left. In effect, the Company explained that, to "restor[e]" the Company's clinical full-time employees, the company must hire two clinicians for every clinician who leaves, implying that half of the Company's clinicians were expected to quit shortly after starting work at the Company. AC ¶ 118. This provided investors for the first time with a numerical indication of the astounding rate at which clinicians were leaving the Company. These allegations are more than sufficient to provide Defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura.*, 544 U.S. at 347.

### E. PLAINTIFFS HAVE PROPERLY PLEADED VIOLATIONS UNDER SECTION 20(A)

As Plaintiffs have adequately pleaded primary violations of Sections 10(b) and 14(a), Defendants' sole argument for dismissal of the Section 20(a) claims fails. (Defs.' Mem. 30.)

### V. CONCLUSION

The Court should deny Defendants' Motions.

35

Dated:  June 10, 2022                                 Respectfully submitted,

                                                     POMERANTZ LLP

                                                     */s/ Austin P. Van*
                                                     Jeremy A. Lieberman
                                                     Austin P. Van
                                                     600 Third Avenue, 20th Floor
                                                     New York, New York 10016
                                                     Telephone: (212) 661-1100
                                                     Facsimile: (212) 661-8665
                                                     jalieberman@pomlaw.com
                                                     avan@pomlaw.com

                                                     ***Attorneys for Lead Plaintiff***

                                                     BERNSTEIN LITOWITZ BERGER &
                                                         GROSSMANN LLP

                                                     Avi Josefson
                                                     875 North Michigan Avenue, Suite 3100
                                                     Chicago, Illinois  60611
                                                     Telephone:  (312) 373-3880
                                                     Facsimile:  (312) 794 7801
                                                     avi@blbglaw.com

                                                     Jeremy P. Robinson
                                                     1251 Avenue of the Americas
                                                     New York, New York   10020
                                                     Telephone:  (212) 554 1400
                                                     Facsimile:  (212) 554 1444
                                                     hannah@blbglaw.com
                                                     scott.foglietta@blbglaw.com

                                                     ***Counsel for Consolidated Plaintiff City of Melbourne Firefighters' Retirement System***

36

KLAUSNER, KAUFMAN, JENSEN & LEVINSON

Robert D. Klausner
Bonni S. Jensen
7080 Northwest Fourth Street
Plantation, Florida   33315
Telephone: (954) 916-1202
Facsimile:  (954) 916 1232
bob@robertdklausner.com
bonni@robertdklausner.com

***Additional Counsel for Consolidated Plaintiff City of Melbourne Firefighters' Retirement System***

37