**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

PHOENIX INSURANCE CO., LTD., and )
THE PHOENIX PENSION & PROVIDENT )
FUNDS, )
                   )
          Plaintiffs, )     No. 1:21-CV-04349
                   )
     v. )
                   )     Judge Edmond E. Chang
ATI PHYSICAL THERAPY, INC. f/k/a )
FORTRESS VALUE ACQUISITION CORP. )
II, *et al.*, )
                   )
          Defendants. )

**MEMORANDUM OPINION AND ORDER**

In June 2021, a special-purpose acquisition company (commonly known in the financial industry as a SPAC) called Fortress Value Acquisition Corp. II (FVAC) completed a merger with ATI Physical Therapy, an until-then privately held outpatient physical-therapy company in the United States. That transaction—resulting in a publicly traded company[1]—led to this class-action suit, in which the Plaintiffs allege violations of federal securities laws under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934.[2] Broadly speaking, the Plaintiffs—Phoenix Insurance Company Ltd., Phoenix Pension & Provident Funds, and the City of Melbourne Firefighters' Retirement System—allege that pre-merger statements and omissions made

---

[1]For readability, this Opinion will refer to both the pre-merger, private form and post-merger, public form of the Company as "ATI." Of course, when necessary, the Opinion will clarify if it is referring to the pre-merger or post-merger form.

[2]The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

by the Defendants misled investors. Those investors then suffered economic loss when stock prices fell after the post-merger disclosure of poor results and projections related to physical-therapist-attrition rates not made public until then. The Plaintiffs seek to recover damages for themselves and the class of persons and entities (excluding the Defendants) that purchased ATI securities or held FVAC stock from February 22, 2021, to October 29, 2021 (the class period). The Defendants have filed two motions to dismiss the amended complaint in its entirety. One motion was filed by ATI—in its post-merger form—as well as Labeed Diab (the former CEO of ATI) and Joseph Jordan (the former CFO of ATI), all of whom will be called the ATI Defendants for convenience's sake. R. 68, ATI Defs.' Mot. Dismiss.[3] The other motion was filed by Andrew McKnight, the former CEO of FVAC, and seven former directors of FVAC (together, the FVAC Defendants).[4] R. 71, FVAC Defs.' Mot. Dismiss. For the reasons explained in this Opinion, these motions to dismiss are granted in part and denied in part.

## I. Background

At this stage, the Court accepts all well-pleaded allegations as true. *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). Even when "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss

---

[3]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[4]In the amended complaint, the Plaintiffs group McKnight with Diab and Jordan and identify the three, together, as the ATI Individual Defendants. R. 58, Am. Compl. ¶¶ 31–34. But McKnight is more properly grouped with the former FVAC directors, namely Joshua Pack, Marc Furstein, Leslee Cowen, Aaron Hood, Carmen Policy, Rakefet Russak-Aminoach, and Sunil Gulati.

for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## A. Pre-Merger

To repeat, ATI provides physical-therapy services across the U.S. in 24 states. Am. Compl. ¶ 46. The company is headquartered in Bolingbrook, Illinois, and was formed in 1996. *Id.* FVAC was incorporated in Delaware as a SPAC on June 10, 2020. *Id.* ¶ 47. A SPAC is a shell company formed for the purpose of raising money through a public offering to acquire or merge with an existing company. *Id.* ¶ 5. A key feature of a SPAC is that if it fails to acquire a company, then it must return its funds to investors. *Id.* ¶ 184. Relatedly, employees of a SPAC will generally lose their employment at the end of the life of the entity. *Id.* ¶ 51. But FVAC did specifically allow its personnel to take employment with or become consultants for the new company created following a successful merger or acquisition. *Id.* ¶ 51. FVAC completed its initial public offering on August 14, 2020, raising $345 million. *Id.* ¶ 52.

Meanwhile, ATI—in its pre-merger form—was undergoing important management changes. Around February 6, 2019, Diab became the new CEO of ATI, replacing McKnight, who at some point afterward became the CEO of FVAC. Am. Compl. ¶ 56. A couple of months later, in April, Cedric Coco was named ATI's new Chief Human Resources Officer (CHRO). *Id.* ¶ 57. Two years after those appointments, ATI and FVAC announced, on February 22, 2021, a proposed merger to take ATI public as a combined entity. *Id.* ¶ 58. Right before, on February 21, Diab, Coco, and then-CFO

Jordan entered into new employment agreements with ATI. *Id.* ¶ 61. These guaranteed that, in the event of the termination of their employment, each executive would receive a multiple of their annual salary—1.5 times for Diab and 1.25 times for Coco and Jordan—as well as a pro-rated annual bonus, and the immediate vesting of any unvested equity. *Id.*

## B. Merger

Naturally, the announcement of the proposed merger between FVAC and ATI led to public filings and disclosures, starting with the February 22, 2021 Securities and Exchange Commission (SEC) Form 8-K announcing the proposed combination. Am. Compl. ¶ 123. The 8-K included ATI's full-year 2021 financial projections: $731 million in revenues and $119 million in adjusted EBITDA. *Id.* ¶ 125. Separately, and on the same day as the merger announcement, Diab spoke at a presentation for investors to discuss the merger. *Id.* ¶ 123. During that presentation, Diab stated that ATI was "certified as a Great Place to Work," with "very high retention" and "low turnover" of its physical therapists. *Id.*

The materials that followed the proposed-merger announcement were ATI's annual SEC Form 10-K, Am. Compl. ¶ 127, and a series of proxy statements soliciting votes in favor of the merger from the owners or holders of FVAC stock. *Id.* ¶ 60. On March 12, 2021, FVAC filed its first proxy on SEC Form Schedule 14A. *Id.* 129. It stated that ATI had "a competitive compensation model," "historically been able to realize high retention rates across [the] organization," "favorable clinician retention rates and engagement scores," and "[a]ttractive recruiting and retention

capabilities … which allows the Company to recruit and retain talent." *Id.* ¶¶ 91, 129. It also explained that ATI faced hypothetical risks from competition to recruit and retain physical therapists. *Id.* ¶ 131. And finally, it included 2021 financial projections, namely the same revenue and adjusted EBITDA projections included in the February 22 Form 8-K, as well as estimates valuing ATI's goodwill at $1,330,085,000 and its tradename and other intangible assets at $644,339,000. *Id.* ¶¶ 133, 136. Afterward came the proxy materials filed on April 1, which included statements that ATI had "high retention" and "strong retention" of employees, as well as a "superior ability to recruit and retain physical therapists" being "the Employer of Choice for P[hysical] T[herapy] Clinicians" with "[b]est-in-class infrastructure" for retaining physical therapists. *Id.* ¶¶ 90, 138, 139. The proxy also again contained the 2021 revenue and adjusted EBITDA projections previously presented on February 22 and March 12. *Id.* ¶ 141.

Relatedly, the next two proxy statements (filed on May 5 and May 14) included the same statements about ATI's competitive advantages from the March 12 proxy, as well as the same hypothetical risks about competition to recruit and retain physical therapists, the same revenue and adjusted EBITDA projections, and the same estimates valuing ATI's goodwill and its tradename and other intangible assets. Am. Compl. ¶¶ 143, 145, 147, 150, 152, 154, 156, 159. Those same 2021 revenue and EBITDA projections were also included, unchanged, in an additional set of proxy-statement materials filed on May 24, along with a statement that ATI had "[s]ignificant labor savings through [a] more productive staffing model." *Id.* ¶¶ 167, 169. ATI

released its financial results for the first quarter of 2021 on May 20. *Id.* ¶ 161. Those results touted the opening of 14 new clinics and stated that the Company was "on track to achieve [its] de novo development targets for [2021]." *Id.* The quarterly results were also incorporated into another proxy from FVAC, which included a statement that beginning in the first quarter of 2021, ATI visit volumes rebounded from COVID-related declines, and that "the Company continues to match its clinical staffing levels accordingly." *Id.* ¶ 163.

Following all those filings, the merger was finally completed on June 16–17, 2021, and stock from the new combined entity began trading publicly. Am. Compl. ¶ 62; R. 70-2, July 26 Form 8-K at 5. Post-merger, ATI then submitted a Form S-1 registration statement to the SEC that repeated—one last time—the 2021 financial projections along with the valuations of goodwill, tradename, and other intangibles. *Id.* ¶ 171.

## C. Attrition

None of the public filings that preceded the merger mentioned actual problems with attrition and retention of physical therapists. Am. Compl. ¶¶ 124, 128, 135, 140, 149, 158. But several former employees of ATI—confidential sources for the Plaintiffs—observed attrition and retention problems in the time leading up to the merger. *Id.* ¶ 67–69, 70, 72–74, 77–88. For instance, Source 1, an ATI talent acquisition specialist from May 2019 to September 2021, noticed that, by early 2020, recruits were rejecting ATI's employment offers almost 50% of the time, mainly because of concerns over compensation. *Id.* ¶ 74. This rejection rate accompanied a physical-therapist

attrition rate of around 40% in late-2020 and early 2021. *Id.* ¶ 79. For context, Source 3, an ATI revenue cycle analyst until April 2020, observed that before late-2020 the attrition rate "hovered just above 20%." *Id.* ¶ 67–68. Source 1 knew about the elevated physical-therapist attrition rate because of weekly reports distributed to her and others. *Id.* ¶ 79. Source 1 also attended quarterly all-personnel meetings. *Id.* ¶ 100. At one in 2020, Source 1 told Diab and Jordan that certain markets, like Washington D.C., were "really bad for attrition" in part because it was "so difficult to attract and retain clinicians." *Id.* At another, Source 1 heard Diab give a "spiel" about "the need to recruit and retain clinicians to support the Company's growth." *Id.*

Source 2, another talent acquisition specialist, worked at ATI from October 2020 to August 2021 and oversaw the onboarding of physical therapists. Am. Compl. ¶ 81. This source also noticed an elevated attrition rate of 41% in late-2020 and also in 2021, driven by worse pay and hours compared to other companies. *Id.* ¶¶ 81–82. Source 2 heard Coco (the then-Chief Human Resources Officer) acknowledge retention problems at an HR department lunch in either November or December 2020 or January or February 2021. *Id.* ¶ 81. Relatedly, Source 7, an ATI talent acquisition manager from June 2015 to August 2020, also heard Coco say that hiring was a "critical priority." *Id.* ¶ 84.

