EFiled: Feb 10 2023 03:54PM EST
Transaction ID 69129451
Case No. 2023-0142-LWW

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| WENDELL ROBINSON, <br><br> Plaintiff, <br><br> v. <br><br> FORTRESS ACQUISITION SPONSOR II, LLC, ANDREW. A. MCKNIGHT, JOSHUA A. PACK, MARC FURSTEIN, LESLEE COWEN, AARON F. HOOD, CARMEN A. POLICY, RAKEFET RUSSAK-AMINOACH, SUNIL GULATI, DANIEL N. BASS, MICAH B. KAPLAN, and LABEED DIAB, <br><br> Defendants. | C.A. No. 2023-0142-LWW <br><br> **PUBLIC VERSION** <br> **Efiled: February 10, 2023** |

## VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT

Plaintiff Wendell Robinson, ("Robinson" or "Plaintiff"), by and through his attorneys, on behalf of himself and all other similarly situated stockholders of ATI Physical Therapy, Inc. ("FAII" or the "Company"), brings the following Verified Stockholder Class Action Complaint (the "Complaint") in connection with a de-SPAC merger, through which FAII brought Wilco Holdco, Inc. ("Legacy ATIP"), an outpatient physical therapy provider company that was incorporated in Delaware, public on June 16, 2021 (the "Merger").[1]

---

[1] To be clear, "FAII" and the "Company" refer to the publicly traded corporation formerly known as "Fortress Value Acquisition Corp. II" that changed its name to ATI Physical Therapy, Inc., following the challenged Merger. "Legacy ATIP" refers to the pre-Transaction privately held company that FAII acquired through the Merger.

{01880439;v1 }                                    2

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief developed from the investigation and analysis of Plaintiff's counsel, including without limitation: (i) a review of FAII's internal books and records produced in response to Plaintiff's demand for books and records pursuant to Title 8 Section 220 ("Section 220") of the Delaware General Corporation Law Code; (ii) an assessment and analysis of complaints and other filings in federal court; (iii) a review and analysis of information filed with the Securities and Exchange Commission (the "SEC"); and (iv) press releases, news articles, and other information made available to the public.

## I. PRELIMINARY STATEMENT

1. Plaintiff asserts claims for breach of fiduciary duty against defendants Fortress Acquisition Sponsor II, LLC ("Sponsor"), Joshua A. Pack ("Pack"), Andrew A. McKnight ("McKnight"), Marc Furstein ("Furstein"), Leslee Cowen ("Cowen"), Aaron F. Hood ("Hood"), Carmen A. Policy ("Policy"), and Rakefet Russak-Aminoach ("Russak-Aminoach"), Sunil Gulati ("Gulati"), Daniel N. Bass ("Bass"), and Micah B. Kaplan ("Kaplan") (collectively, the "Insiders") and an aiding and abetting count against Labeed Diab ("Diab" and together with the Insiders, the "Defendants"). Relevant non-defendant is Fortress Investment Group, LLC ("Fortress").

{01880439;v1 }

3

2.      This action challenges the Insiders' breaches of their fiduciary duties in connection with the Merger, and Diab's aiding and abetting of the same.  To serve their own personal financial interests, Defendants arranged an unfair merger transaction to the detriment of Plaintiff and the Class. Collectively, the Defendants stood to benefit from tens of millions of dollars in windfall gains from their so-called "Founder Shares" upon the closing of the Merger.  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ Of course, as a provider of rehabilitation services, Legacy ATIP's recruitment and retention of enough physical therapists to satisfy demand is essential to its success and growth.

████████████████████████████████████████

███████████████████████████

3.      Sponsor, acting through its principals and agents, had formed FAII as a special purpose acquisition vehicle (or "SPAC") exclusively and expressly for, as described in the Definitive Proxy, "the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses."

{01880439;v1 }

4

4.      On June 15, 2020, Sponsor acquired 8,625,000 shares of Class F common stock ("Founder Shares") totaling 100% of outstanding Class F common stock for $25,000. The Founder Shares would automatically convert into Class A shares upon consummation of a merger with a target company.

5.      These Founder Shares created a manifest conflict of interest for the Defendants. If FAII achieved a business combination within two years of the initial public offering ("IPO"), these Founder Shares would convert into shares of FAII's common stock, likely to be valued at approximately $10.00 per share. In the absence of a business combination, however, the Founder Shares would have been worthless. Accordingly, the Founder Shares gave the Defendants a powerful personal economic incentive to secure almost any business combination, regardless of whether the transaction was fair to FAII's public stockholders.

6.      On June 16, 2021, the Merger was consummated. The truth emerged immediately after the Merger. On July 26, 2021, FAII filed a Form 8-K with the SEC (the "July 2021 8-K"). FAII slashed its projections because of physician attrition and COVID-19, even though the Board had allegedly conducted "significant due diligence" and chose to represent that Legacy ATIP has "high retention rates" and is "an attractive place to work." FAII almost halved its adjusted EBITDA guidance from $119 million to a range of $60 to $70 million and revealed

{01880439;v1 }

that it could only open between 55 and 65 new clinics in 2021, which was much less than the 90 clinics it had told stockholders it would open.

7. In reaction to this announcement, the trading price of FAII's stock plummeted downward, continuing to trade below its pre-Merger price:



8. Analysts were outraged. For example, a Barrington Research report stated that the analyst was "[s]hocked by what has unfolded" at FAII and recognized that FAII had no "good defense for why the company's original guidance (which was officially maintained up until yesterday) ever made sense."

9.      In the July 2021 8-K, FAII also announced that officer Cedric Coco "resigned from the Company" effective July 23, 2021. Then, on August 9, 2021, through a Form 8-K, FAII announced that Diab stepped down as CEO and from the Board of Directors. Shortly thereafter, the SEC commenced an investigation concerning the contents of the July 2021 8-K.

10.     Ultimately, Defendants' misrepresentations and omissions of material facts concerning Legacy ATIP's business prevented FAII's public stockholders from making a fully informed decision on whether to approve the Merger or redeem their shares at approximately $10 per share.  Current FAII stockholders now hold shares in the post-Merger FAII that is presently worth less than $.50 per share.  Plaintiff and the Class are entitled to recovery.

