# EXHIBIT A

**EFiled: Jun 02 2023 03:03PM EDT**
**Transaction ID 70131338**
**Case No. 2023-0142-NAC**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| WENDELL ROBINSON,<br><br>Plaintiff,<br><br>v.<br><br>FORTRESS ACQUISITION SPONSOR II, LLC, ANDREW. A. MCKNIGHT, JOSHUA A. PACK, MARC FURSTEIN, LESLEE COWEN, AARON F. HOOD, CARMEN A. POLICY, RAKEFET RUSSAK-AMINOACH, SUNIL GULATI, DANIEL N. BASS, MICAH B. KAPLAN, and LABEED DIAB,<br><br>Defendants. | Case No.: 2023-0142-NAC<br><br>**PUBLIC VERSION**<br>**Filed: June 2, 2023** |

### PLAINTIFF'S OMNIBUS ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

ASHBY & GEDDES, P.A.
Stephen E. Jenkins (#2152)
Richard D. Heins (#3000)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19801

*Attorneys for Plaintiff*

{01911892;v1 }

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT**……………………………………………...……1

**STATEMENT OF FACTS**……………………………………………………..7

    A.  The Insiders Arranged For The Merger To Have Unique
         Benefits For Themselves . ……………………………………………..7

    B.  ███████████████████████████ . . ……..9

    C.  ███████████████████ . . …………………… 10

    D.  Defendants Hyped The Merger Based On False Premises
         And Materially Misleading Omissions…………...…………………...12

    E.  The Board Failed To Implement Basic Procedural Safeguards……………..13

    F.  ████████████████████…………………14

    G.  The Materially Misleading Definitive Proxy…………………………………16

    H.  The Post-Merger Company's Board Finally Disclosed The Truth ……….. .18

**ARGUMENT** …………………………………………………………………19

    I.  **THE MOTION TO DISMISS STANDARD** ………………………….. . 19

    II. **THE MERGER WAS NOT ENTIRELY FAIR** ……………………….. . 21

        A. **The Entire Fairness Standard Of Review Applies**………..…….…21

            1.  The Merger Preserved The Insiders' Unique
                Founder Shares…………………………………………...……..21

2.  The Insiders Had Mismatched Incentives……..…………… ...……..24

3.  The Whole Board Was Conflicted…………….…………………….29

**B. Defendants Have Failed To Demonstrate That The Merger
   Was Entirely Fair** …………………………………………………… 32

1.  The Merger Price Was Unfair….. …………………………………...32

2.  The Merger Process Was Unfair……………………………………..33

    a.  FAII Made Several Staffing Representations ………… …………35

    b.  FAII Made Several Misrepresentations Concerning
        Legacy ATIP's Growth ……………………………………… …....46

    c.  FAII Made Several Due Diligence Misrepresentations……..…….53

III. **THE BOARD'S DISCLOURE VIOLATIONS ARE
    NOT EXCULPATED UNDER DELAWARE LAW**…………………...….56

IV. **DIAB AIDED AND ABETTED THE BREACHES**……… …………..…….60

**CONCLUSION**………………………………………………………………..64

{01911892;v1 }

# TABLE OF AUTHORITIES

*Albert v. Alex Brown Mgmt. Servs.*,
2005 WL 2130607 (Del. Ch. Aug. 26, 2005)…………..……..…………….35

*Appel v. Berkman*,
180 A.3d 1055 (Del. 2018)…………………………..……36, 42, 55, 58

*AP Servs., LLP v. Lobell*,
2015 WL 3858818 (N.Y. Sup. Ct. 2015)…………………………………22

*Arnold v. Soc'y for Sav. Bancorp., Inc.*,
650 A.2d 1270 (Del. 1994)……………………………………………….47

*Brophy v. Jiangbo Pharms., Inc.*,
781 F.3d 1296 (11th Cir. 2015)……………………...……………..…………63

*Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, LLC*,
27 A.3d 531(Del. 2011)………………………………………………..20

*Chen v. Howard Anderson*,
87 A.3d 648 (Del. Ch. 2014)……………………………………………..60

*Clark v. Davenport*,
2019 WL 3230928 (Del. Ch. May 2, 2019)………………………………60

*Delman v. GigAcquisitions3, LLC*,
288 A.3d 692 (Del. Ch. 2023)………………..…………..……21-25, 44, 53

*Eisenberg v. Chicago Milwaukee Corp.*,
537 A.2d 1051 (Del. Ch. 1987)…………………………………………….34

*Emerald Partners v. Berlin*,
2003 WL 21003437 (Del. Ch. Apr. 28, 2003)……………………………22

*Firefighters' Pension Sys. v. Presidio, Inc.*,
251 A.3d 212 (Del. Ch. Jan. 29, 2021)………………..…………………..44

{01911892;v1 }

iii

*Frank v. Elgamal,*
2012 WL 1096090 (Del. Ch. Mar. 30, 2012)……………….....……….4, 29-31

*Franklin Balance Sheet Inv. Fund v. Crowley,*
2006 WL 3095952 (Del. Ch. Oct. 19, 2006)……………………..…21, 36, 47

*Gilbert v. El Paso Co.,*
490 A.2d 1050 (Del. Ch. 1984)……………………..…………………61

*Goldstein v. Denner,*
2022 WL 1671006 (Del. May 26, 2022)…......................................…..43

*Gradient OC Master, Ltd. v. Universal, Inc.,*
930 A.2d 104 (Del. Ch. July 12, 2007)……………………………..……….56

*Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.,*
2014 WL 1813340 (Del. Ch. May 7, 2014)…...……………………………….32

*Hughes v. Xiaoming Hu,*
2020 WL 1987029 (Del. Ch. Apr. 27, 2020)…………..……………...42, 55

*In re Columbia Pipeline Grp., Inc.,*
2021 WL 772562 (Del. Ch. Mar. 1, 2021)…………....……………....7, 59, 61

*In re Cornerstone Therapeutics, Inc.,*
115 A.3d 1173 (Del. 2015)……………………..……………………56

*In re Crimson Expl. Inc. S'holder Litig.,*
2014 WL 5449419 (Del. Ch. Oct. 24, 2014)……………..…………..…21

*In re Del Monte Foods Co. S'holders Litig.,*
25 A.3d 813 (Del. Ch. 2011)………………………………………..61

*In re Dole Food Co, Inc. S'holder Litig.,*
2015 WL 5052214 (Del. Ch. Aug. 15, 2015)………………………..61

{01911892;v1 }

iv

*In re Ebix, Inc. Stockholder Litig.,*
    2014 WL 3696655 (Del. Ch. July 24, 2014)…………………………...…57

*In re Gen. Elec. Co. Sec. Litig.,*
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)……………………………………58

*In re Gen. Motors S'holders Litig.,*
    734 A.2d 611 (Del. Ch. 1999)…………………………………...…….57

*In re GGP, Inc. Stockholder Litig.,*
    2021 WL 2102326 (Del. Ch. May 25, 2021)……………...……………...…55

*In re Hansen Med., Inc. S'holder Litig.,*
    2018 WL 3030808 (Del. Ch. June 18, 2018)……………….………………6, 58

*In re Orchard Enters., Inc. S'holder Litig.,*
    88 A.3d 1 (Del. Ch. 2014)…………………………………………………..34

*In re Mindbody, Inc. S'holder Litig.,*
    2023 WL 2518149 (Del. Ch. Mar. 15, 2023)………………………………..61

*In re Multiplan Corp. Stockholders Litig.,*
    268 A.3d 784 (Del. Ch. 2022)…………………………………….4, 24, 32-34

*In re P3 Health Grp. Holdings, LLC,*
    2022 WL 15035833 (Del. Ch. Oct. 26, 2022)…………………..………..52

*In re Rural Metro Corp. S'holder Litig.,*
    88 A.3d 54 (Del. Ch. 2014)………………………………………...…44, 60

*In re Tesla Motors, Inc. Stockholder Litig.,*
    2020 WL 553902 (Del. Ch. Feb. 4, 2020)…………………………...…4, 31

*In re TIBCO Software Inc. S'holders Litig.,*
    2015 WL 6155894 (Del. Ch. July 23, 2015)………………………………...61

*In re Tyson Foods, Inc. Consol. S'holder Litig.,*
    919 A.2d 563 (Del. Ch. 2007)……………………………………42, 55, 59

{01911892;v1 }

v

*In re Xura, Inc. S'holder Litig.*,
　　2018 WL 6498677 (Del. Ch. Dec. 10, 2018)…………………….………..42

*Ira Trust FBO Bobbie Ahmed v. Crane*,
　　2017 WL 7053964 (Del. Ch. Dec. 11, 2017)………………..……..4, 22, 24

*Klein v. H.I.G. Capital, L.L.C.*,
　　2018 WL 6719717 (Del. Ch. Dec. 19, 2018)……..………...…….21, 22, 32

*Laidlaw v. GigAcquisitions2, LLC*,
　　2023 WL 2292488 (Del. Ch. Mar. 1, 2023)…………..….……….25, 28-29

*Manti Holdings, LLC v. Carlyle Grp. Inc.*,
　　2022 WL 1815759 (Del. Ch. June 3, 2022)…………….……......4, 21, 24

