# EXHIBIT B

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WENDELL ROBINSON,                        :
                                         :
                Plaintiff,               :
                                         :
            v.                           : C.A. No.
                                         : 2023-0142-NAC
FORTRESS ACQUISITION SPONSOR II, LLC,    :
ANDREW A. MCKNIGHT, JOSHUA A. PACK,      :
MARC FURSTEIN, LESLEE COWEN, AARON F.    :
HOOD, CARMEN A. POLICY, RAKEFET          :
RUSSAK-AMINOACH, SUNIL GULATI, DANIEL    :
N. BASS, MICAH B. KAPLAN, and LABEED     :
DIAB,                                    :
                                         :
                Defendants.              :

                        - - -

                Chambers
                Leonard L. Williams Justice Center
                500 North King Street
                Wilmington, Delaware
                Friday, December 1, 2023
                1:30 p.m.


                        - - -


BEFORE:  HON. NATHAN A. COOK, Vice Chancellor

                        - - -


    ORAL ARGUMENT ON DEFENDANTS' MOTIONS TO DISMISS
                  HELD VIA ZOOM



------------------------------------------------------------
                CHANCERY COURT REPORTERS
          Leonard L. Williams Justice Center
               500 North King Street
             Wilmington, Delaware 19801
                  (302) 255-0521

2

APPEARANCES:

TIFFANY GEYER LYDON, ESQ.
Ashby & Geddes, P.A.
        -and-
DONALD J. ENRIGHT, ESQ.
NOAH R. GEMMA, ESQ.
of the District of Columbia Bar
Levi & Korsinsky, LLP
  for Plaintiff

JENNESS E. PARKER, ESQ.
ELISA M.C. KLEIN, ESQ.
EMILY NOWLAN, ESQ.
Skadden, Arps, Slate, Meagher & Flom LLP
        -and-
SCOTT D. MUSOFF, ESQ.
BLAIR T. THETFORD, ESQ.
of the New York Bar
Skadden, Arps, Slate, Meagher & Flom LLP
  for Defendants Fortress Acquisition Sponsor
  II, LLC, Andrew A. McKnight, Joshua A. Pack,
  Marc Furstein, Leslee Cowen, Aaron F. Hood,
  Carmen A. Policy, Rakefet Russak-Aminoach,
  Sunil Gulati, Daniel N. Bass, and
  Micah B. Kaplan

THEODORE A. KITTILA, ESQ.
Halloran Farkas + Kittila, LLP
        -and-
JEFFREY M. GREILSHEIMER, ESQ.
of the New York Bar
Halloran Farkas + Kittila
  for Defendant Labeed Diab

- - -

3

THE COURT:  Good afternoon, everyone. We can start with appearances, please.

ATTORNEY LYDON:  Good afternoon, Your Honor.  On behalf of Plaintiff Wendell Robinson, Tiffany Lydon from Ashby & Geddes.  With me are Donald Enright and Noah Gemma with Levi & Korsinsky.  With the Court's permission, Mr. Enright, who is admitted *pro hac vice*, will be making the argument today. Thank you.

THE COURT:  That's fine.

ATTORNEY ENRIGHT:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

ATTORNEY PARKER:  Good afternoon, Your Honor.  Jenness Parker from Skadden on behalf of the FAII defendants.  With me on the line, Your Honor, are Scott Musoff, Blair Thetford, Elisa Klein, and Emily Nolan.  And also with us, Your Honor, is David Meisels from Fortress.

THE COURT:  Good afternoon.  Thank you.

ATTORNEY KITTILA:  Good afternoon, Your Honor.  Ted Kittila on behalf of Halloran Farkas + Kittila on behalf of Defendant Labeed Diab.  I have

4

with me my colleague, Jeffrey Greilsheimer, who has been admitted *pro hac vice*, and with the Court's permission, he will be doing the argument on behalf of Mr. Diab.

ATTORNEY GREILSHEIMER: Good afternoon, Your Honor.

THE COURT: Good afternoon.

Okay. Who will be going first on the motions to dismiss?

ATTORNEY PARKER: I will, Your Honor.

THE COURT: Thank you, Ms. Parker.

ATTORNEY PARKER: Thank you for your time today, Your Honor.

So we're here today on our motion to dismiss plaintiff's direct class action claim. They raise one claim here, Your Honor, which is a breach of fiduciary duty of disclosure claim in connection with the definitive proxy that was issued when the FAII SPAC issued the proxy in connection with the merger with ATI Physical Therapy. And that merger closed in June 2021.

So, Your Honor, I'm going to rely on my briefing for facts and my whole argument. I'm just going to give you the highlight reel today, if that

5

works for you.

THE COURT:  That's fine.

ATTORNEY PARKER:  So there are two parts to my argument.  I'll talk about why business judgment rule applies here and not entire fairness, and I'll talk about the disclosure.

So to dive right in, plaintiff's argument here, Your Honor, mimicking *MultiPlan*, *Gig2*, *Gig3*, and obviously the cases that came out after they filed their complaint, but *Excel*, *Fleet*, *Malork*, *FinServ*, plaintiff's arguments mimic those cases, and they say, look, the sponsor and the FAII board intentionally misled the public here to do a bad deal because a bad deal was better than no deal for the sponsor and the FAII defendants.

And that's not true.  And the interests were not misaligned.  And that's why the business judgment rule applies here instead of entire fairness, Your Honor.  So let's talk about why that is the case.

So the public stockholders bought FAII shares at $10 per share in connection with the IPO in August of 2020, so we're still on track with your typical SPAC.  In connection with finding a private

6

company to merge with, the sponsor acquired 8.625 million shares for 25,000 — still on track with your typical SPAC. Four of the board members that were not affiliated with Fortress or that were not employed by Fortress got 25,000 founder shares. Okay. Similarities end there. That's where things are different with this SPAC.

The founder shares. So concurrent with the merger agreement, the sponsor and FAII entered into the parent sponsor letter agreement. Now, this is on page 1 of the proxy, Your Honor, the vesting and forfeiture provisions. So pursuant to that agreement, those founder shares unvest upon the merger and only revest in one-third tranches when the stock price reaches 12, 14 and $16. And if they never reach those share price numbers, they're forfeited after ten years. So that's the vesting and forfeiture provisions.

And that's different from your typical SPAC and certainly from the cases that we have seen. And again, Your Honor, that's not just in the parent sponsor letter. That's attached to the proxy. It's on page 1.

But the nail in the conflict coffin is

7

the PIPE. And I don't think we've seen this in any of the other cases so far either. And this is reflected on page 2 of the proxy. The sponsor acquired 7.5 million shares of FAII Class A common stock at $10 per share, the exact same amount the public stockholders paid. It's elsewhere in the proxy too, Your Honor, but it is featured right on page 2. I'm thinking *Smile Direct*: "It was all on page 1."

This also aligns the FAII defendants' interest with the public stockholder because, look, it's just not reasonably conceivable that the sponsor would enter into the PIPE if, as plaintiff alleges, well, we knew things were going to go south, but we were going to make money no matter what. That's just not the case because the founder shares would not make money in a "bad deal," and the sponsor loses significant sums and indeed did on the $75 million PIPE investment.

Plaintiff doesn't say much about the PIPE but kind of mixes the PIPE and founder shares and say, well, those actually aggregate mismatched incentives. And they make five arguments about why they think that's the case. And I'll just tick through those quickly. Again, these are in my briefs,

8

Your Honor. So if I leave something out, I'm not conceding it.

THE COURT: That's fine.

ATTORNEY PARKER: It's all there.

So, first, they kind of oddly argue, it speaks volumes that the disclosures one month later -- the quick correction of the disclosures one month later, well, that speaks volumes. Well, I don't think that speaks volumes in light of the way the transaction was structured and the founder shares were structured and in light of the PIPE investment. This speaks volumes about knowledge, about why would they enter into this deal if they knew, 30 days later, facts were going to come out that tanked the share price?

And the other thing about this, Your Honor, is the FAII defendants knew that they were not going to control the post-merger board. So there was no way that they would be on the board and say, hey, let's keep lying to everybody until the share price reaches 12, 14, and 16. They just couldn't have done it.

Second, the plaintiff argues that the founder shares needed to stay only for five days at

9

those vesting thresholds. But the more reasonable inference, Your Honor, is, well, right, they needed to stay there for five days. And by the way, they would then still have been at 12, 14, and 16, and thus, value maximizing for the public as well.

Third, Your Honor, plaintiff argues that the FAII defendants and sponsor would lose less in a value-decreasing deal, but that's not true. Again -- and I know I'm being repetitive. It's kind of like the same response for all of these. They would not have made money in a "bad deal" -- we're talking about a bad deal is less than $10, I guess, "bad deal" -- they would not have made money on the founder shares and they lost money on the PIPE. So that argument doesn't make sense.

And then they kind of throw in there that Fortress was willing to take more risk but, again, Your Honor, the risk here was a $75 million investment, and they lost money on it, hence aligning interests.

Their fourth argument is Fortress' $6 million loan in Legacy, they say, well, you don't want to risk that, and you have your wind-up costs, but the losses on the PIPE dwarf those costs.

10

And then, finally, plaintiff argues, well, if somebody wants to buy ATI, boom, that's how you make money on your founder shares. But that's not the way it works. You look at the parent sponsor letter, and it's clear in paragraph 7(d)(2), which is right after the vesting and forfeiture restriction provisions, it says, "All vesting shares that were eligible to vest and remain unvested" will vest at that point upon a merger. And that section directs you to 7(d)(1), which is the vesting provision. So it has to hit 12, 14, and 16 for all of them to vest in a merger and, again, value maximizing for everybody.

So for those reasons, Your Honor, there is no unique benefit here for the sponsor and the FAII directors. And once you get past the no conflicted controller transaction, no unique benefit, what are you left with? Bad faith.

So we made some arguments in our brief, and I can quickly tick through them on the process, because I think that's all they're left with, then, is bad faith in connection with the process, to try to get to entire fairness.

Now, they didn't respond to these, and so I think they have conceded them. Which is the FAII

11

reps met -- looked at 197 targets, talked with a number of others. Plaintiff ignores Party A in the proxy, which FAII met with and discussed a potential transaction with in August 2020. The FAII board met multiple times. The FAII board had six independent advisors, two financial advisors, one of whom, Deutsche Bank, gave them a financial analysis, and then four advisors who did diligence. E&Y, who ended up with I think it was like an 84-page report, including -- and I'll get into this with the disclosures -- the staffing issues. Marwood, Marsh, and Skadden did diligence. And so the board had their independent advisors doing diligence, looking under the hood for them.