Source 4, a senior financial analyst from October 2017 to December 2020, was another former employee who noticed increased attrition in 2020. Am. Compl. ¶ 86. Source 4 prepared monthly slide-decks for ATI's executive leadership that included a monthly scorecard, including a chart with a trend line that detailed climbing attrition

rates throughout the whole year of 2020. *Id.* ¶¶ 103–04. Similarly, Source 5, a former sales director from March 2016 to March 2021, observed the physical-therapist attrition rate reaching around 40% because employees were overworked. *Id.* ¶¶ 70, 77–78. And finally, Source 6, a former ATI clinic director, had monthly calls at the end of 2020 or beginning of 2021 with the then-Chief Operating Officer Ray Wahl who said that ATI needed to "hold onto people because employees were leaving at an alarming rate," which was "starting to impact the service that ATI was able to provide to patients." *Id.* ¶ 83.

### D. Post-Merger Disclosures

Despite the observations of former employees, problems with ATI's physical-therapist attrition and retention did not publicly surface until after the completion of the SPAC merger (the merger happened in June 2021). On July 26, 2021, post-merger ATI reported its financial results for the second quarter of 2021. Am. Compl. ¶ 111. Those results revealed that "the acceleration of attrition among therapists in the second quarter and continuing into the third quarter, combined with the intensifying competition for clinicians in the labor market, prevented [ATI] from being able to meet the demand we have and increased our labor costs." *Id.* That led, in turn, to a reduction of the Company's 2021 full-year revenue and adjusted EBITDA projections: from $731 million to $640–670 million and from $119 million to $60–70 million respectively. *Id.* It also resulted in a lowered estimate for 2021 new-clinic openings: from 90 to 55–60. *Id.* And finally, the July 26 disclosure was accompanied by the

resignation of Coco as CHRO. *Id.* at 112. ATI's stock dropped by $4.52 per share from July 26 to 27. *Id.* ¶ 113.

Around two weeks later, on August 9, 2021, the post-merger ATI board of directors terminated Diab as CEO. Am. Compl. ¶ 116. The press release accompanying the termination stated that the Board determined that it was the right time for a leadership change. *Id.* No replacement, interim or full-time, was announced; rather, the board launched a search for a new CEO. *Id.* That was not the end of the bad news, however. On August 16, ATI announced that it was recognizing non-cash impairment charges for the period ended June 30, 2021, because the values of its trade name and single reporting unit were below their carrying value. *Id.* ¶ 117.

Around two months later, on October 19, 2021, post-merger ATI announced selected preliminary third quarter results for 2021. Am. Compl. ¶ 118. The company further lowered its projected 2021 full-year revenue and adjusted EBITDA: respectively, from $640–670 million to $620–630 million and $60–70 million to $40–44 million. *Id.* ATI also disclosed that it "implemented targeted measures that reduced clinical staff attrition" and "made progress toward restoring FTEs [full-time equivalents] with ATI hiring roughly 2 clinicians for every 1 departure in August and September 2021." *Id.* ¶ 118. The adjustment of financial projections was due to "lower visit volume" linked to the need "to invest[] in [ATI's] field sales force" to "driv[e] visit growth." *Id.* ¶ 15. On October 20, ATI's stock price fell from $3.65 to $2.86 per share. *Id.* ¶ 119.

9

### E. Claims in this Lawsuit

Given those allegations, the Plaintiffs bring the following claims. Count 1 asserts securities fraud against ATI, Diab, Jordan, and McKnight under Section 10(b) of the Securities Exchange Act and accompanying SEC Rule 10b–5. Am. Compl. ¶¶ 204–15.[5] Count 2 is brought under Section 20(a) against Diab, Jordan, and McKnight as controlling persons for purposes of the alleged fraud. *Id.* ¶¶ 216–20. Count 3 alleges misstatements or omissions in proxy statements against all Defendants under Section 14(a) and accompanying SEC Rule 14a–9. *Id.* ¶¶ 231–44. Lastly, Count 4 is another under Section 20(a) claim, this time against Diab, Jordan, McKnight, and the FVAC board of directors as controlling persons for purposes of the proxy statements. *Id.* ¶¶ 245–56.

## II. Legal Standard

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (cleaned up).[6] A "complaint must contain sufficient factual matter, accepted as true, to state a claim

---

[5]The FVAC Defendants point out that a sentence in the amended complaint seems to assert securities fraud claims against them all. Am. Compl. ¶ 19. But this appears to be typographical error. The Plaintiffs clearly only bring securities fraud claims against ATI, Diab, Jordan, and McKnight. *Id.* ¶¶ 204–20.

[6]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

Ordinarily, under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But claims alleging securities fraud must satisfy the heightened pleading requirements imposed by Congress under the Private Securities Litigation Reform Act of 1995 (PSLRA). *Tellabs*, 551 U.S. at 313. "The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Id.* (cleaned up). And a plaintiff that alleges that material statements or omissions were misleading, "shall specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

### III. Analysis

### A. Misstatements and Omissions

First, all of the Defendants seek dismissal of the entire amended complaint on the theory that Plaintiffs have failed to plead *any* actionable misstatements or

omissions.[7] R. 69, ATI Defs.' Br. at 9–18; R. 72, FVAC Defs.' Br. at 7. In support of this argument, the Defendants divide the alleged misstatements and omissions into five purported categories: (1) puffery, (2) forward-looking statements, (3) statements of opinion, (4) a statement of historical fact, and (5) an omission. ATI Defs.' Br. at 9–18. The Plaintiffs respond that they have adequately pleaded numerous actionable misstatements and an omission (though they also concede that some statements in the operative complaint are not, in fact, actionable). R. 78, Pls.' Resp. at 14–22. Given this disagreement, the Court will now analyze each type of contested misstatement and omission.

### 1. Puffery

The Defendants argue that many of Plaintiffs' alleged misstatements are just statements of optimism or puffery that no reasonable investor would rely on. ATI Defs.' Br. at 10–11. The defense specifically refers to the following alleged misstatements, which arise out of a variety of contexts. *Id.*

- February 22 statements made by Diab claiming that ATI had "very high retention" and "low turnover" of its physical therapists. Am. Compl. ¶¶ 89, 123.

- March 12 proxy statement that ATI had "a competitive compensation model," "historically been able to realize high retention rates across the organization,"[8] "favorable clinician retention rates and engagement scores," and "[a]ttractive [r]ecruiting and [r]etention [c]apabilities … which allows the Company to recruit and retain talent." *Id.* ¶¶ 91, 129.[9]

---

[7]For this issue, the FVAC Defendants incorporate the arguments made by the ATI Defendants. FVAC Br. at 7.

[8]This statement is discussed later in the analysis in the context of historical statements. *See infra* note 12. In any case, the Plaintiffs do not specifically defend it as actionable in their response. *See* Pls.' Resp. at 14–20.

[9]The Defendants also point to a statement contained in proxies, including the March 12 proxy, that described ATI as having "engaged employees and clinicians and delivering best in class care." ATI Defs.' Br. at 10. But the amended complaint does not propose that specific

- April 1 proxy-statement materials claiming that ATI had "high retention" and "strong retention" of employees, as well as a "superior ability to recruit and retain physical therapists" being "the Employer of Choice for P[hysical] T[her-apy] Clinicians" with "[b]est-in-class infrastructure" for retaining physical therapists. *Id.* ¶¶ 90, 138–39.

- May 5 and 14 proxy statements repeating the statements about ATI's compet-itive advantages from the March 12 proxy statement. *Id.* ¶¶ 143, 152.

The Plaintiffs argue that these statements are not puffery because they con-stitute falsifiable, concrete assertions that are actionable under securities law. Pls.' Resp. at 15–16. Non-actionable puffery is neither concrete nor verifiable. *See Gal-lagher v. Abbott Lab'ys*, 269 F.3d 806, 811 (7th Cir. 2001). It expresses "only vague optimism" that "cannot be called false." *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (holding that, even at motion-to-dismiss stage, vague statement that "integration was progressing as planned" was puffery) (cleaned up). In all, puffery comprises "excessively vague, generalized and optimistic comments," not the sort of statements that "reasonable investor, exercising due care, would view as moving the investment-decision needle—that is, they're not material." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 638 (7th Cir. 2021) (summarizing holding of *Carvelli v. Ocwen Financial Corp.*, 934 F.3d 1307 (11th Cir. 2019)) (cleaned up). So, the question here is whether any of the statements labeled as mere puffery by the Defendants "lacks the requisite specificity to be considered anything but optimistic rhetoric." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995). To answer that ques-tion, it is important to keep in mind that the materiality (or lack of materiality) of a

---

statement as an actionable misstatement, so the Court does not need to consider it. Though it would also be non-actionable puffery.

statement must be evaluated considering the total mix of information available to investors. *Kuebler*, 13 F.4th at 639.

With all that in mind, it is clear that some of the alleged misstatements are indeed mere, non-actionable puffery: specifically, that ATI had "a competitive compensation model" with the "superior ability to recruit and retain physical therapists," and that ATI had "favorable clinician retention rates and engagement scores." Those adjective-laden statements are too vague and unverifiable. They contain intrinsically vague terms that would alert any reasonable investor that puffery is at play: "competitive," "superior," and "favorable." Those terms are not concrete enough for a listener to discern with reasonable precision *how* competitive or superior or favorable ATI's business models, abilities, rates, and scores are. No reasonable investor could rely on these statements to form a concrete opinion about the health of ATI. The same is true of the statements that ATI had "attractive recruiting and retention capabilities" and that it was "the Employer of Choice for P[hysical] T[herapy] Clinicians" with "[b]est-in-class infrastructure" for retaining physical therapists. Again, these statements contain no concretely useful information; they are window-dressing—"optimistic rhetoric" (or hot air) used indiscriminately by companies and executives. *See Searls*, 64 F.3d at 1066 (holding "recession-resistant" to be a "promotional phrase used to champion the company but [] devoid of any substantive information").