11.     In addition, FAII was one of several SPAC vehicles operating under the Fortress brand.  Pack, McKnight, Furstein, Cowen, Hood, and Policy were each fiduciaries of other Fortress blank-check companies.  These Defendants' interests in, and fiduciary duties to, other SPAC vehicles created additional conflicts of interest when pursuing a business combination for FAII.  Indeed, to ensure the success of the fundraising activities of those SPAC vehicles, it was imperative for the Defendants to secure a business combination for FAII quickly, while avoiding a mass redemption by FAII's public stockholders.

{01880439;v1 }

7

12.    It is reasonably inferable that the entire Board also owed fiduciary duties to Sponsor because its members were directors, partners, and officers of Sponsor, a Delaware entity.  As a result of the Board's fiduciary duties to Sponsor and its Founder Shares, its members were conflicted dual fiduciaries.

13.    By contrast, FAII's public stockholders purchased shares of FAII's Class A common stock ("Class A Common Stock") for approximately $10.00 per share.  FAII's Class A Common Stock carried redemption rights. These rights gave public stockholders the option of redeeming their shares at the purchase price plus interest or remain invested in FAII through the initial business combination. A high percentage of redemptions would have had a negative impact on FAII's ability to close the Merger and the Insiders' ability to attract other investors for their other SPACs. If, however, the Defendants successfully secured a business combination, their Founder Shares and the public stockholders' existing Class A Common Stock would have had identical market valuations. Stockholders who wanted to redeem their shares had to do so by June 11, 2021 (the "Redemption Date").

14.    Upon closing an initial business combination, the 8,625,000 Founder Shares held by the Sponsor, if valued based on the closing price of $9.99 per share

of FAII Class A Common Stock on the New York Stock Exchange ("NYSE") on May 10, 2021, would be valued at approximately $86,163,750.[2]

15. Before the redemption period expired, holders of 8,987,746 shares of ATIP Class A Common Stock reflecting approximately 26% of the outstanding Class A Common Stock, exercised their right to redeem their shares for cash at a redemption price of $10.00 per share, for an aggregate redemption amount of approximately $89.9 million. Approximately 74% of the stockholders chose not to redeem, and approximately $84 million worth of FAII shares could have been, but were not, redeemed.

16. On June 16, 2021, the Merger was consummated pursuant to the Agreement and Plan of Merger that was entered into on February 21, 2021 (the "Merger Agreement").

17. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████.

---

[2] After giving effect to the conversion of such Founder Shares into shares of FAII Class A Common Stock.

{01880439;v1 }

18. As of the time of this filing, FAII's stock price has lost over 95% of its value.

19. Defendants' actions robbed stockholders of the ability to make a valid and fully informed decision when voting on the Merger and determining whether to redeem their FAII shares at $10 per share. In breach of their fiduciary duties to FAII's stockholders, the Defendants elevated their own personal financial interests in achieving *any* business combination over their obligation to secure a fair transaction for FAII's public stockholders. All Defendants omitted or materially misrepresented facts concerning Legacy ATIP. As a result, Plaintiff and the Class have suffered millions of dollars in damages.

20. Plaintiff now brings this direct action against Defendants to remedy their misconduct in connection with the Merger.

## II. PARTIES

### A. Plaintiff

21. Plaintiff Robinson acquired FAII shares before the Merger, held FAII shares at the time of the Transaction, and is a current FAII stockholder.

### B. Defendants

22. *Sponsor*. Sponsor (Fortress Acquisition Sponsor II, LLC) is a Delaware Limited Liability Company and the sponsor of FAII. At the time of the Merger, Sponsor owned approximately 19.7% of FAII's issued shares, including all

{01880439;v1 }

10

the Founder Shares. Leading up to the Merger, Sponsor, together with four of FAII's allegedly independent directors, beneficially owned, on an as-converted basis, approximately 20% of FAII Common Stock and had the right to elect all of FAII's directors prior to the consummation of the Merger as a result of holding all of the Founder Shares. The Definitive Proxy stated that on the day of the Merger, Sponsor's sole owner would transfer all its Founder Shares to Fortress Credit Funds.[3] In other words, the Sponsor was designed for Fortress Credit Funds, including Fortress and the Fortress Insiders, to reap the Founder Shares windfall.

23.    *Joshua Pack*.  Pack was the FAII Chairman of the Board leading up to the Merger. Pack was also Sponsor's Managing Partner from August 2020 to at least June 2021. Before the Merger, Pack was the Chairman of the Fortress Value Acquisition Corp. ("FVAC I") board between April 2020 and FVAC's I consummation of a business combination in November 2020. Pack was also the Chairman of the Fortress Value Acquisition Corp. III ("FVAC III") board since January 2021, was a director on the Fortress Value Acquisition Corp. IV ("FVAC IV") board, and at the time of the Merger, was expected to be Chief Executive Officer of FVAC IV. Pack is a Managing Partner of the Credit Funds business at

---

[3] The Definitive Proxy vaguely defines "Fortress Credit Funds" as "[v]arious investment funds managed by affiliates of the Sponsor." However, the Definitive Proxy does indicate that certain FAII officers and directors who are affiliated with Fortress have rights to distributions of profit made by certain Fortress Credit Funds.

{01880439;v1 }

Fortress. ██████████████████████████████████████████████

████████████████████████████████

24.     *Andrew McKnight*. McKnight was FAII's Chief Executive Officer and a director on the FAII Board at the time of the Merger. McKnight was also Sponsor's Chairman and Managing Partner from August 2020 to at least June 2021. McKnight also was on the board of directors and was the Chief Executive Officer of FVAC I since its inception in January 2020. Additionally, McKnight was a director and Chief Executive Officer of FVAC III since its inception in August 2020. At the time of the Merger, he was expected to be Chairman of the FVAC IV board. McKnight is a Managing Partner of the Credit Funds business at Fortress. At the time of the Merger, McKnight headed the liquid credit investment strategies at Fortress, was on the investment committee for the Credit Funds business at Fortress and was a member of the Management Committee of Fortress. ████████████████████████

████████████████████████████████████████████████████

███████.