*Morrison v. Berry*,
　　191 A.3d 258, 287 (Del. 2018)……………….…….……..34, 39-42

*Orman v. Cullman*,
　　794 A.2d 5 (Del. Ch. Feb. 26, 2002)……………………………...22, 23, 30

*Pfeffer v. Redstone*,
　　965 A.2d 676 (Del. 2009)………………………………………......34, 44

*Pharmathene, Inc. v. Siga Techs., Inc.*,
　　2008 WL 151855 (Del. Ch. Jan. 16, 2008)…………………………….23

*Reith v. Lichtenstein,*
　　2019 WL 2714065 (Del. Ch. June 28, 2019)…………………...……21

*Salladay v. Lev*,
　　2020 WL 954032 (Del. Ch. Feb. 27, 2020).…………………………..29, 32

*Savor, Inc. v. FMR Corp.*,
　　812 A.2d 894 (Del. 2002)…………………………………….……19, 20

{01911892;v1 }

vi

*Silverberg v. Padda*,
 2019 WL 4566909 (Del. Ch. Sep. 19, 2019)……………………………..…..31

*Thor Merritt Square, LLC v. Bayview Malls LLC*,
 2010 WL 972776 (Del. Ch. Dec. 16, 2009)……………………...….21, 37, 48

*Thorpe v. CERBCO, Inc.*,
 611 A.2d 5 (Del. Ch. 1991)…………...……………………………………….63

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
 28 F. Supp. 3d 93 (D. Mass. 2014)………………………………………..59

{01911892;v1 }

vii

Plaintiff Wendell Robinson ("Plaintiff") respectfully submits this Answering Brief in opposition to the Insiders' and Diab's motions to dismiss (the "Motions").[1]

## PRELIMINARY STATEMENT

This case is about the FAII Insiders and Board that misrepresented that the Legacy ATIP target company's weaknesses were actually its strengths to capitalize on their Founder Shares that they uniquely held.

As a provider of rehabilitation services, Legacy ATIP's recruitment and retention of enough physical therapists to satisfy demand was essential to its success and growth.[2] In that regard, the FAII Board trumpeted that Legacy ATIP had "favorable clinician rates."[3] It also touted that Legacy ATIP had "historically been able to realize high retention rates."[4] The Board claimed that it considered Legacy ATIP's supposedly "Attractive Recruiting and Retention Capabilities" to be a

---

[1] Capitalized terms not defined herein have the meanings set forth in the Verified Consolidated Stockholder Class Action Complaint ("Complaint"), cited to as "¶ __." The document that the Complaint refers to as the "Definitive Proxy" is referred to as the "Proxy", and the term "Board Defendants" will be referred to herein as the "Board." The FAII Defendants' Opening Brief in Support of their Motion to Dismiss is cited to as "Br. ___." Diab's Opening Brief in Support of his Motion to Dismiss is cited to as "Diab Br. ___." Emphasis is added and citations are omitted unless otherwise noted.

[2] ¶ 2.

[3] ¶ 70.

[4] ¶ 70.

material factor supporting its decision to recommend the Merger.[5] The Board assured its stockholders that Legacy ATIP staffing problems were just hypothetical possibilities that "may" occur.[6] The Board also affirmed that Legacy ATIP was positioned for "strong future growth" and had "successfully" implemented its growth plans.[7] On several occasions, FAII also proclaimed that Legacy ATIP would open 90 new locations in 2021.[8]

The truth came to light after seven of the eight Board Defendants were replaced.[9] Shortly after the Merger, FAII revealed that it could only open 55 to 65 new locations in 2021 due to significant attrition among its physical therapists, a competitive hiring market, and COVID-19 related concerns.[10] In reaction, the trading price of its stock collapsed from approximately $9.00 to under $3.50.[11]

█████████████████████████████████████████

█████████████████████████████████████████

---

[5] ¶¶ 71, 78, 104.

[6] ¶ 72.

[7] ¶ 76.

[8] ¶¶ 57, 62.

[9] Br. at 18-19.

[10] ¶ 79.

[11] ¶ 81.



All told, the very factors that the FAII Board pointed to as Legacy ATIP's

strengths ███████████████████████████████████████████████████

██████████ As a result of the misrepresentation and omission of these crucial facts,

---

[12] ¶ 102.

[13] ¶¶ 108-09.

[14] ¶¶ 108-09.

[15] ¶¶ 99-105.

[16] ¶ 105.

the Class was wrongfully deprived of an informed exercise of their redemption rights.

The entire fairness standard of review applies to Plaintiff's claims for not one, but three reasons. First, the Insiders received a unique benefit because the Merger provided the Insiders the prospect of the vesting of 8.625 million Founder Shares that were unique to them.[17] Second, the Founder Shares caused the Insiders to have mismatched incentives because the 8.625 million Founder Shares cost just $25,000.[18] Third, the whole Board was conflicted. Half the Board personally owned 25,000 Founder Shares that were effectively conditioned on the Merger,[19] and the

---

[17] *See, e.g., Manti Holdings, LLC v. Carlyle Grp. Inc.,* 2022 WL 1815759, at \*8-9 (Del. Ch. June 3, 2022) (stating that controller has unique benefit by having "something uniquely valuable to the controller" and denying controller's motion to dismiss); *cf. Ira Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at \*9 (Del. Ch. Dec. 11, 2017) (rejecting motion to dismiss because, *inter alia*, controller preserving and "retain[ing]" something unique to it (control) was unique benefit).

[18] *In re Multiplan Corp. Stockholders Litig.,* 268 A.3d 784 (Del. Ch. 2022) (finding controller received unique benefit when, *inter alia*, controller had "different incentives", "misaligned incentives", "mismatched incentives").

[19] *Cf. Frank v. Elgamal,* 2012 WL 1096090, at \*11 (Del. Ch. Mar. 30, 2012) ("Frank has adequately alleged that [director] Toh was interested in the Merger because he received a $250,000 fee for his role in the transaction. The Defendants may ultimately be correct that Toh earned that fee, and that it was not material to him, but at this point, the Court can reasonably infer that Toh was interested in the Merger.").

whole Board was also conflicted as dual fiduciaries of the Sponsor.[20] And while the Insiders cite documents outside the Complaint to purport that the Founder Shares' vesting requirements fully aligned the Insiders' interests with those of the Class, these vesting requirements instead aggravated the Insiders' mismatched incentives by, *inter alia*, incentivizing them to conceal Legacy ATIP's weaknesses to maximize the likelihood that the Founder Shares would vest.

Once it is established that entire fairness is the applicable standard, it is clear that Defendants have failed to meet their burden of proving entire fairness because the Proxy contained at least three different types of material misstatements and omissions that tended to cause stockholders to overestimate the value of the Legacy ATIP. First, as explained *infra*, the Proxy made several misrepresentations about Legacy ATIP's staffing. Second, the Proxy claimed that Legacy ATIP was successfully implementing its plan for explosive growth, but in reality, Legacy ATIP was falling far short of its plans. Third, the Proxy made several misrepresentations concerning FAII's due diligence into Legacy ATIP's merits as a merger partner.

---

[20] *In re Tesla Motors, Inc. Stockholder Litig.*, 2020 WL 553902, at *10 (Del. Ch. Feb. 4, 2020) ("There is no 'dilution of the duty of loyalty when a director 'holds dual or multiple fiduciary obligations.' 'If the interests of the beneficiaries to whom the dual fiduciary owes duties . . . diverge, the fiduciary faces an inherent conflict of interest.'") (internal quotation omitted).

These disclosure violations are not exculpated under Delaware law. ▮



The Board also had the ($85+ million) motive and opportunity to cause the Proxy to

---

[21] *See, e.g.*, *In re Hansen Med., Inc. S'holder Litig.*, 2018 WL 3030808, at *11 (Del. Ch. June 18, 2018) (finding plaintiff stated disclosure claim when defendant "knew the Proxy was materially misleading" due to his own misconduct and still "allow[ed] the Proxy to go out to stockholders").

[22] ¶ 69.

[23] ¶ 104.

[24] ¶ 114.

be materially misleading, because concealing Legacy ATIP's weaknesses maximized the likelihood that the Insiders' 8.625 million Founder Shares would vest.[25]

Lastly, Defendant Diab, who was the CEO and a director of Legacy ATIP, is liable as an aider and abettor because he pitched Legacy ATIP to the FAII stockholders with materially false and misleading statements.[26] ███████████ ████████████████████████, for example, Diab falsely touted to the FAII stockholders that Legacy ATIP was as "on track" to achieve its growth projections.[27]

## STATEMENT OF FACTS

### A. THE INSIDERS ARRANGED FOR THE MERGER TO HAVE UNIQUE BENEFITS FOR THEMSELVES

FAII was incorporated on June 10, 2020, as a Delaware corporation.[28] On June 15, 2020, FAII issued an aggregate of 8,625,000 Founder Shares to the Sponsor for an aggregate purchase price of $25,0000, or approximately $0.003 per share.[29]

---

[25] *See, e.g., In re Columbia Pipeline Grp., Inc.*, 2021 WL 772562, at *57 (Del. Ch. Mar. 1, 2021) ("It is reasonably conceivable that their interest in early retirement and the benefits conferred by the Merger tainted their decisions about what to disclose . . . .").

[26] ¶¶ 34, 58, 61.

[27] ¶ 61.

[28] ¶ 36.