Plaintiffs don't respond at all on the independent advisor point, whether to say those advisors weren't independent or that they didn't do what they should have done or didn't look at thing they should have looked at. You don't hear those arguments.

So plaintiffs concede that there's no bad faith in connection with the process. So business judgment rule should apply here. The only things plaintiffs talk about are the disclosures in

12

connection with the process.

If I may, Your Honor, I have a few slides to try to distill the disclosure section of my briefs down.

Thanks Aaron.

Aaron Shorr, one of our amazing trial tech people, is also on with us.  Trial tech guru, I should say.

Thanks, Aaron.  Next page please.

And so there are three categories of representations: staffing, growth and diligence.

Can we flip on the next page, please.

So if you don't have -- and we know this from *GoPro* and *USG*.  Where you don't have a conflicted controller transaction -- we have here, Your Honor, an exculpatory provision -- you are left with bad faith in connection with the disclosures. And so both *GoPro* and *USG* talk about motive and knowledge.

And I'll read quickly, Your Honor, from *GoPro*.  And this is from *11, page 11 of the opinion.  "It is not surprising Plaintiffs have failed to plead particularized facts to support an inference of affirmative Board-level misconduct given that they

13

have failed to plead any facts that would offer a conceivable explanation of why a majority of the Demand Board would intentionally cause the Company to release false statements to the market knowing full well the Karma inventory shortage would be known to stockholders and the market within a matter of weeks."

And *USG* similarly talks about motive incentive. Here, I won't belabor the point, but I will say again, it doesn't make sense. There was -- the way this transaction was structured, there was no motive for the FAII defendants to mislead the public, to do what the cases have talked about, to do a deal that was bad for the public but was going to make money for the sponsor and the FAII defendants, because that's just not the case.

Knowledge. So, again, *GoPro* and *USG* and a number of other cases talk about when a plaintiff is left with alleging bad faith, they need to allege scienter in connection with the disclosures. And as *GoPro* [*sic*] says, "where the [] omissions or misleading disclosures are pled as evincing bad faith, the pleading is subject to a finer-toothed comb — that of scienter — which is among our law's most straightened." And that's at page 26, Your Honor.

14

Next page, please.

So the staffing representations. Plaintiffs -- to the left is a summary of what the statements in the proxy are that plaintiffs claim were materially misleading, Your Honor: that ATI had historically high retention, favorable clinician rates. They say -- the hypothetical risk issues, they say, well, you knew that these risks were real, and so calling them hypothetical was misleading. And then whether FAII's board considered Legacy ATI's attractive recruiting and retention.

Okay. So knowledge. For these disclosure claims, plaintiffs cite to three documents. Those documents, which are from the 220 production, Your Honor, are listed in the middle. They're the February 18th minutes, May 14th minutes, and May 14th presentations. And they're all Legacy ATI documents, so at a time when there was a different board and it's a different company. They cite no FAII documents.

First of all, the FAII board had its own independent advisors, as we just talked about, do diligence for them. Diligence closed on February 18th. E&Y did staffing diligence, and that is at our -- that's attached as an exhibit to our

15

brief, the E&Y report. They did staffing diligence. That report is dated February 15th.

It's not reasonably inferable that the FAII board would have known about these minutes that plaintiffs are relying on.

The May 14th minutes and presentations, what else was on that day? The definitive proxy was issued on that day, Your Honor. And we all know that minutes aren't prepared the same day as the board meeting. It's just not reasonably inferable that the FAII board would know about these documents.

But even so, Your Honor, I'd like to look quickly at a couple of -- well, not a couple, all three of these. So let's look at, first, Exhibit 10, which is -- and these are exhibits to our brief, Your Honor.

So this is the ATI, again, the Legacy ATI board presentation, which actually says ATI was talking about 2021 talent strategy tools.

And then if we go to the next slide, which is from the same document that plaintiffs raised with Your Honor, the ATI May 14th board presentation that says, look, our hiring challenges are not

16

actually across all markets.

And then the next slide, Your Honor, which is from the May 14th board minutes -- our faces are underneath part of this, but I think you get the gist.

Can we go back to the staffing?

Thanks, Aaron.

So then, finally, I wanted to show Your Honor the January 2021 FAII presentation, even though they don't raise this with Your Honor as evidence for their allegation that it was misleading and false in the proxy to say that the FAII board considered Legacy ATI's attractive recruiting and retention. And by the way, Your Honor, they do cite this for the next -- the growth presentation, so I'm not raising something they haven't already.

So let's look at FAII's January 21 presentation, because the allegation is, well, you guys didn't even think about this. But it's right there in FAII's January 21 board presentation. "ATI benefits from scale, having invested substantial capital over the last decade in operational initiatives including ... recruiting[,]" and then that ATI has "a top recruiting platform."

17

Now let's skip to the growth representations, please.

So here, plaintiffs rely on four documents, largely the same as the slide before, but here, they included another presentation from the 220 documents. I'm not going to repeat myself, Your Honor. Same argument about knowledge here with the timing of the Legacy ATI documents. And the only FAII document they rely on here is the presentation we just looked at. And we'll look at the page here that relates to the second two categories -- the second two statements that they say were misleading.

So on the first, Legacy ATI projected a 2021 EBITDA of 119, and that that was misleading. Well, I'm going to rely -- I have my arguments here I'm going to rely on that in my briefing, Your Honor, and not belabor the point. But, you know, this was early in 2021, projections for a whole year. So you have my arguments. I'm going to move on from that one.

The next is they say, well, you knew that they hadn't hit these projections. You knew they hadn't hit these projections, and so your disclosures about long-term growth strategy were false and

18

misleading.  And their main argument for that is -- and let's pull up the slide, Aaron, on the January 21 presentation.  Because I've highlighted -- to be fair, I highlighted for Your Honor their own argument.  It says here -- and Aaron will highlight -- it's that continued COVID-related volume pressure, where the red cursor is.

So they say, aha.  You knew.  And by the way, this is a key risks and mitigants slide in the FAII January 21 board presentation.  You knew recovery had plateaued, so you couldn't have possibly believed in your own statements.  But what they left out for Your Honor is right below that, mitigant, mitigant, mitigant.  So the plateau does not result in their statements being materially misleading.

And then their final category or their final statement that they allege was misleading is you shouldn't have disclosed that Legacy ATI had a deep pipeline to support 90-plus de novo clinics in 2021. Well, again, Your Honor, we're talking about knowledge.  And if you look back at the January 21 presentation, right above their favorite word of "plateau" is "ATI was in active lease negotiations on over 90 new stores with dozens more already

19

identified."  So that's it for the growth representations.

And then, finally, Your Honor, in the what we've called diligence representations, for the review of other alternatives, their argument is, the proxy was misleading because it says FAII representatives considered 197 other targets.  And they say, well, that's nowhere in your 220 production. But we know, Your Honor, from the *BridgeBio* case, which was affirmed this year by the Supreme Court, and *GGP*, because something wasn't in board minutes doesn't mean that it didn't happen and doesn't render a statement materially misleading.

And then in the second box to the left, Your Honor, right below that, that affiliates had stayed up-to-date on Legacy ATI's performance. And with that, they mean the loan.  But what they -- but the loan was -- I actually think that cuts against them, because that discusses historical information from ATI over the last ten years, not awareness of post-the-signing and post-diligence information.

And again, Your Honor, there was extensive due diligence, which leads me to the third box, the significant due diligence.  They say, ah,

20

that was a lie.  You didn't do significant due diligence.  There were four companies that did due diligence, four independent advisors.  Ernst & Young's presentation alone was 84 to 90 pages, which they don't show Your Honor.  And diligence ended, as we talked about already, on February 18th.  So the things they point Your Honor to were just not knowable at the time.

Nor is it like in FinServ, where they were getting biweekly reports after the fact.  There's no allegation about that here, and there's no allegation that continued updates happened after the fact.

And a final note, Your Honor, is the risks.  And we have this in our brief at pages -- I'm going to pull it up for you.  There were extensive risks related to the transaction that were disclosed.  And this is on page 16 to 18 of our opening brief, with the proxy cite.  So I'll just direct you there for the pages in the proxy, including a list of 19 different -- nonexhaustive list of factors related to, for example, the projections.

So with that, Your Honor, that's my presentation.  And for those reasons, the business

21

judgment rule should apply here, not entire fairness. There was no unique benefit. So you're down to bad faith for the disclosure claims. And they just -- there is no reasonable inference that the FAII defendants had knowledge, knowingly misled the public stockholders.

THE COURT: Thank you, Ms. Parker. If I can just -- if you can provide a copy of those slides --

ATTORNEY PARKER: Yes.

THE COURT: -- that would be very helpful.

ATTORNEY PARKER: Happy to. Via letter?

THE COURT: That's fine.

ATTORNEY PARKER: Will do, Your Honor.

THE COURT: Mr. Greilsheimer?

ATTORNEY GREILSHEIMER: Thank you, Your Honor. For Mr. Diab.

Let's start with Mr. Diab was the CEO and a board member at ATI prior to the acquisition, and he owed his duties to ATI and its shareholders. And the plaintiff here admits that he did not owe duties to FAII's shareholders. That's at paragraph

22

151 of the complaint.

And what he's essentially alleged to have done is to have known information and to have known that the FAII board had that information and that it wasn't in the proxy. And that's the allegation that's been made against him.

And *Xura*, which is cited in both of our briefs, addressed that situation. And it found and dismissed the aiding and abetting claims where the alleged aider and abettor knew information and knew that the board wasn't disclosing the information. And for that reason, Mr. Diab should be out of this case.

But let's take a step back. You heard from Ms. Parker that the FAII board members should be out of the case. Obviously, if they're out of the case, then Mr. Diab needs to be out of the case, because if there is no breach of fiduciary duty, then it's impossible to have aided the breach of fiduciary duty that didn't occur. I don't think that's contested at all.

But if you look at what needs to be alleged against Mr. Diab, it's knowing participation in a breach of fiduciary duty. That requires scienter, and it's a stringent pleading standard. And

23

it's not in this complaint.  Mr. Diab is added very much as an afterthought here.

And there's multiple cases, there's *Xura*, there's the *Morrison* case that we cite, that find that if all you've done is not corrected or forced a board to correct what's believed or alleged to be a misleading disclosure, then that's not enough. There needs to be some duty that you've violated, somewhere.