But compare those high-level, flowery statements to those asserting that ATI had "very high retention" and "low turnover" of its physical therapists, and also "high retention" and "strong retention" of employees. These alleged misstatements are

much more concrete and target a very specific aspect of ATI's operations. They are also more determinate and verifiable. The employment-related statements communicate to the market that a core metric of business performance—retention of physical therapists—is strong. An investor reading these statements could have reasonably believed that during the class period and in the near past ATI had little or no problems with turnover of the company's key employees—the physical therapists delivering the company's core service. There is a marked difference between saying, on the one hand, that ATI has—as a general proposition—a "superior ability to recruit and retain" and, on the other, that it is right now experiencing very strong retention and low turnover. To be sure, as this case progresses, the descriptions will provide the Defendants substantial leeway in arguing that the statements were accurate. It is not as if the attrition-related statements provided precise numbers. But at the pleading stage, giving the Plaintiffs the benefit of reasonable inferences, a reasonable investor plausibly would consider the statements of "very strong" retention and "low" turnover capable of reasonable measurement. For that reason, statements that communicated the generally testable strength of ATI's retention numbers do not—at this early stage, given the total mix of information available, and drawing reasonable inferences in favor of the Plaintiffs—constitute puffery or meaningless optimism.

### 2. Forward-looking Statements

The Defendants contend that a set of the alleged misstatements are non-actionable because they are just *forward*-looking and thus statutorily protected by the PSLRA safe harbor. ATI Defs.' Br. at 12–14. This PSLRA safe harbor protects the

makers of forward-looking statements from liability when those statements are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(B)(ii). It also requires "actual knowledge of falsity, not merely indifference to the danger that a statement is false." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (citing 15 U.S.C. § 78u–5(c)(1)(B)(ii)). That said, the safe harbor applies only to statements that are truly *forward*-looking. In other words, a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Id.* (providing as an example of a mixed present-future statement that sales of a system were "still going strong").

The specific statements at issue here are ATI's fiscal-year 2021 revenue and adjusted EBITDA projections of $731 million and $119 million respectively, as well as the April 1 and May 24 statements that ATI benefited from "significant labor savings through a more productive staffing model." Am. Compl. ¶¶ 94, 125, 133, 139, 141, 147, 156, 167, 169. Also contested are the May 20 statements that "the Company continues to match its clinical staffing levels accordingly" (in the context of customer visits-per-day numbers rebounding from COVID) and the projection that ATI was "on track" to meet its target for new-clinic openings in 2021. *Id.* ¶¶ 93, 109, 161, 163. The Plaintiffs argue that these second statements—about matching clinical staffing levels and being on track to meet new-clinic targets—were not wholly forward-looking statements, but rather mixed statements about the present and future, the present portion

of which would not be protected by the PSLRA safe harbor. Pls.' Resp. at 16–17. The Plaintiffs also argue that the cautionary language attached to these "state-of-clinics" statements was itself misleading and thus ineffective for purposes of the safe harbor. *Id.* at 18–19.

Before getting to those statements, the Plaintiffs do not similarly argue that the fiscal-year 2021 revenue and adjusted EBITDA *projections* or the statements about significant labor savings were mixed statements, or that they were unaccompanied by meaningful cautionary language. Pls.' Resp. at 17 n.3. As to these, the Plaintiffs only state—in a footnote—that they "could not possibly be met" and that they were eventually "revealed as misleading." *Id.* But, again, they do not contend that they were anything other than purely forward-looking statements protected by the PSLRA safe harbor. "We have often said that a party can waive an argument by presenting it only in an undeveloped footnote ...." *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013). The Plaintiffs have done exactly that: failed to advance any substantive position in response to the Defendant's request to dismiss claims related to the 2021 fiscal projections and the statement about significant labor savings. The Court thus holds those to be not actionable and will only concentrate on the truly contested arguments about the state-of-clinics statements—starting with whether these were purely future-facing and then evaluating the cautionary statements that accompanied them.

17

### a. Mixed Present-Future Statements

On the state-of-clinics statements, the Defendants argue that the following statements were forward-looking without a present-state aspect: (1) the company "continues to match its clinical staffing levels accordingly" (as visit-per-day numbers rebound from COVID) and (2) it was "on track" to meet its 2021 target for new clinics. ATI Defs.' Br. at 12–14. But both those statements communicated then-existing, concrete facts as of May 20, 2021. To say that ATI "continues" to match its staffing levels to client-visit volume implies that—at the time that the statement was made—staffing levels were indeed keeping up with rebounding customer visits. The phrase is expressed in the present-indefinite tense to report that an action that is presently and regularly occurring will continue onward—here, that staffing levels are adequate *now* and will be into the future as visits-per-day continue to rebound after a COVID-induced low-point in mid-2020. *See* R. 73-6, May 20 Proxy Statements at 30. An investor could reasonably have read that statement to mean that *as of May 20* ATI was having no problems staffing its clinics with enough employees given higher demand. So, this statement does have a present-state component outside the protection of the PSLRA safe harbor.

But the statement that ATI was "on track to achieve [its] de novo [clinic] development targets" for 2021 is different. Am. Compl. ¶¶ 109, 161. That statement does not communicate any concrete, verifiable present-state condition at ATI. To say that something is on track is an amorphous prediction about the future. In this case, it communicated confidence that by the end of 2021 ATI would boast a certain number

18

of new clinics, regardless of how many clinics had been opened by May 20 when the challenged statement was made. Indeed, ATI could have opened zero clinics from January to May and, if the company's plan was to only open new clinics in the second half of 2021, it still would be "on track" to meet its goals. It is somewhat telling that the Plaintiffs do not substantially contest this argument in their briefing. Instead, their response concentrates only on defending the mixed present-future nature of the clinical-staffing-levels statement, not this one. *See* Pls.' Resp. at 18. This alleged misstatement about ATI being "on track" to meet its 2021 new-clinic goals is purely forward-looking.

### b. Cautionary Statements

Having resolved which state-of-clinics statements are eligible for protection under the PSLRA safe harbor, the Court must now address the parties' arguments about the cautionary statements that accompanied them. Remember that forward-looking statements are statutorily protected only when "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 U.S.C. § 78u–5(c)(1)(B)(ii). The Plaintiffs argue that ATI's cautionary statements—which the Plaintiffs label "hypothetical risk statements"—are in and of themselves actionable statements under securities law and, by extension, not "meaningful" for purposes of the PSLRA safe harbor. Am. Compl. ¶¶ 92, 131, 145, 154; Pls.' Resp. at 12–14. That is because those statements, the Plaintiffs argue, "presented the company's therapist retention problems and the associated business declines as merely possible future events, when in fact they already had occurred."

19

Pls.' Resp. at 12. The Defendants take the opposite position: that their cautionary statements are meaningful and, by extension, non-actionable because the "Plaintiffs have not established that ATI's retention rate was, in fact, materially greater than the average in the industry, let alone that the ATI Defendants were aware of it." ATI Defs.' Br. at 13 n.7.[10] More specifically, the defense contends that the Plaintiffs fail to plead "*with particularity* that ATI's supposedly high attrition rate had already materialized when the allegedly misleading risk disclosures were made." R. 81, ATI Defs.' Reply at 5 (emphasis added). That defense argument is incorrect.

The Plaintiffs have sufficiently pleaded that ATI's problems with physical-therapist attrition rates had materialized by the time that the cautionary statements were made. The specific statements at issue—made by ATI in proxy statements on March 12, May 5, and May 14, Am. Compl. ¶¶ 92, 131, 145, 154—warned that the company "faced competition for experienced physical therapists ... that *may* increase labor costs and reduce profitability." *Id.* ¶¶ 92, 131, 145, 154 (emphasis added); *see also* R. 73-1, May 14 Definitive Proxy Statement at 55. The cautionary language went on to specify that "*if* the Company cannot recruit and retain" physical therapists, then

---

[10]The Plaintiffs argue that the Defendants forfeited their arguments about ATI's cautionary statements because the Defendants "address these statements only in a cursory footnote." Pls.' Resp. at 13. But the Defendants' briefing is more substantive than the Plaintiffs think. For instance, the Defendants propose that ATI's cautionary language was meaningful and not "boilerplate," as it "warned of the impacts that the failure to retain physical therapists and clinicians would have on the Company." ATI Defs.' Br. at 13. And the footnote sufficiently explains their main point (even if it is not overly persuasive, and ideally would have been presented in the text): that the Plaintiffs have not "established" (the Plaintiffs do not have establish anything at the pleading stage) that ATI's attrition rate was abnormally high. *Id.* at 13 n.7. So, the defense's cautionary-statements arguments are not conclusory; they are sufficiently set forth to avoid forfeiture.

"its business *may* decrease and its revenues *may* decline." *Id.* (emphases added).
Lastly, the company cautioned that it "*may* experience increases in its labor costs"
that "*may* lead to increased turnover and other challenges." *Id.* (emphasis added).
The problem with these statements, according to the amended complaint, is that the
factors that ATI identified as mere possibilities had already happened: ATI was al-
legedly already suffering from increased attrition. Am. Compl. ¶¶ 92, 131–32, 145–
46, 154–55. The Plaintiffs allege that from around November 2020 to early 2021 ATI's
physical-therapist attrition rate roughly doubled to around 41% (from an earlier 20%)
because therapists were overworked and underpaid, and there was a negative com-
pany culture. *Id.* ¶¶ 7, 65–69, 70, 72–74, 77–88. The Plaintiffs base these allegations
on the information provided by former employees who worked in the finance, human
resources (talent acquisition), operations, and sales functions of ATI in 2020 and
2021. *Id.* at 67–69, 70, 72–74, 77–88.