25.     *Leslee Cowen*. Cowen was a FAII director at the time of the Merger. Cowen was also a director of Sponsor from August 2020 to June 2021. Additionally, Cowen was as a director of FVAC III since January 2021. At the time of the Merger, Cowen was expected to be a director of FVAC IV. Cowen was a Managing Director in the Credit Funds business at Fortress, co-head of the liquid credit investment

{01880439;v1 }

strategies, and a member of the investment committee. Cowen also was on the Management Committee of Fortress. ███████████████████████████

██████████████████████████████████████████████

26.    *Aaron Hood*.  Hood was a FAII director at the time of the Merger. In addition, Hood was a director of FVAC I between its inception in January 2020 and its consummation of a business combination in November 2020. Hood was a director of Sponsor from August 2020 to June 2021. In August 2020, Sponsor transferred 25,000 Founder Shares to Hood for the same per-share price initially paid by Sponsor. On October 1, 2020, FVAC I filed Amendment No. 1 to Form S-4 Registration Statement (the "FVAC I S-4") with the SEC that indicated Hood had 25,000 of FVAC I's founder shares in its merger. ██████████████████

██████████████████████████████████████████████

██████████████████████████████

27.    *Carmen Policy*.  Policy was a FAII director at the time of the Merger. Policy was also a director of FVAC I between June 2020 and its consummation of a business combination in November 2020. Policy was also a director of Sponsor from August 2020 to June 2021. In August 2020, Sponsor transferred 25,000 Founder Shares to Policy for the same per-share price initially paid by Sponsor. The FVAC I S-4 also indicated that Policy had 25,000 of FVAC I's founder shares.

{01880439;v1 }

13

28. ***Marc Furstein***. Furstein was a FAII director at the time of the Merger. Furstein was also Sponsor's President from August 2020 to at least June 2021. Furstein has been a director of FVAC III since January 2021, and the time of the Merger, he was expected to be a director of FVAC IV. Furstein was the President of Credit Funds at Fortress and was also a member of the firm's Management Committee. ████████████████████████████████████████

████████████████████████████████████████

29. ***Rakefet Russak-Aminoach***. Russak-Aminoach was a FAII director at the time of the Merger. Russak-Aminoach was also a director of Sponsor from August 2020 to June 2021. In August 2020, Sponsor transferred 25,000 Founder Shares to Russak-Aminoach for the same per-share price initially paid by Sponsor.

30. ***Sunil Gulati***. Gulati was a FAII director at the time of the Merger. Gulati was also a director of Sponsor from August 2020 to June 2021. In August 2020, Sponsor transferred 25,00 Founder Shares to Gulati for the same per-share price initially paid by Sponsor. ████████████████████████████

████████████████████████████████████████

████████.

31. ***Daniel Bass.*** Bass was FAII's Chief Financial Officer leading up to the Merger. Bass also was the Chief Financial Officer of FVAC I between its inception its inception in January 2020 and its consummation of a business combination in

{01880439;v1 }

14

November 2020. Additionally, Bass was the Chief Financial Officer of FVAC III since its inception in August 2020, was the Chief Financial Officer of Fortress Capital Acquisition Corp. since September 2020. As of the Definitive Proxy's filing, Bass was expected to be the Chief Financial Officer of FVAC IV. █████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Bass has been Fortress' Chief Financial Officer since 2003. ██████████████████████████████████████

██████████████████████████████████████.

32. ***Micah Kaplan.*** Kaplan was FAII's Chief Operating Officer at the time of the Merger. Kaplan also was the Chief Operating Officer of FVAC I between its inception in January 2020 and its consummation of a business combination in November 2020, was the Chief Operating Officer of FVAC III since its inception in August 2020. As of the Definitive Proxy's filing, Kaplan was expected to be the Chief Operating Officer of FVAC IV. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ Kaplan was the Managing Director in the Corporate Debt and Securities

---

[4] Capitalization removed.

{01880439;v1 }

15

Group at Fortress. ███████████████████████████████████

███████████████████████████████

33.     Pack, McKnight, Cowen, Hood, Policy, Furstein, Russak-Aminoach, and Gulati are collectively referred to as the "Board." Pack, McKnight, Cowen, Furstein, Bass, and Kaplan are collectively referred to as the "Fortress Insiders."

34.     ***Labeed Diab.*** Leading up to the Merger, Diab was Legacy ATIP's Chief Executive Officer and board member.

### C. Relevant Non-Defendant

35.     ***Fortress.*** Fortress is a Delaware LLC and is a global investment manager. Fortress indirectly owns all of the outstanding equity interest in Sponsor, and, at the time of the Merger, may be deemed to have beneficially owned the shares of common stock directly held by Sponsor. Since 2010, Fortress entities were lenders to Legacy ATIP. Indeed, the Definitive Proxy touted that "affiliates of the Sponsor have been in regular contact with [Legacy ATIP's] management for over ten years in the context of managing those affiliates' investments and staying up-to-date on [Legacy ATIP's] industry, volume and pricing trends. Affiliates of the Sponsor have also attended earnings calls with [Legacy ATIP's] management to discuss [Legacy ATIP's] financial performance multiple times per year." Leading up to the Merger, Legacy ATIP was indebted to Fortress entities for nearly $6 million. The Fortress entities were first-lien lenders to Legacy ATIP.

## III.   DEFENDANTS ORCHESTRATED AN UNFAIR MERGER

### A. The Founder Shares Rendered the FAII Board Conflicted

36.     FAII was incorporated on June 10, 2020, as a Delaware corporation. On June 15, 2020, FAII issued an aggregate of 8,625,000 Founder Shares to the Sponsor for an aggregate purchase price of $25,000, or approximately $0.003 per share.

37.     After FAII's IPO was consummated in August, 2020, FAII searched for prospective businesses to acquire. Pack, McKnight, Bass, and other Sponsor representatives, along with representatives of each of FAII's financial advisors, BofA Securities, Inc. and Deutsche Bank Securities Inc., contacted, and were contacted by, a number of individuals and entities with respect to potential business combination opportunities.