[29] *Id.*

If the Merger or another business combination was not consummated by August 14, 2022, FAII would have ceased all operations except for the purpose of winding up and redeeming 100% of the outstanding public shares for cash.[30] In such event, the 8.625 million Founder Shares held by Insiders would have been worthless.[31]

Since March 2010, various Fortress entities had been lenders to Legacy ATIP. As a result, Sponsor's affiliates have been in regular contact with Legacy ATIP's management for over ten years.[32] Sponsor's affiliates have also attended earnings calls with Legacy ATIP's management to discuss Legacy ATIP's financial performance multiple times per year.[33] In addition, Sponsor's affiliates, in their lender roles, have periodically reached out to Legacy ATIP's management to obtain interim insight into certain unusual circumstances.[34]

As of December 31, 2020, Fortress entities held approximately $6 million of first lien indebtedness of Legacy ATIP as lenders under a first lien credit

---

[30] ¶ 38.

[31] ¶ 39.

[32] ¶ 46.

[33] *Id.*

[34] *Id.*

agreement.[35]

Each of FAII's allegedly independent directors, who composed half the Board, namely Hood, Policy, Russak-Aminoach, and Gulati (collectively, the "Directors Holding Founder Shares") received an economic interest in the Merger through the purchase from Sponsor of 25,000 Founder Shares at the original purchase price of $0.004 per share subject to certain vesting and forfeiture provisions.[36]

The Board was also conflicted, among other ways, as dual fiduciaries. Specifically, Pack and McKnight were both partners of the Sponsor, which is the entity that held millions of Founder Shares.[37] In addition, Cowen, Hood, Policy, Furstein, Russak-Aminoach, and Gulati were also directors of Sponsor.[38]

**B.** ███████████████████████████████████████████

Just five months after the IPO, it was decided that FAII would acquire Legacy ATIP. The Board abdicated nearly any role in this decision. ███████████

███████████████████████████████████████████

---

[35] ¶ 47.

[36] ¶ 40.

[37] ¶ 41.

[38] *Id.*

{01911892;v1 }



**C. LEGACY ATIP**

---

[39] ¶ 89.

[40] *Id.*

[41] *Id.*

[42] ¶ 91.

{01911892;v1 }

10



Legacy ATIP

---

[43] ¶ 92.

[44] ¶ 93.

[45] *Id.*

[46] ¶ 102.

{01911892;v1 }

11



### D. DEFENDANTS HYPED THE MERGER BASED ON FALSE PREMISES AND MATERIALLY MISLEADING OMISSIONS

On February 22, 2021, FAII filed a presentation with the SEC touting that Legacy ATIP projected an adjusted EBITDA of $119 million in 2021.[52] It also stated that Legacy ATIP had a "[c]lear [p]ath to a $200+ million of [adjusted] EBITDA[.]"[53] Part of this "clear path" was that Legacy ATIP had a "[d]eep pipeline

---

[47] ¶ 96.

[48] *Id.*

[49] *Id.*

[50] ¶ 98.

[51] ¶ 54.

[52] ¶ 56.

[53] *Id.*

to support 90+ de novo clinics in 2021."[54]

On March 12, 2021, FAII filed the Preliminary Proxy with the SEC.[55] Among the material factors that the FAII Board allegedly considered as supporting approval of the Merger, the Preliminary Proxy listed Legacy ATIP's "Attractive Recruiting and Retention Capabilities" as compared to other companies in the industry, which "allows the Company to recruit and retain talent."[56] ███████████████

████████████████████████████

### E.  THE BOARD FAILED TO IMPLEMENT BASIC PROCEDURAL SAFEGUARDS

The FAII Board refused to implement basic procedural safeguards for the protection of the public stockholders. For example, rather than appoint truly independent directors without ties to the Founder Shares, the Insiders chose to structure the Board consisting of only directors with deep ties to the Founder Shares.[57] Appointing truly independent directors free from conflicts driven by Founder Shares would have been quite simple. Without having any truly independent directors, the Board also could not form a special committee consisting

---

[54] ¶ 57.

[55] ¶ 59.

[56] *Id.*

[57] ¶ 41.

{01911892;v1 }

13

of independent and disinterested directors. ███████████████████

████████████████████████████████████████████[58]

**F.** ███████ ████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████



████████████████████████████████████

███████████████████████

████████████████████████████████

---

[58] ¶ 91.

[59] ¶ 110.

{01911892;v1 }

\* \* \*



The ████████████ also included the following ████████████

████████████████████████████████



---

[60] ¶¶ 108-09.

[61] ¶ 105.



62.

## G. THE MATERIALLY MISLEADING DEFINITIVE PROXY

That same day, May 14, 2021, FAII filed the Definitive Proxy.[63] Among other

representations, the Definitive Proxy hyped Legacy ATIP by touting the following:

- FAII's Board considered "extensive" and "significant" due diligence for the Merger;

- FAII's Board conducted a "thorough review" of other potential business combinations, and found no others of superior merit to the Merger;

---

[62] ¶ 107.

[63] ¶ 2.

- Legacy ATIP had "[a]ttractive [r]ecruiting and [r]etention capabilities";

- Staffing problems "may" occur in the future, *i.e.*, had not already manifested;

- The Board considered Legacy ATIP's attractive recruiting and retention abilities to be a material fact supporting its decision to enter the Merger Agreement and recommend the Merger;

- Legacy ATIP was projected to have a 2021 EBITDA of $119 million;

- The effects of COVID helped instead of hurt Legacy ATIP's valuation; and

- Legacy ATIP had "successfully implemented its long-term growth strategy" including its "labor management model" and "de novo" growth.[64]

On May 24, 2021, FAII filed a Schedule 14A with the SEC touting that Legacy ATIP has a "[d]eep pipeline to support 90+ de novo clinics in 2021."[65]

Stockholders who wanted to redeem their shares had to do so by Redemption Date, which was June 11, 2021.[66] On June 16, 2021, the Merger was consummated.[67]

---

[64] ¶ 78.

[65] ¶ 62.

[66] ¶ 13.

[67] ¶ 6.

### H. THE POST-MERGER COMPANY'S BOARD FINALLY DISCLOSED THE TRUTH

On July 26, 2021, approximately a month after the Merger was consummated, FAII filed the July 2021 8-K. FAII cut its projections because of physician attrition and almost halved its adjusted EBITDA guidance from $119 million to a range of $60 to $70 million.[68] FAII also decreased its 2021 revenue projection to $640-$670 million.[69] FAII revealed that it could only open 55-65 new clinics in 2021, far fewer than the 90 clinics it had told stockholders it would open.[70] FAII attributed its cut to significant attrition among its physical therapists, a competitive hiring market, and COVID-19 related concerns.[71] As a result, the trading price of FAII common stock collapsed.[72]

Then, on August 9, 2021, through a Form 8-K, FAII announced that Diab had stepped down as CEO and from the Board of Directors.[73] Shortly thereafter, the SEC commenced an investigation concerning the contents of the July 2021 8-K.[74]

---

[68] ¶ 79.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] ¶ 7.

[73] ¶ 9.

[74] *Id.*

Analysts were outraged.[75] For example, a Barrington Research report decried that the analyst was "[s]hocked by what has unfolded" at FAII.[76] Barrington further recognized that FAII lacked any "good defense for why the company's original guidance (which was officially maintained up until yesterday) ever made sense."[77]

On March 1, 2022, FAII filed its annual report on Form 10-K with the SEC revealing that FAII had an adjusted EBITDA of $39.7 million for 2021, missing the Definitive Proxy's projected $119 adjusted EBITDA by roughly 67%.[78]

## ARGUMENT

## I.    THE MOTION TO DISMISS STANDARD

Under the "minimal" pleading standards applicable to Defendants' motions, the Court "must draw all reasonable inferences in favor of the non-moving party" and dismissal is improper "unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[79] When considering a motion to dismiss, this Court "(i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the

---

[75] ¶ 80.

[76] *Id.*

[77] *Id.*

[78] ¶ 84.

[79]*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002).

opposing party notice of the claims, and (iii) draws all reasonable inferences in favor of the plaintiffs. Dismissal is inappropriate 'unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.'"[80] The pleading standards are "minimal."[81]

In addition, at the pleading stage it is Plaintiff—and only Plaintiff—who "get[] the benefit of all favorable inferences."[82]  When, as here, a complaint refers to another document, the incorporation by reference doctrine "permits a court to review the actual documents to ensure that a plaintiff has not misrepresented their contents that that any inference the plaintiff seeks to have drawn is a reasonable one."[83] That incorporation by reference doctrine, however "does not enable a court to weigh evidence on a motion to dismiss."[84]

---

[80] *Voigt v. Metcalf*, 2020 WL 614999, at *8 (Del. Ch. Feb. 10, 2020) (quoting *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, LLC*, 27 A.3d 531, 535 (Del. 2011)).

[81] *Central Mortg.*, 27 A.3d, at 536.

[82] *Savor, Inc.*, 812 A. 2d at 897.

[83] *Voigt*, 2020 WL 614999, at *9.

[84] *Id.*

## II.    THE MERGER WAS NOT ENTIRELY FAIR

### A. The Entire Fairness Standard Of Review Applies

The entire fairness standard of review applies to the Court's review of the Merger for not just one, but several reasons.