So plaintiffs respond by citing *Mindbody*.  And *Mindbody* has no application here. *Mindbody* is a case where the facts are quite egregious.  The alleged aider and abettor is alleged to have scrubbed documents to hide information, to have deleted information to make the presentation and other documents false, to have instructed people not to disclose certain things.  None of that is alleged here.

THE COURT:  I did notice the *Mindbody* citations in your briefing.  I just confess I didn't check.  It seems as though those were 2023 cites. Were you citing to the post-trial decision?

ATTORNEY GREILSHEIMER:  I have to check the dates, but I believe so.

24

THE COURT: A different pleading standard would apply at the motion to dismiss. Correct?

ATTORNEY GREILSHEIMER: Yes. But in the *Xura* and the *Morrison* cases, Your Honor, those are motions to dismiss, and they were granted where the only allegation is that the alleged aider and abettor failed to force the board to correct a disclosure.

But let's go back to the facts in *Mindbody*, because there's two fundamental differences here.

First off, we're not accused to have created an information vacuum. That's not what Mr. Diab is accused of having done. The accusations and the allegations in the complaint are that the information was shared with FAII and it wasn't disclosed by FAII.

And there's one other very significant difference, which is in *Mindbody*. Vista, who was the alleged aider and abettor, had a contractual obligation to review the proxies and raise any misleading omissions that were contained in the proxies. That was a contractual obligation in that case. It's not present here.

25

Our contract says that ATI, not Mr. Diab, but ATI, has the right to review and comment upon the proxy but not that they have an obligation to raise and seek the correction of the proxy. They can ask for it, but they have no obligation to do so. So they're not breaching any obligation if they don't raise an issue. There's no contractual obligation to do so.

And so if you take a look at that or you take a look at the other case that's heavily relied on by the plaintiffs, which is *TIBCO*, again, it's a case that involves creating an information vacuum, not disclosing things, and then being stuck in that position where the people making the proxy, issuing the proxy, didn't have the information to make the disclosure. That's not what's alleged here.

We're in the land where *Xura*, which we cited in both of our briefs and wasn't in the opposition papers submitted by the plaintiffs, comes out and says, that's not enough and dismisses the aiding and abetting claims.

And I don't think there's anything else that I need to add there. I should keep this brief. We're very much tagging along in this case.

26

So unless the Court has further questions, I have nothing further.

THE COURT:  Don't the plaintiffs here allege that Mr. Diab did do at least two additional things, which is speak at an FAII investor presentation and make disclosures in that capacity, and then also he participated in a press release to FAII stockholders?

ATTORNEY GREILSHEIMER:  Yes, those allegations are in there.  Those documents are issued by FAII.  And again, Mr. Diab is not in the --

THE COURT:  The press release -- I take it the press release is issued by FAII, but what Mr. Diab said at the investor presentation -- I mean, he wasn't coerced to do it.  He was speaking, or at least that's the allegation.

ATTORNEY GREILSHEIMER:  I think, yes, it's attributed to him.  The words are attributed to him.  But again, he's not issuing those documents.  He may be having them attributed to him.  He's part of a team that's doing this.  It's agreed upon with the FAII folks as to what's going to be said at these conferences.  And you're in the situation where, again, the information was in the possession or is

27

alleged to have been in the possession of FAII, and it wasn't disclosed by FAII. And they had the duty of disclosure, not Mr. Diab.

THE COURT: Well, let's say, hypothetically -- and plaintiffs may say this is what they're alleging -- that Mr. Diab may have either affirmatively made certain statements to FAII stockholders or, I think as you said, it was agreed upon that he would be making certain statements issued by FAII, and Mr. Diab knew that the statements were false.

Is that still privileged conduct? Is that still -- it has no bearing on the aiding and abetting analysis?

ATTORNEY GREILSHEIMER: It has no bearing on the aiding and abetting analysis. The disclosures here that are alleged to have been improper are the proxy. And when you look at that, that's not Mr. Diab's document. This is a document that is prepared by FAII. They had or are alleged to have had the information that is necessary to go into it. And he's in the position of, is he required to correct that? He's got no duty in that scenario to FAII's shareholders. He's got no contractual

28

obligation to correct the proxy. At most, it's ATI that has a contractual right to review and comment on but no obligation to correct the document.

THE COURT: That's a good nuance. So I suppose the point is he is now -- hypothetically, though I'm sure Mr. Enright will let us know if this is the theory or not, but if someone is asked to participate in a speech and does so knowing that it's false, and if he had said, look, guys, I can't say that, that's false, and then he says it, and let's say the disclosures to the stockholders were -- it was a due care issue, it wasn't bad faith, wasn't loyalty, then in that scenario, is that the scienter and the involvement that, for pleading stage, satisfies a pleading-stage requirement for the claim to move forward?

ATTORNEY GREILSHEIMER: No, it's not enough, Your Honor.

THE COURT: Why is that?

ATTORNEY GREILSHEIMER: Because you are in the realm where the information was disclosed. That's the allegation in the complaint, is that it was disclosed to FAII. And FAII made its disclosures. And the question here is did he aid them or abet them?

29

And he did not. He had no obligation to correct their disclosures.

And he had an obligation to achieve the best possible results for his shareholders. That's well-established Delaware law. He turned over the information. FAII did what it did with the information. And it was his fiduciary duty owed to his shareholders not to interfere and prevent something from going forward. He has that obligation to maximize value for Legacy ATI. And that's privileged.

THE COURT: Well, okay. So I mean, this is not the first hearing in this matter, of course. And I am aware of the other complaint that's out there and the claims that are made in the other complaint. And perhaps so that we can talk about this a bit more efficiently, we can keep things abstract.

I mean, I can understand -- I can see a scenario where maybe, as a fiduciary matter and an aiding and abetting matter, this is not aiding and abetting. But if someone makes statements that are false and that they intend for other folks to rely on, maybe that implicates other concepts. Maybe it's just not aiding and abetting. So I -- because I suppose

30

what you're suggesting is that someone can -- that a counterparty, in pursuit of his or her fiduciary duties, maximizing value for his or her stockholders -- I mean, to take your proposition to its sort of maximal point, this individual is privileged to say false things in order to maximize value for his or her stockholders. And that is -- it's, you know, as a matter of Delaware law, I think the suggestion is that there's no claim that arises there. But maybe the -- maybe I can get your reactions to that.

And as I'm thinking through this, maybe the answer is that there are just different concepts that apply, and this is -- there are other standards that would obviously apply if that is the claim, but -- and heightened pleading standards. And again, you know, I am not blind to the other complaint that's out there. But maybe the argument is that this just isn't aiding and abetting.

ATTORNEY GREILSHEIMER: That's exactly it, I think, in your last sentence. That's not aiding and abetting. And that's what's alleged in this case, Judge.

So if -- we're here on the motion to

31

dismiss the claims that are present in this complaint, which is the aiding and abetting claim. We'll address if the other complaint -- if the time comes, we'll address the claims that are made there. But on this one, they haven't alleged aiding and abetting sufficiently. And the holdings in *Xura* and in *Morrison* are what control here. And it's not *Mindbody* and it's not *TIBCO*, for the reasons that I discussed a few minutes earlier.

THE COURT: Okay. Thank you very much.

ATTORNEY GREILSHEIMER: Thank you, Your Honor.

THE COURT: Mr. Enright?

ATTORNEY ENRIGHT: Good afternoon. Thanks for hearing us today, Your Honor. Donald Enright with Levi & Korsinsky for Plaintiff Wendell Robinson.

Your Honor, you've heard a lot of arguments today from the defendants, which mostly echo their briefs. These arguments, I think, while skillfully made, tend to ignore a lot of the plaintiffs's allegations and arguments. And apparently, they're hoping that the Court will ignore

32

those as well.

I suspect that the Court has already noticed that defendants' arguments mainly ask the Court to ignore well-pled facts and the reasonable I inferences that can be drawn therefrom. But of course, the Court is to credit all well-pled allegations and draw all reasonable inferences in plaintiff's favor. And viewed through that lens properly, plaintiff's claims should be sustained and defendants' motions should be denied.

Your Honor, I am mindful of the time, and so I will just say now that anything I don't get to in my oral argument today, I will stand on my brief on, and we reserve all of our arguments from our brief and waive nothing.

This case stems from the acquisition of Legacy ATI by the Fortress Value Acquisitions II SPAC, which I'll just refer to as the SPAC today, and the actions of the SPAC's control group, which we'll call the insiders, and its directors, who falsely stated on numerous occasions that Legacy ATI's severe problems that had been ongoing since 2020 were actually its strengths.

The insiders received 8.625 million

33

founder shares from the SPAC for nominal consideration, and in doing so, the insiders rigged the merger to give themselves an opportunity for a massive windfall that nobody else had. Absent the merger, the founder shares would have been worthless.

On the other hand, the public stockholders purchased their shares for $10 per share or round about there and lacked any opportunity to purchase founder shares for that nominal consideration.

And candid disclosures were crucial to their decision whether to redeem those shares for $10 per share just before the merger was consummated. They would want to know the extent of the SPAC's due diligence of the Legacy ATI target company and would also want to know about Legacy ATI's core operations and trajectories. Unfortunately, they weren't provided with the full scope of information on either of those.

In that regard, as alleged in paragraphs 67 through 69 of the complaint, the SPAC assured the public stockholders through an array of representations that it had conducted extensive due diligence and that its affiliates had stayed

34

up-to-date on Legacy ATI's operating performance at all times, reaching back for years, as a result of the fact that Fortress was a lender to ATI.

And as the complaint notes in paragraphs 70 through 73, the SPAC also claimed that Legacy ATI had favorable clinician rates and had been able to realize high retention rates.

The SPAC board claimed that it considered Legacy ATI's supposedly attractive recruiting and retention capabilities to be a material factor in supporting its decision to recommend the merger. The board assured its stockholders that Legacy ATI -- that any potential problems with staffing that Legacy ATI -- might happen were merely hypothetical. They couched it as a risk when, in reality, this was an already existing problem.

They also claimed that Legacy ATI was positioned for strong future growth and had successfully implemented their growth plans. And also, as alleged in paragraphs 57 and 62 of the complaint, on several occasions, defendants also claimed that Legacy ATI would open 90 new locations in 2021. And the financial projections for ATI that had been provided in the proxy assumed as a premise that

35

90 new locations per year would be opened.