The core of the defense's argument is that these pleadings are insufficiently
particularized because the Plaintiffs do not allege what materials contained the at-
trition numbers alleged to be abnormally high, or who prepared such materials and
when. ATI Defs.' Reply at 5. The Defendants analogize to *Arazie v. Mullane*, a pre-
PSLRA case in which the plaintiffs there provided scant details of internal memos
that allegedly predicted cash short falls and stiff competition in contradiction of pub-
lic forecasts about the company's ability to service its debt. 2 F.3d 1456, 1467 (7th
Cir. 1993). There, the Seventh Circuit held that pleadings about the key memos in
*Arazie* were insufficient because they did not provide enough details about the who,

the what, the when, and other details to verify the memos, as well as who reviewed them. *Id.*

Here, by contrast, the Plaintiffs plead that Source 1, a former talent acquisition specialist at ATI (the who), received and reviewed weekly reports in late-2020 and early-2021 (the when) from Brian Emerson, ATI's Director of Talent Acquisition (again, the who), that showed that the attrition rate among physical therapists was around 41% (the what), and that these reports "contained detailed information on hires, promotions, furloughs and departures and termination" (additional identifying details). Am. Compl. ¶¶ 72, 79. For reference, Source 3, a former revenue cycle analyst who reported to the Director of Revenue Cycle Optimization, Jermaine Paul, observed that before late-2020 the attrition rate was much lower, hovering "just above 20%." *Id.* ¶ 67–68. This set of allegations constitutes just one example of sufficient particularity—significantly beyond what was provided in *Arazie*. There is more. The Plaintiffs pleaded, for instance, that Source 2, another former HR professional who managed new-hire communications, also observed a high attrition rate in late 2020 and 2021. *Id.* ¶ 81. This former employee told the Plaintiffs that physical therapist pay was low and that it was not uncommon for incoming hires to renege on their acceptances. *Id.* ¶¶ 81–82. Source 2 (the who) also reported listening to the then-CHRO Coco (again, the who) explain in a lunch event in November-December 2020 or January-February 2021 (the when) that ATI was having retention problems (the what). *Id.* ¶ 81.

Yet another former employee, Source 6, who was a clinic director at the company from 2005 to July 2021 (the who), had monthly calls at the end of 2020 or beginning of 2021 with then-COO Wahl (again, the who) who said that ATI needed to "hold onto people because employees were leaving at an alarming rate," which was "starting to impact the service that ATI was able to provide to patients" (the what)— an issue that the head of operations would surely know about. Am. Compl. ¶ 83. Just one more example: Source 4, a senior financial analyst from 2017 to December 2020 (the who), personally prepared monthly slide-decks for ATI's executive leadership that included a chart with a trend-line that detailed the climbing attrition rates throughout all of 2020 (the what and when) and which was presented to Jordan, the Board of Directors, and other executives (the recipients). *Id.* ¶¶ 86, 103–04.

So, the Plaintiffs sufficiently pleaded with particularity that the high attrition rate allegedly plaguing ATI had materialized in late-2020 and continued into 2021, before and during the time that ATI issued its cautionary language warning only of the *potential* for attrition and turnover. As explained earlier, the Plaintiffs provide allegations about who within ATI heard, observed, or prepared materials and information that reflected high attrition rates, the timing of those materials and information, and details about the nature and substance of those materials and information. That said, the Court is of course not concluding, at the pleading stage, that ATI's cautionary statements are, as a matter of law, not meaningful. Discovery might reveal them to be sufficiently meaningful. But at this point the cautionary statements are contradicted by the Plaintiffs' detailed allegations, and thus actionable as

misleading statements which, on the pleadings, cannot be used to shield those state-of-clinics statements that the Court held to be forward-looking.

### 3. Opinions

Next, the Defendants argue that several of the alleged misstatements are non-actionable opinions. ATI Defs.' Br. at 14–15. An opinion is actionable when a defendant (1) does not honestly hold the professed belief or (2) "omits material facts about [its] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 182–187, 189 (2015).[11] Not *every* fact contradicting an opinion must be disclosed. *Id.* at 190 (providing the hypothetical example of an issuer that properly "did not disclose that a single junior attorney expressed doubts about a practice's legality, when six of his more senior colleagues gave a stamp of approval"). "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence

---

[11]The parties both cite *Omnicare*, which lays out the standard to evaluate statements of opinion in the context of Section 11 of the Securities Exchange Act. Neither party argues that *Omnicare* should not apply to the claims in this case. But the Seventh Circuit has not yet addressed whether *Omnicare* applies to Section 10(b) and its accompanying Rule 10b–5 (or to any other sections of the Act). That said, other circuit courts that *have* addressed the issue have held that the *Omnicare* framework does apply to claims under Section 10(b) and Rule 10b–5. *See Carvelli*, 934 F.3d at 1322 n.7; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 610 (9th Cir. 2017); *Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016). That makes sense because the Supreme Court noted that the principles supporting its framework "are not unique to § 11." *Omnicare*, 575 U.S. at 191. And "Section 11 and Rule 10b–5 contain virtually identical prohibitions against untrue statements of material fact and omissions of material fact necessary to ensure a statement is not misleading." *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 648 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022); *compare* 15 U.S.C. § 77k(a) *with* 17 C.F.R. § 240.10b-5(b). So the *Omnicare* framework does apply to the claims in this case.

of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* at 189–90. Ultimately, "whether an omission makes an expression of opinion misleading always depends on context," which includes "surrounding text, including hedges, disclaimers, and apparently conflicting information," as well as "the customs and practices of the relevant industry." *Id.* at 190.

With that background in place, the statements characterized by the Defendants as opinions are ATI's 2021 financial projections; its valuations of goodwill, tradename, and other intangible assets; the belief that ATI had "attractive recruiting and retention capabilities"; and finally, the belief that key elements of ATI's competitive advantage included its "competitive compensation model" and "engaged employees and clinicians." ATI Defs.' Br. at 14–15 (citing Am. Compl. ¶¶ 91, 94–95, 125, 129, 133, 136, 141, 143, 147, 150, 152, 156, 159, 165, 169, 171). Most of these statements have already been disposed of as non-actionable. Specifically, statements about attractive recruiting and retention and a competitive compensation model constitute non-actionable puffery. *See supra* Section III.A.1. The one about engaged employees and clinicians was not included in the amended complaint, but in any case, it would also be non-actionable puffery. *See supra* note 9. Relatedly, as Plaintiffs concede by implication, the 2021 financial projections were protected forward-looking statements. *See supra* Section III.A.2. That leaves only the March 12, May 5, May 14, and July 9 statements valuing ATI's goodwill at $1,330,085,000 and its tradename and other intangible assets at $644,339,000. Am. Compl. ¶¶ 136, 150, 159, 171. Incidentally, these are the only statements within this challenged set that the Plaintiffs

defend as actionable. *See* Pls.' Resp at 19–20. Given that "failure to respond to an argument … results in waiver," those are the only statements that the Court will now evaluate—the Plaintiffs have forfeited any argument that the others are not non-actionable opinions. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

The Defendants argue that the Plaintiffs fail to plead facts "establishing that the Defendants did not honestly hold their opinions [about the value of ATI's goodwill, tradename, and other intangible assets] at the time they were offered or that the Defendants lacked a basis to form such opinions." ATI Defs.' Br. at 15. The Plaintiffs, however, do not claim to plead that these were not purely opinions or that any Defendant did not honestly hold these opinions. Pls.' Resp. at 20. Instead, the Plaintiffs respond that statements of the calculated value of ATI's goodwill, tradename, and other intangible assets did not align with information in the Defendants' possession, namely the alleged facts that the company's attrition rate had doubled and was impacting the business. *Id.* The dispositive issue thus is whether the Plaintiffs sufficiently pleaded that the Defendants lacked a reasonable basis for the valuations because they omitted material facts that contradicted their opinions. Accordingly, the Plaintiffs must plead "particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194.

Applying this standard to the amended complaint, the Plaintiffs do not sufficiently plead *particular* and material facts specifically going to the basis for ATI's opinion about the valuations of its goodwill, tradename, and other intangible assets. The Plaintiffs' allegations on this issue are threadbare. *See* Am. Compl. ¶¶ 8, 136–37, 150–51, 159–60, 165–66, 171–72, 228. Specifically, they plead that the valuations were misleading simply "because the value of the Company's goodwill was materially less (approximately $433 million less) and value of the Company's trade name and other intangible assets was also materially less (approximately $34 million less)." *Id.* ¶¶ 137, 151, 160, 166, 172, 228. The alleged reason why these items were materially less valuable is because the valuations turned out to be wrong. After the transaction closed ATI allegedly recognized impairment charges negatively impacting its earlier calculations of its goodwill, tradename, and other intangible assets. *Id.* ¶¶ 14, 117. But "a sincere statement of pure opinion is not an untrue statement of material fact, *regardless [of] whether an investor can ultimately prove the belief wrong.*" *Omnicare*, 575 U.S. at 186 (cleaned up) (emphasis added). So, more is needed.

For instance, there is another allegation that "severe attrition that [ATI] was suffering during the Class Period … rendered materially misleading Defendants' statements regarding … goodwill and trade name and other intangible assets figures." Am. Compl. ¶ 8. But the Plaintiffs do not plead additional—or particular—details. The reader of the amended complaint is thus left to speculate—even giving the benefit of reasonable inferences to the Plaintiffs—as to how or why the omission of the alleged heightened attrition levels would make ATI's goodwill and tradename

opinions misleading to the reasonable person reading the statement fairly and in context. Claims that rely on an omission to render a published statement of opinion misleading cannot be advanced "merely by means of conclusory assertions." *Omnicare*, 575 U.S. at 194. Sufficiently alleging these types of claims is "no small task for an investor" because the Court must be able to consider competing facts, including any that ATI "*did* provide" with the valuations at issue, as well as hedges, disclaimers, or qualifications provided for these specific opinions. *Id.* at 194, 196. After all (and as already explained), opinions by their very nature "convey[] uncertainty" and "[r]easonable investors understand that [they] sometimes rest on a weighing of competing facts." *Id.* at 189–90. So, the Plaintiffs' allegations about ATI's statements of goodwill, tradename, and other intangible assets are insufficient and thus not actionable.