38.     If the Merger or another business combination was not consummated by August 14, 2022, FAII would have ceased all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares for cash and, subject to the approval of its remaining stockholders and the FAII Board, dissolving and liquidating.

39.     In such event, the 8,625,000 Founder Shares held by the Insiders, which were acquired for an aggregate purchase price of $25,000 by Sponsor prior to FAII's IPO, would be worthless because the holders are not entitled to participate in any redemption or distribution with respect to such shares. Such Founder Shares, if

{01880439;v1 }

valued based on the closing price of $9.99 per share of FAII Class A Common Stock on the NYSE on May 10, 2021, would be valued at approximately $86,163,750.

40. In exchange for serving on the FAII Board, each of FAII's allegedly independent directors, Hood, Policy, Russak-Aminoach and Gulati, received an economic interest through the purchase from Sponsor of 25,000 Founder Shares at their original purchase price of $0.003 per share and subject to certain vesting and forfeiture provisions. Such Founder Shares, if valued based on the closing price of $9.99 per share of FAII Class A Common Stock on the NYSE on May 10, 2021, would be valued at approximately $249,750 (after giving effect to the conversion of such Founder Shares into shares of ATI Class A Common Stock). If FAII had failed to complete a business combination by August 14, 2022, these Founder Shares would have become worthless.

41. The entire Board had deep ties to the Founder Shares, thus making them hopelessly conflicted:

| Defendant | FAII's Founder Shares Conflict |
| --- | --- |
| Sponsor | On June 15, 2020, Sponsor acquired 8,625,000 Founder Shares for $25,000. |
| Pack | Pack was Sponsor's Managing Partner. Pack's principal occupation was with Fortress, the entity that would receive the Sponsor's Founder Shares after the Merger. |

| McKnight | McKnight was Sponsor's Managing Partner and Chairman. McKnight's principal occupation was with Fortress, the entity that would receive the Sponsor's Founder Shares after the Merger. |
|---|---|
| Cowen | Cowen was a Sponsor director. Cowen's principal occupation was with Fortress, the entity that would receive the Sponsor's Founder Shares after the Merger. |
| Hood | Hood was a Sponsor director and personally owned 25,000 Founder Shares. |
| Policy | Policy was a Sponsor director and personally owned 25,000 Founder Shares. |
| Furstein | Furstein was Sponsor's President. Furstein's principal occupation was with Fortress, the entity that would receive the Sponsor's Founder Shares after the Merger. |
| Russak-Aminoach | Russak-Aminoach was a Sponsor director and personally owned 25,000 Founder Shares. |
| Gulati | Gulati was a Sponsor director and personally owned 25,000 Founder Shares. |

42.     Accordingly, half of FAII's Board had direct ownership of Founder Shares, thus making half the Board conflicted. In addition, every FAII director was a reasonably inferable dual fiduciary owing fiduciary duties to Sponsor, thus making the whole Board conflicted.[5]

---

[5]

**B. The Board Was Packed With Deep Fortress Loyalists**

43.     The Fortress SPACs are always packed with the same friendly directors to ensure that Fortress's financial interests are protected.

44.     As shown in the chart below, the FAII Board members had directorships on other Fortress SPAC boards and have close Fortress connections:

{01880439;v1 }

| FAII Director | Fortress SPACs | | | Fortress |
| --- | --- | --- | --- | --- |
| | FVAC I | FVAC III | FVAC IV | |
| Pack | Chairman | Chairman | Director<br>CEO | Managing Partner of Credit Funds<br><br>Management Committee |
| McKnight | Director<br>CEO | Director<br>CEO | Chairman | Managing Partner of Credit Funds<br><br>Management Committee |
| Furstein | | Director | Director | Credit Funds President<br><br>Management Committee |
| Cowen | | Director | Director | Managing Director of Credit Funds |
| Hood | Director | | | N/A<br><br>However, Hood had 25,000 Founder Shares in FAII and 25,00 founder shares in FVAC I's merger |
| Policy | Director | | | N/A<br><br>However, Policy had 25,000 Founder Shares in FAII and 25,000 founder shares in FVAC I's merger |

45. ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

███████████

## C. The Unfair Deal Process

46.      Since March 2010, various Fortress entities had been lenders to Legacy ATIP. As a result, Sponsor's affiliates have been in regular contact with Legacy ATIP's management for over ten years in the context of managing those affiliates' investments and staying up to date on Legacy ATIP's industry, volume and pricing trends. Sponsor's affiliates have also attended earnings calls with Legacy ATIP's management to discuss Legacy ATIP's financial performance multiple times per year. In addition, Sponsor's affiliates, in their lender roles, have periodically reached out to Legacy ATIP's management to obtain interim insight into certain unusual circumstances.

47.      As of December 31, 2020, Fortress entities held approximately $6 million of first lien indebtedness of Legacy ATIP as lenders under a first lien credit agreement.

48.      As part of the search for a merger partner, FAII representatives allegedly considered and evaluated over 197 potential acquisition targets. FAII only

signed two non-binding letters of intent in respect of two potential targets, one of which was Legacy ATIP.

49. FAII purportedly decided to pursue an acquisition of Legacy ATIP because it determined that Legacy ATIP represented a compelling opportunity because of, *inter alia*, its strong leadership team, impressive *de novo* growth effort, and position to continue its *de novo* growth.

50. On December 13, 2020, FAII and Legacy ATIP entered into a confidentiality agreement (the "Confidentiality Agreement"), which allowed the Board and its agents to have extensive access to Legacy ATIP internal documents.

51. On December 14, 2020, representatives of Legacy ATIP, Barclays Capital Inc. ("Barclays"), Citigroup Global Markets, Inc. ("Citigroup"), and FAII held a videoconference during which representatives of Legacy ATIP provided an overview of Legacy ATIP and its industry.

52. On January 4, 2021, representatives of FAII, Fortress, and Advent International Corporation ("Advent") held a call to discuss the possibility of a transaction between FAII and Legacy ATIP.