### 1.    The Merger Preserved The Insiders' Unique Founder Shares

Through the Merger, the Insiders had the unique benefit of preserving their Founder Shares. There are "many forms" of controller transactions subject to the entire fairness standard of review.[85] The entire fairness standard of review applies when the "controller gets a unique benefit", which is "something uniquely valuable to the controller."[86]

Here, the Insiders have not disputed that they were a control group, thus waiving this issue.[87] Moreover, the Merger provided the Insiders with the unique

---

[85] *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at *14 (Del. Ch. Dec. 19, 2018); *Reith v. Lichtenstein,* 2019 WL 2714065, at *20 (Del. Ch. June 28, 2019) (same).

[86] *Klein*, 2018 WL 6719717, at *14 (denying motion to dismiss); *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 717 (Del. Ch. 2023) (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *13 (Del. Ch. Oct. 24, 2014)).

[87] *See, e.g.*, *Thor Merritt Square, LLC v. Bayview Malls LLC*, 2010 WL 972776, at *5 (Del. Ch. Dec. 16, 2009) ("The failure to raise a legal issue in an opening brief generally constitutes a waiver of the ability to raise that issue in connection with a matter under submission to the court."); *Franklin Balance Sheet*

{01911892;v1 }

21

benefit of preserving their 8.625 million Founder Shares, which no one else had. None of FAII's public stockholders had the opportunity to acquire Founder Shares. Unlike the shares held by the public stockholders, the Founder Shares had been purchased by the Insiders for nominal consideration ($25,000 total) to position themselves for a windfall, would have expired worthless in the absence of a business combination, and were not eligible for redemption.[88] Thus, absent the Merger, the Founder Shares would have been uniquely worthless and the Insiders would uniquely have lost their opportunity for a $85+ million windfall.[89] Therefore, the Merger provided the Insiders with the unique benefit of the means of preserving their Founder Shares and the possibility of the $85+ million windfall.[90]

---

*Inv. Fund v. Crowley,* 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006); *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003).

[88] ¶¶ 5,13.

[89] *Id.*

[90] *Cf. FBO Bobbie Ahmed*, 2017 WL 7053964, at *9 (rejecting motion to dismiss because, *inter alia*, controller preserving and "retain[ing]" something unique to it (control) was unique benefit); *Orman v. Cullman*, 794 A.2d 5, 30-31 (Del. Ch. Feb. 26, 2002) (reasoning that party was interested in merger because merger was necessary for it to obtain $3.3 million); *AP Servs., LLP v. Lobell*, 2015 WL 3858818, at *5 (N.Y. Sup. Ct. 2015) (applying Delaware law) (holding that allegations that SPAC directors' stock and warrants (that were not purchased at nominal consideration) would be rendered worthless absent a de-SPAC merger were sufficient at the pleadings stage to rebut the presumption of the business judgment); *Klein,* 2018 WL 6719717, at *15 (reasoning that unique benefit in challenged

The Insiders attempt to complicate this simple test by drawing inferences from extraneous matters outside the Complaint. This is obviously inappropriate on a motion to dismiss.[91] Their efforts are misplaced in any event. For example, Defendants attempt to draw inferences from an agreement pursuant to which, "[a]ll of the Sponsor's Founder Shares were unvested and would only revest in one-third tranches at $12, $14 and $16 per share."[92] However, the test is not whether the unique benefit already reached its full value, but rather whether the unique benefit is "valuable." Here, "it would be naïve to say, as a matter of law" that the Founder Shares that the Proxy valued at more than $86 million[93] were not valuable at the time of the Merger, even if they were unvested.[94] Indeed, the Insiders accept the value

---

transaction was "unique and valuable opportunity" in previous transaction that was "interrelated" with challenged transaction").

[91] *See, e.g., Pharmathene, Inc. v. Siga Techs., Inc.*, 2008 WL 151855, at *6 (Del. Ch. Jan. 16, 2008) ("[T]he Court may not consider matters outside the pleadings when assessing a motion to dismiss for failure to state a claim"); *GigAcquisitions3*, 288 A.3d, at 717, n.169 (declining to affirmatively consider lock-up agreement regarding Sponsor's Founder Shares).

[92] Br. at 25.

[93] Specifically, the Proxy stated that the "Founder Shares, if valued based on the closing price of $9.99 per share of FAII Class A common stock on the NYSE on May 10, 2021, would be valued at approximately $86,163,750 (after giving effect to the conversion of such Founder Shares into shares of ATI Class A common stock)." Transmittal Affidavit of Ryan M. Lindsay ("Lindsay Affidavit") Exhibit 1 at 5.

[94] *Orman*, 794 A.2d, at 30-31 ("I think it would be naïve to say, as a matter of law, that $3.3 million is immaterial.").

that the Proxy assigned to the Founder Shares in their brief.[95]

Grasping for straws, the Insiders attempt to draw inferences from the Sponsor's purchase of "common stock at $10 per share for an aggregate price of $75 million—the same price the public stockholders paid for their shares" (the "PIPE Purchase").[96] But the presence of a unique benefit does **not** require that **every** interest that the controllers must be unique, but only that the controllers have "something" uniquely valuable.[97] Preserving the Founder Shares was exactly that.[98] Therefore, the Insiders stood to gain a massive unique benefit, and the entire fairness standard of review applies to the Court's review of the Merger.

### 2. The Insiders Had Mismatched Incentives

Entire fairness applies when a controller has "mismatched incentives" from the unaffiliated stockholders.[99] Indeed, the Insiders correctly imply that if their

---

[95] *See* Br. at 27 (valuing the 25,000 Founder Shares owned by the Directors Holding Founder Shares at "$249,750").

[96] Br. at 25.

[97] *Manti Holdings,* 2022 WL 1815759, at *8-9 (denying controller's motion to dismiss and stating that controller has unique benefit by having "something uniquely valuable to the controller")

[98] *Cf. FBO Bobbie Ahmed*, 2017 WL 7053964, at *9 ("Here, that 'something' was a means for NRG to ensure it would retain vesting control . . . .").

[99] *Multiplan*, 268 A.3d 784 (finding controller received non-ratable benefit when, *inter alia*, controller had "different incentives", "misaligned incentives",

interests were not "fully aligned" with those of the Class, mismatched incentives existed.[100] Here, even assuming, *arguendo*, that the Insiders somehow did not stand to have a unique benefit from saving their Founder Shares (though they did), the entire fairness standard of review also applies because the Insiders had mismatched incentives.

The Founder Shares created mismatched incentives because the Insiders acquired 8,625,000 of them for just $25,000.00.[101] The Proxy stated that, if valued at $9.99 each, these Founder Shares were worth a massive windfall of more than $86 million, which is more than a ***3,400,000% increase on investment***. [102] However, in the absence of a merger, the Founder Shares would have been worthless.[103] The Founder Shares' nominal purchase price meant that the Insiders had less risk exposure to a value-decreasing Merger while having a windfall opportunity from a value-increasing Merger. Accordingly, the Founder Shares gave the Defendants a

---

"mismatched incentives"); *Laidlaw v. GigAcquisitions2, LLC*, 2023 WL 2292488, at *6 (Del. Ch. Mar. 1, 2023) ("misaligned incentives"); *GigAcquisitions3*, 288 A.3d, at 718 ("disparate incentives").

[100]Br. at 2 (using phrase "fully aligned"); *see, e.g., GigAcquisitions3*, 288 A.3d, at 717 (applying entire fairness standard when interests were "generally aligned").

[101] ¶ 4.

[102] ¶ 14.

[103] ¶ 5.

powerful personal economic incentive to secure almost any business combination, regardless of whether the transaction was fair to FAII's public stockholders.[104]

Conversely, FAII's public stockholders purchased shares of FAII's common stock for approximately $10.00 per share.[105] FAII's common stock carried redemption rights that allowed public stockholders the option of redeeming their shares at approximately the purchase price.[106] Due to the nominal consideration at which they were acquired and value only in the presence of a business combination, the Founder Shares created mismatched incentives between the Insiders and the Class.

The Insiders attempt to draw inferences in their favor when spinning the narrative that the Sponsor's interests were "fully aligned" with those of the Class due to an agreement regarding the Founder Shares' vesting rights and the PIPE Purchase. Far from it. Instead of "fully aligning" their interests, the vesting rights and PIPE Purchase aggravated the Insiders' mismatched incentives for multiple reasons.

- The Insiders had the mismatched incentive (of more than $86 million) to conceal Legacy ATIP's weaknesses to maximize the

---

[104] *Id.*

[105] ¶ 13.

[106] *Id.*

{01911892;v1 }

26

likelihood that their 8.625 million Founder Shares would vest, whereas the public stockholders would be best served by candid disclosures to make an informed redemption decision. Indeed, the fact that the Proxy's disclosures were quickly corrected by a new Board without these mismatched incentives speaks volumes.

- The Insiders had the mismatched incentive to benefit when and if the trading price of FAII effectively reached $12.00, $14.00, and/or $16.00 for five days after the Merger, even if it subsequently plummeted below the Redemption Price afterward. Conversely, the public stockholders would likely lose money from such a stock price rollercoaster.