But then shortly after the merger, which closed on June 16th of 2021, ATI revealed that it could only open 55 to 60 new locations in 2021, which is obviously far less than the 90 they had promised. And this was due to recruitment problems and reduced demand, severe attrition among its physical therapists, and residual COVID-19 concerns.

In reaction, the stock price plummeted from $9 down to around $3.50 and then continued to fall to well under $1 per share. But these problems were well known and documented long before the merger. For example, paragraph 102 of the complaint discusses documents obtained in plaintiff's 220 investigation which revealed that in February of 2021, months before the definitive proxy was filed, Legacy ATI revised its 2021 plan down from over 90 new locations to just 75 and discussed that recovery had slowed in the fourth quarter due to staffing.

Paragraphs 105 to 110 of the complaint alleged that plaintiff's books and records investigation also revealed that on May 14th, a Legacy ATI board presentation discussed that revenue softness was driven by staffing challenges and suffered from

36

high attrition.  This same presentation stated that staffing challenges had been ongoing since 2020, and that ATI was also failing to meet its revenue, visits per day, and EBITDA plans.  Instead of achieving growth, it was actually regressing.

And plaintiff is hardly the only one who has asserted that the defendants misled the stockholders.  Upon the revelation of the truth, analysts were outraged.  A Barrington Research analyst said that he was "shocked by what [had] unfolded" and said defendants "had no good defense for why the company's original guidance (which was officially maintained up until [the day before]) ever made sense."

A federal class action and a federal derivative case were filed asserting similar allegations.  And even the SEC started an investigation, which prompted Defendant Diab to resign as CEO.

So the defendants' arguments that the defendants' statements weren't misleading simply don't match up to common sense.

So the Court should deny the plaintiff's motion because their arguments simply defy

37

the well-pled facts of law in the following ways: First, it's at least reasonably conceivable that this was a conflicted controller transaction, so the entire fairness standard of review would apply. Applying that standard, it's also at least reasonably conceivable that the merger wasn't entirely fair and the proxy was materially misleading.

Second, it's undisputed that the insiders had full access to Legacy ATI's internal records, and it's at least reasonably conceivable that the insiders actually knew the factors that rendered the SPAC SEC disclosures materially misleading.

Third, it's at least reasonably conceivable that Diab knowingly and directly participated in the breaches of fiduciary duty by directly making knowingly misleading statements to the SPAC's public stockholders. And, Your Honor, we'll get to it, but that is aiding is abetting. That is knowing participation in the breaches of fiduciary duty. That is the definition of aiding and abetting.

Now, the insiders haven't disputed that they comprised a control group, so that part of the argument would be waived. And they haven't even attempted to claim that they satisfied the

38

requirements of *MFW* to shift the standard to business judgment. So if the merger was a conflicted transaction in any regard, the entire fairness standard would apply.

And Delaware law has emphasized that there are many forms of controller transactions that would be subject to entire fairness. It's not a cookie cutter issue. And here, the merger was conflicted in several respects, or at least three.

First, the complaint pleads facts giving rise to a reasonable inference that the insiders stood to receive unique benefits from the merger. A unique benefit is defined as something uniquely valuable to the controller. Here, the merger provided insiders with the benefit of avoiding the loss of their founder shares that they uniquely acquired for nominal consideration. The merger preserved the insiders' unique windfall opportunity.

By contrast, the SPAC's public stockholders had no founder shares. Now, Ms. Parker emphasized today knowledge. They didn't know. They didn't know. They didn't know. And that's a question of fact, and we'll get to that. But I'd like to say, that's not really something that goes to the issue of

39

whether or not the company received a unique benefit in the merger. That's a question of possible bad faith, could be a question as far as potential exculpation, but that's not an issue as far as whether or not the controllers received or stood to receive a unique benefit from the transaction.

THE COURT: As I take it, the argument is that if entire fairness doesn't apply, then when I look at the alleged disclosure violations, I need to -- I would need to find that bad faith, some sort of knowing scienter, bad faith conduct, was involved in issuing improper disclosures. And so that's why this issue of knowledge and so forth comes into play. But I understand the point that we're talking about whether entire fairness applies here, ala *MultiPlan* and so forth.

ATTORNEY ENRIGHT: Right.

THE COURT: That's the initial issue.

ATTORNEY ENRIGHT: Right. And Ms. Parker and the defendants' briefs kind of conflate the issue. And they repeatedly said there is no unique benefit because they didn't know. And certainly, it would go to the bad faith issue, as Your Honor noted, and to potential exculpation. But it --

40

but just because they argue that they didn't know, that doesn't remove this from a unique benefit conflicted controller transaction.

Simply stated, if the merger went through, the insiders would preserve at least the possibility of a huge windfall profit. If it didn't go through, they would have lost that possibility completely and would have suffered financial and reputational repercussions. So the merger certainly provided them with a unique benefit that the public stockholders lacked.

Then in response, the insiders attempt to rewrite Delaware law, arguing that the unique benefit must result in misaligned incentives. But that's really not the law. And defendants seem to be stretching to the point where it's not really a fair statement of where the law stands on this.

For example, plaintiff cites *FBO Bobbie Ahmed*, where the Court found a unique benefit existed without any finding as to mismatched motives. And the defendants never addressed that case that we cited.

Similarly, the insiders misinterpret the three recent SPAC cases, *MultiPlan* and the two

41

*GigAcquisition*s cases, to argue that mismatched motives are a necessary requirement for a unique benefit.  But those three cases only hold that a mismatched incentive or mismatched incentives would be sufficient but not necessary to demonstrate a unique benefit.  And defendants haven't cited a single Delaware case that has explicitly held that mismatched incentives are a necessary requirement for controllers to have a unique benefit.

Delaware law simply holds that a unique benefit is something uniquely valuable to the controller.  And here, the insiders certainly received the uniquely valuable opportunity of preserving their founder shares from the merger.

THE COURT:  Well, so on that point, I believe the FAII defendants cite, for example, the *Globis Partners* decision.  And I mean, let's -- I suppose let's just try a hypothetical.  If an insider owns equity that would be hashed out in a merger, I take it -- well, maybe I'll ask.  If the insiders' basis in that equity is extremely low, let's say it is a tenth of the average basis of public stockholders, would that be a unique benefit giving rise to entire fairness?

42

ATTORNEY ENRIGHT:  I think the key distinguishing factor here, Your Honor, is the contingency that these founder shares would have been canceled and been worthless absent the merger.  Right?  So that's what makes this different from a normal merger where an insider owns stock at a low basis.  Here, it's not that they own those shares.  It's that those shares will go away if they don't do the deal.

Does that answer your question, Your Honor?

THE COURT:  Well, but just to put a pin in it, if it's not contingent, so let's say it's just ordinary equity, and all the insiders own equity, but it has a very low basis, and so in a merger, they will make a substantially greater return than public stockholders whose average basis is much higher, I don't think, under Delaware law, absent some sort of unusual circumstances, that that, itself, would give rise to application of entire fairness.

ATTORNEY ENRIGHT:  I agree with you, Your Honor.  That, alone, without more, that would not.

THE COURT:  So then let's take a situation where the insiders all own, let's say,

43

options, and those options will expire.  They bought the options for, again, very low basis.  And they will make a lot of money in a merger, and they'll make more money than public stockholders because when you buy options, oftentimes you're buying for some discount.

Would that give rise to entire fairness?  Because the public stockholders make money; the insiders make money.  I don't -- why would that, itself, give rise to entire fairness?

ATTORNEY ENRIGHT:  I think that's where you'd start to go into a gray area, Your Honor.  Particularly where you say, absent this transaction, those options would expire, presumably out of the money.  Okay?

You know, just for your hypothetical purposes, if you had insiders who rushed into a transaction in order to monetize options that were about to expire, which, absent that transaction, would have expired out of the money, I think there's an argument that that's a unique benefit, Your Honor, very clearly, because they received a benefit from accelerating and from monetizing those options that, absent that transaction, they would not have received.

Now, Your Honor, I would note that

44

this requires that it would have -- one member of the board or one officer or even several officers being in that situation wouldn't trigger that. It would have to be in a controller situation where the controller had that interest or where a majority of the board had that interest and drove that process for that purpose.

Is that fair enough, Your Honor? Have I addressed the question?

THE COURT: Now you've got me thinking about, you know, change of control provisions and golden parachutes and other sorts of terms that I think, generally, our law doesn't say the presence of triggers entire fairness, and that, if anything, the case law suggests that those mechanisms are beneficial in that they align interests with the interests of public stockholders.

ATTORNEY ENRIGHT: Sure. And again, the key difference here is, again, the contingency. All of those mechanism that you just described are static, generally speaking, whereas --

THE COURT: A golden parachute goes away if an officer is not an officer anymore. So --

ATTORNEY ENRIGHT: Sure.

THE COURT: -- under this theory,

45

every time an officer pursues a transaction, you know, they would be, well, of course they pursued a transaction because it was contingent and it would go away otherwise.

ATTORNEY ENRIGHT: Well, I would say, Your Honor, if they were about to be fired, if they were -- if controllers or a control group within the company, you know, a majority of the board, something of that nature, pursued that because they were about to be removed, and if they were removed, they would lose that acceleration, would lose that golden parachute, and they pursued a transaction in order to monetize that before they lost their position, again, Your Honor, in that situation, I would argue that they had a unique benefit.

THE COURT: So in this scenario, if the timing matters, then the deal was signed I think it was five months after the IPO. Right?

ATTORNEY ENRIGHT: Mm-hmm.

THE COURT: So there was plenty of time left for exercise -- it's not as though there was that urgency arising under the contingent nature -- well, how do I think about that, then?

ATTORNEY ENRIGHT: So I think what's

46

fair to say, Your Honor, is that in all likelihood, when they commenced their process here, they probably did think ATI was a great target. I have no reason to think that they -- and certainly, we don't allege that when they first hooked up with ATI, that they didn't, you know, starting in December when they signed the confidentiality agreement, et cetera, there's nothing to say that they didn't think that they were a good partner.

However, once -- as I think Your Honor knows, once a transaction like this gains momentum, they often take on a life of their own. And that's where I think concerns come in that, you know, if they drag this out and then it goes away, maybe they don't have the ability to turn around and start over. They'll have reputational harm. Maybe counterparties -- if they cancel, maybe counterparties won't want to engage with them. There's all sorts of reasonable inferences that can be drawn there, that --

THE COURT: But they -- I mean, they lost a lot of money on this.