### 4. Historical Facts

The amended complaint contains an allegation that then-CEO Diab stated, on February 22, 2021, that ATI was "certified as a Great Place to Work" when in fact the company only held that certification from August 2019 through 2020. Am. Compl. ¶¶ 88, 123. But the Defendants argue that neither Diab nor any ATI Defendant ever claimed that the company held the certification for any other time (other than for that year from 2019 to 2020). ATI Defs.' Br. at 16–17. Ultimately, the Plaintiffs do not

respond to this argument, so they concede the point. *See Bonte*, 624 F.3d at 466. This statement is not actionable.[12]

### 5. Omission

There is one more alleged misrepresentation—really, an omission—to evaluate: that ATI "was required to disclose, but omitted to disclose, the known trend that it was suffering attrition rates among its clinical staff that were materially greater than the industry average, which was likely to have, and did have, a material impact on [ATI's] financial performance." Am. Compl. ¶¶ 124, 128, 135, 140, 149, 158. The Defendants challenge the actionability of this omission on three grounds: (1) the Plaintiffs failed to adequately plead an affirmative duty to disclose; (2) even if the Plaintiffs are implying that disclosure duty under Item 303 of the SEC Regulation S-K—the regulations governing how registrants should disclose qualitative information in their required public filings—the Seventh Circuit has not decided whether a Section 10(b) or 14(a) claim can be premised on an Item-303 violation; and finally (3) the Plaintiffs have not sufficiently pleaded that the alleged trend was known to any Defendant. ATI Defs.' Br. at 17–18. In response, the Plaintiffs argue that it was unnecessary to explicitly cite Item 303, or that their failure to do so is harmless; that the omission of a trend required to be disclosed under Item 303 can constitute an actionable omission under federal securities laws; and that they sufficiently pleaded knowledge of the trend. Pls.' Resp. at 21–22. The Court will address the final issue of

---

[12]The alleged statement that ATI has "historically been able to realize high retention rates across [the] organization," Am. Compl. ¶¶ 129, 143, 152, is also not actionable, because the Plaintiffs also do not contest its validity. *See* ATI Defs.' Br. at 17 n. 11; Pls.' Resp. at 14–20.

knowledge later in its analysis on scienter (intent to deceive). For now, the next item up for discussion is the lack of an explicit citation to Item 303 in the Amended Complaint.

The Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). The federal regime of notice pleading does not turn on technicalities. In other words, there is no relevant heightened requirement—and the Defendants identify none—pertaining to legal-theory pleading in the first instance as opposed to factual pleading. For instance, the PSLRA requires particularity in the pleading of "*facts* constituting the alleged violation, and the *facts* evidencing scienter." *Tellabs*, 551 U.S. at 313 (emphases added). In terms of providing notice, plaintiffs must only sufficiently plead their "factual basis for their complaint;" they are "required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." *City of Shelby, Miss.*, 574 U.S. at 11. So, the absence of an explicit cite to Item 303 is not fatal.

Moving on, the tougher question raised by the parties is whether Item 303 can sustain claims under Section 10(b) or Section 14(a). Item 303, for context, requires the disclosure in public filings—like the forms 8-K, 10-K, 10-Q, and Schedule 14A filed in this case—of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) (version effective until Feb. 10, 2021). Again, the Plaintiffs argue

that a failure to disclose a piece of information required under Item 303 constitutes—by itself—an actionable omission. Pls.' Resp. at 21–22. Given that context, the parties agree that an omission "absent a duty to disclose, is not misleading." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). That makes sense. "We do not have a system of continuous disclosure" for federal securities law. *Gallagher*, 269 F.3d at 808. "Instead firms are entitled to keep silent (about good news as well as bad news) unless *positive law* creates a duty to disclose." *Id.* (emphasis added). That principle applies even when nonpublic information is material. *Dirks v. S.E.C.*, 463 U.S. 646, 654 (1983) ("There is no general duty to disclose before trading on material nonpublic information.") (cleaned up). In other words, the issues of materiality and duty to disclose are distinct.

On the duty to disclose, it is generally accepted that statutes or regulations—that is, "positive law"—can generate such a duty. *See, e.g.*, *Gallagher*, 269 F.3d at 808; *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("Such a duty may arise when there is 'a corporate insider trad[ing] on confidential information,' a '*statute or regulation requiring disclosure*,' or a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.'") (emphasis added) (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990)). So, Item 303—a regulation issued by the SEC pursuant to its statutory authority, s*ee* 17 C.F.R § 229.10—should generate an affirmative duty to disclose under federal statutes like Sections 10(b) or 14(a). But the Seventh Circuit has not addressed this issue and, what's more, some courts disagree with that conclusion.

The Ninth Circuit, for instance, has held that Item 303 "does not create a duty to disclose for purposes of Section 10(b) and [its accompanying] Rule 10b–5." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). This holding hinges on the idea that "Item 303's disclosure requirement varies considerably from the general test for securities fraud materiality set out by the Supreme Court in *Basic Inc. v. Levinson.*" 768 F.3d at 1054–55. As far as it goes, that is correct: the SEC's materiality test for Item 303 *is* more inclusive (or, put another way, broader) than *Basic's*. *Compare* Management's Discussion and Analysis of Financial Condition and Results of Operations, 54 Fed. Reg. 22427, 22430 n.27 (May 24, 1989) (Item 303 "specifies its own standard for disclosure [of forward-looking information]—*i.e.*, reasonably likely to have a material effect.") *with Basic*, 485 U.S. at 238 ("Materiality will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.") (cleaned up). But *NVIDIA* conflates the concepts of duty to disclose with materiality—which, as explained earlier (and emphasized again below), are distinct concepts.

Given the distinction between duty to disclose and materiality, the analysis of the Second Circuit in *Stratte-McClure v. Morgan Stanley* is more convincing. That case held that "failure to comply with Item 303 in a [mandatory filing] can give rise to liability under Rule 10b–5 so long as the omission is material under *Basic*, and the other elements of Rule 10b–5 have been established." *Stratte-McClure*, 776 F.3d at 102. *Stratte-McClure* recognizes that a "failure to make a required disclosure under

Item 303 … is not *by itself* sufficient to state a claim for securities fraud." *Id.* (emphasis added). A sufficient—but distinct—pleading of materiality is also required. *Id.* ("Significantly, Rule 10b–5 makes only material omissions actionable.") (cleaned up). That reasoning, which recognizes the difference between the legal concepts of duty to disclose and materiality, makes sense. It also likely—though not definitely—squares with an earlier case that the Ninth and Second Circuits both cite: *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000).

In *Oran*, the Third Circuit held "that a violation of SK–303's reporting requirements does not *automatically* give rise to a material omission under Rule 10b–5." 226 F.3d at 288 (emphasis added). This holding can be logically read—as the Second Circuit did because of the use of the word "automatically"—to suggest that Item 303 "*could* give rise to a material 10b-5 omission … so long as the omission is material under *Basic*." *Stratte-McClure*, 776 F.3d at 103–04. Still, *Oran* can also be plausibly interpreted to reject the viability of Item 303 as a basis to bring a claim under Section 10(b) and Rule 10b–5. For instance, the opinion contains a footnote saying that the court "reject[ed] plaintiffs' claim that … Item 303(a) imposed an affirmative duty of disclosure … that could give rise to a claim under Rule 10b–5." *Oran*, 226 F.3d at 286 n.6. Ultimately, the most that can be said is that *Oran* did not need to address the issue head on.

More importantly, starting from first principles, the duty to disclose and materiality are separate concepts. In *Basic*, the Supreme Court explained that "no particular event or factor ... need be either necessary or sufficient by itself to render

merger discussions *material*." *Basic*, 485 U.S. at 239 (emphasis added). That is be-cause "to be actionable … a statement must also be misleading" and "[s]ilence, *absent a duty to disclose*, is not misleading." *Id.* at 239 n.17 (emphasis added). Given that distinction, this Court adopts the Second Circuit's test synthesizing Item 303's duty to disclose with *Basic's* probability-magnitude test for materiality. By extension, the Court also holds that Item 303 can serve as a proper basis for liability under Section 10(b) and Rule 10b–5—*if* the omission is material under *Basic*, and other necessary elements, like scienter, are satisfied.

That is not the end of this legal analysis, however. As pointed out earlier, the defense also questions whether Item 303 can sustain a claim under Section 14(a), which applies to the proxy statements issued by ATI. For the same reasons that apply to Section 10(b) and Rule 10b–5, the Court answers yes. Item 303—as a promulgated regulation—constitutes positive law that can generate an affirmative duty to disclose. Of course, as with Section 10(b) and Rule 10b–5, it is also necessary to satisfy the materiality requirement[13]—though not scienter. *See Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("There is no required state of mind for a violation of Section 14(a)."). For Section 14(a), "[a]n omitted fact is material if there is a substantial like-lihood that a reasonable shareholder would consider it important in deciding how to vote." *Kuebler*, 13 F.4th at 637 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976))

---

[13]Section 14(a)—through its accompanying Rule 14a–9 also only requires the disclo-sure of "*material* fact[s]" or omissions.) 17 C.F.R. § 240.14a–9 (emphasis added).

The only remaining argument as to the attrition-rate trend under Item 303 is that the "Plaintiffs have not sufficiently pled, as they must, that the alleged trend was in fact *known* to any of the Defendants." ATI Defs.' Br. at 18 (emphasis in original). As promised, this final argument will be addressed in the scienter section below. But before moving on, it is worth summarizing here which of the alleged misstatements or omissions are actionable up to this point in the analysis.