53. On January 8, 2021, McKnight, a Barclays representative, and a Citigroup representative, held a call to further discuss the possibility of a transaction between FAII and Legacy ATIP, and it was agreed that Barclays, at Legacy ATIP's direction, would begin preparing an initial draft of a term sheet to be entered into

{01880439;v1 }

23

between FAII and Legacy ATIP with respect to a potential transaction and to outline, *inter alia*, non-binding terms for the transaction along with binding exclusivity on Legacy ATIP.

54. On February 21, 2021, FAII and Legacy ATIP entered into the "Merger Agreement.

55. ███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████

56. On February 22, 2021, just a few months after FAII went public, FAII announced in a Form 8-K that it would combine with Legacy ATIP. On this day, FAII also filed a presentation with the SEC stating that Legacy ATIP projected an adjusted EBITDA of $119 million in 2021 and stated it expected $175 million in adjusted EBITDA in 2022, with a "[c]lear [p]ath to $200+ million of [adjusted] EBITDA and [b]eyond." It also projected $731 million and $903 million in revenue for 2021 and 2022 respectively.

57. Part of this "clear path" was that Legacy ATIP had a "[d]eep pipeline to support 90+ de novo clinics in 2021." The presentation also claimed that "De Novo [new clinic location openings] are Highly Accretive & Predictable." Legacy

{01880439;v1 }

ATIP, according to the presentation, was "[b]uilt [f]or [s]calability" with "[c]ontinued improvements in clinical labor management model . . . ." Legacy ATIP also "enhanced" itself by developing an "[a]ccelerated staffing strategy."

58. On February 22, 2021, FAII led an investor presentation, in which Defendants Diab and McKnight were the main participants. The transcript contained many remarks touting Legacy ATIP's staffing. Defendant Diab claimed that Legacy ATIP had "strong historical growth and momentum" that has come through "same store growth De Novo growth, and M&A." He also said that "we have identified an additional 900 clinics that can be opened over the next ten years." Defendant Diab also boasted that Legacy ATIP has "very high retention, low turnover."

59. On March 12, 2021, FAII filed a Form PREM14A Preliminary Proxy Statement with the SEC (the "Preliminary Proxy").  Among the material factors that the FAII Board allegedly considered as supporting approval of the Merger, the Preliminary Proxy listed Legacy ATIP's "Attractive Recruiting and Retention Capabilities" as compared to other companies in the industry, "which allows the Company to recruit and retain talent."

60. On April 1, 2021, FAII filed Schedule 14A with the SEC ("April 2021 Presentation"). Therein, FAII indicated that Legacy ATIP had "[s]trong [r]etention."

The April 2021 Presentation included the following slide claiming that Legacy ATIP "is the Employer of Choice for PT Clinicians":



61.     On May 20, 2021, FAII filed a press release with the SEC announcing Legacy ATIP's financial results for the first quarter ended March 31, 2021. Therein, Diab remarked that Legacy ATIP was "on track to achieve our de novo development targets for the year" after opening fourteen new clinics.

62.     On May 24, 2021, FAII filed a Schedule 14A with the SEC touting that Legacy ATIP has a "[d]eep pipeline to support 90+ de novo clinics in 2021."

63.     The Definitive Proxy indicated that a waivable condition to the Merger

{01880439;v1 }

was that FAII needed at least $472.5 million in its trust account to close the Merger after taking into account redemptions.

64. Before the redemption period expired, holders of 8,987,746 shares of ATIP Class A Common Stock, reflecting approximately 26% of the outstanding Class A Common Stock, exercised their right to redeem their shares for cash at a redemption price of $10.00 per share, for an aggregate redemption amount of approximately $89.9 million. The Definitive Proxy represented that the maximum value of potential redemptions was $173.9 million, thus indicating that approximately $84 million worth of redemptions could have been, but were not, redeemed.

65. On June 16, 2021, the Merger was consummated pursuant to the Merger Agreement.

**D. The Definitive Proxy's Representations**

66. Certain critical Definitive Proxy representations centered around three main topics: (i) FAII's due diligence for the Merger (the "Due Diligence Representations"); (ii) Legacy ATIP's staffing and retention rates (the "Staffing Representations"); and (iii) Legacy ATIP's growth prospects and valuation (the "Growth Representations").

67. First, the FAII Board touted its due diligence for the Merger. Specifically, the FAII Board represented that its "significant" due diligence was a

material factor supporting its decision to enter the Merger:

> *Due Diligence*. FAII's management and advisors conducted significant due diligence examinations of the Company, including by: performing commercial and legal due diligence, engaging a healthcare regulatory consultant to perform billing due diligence, and hiring other third-party advisors to perform due diligence on insurance and financial matters[.]

68. To a similar effect, the FAII Board assured FAII stockholders that it had a pre-existing relationship with Legacy ATIP that made it knowledgeable of Legacy ATIP:

> *Pre-Existing Relationship*. The fact that certain funds affiliated with FAII have served as lenders to the Company since March 2010 and, as a result, have been in regular contact with the Company's management for over ten years in the context of managing those affiliates' investments and staying up-to-date on the Company's financial and operating performance, as well as overall industry outlook[.]

69. Moreover, the FAII Board also claimed that it considered its "thorough review" of other potential combinations to be a material factor supporting its decision to enter the Merger:

> *Other Alternatives*. The FAII Board believes, after a thorough review of other business combination opportunities reasonably available to FAII, that the proposed Business Combination represents the best potential business combination for FAII and the most attractive opportunity for FAII's management to accelerate its business plan based upon the process utilized to evaluate and assess other potential acquisition targets, and the FAII Board's belief that such process has not presented a better alternative[.]

70. Second, the FAII Board touted that Legacy ATIP had strong staffing and retention rates throughout the Definitive Proxy. Specifically, Definitive Proxy

represented that Legacy ATIP has:

"historically been able to realize high retention rates" and

"favorable clinician retention rates[.]"

71.     The FAII Board claimed that it "considered" Legacy ATIP's attractive recruiting and retention capabilities to be a "material" factor supporting its decision to enter the Merger:

> *Attractive Recruiting and Retention Capabilities*. The belief that the Company is considered an attractive place to work compared to others in its industry, which allows the Company to recruit and retain talent.