- The Insiders (who were all affiliated with Fortress) had the mismatched incentive to help Legacy ATIP because it owed Fortress millions of dollars.[107]

- The Insiders had the mismatched incentive of making more money than the stockholders in a value-increasing merger while losing less money than the stockholders in a value-decreasing merger. For example, the Insiders had the mismatched incentive to enter a Merger that had a 70% probability of dropping 40% below Redemption Price and 30% probability of increasing 40% above the Redemption Price. These mismatched incentives are even worse when considering that there were four SPACs under the Fortress umbrella at the time of the Proxy and Fortress was a global investment manager, which meant that Fortress was positioned to take mismatched risk-reward calculations.[108]

---

[107] ¶ 35.

[108] In a scenario where the trading price of ATIP stock dropped 40% after the Merger, Defendants stood to lose $30 million from the PIPE Purchase. In a case where the trading price of ATIP stock increased 40% after the Merger, Defendants stood to reap $105 million from the Founder Shares and $30 million from the PIPE

- The Insiders had the mismatched incentive to benefit from FAII being acquired at any time within ten years after the Merger, even in a deal below the Redemption Price, whereas the public stockholders would lose money. For example, if FAII had been acquired after the Merger for just $6.00, the Founder Shares would have profited more than $48 million.[109] Public stockholders, on the other hand, would have lost money in such a transaction.

- The Insiders had mismatched incentives arising from their potential liability for any expenses associated with winding-up FAII if it failed to enter into a merger transaction in the allotted time.[110]

In *GigAcqusitions2*, the Court of Chancery rejected an argument similar to that advanced by the Insiders. There, the SPAC defendants argued that the "Sponsor's incentives were aligned with public stockholders because of a lock-up agreement requiring Sponsor to refrain from selling its shares for twelve months or until the stock reached a particular target price."[111] The Court of Chancery rejected this argument, reasoning that "[s]iding with the defendants, however, would require

---

Purchase. (-$30 million x 7= $210 million of losses whereas $135 million x 3 = $405 million in gains).

[109] The Founder Shares vest if FAII is acquired after the Merger even if FAII's trading price is below the redemption price. *See* Lindsay Affidavit Exhibit 1 at E-5 ("[I]f during the Vesting Period there is an Acceleration Event . . . all Vesting Shares that were eligible to vest . . . and remain unvested, if any, shall vest . . . .").

[110] *See, e.g.*, Lindsay Affidavit Exhibit 1 at 105 ("If the Trust Account is liquidated . . . Sponsor has agreed to indemnify FAII to ensure that proceeds in the Trust Account are not reduced below $10.00 per public share . . . .").

[111] 2023 WL 2292488, at *9 n.107.

{01911892;v1 }

28

the court to draw inferences against the plaintiff."[112] Like the *Gigacqusitions2* defendants, the Insiders advance a similar argument, *i.e.*, that an agreement supposedly aligned their incentives fully with those of the Class. But to interpret this agreement as fully aligning incentives requires inferences to be drawn in the Insiders' favor on an undeveloped factual record. Following the reasoning in *Gigacqusitions2*, the Court should apply the entire fairness standard of review at this juncture.

### 3. The Whole Board Was Conflicted

The entire fairness standard of review also applies when at least half of the directors who approve a transaction were not disinterested and independent.[113] Here, the entire fairness standard of review applies because Plaintiff has credibly alleged that the entire Board was conflicted.

First, the four Directors Holding Founder Shares were conflicted through their personal ownership of thousands of Founder Shares. In *Frank*, the Court of Chancery reasoned that a director was interested in a transaction because the director received a $250,000 fee for negotiating the transaction.[114] *Frank* reasoned that the $250,000

---

[112] *Id.*

[113] *See, e.g., Salladay v. Lev*, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020).

[114] 2012 WL 1096090, at *11.

fee was sufficient to render the director interested without analyzing the director's financial background and without analyzing whether the fee was conditioned on the transaction. Other Court of Chancery decisions have also made pleading-stage inferences that directors were interested to preserve their opportunities to work for consulting fees of $91,000[115] and $75,000.[116] The materiality of compensation and/or unique benefits of a director is also generally unknowable before full-blown merits discovery.[117]

The Insiders question whether "the amount received by the [Directors Holding Founder Shares] ($249,750) was material to them."[118] But, just as the $250,000 fee that was presumptively material in *Frank*, the Directors Holding Founder Shares had 25,000 Founder Shares that the Proxy valued at $249,750. If valued at their vesting price, they were worth approximately $350,000.[119] However, while the $250,000 flat

---

[115] *See In re Ply Gem. Indus., S'holders Litig.*, 2001 WL 755133, at *9 (Del. Ch. June 26, 2001) (inferring at pleading stage that consulting fee of $91,000 were material).

[116] *See Orman*, 794 A.2d, at 30 (holding that at motion to dismiss stage, it was reasonable to infer that $75,000 fee was material to director).

[117] *See, e.g., Voigt*, 2020 WL 614999, at *15.

[118] Br. at 27.

[119] 25,000 Founder Shares divided by the three different vesting prices equals at least 8,333 shares per vesting price. (8,333 shares vesting at $12) + (8,333 shares vesting at $14) + (8,333 shares vesting $16) = $349,986.

{01911892;v1 }

fee was presumptively material in *Frank*, the Directors Holding Founder Shares were even more interested than those in *Frank*, because the Founder Shares were conditioned on the Merger's consummation. Even worse than the directors who were interested due to the *opportunity to work* for consulting fees of less than $100,000, the Directors Holding Founder Shares needed to consummate the Merger to obtain compensation for whatever work they had already done. The vesting requirements also aggravated the directors' conflicts by providing the powerful personal economic motive to conceal Legacy ATIP's weakness from the stockholders to maximize the likelihood their Founder Shares would vest. Following the Court of Chancery's reasoning in *Frank*, at least half the Board was interested in the Merger.

Second, every Board member was conflicted as a dual fiduciary, because every Board member was a director and/or partner of the Sponsor, which is the entity that preserved millions of Founder Shares through the Merger. [120] In fact, the Insiders

---

[120] *See, e.g.*, *Tesla Motors*, 2020 WL 553902, at *10 ("There is no 'dilution of the duty of loyalty when a director 'holds dual or multiple fiduciary obligations.' 'If the interests of the beneficiaries to whom the dual fiduciary owes duties . . . diverge, the fiduciary faces an inherent conflict of interest.'") (internal quotation omitted); *Silverberg v. Padda*, 2019 WL 4566909, at *8 (Del. Ch. Sep. 19, 2019) (holding that it is reasonable to infer that partner status rendered a director a conflicted dual fiduciary).

[120] Def. Br. at 29, 49.

designed the Board such that *every* director had deep ties to the Founder Shares.[121]

Thus, every Board member was a reasonably inferable conflicted dual fiduciary, and

entire fairness review applies.[122]

### B. Defendants Have Failed To Demonstrate That The Merger Was Entirely Fair

With entire fairness established as the relevant standard of review, the Insiders

bear the burden of proving that the Merger was entirely fair, which consists of

proving that the Merger was fair both as to price and process.[123]

### 1. The Merger Price Was Unfair

"The possibility that the entire fairness standard of review may apply tends to

preclude the Court from granting a motion to dismiss under Rule 12(b)(6) unless the

alleged controlling stockholder is able to show, conclusively, that the challenged

transaction was entirely fair based solely on the allegations of the complaint and the

documents integral to it."[124]

Here, the Insiders have not even attempted to shoulder this burden. In any

---

[121] ¶ 41.

[122] *See, e.g., Salladay,* 2020 WL 954032, at *8.

[123] *Multiplan*, 268 A.3d at 815.

[124] *Klein*, 2018 WL 6719717, at *16 (quoting *Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014)).

event, the Complaint explains that was once FAII corrected facts that should have been disclosed before the Redemption Date, the trading price of its stock plummeted, thereby confirming that the Merger was nowhere close to being priced fairly[125]:



### 2. The Merger Process Was Unfair

"[T]he entire fairness standard incorporates a requirement of compliance with the duty of disclosure into the fair dealing aspect of the test."[126] FAII's disclosures were "'unilateral and not counterbalanced by opposing points of view,' placing an even more exacting duty to disclose upon fiduciaries in the position of the

---

[125] ¶ 81.

[126] *Multiplan*, 268 A.3d at 816.

information.'"[127]

"Corporate fiduciaries can breach their duty of disclosure under Delaware law in a number of ways – by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading."[128]

"A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[129] Information is material "regardless of whether it actually sways a stockholder one way or the other, as a single piece of information rarely drives a stockholder's vote."[130]

Here, the Insiders failed to satisfy their burden of proving fair dealing. The Insiders have not even bothered to dispute what information was reasonably available to them, nor whether the Insiders' statements at issue were made in conjunction with a solicitation of stockholder action. Thus, whether the Insiders have made a disclosure violation will turn on whether they made any (i) materially false statement, (ii) materially incomplete statement, and/or (iii) omitted material information.

---

[127] *Multiplan*, 268 A.3d at 816 (quoting *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1057 (Del. Ch. 1987)).

[128] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009).

[129] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 17 (Del. Ch. 2014).

[130] *Morrison v. Berry*, 191 A.3d 258, 287 (Del. 2018).