ATTORNEY ENRIGHT: Fair enough, Your Honor.

THE COURT: I don't know how

47

reasonable it is to say that, you know, folks just got into the swing of things and, you know, couldn't stop, couldn't get off the dance floor.

ATTORNEY ENRIGHT:  And I think that's fair, Your Honor, but I think that's a question of fact for summary judgment or trial.  That's a question of inferences being drawn.

But to bring it back to the question of whether or not they received a unique benefit, the appropriate analysis is concerning whether the insiders received a benefit that the other stockholders didn't receive.  Right?  So the insiders had a windfall opportunity from the possible monetizing of their founder shares, which, again, none of the public stockholders had.

THE COURT:  But, again, it strikes me that what this is, is we're talking about -- I mean, it's the notion that the founder shares had a low basis, but everybody's interests were aligned.  And moreover, even beyond the potential for making substantial returns, the thing that's different here -- and this is what the defendants argued -- the things very different here from *MultiPlan*, *Gig2* and *Gig3*, are that the founder shares would not make any

48

money, zero dollars --

ATTORNEY ENRIGHT:  The vesting issue, Your Honor.  Yes.

THE COURT:  -- unless the public stockholders first made money and made quite significant money.

And so -- and then you layer on top of that the PIPE investment, where, you know, if this company doesn't trade above the $10 per share mark, then that as well is a very substantial loss.  And those seem like very unique and distinct facts from *MultiPlan*, *Gig2* and *Gig3*.

ATTORNEY ENRIGHT:  I think that's fair, Your Honor.  But again, I think you really have to come back to basics.  And the basic reality here is, as a result of this transaction, the insiders preserved the possibility of that windfall.  Okay?  And that's what they received that the other stockholders didn't receive.  It prevented those founder shares from going away.

And were they guaranteed to make money on it?  Certainly not.  The vesting issues are there.  But the reality is, this transaction provided the unique benefit of preserving those founder shares and

49

the possibility of a windfall later. It wasn't a guarantee of one, certainly, but at least the possibility. And that possibility, much like an option, Your Honor, is a benefit. It is a unique benefit.

THE COURT: But just to be clear, the -- I mean, this is not a situation that -- *MultiPlan* and *Gig2* and *Gig3* are talking about circumstances where the sponsor folks would prefer a bad deal other no deal, and with a bad deal being below $10.

ATTORNEY ENRIGHT: Right. Because of the very low basis price for their founder shares in those cases, correct.

THE COURT: And that seemed to be, in those decisions, a critical fact, that the sponsor would prefer a bad deal over no deal.

And here, the argument is that that is not present, that the sponsor absolutely, 100 percent -- well, we do know with certainty -- and I get your argument about the possibility of upside, but what we do know from the way it was structured is that the sponsors would not prefer a bad deal, meaning a deal that would trade below $10.

50

Is that fair?

ATTORNEY ENRIGHT: I think -- I think they certainly were incentivized to seek a good deal in order to reach those vesting prices. I don't think there's any question about that. But when it comes back down to the core issue, Your Honor, preserving the possibility of that windfall is a unique benefit. Regardless of the vesting issue, at the end of the day, they received the unique benefit of preserving those shares, and nobody else got that.

So this is different from *MultiPlan* and *GigAcquisitions* in the respect that you say and in the respect that Ms. Parker said. I don't dispute that it's different. Okay? But in the end, it comes back down to the core issue of, was there a unique benefit? And the answer is yes, there was, because this transaction preserved the possibility of that windfall, which otherwise would have gone away.

I think that's the best I can express that, Your Honor. But I would also --

THE COURT: Just to -- and I understand the point. I think the one thing that I'm getting hung up on is -- well, or one of the things I'm getting hung up on is, even in the scenario where

51

they wanted to preserve, as you assert, preserve the opportunity to receive what you're characterizing as a windfall, still, even in that scenario, where, if the sponsor folks were to make a -- to receive an alleged windfall, the public stockholders would still make money first, it would be value enhancing to them, there would be no circumstance where the sponsors would make money before the public stockholders.

ATTORNEY ENRIGHT: I think that's true. They wouldn't make nearly as much per share. But yes, for the insiders to make money on those founder shares, there would have to be at least some period of time when the stock price traded above $10. Okay? That's certainly true. But at the end of the day, preserving that optionality is a unique benefit.

THE COURT: Thank you.

ATTORNEY ENRIGHT: Okay. But beyond that, Your Honor, the sponsor and the parent company, the insiders, stood to receive other unique benefits as well. Fortress affiliates were owed $6 million by Legacy ATI. That debt was protected by ATI's huge infusion of capital they got from the merger. That's a unique benefit. Fortress would have been obligated to pay substantial liquidation --

52

THE COURT: What about the argument that the $6 million was dwarfed by, for example, the PIPE investment?

ATTORNEY ENRIGHT: Understood, Your Honor. I'm just saying that this is a factor. I'm not saying that it's, alone, dispositive, but it factors into the overall analysis. I'm not saying that it overcomes the PIPE. I'm saying that it's a factor to be considered and sort of netted out against that $75 million.

Also, Fortress would have been obligated to pay substantial liquidation expenses if the SPAC didn't consummate a merger. Avoiding this expense was another unique benefit.

Fortress had a big reputational stake in seeing the merger go through, as this was just one of several SPACs that they were operating. And most of the directors were directly employed by Fortress and had director positions in Fortress' other SPACs.

THE COURT: I mean, isn't the reasonable inference on that that Fortress has a substantially greater reputational interest in being involved with deals that make money as opposed to SPAC deals that crater?

53

ATTORNEY ENRIGHT:  I think that is an inference that can be drawn.  I don't think that's the only inference that can be drawn at this stage.  And again, the inferences need to be drawn in the plaintiff's favor.  And at this stage, I think it's fair to say that they had an interest in seeing this transaction through because, otherwise, they might be seen as somebody who can't get deals done.  And that could cool the interest of counterparties.

But in the end, Your Honor, I think we've discussed the alignment of the interests to the point where I think we've more or less exhausted the issue.  But what I would say, Your Honor, is the defendants aren't entitled to the inference that they had a magical crystal ball to reveal the company's future trading.  The vesting period is ten years.  And they're not entitled to the inference that they know what the stock price is going to be over the course of the next ten years.  These shares could still all vest at some point ahead of us.  They could have expected or hoped for any number of scenarios that could have caused the founder shares to vest, even if they knew the problems that we pointed out.

Their brief is replete with mitigating

54

circumstances and things like that. Ms. Parker's presentation today was replete with mitigating circumstances and sort of rationalizations as to why these things will hopefully turn out okay. But the reality is, if they knew that there were these problems, even if they thought they were going to be transitory, even if they thought they were going to overcome them, if they were existing problems at that time, they had an obligation to disclose those, and they didn't.

And so drawing the inferences in plaintiff's favor, the Court can't conclude at this point that they knew -- that they didn't know about those problems or that -- because if they had known about them, they wouldn't have done this deal. That's not an inference that the Court could draw. Because of that long vesting period and because of the fact that they, themselves, may have believed that although these problems existed, they didn't want to tell anybody about them because they thought they would be transitory, they didn't want to encourage redemptions, and they just thought, oh, you know, we'll ride it out and it will be okay. That is also a perfectly reasonable inference and one I think the Court should

55

draw at this stage.  Again --

THE COURT:  Let's say the vesting amounts were, instead of 12, 14, $16, they were 50, 100, $150.  I take it under your theory, even in that scenario, entire fairness would apply because they're getting the unique benefit.

ATTORNEY ENRIGHT:  Your Honor, it's really hard to say.  It certainly would seem a lot more farfetched that they would ever be able to realize --

THE COURT:  It's ten years.  I mean, that's a very long time period.

ATTORNEY ENRIGHT:  It is.  Certainly, it's more farfetched in that circumstance, but I'm not sure it would be dispositive.  I'd have to think about it more to really give you a fair answer on that, Your Honor.

THE COURT:  But I mean, it's the same principle.  Right?  I mean, what we're doing is we're just saying that the vesting amount, we're -- I don't want to use the word "quibbling," but it's a dispute over the vesting amount.  But then when you say, well, you know, 50, 100, $150, this is a unique benefit, ignore the fact that this is aligned with

56

stockholders' interests, and Fortress has every incentive to go out and get a good deal for stockholders -- because, you know, I think saying 12, 14, $16 arguably is -- I mean, just from an intuitive sense, it has a different ring to it. But that's a 20 percent, 40 percent, 60 percent return. Which, I mean, I, as an investor, would love to get that. So it's not an insignificant thing, is the point.

ATTORNEY ENRIGHT: Over a 10-year period, Your Honor, a 20 percent, 40 percent, 60 percent increase in the price of the stock would be routine. It would be mundane. A 500 percent --

THE COURT: Yeah, but look at the scenario that we're in here. It's not -- what we're -- I think -- there was obviously risk and a lot of risk, and I think that's borne out by the facts of this case. The notion that every SPAC makes money and that this SPAC was going to make money is hard to reconcile with the facts.

ATTORNEY ENRIGHT: So not every SPAC makes money. That's definitely true. Most of them end up with a stock price well below its redemption value. But here, over the course of a 10-year vesting period, a 20 percent, 40 percent, 60 percent increase

57

over that period is perfectly foreseeable and would be mundane. A 500 percent increase would be much more difficult to credit.

But again, Your Honor, at this stage, the inference, I think, needs to be that there are -- while there are certainly innocent inferences that can be drawn, there are innumerable expectations that could have been had, of which I laid out one, where they thought -- where they were aware of these problems, but they thought they were going to be transitory, they thought that they would come around, and they didn't want to tell the stockholders about it because it would result in excessive redemptions.

And they thought, oh, if we tell the stockholders about this stuff, they'll overreact and the redemptions will be high, and the company won't get the capital that it needs. Maybe we won't meet the minimum threshold amount of capital in order to close the transaction. So --

THE COURT: But isn't that what the documents and disclosures actually suggest, is that in making the disclosures -- that these were long-term statements about the long views -- you know, views, opinions, about the long-term prospects of the entity,

58

and you have long-term projections, you have long-term views on staffing and growth and so forth. And --

ATTORNEY ENRIGHT: I disagree with that characterization. I think saying that the company has, you know, low turnover in staffing as a strength and that it's meeting -- it's executing well on its growth strategy, et cetera, when all those things are belied by the current circumstances, I don't think you can say that strictly in the long term without saying, right now, that these things are problems. I think that's a material omission in that situation. It renders it materially incomplete.