First, the alleged misstatements that ATI had "very high retention" and "low turnover" of its physical therapists; and "high retention" and "strong retention" of employees are not puffery and thus are actionable. Second, the alleged (state-of-clinics) misstatements that ATI "continues to match its clinical staffing levels accordingly" and was "on track" to meet its 2021 target for new clinics are also actionable—though the second statement is purely forward-looking. That is because the alleged cautionary statements are themselves actionable and cannot be used to shield the state-of-clinics statements under the PSLRA safe-harbor. Finally, the alleged omission under Item 303 of the supposedly known trend that ATI "was suffering attrition rates among its clinical staff that were materially greater than the industry average" has also survived up to this point in the analysis.

### B. Scienter

The Defendants all argue that the scienter allegations are insufficient for purposes of the Section 10(b) securities-fraud claims (Count 1) against ATI, Diab (former CEO of ATI), Jordan (former CFO of ATI), and McKnight (former CEO of FVAC). *See* ATI Defs.' Br. at 18–27, 29; FVAC Defs.' Br. at 7–13. But each set—ATI, Diab, and

Jordan on one side, and McKnight on the other—also presents separate arguments with points particular to each. *Id.* The Court thus will clarify when the analysis addresses points advanced by all Defendants or just one set of them.

The basis mental-state rule is that "to establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (cleaned up). For this requirement, the PSLRA sets out that for each alleged misstatement or omission, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely scienter. 15 U.S.C. § 78u-4. Interpreting the key term "strong inference" (which the statute does not itself define), the Supreme Court has held that "to qualify as strong … an inference of scienter must be more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Tellabs*, 551 U.S. at 314 (cleaned up). That means that courts must "consider not only inferences urged by the plaintiff … but also competing inferences rationally drawn from the facts alleged. *Id.* (cleaned up). "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

Turning to the parties' arguments here, the ATI Defendants contend that the scienter allegations are insufficient because the motive-and-opportunity allegations are weak; the amended complaint is based on inadequate, uncorroborated

information from confidential sources; and neither the departures of Diab and Coco (ATI's former Chief Human Resources Officer) after the post-merger disclosure of elevated attrition rates, nor the fact that the SEC opened an investigation of ATI support a strong inference of scienter. ATI Defs.' Br. at 20–26. McKnight adds that the specific allegations applicable to him are insufficient. The Plaintiffs respond that, when viewed holistically, numerous allegations support a strong inference of scienter: statements from former employees show that Diab, Jordan, and McKnight all were aware of elevated attrition; the fact that retention of physical therapists is core to ATI's business; and the post-merger departures of Diab and Coco as well as the investigation launched by the SEC. Pls.' Resp. at 22–32. The Court will address each of the parties' arguments in turn.

### 1. Motive Allegations

First, it is true that "without a motive to commit securities fraud, businessmen are unlikely to commit it." *City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) (cleaned up). But importantly, "while … personal financial gain may weigh heavily in favor of a scienter inference … the absence of a motive allegation is not fatal," and its significance "depends on the entirety of the complaint." *Tellabs*, 551 U.S. at 325 (cleaned up). Here, the Plaintiffs allege that on February 21, before the merger, Diab and Jordan entered into new employment agreements that, in the event of termination, guaranteed each executive a multiple of their annual salary—1.5 times for Diab and 1.25 times for Jordan—as well as a pro-rated annual bonus, and the immediate vesting of any

unvested equity. Am. Compl. ¶ 61. The Plaintiffs argue that these new contracts provided Diab and Jordan motive to ensure the success of the SPAC merger. Pls.' Resp. at 27 n.6. The Plaintiffs do not, by contrast, assign a specific motive to McKnight. *See id.* The Plaintiffs do allege that, generally speaking, employees of a SPAC, like FVAC, have incentives to "present a target company in a misleadingly favorable light to ensure the company is acquired" and thus "gain favorable employment" in the post-merger company "rather than returning the acquisition funds to investors." Am. Compl. ¶¶ 51, 184.

These allegations of motive do not contribute much to a strong inference of scienter attributable to Diab, Jordan, or McKnight. Starting with Diab and Jordan, the relevant allegation is that their new employment agreements were contingent on their termination. Am. Compl. ¶ 61. In other words, they were owed the alleged benefits if they were fired for any reason, regardless of whether the merger had been successful. *Id.* There is no allegation of any benefit owed to them contingent on the merger. As to McKnight, the motive allegations are exceedingly generic. To allege that employees of SPACs generally will have the motivation to defraud in order to ensure the successful acquisition of a target says nothing about the motivations, circumstances, and factors *particular* to McKnight. *See Pension Tr. Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d 933, 939–40 (7th Cir. 2018) ("A generalized motive common to all corporate executives is not enough to establish scienter.") (cleaned up). This generalization does not satisfy the requirement to state *with particularity* facts giving rise to a strong inference that McKnight acted with scienter. In all, the alleged

motivations of Diab, Jordan, and McKnight are weak. But those allegations are not necessary to state a Section 10(b) claim, and the Court will consider them in the context of the entire amended complaint. *Tellabs*, 551 U.S. at 325.

## 2. Confidential-Source Allegations

Next, the parties dispute the significance of allegations attributable to anonymous sources—former employees of ATI—that speak to the knowledge that Diab, Jordan, and McKnight had about high attrition at the Company. The ATI Defendants argue that these allegations cannot provide the basis for a strong inference of scienter as to Diab and Jordan. ATI Defs.' Br. at 20–25. McKnight argues, in turn, that these allegations are not sufficiently particularized to him. FVAC Defs.' Br. at 7–10. Naturally, the Plaintiffs disagree. Pls.' Resp. at 24–30. The Seventh Circuit has cautioned lower courts of the difficulty of assessing allegations based on anonymous sources. *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d at 711. In *Higginbotham v. Baxter Int'l, Inc.*, the court instructed that those type of allegations should be discounted, though not ignored, because confidential sources could have "axes to grind," they could be lying, or "perhaps they don't even exist." 495 F.3d 753, 757 (7th Cir. 2007). But after *Higginbotham,* the Seventh Circuit clarified that the relative discount given to confidential-source allegations depends on case-by-case factors like the detail of the allegations, numerosity of sources, corroboration, and whether the sources are "persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d at 712. Ultimately, while it "would be better were the

informants named in the complaint … the absence of proper names does not [automatically] invalidate the drawing of a strong inference from informants' assertions." *Id.*

In this case, the detailed allegations attributable to anonymous former employees weigh in favor of an inference of scienter on the part of Diab and Jordan, but not McKnight. In part, that is because the seven confidential sources relied on by the Plaintiffs appear to have been in positions to know first-hand the facts at issue. *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d at 712. As detailed earlier, the Plaintiffs base many of their allegations on the alleged experiences of former employees across finance, human resources (talent acquisition), operations, and sales in 2020 and 2021. *Id.* ¶ 67–69, 70, 72–74, 77–88. Personnel within those operational areas, especially HR, finance, and operations, would be on the frontlines of dealing with any attrition and hiring problems—as opposed to someone in, for instance, the marketing department. Still, it is necessary to evaluate the sources—who were introduced earlier in this Opinion—and the allegations tied to them, especially those pertaining to scienter. To that end (and despite some repetitiveness), the Court will outline the most relevant allegations source-by-source.

Source 1 was an ATI talent acquisition specialist who, from May 2019 to September 2021, recruited physical therapists across the country. Source 1 reported to Keri Novelli-Ammons, ATI's Director of Talent Acquisition, who in turn reported to Brian Emerson, the Vice President of Talent Management. Am. Compl. ¶ 72. Source 1 allegedly noticed that, by early 2020, recruits were rejecting her employment offers

almost 50% of the time, mainly because of concerns over compensation. *Id.* ¶ 74. This rejection rate allegedly accompanied an attrition rate of approximately 40% in late-2020 and early 2021, double the pre-late-2020 attrition rate of about 20%. *Id.* ¶ 68, 79. Source 1 knew about the heightened attrition rate because of weekly reports distributed to her and others by Emerson. *Id.* ¶ 79. These reports contained detailed information about hiring, departures, and terminations, among other things. *Id.* As to Diab and Jordan, Source 1 allegedly attended quarterly all-personnel meetings with both executives. *Id.* ¶ 100. At one in 2020, Source 1 told Diab and Jordan that certain markets, like Washington D.C., were "really bad for attrition" in part because it was "so difficult to attract and retain clinicians." *Id.* What's more, at another meeting—the timing of which is not alleged—Source 1 allegedly heard Diab give a "spiel" about "the need to recruit and retain clinicians to support the Company's growth." *Id.* Finally, according to Source 1, ATI officers and directors had access to or requested the weekly reports that she received on company-wide attrition. *Id.* ¶ 99. These same ATI officers and directors supposedly also had access to the centralized applicant-tracking database that might have clued them in to attrition problems. *Id.* ¶ 101.

Source 2 is another former talent acquisition specialist, who worked at ATI from October 2020 to August 2021. Am. Compl. ¶ 81. Source 2 corroborates some of the Source-1 allegations. *Id.* Source 2 oversaw the onboarding of physical therapists. *Id.* This source allegedly also noticed an elevated attrition rate of 41% in late-2020 and in 2021, driven by worse pay and hours compared to other companies. *Id.* ¶¶ 81–82. Indeed, Source 2 supposedly heard Coco acknowledge retention problems at an

HR department lunch in either November or December 2020 or January or February 2021. *Id.* ¶ 81. While not directly about Diab or Jordan, this last allegation suggests that the executive leadership was aware of problems with attrition in the months leading into the merger. After all, it would be strange for only the Chief Human Resources Officer, but not the CEO or CFO, to know about significantly increased attrition. Relatedly, Source 7, another former ATI talent acquisition manager, worked at ATI from June 2015 to August 2020, and adds some corroboration for Source 2's allegations. Source 7 allegedly also heard Coco say—sometime after Coco joined the company—that hiring was a "critical priority." *Id.* ¶ 84.