72.     Indeed, the Definitive Proxy indicated that labor costs and recruitment issues were merely hypothetical future risks that "may" occur:

> "If [Legacy ATIP] cannot recruit and retain its base of experienced and clinically skilled therapists and other clinical providers, management and support personnel, its business **may** decrease and its revenues **may** decline."

> "The Company **may** also experience increases in its labor costs, primarily due to higher wages and greater benefits required to attract and retain qualified healthcare personnel, and such increases **may** adversely affect the Company's profitability."

> Legacy ATIP's "facilities face competition for experienced physical therapists and other clinical providers that **may** increase labor costs and reduce profitability."

(Emphases added).

73.     As a provider of rehabilitation services, Legacy ATIP's recruitment and retention of enough physical therapists to meet patient demand is essential to its

{01880439;v1 }

29

success and growth. Thus, the Staffing Representations were obviously of material importance to the stockholders.

74. Third, the FAII Board included financial projections in the Definitive Proxy. The Definitive Proxy represented that the projections were the "best available." The projections presented to the ATIP unaffiliated stockholders were as follows:

| (USD in millions) | Forecast Year Ended December 31, (1) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| **Revenue** | $ 731 | $ 903 | $1,007 | $1,122 | $1,242 |
| Clinic-level expenses | $ 525 | $ 636 | $ 708 | $ 788 | $ 871 |
| *% of revenue* | *71.8%* | *70.5%* | *70.3%* | *70.2%* | *70.1%* |
| SG&A & non-controlling interest | $ 87 | $ 92 | $ 96 | $ 99 | $ 103 |
| *% of revenue* | *11.9%* | *10.2%* | *9.5%* | *8.9%* | *8.3%* |
| **Adjusted EBITDA(2)** | $ 119 | $ 175 | $ 203 | $ 235 | $ 268 |
| *% margin* | *16.3%* | *19.3%* | *20.2%* | *20.9%* | *21.6%* |
| **Cash flow items** | | | | | |
| Maintenance capital expenditures | $ 27 | $ 27 | $ 30 | $ 34 | $ 37 |
| *% of revenue* | *3.6%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* |
| Growth capital expenditures(3) | $ 25 | $ 31 | $ 34 | $ 34 | $ 34 |
| Free cash flow conversion(4) | 77.3% | 84.5% | 85.1% | 85.6% | 86.1% |

75. According to these projections, Legacy ATIP would generate $731 revenue in 2021 and have an adjusted EBITDA of $119 in 2021.

76. The FAII Board also touted Legacy ATIP's growth prospects and valuation as a material factor supporting its decision to enter the Merger:

> *Industry and Growth Prospects*. The belief that the Company has significant growth opportunities over and above recovery from the impacts of the COVID-19 pandemic with multiple levers for growth (including organic growth, acquisitions, acqui-novos, de novos and direct partnerships with employers) . . . .

> *Valuation*. The belief that the Business Combination presents an attractive investment opportunity at the agreed valuation based on extensive due diligence and FAII's careful investigation of the Company. . . . FAII believes that this attractive valuation is partially

enabled by the economic effects resulting from the COVID-19 pandemic, which FAII does not believe will have a long-term impact on the Company. . . .

*Strategy.* The belief that the Company has successfully implemented its long-term growth strategy, including through the continued improvement of the Company's clinical labor management model, which it believes will allow providers to practice at the top of their respective licenses, as well as the Company's robust de novo program, through which the Company has opened approximately 300 new clinics since Advent ownership and demonstrated what FAII believes is an impressive performance record . . . .

the FAII Board noted that the Company is well-positioned for strong future growth[.]

77. In seeking the unaffiliated stockholders' approval and discouraging them from redeeming their stock, the FAII Board advised stockholders that the Merger was in their "best interests."

78. In sum, FAII stockholders were assured through the Definitive Proxy, *inter alia*, that:

    a. FAII's Board considered "extensive" and "significant" due diligence for the Merger;

    b. FAII's Board conducted a "thorough review" of other potential business combinations, and found no others of superior merit to the Merger;

    c. funds affiliated with FAII have stayed "update-to-date" on Legacy ATIP's "financial and operating performance" for the past ten years;

{01880439;v1 }

31

d. Legacy ATIP had "[a]ttractive [r]ecruiting and [r]etention [c]apabilities";

e. staffing problems "may" occur in the future, *i.e.,* had not already manifested;

f. the Board considered Legacy ATIP's attractive and recruiting and retention abilities to be a material factor supporting its decision to enter into the Merger Agreement;

g. Legacy ATIP was projected to have in 2021 revenue of $731 million and an EBITDA of $119 million;

h. Legacy ATIP had strong "[g]rowth [p]rospects;

i. the effects of COVID helped instead of hurt Legacy ATIP's valuation;

j. Legacy ATIP had "successfully implemented its long-term growth strategy" including its "labor management model" and "de novo" growth; and

k. Legacy ATIP was "well-positioned for strong future growth."

**E. The Truth Emerges**

79. On July 26, 2021, approximately a month after the Merger was consummated, FAII filed the July 2021 8-K. FAII cut its projections because of physician attrition and almost halved its adjusted EBITDA guidance from $119 million to a range of $60 to $70 million. FAII also decreased its 2021 revenue

{01880439;v1 }

32

projection to $640-$670 million. FAII revealed that it could only open 55-65 new clinics in 2021, a fraction of the 90 clinics it had told stockholders it would open. FAII attributed its cut to significant attrition among its physical therapists, a competitive hiring market, and COVID-19 related concerns.

80. Analysts were outraged. For example, a Barrington Research report decried that the analyst was "[s]hocked by what has unfolded" at FAII. Barrington further recognized that FAII lacked any "good defense for why the company's original guidance (which was officially maintained up until yesterday) ever made sense."

81. In reaction to, *inter alia*, the July 2021 8-K, FAII stock was sent spiraling downwards, thereby confirming that the Merger was nowhere close to being entirely fair:



82.     On August 16, 2021, FAII filed a 10-Q with the SEC. Therein, FAII

stated that the following factors were harming its performance:

•The attrition of our workforce caused, in part, by changes made during the COVID-19 pandemic related to compensation, staffing levels and support for clinicians. We have taken swift actions to offset those changes, but the company expects the impact of attrition will impact overall profitability for the year.