{01911892;v1 }

### a. FAII Made Several Staffing Misrepresentations

The Insiders cannot prove fair dealing because they made not one, but several material misrepresentations and omissions concerning Legacy ATIP's staffing and employee retention in the Proxy:

| Collectively, the "Staffing Representations" | |
|---|---|
| **Proxy Representation** | **Referenced herein as:** |
| Legacy ATIP has "historically been able to realize high retention rates"[131] | "Historically High Retention" |
| Legacy ATIP has "favorable clinician rates"[132] | "Favorable Clinician Rates" |
| The FAII Board claimed that it "considered" Legacy ATIP's recruiting and retention abilities to be a "material" factor supporting its decision to enter the Merger Agreement and recommend the Merger: | "Attractive Recruiting And Retention" |

---

[131] ¶ 70.

[132] ¶ 70. In a footnote, Defendants cite *Albert v. Alex Brown Mgmt. Servs.*, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005), in which the Court of Chancery rejected a disclosure claim because (i) the representation was "simply" an opinion and (ii) the plaintiff failed to allege that the representation was "false." Distinguishing this case is a simple matter. The Favorable Clinician Rates is not simply an opinion. Also, as explained *infra*, Plaintiff has pled facts showing it was an objectively false statement of fact.

| | |
|---|---|
| *Attractive Recruiting and Retention Capabilities*. The belief that the Company is considered an attractive place to work compared to others in its industry, which allows the Company to recruit and retain talent.[133] | |
| **If** [Legacy ATIP] cannot recruit and retain its base of experienced and clinically skilled therapists and other clinical providers, management and support personnel, its business **may** decrease and its revenues **may** decline." <br><br> "The Company **may** also experience increases in its labor costs, primarily due to higher wages and greater benefits required to attract and retain qualified healthcare personnel, and such increases **may** adversely affect the Company's profitability." <br><br> Legacy ATIP's "facilities face competition for experienced physical therapists and other clinical providers that **may** increase labor costs and reduce profitability."[134] | "Hypothetical Risk Issues" |

---

[133] ¶¶ 71, 78, 104; *see also* Lindsay Affidavit Exhibit 1 at 98-99. Defendants claim that Attractive Recruiting And Retention is a non-actionable opinion. This is not merely an opinion because it describes what the Board allegedly did, which is a factual representation. *See, e.g.*, *Appel v. Berkman*, 180 A.3d 1055, 1060-62 (Del. 2018) (reasoning that defendants' fact v. opinion "distinction is of little relevance, because proxy statements seeking approval of major transactions are filled with statements of fact about opinions, in the sense that they recount why fiduciaries . . . certain actions and why they believed the transaction was in the company's best interest"). Indeed, a board's reasons for recommending a merger are actionable disclosure representations. *See, e.g.*, *Appel*, 180 A.3d, at 1060-62.

[134] ¶ 72.

The Insiders have not disputed the element of materiality regarding the Staffing Representations, and thus they have waived any argument on that point.[135] Of course, as a provider of rehabilitation services, Legacy ATIP's recruitment and retention of enough physical therapists to satisfy demand was essential to its success and growth. This is no surprise because the trading price of FAII stock collapsed in response to the new Board correcting the Staffing Representations.



---

[135] *See, e.g., Thor Merritt Square*, 2010 WL 972776, at *5; *Franklin Balance Sheet,* 2006 WL 3095952, at *4.

[136] ¶ 102.

{01911892;v1 }



Legacy  ATIP's

Defendants ignore this excerpt from the Complaint. Again, this speaks volumes.

---

137 ¶ 110.

{01911892;v1 }

* * *



In *Morrison*, the Delaware Supreme Court sustained disclosure claims similar to the Hypothetical Risk Issues misrepresentations.[139] Overturning the trial court's dismissal, the Delaware Supreme Court reasoned that it was materially misleading to disclose that certain events "could" hypothetically happen when such events "had actually already" happened.[140]

Like the disclosures in *Morrison*, the supposedly Hypothetical Risk Issues had already manifested in actual reality. First, the May Presentation establishes that

---

[138] ¶¶ 105-09.

[139] 191 A.3d, at 287-88.

[140] *Id*.

Legacy ATIP ███████████████████████████████████████████████

███████████ so it was materially misleading for the Proxy to claim that "*if*"

Legacy ATIP has staffing challenges, "its business *may* decrease and its revenues

may decline."[142] Second, Legacy ATIP noted ██████████████████████████

████████████████████████████████████████████████████████████████

███████████ which made it materially misleading for the Proxy to describe

*potential* staffing harms as future hypotheticals that "*may*" occur when they were

*already-existing problems* that needed to be "resolved."[144] Third, ████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Therefore, it was

materially misleading for the Proxy to claim that Legacy ATIP "*may* also experience

increases in its labor costs, primarily due to higher wages and greater benefits

required to attract [staff]" and "competition . . . *may* increase labor costs and reduce

profitability."[146]  Again, these issues, which were cast as hypothetical potential

---

[141]  ¶ 108.

[142] ¶ 72 (quoting the Proxy).

[143] ¶ 109.

[144]  ¶ 72 (quoting the Proxy).

[145] ¶ 110.

[146] ███████████████████████████████████████████
████████████████████████████████████████████

future challenges, were already present, existing problems at the time of the Proxy's filing. Following the Delaware Supreme Court's reasoning in *Morrison*, the Court should find that the Hypothetical Risk Issues were materially misleading.

The Insiders attempt to reduce the Complaint's allegations regarding Attractive Recruiting And Retention to a strawman. Contrary to Defendants' characterizations, the Complaint does not merely allege that it was materially misleading to claim that Legacy ATIP had attractive recruiting and retention, but also that it was materially false and/or misleading to claim that ***the Board considered*** Legacy ATIP's allegedly attractive recruiting and retention to support its decision to enter the Merger.[147]



---

[147] ¶ 78 (d, f).

[148] ¶ 104.

{01911892;v1 }



Indeed, the Insiders have not even disputed ████████████

---

[149] *Hughes v. Xiaoming Hu*, 2020 WL 1987029, at \*16 (Del. Ch. Apr. 27, 2020) (quoting *Tyson Foods, Inc. Consol S'holder Litig.*, 919 A.2d 563, 578 (Del. Ch. 2007)).

[150] *See, e.g.*, *Appel*, 180 A.3d, at 1060-62 (reasoning that board's basis for recommending merger is material); *cf. Morrison*, 191 A.3d, at 284 (holding information material if it helps a reasonable "stockholder to reach a materially more accurate assessment of the probative value of the sale process"); *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at \*12 (Del. Ch. Dec. 10, 2018) (holding plaintiff adequately pled disclosure deficiency sufficient to overcome *Corwin* by pleading "the Strategic Committee did not do the work attributed to it in the Proxy").

[151] ¶ 109.

{01911892;v1 }



The Court should reject this stratagem.[153]

As if Plaintiff had the burden of proving that every one of the Section 220 documents affirmatively proves a disclosure violation ███████████████

███████████████████████████████████████████████

---

[152] Br. at 42.

[153] *See, e.g., Goldstein v. Denner*, 2022 WL 1671006, at \*55 (Del. May 26, 2022) ("At the pleading stage, the court cannot find facts or weigh competing inferences. There are defendant-friendly ways to reconcile the internal emails with the account in the minutes. But the plaintiff has advanced a possible account in which DiFabio created an embellished description of the Board's deliberative process. Discovery may show that the minutes were accurate. At this stage of the case, the plaintiff is entitled to the inference that the minutes were not.").



Specifically, a false disclosure violation requires only "(1) a material statement . . . in contemplating stockholder action (2) that is false."[156] Similarly, partial and/or omitted disclosure violations do not turn on whether the Insiders "ever reviewed the[] documents", but rather, whether the disclosures are undermined by "reasonably available information."[157]

---

[154] Br. at 41.

[155] Br. at 39.

[156] *Pfeffer*, 965 A.2d, at 685.

[157] *Id*. at 686-88; *GigAcquisitions*3, 288 A.3d, at 727 ("It can be inferred that the defendants knew (and should have disclosed) or should have known (but failed to investigate) that [the target's] production would be difficult to scale in the manner predicted. In either event, it is reasonably conceivable that the [Gig3] Board deprived Gig3's public stockholders of an accurate portrayal of [the target's] financial health."); *Firefighters' Pension Sys. v. Presidio, Inc*., 251 A.3d 212, 291 (Del. Ch. Jan. 29, 2021) (summarizing *Rural Metro* as holding that information financial advisor withheld from directors was "reasonably available" to directors and holding that "[u]nder the reasoning of *Rural Metro*, the complaint pleads a claim for breach of fiduciary duty against the Board and Cagnazzi for failing to disclose the tip, even though they did not learn of the tip until this litigation").



Finally, the Insiders seek to defend their several misrepresentations by hiding behind the risk factors. However, listing risk factors does not give the Insiders the license to make materially false and misleading claims to the public stockholders.[161] Indeed, as discussed *supra*, those risk factor disclosures were themselves materially misleading, because what they described as ***hypothetical possible future issues*** were actually already existing problems.

---

[158] ¶ 114.

[159] *Id.*

[160] ¶ 78.

[161] *See, e.g., GigAcquisitions3*, 288 A.3d, at 726 n.246.