Beyond that, Your Honor -- I've completely lost my train of thought, Your Honor. I'm sorry.

THE COURT: Sorry if I did that.

ATTORNEY ENRIGHT: I'm enjoying the colloquy very much, Your Honor, but sometimes I get so wrapped up in one thing that I end up losing the other point.

THE COURT: No worries.

ATTORNEY ENRIGHT: But the point I think, Your Honor, is that they faced the certainty of losing these founder shares if they didn't get a deal

59

done.  They faced the certainty of liquidation costs if they didn't get a deal done.  And that is enough to create misaligned incentives.  Because one could argue that the insiders were heavily motivated to cause the trading price of ATI to reach the vesting periods and, therefore, didn't want to disclose these facts because they thought it was more likely to reach them if they didn't.  And as I said, they didn't want the transaction to close on an overreaction to what they may have thought were transitory issues.

But if they knew about it, and I think the reasonable inferences are that they did, if they knew about them and didn't disclose them in the context of all of these statements about the company's staffing and the company's growth, that's a material omission.

The only thing I was going to say, Your Honor -- aha, I remember.  The risk disclosures, Your Honor.  And I'll get into the disclosure issues a bit more in a moment.  But saying something may happen in the future when it's already actively happening is, itself, a misrepresentation.  And we've alleged that here on several points.  The risk disclosures themselves are alleged to be misrepresentation because

60

they cast several problems that the company had been experiencing since 2020 as hypothetical future "might be" things.  And the case law is in our brief that that is, in and of itself, a misrepresentation.

And Your Honor, the notion that just because the board was going to turn over, it doesn't mean that they would necessarily assume that these facts would immediately come out after the transaction.  I think the inference here is that everybody, both at ATI and at the SPAC, were unwilling to disclose either of these facts.  They may have thought that this was going to be a transitory issue which they would never have to disclose.  But it turned out that that wasn't the case.  There's a reasonable inference that they thought, more or less, that they would get away with it.

And in any event, Your Honor --

THE COURT:  What about the argument that the diligence period had closed?

ATTORNEY ENRIGHT:  Sure.  I think that's a crucial point, Your Honor.  The due diligence, the pre-signing due diligence period, had closed on February 18th.  But I think it's Section 6.3 of the merger agreement entitled the SPAC to

61

essentially unfettered access to ATI's internal information for the purposes of consummating the transaction. And the defendants argue that they were highly motivated to learn all of these facts. And one would assume that they would have been closely monitoring the company, getting their weekly reports, which, by the way, we allege explicitly they received weekly reports about the company's staffing and attrition.

So even after due diligence, pre-signing due diligence closed, they had full access to and certainly the incentive to closely monitor the company's operations and finances. And the notion that they didn't is a little farfetched.

If Your Honor would permit me, I'd like to just finish up the position of the unique benefit and the alignment of interest, and then I'll dive into the disclosures.

So last point on the alignment of interests, Your Honor.

THE COURT: It's 3:00. Why don't we just take our break and resume at 3:15.

ATTORNEY ENRIGHT: Do you want me to just close out this issue and then resume?

62

THE COURT:  Sure.

ATTORNEY ENRIGHT:  That way, I don't have to dive back into this issue when we come back, Your Honor.

The Court of Chancery rejected similar vesting claims that the vesting requirements aligned the interests in *GigAcquisitions2*.  There, there were terms that a certain amount of time would have to pass before any of the founder shares would vest or they would have to reach certain threshold prices.

If that didn't fully align the interests in *GigAcquisition2*, I don't think they fully aligned them here.  And the Court rejected those similar arguments in *GigAcquisition2* because crediting them would have required drawing inferences in defendants' favor.

And that's exactly what we're asking the Court not to do here: don't draw inferences in defendants' favor but, rather, reach the same conclusions that the Court did in *GigAcquisition2* and draw the inferences in plaintiff's favor at this stage and find that there was at least a unique benefit, for the reasons I said, and I would say, at least arguably, a misalignment of incentives that are

63

susceptible to reasonable inferences that should be drawn in our favor.

With that, Your Honor, we can take that break. I hope that was succinct enough.

THE COURT: I appreciate it.

Okay. We'll resume at 3:15. Thank you.

ATTORNEY ENRIGHT: Thank you, Your Honor.

(A brief recess was taken.)

THE COURT: Mr. Enright.

ATTORNEY ENRIGHT: Thank you, Your Honor.

So next, Your Honor, I'd like to talk about how entire fairness applies here because of board conflicts. The insiders and the directors, as I think I've largely already explained, had more opportunities from a value-increasing merger than the public stockholders and less risk on a per share and aggregate basis on a value-decreasing merger.

THE COURT: Mr. Enright, just very quickly, you mentioned that there was a similar vesting issue at play in *Gig2*, I believe.

ATTORNEY ENRIGHT: That's right, Your

64

Honor.

THE COURT: What were the vesting thresholds there?

ATTORNEY ENRIGHT: In terms of the dollar values? I don't know that, Your Honor, off the top my head. I'm sorry.

THE COURT: Okay. Thank you.

ATTORNEY ENRIGHT: But that brief is cited in our -- that decision is cited in our brief, and I'm sure it's easily findable. I'm sorry I don't know that off the top of my head.

The directors and the insiders say that the SPAC defendants, had they known of Legacy ATI's problems, they wouldn't have known that -- I'm sorry -- had they known about Legacy ATI's problems, they also would have known that the founder shares wouldn't vest.

And I already talked about how that draws a lot of inferences in their favor that the Court can't draw at this point. But it's also an admission, number one, that had the truth been disclosed, the stockholders would have redeemed, and that the proxy was materially incomplete and misleading.

65

And it's also essentially an admission that concealing Legacy ATI's weaknesses maximized the likelihood or they could have thought that it maximized the likelihood of the founder shares vesting and, therefore, their motives were misaligned.

But as indicated in paragraphs 23 through 30 of the complaint, half the board members personally, directly owned 25,000 founder shares each. And again, their receiving the value for that was entirely conditioned on consummation of the merger. If no merger occurred, half the board members would assuredly get nothing for their participation, while the merger provided the board members with at least the possibility of substantial personal windfall. And at the pleading stage, it's reasonably inferable that the founder shares rendered half the board conflicted.

*In Voigt*, the Court of Chancery emphasized that the materiality of compensation of the director is generally unknowable before full-blown merits discovery. And in the *Frank* decision -- all these decisions I'm about to mention are cited in our brief. In the *Frank* decision, the Court treated a director's $250,000 what was essentially a contingent fee as presumptively material. Other Court of

66

Chancery decisions, such as *Ply Gem* and *Orman* have also made pleading-stage inferences that directors were interested due to consulting fees of 91,000 and the opportunity to work for consulting fees of 75,000.

So in response, the insiders argue that the board members posed no more -- the board members' ownership of founder shares posed no more of a conflict for the directors than they did for the sponsor. But that isn't correct because none of the directors holding founder shares personally owned any PIPE shares, so their conflicts were unmitigated by the exposure to the PIPE shares and, thus, were even worse than the conflicts of the sponsor.

I'll also note, when talking about those PIPE shares, Your Honor, the defendants never argued that those shares were locked up for any period of time. Our review indicates that if they were locked up, it was for a period of days, not for an extensive period. And certainly, the defendants haven't argued that the PIPE shares were locked up.

If they were freely tradeable essentially right after the transaction, it's quite possible that Fortress sold many of those shares in the period before the bad news was disclosed in July

67

of 2021.  So I think that also mitigates the PIPE shares argument.

In arguing that the plaintiffs didn't plead that the potential value of the founder shares was material to the directors, the defendants really ignore the *Frank* and *Ply Gem* and *Orman* decisions, which we cited in our brief, which all held, under similar circumstances, with the same or even less money at stake, that they presumptively conflicted the directors.

Now we'll get into the disclosure issues, Your Honor.

The SPAC's SEC filings were littered with materially false statements and omitted a litany of material information.  Now, while Ms. Parker did try to say that they weren't false, I think that's pretty plainly based on a very limited, cherry-picked reading of the documents.

And the insiders' reply brief contains a telling admission in this regard.  On the one hand, the insiders contended the proxy wasn't materially misleading.  On the other hand, they admit that Legacy ATI had undisclosed problems when stating that had the defendants known of Legacy ATI's problems, they would

68

not -- they would also have known that the founder shares would not vest.

These are inherently contradictory arguments, and they underscore the fact that the defendants are asking the Court to not only draw inferences in their favor, they're asking the Court to draw contradictory inferences in their favor.

But here are just a few examples of disclosure violations that illustrate the unfairness of the merger process here and the inadequacy of the disclosures. Paragraphs 57 and 62 of the complaint allege that defendants claimed that Legacy ATI was on track to open over 90 new clinics in 2021. The insiders haven't disputed the materiality of these representations.

And it was obviously false because, as shown by the February 2021 presentation and the minutes that accompanied that as well as the May presentation, long before the redemption date, ATI had scaled back their projections of new location openings for 2021 from over 90 to 75. It was 75 in February and then it went up to 78 in May. As was later disclosed, it ended up being far less than that. In July, they disclosed there would only be between 55

69

and 60, I believe.

So there are clearly facts that were in existence that showed that that 90 new clinics statement or statements were false at the time that they were made. And it was false and misleading for defendants to make the favorable clinician rates claims and favorable staffing representations --

THE COURT: On the number of new clinics -- and I think a lot of these arguments go to the disclosures in general. On the number of new clinics specifically, I think there was the disclosure or the statement that folks were in leasing discussions.

ATTORNEY ENRIGHT: That was in November of 2020, Your Honor.

THE COURT: But also that this information, it's found in ATI materials. It's not in the presentations before FAII.

ATTORNEY ENRIGHT: Right. It's done in the SPAC board minutes. But it's clearly known by ATI at that point. And I'll get into why I think there are reasonable inferences to believe that the SPAC and the SPAC board knew or should have known about that.

70

THE COURT:  So a couple things on that.

One, it's been pointed out that there are extensive due diligence materials that have been put forward.