Switching gears slightly, Source 4 was a senior financial analyst from October 2017 to December 2020 who worked for Mike Yates, Director of Financial Planning & Analysis, and then Trang Fransen, Director of Corporate Finance. Am. Compl. ¶ 86. Both Yates and Fransen reported to Senior Vice Presidents who, in turn, reported to Jordan (the CFO). *Id.* Source 4 was responsible for providing business-segment analysis and recommendations, as well as business-operations forecasts. *Id.* ¶ 103. Source 4 also allegedly noticed increased attrition in 2020. *Id.* ¶¶ 87–88, 104. But more importantly, Source 4 allegedly prepared monthly slide-decks for ATI's executive leadership, including a monthly scorecard with a chart showing a trend line detailing the climbing attrition rates throughout the whole year of 2020. *Id.* ¶¶ 103–04. This attrition-rate chart was allegedly prepared for Diab and Jordan and "presented to Jordan, the Board of Directors, and other executives." *Id.* This last allegation speaks to Jordan's knowledge of attrition leading up to the start of the merger

and suggests—though less firmly—that Diab also knew of materials showing wors-

ening attrition throughout 2020.

Source 5, a former sales director from March 2016 to March 2021, also alleg-

edly observed the physical-therapist attrition rate reaching around 40% because em-

ployees were overworked. Am. Compl. ¶¶ 70, 77–78. But the allegations based on

Source 5 do not speak to scienter. But Source 6, a former clinic director, allegedly had

monthly calls at the end of 2020 or beginning of 2021 with the then-COO Ray Wahl,

who said that ATI needed to "hold onto people because employees were leaving at an

alarming rate," which was "starting to impact the service that ATI was able to provide

to patients." *Id.* ¶ 83. Once again, this allegation, though not directly about Jordan

or Diab, does go some way to show that the executive leadership of ATI was aware of

heightened attrition, which was impacting operations in the lead up to the merger.

The point again is that it would be exceedingly strange for the COO to know about

high attrition while the CEO and CFO remained oblivious.

With that summary in place, the Court can explain the relative discount and

value assigned to the allegations from the anonymous sources. When viewed collec-

tively these allegations (1) reinforce and corroborate each other; (2) are detailed

enough for a reader to understand the roles of the sources as well as the nature and

timing of their observations; and (3) come from individuals who would—by the nature

of their former responsibilities, positions, and reporting structures—know about the

facts pleaded. The ATI Defendants still argue that the confidential-source pleadings

are insufficient because none of the confidential sources, they contend, had direct

contact with Diab and Jordan and because mere "access to information" is not enough to satisfy the scienter standard. ATI Defs.' Br. at 22–24.

To the first point, some of the confidential sources do allege direct contact. Specifically, Source 1 spoke directly to Diab and Jordan about harmful attrition in certain markets and heard Jordan give a "spiel" about recruitment and retention. *Id.* ¶ 100. Also, Sources 2 and 5 directly heard other members of the ATI executive team—the CHRO and COO respectively—recognize that the company was suffering from heightened attrition in the time leading into the merger. *Id.* ¶¶ 81, 83. And Source 4's monthly scorecards with heightened attrition were allegedly presented directly to Jordan. *Id.* ¶¶ 103–04. But more importantly, extensive direct contact is not necessary, nor are outright "smoking-gun" allegations. *See Tellabs*, 551 U.S. at 324. In practical terms, it would have been quite a feat for the Plaintiffs to have turned high-level executives into informants, so it makes sense that the Plaintiffs rely—at this pleading stage—on lower-level former employees who had less day-to-day facetime with Diab and Jordan. *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d at 711. ("Because the Reform Act requires detailed fact pleading of falsity, materiality, and scienter, the plaintiff's lawyers in securities-fraud litigation have to conduct elaborate pre-complaint investigations—and without the aid of discovery, which cannot be conducted until the complaint is filed.").

On the defense argument about access to information, it is true that "a complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information."

*Cornielsen v. Infinium Cap. Mgmt.*, *LLC*, 916 F.3d 589, 602 (7th Cir. 2019). But here, the confidential-source allegations are not merely that Diab and Jordan just had access to databases or reports documenting poor attrition numbers. Rather, the two executives also allegedly received materials explicitly documenting the problem and they—or their fellow high-level executives—talked about the problem to employees, among them some of the confidential sources cited in the Amended Complaint. Am. Compl. ¶¶ 83–84, 100, 103–04. For all that, it is true that the allegations are not very precise as to the exact timing of each event or fact described; that they would be more compelling with the names and identities of sources; and that the direct contact between Diab, Jordan, and the confidential sources was not frequent. Still, for the reasons already explained, these confidential-source allegations are credible and provided sufficiently particularized information. So the sources will be weighed—with discounts for anonymity and other flaws identified—along with other allegations to determine whether an inference of scienter is cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Tellabs*, 551 U.S. at 314. But before doing that, one more point should be made right now—about McKnight.

The confidential-source allegations barely touch on the possible knowledge attributable to McKnight. Instead, the scienter allegations outlined above concentrate on Diab, Jordan, or others in the pre-merger ATI executive C-suite and board of directors. McKnight is not alleged—in particularized detail—to have had access to attrition-rate information in the months leading into the merger. For instance, the Plaintiffs argue that McKnight would have received the monthly scorecard from

45

Source 4. Pls.' Resp. at 29. But as laid out above, Source 4 only allegedly prepared scorecards detailing climbing attrition rates for the year 2020. Am. Compl. ¶¶ 103–04. Indeed, Source 4 is only alleged to have been employed by ATI until December 2020. *Id.* ¶ 86. McKnight, by contrast, is not alleged to have been part of the ATI executive team or Board of Directors during 2020. Rather, he is alleged to have been the "CEO of FVAC before it completed the merger with ATI." *Id.* ¶ 33. So, the argument that he would have seen slide-decks from Source 4 prepared for ATI executives and directors during 2020 is contradicted by the Plaintiffs' own allegations. *See id.* ¶¶ 103–04. The same holds true for the Plaintiffs' argument that they sufficiently alleged that McKnight received internally distributed weekly reports with ATI's attrition rates. Pls.' Resp. at 29. All that is pleaded is that the "Company's officers and directors, including [McKnight] had access to and/or received an internally distributed weekly report." Am. Compl. ¶ 99. That is not particularized enough. There is no allegation to explain how or when McKnight would have had access to *internal* ATI reports as the CEO of FVAC.[14] In short, the confidential-source allegations do not favor an inference of scienter on the part of McKnight.

### 3. Departures of Executives and the SEC Investigation

The final category of scienter allegations concerns the (1) termination of Diab and resignation Coco on August 7 and July 23 of 2021, respectively, after the conclusion of the merger and (2) the receipt by ATI of a voluntary request from the SEC for

---

[14]McKnight is correct that—contrary to the Plaintiffs' arguments, *see* Pls.' Resp. at 29 n.9—the amended complaint does not include any allegation that he was privy to internal documents like the weekly attrition reports even with a confidentiality agreement signed for purposes of the SPAC transaction.

documents about the company's July 26 Form 8-K and related matters. Am. Compl. ¶¶ 112, 116, 185–86. The ATI Defendants argue that the allegations do not detail why these departures or the SEC investigation would support an inference of scienter. ATI Defs.' Br. at 25. The Plaintiffs respond that the departures of these executives happened so close to the disclosure of negative attrition trends on July 26 for the second quarter of 2021 that the inference is that Diab and Coco were being held responsible for the until-then undisclosed attrition problem. Pls.' Resp. at 31–32. The Plaintiffs also argue—though not extensively—that an SEC investigation can be indicative of scienter. *Id.* at 32.

Although the Seventh Circuit has not yet addressed the probative value of a termination or resignation, the Ninth Circuit has explained that "[a]bsent allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009), *as amended* (Feb. 10, 2009). The Ninth Circuit's approach makes sense. Allegations must provide enough detail, in the form of suspicious circumstances for instance, to infer that the terminations are tied to misrepresentations. In this case, the timing of the departures do provide some support to an inference of scienter.

The allegations here are that Coco resigned and Diab was terminated suddenly and with no advance notice to ATI employees. Am. Compl. ¶ 185. The departures are alleged to have happened very close to July 26, when—after the merger—ATI disclosed that attrition had prevented it from being able to meet demand in the second quarter of 2021 and that it was reducing its full-year revenue and EBITDA projections, as well as its estimate for new clinic openings for 2021. *Id.* ¶ 111. Indeed, ATI allegedly announced Coco's resignation—with little explanation—along with these negative disclosures. *Id.* ¶ 112. And it is additionally alleged that the ATI post-merger board of directors terminated Diab because "it [was] the right time for a leadership change," yet the company had not selected a replacement as CEO, not even an interim one. *Id.* ¶ 116. Those allegations are sufficient to lend modest support to an inference of scienter because they raise suspicious circumstances, namely, the timing was close to the date of negative disclosures; the generic language of the resignation and termination announcements; the lack of advance warning to the organization and its employees; and that there was no CEO replacement, not even an interim one, suggesting a rushed decision. If there were a benign reason for the departures, then ATI failed to share them publicly. So the Plaintiffs have "alleged sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco Partners*, 552 F.3d at 1002. That said, the extent of the impact of these termination/resignation allegations to each relevant individual defendant is different. They are weightier as to Diab because he was the executive terminated. Less for Jordan because they are not particular to him, though scienter applicable to Diab (and

Coco) logically covers—to some extent—the rest of the high-level executive team who would be working together to manage the company. And lastly, they do not impact McKnight because his particularized involvement in the running of ATI before or after the merger is not alleged.

Unlike the termination/resignation allegations, those addressing the SEC investigation are few. Basically, they are that ATI received a voluntary request from the SEC for the production of documents related to the July 26 Form 8-K, which included the negative disclosures about attrition rates in the second quarter of 2021. Am. Compl. ¶ 186. Almost no additional context is provided. They thus furnish little support for an inference of scienter as to any Defendant.