•Labor market dynamics increased competition for the available physical therapy providers in the workforce, creating wage inflation and elevated employee attrition at [FAII], negatively affecting our ability to capitalize on continued customer demand.

•Decrease in rate per visit primarily driven by continuing less favorable payor and state mix when compared to pre-pandemic profile, with

{01880439;v1 }

34

general shift from workers compensation and auto personal injury to commercial and government, and further impacted by mix-shift out of higher reimbursement states.

83.     Then, on October 19, 2021, FAII filed another Form 8-K with the SEC. FAII announced that it had to further reduce its adjusted EBITDA guidance to a range of $40 to $44 million (from $60 to $70 million) due to "lower visit volume," which FAII expressly linked to the need to "invest[] in our field sales force" to "driv[e] visit growth." FAII reduced its 2021 revenue projection to $620-$640 million.

84.     On March 1, 2022, FAII filed its annual report on Form 10-K (the "2021 10-K") with the SEC. The 2021 10-K revealed that FAII had an adjusted EBITDA of $39.7 million, thus falling far short of the Definitive Proxy's projected $119 adjusted EBITDA.  It also revealed that FAII generated approximately $628 million in net operating revenue, thus falling more than $100 million short of the Definitive Proxy's projections.

**F.  The Merger Spawned Litigation**

85.     On February 8, 2022, a federal securities fraud class action complaint was filed against, *inter alia*, the Board concerning its members' misrepresentations pertaining to the Merger (the "Federal Complaint"). *See Burbige v. ATI Physical Therapy, Inc.*, 1:21-CV-04349 (N.D. Ill. 2022). The Federal Complaint cited and/or quoted multiple anonymous former employees of Legacy ATIP. For example,

{01880439;v1 }

35

several former Legacy ATIP employees noted that Legacy ATIP actually had an attrition rate of approximately 41% during the time frame surrounding the Merger, which the Federal Complaint showed to be far from a favorable rate.

86. The Federal Complaint also alleged that the Legacy ATIP Board of Directors was aware of its attrition problems but failed to disclose them to the unaffiliated stockholders. In fact, the Federal Complaint also cites an anonymous witness stating that FAII's Board "had access to and/or received an internally distributed weekly report that detailed, among other things, the attrition rate among physical therapists." Rather than present the FAII stockholders with the reality, the FAII Board falsely stated that Legacy ATIP had "high retention rates" and "favorable clinician retention rates" in the Definitive Proxy. The Board filed a motion to dismiss the Federal Complaint, but it has not been adjudicated. The Federal Complaint does not appear to have made any use of any Section 220 investigation.

87. On November 21, 2022, a redacted amended derivative complaint against, *inter alia*, the Board directors was filed (the "Federal Derivative Complaint"). *See Reginbald, derivatively on behalf of ATI Physical Therapy, Inc. v. Fortress Acquisition Sponsor II LLC*, No. 1:23-cv-5111 (N.D. Ill. 2022). Similar to the Federal Complaint, the Federal Derivative Complaint indicated that the FAII Board made materially misleading disclosures to FAII unaffiliated stockholders in

{01880439;v1 }

connection with the Merger, including disclosures centering on attrition issues. Unlike the Federal Complaint, a substantial amount of the Federal Derivative Complaint is redacted from the public.

**G. The Definitive Proxy Was Materially Misleading**

88. ███████████████████████████████████████████████
███████████████████████████████████████████████
█████████

89. ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

---

[6] Like the Insiders, Gillette was deeply conflicted. Gillette was FAII's General Counsel, but he also was the Deputy General Counsel and a Managing Director of Fortress. Additionally, Gillette was the General Counsel of FVAC III since its inception in August 2020 and, at the time of the Merger, was expected to serve as General Counsel of FVAC IV.

{01880439;v1 }

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

90. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████.

91. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

{01880439;v1 }

38

███████████████████████████████████████████████████████

████████████████████████████████████

92.   ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████  ███████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████

93.   ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████



94. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

95. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

96. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

97.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

98.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████



99. █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████



100. ██████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████

101. ██████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████

102. ███████████████████████████████████████████████

{01880439;v1 }



103. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████

104. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

105. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



106. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

107. ████████████████████████████████████████████████

██████████████████████████████████████████



108.

109.



110. ██████████████████████████████████

██████████████████████

111. ████████████████████████████

112.

113.

114.

<sup></sup>

---

[8] *See e.g.*, Merger Agreement, Section 6.3(b) ("Each of [FAII] and [Legacy ATIP] shall furnish all required information concerning it as may reasonably be requested by the other Party in connection with the preparation, filing, and distribution, as applicable, of the Proxy Statement and any other filing required to be made by [FAII] in respect of the [Merger].").

[9] *See e.g.,* Merger Agreement, Section 6.8 (d) ("At a reasonable time prior to the filing, issuance or other submission or public disclosure of any reports to be filed with the SEC . . . [Legacy ATIP] shall be given an opportunity to review and comment upon such filing, issuance or other submission and give its prior written consent to the form thereof, such consent not to be unreasonably withheld,

115. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

## IV.    CLASS ALLEGATIONS

116. Plaintiff brings this action individually and pursuant to Court of Chancery Rule 23 on behalf of similarly situated record and beneficial FAII stockholders who were entitled to, but did not, redeem their FAII shares prior to the Transaction (the "Class").

117. This action is properly maintainable as a class action.

118. A class action is superior to other available methods of fair and efficient adjudication of this controversy.

---

conditioned or delayed, and [FAII] and Merger Sub shall accept and incorporate all reasonable comments from [Legacy ATIP] with respect thereto prior to filing, issuance, submission or disclosure thereof.").

119. The Class is so numerous that joinder of all members is impracticable. According to documents filed with the SEC, tens of millions of FAII shares were not redeemed in connection with the Merger. Thus, on information and belief, the Class here potentially includes hundreds, if not thousands, of FAII stockholders.