{01911892;v1 }

### b. FAII Made Several Misrepresentations Concerning Legacy ATIP's Growth

The Insiders failed to overcome their burden of proving fair dealing because they made not one, but several material misrepresentations when touting Legacy ATIP's growth capabilities to the stockholders:

| Collectively, the "Growth Representations" | |
|---|---|
| **Representation** | **Referenced Herein As:** |
| Legacy ATIP projected a 2021 EBTIDA of $119 million[162] | "$119 Million 2021 EBITDA" |
| The FAII Board considered the following to be a material factor supporting its decision to enter the Merger Agreement and recommend the Merger:<br><br>"The belief that the Business Combination presents an attractive investment opportunity at the agreed valuation . . . . FAII believes that this attractive valuation is partially enabled by the economic effects resulting from the COVID-19 pandemic[163] | "COVID Effects Enable Attractive Valuation" |
| The FAII Board considered the following to be a factor supporting its decision to enter the Merger Agreement and recommend the Merger: | "Successful Implementation" |

---

[162] ¶ 78. *See GigAcquisitions3*, 288 A.3d at 726 (holding that the disclosure of "lofty projections [that] were not counterbalanced by impartial information" reflected material disclosure violations).

[163] ¶ 76.

{01911892;v1 }

| | |
|---|---|
| *"Strategy*. The belief that the Company has successfully implemented its long-term growth strategy, including through the continued improvement of the Company's clinical labor management model, which it believes will allow provides to practice at the top of their respective licenses, as well as the Company's robust de novo program, through which the Company has opened approximately 300 new clinics since Advent ownership . . . ."[164] | |
| Legacy ATIP was on track for and/or expected 90+ "de novo" clinics in 2021[165] | "90+ 2021 De Novos" |

In addition, the FAII Board included the following "hockey stick" projections

in the Proxy, representing that they were the "best available"[166]:

| (USD in millions) | Forecast Year Ended December 31, (1) | | | | |
|---|---|---|---|---|---|
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| **Revenue** | **$ 731** | **$ 903** | **$1,007** | **$1,122** | **$1,242** |
| Clinic-level expenses | $ 525 | $ 636 | $ 708 | $ 788 | $ 871 |
| *% of revenue* | *71.8%* | *70.5%* | *70.3%* | *70.2%* | *70.1%* |
| SG&A & non-controlling interest | $ 87 | $ 92 | $ 96 | $ 99 | $ 103 |
| *% of revenue* | *11.9%* | *10.2%* | *9.5%* | *8.9%* | *8.3%* |
| **Adjusted EBITDA**(2) | **$ 119** | **$ 175** | **$ 203** | **$ 235** | **$ 268** |
| *% margin* | *16.3%* | *19.3%* | *20.2%* | *20.9%* | *21.6%* |
| **Cash flow items** | | | | | |
| Maintenance capital expenditures | $ 27 | $ 27 | $ 30 | $ 34 | $ 37 |
| *% of revenue* | *3.6%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* |
| Growth capital expenditures(3) | $ 25 | $ 31 | $ 34 | $ 34 | $ 34 |
| Free cash flow conversion(4) | 77.3% | 84.5% | 85.1% | 85.6% | 86.1% |

---

[164] ¶ 76; *see* Lindsay Affidavit Exhibit 1 at 98-99.

[165] ¶¶ 57, 62; *see Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (holding director's disclosure obligations "attaches to proxy statements and any other disclosures in contemplation of stockholder action").

[166] ¶ 74.

The Insiders have not briefed the issue of whether the Growth Representations were material, thus waiving this issue.[167] Indeed, after several of the Growth Representations were contradicted by newly revealed facts, the stock price collapsed.[168]



---

[167] *See, e.g.*, *Thor Merritt Square*, 2010 WL 972776, at \*5; *Franklin Balance Sheet,* 2006 WL 3095952, at \*4.

[168] ¶ 81.

[169] ¶ 92.

{01911892;v1 }



---

[170] ¶ 102.

[171] ¶ 98.

[172] Lindsay Affidavit Ex. 10 at 20.

[173] ¶ 99.

{01911892;v1 }



Thus, each of the Growth Representations were materially false and/or misleading.

{01911892;v1 }



, Legacy ATIP had

---

███████████████████ █████████████████████████

Legacy ATIP ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ Legacy ATIP ████████████████████

████████████████████████████████████████████████

███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Accordingly, the "lofty

projections were not counterbalanced by impartial information. Stockholders were

---

[176] *See, e.g., In re P3 Health Grp. Holdings, LLC*, 2022 WL 15035833, at \*5 (Del. Ch. Oct. 26, 2022) ("The fact that a business had missed a near-term projection by a large margin supports several possible inferences . . . . at least one possible inference is that the near-term projection was knowingly false. At the pleadings stage, Hudson is entitled to the inference that is favorable to its claim.").

[177] Lindsay Affidavit Ex. 11 at 23.

kept in the dark about what they could realistically expect from the combined company."[178] This is clearly a disclosure violation.

Ultimately, all of the Growth Representations were materially false and misleading. For this reason, the Defendants cannot carry their burden of establishing fair process as to the Merger at this stage.

### c. FAII Made Multiple Due Diligence Misrepresentations

The FAII Board made the following representation to the FAII stockholders in the Proxy:

| Collectively, the "Due Diligence Representations" | |
|---|---|
| **Representation** | **Referenced Herein As:** |
| The FAII Board claimed that it considered its thorough review of other alternatives to be a material factors supports its decision to enter the Merger Agreement and recommend the Merger:<br><br>*Other Alternatives*. The FAII Board believes, after a thorough review of other business combination opportunities reasonably available to FAII, that the proposed Business Combination represents the best potential business combination for FAII and the most attractive opportunity for FAII's management to accelerate its business plan based upon the process utilized to evaluate and assess other potential acquisition | "Review of Other Alternatives" |

---

[178] *GigAcquisitions3*, 288 A.3d 692, at 726.

| | |
|---|---|
| targets, and the FAII Board's belief that such process has not presented a better alternative[.] | |
| *Pre-Existing Relationship.* The fact that certain funds affiliated with FAII have served as lenders to the Company since March 2010 and, as a result, have been in regular contact with the Company's management for over ten years in the context of managing those affiliates' investments and staying up-to-date on the Company's financial and operating performance, as well as overall industry outlook[.] | "Up to Date on Operating Performance" |
| *Due Diligence.* FAII's management and advisors conducted significant due diligence examinations of the Company, including by: performing commercial and legal due diligence, engaging a healthcare regulatory consultant to perform billing due diligence, and hiring other third-party advisors to perform due diligence on insurance and financial matters[.] | "Significant Due Diligence" |

---

[179] ¶ 90. Throughout their brief, the Insiders falsely claim that they "considered and evaluated over 197 potential acquisition targets." Br. at 30. ███

{01911892;v1 }

54



Missing the point entirely, the Insiders cite *In re GGP, Inc. Stockholder Litigation*, in which the plaintiffs noted that "granular detail" was absent from "meeting minutes."[181] Distinguishing *GGP* is a simple matter. The Review of Other Alternatives statement is a material disclosure[182] that is much more meaningful than "granular detail",

Second, the Due Diligence representations underscore an important inconsistency.

---

[180] *Hughes*, 2020 WL 1987029, at *16 (quoting *Tyson Foods*, 919 A.2d, at 578).

[181] 2021 WL 2102326, at *27 (Del. Ch. May 25, 2021).

[182] *Appel*, 180 A.3d, at 1060-62 (holding that directors' reasons for tender offer were material).

{01911892;v1 }

Company's management for over ten years", and had affiliates that stayed "up-to-date on [Legacy ATIP's] financial and operating performance, as well as overall industry outlook[.]" ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ The Insiders "can't have [their] cake and eat it too."[183] ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

## III. THE BOARD'S DISCLOSURE VIOLATIONS ARE NOT EXCULPATED UNDER DELAWARE LAW

Under *Cornerstone*, only independent directors are eligible for exculpation at the motion to dismiss stage.[184] Here, because all of the directors were affiliated with Sponsor and/or had an interest in Founder Shares, none of them should be deemed

---

[183] *Gradient OC Master, Ltd. v. Universal, Inc.*, 930 A.2d 104, 118 (Del. Ch. July 12, 2007).

[184] *In re Cornerstone Therapeutics, Inc.*, 115 A.3d 1173, 1180-87 (Del. 2015).

independent for these purposes.[185] Hence, exculpation should be off the table, at least at this stage.

Moreover, "if it is reasonably conceivable that the disclosure violations were due to a breach of the duty of loyalty or bad faith, then the Court cannot exculpate the Board from liability at this time."[186] The Court of Chancery has recognized the frequent "difficulty in divining an exclusive duty of care breach from a possible duty of loyalty breach or bad faith conduct on a Rule 12(b)(6) motion to dismiss a disclosure claim."[187] Here, it is reasonably conceivable that the Board's disclosure violations concerning the Staffing Representations, Growth Representations, and Due Diligence Representations were due to its breach of the duty of loyalty and/or good faith.

First, the Board made several misrepresentations about its own actions. For example, the Board made representations concerning (i) Attrition And Retention, (ii) COVID Effects Enable Attractive Valuation, (iii) Successful Implementation, and (iv) Through Review of Other Alternatives.[188] In making these representations, the

---

[185] *See id.*

[186] *In re Ebix, Inc. Stockholder Litig.,* 2014 WL 3696655, at *27 (Del. Ch. July 24, 2014) (quoting *In re Gen. Motors S'holders Litig.*, 734 A.2d 611 (Del. Ch. 1999)).

[187] *Ebix*, 2014 WL 3696655, at *27.

[188] *See* ¶¶ 66-78; Lindsay Affidavit Exhibit 1 at 98-100.