Number two, the timing of these things.  You've got -- pointing to ATI board presentations that occur just a couple of days before the merger is signed and then a presentation to the ATI board the same day that the FAII puts the defendant proxy statement out.  And I think the argument is that, you know, it's one thing to point to information at ATI, but there's not -- due diligence had closed and so forth.

And so at the point where we're talking about bad faith, right, depending on the standard that applies, then if the issue is, you know, were the disclosures made in bad faith, I think the argument on that is just because ATI was addressing these things doesn't get you to an allegation that the FAII board was acting in bad faith in saying what it said, relying on a whole host of advisors and so forth.

ATTORNEY ENRIGHT:  Okay.  So all those

71

advisors' roles ended at the signing of the merger. Right? That February presentation was done the same day that the merger agreement was signed. So it's quite possible that those due diligence reviews, even if done properly, didn't pick this up. I think that's highly unlikely, given the fact that these problems had stretched back into 2020, but let's just say that for the sake of argument right now.

Everything that happens after that signing, after that due diligence period and all those due diligence engagements are done, right, that falls into a different category and isn't immunized by relying on prior third-party expertise. Okay?

Because what we're talking about here is facts that happened after due diligence had closed, facts that were evident, at least to ATI, after due diligence had closed, and which -- I think there are numerous well-pled facts here that point to a likelihood and certainly a reasonable inference that the SPAC and the insiders knew of Legacy ATI's serious ongoing problems and, at a minimum, had access to that information.

THE COURT: Was there anything in the 220 production that actually reflected the FAII board

72

receiving these materials?

ATTORNEY ENRIGHT: So no, there's essentially nothing in terms of significant board activity at the SPAC after the merger is signed. Right? In terms of board minutes or anything like that. No. But it's important to note the defendants never disputed the SPAC board at least had access to these documents. Okay?

And because of, as I mentioned earlier, that Section 6.3 of the merger agreement, that gave them essentially the right to unfettered access to internal information at ATI for the purposes of consummating the transaction.

So Fortress had been privy to Legacy ATI's internal information for years, as their lender. They had even greater access to that internal information at least as of December 2020 when they signed a contract agreement. And then following the signing of the merger agreement, I think it was on February 18th, Section 6.3 of the merger agreement -- I'm sorry. It was February 21st. Section 6.3 of the merger agreement gave them that ongoing access to Legacy ATI's internal information from that point forward. So at the very least, we know that they had

73

access.  Okay?

Even more specifically, the complaint alleges in paragraph 86 that the SPAC board actually received Legacy ATI's weekly internal reports detailing its staffing and attrition problems.

THE COURT:  That's an allegation from the federal complaint via an ATI employee.  Is that right?

ATTORNEY ENRIGHT:  My understanding is the confidential witness there was an ATI employee who would presumably be in a position to know what information was being provided to their acquirer.  I think, again, drawing the inferences in plaintiff's favor, the fact that it's referred to as Legacy ATI means that this was before the merger was consummated that they had access to that, because it wouldn't be Legacy ATI after the merger was consummated.  So prior to the consummation of the merger, the allegation here is that the SPAC board was actually provided these weekly updates on staffing and attrition.

THE COURT:  Wouldn't that be the sort of thing that you would get in the Section 220 investigation?  Why do I need to rely on -- take this inference from this confidential witness in the

74

litigation?

ATTORNEY ENRIGHT: Because the SPAC activity after the merger agreement stopped -- I'm sorry. After the merger agreement was signed, the activity essentially stopped. And we didn't obtain any kind of emails or anything like that here that would have potentially contained the distribution of such things. There are no formal board materials that reflect that. But that doesn't mean that that didn't take place in informal communications.

And as Your Honor knows, in order to obtain informal board materials, we would have to have shown that there was some sort of information vacuum that wasn't addressed by the formal board materials. And we didn't get that.

So at this stage, this allegation should be credited and inferences drawn therefrom in plaintiff's favor.

Also, at paragraph 92 of the complaint, it alleges that the SPAC board was expressly informed on January 21 that Legacy ATI's recovery from huge drops in revenues in 2020 had plateaued.

And I'm sorry, Ms. Parker, I know that

75

this word is perhaps overused by plaintiffs.

But it plateaued. The recovery from the drop in revenues from COVID had plateaued at 80 percent of pre-COVID levels. And 40 percent of ATI's patients were over 60 years old and would likely be slower to return to physical therapy. So they certainly had that information about the ongoing slowdown in the company's business that was never disclosed and, instead, they told the stockholders that the company was executing on its growth plan and provided these financial projections, which were not consistent with a plateaued recovery from COVID.

Those projections also, as I noted, Your Honor, weren't consistent with the scaled-back expectations of opening new locations. Those projections explicitly were premised upon the expectation that the company would be opening 90 new locations per year. And that was a known non-fact, again, at least at ATI, by February.

So that January 21 presentation informed the SPAC board that ATI would not only have to overcome post-COVID headwinds but would have to far exceed their pre-COVID rate of new location openings to achieve the projections. Prior to COVID, the

76

company had been opening an average of 70 new locations a year.  So not only would they have to get back to that level, they would have to exceed it by 20 percent, despite all those COVID headwinds and despite all the negative factors that were known to be in place, to reach those projections.

And that's just -- that was an assumption that was not remotely realistic.  And that January 21 presentation even highlighted this as a key risk, due to heightened competition.

So despite all this, as has been well established today, the insiders say that they simply didn't know about ATI's problems.  But they do admit that they had a strong incentive to scrutinize ATI's performance.

They can't credibly argue that the risk of a value-destructive merger was so harsh to them, yet also claim that they never bothered to conduct ongoing monitoring and due diligence with documents to which they undisputedly had access.  Under, again, Section 6.3 of the merger agreement.  So the reasonable inference from this incentive and from their unfettered access is that they obtained and were aware of this information and decided to wait it out.

77

Well-pled allegations say that they actually received the January 2021 information. They had access to all the other information. They had the incentive to keep updated on the information. They claimed to have conducted extensive due diligence on ATI. They claimed to have intimate knowledge of the company going back years. And again, they're specifically alleged to have received weekly updates on staffing and attrition issues.

So similar to *GigAcquisition3*, it's at least reasonably conceivable that the insiders knew the truth about ATI's problems, its reduced expectations of opening new locations, its staffing recruitment and attrition problems, and about the absurdly unreasonable over-optimism of its financial projections. And if so, the proxy's staffing representations, growth representations, and due diligence representations were knowingly false and misleading.

And in terms of the timing, Your Honor, let's say they put out the definitive proxy on May -- I think it was May 14th. Let's say that in the interim, between then and the redemption date, they learned the truth of these factors. They had an

78

obligation to supplement that proxy with that newly found information.  They didn't do that.  So the timing issue, I think, is a bit of a red herring, because even though the definitive proxy came out on the same day as that May presentation, if they received that information before the redemption date, and I think there's a reasonable inference that they did, they had an obligation to supplement that definitive proxy to correct the misrepresentations and omissions that were contained therein.

And if they really didn't know any of this, if they really failed to learn of all these problems that were well documented and ongoing for at least a year, then it's at least reasonably conceivable that the SPAC's claims to have conducted "extensive due diligence," "thorough due diligence," were knowingly false and misleading as well.

Also, Your Honor, there are several statements in terms of factors in favor of the merger that are cited in the proxy that they said the board considered.  They said they considered that ATI had favorable staffing and retention.  In reality, there's nothing in the 220 documents showing that they ever discussed that.  There's nothing reflecting any kind

79

of real analysis of that by the board.  Of course, they did have these outside consultants, but there's nothing in the board minutes showing that the board actually discussed these issues.

THE COURT:  So on that point, I think Ms. Parker, on her slide, had a page from one of the presentations about retention and so forth.  In the briefing, they had the case cites discussing that, you know, it's unsurprising that minutes are not as detailed as proxy statements.

ATTORNEY ENRIGHT:  You know, Your Honor, I think that's fair.  And look, I also think in terms of the pre-signing period during which the due diligence was ongoing, I think it's fair to say that they -- perhaps the board simply relied on their advisors.  I think Ms. Parker has a fair point there.

But in terms of, again, what happened thereafter, that's on the board.  And if they did consider it before and then learned contrary facts after signing, they had an obligation to correct those misapprehensions.

With regard to the 220 production, Your Honor, and whether or not the board considered other alternatives, defendants argue that,

80

essentially, because of the date range of the 220 production -- it began in January of 2021, after the SPAC had already selected ATI as its intended target -- that the consideration of alternatives would have taken place before then.

Fair enough, but we -- plaintiff asked for 220 documents going all the way back to the company's IPO. If there had been exculpatory information in that time frame, one would expect they would have provided it. But they didn't. We asked for it going all the way back to the IPO, and they didn't provide anything that's exculpatory or reflective of consideration of alternatives during that time period.

And under the *Hughes* and *Tyson* cases that we cited in our brief, it's reasonable to draw the inference that if there was exculpatory information, they would have produced it in response to the 220 demand.

THE COURT: I think, on that point, the defendants' argument is that folks agreed to a January date to begin the 220 production. And so that sort of is what it is. And it also, in part, is consistent with the allegations that that January

81

date, the directors were getting emails that, you know, things had been whittled down to Party A and ATI, and they're getting emails saying, hey, we've got -- we've narrowed it down to ATI, and we're about to --

ATTORNEY ENRIGHT: Send a term sheet.

THE COURT: Right.

ATTORNEY ENRIGHT: Yeah. So I think that's fair, Your Honor. But I also think that had there been exculpatory materials prior to that date, they wouldn't have pushed to limit the time frame the way they did.

And also, Your Honor, it appears that the first time the board really heard about ATI was at the point where they were on the verge of signing that term sheet that you just referenced.

All right. In terms of, you know, once entire fairness is the standard to be applied here -- and it should be, because of the conflicted board. Again, half the board directly held shares. The entire board either held founder shares or were essentially employees of Fortress or Fortress affiliates. They all were interested in this transaction. So even apart from the control of the

82

sponsor, you have a conflicted board.

But once we get to the point where entire fairness is the standard, as the Court is aware, the possibility of dismissal of a claim that's being reviewed under entire fairness is nearly impossible unless the defendants can show conclusively that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents that are incorporated by reference.

That's not the case here. The merger price was clearly not entirely fair. A month after the transaction closed, the stock price plummeted to $3.50 per share based on factors that had been affecting the company long before the actual consummation date, long before the redemption date.

So I don't think there's any difficulty in determining, once entire fairness is the standard, that this was not an entirely fair transaction.