### 4. Strong Inference of Scienter

Having examined the relative value of the scienter, the final question is whether "*all* the facts alleged, taken collectively, give rise to a strong inference of scienter" while taking "into account plausible opposing inferences." *Tellabs*, 551 U.S. at 322–23. The answer is that the collective allegations do raise a strong inference as to Diab and Jordan, but not McKnight. In summary, although the motive allegations do not support a strong inference as to any Defendant, the allegations based on the experiences of the confidential sources do strongly suggest that Diab and Jordan knew about physical-therapist attrition problems negatively impacting ATI leading into the merger. It is true that those confidential-source allegations are insufficient as to McKnight. But they are sufficiently credible and particularized as to Diab and Jordan. All the more so because providing physical therapy is and was the core of ATI

49

Physical Therapy's business. Given the allegations, it seems unlikely that the then-CEO and CFO (top executives) of ATI would not have known about a significant, worsening problem—ultimately disclosed to the market—of such importance to the company's core service of providing therapy: a lack of enough physical therapists. The resignation of Coco and termination of Diab lend additional support to this inference. Those alleged sudden departures took place under suspicious circumstances and happened around the time that negative attrition numbers were first disclosed to the market, after the close of the merger.

There are opposing inferences favoring Diab and Jordan, but they are not nearly as compelling as the inference of scienter. For instance, the lack of alleged motive, as well as the problems identified with the confidential-source allegations—including anonymity—support an inference that Diab and Jordan did not know about high attrition negatively impacting ATI. But "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. And again, the allegations that speak to Diab's and Jordan's knowledge of worsening attrition, coupled with the suspicious departures of Diab and Coco, as well as the core nature of physical-therapist retention to ATI's business, support a strong inference of scienter—one that is cogent and more compelling than any opposing inference one could draw from the facts alleged.

Relatedly, the Court has considered the alternative inference posited by the ATI Defendants: that Diab and Jordan could have reasonably believed that the attrition problem was not serious or widespread and could be easily repaired, in part,

because COVID-19 "was wreaking havoc on, among other things, the labor market across the United States." ATI Defs.' Br. at 25. This possible inference is not as compelling as the inference of scienter for the same reasons as the inference that Diab and Jordan simply did not know about heightened attrition. The allegations are that they were presented or had access to information that the attrition problem was getting worse and worse leading into the merger. This was a problem that Diab and Jordan seemed (allegedly) to have recognized given their communications—as well as the communications of their peers in the C-suite—to the ATI workforce, including the confidential sources, directly urging efforts to concentrate on improving physical-therapist retention. Plus, again, there are the suspiciously timed departures of the head of HR and Diab when the problem of heightened attrition affecting operations and financial projections was disclosed to the market. Finally, it *is* likely that the pandemic contributed to physical-therapist attrition, but the "havoc" it wreaked lends greater or at least the same amount of support to an inference of scienter as compared to an inference that Diab and Jordan thought the problem was not serious and would quickly dissipate—how could they have reasonably known that pandemic-induced pressures on the U.S. labor market would soon ease? Indeed, the ATI Defendants do not explain how the COVID-19 pandemic supports an inference favorable to Diab and Jordan. *See* ATI Defs.' Br. at 25.

In all, taking the allegations as true and collectively, there is a strong inference of scienter as to Diab and Jordan. Accordingly, the Plaintiffs successfully pleaded corporate scienter attributable to ATI. *See Pugh v. Trib. Co.*, 521 F.3d 686, 697 (7th

Cir. 2008) ("A corporation may be held liable for statements by employees who have apparent authority to make them."). This also means, of course, that the Plaintiffs sufficiently pleaded, for purposes of their alleged omission under SEC Item 303, knowledge of a high-attrition trend by Diab and Jordan. *See supra* Section III.A.5. Conversely, the Plaintiffs have fallen far short of pleading a strong inference of scienter as to McKnight. So the Section 10(b) claim against McKnight is dismissed, as is the accompanying Section 20(a) claim against him (Count 2), which is contingent on his liability under Section 10(b). *See Walleye Trading LLC v. AbbVie Inc.*, 962 F.3d 975, 977 (7th Cir. 2020) (explaining that liability under Section 20(a) is contingent upon liability under Sections 10(b), or another Section like 14(e)).

### C. Loss Causation

The next argument made by the ATI Defendants for dismissal of the Section 10(b) claim against them[15] is that the allegations on the October 19, 2021 disclosure fail to establish loss causation, because that disclosure supposedly did not reveal anything about the alleged fraud—namely, that high physical-therapist attrition was concealed from investors. ATI Defs.' Br. at 27–28. In short, the ATI Defendants contend that there is no causal connection between that disclosure and the alleged loss occasioned by the supposed fraud. Consequently, the defense asks that the Section 10(b) claim against them be partially dismissed.

---

[15]McKnight also advances this loss-causation argument, FVAC Defs.' Br. at 7, but it is moot given that the Section 10(b) claim against him has already been dismissed for a failure to plead scienter.

Unlike scienter, however, loss causation requires only ordinary notice pleading, meaning that the Plaintiffs' burden is not great. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The Plaintiffs still must provide a defendant "with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.*

Given that low bar, the Plaintiffs sufficiently plead a causal connection between the October 19 corrective disclosure and the alleged fraud. Specifically, they plead that, on October 19, ATI announced that it was further lowering its projected 2021 full-year revenue, as well as EBITDA. That downward adjustment was allegedly accompanied by disclosures that ATI "implemented targeted measures that *reduced* clinical staff attrition" and "made progress toward *restoring* FTEs with ATI hiring roughly 2 clinicians for every 1 departure in August and September 2021." Am. Compl. ¶ 118 (emphases added). The amended complaint further alleges that the downward adjustment of projections was due to "lower visit volume" linked to the need "to invest[] in [ATI's] field sales force." *Id.* ¶ 15. Drawing reasonable inferences in favor of the Plaintiffs, these statements *are* about continued efforts to address what had been previously allegedly concealed: high attrition and a related lack of staff. In essence, the statements constitute an admission that retention continued to cause operational problems and financial losses important to investors, and that ATI is thus implementing measures—like hiring two clinicians for every one that leaves—to *restore* its numbers and *reduce* attrition. So, Plaintiffs sufficiently pleaded loss causation as to the October 19 disclosure.

### D. Section 14(a)

Moving on, the Defendants—together—argue that heightened-pleading requirements apply to the Section 14(a) and Rule 14a–9 proxy-statement claims (Count 3) made against all of them. ATI Defs.' Br. at 29; FVAC Defs.' Br. at 7, 13 n.9. "To state a claim under Section 14(a), a plaintiff must allege: (i) that the proxy statement contained a material misstatement or omission that (ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction." *Kuebler*, 13 F.4th at 637. On the first requirement, "[p]laintiffs must identify each statement alleged to have been misleading, the reason why each statement was misleading, and all relevant facts supporting that conclusion. *Id.* at 638 (citing 15 U.S.C. § 78u-4(b)(1)). Again—as the ATI Defendants acknowledge—"[t]here is no required state of mind for a violation of section 14(a)." *Beck*, 559 F.3d at 682 ("A proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials.") (cleaned up).

The amended complaint satisfies all these pleading requirements. As previously explained, *see supra* Section III.A., the Plaintiffs sufficiently pleaded, with particularity under the PSLRA, material misstatements and an omission that survive dismissal. In addition, the Defendants do not argue that the alleged material statements and omission have not caused injury or that that the proxy solicitation was not an essential link in accomplishing the merger. So the Section 14(a) claims survive.

### E. Section 20(a)

Finally, the two separate sets of Defendants advance distinct arguments against the Section 20(a) controlling-person-liability claims against Diab and Jordan on the one hand, and all FVAC Defendants on the other. First, Diab and Jordan argue that the Section 20(a) claims against them in Counts 2 and 4 fail because the Plaintiffs fail to plead primary violations under Sections 10(b) or 14(a). ATI Defs.' Br. at 30. But as already explained, the Plaintiffs do sufficiently plead Sections 10(b) and 14(a) claims against both executives. So, the Section 20(a) claims against them also survive.

Separately, the FVAC Defendants contend that the Section 20(a) claims against them should be dismissed because (1) they are derivative of failed Section 14(a) claims and because (2) the Plaintiffs do not sufficiently allege general and specific control by the FVAC Defendants over the issuance of proxy statements tied to the SPAC merger. FVAC Defs.' Br. at 13–15. On the first point, the Section 14(a) claims against the FVAC Defendants have survived, so a lack of primary-claim liability would not be a reason to dismiss. But the Plaintiffs altogether failed to respond to the FVAC Defendants' arguments. Pls. Resp. at 35. So the Plaintiffs have forfeited any counterargument. The Count 4, Section 20(a) claims against the FVAC Defendants—McKnight and the seven former directors of FVAC—are dismissed. *See Bonte*, 624 F.3d at 466.

## IV. Conclusion

The Defendants' motions to dismiss are granted in part and denied in part. Specifically, for Count 1, the Section 10(b) claims against ATI, Diab, and Jordan survive, but the same claim against McKnight is dismissed. Similarly, for related Count 2, the Section 20(a) claims against Diab and Jordan survive, but the claim against McKnight is dismissed. For Count 3, the Section 14(a) claims against all Defendants survive. And finally, for Count 4, the Section 20(a) claims against Diab and Jordan survive, but are dismissed as to all other Defendants.[16]

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: September 6, 2023

---

[16]As explained earlier, the following alleged misstatements form the basis for the surviving claims: the statements that ATI had "very high retention" and "low turnover" of its physical therapists, and "high retention" and "strong retention" of employees; the state-of-clinic statements that ATI "continues to match its clinical staffing levels accordingly" and was "on track" to meet its 2021 target for new clinics; the cautionary statements; and the alleged omission under Item 303 of the supposedly known trend that ATI "was suffering attrition rates among its clinical staff that were materially greater than the industry average." *See supra* Section III.A.