120. There are questions of law and fact which are common to all Class members, including, without limitation:

    a.    Whether the Board was disinterested and independent with respect to the Merger;

    b.    Whether any of the Defendants controlled FAII or the Merger;

    c.    Whether the Merger was entirely fair to FAII stockholders;

    d.    Whether the Definitive Proxy contained material misstatements and omissions;

    e.    Whether the Board breached its fiduciary duties to Plaintiff and the Class;

    f.    The existence and extent of any injury to the Class or Plaintiff caused by any breach; and

    g.    The proper measure of the Class's damages.

121. Plaintiff's claims are typical of the claims of other Class members, and Plaintiff has no interests antagonistic or adverse to the interests of other Class members. Plaintiff will fairly and adequately protect the interests of the Class.

122. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

{01880439;v1 }

50

123.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

124.    Defendants have acted in a manner that affected Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

125.    Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

126.    Indeed, as a challenge to a merger transaction in which Defendants are alleged to have made the same misleading disclosures to all stockholders, who subsequently suffered the same harm when they did not seek redemption of their shares, there are no individualized issues that undermine class certification here.

## COUNT I

### Direct Count for Breach of Fiduciary Duty
### Against the Insiders

127. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

128. To be clear, Count I asserts a claim against every defendant except Diab.

129. From the time of the IPO through the Merger, the Insiders controlled FAII and its evaluation of the Merger. Indeed, the Definitive Proxy stated that the Insiders "hold a controlling interest in FAII until the consummation of [the Merger and] control the composition of the FAII Board until [the Merger]."

130. As controlling stockholders, the Insiders owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty in their capacity as FAII officers and directors. These duties required them to, *inter alia*, place the interests of FAII stockholders above their own unique personal interests.

131. The Insiders exercised their control to secure a Merger that was unfair to FAII stockholders. The Merger significantly overvalued Legacy ATIP's business and the Insiders secured stockholder approval with false and misleading material statements.

132. In addition, McKnight was FAII's CEO and President. As a result, McKnight personally managed and was responsible for conducting FAII's business

{01880439;v1 }

52

affairs. McKnight had a responsibility to ensure that FAII, as a SPAC, found an appropriate target company and carried out a de-SPAC transaction for the benefit of FAII and its stockholders.

133. At all relevant times, the Insiders had the power to control, influence, and cause—and actually did control, influence, and cause—FAII to enter the Merger.

134. The Insiders advanced, made, and/or approved the Due Diligence Representations, the Staffing Representations, and/or the Growth Representations, which were false and materially misleading.

135. The Merger was unfair, reflecting an unfair price and unfair process.

136. Through the events and actions described herein, the Insiders breached their fiduciary duties to Plaintiff and the Class by agreeing to, and entering into, the Merger without ensuring that it was entirely fair.

137. As a result, Plaintiff and the Class were harmed by not exercising their redemption rights prior to the Merger.

138. In addition, members of the Class approved the acquisition of Legacy ATIP based on false and misleading information.

139. As a result, Plaintiff and the Class were harmed by these breaches of fiduciary duty, including by failing to redeem their shares prior to the Merger.

140. Plaintiff and the Class do not have an adequate remedy at law.

## COUNT II

### Direct Count for Breach of Fiduciary Duty
### Against The Board

141. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

142. As FAII directors, the Board Defendants each owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty. These duties required them to, *inter alia*, place the interests of FAII stockholders above their own unique personal interests and those of the other Defendants.

143. As FAII directors, the Board Defendants had a responsibility to ensure that FAII found an appropriate target company, carried out a business combination based on fair terms, and approved a transaction only if it was in the best interests of FAII stockholders.

144. In addition, McKnight owed fiduciary duties to FAII's stockholders in his capacity as an officer, including the duties of loyalty and care.

145. The Merger was unfair to FAII stockholders, reflecting an unfair price and an unfair process. The Board Defendants failed to disclose (or otherwise misrepresented) material facts regarding the Merger and the Legacy ATIP business.

146. Through the events and actions described herein, the Board Defendants breached their fiduciary duties to FAII stockholders prior to the Merger, thus

impairing stockholders' ability to make an informed decision on whether to redeem their shares.

147. The Board Defendants made, advanced, and/or approved the Due Diligence Representations, the Staffing Representations, and/or the Growth Representations, which were false and materially misleading.

148. As a result, Plaintiff and the Class were harmed by having to decide whether to redeem their shares without all material information concerning the fairness of the Merger.

149. Plaintiff and the Class do not have an adequate remedy at law.

## COUNT III

**Direct Count for Aiding and Abetting Breach of Fiduciary Duty**
**Against Diab**

150. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

151. Although Diab did not owe fiduciary duties to Plaintiff and the Class prior to the Merger closing, he was aware of the fiduciary duties and obligations of the Insiders and the Board. Indeed, Diab himself was a director of a Delaware corporation, so he should have known of the fiduciary duties that directors owe to stockholders. This includes their duties of loyalty and due care.

152. Diab knowingly made, approved, and/or perpetuated falsehoods and materially misleading statements (in the Definitive Proxy and other public statements).

153. Plaintiff and the Class were damaged by Diab's aiding and abetting of the fiduciary breaches described herein.

154. Plaintiff and the Class have no adequate remedy at law.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and relief in his favor and in favor of the Class, and against Defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action;

B.    Certifying the proposed Class;

C.    Declaring or otherwise finding that the Defendants breached their fiduciary duties to FAII stockholders;

D.    Awarding Plaintiff and other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

E.    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and expert witness fees and other costs; and

F.    Awarding Plaintiff and the Class such other relief as this Court deems just and equitable.

{01880439;v1 }

56

ASHBY & GEDDES, P.A.

*/s/ Tiffany Geyer Lydon*

*Of Counsel:*

LEVI & KORSINSKY, LLP
Donald J. Enright
(*pro hac vice motion forthcoming*)
Noah R. Gemma
(*pro hac vice motion forthcoming*)
1101 30th Street, N.W., Suite 115
Washington, DC 20007

_____
Stephen E. Jenkins (#2152)
Richard D. Heins (#3000)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19801

*Attorneys for Plaintiff*

Dated:  February 7, 2023