By misrepresenting its own actions, the Board committed a knowing disclosure violation in bad faith.[190]

Second, the Board spoke about the Staffing Representations, Growth Representations, and Due Diligence Representations publicly and in detail, so it is reasonable to presume that the Board was knowledgeable about these topics.[191] Indeed, "on the question of pleading knowledge, however, Rules 12(b)(6) and Rule

---

[189] *See, e.g., Appel*, 180 A.3d, at 1060-62.

[190] *See, e.g., Hansen*, 2018 WL 3030808, at *11 (finding plaintiff stated a disclosure claim when defendant "knew the Proxy was materially misleading" due to his own misconduct and still "allow[ed] the Proxy to go out to stockholders").

[191] *See, e.g., In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (remarking it was "highly improbable" that defendant, who publicly described company's finances, did not inquire into basis for those statements); *see also Pattern Energy*, 2021 WL 1812674, at *61 (director defendants' failure "to correct a Proxy they knew to be false and misleading" was "actionable as bad faith").

9(b) are very sympathetic to plaintiff[].”[192]

Third, the SEC investigation provides additional support for an inference of the Board's knowledge.[193] Approximately one month after the Merger closed, FAII finally disclosed the staffing challenges that had been known to exist months before the Merger. In response, the SEC commenced an investigation.

Fourth, the Board had the motive and opportunity to cause the Proxy to be materially misleading. In purporting that the Founder Shares' vesting requirements meant that “[t]here could be no motive”[194] for disclosure violations, the Insiders completely ignore the reality that downplaying Legacy ATIP's weaknesses maximized the likelihood that their 8.625 million Founder Shares would vest.[195] The Insiders also ignore the fact that the vesting requirements are quite minimal. For

---

[192] *Presidio*, 251 A.3d at 275; *Wells Fargo & Co. v. First Interstate Bancorp*, 1996 WL 32169, at *11 (Del. Ch. Jan. 18, 1996).

[193] *See e.g., Tyson Foods*, 919 A.2d, at 600 (“If nothing else, the SEC investigation provides a very strong inference.”); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) (“[T]he government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter [under the heightened pleading standards].”).

[194] Br. at 35.

[195] *See Columbia Pipeline*, 2021 WL 772562, at *57 (“It is reasonably conceivable that their interest in early retirement and the benefits conferred by the Merger tainted their decisions about what to disclose . . . .”).

example, they only effectively require the post-Merger trading price to touch certain prices for just a few days at any time within ten years, and the shares even vest in the event that FAII is acquired below the redemption price. As the entire Board had deep ties to the Founder Shares, they also had the opportunity to taint FAII's disclosures in a manner most beneficial to them.

Finally, assuming *arguendo*, that it is somehow unclear whether the Board's disclosure violations result from the duty of loyalty or care, the Board cannot be dismissed from this action.[196] Again, at this stage all reasonably conceivable inferences must be drawn in Plaintiff's favor.[197]

## IV.   DIAB AIDED AND ABETTED THE BREACHES

"Claims for aiding and abetting are 'fact intensive and ill-suited' for disposition on the pleadings."[198] The aiding and abetting breaches of fiduciary duty elements are "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the non-fiduciary

---

[196] *See Chen v. Howard Anderson*, 87 A.3d 648, 692 (Del. Ch. 2014) (rejecting summary judgment for defendants when "[i]t is not clear as this stage whether the disclosure violations in the Proxy Statement resulted from a breach of the duty of loyalty or the duty of care").

[197] *See Voigt*, 2020 WL 614999, at *26 (mostly denying motion to dismiss).

[198] *Clark v. Davenport*, 2019 WL 3230928, at *15 (Del. Ch. May 2, 2019) (quoting *Good Tech.*, 2017 WL 2537347, at *2 (ORDER)).

defendants, and (4) damages proximately caused by the breach."[199] As explained *supra*, elements one, two, and four are satisfied.

Acts constituting knowing participation can take a "'variety of forms that can differ vastly in their magnitude, effect, and consequential culpability.'"[200] Knowing participation occurs when a party publishes material misleading information to stockholders in connection with their decision-making process for a merger.[201] Diab claims that the Merger was an "arm's-length transaction," as though this mantra has talismanic power in justifying his requested dismissal. However, Delaware law is clear that being on the opposite side of a table does not give Diab the license to deceive FAII's stockholders.[202]

---

[199] *In re Rural Metro Corp. S'holder Litig.*, 88 A.3d 54, 80 (Del. Ch. 2014).

[200] *In re Mindbody, Inc. S'holder Litig.*, 2023 WL 2518149, at *44 (Del. Ch. Mar. 15, 2023) (quoting *In re Dole Food Co, Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 15, 2015)).

[201] *See*, *e.g.*, *Mindbody*, 2021 WL 5564687, at *2 ("Vista knew that the proxy did not disclose information about Vista's own dealings with Stollmeyer, dealings which I previously found support the plaintiffs' claim for breach of the duty of disclosure. The plaintiffs thus adequately alleged that Vista knowingly participated in the disclosure violation related to Stollmeyer's early interactions with Vista."); *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *26 (Del. Ch. July 23, 2015) ("Goldman was motivated to and intentionally created an informational vacuum by failing to disclose material information to the Board at a critical time . . . . As such, the Complaint sufficiently alleges a claim for aiding and abetting the Director Defendants' duty of care.").

[202] *See, e.g., Mindbody*, 2021 WL 5564687, at *2 (sustaining aiding and abetting claim against merger counterparty when merger counterparty failed to

Diab solicited the Merger with materially misleading claims that he knew to be false. For example, Diab told FAII stockholders in a FAII investor presentation that Legacy ATIP had "strong historical growth and momentum" that has come by the way of "same store growth De Novo growth, and M&A."[203] Diab also claimed that Legacy ATIP had "very high retention, low turnover."[204]  ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Diab also publicly remarked through a press release filed with the SEC that Legacy ATIP was "on track to achieve our de novo development targets for the

---

correct materially misleading proxy disclosures without regard to whether merger was arm's length transaction); *Columbia Pipeline Grp.,* 2021 WL 772562, at *58-59 (same); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984) ("Obviously, an offeror who does participate in a target board's breach of fiduciary duty, cannot be said to be conducting arm's-length negotiations."), *aff'd*, 575 A.2d 1131 (Del. 1990); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 837 (Del. Ch. 2011) ("Creating or exploiting a fiduciary breach is not part of legitimate arm's-length bargaining . . . .").

[203] ¶ 58.

[204] *Id.*

[205] ¶¶ 98, 102.

[206] ¶ 93.

year."[207] This was materially false and misleading.



During the same time period as the SEC's investigation and FAII finally disclosing the truth, Diab resigned from his CEO position, which strengthens Plaintiff's claim.[209]

Finally, Diab is also liable for failing to correct the materially false and misleading Proxy. The Merger Agreement provided that "[a]t a reasonable time prior to the filing, issuance or other submission or public disclosure of any reports to be filed with the SEC . . .[Legacy ATIP] shall be given an opportunity to review and comment upon such filing, issuance or other submission and give its prior written

---

[207] ¶ 61.

[208] Lindsay Affidavit Ex. 11 at 23.

[209] *See, e.g.*, *Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 11 (Del. Ch. 1991) (explaining that "the alleged resignation of the members of the committee from the board" supports an inference of defendants' bad faith conduct); *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1305 (11th Cir. 2015) ("Various courts have recognized that an executive officer's resignation can strengthen an inference of scienter [under the heightened pleading standards] when it occurs around the same time as an investigation.").

consent to the form thereof[.]"[210] Thus, as Legacy ATIP's director and CEO at the time of the Proxy's filing, Diab's imprimatur is all over the Proxy, and the most reasonable inference is that its misrepresentations were made with his actual knowledge and consent. Thus, Plaintiff's claim for aiding and abetting against Diab cannot be dismissed at this stage.

## CONCLUSION

For the foregoing reasons, the Motions should be denied in their entireties.

ASHBY & GEDDES

/s/ Tiffany Geyer Lydon

Stephen E. Jenkins (No. 2152)
Richard D. Heins (No. 3000)
Tiffany Geyer Lydon (No. 3950)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
(302) 654-1888

Words: 12,840

*Attorneys for Plaintiff*

*Of Counsel:*

Donald J. Enright
Noah R. Gemma
LEVI & KORSINSKY, LLP
1101 Vermont Ave., N.W., Suite 700
Washington, DC 20005
(202) 524-4290

Dated: May 25, 2023

---

[210] ¶ 49 n.9.

{01911892;v1 }

# CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June, 2023 a true and correct copy of

the public version of *Plaintiff's Omnibus Answering Brief in Opposition to*

*Defendants' Motions to Dismiss* was served on the following counsel of record via

File & Serve*Xpress*:

| | |
|---|---|
| Theodore A. Kittila | Jenness E. Parker |
| HALLORAN FARKAS + KITTILA | Elisa M.C. Klein |
| LLP | SKADDEN, ARPS, SLATE, |
| 5801 Kennett Pike, Suite C/D | MEAGHER & FLOM LLP |
| Wilmington, DE 19807 | One Rodney Square |
| | Wilmington, DE 19801 |

*/s/ Tiffany Geyer Lydon (#3950)*
Tiffany Geyer Lydon (#3950)

{01912117;v1 }