Lastly, Your Honor, I'll turn to aiding and abetting. I recognize I've been going on a lock time, but I'll just wrap up with aiding and abetting, and then I'll take any questions that you might have.

83

Mr. Diab's motion to dismiss should be denied because claims of aiding and abetting are fact intensive and ill-suited for disposition on the pleadings. The insiders breached their fiduciary duties, for the reasons I've already said, and Diab knowingly participated in the breach by knowingly deceiving Fortress', the SPAC's, stockholders.

The complaint alleged, and Your Honor raised this directly with Mr. Greilsheimer during his presentation, the complaint alleged at paragraphs 58 and 61 that Diab directly made misleading statements to the stockholders. These statements were made after the deal was signed. So this wasn't something that's immunized or privileged because it's a part of his negotiation of the transaction. This is post-transaction or post-signing of the merger agreement.

And Mr. Greilsheimer essentially said, look, these are statements that he was told to say by the company, by the SPAC. I mean, look, Mr. Diab wasn't a hand puppet. He chose to speak. And in speaking falsely, he knowingly participated in the breaches of fiduciary duty.

On February 22nd, Mr. Diab spoke at an

84

investor presentation.  And again, these words aren't simply attributed to him elsewhere.  He actively said these words.  He said that Legacy ATI had strong growth and momentum and very high retention and low turnover of employees.  That was simply false at the time he said it, Your Honor, and knowingly so.

THE COURT:  And when was that, again?

ATTORNEY ENRIGHT:  February 22nd, Your Honor.

THE COURT:  Okay.

ATTORNEY ENRIGHT:  Four days, I believe, after the -- no, the next day after the merger agreement was signed.

Mr. Diab made these claims just days after he had participated in a meeting, that would be the February 18th meeting, that discussed the facts that ATI had been suffering from staffing problems since 2020 and had managed to only open 20 new clinics in 2020.

Paragraph 102 of the complaint specifically alleged that the February 18 ATI board minutes explicitly acknowledged that the company had reduced its projected location openings for 2021 from over 90 to 75; that the company's COVID recovery had

85

slowed; and the company was having staffing problems. All these were facts that were in place at the time that Mr. Diab made those statements on February 22nd and thereby knowingly participated in the breaches of fiduciary duty.

So Diab explicitly knew that. He knew that ATI was suffering from staffing problems. He knew that they had high employee attrition rates. He knew that they had lingering problems from COVID, slowed growth, heightened competition, and reduced prospects for opening new locations.

And in a May 20 press release, Mr. Diab said -- and again, there's no inference or contention raised here that these statements in this May 20 press release were made without Mr. Diab's consent. So these are statements that were explicitly attributed to him and for which he is responsible. And he said that ATI was on track to achieve its target to open over 90 new locations in 2021. In reality, ATI had only opened a handful of new locations to that point in the year and had already internally reduced its projected new location openings from over 90 to 75, and then I guess had bounced it back up to 78. But regardless, Your Honor, it's still

86

a lot more than over 90.

He, again, absolutely knew this based on the internal ATI board minutes and presentations and knowingly misrepresented in the May 20 press release. Again, the May minutes and May presentations from just days earlier demonstrate that these were knowingly false statements.

And Mr. Diab knew that ATI's financial projections which he caused to be provided to the SPAC and had explicitly been premised on ATI opening at least 90 new locations per year, he knew that those were utterly unrealistic, given the circumstances. He knew that the projections were unachievable, and he knew that they were based on a false premise.

Now, Mr. Diab's arguments before today completely ignored all of these facts that I just laid out in terms of his direct statements. It was only after Your Honor specifically asked Mr. Greilsheimer about it that they addressed this.

I would argue, Your Honor, that because they didn't address these points in either of their briefs, those arguments are waived. But plaintiffs also allege that Diab failed to correct a materially false and misleading proxy.

87

Now, Mr. Greilsheimer's point that he was under no contractual obligation to do so, that point is well-taken. But even though he wasn't personally obligated, having chosen to speak and having knowingly participated in the breaches of fiduciary duty, that, then, I believe, triggers for him an obligation to fix those problems that he knew were there in the proxy. Otherwise, again, he was knowingly participating in the breach of fiduciary duty.

Having once spoken, as having spoken falsely, I think that triggers an obligation to correct his false statements and the false statements that were based thereon in the proxy.

And lastly, Your Honor, even if the Court somehow concludes that the other defendants' breaches of fiduciary duty were unknowing or exculpated, not in bad faith, they were, you know, merely breaches of the duty of care, Diab still may be held liable for aiding and abetting those breaches.

And Your Honor, I think, sort of touched on that earlier. If, somehow, the Court were to conclude that the board simply had -- the SPAC simply had the wool pulled over their eyes, well, then

88

Mr. Diab was instrumental in pulling the wool over their eyes; and having actively spoken individually in a false way to the stockholders, he knowingly participated in those breaches of fiduciary duty.

So even if those were merely breaches of the duty of care, Mr. Diab can't be dismissed.

So it's conceivable, Your Honor, that you could dismiss all of the defendants except for Mr. Diab. I certainly would counsel against it, for the reason I've already said, but that is a result that's within the realm of possibility.

Unless the Court has any questions, I have nothing further.

THE COURT: I don't have anything. Thank you, Mr. Enright.

ATTORNEY ENRIGHT: I think I talked long enough, Your Honor.

THE COURT: That's fine. Thank you.

Ms. Parker?

ATTORNEY PARKER: Yes, Your Honor. I'll be brief. Just a couple notes.

So I think -- I'll start from the back, the disclosures. I think Mr. Enright has focused in on post-signing. And you heard about 220

89

documents.  And I think Mr. Enright said, well, we didn't get any board materials from FAII post-signing, but they did.  They got audit committee minutes from April 28th and May 13th.

So, Your Honor, Mr. Enright has focused on, from paragraph 86 of his complaint, the February complaint, the securities case.  And he says, well, FAII's board had access, so, Your Honor is right, that would have been in board materials.  And we produced board materials from the audit committee at that point.

But more importantly, Your Honor, and I'm happy to send this opinion to you that that Court issued, the opinion in that case, and found -- and I'm quoting from pages 45 and 46.  And this is about that very weakly report.  The Court found there was no scienter on the FAII side of things, and said, "The confidential-source allegations barely touch on the possible knowledge attributable to McKnight."  And McKnight was the FAII CEO and was a director.

"McKnight is not alleged — in particularized detail — to have had access to attrition-rate information in the months leading into the merger."  That's page 45.

90

Page 46, "the argument that he would have seen slide-decks from Source 4 prepared for ATI executives and directors during 2020 is contradicted by the Plaintiffs' own allegations."

Also page 46, "There is no allegation to explain how or when McKnight would have had access to internal ATI reports as the CEO of FVAC," what we call FAII.

And I'm happy to send that opinion to Your Honor with the slides.

THE COURT: That would be great. Please.

ATTORNEY PARKER: Will do.

Just a couple final points. One more point on the disclosures, and then I'll move back to unique benefits, and then I'll let you have your afternoon back.

You know, if FAII was misled, and we're not saying FAII was, but that's not bad faith. And indeed, the Illinois federal court found that very thing. And we'll send you that opinion.

I think Mr. Enright said that I read the cases incorrectly, so I'll quote so that I can't be accused of that.

91

On the unique benefit, the Court has already found this. And I'm quoting from *Gig2*, and this is at page 8. "A transaction involving a controlling stockholder may be viewed as conflicted, such that entire fairness review is warranted, where the controller 'extract[s] something uniquely valuable to [itself]' at the expense of other stockholders," emphasize added.

And VC Will cites *Crimson* there.

So the point is, it's a conflict when it's at the expense of other stockholders, and not just the unique benefit, as Your Honor discussed earlier.

And I'll just leave you with this: Mr. Enright spoke a lot about you can't make this inference. That's for them. You can't make this inference. That's for them. But he didn't talk much about, if at all, about the standard of reasonable conceivability. And it's just not reasonably conceivable that incentives were misaligned here. Why? Because no deal would have been better for FAII than this deal.

Unless Your Honor has any questions, I have nothing further.

92

THE COURT: I don't. Thank you, Ms. Parker.

ATTORNEY PARKER: Thank you, Your Honor.

THE COURT: Mr. Greilsheimer?

ATTORNEY GREILSHEIMER: Just one quick note, Your Honor.

I think we heard extensively over the last 10 or 15 minutes of Mr. Enright's presentation that he was asking the Court to infer that FAII received information from ATI. Obviously, if the Court were to infer that that information crossed over to FAII from ATI, then it wasn't kept secret by ATI. And that would prevent the creation of an information vacuum, but nothing beyond that, Your Honor.

THE COURT: All right. Thank you.

All right. Thank you all very much for the presentations.

Anything final, Mr. Enright, before we ...

ATTORNEY ENRIGHT: Your Honor, I would just note that creating an informational vacuum is not the only way that someone can knowingly participate in a breach of fiduciary duty. Actively misleading

93

stockholders would certainly qualify as well.

That's it. And thank you for your patience with me today, Your Honor.

THE COURT: All right.

Mr. Greilsheimer I think that was directed at Mr. Diab. Anything final?

ATTORNEY GREILSHEIMER: I don't think we have to add anything to that. I think it's been discussed enough already, Your Honor.

THE COURT: That's fine. Thank you all very much for the presentations. It's all been extremely helpful.

I'm going to take this under advisement. And as it is a Friday, I hope everyone has a very nice weekend.

Thank you all very much. We're adjourned.

ATTORNEY PARKER: Thank you, Your Honor.

ATTORNEY GREILSHEIMER: Thank you, Your Honor.

ATTORNEY ENRIGHT: Thank you, Your Honor.

Take care, everybody.

94

(Proceedings concluded at 4:01 p.m.)

- - -

95

CERTIFICATE


I, JEANNE CAHILL, RDR, CRR, Notary Public of the State of Delaware, do hereby certify that the foregoing pages numbered 3 through 94 contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing in the above cause before the Vice Chancellor of the State of Delaware, on the date therein indicated.

IN WITNESS WHEREOF I have hereunto set my hand at Wilmington, Delaware, this 10th day of December, 2023.


                    /s/ Jeanne Cahill
                    ----------------------------
                    Jeanne Cahill, RDR, CRR
                    Delaware Notary Public
                    Registered Diplomate Reporter
                    Certified Realtime Reporter