# EXHIBIT 1

# Part 1 of 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KEVIN BURBIGE and ZIYANG NIE, Individually and on Behalf of All Others Similarly Situated, <br><br>            Plaintiffs, <br><br>       v. <br><br> ATI PHYSICAL THERAPY, INC. f/k/a FORTRESS VALUE ACQUISITION CORP. II, LABEED DIAB, JOSEPH JORDAN, ANDREW A. MCKNIGHT, JOSHUA A. PACK, MARC FURSTEIN, LESLEE COWEN, AARON F. HOOD, CARMEN A. POLICY, RAKEFET RUSSAK-AMINOACH, and SUNIL GULATI, <br><br>            Defendants. | Case No. 1:21-CV-04349 |

1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *In re ATI Physical Therapy, Inc.* *Shareholder Derivative Litigation* | Case No. 1:21-CV-06415 |

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| WENDELL ROBINSON,<br><br>                    Plaintiff,<br><br>    v.<br><br>FORTRESS ACQUISITION SPONSOR II, LLC, ANDREW A. MCKNIGHT, JOSHUA A. PACK, MARC FURSTEIN, LESLEE COWEN, AARON F. HOOD, CARMEN A. POLICY, RAKEFET RUSSAK-AMINOACH, SUNIL GULATI, DANIEL N. BASS, MICAH B. KAPLAN, and LABEED DIAB,<br><br>                    Defendants. | Case No. 2023-0142-NAC |

3

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| PHILLIP GOLDSTEIN,<br><br>               Plaintiff,<br><br>     v.<br><br>FORTRESS ACQUISITION SPONSOR II, LLC, LABEED DIAB, JOSEPH JORDAN, CEDRIC COCO, RAY WAHL, JOHN L. LARSEN, JOHN MALDONADO, CARMINE PETRONE, JOANNE M. BURNS, CHRISTOPHER KRUBERT, JAMES E. PARISI, JOSHUA A. PACK, ANDREW A. MCKNIGHT, MARC FURSTEIN, AARON F. HOOD, CARMEN A. POLICY, SUNIL GULATI, LESLEE COWEN, RAKEFET RUSSAK-AMINOACH, DANIEL BASS, and MICAH KAPLAN,<br>               Defendants,<br><br>   and<br><br>ATI PHYSICAL THERAPY, INC.,<br>             Nominal Defendant. | Case No. 2023-0582-NAC |

**DECLARATION OF JOSEPHINE BRAVATA**
**CONCERNING THE RESULTS OF THE CLAIMS ADMINISTRATION PROCESS**

I, Josephine Bravata, declare:

1. I submit this declaration in order to provide the Court and the parties involved in the above-captioned litigation with information regarding the results of the claims administration process in this matter. I am over 21 years of age and am not a party to this action. I have personal knowledge of the facts set forth herein.

2. I am the Director of Quality Assurance at Strategic Claims Services ("SCS"), a nationally recognized class action administration firm. I have over twenty years of experience specializing in the administration of class action cases. SCS was established in April 1999 and has administered over five hundred and fifty (550) class action cases since its inception.

**UDPATE ON NOTIFICATION PROCESS**

3.      Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice, dated May 21, 2024 (ECF No. 172, the "Preliminary Approval Order"), the Court authorized the retention of SCS to supervise and administer the notice procedure as well as process claims in connection with the proposed Settlement[1].

4.      As noted in the Declaration of Josephine Bravata Concerning: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections, dated August 20, 2024 and the Supplemental Declaration of Josephine Bravata Concerning: (A) Mailing of the Notice and Claim Form; and (B) Report on Requests for Exclusion and Objections, dated September 17, 2024 (ECF Nos. 183-1 and 188-2, the "Initial Mailing Declarations"), SCS mailed or e-mailed 2,374 letters to the Nominee Account Holders and Institutional Groups contained on SCS's mater mailing list.  As noted in the Initial Mailing Declarations, 14,962 Notice Packets were mailed to potential Settlement Class Members by SCS or nominees, 36 emails were sent by SCS, and 19,086 emails were sent by a nominee. Since the Initial Mailing Declarations were filed, no additional Notice Packets have been mailed, and no additional emails were sent with the link to the Notice Packet on the settlement webpage. To date, a total of 34,084 potential Settlement Class Members were either mailed a Notice Packet or emailed a link to the Notice Packet.

5.      The Initial Mailing Declarations noted that SCS's established a specific webpage on its website at www.strategicclaims.net/ati/ on June 17, 2024. The website is accessible 24 hours a day, 7 days a week.  The website contains a current status of the case, important settlement-

---

[1] All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated as of May 13, 2024 (ECF No. 162-1, the "Stipulation").

related deadlines, an online claim filing link, and downloadable copies of case documents. SCS has and will continue to maintain the Settlement webpage through the distribution process.

6. The Initial Mailing Declarations noted that SCS maintains a toll-free telephone number (1-866-274-4004) for Settlement Class Members to call and obtain information about the Settlement. SCS has and will continue to promptly respond to each telephone inquiry and address Settlement Class Members' inquiries through the distribution process.

7. SCS also sent the Depository Trust Company ("DTC") the Notice Packet for the DTC to publish on the Legal Notice System ("LENS") on June 18, 2024, as stated in Initial Mailing Declarations.

8. The Summary Notice was transmitted over *Globe Newswire* on July 5, 2024.

### CLAIMS PROCESSING AND SCS'S DETERMINATIONS

9. There have been 10,135 Claim Forms (hereafter referred to as "claims") submitted in connection with this settlement.[2] SCS has carefully reviewed, analyzed, and processed all of these claims and has responded to all claimant inquiries regarding the action, the settlement and the procedures for filling out the Claim Forms. SCS has also been in close contact with Lead Counsel to review the administration process. SCS's Report of Claims Administrator is attached hereto as **Exhibit A** and described below.

10. The attached Report of Claims Administrator sets forth the final status of claims submitted to SCS as follows:

    a. <u>PROPERLY DOCUMENTED CLAIMS</u>: SCS has identified 4,432 properly documented valid claims. These valid claims represent Recognized Claims of $156,369,212.13 for Securities Subclass and 19,701,302.4986 shares for the Multiplan

---

[2] SCS has not processed any new claims filed after October 21, 2024, or any additional information received or submitted after March 25, 2025, due to extreme lateness and because their inclusion would have delayed the finalization of the administration.

Subclass. These valid claims were calculated in the manner set forth in the Court-approved Plan of Allocation, included in the Notice. Attached as **Exhibit B** is a spreadsheet of the 4,432 properly documented and timely submitted.

b. INADEQUATELY DOCUMENTED CLAIMS: SCS initially identified 73 inadequately documented claims. SCS mailed deficiency notices to each of these claimants, advising them of the nature of their deficiency and providing them an opportunity to cure. A sample inadequacy notice is attached hereto as **Exhibit C**. Among these 73 deficient claims, 36 have been successfully cured and are considered valid. The remaining 37 inadequate claimants either did not respond to the deficiency notice or responded with insufficient documentation and were sent a rejection notice setting forth the reason for their deficiency. To date, none of the 37 deficient claimants has objected to or contested this determination. See **Exhibit D** for a list of the inadequate, rejected claimants.

c. INELIGIBLE CLAIMS: In addition to the 37 claims discussed above in paragraph b, SCS has identified 5,666 claims which we recommend for complete rejection. Included in this category are: (i) claims filed for shares purchased outside of the Settlement Class Period; (ii) claims with no Recognized Losses; (iii) claims with shares sold short; (iv) claims filed for securities other than ATI Physical Therapy, Inc. ("ATI") or Fortress Value Acquisition Corp. II ("FVAC") common stock; (v) claims filed for shares that were received or transferred into an account, but not purchased; (vi) duplicate claims filed; (vii) claims filed by an excluded parties; (viii) fraudulent claims; and (ix) claims withdrawn from the filing entity. See **Exhibit E** for a list of these ineligible claims. We have communicated with these 5,666 claimants and advised them of our determination. A sample ineligibility notice is attached hereto as **Exhibit F**. To date, 13 of these ineligible claimants has contested SCS's determination.

1) Claim 50006 was filed on behalf of Fortress Acquisition Sponsor II LLC – FIG LLC. SCS determined that this claim is ineligible as Fortress Acquisition Sponsor II LLC as a Defendant is an excluded party for the Securities Subclass and Multiplan Subclass. The Claimant's attorney, Jenness E. Parker, from Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") contests our determination stating that a majority owner of Fortress Acquisition Sponsor II LLC is not "a Defendant alone or with its affiliates" but a fund owned by advisory clients which makes Fortress Acquisition Sponsor II LLC an Investment Vehicle. Fortress Acquisition Sponsor II LLC is defined as one of the *Ghaith* Defendants on page 15 of the Stipulation, *Ghaith* Defendants are including in the Defendants definition on page 14 of the Stipulation, and finally under the Settlement Class definition on page 23 of the Stipulation[3], Defendants are excluded from the Settlement Class.

SCS researched and located that the 7.5 million shares were through a private placement on February 21, 2021 and 8.525 million shares converted from Class F shares to Class A common stock on February 21, 2021.[4] The Class F common stock was defined as Founders' shares through the merger: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d12 2377dex51.htm. Pursuant to the Stipulation on page 13, ATI Securities is defined as ATI's common stock traded on the New York Stock Exchange

---

[3] Excluded from the Settlement Class are (i) Defendants; (ii) current and former Officers and directors of the Company; (iii) members of the Immediate Family of each of Defendants; (iv) all subsidiaries and affiliates of the Company and the directors and Officers of such subsidiaries or affiliates; (v) all persons, firms, trusts, corporations, Officers, directors, and any other individual or entity in which any of Defendants has a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of all such excluded parties; provided, however, that any Investment Vehicle shall not be excluded from the Settlement Class.

[4] https://www.sec.gov/Archives/edgar/data/1815850/000120919121042128/xslF345X03/doc4.xml

("NYSE") under the ticker symbol "ATIP" or FVAC that traded on the NYSE under the ticker symbol FAII; therefore, these shares would be ineligible for the Securities Subclass as they were purchased prior to the Securities Subclass Settlement Class Period as well as purchased on the wrong market. SCS respectfully recommends the Court agree with SCS' determination of this claims as ineligible for the following: excluded party for the Securities Subclass and Multiplan Subclass, shares purchased prior to the Securities Subclass, and shares not purchased on the New York Stock Exchange for the Securities Subclass.

Based on our research and conversation with Skadden, the estimated recognized claim amount total $114,418,500 for the Securities Subclass (42.3%) and 16,025,000 shares for the Multiplan Subclass (44.9%).[5] **Exhibit G** is attached with a copy of the claim and correspondence between SCS and Skadden regarding Claim 50006.

2) Claim 565 was filed for Dakota Holdco LLC claiming a buy of 3,038,197 shares on June 17, 2021 for $10. It appears that these shares were part of the First Amendment to the Amended and Restated Registration Rights Agreement with Fortress Acquisition Sponsor II LLC entered on February 21, 2021, prior to the Securities Subclass.[6] Dakota Holdco LLC has four managers: Gregory Steil, Dylan Bates, Brent Mack, and Robert McKenzie. SCS' research discovered three managers were former officers of ATI: Gregory Steil was a founder and

---

[5] The percentage determined assumes that the other disputes are ineligible and all sponsor shares are approved by the Court.

[6] https://www.sec.gov/Archives/edgar/data/1815849/000119312521050079/d115588dex21.htm, https://www.sec.gov/Archives/edgar/data/1815849/000119312521230784/d122377d424b3.htm, and https://www.sec.gov/Archives/edgar/data/1815849/000114036122030504/ny20005103x1_424b3.htm#TOC

Chief Executive Officer; Dylan Bates was the Chief Executive Officer; and Brent Mack was Vice President of Operations then Chief Operating Officer; and the fourth manager, Robert McKenzie, was General Counsel for ATI. Please see paragraphs 3, 4, and 7 below for those disputed claims. SCS' determined that this claim was ineligible for being filed by an excluded party. Pursuant to the Stipulation on page 23, the Settlement Class excludes former officers and legal representatives. The claimant contests our determination. SCS respectfully recommends the Court agree with SCS' determination of this claim as ineligible for the following: excluded party for the Securities Subclass and Multiplan Subclass, shares purchased prior to the Securities Subclass, and shares not purchased on the New York Stock Exchange for the Securities Subclass. **Exhibit H** is attached with a copy of the claim and correspondence between SCS and Mr. McKenzie regarding Claim 565.

3) Claim 566 was filed by Mr. McKenzie claiming 85,852 shares purchased on June 17, 2021 for $10 and 18,869 shares received after October 19, 2021. SCS' determination of this claim is ineligible for excluded party as he was General Counsel; however, based on our discussions with Mr. McKenzie, SCS discovered that Mr. McKenzie was a limited partner of Wilco Acquisition LP and was distributed 85,852 shares in November 2021 and the 18,869 shares were part of the 3,038,197 shares sold from Dakota Holdco LLC as mentioned in paragraph 2 above. Claim 566 contests our determination stating he is not an excluded party and since the definition of the Settlement Class in the Stipulation includes "otherwise acquired" that this claim should be accepted. SCS's final determination on this claim is ineligible for being an excluded party for the Securities and Multiplan Subclasses, shares purchased prior to the

10

Securities Subclass, and shares not purchased on the New York Stock Exchange for the Securities Subclass. SCS respectfully recommends the Court agree with SCS' determination of this claim. **Exhibit I** is attached with a copy of the claim and correspondence between SCS and Mr. McKenzie regarding Claim 566.

4) Claims 220, 221, and 222 were filed by The Gregory F. Steil Descendants Trust, Willowbrook Holdings Inc., and Gregory F. Steil. The total shares claimed for these three claims are 1,077,987 shares (part of the 3,038,197 Dakota Holdco LLC shares). Mr. Steil as mentioned in paragraph 2 was the founder and Chief Executive Officer of ATI; therefore, SCS determined this claim to be ineligible for being an excluded party. The claimant is contesting our determination stating he is not an excluded party and since the definition of the Settlement Class in the Stipulation includes "otherwise acquired" that this claim should be accepted. The claimant also mentions these claims were filed by limited partners of Wilco Acquisition, LP. SCS's final determination on this claim is ineligible for being an excluded party for the Securities and Multiplan Subclasses, shares purchased prior to the Securities Subclass, and shares not purchased on the New York Stock Exchange for the Securities Subclass. SCS respectfully recommends the Court agree with SCS' determination of this claim. **Exhibit J** is attached with a copy of the claim and correspondence between SCS and Mr. Steil regarding Claims 220, 221, and 222.

5) Claim 277 was filed by Lisa Gutierrez claiming 22,626 shares. SCS' research located that Ms. Gutierrez worked in HR at ATI. Her role in HR assisted ATI in acquisitions; therefore, SCS' determined that this claim was ineligible for being filed by an excluded party. An additional review of the Dakota Holding LLC claim uncovered that the 22,626 shares were part of the shares sold that

11

were part of the agreement entered on February 21, 2021. Ms. Gutierrez also provided Class B and D units from 2013 based on Award Agreements. SCS's final determination on this claim is ineligible for being an excluded party for the Securities and Multiplan Subclasses, shares purchased prior to the Securities Subclass, and shares not purchased on the New York Stock Exchange for the Securities Subclass. SCS respectfully recommends the Court agree with SCS' determination of this claim. **Exhibit K** is attached with a copy of the claim and correspondence between SCS and Ms. Gutierrez regarding Claims 277.

6) Claim 305 was filed by Jason Hafner who was the Division President of ATI. The shares being claimed on this form were 195,597 shares. SCS determined that this claim was ineligible for being filed by an excluded party. The claimant contests our determination and mentions in the response that he is a limited partner of Wilco Acquisition, LP which is when he became the beneficial owner of these shares in or about May 2016. SCS respectfully recommends the Court agree with SCS' determination of this claims as ineligible for the following: excluded party for the Securities Subclass and Multiplan Subclass, shares purchased prior to the Securities Subclass, and shares not purchased on the New York Stock Exchange for the Securities Subclass. **Exhibit L** is a copy of the claim form and correspondence between SCS and Mr. Hafner regarding Claim 305.

7) Claims 227, 228, and 229 were filed by Dylan Bates who was the Chief Executive Officer. The total shares claimed for these three claims are 3,981,802 shares. Out of these shares, 807,989 shares are part of the 3,038,197 Dakota Holdco LLC shares. SCS determined this claim to be ineligible for being an excluded party. The claimant is contesting our determination stating he is not

12

an excluded party and since the definition of the Settlement Class in the Stipulation includes "otherwise acquired" that this claim should be accepted. SCS's final determination on this claim is ineligible for being an excluded party for the Securities and Multiplan Subclasses, shares purchased prior to the Securities Subclass, and shares not purchased on the New York Stock Exchange for the Securities Subclass. SCS respectfully recommends the Court agree with SCS' determination of this claim. **Exhibit M** is attached with a copy of the claim and correspondence between SCS and Mr. Bates regarding Claims 227, 228, and 229.

8) The other two claims (Claims 170 and 214) were determined by SCS to be ineligible for being an excluded party. Claim 170 was filed by Christopher Orr who SCS located online to be the Senior Vice President Real Estate and Clinic Development and Claim 214 was filed by Brent Mack who was the Vice President of Operations then Chief Operating Officer. The total shares claimed for theses claims are 432,713 shares (90,064 shares were part of the 3,038,197 Dakota Holdco LLC shares that were part of the February 21, 2021 Agreement). The original claims only show the shares being held. No purchase documentation was provided with these claims. SCS respectfully recommends the Court agree with SCS' determination of this claims as ineligible for the following: excluded party for the Securities Subclass and Multiplan Subclass, 90,064 shares purchased prior to the Securities Subclass, 90,064 shares not purchased on the New York Stock Exchange for the Securities Subclass, as well as no purchase documentation provided for the 342,649 shares. **Exhibit N** are copies of the claim forms, SCS ineligibility notice, and the claimants' contesting emails.

13

11.     In anticipation of completing this administration, SCS respectfully requests that the Court reject as untimely any claims received after October 21, 2024, any responses to deficiency and/or rejection notices received after March 25, 2025, and the claims that dispute SCS' determination. SCS also respectfully requests that the Court reject the thirteen claims in light of SCS' determinations.

12.     Should the Court concur with SCS's administrative determinations concerning the claims recommended for acceptance and rejection, SCS recommends the following distribution plan:

(a)     The Net Settlement Fund shall be divided into two pools: one for Authorized Claimants in the Securities Subclass ("the Securities Subclass Fund"), and another for Authorized Claimants in the Multiplan Subclass (the "Multiplan Subclass Fund"). 75.9% of the Net Settlement Fund will be allocated to the Securities Subclass Fund. The remainder of the Net Settlement Fund (approximately 24.1%) will be allocated to the Multiplan Subclass Fund.

(b)     Per the Plan of Allocation, each Authorized Claimant shall receive a *pro rata* share of the Net Settlement Fund that each Authorized Claimant's Recognized Claim divided by the total Recognized Claims of the 4,432 Authorized Claimants multiplied by the total amount in the Net Securities Subclass Fund.  Also, an Authorized Claimant will be eligible to receive a *pro rata* payment from the Multiplan Subclass Fund equal to the product of (i) the number of Multiplan Eligible Shares held by the Authorized Claimant; and (ii) the "Per-Share Recovery" for the Multiplan Subclass Fund, which will be determined by dividing the total amount of the Multiplan Subclass Fund by the total number of Multiplan Eligible Shares held by all Authorized Claimants.  If any Authorized Claimant's Distribution Amount calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to such Authorized Claimant

14

(c)  In order to encourage Authorized Claimants to cash their distribution checks promptly, and to avoid or reduce future expenses relating to unpaid distribution checks, all checks should bear a notation "CASH PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION 180 DAYS AFTER ISSUE DATE." Similarly, all other checks issued in connection with subsequent distributions shall bear the same notation.

(d)  To the extent any monies remain in the fund six (6) months after the initial distribution, if Plaintiffs' Counsel, in consultation with the Claims Administrator, determine that it is cost-effective to do so, the Claims Administrator shall conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such redistribution, to Authorized Claimants who have cashed their initial distributions and who would receive at least $10.00 from such re-distribution. Additional redistributions to Authorized Claimants who have cashed their prior checks and who would receive at least $10.00 on such additional re-distributions may occur thereafter if Plaintiffs' Counsel, in consultation with the Claims Administrator, determine that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective.

(e)  Authorized Claimants who do not cash their distribution checks within the time allotted will irrevocably forfeit all recovery from the Settlement unless good cause is shown. The funds allocated to all such stale-dated checks will be available for re-distribution to other Authorized Claimants in subsequent distributions, if such distributions are determined to be economically feasible.

(f)  SCS respectfully requests the Court order that: All persons involved in the review, verification, calculation, tabulation, or any other aspect of the processing of the claims submitted herein, or otherwise involved in the administration or taxation of the

15

Settlement Fund or the Net Settlement Fund, are released and discharged from any and all claims arising out of such involvement, and all Settlement Class Members and other Claimants, whether or not they are to receive payment from the Net Settlement Fund, are barred from making any further claim against the Net Settlement Fund, Lead Plaintiff, Lead Counsel, Plaintiff's Counsel, the Claims Administrator and it's agents/employees, the Escrow Agent, or any other agent retained by Lead Plaintiff or Lead Counsel in connection with the administration or taxation of the Settlement Fund or the Net Settlement Fund, or any other person released under the Settlement beyond the amounts allocated to them pursuant to the terms of the Distribution Order, provided that such released persons acted in accordance with the Stipulation, the Judgment, and the Distribution Order.

(g)     SCS also respectfully requests the Court order that: (i) in no less than one (1) year after the distribution of the Net Settlement Fund, SCS may destroy the paper copies of the Claim Forms and all supporting documentation; and (ii) in no less than one (1) year after all funds have been distributed, SCS may destroy the electronic copies of the Claim Forms and all supporting documentation.  This is the customary document retention period SCS uses to prevent additional costs to the Settlement Class for storage expenses and related fees.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 24th day of April 2025 in Media, Pennsylvania.

Josephine Bravata

16

# EXHIBIT A

## REPORT OF THE CLAIMS ADMINISTRATOR

## ATI PHYSICAL THERAPY, INC. SECURITIES LITIGATION

TOTAL # OF CLAIMS…………………………………………………… 10,135

TOTAL # OF APPROVED VALID CLAIMS………………………………… 4,432

TOTAL # OF INELIGIBLE CLAIMS…………………………………...... 5,703

PURCHASED OUTSIDE CLASS PERIOD................3,273
NO RECOGNIZED LOSSES....................................1,996
SHARES SOLD SHORT.................................................220
WRONG STOCK ............................................................72
SHARES NOT PURCHASED .........................................48
INADEQUATE DOCUMENTATION ............................37
DUPLICATE CLAIMS FILED.......................................20
CLAIMS FILED BY EXCLUDED PARTY ....................18
FRAUDULENT CLAIMS................................................16
CLAIMS WITHDRAWN..................................................3

TOTAL ....................................................................5,703

TOTAL RECOGNIZED CLAIMS FOR SECURITIES SUBCLASS .......$156,369,212.13

TOTAL SHARES FOR MULTIPLAN SUBCLASS ................................19,701,302.4986

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 1 | 8,000.00 | - |
| 2 | 724.91 | 100.0000 |
| 3 | - | 1.0000 |
| 4 | 128.00 | - |
| 5 | 3,879.00 | - |
| 6 | 10,000.00 | 1,000.0000 |
| 7 | 59.25 | - |
| 9 | 18,240.00 | - |
| 10 | 6,034.00 | - |
| 11 | 6,784.51 | - |
| 12 | 63.52 | - |
| 14 | 81.00 | - |
| 16 | 2,285,832.19 | 396,400.0000 |
| 17 | 43,100.00 | - |
| 19 | 512.00 | - |
| 20 | 7,900.00 | - |
| 22 | 5,189.69 | 3,000.0000 |
| 23 | 213.03 | 45.0000 |
| 24 | 312.50 | - |
| 25 | 4,010.00 | - |
| 26 | 5,183.29 | 700.0000 |
| 29 | 2,025.00 | - |
| 30 | 2,025.00 | - |
| 31 | 1,078.50 | 150.0000 |
| 32 | - | 2,000.0000 |
| 33 | 476.35 | - |
| 34 | 20,904.75 | - |
| 35 | 813.32 | 165.0000 |
| 37 | 41,174.60 | 3,000.0000 |
| 38 | 3,081.00 | - |
| 39 | 82,632.45 | 13,225.0000 |
| 40 | 19,337.00 | 3,050.0000 |
| 41 | 1,583.75 | 250.0000 |
| 42 | 2,130.00 | 300.0000 |
| 45 | 291.20 | 130.0000 |
| 46 | 3,824.68 | - |
| 47 | 554.95 | - |
| 48 | 14,581.02 | - |
| 49 | 13,464.14 | - |
| 50 | 14,691.33 | - |
| 51 | 2,602.07 | - |
| 52 | 3,021.99 | - |
| 53 | 819.09 | - |
| 54 | 349.88 | - |
| 55 | 1,243.54 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56 | 741,602.39 | - |
| 57 | 1,928.03 | - |
| 58 | 9,059.25 | - |
| 59 | 3,815.01 | - |
| 60 | 914.14 | - |
| 61 | 834.07 | - |
| 62 | 19,120.34 | - |
| 63 | 9,043.20 | - |
| 64 | 5,492.97 | - |
| 65 | 9,801.74 | - |
| 66 | 14,015.34 | - |
| 67 | 7,771.61 | - |
| 68 | 17,728.65 | - |
| 69 | 17,952.94 | - |
| 70 | 3,179.52 | - |
| 71 | 16,164.84 | - |
| 72 | 2,442.22 | - |
| 73 | 2,991.70 | - |
| 74 | 3,605.43 | - |
| 75 | 27,880.30 | - |
| 76 | 3,665.22 | - |
| 77 | 15,272.86 | - |
| 78 | 2,612.00 | - |
| 79 | 3,654.75 | - |
| 80 | 8,064.60 | - |
| 81 | 2,236.57 | - |
| 82 | 22,339.83 | - |
| 83 | 2,232.41 | - |
| 84 | 1,462.67 | - |
| 85 | 7.50 | - |
| 86 | 2,433.20 | - |
| 87 | 153.49 | - |
| 90 | - | 300.0000 |
| 91 | 626.10 | 50.0000 |
| 92 | 1,932.50 | 351.0000 |
| 93 | 1,884.00 | - |
| 94 | 6,465.00 | 805.0000 |
| 95 | 2,965.00 | - |
| 96 | 14,280.00 | 5,000.0000 |
| 98 | 2,565.84 | 274.0000 |
| 99 | 11,853.63 | 965.0000 |
| 103 | 4,795.60 | - |
| 104 | 10,068.57 | - |
| 105 | - | 20.0000 |
| 106 | 12,754.40 | 1,050.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS** **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 108 | 11,933.05 | 1,200.0000 |
| 109 | 8,996.25 | - |
| 110 | 9,922.23 | 1,385.0000 |
| 111 | 3,346.95 | 679.0000 |
| 112 | 409.13 | 83.0000 |
| 113 | 8,265.38 | 1,395.0000 |
| 114 | 3,340.25 | - |
| 115 | 1,565.12 | 165.0000 |
| 116 | 8,462.00 | - |
| 117 | 29.72 | 4.0000 |
| 118 | 75.50 | 100.0000 |
| 119 | - | 400.0000 |
| 120 | 3,963.45 | 100.0000 |
| 121 | 64.65 | - |
| 122 | 1,637.80 | - |
| 123 | 4,894.53 | 725.0000 |
| 124 | 2,909.50 | 500.0000 |
| 125 | 2,902.50 | 500.0000 |
| 126 | - | 800.0000 |
| 128 | 43,822.61 | 6,686.0000 |
| 129 | 267.22 | 62.0000 |
| 130 | 43.10 | - |
| 131 | 5,120.00 | 1,000.0000 |
| 132 | 36,776.45 | 4,000.0000 |
| 134 | 815.00 | 100.0000 |
| 135 | 671.84 | - |
| 136 | 209.95 | - |
| 138 | 162.00 | - |
| 140 | 1,486.95 | 345.0000 |
| 141 | 2,973.90 | 690.0000 |
| 144 | 353.92 | 35.0000 |
| 146 | 681.23 | - |
| 147 | 819.40 | 120.0000 |
| 148 | 8,176.32 | 1,105.0000 |
| 149 | 18,469.84 | 2,000.0000 |
| 150 | 10,298.18 | 1,020.0000 |
| 152 | 2,292.00 | 300.0000 |
| 154 | 129.28 | - |
| 155 | 287.80 | - |
| 156 | 383.17 | - |
| 157 | 771.67 | 1.0000 |
| 158 | 6,870.00 | 600.0000 |
| 165 | 5.12 | - |
| 166 | 64.82 | - |
| 168 | 82,349.80 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 169 | - | 1.0000 |
| 171 | 424.81 | 40.0000 |
| 172 | 12,844.64 | - |
| 173 | 512,000.00 | 10.0000 |
| 174 | 93.90 | - |
| 175 | 339.24 | 40.0000 |
| 177 | 25,600.00 | - |
| 179 | 26.91 | - |
| 180 | 51,200.00 | 10,000.0000 |
| 181 | 73,270.00 | - |
| 182 | 3.53 | - |
| 183 | 55,218.03 | 1,200.0000 |
| 184 | 284.40 | 32.0000 |
| 185 | 35.40 | 15.0000 |
| 186 | 3,046.40 | 378.4000 |
| 187 | - | 12.0000 |
| 188 | 41.00 | - |
| 189 | 15,242.24 | - |
| 190 | 153,553.92 | - |
| 191 | 381.76 | - |
| 192 | 319.36 | - |
| 193 | 81.00 | - |
| 194 | 1.19 | - |
| 195 | 1,605.60 | 180.0000 |
| 196 | 17,471.50 | - |
| 197 | 301,864.63 | - |
| 198 | 384,882.84 | - |
| 199 | 1,104,355.41 | - |
| 200 | 5,897.58 | - |
| 201 | 207,905.85 | - |
| 202 | 1,021.24 | - |
| 203 | 5,415.00 | - |
| 204 | 4,164.45 | 300.0000 |
| 205 | 178.92 | 24.8504 |
| 206 | 106.50 | - |
| 207 | 1,443.85 | 335.0000 |
| 208 | 193.95 | 45.0000 |
| 209 | 2,779.95 | 645.0000 |
| 210 | 4,096.00 | 500.0000 |
| 211 | 1,640.00 | - |
| 212 | 3,868.74 | 300.0000 |
| 213 | 75,248.06 | 20,000.0000 |
| 215 | - | 50.0000 |
| 216 | 69.63 | 2.0000 |
| 217 | 6,125.32 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**                     **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 218 | 1,556.80 | 200.0000 |
| 223 | - | 1,043.0000 |
| 224 | 790.40 | - |
| 225 | 39.10 | 5.0000 |
| 230 | 710.50 | 100.0000 |
| 232 | 4,544.40 | 200.0000 |
| 233 | 5,103.84 | 800.0000 |
| 234 | 2,560.00 | - |
| 236 | 4,225.00 | 550.0000 |
| 238 | 5,744.30 | 150.0000 |
| 239 | 87,458.62 | 5,500.0000 |
| 241 | 1,061.20 | 14.0000 |
| 244 | 40.50 | - |
| 246 | 121,850.00 | - |
| 247 | 3,089.52 | 404.0000 |
| 248 | 102.32 | - |
| 249 | 504.00 | - |
| 251 | 88,010.00 | 5,000.0000 |
| 252 | 3,340.00 | 500.0000 |
| 254 | 6.19 | - |
| 257 | 12.90 | - |
| 258 | 66.56 | - |
| 259 | 38,141.08 | 3,765.0000 |
| 260 | 5,377.61 | 710.0000 |
| 261 | 1,153.00 | 200.0000 |
| 262 | 6,240.30 | 1,072.0000 |
| 264 | 712.85 | 100.0000 |
| 267 | 72.19 | 10.0000 |
| 272 | 718.50 | 100.0000 |
| 273 | 5,120.00 | - |
| 276 | 7,322.72 | 300.0000 |
| 278 | 870.96 | - |
| 279 | 97.92 | - |
| 282 | 2,160.00 | 300.0000 |
| 283 | 3,597.50 | 500.0000 |
| 284 | 2,520.00 | 350.0000 |
| 285 | - | 500.0000 |
| 286 | 1,433.75 | 193.0000 |
| 288 | 1,841.13 | - |
| 290 | 1,148.80 | 160.0000 |
| 291 | 10,240.00 | 1,000.0000 |
| 292 | 4,096.00 | - |
| 293 | - | 150.0000 |
| 295 | - | 100.0000 |
| 296 | 6,156.00 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 297 | 25,080.80 | - |
| 299 | - | 100.0000 |
| 300 | 3,942.00 | - |
| 301 | 2,560.00 | - |
| 303 | 606.20 | 140.0000 |
| 304 | 1,564,698.09 | - |
| 306 | 4,885.13 | 785.0000 |
| 307 | 3,195.07 | 260.0000 |
| 308 | 3,396.87 | 547.0000 |
| 309 | 2,114.97 | 340.0000 |
| 310 | 1,462.73 | 135.0000 |
| 311 | 2,002.19 | 140.0000 |
| 312 | 7.43 | 1.0000 |
| 313 | 10,562.00 | 12,050.0000 |
| 314 | 96,745.00 | - |
| 315 | 60.90 | 5.0000 |
| 316 | 6,219.71 | 680.0000 |
| 317 | 6,051.74 | 750.0000 |
| 320 | 256.64 | - |
| 321 | 1,855.40 | - |
| 322 | 187.00 | 290.0000 |
| 323 | 301.70 | - |
| 324 | 74.83 | - |
| 325 | 5,294.00 | 700.0000 |
| 328 | 62.40 | - |
| 329 | 4.05 | - |
| 330 | - | 1.0000 |
| 332 | 407.53 | - |
| 333 | 2,159.50 | 300.0000 |
| 334 | 125.50 | 25.0000 |
| 335 | 8,100.00 | - |
| 337 | 9.09 | - |
| 338 | 1.26 | - |
| 340 | 5,120.00 | 1,000.0000 |
| 341 | 5,774.69 | 693.0000 |
| 342 | 3,392.00 | - |
| 343 | - | 15.0000 |
| 344 | 171.25 | - |
| 345 | 1,606.32 | - |
| 347 | - | 1.0000 |
| 348 | 719.00 | 100.0000 |
| 349 | 7,716.30 | - |
| 350 | 371.50 | 50.0000 |
| 351 | 287.50 | - |
| 352 | 370.07 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 353 | 31.43 | - |
| 354 | 33.78 | - |
| 355 | 31.43 | - |
| 356 | 33.75 | - |
| 357 | 30.77 | - |
| 358 | 1,566.72 | - |
| 359 | 81.00 | - |
| 360 | 1,541.00 | - |
| 361 | 1,024.00 | - |
| 363 | 254.95 | - |
| 364 | 901.50 | - |
| 365 | 87.58 | 10.0000 |
| 366 | 427.41 | - |
| 367 | 426.00 | - |
| 368 | 1,184.00 | - |
| 369 | 37.00 | - |
| 370 | 1,740.80 | - |
| 371 | 475.50 | - |
| 372 | 13,902.24 | - |
| 374 | 358.50 | 50.0000 |
| 375 | 106.90 | - |
| 376 | 166.25 | - |
| 377 | 62.50 | - |
| 378 | 31.22 | - |
| 380 | 58.32 | - |
| 381 | 41.21 | - |
| 382 | 37.00 | - |
| 383 | 30.50 | - |
| 384 | 3,051.43 | 455.0000 |
| 386 | 257.80 | 50.0000 |
| 387 | 757.00 | 100.0000 |
| 388 | 185.28 | 15.0000 |
| 389 | 15.30 | - |
| 390 | 7,680.00 | - |
| 391 | 2,531.30 | 100.0000 |
| 392 | 1.62 | - |
| 393 | 0.52 | - |
| 394 | 16.00 | - |
| 395 | 540.00 | 1,600.0000 |
| 396 | 7.35 | 0.9881 |
| 399 | 3.84 | - |
| 400 | 27.00 | - |
| 403 | 19,312.50 | - |
| 404 | 6,500.00 | - |
| 405 | 216.82 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 407 | 79.93 | - |
| 408 | 188.68 | 15.0000 |
| 410 | 4,020.80 | - |
| 411 | - | 20.0000 |
| 412 | 1,409.69 | 221.0000 |
| 413 | 51.20 | - |
| 414 | 179.00 | - |
| 416 | 21.69 | 3.0000 |
| 417 | 12,080.00 | 2,000.0000 |
| 419 | 742.50 | 100.0000 |
| 420 | 96.40 | - |
| 421 | 220.21 | 20.0000 |
| 422 | 216,500.00 | - |
| 423 | 40,478.45 | - |
| 424 | 40,417.76 | - |
| 427 | 4.86 | - |
| 429 | - | 60.0000 |
| 430 | 136.10 | 21.0047 |
| 431 | 208.56 | - |
| 432 | 57,565.00 | 7,500.0000 |
| 433 | - | 4.0000 |
| 434 | 128.00 | - |
| 435 | 8.88 | - |
| 436 | 23.70 | - |
| 439 | - | 10.0000 |
| 440 | 56.49 | 8.0000 |
| 441 | 4,940.00 | 1,000.0000 |
| 442 | 357.14 | 49.9500 |
| 443 | 26.00 | - |
| 444 | 2,412.97 | 99.0000 |
| 445 | 256.00 | - |
| 446 | 799.74 | 70.0000 |
| 448 | 143.40 | 20.0000 |
| 449 | 0.62 | - |
| 450 | 21.51 | 31.0000 |
| 451 | 858.61 | 100.2354 |
| 452 | 27.32 | - |
| 453 | 4,294.62 | 300.0000 |
| 454 | 2,722.00 | - |
| 455 | 733.23 | - |
| 456 | 523.19 | - |
| 457 | 1,142.00 | - |
| 458 | 5,497.80 | 1,000.0000 |
| 461 | 498.13 | - |
| 463 | 1.60 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 464 | 58.00 | - |
| 465 | 358.40 | - |
| 466 | 90.30 | - |
| 467 | 714.24 | 96.0000 |
| 468 | 67.50 | - |
| 469 | 57.76 | 8.0000 |
| 471 | 504.92 | 70.0000 |
| 473 | 35,676.86 | 5,000.0000 |
| 474 | - | 140.0000 |
| 475 | 8.98 | - |
| 477 | 3,705.20 | 2,120.0000 |
| 478 | 768.00 | - |
| 480 | 5.11 | - |
| 483 | 35.73 | 4.9900 |
| 484 | 2,430.00 | - |
| 485 | 57.56 | 8.0000 |
| 486 | 3.24 | - |
| 487 | 4,337.98 | 600.0000 |
| 488 | 810.00 | - |
| 490 | 274.47 | - |
| 491 | 56,320.00 | - |
| 492 | 32.00 | - |
| 493 | 1,243.46 | - |
| 494 | 1,782.00 | - |
| 495 | - | 100.0000 |
| 498 | 2,796.45 | - |
| 500 | 363.20 | - |
| 501 | 0.95 | - |
| 502 | 37.35 | 5.0000 |
| 503 | 304.44 | - |
| 504 | 191.65 | - |
| 505 | 44,827.06 | - |
| 506 | 39.50 | - |
| 507 | 405.00 | - |
| 508 | 293.26 | 20.0000 |
| 509 | 2.43 | - |
| 510 | - | 30.0000 |
| 511 | 23.30 | - |
| 512 | 528.00 | - |
| 513 | 612.49 | - |
| 514 | - | 1,000.0000 |
| 515 | - | 60.0000 |
| 517 | 151.14 | - |
| 519 | 236.50 | - |
| 520 | 722.71 | 102.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 521 | 294.82 | 30.0000 |
| 522 | 4,869.75 | - |
| 523 | 119.10 | 10.0000 |
| 524 | 490.70 | 60.0000 |
| 525 | 612.61 | 102.0000 |
| 526 | 38.13 | 5.0000 |
| 527 | 161.76 | 50.0000 |
| 528 | - | 300.0000 |
| 529 | 3,595.20 | 480.0000 |
| 530 | 4,938.20 | 834.0000 |
| 531 | 3,136.40 | 450.0000 |
| 532 | 5,748.00 | - |
| 533 | 223.00 | - |
| 534 | 10.05 | - |
| 535 | 226.80 | - |
| 536 | 14,197.00 | - |
| 537 | 175.05 | - |
| 538 | 828.30 | 100.0000 |
| 539 | 45.15 | - |
| 540 | 914.00 | 100.0000 |
| 541 | 1,146.88 | 224.0000 |
| 542 | 1,669.12 | - |
| 543 | 547.84 | - |
| 544 | 57.00 | - |
| 545 | 86.45 | - |
| 548 | 0.18 | - |
| 549 | 18,564.00 | 2,000.0000 |
| 550 | 1,508.00 | 200.0000 |
| 551 | 4,310.00 | - |
| 552 | 355.75 | 50.0000 |
| 553 | 299.46 | 39.0000 |
| 554 | 553.62 | 100.0000 |
| 556 | - | 228.0000 |
| 557 | - | 171.0000 |
| 558 | 1,033.29 | 203.0000 |
| 559 | 1,413.12 | 276.0000 |
| 560 | 3,501.16 | 485.0000 |
| 561 | 4,917.00 | 600.0000 |
| 562 | 399,360.00 | - |
| 563 | 128.00 | - |
| 564 | - | 3,000.0000 |
| 567 | 1,643.52 | 150.0000 |
| 568 | 7,140.00 | 1,000.0000 |
| 569 | 73.30 | - |
| 570 | - | 26.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 571 | 566.86 | 115.0000 |
| 572 | 5,180.59 | 1,051.0000 |
| 573 | 394.34 | 80.0000 |
| 574 | 207.03 | 42.0000 |
| 575 | 3,080.75 | 625.0000 |
| 576 | 17,093.80 | 978.0000 |
| 577 | 17,039.52 | 2,400.0000 |
| 578 | - | 1,000.0000 |
| 579 | 2,048.00 | - |
| 580 | 10,752.00 | - |
| 581 | 6,390.00 | 2,400.0000 |
| 582 | 204,725.00 | - |
| 583 | 34,480.00 | - |
| 585 | 47.70 | 15.0000 |
| 50000 | 608,672.56 | 495,339.0000 |
| 50002 | - | 41,000.0000 |
| 50003 | 10,892.75 | - |
| 50007 | 36,864.00 | - |
| 50008 | 161,514.93 | 984.0000 |
| 50009 | - | 64,920.0000 |
| 50010 | - | 14,143.0000 |
| 50011 | 199.68 | - |
| 50012 | 56,632.32 | - |
| 50013 | 142,946.25 | - |
| 50014 | 1,302,807.94 | 45,201.0000 |
| 50019 | 92,502.75 | 11,249.0000 |
| 50031 | 439,251.91 | 145,000.0000 |
| 50033 | 192,366.98 | 30,169.0000 |
| 50035 | 524.35 | 34.0000 |
| 50036 | 1,702,897.49 | 262,586.0000 |
| 50037 | 953,233.41 | - |
| 50041 | - | 44,000.0000 |
| 50045 | 96,284.37 | - |
| 50046 | 53,549.44 | - |
| 50047 | - | 9,500.0000 |
| 50048 | - | 79,882.0000 |
| 50049 | 116,352.60 | 41,000.0000 |
| 50055 | 19,568.13 | 54,500.0000 |
| 50056 | - | 6,000.0000 |
| 50058 | 109,691.32 | 41,182.0000 |
| 50059 | 80,916.48 | 27,418.0000 |
| 50063 | - | 19,465.0000 |
| 50065 | 7,574.32 | - |
| 50068 | 104,602.22 | - |
| 50071 | 116.57 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**                     **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 50072 | 19,571.17 | 2,720.0000 |
| 50076 | 969,192.92 | - |
| 50077 | 225,988.20 | - |
| 50082 | 2,112,370.19 | 315,505.0000 |
| 50086 | 342,720.35 | 48,364.0000 |
| 50087 | 224,317.18 | 33,817.0000 |
| 50088 | 405,796.47 | 59,413.0000 |
| 50089 | 82,904.56 | 11,682.0000 |
| 50090 | 920,682.83 | - |
| 50091 | 872,442.67 | - |
| 50092 | 54,798.28 | - |
| 50093 | 64,005.05 | - |
| 50094 | 492,230.17 | - |
| 50095 | - | 25,000.0000 |
| 50098 | 293,279.72 | - |
| 50099 | 1,280,000.00 | - |
| 50102 | 19.20 | - |
| 50103 | 61.59 | - |
| 50104 | 15.40 | - |
| 50105 | 103.81 | - |
| 50106 | 7,926.50 | - |
| 50114 | 17,869.18 | - |
| 50116 | 3,973,935.08 | - |
| 50117 | 6,761,295.93 | 392,449.0000 |
| 50121 | 3,805.05 | 500.0000 |
| 50123 | 8,400.00 | - |
| 50124 | - | 492.0000 |
| 50125 | 117.00 | - |
| 50126 | 1,091.20 | - |
| 50127 | 713.64 | 100.0000 |
| 50128 | 1,431.29 | 200.0000 |
| 50129 | 10,798.00 | 1,500.0000 |
| 50130 | 1,065.00 | - |
| 50131 | 1,809.38 | 250.0000 |
| 50132 | 709.00 | 100.0000 |
| 50133 | 2,560.00 | - |
| 50134 | 11,544.00 | - |
| 50135 | 2,143.50 | 300.0000 |
| 50136 | 243.00 | - |
| 50137 | 754.13 | - |
| 50138 | 417.00 | - |
| 50142 | 88.00 | - |
| 50145 | 1,462.00 | - |
| 50148 | 12.49 | - |
| 50150 | 21.83 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 50152 | 713.99 | 100.0000 |
| 50153 | 713.95 | 100.0000 |
| 50160 | 10,240.00 | 2,000.0000 |
| 50165 | 30.72 | 6.0000 |
| 50170 | 153.60 | - |
| 50171 | 647.01 | - |
| 50174 | 3,520.00 | - |
| 50175 | 35.88 | - |
| 50179 | 72.99 | - |
| 50180 | 35.88 | - |
| 50182 | 1,395.50 | - |
| 50183 | 563.00 | - |
| 50184 | 5.83 | - |
| 50186 | 9.60 | - |
| 50187 | 2,932.78 | 600.0000 |
| 50188 | 259.04 | 34.0000 |
| 50192 | 81.00 | - |
| 50193 | 256.00 | - |
| 50194 | 63.20 | - |
| 50199 | 106.68 | - |
| 50200 | 9.10 | - |
| 50205 | 923.00 | - |
| 50210 | 121.50 | - |
| 50211 | 15.80 | - |
| 50213 | 545.41 | - |
| 50214 | - | 75.0000 |
| 50215 | 69.66 | - |
| 50220 | 160.00 | - |
| 50225 | 140.00 | - |
| 50226 | 57.60 | - |
| 50227 | 280.46 | 28.0000 |
| 50228 | 1.60 | - |
| 50229 | 67.00 | - |
| 50237 | 11.00 | - |
| 50239 | 562.85 | - |
| 50241 | 71.66 | 10.0000 |
| 50242 | 512.00 | 100.0000 |
| 50243 | 30,478.99 | - |
| 50246 | 20.25 | - |
| 50249 | 256.00 | 50.0000 |
| 50250 | 1,325.50 | - |
| 50251 | 1,431.48 | 200.0000 |
| 50256 | 148.80 | 20.0000 |
| 50262 | 12.93 | - |
| 50263 | 243.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 50264 | 567.56 | - |
| 50266 | 4.19 | - |
| 50267 | 2,168.10 | 300.0000 |
| 50270 | 88.00 | - |
| 50271 | 223.35 | 30.0000 |
| 50275 | 7.14 | 1.0000 |
| 50278 | 28.56 | 4.0000 |
| 50279 | 790.00 | - |
| 50280 | 128.00 | - |
| 50281 | 28.35 | - |
| 50282 | 130.64 | - |
| 50283 | 80.20 | - |
| 50284 | 896.85 | - |
| 50285 | 512.00 | - |
| 50288 | 81.00 | - |
| 50290 | 81.00 | - |
| 50296 | 94.82 | - |
| 50314 | 5.67 | - |
| 50326 | 1.58 | - |
| 50330 | 5.67 | - |
| 50334 | 523.18 | - |
| 50336 | 15.80 | - |
| 50338 | 1.02 | - |
| 50342 | 17.24 | - |
| 50344 | 165.11 | - |
| 50349 | 1.14 | - |
| 50352 | - | 600.0000 |
| 50361 | 18.63 | - |
| 50365 | 7.90 | - |
| 50367 | 179.43 | - |
| 50368 | 11.20 | - |
| 50372 | 5,120.00 | - |
| 50373 | 1,499.78 | 200.0000 |
| 50374 | 183.50 | 25.0000 |
| 50376 | 37.38 | - |
| 50384 | - | 2.0000 |
| 50385 | 177.63 | 25.0000 |
| 50389 | 7.14 | 1.0000 |
| 50391 | 287.20 | 40.0000 |
| 50393 | 364.56 | 49.0000 |
| 50394 | 240.00 | - |
| 50397 | 256.00 | 20.0000 |
| 50400 | 7,379.00 | 1,000.0000 |
| 50401 | 0.02 | - |
| 50409 | 0.54 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 50410 | 30.72 | - |
| 50412 | 285.60 | 40.0000 |
| 50415 | 202.50 | - |
| 50436 | 6.48 | - |
| 50442 | 1.58 | - |
| 50447 | 3.05 | - |
| 50448 | 116.62 | - |
| 50452 | 53.50 | - |
| 50459 | 1.62 | - |
| 50461 | 30.40 | - |
| 50462 | 0.79 | - |
| 50468 | 10.86 | - |
| 50469 | 179.20 | - |
| 50472 | 390.42 | - |
| 50473 | 5.12 | 1.0000 |
| 50474 | 29.49 | - |
| 50475 | 6.32 | - |
| 50476 | 24.70 | - |
| 50477 | 284.38 | - |
| 50478 | 5.40 | - |
| 50479 | 66.96 | - |
| 50480 | 15.36 | 3.0000 |
| 50488 | 2.05 | - |
| 50489 | 153.60 | - |
| 50491 | 11.80 | - |
| 50495 | 11.34 | - |
| 50496 | 39.50 | - |
| 50497 | 4.20 | - |
| 50500 | 4.80 | - |
| 50634 | 4.14 | - |
| 50646 | 45,768.00 | - |
| 50647 | 3,277.23 | - |
| 50648 | 1,849.00 | - |
| 50649 | 8,591.13 | - |
| 50650 | 4,378.97 | - |
| 50651 | 1,327.67 | - |
| 50652 | 224.98 | - |
| 50653 | 6,112.26 | - |
| 50654 | 0.01 | - |
| 50655 | 25.50 | - |
| 50656 | 1.62 | - |
| 50659 | 5.12 | 1.0000 |
| 50661 | 3.15 | - |
| 50662 | 10.24 | - |
| 50663 | 123.05 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---------|----------------------------------------|------------------|
| 50664 | 1.62 | - |
| 50666 | 32.60 | - |
| 50667 | 35.59 | - |
| 50668 | 0.23 | - |
| 50670 | 14.99 | - |
| 50671 | 8.00 | - |
| 50674 | 512.00 | - |
| 50679 | 166.65 | - |
| 50680 | 12.40 | - |
| 50683 | 20.50 | - |
| 50684 | 104.60 | - |
| 50692 | 10.90 | - |
| 50699 | 6.30 | - |
| 50702 | 2.25 | - |
| 50725 | 1.08 | - |
| 50795 | 332.21 | - |
| 50805 | 1,152.00 | - |
| 50808 | 82.40 | - |
| 50813 | 4.86 | - |
| 50814 | 0.46 | - |
| 50816 | 0.28 | - |
| 50823 | 11.34 | - |
| 50824 | 48.60 | - |
| 50834 | 32.40 | - |
| 50836 | 182.47 | - |
| 50850 | 2.43 | - |
| 50852 | 13.80 | - |
| 50857 | 75.98 | - |
| 50899 | 13.60 | - |
| 50910 | 0.66 | - |
| 50914 | 0.62 | - |
| 50955 | 0.24 | - |
| 50970 | 7.56 | - |
| 50974 | 0.30 | - |
| 51109 | 81.00 | - |
| 51110 | 41.31 | - |
| 51113 | 407.64 | - |
| 51116 | 76.15 | 10.0000 |
| 51118 | 7.01 | 1.0000 |
| 51123 | 106.92 | - |
| 51132 | 70.90 | 10.0000 |
| 51140 | 5.53 | - |
| 51143 | 7.90 | - |
| 51146 | 71.60 | 10.0000 |
| 51153 | 25.70 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 51161 | 43.17 | 6.0000 |
| 51162 | 36.55 | 5.0000 |
| 51167 | 37.32 | 5.0000 |
| 51171 | 1,049.60 | 105.0000 |
| 51174 | 36.00 | 5.0000 |
| 51178 | 37.20 | 5.0000 |
| 51182 | 15.36 | 3.0000 |
| 51186 | 31.60 | - |
| 51187 | 5.12 | - |
| 51188 | 0.51 | - |
| 51190 | 260.00 | - |
| 51196 | 192.96 | - |
| 51197 | 0.81 | - |
| 51203 | 1,018.60 | - |
| 51209 | 51.20 | 10.0000 |
| 51210 | 1.81 | 1.0000 |
| 51214 | 35.64 | 5.0000 |
| 51218 | 7.21 | 1.0000 |
| 51222 | 71.45 | 10.0000 |
| 51224 | 5.12 | - |
| 51226 | 2.70 | - |
| 51228 | 21.32 | - |
| 51232 | 0.30 | - |
| 51238 | 28.90 | 4.0000 |
| 51245 | 5.12 | 1.0000 |
| 51252 | 64.99 | 9.0000 |
| 51255 | 3.95 | - |
| 51260 | 195.21 | 27.0000 |
| 51261 | 7.21 | 1.0000 |
| 51263 | 26.88 | - |
| 51265 | 7.12 | 1.0000 |
| 51268 | 28.72 | 4.0000 |
| 51270 | 55.12 | 4.0000 |
| 51274 | 73.70 | 10.0000 |
| 51275 | 164.06 | - |
| 51276 | 28.44 | 4.0000 |
| 51285 | 15.40 | - |
| 51288 | 7.32 | 1.0000 |
| 51289 | 51.20 | - |
| 51303 | 51.20 | 8.0000 |
| 51305 | 66.33 | 9.0000 |
| 51312 | 254.04 | - |
| 51322 | 355.50 | 50.0000 |
| 51324 | 7.17 | 1.0000 |
| 51325 | 86.86 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 51330 | 7.17 | 1.0000 |
| 51332 | 7.16 | 1.0000 |
| 51333 | 39.50 | - |
| 51334 | 48.00 | - |
| 51335 | 25.60 | 5.0000 |
| 51343 | 158.00 | - |
| 51344 | 5.12 | - |
| 51349 | 78.82 | 11.0000 |
| 51350 | 51.20 | - |
| 51353 | 9.60 | - |
| 51356 | 15.80 | - |
| 51357 | 59.13 | - |
| 51359 | - | 15.0000 |
| 51361 | 71.20 | 10.0000 |
| 51363 | 3.57 | - |
| 51365 | 4.80 | - |
| 51367 | 115.70 | - |
| 51368 | 0.79 | - |
| 51375 | 27.73 | - |
| 51376 | 8.69 | - |
| 51377 | - | 1.0000 |
| 51378 | 512.00 | - |
| 51379 | 19.75 | - |
| 51382 | 5.68 | - |
| 51383 | 142.30 | 20.0000 |
| 51395 | 67.20 | - |
| 51396 | 14.24 | 2.0000 |
| 51397 | 3.80 | - |
| 51398 | 3.20 | - |
| 51415 | 0.79 | - |
| 51418 | 25.60 | 5.0000 |
| 51425 | 7.12 | 1.0000 |
| 51428 | 26.07 | - |
| 51429 | 19.75 | - |
| 51430 | 0.79 | - |
| 51439 | 3.24 | - |
| 51447 | 331.00 | - |
| 51452 | 33.72 | - |
| 51456 | 182.12 | - |
| 51458 | 8.91 | - |
| 51462 | 16.00 | - |
| 51466 | 1.35 | - |
| 51469 | 0.21 | - |
| 51471 | 71.10 | 10.0000 |
| 51474 | 6.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 51476 | 72.30 | 10.0000 |
| 51479 | 2.43 | - |
| 51482 | 2.88 | - |
| 51485 | 4.00 | - |
| 51487 | 44.91 | - |
| 51498 | 28.44 | - |
| 51500 | 15.01 | - |
| 51501 | 35.00 | - |
| 51513 | 39.50 | - |
| 51516 | 3.16 | - |
| 51517 | 158.00 | - |
| 51521 | 3.16 | - |
| 51523 | 14.18 | 2.0000 |
| 51525 | 90.58 | - |
| 51528 | 30.72 | - |
| 51539 | 20.34 | - |
| 51544 | 1.17 | - |
| 51545 | 40.96 | 8.0000 |
| 51547 | 5.67 | - |
| 51563 | 3.09 | - |
| 51565 | 217.25 | - |
| 51568 | 3.95 | - |
| 51570 | 8.69 | - |
| 51580 | 6.59 | - |
| 51592 | 47.16 | - |
| 51593 | 158.00 | - |
| 51607 | 41.00 | - |
| 51609 | 76.80 | - |
| 51613 | 5.61 | - |
| 51622 | 162.00 | - |
| 51623 | 0.81 | - |
| 51636 | 506.88 | - |
| 51649 | 0.55 | - |
| 51656 | 7.90 | - |
| 51661 | 8.00 | - |
| 51662 | 25.60 | - |
| 51663 | 83.20 | - |
| 51664 | 4.05 | - |
| 51668 | 6.48 | - |
| 51671 | 104.60 | - |
| 51677 | 0.70 | - |
| 51681 | 2.15 | - |
| 51688 | 712.13 | - |
| 51689 | 8.91 | - |
| 51691 | 81.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**                **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 51694 | 3.25 | - |
| 51696 | 6.18 | - |
| 51702 | 1.58 | - |
| 51710 | 1.59 | - |
| 51712 | 7.32 | - |
| 51713 | 370.93 | - |
| 51717 | 20.48 | - |
| 51719 | 32.39 | - |
| 51722 | 137.92 | - |
| 51727 | 25.60 | - |
| 51733 | 1.38 | - |
| 51736 | 12.64 | - |
| 51737 | 1,280.00 | 250.0000 |
| 51743 | 1.36 | - |
| 51744 | 23.90 | - |
| 51746 | 281.60 | - |
| 51754 | 5.12 | - |
| 51755 | 17.99 | - |
| 51757 | 8.88 | - |
| 51758 | 11.85 | - |
| 51760 | 153.60 | - |
| 51768 | 56.32 | - |
| 51771 | 0.79 | - |
| 51773 | 8.69 | - |
| 51774 | 7.11 | - |
| 51778 | 7.02 | - |
| 51781 | 0.79 | - |
| 51784 | 25.60 | - |
| 51787 | 1.60 | - |
| 51790 | 13.09 | - |
| 51793 | 20.15 | - |
| 51794 | 828.29 | - |
| 51796 | 575.12 | - |
| 51800 | 77.76 | - |
| 51803 | 102.40 | 20.0000 |
| 51809 | 15.36 | - |
| 51810 | 3.16 | - |
| 51814 | 3.57 | - |
| 51818 | 126.48 | - |
| 51824 | 10.24 | - |
| 51825 | 402.25 | - |
| 51826 | 4.70 | - |
| 51829 | 51.20 | - |
| 51838 | 65.57 | - |
| 51845 | 0.44 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 51855 | 72.09 | - |
| 51864 | 0.56 | - |
| 51865 | 5.06 | - |
| 51867 | 5.53 | - |
| 51869 | 327.60 | - |
| 51870 | 7.90 | - |
| 51871 | 648.00 | - |
| 51877 | 1.60 | - |
| 51882 | 4.74 | - |
| 51883 | 43.79 | - |
| 51884 | 7.13 | - |
| 51888 | 0.28 | - |
| 51896 | 14.47 | - |
| 51898 | 15.60 | - |
| 51902 | 169.30 | - |
| 51904 | 79.00 | - |
| 51910 | 5.00 | - |
| 51915 | 8.10 | - |
| 51916 | 4.80 | - |
| 51921 | 8.62 | - |
| 51924 | 7.90 | - |
| 51927 | 3.24 | - |
| 51928 | 0.81 | - |
| 51938 | 23.60 | - |
| 51951 | 3.16 | - |
| 51958 | 3.18 | - |
| 51959 | 14.06 | - |
| 51967 | 3.20 | - |
| 51968 | 202.50 | - |
| 51969 | 8.42 | - |
| 51976 | 1.22 | - |
| 51979 | 2.71 | - |
| 51992 | 0.81 | - |
| 52003 | 14.58 | 2.0000 |
| 52004 | 69.00 | - |
| 52023 | 16.00 | - |
| 52027 | 3.95 | - |
| 52035 | 17.50 | - |
| 52037 | 119.50 | - |
| 52042 | 143.00 | 20.0000 |
| 52046 | 1.23 | - |
| 52058 | 67.20 | - |
| 52067 | 16.00 | - |
| 52083 | 63.20 | - |
| 52093 | 11.25 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 52095 | 1.58 | - |
| 52101 | 1.99 | - |
| 52113 | 51.28 | - |
| 52133 | 272.49 | - |
| 52137 | 712.40 | 100.0000 |
| 52141 | 0.79 | - |
| 52143 | 32.00 | - |
| 52145 | 780.00 | - |
| 52150 | 6,083.00 | - |
| 52151 | 0.96 | - |
| 52154 | 241.27 | - |
| 52170 | 5,724.34 | - |
| 52172 | 51.20 | - |
| 52180 | 3.33 | - |
| 52181 | 7.11 | - |
| 52183 | 1.32 | - |
| 52184 | 37.15 | - |
| 52186 | 30.60 | - |
| 52207 | 27.20 | - |
| 52215 | 3.60 | - |
| 52225 | 9.53 | - |
| 52232 | 15.01 | - |
| 52233 | - | 14.0000 |
| 52234 | 0.08 | - |
| 52235 | 915.93 | - |
| 52236 | 3.20 | - |
| 52250 | 3.30 | - |
| 52254 | 0.11 | - |
| 52257 | 0.16 | - |
| 52270 | 0.29 | - |
| 52276 | 7.18 | 0.9700 |
| 52278 | 3.25 | - |
| 52281 | 2.03 | - |
| 52288 | 8.91 | - |
| 52289 | 1.51 | 0.1800 |
| 52293 | 8.58 | 1.2000 |
| 52297 | 20.90 | - |
| 52298 | 7.13 | 1.0000 |
| 52300 | 185.04 | 15.0000 |
| 52303 | 42.15 | - |
| 52304 | 278.27 | - |
| 52305 | 70.29 | 9.6900 |
| 52309 | 768.00 | 67.0000 |
| 52313 | 0.49 | - |
| 52317 | 10.46 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**     **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 52324 | 4.68 | - |
| 52326 | 22.40 | - |
| 52330 | 15.68 | - |
| 52338 | 3.46 | - |
| 52342 | 8.18 | - |
| 52343 | 9.15 | - |
| 52344 | 3.35 | - |
| 52347 | 16.70 | - |
| 52352 | 71.31 | 10.0300 |
| 52362 | 9.98 | - |
| 52364 | 145.69 | 19.0100 |
| 52367 | 714.85 | 99.7000 |
| 52372 | 3.55 | 0.5000 |
| 52374 | 0.91 | - |
| 52375 | 6.37 | - |
| 52376 | 38.97 | - |
| 52380 | 79.00 | - |
| 52381 | 22.99 | - |
| 52387 | 1.18 | - |
| 52388 | 37.11 | 5.1900 |
| 52392 | - | 0.0100 |
| 52411 | 0.59 | - |
| 52413 | 61.88 | - |
| 52415 | 9.61 | - |
| 52424 | 4.63 | - |
| 52430 | 19.80 | - |
| 52432 | 156.70 | - |
| 52434 | 3.55 | - |
| 52438 | 485.26 | - |
| 52444 | 76.90 | 15.0200 |
| 52446 | 8.38 | - |
| 52448 | 32.53 | - |
| 52450 | 0.63 | - |
| 52454 | 7.51 | - |
| 52460 | 2.32 | - |
| 52461 | 8.20 | - |
| 52462 | 1.55 | - |
| 52465 | 18.74 | 0.9900 |
| 52469 | 0.32 | - |
| 52470 | 4.03 | - |
| 52473 | 0.63 | - |
| 52474 | 2.50 | - |
| 52476 | 7.57 | - |
| 52479 | 10.43 | - |
| 52480 | 2.39 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 52482 | 55.10 | - |
| 52485 | 3.24 | - |
| 52489 | 0.36 | - |
| 52492 | 7.10 | - |
| 52495 | 1.60 | - |
| 52500 | 24.00 | - |
| 52501 | 11.12 | - |
| 52503 | 0.45 | - |
| 52509 | 4.42 | - |
| 52510 | 0.09 | - |
| 52514 | 4.63 | - |
| 52515 | 0.88 | - |
| 52517 | 2.86 | - |
| 52519 | 7.63 | - |
| 52521 | 0.74 | - |
| 52523 | 1.27 | - |
| 52525 | 14.91 | - |
| 52526 | 0.30 | - |
| 52527 | 7.80 | - |
| 52530 | 0.03 | - |
| 52531 | 0.92 | - |
| 52543 | 1.60 | - |
| 52544 | 12.70 | - |
| 52545 | 3.47 | - |
| 52546 | 30.40 | - |
| 52547 | 0.32 | - |
| 52549 | 15.74 | - |
| 52550 | 3.02 | - |
| 52552 | 41.52 | - |
| 52553 | 7.06 | - |
| 52559 | 0.62 | - |
| 52560 | 1.92 | - |
| 52562 | 1.45 | - |
| 52563 | 2.33 | - |
| 52564 | 3.20 | - |
| 52566 | 13.78 | - |
| 52568 | 17.34 | - |
| 52569 | 3.96 | - |
| 52579 | 1.55 | - |
| 52583 | 1.90 | - |
| 52587 | 4.86 | - |
| 52590 | 183.47 | - |
| 52591 | 1.09 | - |
| 52592 | 0.19 | - |
| 52593 | 0.37 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 52594 | 0.93 | - |
| 52596 | 1.90 | - |
| 52654 | 2.95 | - |
| 52715 | 0.75 | - |
| 53101 | 74.03 | - |
| 53102 | 1,093.30 | 201.6200 |
| 53103 | 230.33 | - |
| 53105 | 952.49 | - |
| 53106 | 2.94 | - |
| 53107 | 11.58 | - |
| 53108 | 74.75 | 10.4900 |
| 53111 | 15.47 | - |
| 53113 | 191.90 | 27.0300 |
| 53114 | 73.89 | - |
| 53124 | 160.00 | - |
| 53129 | 169.62 | 10.0000 |
| 53133 | 12.81 | - |
| 53142 | 0.43 | - |
| 53146 | 373.47 | - |
| 53149 | 0.81 | - |
| 53151 | 313.12 | - |
| 53161 | 55.37 | - |
| 53180 | 21.69 | - |
| 53193 | 2,048.00 | - |
| 53194 | 2.80 | - |
| 53205 | 5.12 | - |
| 53206 | 2,110.00 | - |
| 53211 | 7.90 | - |
| 53220 | 0.07 | - |
| 53221 | 61.50 | - |
| 53231 | 3.95 | - |
| 53237 | 453.00 | 60.0000 |
| 53240 | 186.30 | - |
| 53241 | 114.51 | 16.0000 |
| 53250 | 88.80 | 90.0000 |
| 53257 | 470.87 | 66.0000 |
| 53260 | 1.16 | - |
| 53264 | 237.05 | - |
| 53278 | 40.00 | - |
| 53283 | 88.70 | - |
| 53293 | 53.79 | - |
| 53298 | 21.33 | - |
| 53301 | 59.20 | - |
| 53326 | 10.00 | - |
| 53327 | 56.12 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 53350 | 25.60 | - |
| 53356 | 15.80 | - |
| 53357 | 73.00 | - |
| 53359 | 66.15 | - |
| 53367 | 3.24 | - |
| 53379 | 13.43 | - |
| 53380 | 101.96 | - |
| 53386 | 2.80 | - |
| 53389 | 141.34 | - |
| 53390 | 0.81 | - |
| 53393 | 197.64 | - |
| 53394 | 1,935.00 | - |
| 53398 | 22.63 | - |
| 53410 | 405.00 | - |
| 53414 | 46.61 | - |
| 53426 | 67.15 | - |
| 53436 | 432.00 | 60.0000 |
| 53445 | 16.20 | - |
| 53453 | 1.62 | - |
| 53461 | 3.85 | - |
| 53471 | 16.45 | - |
| 53481 | 2.37 | - |
| 53492 | - | 25.0000 |
| 53498 | 32.61 | - |
| 53500 | 1,501.00 | - |
| 53503 | 2.43 | - |
| 53506 | 15.80 | - |
| 53509 | 15.80 | - |
| 53511 | 8.69 | - |
| 53518 | 60.13 | - |
| 53520 | 79.00 | - |
| 53521 | 320.00 | - |
| 53523 | 51.20 | - |
| 53526 | 1.58 | - |
| 53541 | 175.00 | - |
| 53550 | 79.00 | - |
| 53567 | 0.79 | - |
| 53568 | 431.00 | - |
| 53589 | 2.69 | - |
| 53592 | 22.91 | - |
| 53596 | 3.30 | - |
| 53606 | 28.44 | 4.0000 |
| 53615 | 23.70 | - |
| 53616 | 1,279.62 | - |
| 53617 | 23.00 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 53621 | 14.86 | 2.0000 |
| 53625 | 15.80 | - |
| 53626 | 4.36 | - |
| 53627 | 112.86 | - |
| 53634 | 6.34 | - |
| 53646 | 58.00 | - |
| 53648 | 71.20 | 10.0000 |
| 53652 | 510.17 | - |
| 53654 | 30.28 | 4.0000 |
| 53657 | 60.22 | - |
| 53665 | 7.14 | 1.0000 |
| 53669 | 6.15 | - |
| 53680 | 79.00 | - |
| 53695 | 158.00 | - |
| 53698 | 4.11 | - |
| 53711 | 101.40 | - |
| 53719 | 22.40 | - |
| 53721 | 40.50 | - |
| 53723 | 126.42 | - |
| 53732 | 55.69 | 6.0000 |
| 53749 | - | 10.0000 |
| 53754 | 45.00 | - |
| 53759 | 79.00 | - |
| 53760 | 178.50 | 25.0000 |
| 53761 | 31.60 | - |
| 53764 | 9.62 | - |
| 53787 | 27.10 | - |
| 53788 | 199.91 | - |
| 53798 | 0.26 | - |
| 53799 | 52,487.19 | - |
| 53804 | 70.40 | - |
| 53806 | 355.50 | 50.0000 |
| 53816 | 68.00 | - |
| 53828 | 13.98 | - |
| 53833 | 0.79 | - |
| 53834 | 52.85 | - |
| 53840 | 7.90 | - |
| 53849 | 22.27 | 3.0000 |
| 53852 | 0.79 | - |
| 53861 | 160.00 | - |
| 53866 | 1,721.23 | - |
| 53875 | 596.00 | - |
| 53876 | 25.60 | - |
| 53877 | 79.00 | - |
| 53879 | 7.90 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 53881 | 0.50 | - |
| 53885 | 1,120.00 | - |
| 53898 | 7.84 | 1.0000 |
| 53910 | 143.00 | 20.0000 |
| 53914 | 4.31 | - |
| 53926 | 21.52 | 3.0000 |
| 53934 | 288.00 | - |
| 53944 | 5.67 | - |
| 53952 | 3.03 | - |
| 53986 | 690.92 | - |
| 53992 | 296.10 | - |
| 53998 | 31.60 | - |
| 53999 | 113.30 | - |
| 54000 | 0.24 | - |
| 54011 | 58.56 | - |
| 54014 | - | 40.0000 |
| 54022 | 16.20 | - |
| 54041 | 59.20 | - |
| 54049 | 40.50 | - |
| 54058 | 5.05 | - |
| 54059 | 23.70 | - |
| 54063 | 45.00 | - |
| 54076 | 0.81 | - |
| 54078 | 32.40 | - |
| 54079 | 802.64 | - |
| 54082 | 0.57 | - |
| 54086 | 3.16 | - |
| 54091 | 150.78 | 20.0000 |
| 54092 | 594.86 | - |
| 54101 | 361.06 | 50.0000 |
| 54117 | 26.40 | - |
| 54119 | 0.80 | - |
| 54122 | 524.56 | - |
| 54126 | 143.39 | 20.0000 |
| 54135 | 8.91 | - |
| 54137 | 35.50 | 5.0000 |
| 54146 | 138.04 | - |
| 54161 | 3.16 | - |
| 54168 | 8.10 | - |
| 54178 | 78.30 | 10.0000 |
| 54192 | 19.44 | - |
| 54195 | - | 100.0000 |
| 54196 | 42.24 | - |
| 54199 | 142.20 | - |
| 54204 | 9.48 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 54206 | 71.40 | 10.0000 |
| 54208 | 3.95 | - |
| 54214 | 16.00 | - |
| 54217 | 1,508.00 | 200.0000 |
| 54221 | 7.84 | - |
| 54225 | 83.60 | - |
| 54227 | 6.48 | - |
| 54233 | 32.00 | - |
| 54235 | 6.40 | - |
| 54237 | 71.60 | 10.0000 |
| 54241 | 108.05 | 15.0000 |
| 54243 | 3.30 | - |
| 54246 | 50.15 | 7.0000 |
| 54250 | 189.75 | 25.0000 |
| 54254 | 80.41 | 11.0000 |
| 54255 | 8.31 | - |
| 54268 | 144.62 | 20.0000 |
| 54278 | 7.17 | 1.0000 |
| 54292 | 3.12 | - |
| 54293 | 360.50 | 50.0000 |
| 54295 | 512.00 | - |
| 54299 | 71.10 | 10.0000 |
| 54301 | 67.68 | 9.0000 |
| 54314 | 3.95 | - |
| 54316 | 10.24 | 2.0000 |
| 54318 | 1.62 | - |
| 54319 | 0.07 | - |
| 54320 | 4.86 | - |
| 54325 | 15.80 | - |
| 54327 | 0.78 | - |
| 54328 | 132.09 | 17.0000 |
| 54329 | 73.99 | 10.0000 |
| 54330 | 60.55 | - |
| 54331 | 36.45 | 5.0000 |
| 54336 | 16.75 | - |
| 54339 | 1.58 | - |
| 54340 | 35.65 | 5.0000 |
| 54344 | 35.65 | 5.0000 |
| 54347 | 11.36 | - |
| 54348 | 72.50 | 10.0000 |
| 54351 | 15.14 | 2.0000 |
| 54358 | 25.86 | - |
| 54368 | 30.15 | - |
| 54369 | 0.06 | - |
| 54373 | 0.21 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**                    **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 54375 | 0.79 | - |
| 54381 | 71.49 | 10.0000 |
| 54382 | 231.80 | 32.0000 |
| 54384 | 29.00 | 4.0000 |
| 54386 | 8.24 | - |
| 54389 | 3.25 | - |
| 54392 | 79.00 | - |
| 54395 | 24.00 | - |
| 54396 | 15.36 | 3.0000 |
| 54397 | 51.24 | 7.0000 |
| 54403 | 91.20 | - |
| 54407 | 19.44 | - |
| 54410 | 7.90 | - |
| 54420 | 0.02 | - |
| 54421 | 50.16 | 7.0000 |
| 54423 | 14.28 | 2.0000 |
| 54425 | 99.27 | - |
| 54429 | 1,434.39 | 200.0000 |
| 54430 | 14.24 | 2.0000 |
| 54432 | 712.00 | 100.0000 |
| 54438 | 86.20 | - |
| 54442 | 50.05 | 7.0000 |
| 54449 | 35.84 | - |
| 54450 | 96.00 | - |
| 54452 | 150.59 | - |
| 54453 | 307.80 | - |
| 54457 | 45.54 | - |
| 54458 | 5.67 | - |
| 54461 | 27.65 | - |
| 54462 | 24.30 | - |
| 54464 | 35.86 | 3.0000 |
| 54465 | 71.20 | 10.0000 |
| 54476 | 494.50 | - |
| 54477 | 239.47 | - |
| 54485 | 3.16 | - |
| 54486 | 37.20 | 5.0000 |
| 54489 | 2.37 | - |
| 54493 | 1.53 | - |
| 54498 | 7.23 | 1.0000 |
| 54499 | 76.80 | - |
| 54503 | 63.99 | - |
| 54505 | 1.99 | - |
| 54509 | 7.20 | 1.0000 |
| 54511 | 28.55 | 4.0000 |
| 54512 | 38.95 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 54513 | 98.41 | 13.0000 |
| 54514 | 16.00 | - |
| 54516 | 3.20 | - |
| 54520 | 38.71 | - |
| 54522 | 0.02 | - |
| 54523 | 287.50 | 40.0000 |
| 54524 | 72.34 | 10.0000 |
| 54529 | 56.32 | - |
| 54530 | 35.70 | 5.0000 |
| 54541 | 1.58 | - |
| 54543 | 21.96 | 3.0000 |
| 54545 | 78.33 | 11.0000 |
| 54549 | 5,120.00 | - |
| 54550 | 4.05 | - |
| 54554 | 51.20 | - |
| 54555 | 7.18 | 1.0000 |
| 54557 | 43.74 | - |
| 54561 | 26.75 | - |
| 54562 | 354.00 | 50.0000 |
| 54566 | 70.65 | 10.0000 |
| 54575 | 37.44 | 5.0000 |
| 54578 | 357.88 | 50.0000 |
| 54580 | 158.00 | - |
| 54583 | 7.12 | 1.0000 |
| 54589 | 56.00 | - |
| 54592 | 10.53 | - |
| 54593 | 24.30 | - |
| 54603 | 358.50 | 50.0000 |
| 54607 | 107.02 | 15.0000 |
| 54609 | 14.31 | 2.0000 |
| 54619 | 11.39 | - |
| 54620 | 17.60 | - |
| 54625 | 163.20 | - |
| 54627 | 139.27 | 19.0000 |
| 54636 | 13.40 | - |
| 54644 | 16.20 | - |
| 54646 | 71.20 | 10.0000 |
| 54649 | 17.41 | - |
| 54655 | 7.12 | 1.0000 |
| 54656 | 93.10 | 13.0000 |
| 54658 | 193.50 | 25.0000 |
| 54662 | 12.00 | - |
| 54665 | 234.96 | 33.0000 |
| 54670 | 7.12 | 1.0000 |
| 54688 | 3.95 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 54698 | 395.00 | - |
| 54700 | 0.02 | - |
| 54704 | 8.42 | - |
| 54712 | 387.45 | 50.0000 |
| 54713 | 28.42 | 4.0000 |
| 54717 | 544.53 | - |
| 54720 | 1.60 | - |
| 54725 | 706.00 | 100.0000 |
| 54728 | 35.75 | 5.0000 |
| 54731 | 63.98 | - |
| 54734 | 312.56 | 44.0000 |
| 54735 | 7.69 | 1.0000 |
| 54741 | 25.60 | 5.0000 |
| 54742 | 240.64 | - |
| 54752 | 63.98 | 7.0000 |
| 54754 | 142.40 | 20.0000 |
| 54760 | 44.24 | - |
| 54764 | 0.36 | - |
| 54768 | 16.20 | - |
| 54769 | 9.30 | - |
| 54770 | 400.27 | - |
| 54777 | 713.00 | 100.0000 |
| 54789 | 205.16 | - |
| 54797 | 14.36 | 2.0000 |
| 54800 | 257.01 | - |
| 54806 | 107.05 | 15.0000 |
| 54808 | 65.16 | 9.0000 |
| 54814 | 20.25 | - |
| 54816 | 56.32 | 11.0000 |
| 54819 | 18.17 | - |
| 54830 | 80.00 | - |
| 54831 | 22.05 | 3.0000 |
| 54832 | 790.00 | - |
| 54835 | 15.80 | - |
| 54841 | 7.80 | - |
| 54842 | 73.47 | - |
| 54843 | 70.60 | 10.0000 |
| 54845 | 41.33 | - |
| 54847 | 4.86 | - |
| 54848 | 142.00 | 20.0000 |
| 54854 | 0.43 | - |
| 54855 | 2.97 | - |
| 54859 | 791.58 | - |
| 54860 | 8.36 | - |
| 54861 | 73.40 | 10.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 54864 | 6.94 | 1.0000 |
| 54867 | 81.00 | - |
| 54868 | 52.21 | 7.0000 |
| 54873 | 1.62 | - |
| 54879 | 76.80 | 15.0000 |
| 54880 | 0.20 | 4.0000 |
| 54881 | 37.50 | 5.0000 |
| 54889 | 72.20 | 10.0000 |
| 54898 | - | 3.0000 |
| 54899 | 17.08 | - |
| 54902 | 74.10 | 10.0000 |
| 54909 | 25.92 | - |
| 54910 | 121.76 | - |
| 54913 | 0.09 | 0.0100 |
| 54917 | 39.05 | - |
| 54927 | 77.11 | - |
| 54936 | 275.80 | - |
| 54941 | 0.81 | - |
| 54945 | 5,548.50 | - |
| 54948 | 1.53 | - |
| 54949 | 29.68 | 4.0000 |
| 54950 | 7.39 | 1.0000 |
| 54956 | 501.50 | - |
| 54958 | 374.10 | 50.0000 |
| 54960 | 227.84 | - |
| 54974 | 9.60 | - |
| 54977 | 35.80 | 5.0000 |
| 54980 | 39.50 | - |
| 54987 | 73.18 | 10.0800 |
| 54989 | 218.10 | 30.0000 |
| 54991 | 81.00 | - |
| 54992 | 7.16 | 1.0000 |
| 54993 | 24.90 | - |
| 54996 | 0.81 | - |
| 54997 | 15.95 | - |
| 55008 | 1.86 | - |
| 55017 | 7.10 | 1.0000 |
| 55018 | 210.23 | - |
| 55021 | 71.85 | 10.0000 |
| 55033 | 7.44 | 1.0000 |
| 55034 | 360.50 | 50.0000 |
| 55043 | 0.79 | - |
| 55044 | 138.42 | - |
| 55047 | 716.82 | - |
| 55050 | 64.80 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**                 **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55052 | 105.00 | - |
| 55061 | 1.58 | - |
| 55064 | 282.00 | - |
| 55067 | 792.00 | - |
| 55068 | 795.53 | - |
| 55072 | 306.77 | - |
| 55073 | 143.86 | - |
| 55074 | 1.20 | - |
| 55083 | 22.69 | - |
| 55085 | 71.50 | - |
| 55090 | 216.30 | 350.0000 |
| 55099 | 5.12 | - |
| 55101 | 243.00 | - |
| 55103 | 1,024.00 | 100.0000 |
| 55110 | 530.55 | - |
| 55112 | 51.20 | 10.0000 |
| 55118 | - | 1,000.0000 |
| 55121 | 2.22 | - |
| 55125 | 82.00 | - |
| 55129 | 158.00 | - |
| 55130 | 431.00 | - |
| 55132 | 2,004.63 | - |
| 55138 | 309.95 | - |
| 55139 | 520.37 | - |
| 55140 | 271.84 | 38.0000 |
| 55141 | 180.00 | 25.0000 |
| 55143 | 332.34 | - |
| 55147 | 81.00 | - |
| 55148 | 399.00 | - |
| 55149 | 28.35 | - |
| 55151 | 512.00 | - |
| 55153 | 6.79 | - |
| 55155 | 8.00 | - |
| 55156 | 162.00 | - |
| 55166 | 5,193.60 | - |
| 55171 | 2.71 | - |
| 55172 | 2.56 | - |
| 55174 | 5.46 | - |
| 55176 | 109.62 | - |
| 55179 | 18.33 | - |
| 55185 | 1.64 | - |
| 55192 | 5.83 | - |
| 55194 | 11.21 | - |
| 55196 | 1.63 | - |
| 55197 | - | 1.4700 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55198 | 14.34 | - |
| 55201 | 35.63 | 5.0200 |
| 55202 | 7.67 | 0.9900 |
| 55203 | 508.31 | - |
| 55205 | 544.31 | - |
| 55206 | 0.51 | - |
| 55207 | 13.44 | - |
| 55208 | 1.18 | - |
| 55210 | 9.74 | - |
| 55212 | 18.75 | - |
| 55213 | 2.03 | - |
| 55214 | 0.61 | - |
| 55215 | 2.51 | - |
| 55216 | 9.56 | - |
| 55218 | 50.84 | - |
| 55219 | 23.76 | - |
| 55220 | 49.15 | - |
| 55226 | 5.53 | - |
| 55228 | 4.75 | - |
| 55230 | 2.16 | - |
| 55232 | 6.08 | - |
| 55234 | 31.56 | - |
| 55235 | 3.03 | - |
| 55236 | 402.00 | 55.9500 |
| 55242 | 25.60 | 5.0000 |
| 55243 | 2.87 | - |
| 55253 | 0.05 | - |
| 55254 | 35.72 | 5.0100 |
| 55255 | 6.00 | - |
| 55256 | 143.02 | 19.9200 |
| 55257 | 3.14 | - |
| 55258 | 40.10 | - |
| 55260 | 18.83 | - |
| 55261 | 22.50 | - |
| 55262 | 56.12 | - |
| 55263 | 6.66 | - |
| 55264 | 0.92 | - |
| 55265 | 0.28 | - |
| 55266 | 0.87 | - |
| 55267 | 100.51 | - |
| 55269 | 7.50 | - |
| 55270 | 72.38 | 9.6500 |
| 55271 | 7.71 | - |
| 55274 | 5.34 | - |
| 55275 | 0.03 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**                    **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55277 | 33.99 | - |
| 55279 | 39.35 | 5.4800 |
| 55281 | 19.97 | - |
| 55282 | 1.86 | - |
| 55288 | 0.18 | - |
| 55289 | 362.66 | - |
| 55292 | 84.37 | - |
| 55293 | 20.11 | - |
| 55295 | 152.83 | - |
| 55296 | 3.86 | - |
| 55298 | 11.35 | - |
| 55300 | 0.04 | 1.0000 |
| 55301 | 35.75 | 5.0000 |
| 55303 | 0.02 | - |
| 55304 | 0.09 | 0.0100 |
| 55306 | 0.15 | - |
| 55308 | 51.87 | - |
| 55310 | 3.34 | - |
| 55311 | 39.20 | - |
| 55322 | 19.52 | - |
| 55324 | 6.93 | - |
| 55327 | 0.94 | - |
| 55328 | 0.93 | - |
| 55330 | 27.29 | - |
| 55332 | 77.89 | - |
| 55333 | 49.15 | - |
| 55335 | 305.84 | 50.0000 |
| 55336 | 34,341.57 | - |
| 55337 | 1,230.04 | 60.0000 |
| 55338 | 273.46 | 44.0000 |
| 55339 | 186.88 | 26.0000 |
| 55340 | 825.45 | 108.0000 |
| 55341 | 1,024.00 | 200.0000 |
| 55342 | 244.30 | 240.0000 |
| 55343 | 1,208.42 | 100.0000 |
| 55344 | 2,879.76 | 200.0000 |
| 55345 | 988.15 | 200.0000 |
| 55346 | 6.25 | 10.0000 |
| 55347 | 1,129.18 | 135.0000 |
| 55348 | - | 1.0000 |
| 55349 | 280.50 | 50.0000 |
| 55350 | 146.69 | 24.0000 |
| 55351 | 854.60 | 120.0000 |
| 55352 | 173.04 | 2.0000 |
| 55353 | 84.75 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55354 | 2,805.84 | 400.0000 |
| 55355 | 54.26 | 10.0000 |
| 55356 | 400.13 | 78.0000 |
| 55357 | 131.38 | 100.0000 |
| 55358 | 74.95 | 6.0000 |
| 55359 | 35.81 | - |
| 55360 | 11,926.00 | 1,000.0000 |
| 55361 | 4.31 | - |
| 55362 | 2,921.58 | 400.0000 |
| 55363 | 43.68 | 10.0000 |
| 55365 | 1,079.50 | - |
| 55368 | 1,155.74 | 200.0000 |
| 55369 | 0.62 | - |
| 55371 | - | 150.0000 |
| 55374 | 91.10 | 80.0000 |
| 55375 | 86.55 | 200.0000 |
| 55376 | 724.00 | 100.0000 |
| 55377 | 400.60 | 40.0000 |
| 55378 | 1,024.00 | - |
| 55380 | 16.99 | 2.0000 |
| 55381 | 31.20 | 30.0000 |
| 55382 | 713.85 | 100.0000 |
| 55384 | 251.84 | 34.0000 |
| 55385 | 61.20 | 72.0000 |
| 55386 | 53.73 | 6.0000 |
| 55387 | 11.75 | 2.0000 |
| 55388 | 109.60 | 15.0000 |
| 55391 | 1,715.20 | 135.0000 |
| 55392 | 27.33 | 3.0000 |
| 55393 | 179.25 | 25.0000 |
| 55394 | 13.36 | 8.0000 |
| 55396 | 373.19 | 48.0000 |
| 55397 | 5.12 | 1.0000 |
| 55398 | 13.73 | 1.0000 |
| 55399 | 0.51 | 1.0000 |
| 55400 | 223.13 | 20.0000 |
| 55402 | 70.65 | 5.0000 |
| 55404 | - | 14.0000 |
| 55405 | 756.76 | - |
| 55407 | 189.10 | - |
| 55409 | 2,066.54 | 367.0000 |
| 55414 | 191.00 | 51.0000 |
| 55415 | 43.10 | - |
| 55416 | 1,428.00 | 200.0000 |
| 55419 | 752.91 | 59.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55420 | 370.64 | 11.0000 |
| 55421 | 76.80 | 15.0000 |
| 55423 | 115.89 | 20.0000 |
| 55424 | 721.00 | 100.0000 |
| 55427 | 105.53 | 10.0000 |
| 55428 | 1,583.12 | 200.0000 |
| 55429 | 169.62 | 15.0000 |
| 55430 | 44.16 | 2.0000 |
| 55432 | 125.07 | 10.0000 |
| 55433 | 5.94 | 1.0000 |
| 55434 | 2.80 | 2.0000 |
| 55435 | 200.35 | 15.0000 |
| 55438 | 1,401.01 | - |
| 55439 | 521.71 | 1.0000 |
| 55440 | 73.00 | 8.0000 |
| 55441 | 34.98 | - |
| 55442 | 5.15 | 5.0000 |
| 55443 | 71.70 | 10.0000 |
| 55445 | 1,187.43 | - |
| 55447 | 30.72 | - |
| 55448 | 0.86 | - |
| 55450 | 6.45 | 1.0000 |
| 55451 | 300.94 | 50.0000 |
| 55452 | 4.45 | 5.0000 |
| 55453 | 878.99 | - |
| 55454 | 0.99 | 1.0000 |
| 55455 | 58.80 | 98.0000 |
| 55456 | 225.28 | 104.0000 |
| 55457 | 59.07 | 5.0000 |
| 55458 | - | 11.0000 |
| 55459 | 223.97 | - |
| 55460 | 36.14 | 5.0000 |
| 55461 | 709.30 | 67.0000 |
| 55462 | 71.50 | 10.0000 |
| 55463 | 73.56 | 12.0000 |
| 55464 | 848.86 | - |
| 55465 | 109.33 | 25.0000 |
| 55466 | 71.41 | 10.0000 |
| 55467 | 124.59 | 20.0000 |
| 55468 | 522.24 | 2.0000 |
| 55469 | 5.12 | - |
| 55470 | 19.75 | - |
| 55471 | 152.00 | 15.0000 |
| 55472 | 51.44 | - |
| 55474 | 1,502.98 | 173.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55475 | 231.64 | 30.0000 |
| 55476 | - | 5.0000 |
| 55477 | 38.76 | 3.0000 |
| 55478 | 115.00 | - |
| 55480 | 1,372.00 | - |
| 55481 | 126.20 | 10.0000 |
| 55483 | - | 10.0000 |
| 55484 | 0.98 | 1.0000 |
| 55485 | 181.48 | 8.0000 |
| 55486 | - | 20.0000 |
| 55487 | 3.46 | 2.0000 |
| 55488 | 46.52 | 59.0000 |
| 55489 | 35.70 | 5.0000 |
| 55490 | 79.00 | - |
| 55491 | - | 1.0000 |
| 55492 | 17.30 | - |
| 55494 | 19.41 | - |
| 55496 | - | 5.0000 |
| 55497 | 512.00 | 10.0000 |
| 55498 | 112.64 | - |
| 55499 | 138.24 | 1.0000 |
| 55500 | 8.62 | - |
| 55501 | 88.63 | 1.0000 |
| 55502 | 235.52 | 1.0000 |
| 55503 | 18.58 | 6.0000 |
| 55505 | 86.20 | 20.0000 |
| 55506 | 29.75 | 10.0000 |
| 55507 | 3,220.67 | 500.0000 |
| 55509 | 8.69 | 1.0000 |
| 55510 | - | 1.0000 |
| 55512 | 683.21 | 30.0000 |
| 55513 | 35.34 | 12.0000 |
| 55514 | 788.48 | 100.0000 |
| 55516 | 115.65 | 25.0000 |
| 55517 | 27.30 | 81.0000 |
| 55518 | 1.45 | 1.0000 |
| 55519 | - | 1.9000 |
| 55520 | 23.13 | - |
| 55521 | 3.26 | 5.7100 |
| 55523 | 144.06 | 10.0100 |
| 55524 | 98.98 | 12.0300 |
| 55525 | 70.79 | 9.8600 |
| 55526 | 831.02 | 50.0200 |
| 55527 | 315.27 | 23.9000 |
| 55528 | 81.24 | 10.7600 |

### TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55529 | 51.87 | - |
| 55530 | 1.13 | 0.9600 |
| 55531 | 1.88 | 0.2700 |
| 55532 | 0.13 | 0.1900 |
| 55533 | 658.19 | 80.0000 |
| 55534 | 54.40 | 10.0000 |
| 55536 | 818.09 | 100.0000 |
| 55537 | 9.68 | - |
| 55538 | 15.36 | 3.0000 |
| 55539 | 2,430.72 | 486.0000 |
| 55540 | - | 3.0000 |
| 55541 | 14.27 | 2.0000 |
| 55542 | 2,089.62 | 200.0000 |
| 55543 | 599.75 | - |
| 55544 | 434.09 | 51.0000 |
| 55546 | 1,024.00 | - |
| 55547 | 306.75 | 100.0000 |
| 55548 | 899.29 | 75.0000 |
| 55549 | 29.96 | - |
| 55550 | 404.00 | 50.0000 |
| 55551 | 481.69 | 319.0000 |
| 55553 | - | 1.0000 |
| 55554 | 138.99 | 20.0000 |
| 55557 | 224.97 | 10.0000 |
| 55558 | 178.00 | 25.0000 |
| 55559 | 305.57 | 6.0000 |
| 55560 | 512.00 | - |
| 55561 | 43.59 | - |
| 55563 | 147.26 | 20.0000 |
| 55564 | 106.60 | 5.0000 |
| 55565 | 7.23 | 11.0000 |
| 55566 | 0.84 | 2.0000 |
| 55567 | - | 12.0000 |
| 55568 | 65.76 | 11.0000 |
| 55569 | 20.64 | 2.0000 |
| 55570 | - | 200.0000 |
| 55571 | 958.00 | 100.0000 |
| 55572 | 6.29 | 10.0000 |
| 55573 | 1,435.30 | 126.0000 |
| 55574 | 20.48 | - |
| 55575 | 774.40 | 100.0000 |
| 55576 | 250.51 | 5.0000 |
| 55577 | 176.17 | - |
| 55579 | 184.62 | 10.0000 |
| 55580 | 1.09 | 1.0000 |

### TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55581 | - | 75.0000 |
| 55582 | - | 1.0000 |
| 55583 | 5.53 | - |
| 55586 | 1,252.94 | - |
| 55587 | - | 1.0000 |
| 55588 | 73.99 | 10.0000 |
| 55589 | 0.74 | - |
| 55590 | 29.20 | 4.0000 |
| 55591 | 98.90 | 22.0000 |
| 55592 | - | 5.0000 |
| 55593 | 10,621.10 | - |
| 55594 | 86.20 | - |
| 55595 | 4.80 | 10.0000 |
| 55596 | 24.91 | 3.0000 |
| 55597 | 159.47 | - |
| 55598 | 43.10 | 10.0000 |
| 55599 | 2,921.52 | 408.0000 |
| 55600 | 154.39 | 26.0000 |
| 55601 | 17.88 | 2.0000 |
| 55603 | 339.66 | 30.0000 |
| 55604 | 10.56 | 11.0000 |
| 55605 | 2.60 | 60.0000 |
| 55606 | 20.00 | 20.0000 |
| 55607 | 30.87 | - |
| 55608 | 175.46 | 50.0000 |
| 55609 | 241.38 | 327.0000 |
| 55610 | 40.90 | 10.0000 |
| 55611 | 102.50 | - |
| 55612 | 935.43 | 100.0000 |
| 55613 | 1,161.02 | 100.0000 |
| 55614 | 173.97 | 2.0000 |
| 55615 | 0.03 | - |
| 55616 | 12.50 | 25.0000 |
| 55617 | 1,378.02 | - |
| 55618 | 2,758.96 | 120.0000 |
| 55619 | 172.18 | 10.0000 |
| 55620 | - | 5.0000 |
| 55621 | 147.60 | - |
| 55623 | 15.36 | - |
| 55624 | 302.85 | 5.0000 |
| 55625 | 5.50 | 5.0000 |
| 55626 | 306.40 | 20.0000 |
| 55627 | 0.81 | - |
| 55629 | 368.88 | 105.0000 |
| 55630 | 0.03 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55631 | 658.61 | 106.0000 |
| 55632 | 30.72 | 6.0000 |
| 55633 | 82.24 | 9.0000 |
| 55634 | 3.78 | 9.0000 |
| 55635 | 850.87 | 100.0000 |
| 55636 | 825.30 | - |
| 55637 | 12.53 | 13.0000 |
| 55638 | 54.24 | 10.0000 |
| 55639 | 20.48 | 10.0000 |
| 55640 | 63.01 | 3.0000 |
| 55641 | 202.30 | 100.0000 |
| 55642 | 167.50 | 20.0000 |
| 55643 | 283.83 | 40.0000 |
| 55644 | 1,079.50 | 100.0000 |
| 55645 | 55.67 | 61.0000 |
| 55646 | 78.07 | 10.0000 |
| 55647 | 71.40 | 10.0000 |
| 55648 | 287.32 | 15.0000 |
| 55649 | 57.64 | 10.0000 |
| 55650 | 32.85 | 5.0000 |
| 55651 | 59.00 | 10.0000 |
| 55652 | 1,620.69 | 6.0000 |
| 55653 | 220.20 | 100.0000 |
| 55654 | 1.74 | 3.0000 |
| 55655 | 19.20 | 3.0000 |
| 55657 | 20.48 | 1.0000 |
| 55658 | 8.62 | 2.0000 |
| 55659 | 28.75 | 4.0000 |
| 55660 | 173.61 | 5.0000 |
| 55661 | 14.46 | 2.0000 |
| 55662 | 41.32 | 1.0000 |
| 55663 | 120.10 | 20.0000 |
| 55664 | 22.38 | - |
| 55665 | 26.60 | 19.0000 |
| 55666 | 455.66 | 13.0000 |
| 55668 | 323.83 | 45.0000 |
| 55669 | 1,049.60 | 205.0000 |
| 55670 | 88.28 | 12.0000 |
| 55671 | 54.76 | 6.0000 |
| 55672 | 116.89 | 19.0000 |
| 55673 | 14.22 | 2.0000 |
| 55674 | 32.00 | - |
| 55675 | 44.60 | - |
| 55676 | 7.72 | 4.0000 |
| 55677 | 242.60 | 40.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55679 | 4.80 | 10.0000 |
| 55681 | 683.38 | 78.0000 |
| 55682 | 163.34 | 20.0000 |
| 55683 | 6.06 | 1.0000 |
| 55684 | 28.90 | 25.0000 |
| 55685 | 560.94 | 50.0000 |
| 55686 | - | 46.0000 |
| 55687 | 4.00 | 123.0000 |
| 55688 | 102.40 | 20.0000 |
| 55690 | 151.11 | 5.0000 |
| 55691 | 405.14 | 50.0000 |
| 55692 | 43.32 | 6.0000 |
| 55693 | 212.15 | 25.0000 |
| 55694 | 93.58 | 35.0000 |
| 55695 | 1,637.67 | 223.0000 |
| 55698 | 159.58 | 19.0000 |
| 55699 | 6.88 | 4.0000 |
| 55700 | 226.41 | 10.0000 |
| 55701 | 524.24 | 40.0000 |
| 55702 | - | 10.0000 |
| 55703 | 127.39 | 15.0000 |
| 55705 | 15.17 | 2.0000 |
| 55706 | 1,950.64 | 1.0000 |
| 55707 | 3,031.50 | 250.0000 |
| 55708 | 267.99 | 20.0000 |
| 55709 | 129.88 | 17.0000 |
| 55710 | 414.51 | 41.0000 |
| 55711 | 3.73 | 8.0000 |
| 55712 | 5.92 | 1.0000 |
| 55713 | 1,497.04 | 200.0000 |
| 55714 | 59.05 | 5.0000 |
| 55715 | - | 1.0000 |
| 55716 | 5.12 | - |
| 55717 | 5.12 | - |
| 55718 | 101.30 | 10.0000 |
| 55719 | 5.87 | 1.0000 |
| 55720 | 42.97 | 8.0000 |
| 55721 | 611.89 | 10.0000 |
| 55722 | 149.36 | 100.0000 |
| 55723 | 10.45 | 2.0000 |
| 55725 | 36.12 | 4.0000 |
| 55726 | 517.12 | - |
| 55728 | 739.50 | 100.0000 |
| 55730 | 6.86 | 1.0000 |
| 55731 | 40.26 | 5.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55732 | 268.40 | 12.0000 |
| 55733 | 32.31 | 6.0000 |
| 55734 | 146.85 | 15.0000 |
| 55735 | 39.40 | 20.0000 |
| 55737 | 578.25 | - |
| 55738 | - | 20.0000 |
| 55739 | 84.42 | 10.0000 |
| 55740 | 25.08 | 4.0000 |
| 55741 | 19.59 | 35.0000 |
| 55743 | 311.30 | 200.0000 |
| 55744 | 59.71 | - |
| 55746 | 71.68 | 14.0000 |
| 55747 | 7,888.94 | 981.0000 |
| 55748 | 27.22 | - |
| 55749 | - | 270.0000 |
| 55750 | 40,165.08 | 5,581.0000 |
| 55751 | 181.52 | 177.5100 |
| 55752 | 83.32 | - |
| 55753 | 175.93 | 74.9500 |
| 55754 | 193.95 | 30.0000 |
| 55755 | 382.00 | 50.0000 |
| 55756 | 8.20 | 5.0000 |
| 55757 | 900.00 | 100.0000 |
| 55758 | 29.10 | 30.0000 |
| 55759 | 35.76 | 12.0000 |
| 55760 | 2,331.95 | 130.0000 |
| 55761 | 10.90 | 2.0000 |
| 55762 | 16.18 | 3.0000 |
| 55763 | 47.88 | 6.7100 |
| 55764 | 10.38 | 6.0000 |
| 55765 | 337.52 | 20.0000 |
| 55766 | 7.94 | 1.0000 |
| 55767 | 52.54 | 47.0000 |
| 55768 | 109.90 | 15.0000 |
| 55770 | 67.48 | 8.0000 |
| 55773 | 2,560.00 | - |
| 55774 | 109.33 | 50.0000 |
| 55776 | 3,590.65 | 2,000.0000 |
| 55777 | 858.14 | 150.0000 |
| 55778 | 928.20 | 100.0000 |
| 55779 | 2,073.40 | 200.0000 |
| 55780 | 10,899.80 | 2,000.0000 |
| 55781 | 792.56 | 100.0000 |
| 55782 | 352.00 | 100.0000 |
| 55783 | 4,310.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55784 | 858.14 | 150.0000 |
| 55785 | 1,388.60 | 65.0000 |
| 55786 | 134.25 | 300.0000 |
| 55788 | - | 40.0000 |
| 55789 | 1,632.76 | 200.0000 |
| 55790 | 84.91 | 100.0000 |
| 55791 | 243.00 | - |
| 55792 | 1.48 | 30.0000 |
| 55793 | - | 100.0000 |
| 55794 | 3.22 | 10.0000 |
| 55795 | 11.05 | 5.0000 |
| 55796 | 256.00 | - |
| 55797 | - | 10.0000 |
| 55799 | 2.01 | 1.0000 |
| 55800 | 5.69 | 0.4000 |
| 55801 | - | 1.0000 |
| 55802 | 9.74 | 2.1100 |
| 55803 | 4.74 | 1.1000 |
| 55804 | 9.36 | 4.9000 |
| 55805 | 36.11 | 4.8600 |
| 55806 | 7.43 | 1.0000 |
| 55807 | 3.10 | 4.9000 |
| 55808 | 31.90 | 4.9700 |
| 55809 | 2.45 | 0.4800 |
| 55810 | 4.31 | 1.0000 |
| 55811 | 174.41 | 14.4400 |
| 55812 | 73.40 | 8.0800 |
| 55814 | 25.19 | 2.5900 |
| 55815 | 13.44 | 1.8800 |
| 55816 | 37.92 | 5.7200 |
| 55817 | 0.38 | 0.5000 |
| 55818 | 11.70 | 2.0000 |
| 55819 | 12.12 | 1.4800 |
| 55820 | 11.42 | 1.2000 |
| 55821 | 123.77 | 12.9900 |
| 55822 | 0.01 | 0.0100 |
| 55823 | 7.06 | 0.9500 |
| 55824 | 3.71 | 0.2000 |
| 55825 | 0.16 | - |
| 55826 | 320.46 | 34.2900 |
| 55827 | 0.05 | - |
| 55828 | 215.16 | 15.2200 |
| 55830 | 0.05 | - |
| 55831 | 0.05 | - |
| 55832 | 0.05 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 55833 | 30.62 | 4.9000 |
| 55834 | 315.08 | - |
| 55835 | 0.05 | - |
| 55836 | - | 0.3500 |
| 55837 | 12.14 | 13.9500 |
| 55838 | 3.12 | 0.5000 |
| 55839 | 1.75 | - |
| 55840 | 0.01 | 0.0100 |
| 55841 | 2,155.00 | 500.0000 |
| 55936 | - | 2,314.0000 |
| 55945 | - | 601.0000 |
| 55980 | 1,408.00 | - |
| 56006 | 509.55 | - |
| 56007 | 512.00 | - |
| 56008 | 15,360.00 | - |
| 56009 | 26.38 | - |
| 56010 | 545.71 | - |
| 56011 | 516.18 | - |
| 56012 | 234.45 | - |
| 56013 | 21,386.24 | - |
| 56014 | 552.96 | - |
| 56015 | 568.32 | - |
| 56016 | 37.11 | - |
| 56017 | 1,024.00 | - |
| 56018 | 5,120.00 | - |
| 56019 | 1,405.43 | - |
| 56020 | 3,048.00 | - |
| 56021 | 88.35 | - |
| 56022 | 78.43 | - |
| 56023 | 2,560.00 | - |
| 56025 | 2,648.00 | - |
| 56026 | 1,840.30 | - |
| 56027 | 117.76 | - |
| 56028 | 122.88 | - |
| 56029 | 12,800.00 | - |
| 56030 | 194.56 | - |
| 56031 | 138.24 | - |
| 56032 | 153.60 | - |
| 56033 | 107.52 | - |
| 56034 | 102.40 | - |
| 56035 | 153.60 | - |
| 56036 | 220.16 | - |
| 56037 | 106.71 | - |
| 56038 | 107.21 | - |
| 56039 | 245.76 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56040 | 204.80 | - |
| 56042 | 127.58 | - |
| 56045 | 517.12 | - |
| 56046 | 706.56 | - |
| 56047 | 614.40 | - |
| 56048 | 138.24 | - |
| 56049 | 8,487.55 | - |
| 56050 | 225.28 | - |
| 56051 | 230.40 | - |
| 56052 | 153.60 | - |
| 56053 | 107.52 | - |
| 56054 | 107.52 | - |
| 56055 | 2,339.84 | - |
| 56056 | - | 500.0000 |
| 56057 | 20,325.50 | - |
| 56058 | 112.64 | - |
| 56059 | 465.92 | - |
| 56061 | 112.64 | - |
| 56062 | 1,280.00 | - |
| 56063 | 445.44 | - |
| 56064 | 261.12 | - |
| 56065 | 240.64 | - |
| 56067 | 235.52 | - |
| 56068 | 85.41 | - |
| 56069 | 128.00 | - |
| 56070 | 220.16 | - |
| 56071 | 122.88 | - |
| 56074 | 109.35 | - |
| 56076 | 4.10 | - |
| 56078 | 757.76 | - |
| 56079 | 1,208.32 | - |
| 56080 | 645.12 | - |
| 56081 | 993.28 | - |
| 56082 | 762.88 | - |
| 56083 | 153.60 | - |
| 56084 | 276.48 | - |
| 56085 | 276.48 | - |
| 56086 | 125.30 | - |
| 56087 | 266.24 | - |
| 56088 | 691.20 | - |
| 56089 | 261.12 | - |
| 56090 | 455.68 | - |
| 56091 | 194.56 | - |
| 56092 | 184.32 | - |
| 56093 | 209.92 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56094 | 450.56 | - |
| 56095 | 215.04 | - |
| 56096 | 143.36 | - |
| 56097 | 122.88 | - |
| 56098 | 378.88 | - |
| 56099 | 204.80 | - |
| 56100 | 199.68 | - |
| 56101 | 296.96 | - |
| 56102 | 496.64 | - |
| 56103 | 143.36 | - |
| 56104 | 614.40 | - |
| 56105 | 133.12 | - |
| 56106 | 614.40 | - |
| 56107 | 399.36 | - |
| 56108 | 332.80 | - |
| 56109 | 291.84 | - |
| 56110 | 122.88 | - |
| 56111 | 15.75 | - |
| 56112 | 104.19 | - |
| 56113 | 824.32 | - |
| 56114 | 122.88 | - |
| 56115 | 12.20 | - |
| 56117 | 449.92 | - |
| 56118 | 8.51 | - |
| 56119 | 10.36 | - |
| 56120 | 209.92 | - |
| 56121 | 6.98 | - |
| 56122 | 199.68 | - |
| 56123 | 10.13 | - |
| 56125 | 8.00 | - |
| 56126 | 102.40 | - |
| 56127 | 12.04 | - |
| 56128 | 4.50 | - |
| 56130 | 424.96 | - |
| 56131 | 250.88 | - |
| 56132 | 307.20 | - |
| 56133 | 143.36 | - |
| 56134 | 230.40 | - |
| 56135 | 158.72 | - |
| 56136 | 107.52 | - |
| 56137 | 194.56 | - |
| 56138 | 230.40 | - |
| 56139 | 194.56 | - |
| 56140 | 112.64 | - |
| 56141 | 245.76 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56142 | 2,094.08 | - |
| 56143 | 409.60 | - |
| 56144 | 302.08 | - |
| 56145 | 481.28 | - |
| 56146 | 204.80 | - |
| 56147 | 281.60 | - |
| 56148 | 220.16 | - |
| 56149 | 296.96 | - |
| 56150 | 143.36 | - |
| 56151 | 117.76 | - |
| 56152 | 153.60 | - |
| 56153 | 143.36 | - |
| 56154 | 117.76 | - |
| 56155 | 419.84 | - |
| 56156 | 291.84 | - |
| 56157 | 179.20 | - |
| 56158 | 281.60 | - |
| 56159 | 204.80 | - |
| 56160 | 189.44 | - |
| 56161 | 307.20 | - |
| 56162 | 266.24 | - |
| 56163 | 112.64 | - |
| 56164 | 128.00 | - |
| 56165 | 179.20 | - |
| 56166 | 194.56 | - |
| 56167 | 563.20 | - |
| 56168 | 645.12 | - |
| 56169 | 117.76 | - |
| 56170 | 179.20 | - |
| 56171 | 133.12 | - |
| 56172 | 117.76 | - |
| 56173 | 117.76 | - |
| 56174 | 182.39 | - |
| 56175 | 240.64 | - |
| 56176 | 133.12 | - |
| 56177 | 112.64 | - |
| 56178 | 143.36 | - |
| 56180 | 343.04 | - |
| 56181 | 184.32 | - |
| 56182 | 128.00 | - |
| 56183 | 271.36 | - |
| 56184 | 204.80 | - |
| 56185 | 107.52 | - |
| 56186 | 174.08 | - |
| 56187 | 122.88 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56188 | 204.80 | - |
| 56189 | 168.96 | - |
| 56190 | 199.68 | - |
| 56191 | 47.79 | - |
| 56192 | 7,541.76 | - |
| 56193 | 1,889.28 | - |
| 56194 | 163.84 | - |
| 56195 | 727.04 | - |
| 56196 | 286.72 | - |
| 56197 | 368.64 | - |
| 56198 | 486.75 | - |
| 56199 | 245.76 | - |
| 56201 | 307.20 | - |
| 56202 | 455.68 | - |
| 56203 | 209.92 | - |
| 56204 | 3,809.28 | - |
| 56205 | 291.84 | - |
| 56206 | 276.48 | - |
| 56207 | 307.20 | - |
| 56208 | 329.98 | - |
| 56209 | 880.64 | - |
| 56210 | 107.52 | - |
| 56211 | 303.99 | - |
| 56212 | 460.80 | - |
| 56213 | 102.40 | - |
| 56214 | - | 300.0000 |
| 56215 | 810.00 | - |
| 56216 | 163.84 | - |
| 56217 | 174.08 | - |
| 56218 | 189.44 | - |
| 56219 | 143.36 | - |
| 56220 | 190.19 | - |
| 56221 | 128.00 | - |
| 56224 | 29,303.10 | - |
| 56225 | 89,894.00 | 10,000.0000 |
| 56226 | 184.32 | - |
| 56228 | 122.88 | - |
| 56230 | 204.80 | - |
| 56231 | 302.08 | - |
| 56232 | 604.16 | - |
| 56233 | 332.80 | - |
| 56234 | 240.64 | - |
| 56236 | 650.24 | - |
| 56237 | 128.00 | - |
| 56238 | 512.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---------|------------------------------------------|------------------|
| 56239 | 506.88 | - |
| 56240 | 2,211.03 | - |
| 56241 | 327.68 | - |
| 56242 | 2,111.90 | - |
| 56243 | 122.88 | - |
| 56244 | 122.88 | - |
| 56245 | 501.76 | - |
| 56246 | 199.68 | - |
| 56247 | 501.76 | - |
| 56248 | 92.16 | - |
| 56249 | 15.39 | - |
| 56253 | 312.32 | - |
| 56254 | 619.52 | - |
| 56255 | 322.56 | - |
| 56256 | 112.64 | - |
| 56257 | 133.12 | - |
| 56258 | 16.20 | - |
| 56260 | 1,766.40 | - |
| 56261 | 133.12 | - |
| 56263 | 133.12 | - |
| 56264 | 153.60 | - |
| 56265 | 146.54 | - |
| 56266 | 102.40 | - |
| 56267 | 384.00 | - |
| 56268 | 266.24 | - |
| 56269 | 46.02 | - |
| 56270 | 839.80 | - |
| 56271 | 230.40 | - |
| 56272 | 26.97 | - |
| 56274 | 174.08 | - |
| 56275 | 1,056.00 | 500.0000 |
| 56277 | 10,240.00 | - |
| 56278 | 276.48 | - |
| 56279 | 2,184.00 | - |
| 56280 | 209.92 | - |
| 56282 | 281.60 | - |
| 56283 | 1,260.00 | - |
| 56284 | 133.12 | - |
| 56285 | 7.11 | - |
| 56286 | 189.44 | - |
| 56287 | 107.52 | - |
| 56288 | 128.00 | - |
| 56289 | 107.52 | - |
| 56290 | 148.48 | - |
| 56291 | 107.52 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**  **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56292 | 107.52 | - |
| 56293 | 112.64 | - |
| 56294 | 122.88 | - |
| 56295 | 128.00 | - |
| 56297 | 363.52 | - |
| 56298 | 163.84 | - |
| 56299 | 148.48 | - |
| 56300 | 102.40 | - |
| 56301 | 102.40 | - |
| 56302 | 296.96 | - |
| 56303 | 155.31 | - |
| 56304 | 0.33 | - |
| 56305 | 117.76 | - |
| 56306 | 302.08 | - |
| 56307 | 225.28 | - |
| 56308 | 225.28 | - |
| 56309 | 199.68 | - |
| 56311 | 107.52 | - |
| 56312 | 230.40 | - |
| 56313 | 445.44 | - |
| 56317 | 834.56 | - |
| 56318 | 671.45 | - |
| 56319 | 672.36 | - |
| 56320 | 4,645.00 | - |
| 56321 | 1,300.00 | 5,000.0000 |
| 56322 | - | 5,000.0000 |
| 56323 | 511.60 | 2,000.0000 |
| 56324 | 3,020.00 | - |
| 56325 | - | 5,000.0000 |
| 56326 | 1,307.00 | - |
| 56327 | - | 50.0000 |
| 56328 | 1,525.00 | - |
| 56331 | 503.61 | 60.0000 |
| 56332 | 195.00 | 100.0000 |
| 56333 | 26.79 | - |
| 56334 | 1,056.00 | - |
| 56335 | 1,356.00 | 100.0000 |
| 56338 | 10,051.18 | - |
| 56339 | 625.52 | 10.0000 |
| 56341 | 5.00 | - |
| 56343 | 810.41 | 200.0000 |
| 56344 | 715.00 | 100.0000 |
| 56345 | 67.71 | - |
| 56346 | 338.46 | 45.0000 |
| 56347 | 15,722.50 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56349 | 37.50 | 5.0000 |
| 56352 | 2,874.00 | 400.0000 |
| 56354 | 405.00 | - |
| 56355 | 810.00 | - |
| 56356 | 3,550.00 | 500.0000 |
| 56360 | 1,521.52 | 280.0000 |
| 56361 | 143.80 | 20.0000 |
| 56363 | 990.00 | - |
| 56365 | 715.00 | - |
| 56366 | - | 200.0000 |
| 56370 | 455.00 | - |
| 56373 | 10,919.70 | - |
| 56374 | 160.00 | - |
| 56375 | 2,560.00 | 500.0000 |
| 56377 | 190.25 | 25.0000 |
| 56378 | 2,456.98 | 200.0000 |
| 56379 | 248.00 | - |
| 56380 | 7,198.50 | 1,000.0000 |
| 56384 | 8.91 | - |
| 56386 | 32,000.00 | 5,000.0000 |
| 56388 | 4,738.50 | - |
| 56389 | 527.32 | - |
| 56390 | - | 194.0000 |
| 56391 | 97.94 | 100.0000 |
| 56392 | - | 50.0000 |
| 56394 | 39.50 | - |
| 56395 | - | 310.0000 |
| 56396 | 717.60 | 100.0000 |
| 56397 | 55.70 | 125.0000 |
| 56398 | - | 1,200.0000 |
| 56399 | 0.82 | 1.0000 |
| 56402 | 148.74 | - |
| 56403 | - | 50.0000 |
| 56405 | 320.00 | - |
| 56407 | 639.75 | - |
| 56409 | 722.77 | 100.0000 |
| 56412 | - | 1,000.0000 |
| 56414 | 0.30 | - |
| 56416 | 304.98 | - |
| 56418 | 10.16 | 100.0000 |
| 56420 | 110.40 | - |
| 56421 | - | 43.0000 |
| 56422 | 4,799.00 | - |
| 56423 | 160.00 | - |
| 56424 | 675.19 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56430 | 6.75 | 100.0000 |
| 56433 | 1,024.00 | - |
| 56434 | 2,464.20 | 200.0000 |
| 56435 | 166.62 | - |
| 56439 | 295.65 | - |
| 56440 | - | 200.0000 |
| 56445 | 4,050.81 | - |
| 56446 | 215.04 | 20.0000 |
| 56447 | 11.34 | - |
| 56448 | 2,082.75 | 200.0000 |
| 56449 | 680.00 | - |
| 56450 | 35.69 | 5.0000 |
| 56453 | 438.00 | - |
| 56454 | 56.57 | 9.0000 |
| 56455 | - | 5.0000 |
| 56457 | - | 150.0000 |
| 56460 | 330.25 | 50.0000 |
| 56461 | 1,047.99 | - |
| 56463 | 1,737.50 | 100.0000 |
| 56466 | 769.20 | - |
| 56467 | 149.11 | 10.0000 |
| 56472 | 28.80 | - |
| 56474 | 96.04 | 10.0000 |
| 56475 | 35.85 | 5.0000 |
| 56476 | 20.48 | - |
| 56478 | 1,432.64 | 1,233.0000 |
| 56479 | 12.15 | - |
| 56480 | 36.30 | - |
| 56487 | 204.93 | - |
| 56488 | 134.15 | - |
| 56489 | - | 26.0000 |
| 56490 | 137.70 | - |
| 56491 | - | 200.0000 |
| 56493 | 4,337.98 | 600.0000 |
| 56496 | 212.00 | - |
| 56499 | 1,650.20 | - |
| 56500 | 43.00 | - |
| 56501 | 362.00 | 50.0000 |
| 56502 | 213.90 | 30.0000 |
| 56503 | 729.00 | - |
| 56504 | 91.85 | 100.0000 |
| 56506 | - | 1,200.0000 |
| 56508 | 160.00 | - |
| 56509 | 339.25 | 75.0000 |
| 56510 | 81.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56511 | 165.00 | - |
| 56513 | 1,820.00 | - |
| 56516 | - | 35.0000 |
| 56517 | 70.85 | - |
| 56518 | 20,480.00 | 4,000.0000 |
| 56520 | 64,262.64 | 12,190.0000 |
| 56521 | 230.00 | - |
| 56524 | 669.50 | 500.0000 |
| 56525 | 43.10 | - |
| 56526 | 395.16 | - |
| 56527 | - | 250.0000 |
| 56531 | 2,396.16 | - |
| 56533 | 39.50 | - |
| 56534 | 2,593.73 | 350.0000 |
| 56535 | - | 234.0000 |
| 56538 | 704.00 | - |
| 56539 | 5,530.00 | - |
| 56541 | - | 200.0000 |
| 56546 | 1,606.40 | - |
| 56548 | 37.67 | - |
| 56551 | 558.41 | 5.0000 |
| 56553 | 3.00 | - |
| 56555 | 276.34 | - |
| 56563 | 164.50 | 25.0000 |
| 56564 | 332.61 | - |
| 56565 | 2,552.94 | 1,000.0000 |
| 56566 | - | 1,000.0000 |
| 56567 | 289.65 | 49.0000 |
| 56569 | 783.27 | 100.0000 |
| 56570 | 568.62 | - |
| 56572 | 279.35 | 35.0000 |
| 56574 | 1,255.00 | 250.0000 |
| 56575 | 0.50 | 1.0000 |
| 56577 | 26.07 | - |
| 56578 | 1,773.60 | - |
| 56579 | 316.00 | - |
| 56580 | 163.84 | - |
| 56581 | - | 50.0000 |
| 56582 | 160.00 | - |
| 56583 | 652.34 | 50.0000 |
| 56584 | - | 2,000.0000 |
| 56586 | 1,300.00 | - |
| 56587 | 584.18 | 100.0000 |
| 56588 | - | 100.0000 |
| 56589 | - | 10.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56590 | 362.50 | 50.0000 |
| 56591 | 19.38 | - |
| 56592 | 2,048.00 | - |
| 56595 | 67.48 | - |
| 56597 | - | 100.0000 |
| 56598 | 365.04 | 48.0000 |
| 56599 | 1,883.18 | - |
| 56600 | 5,120.00 | - |
| 56602 | 9.19 | 20.0000 |
| 56603 | 4,391.49 | 263.0000 |
| 56606 | 465.48 | 62.0000 |
| 56608 | 2,323.50 | 225.0000 |
| 56610 | 512.00 | - |
| 56611 | 182.75 | 50.0000 |
| 56612 | 512.00 | - |
| 56613 | 141.00 | 20.0000 |
| 56616 | 648.00 | - |
| 56618 | 2,314.57 | - |
| 56619 | 535.43 | 35.0000 |
| 56621 | 34.62 | - |
| 56622 | 1.78 | - |
| 56623 | 253.57 | - |
| 56625 | 3,235.06 | 180.0000 |
| 56626 | 79.00 | 100.0000 |
| 56629 | 354.50 | 50.0000 |
| 56630 | 355.00 | 50.0000 |
| 56633 | 2,680.78 | 600.0000 |
| 56636 | 9,209.50 | - |
| 56640 | 3,772.42 | 500.0000 |
| 56641 | 150.65 | - |
| 56643 | 267.22 | - |
| 56644 | 271.18 | - |
| 56646 | - | 100.0000 |
| 56648 | 1,038.30 | - |
| 56649 | - | 10,000.0000 |
| 56651 | - | 20,000.0000 |
| 56653 | 4,310.00 | - |
| 56654 | 162.00 | - |
| 56655 | 3,361.86 | - |
| 56656 | 2.94 | - |
| 56657 | 7.15 | 1.0000 |
| 56658 | 2,519.20 | - |
| 56659 | 85.62 | 12.0000 |
| 56661 | 702.00 | 602.0000 |
| 56662 | 1,681.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56663 | 52.55 | - |
| 56664 | 497.42 | 133.0000 |
| 56665 | 3,439.37 | 505.0000 |
| 56668 | - | 50.0000 |
| 56669 | 14.24 | 2.0000 |
| 56670 | 1,774.00 | - |
| 56673 | 63.50 | - |
| 56674 | 30.00 | - |
| 56675 | - | 200.0000 |
| 56677 | 1,774.82 | 100.0000 |
| 56678 | 51.20 | - |
| 56679 | 2,708.37 | 98.0000 |
| 56680 | 52.65 | - |
| 56681 | 172.00 | 100.0000 |
| 56682 | 552.50 | - |
| 56683 | 67.00 | - |
| 56684 | 24.64 | 3.0000 |
| 56685 | 0.81 | - |
| 56686 | 19.75 | - |
| 56687 | 1,429.80 | 200.0000 |
| 56688 | 31.48 | - |
| 56689 | 4.05 | - |
| 56691 | 431.00 | - |
| 56692 | - | 200.0000 |
| 56697 | 9.43 | - |
| 56699 | 6.64 | 4.0000 |
| 56701 | 73.88 | - |
| 56702 | 531.36 | - |
| 56703 | 143.25 | 20.0000 |
| 56704 | 195.20 | - |
| 56705 | 42.84 | 6.0000 |
| 56708 | 956.82 | - |
| 56709 | 7,120.00 | - |
| 56710 | 25.60 | 5.0000 |
| 56711 | 383.55 | 14.0000 |
| 56712 | 284.93 | 40.0000 |
| 56713 | 1,546.67 | 200.0000 |
| 56714 | 28.16 | - |
| 56715 | 3.50 | - |
| 56716 | 3.50 | - |
| 56717 | - | 50.0000 |
| 56719 | 95.08 | 15.0000 |
| 56720 | 28.35 | - |
| 56722 | - | 2,500.0000 |
| 56723 | - | 210.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56724 | - | 210.0000 |
| 56725 | 324.71 | 5.0000 |
| 56726 | 1,268.89 | - |
| 56728 | - | 940.0000 |
| 56729 | 25.86 | - |
| 56731 | 71.00 | 10.0000 |
| 56732 | 0.81 | - |
| 56733 | - | 200.0000 |
| 56734 | 162.00 | - |
| 56736 | 0.50 | - |
| 56737 | 7,131.00 | 1,000.0000 |
| 56738 | 159.50 | 200.0000 |
| 56739 | 1,024.00 | 200.0000 |
| 56740 | 153.60 | - |
| 56741 | 668.04 | 10.0000 |
| 56742 | 110.24 | - |
| 56743 | 21.50 | - |
| 56744 | 788.78 | 105.0000 |
| 56745 | 220.82 | 10.0000 |
| 56746 | 256.00 | - |
| 56747 | 148.00 | 20.0000 |
| 56748 | - | 100.0000 |
| 56752 | 36.31 | 5.0000 |
| 56753 | 35.20 | - |
| 56756 | 52.61 | - |
| 56757 | 1,034.85 | 1,500.0000 |
| 56759 | 1,951.29 | - |
| 56760 | 320.00 | - |
| 56763 | 202.50 | - |
| 56764 | 102.20 | - |
| 56765 | 1,886.00 | 200.0000 |
| 56767 | 3,580.00 | 500.0000 |
| 56768 | 213.19 | 30.0000 |
| 56770 | - | 10.0000 |
| 56772 | 965.46 | 200.0000 |
| 56773 | 2,714.44 | - |
| 56774 | 78.89 | - |
| 56775 | - | 64.0000 |
| 56776 | 720.98 | 100.0000 |
| 56777 | 601.07 | 150.0000 |
| 56778 | - | 148.0000 |
| 56779 | 739.00 | 100.0000 |
| 56780 | - | 200.0000 |
| 56781 | 55.00 | - |
| 56784 | 395.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**          **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56785 | 40.50 | - |
| 56788 | 10,775.00 | - |
| 56789 | 3,094.95 | 500.0000 |
| 56790 | 890.00 | 125.0000 |
| 56791 | 243.00 | - |
| 56792 | 133.12 | - |
| 56793 | 40.50 | - |
| 56794 | 160.00 | - |
| 56796 | 11.25 | - |
| 56797 | 557.10 | - |
| 56798 | 398.51 | 50.0000 |
| 56799 | 49.70 | - |
| 56800 | 68.30 | 5.0000 |
| 56802 | 31.49 | 5.0000 |
| 56803 | 102.40 | - |
| 56804 | 3.83 | 5.0000 |
| 56808 | - | 60.0000 |
| 56809 | 36.89 | 5.0000 |
| 56812 | 832.00 | 300.0000 |
| 56813 | 471.20 | - |
| 56814 | - | 100.0000 |
| 56818 | 507.90 | - |
| 56819 | 0.21 | - |
| 56820 | 1,856.25 | - |
| 56822 | 40.50 | - |
| 56823 | 6.40 | - |
| 56825 | 3,607.14 | 485.0000 |
| 56826 | - | 1.0000 |
| 56827 | 29.01 | - |
| 56828 | 2,548.48 | 1.0000 |
| 56832 | - | 40.0000 |
| 56834 | 359.80 | - |
| 56835 | - | 39.0000 |
| 56836 | 651.20 | - |
| 56837 | 2,236.87 | 305.0000 |
| 56838 | 357.90 | 50.0000 |
| 56839 | 29.48 | 4.0000 |
| 56841 | 5.35 | 5.0000 |
| 56842 | - | 300.0000 |
| 56846 | - | 9.0000 |
| 56847 | 24.70 | 10.0000 |
| 56848 | 27.76 | 3.0000 |
| 56849 | 83.48 | - |
| 56850 | 305.63 | 78.0000 |
| 56851 | 758.09 | 105.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56854 | - | 500.0000 |
| 56855 | 1,382.40 | - |
| 56856 | - | 50.0000 |
| 56857 | 9.72 | - |
| 56858 | 17.48 | - |
| 56859 | 846.50 | 200.0000 |
| 56862 | 1,202.78 | - |
| 56863 | 1,117.27 | 210.0000 |
| 56865 | 944.00 | - |
| 56867 | - | 15.0000 |
| 56868 | 162.00 | - |
| 56869 | - | 150.0000 |
| 56871 | 1,265.74 | 200.0000 |
| 56872 | 357.00 | 50.0000 |
| 56876 | 8.10 | - |
| 56879 | 1,696.25 | 250.0000 |
| 56880 | 59.00 | 100.0000 |
| 56881 | 71.00 | - |
| 56882 | 2,362.50 | - |
| 56883 | - | 40.0000 |
| 56884 | 250.00 | - |
| 56885 | 542.24 | - |
| 56887 | 959.50 | - |
| 56889 | 281.60 | - |
| 56891 | 45.91 | - |
| 56892 | 6.02 | - |
| 56896 | 1,240.00 | - |
| 56897 | 2,571.42 | - |
| 56899 | 905.60 | - |
| 56901 | - | 250.0000 |
| 56902 | 545.18 | 68.0000 |
| 56903 | 736.66 | 110.0000 |
| 56904 | 51.20 | - |
| 56906 | 61.96 | - |
| 56908 | 160.00 | - |
| 56909 | 69.14 | 11.0000 |
| 56912 | 63.58 | 10.0000 |
| 56913 | 346.15 | - |
| 56914 | 289.17 | - |
| 56915 | 713.50 | 100.0000 |
| 56916 | 268.95 | 50.0000 |
| 56918 | 149.90 | 150.0000 |
| 56921 | - | 25.0000 |
| 56922 | - | 400.0000 |
| 56926 | 1,760.20 | 100.0000 |

### TIMELY, PROPERLY DOCUMENTED CLAIMS

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56927 | 43.10 | 1.0000 |
| 56929 | 81.00 | - |
| 56931 | 81.66 | 47.0000 |
| 56932 | 18,320.70 | - |
| 56933 | 12.87 | - |
| 56935 | - | 445.0000 |
| 56936 | 274.56 | 2.0000 |
| 56937 | 54.38 | 125.0000 |
| 56938 | 0.61 | - |
| 56939 | 21.33 | 3.0000 |
| 56941 | 2,028.61 | - |
| 56943 | 512.00 | - |
| 56944 | - | 10.0000 |
| 56946 | - | 33.0000 |
| 56948 | 159.58 | - |
| 56949 | 153.60 | - |
| 56950 | 22.68 | - |
| 56951 | - | 100.0000 |
| 56953 | 119.31 | 20.0000 |
| 56955 | 512.00 | - |
| 56956 | 54.57 | 69.0000 |
| 56958 | 50,776.93 | 4,780.0000 |
| 56959 | 1,508.50 | 350.0000 |
| 56960 | 24.11 | - |
| 56961 | - | 1,000.0000 |
| 56963 | 112.64 | - |
| 56964 | 35.65 | 5.0000 |
| 56967 | 384.00 | - |
| 56968 | - | 50.0000 |
| 56969 | 81.00 | - |
| 56970 | 102.40 | - |
| 56971 | 568.53 | 60.0000 |
| 56972 | 68.64 | - |
| 56973 | 5,176.31 | - |
| 56974 | - | 500.0000 |
| 56976 | 14,229.43 | 2,000.0000 |
| 56978 | 2,288.00 | - |
| 56979 | 3.03 | - |
| 56982 | 38.39 | - |
| 56983 | - | 10.0000 |
| 56985 | 8.10 | - |
| 56986 | 12.15 | - |
| 56987 | - | 100.0000 |
| 56989 | 17,745.77 | 1,600.0000 |
| 56992 | 25.13 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 56993 | 3.95 | - |
| 56995 | 15,660.00 | - |
| 56996 | - | 12,200.0000 |
| 56997 | - | 65.0000 |
| 56998 | - | 200.0000 |
| 57001 | 15,360.00 | - |
| 57002 | 116.55 | 15.0000 |
| 57003 | 262.40 | 20.0000 |
| 57005 | 28.00 | - |
| 57008 | 11.85 | - |
| 57009 | 432.50 | - |
| 57010 | 405.00 | - |
| 57011 | - | 40.0000 |
| 57012 | - | 40.0000 |
| 57013 | 81.00 | - |
| 57014 | - | 200.0000 |
| 57019 | 54.50 | - |
| 57023 | - | 1,000.0000 |
| 57024 | 0.23 | - |
| 57027 | 22,019.90 | 3,000.0000 |
| 57028 | 75.48 | 100.0000 |
| 57030 | 156.06 | 14.0000 |
| 57031 | 15.36 | - |
| 57033 | - | 2.0000 |
| 57034 | - | 10.0000 |
| 57036 | 3,038.55 | 355.0000 |
| 57038 | - | 15.0000 |
| 57039 | 30.30 | 5.0000 |
| 57040 | 62.70 | 11.0000 |
| 57042 | - | 100.0000 |
| 57043 | 3.96 | - |
| 57044 | 22.19 | 3.0000 |
| 57048 | - | 10.0000 |
| 57049 | 847.40 | 100.0000 |
| 57052 | 80.00 | - |
| 57055 | 32.88 | - |
| 57057 | 359.81 | 51.0000 |
| 57059 | 8.79 | - |
| 57061 | 558.74 | 50.0000 |
| 57064 | - | 200.0000 |
| 57066 | 343.27 | 5.0000 |
| 57069 | 151.00 | - |
| 57070 | 48.60 | - |
| 57073 | 142.75 | 20.0000 |
| 57079 | - | 500.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57080 | 2,026.49 | - |
| 57081 | 23,906.97 | - |
| 57082 | 1.83 | - |
| 57083 | 105.00 | - |
| 57086 | 431.00 | - |
| 57089 | - | 100.0000 |
| 57090 | 7,125.10 | 1,000.0000 |
| 57091 | 2,965.00 | - |
| 57094 | 16,347.50 | 2,000.0000 |
| 57095 | 435.00 | 500.0000 |
| 57096 | 0.03 | - |
| 57098 | 78.74 | 11.0000 |
| 57099 | 1,512.53 | 203.0000 |
| 57100 | 217.39 | 30.0000 |
| 57101 | 512.00 | 100.0000 |
| 57102 | 270.00 | 300.0000 |
| 57103 | 859.20 | 120.0000 |
| 57104 | 1,126.40 | 150.0000 |
| 57105 | - | 50.0000 |
| 57106 | 151.23 | 8.0000 |
| 57108 | 33.39 | - |
| 57109 | 3,928.61 | 500.0000 |
| 57110 | 285.58 | 40.0000 |
| 57112 | 185.05 | 45.0000 |
| 57114 | 6,510.41 | 830.0000 |
| 57117 | 7.64 | 11.0000 |
| 57118 | 255.00 | - |
| 57119 | 229.09 | 15.0000 |
| 57120 | 113.41 | 10.0000 |
| 57121 | 136.68 | 60.0000 |
| 57122 | 67.64 | 19.0000 |
| 57123 | 43.01 | 6.0000 |
| 57124 | 158.72 | - |
| 57125 | 51.20 | 10.0000 |
| 57126 | 143.30 | 20.0000 |
| 57127 | 628.43 | - |
| 57128 | 885.78 | 100.0000 |
| 57129 | 414.39 | 57.0000 |
| 57132 | 796.95 | 150.0000 |
| 57133 | - | 20.0000 |
| 57134 | 326.83 | 49.0000 |
| 57135 | 5.12 | - |
| 57137 | 102.40 | 20.0000 |
| 57138 | 24.47 | 4.0000 |
| 57139 | 128.17 | 20.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57140 | 689.36 | 30.0000 |
| 57141 | 71.89 | 10.0000 |
| 57142 | 12.93 | - |
| 57146 | 100.52 | - |
| 57149 | 2.63 | - |
| 57150 | 2.08 | - |
| 57152 | 1,825.56 | 318.0000 |
| 57153 | 47.12 | - |
| 57154 | 2,671.64 | 300.0000 |
| 57156 | 794.97 | - |
| 57157 | - | 200.0000 |
| 57158 | 57.49 | - |
| 57159 | 426.45 | 40.0000 |
| 57162 | 301.70 | - |
| 57163 | 29.28 | 4.0000 |
| 57164 | 38.57 | 5.0000 |
| 57165 | 11.85 | - |
| 57166 | 293.73 | - |
| 57167 | 721.00 | 100.0000 |
| 57169 | 24.30 | - |
| 57171 | - | 200.0000 |
| 57174 | 3.68 | - |
| 57175 | 2,756.20 | 100.0000 |
| 57176 | 1,418.50 | 200.0000 |
| 57177 | 12.20 | 25.0000 |
| 57178 | 87.24 | 12.0000 |
| 57180 | 2,460.52 | 300.0000 |
| 57181 | 399.55 | 25.0000 |
| 57182 | 3,147.85 | 500.0000 |
| 57183 | 185.83 | 26.0000 |
| 57184 | 81.00 | - |
| 57186 | 3,144.35 | 500.0000 |
| 57187 | 58.24 | 8.0000 |
| 57188 | 11.62 | 1.0000 |
| 57189 | 697.95 | 99.0000 |
| 57190 | 3,140.75 | 500.0000 |
| 57191 | 25.60 | - |
| 57194 | - | 20.0000 |
| 57195 | 230.40 | - |
| 57196 | 2.50 | - |
| 57197 | 21.68 | 3.0000 |
| 57198 | 472.32 | - |
| 57199 | - | 1.0000 |
| 57200 | 66.40 | 10.0000 |
| 57203 | - | 350.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57205 | - | 100.0000 |
| 57206 | 2,622.05 | 100.0000 |
| 57207 | 404.25 | 55.0000 |
| 57208 | 583.74 | - |
| 57209 | 327.12 | 50.0000 |
| 57210 | 12.15 | - |
| 57211 | 936.89 | - |
| 57212 | - | 7.0000 |
| 57213 | 205.70 | 40.0000 |
| 57215 | 68.74 | 20.0000 |
| 57217 | 503.29 | 70.0000 |
| 57218 | - | 11.0000 |
| 57219 | 849.92 | - |
| 57220 | 7.96 | 13.0000 |
| 57222 | 61.54 | - |
| 57223 | 153.04 | 21.0000 |
| 57224 | 811.09 | 100.0000 |
| 57227 | 39.50 | - |
| 57228 | 205.67 | - |
| 57229 | 28,800.96 | 5,000.0000 |
| 57232 | 71.15 | 10.0000 |
| 57233 | 106.68 | 15.0000 |
| 57234 | 206.46 | 250.0000 |
| 57235 | 2,108.59 | 135.0000 |
| 57238 | 359.00 | 50.0000 |
| 57239 | 405.00 | - |
| 57241 | 13.75 | 2.0000 |
| 57242 | 635.50 | 51.0000 |
| 57243 | 178.15 | 25.0000 |
| 57244 | 29.58 | - |
| 57246 | - | 2.0000 |
| 57247 | 1,197.20 | - |
| 57248 | 292.33 | 20.0000 |
| 57249 | 1,138.80 | - |
| 57250 | 31.22 | - |
| 57251 | - | 100.0000 |
| 57253 | 2,206.16 | 350.0000 |
| 57254 | 19,973.80 | - |
| 57256 | 718.77 | 100.0000 |
| 57257 | 30.72 | 6.0000 |
| 57258 | 512.00 | 100.0000 |
| 57260 | 261.75 | - |
| 57261 | 124.19 | 20.0000 |
| 57262 | - | 5.0000 |
| 57263 | 46.49 | 50.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57264 | 10.68 | 5.0000 |
| 57265 | 15.90 | - |
| 57266 | 103.96 | - |
| 57269 | 51.08 | 50.0000 |
| 57270 | 207.93 | 29.0000 |
| 57271 | 512.00 | 100.0000 |
| 57272 | - | 28.0000 |
| 57274 | 5,126.30 | 4,000.0000 |
| 57275 | 931.80 | - |
| 57276 | 405.00 | - |
| 57277 | 41.55 | - |
| 57278 | 5.00 | - |
| 57279 | - | 50.0000 |
| 57280 | 192.30 | - |
| 57282 | 14.21 | 2.0000 |
| 57283 | - | 25.0000 |
| 57285 | 2.19 | 6.0000 |
| 57286 | 745.83 | 100.0000 |
| 57287 | 236.88 | - |
| 57288 | 197.84 | 19.0000 |
| 57291 | - | 150.0000 |
| 57292 | - | 500.0000 |
| 57297 | 2,382.50 | - |
| 57298 | 512.00 | - |
| 57300 | 2,115.90 | 300.0000 |
| 57303 | 0.79 | - |
| 57304 | 856.50 | 150.0000 |
| 57305 | 16,038.00 | - |
| 57310 | 160.13 | - |
| 57312 | 323.54 | 45.0000 |
| 57313 | - | 200.0000 |
| 57315 | 748.87 | 100.0000 |
| 57317 | - | 50.0000 |
| 57319 | - | 1.0000 |
| 57323 | 20.25 | - |
| 57325 | 231.85 | 30.0000 |
| 57327 | - | 35.0000 |
| 57328 | 1,067.04 | 140.0000 |
| 57329 | 71.50 | 10.0000 |
| 57331 | 1,230.00 | - |
| 57332 | 998.00 | - |
| 57334 | 357.00 | 50.0000 |
| 57337 | 504.50 | 100.0000 |
| 57340 | 1,043.41 | - |
| 57341 | 605.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57342 | 44.04 | 30.0000 |
| 57344 | 512.00 | - |
| 57345 | 431.00 | 200.0000 |
| 57346 | - | 100.0000 |
| 57348 | 5.09 | - |
| 57349 | 45,369.00 | - |
| 57352 | 48.47 | - |
| 57354 | - | 50.0000 |
| 57355 | 6,560.20 | 700.0000 |
| 57357 | 7.10 | 1.0000 |
| 57358 | - | 50.0000 |
| 57359 | 379.25 | - |
| 57361 | 38.00 | - |
| 57363 | 1,455.00 | - |
| 57364 | 0.54 | - |
| 57365 | 16.17 | - |
| 57366 | 0.10 | - |
| 57367 | 862.00 | - |
| 57368 | 249.73 | - |
| 57372 | 71.39 | 10.0000 |
| 57373 | 1,135.51 | 246.0000 |
| 57375 | 20,023.30 | - |
| 57381 | 980.60 | 400.0000 |
| 57382 | 945.70 | - |
| 57385 | 5,454.83 | - |
| 57386 | 713.99 | 100.0000 |
| 57387 | 51.20 | - |
| 57388 | 31.60 | - |
| 57389 | - | 10.0000 |
| 57390 | - | 50.0000 |
| 57392 | 3,200.00 | - |
| 57393 | - | 3,000.0000 |
| 57394 | - | 84.0000 |
| 57396 | 101.08 | 125.0000 |
| 57397 | 2,813.80 | 2,000.0000 |
| 57399 | 2,742.43 | 200.0000 |
| 57400 | 153.98 | 20.0000 |
| 57401 | - | 1,050.0000 |
| 57403 | 2,141.77 | 300.0000 |
| 57404 | 13.14 | 1.0000 |
| 57405 | - | 1,000.0000 |
| 57406 | 5.20 | 13.0000 |
| 57408 | 21.50 | - |
| 57409 | - | 73.0000 |
| 57413 | 646.12 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57414 | 2,560.00 | - |
| 57415 | 220.39 | 5.0000 |
| 57422 | 295.57 | - |
| 57423 | 200.00 | - |
| 57424 | 6,134.13 | 7.0000 |
| 57427 | 1,906.29 | 40.0000 |
| 57428 | - | 73.0000 |
| 57429 | 191.29 | 30.0000 |
| 57430 | 1,053.39 | 200.0000 |
| 57433 | 517.45 | - |
| 57434 | 73.50 | - |
| 57435 | 32.00 | - |
| 57436 | 712.00 | 100.0000 |
| 57438 | 790.00 | - |
| 57440 | 1,056.00 | - |
| 57442 | 5,703.68 | - |
| 57444 | 4,310.00 | - |
| 57445 | 1,536.00 | - |
| 57446 | - | 100.0000 |
| 57448 | - | 510.0000 |
| 57449 | 1,381.00 | - |
| 57450 | 21,875.00 | - |
| 57454 | 213.84 | - |
| 57455 | 1,600.00 | - |
| 57456 | 158.46 | - |
| 57457 | 160.00 | - |
| 57458 | 7,207.15 | 1,000.0000 |
| 57460 | 1,107.83 | 110.0000 |
| 57462 | 1,530.95 | 250.0000 |
| 57464 | 199.68 | - |
| 57466 | - | 3.0000 |
| 57468 | 161.00 | 130.0000 |
| 57469 | - | 500.0000 |
| 57470 | 162.00 | - |
| 57471 | 130.00 | - |
| 57472 | 1,620.00 | - |
| 57473 | 460.99 | 50.0000 |
| 57474 | 2,462.34 | 100.0000 |
| 57475 | 1,478.00 | 200.0000 |
| 57477 | 11.00 | - |
| 57479 | - | 200.0000 |
| 57480 | 405.00 | - |
| 57481 | 1,979.31 | 21,601.0000 |
| 57482 | - | 100.0000 |
| 57483 | 1,600.00 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57484 | - | 300.0000 |
| 57485 | 6,980.00 | 2,000.0000 |
| 57486 | - | 25.0000 |
| 57487 | 862.00 | - |
| 57489 | 334.57 | - |
| 57490 | 34,929.66 | 3,500.0000 |
| 57491 | 136.23 | 19.0000 |
| 57492 | 7.90 | - |
| 57494 | 141.43 | - |
| 57497 | 637.07 | - |
| 57499 | 69.24 | - |
| 57503 | 814.27 | 110.0000 |
| 57504 | 963.90 | - |
| 57505 | 668.78 | - |
| 57506 | - | 500.0000 |
| 57509 | 356.00 | 50.0000 |
| 57510 | 8.05 | - |
| 57513 | 949.90 | 644.0000 |
| 57515 | 258.60 | 15.0000 |
| 57517 | 3,185.26 | 300.0000 |
| 57518 | 3,133.31 | 350.0000 |
| 57520 | 862.00 | - |
| 57521 | 1,819.65 | - |
| 57522 | 228.05 | 30.0000 |
| 57524 | 5,908.25 | 500.0000 |
| 57525 | 78.40 | - |
| 57526 | 810.00 | - |
| 57527 | 80.07 | - |
| 57528 | 31.99 | - |
| 57529 | 173.34 | - |
| 57530 | 1,540.85 | 200.0000 |
| 57533 | - | 250.0000 |
| 57534 | 862.00 | 200.0000 |
| 57536 | 1,496.09 | 105.0000 |
| 57538 | - | 40.0000 |
| 57539 | 718.50 | 100.0000 |
| 57540 | - | 500.0000 |
| 57541 | 1,325.00 | 200.0000 |
| 57542 | 918.83 | 1,100.0000 |
| 57543 | 748.32 | - |
| 57544 | - | 50.0000 |
| 57545 | 1,620.00 | - |
| 57547 | 576.30 | 54.0000 |
| 57548 | 4,249.73 | - |
| 57549 | - | 50.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57550 | 1,544.70 | - |
| 57552 | 1,295.50 | 600.0000 |
| 57554 | 2,622.15 | 200.0000 |
| 57555 | 8.20 | - |
| 57556 | 72.46 | 10.0000 |
| 57557 | 19.33 | - |
| 57558 | - | 300.0000 |
| 57559 | 1,433.38 | - |
| 57560 | - | 450.0000 |
| 57561 | 972.00 | - |
| 57562 | - | 50.0000 |
| 57564 | 724.00 | 100.0000 |
| 57565 | 2,287.00 | - |
| 57566 | 73.49 | 10.0000 |
| 57568 | 1,948.12 | - |
| 57569 | 1,724.00 | - |
| 57570 | 494.80 | 60.0000 |
| 57574 | 121.50 | 135.0000 |
| 57576 | 237.50 | - |
| 57579 | 1,775.96 | 400.0000 |
| 57582 | 8.91 | - |
| 57583 | 9.99 | - |
| 57584 | 2,205.00 | - |
| 57585 | - | 150.0000 |
| 57586 | 13,132.36 | 1,998.0000 |
| 57587 | 320.00 | - |
| 57588 | 1,280.00 | - |
| 57590 | 165.75 | - |
| 57591 | 161.42 | - |
| 57595 | - | 83.0000 |
| 57599 | - | 100.0000 |
| 57600 | 265.00 | - |
| 57601 | 5,120.00 | - |
| 57602 | - | 500.0000 |
| 57603 | 1,024.00 | 500.0000 |
| 57604 | - | 100.0000 |
| 57605 | - | 100.0000 |
| 57606 | 296.45 | 40.0000 |
| 57610 | 703.35 | 66.0000 |
| 57611 | 126.53 | - |
| 57612 | 5.12 | - |
| 57615 | 5,919.30 | 400.0000 |
| 57617 | 70.95 | 10.0000 |
| 57619 | 1,426.00 | 200.0000 |
| 57620 | 312.00 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57621 | 65.07 | - |
| 57622 | 16,456.50 | - |
| 57623 | 217.68 | - |
| 57625 | 11,072.40 | 1,000.0000 |
| 57627 | 485.00 | - |
| 57628 | 198.92 | - |
| 57629 | - | 3,000.0000 |
| 57630 | 1,659.00 | 100.0000 |
| 57633 | 4,310.00 | - |
| 57634 | 2,990.92 | - |
| 57636 | 9.00 | - |
| 57637 | - | 154.0000 |
| 57638 | 6.51 | 4.0000 |
| 57639 | - | 100.0000 |
| 57640 | 71.35 | 10.0000 |
| 57641 | 3,045.48 | 257.0000 |
| 57644 | 3,580.00 | 500.0000 |
| 57645 | 790.00 | - |
| 57646 | - | 2,500.0000 |
| 57647 | - | 509.0000 |
| 57648 | - | 75.0000 |
| 57649 | - | 73.0000 |
| 57650 | - | 84.0000 |
| 57651 | - | 68.0000 |
| 57652 | - | 161.0000 |
| 57653 | - | 188.0000 |
| 57654 | - | 169.0000 |
| 57655 | - | 56.0000 |
| 57657 | - | 330.0000 |
| 57658 | - | 25.0000 |
| 57659 | - | 59.0000 |
| 57660 | - | 147.0000 |
| 57661 | - | 219.0000 |
| 57662 | - | 752.0000 |
| 57663 | - | 1,618.0000 |
| 57664 | - | 286.0000 |
| 57665 | - | 96.0000 |
| 57666 | - | 120.0000 |
| 57667 | 157,521.00 | 10,000.0000 |
| 57668 | - | 100.0000 |
| 57669 | - | 100.0000 |
| 57671 | - | 100.0000 |
| 57672 | - | 500.0000 |
| 57673 | - | 5,000.0000 |
| 57674 | - | 5,000.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57675 | - | 800.0000 |
| 57677 | - | 5.0000 |
| 57678 | 4,499.00 | - |
| 57679 | 320.00 | - |
| 57680 | 58.00 | - |
| 57681 | 640.00 | - |
| 57682 | 810.00 | - |
| 57684 | 14.80 | - |
| 57685 | - | 500.0000 |
| 57686 | 209.90 | 200.0000 |
| 57687 | 5,355.00 | 1,000.0000 |
| 57689 | 3,576.77 | 500.0000 |
| 57691 | 7.90 | - |
| 57694 | 108.00 | 15.0000 |
| 57696 | 1,216.00 | 100.0000 |
| 57697 | 2,155.00 | - |
| 57700 | 1,117.09 | 170.0000 |
| 57705 | - | 500.0000 |
| 57706 | 395.00 | - |
| 57707 | 4,543.17 | - |
| 57709 | - | 1,800.0000 |
| 57711 | - | 1.0000 |
| 57712 | - | 1,000.0000 |
| 57713 | 1,242.50 | 250.0000 |
| 57714 | 455.00 | - |
| 57715 | 31,695.60 | 4,000.0000 |
| 57717 | - | 270.0000 |
| 57718 | 2,560.00 | - |
| 57719 | 1,207.65 | 500.0000 |
| 57720 | 20,015.38 | 2,500.0000 |
| 57724 | 475.00 | - |
| 57725 | 794.95 | - |
| 57727 | 255.00 | - |
| 57728 | - | 20.0000 |
| 57729 | 512.00 | - |
| 57730 | 1,917.80 | 100.0000 |
| 57732 | 8,381.57 | 300.0000 |
| 57733 | 14,425.40 | 1,300.0000 |
| 57734 | - | 518.0000 |
| 57739 | - | 30.0000 |
| 57740 | 1,024.00 | - |
| 57741 | 7,220.65 | 1,000.0000 |
| 57743 | 528.93 | - |
| 57745 | 2,311.88 | - |
| 57746 | 1,919.47 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57747 | 354.50 | 50.0000 |
| 57748 | 71.68 | 14.0000 |
| 57751 | 162.00 | - |
| 57752 | 405.00 | - |
| 57754 | 1,474.60 | 300.0000 |
| 57755 | - | 25.0000 |
| 57759 | 17.21 | - |
| 57762 | - | 25.0000 |
| 57763 | 54.00 | 100.0000 |
| 57764 | 70.15 | 500.0000 |
| 57766 | 255.00 | - |
| 57768 | - | 100.0000 |
| 57769 | - | 500.0000 |
| 57772 | - | 100.0000 |
| 57773 | 977.82 | - |
| 57775 | 1,444.00 | 200.0000 |
| 57777 | - | 150.0000 |
| 57778 | 101.70 | 10.0000 |
| 57779 | 243.00 | - |
| 57782 | 714.00 | 100.0000 |
| 57783 | 159.78 | - |
| 57784 | 1,073.60 | 200.0000 |
| 57785 | 750.00 | - |
| 57786 | 300.00 | - |
| 57787 | - | 200.0000 |
| 57790 | - | 30.0000 |
| 57792 | 2,896.00 | 400.0000 |
| 57793 | 185.61 | - |
| 57795 | 1,103.05 | 500.0000 |
| 57797 | 9.11 | 1.0000 |
| 57798 | 653.05 | 25.0000 |
| 57800 | - | 75.0000 |
| 57802 | 18.00 | - |
| 57803 | 79.00 | - |
| 57804 | 2.60 | - |
| 57807 | 1,536.00 | 200.0000 |
| 57809 | 8,895.00 | - |
| 57810 | - | 500.0000 |
| 57811 | 1,162.08 | - |
| 57812 | - | 200.0000 |
| 57813 | - | 100.0000 |
| 57814 | - | 2,300.0000 |
| 57816 | 1,377.04 | 100.0000 |
| 57818 | 352.00 | 100.0000 |
| 57821 | - | 1,043.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57822 | 2,169.00 | 300.0000 |
| 57823 | 901.64 | 34.0000 |
| 57824 | 435.00 | 500.0000 |
| 57825 | 234.90 | - |
| 57827 | 305.13 | 299.0000 |
| 57828 | 20.25 | - |
| 57833 | 1,078.92 | 150.0000 |
| 57834 | 565.64 | 193.0000 |
| 57836 | - | 150.0000 |
| 57838 | 1,782.84 | 249.0000 |
| 57839 | 1,227.08 | 300.0000 |
| 57840 | 749.50 | 100.0000 |
| 57841 | 357.00 | 50.0000 |
| 57843 | - | 50.0000 |
| 57844 | 42.84 | 6.0000 |
| 57845 | 256.00 | - |
| 57846 | 5,120.00 | - |
| 57847 | 475.59 | 75.0000 |
| 57851 | 158.00 | - |
| 57852 | - | 2,000.0000 |
| 57854 | - | 3,000.0000 |
| 57858 | 14,510.00 | 3,000.0000 |
| 57859 | 13,876.21 | 12,534.0000 |
| 57860 | 699.30 | 45.0000 |
| 57861 | 5,155.94 | 202.0000 |
| 57862 | 751.96 | - |
| 57863 | - | 110.0000 |
| 57864 | 16,495.20 | 2,500.0000 |
| 57865 | 257.19 | - |
| 57866 | 142.70 | 20.0000 |
| 57867 | 1,064.49 | - |
| 57868 | - | 100.0000 |
| 57870 | 639.19 | - |
| 57871 | 185.22 | - |
| 57872 | 25.60 | - |
| 57873 | 292.75 | 50.0000 |
| 57875 | - | 800.0000 |
| 57878 | 15,085.00 | - |
| 57879 | 162.00 | - |
| 57881 | 3,114.50 | 500.0000 |
| 57883 | - | 400.0000 |
| 57885 | 1,179.20 | 120.0000 |
| 57888 | - | 100.0000 |
| 57889 | 4,587.85 | 750.0000 |
| 57891 | 25.00 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57892 | 128.00 | - |
| 57893 | 161.31 | 20.0000 |
| 57894 | 46.00 | - |
| 57895 | 12.15 | - |
| 57897 | 56,312.13 | 2,000.0000 |
| 57898 | 35.20 | - |
| 57899 | 35.24 | - |
| 57900 | 158.00 | - |
| 57901 | 4,272.00 | 600.0000 |
| 57902 | 580.42 | 102.0000 |
| 57904 | 1,434.00 | 200.0000 |
| 57908 | 283.35 | 30.0000 |
| 57910 | 85.05 | - |
| 57911 | 54,742.25 | - |
| 57918 | 395.00 | - |
| 57919 | 190.36 | - |
| 57920 | 0.75 | - |
| 57921 | 1,642.00 | 100.0000 |
| 57922 | 9.25 | - |
| 57923 | 280.15 | - |
| 57924 | - | 10.0000 |
| 57925 | 1.60 | - |
| 57926 | 15.36 | - |
| 57927 | 395.00 | - |
| 57928 | - | 40.0000 |
| 57929 | 88.17 | - |
| 57931 | 51.20 | - |
| 57932 | 4.13 | - |
| 57933 | 11.31 | - |
| 57936 | 230.00 | - |
| 57938 | 40.96 | - |
| 57939 | 3.10 | - |
| 57940 | 1,080.32 | - |
| 57941 | 107.80 | - |
| 57942 | 54.06 | - |
| 57943 | 179.08 | - |
| 57945 | 190.00 | - |
| 57946 | 33.87 | - |
| 57947 | 20.25 | - |
| 57949 | 7.50 | - |
| 57950 | 710.00 | - |
| 57951 | 9.91 | - |
| 57952 | 1,681.10 | - |
| 57953 | 512.00 | 100.0000 |
| 57955 | 7.90 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 57958 | 4.31 | - |
| 57961 | 263.25 | - |
| 57963 | - | 5,060.0000 |
| 57964 | - | 650.0000 |
| 57965 | - | 60.0000 |
| 57967 | - | 150.0000 |
| 57968 | - | 1,200.0000 |
| 57969 | - | 200.0000 |
| 57970 | - | 100.0000 |
| 57971 | - | 200.0000 |
| 57972 | - | 2,000.0000 |
| 57973 | - | 100.0000 |
| 57974 | - | 150.0000 |
| 57975 | - | 1,500.0000 |
| 57976 | - | 500.0000 |
| 57977 | - | 100.0000 |
| 57978 | - | 555.0000 |
| 57979 | - | 3,330.0000 |
| 57980 | - | 100.0000 |
| 57981 | - | 10.0000 |
| 57982 | - | 2,750.0000 |
| 57983 | - | 30.0000 |
| 57984 | - | 200.0000 |
| 57985 | - | 15,000.0000 |
| 57986 | - | 100.0000 |
| 57987 | - | 300.0000 |
| 57988 | - | 1,500.0000 |
| 57989 | - | 200.0000 |
| 57990 | - | 500.0000 |
| 57991 | - | 200.0000 |
| 57992 | - | 2,500.0000 |
| 57993 | - | 600.0000 |
| 57994 | - | 500.0000 |
| 57995 | - | 5,000.0000 |
| 57996 | - | 1,000.0000 |
| 57997 | - | 1,000.0000 |
| 57998 | - | 2,500.0000 |
| 57999 | - | 600.0000 |
| 58000 | - | 550.0000 |
| 58001 | - | 1,000.0000 |
| 58002 | - | 500.0000 |
| 58003 | - | 250.0000 |
| 58004 | - | 500.0000 |
| 58005 | - | 3,000.0000 |
| 58006 | - | 500.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58007 | - | 100.0000 |
| 58008 | - | 300.0000 |
| 58009 | - | 1,000.0000 |
| 58010 | - | 1,000.0000 |
| 58011 | - | 2,000.0000 |
| 58012 | - | 100.0000 |
| 58013 | - | 100.0000 |
| 58014 | - | 1,000.0000 |
| 58015 | - | 1,500.0000 |
| 58016 | - | 100.0000 |
| 58017 | - | 1,000.0000 |
| 58018 | - | 1,000.0000 |
| 58019 | - | 100.0000 |
| 58020 | - | 1,000.0000 |
| 58021 | - | 5,000.0000 |
| 58022 | - | 10.0000 |
| 58023 | - | 1,000.0000 |
| 58024 | - | 500.0000 |
| 58025 | - | 5,000.0000 |
| 58026 | - | 2,000.0000 |
| 58027 | - | 1,000.0000 |
| 58028 | - | 300.0000 |
| 58029 | - | 1,000.0000 |
| 58030 | - | 50.0000 |
| 58031 | - | 1,000.0000 |
| 58032 | - | 2,000.0000 |
| 58033 | - | 1,000.0000 |
| 58034 | - | 2,000.0000 |
| 58035 | - | 100.0000 |
| 58036 | - | 500.0000 |
| 58037 | - | 50.0000 |
| 58038 | - | 100.0000 |
| 58039 | - | 300.0000 |
| 58040 | - | 1,000.0000 |
| 58041 | - | 250.0000 |
| 58042 | - | 2,550.0000 |
| 58043 | - | 200.0000 |
| 58044 | - | 500.0000 |
| 58045 | - | 10,000.0000 |
| 58046 | - | 10,000.0000 |
| 58047 | - | 1,000.0000 |
| 58048 | - | 2,000.0000 |
| 58049 | - | 5,000.0000 |
| 58050 | - | 1,000.0000 |
| 58052 | - | 2,500.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**     **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58053 | 40,980.93 | - |
| 58054 | - | 10,000.0000 |
| 58056 | 67,232.00 | 19,100.0000 |
| 58057 | 155,584.00 | 39,200.0000 |
| 58058 | 20,416.00 | 5,800.0000 |
| 58060 | 642,330.00 | - |
| 58068 | - | 120.0000 |
| 58069 | - | 200.0000 |
| 58071 | - | 205.0000 |
| 58073 | - | 15.0000 |
| 58074 | - | 10.0000 |
| 58075 | 1,057.92 | 245.0000 |
| 58076 | 8,440.27 | 1,177.0000 |
| 58077 | 34,689.88 | 4,000.0000 |
| 58078 | 191,094.33 | - |
| 58080 | 18,439.79 | 52,700.0000 |
| 58081 | 17,374,084.91 | 3,230,968.0000 |
| 58083 | 91.74 | - |
| 58084 | 2,745.47 | 558.0000 |
| 58085 | 1,129.22 | 230.0000 |
| 58086 | 3,060.31 | 616.0000 |
| 58088 | 4,529.81 | 919.0000 |
| 58089 | 23,209.35 | 4,708.0000 |
| 58090 | 3,250.49 | 521.0000 |
| 58091 | 818.96 | 167.0000 |
| 58092 | 909.47 | 185.0000 |
| 58093 | 1,152.20 | 234.0000 |
| 58094 | 1,193.87 | 243.0000 |
| 58095 | 737.01 | 150.0000 |
| 58097 | 1,258.61 | 256.0000 |
| 58098 | 3,047.17 | 619.0000 |
| 58100 | 995.61 | 203.0000 |
| 58101 | 1,107.67 | 225.0000 |
| 58102 | 4,284.14 | 870.0000 |
| 58103 | 1,469.81 | 299.0000 |
| 58104 | 7,594.22 | - |
| 58105 | 1,896.53 | 381.0000 |
| 58106 | 2,595.04 | 529.0000 |
| 58107 | 4,267.20 | 866.0000 |
| 58108 | 1,694.11 | 345.0000 |
| 58109 | 3,099.39 | 631.0000 |
| 58110 | 978.37 | 199.0000 |
| 58112 | 1,427.21 | - |
| 58113 | 1,857.61 | - |
| 58114 | 2,491.36 | 500.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58115 | 805.97 | 164.0000 |
| 58116 | 857.69 | - |
| 58117 | 439.24 | - |
| 58118 | 771.49 | - |
| 58119 | 7,370.10 | 1,168.0000 |
| 58120 | 1,693.93 | 306.0000 |
| 58121 | 1,245.68 | 254.0000 |
| 58122 | 2,874.77 | 584.0000 |
| 58123 | 1,495.57 | - |
| 58124 | 2,202.41 | 451.0000 |
| 58125 | 8,482.69 | 1,720.0000 |
| 58126 | 1,159.58 | 236.0000 |
| 58127 | 11,268.16 | 2,286.0000 |
| 58128 | 737.06 | 151.0000 |
| 58129 | 737.06 | 151.0000 |
| 58130 | 2,555.83 | 520.0000 |
| 58131 | 1,584.49 | 320.0000 |
| 58132 | 1,250.10 | 255.0000 |
| 58133 | 1,055.95 | 215.0000 |
| 58134 | 1,767.10 | - |
| 58135 | 750.06 | 153.0000 |
| 58136 | 1,180.04 | 239.0000 |
| 58137 | 1,547.40 | 314.0000 |
| 58138 | 1,646.53 | 335.0000 |
| 58139 | 1,474.02 | 300.0000 |
| 58140 | 1,668.08 | 339.0000 |
| 58141 | 1,517.12 | 309.0000 |
| 58142 | 2,633.41 | 535.0000 |
| 58144 | 1,586.08 | - |
| 58145 | 2,952.89 | 963.0000 |
| 58146 | 1,956.26 | - |
| 58147 | 1,836.19 | 373.0000 |
| 58150 | 700,245.12 | 61,600.0000 |
| 58152 | 35,700.00 | 5,000.0000 |
| 58155 | - | 87,076.0000 |
| 58156 | - | 20.0000 |
| 58158 | 183.28 | - |
| 58159 | 11,737.77 | 1,626.0000 |
| 58160 | 2,844.21 | 394.0000 |
| 58161 | 2,887.52 | 400.0000 |
| 58162 | 59,439.60 | 8,234.0000 |
| 58163 | 9,832.01 | 1,362.0000 |
| 58164 | 4,721.10 | 654.0000 |
| 58165 | 6,410.29 | 888.0000 |
| 58166 | - | 25,000.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58167 | 14,154.00 | - |
| 58170 | 950.00 | - |
| 58171 | 1,988.20 | 1,000.0000 |
| 58173 | 698.13 | - |
| 58174 | 2,048.00 | - |
| 58175 | 1,280.00 | - |
| 58176 | 983.98 | - |
| 58177 | 736.50 | - |
| 58178 | 1,259.25 | - |
| 58181 | 3,017.75 | 200.0000 |
| 58182 | 1,467.00 | - |
| 58183 | 2,351.00 | 300.0000 |
| 58185 | 2,137.80 | 1,000.0000 |
| 58186 | 2,159.40 | - |
| 58187 | 229.79 | 30.0000 |
| 58191 | 1,536.00 | - |
| 58192 | 1,739.50 | - |
| 58195 | - | 1,000.0000 |
| 58196 | 5,265.00 | - |
| 58197 | 737.55 | - |
| 58198 | 2,800.44 | 499.0000 |
| 58200 | 910.00 | - |
| 58201 | 702.48 | - |
| 58202 | 3,570.00 | 500.0000 |
| 58207 | 1,772.86 | - |
| 58208 | 5,009.30 | 1,000.0000 |
| 58209 | 160.00 | - |
| 58210 | 14,580.00 | - |
| 58211 | - | 33,333.0000 |
| 58212 | 1,600.00 | - |
| 58213 | - | 33,333.0000 |
| 58216 | 1,430.01 | - |
| 58217 | 400.78 | 40.0000 |
| 58218 | 143.19 | - |
| 58219 | 1,458.00 | - |
| 58221 | 1,476.00 | - |
| 58223 | - | 200.0000 |
| 58224 | - | 500.0000 |
| 58228 | 4,798.70 | 500.0000 |
| 58233 | - | 400.0000 |
| 58234 | 51,200.00 | 50,000.0000 |
| 58235 | 8,962.60 | 173,136.0000 |
| 58236 | 241.90 | 66,536.0000 |
| 58237 | 841.02 | 231,333.0000 |
| 58238 | 223.02 | 61,341.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58240 | 178.61 | 49,119.0000 |
| 58241 | 221.58 | 60,941.0000 |
| 58242 | 314.27 | 86,435.0000 |
| 58243 | 293.90 | 80,839.0000 |
| 58244 | 113.07 | 31,087.0000 |
| 58245 | 56.54 | 15,544.0000 |
| 58247 | 2,468.18 | - |
| 58249 | 735,453.53 | - |
| 58250 | 20,082.00 | - |
| 58251 | - | 100,000.0000 |
| 58253 | 1,830.00 | - |
| 58255 | 2,114.00 | 3,000.0000 |
| 58256 | - | 1,000.0000 |
| 58257 | - | 2,800.0000 |
| 58258 | - | 1,400.0000 |
| 58260 | 10,200.00 | - |
| 58261 | 25,412.30 | 3,500.0000 |
| 58263 | 103,183.46 | - |
| 58264 | - | 3,500.0000 |
| 58265 | 16,555.44 | 2,679.0000 |
| 58266 | 77.50 | - |
| 58268 | - | 8,556.0000 |
| 58269 | - | 744.0000 |
| 58270 | 5,075.18 | - |
| 58271 | - | 28,180.0000 |
| 58273 | - | 46,076.0000 |
| 58274 | 567,413.98 | - |
| 58276 | 31,338.01 | - |
| 58277 | - | 14,118.0000 |
| 58278 | 71,400.00 | 32,052.0000 |
| 58279 | 22,655.22 | 3,000.0000 |
| 58280 | - | 2,600.0000 |
| 58281 | 33,480.92 | 4,698.0000 |
| 58283 | 395.00 | - |
| 58285 | - | 1,000.0000 |
| 58286 | 320.00 | - |
| 58290 | 8,727.00 | - |
| 58296 | 1,227,362.37 | - |
| 58298 | - | 200.0000 |
| 58299 | - | 400.0000 |
| 58301 | - | 183,254.0000 |
| 58306 | 89,992.80 | - |
| 58308 | 5,318.88 | - |
| 58309 | 798.02 | - |
| 58325 | 729.00 | 100.0000 |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58328 | 250.00 | - |
| 58329 | 1,668.00 | - |
| 58331 | 211,678.25 | 38,304.0000 |
| 58341 | 523.23 | - |
| 58345 | 7,875.00 | - |
| 58347 | 4,515.64 | - |
| 58350 | 888.65 | - |
| 58352 | 660.57 | - |
| 58353 | 8,100.00 | - |
| 58358 | 4,310.00 | 2,000.0000 |
| 58364 | 8.00 | 1,300.0000 |
| 58371 | 531.50 | 200.0000 |
| 58373 | 7,051.10 | 100.0000 |
| 58377 | 2,553.50 | 1,500.0000 |
| 58379 | 22.13 | - |
| 58380 | 1,046.80 | - |
| 58385 | - | 26,100.0000 |
| 58386 | 2,865.95 | - |
| 58387 | 4,096.00 | 800.0000 |
| 58389 | 3,017.60 | 500.0000 |
| 58399 | 37,380.00 | 3,400.0000 |
| 58401 | 905.00 | - |
| 58403 | 52,600.36 | 5,000.0000 |
| 58406 | 868.80 | 100.0000 |
| 58407 | 500.00 | - |
| 58408 | - | 100.0000 |
| 58409 | - | 5,000.0000 |
| 58410 | - | 100.0000 |
| 58415 | 2,961.82 | 500.0000 |
| 58417 | 71,225.90 | 10,000.0000 |
| 58422 | 15,561.50 | 1,100.0000 |
| 58430 | - | 100.0000 |
| 58438 | 102.40 | - |
| 58440 | 3.86 | 0.1000 |
| 58448 | 4.69 | - |
| 58450 | 103.00 | - |
| 58451 | 2,155.00 | - |
| 58455 | 2,119.94 | 100.0000 |
| 58461 | 41.26 | 4.0000 |
| 58469 | 37,705.62 | 1,560.0000 |
| 58470 | - | 1,000.0000 |
| 58473 | 48.00 | - |
| 58474 | 12,218.93 | 7,838.0000 |
| 58475 | 8,209.68 | 4,867.0000 |
| 58476 | 3,237.00 | 300.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58497 | - | 25.0000 |
| 58500 | 3,645.00 | 500.0000 |
| 58510 | - | 7,899.0000 |
| 58512 | 17,240.00 | 5,000.0000 |
| 58513 | 7.41 | 1.0000 |
| 58515 | 64.50 | 300.0000 |
| 58520 | - | 50.0000 |
| 58522 | 6,602.22 | 1,200.0000 |
| 58523 | 1,337.80 | - |
| 58528 | 6,618.00 | 1,400.0000 |
| 58533 | 18.63 | - |
| 58535 | 23.02 | - |
| 58538 | 518.00 | - |
| 58540 | 4,984.00 | 700.0000 |
| 58541 | 4,594.97 | 400.0000 |
| 58551 | 334.70 | - |
| 58552 | 39.95 | - |
| 58556 | - | 800.0000 |
| 58561 | 72,619.12 | - |
| 58564 | 49,565.00 | - |
| 58567 | - | 1,500.0000 |
| 58568 | - | 100.0000 |
| 58572 | 25,303.04 | - |
| 58573 | 294,993.80 | 50,000.0000 |
| 58574 | 229.17 | 75.0000 |
| 58579 | 158.00 | - |
| 58581 | 376.00 | 300.0000 |
| 58583 | 19,449.50 | - |
| 58585 | - | 500.0000 |
| 58591 | 241.62 | 27,978.0000 |
| 58595 | 810.00 | - |
| 58597 | 89.04 | 97.0000 |
| 58603 | 248.00 | - |
| 58608 | 285.08 | 138.0000 |
| 58609 | 17.07 | 10.0000 |
| 58610 | - | 100.0000 |
| 58624 | 4,800.00 | - |
| 58627 | 14,731.46 | 1,000.0000 |
| 58629 | 3,200.00 | - |
| 58631 | 7.37 | 1.0000 |
| 58634 | 761.00 | 100.0000 |
| 58635 | 165.00 | 200.0000 |
| 58636 | 35.90 | 5.0000 |
| 58638 | 17.60 | 100.0000 |
| 58639 | 2,453.00 | 500.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58640 | 36,499.50 | 6,500.0000 |
| 58648 | 3,160.00 | - |
| 58650 | 106.00 | - |
| 58651 | 759.60 | 100.0000 |
| 58653 | 1,053.00 | - |
| 58654 | 403.24 | - |
| 58655 | 162.00 | - |
| 58658 | 196.00 | - |
| 58661 | 40.50 | - |
| 58665 | 22,363.79 | 13,000.0000 |
| 58668 | 3,811.80 | 300.0000 |
| 58670 | 1.29 | - |
| 58671 | 3,185.14 | - |
| 58672 | 5,708.74 | 802.0000 |
| 58673 | 641.10 | - |
| 58674 | 1,528.00 | 200.0000 |
| 58676 | 105,643.41 | - |
| 58685 | 24,057.36 | - |
| 58686 | 1,103,244.34 | 300,000.0000 |
| 58687 | 90,000.72 | - |
| 58690 | 672,849.68 | - |
| 58696 | - | 65,944.0000 |
| 58697 | - | 153,870.0000 |
| 58699 | 4,209.15 | - |
| 58700 | 83,066.88 | - |
| 58702 | 1,640.32 | - |
| 58705 | - | 143,453.0000 |
| 58706 | 4,394,244.08 | - |
| 58707 | 1,463,854.48 | - |
| 58708 | 606,547.65 | - |
| 58709 | 3,889,165.11 | - |
| 58710 | 2,519,506.16 | - |
| 58711 | 227,240.27 | - |
| 58713 | 2,964.30 | - |
| 58715 | 300,838.00 | - |
| 58722 | 1,192,399.78 | 316,170.0000 |
| 58723 | - | 654,451.0000 |
| 58729 | 2,430.00 | - |
| 58730 | 4,064.76 | 483.0000 |
| 58731 | 4,991.92 | 587.0000 |
| 58732 | 6,258.54 | 714.0000 |
| 58733 | 1,606.89 | 186.0000 |
| 58734 | 2,769.04 | 326.0000 |
| 58735 | 6,118.62 | 714.0000 |
| 58736 | 2,578.30 | 299.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58737 | 8,648.88 | 1,014.0000 |
| 58738 | 9,602.99 | 1,126.0000 |
| 58739 | 2,957.82 | - |
| 58740 | 4,535.97 | 531.0000 |
| 58741 | 2,792.01 | 317.0000 |
| 58742 | 1,601.56 | 506.0000 |
| 58743 | 3,672.06 | 1,846.0000 |
| 58744 | 704.00 | - |
| 58745 | 2,352.59 | 274.0000 |
| 58746 | 1,577.60 | 4,000.0000 |
| 58747 | 1,189.54 | 598.0000 |
| 58748 | 682.30 | 343.0000 |
| 58749 | 1,042.34 | 524.0000 |
| 58750 | 2,683.43 | 1,349.0000 |
| 58751 | 736.00 | 370.0000 |
| 58752 | 5,030.69 | 2,529.0000 |
| 58753 | 915.03 | 460.0000 |
| 58754 | 204.45 | 282.0000 |
| 58755 | 680.31 | 342.0000 |
| 58756 | 3,347.82 | 1,683.0000 |
| 58757 | 1,969.31 | 990.0000 |
| 58758 | 1,867.86 | 939.0000 |
| 58759 | 1,855.92 | 933.0000 |
| 58760 | 2,512.36 | 1,263.0000 |
| 58761 | 1,782.32 | 896.0000 |
| 58762 | 1,684.85 | 847.0000 |
| 58763 | 2,570.05 | 1,292.0000 |
| 58764 | 960.78 | 483.0000 |
| 58765 | 636.54 | 320.0000 |
| 58766 | 3,584.54 | 1,802.0000 |
| 58767 | 1,289.00 | 648.0000 |
| 58768 | 3,216.54 | 1,617.0000 |
| 58769 | 4,599.03 | 2,312.0000 |
| 58770 | 1,684.85 | 847.0000 |
| 58771 | 2,090.65 | 1,051.0000 |
| 58772 | 326.23 | 164.0000 |
| 58773 | 1,096.05 | 551.0000 |
| 58774 | 4,219.09 | 2,121.0000 |
| 58775 | 644.50 | 324.0000 |
| 58776 | 4,469.73 | 2,247.0000 |
| 58777 | 922.99 | 464.0000 |
| 58778 | 2,343.28 | 1,178.0000 |
| 58779 | 1,734.58 | 872.0000 |
| 58780 | 5,185.84 | 2,607.0000 |
| 58781 | 4,175.33 | 2,099.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58782 | 1,545.61 | 777.0000 |
| 58783 | 461.49 | 232.0000 |
| 58784 | 1,479.96 | 744.0000 |
| 58785 | 1,436.20 | 722.0000 |
| 58786 | 588.80 | 296.0000 |
| 58787 | 3,582.55 | 1,801.0000 |
| 58788 | 5,142.08 | 2,585.0000 |
| 58789 | 1,969.31 | 990.0000 |
| 58790 | 399.83 | 201.0000 |
| 58791 | 4,537.47 | 526.0000 |
| 58792 | 513.45 | 264.0000 |
| 58793 | 666.38 | 335.0000 |
| 58794 | 3,057.40 | 1,537.0000 |
| 58795 | 6,610.11 | 3,323.0000 |
| 58796 | 2,932.08 | 1,474.0000 |
| 58797 | 1,143.79 | 575.0000 |
| 58798 | 1,613.24 | 811.0000 |
| 58799 | 1,012.50 | 509.0000 |
| 58800 | 777.78 | 391.0000 |
| 58801 | 360.98 | 181.0000 |
| 58802 | 1,062.23 | 534.0000 |
| 58803 | 537.08 | 270.0000 |
| 58804 | 1,511.79 | 760.0000 |
| 58805 | 475.42 | 239.0000 |
| 58806 | 1,639.10 | 824.0000 |
| 58807 | 1,458.08 | 733.0000 |
| 58808 | 960.78 | 483.0000 |
| 58809 | 1,082.12 | 544.0000 |
| 58810 | 459.51 | 231.0000 |
| 58811 | 2,904.23 | 1,460.0000 |
| 58812 | 1,485.93 | 747.0000 |
| 58813 | 586.81 | 295.0000 |
| 58814 | 2,078.71 | 1,045.0000 |
| 58815 | 2,474.56 | 1,244.0000 |
| 58816 | 2,379.08 | 1,196.0000 |
| 58817 | 855.36 | 430.0000 |
| 58818 | 704.00 | - |
| 58819 | 5,255.47 | 2,642.0000 |
| 58820 | 3,314.01 | 1,666.0000 |
| 58821 | 2,723.21 | 1,369.0000 |
| 58822 | 7,001.98 | 3,520.0000 |
| 58823 | 2,774.93 | 1,395.0000 |
| 58824 | 986.64 | 496.0000 |
| 58825 | 497.30 | 250.0000 |
| 58826 | 1,481.95 | 745.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58827 | 646.49 | 325.0000 |
| 58828 | 527.59 | - |
| 58829 | 2,085.55 | 238.0000 |
| 58830 | 5,209.70 | 1,000.0000 |
| 58831 | 2,594.65 | - |
| 58832 | 3,993.14 | 462.0000 |
| 58833 | 1,070.19 | 538.0000 |
| 58834 | 1,149.64 | - |
| 58835 | 1,137.97 | - |
| 58836 | 1,056.00 | 300.0000 |
| 58837 | 596.76 | 300.0000 |
| 58838 | 3,244.39 | 1,631.0000 |
| 58839 | 1,283.03 | 645.0000 |
| 58840 | 3,990.34 | 2,006.0000 |
| 58841 | 543.05 | 273.0000 |
| 58842 | 3,518.89 | 1,769.0000 |
| 58843 | 2,579.99 | 1,297.0000 |
| 58844 | 1,101.95 | 128.0000 |
| 58845 | 646.49 | 325.0000 |
| 58846 | 958.79 | 482.0000 |
| 58847 | 4,905.37 | 2,466.0000 |
| 58848 | 1,346.69 | 677.0000 |
| 58849 | 2,742.25 | 318.0000 |
| 58850 | 1,055.12 | - |
| 58851 | 13,937.64 | 1,632.0000 |
| 58852 | 5,848.20 | 3,000.0000 |
| 58853 | 2,080.70 | 1,046.0000 |
| 58854 | 618.64 | 311.0000 |
| 58855 | 1,842.00 | 926.0000 |
| 58856 | 1,237.28 | 622.0000 |
| 58857 | 734.01 | 369.0000 |
| 58858 | 1,056.00 | - |
| 58859 | 9,016.00 | 5,000.0000 |
| 58860 | 612.67 | 308.0000 |
| 58861 | 447.57 | 225.0000 |
| 58862 | 1,400.40 | 704.0000 |
| 58863 | 435.63 | 219.0000 |
| 58864 | 783.74 | 394.0000 |
| 58865 | 1,392.44 | 700.0000 |
| 58866 | 592.78 | 298.0000 |
| 58867 | 1,153.74 | 580.0000 |
| 58868 | 4,712.41 | 2,369.0000 |
| 58869 | 2,850.52 | 1,433.0000 |
| 58870 | 1,237.28 | 622.0000 |
| 58871 | 1,438.19 | 723.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58872 | - | 300.0000 |
| 58873 | 198.92 | 100.0000 |
| 58874 | 1,147.77 | 577.0000 |
| 58875 | 443.59 | 223.0000 |
| 58876 | 6,049.80 | - |
| 58877 | 1,939.47 | 975.0000 |
| 58878 | 471.44 | 237.0000 |
| 58879 | 3,192.67 | 1,605.0000 |
| 58880 | 3,457.23 | 1,738.0000 |
| 58881 | 1,408.35 | 708.0000 |
| 58883 | 2,351.55 | 744.0000 |
| 58884 | - | 3,000.0000 |
| 58887 | 934.11 | 115.0000 |
| 58888 | 857.02 | 100.0000 |
| 58889 | 2,414.89 | 1,214.0000 |
| 58890 | 1,040.35 | 523.0000 |
| 58891 | 1,056.00 | - |
| 58892 | 483.38 | 243.0000 |
| 58893 | 433.65 | 218.0000 |
| 58894 | 489.34 | 246.0000 |
| 58895 | 737.99 | 371.0000 |
| 58896 | 674.34 | 339.0000 |
| 58897 | 429.67 | 216.0000 |
| 58898 | 755.90 | 380.0000 |
| 58899 | 624.61 | 314.0000 |
| 58901 | 1,726.63 | 868.0000 |
| 58902 | 4,845.69 | 2,436.0000 |
| 58903 | 1,790.28 | 900.0000 |
| 58904 | 1,060.24 | 533.0000 |
| 58905 | 680.31 | 342.0000 |
| 58906 | 543.05 | 273.0000 |
| 58907 | 1,137.82 | 572.0000 |
| 58910 | 1,195.51 | 601.0000 |
| 58911 | 10,668.30 | 1,337.0000 |
| 58912 | 125.97 | - |
| 58914 | 528.00 | - |
| 58915 | - | 200.0000 |
| 58916 | 2,626.92 | 308.0000 |
| 58917 | 401.82 | 202.0000 |
| 58919 | 3,658.37 | 430.0000 |
| 58921 | 397.84 | 200.0000 |
| 58922 | 672.35 | 338.0000 |
| 58924 | 1,344.70 | 676.0000 |
| 58925 | 461.49 | 232.0000 |
| 58926 | 3,913.16 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 58927 | 1,374.87 | 159.0000 |
| 58928 | 1,217.39 | 612.0000 |
| 58929 | 2,637.68 | 1,326.0000 |
| 58930 | 479.40 | 241.0000 |
| 58931 | 2,066.78 | 1,039.0000 |
| 58933 | 558.97 | 281.0000 |
| 58934 | 5,120.00 | - |
| 58936 | 151.96 | - |
| 58937 | 19,719.37 | 2,291.0000 |
| 58939 | 867.29 | 436.0000 |
| 58941 | 704.00 | - |
| 58943 | 3,516.86 | 311.0000 |
| 58944 | 1,021.49 | 200.0000 |
| 58945 | 960.78 | 483.0000 |
| 58946 | 668.37 | 336.0000 |
| 58947 | 12,492,089.37 | 1,637,511.0000 |
| 58948 | 347,635.68 | 50,354.0000 |
| 58949 | 603,036.11 | 100,000.0000 |
| 58951 | - | 94,738.0000 |
| 58953 | - | 136,423.0000 |
| 58958 | - | 50,783.0000 |
| 58965 | 103,082.06 | - |
| 58976 | 65,343.91 | - |
| 58979 | 112,107.41 | - |
| 58980 | 122,860.86 | - |
| 58983 | 29,773.48 | - |
| 58984 | 64,823.39 | - |
| 58989 | - | 38,186.0000 |
| 58997 | 34,061.93 | - |
| 58998 | 6,197.78 | - |
| 59006 | 266,289.04 | - |
| 59007 | 12,287.81 | - |
| 59014 | 2,550.00 | - |
| 59018 | - | 51,709.0000 |
| 59021 | 5,232.64 | - |
| 59022 | 201,122.69 | - |
| 59023 | 15,966.63 | 4,493.0000 |
| 59024 | 939,730.86 | 259,179.0000 |
| 59027 | 203,540.75 | 53,719.0000 |
| 59028 | 274,878.39 | 75,972.0000 |
| 59030 | 968,128.07 | 281,175.0000 |
| 59032 | 6,461.44 | - |
| 59033 | - | 5,985.0000 |
| 59034 | - | 944.0000 |
| 59035 | - | 2,876.0000 |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 59036 | - | 917.0000 |
| 59037 | - | 861.0000 |
| 59038 | - | 3,392.0000 |
| 59041 | - | 1,867.0000 |
| 59043 | - | 1,261.0000 |
| 59044 | - | 6,000.0000 |
| 59046 | - | 2,582.0000 |
| 59047 | 6,070.58 | - |
| 59048 | - | 1,208.0000 |
| 59050 | 3,208.41 | - |
| 59051 | 13,376.01 | - |
| 59053 | 103,482.63 | 138,100.0000 |
| 59055 | 38,002.56 | - |
| 59058 | - | 10,174.0000 |
| 59059 | 634.05 | - |
| 59060 | 1,375.37 | 40,029.0000 |
| 59061 | 248.38 | 6,802.0000 |
| 59067 | 30,864.00 | - |
| 59069 | - | 1.0000 |
| 59071 | 5,040.15 | - |
| 59072 | 2,563.20 | 200.0000 |
| 59073 | 474.00 | - |
| 59074 | - | 600.0000 |
| 59077 | 5,160.10 | - |
| 59079 | 6,908.46 | - |
| 59080 | 128,199.16 | - |
| 59081 | 251,207.88 | - |
| 59082 | 2,578.80 | - |
| 59084 | 70,295.68 | - |
| 59085 | 48,722.88 | - |
| 59086 | 60,164.37 | - |
| 59087 | 10,163.88 | - |
| 59090 | - | 8,022.0000 |
| 59091 | 23,937.74 | - |
| 59094 | - | 141,436.0000 |
| 59095 | - | 194,754.0000 |
| 59096 | - | 1,481.0000 |
| 59097 | - | 32,377.0000 |
| 59098 | - | 1,449.0000 |
| 59099 | 635,488.80 | - |
| 59101 | 441.71 | 44.0000 |
| 59102 | 1,621,797.77 | 520,000.0000 |
| 59107 | 6,600.00 | - |
| 59108 | 12,998.30 | - |
| 59111 | 5,939,128.28 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 59112 | 18,795.91 | - |
| 59113 | 58,219.48 | - |
| 59114 | 56,943.72 | - |
| 59115 | 357.73 | - |
| 59116 | 282,912.83 | 83,947.0000 |
| 59117 | 78,184.22 | 29,432.0000 |
| 59118 | 188,201.80 | 38,100.0000 |
| 59121 | 49,317.20 | 9,000.0000 |
| 59125 | 2,162,258.60 | 306,157.0000 |
| 59126 | 29,034.27 | 4,111.0000 |
| 59130 | - | 1,862.0000 |
| 59131 | - | 28,328.0000 |
| 59132 | - | 24,314.0000 |
| 59133 | - | 11,981.0000 |
| 59134 | 10,438.50 | - |
| 59135 | 7,246.28 | 21,450.0000 |
| 59136 | 61,619.99 | 173,550.0000 |
| 59138 | - | 14,034.0000 |
| 59139 | 138,916.67 | 28,778.0000 |
| 59140 | 1,645,450.25 | 352,267.0000 |
| 59141 | 129,056.00 | - |
| 59142 | 38,998.00 | - |
| 59143 | 15,836.00 | - |
| 59144 | - | 13,455.0000 |
| 59147 | 349,391.11 | - |
| 59149 | 20,032.00 | - |
| 59150 | 129,540.76 | - |
| 59151 | 131,375.90 | - |
| 59152 | 946,910.71 | 148,032.0000 |
| 59153 | 1,796,068.77 | 249,305.0000 |
| 59154 | 440,180.41 | 68,230.0000 |
| 59158 | 224,373.70 | 34,233.0000 |
| 59159 | 6,595,650.24 | - |
| 59160 | 21,555.41 | - |
| 59161 | 87,914.67 | - |
| 59162 | 27,305.81 | - |
| 59163 | 313,301.89 | - |
| 59164 | 63,243.84 | - |
| 59165 | 1,395,933.44 | - |
| 59166 | 161.92 | - |
| 59168 | 545,498.00 | 7,000.0000 |
| 59170 | 2,294,411.95 | 302,273.0000 |
| 59171 | 16,364.48 | - |
| 59172 | 9,733.66 | - |
| 59173 | 1,325.18 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**　　　**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 59174 | 123.83 | - |
| 59175 | 208,503.03 | - |
| 59176 | 10,120.27 | - |
| 59177 | 1,291,023.65 | - |
| 59178 | 142,503.04 | - |
| 59179 | 31,189.40 | 4,758.0000 |
| 59183 | 738,575.08 | 97,048.0000 |
| 59184 | 16,094.06 | - |
| 59186 | 17,920.00 | 1,900.0000 |
| 59188 | 9,000.64 | - |
| 59190 | 18,089.28 | - |
| 59191 | 5,136.00 | - |
| 59192 | 744.00 | - |
| 59193 | 2,833.60 | - |
| 59194 | 2,189.44 | - |
| 59195 | 1,263,974.98 | - |
| 59196 | - | 47,837.0000 |
| 59197 | 3,450,863.81 | 466,179.0000 |
| 59198 | 1,417,249.94 | 190,366.0000 |
| 59199 | 35,971.40 | - |
| 59200 | 51,296.96 | - |
| 59202 | 307,303.00 | 142,800.0000 |
| 59203 | 111,629.00 | 51,700.0000 |
| 59204 | 119,818.00 | 55,500.0000 |
| 59208 | 689,334.15 | - |
| 59209 | 37,003.39 | - |
| 59210 | 242,549.42 | - |
| 59211 | 14,827.59 | - |
| 59212 | 35,000.00 | - |
| 59213 | 250,662.42 | - |
| 59214 | 45,213.30 | - |
| 59216 | 3,609.99 | 7,013.0000 |
| 59217 | 39,431.04 | - |
| 59218 | 1,640.32 | - |
| 59220 | 148,238.14 | 17,638.0000 |
| 59221 | 860.16 | - |
| 59222 | 435.20 | - |
| 59223 | 146.54 | - |
| 59224 | 2,560.00 | - |
| 59225 | 138.24 | - |
| 59226 | 128.00 | - |
| 59227 | 117.76 | - |
| 59228 | 215.04 | - |
| 59229 | 133.12 | - |
| 59230 | 3,230.72 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 59231 | 2,728.96 | - |
| 59232 | 225.28 | - |
| 59233 | 209.92 | - |
| 59234 | 332.80 | - |
| 59235 | 419.84 | - |
| 59236 | 245.76 | - |
| 59237 | 296.96 | - |
| 59239 | 1,039.36 | - |
| 59240 | 4,797.44 | - |
| 59241 | 624.64 | - |
| 59242 | 2,641.92 | - |
| 59243 | 634.88 | - |
| 59244 | 829.44 | - |
| 59245 | 2,082.83 | - |
| 59246 | 1,919.32 | - |
| 59247 | 655.36 | - |
| 59248 | 1,448.96 | - |
| 59249 | 1,146.88 | - |
| 59250 | 1,489.92 | - |
| 59251 | 343.04 | - |
| 59252 | 126.32 | - |
| 59253 | 1,346.22 | - |
| 59254 | 1,987.74 | - |
| 59255 | 4,374.00 | - |
| 59256 | 128.00 | - |
| 59257 | 1,576.96 | - |
| 59258 | 419.84 | - |
| 59259 | 204.80 | - |
| 59260 | 839.68 | - |
| 59261 | 680.96 | - |
| 59262 | 140.52 | - |
| 59263 | 210.21 | - |
| 59264 | 527.36 | - |
| 59265 | 552.96 | - |
| 59266 | 358.40 | - |
| 59267 | 353.28 | - |
| 59268 | 1,720.32 | - |
| 59269 | 1,720.32 | - |
| 59270 | 1,720.32 | - |
| 59271 | 409.60 | - |
| 59272 | 286.72 | - |
| 59273 | 256.00 | - |
| 59274 | 102.40 | - |
| 59275 | 522.24 | - |
| 59276 | 28.62 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 59277 | 573.44 | - |
| 59278 | 552.96 | - |
| 59279 | 261.12 | - |
| 59280 | 143.36 | - |
| 59281 | 384.00 | - |
| 59282 | 722.18 | - |
| 59283 | 1,469.44 | - |
| 59284 | 271.36 | - |
| 59285 | 1,730.56 | - |
| 59286 | 701.44 | - |
| 59287 | 163.84 | - |
| 59288 | 896.00 | - |
| 59289 | 563.20 | - |
| 59290 | 1,377.28 | - |
| 59291 | 317.44 | - |
| 59292 | 256.00 | - |
| 59293 | 163.84 | - |
| 59294 | 762.88 | - |
| 59295 | 322.56 | - |
| 59296 | 2,057.60 | - |
| 59297 | 148.48 | - |
| 59298 | 117.76 | - |
| 59299 | 358.40 | - |
| 59300 | 721.92 | - |
| 59301 | 158.72 | - |
| 59302 | 317.44 | - |
| 59303 | 168.96 | - |
| 59304 | 307.20 | - |
| 59305 | 179.20 | - |
| 59306 | 174.08 | - |
| 59307 | 189.44 | - |
| 59308 | 271.36 | - |
| 59309 | 168.96 | - |
| 59310 | 849.92 | - |
| 59311 | 967.68 | - |
| 59312 | 2,631.68 | - |
| 59313 | 307.20 | - |
| 59314 | 179.20 | - |
| 59315 | 128.00 | - |
| 59316 | 133.12 | - |
| 59317 | 2,990.08 | - |
| 59318 | 302.08 | - |
| 59319 | 885.76 | - |
| 59320 | 342.66 | - |
| 59321 | 148.48 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 59322 | 11.55 | - |
| 59323 | 1,484.80 | - |
| 59324 | 261.12 | - |
| 59325 | 317.44 | - |
| 59326 | 1,950.72 | - |
| 59327 | 189.44 | - |
| 59328 | 209.92 | - |
| 59329 | 634.88 | - |
| 59330 | 153.60 | - |
| 59331 | 1,955.84 | - |
| 59332 | 235.52 | - |
| 59333 | 649.61 | - |
| 59334 | 87.04 | - |
| 59335 | 614.40 | - |
| 59336 | 245.76 | - |
| 59337 | 225.28 | - |
| 59338 | 235.52 | - |
| 59339 | 221.44 | - |
| 59340 | 768.00 | - |
| 59341 | 220.16 | - |
| 59342 | 271.36 | - |
| 59343 | 194.56 | - |
| 59344 | 189.44 | - |
| 59345 | 532.48 | - |
| 59346 | 117.76 | - |
| 59347 | 634.88 | - |
| 59348 | 133.12 | - |
| 59349 | 133.12 | - |
| 59350 | 1,607.68 | - |
| 59351 | 1,119.14 | - |
| 59352 | 522.24 | - |
| 59353 | 158.72 | - |
| 59354 | 343.04 | - |
| 59355 | 1,807.36 | - |
| 59356 | 522.24 | - |
| 59357 | 1,356.80 | - |
| 59358 | 5,232.64 | - |
| 59359 | 168.96 | - |
| 59360 | 1,561.60 | - |
| 59361 | 312.32 | - |
| 59362 | 578.56 | - |
| 59363 | 860.16 | - |
| 59364 | 834.56 | - |
| 59365 | 322.56 | - |
| 59366 | 230.40 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 59367 | 2,554.88 | - |
| 59368 | 107.52 | - |
| 59369 | 1,858.56 | - |
| 59370 | 2,191.36 | - |
| 59371 | 19,937.28 | - |
| 59372 | 194.56 | - |
| 59373 | 148.48 | - |
| 59374 | 3,082.24 | - |
| 59375 | 3,998.72 | - |
| 59376 | 404.48 | - |
| 59377 | 2,268.16 | - |
| 59378 | 6,072.32 | - |
| 59379 | 368.64 | - |
| 59380 | 163.84 | - |
| 59381 | 199.68 | - |
| 59382 | 225.28 | - |
| 59383 | 148.48 | - |
| 59384 | 143.36 | - |
| 59385 | 179.20 | - |
| 59386 | 5,580.26 | - |
| 59387 | 312.32 | - |
| 59388 | 517.12 | - |
| 59389 | 189.44 | - |
| 59390 | 158.72 | - |
| 59391 | 3,179.52 | - |
| 59392 | 2,585.60 | - |
| 59393 | 542.72 | - |
| 59394 | 650.24 | - |
| 59395 | 1,310.72 | - |
| 59396 | 1,223.68 | - |
| 59397 | 993.28 | - |
| 59398 | 15,308.80 | - |
| 59399 | 8,970.24 | - |
| 59400 | 1,684.48 | - |
| 59401 | 215.04 | - |
| 59402 | 163.84 | - |
| 59403 | 240.64 | - |
| 59404 | 163.84 | - |
| 59405 | 138.24 | - |
| 59406 | 143.36 | - |
| 59407 | 558.08 | - |
| 59408 | 348.16 | - |
| 59409 | 1,602.56 | - |
| 59410 | 220.16 | - |
| 59411 | 1,879.20 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**                    **EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---------|----------------------------------------|------------------|
| 59412 | 298.08 | - |
| 59413 | 302.08 | - |
| 59414 | 609.28 | - |
| 59415 | 747.52 | - |
| 59416 | 2,974.72 | - |
| 59417 | 133.12 | - |
| 59418 | 189.44 | - |
| 59419 | 322.56 | - |
| 59420 | 143.36 | - |
| 59421 | 21.06 | - |
| 59422 | 1,059.84 | - |
| 59423 | 4,321.28 | - |
| 59424 | 133.12 | - |
| 59425 | 174.08 | - |
| 59426 | 209.92 | - |
| 59427 | 266.24 | - |
| 59428 | 308.82 | - |
| 59429 | 112.64 | - |
| 59430 | 153.60 | - |
| 59431 | 2,810.88 | - |
| 59432 | 573.44 | - |
| 59433 | 1,090.56 | - |
| 59434 | 281.60 | - |
| 59435 | 353.28 | - |
| 59436 | 440.32 | - |
| 59437 | 220.16 | - |
| 59438 | 844.80 | - |
| 59439 | 916.48 | - |
| 59440 | 327.68 | - |
| 59441 | 773.12 | - |
| 59442 | 691.20 | - |
| 59443 | 450.56 | - |
| 59444 | 337.92 | - |
| 59445 | 199.68 | - |
| 59446 | 5,591.04 | - |
| 59447 | 153.60 | - |
| 59448 | 1,039.36 | - |
| 59449 | 256.00 | - |
| 59450 | 419.84 | - |
| 59451 | 819.20 | - |
| 59452 | 558.08 | - |
| 59453 | 4,536.32 | - |
| 59454 | 225.28 | - |
| 59455 | 179.20 | - |
| 59456 | 112.64 | - |

**TIMELY, PROPERLY DOCUMENTED CLAIMS**

**EXHIBIT B**

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 59457 | 808.96 | - |
| 59458 | 634.88 | - |
| 59459 | 629.76 | - |
| 59460 | 199.68 | - |
| 59461 | 276.48 | - |
| 59462 | 199.68 | - |
| 59463 | 5,713.92 | - |
| 59464 | 855.04 | - |
| 59465 | 184.32 | - |
| 59466 | 199.68 | - |
| 59468 | 15.81 | - |
| 59469 | 5.51 | - |
| 59470 | 215.04 | - |
| 59471 | 256.00 | - |
| 59472 | 1,971.20 | - |
| 59473 | 665.60 | - |
| 59474 | 7,367.68 | - |
| 59475 | 435.20 | - |
| 59476 | 450.56 | - |
| 59477 | 962.56 | - |
| 59478 | 250.88 | - |
| 59479 | 138.24 | - |
| 59480 | 138.24 | - |
| 59481 | 138.24 | - |
| 59482 | 138.24 | - |
| 59483 | 389.12 | - |
| 59484 | 128.00 | - |
| 59485 | 128.00 | - |
| 59486 | 327.68 | - |
| 59487 | 138.24 | - |
| 59488 | 343.04 | - |
| 59489 | 133.12 | - |
| 59490 | 337.92 | - |
| 59491 | 757.76 | - |
| 59492 | 936.96 | - |
| 59493 | 199.68 | - |
| 59494 | 199.68 | - |
| 59495 | 199.68 | - |
| 59496 | 2,780.16 | - |
| 59497 | 783.36 | - |
| 59498 | 711.68 | - |
| 59499 | 40.50 | - |
| 59500 | 41.31 | - |
| 59501 | 609.28 | - |
| 59502 | 3,020.80 | - |

## TIMELY, PROPERLY DOCUMENTED CLAIMS

# EXHIBIT B

| Claim # | Recognized Claims - Securities Subclass | Multiplan Shares |
|---|---|---|
| 59503 | 276.48 | - |
| 59504 | 427.59 | - |
| 59505 | 55.17 | - |
| 59506 | - | 228,982.0000 |
| 59507 | - | 51,750.0000 |
| 59508 | - | 132,924.0000 |
| 59509 | 58.14 | 32.0000 |
| 59512 | 102,784.00 | 29,200.0000 |
| 59516 | 265.93 | - |
| 59517 | 7,616.35 | - |
| 59531 | 22,482.24 | - |
| 59532 | 42,413.74 | 7,062.0000 |
| 59533 | 51,284.99 | 8,284.0000 |
| 59534 | 83,610.41 | 130,768.0000 |
| 59535 | 869,604.09 | 132,674.0000 |
| 59536 | 88,429.28 | 23,541.0000 |
| 59538 | - | 79,302.0000 |
| 59539 | 280,391.36 | - |
| 59543 | 72,580.40 | - |
| 59544 | 17,445.79 | - |
| 59546 | 16,167,622.56 | 1,145,945.0000 |
| 59547 | 1,625,128.96 | 317,408.0000 |
| **Total** | **4,432** | **$156,369,212.13** | **19,701,302.4986** |

**EXHIBIT C**

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street - Suite 205
Media, PA  19063

Phone (866) 274-4004
Fax (610) 565-7985

Email: info@strategicclaims.net

## DEFICIENCY NOTICE

**CONTROL#:**   27                                      **January 9, 2025**

**AcctNum:**

A review of your claim has revealed some incomplete or missing information.  In order to assist you in completing the claims process, the information required to process your claim has been noted below:

| Description: | Shares: |
| --- | --- |
| Documentation* was not provided. In order to process your claim we require: (1) proof of holdings of Fortress Value Acquisition Corp. II ("FVAC") common stock held at the opening of trading on February 22, 2021; (2) any transactions of FVAC or ATI Physical Therapy, Inc. ("ATI") common stock between February 22, 2021 through January 14, 2022, inclusive; and (3) proof of holdings of ATI common stock held at the close of trading on January 14, 2022. | |

**Please call our office if you may need further clarification of this notice.**

**If you do not return these corrections and the requested information within twenty (20) calendar days from the date of this notice, your claim may be deemed ineligible to participate in the distribution of the settlement fund.**

**Note: Please supply the omitted item(s) and return the information, along with this letter, to the address above.**

*Supporting documentation would be broker confirmation slips, monthly statements, 1099's, dividend reinvestment statements,  etc . . . for (1) proof of holdings of Fortress Value Acquisition Corp. II ("FVAC") common stock held at the opening of trading on February 22, 2021; (2) any transactions of FVAC or ATI Physical Therapy, Inc. ("ATI") common stock between February 22, 2021 through January 14, 2022, inclusive; and (3) proof of holdings of ATI common stock held at the close of trading on January 14, 2022.

INADEQUATELY DOCUMENTED CLAIMS EXHIBIT D

| Claim # | Rejection Reason |
| --- | --- |
| 13 | INADEQUATELY DOCUMENTED CLAIM |
| 18 | INADEQUATELY DOCUMENTED CLAIM |
| 27 | INADEQUATELY DOCUMENTED CLAIM |
| 44 | INADEQUATELY DOCUMENTED CLAIM |
| 88 | INADEQUATELY DOCUMENTED CLAIM |
| 97 | INADEQUATELY DOCUMENTED CLAIM |
| 100 | INADEQUATELY DOCUMENTED CLAIM |
| 101 | INADEQUATELY DOCUMENTED CLAIM |
| 102 | INADEQUATELY DOCUMENTED CLAIM |
| 107 | INADEQUATELY DOCUMENTED CLAIM |
| 127 | INADEQUATELY DOCUMENTED CLAIM |
| 151 | INADEQUATELY DOCUMENTED CLAIM |
| 153 | INADEQUATELY DOCUMENTED CLAIM |
| 167 | INADEQUATELY DOCUMENTED CLAIM |
| 231 | INADEQUATELY DOCUMENTED CLAIM |
| 237 | INADEQUATELY DOCUMENTED CLAIM |
| 240 | INADEQUATELY DOCUMENTED CLAIM |
| 243 | INADEQUATELY DOCUMENTED CLAIM |
| 256 | INADEQUATELY DOCUMENTED CLAIM |
| 280 | INADEQUATELY DOCUMENTED CLAIM |
| 318 | INADEQUATELY DOCUMENTED CLAIM |
| 319 | INADEQUATELY DOCUMENTED CLAIM |
| 331 | INADEQUATELY DOCUMENTED CLAIM |
| 336 | INADEQUATELY DOCUMENTED CLAIM |
| 373 | INADEQUATELY DOCUMENTED CLAIM |
| 385 | INADEQUATELY DOCUMENTED CLAIM |
| 398 | INADEQUATELY DOCUMENTED CLAIM |
| 406 | INADEQUATELY DOCUMENTED CLAIM |
| 426 | INADEQUATELY DOCUMENTED CLAIM |
| 470 | INADEQUATELY DOCUMENTED CLAIM |
| 476 | INADEQUATELY DOCUMENTED CLAIM |
| 481 | INADEQUATELY DOCUMENTED CLAIM |
| 482 | INADEQUATELY DOCUMENTED CLAIM |
| 496 | INADEQUATELY DOCUMENTED CLAIM |
| 546 | INADEQUATELY DOCUMENTED CLAIM |
| 584 | INADEQUATELY DOCUMENTED CLAIM |
| 586 | INADEQUATELY DOCUMENTED CLAIM |

**Total** 37

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 8 | NO RECOGNIZED LOSSES |
| 15 | WRONG STOCK |
| 21 | PURCHASED OUTSIDE CLASS PERIOD |
| 28 | NO RECOGNIZED LOSSES |
| 36 | DUPLICATE CLAIM FILED |
| 43 | DUPLICATE CLAIM FILED |
| 89 | DUPLICATE CLAIM FILED |
| 133 | NO RECOGNIZED LOSSES |
| 137 | DUPLICATE CLAIM FILED |
| 139 | NO RECOGNIZED LOSSES |
| 142 | DUPLICATE CLAIM FILED |
| 143 | CLAIM WITHDRAWN |
| 145 | NO RECOGNIZED LOSSES |
| 159 | PURCHASED OUTSIDE CLASS PERIOD |
| 160 | PURCHASED OUTSIDE CLASS PERIOD |
| 161 | PURCHASED OUTSIDE CLASS PERIOD |
| 162 | PURCHASED OUTSIDE CLASS PERIOD |
| 163 | PURCHASED OUTSIDE CLASS PERIOD |
| 164 | PURCHASED OUTSIDE CLASS PERIOD |
| 170 | CLAIM FILED BY EXCLUDED PARTY |
| 176 | NO RECOGNIZED LOSSES |
| 178 | PURCHASED OUTSIDE CLASS PERIOD |
| 214 | CLAIM FILED BY EXCLUDED PARTY |
| 219 | NO RECOGNIZED LOSSES |
| 220 | CLAIM FILED BY EXCLUDED PARTY |
| 221 | CLAIM FILED BY EXCLUDED PARTY |
| 222 | CLAIM FILED BY EXCLUDED PARTY |
| 226 | NO RECOGNIZED LOSSES |
| 227 | CLAIM FILED BY EXCLUDED PARTY |
| 228 | CLAIM FILED BY EXCLUDED PARTY |
| 229 | CLAIM FILED BY EXCLUDED PARTY |
| 235 | FRAUDULENT CLAIM |
| 242 | FRAUDULENT CLAIM |
| 245 | FRAUDULENT CLAIM |
| 250 | PURCHASED OUTSIDE CLASS PERIOD |
| 253 | DUPLICATE CLAIM FILED |
| 255 | FRAUDULENT CLAIM |
| 263 | PURCHASED OUTSIDE CLASS PERIOD |
| 265 | NO RECOGNIZED LOSSES |
| 266 | FRAUDULENT CLAIM |
| 268 | FRAUDULENT CLAIM |
| 269 | FRAUDULENT CLAIM |
| 270 | FRAUDULENT CLAIM |
| 271 | FRAUDULENT CLAIM |
| 274 | PURCHASED OUTSIDE CLASS PERIOD |
| 275 | FRAUDULENT CLAIM |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 277 | CLAIM FILED BY EXCLUDED PARTY |
| 281 | FRAUDULENT CLAIM |
| 287 | FRAUDULENT CLAIM |
| 289 | FRAUDULENT CLAIM |
| 294 | FRAUDULENT CLAIM |
| 298 | FRAUDULENT CLAIM |
| 302 | FRAUDULENT CLAIM |
| 305 | CLAIM FILED BY EXCLUDED PARTY |
| 326 | NO RECOGNIZED LOSSES |
| 327 | NO RECOGNIZED LOSSES |
| 339 | WRONG STOCK |
| 346 | WRONG STOCK |
| 362 | PURCHASED OUTSIDE CLASS PERIOD |
| 379 | PURCHASED OUTSIDE CLASS PERIOD |
| 397 | PURCHASED OUTSIDE CLASS PERIOD |
| 401 | PURCHASED OUTSIDE CLASS PERIOD |
| 402 | PURCHASED OUTSIDE CLASS PERIOD |
| 409 | NO RECOGNIZED LOSSES |
| 415 | PURCHASED OUTSIDE CLASS PERIOD |
| 418 | WRONG STOCK |
| 425 | PURCHASED OUTSIDE CLASS PERIOD |
| 428 | NO RECOGNIZED LOSSES |
| 437 | NO RECOGNIZED LOSSES |
| 438 | NO RECOGNIZED LOSSES |
| 447 | NO RECOGNIZED LOSSES |
| 459 | NO RECOGNIZED LOSSES |
| 460 | NO RECOGNIZED LOSSES |
| 462 | WRONG STOCK |
| 472 | NO RECOGNIZED LOSSES |
| 479 | NO RECOGNIZED LOSSES |
| 489 | NO RECOGNIZED LOSSES |
| 497 | PURCHASED OUTSIDE CLASS PERIOD |
| 499 | NO RECOGNIZED LOSSES |
| 516 | NO RECOGNIZED LOSSES |
| 518 | PURCHASED OUTSIDE CLASS PERIOD |
| 547 | NO RECOGNIZED LOSSES |
| 555 | CLAIM FILED BY EXCLUDED PARTY |
| 565 | CLAIM FILED BY EXCLUDED PARTY |
| 566 | CLAIM FILED BY EXCLUDED PARTY |
| 50001 | SHARES NOT PURCHASED |
| 50004 | NO RECOGNIZED LOSSES |
| 50005 | NO RECOGNIZED LOSSES |
| 50006 | CLAIM FILED BY EXCLUDED PARTY |
| 50015 | NO RECOGNIZED LOSSES |
| 50016 | NO RECOGNIZED LOSSES |
| 50017 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 50018 | NO RECOGNIZED LOSSES |
| 50020 | NO RECOGNIZED LOSSES |
| 50021 | NO RECOGNIZED LOSSES |
| 50022 | NO RECOGNIZED LOSSES |
| 50023 | NO RECOGNIZED LOSSES |
| 50024 | SHARES SOLD SHORT |
| 50025 | SHARES SOLD SHORT |
| 50026 | SHARES SOLD SHORT |
| 50027 | SHARES SOLD SHORT |
| 50028 | PURCHASED OUTSIDE CLASS PERIOD |
| 50029 | SHARES SOLD SHORT |
| 50030 | NO RECOGNIZED LOSSES |
| 50032 | NO RECOGNIZED LOSSES |
| 50034 | NO RECOGNIZED LOSSES |
| 50038 | NO RECOGNIZED LOSSES |
| 50039 | NO RECOGNIZED LOSSES |
| 50040 | NO RECOGNIZED LOSSES |
| 50042 | SHARES SOLD SHORT |
| 50043 | NO RECOGNIZED LOSSES |
| 50044 | SHARES SOLD SHORT |
| 50050 | NO RECOGNIZED LOSSES |
| 50051 | NO RECOGNIZED LOSSES |
| 50052 | NO RECOGNIZED LOSSES |
| 50053 | NO RECOGNIZED LOSSES |
| 50054 | NO RECOGNIZED LOSSES |
| 50057 | NO RECOGNIZED LOSSES |
| 50060 | NO RECOGNIZED LOSSES |
| 50061 | NO RECOGNIZED LOSSES |
| 50062 | NO RECOGNIZED LOSSES |
| 50064 | NO RECOGNIZED LOSSES |
| 50066 | NO RECOGNIZED LOSSES |
| 50067 | DUPLICATE CLAIM FILED |
| 50069 | SHARES SOLD SHORT |
| 50070 | NO RECOGNIZED LOSSES |
| 50073 | NO RECOGNIZED LOSSES |
| 50074 | NO RECOGNIZED LOSSES |
| 50075 | NO RECOGNIZED LOSSES |
| 50078 | PURCHASED OUTSIDE CLASS PERIOD |
| 50079 | SHARES SOLD SHORT |
| 50080 | NO RECOGNIZED LOSSES |
| 50081 | NO RECOGNIZED LOSSES |
| 50083 | NO RECOGNIZED LOSSES |
| 50084 | NO RECOGNIZED LOSSES |
| 50085 | NO RECOGNIZED LOSSES |
| 50096 | SHARES NOT PURCHASED |
| 50097 | SHARES SOLD SHORT |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 50100 | NO RECOGNIZED LOSSES |
| 50101 | NO RECOGNIZED LOSSES |
| 50107 | NO RECOGNIZED LOSSES |
| 50108 | PURCHASED OUTSIDE CLASS PERIOD |
| 50109 | SHARES SOLD SHORT |
| 50110 | SHARES SOLD SHORT |
| 50111 | SHARES SOLD SHORT |
| 50112 | PURCHASED OUTSIDE CLASS PERIOD |
| 50113 | PURCHASED OUTSIDE CLASS PERIOD |
| 50115 | SHARES SOLD SHORT |
| 50118 | SHARES SOLD SHORT |
| 50119 | SHARES SOLD SHORT |
| 50120 | NO RECOGNIZED LOSSES |
| 50122 | SHARES NOT PURCHASED |
| 50139 | NO RECOGNIZED LOSSES |
| 50140 | PURCHASED OUTSIDE CLASS PERIOD |
| 50141 | SHARES SOLD SHORT |
| 50143 | PURCHASED OUTSIDE CLASS PERIOD |
| 50144 | PURCHASED OUTSIDE CLASS PERIOD |
| 50146 | PURCHASED OUTSIDE CLASS PERIOD |
| 50147 | NO RECOGNIZED LOSSES |
| 50149 | PURCHASED OUTSIDE CLASS PERIOD |
| 50151 | SHARES SOLD SHORT |
| 50154 | NO RECOGNIZED LOSSES |
| 50155 | PURCHASED OUTSIDE CLASS PERIOD |
| 50156 | NO RECOGNIZED LOSSES |
| 50157 | NO RECOGNIZED LOSSES |
| 50158 | PURCHASED OUTSIDE CLASS PERIOD |
| 50159 | PURCHASED OUTSIDE CLASS PERIOD |
| 50161 | NO RECOGNIZED LOSSES |
| 50162 | PURCHASED OUTSIDE CLASS PERIOD |
| 50163 | NO RECOGNIZED LOSSES |
| 50164 | NO RECOGNIZED LOSSES |
| 50166 | NO RECOGNIZED LOSSES |
| 50167 | PURCHASED OUTSIDE CLASS PERIOD |
| 50168 | PURCHASED OUTSIDE CLASS PERIOD |
| 50169 | PURCHASED OUTSIDE CLASS PERIOD |
| 50172 | PURCHASED OUTSIDE CLASS PERIOD |
| 50173 | PURCHASED OUTSIDE CLASS PERIOD |
| 50176 | PURCHASED OUTSIDE CLASS PERIOD |
| 50177 | NO RECOGNIZED LOSSES |
| 50178 | NO RECOGNIZED LOSSES |
| 50181 | PURCHASED OUTSIDE CLASS PERIOD |
| 50185 | NO RECOGNIZED LOSSES |
| 50189 | PURCHASED OUTSIDE CLASS PERIOD |
| 50190 | SHARES SOLD SHORT |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 50191 | NO RECOGNIZED LOSSES |
| 50195 | PURCHASED OUTSIDE CLASS PERIOD |
| 50196 | PURCHASED OUTSIDE CLASS PERIOD |
| 50197 | NO RECOGNIZED LOSSES |
| 50198 | NO RECOGNIZED LOSSES |
| 50201 | PURCHASED OUTSIDE CLASS PERIOD |
| 50202 | PURCHASED OUTSIDE CLASS PERIOD |
| 50203 | PURCHASED OUTSIDE CLASS PERIOD |
| 50204 | PURCHASED OUTSIDE CLASS PERIOD |
| 50206 | NO RECOGNIZED LOSSES |
| 50207 | PURCHASED OUTSIDE CLASS PERIOD |
| 50208 | SHARES SOLD SHORT |
| 50209 | PURCHASED OUTSIDE CLASS PERIOD |
| 50212 | PURCHASED OUTSIDE CLASS PERIOD |
| 50216 | PURCHASED OUTSIDE CLASS PERIOD |
| 50217 | PURCHASED OUTSIDE CLASS PERIOD |
| 50218 | PURCHASED OUTSIDE CLASS PERIOD |
| 50219 | PURCHASED OUTSIDE CLASS PERIOD |
| 50221 | PURCHASED OUTSIDE CLASS PERIOD |
| 50222 | NO RECOGNIZED LOSSES |
| 50223 | PURCHASED OUTSIDE CLASS PERIOD |
| 50224 | PURCHASED OUTSIDE CLASS PERIOD |
| 50230 | PURCHASED OUTSIDE CLASS PERIOD |
| 50231 | PURCHASED OUTSIDE CLASS PERIOD |
| 50232 | NO RECOGNIZED LOSSES |
| 50233 | PURCHASED OUTSIDE CLASS PERIOD |
| 50234 | PURCHASED OUTSIDE CLASS PERIOD |
| 50235 | NO RECOGNIZED LOSSES |
| 50236 | PURCHASED OUTSIDE CLASS PERIOD |
| 50238 | PURCHASED OUTSIDE CLASS PERIOD |
| 50240 | PURCHASED OUTSIDE CLASS PERIOD |
| 50244 | PURCHASED OUTSIDE CLASS PERIOD |
| 50245 | PURCHASED OUTSIDE CLASS PERIOD |
| 50247 | PURCHASED OUTSIDE CLASS PERIOD |
| 50248 | NO RECOGNIZED LOSSES |
| 50252 | PURCHASED OUTSIDE CLASS PERIOD |
| 50253 | PURCHASED OUTSIDE CLASS PERIOD |
| 50254 | NO RECOGNIZED LOSSES |
| 50255 | PURCHASED OUTSIDE CLASS PERIOD |
| 50257 | NO RECOGNIZED LOSSES |
| 50258 | PURCHASED OUTSIDE CLASS PERIOD |
| 50259 | PURCHASED OUTSIDE CLASS PERIOD |
| 50260 | PURCHASED OUTSIDE CLASS PERIOD |
| 50261 | PURCHASED OUTSIDE CLASS PERIOD |
| 50265 | PURCHASED OUTSIDE CLASS PERIOD |
| 50268 | SHARES SOLD SHORT |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 50269 | SHARES SOLD SHORT |
| 50272 | NO RECOGNIZED LOSSES |
| 50273 | SHARES SOLD SHORT |
| 50274 | NO RECOGNIZED LOSSES |
| 50276 | NO RECOGNIZED LOSSES |
| 50277 | NO RECOGNIZED LOSSES |
| 50286 | NO RECOGNIZED LOSSES |
| 50287 | PURCHASED OUTSIDE CLASS PERIOD |
| 50289 | PURCHASED OUTSIDE CLASS PERIOD |
| 50291 | NO RECOGNIZED LOSSES |
| 50292 | PURCHASED OUTSIDE CLASS PERIOD |
| 50293 | PURCHASED OUTSIDE CLASS PERIOD |
| 50294 | PURCHASED OUTSIDE CLASS PERIOD |
| 50295 | NO RECOGNIZED LOSSES |
| 50297 | PURCHASED OUTSIDE CLASS PERIOD |
| 50298 | PURCHASED OUTSIDE CLASS PERIOD |
| 50299 | NO RECOGNIZED LOSSES |
| 50300 | NO RECOGNIZED LOSSES |
| 50301 | NO RECOGNIZED LOSSES |
| 50302 | NO RECOGNIZED LOSSES |
| 50303 | NO RECOGNIZED LOSSES |
| 50304 | NO RECOGNIZED LOSSES |
| 50305 | NO RECOGNIZED LOSSES |
| 50306 | PURCHASED OUTSIDE CLASS PERIOD |
| 50307 | PURCHASED OUTSIDE CLASS PERIOD |
| 50308 | PURCHASED OUTSIDE CLASS PERIOD |
| 50309 | PURCHASED OUTSIDE CLASS PERIOD |
| 50310 | PURCHASED OUTSIDE CLASS PERIOD |
| 50311 | PURCHASED OUTSIDE CLASS PERIOD |
| 50312 | PURCHASED OUTSIDE CLASS PERIOD |
| 50313 | PURCHASED OUTSIDE CLASS PERIOD |
| 50315 | PURCHASED OUTSIDE CLASS PERIOD |
| 50316 | PURCHASED OUTSIDE CLASS PERIOD |
| 50317 | NO RECOGNIZED LOSSES |
| 50318 | PURCHASED OUTSIDE CLASS PERIOD |
| 50319 | NO RECOGNIZED LOSSES |
| 50320 | PURCHASED OUTSIDE CLASS PERIOD |
| 50321 | PURCHASED OUTSIDE CLASS PERIOD |
| 50322 | NO RECOGNIZED LOSSES |
| 50323 | PURCHASED OUTSIDE CLASS PERIOD |
| 50324 | PURCHASED OUTSIDE CLASS PERIOD |
| 50325 | PURCHASED OUTSIDE CLASS PERIOD |
| 50327 | NO RECOGNIZED LOSSES |
| 50328 | NO RECOGNIZED LOSSES |
| 50329 | NO RECOGNIZED LOSSES |
| 50331 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 50332 | PURCHASED OUTSIDE CLASS PERIOD |
| 50333 | PURCHASED OUTSIDE CLASS PERIOD |
| 50335 | PURCHASED OUTSIDE CLASS PERIOD |
| 50337 | PURCHASED OUTSIDE CLASS PERIOD |
| 50339 | PURCHASED OUTSIDE CLASS PERIOD |
| 50340 | PURCHASED OUTSIDE CLASS PERIOD |
| 50341 | NO RECOGNIZED LOSSES |
| 50343 | PURCHASED OUTSIDE CLASS PERIOD |
| 50345 | PURCHASED OUTSIDE CLASS PERIOD |
| 50346 | NO RECOGNIZED LOSSES |
| 50347 | SHARES SOLD SHORT |
| 50348 | PURCHASED OUTSIDE CLASS PERIOD |
| 50350 | PURCHASED OUTSIDE CLASS PERIOD |
| 50351 | PURCHASED OUTSIDE CLASS PERIOD |
| 50353 | PURCHASED OUTSIDE CLASS PERIOD |
| 50354 | PURCHASED OUTSIDE CLASS PERIOD |
| 50355 | PURCHASED OUTSIDE CLASS PERIOD |
| 50356 | PURCHASED OUTSIDE CLASS PERIOD |
| 50357 | PURCHASED OUTSIDE CLASS PERIOD |
| 50358 | NO RECOGNIZED LOSSES |
| 50359 | PURCHASED OUTSIDE CLASS PERIOD |
| 50360 | PURCHASED OUTSIDE CLASS PERIOD |
| 50362 | PURCHASED OUTSIDE CLASS PERIOD |
| 50363 | PURCHASED OUTSIDE CLASS PERIOD |
| 50364 | NO RECOGNIZED LOSSES |
| 50366 | PURCHASED OUTSIDE CLASS PERIOD |
| 50369 | PURCHASED OUTSIDE CLASS PERIOD |
| 50370 | PURCHASED OUTSIDE CLASS PERIOD |
| 50371 | PURCHASED OUTSIDE CLASS PERIOD |
| 50375 | PURCHASED OUTSIDE CLASS PERIOD |
| 50377 | PURCHASED OUTSIDE CLASS PERIOD |
| 50378 | PURCHASED OUTSIDE CLASS PERIOD |
| 50379 | PURCHASED OUTSIDE CLASS PERIOD |
| 50380 | PURCHASED OUTSIDE CLASS PERIOD |
| 50381 | PURCHASED OUTSIDE CLASS PERIOD |
| 50382 | NO RECOGNIZED LOSSES |
| 50383 | PURCHASED OUTSIDE CLASS PERIOD |
| 50386 | NO RECOGNIZED LOSSES |
| 50387 | NO RECOGNIZED LOSSES |
| 50388 | NO RECOGNIZED LOSSES |
| 50390 | PURCHASED OUTSIDE CLASS PERIOD |
| 50392 | PURCHASED OUTSIDE CLASS PERIOD |
| 50395 | NO RECOGNIZED LOSSES |
| 50396 | PURCHASED OUTSIDE CLASS PERIOD |
| 50398 | NO RECOGNIZED LOSSES |
| 50399 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---------|------------------|
| 50402 | NO RECOGNIZED LOSSES |
| 50403 | NO RECOGNIZED LOSSES |
| 50404 | SHARES SOLD SHORT |
| 50405 | NO RECOGNIZED LOSSES |
| 50406 | PURCHASED OUTSIDE CLASS PERIOD |
| 50407 | SHARES SOLD SHORT |
| 50408 | NO RECOGNIZED LOSSES |
| 50411 | PURCHASED OUTSIDE CLASS PERIOD |
| 50413 | PURCHASED OUTSIDE CLASS PERIOD |
| 50414 | NO RECOGNIZED LOSSES |
| 50416 | PURCHASED OUTSIDE CLASS PERIOD |
| 50417 | PURCHASED OUTSIDE CLASS PERIOD |
| 50418 | NO RECOGNIZED LOSSES |
| 50419 | PURCHASED OUTSIDE CLASS PERIOD |
| 50420 | NO RECOGNIZED LOSSES |
| 50421 | NO RECOGNIZED LOSSES |
| 50422 | PURCHASED OUTSIDE CLASS PERIOD |
| 50423 | NO RECOGNIZED LOSSES |
| 50424 | NO RECOGNIZED LOSSES |
| 50425 | NO RECOGNIZED LOSSES |
| 50426 | PURCHASED OUTSIDE CLASS PERIOD |
| 50427 | PURCHASED OUTSIDE CLASS PERIOD |
| 50428 | NO RECOGNIZED LOSSES |
| 50429 | PURCHASED OUTSIDE CLASS PERIOD |
| 50430 | PURCHASED OUTSIDE CLASS PERIOD |
| 50431 | PURCHASED OUTSIDE CLASS PERIOD |
| 50432 | PURCHASED OUTSIDE CLASS PERIOD |
| 50433 | NO RECOGNIZED LOSSES |
| 50434 | PURCHASED OUTSIDE CLASS PERIOD |
| 50435 | NO RECOGNIZED LOSSES |
| 50437 | PURCHASED OUTSIDE CLASS PERIOD |
| 50438 | SHARES SOLD SHORT |
| 50439 | PURCHASED OUTSIDE CLASS PERIOD |
| 50440 | NO RECOGNIZED LOSSES |
| 50441 | PURCHASED OUTSIDE CLASS PERIOD |
| 50443 | PURCHASED OUTSIDE CLASS PERIOD |
| 50444 | PURCHASED OUTSIDE CLASS PERIOD |
| 50445 | PURCHASED OUTSIDE CLASS PERIOD |
| 50446 | NO RECOGNIZED LOSSES |
| 50449 | PURCHASED OUTSIDE CLASS PERIOD |
| 50450 | PURCHASED OUTSIDE CLASS PERIOD |
| 50451 | PURCHASED OUTSIDE CLASS PERIOD |
| 50453 | PURCHASED OUTSIDE CLASS PERIOD |
| 50454 | PURCHASED OUTSIDE CLASS PERIOD |
| 50455 | PURCHASED OUTSIDE CLASS PERIOD |
| 50456 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---------|------------------|
| 50457 | PURCHASED OUTSIDE CLASS PERIOD |
| 50458 | PURCHASED OUTSIDE CLASS PERIOD |
| 50460 | PURCHASED OUTSIDE CLASS PERIOD |
| 50463 | PURCHASED OUTSIDE CLASS PERIOD |
| 50464 | PURCHASED OUTSIDE CLASS PERIOD |
| 50465 | PURCHASED OUTSIDE CLASS PERIOD |
| 50466 | NO RECOGNIZED LOSSES |
| 50467 | NO RECOGNIZED LOSSES |
| 50470 | NO RECOGNIZED LOSSES |
| 50471 | NO RECOGNIZED LOSSES |
| 50481 | PURCHASED OUTSIDE CLASS PERIOD |
| 50482 | PURCHASED OUTSIDE CLASS PERIOD |
| 50483 | NO RECOGNIZED LOSSES |
| 50484 | PURCHASED OUTSIDE CLASS PERIOD |
| 50485 | PURCHASED OUTSIDE CLASS PERIOD |
| 50486 | PURCHASED OUTSIDE CLASS PERIOD |
| 50487 | PURCHASED OUTSIDE CLASS PERIOD |
| 50490 | PURCHASED OUTSIDE CLASS PERIOD |
| 50492 | PURCHASED OUTSIDE CLASS PERIOD |
| 50493 | PURCHASED OUTSIDE CLASS PERIOD |
| 50494 | NO RECOGNIZED LOSSES |
| 50498 | NO RECOGNIZED LOSSES |
| 50499 | PURCHASED OUTSIDE CLASS PERIOD |
| 50501 | PURCHASED OUTSIDE CLASS PERIOD |
| 50502 | PURCHASED OUTSIDE CLASS PERIOD |
| 50503 | NO RECOGNIZED LOSSES |
| 50504 | NO RECOGNIZED LOSSES |
| 50505 | PURCHASED OUTSIDE CLASS PERIOD |
| 50506 | PURCHASED OUTSIDE CLASS PERIOD |
| 50507 | PURCHASED OUTSIDE CLASS PERIOD |
| 50508 | PURCHASED OUTSIDE CLASS PERIOD |
| 50509 | PURCHASED OUTSIDE CLASS PERIOD |
| 50510 | PURCHASED OUTSIDE CLASS PERIOD |
| 50511 | PURCHASED OUTSIDE CLASS PERIOD |
| 50512 | PURCHASED OUTSIDE CLASS PERIOD |
| 50513 | PURCHASED OUTSIDE CLASS PERIOD |
| 50514 | PURCHASED OUTSIDE CLASS PERIOD |
| 50515 | SHARES SOLD SHORT |
| 50516 | PURCHASED OUTSIDE CLASS PERIOD |
| 50517 | PURCHASED OUTSIDE CLASS PERIOD |
| 50518 | PURCHASED OUTSIDE CLASS PERIOD |
| 50519 | PURCHASED OUTSIDE CLASS PERIOD |
| 50520 | PURCHASED OUTSIDE CLASS PERIOD |
| 50521 | PURCHASED OUTSIDE CLASS PERIOD |
| 50522 | PURCHASED OUTSIDE CLASS PERIOD |
| 50523 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

| Claim # | Rejection Reason |
|---|---|
| 50524 | PURCHASED OUTSIDE CLASS PERIOD |
| 50525 | PURCHASED OUTSIDE CLASS PERIOD |
| 50526 | PURCHASED OUTSIDE CLASS PERIOD |
| 50527 | PURCHASED OUTSIDE CLASS PERIOD |
| 50528 | PURCHASED OUTSIDE CLASS PERIOD |
| 50529 | PURCHASED OUTSIDE CLASS PERIOD |
| 50530 | PURCHASED OUTSIDE CLASS PERIOD |
| 50531 | PURCHASED OUTSIDE CLASS PERIOD |
| 50532 | PURCHASED OUTSIDE CLASS PERIOD |
| 50533 | NO RECOGNIZED LOSSES |
| 50534 | PURCHASED OUTSIDE CLASS PERIOD |
| 50535 | PURCHASED OUTSIDE CLASS PERIOD |
| 50536 | PURCHASED OUTSIDE CLASS PERIOD |
| 50537 | PURCHASED OUTSIDE CLASS PERIOD |
| 50538 | PURCHASED OUTSIDE CLASS PERIOD |
| 50539 | PURCHASED OUTSIDE CLASS PERIOD |
| 50540 | PURCHASED OUTSIDE CLASS PERIOD |
| 50541 | PURCHASED OUTSIDE CLASS PERIOD |
| 50542 | PURCHASED OUTSIDE CLASS PERIOD |
| 50543 | PURCHASED OUTSIDE CLASS PERIOD |
| 50544 | PURCHASED OUTSIDE CLASS PERIOD |
| 50545 | PURCHASED OUTSIDE CLASS PERIOD |
| 50546 | SHARES SOLD SHORT |
| 50547 | PURCHASED OUTSIDE CLASS PERIOD |
| 50548 | PURCHASED OUTSIDE CLASS PERIOD |
| 50549 | NO RECOGNIZED LOSSES |
| 50550 | PURCHASED OUTSIDE CLASS PERIOD |
| 50551 | PURCHASED OUTSIDE CLASS PERIOD |
| 50552 | PURCHASED OUTSIDE CLASS PERIOD |
| 50553 | PURCHASED OUTSIDE CLASS PERIOD |
| 50554 | PURCHASED OUTSIDE CLASS PERIOD |
| 50555 | PURCHASED OUTSIDE CLASS PERIOD |
| 50556 | PURCHASED OUTSIDE CLASS PERIOD |
| 50557 | PURCHASED OUTSIDE CLASS PERIOD |
| 50558 | PURCHASED OUTSIDE CLASS PERIOD |
| 50559 | PURCHASED OUTSIDE CLASS PERIOD |
| 50560 | PURCHASED OUTSIDE CLASS PERIOD |
| 50561 | NO RECOGNIZED LOSSES |
| 50562 | PURCHASED OUTSIDE CLASS PERIOD |
| 50563 | PURCHASED OUTSIDE CLASS PERIOD |
| 50564 | PURCHASED OUTSIDE CLASS PERIOD |
| 50565 | NO RECOGNIZED LOSSES |
| 50566 | PURCHASED OUTSIDE CLASS PERIOD |
| 50567 | PURCHASED OUTSIDE CLASS PERIOD |
| 50568 | PURCHASED OUTSIDE CLASS PERIOD |
| 50569 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

| Claim # | Rejection Reason |
|---|---|
| 50570 | PURCHASED OUTSIDE CLASS PERIOD |
| 50571 | PURCHASED OUTSIDE CLASS PERIOD |
| 50572 | PURCHASED OUTSIDE CLASS PERIOD |
| 50573 | PURCHASED OUTSIDE CLASS PERIOD |
| 50574 | PURCHASED OUTSIDE CLASS PERIOD |
| 50575 | PURCHASED OUTSIDE CLASS PERIOD |
| 50576 | SHARES SOLD SHORT |
| 50577 | PURCHASED OUTSIDE CLASS PERIOD |
| 50578 | PURCHASED OUTSIDE CLASS PERIOD |
| 50579 | SHARES SOLD SHORT |
| 50580 | PURCHASED OUTSIDE CLASS PERIOD |
| 50581 | PURCHASED OUTSIDE CLASS PERIOD |
| 50582 | PURCHASED OUTSIDE CLASS PERIOD |
| 50583 | PURCHASED OUTSIDE CLASS PERIOD |
| 50584 | SHARES SOLD SHORT |
| 50585 | PURCHASED OUTSIDE CLASS PERIOD |
| 50586 | PURCHASED OUTSIDE CLASS PERIOD |
| 50587 | PURCHASED OUTSIDE CLASS PERIOD |
| 50588 | SHARES SOLD SHORT |
| 50589 | PURCHASED OUTSIDE CLASS PERIOD |
| 50590 | PURCHASED OUTSIDE CLASS PERIOD |
| 50591 | PURCHASED OUTSIDE CLASS PERIOD |
| 50592 | PURCHASED OUTSIDE CLASS PERIOD |
| 50593 | PURCHASED OUTSIDE CLASS PERIOD |
| 50594 | PURCHASED OUTSIDE CLASS PERIOD |
| 50595 | PURCHASED OUTSIDE CLASS PERIOD |
| 50596 | PURCHASED OUTSIDE CLASS PERIOD |
| 50597 | PURCHASED OUTSIDE CLASS PERIOD |
| 50598 | PURCHASED OUTSIDE CLASS PERIOD |
| 50599 | PURCHASED OUTSIDE CLASS PERIOD |
| 50600 | PURCHASED OUTSIDE CLASS PERIOD |
| 50601 | SHARES SOLD SHORT |
| 50602 | PURCHASED OUTSIDE CLASS PERIOD |
| 50603 | PURCHASED OUTSIDE CLASS PERIOD |
| 50604 | SHARES SOLD SHORT |
| 50605 | PURCHASED OUTSIDE CLASS PERIOD |
| 50606 | PURCHASED OUTSIDE CLASS PERIOD |
| 50607 | PURCHASED OUTSIDE CLASS PERIOD |
| 50608 | PURCHASED OUTSIDE CLASS PERIOD |
| 50609 | PURCHASED OUTSIDE CLASS PERIOD |
| 50610 | PURCHASED OUTSIDE CLASS PERIOD |
| 50611 | SHARES SOLD SHORT |
| 50612 | PURCHASED OUTSIDE CLASS PERIOD |
| 50613 | PURCHASED OUTSIDE CLASS PERIOD |
| 50614 | PURCHASED OUTSIDE CLASS PERIOD |
| 50615 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---------|------------------|
| 50616 | PURCHASED OUTSIDE CLASS PERIOD |
| 50617 | SHARES SOLD SHORT |
| 50618 | SHARES SOLD SHORT |
| 50619 | PURCHASED OUTSIDE CLASS PERIOD |
| 50620 | PURCHASED OUTSIDE CLASS PERIOD |
| 50621 | PURCHASED OUTSIDE CLASS PERIOD |
| 50622 | PURCHASED OUTSIDE CLASS PERIOD |
| 50623 | PURCHASED OUTSIDE CLASS PERIOD |
| 50624 | PURCHASED OUTSIDE CLASS PERIOD |
| 50625 | NO RECOGNIZED LOSSES |
| 50626 | PURCHASED OUTSIDE CLASS PERIOD |
| 50627 | PURCHASED OUTSIDE CLASS PERIOD |
| 50628 | PURCHASED OUTSIDE CLASS PERIOD |
| 50629 | PURCHASED OUTSIDE CLASS PERIOD |
| 50630 | PURCHASED OUTSIDE CLASS PERIOD |
| 50631 | PURCHASED OUTSIDE CLASS PERIOD |
| 50632 | PURCHASED OUTSIDE CLASS PERIOD |
| 50633 | PURCHASED OUTSIDE CLASS PERIOD |
| 50635 | PURCHASED OUTSIDE CLASS PERIOD |
| 50636 | PURCHASED OUTSIDE CLASS PERIOD |
| 50637 | PURCHASED OUTSIDE CLASS PERIOD |
| 50638 | PURCHASED OUTSIDE CLASS PERIOD |
| 50639 | NO RECOGNIZED LOSSES |
| 50640 | NO RECOGNIZED LOSSES |
| 50641 | NO RECOGNIZED LOSSES |
| 50642 | NO RECOGNIZED LOSSES |
| 50643 | PURCHASED OUTSIDE CLASS PERIOD |
| 50644 | NO RECOGNIZED LOSSES |
| 50645 | NO RECOGNIZED LOSSES |
| 50657 | NO RECOGNIZED LOSSES |
| 50658 | NO RECOGNIZED LOSSES |
| 50660 | NO RECOGNIZED LOSSES |
| 50665 | PURCHASED OUTSIDE CLASS PERIOD |
| 50669 | NO RECOGNIZED LOSSES |
| 50672 | PURCHASED OUTSIDE CLASS PERIOD |
| 50673 | PURCHASED OUTSIDE CLASS PERIOD |
| 50675 | PURCHASED OUTSIDE CLASS PERIOD |
| 50676 | NO RECOGNIZED LOSSES |
| 50677 | NO RECOGNIZED LOSSES |
| 50678 | PURCHASED OUTSIDE CLASS PERIOD |
| 50681 | PURCHASED OUTSIDE CLASS PERIOD |
| 50682 | NO RECOGNIZED LOSSES |
| 50685 | PURCHASED OUTSIDE CLASS PERIOD |
| 50686 | PURCHASED OUTSIDE CLASS PERIOD |
| 50687 | PURCHASED OUTSIDE CLASS PERIOD |
| 50688 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 50689 | PURCHASED OUTSIDE CLASS PERIOD |
| 50690 | PURCHASED OUTSIDE CLASS PERIOD |
| 50691 | PURCHASED OUTSIDE CLASS PERIOD |
| 50693 | PURCHASED OUTSIDE CLASS PERIOD |
| 50694 | PURCHASED OUTSIDE CLASS PERIOD |
| 50695 | PURCHASED OUTSIDE CLASS PERIOD |
| 50696 | PURCHASED OUTSIDE CLASS PERIOD |
| 50697 | PURCHASED OUTSIDE CLASS PERIOD |
| 50698 | PURCHASED OUTSIDE CLASS PERIOD |
| 50700 | PURCHASED OUTSIDE CLASS PERIOD |
| 50701 | PURCHASED OUTSIDE CLASS PERIOD |
| 50703 | PURCHASED OUTSIDE CLASS PERIOD |
| 50704 | PURCHASED OUTSIDE CLASS PERIOD |
| 50705 | PURCHASED OUTSIDE CLASS PERIOD |
| 50706 | PURCHASED OUTSIDE CLASS PERIOD |
| 50707 | PURCHASED OUTSIDE CLASS PERIOD |
| 50708 | PURCHASED OUTSIDE CLASS PERIOD |
| 50709 | PURCHASED OUTSIDE CLASS PERIOD |
| 50710 | PURCHASED OUTSIDE CLASS PERIOD |
| 50711 | PURCHASED OUTSIDE CLASS PERIOD |
| 50712 | PURCHASED OUTSIDE CLASS PERIOD |
| 50713 | PURCHASED OUTSIDE CLASS PERIOD |
| 50714 | PURCHASED OUTSIDE CLASS PERIOD |
| 50715 | PURCHASED OUTSIDE CLASS PERIOD |
| 50716 | PURCHASED OUTSIDE CLASS PERIOD |
| 50717 | PURCHASED OUTSIDE CLASS PERIOD |
| 50718 | PURCHASED OUTSIDE CLASS PERIOD |
| 50719 | PURCHASED OUTSIDE CLASS PERIOD |
| 50720 | PURCHASED OUTSIDE CLASS PERIOD |
| 50721 | PURCHASED OUTSIDE CLASS PERIOD |
| 50722 | PURCHASED OUTSIDE CLASS PERIOD |
| 50723 | PURCHASED OUTSIDE CLASS PERIOD |
| 50724 | PURCHASED OUTSIDE CLASS PERIOD |
| 50726 | PURCHASED OUTSIDE CLASS PERIOD |
| 50727 | PURCHASED OUTSIDE CLASS PERIOD |
| 50728 | PURCHASED OUTSIDE CLASS PERIOD |
| 50729 | PURCHASED OUTSIDE CLASS PERIOD |
| 50730 | PURCHASED OUTSIDE CLASS PERIOD |
| 50731 | PURCHASED OUTSIDE CLASS PERIOD |
| 50732 | PURCHASED OUTSIDE CLASS PERIOD |
| 50733 | PURCHASED OUTSIDE CLASS PERIOD |
| 50734 | PURCHASED OUTSIDE CLASS PERIOD |
| 50735 | PURCHASED OUTSIDE CLASS PERIOD |
| 50736 | PURCHASED OUTSIDE CLASS PERIOD |
| 50737 | PURCHASED OUTSIDE CLASS PERIOD |
| 50738 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 50739 | PURCHASED OUTSIDE CLASS PERIOD |
| 50740 | PURCHASED OUTSIDE CLASS PERIOD |
| 50741 | PURCHASED OUTSIDE CLASS PERIOD |
| 50742 | PURCHASED OUTSIDE CLASS PERIOD |
| 50743 | PURCHASED OUTSIDE CLASS PERIOD |
| 50744 | PURCHASED OUTSIDE CLASS PERIOD |
| 50745 | PURCHASED OUTSIDE CLASS PERIOD |
| 50746 | PURCHASED OUTSIDE CLASS PERIOD |
| 50747 | PURCHASED OUTSIDE CLASS PERIOD |
| 50748 | PURCHASED OUTSIDE CLASS PERIOD |
| 50749 | PURCHASED OUTSIDE CLASS PERIOD |
| 50750 | PURCHASED OUTSIDE CLASS PERIOD |
| 50751 | PURCHASED OUTSIDE CLASS PERIOD |
| 50752 | PURCHASED OUTSIDE CLASS PERIOD |
| 50753 | PURCHASED OUTSIDE CLASS PERIOD |
| 50754 | PURCHASED OUTSIDE CLASS PERIOD |
| 50755 | PURCHASED OUTSIDE CLASS PERIOD |
| 50756 | PURCHASED OUTSIDE CLASS PERIOD |
| 50757 | PURCHASED OUTSIDE CLASS PERIOD |
| 50758 | PURCHASED OUTSIDE CLASS PERIOD |
| 50759 | PURCHASED OUTSIDE CLASS PERIOD |
| 50760 | PURCHASED OUTSIDE CLASS PERIOD |
| 50761 | PURCHASED OUTSIDE CLASS PERIOD |
| 50762 | PURCHASED OUTSIDE CLASS PERIOD |
| 50763 | PURCHASED OUTSIDE CLASS PERIOD |
| 50764 | PURCHASED OUTSIDE CLASS PERIOD |
| 50765 | PURCHASED OUTSIDE CLASS PERIOD |
| 50766 | PURCHASED OUTSIDE CLASS PERIOD |
| 50767 | PURCHASED OUTSIDE CLASS PERIOD |
| 50768 | PURCHASED OUTSIDE CLASS PERIOD |
| 50769 | PURCHASED OUTSIDE CLASS PERIOD |
| 50770 | PURCHASED OUTSIDE CLASS PERIOD |
| 50771 | PURCHASED OUTSIDE CLASS PERIOD |
| 50772 | PURCHASED OUTSIDE CLASS PERIOD |
| 50773 | PURCHASED OUTSIDE CLASS PERIOD |
| 50774 | PURCHASED OUTSIDE CLASS PERIOD |
| 50775 | PURCHASED OUTSIDE CLASS PERIOD |
| 50776 | PURCHASED OUTSIDE CLASS PERIOD |
| 50777 | PURCHASED OUTSIDE CLASS PERIOD |
| 50778 | PURCHASED OUTSIDE CLASS PERIOD |
| 50779 | PURCHASED OUTSIDE CLASS PERIOD |
| 50780 | PURCHASED OUTSIDE CLASS PERIOD |
| 50781 | PURCHASED OUTSIDE CLASS PERIOD |
| 50782 | PURCHASED OUTSIDE CLASS PERIOD |
| 50783 | PURCHASED OUTSIDE CLASS PERIOD |
| 50784 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 50785 | PURCHASED OUTSIDE CLASS PERIOD |
| 50786 | PURCHASED OUTSIDE CLASS PERIOD |
| 50787 | PURCHASED OUTSIDE CLASS PERIOD |
| 50788 | PURCHASED OUTSIDE CLASS PERIOD |
| 50789 | PURCHASED OUTSIDE CLASS PERIOD |
| 50790 | PURCHASED OUTSIDE CLASS PERIOD |
| 50791 | SHARES SOLD SHORT |
| 50792 | PURCHASED OUTSIDE CLASS PERIOD |
| 50793 | PURCHASED OUTSIDE CLASS PERIOD |
| 50794 | NO RECOGNIZED LOSSES |
| 50796 | PURCHASED OUTSIDE CLASS PERIOD |
| 50797 | NO RECOGNIZED LOSSES |
| 50798 | NO RECOGNIZED LOSSES |
| 50799 | NO RECOGNIZED LOSSES |
| 50800 | NO RECOGNIZED LOSSES |
| 50801 | PURCHASED OUTSIDE CLASS PERIOD |
| 50802 | NO RECOGNIZED LOSSES |
| 50803 | NO RECOGNIZED LOSSES |
| 50804 | PURCHASED OUTSIDE CLASS PERIOD |
| 50806 | NO RECOGNIZED LOSSES |
| 50807 | PURCHASED OUTSIDE CLASS PERIOD |
| 50809 | NO RECOGNIZED LOSSES |
| 50810 | PURCHASED OUTSIDE CLASS PERIOD |
| 50811 | PURCHASED OUTSIDE CLASS PERIOD |
| 50812 | PURCHASED OUTSIDE CLASS PERIOD |
| 50815 | PURCHASED OUTSIDE CLASS PERIOD |
| 50817 | PURCHASED OUTSIDE CLASS PERIOD |
| 50818 | PURCHASED OUTSIDE CLASS PERIOD |
| 50819 | PURCHASED OUTSIDE CLASS PERIOD |
| 50820 | PURCHASED OUTSIDE CLASS PERIOD |
| 50821 | NO RECOGNIZED LOSSES |
| 50822 | PURCHASED OUTSIDE CLASS PERIOD |
| 50825 | PURCHASED OUTSIDE CLASS PERIOD |
| 50826 | PURCHASED OUTSIDE CLASS PERIOD |
| 50827 | PURCHASED OUTSIDE CLASS PERIOD |
| 50828 | PURCHASED OUTSIDE CLASS PERIOD |
| 50829 | PURCHASED OUTSIDE CLASS PERIOD |
| 50830 | PURCHASED OUTSIDE CLASS PERIOD |
| 50831 | PURCHASED OUTSIDE CLASS PERIOD |
| 50832 | PURCHASED OUTSIDE CLASS PERIOD |
| 50833 | PURCHASED OUTSIDE CLASS PERIOD |
| 50835 | PURCHASED OUTSIDE CLASS PERIOD |
| 50837 | SHARES SOLD SHORT |
| 50838 | PURCHASED OUTSIDE CLASS PERIOD |
| 50839 | PURCHASED OUTSIDE CLASS PERIOD |
| 50840 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 50841 | PURCHASED OUTSIDE CLASS PERIOD |
| 50842 | PURCHASED OUTSIDE CLASS PERIOD |
| 50843 | PURCHASED OUTSIDE CLASS PERIOD |
| 50844 | PURCHASED OUTSIDE CLASS PERIOD |
| 50845 | PURCHASED OUTSIDE CLASS PERIOD |
| 50846 | PURCHASED OUTSIDE CLASS PERIOD |
| 50847 | PURCHASED OUTSIDE CLASS PERIOD |
| 50848 | PURCHASED OUTSIDE CLASS PERIOD |
| 50849 | PURCHASED OUTSIDE CLASS PERIOD |
| 50851 | PURCHASED OUTSIDE CLASS PERIOD |
| 50853 | PURCHASED OUTSIDE CLASS PERIOD |
| 50854 | PURCHASED OUTSIDE CLASS PERIOD |
| 50855 | PURCHASED OUTSIDE CLASS PERIOD |
| 50856 | PURCHASED OUTSIDE CLASS PERIOD |
| 50858 | PURCHASED OUTSIDE CLASS PERIOD |
| 50859 | PURCHASED OUTSIDE CLASS PERIOD |
| 50860 | PURCHASED OUTSIDE CLASS PERIOD |
| 50861 | PURCHASED OUTSIDE CLASS PERIOD |
| 50862 | PURCHASED OUTSIDE CLASS PERIOD |
| 50863 | PURCHASED OUTSIDE CLASS PERIOD |
| 50864 | PURCHASED OUTSIDE CLASS PERIOD |
| 50865 | PURCHASED OUTSIDE CLASS PERIOD |
| 50866 | PURCHASED OUTSIDE CLASS PERIOD |
| 50867 | PURCHASED OUTSIDE CLASS PERIOD |
| 50868 | PURCHASED OUTSIDE CLASS PERIOD |
| 50869 | PURCHASED OUTSIDE CLASS PERIOD |
| 50870 | PURCHASED OUTSIDE CLASS PERIOD |
| 50871 | PURCHASED OUTSIDE CLASS PERIOD |
| 50872 | PURCHASED OUTSIDE CLASS PERIOD |
| 50873 | SHARES SOLD SHORT |
| 50874 | PURCHASED OUTSIDE CLASS PERIOD |
| 50875 | SHARES SOLD SHORT |
| 50876 | PURCHASED OUTSIDE CLASS PERIOD |
| 50877 | PURCHASED OUTSIDE CLASS PERIOD |
| 50878 | PURCHASED OUTSIDE CLASS PERIOD |
| 50879 | PURCHASED OUTSIDE CLASS PERIOD |
| 50880 | PURCHASED OUTSIDE CLASS PERIOD |
| 50881 | PURCHASED OUTSIDE CLASS PERIOD |
| 50882 | PURCHASED OUTSIDE CLASS PERIOD |
| 50883 | PURCHASED OUTSIDE CLASS PERIOD |
| 50884 | PURCHASED OUTSIDE CLASS PERIOD |
| 50885 | PURCHASED OUTSIDE CLASS PERIOD |
| 50886 | PURCHASED OUTSIDE CLASS PERIOD |
| 50887 | PURCHASED OUTSIDE CLASS PERIOD |
| 50888 | PURCHASED OUTSIDE CLASS PERIOD |
| 50889 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 50890 | PURCHASED OUTSIDE CLASS PERIOD |
| 50891 | PURCHASED OUTSIDE CLASS PERIOD |
| 50892 | PURCHASED OUTSIDE CLASS PERIOD |
| 50893 | PURCHASED OUTSIDE CLASS PERIOD |
| 50894 | SHARES SOLD SHORT |
| 50895 | PURCHASED OUTSIDE CLASS PERIOD |
| 50896 | PURCHASED OUTSIDE CLASS PERIOD |
| 50897 | PURCHASED OUTSIDE CLASS PERIOD |
| 50898 | PURCHASED OUTSIDE CLASS PERIOD |
| 50900 | PURCHASED OUTSIDE CLASS PERIOD |
| 50901 | PURCHASED OUTSIDE CLASS PERIOD |
| 50902 | PURCHASED OUTSIDE CLASS PERIOD |
| 50903 | PURCHASED OUTSIDE CLASS PERIOD |
| 50904 | PURCHASED OUTSIDE CLASS PERIOD |
| 50905 | PURCHASED OUTSIDE CLASS PERIOD |
| 50906 | PURCHASED OUTSIDE CLASS PERIOD |
| 50907 | PURCHASED OUTSIDE CLASS PERIOD |
| 50908 | PURCHASED OUTSIDE CLASS PERIOD |
| 50909 | PURCHASED OUTSIDE CLASS PERIOD |
| 50911 | PURCHASED OUTSIDE CLASS PERIOD |
| 50912 | PURCHASED OUTSIDE CLASS PERIOD |
| 50913 | PURCHASED OUTSIDE CLASS PERIOD |
| 50915 | PURCHASED OUTSIDE CLASS PERIOD |
| 50916 | PURCHASED OUTSIDE CLASS PERIOD |
| 50917 | PURCHASED OUTSIDE CLASS PERIOD |
| 50918 | PURCHASED OUTSIDE CLASS PERIOD |
| 50919 | PURCHASED OUTSIDE CLASS PERIOD |
| 50920 | PURCHASED OUTSIDE CLASS PERIOD |
| 50921 | PURCHASED OUTSIDE CLASS PERIOD |
| 50922 | PURCHASED OUTSIDE CLASS PERIOD |
| 50923 | PURCHASED OUTSIDE CLASS PERIOD |
| 50924 | PURCHASED OUTSIDE CLASS PERIOD |
| 50925 | PURCHASED OUTSIDE CLASS PERIOD |
| 50926 | PURCHASED OUTSIDE CLASS PERIOD |
| 50927 | SHARES SOLD SHORT |
| 50928 | PURCHASED OUTSIDE CLASS PERIOD |
| 50929 | PURCHASED OUTSIDE CLASS PERIOD |
| 50930 | PURCHASED OUTSIDE CLASS PERIOD |
| 50931 | PURCHASED OUTSIDE CLASS PERIOD |
| 50932 | PURCHASED OUTSIDE CLASS PERIOD |
| 50933 | PURCHASED OUTSIDE CLASS PERIOD |
| 50934 | PURCHASED OUTSIDE CLASS PERIOD |
| 50935 | PURCHASED OUTSIDE CLASS PERIOD |
| 50936 | PURCHASED OUTSIDE CLASS PERIOD |
| 50937 | PURCHASED OUTSIDE CLASS PERIOD |
| 50938 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 50939 | PURCHASED OUTSIDE CLASS PERIOD |
| 50940 | PURCHASED OUTSIDE CLASS PERIOD |
| 50941 | PURCHASED OUTSIDE CLASS PERIOD |
| 50942 | PURCHASED OUTSIDE CLASS PERIOD |
| 50943 | PURCHASED OUTSIDE CLASS PERIOD |
| 50944 | PURCHASED OUTSIDE CLASS PERIOD |
| 50945 | PURCHASED OUTSIDE CLASS PERIOD |
| 50946 | PURCHASED OUTSIDE CLASS PERIOD |
| 50947 | PURCHASED OUTSIDE CLASS PERIOD |
| 50948 | PURCHASED OUTSIDE CLASS PERIOD |
| 50949 | PURCHASED OUTSIDE CLASS PERIOD |
| 50950 | PURCHASED OUTSIDE CLASS PERIOD |
| 50951 | PURCHASED OUTSIDE CLASS PERIOD |
| 50952 | PURCHASED OUTSIDE CLASS PERIOD |
| 50953 | PURCHASED OUTSIDE CLASS PERIOD |
| 50954 | PURCHASED OUTSIDE CLASS PERIOD |
| 50956 | PURCHASED OUTSIDE CLASS PERIOD |
| 50957 | SHARES SOLD SHORT |
| 50958 | PURCHASED OUTSIDE CLASS PERIOD |
| 50959 | NO RECOGNIZED LOSSES |
| 50960 | SHARES SOLD SHORT |
| 50961 | PURCHASED OUTSIDE CLASS PERIOD |
| 50962 | PURCHASED OUTSIDE CLASS PERIOD |
| 50963 | PURCHASED OUTSIDE CLASS PERIOD |
| 50964 | PURCHASED OUTSIDE CLASS PERIOD |
| 50965 | PURCHASED OUTSIDE CLASS PERIOD |
| 50966 | PURCHASED OUTSIDE CLASS PERIOD |
| 50967 | PURCHASED OUTSIDE CLASS PERIOD |
| 50968 | PURCHASED OUTSIDE CLASS PERIOD |
| 50969 | PURCHASED OUTSIDE CLASS PERIOD |
| 50971 | PURCHASED OUTSIDE CLASS PERIOD |
| 50972 | PURCHASED OUTSIDE CLASS PERIOD |
| 50973 | PURCHASED OUTSIDE CLASS PERIOD |
| 50975 | PURCHASED OUTSIDE CLASS PERIOD |
| 50976 | PURCHASED OUTSIDE CLASS PERIOD |
| 50977 | PURCHASED OUTSIDE CLASS PERIOD |
| 50978 | PURCHASED OUTSIDE CLASS PERIOD |
| 50979 | PURCHASED OUTSIDE CLASS PERIOD |
| 50980 | PURCHASED OUTSIDE CLASS PERIOD |
| 50981 | PURCHASED OUTSIDE CLASS PERIOD |
| 50982 | PURCHASED OUTSIDE CLASS PERIOD |
| 50983 | PURCHASED OUTSIDE CLASS PERIOD |
| 50984 | PURCHASED OUTSIDE CLASS PERIOD |
| 50985 | PURCHASED OUTSIDE CLASS PERIOD |
| 50986 | PURCHASED OUTSIDE CLASS PERIOD |
| 50987 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

EXHIBIT E

| Claim # | Rejection Reason |
|---------|------------------|
| 50988 | PURCHASED OUTSIDE CLASS PERIOD |
| 50989 | PURCHASED OUTSIDE CLASS PERIOD |
| 50990 | PURCHASED OUTSIDE CLASS PERIOD |
| 50991 | PURCHASED OUTSIDE CLASS PERIOD |
| 50992 | PURCHASED OUTSIDE CLASS PERIOD |
| 50993 | PURCHASED OUTSIDE CLASS PERIOD |
| 50994 | PURCHASED OUTSIDE CLASS PERIOD |
| 50995 | PURCHASED OUTSIDE CLASS PERIOD |
| 50996 | PURCHASED OUTSIDE CLASS PERIOD |
| 50997 | PURCHASED OUTSIDE CLASS PERIOD |
| 50998 | PURCHASED OUTSIDE CLASS PERIOD |
| 50999 | PURCHASED OUTSIDE CLASS PERIOD |
| 51000 | PURCHASED OUTSIDE CLASS PERIOD |
| 51001 | PURCHASED OUTSIDE CLASS PERIOD |
| 51002 | PURCHASED OUTSIDE CLASS PERIOD |
| 51003 | PURCHASED OUTSIDE CLASS PERIOD |
| 51004 | PURCHASED OUTSIDE CLASS PERIOD |
| 51005 | PURCHASED OUTSIDE CLASS PERIOD |
| 51006 | PURCHASED OUTSIDE CLASS PERIOD |
| 51007 | PURCHASED OUTSIDE CLASS PERIOD |
| 51008 | PURCHASED OUTSIDE CLASS PERIOD |
| 51009 | PURCHASED OUTSIDE CLASS PERIOD |
| 51010 | PURCHASED OUTSIDE CLASS PERIOD |
| 51011 | PURCHASED OUTSIDE CLASS PERIOD |
| 51012 | PURCHASED OUTSIDE CLASS PERIOD |
| 51013 | PURCHASED OUTSIDE CLASS PERIOD |
| 51014 | PURCHASED OUTSIDE CLASS PERIOD |
| 51015 | PURCHASED OUTSIDE CLASS PERIOD |
| 51016 | PURCHASED OUTSIDE CLASS PERIOD |
| 51017 | PURCHASED OUTSIDE CLASS PERIOD |
| 51018 | PURCHASED OUTSIDE CLASS PERIOD |
| 51019 | SHARES SOLD SHORT |
| 51020 | PURCHASED OUTSIDE CLASS PERIOD |
| 51021 | PURCHASED OUTSIDE CLASS PERIOD |
| 51022 | PURCHASED OUTSIDE CLASS PERIOD |
| 51023 | PURCHASED OUTSIDE CLASS PERIOD |
| 51024 | PURCHASED OUTSIDE CLASS PERIOD |
| 51025 | PURCHASED OUTSIDE CLASS PERIOD |
| 51026 | PURCHASED OUTSIDE CLASS PERIOD |
| 51027 | PURCHASED OUTSIDE CLASS PERIOD |
| 51028 | PURCHASED OUTSIDE CLASS PERIOD |
| 51029 | PURCHASED OUTSIDE CLASS PERIOD |
| 51030 | PURCHASED OUTSIDE CLASS PERIOD |
| 51031 | PURCHASED OUTSIDE CLASS PERIOD |
| 51032 | PURCHASED OUTSIDE CLASS PERIOD |
| 51033 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 51034 | PURCHASED OUTSIDE CLASS PERIOD |
| 51035 | SHARES SOLD SHORT |
| 51036 | PURCHASED OUTSIDE CLASS PERIOD |
| 51037 | PURCHASED OUTSIDE CLASS PERIOD |
| 51038 | PURCHASED OUTSIDE CLASS PERIOD |
| 51039 | PURCHASED OUTSIDE CLASS PERIOD |
| 51040 | PURCHASED OUTSIDE CLASS PERIOD |
| 51041 | PURCHASED OUTSIDE CLASS PERIOD |
| 51042 | PURCHASED OUTSIDE CLASS PERIOD |
| 51043 | PURCHASED OUTSIDE CLASS PERIOD |
| 51044 | PURCHASED OUTSIDE CLASS PERIOD |
| 51045 | PURCHASED OUTSIDE CLASS PERIOD |
| 51046 | PURCHASED OUTSIDE CLASS PERIOD |
| 51047 | PURCHASED OUTSIDE CLASS PERIOD |
| 51048 | PURCHASED OUTSIDE CLASS PERIOD |
| 51049 | PURCHASED OUTSIDE CLASS PERIOD |
| 51050 | PURCHASED OUTSIDE CLASS PERIOD |
| 51051 | PURCHASED OUTSIDE CLASS PERIOD |
| 51052 | PURCHASED OUTSIDE CLASS PERIOD |
| 51053 | PURCHASED OUTSIDE CLASS PERIOD |
| 51054 | PURCHASED OUTSIDE CLASS PERIOD |
| 51055 | PURCHASED OUTSIDE CLASS PERIOD |
| 51056 | PURCHASED OUTSIDE CLASS PERIOD |
| 51057 | PURCHASED OUTSIDE CLASS PERIOD |
| 51058 | PURCHASED OUTSIDE CLASS PERIOD |
| 51059 | PURCHASED OUTSIDE CLASS PERIOD |
| 51060 | PURCHASED OUTSIDE CLASS PERIOD |
| 51061 | PURCHASED OUTSIDE CLASS PERIOD |
| 51062 | PURCHASED OUTSIDE CLASS PERIOD |
| 51063 | PURCHASED OUTSIDE CLASS PERIOD |
| 51064 | PURCHASED OUTSIDE CLASS PERIOD |
| 51065 | PURCHASED OUTSIDE CLASS PERIOD |
| 51066 | SHARES SOLD SHORT |
| 51067 | PURCHASED OUTSIDE CLASS PERIOD |
| 51068 | PURCHASED OUTSIDE CLASS PERIOD |
| 51069 | PURCHASED OUTSIDE CLASS PERIOD |
| 51070 | PURCHASED OUTSIDE CLASS PERIOD |
| 51071 | PURCHASED OUTSIDE CLASS PERIOD |
| 51072 | PURCHASED OUTSIDE CLASS PERIOD |
| 51073 | PURCHASED OUTSIDE CLASS PERIOD |
| 51074 | PURCHASED OUTSIDE CLASS PERIOD |
| 51075 | PURCHASED OUTSIDE CLASS PERIOD |
| 51076 | PURCHASED OUTSIDE CLASS PERIOD |
| 51077 | PURCHASED OUTSIDE CLASS PERIOD |
| 51078 | PURCHASED OUTSIDE CLASS PERIOD |
| 51079 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 51080 | PURCHASED OUTSIDE CLASS PERIOD |
| 51081 | PURCHASED OUTSIDE CLASS PERIOD |
| 51082 | PURCHASED OUTSIDE CLASS PERIOD |
| 51083 | PURCHASED OUTSIDE CLASS PERIOD |
| 51084 | PURCHASED OUTSIDE CLASS PERIOD |
| 51085 | PURCHASED OUTSIDE CLASS PERIOD |
| 51086 | PURCHASED OUTSIDE CLASS PERIOD |
| 51087 | PURCHASED OUTSIDE CLASS PERIOD |
| 51088 | PURCHASED OUTSIDE CLASS PERIOD |
| 51089 | PURCHASED OUTSIDE CLASS PERIOD |
| 51090 | PURCHASED OUTSIDE CLASS PERIOD |
| 51091 | PURCHASED OUTSIDE CLASS PERIOD |
| 51092 | PURCHASED OUTSIDE CLASS PERIOD |
| 51093 | PURCHASED OUTSIDE CLASS PERIOD |
| 51094 | PURCHASED OUTSIDE CLASS PERIOD |
| 51095 | PURCHASED OUTSIDE CLASS PERIOD |
| 51096 | PURCHASED OUTSIDE CLASS PERIOD |
| 51097 | PURCHASED OUTSIDE CLASS PERIOD |
| 51098 | PURCHASED OUTSIDE CLASS PERIOD |
| 51099 | PURCHASED OUTSIDE CLASS PERIOD |
| 51100 | PURCHASED OUTSIDE CLASS PERIOD |
| 51101 | PURCHASED OUTSIDE CLASS PERIOD |
| 51102 | SHARES SOLD SHORT |
| 51103 | PURCHASED OUTSIDE CLASS PERIOD |
| 51104 | PURCHASED OUTSIDE CLASS PERIOD |
| 51105 | PURCHASED OUTSIDE CLASS PERIOD |
| 51106 | PURCHASED OUTSIDE CLASS PERIOD |
| 51107 | PURCHASED OUTSIDE CLASS PERIOD |
| 51108 | PURCHASED OUTSIDE CLASS PERIOD |
| 51111 | NO RECOGNIZED LOSSES |
| 51112 | NO RECOGNIZED LOSSES |
| 51114 | PURCHASED OUTSIDE CLASS PERIOD |
| 51115 | PURCHASED OUTSIDE CLASS PERIOD |
| 51117 | PURCHASED OUTSIDE CLASS PERIOD |
| 51119 | PURCHASED OUTSIDE CLASS PERIOD |
| 51120 | PURCHASED OUTSIDE CLASS PERIOD |
| 51121 | NO RECOGNIZED LOSSES |
| 51122 | NO RECOGNIZED LOSSES |
| 51124 | NO RECOGNIZED LOSSES |
| 51125 | NO RECOGNIZED LOSSES |
| 51126 | SHARES SOLD SHORT |
| 51127 | NO RECOGNIZED LOSSES |
| 51128 | PURCHASED OUTSIDE CLASS PERIOD |
| 51129 | PURCHASED OUTSIDE CLASS PERIOD |
| 51130 | PURCHASED OUTSIDE CLASS PERIOD |
| 51131 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 51133 | PURCHASED OUTSIDE CLASS PERIOD |
| 51134 | PURCHASED OUTSIDE CLASS PERIOD |
| 51135 | NO RECOGNIZED LOSSES |
| 51136 | PURCHASED OUTSIDE CLASS PERIOD |
| 51137 | PURCHASED OUTSIDE CLASS PERIOD |
| 51138 | NO RECOGNIZED LOSSES |
| 51139 | PURCHASED OUTSIDE CLASS PERIOD |
| 51141 | NO RECOGNIZED LOSSES |
| 51142 | NO RECOGNIZED LOSSES |
| 51144 | PURCHASED OUTSIDE CLASS PERIOD |
| 51145 | PURCHASED OUTSIDE CLASS PERIOD |
| 51147 | PURCHASED OUTSIDE CLASS PERIOD |
| 51148 | PURCHASED OUTSIDE CLASS PERIOD |
| 51149 | NO RECOGNIZED LOSSES |
| 51150 | PURCHASED OUTSIDE CLASS PERIOD |
| 51151 | NO RECOGNIZED LOSSES |
| 51152 | NO RECOGNIZED LOSSES |
| 51154 | NO RECOGNIZED LOSSES |
| 51155 | NO RECOGNIZED LOSSES |
| 51156 | NO RECOGNIZED LOSSES |
| 51157 | PURCHASED OUTSIDE CLASS PERIOD |
| 51158 | PURCHASED OUTSIDE CLASS PERIOD |
| 51159 | PURCHASED OUTSIDE CLASS PERIOD |
| 51160 | PURCHASED OUTSIDE CLASS PERIOD |
| 51163 | PURCHASED OUTSIDE CLASS PERIOD |
| 51164 | NO RECOGNIZED LOSSES |
| 51165 | PURCHASED OUTSIDE CLASS PERIOD |
| 51166 | PURCHASED OUTSIDE CLASS PERIOD |
| 51168 | PURCHASED OUTSIDE CLASS PERIOD |
| 51169 | PURCHASED OUTSIDE CLASS PERIOD |
| 51170 | PURCHASED OUTSIDE CLASS PERIOD |
| 51172 | PURCHASED OUTSIDE CLASS PERIOD |
| 51173 | NO RECOGNIZED LOSSES |
| 51175 | PURCHASED OUTSIDE CLASS PERIOD |
| 51176 | PURCHASED OUTSIDE CLASS PERIOD |
| 51177 | NO RECOGNIZED LOSSES |
| 51179 | NO RECOGNIZED LOSSES |
| 51180 | NO RECOGNIZED LOSSES |
| 51181 | PURCHASED OUTSIDE CLASS PERIOD |
| 51183 | PURCHASED OUTSIDE CLASS PERIOD |
| 51184 | SHARES SOLD SHORT |
| 51185 | NO RECOGNIZED LOSSES |
| 51189 | NO RECOGNIZED LOSSES |
| 51191 | PURCHASED OUTSIDE CLASS PERIOD |
| 51192 | NO RECOGNIZED LOSSES |
| 51193 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 51194 | NO RECOGNIZED LOSSES |
| 51195 | PURCHASED OUTSIDE CLASS PERIOD |
| 51198 | PURCHASED OUTSIDE CLASS PERIOD |
| 51199 | NO RECOGNIZED LOSSES |
| 51200 | PURCHASED OUTSIDE CLASS PERIOD |
| 51201 | NO RECOGNIZED LOSSES |
| 51202 | PURCHASED OUTSIDE CLASS PERIOD |
| 51204 | NO RECOGNIZED LOSSES |
| 51205 | NO RECOGNIZED LOSSES |
| 51206 | NO RECOGNIZED LOSSES |
| 51207 | NO RECOGNIZED LOSSES |
| 51208 | PURCHASED OUTSIDE CLASS PERIOD |
| 51211 | NO RECOGNIZED LOSSES |
| 51212 | NO RECOGNIZED LOSSES |
| 51213 | PURCHASED OUTSIDE CLASS PERIOD |
| 51215 | PURCHASED OUTSIDE CLASS PERIOD |
| 51216 | NO RECOGNIZED LOSSES |
| 51217 | NO RECOGNIZED LOSSES |
| 51219 | NO RECOGNIZED LOSSES |
| 51220 | PURCHASED OUTSIDE CLASS PERIOD |
| 51221 | PURCHASED OUTSIDE CLASS PERIOD |
| 51223 | NO RECOGNIZED LOSSES |
| 51225 | PURCHASED OUTSIDE CLASS PERIOD |
| 51227 | PURCHASED OUTSIDE CLASS PERIOD |
| 51229 | NO RECOGNIZED LOSSES |
| 51230 | NO RECOGNIZED LOSSES |
| 51231 | NO RECOGNIZED LOSSES |
| 51233 | PURCHASED OUTSIDE CLASS PERIOD |
| 51234 | PURCHASED OUTSIDE CLASS PERIOD |
| 51235 | NO RECOGNIZED LOSSES |
| 51236 | PURCHASED OUTSIDE CLASS PERIOD |
| 51237 | PURCHASED OUTSIDE CLASS PERIOD |
| 51239 | PURCHASED OUTSIDE CLASS PERIOD |
| 51240 | PURCHASED OUTSIDE CLASS PERIOD |
| 51241 | NO RECOGNIZED LOSSES |
| 51242 | PURCHASED OUTSIDE CLASS PERIOD |
| 51243 | NO RECOGNIZED LOSSES |
| 51244 | SHARES SOLD SHORT |
| 51246 | PURCHASED OUTSIDE CLASS PERIOD |
| 51247 | PURCHASED OUTSIDE CLASS PERIOD |
| 51248 | NO RECOGNIZED LOSSES |
| 51249 | PURCHASED OUTSIDE CLASS PERIOD |
| 51250 | NO RECOGNIZED LOSSES |
| 51251 | PURCHASED OUTSIDE CLASS PERIOD |
| 51253 | PURCHASED OUTSIDE CLASS PERIOD |
| 51254 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 51256 | NO RECOGNIZED LOSSES |
| 51257 | NO RECOGNIZED LOSSES |
| 51258 | SHARES SOLD SHORT |
| 51259 | NO RECOGNIZED LOSSES |
| 51262 | NO RECOGNIZED LOSSES |
| 51264 | PURCHASED OUTSIDE CLASS PERIOD |
| 51266 | SHARES SOLD SHORT |
| 51267 | PURCHASED OUTSIDE CLASS PERIOD |
| 51269 | NO RECOGNIZED LOSSES |
| 51271 | PURCHASED OUTSIDE CLASS PERIOD |
| 51272 | SHARES SOLD SHORT |
| 51273 | NO RECOGNIZED LOSSES |
| 51277 | PURCHASED OUTSIDE CLASS PERIOD |
| 51278 | PURCHASED OUTSIDE CLASS PERIOD |
| 51279 | PURCHASED OUTSIDE CLASS PERIOD |
| 51280 | NO RECOGNIZED LOSSES |
| 51281 | NO RECOGNIZED LOSSES |
| 51282 | SHARES SOLD SHORT |
| 51283 | NO RECOGNIZED LOSSES |
| 51284 | PURCHASED OUTSIDE CLASS PERIOD |
| 51286 | NO RECOGNIZED LOSSES |
| 51287 | NO RECOGNIZED LOSSES |
| 51290 | PURCHASED OUTSIDE CLASS PERIOD |
| 51291 | PURCHASED OUTSIDE CLASS PERIOD |
| 51292 | NO RECOGNIZED LOSSES |
| 51293 | PURCHASED OUTSIDE CLASS PERIOD |
| 51294 | PURCHASED OUTSIDE CLASS PERIOD |
| 51295 | NO RECOGNIZED LOSSES |
| 51296 | NO RECOGNIZED LOSSES |
| 51297 | NO RECOGNIZED LOSSES |
| 51298 | NO RECOGNIZED LOSSES |
| 51299 | NO RECOGNIZED LOSSES |
| 51300 | PURCHASED OUTSIDE CLASS PERIOD |
| 51301 | NO RECOGNIZED LOSSES |
| 51302 | PURCHASED OUTSIDE CLASS PERIOD |
| 51304 | SHARES SOLD SHORT |
| 51306 | PURCHASED OUTSIDE CLASS PERIOD |
| 51307 | NO RECOGNIZED LOSSES |
| 51308 | PURCHASED OUTSIDE CLASS PERIOD |
| 51309 | PURCHASED OUTSIDE CLASS PERIOD |
| 51310 | PURCHASED OUTSIDE CLASS PERIOD |
| 51311 | PURCHASED OUTSIDE CLASS PERIOD |
| 51313 | NO RECOGNIZED LOSSES |
| 51314 | PURCHASED OUTSIDE CLASS PERIOD |
| 51315 | NO RECOGNIZED LOSSES |
| 51316 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 51317 | PURCHASED OUTSIDE CLASS PERIOD |
| 51318 | PURCHASED OUTSIDE CLASS PERIOD |
| 51319 | NO RECOGNIZED LOSSES |
| 51320 | NO RECOGNIZED LOSSES |
| 51321 | PURCHASED OUTSIDE CLASS PERIOD |
| 51323 | PURCHASED OUTSIDE CLASS PERIOD |
| 51326 | PURCHASED OUTSIDE CLASS PERIOD |
| 51327 | PURCHASED OUTSIDE CLASS PERIOD |
| 51328 | NO RECOGNIZED LOSSES |
| 51329 | PURCHASED OUTSIDE CLASS PERIOD |
| 51331 | NO RECOGNIZED LOSSES |
| 51336 | PURCHASED OUTSIDE CLASS PERIOD |
| 51337 | NO RECOGNIZED LOSSES |
| 51338 | PURCHASED OUTSIDE CLASS PERIOD |
| 51339 | PURCHASED OUTSIDE CLASS PERIOD |
| 51340 | NO RECOGNIZED LOSSES |
| 51341 | PURCHASED OUTSIDE CLASS PERIOD |
| 51342 | NO RECOGNIZED LOSSES |
| 51345 | PURCHASED OUTSIDE CLASS PERIOD |
| 51346 | NO RECOGNIZED LOSSES |
| 51347 | PURCHASED OUTSIDE CLASS PERIOD |
| 51348 | NO RECOGNIZED LOSSES |
| 51351 | PURCHASED OUTSIDE CLASS PERIOD |
| 51352 | NO RECOGNIZED LOSSES |
| 51354 | SHARES SOLD SHORT |
| 51355 | PURCHASED OUTSIDE CLASS PERIOD |
| 51358 | NO RECOGNIZED LOSSES |
| 51360 | PURCHASED OUTSIDE CLASS PERIOD |
| 51362 | PURCHASED OUTSIDE CLASS PERIOD |
| 51364 | PURCHASED OUTSIDE CLASS PERIOD |
| 51366 | NO RECOGNIZED LOSSES |
| 51369 | PURCHASED OUTSIDE CLASS PERIOD |
| 51370 | NO RECOGNIZED LOSSES |
| 51371 | PURCHASED OUTSIDE CLASS PERIOD |
| 51372 | PURCHASED OUTSIDE CLASS PERIOD |
| 51373 | PURCHASED OUTSIDE CLASS PERIOD |
| 51374 | PURCHASED OUTSIDE CLASS PERIOD |
| 51380 | NO RECOGNIZED LOSSES |
| 51381 | PURCHASED OUTSIDE CLASS PERIOD |
| 51384 | PURCHASED OUTSIDE CLASS PERIOD |
| 51385 | PURCHASED OUTSIDE CLASS PERIOD |
| 51386 | NO RECOGNIZED LOSSES |
| 51387 | PURCHASED OUTSIDE CLASS PERIOD |
| 51388 | PURCHASED OUTSIDE CLASS PERIOD |
| 51389 | NO RECOGNIZED LOSSES |
| 51390 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 51391 | PURCHASED OUTSIDE CLASS PERIOD |
| 51392 | NO RECOGNIZED LOSSES |
| 51393 | NO RECOGNIZED LOSSES |
| 51394 | PURCHASED OUTSIDE CLASS PERIOD |
| 51399 | NO RECOGNIZED LOSSES |
| 51400 | NO RECOGNIZED LOSSES |
| 51401 | NO RECOGNIZED LOSSES |
| 51402 | PURCHASED OUTSIDE CLASS PERIOD |
| 51403 | PURCHASED OUTSIDE CLASS PERIOD |
| 51404 | PURCHASED OUTSIDE CLASS PERIOD |
| 51405 | NO RECOGNIZED LOSSES |
| 51406 | NO RECOGNIZED LOSSES |
| 51407 | PURCHASED OUTSIDE CLASS PERIOD |
| 51408 | PURCHASED OUTSIDE CLASS PERIOD |
| 51409 | PURCHASED OUTSIDE CLASS PERIOD |
| 51410 | PURCHASED OUTSIDE CLASS PERIOD |
| 51411 | PURCHASED OUTSIDE CLASS PERIOD |
| 51412 | NO RECOGNIZED LOSSES |
| 51413 | PURCHASED OUTSIDE CLASS PERIOD |
| 51414 | PURCHASED OUTSIDE CLASS PERIOD |
| 51416 | PURCHASED OUTSIDE CLASS PERIOD |
| 51417 | NO RECOGNIZED LOSSES |
| 51419 | PURCHASED OUTSIDE CLASS PERIOD |
| 51420 | PURCHASED OUTSIDE CLASS PERIOD |
| 51421 | SHARES SOLD SHORT |
| 51422 | SHARES SOLD SHORT |
| 51423 | NO RECOGNIZED LOSSES |
| 51424 | SHARES SOLD SHORT |
| 51426 | PURCHASED OUTSIDE CLASS PERIOD |
| 51427 | PURCHASED OUTSIDE CLASS PERIOD |
| 51431 | PURCHASED OUTSIDE CLASS PERIOD |
| 51432 | PURCHASED OUTSIDE CLASS PERIOD |
| 51433 | NO RECOGNIZED LOSSES |
| 51434 | PURCHASED OUTSIDE CLASS PERIOD |
| 51435 | PURCHASED OUTSIDE CLASS PERIOD |
| 51436 | NO RECOGNIZED LOSSES |
| 51437 | PURCHASED OUTSIDE CLASS PERIOD |
| 51438 | NO RECOGNIZED LOSSES |
| 51440 | PURCHASED OUTSIDE CLASS PERIOD |
| 51441 | PURCHASED OUTSIDE CLASS PERIOD |
| 51442 | PURCHASED OUTSIDE CLASS PERIOD |
| 51443 | SHARES SOLD SHORT |
| 51444 | PURCHASED OUTSIDE CLASS PERIOD |
| 51445 | PURCHASED OUTSIDE CLASS PERIOD |
| 51446 | PURCHASED OUTSIDE CLASS PERIOD |
| 51448 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 51449 | PURCHASED OUTSIDE CLASS PERIOD |
| 51450 | SHARES SOLD SHORT |
| 51451 | NO RECOGNIZED LOSSES |
| 51453 | NO RECOGNIZED LOSSES |
| 51454 | PURCHASED OUTSIDE CLASS PERIOD |
| 51455 | PURCHASED OUTSIDE CLASS PERIOD |
| 51457 | PURCHASED OUTSIDE CLASS PERIOD |
| 51459 | NO RECOGNIZED LOSSES |
| 51460 | NO RECOGNIZED LOSSES |
| 51461 | PURCHASED OUTSIDE CLASS PERIOD |
| 51463 | PURCHASED OUTSIDE CLASS PERIOD |
| 51464 | NO RECOGNIZED LOSSES |
| 51465 | PURCHASED OUTSIDE CLASS PERIOD |
| 51467 | NO RECOGNIZED LOSSES |
| 51468 | PURCHASED OUTSIDE CLASS PERIOD |
| 51470 | SHARES SOLD SHORT |
| 51472 | PURCHASED OUTSIDE CLASS PERIOD |
| 51473 | SHARES SOLD SHORT |
| 51475 | PURCHASED OUTSIDE CLASS PERIOD |
| 51477 | PURCHASED OUTSIDE CLASS PERIOD |
| 51478 | PURCHASED OUTSIDE CLASS PERIOD |
| 51480 | PURCHASED OUTSIDE CLASS PERIOD |
| 51481 | SHARES SOLD SHORT |
| 51483 | PURCHASED OUTSIDE CLASS PERIOD |
| 51484 | PURCHASED OUTSIDE CLASS PERIOD |
| 51486 | PURCHASED OUTSIDE CLASS PERIOD |
| 51488 | NO RECOGNIZED LOSSES |
| 51489 | PURCHASED OUTSIDE CLASS PERIOD |
| 51490 | PURCHASED OUTSIDE CLASS PERIOD |
| 51491 | PURCHASED OUTSIDE CLASS PERIOD |
| 51492 | SHARES SOLD SHORT |
| 51493 | NO RECOGNIZED LOSSES |
| 51494 | PURCHASED OUTSIDE CLASS PERIOD |
| 51495 | PURCHASED OUTSIDE CLASS PERIOD |
| 51496 | PURCHASED OUTSIDE CLASS PERIOD |
| 51497 | NO RECOGNIZED LOSSES |
| 51499 | PURCHASED OUTSIDE CLASS PERIOD |
| 51502 | PURCHASED OUTSIDE CLASS PERIOD |
| 51503 | PURCHASED OUTSIDE CLASS PERIOD |
| 51504 | PURCHASED OUTSIDE CLASS PERIOD |
| 51505 | PURCHASED OUTSIDE CLASS PERIOD |
| 51506 | PURCHASED OUTSIDE CLASS PERIOD |
| 51507 | PURCHASED OUTSIDE CLASS PERIOD |
| 51508 | PURCHASED OUTSIDE CLASS PERIOD |
| 51509 | NO RECOGNIZED LOSSES |
| 51510 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 51511 | SHARES SOLD SHORT |
| 51512 | NO RECOGNIZED LOSSES |
| 51514 | NO RECOGNIZED LOSSES |
| 51515 | NO RECOGNIZED LOSSES |
| 51518 | PURCHASED OUTSIDE CLASS PERIOD |
| 51519 | PURCHASED OUTSIDE CLASS PERIOD |
| 51520 | PURCHASED OUTSIDE CLASS PERIOD |
| 51522 | PURCHASED OUTSIDE CLASS PERIOD |
| 51524 | PURCHASED OUTSIDE CLASS PERIOD |
| 51526 | NO RECOGNIZED LOSSES |
| 51527 | NO RECOGNIZED LOSSES |
| 51529 | PURCHASED OUTSIDE CLASS PERIOD |
| 51530 | PURCHASED OUTSIDE CLASS PERIOD |
| 51531 | PURCHASED OUTSIDE CLASS PERIOD |
| 51532 | PURCHASED OUTSIDE CLASS PERIOD |
| 51533 | PURCHASED OUTSIDE CLASS PERIOD |
| 51534 | PURCHASED OUTSIDE CLASS PERIOD |
| 51535 | PURCHASED OUTSIDE CLASS PERIOD |
| 51536 | NO RECOGNIZED LOSSES |
| 51537 | PURCHASED OUTSIDE CLASS PERIOD |
| 51538 | PURCHASED OUTSIDE CLASS PERIOD |
| 51540 | NO RECOGNIZED LOSSES |
| 51541 | NO RECOGNIZED LOSSES |
| 51542 | PURCHASED OUTSIDE CLASS PERIOD |
| 51543 | PURCHASED OUTSIDE CLASS PERIOD |
| 51546 | PURCHASED OUTSIDE CLASS PERIOD |
| 51548 | PURCHASED OUTSIDE CLASS PERIOD |
| 51549 | PURCHASED OUTSIDE CLASS PERIOD |
| 51550 | PURCHASED OUTSIDE CLASS PERIOD |
| 51551 | NO RECOGNIZED LOSSES |
| 51552 | NO RECOGNIZED LOSSES |
| 51553 | PURCHASED OUTSIDE CLASS PERIOD |
| 51554 | PURCHASED OUTSIDE CLASS PERIOD |
| 51555 | NO RECOGNIZED LOSSES |
| 51556 | PURCHASED OUTSIDE CLASS PERIOD |
| 51557 | PURCHASED OUTSIDE CLASS PERIOD |
| 51558 | PURCHASED OUTSIDE CLASS PERIOD |
| 51559 | PURCHASED OUTSIDE CLASS PERIOD |
| 51560 | PURCHASED OUTSIDE CLASS PERIOD |
| 51561 | SHARES SOLD SHORT |
| 51562 | PURCHASED OUTSIDE CLASS PERIOD |
| 51564 | PURCHASED OUTSIDE CLASS PERIOD |
| 51566 | PURCHASED OUTSIDE CLASS PERIOD |
| 51567 | PURCHASED OUTSIDE CLASS PERIOD |
| 51569 | PURCHASED OUTSIDE CLASS PERIOD |
| 51571 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 51572 | NO RECOGNIZED LOSSES |
| 51573 | PURCHASED OUTSIDE CLASS PERIOD |
| 51574 | PURCHASED OUTSIDE CLASS PERIOD |
| 51575 | NO RECOGNIZED LOSSES |
| 51576 | PURCHASED OUTSIDE CLASS PERIOD |
| 51577 | NO RECOGNIZED LOSSES |
| 51578 | PURCHASED OUTSIDE CLASS PERIOD |
| 51579 | PURCHASED OUTSIDE CLASS PERIOD |
| 51581 | PURCHASED OUTSIDE CLASS PERIOD |
| 51582 | PURCHASED OUTSIDE CLASS PERIOD |
| 51583 | PURCHASED OUTSIDE CLASS PERIOD |
| 51584 | PURCHASED OUTSIDE CLASS PERIOD |
| 51585 | PURCHASED OUTSIDE CLASS PERIOD |
| 51586 | PURCHASED OUTSIDE CLASS PERIOD |
| 51587 | NO RECOGNIZED LOSSES |
| 51588 | SHARES SOLD SHORT |
| 51589 | NO RECOGNIZED LOSSES |
| 51590 | PURCHASED OUTSIDE CLASS PERIOD |
| 51591 | PURCHASED OUTSIDE CLASS PERIOD |
| 51594 | NO RECOGNIZED LOSSES |
| 51595 | PURCHASED OUTSIDE CLASS PERIOD |
| 51596 | NO RECOGNIZED LOSSES |
| 51597 | PURCHASED OUTSIDE CLASS PERIOD |
| 51598 | NO RECOGNIZED LOSSES |
| 51599 | PURCHASED OUTSIDE CLASS PERIOD |
| 51600 | NO RECOGNIZED LOSSES |
| 51601 | NO RECOGNIZED LOSSES |
| 51602 | PURCHASED OUTSIDE CLASS PERIOD |
| 51603 | PURCHASED OUTSIDE CLASS PERIOD |
| 51604 | NO RECOGNIZED LOSSES |
| 51605 | NO RECOGNIZED LOSSES |
| 51606 | PURCHASED OUTSIDE CLASS PERIOD |
| 51608 | NO RECOGNIZED LOSSES |
| 51610 | PURCHASED OUTSIDE CLASS PERIOD |
| 51611 | PURCHASED OUTSIDE CLASS PERIOD |
| 51612 | PURCHASED OUTSIDE CLASS PERIOD |
| 51614 | PURCHASED OUTSIDE CLASS PERIOD |
| 51615 | PURCHASED OUTSIDE CLASS PERIOD |
| 51616 | PURCHASED OUTSIDE CLASS PERIOD |
| 51617 | PURCHASED OUTSIDE CLASS PERIOD |
| 51618 | PURCHASED OUTSIDE CLASS PERIOD |
| 51619 | NO RECOGNIZED LOSSES |
| 51620 | PURCHASED OUTSIDE CLASS PERIOD |
| 51621 | PURCHASED OUTSIDE CLASS PERIOD |
| 51624 | PURCHASED OUTSIDE CLASS PERIOD |
| 51625 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
| --- | --- |
| 51626 | PURCHASED OUTSIDE CLASS PERIOD |
| 51627 | PURCHASED OUTSIDE CLASS PERIOD |
| 51628 | PURCHASED OUTSIDE CLASS PERIOD |
| 51629 | NO RECOGNIZED LOSSES |
| 51630 | NO RECOGNIZED LOSSES |
| 51631 | PURCHASED OUTSIDE CLASS PERIOD |
| 51632 | PURCHASED OUTSIDE CLASS PERIOD |
| 51633 | PURCHASED OUTSIDE CLASS PERIOD |
| 51634 | NO RECOGNIZED LOSSES |
| 51635 | NO RECOGNIZED LOSSES |
| 51637 | PURCHASED OUTSIDE CLASS PERIOD |
| 51638 | NO RECOGNIZED LOSSES |
| 51639 | PURCHASED OUTSIDE CLASS PERIOD |
| 51640 | NO RECOGNIZED LOSSES |
| 51641 | PURCHASED OUTSIDE CLASS PERIOD |
| 51642 | PURCHASED OUTSIDE CLASS PERIOD |
| 51643 | NO RECOGNIZED LOSSES |
| 51644 | PURCHASED OUTSIDE CLASS PERIOD |
| 51645 | NO RECOGNIZED LOSSES |
| 51646 | NO RECOGNIZED LOSSES |
| 51647 | PURCHASED OUTSIDE CLASS PERIOD |
| 51648 | PURCHASED OUTSIDE CLASS PERIOD |
| 51650 | NO RECOGNIZED LOSSES |
| 51651 | PURCHASED OUTSIDE CLASS PERIOD |
| 51652 | PURCHASED OUTSIDE CLASS PERIOD |
| 51653 | SHARES SOLD SHORT |
| 51654 | PURCHASED OUTSIDE CLASS PERIOD |
| 51655 | PURCHASED OUTSIDE CLASS PERIOD |
| 51657 | PURCHASED OUTSIDE CLASS PERIOD |
| 51658 | PURCHASED OUTSIDE CLASS PERIOD |
| 51659 | PURCHASED OUTSIDE CLASS PERIOD |
| 51660 | NO RECOGNIZED LOSSES |
| 51665 | PURCHASED OUTSIDE CLASS PERIOD |
| 51666 | PURCHASED OUTSIDE CLASS PERIOD |
| 51667 | NO RECOGNIZED LOSSES |
| 51669 | PURCHASED OUTSIDE CLASS PERIOD |
| 51670 | PURCHASED OUTSIDE CLASS PERIOD |
| 51672 | PURCHASED OUTSIDE CLASS PERIOD |
| 51673 | PURCHASED OUTSIDE CLASS PERIOD |
| 51674 | NO RECOGNIZED LOSSES |
| 51675 | PURCHASED OUTSIDE CLASS PERIOD |
| 51676 | NO RECOGNIZED LOSSES |
| 51678 | PURCHASED OUTSIDE CLASS PERIOD |
| 51679 | PURCHASED OUTSIDE CLASS PERIOD |
| 51680 | PURCHASED OUTSIDE CLASS PERIOD |
| 51682 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 51683 | PURCHASED OUTSIDE CLASS PERIOD |
| 51684 | NO RECOGNIZED LOSSES |
| 51685 | NO RECOGNIZED LOSSES |
| 51686 | PURCHASED OUTSIDE CLASS PERIOD |
| 51687 | PURCHASED OUTSIDE CLASS PERIOD |
| 51690 | PURCHASED OUTSIDE CLASS PERIOD |
| 51692 | NO RECOGNIZED LOSSES |
| 51693 | PURCHASED OUTSIDE CLASS PERIOD |
| 51695 | PURCHASED OUTSIDE CLASS PERIOD |
| 51697 | PURCHASED OUTSIDE CLASS PERIOD |
| 51698 | NO RECOGNIZED LOSSES |
| 51699 | PURCHASED OUTSIDE CLASS PERIOD |
| 51700 | NO RECOGNIZED LOSSES |
| 51701 | PURCHASED OUTSIDE CLASS PERIOD |
| 51703 | PURCHASED OUTSIDE CLASS PERIOD |
| 51704 | PURCHASED OUTSIDE CLASS PERIOD |
| 51705 | NO RECOGNIZED LOSSES |
| 51706 | SHARES SOLD SHORT |
| 51707 | NO RECOGNIZED LOSSES |
| 51708 | PURCHASED OUTSIDE CLASS PERIOD |
| 51709 | PURCHASED OUTSIDE CLASS PERIOD |
| 51711 | PURCHASED OUTSIDE CLASS PERIOD |
| 51714 | PURCHASED OUTSIDE CLASS PERIOD |
| 51715 | NO RECOGNIZED LOSSES |
| 51716 | PURCHASED OUTSIDE CLASS PERIOD |
| 51718 | NO RECOGNIZED LOSSES |
| 51720 | PURCHASED OUTSIDE CLASS PERIOD |
| 51721 | NO RECOGNIZED LOSSES |
| 51723 | NO RECOGNIZED LOSSES |
| 51724 | NO RECOGNIZED LOSSES |
| 51725 | NO RECOGNIZED LOSSES |
| 51726 | NO RECOGNIZED LOSSES |
| 51728 | PURCHASED OUTSIDE CLASS PERIOD |
| 51729 | PURCHASED OUTSIDE CLASS PERIOD |
| 51730 | PURCHASED OUTSIDE CLASS PERIOD |
| 51731 | NO RECOGNIZED LOSSES |
| 51732 | PURCHASED OUTSIDE CLASS PERIOD |
| 51734 | NO RECOGNIZED LOSSES |
| 51735 | PURCHASED OUTSIDE CLASS PERIOD |
| 51738 | PURCHASED OUTSIDE CLASS PERIOD |
| 51739 | PURCHASED OUTSIDE CLASS PERIOD |
| 51740 | PURCHASED OUTSIDE CLASS PERIOD |
| 51741 | PURCHASED OUTSIDE CLASS PERIOD |
| 51742 | NO RECOGNIZED LOSSES |
| 51745 | NO RECOGNIZED LOSSES |
| 51747 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 51748 | PURCHASED OUTSIDE CLASS PERIOD |
| 51749 | PURCHASED OUTSIDE CLASS PERIOD |
| 51750 | PURCHASED OUTSIDE CLASS PERIOD |
| 51751 | PURCHASED OUTSIDE CLASS PERIOD |
| 51752 | PURCHASED OUTSIDE CLASS PERIOD |
| 51753 | PURCHASED OUTSIDE CLASS PERIOD |
| 51756 | PURCHASED OUTSIDE CLASS PERIOD |
| 51759 | NO RECOGNIZED LOSSES |
| 51761 | PURCHASED OUTSIDE CLASS PERIOD |
| 51762 | PURCHASED OUTSIDE CLASS PERIOD |
| 51763 | PURCHASED OUTSIDE CLASS PERIOD |
| 51764 | NO RECOGNIZED LOSSES |
| 51765 | PURCHASED OUTSIDE CLASS PERIOD |
| 51766 | NO RECOGNIZED LOSSES |
| 51767 | PURCHASED OUTSIDE CLASS PERIOD |
| 51769 | PURCHASED OUTSIDE CLASS PERIOD |
| 51770 | PURCHASED OUTSIDE CLASS PERIOD |
| 51772 | PURCHASED OUTSIDE CLASS PERIOD |
| 51775 | NO RECOGNIZED LOSSES |
| 51776 | PURCHASED OUTSIDE CLASS PERIOD |
| 51777 | PURCHASED OUTSIDE CLASS PERIOD |
| 51779 | SHARES SOLD SHORT |
| 51780 | PURCHASED OUTSIDE CLASS PERIOD |
| 51782 | PURCHASED OUTSIDE CLASS PERIOD |
| 51783 | PURCHASED OUTSIDE CLASS PERIOD |
| 51785 | SHARES SOLD SHORT |
| 51786 | NO RECOGNIZED LOSSES |
| 51788 | PURCHASED OUTSIDE CLASS PERIOD |
| 51789 | NO RECOGNIZED LOSSES |
| 51791 | PURCHASED OUTSIDE CLASS PERIOD |
| 51792 | PURCHASED OUTSIDE CLASS PERIOD |
| 51795 | NO RECOGNIZED LOSSES |
| 51797 | PURCHASED OUTSIDE CLASS PERIOD |
| 51798 | SHARES SOLD SHORT |
| 51799 | PURCHASED OUTSIDE CLASS PERIOD |
| 51801 | NO RECOGNIZED LOSSES |
| 51802 | PURCHASED OUTSIDE CLASS PERIOD |
| 51804 | PURCHASED OUTSIDE CLASS PERIOD |
| 51805 | NO RECOGNIZED LOSSES |
| 51806 | PURCHASED OUTSIDE CLASS PERIOD |
| 51807 | NO RECOGNIZED LOSSES |
| 51808 | PURCHASED OUTSIDE CLASS PERIOD |
| 51811 | PURCHASED OUTSIDE CLASS PERIOD |
| 51812 | PURCHASED OUTSIDE CLASS PERIOD |
| 51813 | NO RECOGNIZED LOSSES |
| 51815 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 51816 | PURCHASED OUTSIDE CLASS PERIOD |
| 51817 | NO RECOGNIZED LOSSES |
| 51819 | NO RECOGNIZED LOSSES |
| 51820 | PURCHASED OUTSIDE CLASS PERIOD |
| 51821 | PURCHASED OUTSIDE CLASS PERIOD |
| 51822 | PURCHASED OUTSIDE CLASS PERIOD |
| 51823 | PURCHASED OUTSIDE CLASS PERIOD |
| 51827 | PURCHASED OUTSIDE CLASS PERIOD |
| 51828 | NO RECOGNIZED LOSSES |
| 51830 | PURCHASED OUTSIDE CLASS PERIOD |
| 51831 | PURCHASED OUTSIDE CLASS PERIOD |
| 51832 | NO RECOGNIZED LOSSES |
| 51833 | PURCHASED OUTSIDE CLASS PERIOD |
| 51834 | PURCHASED OUTSIDE CLASS PERIOD |
| 51835 | PURCHASED OUTSIDE CLASS PERIOD |
| 51836 | PURCHASED OUTSIDE CLASS PERIOD |
| 51837 | PURCHASED OUTSIDE CLASS PERIOD |
| 51839 | PURCHASED OUTSIDE CLASS PERIOD |
| 51840 | PURCHASED OUTSIDE CLASS PERIOD |
| 51841 | PURCHASED OUTSIDE CLASS PERIOD |
| 51842 | PURCHASED OUTSIDE CLASS PERIOD |
| 51843 | NO RECOGNIZED LOSSES |
| 51844 | PURCHASED OUTSIDE CLASS PERIOD |
| 51846 | PURCHASED OUTSIDE CLASS PERIOD |
| 51847 | PURCHASED OUTSIDE CLASS PERIOD |
| 51848 | NO RECOGNIZED LOSSES |
| 51849 | PURCHASED OUTSIDE CLASS PERIOD |
| 51850 | NO RECOGNIZED LOSSES |
| 51851 | PURCHASED OUTSIDE CLASS PERIOD |
| 51852 | NO RECOGNIZED LOSSES |
| 51853 | PURCHASED OUTSIDE CLASS PERIOD |
| 51854 | PURCHASED OUTSIDE CLASS PERIOD |
| 51856 | NO RECOGNIZED LOSSES |
| 51857 | PURCHASED OUTSIDE CLASS PERIOD |
| 51858 | PURCHASED OUTSIDE CLASS PERIOD |
| 51859 | PURCHASED OUTSIDE CLASS PERIOD |
| 51860 | PURCHASED OUTSIDE CLASS PERIOD |
| 51861 | PURCHASED OUTSIDE CLASS PERIOD |
| 51862 | PURCHASED OUTSIDE CLASS PERIOD |
| 51863 | PURCHASED OUTSIDE CLASS PERIOD |
| 51866 | PURCHASED OUTSIDE CLASS PERIOD |
| 51868 | PURCHASED OUTSIDE CLASS PERIOD |
| 51872 | PURCHASED OUTSIDE CLASS PERIOD |
| 51873 | PURCHASED OUTSIDE CLASS PERIOD |
| 51874 | PURCHASED OUTSIDE CLASS PERIOD |
| 51875 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---------|------------------|
| 51876 | NO RECOGNIZED LOSSES |
| 51878 | PURCHASED OUTSIDE CLASS PERIOD |
| 51879 | PURCHASED OUTSIDE CLASS PERIOD |
| 51880 | PURCHASED OUTSIDE CLASS PERIOD |
| 51881 | PURCHASED OUTSIDE CLASS PERIOD |
| 51885 | NO RECOGNIZED LOSSES |
| 51886 | PURCHASED OUTSIDE CLASS PERIOD |
| 51887 | PURCHASED OUTSIDE CLASS PERIOD |
| 51889 | NO RECOGNIZED LOSSES |
| 51890 | NO RECOGNIZED LOSSES |
| 51891 | PURCHASED OUTSIDE CLASS PERIOD |
| 51892 | PURCHASED OUTSIDE CLASS PERIOD |
| 51893 | PURCHASED OUTSIDE CLASS PERIOD |
| 51894 | PURCHASED OUTSIDE CLASS PERIOD |
| 51895 | NO RECOGNIZED LOSSES |
| 51897 | PURCHASED OUTSIDE CLASS PERIOD |
| 51899 | NO RECOGNIZED LOSSES |
| 51900 | NO RECOGNIZED LOSSES |
| 51901 | PURCHASED OUTSIDE CLASS PERIOD |
| 51903 | PURCHASED OUTSIDE CLASS PERIOD |
| 51905 | PURCHASED OUTSIDE CLASS PERIOD |
| 51906 | SHARES SOLD SHORT |
| 51907 | NO RECOGNIZED LOSSES |
| 51908 | NO RECOGNIZED LOSSES |
| 51909 | PURCHASED OUTSIDE CLASS PERIOD |
| 51911 | NO RECOGNIZED LOSSES |
| 51912 | NO RECOGNIZED LOSSES |
| 51913 | NO RECOGNIZED LOSSES |
| 51914 | PURCHASED OUTSIDE CLASS PERIOD |
| 51917 | NO RECOGNIZED LOSSES |
| 51918 | NO RECOGNIZED LOSSES |
| 51919 | PURCHASED OUTSIDE CLASS PERIOD |
| 51920 | PURCHASED OUTSIDE CLASS PERIOD |
| 51922 | NO RECOGNIZED LOSSES |
| 51923 | NO RECOGNIZED LOSSES |
| 51925 | PURCHASED OUTSIDE CLASS PERIOD |
| 51926 | NO RECOGNIZED LOSSES |
| 51929 | PURCHASED OUTSIDE CLASS PERIOD |
| 51930 | SHARES SOLD SHORT |
| 51931 | PURCHASED OUTSIDE CLASS PERIOD |
| 51932 | PURCHASED OUTSIDE CLASS PERIOD |
| 51933 | PURCHASED OUTSIDE CLASS PERIOD |
| 51934 | PURCHASED OUTSIDE CLASS PERIOD |
| 51935 | NO RECOGNIZED LOSSES |
| 51936 | NO RECOGNIZED LOSSES |
| 51937 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
| --- | --- |
| 51939 | PURCHASED OUTSIDE CLASS PERIOD |
| 51940 | PURCHASED OUTSIDE CLASS PERIOD |
| 51941 | NO RECOGNIZED LOSSES |
| 51942 | PURCHASED OUTSIDE CLASS PERIOD |
| 51943 | NO RECOGNIZED LOSSES |
| 51944 | PURCHASED OUTSIDE CLASS PERIOD |
| 51945 | PURCHASED OUTSIDE CLASS PERIOD |
| 51946 | NO RECOGNIZED LOSSES |
| 51947 | PURCHASED OUTSIDE CLASS PERIOD |
| 51948 | NO RECOGNIZED LOSSES |
| 51949 | NO RECOGNIZED LOSSES |
| 51950 | NO RECOGNIZED LOSSES |
| 51952 | NO RECOGNIZED LOSSES |
| 51953 | NO RECOGNIZED LOSSES |
| 51954 | NO RECOGNIZED LOSSES |
| 51955 | NO RECOGNIZED LOSSES |
| 51956 | PURCHASED OUTSIDE CLASS PERIOD |
| 51957 | PURCHASED OUTSIDE CLASS PERIOD |
| 51960 | NO RECOGNIZED LOSSES |
| 51961 | PURCHASED OUTSIDE CLASS PERIOD |
| 51962 | PURCHASED OUTSIDE CLASS PERIOD |
| 51963 | NO RECOGNIZED LOSSES |
| 51964 | PURCHASED OUTSIDE CLASS PERIOD |
| 51965 | NO RECOGNIZED LOSSES |
| 51966 | NO RECOGNIZED LOSSES |
| 51970 | PURCHASED OUTSIDE CLASS PERIOD |
| 51971 | PURCHASED OUTSIDE CLASS PERIOD |
| 51972 | PURCHASED OUTSIDE CLASS PERIOD |
| 51973 | PURCHASED OUTSIDE CLASS PERIOD |
| 51974 | NO RECOGNIZED LOSSES |
| 51975 | NO RECOGNIZED LOSSES |
| 51977 | NO RECOGNIZED LOSSES |
| 51978 | NO RECOGNIZED LOSSES |
| 51980 | PURCHASED OUTSIDE CLASS PERIOD |
| 51981 | SHARES SOLD SHORT |
| 51982 | PURCHASED OUTSIDE CLASS PERIOD |
| 51983 | PURCHASED OUTSIDE CLASS PERIOD |
| 51984 | PURCHASED OUTSIDE CLASS PERIOD |
| 51985 | SHARES SOLD SHORT |
| 51986 | NO RECOGNIZED LOSSES |
| 51987 | NO RECOGNIZED LOSSES |
| 51988 | PURCHASED OUTSIDE CLASS PERIOD |
| 51989 | NO RECOGNIZED LOSSES |
| 51990 | PURCHASED OUTSIDE CLASS PERIOD |
| 51991 | PURCHASED OUTSIDE CLASS PERIOD |
| 51993 | NO RECOGNIZED LOSSES |

## INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
| --- | --- |
| 51994 | SHARES SOLD SHORT |
| 51995 | NO RECOGNIZED LOSSES |
| 51996 | NO RECOGNIZED LOSSES |
| 51997 | NO RECOGNIZED LOSSES |
| 51998 | PURCHASED OUTSIDE CLASS PERIOD |
| 51999 | SHARES SOLD SHORT |
| 52000 | NO RECOGNIZED LOSSES |
| 52001 | PURCHASED OUTSIDE CLASS PERIOD |
| 52002 | PURCHASED OUTSIDE CLASS PERIOD |
| 52005 | PURCHASED OUTSIDE CLASS PERIOD |
| 52006 | PURCHASED OUTSIDE CLASS PERIOD |
| 52007 | PURCHASED OUTSIDE CLASS PERIOD |
| 52008 | PURCHASED OUTSIDE CLASS PERIOD |
| 52009 | NO RECOGNIZED LOSSES |
| 52010 | NO RECOGNIZED LOSSES |
| 52011 | NO RECOGNIZED LOSSES |
| 52012 | PURCHASED OUTSIDE CLASS PERIOD |
| 52013 | PURCHASED OUTSIDE CLASS PERIOD |
| 52014 | PURCHASED OUTSIDE CLASS PERIOD |
| 52015 | NO RECOGNIZED LOSSES |
| 52016 | PURCHASED OUTSIDE CLASS PERIOD |
| 52017 | NO RECOGNIZED LOSSES |
| 52018 | PURCHASED OUTSIDE CLASS PERIOD |
| 52019 | PURCHASED OUTSIDE CLASS PERIOD |
| 52020 | PURCHASED OUTSIDE CLASS PERIOD |
| 52021 | PURCHASED OUTSIDE CLASS PERIOD |
| 52022 | NO RECOGNIZED LOSSES |
| 52024 | NO RECOGNIZED LOSSES |
| 52025 | PURCHASED OUTSIDE CLASS PERIOD |
| 52026 | PURCHASED OUTSIDE CLASS PERIOD |
| 52028 | NO RECOGNIZED LOSSES |
| 52029 | PURCHASED OUTSIDE CLASS PERIOD |
| 52030 | NO RECOGNIZED LOSSES |
| 52031 | PURCHASED OUTSIDE CLASS PERIOD |
| 52032 | NO RECOGNIZED LOSSES |
| 52033 | PURCHASED OUTSIDE CLASS PERIOD |
| 52034 | SHARES SOLD SHORT |
| 52036 | PURCHASED OUTSIDE CLASS PERIOD |
| 52038 | PURCHASED OUTSIDE CLASS PERIOD |
| 52039 | PURCHASED OUTSIDE CLASS PERIOD |
| 52040 | PURCHASED OUTSIDE CLASS PERIOD |
| 52041 | NO RECOGNIZED LOSSES |
| 52043 | NO RECOGNIZED LOSSES |
| 52044 | PURCHASED OUTSIDE CLASS PERIOD |
| 52045 | PURCHASED OUTSIDE CLASS PERIOD |
| 52047 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 52048 | NO RECOGNIZED LOSSES |
| 52049 | PURCHASED OUTSIDE CLASS PERIOD |
| 52050 | NO RECOGNIZED LOSSES |
| 52051 | NO RECOGNIZED LOSSES |
| 52052 | NO RECOGNIZED LOSSES |
| 52053 | PURCHASED OUTSIDE CLASS PERIOD |
| 52054 | PURCHASED OUTSIDE CLASS PERIOD |
| 52055 | PURCHASED OUTSIDE CLASS PERIOD |
| 52056 | SHARES SOLD SHORT |
| 52057 | PURCHASED OUTSIDE CLASS PERIOD |
| 52059 | PURCHASED OUTSIDE CLASS PERIOD |
| 52060 | PURCHASED OUTSIDE CLASS PERIOD |
| 52061 | NO RECOGNIZED LOSSES |
| 52062 | SHARES SOLD SHORT |
| 52063 | PURCHASED OUTSIDE CLASS PERIOD |
| 52064 | PURCHASED OUTSIDE CLASS PERIOD |
| 52065 | PURCHASED OUTSIDE CLASS PERIOD |
| 52066 | PURCHASED OUTSIDE CLASS PERIOD |
| 52068 | PURCHASED OUTSIDE CLASS PERIOD |
| 52069 | PURCHASED OUTSIDE CLASS PERIOD |
| 52070 | NO RECOGNIZED LOSSES |
| 52071 | NO RECOGNIZED LOSSES |
| 52072 | PURCHASED OUTSIDE CLASS PERIOD |
| 52073 | NO RECOGNIZED LOSSES |
| 52074 | NO RECOGNIZED LOSSES |
| 52075 | NO RECOGNIZED LOSSES |
| 52076 | NO RECOGNIZED LOSSES |
| 52077 | PURCHASED OUTSIDE CLASS PERIOD |
| 52078 | PURCHASED OUTSIDE CLASS PERIOD |
| 52079 | NO RECOGNIZED LOSSES |
| 52080 | PURCHASED OUTSIDE CLASS PERIOD |
| 52081 | PURCHASED OUTSIDE CLASS PERIOD |
| 52082 | PURCHASED OUTSIDE CLASS PERIOD |
| 52084 | PURCHASED OUTSIDE CLASS PERIOD |
| 52085 | SHARES SOLD SHORT |
| 52086 | PURCHASED OUTSIDE CLASS PERIOD |
| 52087 | PURCHASED OUTSIDE CLASS PERIOD |
| 52088 | NO RECOGNIZED LOSSES |
| 52089 | PURCHASED OUTSIDE CLASS PERIOD |
| 52090 | PURCHASED OUTSIDE CLASS PERIOD |
| 52091 | PURCHASED OUTSIDE CLASS PERIOD |
| 52092 | NO RECOGNIZED LOSSES |
| 52094 | NO RECOGNIZED LOSSES |
| 52096 | NO RECOGNIZED LOSSES |
| 52097 | PURCHASED OUTSIDE CLASS PERIOD |
| 52098 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 52099 | NO RECOGNIZED LOSSES |
| 52100 | NO RECOGNIZED LOSSES |
| 52102 | NO RECOGNIZED LOSSES |
| 52103 | NO RECOGNIZED LOSSES |
| 52104 | NO RECOGNIZED LOSSES |
| 52105 | PURCHASED OUTSIDE CLASS PERIOD |
| 52106 | PURCHASED OUTSIDE CLASS PERIOD |
| 52107 | SHARES SOLD SHORT |
| 52108 | NO RECOGNIZED LOSSES |
| 52109 | PURCHASED OUTSIDE CLASS PERIOD |
| 52110 | PURCHASED OUTSIDE CLASS PERIOD |
| 52111 | PURCHASED OUTSIDE CLASS PERIOD |
| 52112 | NO RECOGNIZED LOSSES |
| 52114 | PURCHASED OUTSIDE CLASS PERIOD |
| 52115 | SHARES SOLD SHORT |
| 52116 | PURCHASED OUTSIDE CLASS PERIOD |
| 52117 | PURCHASED OUTSIDE CLASS PERIOD |
| 52118 | PURCHASED OUTSIDE CLASS PERIOD |
| 52119 | PURCHASED OUTSIDE CLASS PERIOD |
| 52120 | PURCHASED OUTSIDE CLASS PERIOD |
| 52121 | PURCHASED OUTSIDE CLASS PERIOD |
| 52122 | PURCHASED OUTSIDE CLASS PERIOD |
| 52123 | NO RECOGNIZED LOSSES |
| 52124 | NO RECOGNIZED LOSSES |
| 52125 | PURCHASED OUTSIDE CLASS PERIOD |
| 52126 | NO RECOGNIZED LOSSES |
| 52127 | PURCHASED OUTSIDE CLASS PERIOD |
| 52128 | NO RECOGNIZED LOSSES |
| 52129 | PURCHASED OUTSIDE CLASS PERIOD |
| 52130 | PURCHASED OUTSIDE CLASS PERIOD |
| 52131 | PURCHASED OUTSIDE CLASS PERIOD |
| 52132 | PURCHASED OUTSIDE CLASS PERIOD |
| 52134 | PURCHASED OUTSIDE CLASS PERIOD |
| 52135 | NO RECOGNIZED LOSSES |
| 52136 | PURCHASED OUTSIDE CLASS PERIOD |
| 52138 | NO RECOGNIZED LOSSES |
| 52139 | PURCHASED OUTSIDE CLASS PERIOD |
| 52140 | SHARES SOLD SHORT |
| 52142 | PURCHASED OUTSIDE CLASS PERIOD |
| 52144 | PURCHASED OUTSIDE CLASS PERIOD |
| 52146 | NO RECOGNIZED LOSSES |
| 52147 | PURCHASED OUTSIDE CLASS PERIOD |
| 52148 | PURCHASED OUTSIDE CLASS PERIOD |
| 52149 | PURCHASED OUTSIDE CLASS PERIOD |
| 52152 | PURCHASED OUTSIDE CLASS PERIOD |
| 52153 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 52155 | PURCHASED OUTSIDE CLASS PERIOD |
| 52156 | PURCHASED OUTSIDE CLASS PERIOD |
| 52157 | PURCHASED OUTSIDE CLASS PERIOD |
| 52158 | SHARES SOLD SHORT |
| 52159 | NO RECOGNIZED LOSSES |
| 52160 | PURCHASED OUTSIDE CLASS PERIOD |
| 52161 | NO RECOGNIZED LOSSES |
| 52162 | NO RECOGNIZED LOSSES |
| 52163 | PURCHASED OUTSIDE CLASS PERIOD |
| 52164 | PURCHASED OUTSIDE CLASS PERIOD |
| 52165 | PURCHASED OUTSIDE CLASS PERIOD |
| 52166 | PURCHASED OUTSIDE CLASS PERIOD |
| 52167 | NO RECOGNIZED LOSSES |
| 52168 | SHARES SOLD SHORT |
| 52169 | NO RECOGNIZED LOSSES |
| 52171 | PURCHASED OUTSIDE CLASS PERIOD |
| 52173 | PURCHASED OUTSIDE CLASS PERIOD |
| 52174 | NO RECOGNIZED LOSSES |
| 52175 | PURCHASED OUTSIDE CLASS PERIOD |
| 52176 | NO RECOGNIZED LOSSES |
| 52177 | PURCHASED OUTSIDE CLASS PERIOD |
| 52178 | NO RECOGNIZED LOSSES |
| 52179 | PURCHASED OUTSIDE CLASS PERIOD |
| 52182 | PURCHASED OUTSIDE CLASS PERIOD |
| 52185 | PURCHASED OUTSIDE CLASS PERIOD |
| 52187 | PURCHASED OUTSIDE CLASS PERIOD |
| 52188 | NO RECOGNIZED LOSSES |
| 52189 | NO RECOGNIZED LOSSES |
| 52190 | NO RECOGNIZED LOSSES |
| 52191 | NO RECOGNIZED LOSSES |
| 52192 | PURCHASED OUTSIDE CLASS PERIOD |
| 52193 | PURCHASED OUTSIDE CLASS PERIOD |
| 52194 | PURCHASED OUTSIDE CLASS PERIOD |
| 52195 | PURCHASED OUTSIDE CLASS PERIOD |
| 52196 | SHARES SOLD SHORT |
| 52197 | PURCHASED OUTSIDE CLASS PERIOD |
| 52198 | PURCHASED OUTSIDE CLASS PERIOD |
| 52199 | PURCHASED OUTSIDE CLASS PERIOD |
| 52200 | NO RECOGNIZED LOSSES |
| 52201 | PURCHASED OUTSIDE CLASS PERIOD |
| 52202 | PURCHASED OUTSIDE CLASS PERIOD |
| 52203 | PURCHASED OUTSIDE CLASS PERIOD |
| 52204 | PURCHASED OUTSIDE CLASS PERIOD |
| 52205 | PURCHASED OUTSIDE CLASS PERIOD |
| 52206 | PURCHASED OUTSIDE CLASS PERIOD |
| 52208 | NO RECOGNIZED LOSSES |

INELIGIBLE CLAIMS

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 52209 | PURCHASED OUTSIDE CLASS PERIOD |
| 52210 | NO RECOGNIZED LOSSES |
| 52211 | PURCHASED OUTSIDE CLASS PERIOD |
| 52212 | PURCHASED OUTSIDE CLASS PERIOD |
| 52213 | NO RECOGNIZED LOSSES |
| 52214 | PURCHASED OUTSIDE CLASS PERIOD |
| 52216 | NO RECOGNIZED LOSSES |
| 52217 | NO RECOGNIZED LOSSES |
| 52218 | PURCHASED OUTSIDE CLASS PERIOD |
| 52219 | PURCHASED OUTSIDE CLASS PERIOD |
| 52220 | PURCHASED OUTSIDE CLASS PERIOD |
| 52221 | PURCHASED OUTSIDE CLASS PERIOD |
| 52222 | PURCHASED OUTSIDE CLASS PERIOD |
| 52223 | PURCHASED OUTSIDE CLASS PERIOD |
| 52224 | PURCHASED OUTSIDE CLASS PERIOD |
| 52226 | PURCHASED OUTSIDE CLASS PERIOD |
| 52227 | NO RECOGNIZED LOSSES |
| 52228 | NO RECOGNIZED LOSSES |
| 52229 | PURCHASED OUTSIDE CLASS PERIOD |
| 52230 | NO RECOGNIZED LOSSES |
| 52231 | NO RECOGNIZED LOSSES |
| 52237 | NO RECOGNIZED LOSSES |
| 52238 | SHARES SOLD SHORT |
| 52239 | PURCHASED OUTSIDE CLASS PERIOD |
| 52240 | NO RECOGNIZED LOSSES |
| 52241 | PURCHASED OUTSIDE CLASS PERIOD |
| 52242 | PURCHASED OUTSIDE CLASS PERIOD |
| 52243 | PURCHASED OUTSIDE CLASS PERIOD |
| 52244 | PURCHASED OUTSIDE CLASS PERIOD |
| 52245 | NO RECOGNIZED LOSSES |
| 52246 | NO RECOGNIZED LOSSES |
| 52247 | NO RECOGNIZED LOSSES |
| 52248 | PURCHASED OUTSIDE CLASS PERIOD |
| 52249 | PURCHASED OUTSIDE CLASS PERIOD |
| 52251 | PURCHASED OUTSIDE CLASS PERIOD |
| 52252 | PURCHASED OUTSIDE CLASS PERIOD |
| 52253 | NO RECOGNIZED LOSSES |
| 52255 | NO RECOGNIZED LOSSES |
| 52256 | PURCHASED OUTSIDE CLASS PERIOD |
| 52258 | PURCHASED OUTSIDE CLASS PERIOD |
| 52259 | NO RECOGNIZED LOSSES |
| 52260 | PURCHASED OUTSIDE CLASS PERIOD |
| 52261 | PURCHASED OUTSIDE CLASS PERIOD |
| 52262 | PURCHASED OUTSIDE CLASS PERIOD |
| 52263 | SHARES SOLD SHORT |
| 52264 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 52265 | PURCHASED OUTSIDE CLASS PERIOD |
| 52266 | PURCHASED OUTSIDE CLASS PERIOD |
| 52267 | PURCHASED OUTSIDE CLASS PERIOD |
| 52268 | NO RECOGNIZED LOSSES |
| 52269 | PURCHASED OUTSIDE CLASS PERIOD |
| 52271 | PURCHASED OUTSIDE CLASS PERIOD |
| 52272 | NO RECOGNIZED LOSSES |
| 52273 | PURCHASED OUTSIDE CLASS PERIOD |
| 52274 | PURCHASED OUTSIDE CLASS PERIOD |
| 52275 | PURCHASED OUTSIDE CLASS PERIOD |
| 52277 | PURCHASED OUTSIDE CLASS PERIOD |
| 52279 | NO RECOGNIZED LOSSES |
| 52280 | PURCHASED OUTSIDE CLASS PERIOD |
| 52282 | PURCHASED OUTSIDE CLASS PERIOD |
| 52283 | PURCHASED OUTSIDE CLASS PERIOD |
| 52284 | PURCHASED OUTSIDE CLASS PERIOD |
| 52285 | PURCHASED OUTSIDE CLASS PERIOD |
| 52286 | PURCHASED OUTSIDE CLASS PERIOD |
| 52287 | PURCHASED OUTSIDE CLASS PERIOD |
| 52290 | NO RECOGNIZED LOSSES |
| 52291 | PURCHASED OUTSIDE CLASS PERIOD |
| 52292 | PURCHASED OUTSIDE CLASS PERIOD |
| 52294 | PURCHASED OUTSIDE CLASS PERIOD |
| 52295 | PURCHASED OUTSIDE CLASS PERIOD |
| 52296 | PURCHASED OUTSIDE CLASS PERIOD |
| 52299 | NO RECOGNIZED LOSSES |
| 52301 | PURCHASED OUTSIDE CLASS PERIOD |
| 52302 | PURCHASED OUTSIDE CLASS PERIOD |
| 52306 | NO RECOGNIZED LOSSES |
| 52307 | NO RECOGNIZED LOSSES |
| 52308 | PURCHASED OUTSIDE CLASS PERIOD |
| 52310 | NO RECOGNIZED LOSSES |
| 52311 | NO RECOGNIZED LOSSES |
| 52312 | NO RECOGNIZED LOSSES |
| 52314 | PURCHASED OUTSIDE CLASS PERIOD |
| 52315 | NO RECOGNIZED LOSSES |
| 52316 | NO RECOGNIZED LOSSES |
| 52318 | NO RECOGNIZED LOSSES |
| 52319 | PURCHASED OUTSIDE CLASS PERIOD |
| 52320 | PURCHASED OUTSIDE CLASS PERIOD |
| 52321 | NO RECOGNIZED LOSSES |
| 52322 | PURCHASED OUTSIDE CLASS PERIOD |
| 52323 | PURCHASED OUTSIDE CLASS PERIOD |
| 52325 | PURCHASED OUTSIDE CLASS PERIOD |
| 52327 | NO RECOGNIZED LOSSES |
| 52328 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 52329 | PURCHASED OUTSIDE CLASS PERIOD |
| 52331 | PURCHASED OUTSIDE CLASS PERIOD |
| 52332 | PURCHASED OUTSIDE CLASS PERIOD |
| 52333 | PURCHASED OUTSIDE CLASS PERIOD |
| 52334 | NO RECOGNIZED LOSSES |
| 52335 | NO RECOGNIZED LOSSES |
| 52336 | PURCHASED OUTSIDE CLASS PERIOD |
| 52337 | NO RECOGNIZED LOSSES |
| 52339 | PURCHASED OUTSIDE CLASS PERIOD |
| 52340 | PURCHASED OUTSIDE CLASS PERIOD |
| 52341 | NO RECOGNIZED LOSSES |
| 52345 | NO RECOGNIZED LOSSES |
| 52346 | PURCHASED OUTSIDE CLASS PERIOD |
| 52348 | NO RECOGNIZED LOSSES |
| 52349 | PURCHASED OUTSIDE CLASS PERIOD |
| 52350 | NO RECOGNIZED LOSSES |
| 52351 | NO RECOGNIZED LOSSES |
| 52353 | PURCHASED OUTSIDE CLASS PERIOD |
| 52354 | NO RECOGNIZED LOSSES |
| 52355 | PURCHASED OUTSIDE CLASS PERIOD |
| 52356 | PURCHASED OUTSIDE CLASS PERIOD |
| 52357 | NO RECOGNIZED LOSSES |
| 52358 | PURCHASED OUTSIDE CLASS PERIOD |
| 52359 | NO RECOGNIZED LOSSES |
| 52360 | PURCHASED OUTSIDE CLASS PERIOD |
| 52361 | NO RECOGNIZED LOSSES |
| 52363 | NO RECOGNIZED LOSSES |
| 52365 | PURCHASED OUTSIDE CLASS PERIOD |
| 52366 | NO RECOGNIZED LOSSES |
| 52368 | PURCHASED OUTSIDE CLASS PERIOD |
| 52369 | PURCHASED OUTSIDE CLASS PERIOD |
| 52370 | PURCHASED OUTSIDE CLASS PERIOD |
| 52371 | PURCHASED OUTSIDE CLASS PERIOD |
| 52373 | PURCHASED OUTSIDE CLASS PERIOD |
| 52377 | PURCHASED OUTSIDE CLASS PERIOD |
| 52378 | PURCHASED OUTSIDE CLASS PERIOD |
| 52379 | NO RECOGNIZED LOSSES |
| 52382 | SHARES SOLD SHORT |
| 52383 | PURCHASED OUTSIDE CLASS PERIOD |
| 52384 | NO RECOGNIZED LOSSES |
| 52385 | PURCHASED OUTSIDE CLASS PERIOD |
| 52386 | NO RECOGNIZED LOSSES |
| 52389 | PURCHASED OUTSIDE CLASS PERIOD |
| 52390 | NO RECOGNIZED LOSSES |
| 52391 | PURCHASED OUTSIDE CLASS PERIOD |
| 52393 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---------|------------------|
| 52394 | NO RECOGNIZED LOSSES |
| 52395 | PURCHASED OUTSIDE CLASS PERIOD |
| 52396 | PURCHASED OUTSIDE CLASS PERIOD |
| 52397 | NO RECOGNIZED LOSSES |
| 52398 | NO RECOGNIZED LOSSES |
| 52399 | PURCHASED OUTSIDE CLASS PERIOD |
| 52400 | PURCHASED OUTSIDE CLASS PERIOD |
| 52401 | PURCHASED OUTSIDE CLASS PERIOD |
| 52402 | NO RECOGNIZED LOSSES |
| 52403 | PURCHASED OUTSIDE CLASS PERIOD |
| 52404 | NO RECOGNIZED LOSSES |
| 52405 | NO RECOGNIZED LOSSES |
| 52406 | PURCHASED OUTSIDE CLASS PERIOD |
| 52407 | NO RECOGNIZED LOSSES |
| 52408 | PURCHASED OUTSIDE CLASS PERIOD |
| 52409 | NO RECOGNIZED LOSSES |
| 52410 | PURCHASED OUTSIDE CLASS PERIOD |
| 52412 | PURCHASED OUTSIDE CLASS PERIOD |
| 52414 | NO RECOGNIZED LOSSES |
| 52416 | PURCHASED OUTSIDE CLASS PERIOD |
| 52417 | PURCHASED OUTSIDE CLASS PERIOD |
| 52418 | PURCHASED OUTSIDE CLASS PERIOD |
| 52419 | PURCHASED OUTSIDE CLASS PERIOD |
| 52420 | PURCHASED OUTSIDE CLASS PERIOD |
| 52421 | PURCHASED OUTSIDE CLASS PERIOD |
| 52422 | PURCHASED OUTSIDE CLASS PERIOD |
| 52423 | PURCHASED OUTSIDE CLASS PERIOD |
| 52425 | NO RECOGNIZED LOSSES |
| 52426 | PURCHASED OUTSIDE CLASS PERIOD |
| 52427 | PURCHASED OUTSIDE CLASS PERIOD |
| 52428 | PURCHASED OUTSIDE CLASS PERIOD |
| 52429 | SHARES SOLD SHORT |
| 52431 | PURCHASED OUTSIDE CLASS PERIOD |
| 52433 | NO RECOGNIZED LOSSES |
| 52435 | PURCHASED OUTSIDE CLASS PERIOD |
| 52436 | PURCHASED OUTSIDE CLASS PERIOD |
| 52437 | PURCHASED OUTSIDE CLASS PERIOD |
| 52439 | PURCHASED OUTSIDE CLASS PERIOD |
| 52440 | NO RECOGNIZED LOSSES |
| 52441 | PURCHASED OUTSIDE CLASS PERIOD |
| 52442 | PURCHASED OUTSIDE CLASS PERIOD |
| 52443 | PURCHASED OUTSIDE CLASS PERIOD |
| 52445 | NO RECOGNIZED LOSSES |
| 52447 | PURCHASED OUTSIDE CLASS PERIOD |
| 52449 | PURCHASED OUTSIDE CLASS PERIOD |
| 52451 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 52452 | PURCHASED OUTSIDE CLASS PERIOD |
| 52453 | PURCHASED OUTSIDE CLASS PERIOD |
| 52455 | PURCHASED OUTSIDE CLASS PERIOD |
| 52456 | PURCHASED OUTSIDE CLASS PERIOD |
| 52457 | PURCHASED OUTSIDE CLASS PERIOD |
| 52458 | NO RECOGNIZED LOSSES |
| 52459 | PURCHASED OUTSIDE CLASS PERIOD |
| 52463 | PURCHASED OUTSIDE CLASS PERIOD |
| 52464 | PURCHASED OUTSIDE CLASS PERIOD |
| 52466 | PURCHASED OUTSIDE CLASS PERIOD |
| 52467 | PURCHASED OUTSIDE CLASS PERIOD |
| 52468 | PURCHASED OUTSIDE CLASS PERIOD |
| 52471 | PURCHASED OUTSIDE CLASS PERIOD |
| 52472 | PURCHASED OUTSIDE CLASS PERIOD |
| 52475 | PURCHASED OUTSIDE CLASS PERIOD |
| 52477 | PURCHASED OUTSIDE CLASS PERIOD |
| 52478 | PURCHASED OUTSIDE CLASS PERIOD |
| 52481 | SHARES SOLD SHORT |
| 52483 | NO RECOGNIZED LOSSES |
| 52484 | PURCHASED OUTSIDE CLASS PERIOD |
| 52486 | SHARES SOLD SHORT |
| 52487 | PURCHASED OUTSIDE CLASS PERIOD |
| 52488 | PURCHASED OUTSIDE CLASS PERIOD |
| 52490 | PURCHASED OUTSIDE CLASS PERIOD |
| 52491 | PURCHASED OUTSIDE CLASS PERIOD |
| 52493 | PURCHASED OUTSIDE CLASS PERIOD |
| 52494 | NO RECOGNIZED LOSSES |
| 52496 | NO RECOGNIZED LOSSES |
| 52497 | PURCHASED OUTSIDE CLASS PERIOD |
| 52498 | PURCHASED OUTSIDE CLASS PERIOD |
| 52499 | PURCHASED OUTSIDE CLASS PERIOD |
| 52502 | PURCHASED OUTSIDE CLASS PERIOD |
| 52504 | PURCHASED OUTSIDE CLASS PERIOD |
| 52505 | PURCHASED OUTSIDE CLASS PERIOD |
| 52506 | NO RECOGNIZED LOSSES |
| 52507 | PURCHASED OUTSIDE CLASS PERIOD |
| 52508 | NO RECOGNIZED LOSSES |
| 52511 | NO RECOGNIZED LOSSES |
| 52512 | NO RECOGNIZED LOSSES |
| 52513 | NO RECOGNIZED LOSSES |
| 52516 | PURCHASED OUTSIDE CLASS PERIOD |
| 52518 | NO RECOGNIZED LOSSES |
| 52520 | PURCHASED OUTSIDE CLASS PERIOD |
| 52522 | PURCHASED OUTSIDE CLASS PERIOD |
| 52524 | NO RECOGNIZED LOSSES |
| 52528 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
| --- | --- |
| 52529 | PURCHASED OUTSIDE CLASS PERIOD |
| 52532 | PURCHASED OUTSIDE CLASS PERIOD |
| 52533 | NO RECOGNIZED LOSSES |
| 52534 | NO RECOGNIZED LOSSES |
| 52535 | NO RECOGNIZED LOSSES |
| 52536 | PURCHASED OUTSIDE CLASS PERIOD |
| 52537 | NO RECOGNIZED LOSSES |
| 52538 | NO RECOGNIZED LOSSES |
| 52539 | NO RECOGNIZED LOSSES |
| 52540 | PURCHASED OUTSIDE CLASS PERIOD |
| 52541 | NO RECOGNIZED LOSSES |
| 52542 | NO RECOGNIZED LOSSES |
| 52548 | NO RECOGNIZED LOSSES |
| 52551 | PURCHASED OUTSIDE CLASS PERIOD |
| 52554 | NO RECOGNIZED LOSSES |
| 52555 | PURCHASED OUTSIDE CLASS PERIOD |
| 52556 | NO RECOGNIZED LOSSES |
| 52557 | PURCHASED OUTSIDE CLASS PERIOD |
| 52558 | NO RECOGNIZED LOSSES |
| 52561 | NO RECOGNIZED LOSSES |
| 52565 | NO RECOGNIZED LOSSES |
| 52567 | NO RECOGNIZED LOSSES |
| 52570 | NO RECOGNIZED LOSSES |
| 52571 | PURCHASED OUTSIDE CLASS PERIOD |
| 52572 | NO RECOGNIZED LOSSES |
| 52573 | NO RECOGNIZED LOSSES |
| 52574 | NO RECOGNIZED LOSSES |
| 52575 | PURCHASED OUTSIDE CLASS PERIOD |
| 52576 | NO RECOGNIZED LOSSES |
| 52577 | PURCHASED OUTSIDE CLASS PERIOD |
| 52578 | NO RECOGNIZED LOSSES |
| 52580 | NO RECOGNIZED LOSSES |
| 52581 | PURCHASED OUTSIDE CLASS PERIOD |
| 52582 | PURCHASED OUTSIDE CLASS PERIOD |
| 52584 | NO RECOGNIZED LOSSES |
| 52585 | PURCHASED OUTSIDE CLASS PERIOD |
| 52586 | PURCHASED OUTSIDE CLASS PERIOD |
| 52588 | PURCHASED OUTSIDE CLASS PERIOD |
| 52589 | NO RECOGNIZED LOSSES |
| 52595 | NO RECOGNIZED LOSSES |
| 52597 | PURCHASED OUTSIDE CLASS PERIOD |
| 52598 | NO RECOGNIZED LOSSES |
| 52599 | PURCHASED OUTSIDE CLASS PERIOD |
| 52600 | PURCHASED OUTSIDE CLASS PERIOD |
| 52601 | PURCHASED OUTSIDE CLASS PERIOD |
| 52602 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---------|------------------|
| 52603 | PURCHASED OUTSIDE CLASS PERIOD |
| 52604 | PURCHASED OUTSIDE CLASS PERIOD |
| 52605 | PURCHASED OUTSIDE CLASS PERIOD |
| 52606 | PURCHASED OUTSIDE CLASS PERIOD |
| 52607 | PURCHASED OUTSIDE CLASS PERIOD |
| 52608 | PURCHASED OUTSIDE CLASS PERIOD |
| 52609 | PURCHASED OUTSIDE CLASS PERIOD |
| 52610 | PURCHASED OUTSIDE CLASS PERIOD |
| 52611 | PURCHASED OUTSIDE CLASS PERIOD |
| 52612 | PURCHASED OUTSIDE CLASS PERIOD |
| 52613 | PURCHASED OUTSIDE CLASS PERIOD |
| 52614 | PURCHASED OUTSIDE CLASS PERIOD |
| 52615 | PURCHASED OUTSIDE CLASS PERIOD |
| 52616 | PURCHASED OUTSIDE CLASS PERIOD |
| 52617 | PURCHASED OUTSIDE CLASS PERIOD |
| 52618 | PURCHASED OUTSIDE CLASS PERIOD |
| 52619 | PURCHASED OUTSIDE CLASS PERIOD |
| 52620 | PURCHASED OUTSIDE CLASS PERIOD |
| 52621 | PURCHASED OUTSIDE CLASS PERIOD |
| 52622 | PURCHASED OUTSIDE CLASS PERIOD |
| 52623 | PURCHASED OUTSIDE CLASS PERIOD |
| 52624 | PURCHASED OUTSIDE CLASS PERIOD |
| 52625 | PURCHASED OUTSIDE CLASS PERIOD |
| 52626 | PURCHASED OUTSIDE CLASS PERIOD |
| 52627 | PURCHASED OUTSIDE CLASS PERIOD |
| 52628 | PURCHASED OUTSIDE CLASS PERIOD |
| 52629 | PURCHASED OUTSIDE CLASS PERIOD |
| 52630 | PURCHASED OUTSIDE CLASS PERIOD |
| 52631 | PURCHASED OUTSIDE CLASS PERIOD |
| 52632 | PURCHASED OUTSIDE CLASS PERIOD |
| 52633 | PURCHASED OUTSIDE CLASS PERIOD |
| 52634 | PURCHASED OUTSIDE CLASS PERIOD |
| 52635 | PURCHASED OUTSIDE CLASS PERIOD |
| 52636 | PURCHASED OUTSIDE CLASS PERIOD |
| 52637 | PURCHASED OUTSIDE CLASS PERIOD |
| 52638 | PURCHASED OUTSIDE CLASS PERIOD |
| 52639 | PURCHASED OUTSIDE CLASS PERIOD |
| 52640 | PURCHASED OUTSIDE CLASS PERIOD |
| 52641 | PURCHASED OUTSIDE CLASS PERIOD |
| 52642 | PURCHASED OUTSIDE CLASS PERIOD |
| 52643 | PURCHASED OUTSIDE CLASS PERIOD |
| 52644 | PURCHASED OUTSIDE CLASS PERIOD |
| 52645 | PURCHASED OUTSIDE CLASS PERIOD |
| 52646 | PURCHASED OUTSIDE CLASS PERIOD |
| 52647 | PURCHASED OUTSIDE CLASS PERIOD |
| 52648 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 52649 | PURCHASED OUTSIDE CLASS PERIOD |
| 52650 | PURCHASED OUTSIDE CLASS PERIOD |
| 52651 | PURCHASED OUTSIDE CLASS PERIOD |
| 52652 | PURCHASED OUTSIDE CLASS PERIOD |
| 52653 | PURCHASED OUTSIDE CLASS PERIOD |
| 52655 | PURCHASED OUTSIDE CLASS PERIOD |
| 52656 | PURCHASED OUTSIDE CLASS PERIOD |
| 52657 | PURCHASED OUTSIDE CLASS PERIOD |
| 52658 | PURCHASED OUTSIDE CLASS PERIOD |
| 52659 | PURCHASED OUTSIDE CLASS PERIOD |
| 52660 | PURCHASED OUTSIDE CLASS PERIOD |
| 52661 | PURCHASED OUTSIDE CLASS PERIOD |
| 52662 | PURCHASED OUTSIDE CLASS PERIOD |
| 52663 | PURCHASED OUTSIDE CLASS PERIOD |
| 52664 | PURCHASED OUTSIDE CLASS PERIOD |
| 52665 | PURCHASED OUTSIDE CLASS PERIOD |
| 52666 | PURCHASED OUTSIDE CLASS PERIOD |
| 52667 | PURCHASED OUTSIDE CLASS PERIOD |
| 52668 | PURCHASED OUTSIDE CLASS PERIOD |
| 52669 | PURCHASED OUTSIDE CLASS PERIOD |
| 52670 | PURCHASED OUTSIDE CLASS PERIOD |
| 52671 | PURCHASED OUTSIDE CLASS PERIOD |
| 52672 | PURCHASED OUTSIDE CLASS PERIOD |
| 52673 | PURCHASED OUTSIDE CLASS PERIOD |
| 52674 | PURCHASED OUTSIDE CLASS PERIOD |
| 52675 | PURCHASED OUTSIDE CLASS PERIOD |
| 52676 | PURCHASED OUTSIDE CLASS PERIOD |
| 52677 | PURCHASED OUTSIDE CLASS PERIOD |
| 52678 | PURCHASED OUTSIDE CLASS PERIOD |
| 52679 | PURCHASED OUTSIDE CLASS PERIOD |
| 52680 | PURCHASED OUTSIDE CLASS PERIOD |
| 52681 | PURCHASED OUTSIDE CLASS PERIOD |
| 52682 | PURCHASED OUTSIDE CLASS PERIOD |
| 52683 | PURCHASED OUTSIDE CLASS PERIOD |
| 52684 | PURCHASED OUTSIDE CLASS PERIOD |
| 52685 | PURCHASED OUTSIDE CLASS PERIOD |
| 52686 | PURCHASED OUTSIDE CLASS PERIOD |
| 52687 | PURCHASED OUTSIDE CLASS PERIOD |
| 52688 | PURCHASED OUTSIDE CLASS PERIOD |
| 52689 | PURCHASED OUTSIDE CLASS PERIOD |
| 52690 | PURCHASED OUTSIDE CLASS PERIOD |
| 52691 | NO RECOGNIZED LOSSES |
| 52692 | PURCHASED OUTSIDE CLASS PERIOD |
| 52693 | PURCHASED OUTSIDE CLASS PERIOD |
| 52694 | PURCHASED OUTSIDE CLASS PERIOD |
| 52695 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 52696 | PURCHASED OUTSIDE CLASS PERIOD |
| 52697 | PURCHASED OUTSIDE CLASS PERIOD |
| 52698 | PURCHASED OUTSIDE CLASS PERIOD |
| 52699 | NO RECOGNIZED LOSSES |
| 52700 | PURCHASED OUTSIDE CLASS PERIOD |
| 52701 | PURCHASED OUTSIDE CLASS PERIOD |
| 52702 | PURCHASED OUTSIDE CLASS PERIOD |
| 52703 | PURCHASED OUTSIDE CLASS PERIOD |
| 52704 | PURCHASED OUTSIDE CLASS PERIOD |
| 52705 | PURCHASED OUTSIDE CLASS PERIOD |
| 52706 | PURCHASED OUTSIDE CLASS PERIOD |
| 52707 | PURCHASED OUTSIDE CLASS PERIOD |
| 52708 | PURCHASED OUTSIDE CLASS PERIOD |
| 52709 | PURCHASED OUTSIDE CLASS PERIOD |
| 52710 | PURCHASED OUTSIDE CLASS PERIOD |
| 52711 | PURCHASED OUTSIDE CLASS PERIOD |
| 52712 | PURCHASED OUTSIDE CLASS PERIOD |
| 52713 | PURCHASED OUTSIDE CLASS PERIOD |
| 52714 | PURCHASED OUTSIDE CLASS PERIOD |
| 52716 | PURCHASED OUTSIDE CLASS PERIOD |
| 52717 | PURCHASED OUTSIDE CLASS PERIOD |
| 52718 | PURCHASED OUTSIDE CLASS PERIOD |
| 52719 | PURCHASED OUTSIDE CLASS PERIOD |
| 52720 | PURCHASED OUTSIDE CLASS PERIOD |
| 52721 | PURCHASED OUTSIDE CLASS PERIOD |
| 52722 | PURCHASED OUTSIDE CLASS PERIOD |
| 52723 | PURCHASED OUTSIDE CLASS PERIOD |
| 52724 | PURCHASED OUTSIDE CLASS PERIOD |
| 52725 | PURCHASED OUTSIDE CLASS PERIOD |
| 52726 | PURCHASED OUTSIDE CLASS PERIOD |
| 52727 | PURCHASED OUTSIDE CLASS PERIOD |
| 52728 | PURCHASED OUTSIDE CLASS PERIOD |
| 52729 | PURCHASED OUTSIDE CLASS PERIOD |
| 52730 | PURCHASED OUTSIDE CLASS PERIOD |
| 52731 | PURCHASED OUTSIDE CLASS PERIOD |
| 52732 | PURCHASED OUTSIDE CLASS PERIOD |
| 52733 | PURCHASED OUTSIDE CLASS PERIOD |
| 52734 | PURCHASED OUTSIDE CLASS PERIOD |
| 52735 | PURCHASED OUTSIDE CLASS PERIOD |
| 52736 | PURCHASED OUTSIDE CLASS PERIOD |
| 52737 | PURCHASED OUTSIDE CLASS PERIOD |
| 52738 | PURCHASED OUTSIDE CLASS PERIOD |
| 52739 | PURCHASED OUTSIDE CLASS PERIOD |
| 52740 | PURCHASED OUTSIDE CLASS PERIOD |
| 52741 | PURCHASED OUTSIDE CLASS PERIOD |
| 52742 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|-----------------|
| 52743 | PURCHASED OUTSIDE CLASS PERIOD |
| 52744 | PURCHASED OUTSIDE CLASS PERIOD |
| 52745 | PURCHASED OUTSIDE CLASS PERIOD |
| 52746 | PURCHASED OUTSIDE CLASS PERIOD |
| 52747 | PURCHASED OUTSIDE CLASS PERIOD |
| 52748 | PURCHASED OUTSIDE CLASS PERIOD |
| 52749 | PURCHASED OUTSIDE CLASS PERIOD |
| 52750 | PURCHASED OUTSIDE CLASS PERIOD |
| 52751 | PURCHASED OUTSIDE CLASS PERIOD |
| 52752 | PURCHASED OUTSIDE CLASS PERIOD |
| 52753 | PURCHASED OUTSIDE CLASS PERIOD |
| 52754 | PURCHASED OUTSIDE CLASS PERIOD |
| 52755 | PURCHASED OUTSIDE CLASS PERIOD |
| 52756 | PURCHASED OUTSIDE CLASS PERIOD |
| 52757 | PURCHASED OUTSIDE CLASS PERIOD |
| 52758 | PURCHASED OUTSIDE CLASS PERIOD |
| 52759 | PURCHASED OUTSIDE CLASS PERIOD |
| 52760 | PURCHASED OUTSIDE CLASS PERIOD |
| 52761 | PURCHASED OUTSIDE CLASS PERIOD |
| 52762 | PURCHASED OUTSIDE CLASS PERIOD |
| 52763 | PURCHASED OUTSIDE CLASS PERIOD |
| 52764 | PURCHASED OUTSIDE CLASS PERIOD |
| 52765 | PURCHASED OUTSIDE CLASS PERIOD |
| 52766 | PURCHASED OUTSIDE CLASS PERIOD |
| 52767 | PURCHASED OUTSIDE CLASS PERIOD |
| 52768 | PURCHASED OUTSIDE CLASS PERIOD |
| 52769 | PURCHASED OUTSIDE CLASS PERIOD |
| 52770 | PURCHASED OUTSIDE CLASS PERIOD |
| 52771 | PURCHASED OUTSIDE CLASS PERIOD |
| 52772 | PURCHASED OUTSIDE CLASS PERIOD |
| 52773 | PURCHASED OUTSIDE CLASS PERIOD |
| 52774 | PURCHASED OUTSIDE CLASS PERIOD |
| 52775 | PURCHASED OUTSIDE CLASS PERIOD |
| 52776 | PURCHASED OUTSIDE CLASS PERIOD |
| 52777 | PURCHASED OUTSIDE CLASS PERIOD |
| 52778 | PURCHASED OUTSIDE CLASS PERIOD |
| 52779 | PURCHASED OUTSIDE CLASS PERIOD |
| 52780 | PURCHASED OUTSIDE CLASS PERIOD |
| 52781 | PURCHASED OUTSIDE CLASS PERIOD |
| 52782 | PURCHASED OUTSIDE CLASS PERIOD |
| 52783 | PURCHASED OUTSIDE CLASS PERIOD |
| 52784 | PURCHASED OUTSIDE CLASS PERIOD |
| 52785 | PURCHASED OUTSIDE CLASS PERIOD |
| 52786 | PURCHASED OUTSIDE CLASS PERIOD |
| 52787 | PURCHASED OUTSIDE CLASS PERIOD |
| 52788 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 52789 | PURCHASED OUTSIDE CLASS PERIOD |
| 52790 | PURCHASED OUTSIDE CLASS PERIOD |
| 52791 | PURCHASED OUTSIDE CLASS PERIOD |
| 52792 | PURCHASED OUTSIDE CLASS PERIOD |
| 52793 | PURCHASED OUTSIDE CLASS PERIOD |
| 52794 | PURCHASED OUTSIDE CLASS PERIOD |
| 52795 | PURCHASED OUTSIDE CLASS PERIOD |
| 52796 | PURCHASED OUTSIDE CLASS PERIOD |
| 52797 | PURCHASED OUTSIDE CLASS PERIOD |
| 52798 | PURCHASED OUTSIDE CLASS PERIOD |
| 52799 | PURCHASED OUTSIDE CLASS PERIOD |
| 52800 | PURCHASED OUTSIDE CLASS PERIOD |
| 52801 | PURCHASED OUTSIDE CLASS PERIOD |
| 52802 | PURCHASED OUTSIDE CLASS PERIOD |
| 52803 | PURCHASED OUTSIDE CLASS PERIOD |
| 52804 | PURCHASED OUTSIDE CLASS PERIOD |
| 52805 | PURCHASED OUTSIDE CLASS PERIOD |
| 52806 | PURCHASED OUTSIDE CLASS PERIOD |
| 52807 | SHARES SOLD SHORT |
| 52808 | PURCHASED OUTSIDE CLASS PERIOD |
| 52809 | PURCHASED OUTSIDE CLASS PERIOD |
| 52810 | PURCHASED OUTSIDE CLASS PERIOD |
| 52811 | PURCHASED OUTSIDE CLASS PERIOD |
| 52812 | PURCHASED OUTSIDE CLASS PERIOD |
| 52813 | PURCHASED OUTSIDE CLASS PERIOD |
| 52814 | PURCHASED OUTSIDE CLASS PERIOD |
| 52815 | PURCHASED OUTSIDE CLASS PERIOD |
| 52816 | PURCHASED OUTSIDE CLASS PERIOD |
| 52817 | PURCHASED OUTSIDE CLASS PERIOD |
| 52818 | PURCHASED OUTSIDE CLASS PERIOD |
| 52819 | PURCHASED OUTSIDE CLASS PERIOD |
| 52820 | PURCHASED OUTSIDE CLASS PERIOD |
| 52821 | PURCHASED OUTSIDE CLASS PERIOD |
| 52822 | PURCHASED OUTSIDE CLASS PERIOD |
| 52823 | PURCHASED OUTSIDE CLASS PERIOD |
| 52824 | PURCHASED OUTSIDE CLASS PERIOD |
| 52825 | PURCHASED OUTSIDE CLASS PERIOD |
| 52826 | PURCHASED OUTSIDE CLASS PERIOD |
| 52827 | PURCHASED OUTSIDE CLASS PERIOD |
| 52828 | PURCHASED OUTSIDE CLASS PERIOD |
| 52829 | PURCHASED OUTSIDE CLASS PERIOD |
| 52830 | PURCHASED OUTSIDE CLASS PERIOD |
| 52831 | PURCHASED OUTSIDE CLASS PERIOD |
| 52832 | PURCHASED OUTSIDE CLASS PERIOD |
| 52833 | SHARES SOLD SHORT |
| 52834 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 52835 | PURCHASED OUTSIDE CLASS PERIOD |
| 52836 | PURCHASED OUTSIDE CLASS PERIOD |
| 52837 | PURCHASED OUTSIDE CLASS PERIOD |
| 52838 | PURCHASED OUTSIDE CLASS PERIOD |
| 52839 | PURCHASED OUTSIDE CLASS PERIOD |
| 52840 | PURCHASED OUTSIDE CLASS PERIOD |
| 52841 | PURCHASED OUTSIDE CLASS PERIOD |
| 52842 | PURCHASED OUTSIDE CLASS PERIOD |
| 52843 | PURCHASED OUTSIDE CLASS PERIOD |
| 52844 | PURCHASED OUTSIDE CLASS PERIOD |
| 52845 | PURCHASED OUTSIDE CLASS PERIOD |
| 52846 | PURCHASED OUTSIDE CLASS PERIOD |
| 52847 | PURCHASED OUTSIDE CLASS PERIOD |
| 52848 | PURCHASED OUTSIDE CLASS PERIOD |
| 52849 | PURCHASED OUTSIDE CLASS PERIOD |
| 52850 | PURCHASED OUTSIDE CLASS PERIOD |
| 52851 | SHARES SOLD SHORT |
| 52852 | PURCHASED OUTSIDE CLASS PERIOD |
| 52853 | PURCHASED OUTSIDE CLASS PERIOD |
| 52854 | PURCHASED OUTSIDE CLASS PERIOD |
| 52855 | PURCHASED OUTSIDE CLASS PERIOD |
| 52856 | PURCHASED OUTSIDE CLASS PERIOD |
| 52857 | PURCHASED OUTSIDE CLASS PERIOD |
| 52858 | PURCHASED OUTSIDE CLASS PERIOD |
| 52859 | PURCHASED OUTSIDE CLASS PERIOD |
| 52860 | PURCHASED OUTSIDE CLASS PERIOD |
| 52861 | PURCHASED OUTSIDE CLASS PERIOD |
| 52862 | PURCHASED OUTSIDE CLASS PERIOD |
| 52863 | PURCHASED OUTSIDE CLASS PERIOD |
| 52864 | PURCHASED OUTSIDE CLASS PERIOD |
| 52865 | PURCHASED OUTSIDE CLASS PERIOD |
| 52866 | PURCHASED OUTSIDE CLASS PERIOD |
| 52867 | PURCHASED OUTSIDE CLASS PERIOD |
| 52868 | PURCHASED OUTSIDE CLASS PERIOD |
| 52869 | PURCHASED OUTSIDE CLASS PERIOD |
| 52870 | PURCHASED OUTSIDE CLASS PERIOD |
| 52871 | PURCHASED OUTSIDE CLASS PERIOD |
| 52872 | PURCHASED OUTSIDE CLASS PERIOD |
| 52873 | PURCHASED OUTSIDE CLASS PERIOD |
| 52874 | PURCHASED OUTSIDE CLASS PERIOD |
| 52875 | PURCHASED OUTSIDE CLASS PERIOD |
| 52876 | PURCHASED OUTSIDE CLASS PERIOD |
| 52877 | PURCHASED OUTSIDE CLASS PERIOD |
| 52878 | PURCHASED OUTSIDE CLASS PERIOD |
| 52879 | PURCHASED OUTSIDE CLASS PERIOD |
| 52880 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

EXHIBIT E

| Claim # | Rejection Reason |
|---------|------------------|
| 52881 | PURCHASED OUTSIDE CLASS PERIOD |
| 52882 | PURCHASED OUTSIDE CLASS PERIOD |
| 52883 | PURCHASED OUTSIDE CLASS PERIOD |
| 52884 | PURCHASED OUTSIDE CLASS PERIOD |
| 52885 | PURCHASED OUTSIDE CLASS PERIOD |
| 52886 | PURCHASED OUTSIDE CLASS PERIOD |
| 52887 | PURCHASED OUTSIDE CLASS PERIOD |
| 52888 | PURCHASED OUTSIDE CLASS PERIOD |
| 52889 | PURCHASED OUTSIDE CLASS PERIOD |
| 52890 | PURCHASED OUTSIDE CLASS PERIOD |
| 52891 | PURCHASED OUTSIDE CLASS PERIOD |
| 52892 | PURCHASED OUTSIDE CLASS PERIOD |
| 52893 | PURCHASED OUTSIDE CLASS PERIOD |
| 52894 | PURCHASED OUTSIDE CLASS PERIOD |
| 52895 | PURCHASED OUTSIDE CLASS PERIOD |
| 52896 | PURCHASED OUTSIDE CLASS PERIOD |
| 52897 | PURCHASED OUTSIDE CLASS PERIOD |
| 52898 | PURCHASED OUTSIDE CLASS PERIOD |
| 52899 | PURCHASED OUTSIDE CLASS PERIOD |
| 52900 | PURCHASED OUTSIDE CLASS PERIOD |
| 52901 | PURCHASED OUTSIDE CLASS PERIOD |
| 52902 | PURCHASED OUTSIDE CLASS PERIOD |
| 52903 | PURCHASED OUTSIDE CLASS PERIOD |
| 52904 | PURCHASED OUTSIDE CLASS PERIOD |
| 52905 | PURCHASED OUTSIDE CLASS PERIOD |
| 52906 | PURCHASED OUTSIDE CLASS PERIOD |
| 52907 | PURCHASED OUTSIDE CLASS PERIOD |
| 52908 | PURCHASED OUTSIDE CLASS PERIOD |
| 52909 | PURCHASED OUTSIDE CLASS PERIOD |
| 52910 | PURCHASED OUTSIDE CLASS PERIOD |
| 52911 | PURCHASED OUTSIDE CLASS PERIOD |
| 52912 | PURCHASED OUTSIDE CLASS PERIOD |
| 52913 | PURCHASED OUTSIDE CLASS PERIOD |
| 52914 | PURCHASED OUTSIDE CLASS PERIOD |
| 52915 | PURCHASED OUTSIDE CLASS PERIOD |
| 52916 | PURCHASED OUTSIDE CLASS PERIOD |
| 52917 | PURCHASED OUTSIDE CLASS PERIOD |
| 52918 | PURCHASED OUTSIDE CLASS PERIOD |
| 52919 | PURCHASED OUTSIDE CLASS PERIOD |
| 52920 | PURCHASED OUTSIDE CLASS PERIOD |
| 52921 | PURCHASED OUTSIDE CLASS PERIOD |
| 52922 | PURCHASED OUTSIDE CLASS PERIOD |
| 52923 | PURCHASED OUTSIDE CLASS PERIOD |
| 52924 | PURCHASED OUTSIDE CLASS PERIOD |
| 52925 | PURCHASED OUTSIDE CLASS PERIOD |
| 52926 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 52927 | PURCHASED OUTSIDE CLASS PERIOD |
| 52928 | PURCHASED OUTSIDE CLASS PERIOD |
| 52929 | PURCHASED OUTSIDE CLASS PERIOD |
| 52930 | PURCHASED OUTSIDE CLASS PERIOD |
| 52931 | PURCHASED OUTSIDE CLASS PERIOD |
| 52932 | PURCHASED OUTSIDE CLASS PERIOD |
| 52933 | PURCHASED OUTSIDE CLASS PERIOD |
| 52934 | PURCHASED OUTSIDE CLASS PERIOD |
| 52935 | PURCHASED OUTSIDE CLASS PERIOD |
| 52936 | PURCHASED OUTSIDE CLASS PERIOD |
| 52937 | PURCHASED OUTSIDE CLASS PERIOD |
| 52938 | PURCHASED OUTSIDE CLASS PERIOD |
| 52939 | PURCHASED OUTSIDE CLASS PERIOD |
| 52940 | PURCHASED OUTSIDE CLASS PERIOD |
| 52941 | PURCHASED OUTSIDE CLASS PERIOD |
| 52942 | PURCHASED OUTSIDE CLASS PERIOD |
| 52943 | PURCHASED OUTSIDE CLASS PERIOD |
| 52944 | PURCHASED OUTSIDE CLASS PERIOD |
| 52945 | PURCHASED OUTSIDE CLASS PERIOD |
| 52946 | PURCHASED OUTSIDE CLASS PERIOD |
| 52947 | PURCHASED OUTSIDE CLASS PERIOD |
| 52948 | PURCHASED OUTSIDE CLASS PERIOD |
| 52949 | PURCHASED OUTSIDE CLASS PERIOD |
| 52950 | PURCHASED OUTSIDE CLASS PERIOD |
| 52951 | PURCHASED OUTSIDE CLASS PERIOD |
| 52952 | PURCHASED OUTSIDE CLASS PERIOD |
| 52953 | PURCHASED OUTSIDE CLASS PERIOD |
| 52954 | PURCHASED OUTSIDE CLASS PERIOD |
| 52955 | PURCHASED OUTSIDE CLASS PERIOD |
| 52956 | PURCHASED OUTSIDE CLASS PERIOD |
| 52957 | PURCHASED OUTSIDE CLASS PERIOD |
| 52958 | PURCHASED OUTSIDE CLASS PERIOD |
| 52959 | PURCHASED OUTSIDE CLASS PERIOD |
| 52960 | PURCHASED OUTSIDE CLASS PERIOD |
| 52961 | PURCHASED OUTSIDE CLASS PERIOD |
| 52962 | PURCHASED OUTSIDE CLASS PERIOD |
| 52963 | PURCHASED OUTSIDE CLASS PERIOD |
| 52964 | PURCHASED OUTSIDE CLASS PERIOD |
| 52965 | PURCHASED OUTSIDE CLASS PERIOD |
| 52966 | PURCHASED OUTSIDE CLASS PERIOD |
| 52967 | PURCHASED OUTSIDE CLASS PERIOD |
| 52968 | PURCHASED OUTSIDE CLASS PERIOD |
| 52969 | PURCHASED OUTSIDE CLASS PERIOD |
| 52970 | PURCHASED OUTSIDE CLASS PERIOD |
| 52971 | PURCHASED OUTSIDE CLASS PERIOD |
| 52972 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 52973 | PURCHASED OUTSIDE CLASS PERIOD |
| 52974 | PURCHASED OUTSIDE CLASS PERIOD |
| 52975 | PURCHASED OUTSIDE CLASS PERIOD |
| 52976 | PURCHASED OUTSIDE CLASS PERIOD |
| 52977 | PURCHASED OUTSIDE CLASS PERIOD |
| 52978 | PURCHASED OUTSIDE CLASS PERIOD |
| 52979 | PURCHASED OUTSIDE CLASS PERIOD |
| 52980 | PURCHASED OUTSIDE CLASS PERIOD |
| 52981 | PURCHASED OUTSIDE CLASS PERIOD |
| 52982 | PURCHASED OUTSIDE CLASS PERIOD |
| 52983 | PURCHASED OUTSIDE CLASS PERIOD |
| 52984 | PURCHASED OUTSIDE CLASS PERIOD |
| 52985 | PURCHASED OUTSIDE CLASS PERIOD |
| 52986 | PURCHASED OUTSIDE CLASS PERIOD |
| 52987 | PURCHASED OUTSIDE CLASS PERIOD |
| 52988 | PURCHASED OUTSIDE CLASS PERIOD |
| 52989 | PURCHASED OUTSIDE CLASS PERIOD |
| 52990 | PURCHASED OUTSIDE CLASS PERIOD |
| 52991 | PURCHASED OUTSIDE CLASS PERIOD |
| 52992 | PURCHASED OUTSIDE CLASS PERIOD |
| 52993 | PURCHASED OUTSIDE CLASS PERIOD |
| 52994 | PURCHASED OUTSIDE CLASS PERIOD |
| 52995 | PURCHASED OUTSIDE CLASS PERIOD |
| 52996 | PURCHASED OUTSIDE CLASS PERIOD |
| 52997 | PURCHASED OUTSIDE CLASS PERIOD |
| 52998 | PURCHASED OUTSIDE CLASS PERIOD |
| 52999 | PURCHASED OUTSIDE CLASS PERIOD |
| 53000 | PURCHASED OUTSIDE CLASS PERIOD |
| 53001 | PURCHASED OUTSIDE CLASS PERIOD |
| 53002 | PURCHASED OUTSIDE CLASS PERIOD |
| 53003 | PURCHASED OUTSIDE CLASS PERIOD |
| 53004 | PURCHASED OUTSIDE CLASS PERIOD |
| 53005 | PURCHASED OUTSIDE CLASS PERIOD |
| 53006 | PURCHASED OUTSIDE CLASS PERIOD |
| 53007 | PURCHASED OUTSIDE CLASS PERIOD |
| 53008 | PURCHASED OUTSIDE CLASS PERIOD |
| 53009 | PURCHASED OUTSIDE CLASS PERIOD |
| 53010 | PURCHASED OUTSIDE CLASS PERIOD |
| 53011 | PURCHASED OUTSIDE CLASS PERIOD |
| 53012 | PURCHASED OUTSIDE CLASS PERIOD |
| 53013 | PURCHASED OUTSIDE CLASS PERIOD |
| 53014 | PURCHASED OUTSIDE CLASS PERIOD |
| 53015 | PURCHASED OUTSIDE CLASS PERIOD |
| 53016 | PURCHASED OUTSIDE CLASS PERIOD |
| 53017 | PURCHASED OUTSIDE CLASS PERIOD |
| 53018 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
| --- | --- |
| 53019 | PURCHASED OUTSIDE CLASS PERIOD |
| 53020 | PURCHASED OUTSIDE CLASS PERIOD |
| 53021 | PURCHASED OUTSIDE CLASS PERIOD |
| 53022 | PURCHASED OUTSIDE CLASS PERIOD |
| 53023 | PURCHASED OUTSIDE CLASS PERIOD |
| 53024 | PURCHASED OUTSIDE CLASS PERIOD |
| 53025 | PURCHASED OUTSIDE CLASS PERIOD |
| 53026 | PURCHASED OUTSIDE CLASS PERIOD |
| 53027 | PURCHASED OUTSIDE CLASS PERIOD |
| 53028 | PURCHASED OUTSIDE CLASS PERIOD |
| 53029 | PURCHASED OUTSIDE CLASS PERIOD |
| 53030 | PURCHASED OUTSIDE CLASS PERIOD |
| 53031 | PURCHASED OUTSIDE CLASS PERIOD |
| 53032 | PURCHASED OUTSIDE CLASS PERIOD |
| 53033 | PURCHASED OUTSIDE CLASS PERIOD |
| 53034 | PURCHASED OUTSIDE CLASS PERIOD |
| 53035 | PURCHASED OUTSIDE CLASS PERIOD |
| 53036 | PURCHASED OUTSIDE CLASS PERIOD |
| 53037 | PURCHASED OUTSIDE CLASS PERIOD |
| 53038 | PURCHASED OUTSIDE CLASS PERIOD |
| 53039 | PURCHASED OUTSIDE CLASS PERIOD |
| 53040 | PURCHASED OUTSIDE CLASS PERIOD |
| 53041 | PURCHASED OUTSIDE CLASS PERIOD |
| 53042 | PURCHASED OUTSIDE CLASS PERIOD |
| 53043 | PURCHASED OUTSIDE CLASS PERIOD |
| 53044 | PURCHASED OUTSIDE CLASS PERIOD |
| 53045 | PURCHASED OUTSIDE CLASS PERIOD |
| 53046 | PURCHASED OUTSIDE CLASS PERIOD |
| 53047 | PURCHASED OUTSIDE CLASS PERIOD |
| 53048 | PURCHASED OUTSIDE CLASS PERIOD |
| 53049 | PURCHASED OUTSIDE CLASS PERIOD |
| 53050 | PURCHASED OUTSIDE CLASS PERIOD |
| 53051 | PURCHASED OUTSIDE CLASS PERIOD |
| 53052 | PURCHASED OUTSIDE CLASS PERIOD |
| 53053 | PURCHASED OUTSIDE CLASS PERIOD |
| 53054 | PURCHASED OUTSIDE CLASS PERIOD |
| 53055 | PURCHASED OUTSIDE CLASS PERIOD |
| 53056 | PURCHASED OUTSIDE CLASS PERIOD |
| 53057 | PURCHASED OUTSIDE CLASS PERIOD |
| 53058 | PURCHASED OUTSIDE CLASS PERIOD |
| 53059 | PURCHASED OUTSIDE CLASS PERIOD |
| 53060 | PURCHASED OUTSIDE CLASS PERIOD |
| 53061 | PURCHASED OUTSIDE CLASS PERIOD |
| 53062 | PURCHASED OUTSIDE CLASS PERIOD |
| 53063 | PURCHASED OUTSIDE CLASS PERIOD |
| 53064 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 53065 | PURCHASED OUTSIDE CLASS PERIOD |
| 53066 | PURCHASED OUTSIDE CLASS PERIOD |
| 53067 | PURCHASED OUTSIDE CLASS PERIOD |
| 53068 | PURCHASED OUTSIDE CLASS PERIOD |
| 53069 | PURCHASED OUTSIDE CLASS PERIOD |
| 53070 | PURCHASED OUTSIDE CLASS PERIOD |
| 53071 | PURCHASED OUTSIDE CLASS PERIOD |
| 53072 | PURCHASED OUTSIDE CLASS PERIOD |
| 53073 | PURCHASED OUTSIDE CLASS PERIOD |
| 53074 | PURCHASED OUTSIDE CLASS PERIOD |
| 53075 | PURCHASED OUTSIDE CLASS PERIOD |
| 53076 | PURCHASED OUTSIDE CLASS PERIOD |
| 53077 | PURCHASED OUTSIDE CLASS PERIOD |
| 53078 | PURCHASED OUTSIDE CLASS PERIOD |
| 53079 | PURCHASED OUTSIDE CLASS PERIOD |
| 53080 | PURCHASED OUTSIDE CLASS PERIOD |
| 53081 | PURCHASED OUTSIDE CLASS PERIOD |
| 53082 | PURCHASED OUTSIDE CLASS PERIOD |
| 53083 | PURCHASED OUTSIDE CLASS PERIOD |
| 53084 | PURCHASED OUTSIDE CLASS PERIOD |
| 53085 | PURCHASED OUTSIDE CLASS PERIOD |
| 53086 | PURCHASED OUTSIDE CLASS PERIOD |
| 53087 | PURCHASED OUTSIDE CLASS PERIOD |
| 53088 | PURCHASED OUTSIDE CLASS PERIOD |
| 53089 | PURCHASED OUTSIDE CLASS PERIOD |
| 53090 | PURCHASED OUTSIDE CLASS PERIOD |
| 53091 | PURCHASED OUTSIDE CLASS PERIOD |
| 53092 | PURCHASED OUTSIDE CLASS PERIOD |
| 53093 | PURCHASED OUTSIDE CLASS PERIOD |
| 53094 | PURCHASED OUTSIDE CLASS PERIOD |
| 53095 | PURCHASED OUTSIDE CLASS PERIOD |
| 53096 | PURCHASED OUTSIDE CLASS PERIOD |
| 53097 | PURCHASED OUTSIDE CLASS PERIOD |
| 53098 | PURCHASED OUTSIDE CLASS PERIOD |
| 53099 | PURCHASED OUTSIDE CLASS PERIOD |
| 53100 | NO RECOGNIZED LOSSES |
| 53104 | SHARES SOLD SHORT |
| 53109 | PURCHASED OUTSIDE CLASS PERIOD |
| 53110 | PURCHASED OUTSIDE CLASS PERIOD |
| 53112 | NO RECOGNIZED LOSSES |
| 53115 | PURCHASED OUTSIDE CLASS PERIOD |
| 53116 | PURCHASED OUTSIDE CLASS PERIOD |
| 53117 | PURCHASED OUTSIDE CLASS PERIOD |
| 53118 | PURCHASED OUTSIDE CLASS PERIOD |
| 53119 | NO RECOGNIZED LOSSES |
| 53120 | PURCHASED OUTSIDE CLASS PERIOD |

## INELIGIBLE CLAIMS

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 53121 | PURCHASED OUTSIDE CLASS PERIOD |
| 53122 | NO RECOGNIZED LOSSES |
| 53123 | NO RECOGNIZED LOSSES |
| 53125 | NO RECOGNIZED LOSSES |
| 53126 | PURCHASED OUTSIDE CLASS PERIOD |
| 53127 | PURCHASED OUTSIDE CLASS PERIOD |
| 53128 | PURCHASED OUTSIDE CLASS PERIOD |
| 53130 | NO RECOGNIZED LOSSES |
| 53131 | PURCHASED OUTSIDE CLASS PERIOD |
| 53132 | PURCHASED OUTSIDE CLASS PERIOD |
| 53134 | PURCHASED OUTSIDE CLASS PERIOD |
| 53135 | NO RECOGNIZED LOSSES |
| 53136 | PURCHASED OUTSIDE CLASS PERIOD |
| 53137 | NO RECOGNIZED LOSSES |
| 53138 | PURCHASED OUTSIDE CLASS PERIOD |
| 53139 | PURCHASED OUTSIDE CLASS PERIOD |
| 53140 | PURCHASED OUTSIDE CLASS PERIOD |
| 53141 | PURCHASED OUTSIDE CLASS PERIOD |
| 53143 | PURCHASED OUTSIDE CLASS PERIOD |
| 53144 | PURCHASED OUTSIDE CLASS PERIOD |
| 53145 | NO RECOGNIZED LOSSES |
| 53147 | NO RECOGNIZED LOSSES |
| 53148 | PURCHASED OUTSIDE CLASS PERIOD |
| 53150 | PURCHASED OUTSIDE CLASS PERIOD |
| 53152 | PURCHASED OUTSIDE CLASS PERIOD |
| 53153 | SHARES SOLD SHORT |
| 53154 | PURCHASED OUTSIDE CLASS PERIOD |
| 53155 | NO RECOGNIZED LOSSES |
| 53156 | PURCHASED OUTSIDE CLASS PERIOD |
| 53157 | NO RECOGNIZED LOSSES |
| 53158 | NO RECOGNIZED LOSSES |
| 53159 | NO RECOGNIZED LOSSES |
| 53160 | PURCHASED OUTSIDE CLASS PERIOD |
| 53162 | PURCHASED OUTSIDE CLASS PERIOD |
| 53163 | PURCHASED OUTSIDE CLASS PERIOD |
| 53164 | PURCHASED OUTSIDE CLASS PERIOD |
| 53165 | NO RECOGNIZED LOSSES |
| 53166 | PURCHASED OUTSIDE CLASS PERIOD |
| 53167 | PURCHASED OUTSIDE CLASS PERIOD |
| 53168 | SHARES SOLD SHORT |
| 53169 | SHARES SOLD SHORT |
| 53170 | PURCHASED OUTSIDE CLASS PERIOD |
| 53171 | PURCHASED OUTSIDE CLASS PERIOD |
| 53172 | PURCHASED OUTSIDE CLASS PERIOD |
| 53173 | PURCHASED OUTSIDE CLASS PERIOD |
| 53174 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---------|------------------|
| 53175 | PURCHASED OUTSIDE CLASS PERIOD |
| 53176 | NO RECOGNIZED LOSSES |
| 53177 | NO RECOGNIZED LOSSES |
| 53178 | SHARES SOLD SHORT |
| 53179 | PURCHASED OUTSIDE CLASS PERIOD |
| 53181 | PURCHASED OUTSIDE CLASS PERIOD |
| 53182 | PURCHASED OUTSIDE CLASS PERIOD |
| 53183 | PURCHASED OUTSIDE CLASS PERIOD |
| 53184 | NO RECOGNIZED LOSSES |
| 53185 | NO RECOGNIZED LOSSES |
| 53186 | PURCHASED OUTSIDE CLASS PERIOD |
| 53187 | PURCHASED OUTSIDE CLASS PERIOD |
| 53188 | PURCHASED OUTSIDE CLASS PERIOD |
| 53189 | NO RECOGNIZED LOSSES |
| 53190 | NO RECOGNIZED LOSSES |
| 53191 | PURCHASED OUTSIDE CLASS PERIOD |
| 53192 | PURCHASED OUTSIDE CLASS PERIOD |
| 53195 | PURCHASED OUTSIDE CLASS PERIOD |
| 53196 | NO RECOGNIZED LOSSES |
| 53197 | PURCHASED OUTSIDE CLASS PERIOD |
| 53198 | NO RECOGNIZED LOSSES |
| 53199 | PURCHASED OUTSIDE CLASS PERIOD |
| 53200 | NO RECOGNIZED LOSSES |
| 53201 | NO RECOGNIZED LOSSES |
| 53202 | PURCHASED OUTSIDE CLASS PERIOD |
| 53203 | NO RECOGNIZED LOSSES |
| 53204 | PURCHASED OUTSIDE CLASS PERIOD |
| 53207 | NO RECOGNIZED LOSSES |
| 53208 | PURCHASED OUTSIDE CLASS PERIOD |
| 53209 | PURCHASED OUTSIDE CLASS PERIOD |
| 53210 | NO RECOGNIZED LOSSES |
| 53212 | PURCHASED OUTSIDE CLASS PERIOD |
| 53213 | NO RECOGNIZED LOSSES |
| 53214 | PURCHASED OUTSIDE CLASS PERIOD |
| 53215 | NO RECOGNIZED LOSSES |
| 53216 | NO RECOGNIZED LOSSES |
| 53217 | PURCHASED OUTSIDE CLASS PERIOD |
| 53218 | PURCHASED OUTSIDE CLASS PERIOD |
| 53219 | NO RECOGNIZED LOSSES |
| 53222 | NO RECOGNIZED LOSSES |
| 53223 | PURCHASED OUTSIDE CLASS PERIOD |
| 53224 | NO RECOGNIZED LOSSES |
| 53225 | NO RECOGNIZED LOSSES |
| 53226 | NO RECOGNIZED LOSSES |
| 53227 | PURCHASED OUTSIDE CLASS PERIOD |
| 53228 | SHARES SOLD SHORT |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 53229 | PURCHASED OUTSIDE CLASS PERIOD |
| 53230 | PURCHASED OUTSIDE CLASS PERIOD |
| 53232 | PURCHASED OUTSIDE CLASS PERIOD |
| 53233 | PURCHASED OUTSIDE CLASS PERIOD |
| 53234 | SHARES SOLD SHORT |
| 53235 | NO RECOGNIZED LOSSES |
| 53236 | NO RECOGNIZED LOSSES |
| 53238 | PURCHASED OUTSIDE CLASS PERIOD |
| 53239 | NO RECOGNIZED LOSSES |
| 53242 | NO RECOGNIZED LOSSES |
| 53243 | NO RECOGNIZED LOSSES |
| 53244 | PURCHASED OUTSIDE CLASS PERIOD |
| 53245 | PURCHASED OUTSIDE CLASS PERIOD |
| 53246 | PURCHASED OUTSIDE CLASS PERIOD |
| 53247 | PURCHASED OUTSIDE CLASS PERIOD |
| 53248 | NO RECOGNIZED LOSSES |
| 53249 | PURCHASED OUTSIDE CLASS PERIOD |
| 53251 | PURCHASED OUTSIDE CLASS PERIOD |
| 53252 | PURCHASED OUTSIDE CLASS PERIOD |
| 53253 | NO RECOGNIZED LOSSES |
| 53254 | SHARES SOLD SHORT |
| 53255 | NO RECOGNIZED LOSSES |
| 53256 | PURCHASED OUTSIDE CLASS PERIOD |
| 53258 | PURCHASED OUTSIDE CLASS PERIOD |
| 53259 | NO RECOGNIZED LOSSES |
| 53261 | PURCHASED OUTSIDE CLASS PERIOD |
| 53262 | NO RECOGNIZED LOSSES |
| 53263 | PURCHASED OUTSIDE CLASS PERIOD |
| 53265 | PURCHASED OUTSIDE CLASS PERIOD |
| 53266 | PURCHASED OUTSIDE CLASS PERIOD |
| 53267 | PURCHASED OUTSIDE CLASS PERIOD |
| 53268 | NO RECOGNIZED LOSSES |
| 53269 | PURCHASED OUTSIDE CLASS PERIOD |
| 53270 | NO RECOGNIZED LOSSES |
| 53271 | PURCHASED OUTSIDE CLASS PERIOD |
| 53272 | NO RECOGNIZED LOSSES |
| 53273 | PURCHASED OUTSIDE CLASS PERIOD |
| 53274 | NO RECOGNIZED LOSSES |
| 53275 | PURCHASED OUTSIDE CLASS PERIOD |
| 53276 | NO RECOGNIZED LOSSES |
| 53277 | NO RECOGNIZED LOSSES |
| 53279 | PURCHASED OUTSIDE CLASS PERIOD |
| 53280 | PURCHASED OUTSIDE CLASS PERIOD |
| 53281 | PURCHASED OUTSIDE CLASS PERIOD |
| 53282 | PURCHASED OUTSIDE CLASS PERIOD |
| 53284 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

| Claim # | Rejection Reason |
|---|---|
| 53285 | SHARES SOLD SHORT |
| 53286 | PURCHASED OUTSIDE CLASS PERIOD |
| 53287 | NO RECOGNIZED LOSSES |
| 53288 | PURCHASED OUTSIDE CLASS PERIOD |
| 53289 | PURCHASED OUTSIDE CLASS PERIOD |
| 53290 | PURCHASED OUTSIDE CLASS PERIOD |
| 53291 | NO RECOGNIZED LOSSES |
| 53292 | PURCHASED OUTSIDE CLASS PERIOD |
| 53294 | NO RECOGNIZED LOSSES |
| 53295 | PURCHASED OUTSIDE CLASS PERIOD |
| 53296 | PURCHASED OUTSIDE CLASS PERIOD |
| 53297 | NO RECOGNIZED LOSSES |
| 53299 | NO RECOGNIZED LOSSES |
| 53300 | PURCHASED OUTSIDE CLASS PERIOD |
| 53302 | PURCHASED OUTSIDE CLASS PERIOD |
| 53303 | NO RECOGNIZED LOSSES |
| 53304 | NO RECOGNIZED LOSSES |
| 53305 | PURCHASED OUTSIDE CLASS PERIOD |
| 53306 | SHARES SOLD SHORT |
| 53307 | PURCHASED OUTSIDE CLASS PERIOD |
| 53308 | PURCHASED OUTSIDE CLASS PERIOD |
| 53309 | PURCHASED OUTSIDE CLASS PERIOD |
| 53310 | PURCHASED OUTSIDE CLASS PERIOD |
| 53311 | PURCHASED OUTSIDE CLASS PERIOD |
| 53312 | NO RECOGNIZED LOSSES |
| 53313 | PURCHASED OUTSIDE CLASS PERIOD |
| 53314 | SHARES SOLD SHORT |
| 53315 | NO RECOGNIZED LOSSES |
| 53316 | PURCHASED OUTSIDE CLASS PERIOD |
| 53317 | PURCHASED OUTSIDE CLASS PERIOD |
| 53318 | PURCHASED OUTSIDE CLASS PERIOD |
| 53319 | PURCHASED OUTSIDE CLASS PERIOD |
| 53320 | PURCHASED OUTSIDE CLASS PERIOD |
| 53321 | NO RECOGNIZED LOSSES |
| 53322 | PURCHASED OUTSIDE CLASS PERIOD |
| 53323 | PURCHASED OUTSIDE CLASS PERIOD |
| 53324 | PURCHASED OUTSIDE CLASS PERIOD |
| 53325 | PURCHASED OUTSIDE CLASS PERIOD |
| 53328 | NO RECOGNIZED LOSSES |
| 53329 | PURCHASED OUTSIDE CLASS PERIOD |
| 53330 | NO RECOGNIZED LOSSES |
| 53331 | NO RECOGNIZED LOSSES |
| 53332 | PURCHASED OUTSIDE CLASS PERIOD |
| 53333 | NO RECOGNIZED LOSSES |
| 53334 | PURCHASED OUTSIDE CLASS PERIOD |
| 53335 | SHARES SOLD SHORT |

INELIGIBLE CLAIMS

| Claim # | Rejection Reason |
|---|---|
| 53336 | NO RECOGNIZED LOSSES |
| 53337 | NO RECOGNIZED LOSSES |
| 53338 | NO RECOGNIZED LOSSES |
| 53339 | NO RECOGNIZED LOSSES |
| 53340 | PURCHASED OUTSIDE CLASS PERIOD |
| 53341 | PURCHASED OUTSIDE CLASS PERIOD |
| 53342 | NO RECOGNIZED LOSSES |
| 53343 | NO RECOGNIZED LOSSES |
| 53344 | PURCHASED OUTSIDE CLASS PERIOD |
| 53345 | PURCHASED OUTSIDE CLASS PERIOD |
| 53346 | PURCHASED OUTSIDE CLASS PERIOD |
| 53347 | PURCHASED OUTSIDE CLASS PERIOD |
| 53348 | PURCHASED OUTSIDE CLASS PERIOD |
| 53349 | PURCHASED OUTSIDE CLASS PERIOD |
| 53351 | PURCHASED OUTSIDE CLASS PERIOD |
| 53352 | NO RECOGNIZED LOSSES |
| 53353 | PURCHASED OUTSIDE CLASS PERIOD |
| 53354 | PURCHASED OUTSIDE CLASS PERIOD |
| 53355 | NO RECOGNIZED LOSSES |
| 53358 | PURCHASED OUTSIDE CLASS PERIOD |
| 53360 | PURCHASED OUTSIDE CLASS PERIOD |
| 53361 | PURCHASED OUTSIDE CLASS PERIOD |
| 53362 | PURCHASED OUTSIDE CLASS PERIOD |
| 53363 | NO RECOGNIZED LOSSES |
| 53364 | PURCHASED OUTSIDE CLASS PERIOD |
| 53365 | PURCHASED OUTSIDE CLASS PERIOD |
| 53366 | PURCHASED OUTSIDE CLASS PERIOD |
| 53368 | SHARES SOLD SHORT |
| 53369 | PURCHASED OUTSIDE CLASS PERIOD |
| 53370 | PURCHASED OUTSIDE CLASS PERIOD |
| 53371 | NO RECOGNIZED LOSSES |
| 53372 | NO RECOGNIZED LOSSES |
| 53373 | PURCHASED OUTSIDE CLASS PERIOD |
| 53374 | PURCHASED OUTSIDE CLASS PERIOD |
| 53375 | PURCHASED OUTSIDE CLASS PERIOD |
| 53376 | NO RECOGNIZED LOSSES |
| 53377 | PURCHASED OUTSIDE CLASS PERIOD |
| 53378 | NO RECOGNIZED LOSSES |
| 53381 | SHARES SOLD SHORT |
| 53382 | PURCHASED OUTSIDE CLASS PERIOD |
| 53383 | PURCHASED OUTSIDE CLASS PERIOD |
| 53384 | NO RECOGNIZED LOSSES |
| 53385 | PURCHASED OUTSIDE CLASS PERIOD |
| 53387 | PURCHASED OUTSIDE CLASS PERIOD |
| 53388 | PURCHASED OUTSIDE CLASS PERIOD |
| 53391 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 53392 | SHARES SOLD SHORT |
| 53395 | NO RECOGNIZED LOSSES |
| 53396 | NO RECOGNIZED LOSSES |
| 53397 | PURCHASED OUTSIDE CLASS PERIOD |
| 53399 | PURCHASED OUTSIDE CLASS PERIOD |
| 53400 | PURCHASED OUTSIDE CLASS PERIOD |
| 53401 | NO RECOGNIZED LOSSES |
| 53402 | PURCHASED OUTSIDE CLASS PERIOD |
| 53403 | NO RECOGNIZED LOSSES |
| 53404 | PURCHASED OUTSIDE CLASS PERIOD |
| 53405 | PURCHASED OUTSIDE CLASS PERIOD |
| 53406 | PURCHASED OUTSIDE CLASS PERIOD |
| 53407 | PURCHASED OUTSIDE CLASS PERIOD |
| 53408 | SHARES SOLD SHORT |
| 53409 | PURCHASED OUTSIDE CLASS PERIOD |
| 53411 | NO RECOGNIZED LOSSES |
| 53412 | NO RECOGNIZED LOSSES |
| 53413 | PURCHASED OUTSIDE CLASS PERIOD |
| 53415 | SHARES SOLD SHORT |
| 53416 | NO RECOGNIZED LOSSES |
| 53417 | NO RECOGNIZED LOSSES |
| 53418 | PURCHASED OUTSIDE CLASS PERIOD |
| 53419 | PURCHASED OUTSIDE CLASS PERIOD |
| 53420 | NO RECOGNIZED LOSSES |
| 53421 | NO RECOGNIZED LOSSES |
| 53422 | PURCHASED OUTSIDE CLASS PERIOD |
| 53423 | PURCHASED OUTSIDE CLASS PERIOD |
| 53424 | PURCHASED OUTSIDE CLASS PERIOD |
| 53425 | PURCHASED OUTSIDE CLASS PERIOD |
| 53427 | PURCHASED OUTSIDE CLASS PERIOD |
| 53428 | PURCHASED OUTSIDE CLASS PERIOD |
| 53429 | NO RECOGNIZED LOSSES |
| 53430 | NO RECOGNIZED LOSSES |
| 53431 | NO RECOGNIZED LOSSES |
| 53432 | PURCHASED OUTSIDE CLASS PERIOD |
| 53433 | NO RECOGNIZED LOSSES |
| 53434 | PURCHASED OUTSIDE CLASS PERIOD |
| 53435 | PURCHASED OUTSIDE CLASS PERIOD |
| 53437 | PURCHASED OUTSIDE CLASS PERIOD |
| 53438 | PURCHASED OUTSIDE CLASS PERIOD |
| 53439 | SHARES SOLD SHORT |
| 53440 | PURCHASED OUTSIDE CLASS PERIOD |
| 53441 | PURCHASED OUTSIDE CLASS PERIOD |
| 53442 | NO RECOGNIZED LOSSES |
| 53443 | PURCHASED OUTSIDE CLASS PERIOD |
| 53444 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 53446 | NO RECOGNIZED LOSSES |
| 53447 | PURCHASED OUTSIDE CLASS PERIOD |
| 53448 | PURCHASED OUTSIDE CLASS PERIOD |
| 53449 | PURCHASED OUTSIDE CLASS PERIOD |
| 53450 | NO RECOGNIZED LOSSES |
| 53451 | NO RECOGNIZED LOSSES |
| 53452 | NO RECOGNIZED LOSSES |
| 53454 | NO RECOGNIZED LOSSES |
| 53455 | NO RECOGNIZED LOSSES |
| 53456 | SHARES SOLD SHORT |
| 53457 | PURCHASED OUTSIDE CLASS PERIOD |
| 53458 | NO RECOGNIZED LOSSES |
| 53459 | PURCHASED OUTSIDE CLASS PERIOD |
| 53460 | PURCHASED OUTSIDE CLASS PERIOD |
| 53462 | PURCHASED OUTSIDE CLASS PERIOD |
| 53463 | NO RECOGNIZED LOSSES |
| 53464 | PURCHASED OUTSIDE CLASS PERIOD |
| 53465 | PURCHASED OUTSIDE CLASS PERIOD |
| 53466 | NO RECOGNIZED LOSSES |
| 53467 | PURCHASED OUTSIDE CLASS PERIOD |
| 53468 | PURCHASED OUTSIDE CLASS PERIOD |
| 53469 | PURCHASED OUTSIDE CLASS PERIOD |
| 53470 | NO RECOGNIZED LOSSES |
| 53472 | NO RECOGNIZED LOSSES |
| 53473 | PURCHASED OUTSIDE CLASS PERIOD |
| 53474 | PURCHASED OUTSIDE CLASS PERIOD |
| 53475 | PURCHASED OUTSIDE CLASS PERIOD |
| 53476 | PURCHASED OUTSIDE CLASS PERIOD |
| 53477 | PURCHASED OUTSIDE CLASS PERIOD |
| 53478 | NO RECOGNIZED LOSSES |
| 53479 | PURCHASED OUTSIDE CLASS PERIOD |
| 53480 | PURCHASED OUTSIDE CLASS PERIOD |
| 53482 | PURCHASED OUTSIDE CLASS PERIOD |
| 53483 | PURCHASED OUTSIDE CLASS PERIOD |
| 53484 | PURCHASED OUTSIDE CLASS PERIOD |
| 53485 | PURCHASED OUTSIDE CLASS PERIOD |
| 53486 | PURCHASED OUTSIDE CLASS PERIOD |
| 53487 | PURCHASED OUTSIDE CLASS PERIOD |
| 53488 | SHARES SOLD SHORT |
| 53489 | PURCHASED OUTSIDE CLASS PERIOD |
| 53490 | NO RECOGNIZED LOSSES |
| 53491 | PURCHASED OUTSIDE CLASS PERIOD |
| 53493 | NO RECOGNIZED LOSSES |
| 53494 | PURCHASED OUTSIDE CLASS PERIOD |
| 53495 | PURCHASED OUTSIDE CLASS PERIOD |
| 53496 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**                                    **EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 53497 | PURCHASED OUTSIDE CLASS PERIOD |
| 53499 | NO RECOGNIZED LOSSES |
| 53501 | PURCHASED OUTSIDE CLASS PERIOD |
| 53502 | PURCHASED OUTSIDE CLASS PERIOD |
| 53504 | NO RECOGNIZED LOSSES |
| 53505 | PURCHASED OUTSIDE CLASS PERIOD |
| 53507 | NO RECOGNIZED LOSSES |
| 53508 | PURCHASED OUTSIDE CLASS PERIOD |
| 53510 | NO RECOGNIZED LOSSES |
| 53512 | NO RECOGNIZED LOSSES |
| 53513 | NO RECOGNIZED LOSSES |
| 53514 | PURCHASED OUTSIDE CLASS PERIOD |
| 53515 | PURCHASED OUTSIDE CLASS PERIOD |
| 53516 | NO RECOGNIZED LOSSES |
| 53517 | PURCHASED OUTSIDE CLASS PERIOD |
| 53519 | PURCHASED OUTSIDE CLASS PERIOD |
| 53522 | SHARES SOLD SHORT |
| 53524 | NO RECOGNIZED LOSSES |
| 53525 | PURCHASED OUTSIDE CLASS PERIOD |
| 53527 | NO RECOGNIZED LOSSES |
| 53528 | PURCHASED OUTSIDE CLASS PERIOD |
| 53529 | NO RECOGNIZED LOSSES |
| 53530 | NO RECOGNIZED LOSSES |
| 53531 | PURCHASED OUTSIDE CLASS PERIOD |
| 53532 | PURCHASED OUTSIDE CLASS PERIOD |
| 53533 | PURCHASED OUTSIDE CLASS PERIOD |
| 53534 | PURCHASED OUTSIDE CLASS PERIOD |
| 53535 | PURCHASED OUTSIDE CLASS PERIOD |
| 53536 | NO RECOGNIZED LOSSES |
| 53537 | NO RECOGNIZED LOSSES |
| 53538 | NO RECOGNIZED LOSSES |
| 53539 | NO RECOGNIZED LOSSES |
| 53540 | PURCHASED OUTSIDE CLASS PERIOD |
| 53542 | NO RECOGNIZED LOSSES |
| 53543 | PURCHASED OUTSIDE CLASS PERIOD |
| 53544 | NO RECOGNIZED LOSSES |
| 53545 | NO RECOGNIZED LOSSES |
| 53546 | SHARES SOLD SHORT |
| 53547 | PURCHASED OUTSIDE CLASS PERIOD |
| 53548 | NO RECOGNIZED LOSSES |
| 53549 | NO RECOGNIZED LOSSES |
| 53551 | PURCHASED OUTSIDE CLASS PERIOD |
| 53552 | PURCHASED OUTSIDE CLASS PERIOD |
| 53553 | PURCHASED OUTSIDE CLASS PERIOD |
| 53554 | PURCHASED OUTSIDE CLASS PERIOD |
| 53555 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 53556 | PURCHASED OUTSIDE CLASS PERIOD |
| 53557 | PURCHASED OUTSIDE CLASS PERIOD |
| 53558 | NO RECOGNIZED LOSSES |
| 53559 | NO RECOGNIZED LOSSES |
| 53560 | PURCHASED OUTSIDE CLASS PERIOD |
| 53561 | PURCHASED OUTSIDE CLASS PERIOD |
| 53562 | PURCHASED OUTSIDE CLASS PERIOD |
| 53563 | PURCHASED OUTSIDE CLASS PERIOD |
| 53564 | NO RECOGNIZED LOSSES |
| 53565 | PURCHASED OUTSIDE CLASS PERIOD |
| 53566 | PURCHASED OUTSIDE CLASS PERIOD |
| 53569 | PURCHASED OUTSIDE CLASS PERIOD |
| 53570 | PURCHASED OUTSIDE CLASS PERIOD |
| 53571 | NO RECOGNIZED LOSSES |
| 53572 | NO RECOGNIZED LOSSES |
| 53573 | PURCHASED OUTSIDE CLASS PERIOD |
| 53574 | PURCHASED OUTSIDE CLASS PERIOD |
| 53575 | NO RECOGNIZED LOSSES |
| 53576 | PURCHASED OUTSIDE CLASS PERIOD |
| 53577 | PURCHASED OUTSIDE CLASS PERIOD |
| 53578 | PURCHASED OUTSIDE CLASS PERIOD |
| 53579 | PURCHASED OUTSIDE CLASS PERIOD |
| 53580 | PURCHASED OUTSIDE CLASS PERIOD |
| 53581 | SHARES SOLD SHORT |
| 53582 | NO RECOGNIZED LOSSES |
| 53583 | PURCHASED OUTSIDE CLASS PERIOD |
| 53584 | NO RECOGNIZED LOSSES |
| 53585 | PURCHASED OUTSIDE CLASS PERIOD |
| 53586 | PURCHASED OUTSIDE CLASS PERIOD |
| 53587 | PURCHASED OUTSIDE CLASS PERIOD |
| 53588 | PURCHASED OUTSIDE CLASS PERIOD |
| 53590 | PURCHASED OUTSIDE CLASS PERIOD |
| 53591 | NO RECOGNIZED LOSSES |
| 53593 | PURCHASED OUTSIDE CLASS PERIOD |
| 53594 | SHARES SOLD SHORT |
| 53595 | PURCHASED OUTSIDE CLASS PERIOD |
| 53597 | NO RECOGNIZED LOSSES |
| 53598 | NO RECOGNIZED LOSSES |
| 53599 | NO RECOGNIZED LOSSES |
| 53600 | PURCHASED OUTSIDE CLASS PERIOD |
| 53601 | SHARES SOLD SHORT |
| 53602 | PURCHASED OUTSIDE CLASS PERIOD |
| 53603 | NO RECOGNIZED LOSSES |
| 53604 | PURCHASED OUTSIDE CLASS PERIOD |
| 53605 | PURCHASED OUTSIDE CLASS PERIOD |
| 53607 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 53608 | NO RECOGNIZED LOSSES |
| 53609 | NO RECOGNIZED LOSSES |
| 53610 | NO RECOGNIZED LOSSES |
| 53611 | NO RECOGNIZED LOSSES |
| 53612 | PURCHASED OUTSIDE CLASS PERIOD |
| 53613 | NO RECOGNIZED LOSSES |
| 53614 | PURCHASED OUTSIDE CLASS PERIOD |
| 53618 | PURCHASED OUTSIDE CLASS PERIOD |
| 53619 | PURCHASED OUTSIDE CLASS PERIOD |
| 53620 | NO RECOGNIZED LOSSES |
| 53622 | PURCHASED OUTSIDE CLASS PERIOD |
| 53623 | PURCHASED OUTSIDE CLASS PERIOD |
| 53624 | PURCHASED OUTSIDE CLASS PERIOD |
| 53628 | PURCHASED OUTSIDE CLASS PERIOD |
| 53629 | PURCHASED OUTSIDE CLASS PERIOD |
| 53630 | PURCHASED OUTSIDE CLASS PERIOD |
| 53631 | NO RECOGNIZED LOSSES |
| 53632 | PURCHASED OUTSIDE CLASS PERIOD |
| 53633 | PURCHASED OUTSIDE CLASS PERIOD |
| 53635 | PURCHASED OUTSIDE CLASS PERIOD |
| 53636 | PURCHASED OUTSIDE CLASS PERIOD |
| 53637 | PURCHASED OUTSIDE CLASS PERIOD |
| 53638 | NO RECOGNIZED LOSSES |
| 53639 | NO RECOGNIZED LOSSES |
| 53640 | NO RECOGNIZED LOSSES |
| 53641 | PURCHASED OUTSIDE CLASS PERIOD |
| 53642 | PURCHASED OUTSIDE CLASS PERIOD |
| 53643 | PURCHASED OUTSIDE CLASS PERIOD |
| 53644 | NO RECOGNIZED LOSSES |
| 53645 | NO RECOGNIZED LOSSES |
| 53647 | PURCHASED OUTSIDE CLASS PERIOD |
| 53649 | PURCHASED OUTSIDE CLASS PERIOD |
| 53650 | PURCHASED OUTSIDE CLASS PERIOD |
| 53651 | PURCHASED OUTSIDE CLASS PERIOD |
| 53653 | NO RECOGNIZED LOSSES |
| 53655 | NO RECOGNIZED LOSSES |
| 53656 | PURCHASED OUTSIDE CLASS PERIOD |
| 53658 | PURCHASED OUTSIDE CLASS PERIOD |
| 53659 | PURCHASED OUTSIDE CLASS PERIOD |
| 53660 | PURCHASED OUTSIDE CLASS PERIOD |
| 53661 | PURCHASED OUTSIDE CLASS PERIOD |
| 53662 | NO RECOGNIZED LOSSES |
| 53663 | PURCHASED OUTSIDE CLASS PERIOD |
| 53664 | PURCHASED OUTSIDE CLASS PERIOD |
| 53666 | NO RECOGNIZED LOSSES |
| 53667 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 53668 | NO RECOGNIZED LOSSES |
| 53670 | PURCHASED OUTSIDE CLASS PERIOD |
| 53671 | PURCHASED OUTSIDE CLASS PERIOD |
| 53672 | PURCHASED OUTSIDE CLASS PERIOD |
| 53673 | PURCHASED OUTSIDE CLASS PERIOD |
| 53674 | PURCHASED OUTSIDE CLASS PERIOD |
| 53675 | PURCHASED OUTSIDE CLASS PERIOD |
| 53676 | PURCHASED OUTSIDE CLASS PERIOD |
| 53677 | NO RECOGNIZED LOSSES |
| 53678 | NO RECOGNIZED LOSSES |
| 53679 | PURCHASED OUTSIDE CLASS PERIOD |
| 53681 | PURCHASED OUTSIDE CLASS PERIOD |
| 53682 | PURCHASED OUTSIDE CLASS PERIOD |
| 53683 | NO RECOGNIZED LOSSES |
| 53684 | PURCHASED OUTSIDE CLASS PERIOD |
| 53685 | PURCHASED OUTSIDE CLASS PERIOD |
| 53686 | NO RECOGNIZED LOSSES |
| 53687 | NO RECOGNIZED LOSSES |
| 53688 | NO RECOGNIZED LOSSES |
| 53689 | NO RECOGNIZED LOSSES |
| 53690 | NO RECOGNIZED LOSSES |
| 53691 | PURCHASED OUTSIDE CLASS PERIOD |
| 53692 | PURCHASED OUTSIDE CLASS PERIOD |
| 53693 | NO RECOGNIZED LOSSES |
| 53694 | NO RECOGNIZED LOSSES |
| 53696 | PURCHASED OUTSIDE CLASS PERIOD |
| 53697 | PURCHASED OUTSIDE CLASS PERIOD |
| 53699 | PURCHASED OUTSIDE CLASS PERIOD |
| 53700 | PURCHASED OUTSIDE CLASS PERIOD |
| 53701 | SHARES SOLD SHORT |
| 53702 | PURCHASED OUTSIDE CLASS PERIOD |
| 53703 | NO RECOGNIZED LOSSES |
| 53704 | PURCHASED OUTSIDE CLASS PERIOD |
| 53705 | NO RECOGNIZED LOSSES |
| 53706 | PURCHASED OUTSIDE CLASS PERIOD |
| 53707 | PURCHASED OUTSIDE CLASS PERIOD |
| 53708 | PURCHASED OUTSIDE CLASS PERIOD |
| 53709 | PURCHASED OUTSIDE CLASS PERIOD |
| 53710 | NO RECOGNIZED LOSSES |
| 53712 | PURCHASED OUTSIDE CLASS PERIOD |
| 53713 | PURCHASED OUTSIDE CLASS PERIOD |
| 53714 | PURCHASED OUTSIDE CLASS PERIOD |
| 53715 | PURCHASED OUTSIDE CLASS PERIOD |
| 53716 | PURCHASED OUTSIDE CLASS PERIOD |
| 53717 | NO RECOGNIZED LOSSES |
| 53718 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---------|------------------|
| 53720 | PURCHASED OUTSIDE CLASS PERIOD |
| 53722 | PURCHASED OUTSIDE CLASS PERIOD |
| 53724 | SHARES SOLD SHORT |
| 53725 | PURCHASED OUTSIDE CLASS PERIOD |
| 53726 | SHARES SOLD SHORT |
| 53727 | PURCHASED OUTSIDE CLASS PERIOD |
| 53728 | NO RECOGNIZED LOSSES |
| 53729 | PURCHASED OUTSIDE CLASS PERIOD |
| 53730 | PURCHASED OUTSIDE CLASS PERIOD |
| 53731 | PURCHASED OUTSIDE CLASS PERIOD |
| 53733 | PURCHASED OUTSIDE CLASS PERIOD |
| 53734 | NO RECOGNIZED LOSSES |
| 53735 | PURCHASED OUTSIDE CLASS PERIOD |
| 53736 | PURCHASED OUTSIDE CLASS PERIOD |
| 53737 | PURCHASED OUTSIDE CLASS PERIOD |
| 53738 | PURCHASED OUTSIDE CLASS PERIOD |
| 53739 | NO RECOGNIZED LOSSES |
| 53740 | PURCHASED OUTSIDE CLASS PERIOD |
| 53741 | PURCHASED OUTSIDE CLASS PERIOD |
| 53742 | PURCHASED OUTSIDE CLASS PERIOD |
| 53743 | PURCHASED OUTSIDE CLASS PERIOD |
| 53744 | PURCHASED OUTSIDE CLASS PERIOD |
| 53745 | PURCHASED OUTSIDE CLASS PERIOD |
| 53746 | PURCHASED OUTSIDE CLASS PERIOD |
| 53747 | NO RECOGNIZED LOSSES |
| 53748 | PURCHASED OUTSIDE CLASS PERIOD |
| 53750 | PURCHASED OUTSIDE CLASS PERIOD |
| 53751 | PURCHASED OUTSIDE CLASS PERIOD |
| 53752 | PURCHASED OUTSIDE CLASS PERIOD |
| 53753 | PURCHASED OUTSIDE CLASS PERIOD |
| 53755 | PURCHASED OUTSIDE CLASS PERIOD |
| 53756 | PURCHASED OUTSIDE CLASS PERIOD |
| 53757 | SHARES SOLD SHORT |
| 53758 | PURCHASED OUTSIDE CLASS PERIOD |
| 53762 | NO RECOGNIZED LOSSES |
| 53763 | NO RECOGNIZED LOSSES |
| 53765 | PURCHASED OUTSIDE CLASS PERIOD |
| 53766 | PURCHASED OUTSIDE CLASS PERIOD |
| 53767 | PURCHASED OUTSIDE CLASS PERIOD |
| 53768 | PURCHASED OUTSIDE CLASS PERIOD |
| 53769 | PURCHASED OUTSIDE CLASS PERIOD |
| 53770 | PURCHASED OUTSIDE CLASS PERIOD |
| 53771 | NO RECOGNIZED LOSSES |
| 53772 | PURCHASED OUTSIDE CLASS PERIOD |
| 53773 | NO RECOGNIZED LOSSES |
| 53774 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 53775 | NO RECOGNIZED LOSSES |
| 53776 | PURCHASED OUTSIDE CLASS PERIOD |
| 53777 | PURCHASED OUTSIDE CLASS PERIOD |
| 53778 | PURCHASED OUTSIDE CLASS PERIOD |
| 53779 | PURCHASED OUTSIDE CLASS PERIOD |
| 53780 | PURCHASED OUTSIDE CLASS PERIOD |
| 53781 | NO RECOGNIZED LOSSES |
| 53782 | NO RECOGNIZED LOSSES |
| 53783 | PURCHASED OUTSIDE CLASS PERIOD |
| 53784 | PURCHASED OUTSIDE CLASS PERIOD |
| 53785 | PURCHASED OUTSIDE CLASS PERIOD |
| 53786 | SHARES SOLD SHORT |
| 53789 | PURCHASED OUTSIDE CLASS PERIOD |
| 53790 | SHARES SOLD SHORT |
| 53791 | PURCHASED OUTSIDE CLASS PERIOD |
| 53792 | PURCHASED OUTSIDE CLASS PERIOD |
| 53793 | NO RECOGNIZED LOSSES |
| 53794 | PURCHASED OUTSIDE CLASS PERIOD |
| 53795 | PURCHASED OUTSIDE CLASS PERIOD |
| 53796 | NO RECOGNIZED LOSSES |
| 53797 | NO RECOGNIZED LOSSES |
| 53800 | PURCHASED OUTSIDE CLASS PERIOD |
| 53801 | NO RECOGNIZED LOSSES |
| 53802 | NO RECOGNIZED LOSSES |
| 53803 | PURCHASED OUTSIDE CLASS PERIOD |
| 53805 | NO RECOGNIZED LOSSES |
| 53807 | NO RECOGNIZED LOSSES |
| 53808 | PURCHASED OUTSIDE CLASS PERIOD |
| 53809 | NO RECOGNIZED LOSSES |
| 53810 | PURCHASED OUTSIDE CLASS PERIOD |
| 53811 | PURCHASED OUTSIDE CLASS PERIOD |
| 53812 | PURCHASED OUTSIDE CLASS PERIOD |
| 53813 | NO RECOGNIZED LOSSES |
| 53814 | PURCHASED OUTSIDE CLASS PERIOD |
| 53815 | PURCHASED OUTSIDE CLASS PERIOD |
| 53817 | NO RECOGNIZED LOSSES |
| 53818 | PURCHASED OUTSIDE CLASS PERIOD |
| 53819 | PURCHASED OUTSIDE CLASS PERIOD |
| 53820 | NO RECOGNIZED LOSSES |
| 53821 | PURCHASED OUTSIDE CLASS PERIOD |
| 53822 | NO RECOGNIZED LOSSES |
| 53823 | PURCHASED OUTSIDE CLASS PERIOD |
| 53824 | PURCHASED OUTSIDE CLASS PERIOD |
| 53825 | NO RECOGNIZED LOSSES |
| 53826 | PURCHASED OUTSIDE CLASS PERIOD |
| 53827 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 53829 | PURCHASED OUTSIDE CLASS PERIOD |
| 53830 | PURCHASED OUTSIDE CLASS PERIOD |
| 53831 | PURCHASED OUTSIDE CLASS PERIOD |
| 53832 | PURCHASED OUTSIDE CLASS PERIOD |
| 53835 | PURCHASED OUTSIDE CLASS PERIOD |
| 53836 | NO RECOGNIZED LOSSES |
| 53837 | NO RECOGNIZED LOSSES |
| 53838 | PURCHASED OUTSIDE CLASS PERIOD |
| 53839 | PURCHASED OUTSIDE CLASS PERIOD |
| 53841 | PURCHASED OUTSIDE CLASS PERIOD |
| 53842 | PURCHASED OUTSIDE CLASS PERIOD |
| 53843 | PURCHASED OUTSIDE CLASS PERIOD |
| 53844 | PURCHASED OUTSIDE CLASS PERIOD |
| 53845 | PURCHASED OUTSIDE CLASS PERIOD |
| 53846 | PURCHASED OUTSIDE CLASS PERIOD |
| 53847 | NO RECOGNIZED LOSSES |
| 53848 | PURCHASED OUTSIDE CLASS PERIOD |
| 53850 | NO RECOGNIZED LOSSES |
| 53851 | PURCHASED OUTSIDE CLASS PERIOD |
| 53853 | NO RECOGNIZED LOSSES |
| 53854 | PURCHASED OUTSIDE CLASS PERIOD |
| 53855 | NO RECOGNIZED LOSSES |
| 53856 | PURCHASED OUTSIDE CLASS PERIOD |
| 53857 | PURCHASED OUTSIDE CLASS PERIOD |
| 53858 | PURCHASED OUTSIDE CLASS PERIOD |
| 53859 | PURCHASED OUTSIDE CLASS PERIOD |
| 53860 | NO RECOGNIZED LOSSES |
| 53862 | SHARES SOLD SHORT |
| 53863 | NO RECOGNIZED LOSSES |
| 53864 | NO RECOGNIZED LOSSES |
| 53865 | SHARES SOLD SHORT |
| 53867 | PURCHASED OUTSIDE CLASS PERIOD |
| 53868 | NO RECOGNIZED LOSSES |
| 53869 | NO RECOGNIZED LOSSES |
| 53870 | PURCHASED OUTSIDE CLASS PERIOD |
| 53871 | PURCHASED OUTSIDE CLASS PERIOD |
| 53872 | NO RECOGNIZED LOSSES |
| 53873 | PURCHASED OUTSIDE CLASS PERIOD |
| 53874 | PURCHASED OUTSIDE CLASS PERIOD |
| 53878 | SHARES SOLD SHORT |
| 53880 | PURCHASED OUTSIDE CLASS PERIOD |
| 53882 | PURCHASED OUTSIDE CLASS PERIOD |
| 53883 | NO RECOGNIZED LOSSES |
| 53884 | SHARES SOLD SHORT |
| 53886 | PURCHASED OUTSIDE CLASS PERIOD |
| 53887 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 53888 | NO RECOGNIZED LOSSES |
| 53889 | PURCHASED OUTSIDE CLASS PERIOD |
| 53890 | PURCHASED OUTSIDE CLASS PERIOD |
| 53891 | NO RECOGNIZED LOSSES |
| 53892 | PURCHASED OUTSIDE CLASS PERIOD |
| 53893 | PURCHASED OUTSIDE CLASS PERIOD |
| 53894 | NO RECOGNIZED LOSSES |
| 53895 | PURCHASED OUTSIDE CLASS PERIOD |
| 53896 | PURCHASED OUTSIDE CLASS PERIOD |
| 53897 | NO RECOGNIZED LOSSES |
| 53899 | PURCHASED OUTSIDE CLASS PERIOD |
| 53900 | NO RECOGNIZED LOSSES |
| 53901 | NO RECOGNIZED LOSSES |
| 53902 | PURCHASED OUTSIDE CLASS PERIOD |
| 53903 | SHARES SOLD SHORT |
| 53904 | PURCHASED OUTSIDE CLASS PERIOD |
| 53905 | PURCHASED OUTSIDE CLASS PERIOD |
| 53906 | NO RECOGNIZED LOSSES |
| 53907 | PURCHASED OUTSIDE CLASS PERIOD |
| 53908 | PURCHASED OUTSIDE CLASS PERIOD |
| 53909 | NO RECOGNIZED LOSSES |
| 53911 | SHARES SOLD SHORT |
| 53912 | PURCHASED OUTSIDE CLASS PERIOD |
| 53913 | NO RECOGNIZED LOSSES |
| 53915 | PURCHASED OUTSIDE CLASS PERIOD |
| 53916 | NO RECOGNIZED LOSSES |
| 53917 | PURCHASED OUTSIDE CLASS PERIOD |
| 53918 | PURCHASED OUTSIDE CLASS PERIOD |
| 53919 | PURCHASED OUTSIDE CLASS PERIOD |
| 53920 | PURCHASED OUTSIDE CLASS PERIOD |
| 53921 | PURCHASED OUTSIDE CLASS PERIOD |
| 53922 | PURCHASED OUTSIDE CLASS PERIOD |
| 53923 | NO RECOGNIZED LOSSES |
| 53924 | NO RECOGNIZED LOSSES |
| 53925 | PURCHASED OUTSIDE CLASS PERIOD |
| 53927 | PURCHASED OUTSIDE CLASS PERIOD |
| 53928 | NO RECOGNIZED LOSSES |
| 53929 | PURCHASED OUTSIDE CLASS PERIOD |
| 53930 | NO RECOGNIZED LOSSES |
| 53931 | PURCHASED OUTSIDE CLASS PERIOD |
| 53932 | PURCHASED OUTSIDE CLASS PERIOD |
| 53933 | PURCHASED OUTSIDE CLASS PERIOD |
| 53935 | NO RECOGNIZED LOSSES |
| 53936 | PURCHASED OUTSIDE CLASS PERIOD |
| 53937 | PURCHASED OUTSIDE CLASS PERIOD |
| 53938 | SHARES SOLD SHORT |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
| --- | --- |
| 53939 | PURCHASED OUTSIDE CLASS PERIOD |
| 53940 | PURCHASED OUTSIDE CLASS PERIOD |
| 53941 | NO RECOGNIZED LOSSES |
| 53942 | PURCHASED OUTSIDE CLASS PERIOD |
| 53943 | NO RECOGNIZED LOSSES |
| 53945 | PURCHASED OUTSIDE CLASS PERIOD |
| 53946 | PURCHASED OUTSIDE CLASS PERIOD |
| 53947 | PURCHASED OUTSIDE CLASS PERIOD |
| 53948 | NO RECOGNIZED LOSSES |
| 53949 | NO RECOGNIZED LOSSES |
| 53950 | NO RECOGNIZED LOSSES |
| 53951 | NO RECOGNIZED LOSSES |
| 53953 | PURCHASED OUTSIDE CLASS PERIOD |
| 53954 | NO RECOGNIZED LOSSES |
| 53955 | PURCHASED OUTSIDE CLASS PERIOD |
| 53956 | PURCHASED OUTSIDE CLASS PERIOD |
| 53957 | PURCHASED OUTSIDE CLASS PERIOD |
| 53958 | PURCHASED OUTSIDE CLASS PERIOD |
| 53959 | NO RECOGNIZED LOSSES |
| 53960 | PURCHASED OUTSIDE CLASS PERIOD |
| 53961 | PURCHASED OUTSIDE CLASS PERIOD |
| 53962 | NO RECOGNIZED LOSSES |
| 53963 | NO RECOGNIZED LOSSES |
| 53964 | NO RECOGNIZED LOSSES |
| 53965 | PURCHASED OUTSIDE CLASS PERIOD |
| 53966 | PURCHASED OUTSIDE CLASS PERIOD |
| 53967 | PURCHASED OUTSIDE CLASS PERIOD |
| 53968 | NO RECOGNIZED LOSSES |
| 53969 | PURCHASED OUTSIDE CLASS PERIOD |
| 53970 | PURCHASED OUTSIDE CLASS PERIOD |
| 53971 | PURCHASED OUTSIDE CLASS PERIOD |
| 53972 | NO RECOGNIZED LOSSES |
| 53973 | PURCHASED OUTSIDE CLASS PERIOD |
| 53974 | PURCHASED OUTSIDE CLASS PERIOD |
| 53975 | NO RECOGNIZED LOSSES |
| 53976 | PURCHASED OUTSIDE CLASS PERIOD |
| 53977 | PURCHASED OUTSIDE CLASS PERIOD |
| 53978 | PURCHASED OUTSIDE CLASS PERIOD |
| 53979 | PURCHASED OUTSIDE CLASS PERIOD |
| 53980 | SHARES SOLD SHORT |
| 53981 | NO RECOGNIZED LOSSES |
| 53982 | PURCHASED OUTSIDE CLASS PERIOD |
| 53983 | PURCHASED OUTSIDE CLASS PERIOD |
| 53984 | PURCHASED OUTSIDE CLASS PERIOD |
| 53985 | PURCHASED OUTSIDE CLASS PERIOD |
| 53987 | SHARES SOLD SHORT |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 53988 | PURCHASED OUTSIDE CLASS PERIOD |
| 53989 | PURCHASED OUTSIDE CLASS PERIOD |
| 53990 | NO RECOGNIZED LOSSES |
| 53991 | PURCHASED OUTSIDE CLASS PERIOD |
| 53993 | SHARES SOLD SHORT |
| 53994 | NO RECOGNIZED LOSSES |
| 53995 | PURCHASED OUTSIDE CLASS PERIOD |
| 53996 | NO RECOGNIZED LOSSES |
| 53997 | PURCHASED OUTSIDE CLASS PERIOD |
| 54001 | NO RECOGNIZED LOSSES |
| 54002 | NO RECOGNIZED LOSSES |
| 54003 | NO RECOGNIZED LOSSES |
| 54004 | PURCHASED OUTSIDE CLASS PERIOD |
| 54005 | NO RECOGNIZED LOSSES |
| 54006 | PURCHASED OUTSIDE CLASS PERIOD |
| 54007 | PURCHASED OUTSIDE CLASS PERIOD |
| 54008 | PURCHASED OUTSIDE CLASS PERIOD |
| 54009 | PURCHASED OUTSIDE CLASS PERIOD |
| 54010 | PURCHASED OUTSIDE CLASS PERIOD |
| 54012 | NO RECOGNIZED LOSSES |
| 54013 | NO RECOGNIZED LOSSES |
| 54015 | SHARES SOLD SHORT |
| 54016 | PURCHASED OUTSIDE CLASS PERIOD |
| 54017 | PURCHASED OUTSIDE CLASS PERIOD |
| 54018 | PURCHASED OUTSIDE CLASS PERIOD |
| 54019 | NO RECOGNIZED LOSSES |
| 54020 | PURCHASED OUTSIDE CLASS PERIOD |
| 54021 | NO RECOGNIZED LOSSES |
| 54023 | PURCHASED OUTSIDE CLASS PERIOD |
| 54024 | SHARES SOLD SHORT |
| 54025 | PURCHASED OUTSIDE CLASS PERIOD |
| 54026 | PURCHASED OUTSIDE CLASS PERIOD |
| 54027 | NO RECOGNIZED LOSSES |
| 54028 | PURCHASED OUTSIDE CLASS PERIOD |
| 54029 | NO RECOGNIZED LOSSES |
| 54030 | NO RECOGNIZED LOSSES |
| 54031 | PURCHASED OUTSIDE CLASS PERIOD |
| 54032 | NO RECOGNIZED LOSSES |
| 54033 | PURCHASED OUTSIDE CLASS PERIOD |
| 54034 | PURCHASED OUTSIDE CLASS PERIOD |
| 54035 | SHARES SOLD SHORT |
| 54036 | PURCHASED OUTSIDE CLASS PERIOD |
| 54037 | NO RECOGNIZED LOSSES |
| 54038 | PURCHASED OUTSIDE CLASS PERIOD |
| 54039 | PURCHASED OUTSIDE CLASS PERIOD |
| 54040 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 54042 | NO RECOGNIZED LOSSES |
| 54043 | PURCHASED OUTSIDE CLASS PERIOD |
| 54044 | SHARES SOLD SHORT |
| 54045 | NO RECOGNIZED LOSSES |
| 54046 | PURCHASED OUTSIDE CLASS PERIOD |
| 54047 | SHARES SOLD SHORT |
| 54048 | NO RECOGNIZED LOSSES |
| 54050 | PURCHASED OUTSIDE CLASS PERIOD |
| 54051 | NO RECOGNIZED LOSSES |
| 54052 | NO RECOGNIZED LOSSES |
| 54053 | NO RECOGNIZED LOSSES |
| 54054 | SHARES SOLD SHORT |
| 54055 | PURCHASED OUTSIDE CLASS PERIOD |
| 54056 | PURCHASED OUTSIDE CLASS PERIOD |
| 54057 | PURCHASED OUTSIDE CLASS PERIOD |
| 54060 | PURCHASED OUTSIDE CLASS PERIOD |
| 54061 | PURCHASED OUTSIDE CLASS PERIOD |
| 54062 | PURCHASED OUTSIDE CLASS PERIOD |
| 54064 | NO RECOGNIZED LOSSES |
| 54065 | PURCHASED OUTSIDE CLASS PERIOD |
| 54066 | PURCHASED OUTSIDE CLASS PERIOD |
| 54067 | PURCHASED OUTSIDE CLASS PERIOD |
| 54068 | PURCHASED OUTSIDE CLASS PERIOD |
| 54069 | NO RECOGNIZED LOSSES |
| 54070 | PURCHASED OUTSIDE CLASS PERIOD |
| 54071 | PURCHASED OUTSIDE CLASS PERIOD |
| 54072 | PURCHASED OUTSIDE CLASS PERIOD |
| 54073 | NO RECOGNIZED LOSSES |
| 54074 | NO RECOGNIZED LOSSES |
| 54075 | PURCHASED OUTSIDE CLASS PERIOD |
| 54077 | PURCHASED OUTSIDE CLASS PERIOD |
| 54080 | NO RECOGNIZED LOSSES |
| 54081 | NO RECOGNIZED LOSSES |
| 54083 | PURCHASED OUTSIDE CLASS PERIOD |
| 54084 | PURCHASED OUTSIDE CLASS PERIOD |
| 54085 | PURCHASED OUTSIDE CLASS PERIOD |
| 54087 | PURCHASED OUTSIDE CLASS PERIOD |
| 54088 | PURCHASED OUTSIDE CLASS PERIOD |
| 54089 | SHARES SOLD SHORT |
| 54090 | NO RECOGNIZED LOSSES |
| 54093 | PURCHASED OUTSIDE CLASS PERIOD |
| 54094 | PURCHASED OUTSIDE CLASS PERIOD |
| 54095 | PURCHASED OUTSIDE CLASS PERIOD |
| 54096 | SHARES SOLD SHORT |
| 54097 | PURCHASED OUTSIDE CLASS PERIOD |
| 54098 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 54099 | SHARES SOLD SHORT |
| 54100 | PURCHASED OUTSIDE CLASS PERIOD |
| 54102 | PURCHASED OUTSIDE CLASS PERIOD |
| 54103 | PURCHASED OUTSIDE CLASS PERIOD |
| 54104 | PURCHASED OUTSIDE CLASS PERIOD |
| 54105 | PURCHASED OUTSIDE CLASS PERIOD |
| 54106 | PURCHASED OUTSIDE CLASS PERIOD |
| 54107 | PURCHASED OUTSIDE CLASS PERIOD |
| 54108 | PURCHASED OUTSIDE CLASS PERIOD |
| 54109 | PURCHASED OUTSIDE CLASS PERIOD |
| 54110 | NO RECOGNIZED LOSSES |
| 54111 | PURCHASED OUTSIDE CLASS PERIOD |
| 54112 | NO RECOGNIZED LOSSES |
| 54113 | PURCHASED OUTSIDE CLASS PERIOD |
| 54114 | NO RECOGNIZED LOSSES |
| 54115 | NO RECOGNIZED LOSSES |
| 54116 | SHARES SOLD SHORT |
| 54118 | NO RECOGNIZED LOSSES |
| 54120 | NO RECOGNIZED LOSSES |
| 54121 | NO RECOGNIZED LOSSES |
| 54123 | PURCHASED OUTSIDE CLASS PERIOD |
| 54124 | NO RECOGNIZED LOSSES |
| 54125 | PURCHASED OUTSIDE CLASS PERIOD |
| 54127 | PURCHASED OUTSIDE CLASS PERIOD |
| 54128 | NO RECOGNIZED LOSSES |
| 54129 | PURCHASED OUTSIDE CLASS PERIOD |
| 54130 | NO RECOGNIZED LOSSES |
| 54131 | NO RECOGNIZED LOSSES |
| 54132 | NO RECOGNIZED LOSSES |
| 54133 | SHARES SOLD SHORT |
| 54134 | PURCHASED OUTSIDE CLASS PERIOD |
| 54136 | PURCHASED OUTSIDE CLASS PERIOD |
| 54138 | NO RECOGNIZED LOSSES |
| 54139 | SHARES SOLD SHORT |
| 54140 | PURCHASED OUTSIDE CLASS PERIOD |
| 54141 | PURCHASED OUTSIDE CLASS PERIOD |
| 54142 | NO RECOGNIZED LOSSES |
| 54143 | NO RECOGNIZED LOSSES |
| 54144 | PURCHASED OUTSIDE CLASS PERIOD |
| 54145 | PURCHASED OUTSIDE CLASS PERIOD |
| 54147 | NO RECOGNIZED LOSSES |
| 54148 | NO RECOGNIZED LOSSES |
| 54149 | NO RECOGNIZED LOSSES |
| 54150 | PURCHASED OUTSIDE CLASS PERIOD |
| 54151 | NO RECOGNIZED LOSSES |
| 54152 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 54153 | NO RECOGNIZED LOSSES |
| 54154 | PURCHASED OUTSIDE CLASS PERIOD |
| 54155 | PURCHASED OUTSIDE CLASS PERIOD |
| 54156 | PURCHASED OUTSIDE CLASS PERIOD |
| 54157 | NO RECOGNIZED LOSSES |
| 54158 | PURCHASED OUTSIDE CLASS PERIOD |
| 54159 | PURCHASED OUTSIDE CLASS PERIOD |
| 54160 | PURCHASED OUTSIDE CLASS PERIOD |
| 54162 | PURCHASED OUTSIDE CLASS PERIOD |
| 54163 | PURCHASED OUTSIDE CLASS PERIOD |
| 54164 | PURCHASED OUTSIDE CLASS PERIOD |
| 54165 | PURCHASED OUTSIDE CLASS PERIOD |
| 54166 | PURCHASED OUTSIDE CLASS PERIOD |
| 54167 | PURCHASED OUTSIDE CLASS PERIOD |
| 54169 | PURCHASED OUTSIDE CLASS PERIOD |
| 54170 | NO RECOGNIZED LOSSES |
| 54171 | NO RECOGNIZED LOSSES |
| 54172 | PURCHASED OUTSIDE CLASS PERIOD |
| 54173 | NO RECOGNIZED LOSSES |
| 54174 | PURCHASED OUTSIDE CLASS PERIOD |
| 54175 | NO RECOGNIZED LOSSES |
| 54176 | PURCHASED OUTSIDE CLASS PERIOD |
| 54177 | PURCHASED OUTSIDE CLASS PERIOD |
| 54179 | PURCHASED OUTSIDE CLASS PERIOD |
| 54180 | NO RECOGNIZED LOSSES |
| 54181 | NO RECOGNIZED LOSSES |
| 54182 | NO RECOGNIZED LOSSES |
| 54183 | PURCHASED OUTSIDE CLASS PERIOD |
| 54184 | PURCHASED OUTSIDE CLASS PERIOD |
| 54185 | SHARES SOLD SHORT |
| 54186 | PURCHASED OUTSIDE CLASS PERIOD |
| 54187 | PURCHASED OUTSIDE CLASS PERIOD |
| 54188 | NO RECOGNIZED LOSSES |
| 54189 | PURCHASED OUTSIDE CLASS PERIOD |
| 54190 | PURCHASED OUTSIDE CLASS PERIOD |
| 54191 | PURCHASED OUTSIDE CLASS PERIOD |
| 54193 | PURCHASED OUTSIDE CLASS PERIOD |
| 54194 | PURCHASED OUTSIDE CLASS PERIOD |
| 54197 | NO RECOGNIZED LOSSES |
| 54198 | PURCHASED OUTSIDE CLASS PERIOD |
| 54200 | PURCHASED OUTSIDE CLASS PERIOD |
| 54201 | NO RECOGNIZED LOSSES |
| 54202 | PURCHASED OUTSIDE CLASS PERIOD |
| 54203 | PURCHASED OUTSIDE CLASS PERIOD |
| 54205 | NO RECOGNIZED LOSSES |
| 54207 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 54209 | PURCHASED OUTSIDE CLASS PERIOD |
| 54210 | NO RECOGNIZED LOSSES |
| 54211 | PURCHASED OUTSIDE CLASS PERIOD |
| 54212 | PURCHASED OUTSIDE CLASS PERIOD |
| 54213 | NO RECOGNIZED LOSSES |
| 54215 | NO RECOGNIZED LOSSES |
| 54216 | NO RECOGNIZED LOSSES |
| 54218 | PURCHASED OUTSIDE CLASS PERIOD |
| 54219 | PURCHASED OUTSIDE CLASS PERIOD |
| 54220 | PURCHASED OUTSIDE CLASS PERIOD |
| 54222 | NO RECOGNIZED LOSSES |
| 54223 | PURCHASED OUTSIDE CLASS PERIOD |
| 54224 | SHARES SOLD SHORT |
| 54226 | NO RECOGNIZED LOSSES |
| 54228 | PURCHASED OUTSIDE CLASS PERIOD |
| 54229 | SHARES SOLD SHORT |
| 54230 | SHARES SOLD SHORT |
| 54231 | PURCHASED OUTSIDE CLASS PERIOD |
| 54232 | PURCHASED OUTSIDE CLASS PERIOD |
| 54234 | NO RECOGNIZED LOSSES |
| 54236 | PURCHASED OUTSIDE CLASS PERIOD |
| 54238 | NO RECOGNIZED LOSSES |
| 54239 | NO RECOGNIZED LOSSES |
| 54240 | NO RECOGNIZED LOSSES |
| 54242 | PURCHASED OUTSIDE CLASS PERIOD |
| 54244 | NO RECOGNIZED LOSSES |
| 54245 | PURCHASED OUTSIDE CLASS PERIOD |
| 54247 | NO RECOGNIZED LOSSES |
| 54248 | SHARES SOLD SHORT |
| 54249 | PURCHASED OUTSIDE CLASS PERIOD |
| 54251 | PURCHASED OUTSIDE CLASS PERIOD |
| 54252 | PURCHASED OUTSIDE CLASS PERIOD |
| 54253 | PURCHASED OUTSIDE CLASS PERIOD |
| 54256 | NO RECOGNIZED LOSSES |
| 54257 | PURCHASED OUTSIDE CLASS PERIOD |
| 54258 | PURCHASED OUTSIDE CLASS PERIOD |
| 54259 | NO RECOGNIZED LOSSES |
| 54260 | PURCHASED OUTSIDE CLASS PERIOD |
| 54261 | PURCHASED OUTSIDE CLASS PERIOD |
| 54262 | NO RECOGNIZED LOSSES |
| 54263 | NO RECOGNIZED LOSSES |
| 54264 | PURCHASED OUTSIDE CLASS PERIOD |
| 54265 | NO RECOGNIZED LOSSES |
| 54266 | PURCHASED OUTSIDE CLASS PERIOD |
| 54267 | PURCHASED OUTSIDE CLASS PERIOD |
| 54269 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 54270 | PURCHASED OUTSIDE CLASS PERIOD |
| 54271 | PURCHASED OUTSIDE CLASS PERIOD |
| 54272 | PURCHASED OUTSIDE CLASS PERIOD |
| 54273 | PURCHASED OUTSIDE CLASS PERIOD |
| 54274 | PURCHASED OUTSIDE CLASS PERIOD |
| 54275 | NO RECOGNIZED LOSSES |
| 54276 | NO RECOGNIZED LOSSES |
| 54277 | PURCHASED OUTSIDE CLASS PERIOD |
| 54279 | PURCHASED OUTSIDE CLASS PERIOD |
| 54280 | PURCHASED OUTSIDE CLASS PERIOD |
| 54281 | PURCHASED OUTSIDE CLASS PERIOD |
| 54282 | NO RECOGNIZED LOSSES |
| 54283 | PURCHASED OUTSIDE CLASS PERIOD |
| 54284 | PURCHASED OUTSIDE CLASS PERIOD |
| 54285 | SHARES SOLD SHORT |
| 54286 | NO RECOGNIZED LOSSES |
| 54287 | PURCHASED OUTSIDE CLASS PERIOD |
| 54288 | PURCHASED OUTSIDE CLASS PERIOD |
| 54289 | SHARES SOLD SHORT |
| 54290 | PURCHASED OUTSIDE CLASS PERIOD |
| 54291 | NO RECOGNIZED LOSSES |
| 54294 | NO RECOGNIZED LOSSES |
| 54296 | PURCHASED OUTSIDE CLASS PERIOD |
| 54297 | PURCHASED OUTSIDE CLASS PERIOD |
| 54298 | NO RECOGNIZED LOSSES |
| 54300 | NO RECOGNIZED LOSSES |
| 54302 | NO RECOGNIZED LOSSES |
| 54303 | PURCHASED OUTSIDE CLASS PERIOD |
| 54304 | PURCHASED OUTSIDE CLASS PERIOD |
| 54305 | SHARES SOLD SHORT |
| 54306 | NO RECOGNIZED LOSSES |
| 54307 | NO RECOGNIZED LOSSES |
| 54308 | SHARES SOLD SHORT |
| 54309 | PURCHASED OUTSIDE CLASS PERIOD |
| 54310 | NO RECOGNIZED LOSSES |
| 54311 | PURCHASED OUTSIDE CLASS PERIOD |
| 54312 | PURCHASED OUTSIDE CLASS PERIOD |
| 54313 | SHARES SOLD SHORT |
| 54315 | NO RECOGNIZED LOSSES |
| 54317 | NO RECOGNIZED LOSSES |
| 54321 | SHARES SOLD SHORT |
| 54322 | PURCHASED OUTSIDE CLASS PERIOD |
| 54323 | NO RECOGNIZED LOSSES |
| 54324 | PURCHASED OUTSIDE CLASS PERIOD |
| 54326 | SHARES SOLD SHORT |
| 54332 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 54333 | PURCHASED OUTSIDE CLASS PERIOD |
| 54334 | PURCHASED OUTSIDE CLASS PERIOD |
| 54335 | PURCHASED OUTSIDE CLASS PERIOD |
| 54337 | NO RECOGNIZED LOSSES |
| 54338 | NO RECOGNIZED LOSSES |
| 54341 | NO RECOGNIZED LOSSES |
| 54342 | NO RECOGNIZED LOSSES |
| 54343 | PURCHASED OUTSIDE CLASS PERIOD |
| 54345 | PURCHASED OUTSIDE CLASS PERIOD |
| 54346 | PURCHASED OUTSIDE CLASS PERIOD |
| 54349 | NO RECOGNIZED LOSSES |
| 54350 | PURCHASED OUTSIDE CLASS PERIOD |
| 54352 | NO RECOGNIZED LOSSES |
| 54353 | PURCHASED OUTSIDE CLASS PERIOD |
| 54354 | NO RECOGNIZED LOSSES |
| 54355 | PURCHASED OUTSIDE CLASS PERIOD |
| 54356 | NO RECOGNIZED LOSSES |
| 54357 | PURCHASED OUTSIDE CLASS PERIOD |
| 54359 | NO RECOGNIZED LOSSES |
| 54360 | NO RECOGNIZED LOSSES |
| 54361 | PURCHASED OUTSIDE CLASS PERIOD |
| 54362 | PURCHASED OUTSIDE CLASS PERIOD |
| 54363 | PURCHASED OUTSIDE CLASS PERIOD |
| 54364 | PURCHASED OUTSIDE CLASS PERIOD |
| 54365 | NO RECOGNIZED LOSSES |
| 54366 | NO RECOGNIZED LOSSES |
| 54367 | PURCHASED OUTSIDE CLASS PERIOD |
| 54370 | NO RECOGNIZED LOSSES |
| 54371 | NO RECOGNIZED LOSSES |
| 54372 | NO RECOGNIZED LOSSES |
| 54374 | NO RECOGNIZED LOSSES |
| 54376 | PURCHASED OUTSIDE CLASS PERIOD |
| 54377 | NO RECOGNIZED LOSSES |
| 54378 | NO RECOGNIZED LOSSES |
| 54379 | NO RECOGNIZED LOSSES |
| 54380 | NO RECOGNIZED LOSSES |
| 54383 | PURCHASED OUTSIDE CLASS PERIOD |
| 54385 | NO RECOGNIZED LOSSES |
| 54387 | NO RECOGNIZED LOSSES |
| 54388 | PURCHASED OUTSIDE CLASS PERIOD |
| 54390 | PURCHASED OUTSIDE CLASS PERIOD |
| 54391 | PURCHASED OUTSIDE CLASS PERIOD |
| 54393 | NO RECOGNIZED LOSSES |
| 54394 | PURCHASED OUTSIDE CLASS PERIOD |
| 54398 | PURCHASED OUTSIDE CLASS PERIOD |
| 54399 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
| --- | --- |
| 54400 | PURCHASED OUTSIDE CLASS PERIOD |
| 54401 | NO RECOGNIZED LOSSES |
| 54402 | PURCHASED OUTSIDE CLASS PERIOD |
| 54404 | NO RECOGNIZED LOSSES |
| 54405 | PURCHASED OUTSIDE CLASS PERIOD |
| 54406 | NO RECOGNIZED LOSSES |
| 54408 | PURCHASED OUTSIDE CLASS PERIOD |
| 54409 | PURCHASED OUTSIDE CLASS PERIOD |
| 54411 | PURCHASED OUTSIDE CLASS PERIOD |
| 54412 | NO RECOGNIZED LOSSES |
| 54413 | NO RECOGNIZED LOSSES |
| 54414 | PURCHASED OUTSIDE CLASS PERIOD |
| 54415 | NO RECOGNIZED LOSSES |
| 54416 | NO RECOGNIZED LOSSES |
| 54417 | NO RECOGNIZED LOSSES |
| 54418 | PURCHASED OUTSIDE CLASS PERIOD |
| 54419 | NO RECOGNIZED LOSSES |
| 54422 | PURCHASED OUTSIDE CLASS PERIOD |
| 54424 | PURCHASED OUTSIDE CLASS PERIOD |
| 54426 | NO RECOGNIZED LOSSES |
| 54427 | NO RECOGNIZED LOSSES |
| 54428 | PURCHASED OUTSIDE CLASS PERIOD |
| 54431 | NO RECOGNIZED LOSSES |
| 54433 | NO RECOGNIZED LOSSES |
| 54434 | NO RECOGNIZED LOSSES |
| 54435 | PURCHASED OUTSIDE CLASS PERIOD |
| 54436 | PURCHASED OUTSIDE CLASS PERIOD |
| 54437 | NO RECOGNIZED LOSSES |
| 54439 | PURCHASED OUTSIDE CLASS PERIOD |
| 54440 | NO RECOGNIZED LOSSES |
| 54441 | NO RECOGNIZED LOSSES |
| 54443 | PURCHASED OUTSIDE CLASS PERIOD |
| 54444 | PURCHASED OUTSIDE CLASS PERIOD |
| 54445 | NO RECOGNIZED LOSSES |
| 54446 | NO RECOGNIZED LOSSES |
| 54447 | PURCHASED OUTSIDE CLASS PERIOD |
| 54448 | PURCHASED OUTSIDE CLASS PERIOD |
| 54451 | NO RECOGNIZED LOSSES |
| 54454 | NO RECOGNIZED LOSSES |
| 54455 | NO RECOGNIZED LOSSES |
| 54456 | PURCHASED OUTSIDE CLASS PERIOD |
| 54459 | PURCHASED OUTSIDE CLASS PERIOD |
| 54460 | NO RECOGNIZED LOSSES |
| 54463 | NO RECOGNIZED LOSSES |
| 54466 | PURCHASED OUTSIDE CLASS PERIOD |
| 54467 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 54468 | PURCHASED OUTSIDE CLASS PERIOD |
| 54469 | NO RECOGNIZED LOSSES |
| 54470 | PURCHASED OUTSIDE CLASS PERIOD |
| 54471 | NO RECOGNIZED LOSSES |
| 54472 | NO RECOGNIZED LOSSES |
| 54473 | PURCHASED OUTSIDE CLASS PERIOD |
| 54474 | PURCHASED OUTSIDE CLASS PERIOD |
| 54475 | NO RECOGNIZED LOSSES |
| 54478 | NO RECOGNIZED LOSSES |
| 54479 | SHARES SOLD SHORT |
| 54480 | SHARES SOLD SHORT |
| 54481 | NO RECOGNIZED LOSSES |
| 54482 | NO RECOGNIZED LOSSES |
| 54483 | NO RECOGNIZED LOSSES |
| 54484 | PURCHASED OUTSIDE CLASS PERIOD |
| 54487 | PURCHASED OUTSIDE CLASS PERIOD |
| 54488 | PURCHASED OUTSIDE CLASS PERIOD |
| 54490 | NO RECOGNIZED LOSSES |
| 54491 | PURCHASED OUTSIDE CLASS PERIOD |
| 54492 | NO RECOGNIZED LOSSES |
| 54494 | PURCHASED OUTSIDE CLASS PERIOD |
| 54495 | PURCHASED OUTSIDE CLASS PERIOD |
| 54496 | PURCHASED OUTSIDE CLASS PERIOD |
| 54497 | NO RECOGNIZED LOSSES |
| 54500 | PURCHASED OUTSIDE CLASS PERIOD |
| 54501 | PURCHASED OUTSIDE CLASS PERIOD |
| 54502 | NO RECOGNIZED LOSSES |
| 54504 | PURCHASED OUTSIDE CLASS PERIOD |
| 54506 | PURCHASED OUTSIDE CLASS PERIOD |
| 54507 | SHARES SOLD SHORT |
| 54508 | NO RECOGNIZED LOSSES |
| 54510 | PURCHASED OUTSIDE CLASS PERIOD |
| 54515 | PURCHASED OUTSIDE CLASS PERIOD |
| 54517 | NO RECOGNIZED LOSSES |
| 54518 | PURCHASED OUTSIDE CLASS PERIOD |
| 54519 | NO RECOGNIZED LOSSES |
| 54521 | PURCHASED OUTSIDE CLASS PERIOD |
| 54525 | PURCHASED OUTSIDE CLASS PERIOD |
| 54526 | PURCHASED OUTSIDE CLASS PERIOD |
| 54527 | NO RECOGNIZED LOSSES |
| 54528 | NO RECOGNIZED LOSSES |
| 54531 | NO RECOGNIZED LOSSES |
| 54532 | NO RECOGNIZED LOSSES |
| 54533 | PURCHASED OUTSIDE CLASS PERIOD |
| 54534 | PURCHASED OUTSIDE CLASS PERIOD |
| 54535 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 54536 | PURCHASED OUTSIDE CLASS PERIOD |
| 54537 | PURCHASED OUTSIDE CLASS PERIOD |
| 54538 | PURCHASED OUTSIDE CLASS PERIOD |
| 54539 | PURCHASED OUTSIDE CLASS PERIOD |
| 54540 | PURCHASED OUTSIDE CLASS PERIOD |
| 54542 | PURCHASED OUTSIDE CLASS PERIOD |
| 54544 | PURCHASED OUTSIDE CLASS PERIOD |
| 54546 | NO RECOGNIZED LOSSES |
| 54547 | PURCHASED OUTSIDE CLASS PERIOD |
| 54548 | NO RECOGNIZED LOSSES |
| 54551 | SHARES SOLD SHORT |
| 54552 | PURCHASED OUTSIDE CLASS PERIOD |
| 54553 | NO RECOGNIZED LOSSES |
| 54556 | PURCHASED OUTSIDE CLASS PERIOD |
| 54558 | PURCHASED OUTSIDE CLASS PERIOD |
| 54559 | PURCHASED OUTSIDE CLASS PERIOD |
| 54560 | NO RECOGNIZED LOSSES |
| 54563 | NO RECOGNIZED LOSSES |
| 54564 | NO RECOGNIZED LOSSES |
| 54565 | NO RECOGNIZED LOSSES |
| 54567 | NO RECOGNIZED LOSSES |
| 54568 | NO RECOGNIZED LOSSES |
| 54569 | NO RECOGNIZED LOSSES |
| 54570 | PURCHASED OUTSIDE CLASS PERIOD |
| 54571 | PURCHASED OUTSIDE CLASS PERIOD |
| 54572 | SHARES SOLD SHORT |
| 54573 | PURCHASED OUTSIDE CLASS PERIOD |
| 54574 | NO RECOGNIZED LOSSES |
| 54576 | NO RECOGNIZED LOSSES |
| 54577 | NO RECOGNIZED LOSSES |
| 54579 | NO RECOGNIZED LOSSES |
| 54581 | NO RECOGNIZED LOSSES |
| 54582 | PURCHASED OUTSIDE CLASS PERIOD |
| 54584 | NO RECOGNIZED LOSSES |
| 54585 | PURCHASED OUTSIDE CLASS PERIOD |
| 54586 | NO RECOGNIZED LOSSES |
| 54587 | NO RECOGNIZED LOSSES |
| 54588 | NO RECOGNIZED LOSSES |
| 54590 | PURCHASED OUTSIDE CLASS PERIOD |
| 54591 | PURCHASED OUTSIDE CLASS PERIOD |
| 54594 | NO RECOGNIZED LOSSES |
| 54595 | PURCHASED OUTSIDE CLASS PERIOD |
| 54596 | PURCHASED OUTSIDE CLASS PERIOD |
| 54597 | NO RECOGNIZED LOSSES |
| 54598 | NO RECOGNIZED LOSSES |
| 54599 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 54600 | NO RECOGNIZED LOSSES |
| 54601 | NO RECOGNIZED LOSSES |
| 54602 | NO RECOGNIZED LOSSES |
| 54604 | NO RECOGNIZED LOSSES |
| 54605 | PURCHASED OUTSIDE CLASS PERIOD |
| 54606 | PURCHASED OUTSIDE CLASS PERIOD |
| 54608 | NO RECOGNIZED LOSSES |
| 54610 | NO RECOGNIZED LOSSES |
| 54611 | NO RECOGNIZED LOSSES |
| 54612 | PURCHASED OUTSIDE CLASS PERIOD |
| 54613 | PURCHASED OUTSIDE CLASS PERIOD |
| 54614 | PURCHASED OUTSIDE CLASS PERIOD |
| 54615 | NO RECOGNIZED LOSSES |
| 54616 | NO RECOGNIZED LOSSES |
| 54617 | NO RECOGNIZED LOSSES |
| 54618 | PURCHASED OUTSIDE CLASS PERIOD |
| 54621 | PURCHASED OUTSIDE CLASS PERIOD |
| 54622 | NO RECOGNIZED LOSSES |
| 54623 | NO RECOGNIZED LOSSES |
| 54624 | NO RECOGNIZED LOSSES |
| 54626 | NO RECOGNIZED LOSSES |
| 54628 | PURCHASED OUTSIDE CLASS PERIOD |
| 54629 | NO RECOGNIZED LOSSES |
| 54630 | PURCHASED OUTSIDE CLASS PERIOD |
| 54631 | NO RECOGNIZED LOSSES |
| 54632 | PURCHASED OUTSIDE CLASS PERIOD |
| 54633 | NO RECOGNIZED LOSSES |
| 54634 | PURCHASED OUTSIDE CLASS PERIOD |
| 54635 | NO RECOGNIZED LOSSES |
| 54637 | SHARES SOLD SHORT |
| 54638 | NO RECOGNIZED LOSSES |
| 54639 | NO RECOGNIZED LOSSES |
| 54640 | NO RECOGNIZED LOSSES |
| 54641 | PURCHASED OUTSIDE CLASS PERIOD |
| 54642 | NO RECOGNIZED LOSSES |
| 54643 | NO RECOGNIZED LOSSES |
| 54645 | PURCHASED OUTSIDE CLASS PERIOD |
| 54647 | NO RECOGNIZED LOSSES |
| 54648 | NO RECOGNIZED LOSSES |
| 54650 | NO RECOGNIZED LOSSES |
| 54651 | NO RECOGNIZED LOSSES |
| 54652 | PURCHASED OUTSIDE CLASS PERIOD |
| 54653 | NO RECOGNIZED LOSSES |
| 54654 | SHARES SOLD SHORT |
| 54657 | NO RECOGNIZED LOSSES |
| 54659 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 54660 | NO RECOGNIZED LOSSES |
| 54661 | PURCHASED OUTSIDE CLASS PERIOD |
| 54663 | PURCHASED OUTSIDE CLASS PERIOD |
| 54664 | NO RECOGNIZED LOSSES |
| 54666 | PURCHASED OUTSIDE CLASS PERIOD |
| 54667 | NO RECOGNIZED LOSSES |
| 54668 | SHARES SOLD SHORT |
| 54669 | PURCHASED OUTSIDE CLASS PERIOD |
| 54671 | NO RECOGNIZED LOSSES |
| 54672 | PURCHASED OUTSIDE CLASS PERIOD |
| 54673 | NO RECOGNIZED LOSSES |
| 54674 | PURCHASED OUTSIDE CLASS PERIOD |
| 54675 | NO RECOGNIZED LOSSES |
| 54676 | PURCHASED OUTSIDE CLASS PERIOD |
| 54677 | NO RECOGNIZED LOSSES |
| 54678 | PURCHASED OUTSIDE CLASS PERIOD |
| 54679 | PURCHASED OUTSIDE CLASS PERIOD |
| 54680 | NO RECOGNIZED LOSSES |
| 54681 | PURCHASED OUTSIDE CLASS PERIOD |
| 54682 | PURCHASED OUTSIDE CLASS PERIOD |
| 54683 | PURCHASED OUTSIDE CLASS PERIOD |
| 54684 | PURCHASED OUTSIDE CLASS PERIOD |
| 54685 | NO RECOGNIZED LOSSES |
| 54686 | PURCHASED OUTSIDE CLASS PERIOD |
| 54687 | PURCHASED OUTSIDE CLASS PERIOD |
| 54689 | PURCHASED OUTSIDE CLASS PERIOD |
| 54690 | NO RECOGNIZED LOSSES |
| 54691 | NO RECOGNIZED LOSSES |
| 54692 | NO RECOGNIZED LOSSES |
| 54693 | NO RECOGNIZED LOSSES |
| 54694 | PURCHASED OUTSIDE CLASS PERIOD |
| 54695 | PURCHASED OUTSIDE CLASS PERIOD |
| 54696 | NO RECOGNIZED LOSSES |
| 54697 | NO RECOGNIZED LOSSES |
| 54699 | NO RECOGNIZED LOSSES |
| 54701 | NO RECOGNIZED LOSSES |
| 54702 | PURCHASED OUTSIDE CLASS PERIOD |
| 54703 | PURCHASED OUTSIDE CLASS PERIOD |
| 54705 | NO RECOGNIZED LOSSES |
| 54706 | SHARES SOLD SHORT |
| 54707 | NO RECOGNIZED LOSSES |
| 54708 | NO RECOGNIZED LOSSES |
| 54709 | NO RECOGNIZED LOSSES |
| 54710 | NO RECOGNIZED LOSSES |
| 54711 | PURCHASED OUTSIDE CLASS PERIOD |
| 54714 | NO RECOGNIZED LOSSES |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 54715 | NO RECOGNIZED LOSSES |
| 54716 | PURCHASED OUTSIDE CLASS PERIOD |
| 54718 | PURCHASED OUTSIDE CLASS PERIOD |
| 54719 | NO RECOGNIZED LOSSES |
| 54721 | NO RECOGNIZED LOSSES |
| 54722 | NO RECOGNIZED LOSSES |
| 54723 | NO RECOGNIZED LOSSES |
| 54724 | PURCHASED OUTSIDE CLASS PERIOD |
| 54726 | PURCHASED OUTSIDE CLASS PERIOD |
| 54727 | PURCHASED OUTSIDE CLASS PERIOD |
| 54729 | NO RECOGNIZED LOSSES |
| 54730 | PURCHASED OUTSIDE CLASS PERIOD |
| 54732 | PURCHASED OUTSIDE CLASS PERIOD |
| 54733 | PURCHASED OUTSIDE CLASS PERIOD |
| 54736 | PURCHASED OUTSIDE CLASS PERIOD |
| 54737 | PURCHASED OUTSIDE CLASS PERIOD |
| 54738 | SHARES SOLD SHORT |
| 54739 | PURCHASED OUTSIDE CLASS PERIOD |
| 54740 | PURCHASED OUTSIDE CLASS PERIOD |
| 54743 | PURCHASED OUTSIDE CLASS PERIOD |
| 54744 | PURCHASED OUTSIDE CLASS PERIOD |
| 54745 | PURCHASED OUTSIDE CLASS PERIOD |
| 54746 | NO RECOGNIZED LOSSES |
| 54747 | NO RECOGNIZED LOSSES |
| 54748 | PURCHASED OUTSIDE CLASS PERIOD |
| 54749 | NO RECOGNIZED LOSSES |
| 54750 | PURCHASED OUTSIDE CLASS PERIOD |
| 54751 | NO RECOGNIZED LOSSES |
| 54753 | PURCHASED OUTSIDE CLASS PERIOD |
| 54755 | SHARES SOLD SHORT |
| 54756 | PURCHASED OUTSIDE CLASS PERIOD |
| 54757 | NO RECOGNIZED LOSSES |
| 54758 | PURCHASED OUTSIDE CLASS PERIOD |
| 54759 | PURCHASED OUTSIDE CLASS PERIOD |
| 54761 | PURCHASED OUTSIDE CLASS PERIOD |
| 54762 | NO RECOGNIZED LOSSES |
| 54763 | PURCHASED OUTSIDE CLASS PERIOD |
| 54765 | PURCHASED OUTSIDE CLASS PERIOD |
| 54766 | NO RECOGNIZED LOSSES |
| 54767 | NO RECOGNIZED LOSSES |
| 54771 | NO RECOGNIZED LOSSES |
| 54772 | PURCHASED OUTSIDE CLASS PERIOD |
| 54773 | NO RECOGNIZED LOSSES |
| 54774 | PURCHASED OUTSIDE CLASS PERIOD |
| 54775 | PURCHASED OUTSIDE CLASS PERIOD |
| 54776 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 54778 | NO RECOGNIZED LOSSES |
| 54779 | PURCHASED OUTSIDE CLASS PERIOD |
| 54780 | NO RECOGNIZED LOSSES |
| 54781 | PURCHASED OUTSIDE CLASS PERIOD |
| 54782 | PURCHASED OUTSIDE CLASS PERIOD |
| 54783 | NO RECOGNIZED LOSSES |
| 54784 | SHARES SOLD SHORT |
| 54785 | PURCHASED OUTSIDE CLASS PERIOD |
| 54786 | NO RECOGNIZED LOSSES |
| 54787 | NO RECOGNIZED LOSSES |
| 54788 | NO RECOGNIZED LOSSES |
| 54790 | NO RECOGNIZED LOSSES |
| 54791 | PURCHASED OUTSIDE CLASS PERIOD |
| 54792 | PURCHASED OUTSIDE CLASS PERIOD |
| 54793 | PURCHASED OUTSIDE CLASS PERIOD |
| 54794 | PURCHASED OUTSIDE CLASS PERIOD |
| 54795 | PURCHASED OUTSIDE CLASS PERIOD |
| 54796 | NO RECOGNIZED LOSSES |
| 54798 | NO RECOGNIZED LOSSES |
| 54799 | PURCHASED OUTSIDE CLASS PERIOD |
| 54801 | PURCHASED OUTSIDE CLASS PERIOD |
| 54802 | NO RECOGNIZED LOSSES |
| 54803 | PURCHASED OUTSIDE CLASS PERIOD |
| 54804 | NO RECOGNIZED LOSSES |
| 54805 | PURCHASED OUTSIDE CLASS PERIOD |
| 54807 | PURCHASED OUTSIDE CLASS PERIOD |
| 54809 | NO RECOGNIZED LOSSES |
| 54810 | PURCHASED OUTSIDE CLASS PERIOD |
| 54811 | NO RECOGNIZED LOSSES |
| 54812 | PURCHASED OUTSIDE CLASS PERIOD |
| 54813 | NO RECOGNIZED LOSSES |
| 54815 | SHARES SOLD SHORT |
| 54817 | NO RECOGNIZED LOSSES |
| 54818 | NO RECOGNIZED LOSSES |
| 54820 | NO RECOGNIZED LOSSES |
| 54821 | PURCHASED OUTSIDE CLASS PERIOD |
| 54822 | NO RECOGNIZED LOSSES |
| 54823 | NO RECOGNIZED LOSSES |
| 54824 | PURCHASED OUTSIDE CLASS PERIOD |
| 54825 | PURCHASED OUTSIDE CLASS PERIOD |
| 54826 | PURCHASED OUTSIDE CLASS PERIOD |
| 54827 | NO RECOGNIZED LOSSES |
| 54828 | NO RECOGNIZED LOSSES |
| 54829 | NO RECOGNIZED LOSSES |
| 54833 | SHARES SOLD SHORT |
| 54834 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 54836 | PURCHASED OUTSIDE CLASS PERIOD |
| 54837 | NO RECOGNIZED LOSSES |
| 54838 | SHARES SOLD SHORT |
| 54839 | PURCHASED OUTSIDE CLASS PERIOD |
| 54840 | PURCHASED OUTSIDE CLASS PERIOD |
| 54844 | PURCHASED OUTSIDE CLASS PERIOD |
| 54846 | PURCHASED OUTSIDE CLASS PERIOD |
| 54849 | PURCHASED OUTSIDE CLASS PERIOD |
| 54850 | PURCHASED OUTSIDE CLASS PERIOD |
| 54851 | NO RECOGNIZED LOSSES |
| 54852 | PURCHASED OUTSIDE CLASS PERIOD |
| 54853 | NO RECOGNIZED LOSSES |
| 54856 | PURCHASED OUTSIDE CLASS PERIOD |
| 54857 | NO RECOGNIZED LOSSES |
| 54858 | PURCHASED OUTSIDE CLASS PERIOD |
| 54862 | PURCHASED OUTSIDE CLASS PERIOD |
| 54863 | PURCHASED OUTSIDE CLASS PERIOD |
| 54865 | PURCHASED OUTSIDE CLASS PERIOD |
| 54866 | NO RECOGNIZED LOSSES |
| 54869 | PURCHASED OUTSIDE CLASS PERIOD |
| 54870 | PURCHASED OUTSIDE CLASS PERIOD |
| 54871 | PURCHASED OUTSIDE CLASS PERIOD |
| 54872 | PURCHASED OUTSIDE CLASS PERIOD |
| 54874 | NO RECOGNIZED LOSSES |
| 54875 | NO RECOGNIZED LOSSES |
| 54876 | PURCHASED OUTSIDE CLASS PERIOD |
| 54877 | SHARES SOLD SHORT |
| 54878 | NO RECOGNIZED LOSSES |
| 54882 | NO RECOGNIZED LOSSES |
| 54883 | NO RECOGNIZED LOSSES |
| 54884 | PURCHASED OUTSIDE CLASS PERIOD |
| 54885 | PURCHASED OUTSIDE CLASS PERIOD |
| 54886 | NO RECOGNIZED LOSSES |
| 54887 | PURCHASED OUTSIDE CLASS PERIOD |
| 54888 | PURCHASED OUTSIDE CLASS PERIOD |
| 54890 | PURCHASED OUTSIDE CLASS PERIOD |
| 54891 | NO RECOGNIZED LOSSES |
| 54892 | NO RECOGNIZED LOSSES |
| 54893 | PURCHASED OUTSIDE CLASS PERIOD |
| 54894 | PURCHASED OUTSIDE CLASS PERIOD |
| 54895 | PURCHASED OUTSIDE CLASS PERIOD |
| 54896 | PURCHASED OUTSIDE CLASS PERIOD |
| 54897 | PURCHASED OUTSIDE CLASS PERIOD |
| 54900 | PURCHASED OUTSIDE CLASS PERIOD |
| 54901 | NO RECOGNIZED LOSSES |
| 54903 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 54904 | PURCHASED OUTSIDE CLASS PERIOD |
| 54905 | NO RECOGNIZED LOSSES |
| 54906 | NO RECOGNIZED LOSSES |
| 54907 | NO RECOGNIZED LOSSES |
| 54908 | PURCHASED OUTSIDE CLASS PERIOD |
| 54911 | NO RECOGNIZED LOSSES |
| 54912 | SHARES SOLD SHORT |
| 54914 | NO RECOGNIZED LOSSES |
| 54915 | NO RECOGNIZED LOSSES |
| 54916 | PURCHASED OUTSIDE CLASS PERIOD |
| 54918 | NO RECOGNIZED LOSSES |
| 54919 | NO RECOGNIZED LOSSES |
| 54920 | NO RECOGNIZED LOSSES |
| 54921 | PURCHASED OUTSIDE CLASS PERIOD |
| 54922 | NO RECOGNIZED LOSSES |
| 54923 | PURCHASED OUTSIDE CLASS PERIOD |
| 54924 | PURCHASED OUTSIDE CLASS PERIOD |
| 54925 | NO RECOGNIZED LOSSES |
| 54926 | NO RECOGNIZED LOSSES |
| 54928 | NO RECOGNIZED LOSSES |
| 54929 | PURCHASED OUTSIDE CLASS PERIOD |
| 54930 | PURCHASED OUTSIDE CLASS PERIOD |
| 54931 | PURCHASED OUTSIDE CLASS PERIOD |
| 54932 | PURCHASED OUTSIDE CLASS PERIOD |
| 54933 | PURCHASED OUTSIDE CLASS PERIOD |
| 54934 | PURCHASED OUTSIDE CLASS PERIOD |
| 54935 | PURCHASED OUTSIDE CLASS PERIOD |
| 54937 | NO RECOGNIZED LOSSES |
| 54938 | NO RECOGNIZED LOSSES |
| 54939 | PURCHASED OUTSIDE CLASS PERIOD |
| 54940 | PURCHASED OUTSIDE CLASS PERIOD |
| 54942 | NO RECOGNIZED LOSSES |
| 54943 | PURCHASED OUTSIDE CLASS PERIOD |
| 54944 | PURCHASED OUTSIDE CLASS PERIOD |
| 54946 | PURCHASED OUTSIDE CLASS PERIOD |
| 54947 | NO RECOGNIZED LOSSES |
| 54951 | PURCHASED OUTSIDE CLASS PERIOD |
| 54952 | PURCHASED OUTSIDE CLASS PERIOD |
| 54953 | PURCHASED OUTSIDE CLASS PERIOD |
| 54954 | NO RECOGNIZED LOSSES |
| 54955 | PURCHASED OUTSIDE CLASS PERIOD |
| 54957 | PURCHASED OUTSIDE CLASS PERIOD |
| 54959 | PURCHASED OUTSIDE CLASS PERIOD |
| 54961 | PURCHASED OUTSIDE CLASS PERIOD |
| 54962 | PURCHASED OUTSIDE CLASS PERIOD |
| 54963 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 54964 | PURCHASED OUTSIDE CLASS PERIOD |
| 54965 | PURCHASED OUTSIDE CLASS PERIOD |
| 54966 | PURCHASED OUTSIDE CLASS PERIOD |
| 54967 | PURCHASED OUTSIDE CLASS PERIOD |
| 54968 | PURCHASED OUTSIDE CLASS PERIOD |
| 54969 | PURCHASED OUTSIDE CLASS PERIOD |
| 54970 | NO RECOGNIZED LOSSES |
| 54971 | PURCHASED OUTSIDE CLASS PERIOD |
| 54972 | PURCHASED OUTSIDE CLASS PERIOD |
| 54973 | PURCHASED OUTSIDE CLASS PERIOD |
| 54975 | PURCHASED OUTSIDE CLASS PERIOD |
| 54976 | NO RECOGNIZED LOSSES |
| 54978 | PURCHASED OUTSIDE CLASS PERIOD |
| 54979 | NO RECOGNIZED LOSSES |
| 54981 | PURCHASED OUTSIDE CLASS PERIOD |
| 54982 | PURCHASED OUTSIDE CLASS PERIOD |
| 54983 | PURCHASED OUTSIDE CLASS PERIOD |
| 54984 | PURCHASED OUTSIDE CLASS PERIOD |
| 54985 | PURCHASED OUTSIDE CLASS PERIOD |
| 54986 | PURCHASED OUTSIDE CLASS PERIOD |
| 54988 | SHARES SOLD SHORT |
| 54990 | PURCHASED OUTSIDE CLASS PERIOD |
| 54994 | NO RECOGNIZED LOSSES |
| 54995 | PURCHASED OUTSIDE CLASS PERIOD |
| 54998 | PURCHASED OUTSIDE CLASS PERIOD |
| 54999 | PURCHASED OUTSIDE CLASS PERIOD |
| 55000 | PURCHASED OUTSIDE CLASS PERIOD |
| 55001 | PURCHASED OUTSIDE CLASS PERIOD |
| 55002 | NO RECOGNIZED LOSSES |
| 55003 | NO RECOGNIZED LOSSES |
| 55004 | PURCHASED OUTSIDE CLASS PERIOD |
| 55005 | PURCHASED OUTSIDE CLASS PERIOD |
| 55006 | PURCHASED OUTSIDE CLASS PERIOD |
| 55007 | NO RECOGNIZED LOSSES |
| 55009 | PURCHASED OUTSIDE CLASS PERIOD |
| 55010 | PURCHASED OUTSIDE CLASS PERIOD |
| 55011 | PURCHASED OUTSIDE CLASS PERIOD |
| 55012 | NO RECOGNIZED LOSSES |
| 55013 | PURCHASED OUTSIDE CLASS PERIOD |
| 55014 | PURCHASED OUTSIDE CLASS PERIOD |
| 55015 | NO RECOGNIZED LOSSES |
| 55016 | PURCHASED OUTSIDE CLASS PERIOD |
| 55019 | PURCHASED OUTSIDE CLASS PERIOD |
| 55020 | PURCHASED OUTSIDE CLASS PERIOD |
| 55022 | NO RECOGNIZED LOSSES |
| 55023 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 55024 | PURCHASED OUTSIDE CLASS PERIOD |
| 55025 | PURCHASED OUTSIDE CLASS PERIOD |
| 55026 | PURCHASED OUTSIDE CLASS PERIOD |
| 55027 | NO RECOGNIZED LOSSES |
| 55028 | PURCHASED OUTSIDE CLASS PERIOD |
| 55029 | PURCHASED OUTSIDE CLASS PERIOD |
| 55030 | NO RECOGNIZED LOSSES |
| 55031 | PURCHASED OUTSIDE CLASS PERIOD |
| 55032 | PURCHASED OUTSIDE CLASS PERIOD |
| 55035 | NO RECOGNIZED LOSSES |
| 55036 | PURCHASED OUTSIDE CLASS PERIOD |
| 55037 | NO RECOGNIZED LOSSES |
| 55038 | PURCHASED OUTSIDE CLASS PERIOD |
| 55039 | PURCHASED OUTSIDE CLASS PERIOD |
| 55040 | NO RECOGNIZED LOSSES |
| 55041 | PURCHASED OUTSIDE CLASS PERIOD |
| 55042 | NO RECOGNIZED LOSSES |
| 55045 | NO RECOGNIZED LOSSES |
| 55046 | PURCHASED OUTSIDE CLASS PERIOD |
| 55048 | NO RECOGNIZED LOSSES |
| 55049 | NO RECOGNIZED LOSSES |
| 55051 | NO RECOGNIZED LOSSES |
| 55053 | NO RECOGNIZED LOSSES |
| 55054 | PURCHASED OUTSIDE CLASS PERIOD |
| 55055 | NO RECOGNIZED LOSSES |
| 55056 | PURCHASED OUTSIDE CLASS PERIOD |
| 55057 | NO RECOGNIZED LOSSES |
| 55058 | PURCHASED OUTSIDE CLASS PERIOD |
| 55059 | PURCHASED OUTSIDE CLASS PERIOD |
| 55060 | PURCHASED OUTSIDE CLASS PERIOD |
| 55062 | NO RECOGNIZED LOSSES |
| 55063 | NO RECOGNIZED LOSSES |
| 55065 | NO RECOGNIZED LOSSES |
| 55066 | PURCHASED OUTSIDE CLASS PERIOD |
| 55069 | PURCHASED OUTSIDE CLASS PERIOD |
| 55070 | PURCHASED OUTSIDE CLASS PERIOD |
| 55071 | NO RECOGNIZED LOSSES |
| 55075 | PURCHASED OUTSIDE CLASS PERIOD |
| 55076 | NO RECOGNIZED LOSSES |
| 55077 | NO RECOGNIZED LOSSES |
| 55078 | NO RECOGNIZED LOSSES |
| 55079 | PURCHASED OUTSIDE CLASS PERIOD |
| 55080 | NO RECOGNIZED LOSSES |
| 55081 | PURCHASED OUTSIDE CLASS PERIOD |
| 55082 | SHARES SOLD SHORT |
| 55084 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 55086 | PURCHASED OUTSIDE CLASS PERIOD |
| 55087 | NO RECOGNIZED LOSSES |
| 55088 | NO RECOGNIZED LOSSES |
| 55089 | PURCHASED OUTSIDE CLASS PERIOD |
| 55091 | NO RECOGNIZED LOSSES |
| 55092 | PURCHASED OUTSIDE CLASS PERIOD |
| 55093 | NO RECOGNIZED LOSSES |
| 55094 | PURCHASED OUTSIDE CLASS PERIOD |
| 55095 | NO RECOGNIZED LOSSES |
| 55096 | PURCHASED OUTSIDE CLASS PERIOD |
| 55097 | NO RECOGNIZED LOSSES |
| 55098 | PURCHASED OUTSIDE CLASS PERIOD |
| 55100 | PURCHASED OUTSIDE CLASS PERIOD |
| 55102 | PURCHASED OUTSIDE CLASS PERIOD |
| 55104 | PURCHASED OUTSIDE CLASS PERIOD |
| 55105 | NO RECOGNIZED LOSSES |
| 55106 | NO RECOGNIZED LOSSES |
| 55107 | PURCHASED OUTSIDE CLASS PERIOD |
| 55108 | PURCHASED OUTSIDE CLASS PERIOD |
| 55109 | NO RECOGNIZED LOSSES |
| 55111 | PURCHASED OUTSIDE CLASS PERIOD |
| 55113 | PURCHASED OUTSIDE CLASS PERIOD |
| 55114 | PURCHASED OUTSIDE CLASS PERIOD |
| 55115 | NO RECOGNIZED LOSSES |
| 55116 | PURCHASED OUTSIDE CLASS PERIOD |
| 55117 | NO RECOGNIZED LOSSES |
| 55119 | PURCHASED OUTSIDE CLASS PERIOD |
| 55120 | NO RECOGNIZED LOSSES |
| 55122 | PURCHASED OUTSIDE CLASS PERIOD |
| 55123 | PURCHASED OUTSIDE CLASS PERIOD |
| 55124 | SHARES SOLD SHORT |
| 55126 | NO RECOGNIZED LOSSES |
| 55127 | NO RECOGNIZED LOSSES |
| 55128 | NO RECOGNIZED LOSSES |
| 55131 | NO RECOGNIZED LOSSES |
| 55133 | PURCHASED OUTSIDE CLASS PERIOD |
| 55134 | NO RECOGNIZED LOSSES |
| 55135 | NO RECOGNIZED LOSSES |
| 55136 | NO RECOGNIZED LOSSES |
| 55137 | SHARES SOLD SHORT |
| 55142 | NO RECOGNIZED LOSSES |
| 55144 | SHARES SOLD SHORT |
| 55145 | PURCHASED OUTSIDE CLASS PERIOD |
| 55146 | PURCHASED OUTSIDE CLASS PERIOD |
| 55150 | NO RECOGNIZED LOSSES |
| 55152 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**                                    **EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 55154 | NO RECOGNIZED LOSSES |
| 55157 | PURCHASED OUTSIDE CLASS PERIOD |
| 55158 | PURCHASED OUTSIDE CLASS PERIOD |
| 55159 | PURCHASED OUTSIDE CLASS PERIOD |
| 55160 | PURCHASED OUTSIDE CLASS PERIOD |
| 55161 | SHARES SOLD SHORT |
| 55162 | PURCHASED OUTSIDE CLASS PERIOD |
| 55163 | PURCHASED OUTSIDE CLASS PERIOD |
| 55164 | PURCHASED OUTSIDE CLASS PERIOD |
| 55165 | PURCHASED OUTSIDE CLASS PERIOD |
| 55167 | PURCHASED OUTSIDE CLASS PERIOD |
| 55168 | PURCHASED OUTSIDE CLASS PERIOD |
| 55169 | PURCHASED OUTSIDE CLASS PERIOD |
| 55170 | PURCHASED OUTSIDE CLASS PERIOD |
| 55173 | PURCHASED OUTSIDE CLASS PERIOD |
| 55175 | NO RECOGNIZED LOSSES |
| 55177 | SHARES SOLD SHORT |
| 55178 | NO RECOGNIZED LOSSES |
| 55180 | NO RECOGNIZED LOSSES |
| 55181 | PURCHASED OUTSIDE CLASS PERIOD |
| 55182 | NO RECOGNIZED LOSSES |
| 55183 | PURCHASED OUTSIDE CLASS PERIOD |
| 55184 | PURCHASED OUTSIDE CLASS PERIOD |
| 55186 | PURCHASED OUTSIDE CLASS PERIOD |
| 55187 | PURCHASED OUTSIDE CLASS PERIOD |
| 55188 | PURCHASED OUTSIDE CLASS PERIOD |
| 55189 | PURCHASED OUTSIDE CLASS PERIOD |
| 55190 | PURCHASED OUTSIDE CLASS PERIOD |
| 55191 | NO RECOGNIZED LOSSES |
| 55193 | NO RECOGNIZED LOSSES |
| 55195 | PURCHASED OUTSIDE CLASS PERIOD |
| 55199 | PURCHASED OUTSIDE CLASS PERIOD |
| 55200 | NO RECOGNIZED LOSSES |
| 55204 | NO RECOGNIZED LOSSES |
| 55209 | NO RECOGNIZED LOSSES |
| 55211 | NO RECOGNIZED LOSSES |
| 55217 | PURCHASED OUTSIDE CLASS PERIOD |
| 55221 | SHARES SOLD SHORT |
| 55222 | NO RECOGNIZED LOSSES |
| 55223 | PURCHASED OUTSIDE CLASS PERIOD |
| 55224 | PURCHASED OUTSIDE CLASS PERIOD |
| 55225 | PURCHASED OUTSIDE CLASS PERIOD |
| 55227 | NO RECOGNIZED LOSSES |
| 55229 | PURCHASED OUTSIDE CLASS PERIOD |
| 55231 | PURCHASED OUTSIDE CLASS PERIOD |
| 55233 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 55237 | NO RECOGNIZED LOSSES |
| 55238 | SHARES SOLD SHORT |
| 55239 | PURCHASED OUTSIDE CLASS PERIOD |
| 55240 | PURCHASED OUTSIDE CLASS PERIOD |
| 55241 | PURCHASED OUTSIDE CLASS PERIOD |
| 55244 | NO RECOGNIZED LOSSES |
| 55245 | NO RECOGNIZED LOSSES |
| 55246 | PURCHASED OUTSIDE CLASS PERIOD |
| 55247 | PURCHASED OUTSIDE CLASS PERIOD |
| 55248 | PURCHASED OUTSIDE CLASS PERIOD |
| 55249 | NO RECOGNIZED LOSSES |
| 55250 | NO RECOGNIZED LOSSES |
| 55251 | NO RECOGNIZED LOSSES |
| 55252 | NO RECOGNIZED LOSSES |
| 55259 | NO RECOGNIZED LOSSES |
| 55268 | NO RECOGNIZED LOSSES |
| 55272 | NO RECOGNIZED LOSSES |
| 55273 | NO RECOGNIZED LOSSES |
| 55276 | PURCHASED OUTSIDE CLASS PERIOD |
| 55278 | NO RECOGNIZED LOSSES |
| 55280 | NO RECOGNIZED LOSSES |
| 55283 | PURCHASED OUTSIDE CLASS PERIOD |
| 55284 | NO RECOGNIZED LOSSES |
| 55285 | NO RECOGNIZED LOSSES |
| 55286 | NO RECOGNIZED LOSSES |
| 55287 | PURCHASED OUTSIDE CLASS PERIOD |
| 55290 | PURCHASED OUTSIDE CLASS PERIOD |
| 55291 | PURCHASED OUTSIDE CLASS PERIOD |
| 55294 | NO RECOGNIZED LOSSES |
| 55297 | NO RECOGNIZED LOSSES |
| 55299 | PURCHASED OUTSIDE CLASS PERIOD |
| 55302 | NO RECOGNIZED LOSSES |
| 55305 | PURCHASED OUTSIDE CLASS PERIOD |
| 55307 | SHARES SOLD SHORT |
| 55309 | PURCHASED OUTSIDE CLASS PERIOD |
| 55312 | PURCHASED OUTSIDE CLASS PERIOD |
| 55313 | PURCHASED OUTSIDE CLASS PERIOD |
| 55314 | PURCHASED OUTSIDE CLASS PERIOD |
| 55315 | PURCHASED OUTSIDE CLASS PERIOD |
| 55316 | NO RECOGNIZED LOSSES |
| 55317 | PURCHASED OUTSIDE CLASS PERIOD |
| 55318 | PURCHASED OUTSIDE CLASS PERIOD |
| 55319 | SHARES SOLD SHORT |
| 55320 | NO RECOGNIZED LOSSES |
| 55321 | SHARES SOLD SHORT |
| 55323 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 55325 | NO RECOGNIZED LOSSES |
| 55326 | PURCHASED OUTSIDE CLASS PERIOD |
| 55329 | PURCHASED OUTSIDE CLASS PERIOD |
| 55331 | PURCHASED OUTSIDE CLASS PERIOD |
| 55334 | NO RECOGNIZED LOSSES |
| 55364 | NO RECOGNIZED LOSSES |
| 55366 | NO RECOGNIZED LOSSES |
| 55367 | NO RECOGNIZED LOSSES |
| 55370 | SHARES SOLD SHORT |
| 55372 | NO RECOGNIZED LOSSES |
| 55373 | PURCHASED OUTSIDE CLASS PERIOD |
| 55379 | NO RECOGNIZED LOSSES |
| 55383 | NO RECOGNIZED LOSSES |
| 55389 | NO RECOGNIZED LOSSES |
| 55390 | NO RECOGNIZED LOSSES |
| 55395 | NO RECOGNIZED LOSSES |
| 55401 | NO RECOGNIZED LOSSES |
| 55403 | NO RECOGNIZED LOSSES |
| 55406 | NO RECOGNIZED LOSSES |
| 55408 | PURCHASED OUTSIDE CLASS PERIOD |
| 55410 | PURCHASED OUTSIDE CLASS PERIOD |
| 55411 | NO RECOGNIZED LOSSES |
| 55412 | PURCHASED OUTSIDE CLASS PERIOD |
| 55413 | NO RECOGNIZED LOSSES |
| 55417 | NO RECOGNIZED LOSSES |
| 55418 | NO RECOGNIZED LOSSES |
| 55422 | SHARES SOLD SHORT |
| 55425 | PURCHASED OUTSIDE CLASS PERIOD |
| 55426 | NO RECOGNIZED LOSSES |
| 55431 | NO RECOGNIZED LOSSES |
| 55436 | NO RECOGNIZED LOSSES |
| 55437 | NO RECOGNIZED LOSSES |
| 55444 | NO RECOGNIZED LOSSES |
| 55446 | NO RECOGNIZED LOSSES |
| 55449 | PURCHASED OUTSIDE CLASS PERIOD |
| 55473 | NO RECOGNIZED LOSSES |
| 55479 | NO RECOGNIZED LOSSES |
| 55482 | NO RECOGNIZED LOSSES |
| 55493 | NO RECOGNIZED LOSSES |
| 55495 | NO RECOGNIZED LOSSES |
| 55504 | NO RECOGNIZED LOSSES |
| 55508 | NO RECOGNIZED LOSSES |
| 55511 | NO RECOGNIZED LOSSES |
| 55515 | NO RECOGNIZED LOSSES |
| 55522 | NO RECOGNIZED LOSSES |
| 55535 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 55545 | NO RECOGNIZED LOSSES |
| 55552 | NO RECOGNIZED LOSSES |
| 55555 | NO RECOGNIZED LOSSES |
| 55556 | NO RECOGNIZED LOSSES |
| 55562 | PURCHASED OUTSIDE CLASS PERIOD |
| 55578 | NO RECOGNIZED LOSSES |
| 55584 | NO RECOGNIZED LOSSES |
| 55585 | PURCHASED OUTSIDE CLASS PERIOD |
| 55602 | NO RECOGNIZED LOSSES |
| 55622 | NO RECOGNIZED LOSSES |
| 55628 | NO RECOGNIZED LOSSES |
| 55656 | NO RECOGNIZED LOSSES |
| 55667 | NO RECOGNIZED LOSSES |
| 55678 | NO RECOGNIZED LOSSES |
| 55680 | NO RECOGNIZED LOSSES |
| 55689 | NO RECOGNIZED LOSSES |
| 55696 | NO RECOGNIZED LOSSES |
| 55697 | NO RECOGNIZED LOSSES |
| 55704 | NO RECOGNIZED LOSSES |
| 55724 | NO RECOGNIZED LOSSES |
| 55727 | NO RECOGNIZED LOSSES |
| 55729 | NO RECOGNIZED LOSSES |
| 55736 | NO RECOGNIZED LOSSES |
| 55742 | NO RECOGNIZED LOSSES |
| 55745 | NO RECOGNIZED LOSSES |
| 55769 | NO RECOGNIZED LOSSES |
| 55771 | NO RECOGNIZED LOSSES |
| 55772 | PURCHASED OUTSIDE CLASS PERIOD |
| 55775 | NO RECOGNIZED LOSSES |
| 55787 | NO RECOGNIZED LOSSES |
| 55798 | NO RECOGNIZED LOSSES |
| 55813 | PURCHASED OUTSIDE CLASS PERIOD |
| 55829 | PURCHASED OUTSIDE CLASS PERIOD |
| 55842 | NO RECOGNIZED LOSSES |
| 55843 | PURCHASED OUTSIDE CLASS PERIOD |
| 55844 | PURCHASED OUTSIDE CLASS PERIOD |
| 55845 | PURCHASED OUTSIDE CLASS PERIOD |
| 55846 | PURCHASED OUTSIDE CLASS PERIOD |
| 55847 | PURCHASED OUTSIDE CLASS PERIOD |
| 55848 | PURCHASED OUTSIDE CLASS PERIOD |
| 55849 | PURCHASED OUTSIDE CLASS PERIOD |
| 55850 | PURCHASED OUTSIDE CLASS PERIOD |
| 55851 | PURCHASED OUTSIDE CLASS PERIOD |
| 55852 | PURCHASED OUTSIDE CLASS PERIOD |
| 55853 | PURCHASED OUTSIDE CLASS PERIOD |
| 55854 | PURCHASED OUTSIDE CLASS PERIOD |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|-----------------|
| 55855 | PURCHASED OUTSIDE CLASS PERIOD |
| 55856 | PURCHASED OUTSIDE CLASS PERIOD |
| 55857 | PURCHASED OUTSIDE CLASS PERIOD |
| 55858 | PURCHASED OUTSIDE CLASS PERIOD |
| 55859 | PURCHASED OUTSIDE CLASS PERIOD |
| 55860 | PURCHASED OUTSIDE CLASS PERIOD |
| 55861 | PURCHASED OUTSIDE CLASS PERIOD |
| 55862 | PURCHASED OUTSIDE CLASS PERIOD |
| 55863 | PURCHASED OUTSIDE CLASS PERIOD |
| 55864 | PURCHASED OUTSIDE CLASS PERIOD |
| 55865 | PURCHASED OUTSIDE CLASS PERIOD |
| 55866 | PURCHASED OUTSIDE CLASS PERIOD |
| 55867 | PURCHASED OUTSIDE CLASS PERIOD |
| 55868 | PURCHASED OUTSIDE CLASS PERIOD |
| 55869 | PURCHASED OUTSIDE CLASS PERIOD |
| 55870 | PURCHASED OUTSIDE CLASS PERIOD |
| 55871 | PURCHASED OUTSIDE CLASS PERIOD |
| 55872 | PURCHASED OUTSIDE CLASS PERIOD |
| 55873 | PURCHASED OUTSIDE CLASS PERIOD |
| 55874 | PURCHASED OUTSIDE CLASS PERIOD |
| 55875 | PURCHASED OUTSIDE CLASS PERIOD |
| 55876 | PURCHASED OUTSIDE CLASS PERIOD |
| 55877 | PURCHASED OUTSIDE CLASS PERIOD |
| 55878 | PURCHASED OUTSIDE CLASS PERIOD |
| 55879 | PURCHASED OUTSIDE CLASS PERIOD |
| 55880 | PURCHASED OUTSIDE CLASS PERIOD |
| 55881 | PURCHASED OUTSIDE CLASS PERIOD |
| 55882 | PURCHASED OUTSIDE CLASS PERIOD |
| 55883 | PURCHASED OUTSIDE CLASS PERIOD |
| 55884 | PURCHASED OUTSIDE CLASS PERIOD |
| 55885 | PURCHASED OUTSIDE CLASS PERIOD |
| 55886 | PURCHASED OUTSIDE CLASS PERIOD |
| 55887 | PURCHASED OUTSIDE CLASS PERIOD |
| 55888 | PURCHASED OUTSIDE CLASS PERIOD |
| 55889 | PURCHASED OUTSIDE CLASS PERIOD |
| 55890 | PURCHASED OUTSIDE CLASS PERIOD |
| 55891 | PURCHASED OUTSIDE CLASS PERIOD |
| 55892 | PURCHASED OUTSIDE CLASS PERIOD |
| 55893 | PURCHASED OUTSIDE CLASS PERIOD |
| 55894 | PURCHASED OUTSIDE CLASS PERIOD |
| 55895 | PURCHASED OUTSIDE CLASS PERIOD |
| 55896 | PURCHASED OUTSIDE CLASS PERIOD |
| 55897 | PURCHASED OUTSIDE CLASS PERIOD |
| 55898 | PURCHASED OUTSIDE CLASS PERIOD |
| 55899 | PURCHASED OUTSIDE CLASS PERIOD |
| 55900 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 55901 | PURCHASED OUTSIDE CLASS PERIOD |
| 55902 | PURCHASED OUTSIDE CLASS PERIOD |
| 55903 | PURCHASED OUTSIDE CLASS PERIOD |
| 55904 | PURCHASED OUTSIDE CLASS PERIOD |
| 55905 | PURCHASED OUTSIDE CLASS PERIOD |
| 55906 | PURCHASED OUTSIDE CLASS PERIOD |
| 55907 | PURCHASED OUTSIDE CLASS PERIOD |
| 55908 | PURCHASED OUTSIDE CLASS PERIOD |
| 55909 | PURCHASED OUTSIDE CLASS PERIOD |
| 55910 | PURCHASED OUTSIDE CLASS PERIOD |
| 55911 | PURCHASED OUTSIDE CLASS PERIOD |
| 55912 | PURCHASED OUTSIDE CLASS PERIOD |
| 55913 | PURCHASED OUTSIDE CLASS PERIOD |
| 55914 | PURCHASED OUTSIDE CLASS PERIOD |
| 55915 | PURCHASED OUTSIDE CLASS PERIOD |
| 55916 | PURCHASED OUTSIDE CLASS PERIOD |
| 55917 | PURCHASED OUTSIDE CLASS PERIOD |
| 55918 | PURCHASED OUTSIDE CLASS PERIOD |
| 55919 | PURCHASED OUTSIDE CLASS PERIOD |
| 55920 | PURCHASED OUTSIDE CLASS PERIOD |
| 55921 | PURCHASED OUTSIDE CLASS PERIOD |
| 55922 | PURCHASED OUTSIDE CLASS PERIOD |
| 55923 | PURCHASED OUTSIDE CLASS PERIOD |
| 55924 | PURCHASED OUTSIDE CLASS PERIOD |
| 55925 | PURCHASED OUTSIDE CLASS PERIOD |
| 55926 | PURCHASED OUTSIDE CLASS PERIOD |
| 55927 | PURCHASED OUTSIDE CLASS PERIOD |
| 55928 | PURCHASED OUTSIDE CLASS PERIOD |
| 55929 | PURCHASED OUTSIDE CLASS PERIOD |
| 55930 | PURCHASED OUTSIDE CLASS PERIOD |
| 55931 | PURCHASED OUTSIDE CLASS PERIOD |
| 55932 | PURCHASED OUTSIDE CLASS PERIOD |
| 55933 | PURCHASED OUTSIDE CLASS PERIOD |
| 55934 | PURCHASED OUTSIDE CLASS PERIOD |
| 55935 | PURCHASED OUTSIDE CLASS PERIOD |
| 55937 | PURCHASED OUTSIDE CLASS PERIOD |
| 55938 | PURCHASED OUTSIDE CLASS PERIOD |
| 55939 | PURCHASED OUTSIDE CLASS PERIOD |
| 55940 | PURCHASED OUTSIDE CLASS PERIOD |
| 55941 | PURCHASED OUTSIDE CLASS PERIOD |
| 55942 | PURCHASED OUTSIDE CLASS PERIOD |
| 55943 | PURCHASED OUTSIDE CLASS PERIOD |
| 55944 | PURCHASED OUTSIDE CLASS PERIOD |
| 55946 | PURCHASED OUTSIDE CLASS PERIOD |
| 55947 | PURCHASED OUTSIDE CLASS PERIOD |
| 55948 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 55949 | PURCHASED OUTSIDE CLASS PERIOD |
| 55950 | PURCHASED OUTSIDE CLASS PERIOD |
| 55951 | PURCHASED OUTSIDE CLASS PERIOD |
| 55952 | PURCHASED OUTSIDE CLASS PERIOD |
| 55953 | PURCHASED OUTSIDE CLASS PERIOD |
| 55954 | PURCHASED OUTSIDE CLASS PERIOD |
| 55955 | PURCHASED OUTSIDE CLASS PERIOD |
| 55956 | PURCHASED OUTSIDE CLASS PERIOD |
| 55957 | PURCHASED OUTSIDE CLASS PERIOD |
| 55958 | PURCHASED OUTSIDE CLASS PERIOD |
| 55959 | PURCHASED OUTSIDE CLASS PERIOD |
| 55960 | PURCHASED OUTSIDE CLASS PERIOD |
| 55961 | PURCHASED OUTSIDE CLASS PERIOD |
| 55962 | PURCHASED OUTSIDE CLASS PERIOD |
| 55963 | PURCHASED OUTSIDE CLASS PERIOD |
| 55964 | PURCHASED OUTSIDE CLASS PERIOD |
| 55965 | PURCHASED OUTSIDE CLASS PERIOD |
| 55966 | PURCHASED OUTSIDE CLASS PERIOD |
| 55967 | PURCHASED OUTSIDE CLASS PERIOD |
| 55968 | PURCHASED OUTSIDE CLASS PERIOD |
| 55969 | PURCHASED OUTSIDE CLASS PERIOD |
| 55970 | PURCHASED OUTSIDE CLASS PERIOD |
| 55971 | PURCHASED OUTSIDE CLASS PERIOD |
| 55972 | PURCHASED OUTSIDE CLASS PERIOD |
| 55973 | PURCHASED OUTSIDE CLASS PERIOD |
| 55974 | PURCHASED OUTSIDE CLASS PERIOD |
| 55975 | PURCHASED OUTSIDE CLASS PERIOD |
| 55976 | PURCHASED OUTSIDE CLASS PERIOD |
| 55977 | PURCHASED OUTSIDE CLASS PERIOD |
| 55978 | PURCHASED OUTSIDE CLASS PERIOD |
| 55979 | PURCHASED OUTSIDE CLASS PERIOD |
| 55981 | PURCHASED OUTSIDE CLASS PERIOD |
| 55982 | PURCHASED OUTSIDE CLASS PERIOD |
| 55983 | PURCHASED OUTSIDE CLASS PERIOD |
| 55984 | PURCHASED OUTSIDE CLASS PERIOD |
| 55985 | PURCHASED OUTSIDE CLASS PERIOD |
| 55986 | PURCHASED OUTSIDE CLASS PERIOD |
| 55987 | PURCHASED OUTSIDE CLASS PERIOD |
| 55988 | PURCHASED OUTSIDE CLASS PERIOD |
| 55989 | PURCHASED OUTSIDE CLASS PERIOD |
| 55990 | PURCHASED OUTSIDE CLASS PERIOD |
| 55991 | PURCHASED OUTSIDE CLASS PERIOD |
| 55992 | PURCHASED OUTSIDE CLASS PERIOD |
| 55993 | PURCHASED OUTSIDE CLASS PERIOD |
| 55994 | PURCHASED OUTSIDE CLASS PERIOD |
| 55995 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
| --- | --- |
| 55996 | PURCHASED OUTSIDE CLASS PERIOD |
| 55997 | PURCHASED OUTSIDE CLASS PERIOD |
| 55998 | PURCHASED OUTSIDE CLASS PERIOD |
| 55999 | PURCHASED OUTSIDE CLASS PERIOD |
| 56000 | PURCHASED OUTSIDE CLASS PERIOD |
| 56001 | PURCHASED OUTSIDE CLASS PERIOD |
| 56002 | PURCHASED OUTSIDE CLASS PERIOD |
| 56003 | PURCHASED OUTSIDE CLASS PERIOD |
| 56004 | PURCHASED OUTSIDE CLASS PERIOD |
| 56005 | PURCHASED OUTSIDE CLASS PERIOD |
| 56024 | NO RECOGNIZED LOSSES |
| 56041 | NO RECOGNIZED LOSSES |
| 56043 | NO RECOGNIZED LOSSES |
| 56044 | NO RECOGNIZED LOSSES |
| 56060 | PURCHASED OUTSIDE CLASS PERIOD |
| 56066 | PURCHASED OUTSIDE CLASS PERIOD |
| 56072 | PURCHASED OUTSIDE CLASS PERIOD |
| 56073 | PURCHASED OUTSIDE CLASS PERIOD |
| 56075 | SHARES NOT PURCHASED |
| 56077 | PURCHASED OUTSIDE CLASS PERIOD |
| 56116 | PURCHASED OUTSIDE CLASS PERIOD |
| 56124 | PURCHASED OUTSIDE CLASS PERIOD |
| 56129 | PURCHASED OUTSIDE CLASS PERIOD |
| 56179 | PURCHASED OUTSIDE CLASS PERIOD |
| 56200 | PURCHASED OUTSIDE CLASS PERIOD |
| 56222 | NO RECOGNIZED LOSSES |
| 56223 | PURCHASED OUTSIDE CLASS PERIOD |
| 56227 | NO RECOGNIZED LOSSES |
| 56229 | PURCHASED OUTSIDE CLASS PERIOD |
| 56235 | PURCHASED OUTSIDE CLASS PERIOD |
| 56250 | PURCHASED OUTSIDE CLASS PERIOD |
| 56251 | PURCHASED OUTSIDE CLASS PERIOD |
| 56252 | PURCHASED OUTSIDE CLASS PERIOD |
| 56259 | NO RECOGNIZED LOSSES |
| 56262 | PURCHASED OUTSIDE CLASS PERIOD |
| 56273 | PURCHASED OUTSIDE CLASS PERIOD |
| 56276 | NO RECOGNIZED LOSSES |
| 56281 | PURCHASED OUTSIDE CLASS PERIOD |
| 56296 | PURCHASED OUTSIDE CLASS PERIOD |
| 56310 | PURCHASED OUTSIDE CLASS PERIOD |
| 56314 | PURCHASED OUTSIDE CLASS PERIOD |
| 56315 | PURCHASED OUTSIDE CLASS PERIOD |
| 56316 | PURCHASED OUTSIDE CLASS PERIOD |
| 56329 | NO RECOGNIZED LOSSES |
| 56330 | NO RECOGNIZED LOSSES |
| 56336 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 56337 | NO RECOGNIZED LOSSES |
| 56340 | NO RECOGNIZED LOSSES |
| 56342 | NO RECOGNIZED LOSSES |
| 56348 | NO RECOGNIZED LOSSES |
| 56350 | NO RECOGNIZED LOSSES |
| 56351 | NO RECOGNIZED LOSSES |
| 56353 | NO RECOGNIZED LOSSES |
| 56357 | NO RECOGNIZED LOSSES |
| 56358 | NO RECOGNIZED LOSSES |
| 56359 | NO RECOGNIZED LOSSES |
| 56362 | NO RECOGNIZED LOSSES |
| 56364 | NO RECOGNIZED LOSSES |
| 56367 | SHARES NOT PURCHASED |
| 56368 | NO RECOGNIZED LOSSES |
| 56369 | NO RECOGNIZED LOSSES |
| 56371 | NO RECOGNIZED LOSSES |
| 56372 | NO RECOGNIZED LOSSES |
| 56376 | NO RECOGNIZED LOSSES |
| 56381 | SHARES NOT PURCHASED |
| 56382 | NO RECOGNIZED LOSSES |
| 56383 | NO RECOGNIZED LOSSES |
| 56385 | NO RECOGNIZED LOSSES |
| 56387 | NO RECOGNIZED LOSSES |
| 56393 | NO RECOGNIZED LOSSES |
| 56400 | NO RECOGNIZED LOSSES |
| 56401 | NO RECOGNIZED LOSSES |
| 56404 | NO RECOGNIZED LOSSES |
| 56406 | NO RECOGNIZED LOSSES |
| 56408 | NO RECOGNIZED LOSSES |
| 56410 | NO RECOGNIZED LOSSES |
| 56411 | NO RECOGNIZED LOSSES |
| 56413 | NO RECOGNIZED LOSSES |
| 56415 | PURCHASED OUTSIDE CLASS PERIOD |
| 56417 | NO RECOGNIZED LOSSES |
| 56419 | NO RECOGNIZED LOSSES |
| 56425 | NO RECOGNIZED LOSSES |
| 56426 | NO RECOGNIZED LOSSES |
| 56427 | NO RECOGNIZED LOSSES |
| 56428 | NO RECOGNIZED LOSSES |
| 56429 | NO RECOGNIZED LOSSES |
| 56431 | NO RECOGNIZED LOSSES |
| 56432 | NO RECOGNIZED LOSSES |
| 56436 | NO RECOGNIZED LOSSES |
| 56437 | NO RECOGNIZED LOSSES |
| 56438 | NO RECOGNIZED LOSSES |
| 56441 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 56442 | NO RECOGNIZED LOSSES |
| 56443 | NO RECOGNIZED LOSSES |
| 56444 | NO RECOGNIZED LOSSES |
| 56451 | NO RECOGNIZED LOSSES |
| 56452 | NO RECOGNIZED LOSSES |
| 56456 | NO RECOGNIZED LOSSES |
| 56458 | NO RECOGNIZED LOSSES |
| 56459 | NO RECOGNIZED LOSSES |
| 56462 | NO RECOGNIZED LOSSES |
| 56464 | NO RECOGNIZED LOSSES |
| 56465 | NO RECOGNIZED LOSSES |
| 56468 | NO RECOGNIZED LOSSES |
| 56469 | NO RECOGNIZED LOSSES |
| 56470 | NO RECOGNIZED LOSSES |
| 56471 | NO RECOGNIZED LOSSES |
| 56473 | NO RECOGNIZED LOSSES |
| 56477 | NO RECOGNIZED LOSSES |
| 56481 | NO RECOGNIZED LOSSES |
| 56482 | NO RECOGNIZED LOSSES |
| 56483 | NO RECOGNIZED LOSSES |
| 56484 | NO RECOGNIZED LOSSES |
| 56485 | NO RECOGNIZED LOSSES |
| 56486 | NO RECOGNIZED LOSSES |
| 56492 | NO RECOGNIZED LOSSES |
| 56494 | NO RECOGNIZED LOSSES |
| 56495 | NO RECOGNIZED LOSSES |
| 56497 | NO RECOGNIZED LOSSES |
| 56498 | NO RECOGNIZED LOSSES |
| 56505 | NO RECOGNIZED LOSSES |
| 56507 | NO RECOGNIZED LOSSES |
| 56512 | NO RECOGNIZED LOSSES |
| 56514 | NO RECOGNIZED LOSSES |
| 56515 | NO RECOGNIZED LOSSES |
| 56519 | NO RECOGNIZED LOSSES |
| 56522 | NO RECOGNIZED LOSSES |
| 56523 | NO RECOGNIZED LOSSES |
| 56528 | NO RECOGNIZED LOSSES |
| 56529 | NO RECOGNIZED LOSSES |
| 56530 | NO RECOGNIZED LOSSES |
| 56532 | NO RECOGNIZED LOSSES |
| 56536 | NO RECOGNIZED LOSSES |
| 56537 | NO RECOGNIZED LOSSES |
| 56540 | NO RECOGNIZED LOSSES |
| 56542 | NO RECOGNIZED LOSSES |
| 56543 | NO RECOGNIZED LOSSES |
| 56544 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 56545 | NO RECOGNIZED LOSSES |
| 56547 | NO RECOGNIZED LOSSES |
| 56549 | NO RECOGNIZED LOSSES |
| 56550 | NO RECOGNIZED LOSSES |
| 56552 | NO RECOGNIZED LOSSES |
| 56554 | NO RECOGNIZED LOSSES |
| 56556 | NO RECOGNIZED LOSSES |
| 56557 | NO RECOGNIZED LOSSES |
| 56558 | NO RECOGNIZED LOSSES |
| 56559 | NO RECOGNIZED LOSSES |
| 56560 | NO RECOGNIZED LOSSES |
| 56561 | NO RECOGNIZED LOSSES |
| 56562 | NO RECOGNIZED LOSSES |
| 56568 | NO RECOGNIZED LOSSES |
| 56571 | NO RECOGNIZED LOSSES |
| 56573 | NO RECOGNIZED LOSSES |
| 56576 | NO RECOGNIZED LOSSES |
| 56585 | NO RECOGNIZED LOSSES |
| 56593 | NO RECOGNIZED LOSSES |
| 56594 | NO RECOGNIZED LOSSES |
| 56596 | NO RECOGNIZED LOSSES |
| 56601 | NO RECOGNIZED LOSSES |
| 56604 | NO RECOGNIZED LOSSES |
| 56605 | NO RECOGNIZED LOSSES |
| 56607 | NO RECOGNIZED LOSSES |
| 56609 | NO RECOGNIZED LOSSES |
| 56614 | NO RECOGNIZED LOSSES |
| 56615 | NO RECOGNIZED LOSSES |
| 56617 | NO RECOGNIZED LOSSES |
| 56620 | NO RECOGNIZED LOSSES |
| 56624 | NO RECOGNIZED LOSSES |
| 56627 | NO RECOGNIZED LOSSES |
| 56628 | NO RECOGNIZED LOSSES |
| 56631 | NO RECOGNIZED LOSSES |
| 56632 | NO RECOGNIZED LOSSES |
| 56634 | PURCHASED OUTSIDE CLASS PERIOD |
| 56635 | NO RECOGNIZED LOSSES |
| 56637 | NO RECOGNIZED LOSSES |
| 56638 | NO RECOGNIZED LOSSES |
| 56639 | NO RECOGNIZED LOSSES |
| 56642 | NO RECOGNIZED LOSSES |
| 56645 | NO RECOGNIZED LOSSES |
| 56647 | NO RECOGNIZED LOSSES |
| 56650 | CLAIM FILED BY EXCLUDED PARTY |
| 56652 | NO RECOGNIZED LOSSES |
| 56660 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 56666 | NO RECOGNIZED LOSSES |
| 56667 | NO RECOGNIZED LOSSES |
| 56671 | NO RECOGNIZED LOSSES |
| 56672 | NO RECOGNIZED LOSSES |
| 56676 | NO RECOGNIZED LOSSES |
| 56690 | NO RECOGNIZED LOSSES |
| 56693 | NO RECOGNIZED LOSSES |
| 56694 | NO RECOGNIZED LOSSES |
| 56695 | NO RECOGNIZED LOSSES |
| 56696 | NO RECOGNIZED LOSSES |
| 56698 | NO RECOGNIZED LOSSES |
| 56700 | NO RECOGNIZED LOSSES |
| 56706 | NO RECOGNIZED LOSSES |
| 56707 | NO RECOGNIZED LOSSES |
| 56718 | NO RECOGNIZED LOSSES |
| 56721 | NO RECOGNIZED LOSSES |
| 56727 | NO RECOGNIZED LOSSES |
| 56730 | NO RECOGNIZED LOSSES |
| 56735 | NO RECOGNIZED LOSSES |
| 56749 | NO RECOGNIZED LOSSES |
| 56750 | NO RECOGNIZED LOSSES |
| 56751 | NO RECOGNIZED LOSSES |
| 56754 | NO RECOGNIZED LOSSES |
| 56755 | NO RECOGNIZED LOSSES |
| 56758 | NO RECOGNIZED LOSSES |
| 56761 | NO RECOGNIZED LOSSES |
| 56762 | NO RECOGNIZED LOSSES |
| 56766 | NO RECOGNIZED LOSSES |
| 56769 | NO RECOGNIZED LOSSES |
| 56771 | NO RECOGNIZED LOSSES |
| 56782 | NO RECOGNIZED LOSSES |
| 56783 | NO RECOGNIZED LOSSES |
| 56786 | NO RECOGNIZED LOSSES |
| 56787 | NO RECOGNIZED LOSSES |
| 56795 | NO RECOGNIZED LOSSES |
| 56801 | NO RECOGNIZED LOSSES |
| 56805 | NO RECOGNIZED LOSSES |
| 56806 | NO RECOGNIZED LOSSES |
| 56807 | NO RECOGNIZED LOSSES |
| 56810 | NO RECOGNIZED LOSSES |
| 56811 | NO RECOGNIZED LOSSES |
| 56815 | NO RECOGNIZED LOSSES |
| 56816 | NO RECOGNIZED LOSSES |
| 56817 | NO RECOGNIZED LOSSES |
| 56821 | NO RECOGNIZED LOSSES |
| 56824 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**                                    **EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 56829 | NO RECOGNIZED LOSSES |
| 56830 | NO RECOGNIZED LOSSES |
| 56831 | NO RECOGNIZED LOSSES |
| 56833 | NO RECOGNIZED LOSSES |
| 56840 | NO RECOGNIZED LOSSES |
| 56843 | NO RECOGNIZED LOSSES |
| 56844 | NO RECOGNIZED LOSSES |
| 56845 | NO RECOGNIZED LOSSES |
| 56852 | NO RECOGNIZED LOSSES |
| 56853 | NO RECOGNIZED LOSSES |
| 56860 | NO RECOGNIZED LOSSES |
| 56861 | NO RECOGNIZED LOSSES |
| 56864 | NO RECOGNIZED LOSSES |
| 56866 | NO RECOGNIZED LOSSES |
| 56870 | NO RECOGNIZED LOSSES |
| 56873 | NO RECOGNIZED LOSSES |
| 56874 | NO RECOGNIZED LOSSES |
| 56875 | NO RECOGNIZED LOSSES |
| 56877 | NO RECOGNIZED LOSSES |
| 56878 | NO RECOGNIZED LOSSES |
| 56886 | NO RECOGNIZED LOSSES |
| 56888 | NO RECOGNIZED LOSSES |
| 56890 | NO RECOGNIZED LOSSES |
| 56893 | NO RECOGNIZED LOSSES |
| 56894 | NO RECOGNIZED LOSSES |
| 56895 | NO RECOGNIZED LOSSES |
| 56898 | NO RECOGNIZED LOSSES |
| 56900 | NO RECOGNIZED LOSSES |
| 56905 | PURCHASED OUTSIDE CLASS PERIOD |
| 56907 | NO RECOGNIZED LOSSES |
| 56910 | NO RECOGNIZED LOSSES |
| 56911 | NO RECOGNIZED LOSSES |
| 56917 | NO RECOGNIZED LOSSES |
| 56919 | NO RECOGNIZED LOSSES |
| 56920 | NO RECOGNIZED LOSSES |
| 56923 | NO RECOGNIZED LOSSES |
| 56924 | NO RECOGNIZED LOSSES |
| 56925 | NO RECOGNIZED LOSSES |
| 56928 | NO RECOGNIZED LOSSES |
| 56930 | NO RECOGNIZED LOSSES |
| 56934 | NO RECOGNIZED LOSSES |
| 56940 | NO RECOGNIZED LOSSES |
| 56942 | PURCHASED OUTSIDE CLASS PERIOD |
| 56945 | NO RECOGNIZED LOSSES |
| 56947 | NO RECOGNIZED LOSSES |
| 56952 | NO RECOGNIZED LOSSES |

INELIGIBLE CLAIMS

**EXHIBIT E**

**Claim #**          **Rejection Reason**

56954 NO RECOGNIZED LOSSES
56957 NO RECOGNIZED LOSSES
56962 NO RECOGNIZED LOSSES
56965 NO RECOGNIZED LOSSES
56966 NO RECOGNIZED LOSSES
56975 NO RECOGNIZED LOSSES
56977 NO RECOGNIZED LOSSES
56980 NO RECOGNIZED LOSSES
56981 NO RECOGNIZED LOSSES
56984 NO RECOGNIZED LOSSES
56988 NO RECOGNIZED LOSSES
56990 NO RECOGNIZED LOSSES
56991 NO RECOGNIZED LOSSES
56994 SHARES NOT PURCHASED
56999 NO RECOGNIZED LOSSES
57000 NO RECOGNIZED LOSSES
57004 NO RECOGNIZED LOSSES
57006 NO RECOGNIZED LOSSES
57007 NO RECOGNIZED LOSSES
57015 NO RECOGNIZED LOSSES
57016 NO RECOGNIZED LOSSES
57017 NO RECOGNIZED LOSSES
57018 NO RECOGNIZED LOSSES
57020 NO RECOGNIZED LOSSES
57021 NO RECOGNIZED LOSSES
57022 NO RECOGNIZED LOSSES
57025 NO RECOGNIZED LOSSES
57026 NO RECOGNIZED LOSSES
57029 NO RECOGNIZED LOSSES
57032 NO RECOGNIZED LOSSES
57035 NO RECOGNIZED LOSSES
57037 NO RECOGNIZED LOSSES
57041 NO RECOGNIZED LOSSES
57045 NO RECOGNIZED LOSSES
57046 NO RECOGNIZED LOSSES
57047 NO RECOGNIZED LOSSES
57050 NO RECOGNIZED LOSSES
57051 NO RECOGNIZED LOSSES
57053 NO RECOGNIZED LOSSES
57054 NO RECOGNIZED LOSSES
57056 NO RECOGNIZED LOSSES
57058 NO RECOGNIZED LOSSES
57060 NO RECOGNIZED LOSSES
57062 NO RECOGNIZED LOSSES
57063 NO RECOGNIZED LOSSES
57065 NO RECOGNIZED LOSSES

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 57067 | NO RECOGNIZED LOSSES |
| 57068 | NO RECOGNIZED LOSSES |
| 57071 | NO RECOGNIZED LOSSES |
| 57072 | NO RECOGNIZED LOSSES |
| 57074 | NO RECOGNIZED LOSSES |
| 57075 | NO RECOGNIZED LOSSES |
| 57076 | NO RECOGNIZED LOSSES |
| 57077 | NO RECOGNIZED LOSSES |
| 57078 | NO RECOGNIZED LOSSES |
| 57084 | NO RECOGNIZED LOSSES |
| 57085 | NO RECOGNIZED LOSSES |
| 57087 | NO RECOGNIZED LOSSES |
| 57088 | NO RECOGNIZED LOSSES |
| 57092 | NO RECOGNIZED LOSSES |
| 57093 | NO RECOGNIZED LOSSES |
| 57097 | NO RECOGNIZED LOSSES |
| 57107 | NO RECOGNIZED LOSSES |
| 57111 | NO RECOGNIZED LOSSES |
| 57113 | NO RECOGNIZED LOSSES |
| 57115 | SHARES NOT PURCHASED |
| 57116 | NO RECOGNIZED LOSSES |
| 57130 | NO RECOGNIZED LOSSES |
| 57131 | NO RECOGNIZED LOSSES |
| 57136 | NO RECOGNIZED LOSSES |
| 57143 | NO RECOGNIZED LOSSES |
| 57144 | NO RECOGNIZED LOSSES |
| 57145 | NO RECOGNIZED LOSSES |
| 57147 | NO RECOGNIZED LOSSES |
| 57148 | NO RECOGNIZED LOSSES |
| 57151 | NO RECOGNIZED LOSSES |
| 57155 | NO RECOGNIZED LOSSES |
| 57160 | NO RECOGNIZED LOSSES |
| 57161 | NO RECOGNIZED LOSSES |
| 57168 | SHARES NOT PURCHASED |
| 57170 | NO RECOGNIZED LOSSES |
| 57172 | NO RECOGNIZED LOSSES |
| 57173 | NO RECOGNIZED LOSSES |
| 57179 | NO RECOGNIZED LOSSES |
| 57185 | NO RECOGNIZED LOSSES |
| 57192 | NO RECOGNIZED LOSSES |
| 57193 | NO RECOGNIZED LOSSES |
| 57201 | NO RECOGNIZED LOSSES |
| 57202 | NO RECOGNIZED LOSSES |
| 57204 | PURCHASED OUTSIDE CLASS PERIOD |
| 57214 | NO RECOGNIZED LOSSES |
| 57216 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
| --- | --- |
| 57221 | NO RECOGNIZED LOSSES |
| 57225 | NO RECOGNIZED LOSSES |
| 57226 | NO RECOGNIZED LOSSES |
| 57230 | NO RECOGNIZED LOSSES |
| 57231 | NO RECOGNIZED LOSSES |
| 57236 | SHARES SOLD SHORT |
| 57237 | NO RECOGNIZED LOSSES |
| 57240 | NO RECOGNIZED LOSSES |
| 57245 | NO RECOGNIZED LOSSES |
| 57252 | NO RECOGNIZED LOSSES |
| 57255 | NO RECOGNIZED LOSSES |
| 57259 | NO RECOGNIZED LOSSES |
| 57267 | NO RECOGNIZED LOSSES |
| 57268 | NO RECOGNIZED LOSSES |
| 57273 | NO RECOGNIZED LOSSES |
| 57281 | NO RECOGNIZED LOSSES |
| 57284 | NO RECOGNIZED LOSSES |
| 57289 | NO RECOGNIZED LOSSES |
| 57290 | NO RECOGNIZED LOSSES |
| 57293 | NO RECOGNIZED LOSSES |
| 57294 | NO RECOGNIZED LOSSES |
| 57295 | NO RECOGNIZED LOSSES |
| 57296 | NO RECOGNIZED LOSSES |
| 57299 | NO RECOGNIZED LOSSES |
| 57301 | NO RECOGNIZED LOSSES |
| 57302 | NO RECOGNIZED LOSSES |
| 57306 | NO RECOGNIZED LOSSES |
| 57307 | NO RECOGNIZED LOSSES |
| 57308 | NO RECOGNIZED LOSSES |
| 57309 | NO RECOGNIZED LOSSES |
| 57311 | NO RECOGNIZED LOSSES |
| 57314 | SHARES NOT PURCHASED |
| 57316 | NO RECOGNIZED LOSSES |
| 57318 | NO RECOGNIZED LOSSES |
| 57320 | NO RECOGNIZED LOSSES |
| 57321 | NO RECOGNIZED LOSSES |
| 57322 | NO RECOGNIZED LOSSES |
| 57324 | NO RECOGNIZED LOSSES |
| 57326 | NO RECOGNIZED LOSSES |
| 57330 | NO RECOGNIZED LOSSES |
| 57333 | NO RECOGNIZED LOSSES |
| 57335 | NO RECOGNIZED LOSSES |
| 57336 | NO RECOGNIZED LOSSES |
| 57338 | NO RECOGNIZED LOSSES |
| 57339 | NO RECOGNIZED LOSSES |
| 57343 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 57347 | NO RECOGNIZED LOSSES |
| 57350 | NO RECOGNIZED LOSSES |
| 57351 | NO RECOGNIZED LOSSES |
| 57353 | NO RECOGNIZED LOSSES |
| 57356 | NO RECOGNIZED LOSSES |
| 57360 | NO RECOGNIZED LOSSES |
| 57362 | NO RECOGNIZED LOSSES |
| 57369 | NO RECOGNIZED LOSSES |
| 57370 | NO RECOGNIZED LOSSES |
| 57371 | NO RECOGNIZED LOSSES |
| 57374 | NO RECOGNIZED LOSSES |
| 57376 | NO RECOGNIZED LOSSES |
| 57377 | NO RECOGNIZED LOSSES |
| 57378 | NO RECOGNIZED LOSSES |
| 57379 | NO RECOGNIZED LOSSES |
| 57380 | NO RECOGNIZED LOSSES |
| 57383 | NO RECOGNIZED LOSSES |
| 57384 | NO RECOGNIZED LOSSES |
| 57391 | NO RECOGNIZED LOSSES |
| 57395 | NO RECOGNIZED LOSSES |
| 57398 | NO RECOGNIZED LOSSES |
| 57402 | NO RECOGNIZED LOSSES |
| 57407 | NO RECOGNIZED LOSSES |
| 57410 | NO RECOGNIZED LOSSES |
| 57411 | PURCHASED OUTSIDE CLASS PERIOD |
| 57412 | NO RECOGNIZED LOSSES |
| 57416 | NO RECOGNIZED LOSSES |
| 57417 | NO RECOGNIZED LOSSES |
| 57418 | NO RECOGNIZED LOSSES |
| 57419 | NO RECOGNIZED LOSSES |
| 57420 | PURCHASED OUTSIDE CLASS PERIOD |
| 57421 | PURCHASED OUTSIDE CLASS PERIOD |
| 57425 | NO RECOGNIZED LOSSES |
| 57426 | NO RECOGNIZED LOSSES |
| 57431 | NO RECOGNIZED LOSSES |
| 57432 | NO RECOGNIZED LOSSES |
| 57437 | NO RECOGNIZED LOSSES |
| 57439 | NO RECOGNIZED LOSSES |
| 57441 | NO RECOGNIZED LOSSES |
| 57443 | NO RECOGNIZED LOSSES |
| 57447 | NO RECOGNIZED LOSSES |
| 57451 | NO RECOGNIZED LOSSES |
| 57452 | NO RECOGNIZED LOSSES |
| 57453 | NO RECOGNIZED LOSSES |
| 57459 | NO RECOGNIZED LOSSES |
| 57461 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 57463 | NO RECOGNIZED LOSSES |
| 57465 | NO RECOGNIZED LOSSES |
| 57467 | NO RECOGNIZED LOSSES |
| 57476 | NO RECOGNIZED LOSSES |
| 57478 | NO RECOGNIZED LOSSES |
| 57488 | NO RECOGNIZED LOSSES |
| 57493 | NO RECOGNIZED LOSSES |
| 57495 | NO RECOGNIZED LOSSES |
| 57496 | NO RECOGNIZED LOSSES |
| 57498 | NO RECOGNIZED LOSSES |
| 57500 | NO RECOGNIZED LOSSES |
| 57501 | NO RECOGNIZED LOSSES |
| 57502 | NO RECOGNIZED LOSSES |
| 57507 | NO RECOGNIZED LOSSES |
| 57508 | NO RECOGNIZED LOSSES |
| 57511 | NO RECOGNIZED LOSSES |
| 57512 | NO RECOGNIZED LOSSES |
| 57514 | NO RECOGNIZED LOSSES |
| 57516 | NO RECOGNIZED LOSSES |
| 57519 | NO RECOGNIZED LOSSES |
| 57523 | NO RECOGNIZED LOSSES |
| 57531 | NO RECOGNIZED LOSSES |
| 57532 | NO RECOGNIZED LOSSES |
| 57535 | SHARES NOT PURCHASED |
| 57537 | NO RECOGNIZED LOSSES |
| 57546 | NO RECOGNIZED LOSSES |
| 57551 | NO RECOGNIZED LOSSES |
| 57553 | NO RECOGNIZED LOSSES |
| 57563 | NO RECOGNIZED LOSSES |
| 57567 | NO RECOGNIZED LOSSES |
| 57571 | PURCHASED OUTSIDE CLASS PERIOD |
| 57572 | NO RECOGNIZED LOSSES |
| 57573 | NO RECOGNIZED LOSSES |
| 57575 | NO RECOGNIZED LOSSES |
| 57577 | NO RECOGNIZED LOSSES |
| 57578 | NO RECOGNIZED LOSSES |
| 57580 | NO RECOGNIZED LOSSES |
| 57581 | NO RECOGNIZED LOSSES |
| 57589 | NO RECOGNIZED LOSSES |
| 57592 | NO RECOGNIZED LOSSES |
| 57593 | NO RECOGNIZED LOSSES |
| 57594 | NO RECOGNIZED LOSSES |
| 57596 | NO RECOGNIZED LOSSES |
| 57597 | NO RECOGNIZED LOSSES |
| 57598 | NO RECOGNIZED LOSSES |
| 57607 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---|---|
| 57608 | NO RECOGNIZED LOSSES |
| 57609 | NO RECOGNIZED LOSSES |
| 57613 | NO RECOGNIZED LOSSES |
| 57614 | NO RECOGNIZED LOSSES |
| 57616 | NO RECOGNIZED LOSSES |
| 57618 | NO RECOGNIZED LOSSES |
| 57624 | NO RECOGNIZED LOSSES |
| 57626 | NO RECOGNIZED LOSSES |
| 57631 | NO RECOGNIZED LOSSES |
| 57632 | NO RECOGNIZED LOSSES |
| 57635 | NO RECOGNIZED LOSSES |
| 57642 | NO RECOGNIZED LOSSES |
| 57643 | NO RECOGNIZED LOSSES |
| 57656 | NO RECOGNIZED LOSSES |
| 57670 | NO RECOGNIZED LOSSES |
| 57676 | CLAIM FILED BY EXCLUDED PARTY |
| 57683 | NO RECOGNIZED LOSSES |
| 57688 | NO RECOGNIZED LOSSES |
| 57690 | NO RECOGNIZED LOSSES |
| 57692 | NO RECOGNIZED LOSSES |
| 57693 | NO RECOGNIZED LOSSES |
| 57695 | NO RECOGNIZED LOSSES |
| 57698 | NO RECOGNIZED LOSSES |
| 57699 | NO RECOGNIZED LOSSES |
| 57701 | NO RECOGNIZED LOSSES |
| 57702 | NO RECOGNIZED LOSSES |
| 57703 | NO RECOGNIZED LOSSES |
| 57704 | NO RECOGNIZED LOSSES |
| 57708 | NO RECOGNIZED LOSSES |
| 57710 | NO RECOGNIZED LOSSES |
| 57716 | NO RECOGNIZED LOSSES |
| 57721 | NO RECOGNIZED LOSSES |
| 57722 | NO RECOGNIZED LOSSES |
| 57723 | NO RECOGNIZED LOSSES |
| 57726 | NO RECOGNIZED LOSSES |
| 57731 | NO RECOGNIZED LOSSES |
| 57735 | NO RECOGNIZED LOSSES |
| 57736 | NO RECOGNIZED LOSSES |
| 57737 | NO RECOGNIZED LOSSES |
| 57738 | NO RECOGNIZED LOSSES |
| 57742 | NO RECOGNIZED LOSSES |
| 57744 | NO RECOGNIZED LOSSES |
| 57749 | NO RECOGNIZED LOSSES |
| 57750 | NO RECOGNIZED LOSSES |
| 57753 | NO RECOGNIZED LOSSES |
| 57756 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 57757 | NO RECOGNIZED LOSSES |
| 57758 | NO RECOGNIZED LOSSES |
| 57760 | NO RECOGNIZED LOSSES |
| 57761 | DUPLICATE CLAIM FILED |
| 57765 | NO RECOGNIZED LOSSES |
| 57767 | SHARES NOT PURCHASED |
| 57770 | NO RECOGNIZED LOSSES |
| 57771 | NO RECOGNIZED LOSSES |
| 57774 | NO RECOGNIZED LOSSES |
| 57776 | NO RECOGNIZED LOSSES |
| 57780 | NO RECOGNIZED LOSSES |
| 57781 | NO RECOGNIZED LOSSES |
| 57788 | NO RECOGNIZED LOSSES |
| 57789 | NO RECOGNIZED LOSSES |
| 57791 | NO RECOGNIZED LOSSES |
| 57794 | NO RECOGNIZED LOSSES |
| 57796 | NO RECOGNIZED LOSSES |
| 57799 | NO RECOGNIZED LOSSES |
| 57801 | NO RECOGNIZED LOSSES |
| 57805 | NO RECOGNIZED LOSSES |
| 57806 | NO RECOGNIZED LOSSES |
| 57808 | NO RECOGNIZED LOSSES |
| 57815 | NO RECOGNIZED LOSSES |
| 57817 | NO RECOGNIZED LOSSES |
| 57819 | NO RECOGNIZED LOSSES |
| 57820 | NO RECOGNIZED LOSSES |
| 57826 | NO RECOGNIZED LOSSES |
| 57829 | PURCHASED OUTSIDE CLASS PERIOD |
| 57830 | NO RECOGNIZED LOSSES |
| 57831 | NO RECOGNIZED LOSSES |
| 57832 | NO RECOGNIZED LOSSES |
| 57835 | NO RECOGNIZED LOSSES |
| 57837 | NO RECOGNIZED LOSSES |
| 57842 | NO RECOGNIZED LOSSES |
| 57848 | SHARES NOT PURCHASED |
| 57849 | NO RECOGNIZED LOSSES |
| 57850 | NO RECOGNIZED LOSSES |
| 57853 | SHARES NOT PURCHASED |
| 57855 | NO RECOGNIZED LOSSES |
| 57856 | NO RECOGNIZED LOSSES |
| 57857 | NO RECOGNIZED LOSSES |
| 57869 | NO RECOGNIZED LOSSES |
| 57874 | NO RECOGNIZED LOSSES |
| 57876 | NO RECOGNIZED LOSSES |
| 57877 | NO RECOGNIZED LOSSES |
| 57880 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 57882 | NO RECOGNIZED LOSSES |
| 57884 | NO RECOGNIZED LOSSES |
| 57886 | NO RECOGNIZED LOSSES |
| 57887 | CLAIM FILED BY EXCLUDED PARTY |
| 57890 | NO RECOGNIZED LOSSES |
| 57896 | NO RECOGNIZED LOSSES |
| 57903 | NO RECOGNIZED LOSSES |
| 57905 | NO RECOGNIZED LOSSES |
| 57906 | PURCHASED OUTSIDE CLASS PERIOD |
| 57907 | NO RECOGNIZED LOSSES |
| 57909 | NO RECOGNIZED LOSSES |
| 57912 | PURCHASED OUTSIDE CLASS PERIOD |
| 57913 | NO RECOGNIZED LOSSES |
| 57914 | SHARES NOT PURCHASED |
| 57915 | SHARES NOT PURCHASED |
| 57916 | SHARES NOT PURCHASED |
| 57917 | SHARES NOT PURCHASED |
| 57930 | NO RECOGNIZED LOSSES |
| 57934 | NO RECOGNIZED LOSSES |
| 57935 | NO RECOGNIZED LOSSES |
| 57937 | NO RECOGNIZED LOSSES |
| 57944 | NO RECOGNIZED LOSSES |
| 57948 | NO RECOGNIZED LOSSES |
| 57954 | NO RECOGNIZED LOSSES |
| 57956 | NO RECOGNIZED LOSSES |
| 57957 | NO RECOGNIZED LOSSES |
| 57959 | NO RECOGNIZED LOSSES |
| 57960 | NO RECOGNIZED LOSSES |
| 57962 | SHARES NOT PURCHASED |
| 57966 | NO RECOGNIZED LOSSES |
| 58051 | CLAIM FILED BY EXCLUDED PARTY |
| 58055 | NO RECOGNIZED LOSSES |
| 58059 | PURCHASED OUTSIDE CLASS PERIOD |
| 58061 | PURCHASED OUTSIDE CLASS PERIOD |
| 58062 | PURCHASED OUTSIDE CLASS PERIOD |
| 58063 | CLAIM WITHDRAWN |
| 58064 | CLAIM WITHDRAWN |
| 58065 | SHARES SOLD SHORT |
| 58066 | PURCHASED OUTSIDE CLASS PERIOD |
| 58067 | NO RECOGNIZED LOSSES |
| 58070 | PURCHASED OUTSIDE CLASS PERIOD |
| 58072 | SHARES NOT PURCHASED |
| 58079 | PURCHASED OUTSIDE CLASS PERIOD |
| 58082 | NO RECOGNIZED LOSSES |
| 58087 | NO RECOGNIZED LOSSES |
| 58096 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 58099 | NO RECOGNIZED LOSSES |
| 58111 | NO RECOGNIZED LOSSES |
| 58143 | NO RECOGNIZED LOSSES |
| 58148 | PURCHASED OUTSIDE CLASS PERIOD |
| 58149 | SHARES SOLD SHORT |
| 58151 | PURCHASED OUTSIDE CLASS PERIOD |
| 58153 | PURCHASED OUTSIDE CLASS PERIOD |
| 58154 | SHARES NOT PURCHASED |
| 58157 | NO RECOGNIZED LOSSES |
| 58168 | PURCHASED OUTSIDE CLASS PERIOD |
| 58169 | PURCHASED OUTSIDE CLASS PERIOD |
| 58172 | SHARES SOLD SHORT |
| 58179 | NO RECOGNIZED LOSSES |
| 58180 | NO RECOGNIZED LOSSES |
| 58184 | SHARES SOLD SHORT |
| 58188 | PURCHASED OUTSIDE CLASS PERIOD |
| 58189 | NO RECOGNIZED LOSSES |
| 58190 | PURCHASED OUTSIDE CLASS PERIOD |
| 58193 | PURCHASED OUTSIDE CLASS PERIOD |
| 58194 | PURCHASED OUTSIDE CLASS PERIOD |
| 58199 | SHARES NOT PURCHASED |
| 58203 | PURCHASED OUTSIDE CLASS PERIOD |
| 58204 | NO RECOGNIZED LOSSES |
| 58205 | PURCHASED OUTSIDE CLASS PERIOD |
| 58206 | PURCHASED OUTSIDE CLASS PERIOD |
| 58214 | SHARES SOLD SHORT |
| 58215 | NO RECOGNIZED LOSSES |
| 58220 | PURCHASED OUTSIDE CLASS PERIOD |
| 58222 | PURCHASED OUTSIDE CLASS PERIOD |
| 58225 | PURCHASED OUTSIDE CLASS PERIOD |
| 58226 | NO RECOGNIZED LOSSES |
| 58227 | SHARES NOT PURCHASED |
| 58229 | PURCHASED OUTSIDE CLASS PERIOD |
| 58230 | NO RECOGNIZED LOSSES |
| 58231 | PURCHASED OUTSIDE CLASS PERIOD |
| 58232 | SHARES SOLD SHORT |
| 58239 | NO RECOGNIZED LOSSES |
| 58246 | PURCHASED OUTSIDE CLASS PERIOD |
| 58248 | PURCHASED OUTSIDE CLASS PERIOD |
| 58252 | SHARES NOT PURCHASED |
| 58254 | PURCHASED OUTSIDE CLASS PERIOD |
| 58259 | NO RECOGNIZED LOSSES |
| 58262 | DUPLICATE CLAIM FILED |
| 58267 | NO RECOGNIZED LOSSES |
| 58272 | PURCHASED OUTSIDE CLASS PERIOD |
| 58275 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
| --- | --- |
| 58282 | NO RECOGNIZED LOSSES |
| 58284 | PURCHASED OUTSIDE CLASS PERIOD |
| 58287 | SHARES NOT PURCHASED |
| 58288 | PURCHASED OUTSIDE CLASS PERIOD |
| 58289 | SHARES NOT PURCHASED |
| 58291 | NO RECOGNIZED LOSSES |
| 58292 | PURCHASED OUTSIDE CLASS PERIOD |
| 58293 | PURCHASED OUTSIDE CLASS PERIOD |
| 58294 | PURCHASED OUTSIDE CLASS PERIOD |
| 58295 | NO RECOGNIZED LOSSES |
| 58297 | NO RECOGNIZED LOSSES |
| 58300 | NO RECOGNIZED LOSSES |
| 58302 | WRONG STOCK |
| 58303 | WRONG STOCK |
| 58304 | SHARES NOT PURCHASED |
| 58305 | WRONG STOCK |
| 58307 | WRONG STOCK |
| 58310 | PURCHASED OUTSIDE CLASS PERIOD |
| 58311 | PURCHASED OUTSIDE CLASS PERIOD |
| 58312 | PURCHASED OUTSIDE CLASS PERIOD |
| 58313 | PURCHASED OUTSIDE CLASS PERIOD |
| 58314 | PURCHASED OUTSIDE CLASS PERIOD |
| 58315 | PURCHASED OUTSIDE CLASS PERIOD |
| 58316 | PURCHASED OUTSIDE CLASS PERIOD |
| 58317 | PURCHASED OUTSIDE CLASS PERIOD |
| 58318 | PURCHASED OUTSIDE CLASS PERIOD |
| 58319 | PURCHASED OUTSIDE CLASS PERIOD |
| 58320 | PURCHASED OUTSIDE CLASS PERIOD |
| 58321 | PURCHASED OUTSIDE CLASS PERIOD |
| 58322 | PURCHASED OUTSIDE CLASS PERIOD |
| 58323 | NO RECOGNIZED LOSSES |
| 58324 | NO RECOGNIZED LOSSES |
| 58326 | PURCHASED OUTSIDE CLASS PERIOD |
| 58327 | WRONG STOCK |
| 58330 | NO RECOGNIZED LOSSES |
| 58332 | PURCHASED OUTSIDE CLASS PERIOD |
| 58333 | PURCHASED OUTSIDE CLASS PERIOD |
| 58334 | PURCHASED OUTSIDE CLASS PERIOD |
| 58335 | WRONG STOCK |
| 58336 | WRONG STOCK |
| 58337 | NO RECOGNIZED LOSSES |
| 58338 | PURCHASED OUTSIDE CLASS PERIOD |
| 58339 | WRONG STOCK |
| 58340 | PURCHASED OUTSIDE CLASS PERIOD |
| 58342 | PURCHASED OUTSIDE CLASS PERIOD |
| 58343 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

| Claim # | Rejection Reason |
|---|---|
| 58344 | PURCHASED OUTSIDE CLASS PERIOD |
| 58346 | SHARES SOLD SHORT |
| 58348 | PURCHASED OUTSIDE CLASS PERIOD |
| 58349 | NO RECOGNIZED LOSSES |
| 58351 | WRONG STOCK |
| 58354 | PURCHASED OUTSIDE CLASS PERIOD |
| 58355 | NO RECOGNIZED LOSSES |
| 58356 | NO RECOGNIZED LOSSES |
| 58357 | NO RECOGNIZED LOSSES |
| 58359 | NO RECOGNIZED LOSSES |
| 58360 | NO RECOGNIZED LOSSES |
| 58361 | NO RECOGNIZED LOSSES |
| 58362 | PURCHASED OUTSIDE CLASS PERIOD |
| 58363 | NO RECOGNIZED LOSSES |
| 58365 | NO RECOGNIZED LOSSES |
| 58366 | PURCHASED OUTSIDE CLASS PERIOD |
| 58367 | NO RECOGNIZED LOSSES |
| 58368 | PURCHASED OUTSIDE CLASS PERIOD |
| 58369 | NO RECOGNIZED LOSSES |
| 58370 | PURCHASED OUTSIDE CLASS PERIOD |
| 58372 | PURCHASED OUTSIDE CLASS PERIOD |
| 58374 | WRONG STOCK |
| 58375 | NO RECOGNIZED LOSSES |
| 58376 | PURCHASED OUTSIDE CLASS PERIOD |
| 58378 | PURCHASED OUTSIDE CLASS PERIOD |
| 58381 | NO RECOGNIZED LOSSES |
| 58382 | PURCHASED OUTSIDE CLASS PERIOD |
| 58383 | PURCHASED OUTSIDE CLASS PERIOD |
| 58384 | NO RECOGNIZED LOSSES |
| 58388 | PURCHASED OUTSIDE CLASS PERIOD |
| 58390 | NO RECOGNIZED LOSSES |
| 58391 | PURCHASED OUTSIDE CLASS PERIOD |
| 58392 | PURCHASED OUTSIDE CLASS PERIOD |
| 58393 | NO RECOGNIZED LOSSES |
| 58394 | SHARES SOLD SHORT |
| 58395 | WRONG STOCK |
| 58396 | WRONG STOCK |
| 58397 | NO RECOGNIZED LOSSES |
| 58398 | WRONG STOCK |
| 58400 | NO RECOGNIZED LOSSES |
| 58402 | PURCHASED OUTSIDE CLASS PERIOD |
| 58404 | NO RECOGNIZED LOSSES |
| 58405 | PURCHASED OUTSIDE CLASS PERIOD |
| 58411 | SHARES SOLD SHORT |
| 58412 | PURCHASED OUTSIDE CLASS PERIOD |
| 58413 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---------|------------------|
| 58414 | PURCHASED OUTSIDE CLASS PERIOD |
| 58416 | PURCHASED OUTSIDE CLASS PERIOD |
| 58418 | NO RECOGNIZED LOSSES |
| 58419 | PURCHASED OUTSIDE CLASS PERIOD |
| 58420 | PURCHASED OUTSIDE CLASS PERIOD |
| 58421 | WRONG STOCK |
| 58423 | SHARES SOLD SHORT |
| 58424 | PURCHASED OUTSIDE CLASS PERIOD |
| 58425 | PURCHASED OUTSIDE CLASS PERIOD |
| 58426 | PURCHASED OUTSIDE CLASS PERIOD |
| 58427 | NO RECOGNIZED LOSSES |
| 58428 | PURCHASED OUTSIDE CLASS PERIOD |
| 58429 | NO RECOGNIZED LOSSES |
| 58431 | NO RECOGNIZED LOSSES |
| 58432 | PURCHASED OUTSIDE CLASS PERIOD |
| 58433 | PURCHASED OUTSIDE CLASS PERIOD |
| 58434 | NO RECOGNIZED LOSSES |
| 58435 | PURCHASED OUTSIDE CLASS PERIOD |
| 58436 | PURCHASED OUTSIDE CLASS PERIOD |
| 58437 | PURCHASED OUTSIDE CLASS PERIOD |
| 58439 | NO RECOGNIZED LOSSES |
| 58441 | NO RECOGNIZED LOSSES |
| 58442 | WRONG STOCK |
| 58443 | NO RECOGNIZED LOSSES |
| 58444 | NO RECOGNIZED LOSSES |
| 58445 | PURCHASED OUTSIDE CLASS PERIOD |
| 58446 | NO RECOGNIZED LOSSES |
| 58447 | PURCHASED OUTSIDE CLASS PERIOD |
| 58449 | PURCHASED OUTSIDE CLASS PERIOD |
| 58452 | WRONG STOCK |
| 58453 | WRONG STOCK |
| 58454 | PURCHASED OUTSIDE CLASS PERIOD |
| 58456 | PURCHASED OUTSIDE CLASS PERIOD |
| 58457 | PURCHASED OUTSIDE CLASS PERIOD |
| 58458 | PURCHASED OUTSIDE CLASS PERIOD |
| 58459 | PURCHASED OUTSIDE CLASS PERIOD |
| 58460 | WRONG STOCK |
| 58462 | PURCHASED OUTSIDE CLASS PERIOD |
| 58463 | PURCHASED OUTSIDE CLASS PERIOD |
| 58464 | WRONG STOCK |
| 58465 | NO RECOGNIZED LOSSES |
| 58466 | WRONG STOCK |
| 58467 | PURCHASED OUTSIDE CLASS PERIOD |
| 58468 | PURCHASED OUTSIDE CLASS PERIOD |
| 58471 | NO RECOGNIZED LOSSES |
| 58472 | NO RECOGNIZED LOSSES |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 58477 | SHARES SOLD SHORT |
| 58478 | NO RECOGNIZED LOSSES |
| 58479 | NO RECOGNIZED LOSSES |
| 58480 | WRONG STOCK |
| 58481 | WRONG STOCK |
| 58482 | PURCHASED OUTSIDE CLASS PERIOD |
| 58483 | NO RECOGNIZED LOSSES |
| 58484 | SHARES SOLD SHORT |
| 58485 | WRONG STOCK |
| 58486 | PURCHASED OUTSIDE CLASS PERIOD |
| 58487 | NO RECOGNIZED LOSSES |
| 58488 | WRONG STOCK |
| 58489 | NO RECOGNIZED LOSSES |
| 58490 | PURCHASED OUTSIDE CLASS PERIOD |
| 58491 | PURCHASED OUTSIDE CLASS PERIOD |
| 58492 | WRONG STOCK |
| 58493 | NO RECOGNIZED LOSSES |
| 58494 | NO RECOGNIZED LOSSES |
| 58495 | PURCHASED OUTSIDE CLASS PERIOD |
| 58496 | NO RECOGNIZED LOSSES |
| 58498 | PURCHASED OUTSIDE CLASS PERIOD |
| 58499 | PURCHASED OUTSIDE CLASS PERIOD |
| 58501 | PURCHASED OUTSIDE CLASS PERIOD |
| 58502 | PURCHASED OUTSIDE CLASS PERIOD |
| 58503 | PURCHASED OUTSIDE CLASS PERIOD |
| 58504 | PURCHASED OUTSIDE CLASS PERIOD |
| 58505 | PURCHASED OUTSIDE CLASS PERIOD |
| 58506 | PURCHASED OUTSIDE CLASS PERIOD |
| 58507 | PURCHASED OUTSIDE CLASS PERIOD |
| 58508 | PURCHASED OUTSIDE CLASS PERIOD |
| 58509 | PURCHASED OUTSIDE CLASS PERIOD |
| 58511 | SHARES NOT PURCHASED |
| 58514 | NO RECOGNIZED LOSSES |
| 58516 | WRONG STOCK |
| 58517 | WRONG STOCK |
| 58518 | NO RECOGNIZED LOSSES |
| 58519 | PURCHASED OUTSIDE CLASS PERIOD |
| 58521 | PURCHASED OUTSIDE CLASS PERIOD |
| 58524 | PURCHASED OUTSIDE CLASS PERIOD |
| 58525 | SHARES SOLD SHORT |
| 58526 | PURCHASED OUTSIDE CLASS PERIOD |
| 58527 | PURCHASED OUTSIDE CLASS PERIOD |
| 58529 | NO RECOGNIZED LOSSES |
| 58530 | PURCHASED OUTSIDE CLASS PERIOD |
| 58531 | PURCHASED OUTSIDE CLASS PERIOD |
| 58532 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 58534 | PURCHASED OUTSIDE CLASS PERIOD |
| 58536 | PURCHASED OUTSIDE CLASS PERIOD |
| 58537 | NO RECOGNIZED LOSSES |
| 58539 | PURCHASED OUTSIDE CLASS PERIOD |
| 58542 | PURCHASED OUTSIDE CLASS PERIOD |
| 58543 | PURCHASED OUTSIDE CLASS PERIOD |
| 58544 | PURCHASED OUTSIDE CLASS PERIOD |
| 58545 | PURCHASED OUTSIDE CLASS PERIOD |
| 58546 | PURCHASED OUTSIDE CLASS PERIOD |
| 58547 | NO RECOGNIZED LOSSES |
| 58548 | NO RECOGNIZED LOSSES |
| 58549 | WRONG STOCK |
| 58550 | NO RECOGNIZED LOSSES |
| 58553 | NO RECOGNIZED LOSSES |
| 58554 | NO RECOGNIZED LOSSES |
| 58555 | NO RECOGNIZED LOSSES |
| 58557 | PURCHASED OUTSIDE CLASS PERIOD |
| 58558 | PURCHASED OUTSIDE CLASS PERIOD |
| 58559 | PURCHASED OUTSIDE CLASS PERIOD |
| 58560 | PURCHASED OUTSIDE CLASS PERIOD |
| 58562 | PURCHASED OUTSIDE CLASS PERIOD |
| 58563 | PURCHASED OUTSIDE CLASS PERIOD |
| 58565 | PURCHASED OUTSIDE CLASS PERIOD |
| 58566 | SHARES SOLD SHORT |
| 58569 | PURCHASED OUTSIDE CLASS PERIOD |
| 58570 | PURCHASED OUTSIDE CLASS PERIOD |
| 58571 | WRONG STOCK |
| 58575 | NO RECOGNIZED LOSSES |
| 58576 | WRONG STOCK |
| 58577 | WRONG STOCK |
| 58578 | WRONG STOCK |
| 58580 | NO RECOGNIZED LOSSES |
| 58582 | PURCHASED OUTSIDE CLASS PERIOD |
| 58584 | PURCHASED OUTSIDE CLASS PERIOD |
| 58586 | PURCHASED OUTSIDE CLASS PERIOD |
| 58587 | WRONG STOCK |
| 58588 | PURCHASED OUTSIDE CLASS PERIOD |
| 58589 | WRONG STOCK |
| 58590 | NO RECOGNIZED LOSSES |
| 58592 | PURCHASED OUTSIDE CLASS PERIOD |
| 58593 | PURCHASED OUTSIDE CLASS PERIOD |
| 58594 | PURCHASED OUTSIDE CLASS PERIOD |
| 58596 | PURCHASED OUTSIDE CLASS PERIOD |
| 58598 | NO RECOGNIZED LOSSES |
| 58599 | WRONG STOCK |
| 58600 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 58601 | PURCHASED OUTSIDE CLASS PERIOD |
| 58602 | PURCHASED OUTSIDE CLASS PERIOD |
| 58604 | WRONG STOCK |
| 58605 | NO RECOGNIZED LOSSES |
| 58606 | PURCHASED OUTSIDE CLASS PERIOD |
| 58607 | WRONG STOCK |
| 58611 | NO RECOGNIZED LOSSES |
| 58612 | PURCHASED OUTSIDE CLASS PERIOD |
| 58613 | WRONG STOCK |
| 58614 | PURCHASED OUTSIDE CLASS PERIOD |
| 58615 | PURCHASED OUTSIDE CLASS PERIOD |
| 58616 | PURCHASED OUTSIDE CLASS PERIOD |
| 58617 | NO RECOGNIZED LOSSES |
| 58618 | NO RECOGNIZED LOSSES |
| 58619 | PURCHASED OUTSIDE CLASS PERIOD |
| 58620 | PURCHASED OUTSIDE CLASS PERIOD |
| 58621 | NO RECOGNIZED LOSSES |
| 58622 | WRONG STOCK |
| 58623 | WRONG STOCK |
| 58625 | NO RECOGNIZED LOSSES |
| 58626 | WRONG STOCK |
| 58628 | NO RECOGNIZED LOSSES |
| 58630 | PURCHASED OUTSIDE CLASS PERIOD |
| 58632 | NO RECOGNIZED LOSSES |
| 58633 | PURCHASED OUTSIDE CLASS PERIOD |
| 58637 | NO RECOGNIZED LOSSES |
| 58641 | NO RECOGNIZED LOSSES |
| 58642 | WRONG STOCK |
| 58643 | NO RECOGNIZED LOSSES |
| 58644 | PURCHASED OUTSIDE CLASS PERIOD |
| 58645 | PURCHASED OUTSIDE CLASS PERIOD |
| 58646 | PURCHASED OUTSIDE CLASS PERIOD |
| 58647 | PURCHASED OUTSIDE CLASS PERIOD |
| 58649 | PURCHASED OUTSIDE CLASS PERIOD |
| 58652 | PURCHASED OUTSIDE CLASS PERIOD |
| 58656 | PURCHASED OUTSIDE CLASS PERIOD |
| 58657 | PURCHASED OUTSIDE CLASS PERIOD |
| 58659 | PURCHASED OUTSIDE CLASS PERIOD |
| 58660 | PURCHASED OUTSIDE CLASS PERIOD |
| 58662 | SHARES NOT PURCHASED |
| 58663 | SHARES NOT PURCHASED |
| 58664 | PURCHASED OUTSIDE CLASS PERIOD |
| 58666 | NO RECOGNIZED LOSSES |
| 58667 | PURCHASED OUTSIDE CLASS PERIOD |
| 58669 | PURCHASED OUTSIDE CLASS PERIOD |
| 58675 | NO RECOGNIZED LOSSES |

INELIGIBLE CLAIMS

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 58677 | SHARES SOLD SHORT |
| 58678 | WRONG STOCK |
| 58679 | WRONG STOCK |
| 58680 | WRONG STOCK |
| 58681 | NO RECOGNIZED LOSSES |
| 58682 | SHARES SOLD SHORT |
| 58683 | WRONG STOCK |
| 58684 | PURCHASED OUTSIDE CLASS PERIOD |
| 58688 | SHARES SOLD SHORT |
| 58689 | SHARES SOLD SHORT |
| 58691 | NO RECOGNIZED LOSSES |
| 58692 | NO RECOGNIZED LOSSES |
| 58693 | PURCHASED OUTSIDE CLASS PERIOD |
| 58694 | NO RECOGNIZED LOSSES |
| 58695 | NO RECOGNIZED LOSSES |
| 58698 | NO RECOGNIZED LOSSES |
| 58701 | PURCHASED OUTSIDE CLASS PERIOD |
| 58703 | DUPLICATE CLAIM FILED |
| 58704 | NO RECOGNIZED LOSSES |
| 58712 | PURCHASED OUTSIDE CLASS PERIOD |
| 58714 | SHARES SOLD SHORT |
| 58716 | PURCHASED OUTSIDE CLASS PERIOD |
| 58717 | PURCHASED OUTSIDE CLASS PERIOD |
| 58718 | PURCHASED OUTSIDE CLASS PERIOD |
| 58719 | PURCHASED OUTSIDE CLASS PERIOD |
| 58720 | WRONG STOCK |
| 58721 | PURCHASED OUTSIDE CLASS PERIOD |
| 58724 | PURCHASED OUTSIDE CLASS PERIOD |
| 58725 | PURCHASED OUTSIDE CLASS PERIOD |
| 58726 | PURCHASED OUTSIDE CLASS PERIOD |
| 58727 | NO RECOGNIZED LOSSES |
| 58728 | WRONG STOCK |
| 58882 | PURCHASED OUTSIDE CLASS PERIOD |
| 58885 | NO RECOGNIZED LOSSES |
| 58886 | NO RECOGNIZED LOSSES |
| 58900 | NO RECOGNIZED LOSSES |
| 58908 | PURCHASED OUTSIDE CLASS PERIOD |
| 58909 | SHARES NOT PURCHASED |
| 58913 | PURCHASED OUTSIDE CLASS PERIOD |
| 58918 | SHARES NOT PURCHASED |
| 58920 | PURCHASED OUTSIDE CLASS PERIOD |
| 58923 | PURCHASED OUTSIDE CLASS PERIOD |
| 58932 | PURCHASED OUTSIDE CLASS PERIOD |
| 58935 | SHARES NOT PURCHASED |
| 58938 | SHARES NOT PURCHASED |
| 58940 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 58942 | PURCHASED OUTSIDE CLASS PERIOD |
| 58950 | NO RECOGNIZED LOSSES |
| 58952 | WRONG STOCK |
| 58954 | NO RECOGNIZED LOSSES |
| 58955 | NO RECOGNIZED LOSSES |
| 58956 | NO RECOGNIZED LOSSES |
| 58957 | NO RECOGNIZED LOSSES |
| 58959 | NO RECOGNIZED LOSSES |
| 58960 | NO RECOGNIZED LOSSES |
| 58961 | NO RECOGNIZED LOSSES |
| 58962 | PURCHASED OUTSIDE CLASS PERIOD |
| 58963 | PURCHASED OUTSIDE CLASS PERIOD |
| 58964 | NO RECOGNIZED LOSSES |
| 58966 | NO RECOGNIZED LOSSES |
| 58967 | WRONG STOCK |
| 58968 | WRONG STOCK |
| 58969 | NO RECOGNIZED LOSSES |
| 58970 | NO RECOGNIZED LOSSES |
| 58971 | NO RECOGNIZED LOSSES |
| 58972 | NO RECOGNIZED LOSSES |
| 58973 | NO RECOGNIZED LOSSES |
| 58974 | PURCHASED OUTSIDE CLASS PERIOD |
| 58975 | WRONG STOCK |
| 58977 | NO RECOGNIZED LOSSES |
| 58978 | PURCHASED OUTSIDE CLASS PERIOD |
| 58981 | PURCHASED OUTSIDE CLASS PERIOD |
| 58982 | PURCHASED OUTSIDE CLASS PERIOD |
| 58985 | PURCHASED OUTSIDE CLASS PERIOD |
| 58986 | PURCHASED OUTSIDE CLASS PERIOD |
| 58987 | DUPLICATE CLAIM FILED |
| 58988 | NO RECOGNIZED LOSSES |
| 58990 | PURCHASED OUTSIDE CLASS PERIOD |
| 58991 | DUPLICATE CLAIM FILED |
| 58992 | NO RECOGNIZED LOSSES |
| 58993 | NO RECOGNIZED LOSSES |
| 58994 | NO RECOGNIZED LOSSES |
| 58995 | DUPLICATE CLAIM FILED |
| 58996 | NO RECOGNIZED LOSSES |
| 58999 | NO RECOGNIZED LOSSES |
| 59000 | NO RECOGNIZED LOSSES |
| 59001 | NO RECOGNIZED LOSSES |
| 59002 | NO RECOGNIZED LOSSES |
| 59003 | NO RECOGNIZED LOSSES |
| 59004 | PURCHASED OUTSIDE CLASS PERIOD |
| 59005 | PURCHASED OUTSIDE CLASS PERIOD |
| 59008 | PURCHASED OUTSIDE CLASS PERIOD |

**INELIGIBLE CLAIMS**                                    **EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 59009 | PURCHASED OUTSIDE CLASS PERIOD |
| 59010 | PURCHASED OUTSIDE CLASS PERIOD |
| 59011 | WRONG STOCK |
| 59012 | PURCHASED OUTSIDE CLASS PERIOD |
| 59013 | PURCHASED OUTSIDE CLASS PERIOD |
| 59015 | NO RECOGNIZED LOSSES |
| 59016 | WRONG STOCK |
| 59017 | NO RECOGNIZED LOSSES |
| 59019 | NO RECOGNIZED LOSSES |
| 59020 | NO RECOGNIZED LOSSES |
| 59025 | WRONG STOCK |
| 59026 | WRONG STOCK |
| 59029 | NO RECOGNIZED LOSSES |
| 59031 | NO RECOGNIZED LOSSES |
| 59039 | WRONG STOCK |
| 59040 | WRONG STOCK |
| 59042 | WRONG STOCK |
| 59045 | PURCHASED OUTSIDE CLASS PERIOD |
| 59049 | WRONG STOCK |
| 59052 | PURCHASED OUTSIDE CLASS PERIOD |
| 59054 | NO RECOGNIZED LOSSES |
| 59056 | NO RECOGNIZED LOSSES |
| 59057 | NO RECOGNIZED LOSSES |
| 59062 | WRONG STOCK |
| 59063 | WRONG STOCK |
| 59064 | WRONG STOCK |
| 59065 | WRONG STOCK |
| 59066 | PURCHASED OUTSIDE CLASS PERIOD |
| 59068 | PURCHASED OUTSIDE CLASS PERIOD |
| 59070 | PURCHASED OUTSIDE CLASS PERIOD |
| 59075 | PURCHASED OUTSIDE CLASS PERIOD |
| 59076 | PURCHASED OUTSIDE CLASS PERIOD |
| 59078 | PURCHASED OUTSIDE CLASS PERIOD |
| 59083 | NO RECOGNIZED LOSSES |
| 59088 | PURCHASED OUTSIDE CLASS PERIOD |
| 59089 | NO RECOGNIZED LOSSES |
| 59092 | SHARES NOT PURCHASED |
| 59093 | SHARES NOT PURCHASED |
| 59100 | NO RECOGNIZED LOSSES |
| 59103 | NO RECOGNIZED LOSSES |
| 59104 | NO RECOGNIZED LOSSES |
| 59105 | NO RECOGNIZED LOSSES |
| 59106 | NO RECOGNIZED LOSSES |
| 59109 | PURCHASED OUTSIDE CLASS PERIOD |
| 59110 | PURCHASED OUTSIDE CLASS PERIOD |
| 59119 | SHARES SOLD SHORT |

**INELIGIBLE CLAIMS**

**EXHIBIT E**

| Claim # | Rejection Reason |
|---|---|
| 59120 | SHARES SOLD SHORT |
| 59122 | SHARES SOLD SHORT |
| 59123 | PURCHASED OUTSIDE CLASS PERIOD |
| 59124 | PURCHASED OUTSIDE CLASS PERIOD |
| 59127 | PURCHASED OUTSIDE CLASS PERIOD |
| 59128 | SHARES NOT PURCHASED |
| 59129 | SHARES NOT PURCHASED |
| 59137 | DUPLICATE CLAIM FILED |
| 59145 | NO RECOGNIZED LOSSES |
| 59146 | DUPLICATE CLAIM FILED |
| 59148 | PURCHASED OUTSIDE CLASS PERIOD |
| 59155 | DUPLICATE CLAIM FILED |
| 59156 | DUPLICATE CLAIM FILED |
| 59157 | DUPLICATE CLAIM FILED |
| 59167 | PURCHASED OUTSIDE CLASS PERIOD |
| 59169 | PURCHASED OUTSIDE CLASS PERIOD |
| 59180 | DUPLICATE CLAIM FILED |
| 59181 | PURCHASED OUTSIDE CLASS PERIOD |
| 59182 | DUPLICATE CLAIM FILED |
| 59185 | PURCHASED OUTSIDE CLASS PERIOD |
| 59187 | NO RECOGNIZED LOSSES |
| 59189 | WRONG STOCK |
| 59201 | WRONG STOCK |
| 59205 | NO RECOGNIZED LOSSES |
| 59206 | NO RECOGNIZED LOSSES |
| 59207 | NO RECOGNIZED LOSSES |
| 59215 | NO RECOGNIZED LOSSES |
| 59219 | NO RECOGNIZED LOSSES |
| 59238 | PURCHASED OUTSIDE CLASS PERIOD |
| 59467 | NO RECOGNIZED LOSSES |
| 59510 | PURCHASED OUTSIDE CLASS PERIOD |
| 59511 | PURCHASED OUTSIDE CLASS PERIOD |
| 59513 | NO RECOGNIZED LOSSES |
| 59514 | PURCHASED OUTSIDE CLASS PERIOD |
| 59515 | WRONG STOCK |
| 59518 | PURCHASED OUTSIDE CLASS PERIOD |
| 59519 | NO RECOGNIZED LOSSES |
| 59520 | SHARES NOT PURCHASED |
| 59521 | SHARES NOT PURCHASED |
| 59522 | SHARES NOT PURCHASED |
| 59523 | SHARES NOT PURCHASED |
| 59524 | SHARES NOT PURCHASED |
| 59525 | SHARES NOT PURCHASED |
| 59526 | SHARES NOT PURCHASED |
| 59527 | SHARES NOT PURCHASED |
| 59528 | SHARES NOT PURCHASED |

**INELIGIBLE CLAIMS**

EXHIBIT E

| Claim # | Rejection Reason |
|---------|------------------|
| 59529 | SHARES NOT PURCHASED |
| 59530 | NO RECOGNIZED LOSSES |
| 59537 | PURCHASED OUTSIDE CLASS PERIOD |
| 59540 | PURCHASED OUTSIDE CLASS PERIOD |
| 59541 | PURCHASED OUTSIDE CLASS PERIOD |
| 59542 | NO RECOGNIZED LOSSES |
| 59545 | PURCHASED OUTSIDE CLASS PERIOD |
| 59548 | NO RECOGNIZED LOSSES |
| **Total** | **5,666** |

EXHIBIT F

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street - Suite 205
Media, PA  19063

Phone (866) 274-4004
Fax (610) 565-7985

Email: info@strategicclaims.net

## NOTICE OF INELIGIBILITY

**CONTROL#:**   235

**February 21, 2025**

**ACCOUNT#:**

Your claim in the above matter is ineligible for the following reason(s):

| Description: | Shares: |
|---|---|
| Your claim form has been reviewed, and it has been determined that this claim is fraudulent; therefore, you are not eligible to participate in the Net Settlement Fund. | |

## We strongly suggest you contact our office for any question or clarification you may have. It is important that you contact us before any further action is taken in the event that a processing error has occurred.

If you feel you received this notice in error and would like to contest our determination, please contact our office in writing no later than twenty (20) calendar days after the date of this notice. Please be sure to include your Control number as noted above, your reason for contesting our determination, and documentation supporting your reason. You can also contact our office at 1-866-274-4004 or info@strategicclaims.net. If after contacting us, you still disagree, you can request in writing to Plaintiffs' Counsel to review your claim.

When calling our office, please have ready the Control Number found at the top left-hand corner of this form.

*ATI Class Actions Settlement*
**c/o Strategic Claims Services**
**P.O. Box 230**
**600 North Jackson Street – Suite 205**
**Media, PA 19063**
**Toll-Free Number: (866) 274-4004**
**Facsimile: (610) 565-7985**
**Email:  info@strategicclaims.net**
**Website:  www.strategicclaims.net/ati**

## PROOF OF CLAIM AND RELEASE

To be eligible to receive a share of the Settlement Fund in connection with the Settlement of the Actions, you must complete and sign this Proof of Claim and Release form ("Claim Form") and mail it by first-class mail to the above address, *postmarked* **no later than October 18, 2024 or submit it online at the above website on or before 11:59 p.m. Eastern time on October 18, 2024**.

Failure to submit your Claim Form by the date specified will subject your claim to rejection and may preclude you from being eligible to receive any money in connection with the Settlement.

**Do not mail or deliver your Claim Form to the Court, the parties to the Actions, or their counsel.  Submit your Claim Form only to the Claims Administrator at the address set forth above.**

## PART I – INTRODUCTION

**A.      General Instructions**

1.      To recover as a member of the Settlement Class based on your putative class (direct) claims in the above-captioned actions (collectively, the "Actions"), you must complete, and on page 7 hereof, sign this Claim Form.  If you fail to file a properly addressed (as set forth in ¶A.3 below) Claim Form, your claim may be rejected, and you may be precluded from any recovery from the Settlement Fund created in connection with the proposed settlement of the Actions.

2.      Submission of this Claim Form, however, does not assure that you will share in the proceeds of settlement in the Actions.

3.      YOU MUST MAIL OR SUBMIT ONLINE YOUR COMPLETED AND SIGNED CLAIM FORM ON OR BEFORE OCTOBER 18, 2024, ADDRESSED AS FOLLOWS:

*ATI Class Actions Settlement*
c/o Strategic Claims Services
P.O. Box 230
600 North Jackson Street – Suite 205
Media, PA 19063
www.strategicclaims.net/ati

If you are NOT a member of the Settlement Class, as defined in the Notice of (I) Pendency of Class Actions, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice"), DO NOT submit a Claim Form.

4.      If you are a member of the Settlement Class and you do not timely and validly request exclusion from the Settlement Class, you are bound by the terms of any judgment entered in the Actions, including the releases provided therein, WHETHER OR NOT YOU SUBMIT A CLAIM FORM.

5.      It is important that you completely read and understand the Notice that accompanies this Claim Form, including the Plan of Allocation set forth in the Notice.  The Notice describes the proposed Settlement, how Settlement Class Members are affected by the Settlement, and the manner in which the Net Settlement Fund will be distributed if the Settlement and Plan of Allocation are approved by the Court.  The Notice also contains the definitions of many of the defined terms (which are indicated by initial capital letters) used in this Claim Form.  By signing and submitting this Claim Form, you will be certifying that you have read and that you understand the Notice, including the terms of the releases described therein and provided for herein.

**B.      Claimant Identification**

1.      If you purchased or acquired ATI Physical Therapy, Inc. ("ATI") common stock or Fortress Value Acquisition Corp. II ("FVAC") common stock (collectively, "ATI Securities") and held the certificate(s) in your name, you

- 2 -

are the beneficial purchaser or acquirer as well as the record purchaser or acquirer.[1] If, however, the certificate(s) were registered in the name of a third party, such as a nominee or brokerage firm, you are the beneficial purchaser and the third party is the record purchaser.

2. Use Part II of this form entitled "Claimant Identification" to identify the beneficial owner(s) of ATI Securities. The complete name(s) of the beneficial owner(s) must be entered. If you held the ATI Securities in your own name, you are the beneficial owner as well as the record owner. If, however, your shares of ATI Securities were registered in the name of a third party, such as a nominee or brokerage firm, you are the beneficial owner of these shares, but the third party is the record owner. THIS CLAIM MUST BE FILED AND SIGNED BY THE ACTUAL BENEFICIAL PURCHASER(S) OR ACQUIRER(S) OR THE LEGAL REPRESENTATIVE OF SUCH PURCHASER(S) OR ACQUIRER(S) OF ATI SECURITIES UPON WHICH THIS CLAIM IS BASED.

3. All joint purchasers must sign this Claim Form and be identified in Part II. The Social Security (or taxpayer identification) number and telephone number of the beneficial owner may be used in verifying the claim. Failure to provide the foregoing information could delay verification of your claim or result in rejection of the claim.

4. **One Claim Form should be submitted for each separate legal entity.** Separate Claim Forms should be submitted for each separate legal entity (*e.g.*, a claim from joint owners should not include separate transactions of just one of the joint owners, and an individual should not combine his or her IRA transactions with transactions made solely in the individual's name). Conversely, a single Claim Form should be submitted on behalf of one legal entity including all transactions made by that entity on one Claim Form, no matter how many separate accounts that entity has (*e.g.*, a corporation with multiple brokerage accounts should include all transactions made in all accounts on one Claim Form).

5. Agents, executors, administrators, guardians, and trustees must complete and sign the Claim Form on behalf of persons represented by them, and they must:

  (a) expressly state the capacity in which they are acting;

  (b) identify the name, account number, Social Security Number (or taxpayer identification number), address, and telephone number of the beneficial owner of (or other person or entity on whose behalf they are acting with respect to) the ATI Securities; and

  (c) furnish herewith evidence of their authority to bind to the Claim Form the person or entity on whose behalf they are acting. (Authority to complete and sign a Claim Form cannot be established by stockbrokers demonstrating only that they have discretionary authority to trade securities in another person's accounts.)

6. By submitting a signed Claim Form, you will be swearing that you:

  (a) own or owned the ATI Securities you have listed in the Claim Form; or

  (b) are expressly authorized to act on behalf of the owner thereof.

**C.** **Claim Form**

1. Use Part III of this form entitled "Schedule of Transactions in ATI Securities" to supply all required details of your transaction(s) in and holdings of ATI common stock or FVAC common stock. Use Part IV of this form entitled "FVAC Common Stock Holdings on May 24, 2021 and June 11, 2021" to supply the required additional details about your holdings in FVAC common stock on May 24, 2021 and/or June 11, 2021. If you need more space or additional schedules, attach separate sheets giving all of the required information in substantially the same form. Sign and print or type your name on each additional sheet.

2. On the schedules, provide all of the requested information with respect to all of your purchases and acquisitions and all of your sales of ATI Securities that took place at any time from February 22, 2021 through January 14, 2022, both dates inclusive, whether such transactions resulted in a profit or a loss. Failure to report all such transactions may result in the rejection of your claim. Also, list the number of shares of ATI Securities held at the opening of trading on February 22, 2021 and the close of trading on January 14, 2022. Lastly and if applicable, state the total number of FVAC common stock shares held as of May 24, 2021 that were exchanged for shares of ATI common stock on or about June 16, 2021, and the total number of FVAC common stock shares held as of June 11, 2021 that were not redeemed.

3. List each transaction in the Settlement Class Period (as defined in the Notice) separately and in chronological order, by trade date, beginning with the earliest. You must accurately provide the month, day and year of each transaction you list.

4. You are required to submit genuine and sufficient documentation for all of your transactions in and holdings of ATI Securities set forth in the Claim Form. Documentation may consist of copies of brokerage confirmation slips or monthly

---

[1] An FVAC Unit purchased during the Settlement Class Period that was subsequently separated into its underlying component securities (including one share of FVAC or ATI common stock) at the request of the holder thereof, or automatically in the Business Combination, shall be treated as a purchase of an ATI Security on the date of separation. The purchase price for the ATI Security received shall be the closing price of the ATI Security on the date of separation. Any such Units purchased prior to the Settlement Class Period that were subsequently separated into their underlying component securities during the Settlement Class Period are not eligible for a recovery from the Settlement.

- 3 -

brokerage account statements, or an authorized statement from your broker containing the transactional and holding information found in a broker confirmation slip or account statement. The parties and the Claims Administrator do not independently have information about your investments in ATI Securities. IF SUCH DOCUMENTS ARE NOT IN YOUR POSSESSION, PLEASE OBTAIN COPIES OF THE DOCUMENTS OR EQUIVALENT DOCUMENTS FROM YOUR BROKER. FAILURE TO SUPPLY THIS DOCUMENTATION MAY RESULT IN THE REJECTION OF YOUR CLAIM. DO NOT SEND ORIGINAL DOCUMENTS. **Please keep a copy of all documents that you send to the Claims Administrator. Also, do not highlight any portion of the Claim Form or any supporting documents**.

5. The above requests are designed to provide the minimum amount of information necessary to process the simplest claims. The Claims Administrator may request additional information as required to efficiently and reliably calculate your losses. In the event the Claims Administrator cannot perform the calculation accurately or at a reasonable cost to the Settlement Class with the information provided, the Claims Administrator may condition acceptance of the claim upon the production of additional information and/or the claimant's responsibility for any increased costs due to the nature and/or scope of the claim.

6. If the Court approves the Settlement, payments to eligible Authorized Claimants pursuant to the Plan of Allocation (or such other plan of allocation as the Court approves) will be made after any appeals are resolved and after the completion of all claims processing. The claims process will take substantial time to complete fully and fairly. Please be patient.

7. **PLEASE NOTE:** As set forth in the Plan of Allocation, each Authorized Claimant shall receive his, her, or its *pro rata* share of the Settlement Fund. If the prorated payment to any Authorized Claimant calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to that Authorized Claimant.

8. If you have questions concerning the Claim Form, or need additional copies of the Claim Form or the Notice, you may contact the Claims Administrator, Strategic Claims Services, at the address on page 2 of the Claim Form, by email at info@strategicclaims.net, or by toll-free phone at (866) 274-4004, or you can visit the website, www.strategicclaims.net/ati, where copies of the Claim Form and Notice are available for downloading.

9. NOTICE REGARDING INSTITUTIONAL FILERS: Certain filers submitting claims on behalf of other beneficial owners ("Representative Filers") with large numbers of transactions may request, or may be requested, to submit information regarding their transactions in electronic files. (This is different than the online claim portal on the Settlement website.) All such Representative Filers MUST also submit a manually signed paper Claim Form whether or not they also submit electronic copies. Claims should be combined on a legal entity basis, where applicable. Sub-accounts should be rolled up into a parent account if the sub-accounts contain the same tax identification number. To obtain the *mandatory* electronic filing requirements and file layout, you may visit the Claims Administrator's website at www.strategicclaims.net/institutional-filers or you may email the Claims Administrator's electronic filing department at efile@strategicclaims.net. **Any file not in accordance with the required electronic filing format will be subject to rejection.** Only one claim should be submitted for each separate legal entity (*see* ¶B.4 above) and the *complete* name of the beneficial owner(s) of the securities must be entered where called for (*see* ¶B.2 above). No electronic files will be considered to have been submitted unless the Claims Administrator issues an email to that effect. **Do not assume that your file has been received until you receive this email. If you do not receive such an email within 10 days of your submission, you should contact the electronic filing department at efile@strategicclaims.net to inquire about your file and confirm it was received.**

10. NOTICE REGARDING ONLINE FILING: Claimants who are not Representative Filers may submit their claims online using the electronic version of the Claim Form hosted at www.strategicclaims.net/ati. If you are not acting as a Representative Filer, you do not need to contact the Claims Administrator prior to filing. You will receive an automated e-mail confirming receipt once your Claim Form has been submitted. If you are unsure if you should submit your claim as a Representative Filer, please contact the Claims Administrator at info@strategicclaims.net or (866) 274-4004. If you are not a Representative Filer, but your claim contains a large number of transactions, the Claims Administrator may request that you also submit an electronic spreadsheet showing your transactions to accompany your Claim Form.

### IMPORTANT: PLEASE NOTE

**YOUR CLAIM IS NOT DEEMED FILED UNTIL YOU RECEIVE AN ACKNOWLEDGEMENT POSTCARD. THE CLAIMS ADMINISTRATOR WILL ACKNOWLEDGE RECEIPT OF YOUR CLAIM FORM BY MAIL, WITHIN 60 DAYS. IF YOU DO NOT RECEIVE AN ACKNOWLEDGEMENT POSTCARD WITHIN 60 DAYS, CALL THE CLAIMS ADMINISTRATOR TOLL FREE AT (866) 274-4004.**

ATI

**PART II – CLAIMANT IDENTIFICATION**

| |
|---|
| Beneficial Owner's Name (First, Middle, Last) |
| Joint Beneficial Owner's Name (if applicable) (First, Middle, Last) |
| Name of Representative, if applicable (executor, administrator, trustee, c/o, etc.), if different from Beneficial Owner |
| Record Owner's Name (*if different from beneficial owner listed above*) |
| Street Address |
| Street Address 2 |

| City | State | Zip Code |
|---|---|---|
| | | |

| |
|---|
| Foreign Country |

| Telephone Number (Work) | Telephone Number (Home) |
|---|---|
| | |

| |
|---|
| E-mail Address |

| Social Security Number (for individuals): | OR | Taxpayer Identification Number (for estates, trusts, corporations, etc.): |
|---|---|---|
| | | |

Type of Account:
- ☐ Individual
- ☐ Corporation/Other: _____

**PART III – SCHEDULE OF TRANSACTIONS IN ATI SECURITIES**

"ATI Securities" means, collectively, Fortress Value Acquisition Corp. II ("FVAC") common stock, which traded on the New York Stock Exchange ("NYSE") under the ticker symbol "FAII" until June 16, 2021, and ATI Physical Therapy, Inc. ("ATI") common stock, which traded on the NYSE under the ticker symbol "ATIP" from June 17, 2021. Please be sure to include proper documentation with your Claim Form as described in detail in ¶C.4 of the Instructions. Do not include information in this section regarding securities other than ATI or FVAC common stock.

A.      Number of shares of ATI Securities (then known as FVAC common stock) held at the opening of trading on February 22, 2021, long or short. (Must be documented.) If none, write "zero": _____

B.      Purchases or acquisitions of ATI Securities (either FVAC or ATI common stock) from February 22, 2021 through October 19, 2021, inclusive. (Must be documented. Prices should exclude any taxes, commissions, and fees.):

| Date of Purchase MM/DD/YY | Ticker Symbol (FAII or ATIP) | Number of Shares Purchased | Purchase Price Per Share | Total Purchase Price | Was Stock Purchase due to Exercise of Warrant (Y/N) |
|---|---|---|---|---|---|
| /    / | | | $ | $ | |
| /    / | | | $ | $ | |
| /    / | | | $ | $ | |
| /    / | | | $ | $ | |

ATI

C.       Separately list the number of shares of ATI Securities (either FVAC or ATI common stock) acquired during the period February 22, 2021 through June 16, 2021, both dates inclusive, as the result of the separation of FVAC Units into the underlying component securities.  (Must be documented):

| Date of Separation of FVAC Units MM/DD/YY | Ticker Symbol of Shares Acquired (FAII or ATIP) | Number of Shares Acquired |
|---|---|---|
|  |  |  |
|  |  |  |

D.       State the number of shares of ATI common stock that were purchased from October 20, 2021 through January 14, 2022.  If none, write "zero": _____

E.       Sales of ATI Securities (either FVAC or ATI common stock) from February 22, 2021 through January 14, 2022, inclusive.  (Must be documented.  Prices should exclude any taxes, commissions, and fees.):

| Trade Date MM/DD/YY | Ticker Symbol (FAII or ATIP) | Number of Shares Sold | Sale Price Per Share | Total Sales Price |
|---|---|---|---|---|
| /   / |  |  | $ | $ |
| /   / |  |  | $ | $ |
| /   / |  |  | $ | $ |
| /   / |  |  | $ | $ |

F.       Number of shares of ATI common stock held at the close of trading on January 14, 2022, long or short.  (Must be documented.)  If none, write "zero": _____.

If you require additional space, attach extra schedules in the same format as above.  Sign and print your name on each additional page.

## PART IV – FVAC COMMON STOCK HOLDINGS ON MAY 24, 2021 AND JUNE 11, 2021

Please be sure to include proper documentation with your Claim Form as described in detail in ¶C.4 of the Instructions.  Do not include information in this section regarding securities other than FVAC common stock.

A.       Number of shares of FVAC common stock held at the close of trading on May 24, 2021.  (Must be documented.)  If none, write "zero": _____

B.       Were you *eligible* to vote at FVAC's June 15, 2021 special meeting?  (Must be documented.)  Write "yes" or "no": _____.

C.       Number of shares of FVAC common stock held at the close of trading on June 11, 2021 that were *not* redeemed. (Must be documented.)  If none, write "zero": _____

**YOU MUST READ AND SIGN THE RELEASE ON PAGE 7.**
**FAILURE TO SIGN THE RELEASE MAY RESULT IN A DELAY IN PROCESSING OR THE REJECTION OF YOUR CLAIM.**

## PART V – SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS

I (We) submit this Claim Form under the terms of the Stipulation and Agreement of Settlement dated May 13, 2024 ("Stipulation") described in the Notice.  I (We) also submit to the jurisdiction of the United States District Court for the Northern District of Illinois, with respect to my (our) claim as a Settlement Class Member(s) (as defined in the Notice) and for purposes of enforcing the release set forth herein.  I (We) further acknowledge that I am (we are) bound by and subject to the terms of any judgment that may be entered in the Actions.  I (We) agree to furnish additional information to Plaintiffs' Counsel and/or the Claims Administrator to support this claim if required to do so.  I (We) have not submitted any other claim covering the

ATI

same purchases, acquisitions, or sales of ATI Securities during the Settlement Class Period and know of no other Person having done so on my (our) behalf.

### PART VI – RELEASE

1.      I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully, finally and forever settle, release, relinquish and discharge all of the Released Plaintiffs' Claims (including Unknown Claims) against each and all of the Defendants' Releasees, all as defined herein and in the Notice and Stipulation.

2.      This release shall be of no force or effect unless and until the Court approves the Stipulation and it becomes effective on the Effective Date.

3.      I (We) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to this release or any other part or portion thereof and have not submitted any other claim covering the same purchases of ATI Securities and know of no other Person having done so on my (our) behalf.

4.      I (We) hereby warrant and represent that I (we) have included all requested information about all of my (our) purchases or acquisitions and sales of ATI Securities during the Settlement Class Period and 90-Day Lookback Period as well as the number of ATI Securities held at the opening of trading on February 22, 2021 and close of trading on January 14, 2022, and the requested information regarding FVAC common stock.

5.      The number(s) shown on this form is (are) the correct SSN/TIN(s).

6.      I (We) waive the right to trial by jury, to the extent it exists, and agree to the determination by the Court of the validity or amount of this claim, and waive any right of appeal or review with respect to such determination.

7.      I (We) certify that I am (we are) NOT subject to backup withholding under the provisions of Section 3406(a)(1)(C) of the Internal Revenue Code.

(NOTE: If you have been notified by the Internal Revenue Service that you are subject to backup withholding, you must cross out Item 7 above.)

I (We) declare under penalty of perjury under the laws of the United States of America that the foregoing information supplied by the undersigned is true and correct.

Executed this _____ day of _____ __, 20__, in _____,_____.

        /Year)        (City)        (State/Country)

_____
(Type or print your name here)

_____
(Capacity of person(s) signing, *e.g.*, Beneficial Purchaser
or Acquirer, Executor or Administrator)

For Joint Beneficial Purchaser, if any:

_____    _____
(Sign your name here)        (Type or print your name here)

<div align="center">ACCURATE CLAIMS PROCESSING TAKES A
SIGNIFICANT AMOUNT OF TIME.
THANK YOU FOR YOUR PATIENCE.</div>

Reminder Checklist:

1.      Please sign the above release and acknowledgment.
2.      Remember to attach copies of supporting documentation, if available.
3.      Do not send original stock certificates. Attach only *copies* of acceptable supporting documentation as these documents will not be returned to you.
4.      Keep a copy of your Claim Form and all supporting documentation for your records.
5.      The Claims Administrator will acknowledge receipt of your Claim Form by mail, within 60 days. Your claim is not deemed filed until you receive an acknowledgement postcard. **If you do not receive an acknowledgement postcard within 60 days, please call the Claims Administrator toll free at (866) 274-4004.**
6.      If you move, please send the Claims Administrator your new address.
7.      If you have any questions or concerns regarding your claim, contact the Claims Administrator at (610) 565-9202, by email at info@strategicclaims.net or by toll-free phone at (866) 274-4004, or you may visit www.strategicclaims.net/ati. DO NOT call ATI, the other Defendants, or their counsel with questions regarding your claim.

<div align="center">- 7 -</div>

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson St., Suite 205
Media, PA 19063

**IMPORTANT LEGAL NOTICE – PLEASE FORWARD**

Re: ATI PHYSICAL THERAPY
Date: 10/10/2024



Enclosed is a fully executed Proof of Claim Form and Release with required authorizations and affidavits as well as an electronic media attachment, which is being filed in connection with the ATI PHYSICAL THERAPY Securities Litigation.

The attachment consists of 1 account/claim in MS EXCEL format with 6 transactions, including all the positions for the account/claim. Each transaction contains corresponding account information for which the claim is being filed.

Battea - Class Action Services attests that all data provided corresponds to the entity's internal records and are true and accurate to the best of our knowledge.

Keith McComb
Battea - Class Action Services
filer@battea.com

## AUTHORIZATION TO FILE CLAIMS AND RECEIVE RECOVERIES

### Battea - Class Action Services, LLC

This Authorization to File Claims and Receive Recoveries is made on January 23, 2017 (the "Authorization") by and between FIG LLC ("Client") and Battea-Class Action Services, LLC, a California limited liability company ("CAS").

CAS provides services to Client such as identifying, asserting and filing claims and related documents (collectively referred to as "Claims") on behalf of Client in class action securities litigations, disgorgement funds and victim trusts. CAS then prepares and pursues those Claims. When a Claim results in a distribution of funds and/or stock (a "Recovery"), CAS receives the Recovery on behalf of the Client. In order to assist and facilitate CAS in providing such services, Client grants CAS the following authority:

1. Client hereby authorizes CAS to complete and file Claims on behalf of Client.

2. Client hereby authorizes CAS to receive Recoveries on behalf of Client.

The undersigned has executed this Authorization as of the date set forth above

Client: FIG LLC

By: _____

Name: _Daniel Bass_

Title: _Chief Financial Officer_

CAS acknowledges receipt of this Authorization.

By: _____

Name: _Timothy Hoder_

Title: _Senior VP Legal_

A-1



**Direct Registration / Book Entry Account Statement**

ATI PHYSICAL THERAPY

| Account Number | Statement Date |
|---|---|
| | 01/14/2022 |

|||||||||||‖‖|||||||‖‖‖|||||||||||||||||‖||||||‖|‖||||||||||||||

FORTRESS ACQUISITION SPONSOR II LLC

**Important Information**

\* Please review the reverse side for account changes or important information pertaining to this statement.

-----------------------------------------------------------------------------------------------------------------------------

^ FOLD AND DETACH HERE ^

FORTRESS ACQUISITION SPONSOR II LLC
1345 AVENUE OF THE AMERICAS
NEW YORK NY 10105-0302

**Shareholder Account #:**

**Total DRS / Book Holdings:** 7,500,000

**Account Value:** $1,290,000.00

**ATI PHYSICAL THERAPY**

**Broker/Dealer Name:**

**Broker/Dealer DTC Participant #:**

**CUSIP:**          00216W109

**Customer Account #:**

**Ticker Symbol:**

**Market Value:**    $0.1720

| Total DRS / Book Entry Holdings | Total Restricted Book Entry Holdings |
|---|---|
| 0.00 | 7,500,000 |

| Transaction Date | Transaction Type | Transaction Amount | Holdings Balance | Restriction Code(s) |
|---|---|---|---|---|
| 06/16/21 | LOADED TRANSACTION | 7,500,000 | 7,500,000 | F508E, F508F |

This statement is a record of rights of the shareholder at the time of its issuance. Delivery of this statement of itself conveys no rights to the recipient. This statement is neither a negotiable instrument nor a security.

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
800-509-5586

CSTDRS

| **Share Transaction Requests** | **To change the Mailing Address, Email Address or Phone Number on the account, please provide the new information below:** |
|---|---|

☐ Deposit the enclosed certificate(s) for _____ shares to my account.

_____

_____

_____

_____

**Signature(s)** All registered owners must sign and date to validate any transaction(s) or change(s) to the account

_____

_____

F508COMA          ATI PHYSICAL THERAPY

**Account No.:**

**Account Alpha ID:** FORTRESS ACQUISITION

---

^ FOLD AND DETACH HERE ^

### INSTRUCTIONS FOR TRANSACTION REQUEST

HOLDINGS TRANSACTION REQUEST:
If you have any physical stock certificates in your possession and you wish to deposit them in your account, mark the box on the back of this statement and on the blank line provided write in the number of shares represented by the certificate(s) you are sending to us for deposit.

ACCOUNT UPDATES:
Please write in your new address, telephone number and or email address in the available space provided. Note, all registered holders must sign their names exactly as they appear on the front of this statement.  Your request should be returned to the mailing address indicated below.

MAILING ADDRESS: 1 State Street, 30th Floor, New York, NY, 10004-1561

If you require further assistance, feel free to contact us:
PHONE: Monday through Friday, 8:00 am to 6:00pm, Eastern Time at 800-509-5586
EMAIL: CSTMail@continentalstock.com
WEBSITE: www.continentalstock.com

### About your Statement

This statement is your record of the securities being credited to your account in book entry form and may be part of the Direct Registration System, if applicable. It should be kept with your important documents as a record of your ownership of these securities.

THE CORPORATION WILL FURNISH TO ANY SHAREHOLDERS UPON REQUEST AND WITHOUT CHARGE, A FULL STATEMENT OF THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF THE SHARES OF EACH CLASS OF SECURITIES, IF MORE THAN ONE, AUTHORIZED TO BE ISSUED AND THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF EACH SERIES OF ANY CLASS OF PREFERRED HOLDINGS AUTHORIZED TO BE ISSUED SO FAR AS THE SAME HAVE BEEN FIXED AND THE AUTHORITY OF THE BOARD OF DIRECTORS TO DESIGNATE AND FIX THE RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF OTHER SERIES.
There may be rights, privileges, restrictions and conditions attached to the securities covered by this statement.  A full copy of the text of any rights, privileges, restrictions and conditions can be obtained by contacting Continental Stock Transfer & Trust Company at 800-509-5586  or cstmail@continentalstock.com.

### Transactions Through Your Broker/Dealer

You would initiate the transaction with your broker/dealer who may instruct Continental Stock Transfer & Trust Company ("CST") to deliver your holdings on your behalf.

The Direct Registration System ("DRS"), if applicable, allows you to authorize your broker/dealer to send an electronic instruction to CST to debit holdings from your DRS position and deliver them electronically to your account with your broker/dealer. To effect such transactions your broker/dealer will need to include the following information which will need to match the information within the account held with CST:

- CST ACCOUNT NUMBER - which should be a total of ten digits. If your account number is less than ten digits, please add leading zeros. This ONLY applies to moving your shares to a Broker.
- SOCIAL SECURITY or TAXPAYER IDENTIFICATION NUMBER
- the NAME of your CST ACCOUNT
- the NUMBER of DRS shares to be delivered

CST will honor such requests from any broker/dealer participating in the Diredt Registration System. While a broker/dealer should have your authorization to debit holdings from your CST account, CST will have no way of verifying if you actually authorized the transaction since the instruction is coming directly from the broker/dealer.

CSTDRS

**Account Alpha ID:** FORTRESS ACQUISITION

**Account No.:**

## Restriction Code Definitions

*Attention: if your Direct Registration/Book Entry holdings are not restricted this page will not display any Restriction Code Definitions.*

F508E

THIS SECURITY HAS BEEN ACQUIRED FOR INVESTMENT AND WITHOUT A VIEW TO DISTRIBUTION AND HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"), OR UNDER STATE SECURITIES LAWS. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS SECURITY OR ANY INTEREST OR PARTICIPATION THEREIN MAY BE MADE EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS AND, IN THE CASE OF CLAUSE (B), UNLESS THE ISSUER RECEIVES AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS. IN ADDITION, ANY SUCH TRANSFER OR OTHER DISPOSITION IS SUBJECT TO THE CONDITIONS CONTAINED IN A SUBSCRIPTION AGREEMENT, DATED FEBRUARY 21, 2021.  A COPY OF SUCH CONDITIONS WILL BE PROVIDED TO THE HOLDER HEREOF UPON REQUEST.

F508F

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE HELD BY A PERSON OR ENTITY WHO MAY BE DEEMED TO BE AN AFFILIATE OF THE ISSUER FOR PURPOSES OF RULE 144 PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

CSTDRS

**Account Alpha ID:** FORTRESS ACQUISITION

**Account No.:**

This Page Left Intentionally Blank



**Direct Registration / Book Entry Account Statement**

ATI PHYSICAL THERAPY

| Account Number | Statement Date |
|---|---|
| | **01/14/2022** |

**FORTRESS ACQUISITION SPONSOR II LLC**

**Important Information**

\* Please review the reverse side for account changes or important information pertaining to this statement.

-------------------------------------------------------------------------------------------------------------------------
^ FOLD AND DETACH HERE ^

FORTRESS ACQUISITION SPONSOR II LLC
C/O FORTRESS VALUE ACQUISITION CORP II
1345 AVENUE OF THE AMERICAS FL 46
NEW YORK NY 10105-4302

**Shareholder Account #:**

**Total DRS / Book Holdings:** 8,525,000

**Account Value:** $1,466,300.00

**ATI PHYSICAL THERAPY**

**Broker/Dealer Name:**

**Broker/Dealer DTC Participant #:**

**Customer Account #:**

**CUSIP:**          00216W109

**Ticker Symbol:**

**Market Value:**     $0.1720

| Total DRS / Book Entry Holdings | Total Restricted Book Entry Holdings |
|---|---|
| 0.00 | 8,525,000 |

| Transaction Date | Transaction Type | Transaction Amount | Holdings Balance | Restriction Code(s) |
|---|---|---|---|---|
| 06/16/21 | ISSUE SECURITIES | 8,525,000 | 8,525,000 | F508B, F508C, F508D |

This statement is a record of rights of the shareholder at the time of its issuance. Delivery of this statement of itself conveys no rights to the recipient. This statement is neither a negotiable instrument nor a security.

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
800-509-5586

CSTDRS

| Share Transaction Requests |
|---|

☐ Deposit the enclosed certificate(s) for _____shares to my account.

| To change the Mailing Address, Email Address or Phone Number on the account, please provide the new information below: |
|---|

_____

_____

_____

_____

**Signature(s)** All registered owners must sign and date to validate any transaction(s) or change(s) to the account

_____

_____

F508COMA      ATI PHYSICAL THERAPY

**Account No.:**

**Account Alpha ID:** FORTRESS

---------------------------------------------------------------------------------------------------------------------------------------

^ FOLD AND DETACH HERE ^

### INSTRUCTIONS FOR TRANSACTION REQUEST

HOLDINGS TRANSACTION REQUEST:
If you have any physical stock certificates in your possession and you wish to deposit them in your account, mark the box on the back of this statement and on the blank line provided write in the number of shares represented by the certificate(s) you are sending to us for deposit.

ACCOUNT UPDATES:
Please write in your new address, telephone number and or email address in the available space provided. Note, all registered holders must sign their names exactly as they appear on the front of this statement. Your request should be returned to the mailing address indicated below.

MAILING ADDRESS: 1 State Street, 30th Floor, New York, NY, 10004-1561

If you require further assistance, feel free to contact us:
PHONE: Monday through Friday, 8:00 am to 6:00pm, Eastern Time at 800-509-5586
EMAIL: CSTMail@continentalstock.com
WEBSITE: www.continentalstock.com

### About your Statement

This statement is your record of the securities being credited to your account in book entry form and may be part of the Direct Registration System, if applicable. It should be kept with your important documents as a record of your ownership of these securities.

THE CORPORATION WILL FURNISH TO ANY SHAREHOLDERS UPON REQUEST AND WITHOUT CHARGE, A FULL STATEMENT OF THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF THE SHARES OF EACH CLASS OF SECURITIES, IF MORE THAN ONE, AUTHORIZED TO BE ISSUED AND THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF EACH SERIES OF ANY CLASS OF PREFERRED HOLDINGS AUTHORIZED TO BE ISSUED SO FAR AS THE SAME HAVE BEEN FIXED AND THE AUTHORITY OF THE BOARD OF DIRECTORS TO DESIGNATE AND FIX THE RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF OTHER SERIES.
There may be rights, privileges, restrictions and conditions attached to the securities covered by this statement. A full copy of the text of any rights, privileges, restrictions and conditions can be obtained by contacting Continental Stock Transfer & Trust Company at 800-509-5586 or cstmail@continentalstock.com.

### Transactions Through Your Broker/Dealer

You would initiate the transaction with your broker/dealer who may instruct Continental Stock Transfer & Trust Company ("CST") to deliver your holdings on your behalf.

The Direct Registration System ("DRS"), if applicable, allows you to authorize your broker/dealer to send an electronic instruction to CST to debit holdings from your DRS position and deliver them electronically to your account with your broker/dealer. To effect such transactions your broker/dealer will need to include the following information which will need to match the information within the account held with CST:

- CST ACCOUNT NUMBER - which should be a total of ten digits. If your account number is less than ten digits, please add leading zeros. This ONLY applies to moving your shares to a Broker.
- SOCIAL SECURITY or TAXPAYER IDENTIFICATION NUMBER
- the NAME of your CST ACCOUNT
- the NUMBER of DRS shares to be delivered

CST will honor such requests from any broker/dealer participating in the Diredt Registration System. While a broker/dealer should have your authorization to debit holdings from your CST account, CST will have no way of verifying if you actually authorized the transaction since the instruction is coming directly from the broker/dealer.

CSTDRS

**Account Alpha ID:** FORTRESS

**Account No.:**

## Restriction Code Definitions

*Attention: if your Direct Registration/Book Entry holdings are not restricted this page will not display any Restriction Code Definitions.*

F508B

THE SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED PURSUANT TO THE TERMS OF A LETTER AGREEMENT EXECUTED BY THE HOLDER, A COPY OF WHICH IS AVAILABLE UPON REQUEST.

F508C

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE HELD BY A PERSON OR ENTITY WHO MAY BE DEEMED TO BE AN AFFILIATE OF THE ISSUER FOR PURPOSES OF RULE 144 PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED

F508D

THIS SECURITY HAS BEEN ACQUIRED FOR INVESTMENT AND WITHOUT A VIEW TO DISTRIBUTION AND HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"), OR UNDER STATE SECURITIES LAWS. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS SECURITY OR ANY INTEREST OR PARTICIPATION THEREIN MAY BE MADE EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS AND, IN THE CASE OF CLAUSE (B), UNLESS THE ISSUER RECEIVES AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS.

CSTDRS

**Account Alpha ID:** FORTRESS

**Account No.:**

This Page Left Intentionally Blank



FORTRESS VALUE ACQUISITION CORP II

| Account Number | Statement Date |
|---|---|
| | 06/17/2021 |

FORTRESS ACQUISITION SPONSOR II LLC

**Important Information**

\* Please review the reverse side for account changes or important information pertaining to this statement.

------------------------------------------------------------------------------------------------------------------------

^ FOLD AND DETACH HERE ^

FORTRESS ACQUISITION SPONSOR II LLC
C/O FORTRESS VALUE ACQUISITION CORP II
1345 AVENUE OF THE AMERICAS FL 46
NEW YORK NY 10105-4302

**Shareholder Account #:**

**Total DRS / Book Holdings:** 0

**Account Value:** $0.00

**FORTRESS VALUE ACQUISITION CORP II**

**Broker/Dealer Name:**

**Broker/Dealer DTC Participant #:**

**Customer Account #:**

**CUSIP:**

**Ticker Symbol:**

**Market Value:**      $0.0000

| Total DRS / Book Entry Holdings | Total Restricted Book Entry Holdings |
|---|---|
| 0.00 | 0 |

| Transaction Date | Transaction Type | Transaction Amount | Holdings Balance | Restriction Code(s) |
|---|---|---|---|---|
| 08/14/20 | ISSUE SECURITIES | 8,525,000 | 8,525,000 | F508 |
| 06/16/21 | CANCEL SECURITIES | -8,525,000 | 0 | F508 |

This statement is a record of rights of the shareholder at the time of its issuance. Delivery of this statement of itself conveys no rights to the recipient. This statement is neither a negotiable instrument nor a security.

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
800-509-5586

CSTDRS

| **Share Transaction Requests** | **To change the Mailing Address, Email Address or Phone Number on the account, please provide the new information below:** |
|---|---|

☐ Deposit the enclosed certificate(s) for _____shares to my account.

_____

_____

_____

_____

**Signature(s)** All registered owners must sign and date to validate any transaction(s) or change(s) to the account

_____

_____

F508COMF      FORTRESS VALUE ACQUISITION CORP II

**Account No.:**

**Account Alpha ID:** FORTRESS

---------------------------------------------------------------------------------------------------------------------------------

^ FOLD AND DETACH HERE ^

### INSTRUCTIONS FOR TRANSACTION REQUEST

HOLDINGS TRANSACTION REQUEST:
If you have any physical stock certificates in your possession and you wish to deposit them in your account, mark the box on the back of this statement and on the blank line provided write in the number of shares represented by the certificate(s) you are sending to us for deposit.

ACCOUNT UPDATES:
Please write in your new address, telephone number and or email address in the available space provided. Note, all registered holders must sign their names exactly as they appear on the front of this statement.  Your request should be returned to the mailing address indicated below.

MAILING ADDRESS: 1 State Street, 30th Floor, New York, NY, 10004-1561

If you require further assistance, feel free to contact us:
PHONE: Monday through Friday, 8:00 am to 6:00pm, Eastern Time at 800-509-5586
EMAIL: CSTMail@continentalstock.com
WEBSITE: www.continentalstock.com

### About your Statement

This statement is your record of the securities being credited to your account in book entry form and may be part of the Direct Registration System, if applicable. It should be kept with your important documents as a record of your ownership of these securities.

THE CORPORATION WILL FURNISH TO ANY SHAREHOLDERS UPON REQUEST AND WITHOUT CHARGE, A FULL STATEMENT OF THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF THE SHARES OF EACH CLASS OF SECURITIES, IF MORE THAN ONE, AUTHORIZED TO BE ISSUED AND THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF EACH SERIES OF ANY CLASS OF PREFERRED HOLDINGS AUTHORIZED TO BE ISSUED SO FAR AS THE SAME HAVE BEEN FIXED AND THE AUTHORITY OF THE BOARD OF DIRECTORS TO DESIGNATE AND FIX THE RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF OTHER SERIES.
There may be rights, privileges, restrictions and conditions attached to the securities covered by this statement.  A full copy of the text of any rights, privileges, restrictions and conditions can be obtained by contacting Continental Stock Transfer & Trust Company at 800-509-5586  or cstmail@continentalstock.com.

### Transactions Through Your Broker/Dealer

You would initiate the transaction with your broker/dealer who may instruct Continental Stock Transfer & Trust Company ("CST") to deliver your holdings on your behalf.

The Direct Registration System ("DRS"), if applicable, allows you to authorize your broker/dealer to send an electronic instruction to CST to debit holdings from your DRS position and deliver them electronically to your account with your broker/dealer. To effect such transactions your broker/dealer will need to include the following information which will need to match the information within the account held with CST:

- CST ACCOUNT NUMBER - which should be a total of ten digits. If your account number is less than ten digits, please add leading zeros. This ONLY applies to moving your shares to a Broker.
- SOCIAL SECURITY or TAXPAYER IDENTIFICATION NUMBER
- the NAME of your CST ACCOUNT
- the NUMBER of DRS shares to be delivered

CST will honor such requests from any broker/dealer participating in the Diredt Registration System. While a broker/dealer should have your authorization to debit holdings from your CST account, CST will have no way of verifying if you actually authorized the transaction since the instruction is coming directly from the broker/dealer.

**Account Alpha ID:** FORTRESS

**Account No.:**

## Restriction Code Definitions

*Attention: if your Direct Registration/Book Entry holdings are not restricted this page will not display any Restriction Code Definitions.*

CSTDRS

**Account Alpha ID:** FORTRESS

**Account No.:**

This Page Left Intentionally Blank

**mshillady@strategicclaims.net**

| | |
|---|---|
| **From:** | Sam Hensley |
| **Sent:** | Wednesday, October 9, 2024 12:44 PM |
| **To:** | Sam Hensley |
| **Subject:** | FW: ACTION REQUIRED: FIG Trade Volume Confirmation |

---

**From:** Andrew Walsh <awalsh@fortress.com>
**Sent:** Tuesday, September 3, 2024 11:22 AM
**To:** Chris Marcon <cmarcon@Battea.com>
**Cc:** Albi Skenderi <askenderi@fortress.com>
**Subject:** RE: ACTION REQUIRED: FIG Trade Volume Confirmation

[EXTERNAL EMAIL: This email was generated from outside of your organization]
The investment vehicle carve-out applies to Fortress Acquisition Sponsor, so we should still submit the claim.

Excluded from the Settlement Class are: (i) Defendants; (ii) current and former Officers and directors of the Company; (iii) members of the Immediate Family of each of Defendants; (iv) all subsidiaries and affiliates of the Company and the directors and Officers of such subsidiaries or affiliates; (v) all persons, firms, trusts, corporations, Officers, directors, and any other individual or entity in which any of Defendants has a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of all such excluded parties; *provided, however*, that any Investment Vehicle shall not be excluded from the Settlement Class.

a) "Investment Vehicle" means any investment company, separately managed account, or pooled investment fund, including, but not limited to, mutual funds, exchange traded funds, funds of funds, hedge funds, and employee benefit plans, in which any Defendant has or may have a direct or indirect interest, or as to which that Defendant or its affiliates may act as an investment advisor or manager, but in which any Defendant alone or together with his, her, or its respective affiliates is not a majority owner or does not hold a majority beneficial interest.

---

**From:** Chris Marcon <cmarcon@Battea.com>
**Sent:** Thursday, August 22, 2024 2:50 PM
**To:** Andrew Walsh <awalsh@fortress.com>
**Cc:** Albi Skenderi <askenderi@fortress.com>
**Subject:** RE: ACTION REQUIRED: FIG Trade Volume Confirmation

So further analysis from our side:

The Stipulation and Agreement of Settlement (below) refers to the "above-captioned actions" which includes the federal and state cases on Page 4-7 of the Stipulation and Agreement and then goes on to define the plaintiffs and defendants of the "actions". Below, is the Exclusion language as well as the Defendant definition and additional backup linking all the defendants to the settlement. The analysts believe the Fortress Fund is excluded from the settlement.

1

**STIPULATION AND AGREEMENT OF SETTLEMENT**

This Stipulation and Agreement of Settlement, dated as of May 13, 2024 (the "Stipulation"), which embodies the terms and conditions of the settlement of the putative class (direct) claims in the above-captioned actions (collectively, the "Actions"), is entered into between (a) Lead Plaintiffs Phoenix Insurance Company Ltd. and The Phoenix Pension & Provident Funds ("Lead Plaintiffs"), and Consolidated Plaintiff City of Melbourne Firefighters' Retirement System (together with Lead Plaintiffs, the "Securities Plaintiffs"); (b) Plaintiffs Vinay Kumar, Ziyang Nie, Julia Chang, and Brendan Reginbald (collectively, the "*Ghaith* Plaintiffs"); (c) Plaintiff Wendell Robinson; (d) Plaintiff Phillip Goldstein (together with the Securities Plaintiffs, the *Ghaith* Plaintiffs, and Plaintiff Wendell Robinson, "Plaintiffs"), on behalf of themselves and the Settlement Class (defined below); and (e) Defendants ATI Physical Therapy, Inc. ("ATI" or the "Company") f/k/a Fortress Value Acquisition Corp. II ("FVAC"), Labeed Diab, Joseph Jordan, Andrew A. McKnight, Joshua A. Pack, Marc Furstein, Leslee Cowen, Aaron F. Hood, Carmen A. Policy, Rakefet Russak-Aminoach, Sunil Gulati, John L. Larsen, John Maldonado, Carmine Petrone, Joanne M. Burns, Christopher Krubert, James E. Parisi, Micah B. Kaplan, Cedric Coco, Ray Wahl, Daniel N. Bass, Fortress Acquisition Sponsor II LLC, and Fortress Investment Group

Excluded from the Class are Defendants:

to vote at FVAC's June 15, 2021 special meeting to vote on the Business Combination (the "Securities Subclass"); and/or (b) beneficially owned and/or held FVAC Class A common stock as of the June 11, 2021 Redemption Date who were entitled to, but did not elect to, redeem their shares (the "Multiplan Subclass"). Excluded from the Settlement Class are (i) Defendants; (ii) current and former Officers and directors of the Company; (iii) members of the Immediate Family of each of Defendants; (iv) all subsidiaries and affiliates of the Company and the directors and Officers of such subsidiaries or affiliates; (v) all persons, firms, trusts, corporations, Officers

Defendants are defined as:

1) "Defendants" means, collectively, the Securities Defendants, the *Ghaith* Defendants, the *Robinson* Defendants, and the *Goldstein* Defendants (and each individually, a "Defendant").

The Ghaith Defendants include Fortress Acquisition Sponsor II LLC

**Overview Of The *Ghaith* Action**

G.     On December 1, 2021, May 10, 2022, and September 22, 2022, respectively, Plaintiffs Hamza Ghaith, Vinay Kumar, and Brendan Reginbald filed stockholder derivative complaints on behalf of ATI, which were subsequently consolidated and styled *In re ATI Physical Therapy, Inc. S'Holder Deriv. Litig.*, No. 1-21-cv-06415 (N.D. Ill) (the "*Ghaith* Action"). On November 21, 2022, Plaintiffs Kumar, Nie, Chang, and Reginbald (collectively, the "*Ghaith* Plaintiffs") filed a consolidated amended stockholder derivative complaint against Nominal

- 7 -

STIPULATION AND AGREEMENT OF SETTLEMENT

Case: 1:21-cv-04349 Document #: 162-1 Filed: 05/13/24 Page 8 of 57 PageID #:3886

Defendant ATI and Defendants Fortress Investment Group LLC, Fortress Acquisition Sponsor II LLC, Labeed Diab, Joseph Jordan, John L. Larsen, John Maldonado, Carmine Petrone, Joanne M.

I think at this point if you believe the fund is still eligible I can elevate this to our GC & let him & your litigation counsel (or you) take it from here. Thoughts?

Thanks

3

| From: | Sam Hensley |
|---|---|
| Sent: | Wednesday, October 9, 2024 12:35 PM |
| To: | Sam Hensley |
| Subject: | FW: ACTION REQUIRED: FIG Trade Volume Confirmation |

**From:** Florencio Ortega <fortega@fortress.com>
**Sent:** Wednesday, October 2, 2024 4:37 PM
**To:** Chris Marcon <cmarcon@Battea.com>
**Subject:** RE: ACTION REQUIRED: FIG Trade Volume Confirmation

[EXTERNAL EMAIL: This email was generated from outside of your organization]
Hi Chris,

Please see the below screenshots of wire instructed to FIG for payment on the transactions mentioned below. Let me know if this works.

1

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 269 of 927 PageID #:5149

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 270 of 927 PageID #:5150

# FORTRESS CREDIT FUNDS
## FORTRESS ACQUISITION SPONSOR II LLC

**Debit**

Cash at Sponsor

Class F Common Stock

Private Placement Warrants

CT Corp Filing Fees

| +/- | ID | Mode | Originating Acct. | | Rec... |
| --- | --- | --- | --- | --- | --- |
| | | | Legal Entity | Acct. Num / Acct. Name | Legal Entity |
| ⊞ | 3361360 | SWIFT | FCOF V UB Investments L.P. | / FCOF V UB Investments L.P. | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361361 | SWIFT | FTS SIP II L.P. | / FTS SIP II L.P. - FCOF V | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361362 | SWIFT | FCO MA J5 L.P. | / FCO MA J5 L.P. Operating | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361363 | SWIFT | FCO MA V UB Securities LLC | / FCO MA V UB Securities LLC | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361364 | SWIFT | Super FCO MA III L.P. | / Super FCO MA III L.P. | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361365 | SWIFT | FCO MA Centre Street II (ER) LP | / FCO MA Centre Street II (ER) | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361366 | SWIFT | FCO MA Centre Street II (PF) LP | / FCO MA Centre Street II (PF) | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361367 | SWIFT | FCO MA Centre Street II (TR) LP | / FCO MA Centre Street II (TR) | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361368 | SWIFT | FCO V LSS SubCo LP | / FCO V LSS SubCo LP | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361369 | SWIFT | FCO MA MAPLE LEAF LP | / FCO MA MAPLE LEAF LP 2nd | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |
| ⊞ | 3361370 | SWIFT | FCO MA MI II L.P. | / FCO MA MI II L.P. Operating | Principal Holdings I LP (f/k/a Fortress Principal Investment Holdings III LLC) |

3

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 272 of 927 PageID #:5152

# FORTRESS CREDIT FUNDS
## FORTRESS VALUE ACQUISITION SPONSOR II LLC

| | Debit |
|---|---|
| Subscription Shares of Fortress Value Acquisition Corp. II to be acquired by Fort[...] Sponsor II LLC | |
| Purchase Price for Subscribed Shares of Fortress Value Acquisition Corp. II | |
| | Total A[...] |

4

| +/- | ID | Mode | Originating Acct. Legal Entity | Acct. Num / Acct. Name | Legal Entity | Routing |
|---|---|---|---|---|---|---|
| + | 3354030 | SWIFT | FCOF V UB Investments L.P. | / FCOF V UB Investments L.P. | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354031 | SWIFT | FTS SIP II L.P. | / FTS SIP II L.P. - FCOF V | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354032 | SWIFT | FCO MA J5 L.P. | / FCO MA J5 L.P. Operating | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354033 | SWIFT | FCO MA V UB Securities LLC | / FCO MA V UB Securities LLC | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354034 | SWIFT | Super FCO MA III L.P. | / Super FCO MA III L.P. Operating | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354035 | SWIFT | FCO MA Centre Street II (ER) LP | / FCO MA Centre Street II (ER) LP | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354036 | SWIFT | FCO MA Centre Street II (PF) LP | / FCO MA Centre Street II (PF) LP | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354037 | SWIFT | FCO MA Centre Street II (TR) LP | / FCO MA Centre Street II (TR) LP | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354038 | SWIFT | FCO V LSS SubCo LP | / FCO V LSS SubCo LP | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354039 | SWIFT | FCO MA MAPLE LEAF LP | / FCO MA MAPLE LEAF LP 2nd Subsequent | ATI Physical Therapy. Inc. | ABA:0260-0 3 |
| + | 3354040 | SWIFT | FCO MA MI II L.P. | / FCO MA MI II L.P. Operating | ATI Physical Therapy. | ABA:0260-0 |

**Florencio Ortega**
Fortress Investment Group LLC
Fortress Credit Funds
1345 Avenue of the Americas | 26th Floor
New York, NY 10105
(212) 479-5265
fortega@fortress.com

5

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE RODNEY SQUARE

P.O. BOX 636

WILMINGTON, DELAWARE 19899-0636
————
TEL: (302) 651-3000

FAX: (302) 651-3001

www.skadden.com

FIRM/AFFILIATE OFFICES
————
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
————
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
(302) 651-3183
EMAIL ADDRESS
JENNESS.PARKER@SKADDEN.COM

February 21, 2025

**BY E-MAIL**

Chris Marcon
Battea Class Action Services
Three Harbor Landing
46 Southfield Ave., 4th Fl.
Stamford, CT 06902

<div style="text-align:center">RE:    <u>Participation in ATI Physical Therapy, Inc. Settlement</u></div>

To whom it may concern:

I write on behalf of Fortress Investment Group LLC ("Fortress") regarding the participation of Fortress Acquisition Sponsor II LLC ("FAII") in the settlement of the below-listed actions related to the de-SPAC business combination that resulted in the publicly traded company, ATI Physical Therapy, Inc. ("ATI"):

1. *Burbige, et al. v. ATI Physical Therapy, Inc. f/k/a Fortress Value Acquisition Corp. II, et al.*, No. 1:21-cv-04349 (N.D. Ill.);
2. *In re ATI Physical Therapy, Inc. Shareholder Derivative Litigation*, No. 1:21-CV-06415 (N.D. Ill);
3. *Robinson v. Fortress Acquisition Sponsor II, LLC*, C.A. No. 2023-0142-NAC (Del. Ch.); and
4. *Goldstein v. Fortress Acquisition Sponsor II, LLC*, C.A. No. 2023-0582-NAC (Del. Ch.).

Pursuant to the Stipulation and Agreement of Settlement (the "Settlement Agreement") in these matters, approved by the Honorable Edmond E. Chang on September 24, 2024, FAII is a proper member of the Settlement Class, irrespective

Chris Marcon
February 21, 2025
Page 2

of its status as a Defendant in any of the above-listed actions, because it qualifies as an Investment Vehicle. *See* Stipulation and Agreement of Settlement at Section 1.jjj, *Burbige, et al. v. ATI Physical Therapy, Inc. f/k/a Fortress Value Acquisition Corp. II, et al.*, No. 1:21-cv-04349 (N.D. Ill.) (ECF 162-1) (defining Settlement Class to exclude Defendants . . . "*provided, however*, that any Investment Vehicle shall not be excluded from the Settlement Class"). Section 1.bb of the Settlement Agreement defines an Investment Vehicle as "any investment company, separately managed account, or pooled investment fund, including, but not limited to, mutual funds, exchange traded funds, funds of funds, hedge funds, and employee benefit plans, in which any Defendant has or may have a direct or indirect interest, or as to which that Defendant or its affiliates may act as an investment advisor or manager, but in which any Defendant alone or together with his, her, or its respective affiliates is not a majority owner or does not hold a majority beneficial interest." *Id.* As the sponsor of the Special Purpose Acquisition Company that was ultimately used to bring ATI public, FAII is an investment company in which sixteen different Fortress funds or accounts hold ownership interest and no Defendant has a majority interest. Accordingly, FAII qualifies as an Investment Vehicle and a member of the Settlement Class entitled to a distribution from the Net Settlement Fund, as defined in Section 1.jj of the Settlement Agreement.

This should resolve the matter of FAII's participation in the ATI settlement. If you have any questions or wish to discuss further, please do not hesitate to contact me.

Regards,

*/s/ Jenness E. Parker*

Jenness E. Parker

cc:     David Meisels

 Josephine Bravata &lt;jbravata@strategicclaims.net&gt;

## ATI Class Actions Settlement - Claim 50006 Determination

**Josephine Bravata** &lt;jbravata@strategicclaims.net&gt;                    Fri, Feb 28, 2025 at 11:00 AM
To: jenness.parker@skadden.com
Cc: Jadranka Bibic &lt;jbibic@battea.com&gt;, Christie Cellini &lt;CCELLINI@battea.com&gt;, James Facciolla &lt;jfacciolla@strategicclaims.net&gt;

Good morning,

Attached is the claim determination letter.

Regards,


Josephine Bravata

Director of Quality Assurance

Strategic Claims Services, Inc.

600 N. Jackson Street, Suite 205

Media, PA 19063

Phone: (610) 565-9202 ext. 1002

Fax: (610) 565-7985


*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*



**50006 - Claim Determination.pdf**
88K

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street, Suite 205
Media, PA 19063

Phone: (866) 274-4004
Fax: (610) 565-7985
Email: info@strategicclaims.net
Website: www.strategicclaims.net/ati

February 28, 2025

Claim # 50006
Battea Class Action Services LLC FBO
Fortress Acquisition Sponsor II LLC - FIG LLC
46 Southfield Avenue, Suite 450
Stamford, CT 06902

Re: ATI Class Actions Settlement – Account # FIG-FED-102140

To Whom It May Concern:

We received your letter dated February 21, 2025.

SCS has reviewed and discussed this claim with Lead Counsel.

The determination of Claim 50006 is ineligible as an excluded party.

The claimant, Fortress Acquisition Sponsor II LLC does not qualify for the Investment Vehicle exception, because, under the terms of the May 13, 2024 Stipulation and Agreement of Settlement ("Stipulation"), an entity is not an Investment Vehicle as it is defined if a Defendant alone or with its affiliates is the majority owner of the entity. Stipulation ¶ 1(bb). Fortress Acquisition Sponsor II LLC is clearly the majority owner of itself; therefore, it does not qualify.

If you disagree with the above determination, please respond to this notice no later than twenty (20) days from the date of this notice to my attention. Please be sure to include the claim number, reason for contesting our determination, as well as documentation supporting your reason.

Regards,

Josephine Bravata
Director of Quality Assurance
Strategic Claims Services

cc: Skadden, Arps, Slate, Meagher & Flom LLP
    Attn: Jenness E. Parker
    One Rodney Square
    PO Box 636
    Wilmington, DE 19899

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE RODNEY SQUARE

P.O. BOX 636

WILMINGTON, DELAWARE 19899-0636

————

TEL: (302) 651-3000

FAX: (302) 651-3001

www.skadden.com

FIRM/AFFILIATE OFFICES

————

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.

————

ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
(302) 651-3183
EMAIL ADDRESS
JENNESS.PARKER@SKADDEN.COM

March 8, 2025

**BY E-MAIL**

Josephine Bravata
ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street, Suite 205
Media, PA 19063
Email: info@strategicclaims.net

RE:  ATI Class Actions Settlement – Claim 50006

Dear Ms. Bravata:

I write to contest the determination of Claim 50006, that Fortress Acquisition Sponsor II LLC ("FAII") is ineligible for participation in the ATI Class Action Settlement as an excluded party. Contrary to the assertion in the February 28, 2025 determination letter, "a Defendant alone or with its affiliates" is not the majority owner of FAII. Instead, FAII is a fund owned by advisory clients of Fortress Investment Group LLC ("Fortress") and/or its affiliates, all of whom are listed in the chart below. Further, Fortress, FAII, and/or their affiliates do not own a majority interest of the funds that own FAII.

| Investors | Global Own % |
|---|---|
| DBSO TRG Fund (A) L.P. | 2.32674% |
| Drawbridge Special Opportunities Fund LP | 15.53073% |
| Drawbridge Special Opportunities Fund Ltd. | 8.19317% |
| FCO MA Centre Street II (ER) LP | 1.68488% |
| FCO MA Centre Street II (PF) LP | 1.44419% |

Josephine Bravata
March 8, 2025
Page 2

| Investors | Global Own % |
|---|---|
| FCO MA Centre Street II (TR) LP | 1.68488% |
| FCO MA J5 L.P. | 1.16337% |
| FCO MA MAPLE LEAF LP | 6.98023% |
| FCO MA MI II L.P. | 2.32674% |
| FCO MA V UB Securities LLC | 2.40698% |
| FCO V LSS SubCo LP | 1.16337% |
| FCOF V UB Investments L.P. | 45.25075% |
| Fortress Vintage Securities Fund L.P. | 4.07180% |
| FTS SIP II L.P. | 3.44542% |
| Super FCO MA III L.P. | 2.32674% |
| **Total** | 100.00000% |

Accordingly, FAII qualifies as an Investment Vehicle under Section 1.jjj of the May 13, 2024 Stipulation and Agreement of Settlement and is, therefore, a proper participant in the ATI Class Action Settlement.

I am available to discuss if you have any questions.

Regards,

Jenness E. Parker

cc:     David Meisels

**EXHIBIT H**

565                                                                ATI

## Claimant Information

Dakota Holdco LLC

Phone:
Phone:
Email:
SSN/TaxID:
Date Submitted: 2024-06-24 14:56:43
SubmissionTieBack: XJ82RE9

## Transaction Information

Beginning Balance: 0

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |
| 6/17/2021 | 3038197 | 30381970 | | | |
| 10/20/2021 | 0 | 0 90-Day | | | |

Ending Balance: 78

Beginning Balance: [BegBalance1]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance1]

Beginning Balance: [BegBalance2]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance2]

Beginning Balance: [BegBalance3]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance3]

## Documentation List

134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\06\2021.06.30-Continental-Stock-Transfer-_-Trust.pdf
134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\06\Instruction-Letter-and-Stock-Power-Signed-by-Greg.pdf
134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\06\Dakota-Holdco-Fidelity-Statement.pdf



| Shareholder of: | F508COMA |
|---|---|
| **ATI PHYSICAL THERAPY** | |

**Account Number:**

**Statement Date:** 06/30/2021
**CUSIP:** 00216W109
**Symbol:** ATIP

**Save this Statement for Tax Purposes**

DAKOTA HOLDCO LLC
C/O ROBERT MCKENZIE

*Special Investor Message:*

**Telephone: 866-509-5586**
**Email: cstmail@continentalstock.com**



## Account Summary

| FOR PERIOD ENDING | TOTAL DIVIDENDS RECEIVED DURING YEAR | CERTIFICATED BALANCE |
|---|---|---|
| 06/30/2021 | $0.00 | 0.0000 |
| **BOOK BALANCE** | **TOTAL PLAN BALANCE** | **TOTAL SHARES END OF PERIOD** |
| 3,038,197.0000 | 0.0000 | 3,038,197.0000 |

| Price per Share as of Statement Date: | $9.5100 | Account Value: | $28,893,253.47 |
|---|---|---|---|

## Transaction History

*BALANCE FORWARD*          *0.00000*

| DATE | TRANSACTION | SHARES IN/SHARES OUT | SHARE BALANCE |
|---|---|---|---|
| 06/23/21 | RSTR TRANSFER SECURITIES | 3,038,197 | 3,038,197 |

## Cost Basis Information

| ACQUISITION DATE | LOT SHARES | LOT COST | FAIR MARKET VALUE | CERTIFICATE NUMBER |
|---|---|---|---|---|
| | 3,038,197 | 0.00 | | |

**Address Change (including city, state and ZIP code)**
(Please Print)

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
866-509-5586 | cstmail@continentalstock.com

*New Address:*

_____

_____

_____

Daytime Telephone Number: _____

Signature: _____ Date: _____

Signature: _____ Date: _____

**All registered owners must sign.**

**DAKOTA HOLDCO LLC**
**C/O ROBERT MCKENZIE**

| Shareholder of: |
|---|
| **ATI PHYSICAL THERAPY** |

**Account Number:**

| **CUSIP:** | 00216W109 |
|---|---|
| **Symbol:** | ATIP |

**Telephone: 212-509-4000**
**Email: cstmail@continentalstock.com**

## Direct Registration System

The company for which you own stock in may participate in the Direct Registration System (DRS), which allows for electronic movement of your book entry shares between your broker account and your account with Continental Stock Transfer & Trust Company, ("CST"). For information on electronically moving your shares, please contact your broker to initiate the transfer. To initiate electronic transfer, your broker will need to provide the information listed to the right of this paragraph.

1) your CST account number shown on the front of this statement;
2) your Social Security or taxpayer identification number;
3) the registered name(s) on your account exactly as they appear on this statement; and;
4) the number of shares to be delivered.

*CST will honor such requests from any broker participating in the DRS. While a broker should have your authorization to move shares from your CST shareholder account, CST will have no way of stopping the transaction since the instruction is coming directly from the broker.*

## Definitions

### ACCOUNT SUMMARY:

| | |
|---|---|
| **For Period Ending -** | Ending date of data capture for the statement. |
| **Total Dividends Received During Year -** | Lists cumulative dividend payment information up to the period ending date. |
| **Certificated Balance -** | Lists the total number of shares represented by physical stock certificates that have been issued and are in your possession. |
| **Book Balance -** | Lists the total number of book-entry/DRS shares held for you in your account at CST. |
| **Total Plan Balance -** | Lists the total number of shares held in your Dividend Reinvestment/Direct Stock Purchase/Employee Stock Purchase or other Plan that may be offered by the issuer of the stock you own to which you are enrolled. |
| **Total Shares End of Period -** | Lists the overall total number of shares you hold for the period ending date. |

### TRANSACTION HISTORY:

| | |
|---|---|
| **Balance Forward -** | Lists the starting balance of shares for the statement period. |
| **Date -** | Transaction date. |
| **Transaction -** | Description of transaction. |
| **Shares In/Shares Out -** | Lists the number of shares for the transaction. |
| **Share Balance -** | Lists the running/cumulative share balance as each transaction is processed. |

### COST BASIS INFORMATION:

| | |
|---|---|
| **Acquisition Date -** | Date the shares were acquired, if available. |
| **Lot Shares -** | Lists shares specific to the cost basis, if available. |
| **Lot Cost -** | Lists the cost of the shares in the lot, if available. |
| **Fair Market Value -** | Lists the Fair Market Value at the time the shares were acquired, if available. |

**SHSTMNT**

| FIDELITY PRIVATE CLIENT GROUP®

FIDELITY ACCOUNT DAKOTA HOLDCO LLC
► **Account Number:**

Envelope # BLZHNPBBBPMBK

DAKOTA HOLDCO LLC

**Your Account Value:** **$256.48**

**Change from Last Period:** ▲ $246.48

| | This Period | Year-to-Date |
|---|---|---|
| **Beginning Account Value** | **$10.00** | **$10.00** |
| Additions | 244.92 | 244.92 |
| Change in Investment Value * | 1.56 | 1.56 |
| **Ending Account Value ** | **$256.48** | **$256.48** |

\*     *Reflects appreciation or depreciation of your holdings due to price changes, transactions from Other Activity In or Out and Multi-currency transactions, plus any distribution and income earned during the statement period.*

\*\*    *Excludes unpriced securities.*

## Contact Information

| | |
|---|---|
| Online | Fidelity.com |
| FAST®-Automated Telephone | (800) 544-5555 |
| Private Client Group | (800) 544-5704 |

*Brokerage services provided by Fidelity Brokerage Services LLC (FBS), Member NYSE, SIPC (800) 544-6666. Brokerage accounts carried by National Financial Services LLC (NFS), Member NYSE, SIPC.*

H02381629920220131

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 284 of 927 PageID #:5184

# Account Summary

**Account #**
**DAKOTA HOLDCO LLC - LIMITED LIABILITY CO**

Account Value: $256.48

Change in Account Value ▲ $246.48

|  | This Period | Year-to-Date |
|---|---|---|
| **Beginning Account Value** | **$10.00** | **$10.00** |
| **Additions** | **244.92** | **244.92** |
| Securities Transferred In | 244.92 | 244.92 |
| **Change in Investment Value *** | **1.56** | **1.56** |
| **Ending Account Value** | **$256.48** | **$256.48** |

Total Account Trades Feb 2021 - Jan 2022: 0

*  *Reflects appreciation or depreciation of your holdings due to price changes, transactions from Other Activity In or Out and Multi-currency transactions, plus any distribution and income earned during the statement period.*

## Account Holdings

4% Core Account ($10)

96% Stocks ($246)

### Top Holdings

| Description | Value | Percent of Account |
|---|---|---|
| Ati Physical Therapy INC Com Cl A | $246 | 96% |
| Fidelity Government Money Market | 10 | 4 |
| **Total** | **$256** | **100%** |

*Please note that, due to rounding, percentages may not add to 100%.*

# Holdings

## Core Account

| Description | Beginning Market Value Jan 1, 2022 | Quantity Jan 31, 2022 | Price Per Unit Jan 31, 2022 | Ending Market Value Jan 31, 2022 | Total Cost Basis | Unrealized Gain/Loss Jan 31, 2022 | EAI ($) / EY (%) |
|---|---|---|---|---|---|---|---|
| **FIDELITY GOVERNMENT MONEY MARKET**  (SPAXX)<br>-- 7-day yield:  0.01% | $10.00 | 10.000 | $1.0000 | $10.00 | not applicable | not applicable | -<br>- |
| **Total Core Account (4% of account holdings)** | **$10.00** |  |  | **$10.00** |  |  | - |

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 285 of 927 PageID #:5185

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 286 of 927 PageID #:3186

# Holdings

**Account #**
**DAKOTA HOLDCO LLC - LIMITED LIABILITY CO**

## Stocks

| Description | Beginning Market Value Jan 1, 2022 | Quantity Jan 31, 2022 | Price Per Unit Jan 31, 2022 | Ending Market Value Jan 31, 2022 | Total Cost Basis | Unrealized Gain/Loss Jan 31, 2022 | EAI ($) / EY (%) |
|---|---|---|---|---|---|---|---|
| **Common Stock** | | | | | | | |
| **ATI PHYSICAL THERAPY INC COM CL A** (ATIP) | unavailable | 78.000 | $3.1600 | $246.48 | unknown | unknown | - - |
| Total Common Stock (96% of account holdings) | unavailable | | | $246.48 | | | - |
| **Total Stocks (96% of account holdings)** | **unavailable** | | | **$246.48** | | | **-** |
| **Total Holdings** | | | | **$256.48** | **$0.00** | **$0.00** | **$0.00** |

*All positions held in cash account unless indicated otherwise.*

*Total Cost Basis does not include the cost basis on core, money market or other positions where cost basis is unknown or not applicable.*

# Activity

## Securities Transferred In

| Settlement Date | Security Name | Symbol/ CUSIP | Description | Quantity | Price | Amount |
|---|---|---|---|---|---|---|
| 01/26 | **ATI PHYSICAL THERAPY INC COM CL A** VALUE OF TRANSACTION $244.92 | 00216W109 | Received From You | 78.000 | $3.1400 | - |
| **Total Securities Transferred In** | | | | | | **-** |

# Additional Information and Endnotes

**Account #**
**DAKOTA HOLDCO LLC - LIMITED LIABILITY CO**

► Electronic Funds Transfer Notice: The following notice is required by the Bureau of Consumer Financial Protection's Regulation E and applies to electronic funds transfers (EFTs) made by consumers. However, it doesn't apply to all EFTs. Generally, EFTs in nonretirement accounts, aside from those made for the purchase or sale of securities, are subject to Regulation E (each a "Covered Transfer").

Error Resolution: In the case of errors or questions about a Covered Transfer, promptly call or write Fidelity using the contact information listed below. You must call or write Fidelity if you think that your statement is wrong or if you need more information about a Covered Transfer on the statement. Fidelity must hear from you no later than 60 days after Fidelity sent the FIRST statement on which the problem or error appeared. You will need to tell Fidelity your name and account number, describe the error or Covered Transfer that you are unsure about, explain as clearly as you can why you believe that it is an error or why you need more information, and tell Fidelity the dollar amount of the suspected error.

If you notify Fidelity orally, Fidelity may require that you send your complaint or question in writing within 10 business days. Fidelity will tell you the results of its investigation within 10 business days of hearing from you and will correct any error promptly. If Fidelity needs more time, however, it may take up to 45 days to investigate your complaint or question. If Fidelity decides to do this, it will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes Fidelity to complete its investigation. If Fidelity asks you to put your request or question in writing and doesn't receive it within 10 business days, or if your account is a brokerage account subject to Regulation T of the Board of Governors of the Federal Reserve System (Credit by Brokers and Dealers, 12 CFR 220), Fidelity may not credit your account.

For questions involving new accounts, or point-of-sale or foreign-initiated transactions, Fidelity may take up to 90 days to investigate your complaint or question. For new accounts, Fidelity may take up to 20 days to credit your account for the amount you think is in error. Fidelity will inform you of the results of its investigation within three business days of its completion. If Fidelity decides that there was no error, Fidelity will send you a written explanation. You may ask for copies of the documents that Fidelity used in the investigation.

Contact Information: You can contact Fidelity by mail at Fidelity Investments, PO Box 770001, Cincinnati, OH, 45277-0002, or by phone at 800-544-6666. 707063.2.0

For more information about your statement, please refer to our **Frequently Asked Questions** document at **Fidelity.com/statements** .

## Information About Your Fidelity Statement

TDD Service for the Hearing-Impaired Call 800-544-0118, 9 am - 9 pm ET, 7 days a week.
**Lost or Stolen Cards** For 24-Hour worldwide customer service, call 800-529-2164 for American Express or 800-323-5353 for Fidelity® Debit Card.
**Additional Investments with Fidelity** Make checks payable to Fidelity Investments. Include your account number on the check. For retirement and health savings accounts (HSA), designate in the memo field whether your contribution is for the current or prior year. Mail checks or other inquiries to: Fidelity Investments, P.O. Box 770001, Cincinnati, OH 45277-0003.
**Income Summary** Shows income by tax status for the statement and year-to-date periods. Except for interest income earned on, or distributed by, tax-exempt securities, Fidelity reports dividends and capital gains held in taxable accounts as taxable income. A portion of income reported as tax-exempt income may be subject to alternative minimum taxes and/or state and local taxes. In Traditional IRAs, Rollover IRAs, SEP-IRAs, SIMPLE IRAs and Keoghs, earnings are reported as tax-deferred income. In Roth IRAs and HSAs, earnings are reported as tax-exempt income as they may be federally tax-exempt if certain conditions are met.
**Cost Basis, Gain/Loss, and Holding Period Information** NFS is required to report certain cost basis and holding period information to the IRS on Form 1099-B. Unless otherwise specified, NFS applies the average cost method for open-end mutual funds and the first-in, first-out (FIFO) method for all other securities. Cost basis is adjusted for wash sales on securities with the same CUSIP held in the same account (unless your account receives mark-to-market reporting). Your statement may not reflect all adjustments required for tax purposes. Customers should consult their tax advisors for further information.
**Cost** Fidelity provides purchase cost information for securities held in retirement and HSA accounts. Such information may be adjusted for certain transactions and does not reflect dividends or capital gains reinvestments. Fidelity reports transaction profit or loss information when securities are sold within a retirement or HSA account. Transaction profit or loss is calculated by subtracting purchase cost from sales proceeds

using the FIFO method if shares were purchased at different times or prices. **Statement Mailing** We deliver statements at least four times during the calendar year for any account with a balance.
**Statement Discrepancies Please review your statement and report any inaccuracies or discrepancies. Inquiries, concerns or questions regarding your brokerage account or the activity therein should be directed to FBS by calling 800-544-6666, and NFS, who carries your brokerage accounts, by calling 866-408-1138.** Any oral communications regarding inaccuracies or discrepancies should be reconfirmed in writing to protect your rights, including those under the Securities Investor Protection Act (SIPA).
**Material Changes** Please advise us of material changes in your investment objectives or financial situation related to your brokerage account(s).
**Mutual Funds and Performance  Before investing, consider the funds' investment objectives, risks, charges and expenses. Contact Fidelity for a prospectus containing this information. Read it carefully. Performance data shown represents past performance and is no guarantee of future results. Investment return and principal value will fluctuate, so you may have a gain or loss when shares are sold. Current performance may be higher or lower than that quoted. Visit Fidelity.com/performance for most recent month-end performance.**
**Sales Loads & Fees** Each fund reserves the right to terminate or modify its exchange privilege in the future. In connection with (i) access to, purchase or redemption of, and/or maintenance of positions in mutual funds and other investment products such as alternative investments or private placements ("funds") or (ii) infrastructure needed to support such funds, some funds, or their investment affiliates, pay FBS and/or NFS sales loads and 12b-1 fees described in the Offering Materials as well as additional compensation for shareholder services, start-up fees, infrastructure support and maintenance, and marketing, engagement and analytics programs. Additional information about the source(s) and amount(s) of compensation as well as other remuneration received by FBS or NFS will be furnished to you upon written request. At the time you purchase shares of funds those shares will be assigned either a load, transaction fee (TF) or no transaction fee (NTF) status. When you subsequently sell those shares, any fees applicable to your transaction will be assessed based on the status assigned to the shares at the time of purchase.

## Additional Information About Your Brokerage Account, If Applicable

**Free credit balances (FCB)** are funds payable to you on demand. FCB are subject to open commitments such as uncleared checks and exclude proceeds from sales of certificated securities without delivery of the certificate. If your FCB is swept to a core position, you can liquidate the core position and have the proceeds sent to you or held in your account subject to the terms of your account agreement. Required rule 10b-10(a) information not contained herein will be provided on written request. Fidelity may use this free credit balance in connection with its business, subject to applicable law. **Assets Separate from Your Brokerage Account** Only securities in the margin portion of your brokerage account contribute to margin and maintenance requirements. Other Assets, which may be reported on your statement, including insurance products that are distributed by FBS and Fidelity Insurance Agency, Inc. and mutual fund only accounts held directly with the fund (Fidelity Mutual Fund Accounts) are not carried by NFS, not covered by the Securities Investor Protection Corporation (SIPC) and do not count toward your margin and maintenance requirements. Assets held in brokerage accounts managed by Fidelity Personal and Workplace Advisors LLC (FPWA) are carried by NFS and covered by SIPC but do not contribute to your margin and maintenance requirements. **Short Account Balances** Securities sold short are held in a segregated short account. These securities are marked-to-market for margin purposes, and any increase or decrease from the previous week's value is transferred weekly to your margin account. Fidelity represents your short account balance as of the last weekly mark-to-market, not as of the statement end date. **Information About Your Option Transactions** Each transaction confirmation previously delivered to you contains full information about commissions and other charges, and such information is available promptly upon request. Assignments of American and European-style options are allocated among customer short positions pursuant to a random allocation procedure, a description is available upon request. Short positions in American-style options are liable for assignment anytime. The writer of a European-style option is subject to exercise assignment only during the exercise period. For more information, please call Fidelity at 800-544-6666. **Equity Dividend Reinvestment** Shares credited to your account resulted from transactions by FBS acting as agent for your account, or the Depository Trust Company (DTC). **Price Information/Total Market Value** The Total Market Value has been calculated out to 9 decimal places; however, the individual unit price is displayed in 5 decimal places. The Total Market Value represents prices obtained from various sources, may be impacted by the frequency with which such prices are reported and such prices are not guaranteed. Prices received from pricing vendors are generally based on current market quotes, but when such quotes are not available the pricing vendors use a variety of techniques to estimate value. These estimates, particularly for fixed income securities, may be based on certain minimum principal amounts (e.g. $1 million) and may not reflect all of the factors that affect the value of the security, including liquidity risk. The prices provided are not firm bids or offers. Certain securities may reflect N/A or unavailable where the price for such security is generally not available from a pricing source. The Market Value of a security, including those priced at par value, may differ from its purchase price and may not closely reflect the value at which the security may be sold or purchased based on various market factors. The sale or redemption of any fixed income security prior to maturity may result in a loss. Prices for Certificates of Deposits (CDs) on your statement are generally estimates and are not based on actual market prices. The secondary market for CDs is generally illiquid. You should always request a current valuation for your securities prior to making a financial decision or placing an order.

**Executing Orders on the Floor of the NYSE** The Floor broker may permit the Designated Market Maker to trade on parity with the order for some or all of the executions associated with filling that order, where such permission would not be inconsistent with the broker's best execution obligations.
**SIPC** Securities in accounts carried by NFS, a Fidelity Investments company, are protected in accordance with the SIPC up to $500,000 (including cash claims limited to $250,000). For details, including the SIPC brochure, please see www.sipc.org or call 1-202-371-8300. NFS has arranged for additional protection for cash and covered securities to supplement its SIPC coverage. Neither coverage protects against a decline in the market value of securities.
**Fidelity Investments** Fidelity Distributors Company LLC (FDC) is the distributor for Fidelity Funds with marketing and shareholder services provided by FBS or NFS. **Brokerage services are provided by FBS, which clears all transactions through its affiliate, NFS. NFS carries all brokerage accounts. FBS and NFS are members of the NYSE and SIPC.** Upon written request, Fidelity will mail an NFS financial statement, which is also available for inspection at its office. Fidelity Investments (with pyramid logo) is a trademark of FMR LLC.
**FPWA Services** Fidelity Go®, Fidelity® Personalized Planning & Advice and Fidelity® Strategic Disciplines are advisory services offered by FPWA, a registered investment adviser. Fidelity® Strategic Disciplines includes the Breckinridge Intermediate Municipal Strategy, the Fidelity® Equity-Income Strategy, the Fidelity® Tax-Managed U.S. Equity Index Strategy, the Fidelity® U.S. Large Cap Equity Strategy,  the Fidelity® International Equity Strategy, the Fidelity® Tax-Managed International Equity Index Strategy, the Fidelity® Intermediate Municipal Strategy and the Fidelity® Core Bond Strategy. Fidelity® Wealth Services are advisory services offered by FPWA or Fidelity Personal Trust Company, FSB (FPTC), a federal savings bank. Nondeposit investment products and trust services offered by FPTC and its affiliates are not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency, are not obligations of any bank, and are subject to risk, including possible loss of principal. **These advisory services are provided for a fee.** FBS, NFS, FDC, FPWA and FPTC are direct or indirect subsidiaries of FMR LLC.
**Ratings Information from Standard & Poors ("S&P")** may not be reproduced. S&P credit ratings are statements of opinion and are not statements of fact or recommendations to purchase, hold, or sell securities, nor do they address the suitability of securities for investment purposes, and should not be relied on as investment advice. S&P does not guarantee the accuracy, completeness, timeliness or availability of any information, including ratings, and is not responsible for errors or omissions (negligent or otherwise). S&P gives no express or implied warranties, including but not limited to any warranties of merchantability or fitness for a particular purpose or use. S&P shall not be liable for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including lost income or profits and opportunity costs) in connection with any use of ratings.
**Miscellaneous** Mutual fund shares, other securities held in your account, and insurance products are neither deposits nor obligations of, nor endorsed or guaranteed by, any bank or other depositing institution, nor are they federally insured by the FDIC or any other agency. If you request a reprint of your statement, the disclosure information may not be the same as the information originally provided. To confirm that an authorized, direct deposit has been made to your Fidelity Account or Fidelity Mutual Fund Account, call Fidelity at 1-800-544-5555.

588130.45.0

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 288 of 927 PageID #:5188

This page intentionally left blank



**Dakota Holdco, LLC**

**Sent via email to:**    mincorvaia@continentalstock.com    **and**
                         **compliance@continentalstock.com**

November 30, 2021

Michael Incorvaia
Account Administrator
Continental Stock Transfer & Trust Company
One State Street, 30th Floor
New York, NY 10004-1561
U. S. A.

Re:    Instruction Letter for Transfer of Common Stock of ATI Physical Therapy, Inc.

Dear: Michael Incorvaia,

With this instruction letter, you are hereby authorized and directed to:

A.  Transfer 3,038,119 shares of common stock, par value $0.0001 per share (the "Common Stock"), of ATI Physical Therapy, Inc. (the "Company") in book entry form from the account of Dakota Holdco, LLC (Acct #: 12) to the entities or persons listed on Schedule A hereto, in accordance with the instructions set forth in Item B below. The shares to be transferred are being distributed in accordance with an effective Registration Statement (File No. 333-257801) and have been registered, and are validly issued, fully paid and non-assessable.

B.  The shares of Common Stock transferred pursuant to Schedule A are subject to certain lock-up restrictions. You are instructed to (i) place appropriate stop transfer instructions on all such shares of Common Stock and (ii) place the legends set forth below on all such shares of Common Stock:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO LOCKUP PROVISIONS AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED DURING THE TERM OF THE LOCKUP."

We will request the Company's counsel at Weil, Gotshal & Manges LLP to provide the appropriate opinion letter for the issuance of these shares.

[*Signature page follows*]

WEIL:\98271628\1\18434.0005

**Dakota Holdco, LLC**


By: _____
    Name: Gregory F. Steil
    Title: Manager and Vice President


[Signature page to Instruction Letter]

WEIL:\98271628\1\18434.0005

## Schedule A
(See attached Master Distload for additional details)

| | Name | No. of Shares |
|---|---|---|
| 1 | The Gregory F. Steil Descendants Trust dated November 1, 2005 | 210,764.00 |
| 2 | Willowbrook Holdings Inc. | 106,650.00 |
| 3 | Greg Steil | 573,916.00 |
| 4 | Bates Enterprises, LLC | 42,857.00 |
| 5 | Dylan Bates | 388,588.00 |
| 6 | Bates Investment, LLC | 376,544.00 |
| 7 | Jason VanDenEeden | 59,354.00 |
| 8 | Ralph Franceschini | 24,897.00 |
| 9 | Francis J. Kosinski | 14,942.00 |
| 10 | Paul Schweizer | 11,279.00 |
| 11 | Matthew Kruger | 12,531.00 |
| 12 | Kathy Callaway | 12,553.00 |
| 13 | Brent Mack | 71,939.00 |
| 14 | Jason Hafner | 59,360.00 |
| 15 | Christopher Orr | 18,125.00 |
| 16 | Lisa Gutierrez | 22,626.00 |
| 17 | Chris Noga | 11,397.00 |
| 18 | Henry Tobie | 29,496.00 |
| 19 | Daniel Baughan | 10,904.00 |
| 20 | Ray Wahl | 17,193.00 |
| 21 | Jim Allivato | 4,629.00 |
| 22 | Kimberly A. Kollwelter | 13,047.00 |
| 23 | Matthew Zieba | 13,421.00 |
| 24 | Ken Findley | 3,044.00 |
| 25 | Van Huffine | 8,367.00 |
| 26 | Don Rittof | 8,449.00 |
| 27 | Steven B. Isaac | 2,755.00 |
| 28 | Lew Caldwell | 466.00 |
| 29 | Anthony Placek | 18,579.00 |
| 30 | Jeff Rogers | 14,817.00 |
| 31 | Mike VanderWoude | 354.00 |
| 32 | Derek Pequette | 7,358.00 |
| 33 | James C Brinton | 256.00 |
| 34 | Julie Roper | 9,874.00 |
| 35 | Keith Jackson | 18,677.00 |
| 36 | David Baron | 9,894.00 |
| 37 | One Worldwide Investors LLC | 221.00 |
| 38 | Don Rimbo | 3,635.00 |

WEIL:\98271628\1\18434.0005

| | | |
|---|---|---|
| 39 | Jennifer Eley | 160.00 |
| 40 | David Sulaski | 137.00 |
| 41 | Sheila Denman | 4,932.00 |
| 42 | Dennis Carter | 3,725.00 |
| 43 | Tom Wegrzyn | 64.00 |
| 44 | Cindy Griffiths | 50.00 |
| 45 | Anthony Caronia | 50.00 |
| 46 | Brian LaRue | 50.00 |
| 47 | Chris Lask | 50.00 |
| 48 | Dan Curtis | 50.00 |
| 49 | Dave Griffiths | 3,737.00 |
| 50 | Dave Pinkerton | 50.00 |
| 51 | Jason Guarneri | 3,737.00 |
| 52 | Jason Pequette | 50.00 |
| 53 | Johanna Koehler | 50.00 |
| 54 | Kerri Zabel | 3,737.00 |
| 55 | Mark Schodrof | 18,830.00 |
| 56 | Maureen Swiatek | 50.00 |
| 57 | Michael F Stanwood | 50.00 |
| 58 | Michael J Dillon | 50.00 |
| 59 | Michele Quillin | 50.00 |
| 60 | Robert P McDonnell | 50.00 |
| 61 | Scott Yacovelli | 3,737.00 |
| 62 | Thomas G Ballenger | 50.00 |
| 63 | Tom Werner | 50.00 |
| 64 | Wade Meyer | 50.00 |
| 65 | Gena Sobodas | 50.00 |
| 66 | Marie R Mullen | 36.00 |
| 67 | Fletcher Boyle | 12,579.00 |
| 68 | Robert McKenzie | 18,869.00 |
| 69 | Steven Cagney | 4,527.00 |
| 70 | Antonio Pomponi | 15,095.00 |
| 71 | Dan Benjamin | 6,289.00 |
| 72 | Daniel Greenhill | 12,579.00 |
| 73 | Lynn McGivern | 8,586.00 |
| 74 | Todd Sayer | 5,032.00 |
| 75 | Wesley Williams | 5,032.00 |
| 76 | Kathy Albright | 3,773.00 |
| 77 | Thomas Ballenger | 3,773.00 |
| 78 | Kevin Burgman | 5,032.00 |
| 79 | Laura Williams | 3,773.00 |
| 80 | Timothy Flaherty | 3,773.00 |

| | | |
|---|---|---|
| 81 | Jennifer Theisen | 3,773.00 |
| 82 | Edward Maher | 7,546.00 |
| 83 | Robert McDonnell | 3,773.00 |
| 84 | Sheila Sennett | 7,546.00 |
| 85 | Lucas Myers | 3,773.00 |
| 86 | Joseph Laws | 7,763.00 |
| 87 | Kathryn Wirth | 7,763.00 |
| 88 | Donna Welch | 9,642.00 |
| 89 | Mark Lupo | 12,053.00 |
| 90 | Nathan Bard | 12,427.00 |
| 91 | Ruben Alejandro Castillo | 6,213.00 |
| 92 | Bridget Morehouse | 4,660.00 |
| 93 | Robert Pearse | 1,256.00 |
| 94 | Jeff Piejak | 11,936.00 |
| 95 | Scott & Ashley Weaver | 9,902.00 |
| 96 | Jouni Mantyla | 7,993.00 |
| 97 | Bernie Ray | 3,556.00 |
| 98 | Jennifer Ray | 3,556.00 |
| 99 | Michelle Porter | 4,256.00 |
| 100 | Keith Krings | 3,310.00 |
| 101 | PAUL A. IAMARINO REVOCABLE TRUST, dated May 15, 2014 | 6,358.00 |
| 102 | Carol Glenn | 3,789.00 |
| 103 | Scott Smith | 4,863.00 |
| 104 | Michael Barwis | 2,154.00 |
| 105 | The Michael C. Barwis & Autumn R. Barwis Revocable Living Trust Dated June 18, 2009 | 934.00 |
| 106 | Jay Claypool | 2,316.00 |
| 107 | Dena Johnson | 1,544.00 |
| 108 | Kristin Kepsel | 1,544.00 |
| 109 | Ashlee Wines | 1,544.00 |
| 110 | Nicole Mead | 3,351.00 |
| 111 | Tiziano Marovino | 2,299.00 |
| 112 | Casey Maul | 3,088.00 |
| 113 | Alvin Miller | 2,316.00 |
| 114 | Sarah Winans | 1,544.00 |
| 115 | Beth Remke | 1,544.00 |
| 116 | Stephanie Walton | 1,544.00 |
| 117 | Ronald Warhurst | 1,544.00 |
| 118 | Bradford Skinner | 3,088.00 |
| 119 | Gary Carlson | 11,369.00 |
| 120 | Chris Maschhoff | 11,369.00 |
| 121 | Andrew Marini | 5,684.00 |

| 122 | Robert Miles | 6,690.00 |
|---|---|---|
| 123 | Bradley D. Morin | 2,977.00 |
| 124 | Total Physical Therapy, LLC | 47,188.00 |
| 125 | The Hillegass Family Trust dated July 20, 2005 | 6,035.00 |
| 126 | The Burton Wallace Johnson Revocable Trust, under Agreement dated March 31, 2010, as amended | 28,044.00 |
| 127 | Steven J. Stalzer | 28,044.00 |
| 128 | Robert A. Leonard | 4,674.00 |
| 129 | MHA Therapy, Inc. | 224,356.00 |
| 130 | Eric Fletcher | 1,794.00 |
| 131 | Gretchen Baker-Bold | 1,794.00 |
| 132 | Mark Bouma | 1,794.00 |
| 133 | Mark Looper | 3,588.00 |
| 134 | Kenneth Cole | 3,588.00 |
| 135 | J'Anna Post as Personal Representative of the Estate of Larry J. Post (Deceased) | 8,970.00 |
| 136 | J'Anna Post | 8,970.00 |
| 137 | SPTA Holdings, Inc. | 13,094.00 |
| 138 | Daniel Murray | 654.00 |
| 139 | Ian McPherson | 392.00 |
| 140 | Andrew Rizza | 392.00 |
| 141 | Paula Bresnahan Janes | 392.00 |
| 142 | MTJ Holdings, LLC | 1,964.00 |
| 143 | MOT Medical Holding Company, LLC | 19,116.00 |
| 144 | SOMA Physical Therapy, LLC | 38,233.00 |
| 145 | M.C.M. Investments, LLC | 6,372.00 |
| 146 | Chad Miltenberger | 382.00 |
| 147 | Tom Adams | 382.00 |
| 148 | Keith Fischer | 1,274.00 |
| 149 | Nicholas Papania | 1,274.00 |
| 150 | Siamack Hozhabri | 382.00 |
| 151 | Doug Lehman | 382.00 |
| 152 | Eric Shifley | 382.00 |
| 153 | James Breyer | 1,529.00 |
| 154 | Anthony Lelo | 382.00 |
| | **Total:** | **3,038,119.00** |


**CONTINENTAL**
STOCK TRANSFER & TRUST

# IRREVOCABLE STOCK POWER

(For help to complete the stock power, refer to instructions on our website – www.continentalstock.com)

For value received, I/We hereby sell, assign and transfer unto:

| ¹ Full Name of New Owner (Transferee) | ² Full Address | ³ Social Security or Tax Identification Number |
|---|---|---|
| Per Dakota Holdco, LLC Instruction Letter | | |

| ⁴ Number of **Certificated** Shares | ⁵ Number of **DRS** or **Book Entry** Shares | ⁶ Number of **Dividend Reinvestment Plan** Shares | ⁷ Total Number of Shares |
|---|---|---|---|
| | | | |

of the ⁸ [X] **Common Stock** [ ] **Preferred Stock** [ ] **Warrants** [ ] **Units** [ ] **Notes** [ ] _____ of
Other

9  ATI Physical Therapy, Inc. _____ currently registered in the name of
Name of Issuing Corporation (Issuer)

10  Dakota Holdco, LLC _____
Name of Registered Shareholder(s) corresponding to the face of the Certificate, Book, DRS or DRIP Statement

represented by **Certificate** or **Account** number(s)  _____. The
Certificate Number from Certificate or Account Number from DRS/DRIP Statements

undersigned does hereby irrevocably constitute and appoint **Continental Stock Transfer & Trust Company** as attorney to transfer said stock on the books of said company with full power of substitution in the premises.

12. [ ] Issue **physical certificate(s)** to new shareholder(s)   [X] Issue **DRS/Book Statements** reflecting book entry position to new shareholder(s)   [ ] Retain shares for safekeeping and reinvest dividends (**DRIP**)

13. **COST BASIS INFORMATION**: Check Transaction Type: [X] SALE  [ ] INHERITANCE  [ ] GIFT  [ ] OTHER

Acquisition/Transaction Date: __11/30/2021__       Price per share/FMV: _____
mm/dd/yyyy

14. __11/30/2021__
Date

15. _____
Daytime Telephone Number

_____
Signature of Registered Shareholder or Legal Representative
By: Gregory F. Steil, Manager and Vice President

_____
Signature (if Joint Owner or second Fiduciary Representative)

**IMPORTANT – READ CAREFULLY:**
The signatures to this assignment must correspond with the name as written upon the face of the certificate(s) / DRS Advice / DRP Statement in every particular without alteration or enlargement or any changes whatsoever. The signature of the person executing this stock power must be guaranteed by an Eligible Guarantor (Financial) Institution such as a Commercial Bank, Securities Broker Dealer, Credit Union or Savings Association participating in a Medallion Program approved by the Securities Transfer Association. **Please note that no other Form of signature guarantee is acceptable.**

**AFFIX MEDALLION STAMP** (must be legible)

03/2014

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street - Suite 205
Media, PA  19063

Phone (866) 274-4004
Fax (610) 565-7985

Email: info@strategicclaims.net

## NOTICE OF INELIGIBILITY

**CONTROL#:**   565

**February 27, 2025**

DAKOTA HOLDCO LLC
ROBERT MCKENZIE, MANAGER

**ACCOUNT#:**

Your claim in the above matter is ineligible for the following reason(s):

| Description: | Shares: |
| --- | --- |
| This claim was filed on behalf of an excluded party and it is not eligible. Pursuant to the Stipulation and Agreement of Settlement, excluded from the Settlement Class are (i) Defendants; (ii) current and former Officers and directors of the Company; (iii) members of the Immediate Family of each of Defendants; (iv) all subsidiaries and affiliates of the Company and the directors and Officers of such subsidiaries or affiliates; (v) all persons, firms, trusts, corporations, Officers, directors, and any other individual or entity in which any of Defendants has a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of all such excluded parties; provided, however, that any Investment Vehicle shall not be excluded from the Settlement Class. | |

**We strongly suggest you contact our office for any question or clarification you may have. It is important that you contact us before any further action is taken in the event that a processing error has occurred.**

If you feel you received this notice in error and would like to contest our determination, please contact our office in writing no later than twenty (20) calendar days after the date of this notice. Please be sure to include your Control number as noted above, your reason for contesting our determination, and documentation supporting your reason. You can also contact our office at 1-866-274-4004 or info@strategicclaims.net. If after contacting us, you still disagree, you can request in writing to Plaintiffs' Counsel to review your claim.

When calling our office, please have ready the Control Number found at the top left-hand corner of this form.

# SUPPORT CENTER
### Support Ticket System

03/06/2025 04:21:47 PM

# Ticket #524998

| | | | | |
|---|---|---|---|---|
| **Status** | Completed | | **Name** | Bob McKenzie |
| **Priority** | Normal | | **Email** | |
| **Department** | Claims Administrators | | **Phone** | |
| **Create Date** | 03/06/2025 03:48:11 PM | | **Source** | Email |

| | | | | |
|---|---|---|---|---|
| **Assigned To** | George Allen | | **Help Topic** | Claims |
| **SLA Plan** | Default SLA | | **Last Response** | 03/06/2025 04:21:38 PM |
| **Due Date** | 03/07/2025 03:48:11 PM | | **Last Message** | 03/06/2025 03:48:11 PM |

## Ticket Details

*DISPUTE*

| | |
|---|---|
| **Case:** | ATI |
| **Control Number:** | 565, 566 |

# Notice of Ineligibility / Control #'s 565 and 566

| 03/06/2025 03:48:11 PM Notice of Ineligibility / Control #'s 565 and 566 | Bob McKenzie |
|---|---|

To Whom It May Concern -

I write to follow-up on my call to Strategic Claims Services on March 6, 2025 and to contest your determination that Robert McKenzie, Control #566, and Dakota Holdco, LLC, Control #565, are ineligible to participate in the ATI Class Action Settlement.

Your agent advised me that the basis of your determination is that I previously served as the General Counsel of the Company. This is not correct.

The "Company," as defined in the Notice of (I) Pendency of Class Actions, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice"), is ATI Physical Therapy, Inc. *See*, https://www.strategicclaims.net/wp-content/uploads/2024/06/ATI-Final-Long-Notice-and-Claim-Form2.pdf. ATI Physical Therapy, Inc. was organized as Fortress Value Acquisition Corp. II and was renamed ATI Physical Therapy, Inc. after its subsidiary, FVAC Merger Corp. II merged with Wilco Holdco, Inc. in or about June 2021. *See*, https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm.

---

Ticket #524998 printed by gallen on 03/06/2025 04:21:47 PM                    Page 1

# SUPPORT CENTER
Support Ticket System

03/06/2025 04:21:47 PM

I ceased my employment with a subsidiary of Wilco Holdco, Inc., and resigned any and all roles with Wilco Holdco, Inc. and its affiliates, in 2018. I was succeeded by Diana Chafey. *See*, https://news.atipt.com/2018-09-19-Legal-Veteran-Diana-Chafey-Joins-ATI-Physical-Therapy-as-Chief-Legal-Counsel. I was never, and could never have been, an officer, director or employee of Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc. because it did not become affiliated with Wilco Holdco, Inc. until more than 30 months after my resignation from all roles with Wilco Holdco, Inc. and/or its affiliates.

In addition:

1) Neither I nor Dakota Holdco, LLC is a Defendant;
2) Neither I nor Dakota Holdco, LLC is a current or former officer or director of the Company, i.e. Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc.;
3) Neither I nor Dakota Holdco, LLC is an immediate family member of a Defendant;
4) Neither I nor Dakota Holdco, LLC is a subsidiary or affiliate of the Company, i.e. Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc., or a director or office of a subsidiary or affiliate of the Company; and
5) No Defendant had or has a controlling interest in Dakota Holdco, LLC or in me, individually.

As set forth above, Dakota Holdco, LLC and I dispute your determination that neither Dakota Holdco, LLC nor I are ineligible to participate in the ATI Class Action Settlement. Please provide your response to this dispute within fourteen (14) days.

-Robert McKenzie, individually and as the Manager of Dakota Holdco, LLC

# SUPPORT CENTER
Support Ticket System

03/06/2025 04:21:47 PM

| 03/06/2025 04:21:38 PM | George Allen |
| --- | --- |

Good afternoon,

We have received your information and will pass it on for further review.

Thank you.

--

Claims Administrator
Strategic Claims Services, Inc.
600 N. Jackson St. - Suite 205
Media PA 19063
Phone: 610-565-9202
Fax: 610-565-7985
Toll Free: 1-866-274-4004

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 301 of 927 PageID #:5181



**James Facciolla <jfacciolla@strategicclaims.net>**

---

## Re: ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents

1 message

---

**Bob McKenzie**                                                    Thu, Mar 20, 2025 at 2:13 PM
To: James Facciolla <jfacciolla@strategicclaims.net>
Cc: Claims Analyst <info@strategicclaims.net>

James -

I write to follow-up on our call of March 20, 2025 and my email of March 20, 2025.  I dispute the determination set forth in your email below regarding Robert McKenzie, Control #566, and Dakota Holdco, LLC, Control #565 and request court review.

Strategic Claims' conclusion that Dakota Holdco, LLC and I did not acquire or purchase ATI Securities and, instead, engaged in an equity conversion or continued to hold private shares of "'old' ATI" is incorrect.  As more fully set forth below, Dakota Holdco, LLC and I do not believe that we engaged in an equity conversion or made a claim related to private shares of "'old' ATI," but instead purchased or acquired Company stock.  Had this been a conversion we believe that there would have been no exchange of any prior equity interest for new equity interests, but instead, that Dakota Holdco, LLC and I would have retained our as-converted original equity interests.  That did not happen here as Dakota Holdco, LLC and I gave up our original equity interests and received new, completely different, equity interests in a completely different entity.

Strategic Claims' conclusion that Dakota Holdco, LLC and I acquired shares prior to the settlement period is also incorrect.  As more fully set forth below, Dakota Holdco, LLC and I believe that we acquired shares of the Company in or about June 2021 and that any prior equity interests were not shares of or equity interest in the Company.  We believe that since there was no conversion of shares, but instead Dakota Holdco, LLC and I gave up our original equity interests and received new, completely different, equity interests in a completely different entity, we certainly did not acquire those new equity interests prior to the settlement period.

If Strategic Claims refuses to resolve this amicably, I anticipate that Dakota Holdco, LLC and I will be forced to retain counsel and litigate this matter, which would unfortunately hold up the settlement for the entire class.

**Regarding Dakota Holdco, LLC:**

I have attached a Written Consent In Lieu of A Meeting of Stockholders of Wilco Holdco, Inc. dated February 21, 2021 confirming that prior to the Merger, Dakota Holdco, LLC was the holder of 23,179.19910431 shares of Series A-1 preferred stock of Wilco Holdco, Inc.

I also direct you to the *Amended and Restated Registration Rights Agreement* included in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/ d121614ddefm14a.htm (last visited March 20, 2025).  Dakota Holdco, LLC was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature

---

page included therewith.  The Amended and Restated Registration Rights Agreement provided that New Holders, including Dakota Holdco, LLC, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)."  The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of preferred stock of Wilco Holdco, Inc. would receive common stock of the Company:  "Each share of [Wilco Holdco, Inc.] preferred stock issued and outstanding immediately prior to the effective time will be converted into the right to receive ... (B) a number of shares of ATI Class A common stock equal in value to (i) the product of (a) (x) the Preferred Stock Adjusted Base plus (y) an aggregate accrued amount, calculated based on the Preferred Stock Adjusted Base, at the Dividend Rate (as defined in the  [Wilco Holdco, Inc.'s] current charter) from the closing date through the date that is 180 days from the closing date, multiplied by (b) 1.05, divided by (ii) the number of shares of  [Wilco Holdco, Inc.]  preferred stock outstanding as of immediately prior to the effective time."

**Thus, Dakota Holdco, LLC, in consideration of agreeing to convert certain of its rights in preferred stock of Wilco Holdco, Inc., then valued at $30,381,970 (which Dakota Holdco, LLC argues is its cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 3,038,197 shares of common stock of Company, valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders."**  See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Dakota Holdco, LLC: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

**Regarding Robert McKenzie, Individually:**

As you are aware, I submitted an individual claim related to 85,852 shares of the Company's common stock.  In or about May, 2016, I became a limited partner of Wilco Acquisition, LP and through Wilco Acquisition, LP I became a beneficial owner of 85,852 shares of the Company's common stock that were distributed to me in or about November, 2021.  *See*, the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021 which provides that "Wilco Acquisition intends to distribute such shares of Common Stock to its limited partners and general partner, each of which will be a permitted transferee under the A&R RRA and is named as a selling securityholder herein." https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

I understand that Wilco Acquisition, LP failed or refused to file a claim in this matter and, as a result, I filed my individual claim as I was the beneficial owner of the shares.  I have attached a copy of a Rollover and Contribution Agreement made effective in May, 2016 (Exhibit A redacted), reflecting my initial investment of $575,000 in Wilco Acquisition, LP.  Thus, I did not have zero basis in my interest as you assert.

I again direct you to the *Amended and Restated Registration Rights Agreement* included in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 303 of 927 PageID #:5183

d121614ddefm14a.htm (last visited March 20, 2025).  Wilco Acquisition, LP was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature page included therewith.  The Amended and Restated Registration Rights Agreement provided that New Holders, including Wilco Acquisition, LP, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)."  The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of common stock of Wilco Holdco, Inc. would receive common stock of the Company:  " Each share of [Wilco Holdco, Inc.] common stock issued and outstanding immediately prior to the effective time will be converted into the right to receive (A) a number of shares of ATI Class A common stock equal in value to (1) $1,303,000,000 <u>divided by</u> (2) the number of shares of Company common stock outstanding as of immediately prior to the effective time…"

Thus, Wilco Acquisition, LP, in consideration of agreeing to convert certain of its rights in common stock of Wilco Holdco, Inc. valued at $1,303,0000,000 (which I believe represents Wilco Acquisition, LP's cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 130,300,000 shares of common stock of Company **(of which 85,852 shares, with a cost basis of $858,520, were beneficially owned by Robert McKenzie, individually),** valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders."  See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Wilco Acquisition, LP: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

-Robert McKenzie
Individually and as Manager of Dakota Holdco, LLC

On Thu, Mar 20, 2025 at 11:59 AM James Facciolla <jfacciolla@strategicclaims.net> wrote:

Hello Robert,

Per our earlier phone call, and at request of Pomerantz LLP, I am reaching out to clarify the ineligibility letter you received from Strategic Claims Services, mailed February 27, 2025.

Our final determination is as follows.

**Your claims (see below) remain ineligible for the following reasons.**

| Claim | Name 1 | Name 2 |
|---|---|---|
| 565 | DAKOTA HOLDCO LLC | ROBERT MCKENZIE, MANAGER |
| 566 | ROBERT MCKENZIE | |

(1) Per the definition in the Stipulation of Settlement (https://www.strategicclaims.net/wp-content/uploads/2024/06/FULLY-EXECUTED-ATI-Stipulation-of-Settlement-PDF-00609416xC40C2.pdf), *"ATI Securities" means ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII.* Equity conversions, or private shares of "old" ATI do not classify as a purchase or acquisition based upon the language of the Stipulation of Settlement.

(2) Your shares were acquired prior to the Settlement Class Period, in order to participate in the Settlement, shares must have been *(a) purchased or otherwise acquired ATI Securities between February 22, 2021 and October 19,*

*2021, both dates inclusive, and/or beneficially owned and/or held FVAC common stock as of May 24, 2021 and were eligible to vote at FVAC's June 15, 2021 special meeting to vote on the Business Combination (the "Securities Subclass"); and/or (b) beneficially owned and/or held FVAC Class A common stock as of the June 11, 2021 Redemption Date who were entitled to, but did not elect to, redeem their shares (the "Multiplan Subclass").* Per the ATI IPO Filing and Prospectus, these shares were held prior to the Settlement Class Period dates making them ineligible.

If you disagree with our determination please provide us the necessary supporting documentation to allow us to amend or confirm the above. Some examples of supporting documentation could include monthly statements from your financial institution, grant or option agreements, copies of checks, wires or other payment related receipts, etc. We already have your documents from the Transfer Agent, Continental, so you do not need to resend those documents. Any additional documents should be sent directly to me.

If you feel you still have received this notice in error and would like to contest our determination, please respond to this email in writing no later than Tuesday, March 25, 2025 officially requesting for Court review. Please be sure to include your claim number as noted above, your reason for contesting our determination, and documentation supporting your reason. If we do not hear from you by the above date, we will assume you agree with our determination and close out the dispute without Court review.

Thank you,

--
James Facciolla
Institution Relations Manager
Strategic Claims Services, Inc.
600 N. Jackson Street
Suite 205
Media, PA 19063
610-565-9202 x 1013

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

---

**2 attachments**

 **ATI  Rollover and Contribution Agreement (Robert McKenzie)(executed) (2).pdf**
117K

 **Project Skyline - SH Written Consent (Dakota) (Execution Version) (2).PDF**
2084K

## ROLLOVER AND CONTRIBUTION AGREEMENT

This ROLLOVER AND CONTRIBUTION AGREEMENT (this "Agreement"), dated as of May __, 2016, is entered into by and between the undersigned (the "Investor"), and Wilco Acquisition, LP, a Delaware limited partnership ("Parent"). Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, an indirect subsidiary of the Parent, Wilco Purchaser, Inc., a Delaware corporation ("Purchaser"), has entered into that certain Stock Purchase Agreement, dated March 25, 2016 (the "Purchase Agreement"), with ATI Holdings Acquisition, Inc., a Delaware corporation (the "Company"), and ATI Physical Therapy Holdings, LLC, a Delaware limited liability company ("Seller"), pursuant to which Purchaser will acquire all of the issued and outstanding capital stock, other than certain shares of stock (i) being contributed to Parent pursuant to this Agreement and similar agreements, and (ii) being contributed to Parent's subsidiary, Wilco Holdco, Inc. ("Holdco"), in exchange for shares of preferred stock of Holdco, of the Company (the "Stock Purchase");

WHEREAS, the Investor is currently an equity holder of Seller, and immediately prior to the Closing (as defined in the Purchase Agreement), Seller shall distribute to the Investor in lieu of cash in an amount equal to the Investor Rollover Amount (as defined below) that would otherwise be distributed to Investor with respect to his, her or its equity in Seller pursuant to Seller's Amended and Restated Limited Liability Company Agreement, dated as of December 21, 2012, by and among Seller, the KRG Members (as defined therein), and each of the other Members (as defined therein) listed on the signature pages thereto (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Seller LLC Agreement"), that number of shares of common stock, par value $0.001 per share, of the Company (the "Company Common Stock") equal to (i)(A) the Investor Rollover Amount, divided by (B) the Cash Consideration to be received by Seller upon the Closing, assuming the Investor Rollover Amount and the Seller Contribution Amount are equal to zero dollars ($0) for the purposes of calculating Cash Consideration, multiplied by (ii) 100,000 (such number of shares of Company Common Stock resulting from the product of clause (i) and (ii), the "Rollover Shares"); where the "Investor Rollover Amount" means the lesser of (i) the amount set forth on the Investor's signature page hereto and (ii) an amount equal to the portion of the actual Cash Consideration that would, but for such distribution of Company Common Stock, be distributed to the Member pursuant to the Seller LLC Agreement promptly following the Closing;

WHEREAS, subject to the terms and conditions of this Agreement, the Investor desires, immediately prior to the Closing, to contribute the Rollover Shares to Parent (the "Contribution") in exchange for that number of newly issued Class B Common Units of Parent (the "Parent Class B Common Units") equal to (i) the Investor Rollover Amount divided by (ii) the price per unit at which the Advent Investors (defined below) purchase Class A Common Units of Parent at the Closing (such number of Parent Class B Common Units, the "Exchange Units");

WEIL:\95645638\18\11623.0311

WHEREAS, Parent and the Investor agree that the transactions contemplated by this Agreement are intended to, and shall, result in the Investor investing in Parent Class B Common Units through the Contribution at the same price per unit at which the Advent Investors at Closing shall acquire Class A Common Units of Parent at the Closing;

WHEREAS, Parent desires to issue to the Investor such Exchange Units in exchange for the Investor's contribution to Parent of the Rollover Shares;

WHEREAS, subject to the terms and conditions of the Equity Commitment Letter, dated March 25, 2016 by and among affiliated investment funds of Advent International Corporation ("Advent") and Purchaser, substantially simultaneously with the consummation of the Contribution, Advent and/or one or more of its affiliated funds, successors or assigns (together with Advent, the "Advent Investors") will capitalize Parent with up to $887,162,500 in cash (the amount actually contributed pursuant to the Equity Commitment Letter, the "Cash Equity Capitalization"), with such Cash Equity Capitalization to be contributed by Parent indirectly to Purchaser (through intermediate holding companies) immediately prior to the Closing, and Parent will issue to the Advent Investors newly issued Class A Common Units of Parent in consideration for the Cash Equity Capitalization;

WHEREAS, for United States federal income tax purposes, it is intended that the contribution by the Investor of the Rollover Shares to Parent in exchange for the Exchange Units will qualify as a transaction described in Section 721(a) of the Internal Revenue Code of 1986, as amended (the "Code"); and

WHEREAS, concurrently with Closing, Parent, the Investor, the Advent Investors and certain other rollover investors will enter into an Amended and Restated Agreement of Limited Partnership of Parent substantially in the form attached as Exhibit A hereto (the "Partnership Agreement").

NOW, THEREFORE, in order to implement the foregoing and in consideration of the mutual representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

**AGREEMENT**

Section 1.      Contribution of the Rollover Shares.

1.1      Contribution of the Rollover Shares in Exchange for the Exchange Units. On the terms and conditions set forth herein, (i) the Investor agrees, at the closing of the Contribution (the "Contribution Closing"), to contribute to Parent the Rollover Shares, free and clear of any and all Liens (as defined in Section 3.1 below), in exchange for the issuance by Parent to the Investor of the Exchange Units, and (ii) Parent agrees, at the Contribution Closing,

2

to issue to the Investor the Exchange Units in exchange for the contribution by the Investor to Parent of the Rollover Shares.

1.2     Closing.  The Contribution Closing shall occur immediately prior to the consummation of the Stock Purchase on the Closing Date (as defined below).  The Contribution Closing shall take place at the offices of Weil, Gotshal & Manges LLP located at 100 Federal Street, Boston, MA  02110, or such other place as agreed upon by the parties.

1.3     Conditions to Closing.  The Contribution Closing shall be subject to the satisfaction of the following conditions unless waived in writing by Parent and the Investor (in the case of clause (a)), by Parent (in the case of clause (b)) or by the Investor (in the case of clause (c)):

(a)     Purchase Agreement Conditions.  The conditions set forth in Article 7 of the Purchase Agreement (other than those conditions that can be satisfied only by virtue of this Agreement and those conditions that may only be satisfied as of the Closing) shall have been satisfied or waived and the parties to the Purchase Agreement shall have indicated that they intend to consummate the Stock Purchase immediately following the consummation of the Contribution.

(b)     Representations, Warranties and Covenants of the Investor.  All representations and warranties made in this Agreement by the Investor shall be true and correct in all respects on the date when made and on and as of the Contribution Closing with the same effect as if made on and as of the Contribution Closing, and the Investor shall have performed or complied in all material respects with all covenants and agreements to be performed by the Investor under this Agreement at or prior to the date of the Contribution Closing (the "Closing Date").

(c)     Representations, Warranties and Covenants of Parent.  All representations and warranties made in this Agreement by Parent shall be true and correct in all respects on the date when made and on and as of the Contribution Closing with the same effect as if made on and as of the Closing Date, and Parent shall have performed or complied in all material respects with all covenants and agreements to be performed by Parent under this Agreement at or prior to the Closing Date.

1.4     Parent Deliveries.  At the Contribution Closing, Parent shall deliver to the Investor (a) certificates or other documentation representing the Investor's Exchange Units and (b) an executed copy of the Partnership Agreement.

1.5     Investor Deliveries.  At the Contribution Closing, the Investor shall deliver to Parent (a) an executed stock power in form and substance reasonably satisfactory to Parent and (b) a duly executed signature page to the Partnership Agreement.

Section 2.     Representations and Warranties of Parent.  Parent hereby represents and warrants to the Investor as follows:

3

WEIL:\95645638\18\11623.0311

2.1    Organization.  Parent is a limited partnership, duly organized, validly existing and in good standing under the Laws of the State of Delaware.

2.2    Authority.  Parent has the requisite power and authority to enter into and deliver this Agreement, perform its obligations herein, and consummate the transactions contemplated hereby.  Parent has duly executed and delivered this Agreement and, assuming the due authorization, execution and delivery by the Investor, this Agreement is a valid, legal and binding obligation of Parent, enforceable against Parent in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether such enforcement is considered in a proceeding at Law or at equity).

2.3    Shares Duly Authorized.  All of the Class B Common Units of Parent to be issued to the Investor under this Agreement, when issued and delivered in accordance with the terms of this Agreement, will be duly authorized, validly issued, fully paid and non-assessable without being subject to preemptive rights, and shall be free of rights of first refusal or similar rights (except such rights granted to the Investor and the other partners of Parent pursuant to, or limitations set forth in, the Partnership Agreement).  The Investor will acquire good, valid, and marketable title to the Exchange Units, free and clear of all mortgages, liens, pledges, charges, claims, security interests, agreements, and encumbrances whatsoever, other than those imposed by law or contemplated by this Agreement and the Partnership Agreement or those that result from action by the Investor.

2.4    Capitalization.  Following consummation of the transactions contemplated by this Agreement and the Purchase Agreement, the outstanding securities of Parent and the authorized and outstanding securities of Holdco will be as indicated on Exhibit B and Holdco will own, directly or indirectly, all of the issued and outstanding securities of Purchaser.  Except for this Agreement, the Purchase Agreement, the Amended and Restated Limited Partnership Agreement of Parent (the "LP Agreement"), the 2016 Equity Incentive Plan of Parent, any award agreements issued in connection with the profits interests issued at Closing pursuant to the LP Agreement, and that certain Stockholders Agreement by and among Holdco, Seller, Parent and certain other parties thereto (such agreements collectively being referred to herein as the "Transaction Documents"), neither Parent nor any of its Subsidiaries is a party to any option, warrant, purchase right, or other contract or commitment that would require it to sell, transfer, or otherwise dispose of any of its securities or that imposes any Lien on any of its securities.  Except for and as contemplated by the Transaction Documents, there are no outstanding (i) securities convertible into or exchangeable for securities of Parent or any of its Subsidiaries, (ii) subscriptions, options, warrants, calls or rights of any kind to purchase or otherwise acquire securities of Parent or any of its Subsidiaries to which Parent or any of its Subsidiaries is a party, or (iii) contracts of any kind by which Parent or any of its Subsidiaries is bound requiring the issuance after the date hereof of or relating to (x) any securities of Parent or any of its Subsidiaries, (y) any convertible or exchangeable security of the type referred to in clause (i) or (z) any options, warrants, calls or rights of the type referred to in clause (ii).  Except for the

4

Transaction Documents, there are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to Parent or any of its Subsidiaries by which Parent or any of its Subsidiaries is bound. Except for the Transaction Documents, there are no voting trusts, proxies or other contracts, agreements or understandings with respect to the securities of Parent or any of its Subsidiaries or restrictions on the transfer of the securities of Parent or any of its Subsidiaries to which Parent or any of its Subsidiaries is a party.

2.5     No Conflicts; No Consents.  The execution and delivery of this Agreement by Parent, the performance by Parent of its obligations hereunder, and the consummation by Parent of the transactions contemplated hereby, do not and will not (a) conflict with Parent's agreement of limited partnership, (b) materially violate or materially conflict with any constitution, law, ordinance, regulation, statute or treaty of any Governmental Authority ("Law") applicable to Parent or any of Parent's assets or properties or (c) violate or conflict with in any material respect, result in any material breach of, or constitute a material default (or event which with the giving of notice or lapse of time, or both, would become a default) under, any agreement to which Parent is a party or by which any of its assets or properties is bound.  No consent, approval, authorization, license, order or permit of, or declaration, filing or registration with, or notification to, any Governmental Authority, or any other Person, on the part of Parent is required to be made or obtained in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, other than any filings as may be required under applicable state "Blue Sky" Laws.

2.6     Newly-Formed.     Parent was newly formed to facilitate and in contemplation of the transactions contemplated by the Transaction Documents.  Other than the Transaction Documents and other agreements, certificates and instruments contemplated thereby and all transactions contemplated by any of the foregoing (including, but not limited to, the financing of the transactions contemplated by the foregoing and all agreements, certificates and instruments entered into in connection therewith), Parent has conducted no business activities and has not entered into any contracts or agreements.

Section 3.     Representations and Warranties of Investor.  The Investor hereby represents and warrants to Parent as follows:

3.1     Ownership of the Rollover Shares.  At the Contribution Closing, the Investor will be the record and beneficial owner of the Rollover Shares, free and clear of all pledges, liens, proxies, claims, charges, security interests, preemptive rights, voting trusts, voting agreements, options, rights of first offer or refusal and any other encumbrances or arrangements whatsoever with respect to the ownership, transfer or other voting of the Rollover Shares ("Liens").  Neither the Investor nor any of his or her Affiliates is a party to, or bound by, any contract, arrangement, agreement, instrument or order (other than this Agreement and the Seller LLC Agreement) (i) relating to the sale, repurchase, assignment or other transfer of any capital stock or equity securities of the Company, (ii) relating to the receipt of dividends, proxy rights or voting rights of any capital stock or other equity securities of the Company or (iii) relating to the rights to registration under the Securities Act of 1933, as amended (the "Securities Act"), or the

5

Securities and Exchange Act of 1934, as amended (the "Exchange Act"), of any capital stock or equity securities of the Company.

3.2     Authority.  The Investor has the requisite power and authority to enter into and deliver this Agreement, perform his or her obligations herein, and consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by the Investor and, assuming the due authorization, execution and delivery by Parent, this Agreement is a valid, legal and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether such enforcement is considered in a proceeding at Law or in equity).

3.3     Investor Intent.  The Investor is acquiring the Exchange Units for the Investor's own account as principal, for investment purposes only, not for any other Person and not for the purposes of resale or distribution. The Investor is not subscribing for the Exchange Units from Parent in a fiduciary capacity.

3.4     Financial Status.  The Investor is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act.  The Investor is able to bear the economic risk of an investment in the Exchange Units for an indefinite period of time, has adequate means of providing for its current financial needs and business contingencies, has no need for liquidity in the investment in the Exchange Units, understands that the Investor may not be able to liquidate the Exchange Units in an emergency, if at all, and can afford a complete loss of the investment. The Investor has received no advice from Parent or any of its Affiliates as to the legal, investment or tax consequences of the Contribution contemplated by this Agreement or the Investor's investment in the Exchange Units.

3.5     Access to Information.  The Investor has been given the opportunity to ask questions of and receive answers from Parent and its representatives concerning (i) the terms and conditions of the issuance of the Exchange Units and the other transactions contemplated in connection with the Contribution and the Purchase Agreement and (ii) the financial condition, operation and prospects of Parent and its subsidiaries after giving effect to the Stock Purchase.

3.6     No Other Representation.     The Investor has received no other representations or warranties from Parent or any other Person acting on behalf of the Company or Parent, other than those contained in Section 2 of this Agreement.

3.7     No Conflicts; No Consents.  The execution and delivery of this Agreement by the Investor, the performance by the Investor of his or her obligations hereunder and the consummation by the Investor of the transactions contemplated hereby do not and will not (a) materially violate or materially conflict with any Law applicable to the Investor or any of the Investor's assets or properties or (b) violate or conflict with in any material respect, result in any material breach of, or constitute a material default (or event which with the giving of notice or lapse of time, or both, would become a default) under, any agreement to which the Investor is a

6

party or by which any of his or her assets or properties is bound. No consent, approval, authorization, license, order or permit of, or declaration, filing or registration with, or notification to, any Governmental Authority, or any other Person, is required to be made or obtained by the Investor in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby that has not been made or obtained or will not be made or obtained on or prior to the Contribution Closing.

Section 4.    Agreements and Acknowledgements of the Investor. The Investor hereby agrees and acknowledges to Parent as follows:

4.1    No Registration. The Investor understands and agrees that the Exchange Units are being acquired by the Investor in a transaction not involving any public offering within the meaning of the Securities Act, in reliance on an exemption therefrom. The Investor understands that the Exchange Units have not been, and will not be, approved or disapproved by the Securities and Exchange Commission or by any other federal or state agency, and that no such agency has passed on the accuracy or adequacy of disclosures made to the Investor by Parent. No federal or state governmental agency has passed on or made any recommendation or endorsement of the Exchange Units or an investment in Parent.

4.2    Limitations on Disposition and Resale. The Investor understands and acknowledges that the Exchange Units have not been and will not be registered under the Securities Act, or the securities laws of any state and, unless the Exchange Units are so registered, they may not be offered, sold, transferred or otherwise disposed of except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable securities laws of any state or foreign jurisdiction. The Investor agrees not to sell, transfer or otherwise dispose of the Exchange Units unless the Exchange Units have been so registered or an exemption from the requirement of registration is available under the Securities Act and any applicable state securities laws. The Investor further acknowledges and agrees that his or her ability to dispose of the Exchange Units will be subject to restrictions contained in the Partnership Agreement. The Investor recognizes that there will not be any public trading market for Parent Class B Common Units and, as a result, the Investor may be unable to sell or dispose of his or her interest in Parent. The Investor further acknowledges and agrees that, except as may be set forth in the Partnership Agreement, Parent shall have no obligation to register any Parent Class B Common Units.

4.3    Legend. The Investor acknowledges and agrees that the Exchange Units received in the Contribution, to the extent represented by physical certificates, will bear the following legend (or one to substantially similar effect):

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES OR BLUE SKY LAWS. THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION

7

THEREFROM UNDER SAID ACT OR LAWS. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO A PARTNERSHIP AGREEMENT DATED AS OF MAY [___], 2016 BY AND AMONG WILCO ACQUISITION, LP ("PARENT") AND THE OTHER PARTIES NAMED THEREIN. THE TERMS OF SUCH PARTNERSHIP AGREEMENT INCLUDE, AMONG OTHER THINGS, RESTRICTIONS ON TRANSFER. A COPY OF SUCH AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY PARENT TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

4.4     Newly Formed Entity. The Investor recognizes that Parent was only recently formed and, accordingly, has no financial or operating history and that the investment in Parent is extremely speculative and involves a high degree of risk.

4.5     Other Acknowledgments. The Investor acknowledges that (i) Paul Hastings LLP ("Paul Hastings") is counsel to certain members of Seller; (ii) that Hogan Lovells US LLP ("Hogan Lovells") is counsel to Seller and its direct and indirect subsidiaries; (iii) that Weil, Gotshal & Manges LLP ("Weil") is counsel to Parent and its direct and indirect subsidiaries; and (iii) that unless Investor has signed an engagement letter with the applicable counsel (an "Engagement Letter"), none of Paul Hastings, Hogan Lovells or Weil represent Investor regarding legal matters concerning an investment in the Exchange Units (or any other matter). Investor waives any conflict of interest in connection with such representation by any of Paul Hastings, Hogan Lovells or Weil. Unless Investor has signed an Engagement Letter, Investor further acknowledges that it has been advised to consult with its own tax, legal and other advisors, and not Paul Hastings, Hogan Lovells or Weil, regarding the tax consequences of acquiring the Exchange Units, legal matters concerning Parent or any other action to be taken in connection with the acquisition of the Exchange Units contemplated hereby.

Section 5.     Tax Treatment. For U.S. federal income tax purposes, the parties hereby agree to treat the contribution of the Rollover Shares solely in exchange for the Exchange Units as a transaction intended by the parties to qualify under Section 721(a) of the Code, and neither of the parties shall take any position inconsistent with such treatment on any tax return except as otherwise required by a change in law following the date of this Agreement or pursuant to a good faith resolution of a tax dispute.

Section 6.     Governing Law, Severability, Consent to Jurisdiction, Waiver of Jury Trial. This Agreement is governed by and shall be construed in accordance with the Laws of the State of Delaware applicable to contracts made and to be performed entirely in such state, without giving effect to conflicts of Law principles thereunder that would give effect to the Laws of another jurisdiction. Each of the parties hereto, on behalf of itself and its respective Affiliates, (i) consents to submit to the personal jurisdiction of the Delaware Court of Chancery or the other courts of the State of Delaware, in each case in connection with any action arising out of, in connection with, in respect of, or in any way relating to the negotiation, execution and performance of this Agreement and the transactions contemplated hereby and waives any right to trial by jury with respect to any such matters. Each party hereto, on behalf of itself and its

8

respective Affiliates, irrevocably and unconditionally waives any objection to the laying of venue of any claim, action or proceeding arising out of, in connection with, or in respect of this Agreement. If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected thereby, and that provision shall be enforced to the greatest extent permitted by Law.

Section 7. <u>Notices</u>. All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given when (i) delivered in person, (ii) three (3) days after posting in the United States mail having been sent registered or certified mail return receipt requested, or (iii) delivered by telecopy and promptly confirmed by delivery in person or post as aforesaid in each case, with postage prepaid, addressed as follows:

(a)    If to Parent, then to:

c/o Advent International Corporation
375 Park Avenue
New York, NY 10152
Attention: John Maldonado
Facsimile No.: (617) 951-0566
E-mail: jmaldonado@adventinternational.com

and

c/o Advent International Corporation
75 State Street
Boston, MA 02109
Attention: James Westra
Facsimile No.: (617) 951-0566
E-mail: jwestra@adventinternational.com

and

Weil, Gotshal & Manges LLP
100 Federal Street, 34th Floor
Boston, MA 02210
Attention: Marilyn French Shaw
Facsimile No.: (617) 772-8333
E-mail: marilynfrench.shaw@weil.com

(b)    If to the Investor, then to the address set forth on the Investor's signature page hereto.

9

Section 8.    Assignment.  No party shall have the right or the power to assign or delegate any provision of this Agreement except with the prior written consent of Parent, in the case of an assignment or delegation by the Investor, or with the prior written consent of the Investor, in the case of an assignment or delegation by Parent; provided, however, that Investor may assign any or all of its rights hereunder, without the prior written consent of Parent, to any of Investor's Affiliates who own shares of Company Common Stock; provided further that any such assignee shall agree to be bound by all of the terms of this Agreement, including the representations and warranties hereunder, and shall assume all obligations hereunder. Such assignment shall not release the Investor from liability in the event that such assignee fails to perform its obligations hereunder.  Except as provided in the first sentence of this Section 8, this Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors, assigns, executors and administrators.

Section 9.    Counterparts.  This Agreement may be executed in counterparts, including via facsimile, each of which shall be deemed an original and all of which taken together, shall constitute one and the same document.

Section 10.    Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in a writing executed by the party to be bound thereby.  This Agreement supersedes all prior and contemporaneous agreements of the parties hereto, whether written, oral or otherwise, that directly or indirectly bear on the subject matter hereof.

Section 11.    Termination of this Agreement.  This Agreement shall terminate and no longer have any force or effect upon on the earlier of (i) the mutual written consent of Parent and the Investor and (ii) the termination of the Purchase Agreement pursuant to its terms.

Section 12.    Remedies.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  Accordingly, the parties agree that, in the event of any breach or threatened breach by the other party of any covenant or obligation in this Agreement, such other party shall be entitled (in addition to any other remedy that may be available whether in Law or in equity) to seek and obtain (i) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation, and (ii) an injunction restraining such breach or threatened breach.  The parties agree that neither party shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 12, and each party irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

Section 13.    No Third Party Beneficiaries.  This Agreement shall be binding on the undersigned solely for the benefit of the undersigned parties to this Agreement, and nothing set forth herein shall be construed to confer upon or give to any person other than the parties to this Agreement any benefits, rights, or remedies under or by reason of, or any rights to enforce or cause such parties to enforce, the transactions contemplated hereby or any provision of this Agreement.

10

WEIL:\95645638\18\11623.0311

Section 14. <u>Further Assurances</u>. Subject to the terms and conditions provided herein, each party hereto agrees to use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable, whether under applicable Laws or otherwise, in order to consummate and make effective the transactions contemplated by this Agreement.

WEIL:\95645638\18\11623.0311

**IN WITNESS WHEREOF**, the parties have hereby executed this Agreement as of the date first above written.

<div align="center">

**INVESTOR:**

</div>

Signature: _____                    _____
                Robert McKenzie

Address: ____

_____

Investor Rollover Amount: $575,000

<div align="center">

[SIGNATURE PAGE TO ROLLOVER AND CONTRIBUTION AGREEMENT]

</div>

**IN WITNESS WHEREOF**, the parties have hereby executed this Rollover Agreement as of the date first above written.

<div style="text-align: center;">

**WILCO ACQUISITION, LP**

</div>

By:    WILCO GP, INC.
          its general partner


By:

        Name: John Maldonado
        Title:  President

<div style="text-align: center;">

[SIGNATURE PAGE TO ROLLOVER AND CONTRIBUTION AGREEMENT]

</div>

**Execution Version**

<div align="center">

**WRITTEN CONSENT**
**IN LIEU OF A**
**MEETING OF STOCKHOLDERS**
**OF**
**WILCO HOLDCO, INC.**

**February 21, 2021**

</div>

The undersigned (the "Stockholder"), being the holder of 23,179.19910431 shares of Series A-1 preferred stock, par value $0.01 per share (the "Preferred Stock" and together with the common stock, par value $0.01 per share, the "Company Stock"), of Wilco Holdco, Inc., a Delaware corporation (the "Company"), as reflected in Schedule 1 attached hereto, acting pursuant to Section 228 and Section 251 of the General Corporation Law of the State of Delaware (the "DGCL") and the Bylaws of the Company, does hereby (i) irrevocably consent to the adoption of, and does hereby adopt, the following resolutions in lieu of a meeting with respect to all of the shares of Company Stock held by the Stockholder, effective as of the date and time set forth herein, and (ii) direct that this written consent (this "Written Consent") be filed with the permanent records of the Company:

<div align="center">

MERGER AGREEMENT

</div>

WHEREAS, the Company intends to enter into an Agreement and Plan of Merger (the "Merger Agreement"), by and among the Company, Fortress Value Acquisition Corp. II, a Delaware corporation ("Acquiror"), and FVAC Merger Corp. II, a Delaware corporation and a direct, wholly-owned subsidiary of Acquiror ("Merger Sub"), a copy of which is attached hereto as Exhibit A (capitalized terms used herein without definition shall have the respective meaning ascribed to them in the Merger Agreement);

WHEREAS, pursuant to the Merger Agreement, Merger Sub will be merged with and into the Company (the "Merger"), with the Company continuing as the surviving corporation of the Merger, upon the terms and subject to the conditions set forth in the Merger Agreement;

WHEREAS, prior to the due execution of the Merger Agreement by the Company, the board of directors of the Company (the "Company Board") shall (i) determine that it is in the best interests of the Company and its stockholders to enter into the Merger Agreement, each Ancillary Agreement to which it is a party and to consummate the transactions contemplated thereby, including the Merger (such transactions, the "Transactions"), (ii) approve and declare advisable the Merger Agreement, the Ancillary Agreements to which it is a party and the execution, delivery and performance thereof and the consummation of the Transactions, including the Merger, upon the terms and subject to the conditions set forth in the Merger Agreement and each Ancillary Agreement, (iii) recommend the adoption of the Merger Agreement and the approval of the Transactions, including the Merger, by the holders of shares of the Company Stock, upon the terms and subject to the conditions set forth therein (such actions by the Company Board referenced in clauses "(i)" through "(iii)," the "Board Recommendation") and (iv) determine to submit the

Merger Agreement and the Transactions, including the Merger, to the holders of shares of the Company Stock for their adoption and approval;

WHEREAS, following and pursuant to the Board Recommendation, the Company shall duly execute the Merger Agreement and deliver the Merger Agreement to Acquiror; and

WHEREAS, pursuant to the Second Amended and Restated Certificate of Incorporation of the Company, dated as of August 31, 2016 and the DGCL, the affirmative vote by the holders of a majority of the outstanding shares of Company Stock entitled to vote thereon, voting together as a single class, is required to adopt the Merger Agreement and approve the Transactions, including the Merger.

NOW, THEREFORE, BE IT RESOLVED, that, in accordance with Section 228(c) of the DGCL, immediately after (i) the making by the Company Board of the Board Recommendation, and (ii) the execution of the Merger Agreement by the Company and the delivery of the Merger Agreement to Acquiror (such time, the "Effective Time"), the Merger Agreement is hereby adopted and the Transactions, including the Merger, are hereby approved in all respects, and the Stockholder hereby votes all of the shares of Company Stock held by such Stockholder in favor of the adoption of the Merger Agreement and the approval of Transactions, including the Merger;

FURTHER RESOLVED, that the Stockholder hereby waives any and all irregularities of notice, with respect to the time and place of meeting, and consents to the transaction of all business represented by this Written Consent;

FURTHER RESOLVED, that the Stockholder (i) acknowledges and agrees that such Stockholder (a) received and read a copy of Section 262 of the DGCL, which is attached as Exhibit B and (b) is aware of such Stockholder's ability to seek appraisal and request an appraisal of the fair value of shares of the Company Stock held by such Stockholder under Section 262 of the DGCL, (ii) that by signing this Written Consent, such Stockholder adopts and approves in all respects the Merger Agreement and the Transactions, including the Merger, and as a result, (iii) irrevocably and unconditionally waives any appraisal rights, dissenters' rights and any similar rights for such shares under the DGCL and/or other applicable Laws with respect to the Merger Agreement and the Transactions, including the Merger; and

FURTHER RESOLVED, that this Written Consent shall be effective as of the Effective Time, and may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other electronic reproduction of this Written Consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used.

*[Remainder of page intentionally left blank.*
*Signature page follows.]*

2

In witness whereof, by executing this Written Consent, the undersigned is giving written consent with respect to all shares of the Company Stock held by such Stockholder.

DAKOTA HOLDCO LLC

By
    Name: Gregory Steil
    Title:   Manager and Vice President

*Signature Page to Written Consent in Lieu of a Meeting of Stockholders of Wilco Holdco, Inc.*

## SCHEDULE 1

| Type of Security | Number of Shares |
|---|---|
| Company Common Stock | 0 |
| Company Series A-1 Preferred Stock | 23,179.19910431 |
| Company Series A-2 Preferred Stock | 0 |

# EXHIBIT A

# MERGER AGREEMENT

EXECUTION VERSION

**AGREEMENT AND PLAN OF MERGER**

**by and among**

**FORTRESS VALUE ACQUISITION CORP. II,**

**FVAC MERGER CORP. II,**

**and**

**WILCO HOLDCO, INC.**

**February 21, 2021**

**Table of Contents**

**Page**

**Article I
THE MERGER**

Section 1.1    The Merger ................................................................................................3
Section 1.2    Effect of the Merger .................................................................................3
Section 1.3    Governing Documents ..............................................................................3
Section 1.4    Directors and Officers of the Surviving Company ..................................3
Section 1.5    Effect of the Merger on the Company Stock ...........................................3
Section 1.6    Fractional Shares .....................................................................................4
Section 1.7    Dissenting Shares .....................................................................................4
Section 1.8    Exchange of Certificates ..........................................................................5
Section 1.9    Adjustments to Per Share Consideration .................................................7
Section 1.10   Closing of Transfer Books .......................................................................7
Section 1.11   Withholding Rights ..................................................................................7
Section 1.12   Corporate Governance Matters ...............................................................8

**Article II
THE CLOSING**

Section 2.1    Closing ......................................................................................................8
Section 2.2    Deliveries at Closing ................................................................................8
Section 2.3    Closing ......................................................................................................9

**Article III
EARN-OUT**

Section 3.1    Issuance of Earn Out Shares ..................................................................10
Section 3.2    Acceleration Event .................................................................................11
Section 3.3    Adjustments to Earn Out Shares ............................................................11
Section 3.4    Tax Treatment of Earn Out Shares ........................................................11

**Article IV
REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Section 4.1    Organization and Authority ...................................................................11
Section 4.2    Authorization and Enforceability ...........................................................12
Section 4.3    Noncontravention ...................................................................................12
Section 4.4    Subsidiaries ............................................................................................13
Section 4.5    Governmental Authorities; Consents .....................................................13
Section 4.6    Capitalization .........................................................................................13
Section 4.7    Financial Statements ..............................................................................14
Section 4.8    Undisclosed Liabilities ...........................................................................15
Section 4.9    Actions. ...................................................................................................15

i

Section 4.10    Compliance with Laws; Permits ...............................................................15
Section 4.11    Material Contracts....................................................................................16
Section 4.12    Real Property ...........................................................................................18
Section 4.13    Employee Benefits ...................................................................................18
Section 4.14    Labor and Employment............................................................................20
Section 4.15    Taxes ........................................................................................................21
Section 4.16    Intellectual Property.................................................................................23
Section 4.17    Compliance with Healthcare Laws and Information Privacy and Security
                Laws ..........................................................................................................24
Section 4.18    Material Payor and Material Supplier Relations......................................27
Section 4.19    Environmental Matters.............................................................................28
Section 4.20    Insurance ..................................................................................................28
Section 4.21    Absence of Changes.................................................................................28
Section 4.22    Interested Party Transactions...................................................................29
Section 4.23    Proxy Statement .......................................................................................29
Section 4.24    No Brokers' Fees ......................................................................................29
Section 4.25    No Additional Representations and Warranties; Non-Reliance of the
                Company ...................................................................................................29

## Article V
## REPRESENTATIONS AND WARRANTIES OF
## ACQUIROR AND MERGER SUB

Section 5.1     Organization and Authority ......................................................................30
Section 5.2     Authorization and Enforceability..............................................................30
Section 5.3     Noncontravention.....................................................................................32
Section 5.4     Governmental Authorities; Consents........................................................32
Section 5.5     Capitalization ...........................................................................................32
Section 5.6     SEC Reports; Financial Statements .........................................................33
Section 5.7     Actions .....................................................................................................35
Section 5.8     Compliance with Laws; Permits ..............................................................35
Section 5.9     Financial Ability; Trust Account; PIPE Investment Amount ...................35
Section 5.10    No Brokers' Fees ......................................................................................37
Section 5.11    Business Activities....................................................................................37
Section 5.12    Material Contracts....................................................................................37
Section 5.13    Employees; Acquiror Benefit Plans..........................................................38
Section 5.14    No Acquiror Material Adverse Effect.......................................................38
Section 5.15    Undisclosed Liabilities/Transaction Expenses .........................................38
Section 5.16    Reporting Company ..................................................................................38
Section 5.17    Listing ......................................................................................................38
Section 5.18    Sarbanes-Oxley Act .................................................................................39
Section 5.19    Investment Company ................................................................................39
Section 5.20    Taxes ........................................................................................................39
Section 5.21    Sponsor Letter Agreement .......................................................................39
Section 5.22    No Additional Representations and Warranties; Non-Reliance of Acquiror
                and Merger Sub.........................................................................................39

## Article VI
## COVENANTS

Section 6.1    Conduct of Business by the Company ................................................................40
Section 6.2    Conduct of Business by Acquiror ..................................................................42
Section 6.3    Proxy Statement; Proxy Solicitation; Other Actions ....................................43
Section 6.4    Acquiror Special Meeting ..............................................................................45
Section 6.5    Company Written Consents ...........................................................................47
Section 6.6    Access to Information ....................................................................................47
Section 6.7    Efforts; Consents...........................................................................................47
Section 6.8    Publicity ........................................................................................................49
Section 6.9    Non-Solicitation............................................................................................50
Section 6.10   Pre-Closing Structuring ................................................................................51
Section 6.11   Directors' and Officers' Indemnification; Insurance....................................51
Section 6.12   Trust Account................................................................................................52
Section 6.13   Intended Tax Treatment.................................................................................53
Section 6.14   FIRPTA Certificate .......................................................................................54
Section 6.15   Incentive Plan................................................................................................54
Section 6.16   Section 16(b) Exemption ...............................................................................54
Section 6.17   Stock Exchange Matters ................................................................................54
Section 6.18   Stockholder Litigation ..................................................................................55
Section 6.19   Subscription Agreements ...............................................................................56
Section 6.20   Sponsor Letter Agreement .............................................................................56
Section 6.21   Debt Financing...............................................................................................56

## Article VII
## CONDITIONS TO CLOSING

Section 7.1    Conditions to Obligations of all Parties.........................................................57
Section 7.2    Conditions to Obligations of Acquiror .........................................................58
Section 7.3    Conditions to Obligations of Company .........................................................59
Section 7.4    Frustration of Closing Conditions..................................................................60

## Article VIII
## TERMINATION

Section 8.1    Termination....................................................................................................60
Section 8.2    Effect of Termination.....................................................................................61

## Article IX
## MISCELLANEOUS

Section 9.1    Non Survival of Representations, Warranties and Agreements...........................62
Section 9.2    Modification or Amendment..........................................................................62
Section 9.3    Extension; Waiver.........................................................................................62
Section 9.4    Notices ..........................................................................................................62
Section 9.5    Entire Agreement ..........................................................................................64

iii

Section 9.6     Assignment ...................................................................................................64
Section 9.7     Counterparts.................................................................................................64
Section 9.8     No Third-Party Beneficiaries.....................................................................64
Section 9.9     Governing Law ...........................................................................................64
Section 9.10    Exclusive Jurisdiction ................................................................................64
Section 9.11    WAIVER OF TRIAL BY JURY ................................................................65
Section 9.12    Severability ................................................................................................65
Section 9.13    Fees and Expenses .....................................................................................65
Section 9.14    Specific Performance .................................................................................65
Section 9.15    Non-Recourse ............................................................................................66
Section 9.16    Legal Representation .................................................................................66
Section 9.17    Release .......................................................................................................67

**Article X**
**DEFINITIONS**

Section 10.1    Definitions..................................................................................................68
Section 10.2    Construction...............................................................................................87

Exhibit A – Acquiror A&R Charter
Exhibit B – Acquiror A&R Bylaws
Exhibit C – Form of Subscription Agreement
Exhibit D – Stockholders Agreement
Exhibit E – Registration Rights Agreement

iv

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger is made and entered into as of February 21, 2021, by and among Fortress Value Acquisition Corp. II, a Delaware corporation ("Acquiror"), FVAC Merger Corp. II, a Delaware corporation and a direct, wholly-owned subsidiary of Acquiror ("Merger Sub") and Wilco Holdco, Inc., a Delaware corporation (the "Company").

## RECITALS

WHEREAS, Acquiror is a blank check company incorporated for the purpose of effecting a Business Combination;

WHEREAS, Merger Sub is a newly formed, wholly-owned, direct subsidiary of Acquiror, and was formed for the sole purpose of effecting the Merger (as defined below);

WHEREAS, the Company is a healthcare company, specializing in outpatient physical therapy services (the "Business");

WHEREAS, upon the terms and subject to the conditions of this Agreement and in accordance with the General Corporation Law of the State of Delaware (the "DGCL") and other applicable requirements of Law, the Parties wish to enter into a Business Combination transaction by which Merger Sub will merge with and into the Company (the "Merger"), with the Company being the Surviving Company of the Merger (the Company, in its capacity as the Surviving Company of the Merger, is sometimes referred to as the "Surviving Company");

WHEREAS, in connection with the Closing, Acquiror will, (a) subject to obtaining the Acquiror Stockholder Approval, adopt the Amended and Restated Certificate of Incorporation substantially in the form attached hereto as Exhibit A (the "Acquiror A&R Charter"); and (b) adopt the Amended and Restated Bylaws of Acquiror substantially in the form attached hereto as Exhibit B (the "Acquiror A&R Bylaws");

WHEREAS, concurrently with the execution and delivery of this Agreement, the Sponsor and Acquiror and certain officers and directors of Acquiror have entered into an Amended and Restated Letter Agreement (as it may be amended, restated, modified or supplemented from time to time, the "Sponsor Letter Agreement") dated as of the date hereof;

WHEREAS, concurrently with the execution and delivery of this Agreement, certain investors have entered into subscription agreements, in substantially the form attached hereto as Exhibit C (collectively, the "Subscription Agreements"), pursuant to which, at the Closing, such investors have agreed, upon the terms and subject to the conditions set forth therein, to subscribe for and purchase Acquiror Class A Common Stock at a purchase price of $10.00 per share, for an aggregate cash amount of $300,000,000 (such amount, the "PIPE Investment Amount," and, such purchase of Acquiror Class A Common Stock, the "PIPE Investment");

WHEREAS, concurrently with the execution and delivery of this Agreement, Acquiror, certain stockholders of the Company and their Affiliates have entered into a stockholders

agreement attached hereto as Exhibit D (the "Stockholders Agreement"), to be effective upon the Effective Time;

WHEREAS, concurrently with the execution and delivery of this Agreement, Acquiror, the Sponsor, certain stockholders of the Company and their Affiliates have entered into an amended and restated registration rights agreement attached hereto as Exhibit E (the "Registration Rights Agreement"), to be effective upon the Effective Time;

WHEREAS, the Acquiror Board has unanimously (a) determined that the transactions contemplated by this Agreement and the Ancillary Agreements, including the Merger (the "Transactions"), are fair to, advisable and in the best interests of Acquiror and its stockholders, (b) approved and declared advisable this Agreement and the Transactions, including the issuance of shares of Acquiror Class A Common Stock to the stockholders of the Company pursuant to the terms of this Agreement and the adoption of the Acquiror A&R Charter in connection with the Transactions and (c) recommended that the stockholders of Acquiror approve the Transactions and each of the Transaction Proposals;

WHEREAS, the Merger Sub Board has (a) determined that the Transactions are fair to, advisable and in the best interests of Merger Sub and its sole stockholder, (b) approved and declared advisable this Agreement and the Transactions and (c) recommended that the sole stockholder of Merger Sub adopt this Agreement and approve the Transactions;

WHEREAS, effective upon the execution of this Agreement, Acquiror, as the sole stockholder of Merger Sub, has adopted this Agreement in accordance with the DGCL;

WHEREAS, the board of directors of the Company (the "Company Board") has unanimously (a) determined that the Transactions are fair to, advisable and in the best interests of the Company and its stockholders, (b) approved and declared advisable this Agreement and the Transactions and (c) recommended that the stockholders of the Company adopt this Agreement and approve the Transactions (the "Company Board Approval");

WHEREAS, effective upon the Company Board Approval and the subsequent execution and delivery of this Agreement, the Company Stockholders have adopted this Agreement in accordance with the DGCL;

WHEREAS, each of the Key Employees has entered into an employment agreement (or an amendment to an existing agreement), dated as of the date hereof and effective upon the Closing (each, an "Employment Agreement"); and

WHEREAS, each of the Parties intends that, for U.S. federal and applicable state and local income tax purposes, the Merger shall qualify either as a reorganization within the meaning of Section 368(a) of the Code, or an exchange to which Section 351(a) of the Code applies (or both) (the "Intended Tax Treatment").

NOW, THEREFORE, in consideration of the foregoing, and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

## ARTICLE I
## THE MERGER

Section 1.1     The Merger. At the Effective Time, upon the terms and subject to the conditions of this Agreement and in accordance with the applicable provisions of the DGCL, Merger Sub and the Company shall consummate the Merger, pursuant to which Merger Sub shall be merged with and into the Company, following which the separate corporate existence of Merger Sub shall cease and the Company shall continue as the Surviving Company after the Merger as a direct, wholly-owned subsidiary of Acquiror.

Section 1.2     Effect of the Merger. At the Effective Time, the effect of the Merger shall be as provided in this Agreement, the Certificate of Merger and the applicable provisions of the DGCL. Without limiting the generality of the foregoing, at the Effective Time, all the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of Merger Sub and the Company shall become the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of the Surviving Company.

Section 1.3     Governing Documents. By virtue of the Merger and without any further action on the part of Acquiror, Merger Sub, the Company, the Company Stockholders or the holders of any of the securities of Acquiror or any other Person, at the Effective Time:

(a)     the certificate of incorporation of the Surviving Company shall remain the same as the certificate of incorporation of the Company as in effect immediately prior to the Effective Time, shall not be amended by the Merger and shall remain the certificate of incorporation of the Surviving Company until thereafter amended as provided therein or as may be required by applicable Law; and

(b)     the bylaws of the Surviving Company shall remain the same as the bylaws of the Company as in effect immediately prior to the Effective Time, shall not be amended by the Merger, and shall remain the bylaws of the Surviving Company until thereafter amended as provided therein or as may be required by applicable Law.

Section 1.4     Directors and Officers of the Surviving Company. The Parties shall take all requisite actions so that, at the Effective Time, until their successors are duly elected or appointed and qualified in accordance with applicable requirements of Law: (i) the directors of the Company immediately prior to the Effective Time shall be the directors of the Surviving Company; and (ii) the officers of the Company immediately prior to the Effective Time shall be the officers of the Surviving Company.

Section 1.5     Effect of the Merger on the Company Stock. Upon the terms and subject to the conditions of this Agreement, at the Effective Time, by virtue of the Merger and without any further action on the part of Acquiror, Merger Sub, the Company, the Company Stockholders or the holders of any of the securities of Acquiror or any other Person, the following shall occur:

(a)     any shares of Company Stock held in the Company's treasury or held, directly or indirectly, by Acquiror, Merger Sub or any direct wholly-owned Subsidiary of the Company immediately prior to the Effective Time (each an "Excluded Share") shall be cancelled and retired, and no consideration shall be paid or payable in respect thereof;

3

(b)      except for Dissenting Shares, if applicable, and subject to Section 1.6 and Section 1.9, (i) each share of Company Preferred Stock issued and outstanding immediately prior to the Effective Time shall be automatically converted into the right to receive the Per Share Preferred Consideration and (ii) each share of Company Common Stock issued and immediately prior to the Effective Time shall be automatically converted into (A) the right to receive the Per Share Common Stock Consideration and (B) the contingent right to receive the Earn Out Shares following the Closing in accordance with, and subject to the vesting conditions provided for in, ARTICLE III (together with the Per Share Common Stock Consideration and the Per Share Preferred Consideration, the "Per Share Consideration"); and

(c)      each share of Merger Sub Common Stock outstanding immediately prior to the Effective Time shall be converted into one fully paid, validly issued and non-assessable share of common stock, par value $0.01 per share, of the Surviving Company.

Section 1.6      Fractional Shares.

(a)      No fractional shares of Acquiror Class A Common Stock shall be issued in connection with the Transactions, and no certificates or scrip for any such fractional shares shall be issued.

(b)      Any holder of shares of Company Stock who would otherwise be entitled to receive a fraction of a share of Acquiror Class A Common Stock (after aggregating all fractional shares of Acquiror Class A Common Stock issuable to such holder) pursuant to Section 1.5 shall, in lieu of such fraction of a share and upon compliance with Section 1.8, be paid in cash the dollar amount (rounded to the nearest whole cent), without interest and subject to any required Tax withholding, equal to the product of (i) the amount of the fractional share interest in a share of Acquiror Class A Common Stock to which such holder otherwise would have been entitled but for this Section 1.6 multiplied by (ii) $10.00.

Section 1.7      Dissenting Shares.

(a)      Notwithstanding anything to the contrary contained in this Agreement, shares of Company Stock with respect to which appraisal rights are available under Section 262 of the DGCL, if any (it being understood that nothing set forth in this Agreement shall be deemed to imply, admit or establish the availability of any such appraisal rights in connection with the Transactions), and which are held by a holder who shall have neither voted in favor of the Merger nor consented thereto in writing and, as of the Closing: (i) has made a proper demand for appraisal of such shares of Company Stock in accordance with Section 262 of the DGCL; and (ii) has otherwise complied with all applicable provisions of Section 262 of the DGCL (any such shares being referred to as "Dissenting Shares" until such time as such holder withdraws, fails to perfect or otherwise loses such holder's appraisal rights under Section 262 of the DGCL with respect to such shares) shall not be converted into or represent the right to receive the applicable Per Share Consideration in accordance with Section 1.5, but shall be entitled only to such rights (if any) as are granted by the DGCL to a holder of Dissenting Shares.

(b)      Notwithstanding the provisions of Section 1.7(a), if any Dissenting Shares shall lose their status as such (through failure to perfect, waiver, withdrawal or otherwise), then

4

such shares shall be deemed automatically, as of the Effective Time, to have been converted into, and to represent only, the right to receive the applicable Per Share Consideration in accordance with Section 1.5(b), without interest thereon, upon proper delivery of the Company Stock Certificates in the manner provided in this ARTICLE I.

(c)     The Company shall give Acquiror (i) prompt written notice of (A) any demand for appraisal received from its stockholders prior to the Effective Time pursuant to Section 262 of the DGCL, (B) any withdrawal of such demand pursuant to Section 262 of the DGCL and (C) any other instruments served pursuant to the DGCL received by the Company relating to appraisal demands, and (ii) the opportunity to participate in all negotiations and proceedings with respect to demands for appraisal pursuant to the DGCL. The Company shall not, except with the prior written consent of Acquiror (which consent shall not be unreasonably withheld, conditioned or delayed), make any payment with respect to, or settle or offer to settle, any such demands, or agree to do or commit to do any of the foregoing.

Section 1.8     Exchange of Certificates.

(a)     Prior to the dissemination of the Proxy Statement, Acquiror and the Company shall mutually agree upon a transfer agent or another bank or trust company to act as exchange agent in the Merger (the "Exchange Agent") and Acquiror shall enter into an agreement reasonably acceptable to Acquiror and the Company with the Exchange Agent relating to the services to be performed by the Exchange Agent. Substantially concurrently with the Effective Time, Acquiror shall cause to be deposited with the Exchange Agent: (i) a sufficient number of shares of Acquiror Class A Common Stock (whether represented in certificated or non-certificated direct registration form) to be issued pursuant to Section 1.5; (ii) cash in immediately available funds sufficient to make payments of the Aggregate Preferred Cash Consideration pursuant to Section 1.5 and (iii) cash in immediately available funds sufficient to make payments in lieu of fractional shares in accordance with Section 1.6 and, if applicable, any dividends or other distributions pursuant to Section 1.8(c).  The shares of Acquiror Class A Common Stock and cash amounts so deposited with the Exchange Agent pursuant to this Section 1.8(a), together with any dividends or distributions received by the Exchange Agent with respect to such shares of Acquiror Class A Common Stock, are referred to collectively as the "Exchange Fund." The Exchange Fund shall be held in trust by the Exchange Agent and shall not be used for any purpose other than to pay the Per Share Consideration to holders of Company Stock in accordance with Section 1.5(b), cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c).

(b)     Concurrently with the mailing of the Proxy Statement, Acquiror shall cause the Exchange Agent to mail to each Person who is a holder of record of Company Stock Certificates: (i) a letter of transmittal in customary form to be approved by the Company (the "Letter of Transmittal"), and including a provision confirming that delivery of Company Stock Certificates shall be effected, and risk of loss and title to Company Stock Certificates shall pass, only upon delivery of such Company Stock Certificates to the Exchange Agent (and such other documents as may be reasonably required by the Exchange Agent); and (ii) instructions for use in effecting the surrender of Company Stock Certificates in exchange for the applicable Per Share Consideration that such holder is entitled to receive pursuant to Section 1.5; cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant

5

to Section 1.8(c). Upon surrender of a Company Stock Certificate to the Exchange Agent for exchange, together with a duly executed Letter of Transmittal and such other documents as may be reasonably required by the Exchange Agent: (A) the holder of such Company Stock Certificate shall be entitled to receive in exchange therefor the applicable Per Share Consideration that such holder is entitled to receive pursuant to Section 1.5 (and cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c)); and (B) the Company Stock Certificate so surrendered shall be cancelled. Until surrendered or cancelled as contemplated by this Section 1.8(b), each Company Stock Certificate shall be deemed, from and after the Effective Time, to represent only the right to receive the applicable Per Share Consideration that such holder is entitled to receive pursuant to Section 1.5 (and cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c)). In the event of a transfer of ownership of Company Stock which is not registered in the transfer records of the Company, the applicable Per Share Consideration that such holder is entitled to receive pursuant to Section 1.5 (and cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c)) may be issued to or paid to, as applicable, a Person other than the Person in whose name the Company Stock Certificates so surrendered are registered, if such Company Stock Certificates so surrendered are registered, shall be properly endorsed or otherwise be in proper form and with proper evidence for transfer and the Person requesting such issuance shall pay any transfer, stamp or other similar Taxes required by reason of the issuance of or payment of the applicable Per Share Consideration to a Person other than the registered holder of such Company Stock Certificates, or establish to the satisfaction of Acquiror that such Tax has been paid or is not applicable. If any Company Stock Certificate shall have been lost, stolen or destroyed, Acquiror may, in its reasonable discretion and as a condition to the issuance of or payment of the applicable Per Share Consideration require the owner of such lost, stolen or destroyed Company Stock Certificate to provide an appropriate affidavit and to deliver a bond (in such sum as Acquiror may reasonably direct) as indemnity against any claim that may be made against the Exchange Agent, Acquiror or the Surviving Company with respect to such Company Stock Certificate.

(c)      No dividends or other distributions declared or made with respect to Acquiror Class A Common Stock with a record date after the Effective Time shall be paid or otherwise delivered to the holder of any unsurrendered Company Stock Certificate with respect to the shares of Acquiror Class A Common Stock that such holder has the right to receive in the Merger until the later to occur of: (i) the date on which the holder surrenders such Company Stock Certificate in accordance with this Section 1.8 and (ii) the payment date for such dividend or distribution with respect to Acquiror Class A Common Stock (at which time such holder shall be entitled, subject to the effect of applicable abandoned property, escheat or similar laws, to receive all such dividends and distributions, without interest).

(d)      Any portion of the Exchange Fund that remains undistributed to holders of Company Stock Certificates as of the date that is six months after the Closing Date shall be delivered to Acquiror upon written demand. Any holders of Company Stock Certificates who have not theretofore surrendered their Company Stock Certificates in accordance with this Section 1.8 shall thereafter look only to Acquiror for, and be entitled to the applicable Per Share Consideration that such holder has the right to receive pursuant to the provisions of Section 1.5 (and cash in lieu of fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c)).

6

(e)  Neither Acquiror nor the Surviving Company shall be liable to any holder or former holder of Company Stock or to any other Person with respect to any shares of Acquiror Class A Common Stock (or dividends or distributions with respect thereto), or for any cash amounts, delivered to any public official pursuant to any applicable abandoned property law, escheat law or other similar requirements of Law.

Section 1.9  Adjustments to Per Share Consideration. If, during the period from the date of this Agreement through the Effective Time, the outstanding shares of Acquiror Class A Common Stock are changed into a different number or class of shares by reason of any stock split, division or subdivision of shares, stock dividend, reverse stock split, consolidation of shares, reorganization, reclassification, recapitalization or other similar transaction, or a record date with respect to any such event shall occur during such period, then the Per Share Consideration shall be adjusted to the extent appropriate to provide the same economic effect as contemplated by this Agreement prior to such action; provided, however, that nothing in this Section 1.9 shall be construed as permitting Acquiror to take any action or enter into any transaction otherwise prohibited by this Agreement.

Section 1.10  Closing of Transfer Books.

(a)  All shares of Company Stock outstanding immediately prior to the Effective Time shall automatically be cancelled and retired and shall cease to exist, and all holders of Company Stock Certificate(s) shall cease to have any rights as Company Stockholders, except the right to receive the applicable Per Share Consideration contemplated by Section 1.5, cash in lieu of any fractional share of Acquiror Class A Common Stock pursuant to Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c).

(b)  At the Effective Time, the stock transfer books of the Company shall be closed with respect to all shares of Company Stock outstanding immediately prior to the Effective Time and no further transfer of any such shares of Company Stock shall be made on such stock transfer books after the Effective Time. If, after the Effective Time, a valid Company Stock Certificate is presented to the Exchange Agent or to the Surviving Company or Acquiror, such Company Stock Certificate shall be cancelled and shall be exchanged as provided in Section 1.8.

Section 1.11  Withholding Rights. Each of the Exchange Agent, Acquiror and the Surviving Company shall be entitled to deduct and withhold from any consideration otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld with respect to the making of such payment under the Code, or under any provision of state, local or foreign Tax law; provided, that the Exchange Agent, Acquiror and the Surviving Company, as applicable, shall use commercially reasonable efforts to provide the Company with a written notice of such Person's intention to withhold at least five Business Days prior to any such withholding and shall reasonably cooperate with the applicable payee to minimize any such withholding. To the extent that amounts are so deducted and withheld and timely remitted to the applicable Governmental Authority, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made by the Exchange Agent, Acquiror or the Surviving Company, as the case may be.

7

Section 1.12    Corporate Governance Matters. At the Effective Time, the Acquiror Board shall be a classified board initially comprised of eight members. Unless otherwise agreed to by Acquiror and the Company prior to the Closing, Acquiror shall cause the Acquiror Board, the committees of the Acquiror Board and the officers of Acquiror at the Effective Time to be comprised of the individuals set forth on Schedule 1.12 in accordance with the procedures contemplated thereon, in each case to hold office from and after the Effective Time until the earliest to occur of the appointment or election of his or her respective successor, resignation or proper removal in accordance with applicable requirements of Law. The Acquiror Board shall comply with Stock Exchange requirements applicable to "controlled companies," including with respect to independence and committee composition, and will not be required to comply with certain Stock Exchange governance requirements from which "controlled companies" are exempt.

## ARTICLE II
## THE CLOSING

Section 2.1    Closing. Upon the terms and subject to the conditions set forth in this Agreement, the closing of the Transactions (the "Closing"), other than the filing of the Certificate of Merger, shall take place remotely by electronic exchange of executed documents, commencing at 9:00 a.m. New York City time on the date that is three Business Days after the date on which all conditions set forth in ARTICLE VII shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof) or at such other time and place as Acquiror and the Company may mutually agree. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date." Notwithstanding anything to the contrary contained herein, in no event shall the Closing Date occur prior to the date that is 60 days after the date hereof without the prior written consent of the Company.

Section 2.2    Deliveries at Closing.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, except in the case of the Company Transaction Expense Certificate and the Company Preferred Consideration Certificate, which shall be delivered two Business Days prior to Closing, the Company shall deliver to Acquiror:

(i)    a written statement setting forth all accrued and unpaid Transaction Expenses of the Company, which shall include the respective amounts and wire transfer instructions for the payment thereof (the "Company Transaction Expense Certificate");

(ii)    a written statement setting forth the respective amounts payable to each holder of Company Preferred Stock entitled to receive the Per Share Consideration pursuant to Section 1.5(b)(i)  (the "Company Preferred Consideration Certificate");

(iii)    a copy of the certificate of merger with respect to the Merger (the "Certificate of Merger"), duly executed by the Company;

(iv)    a certificate signed on behalf of the Company by an authorized officer of the Company certifying that, to the knowledge and belief of such officer, and solely in his or her capacity as an officer of the Company, the conditions set forth in

Section 7.2(a), Section 7.2(b) and Section 7.2(c) as they relate to the Company have been satisfied;

        (v)     the certificate required under Section 6.14; and

        (vi)     the other documents, instruments or certificates required to be delivered by the Company at or prior to the Closing pursuant to Section 7.2.

        (b)     Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, except in the case of the Acquiror Financing Certificate and Acquiror Transaction Expense Certificate, which shall be delivered two Business Days prior to Closing, Acquiror shall deliver to the Company:

        (i)     a certificate (the "Acquiror Financing Certificate"), signed by the secretary of Acquiror, certifying (A) that the Acquiror Stockholder Approval has been obtained and remains in full force and effect, (B) the number of shares of Acquiror Class A Common Stock included in the Acquiror Stock Redemption, if any, and the aggregate amount of cash proceeds that will be required to complete the Acquiror Stock Redemption, (C) the number of shares of Acquiror Class A Common Stock to be outstanding as of the Closing after giving effect to the Acquiror Stock Redemption; (D) the amount of Available Cash as of the Reference Time and (E) that the Available Cash as of immediately prior to the Closing equals or exceeds the Minimum Cash Balance after giving effect to the Acquiror Stock Redemption, if any;

        (ii)     a written statement setting forth all accrued Transaction Expenses of Acquiror, which shall include the respective amounts and wire transfer instructions for the payment thereof (the "Acquiror Transaction Expense Certificate");

        (iii)     evidence from the Secretary of State of the State of Delaware of the filing of the Acquiror A&R Charter with the Secretary of State of the State of Delaware in accordance with Section 2.3(d) and evidence from Acquiror of the adoption of the Acquiror A&R Bylaws;

        (iv)     a certificate signed on behalf of Acquiror by an authorized officer of Acquiror certifying that, to the knowledge and belief of such officer, and solely in his or her capacity as an officer of Acquiror, the conditions set forth in Section 7.3(a), Section 7.3(b) and Section 7.3(c) as they relate to Acquiror have been satisfied;

        (v)     the other documents, instruments or certificates required to be delivered by Acquiror at or prior to the Closing pursuant to Schedule 1.12; and

        (vi)     the other documents, instruments or certificates required to be delivered by Acquiror at or prior to the Closing pursuant to Section 7.3.

Section 2.3    Closing. At the Closing, the Parties shall cause the consummation of the following transactions in the following order, upon the terms and subject to the conditions of this Agreement:

(a)     Acquiror shall make any payments required to be made by Acquiror in connection with the Acquiror Stock Redemption;

(b)     Acquiror shall pay, or cause to be paid by wire transfer of immediately available funds, (i) all accrued Transaction Expenses of Acquiror as set forth on the Acquiror Transaction Expense Certificate and (ii) all accrued and unpaid Transaction Expenses of the Company as set forth of the Company Transaction Expense Certificate to the applicable payees, to the extent not paid prior to the Closing;

(c)     Acquiror shall contribute to Merger Sub: (i) the amount of cash remaining in the Trust Account and (ii) the PIPE Investment Amount after giving effect to the transactions set forth in clauses "(a)" and "(b);"

(d)     the Acquiror A&R Charter shall be filed by Acquiror with the Secretary of State of the State of Delaware, in accordance with the procedures set forth in Schedule 2.3 and the applicable provisions of the DGCL; and

(e)     the Certificate of Merger shall be filed by the Company with the Secretary of State of the State of Delaware, in accordance with the applicable provisions of the DGCL (the time of such filing, or such later time as may be agreed in writing by the Company and Acquiror and specified in the Certificate of Merger, being the "Effective Time").

## ARTICLE III
## EARN-OUT

Section 3.1     Issuance of Earn Out Shares.

(a)     Following the Closing, and as additional consideration for the Merger and the Transactions, within five Business Days after the occurrence of a Triggering Event, Acquiror shall issue or cause to be issued to the Company Common Stockholder the following shares of Acquiror Class A Common Stock (which may be equitably adjusted in accordance with Section 3.3, the "Earn Out Shares"), upon the terms and subject to the conditions set forth in this Agreement and the Ancillary Agreements:

(i)     upon the occurrence of Triggering Event I, a one-time issuance of 5,000,000 Earn Out Shares;

(ii)     upon the occurrence of Triggering Event II, a one-time issuance of 5,000,000 Earn Out Shares; and

(iii)     upon the occurrence of Triggering Event III, a one-time issuance of 5,000,000 Earn Out Shares.

(b)     For the avoidance of doubt, the Company Common Stockholder shall be entitled to receive Earn Out Shares upon the occurrence of each Triggering Event; provided, however, that each Triggering Event shall only occur once, if at all, and in no event shall the Company Common Stockholder be entitled to receive more than an aggregate of 15,000,000 Earn Out Shares.

Section 3.2 <u>Acceleration Event</u>. If, during the Earn Out Period, there is a Change of Control that will result in the holders of Acquiror Class A Common Stock receiving a per share price in excess of the applicable Common Share Price required in connection with any Triggering Event (an "<u>Acceleration Event</u>"), then immediately prior to the consummation of such Change of Control: (a) any such Triggering Event that has not previously occurred shall be deemed to have occurred; and (b) Acquiror shall issue the applicable Earn Out Shares to the Company Common Stockholder, and the recipients of such issued Earn Out Shares shall be eligible to participate in such Change of Control.

Section 3.3 <u>Adjustments to Earn Out Shares</u>. If, during the period from the Effective Time through the end of the Earn Out Period, the outstanding shares of Acquiror Class A Common Stock are changed into a different number or class of shares by reason of any merger, stock split, division or subdivision of shares, stock dividend, reverse stock split, consolidation of shares, reorganization, reclassification, recapitalization or other similar transaction, or a record date with respect to any such event shall occur during such period, then the number of Earn Out Shares issued pursuant to this <u>ARTICLE III</u> shall be adjusted to the extent appropriate to provide the same economic effect as contemplated by this Agreement prior to such action; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 3.3</u> shall be construed as permitting Acquiror to take any action or enter into any transaction otherwise prohibited by this Agreement. If, during the period from the Effective Time through the end of the Earn Out Period, Acquiror, the Surviving Company, or any of their respective successors or assigns consolidates with or merges into any other Person (including in connection with a Change of Control) and shall not be the continuing or surviving corporation or entity of such consolidation or merger or transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each case, Acquiror and the Surviving Company shall ensure that proper provision shall be made so that the successors and assigns of Acquiror or the Surviving Company, as the case may be, shall succeed to the obligations set forth in this Article III, provided however, that the forgoing shall not limit Acquiror or the Surviving Company from consummating a Change of Control or entering into an agreement that contemplates a Change of Control.

Section 3.4 <u>Tax Treatment of Earn Out Shares</u>. Any issuance of Earn Out Shares, including any issuance of Earn Out Shares made upon the occurrence of an Acceleration Event pursuant to <u>Section 3.2</u>, shall be treated as an adjustment to the Aggregate Common Stock Consideration by the Parties for U.S. federal and applicable state and local income tax purposes, unless otherwise required by Law.

<div align="center">

**ARTICLE IV**
**<u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>**

</div>

Except as set forth in the Disclosure Schedules prepared in accordance with <u>Section 10.2(e)</u>, the Company represents and warrants to Acquiror as follows:

Section 4.1 <u>Organization and Authority</u>. The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to own, lease or operate its properties and assets and to conduct the Business as it is now being conducted and contemplated to be conducted, except where the failure to have such power and authority would not be material to the Company and its

<div align="center">11</div>

Subsidiaries, taken as a whole. True, accurate and complete copies of the Company Organizational Documents have been Made Available to Acquiror. The Company is duly licensed or qualified to do business and in good standing in all jurisdictions in which its ownership of property or assets or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified and in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 4.2 <u>Authorization and Enforceability</u>. The Company has all requisite corporate power and authority to execute, deliver and perform this Agreement and each Ancillary Agreement to which it is a party, and carry out the Company's obligations hereunder and thereunder and to consummate the Transactions, in each case, subject to the consents, approvals, authorizations and other requirements described in <u>Section 4.5</u> and the adoption of this Agreement by holders of a majority of the voting power represented by all outstanding shares of Company Stock voting together as a single class (the "<u>Company Requisite Approval</u>"). The execution, delivery and performance by the Company of this Agreement and each Ancillary Agreement to which it is a party and the consummation of the Transactions have been duly and validly authorized and approved by the Company Board and, upon receipt of the Company Requisite Approval, no other proceeding on the part of the Company is necessary to consummate the Transactions contemplated by this Agreement or any Ancillary Agreement to which it is or will be a party. This Agreement has been duly and validly executed and delivered by the Company, and assuming due authorization and execution by each other Party, constitutes a legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as such enforceability (x) may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Laws affecting or relating to enforcement of creditors' rights generally and (y) is subject to general principles of equity, regardless of whether enforceability is considered in a proceeding at law or in equity (the "<u>Bankruptcy and Equity Exceptions</u>"). Each Ancillary Agreement to be executed by the Company at or prior to the Closing will be, when executed and delivered by the Company, duly and validly executed and delivered, and assuming due authorization and execution by each other Party thereto and the consummation of the Closing, will constitute a legal, valid and binding obligation of the Company, enforceable against the Company, in accordance with its terms, except as such enforceability may be limited by or subject to any applicable Bankruptcy and Equity Exception. The Company Requisite Approval is the only vote of the holders of any class or series of capital stock of the Company required to adopt this Agreement and approve the Transactions.

Section 4.3 <u>Noncontravention</u>. The execution, delivery and performance of this Agreement and the other Ancillary Agreements to which the Company is a party by the Company do not, and the consummation or performance of the Transactions will not, (a) conflict with or violate any provision, or result in the breach, of the Company Organizational Documents or any Organizational Document of any Subsidiary of the Company, (b) conflict with or result in any violation of any provision of any Law applicable to the Company or any of its Subsidiaries, or any of their respective properties or assets, (c) violate, conflict with, result in a breach of, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in a right of termination, cancellation, modification, acceleration or amendment under, any of the terms, conditions or provisions of any Material Contract or any of the Leases or (d) result in the creation of any Lien upon any of the material properties or assets of the Company, except with respect to clauses "<u>(b)</u>", "<u>(c)</u>" and "<u>(d)</u>" above, where any such violation, conflict,

12

breach, default or right would not, individually or in the aggregate, reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

Section 4.4     Subsidiaries. A true, correct and complete list of all the Company's Subsidiaries, together with the jurisdiction of organization or incorporation of each such Subsidiary, the percentage of the outstanding ownership interest and the names of the record owners of all securities and other equity interests of each such Subsidiary owned by the Company and each other Subsidiary of the Company, in each case, as of the date hereof, is set forth on Schedule 4.4. Each Subsidiary of the Company has been duly formed or organized and is validly existing under the Laws of its jurisdiction of incorporation or organization and has the requisite corporate or entity power and authority to own, lease or operate its assets and to conduct its business as it is now being conducted, except where the failure to have such power and authority would not reasonably be expected to have a Company Material Adverse Effect. True, accurate and complete copies of the Organizational Documents of each of the Company's Subsidiaries have been Made Available to Acquiror. Each Subsidiary of the Company is duly qualified or licensed as a foreign limited liability company, foreign corporation or other organization to do business, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except for such failures to be so qualified or licensed and in good standing that would not reasonably be expected to have a Company Material Adverse Effect. Other than each of the Company's Subsidiaries, the Company does not directly or indirectly own any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity or similar interest in, any Person.

Section 4.5     Governmental Authorities; Consents. The execution and delivery of this Agreement, and the other Ancillary Agreements to which the Company is a party, by the Company does not, and the consummation or performance of the Transactions by the Company will not, require any consent, approval, authorization or Permit of, or filing with or notification to, any Governmental Authority, except (a) for applicable requirements, if any, of the Exchange Act or state securities or "blue sky" laws ("Blue Sky Laws"), (b) applicable requirements of the HSR Act, (c) the filing of the Certificate of Merger in accordance with the DGCL and (d) such consents, approvals, authorizations, permissions, filings or notifications which are made or obtained or, if not made or obtained, would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

Section 4.6     Capitalization.

(a)     Schedule 4.6(a) accurately sets forth, as of the date hereof, the number of equity interests of each class and series of the Company which are authorized (where applicable) and which are issued and outstanding. All such issued and outstanding equity interests of the Company are duly authorized, validly issued, fully paid and non-assessable, and are held of record by the Persons and in the amounts set forth on Schedule 4.6(a).

(b)     (i) No equity interests of the Company are reserved for issuance or are held as treasury securities; (ii) no equity interests of the Company are subject to or were issued in violation of any pre-emptive rights, rights of first refusal, tag-along rights, drag-along rights, transfer restrictions, proxies, voting trusts, stockholder agreements or other agreements or

13

understandings in effect to which the Company is a party with respect to the voting or transfer of such equity interests; (iii) there is no restricted stock or any outstanding subscriptions, options, warrants, rights, calls, conversion rights, rights of exchange, convertible or exchangeable securities or other plans or commitments, contingent or otherwise, relating to the equity interests of the Company other than as contemplated by this Agreement; (iv) there are no outstanding contracts or other agreements to which the Company is a party to purchase, redeem or otherwise acquire any outstanding equity interests of the Company or securities or obligations of any kind convertible into any equity interests of the Company; and (v) there are no outstanding or authorized equity appreciation, phantom equity, equity incentive plans, profits interests or similar rights with respect to the Company.

Section 4.7    Financial Statements.

(a)    The Company has Made Available true, correct and complete copies of the audited consolidated balance sheets and consolidated statements of income (loss), stockholders' equity and cash flows of the Company and its Subsidiaries as of and for the twelve months ended December 31, 2019 and 2018 (collectively, the "Year-End Financial Statements"), together with all related notes and schedules thereto, prepared in accordance with GAAP applied on a consistent basis throughout the covered periods (except as may be indicated in the notes thereto), accompanied by an unqualified report of the Company's independent auditor with respect thereto.

(b)    The Company has Made Available true, correct and complete copies of the unaudited consolidated balance sheets and consolidated statements of income (loss), stockholders' equity and cash flows of the Company and its Subsidiaries as of and for the nine months ended September 30, 2020 and the prior comparable period (the "Interim Financial Statements" and, together with the Year-End Financial Statements, the "Financial Statements"), prepared in accordance with GAAP applied on a consistent basis throughout the covered periods (except as may be indicated in the related notes and schedules and subject, in the case of unaudited financial statements, to normal recurring year-end and quarter-end adjustments (the effect of which will not, individually or in the aggregate, be material to such financial statements) and the absence of notes to such statements).

(c)    The Financial Statements fairly present, in all material respects, the financial position, results of operations and cash flows of the Company and its Subsidiaries for the periods indicated in such Financial Statements and were derived from, and accurately reflect in all material respects, the books and records of the Company and its Subsidiaries.

(d)    As of the Closing, the Company will have established and will maintain a system of "internal controls over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) sufficient to provide reasonable assurances: (i) that records are maintained that in reasonable detail accurately and fairly reflect the transactions and dispositions of assets of the Company and its Subsidiaries; (ii) that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company and its Subsidiaries are being made only in accordance with the authorizations of management and directors of the Company; and (iii) regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's and its Subsidiaries' assets that could have a material effect on the financial statements. As of the date

14

hereof, the Company has not identified or been made aware of, and has not received from its independent auditors any notification of, any (x) "significant deficiency" in the internal controls over financial reporting of the Company and its Subsidiaries, (y) "material weakness" in the internal controls over financial reporting of the Company and its Subsidiaries or (z) fraud, whether or not material, that involves management or other employees of the Company and its Subsidiaries who have a role in the internal controls over financial reporting of the Company and its Subsidiaries.

(e)     There are no outstanding loans or other extensions of credit made by the Company to any executive officer (as defined in Rule 3b-7 under the Exchange Act) or director of the Company.

Section 4.8     Undisclosed Liabilities. There is no liability, debt or obligation of the Company or any of its Subsidiaries that would be required to be set forth or reserved for on a consolidated balance sheet prepared in accordance with GAAP consistently applied and in accordance with past practice, except for liabilities and obligations (a) reflected or reserved for on the Financial Statements or disclosed in the notes thereto (if any), (b) that have arisen since the date of the most recent balance sheet included in the Interim Financial Statements in the Ordinary Course of Business, (c) that have arisen in connection with the Transactions, (d) for future performance under any Contract to which the Company or any of its Subsidiaries is a party or (e) which would not be material to the Company and its Subsidiaries, taken as a whole.

Section 4.9     Actions. As of the date of this Agreement, (a) there are no pending Actions or, to the Knowledge of the Company, Actions threatened, against the Company or any of its Subsidiaries, or, to the Knowledge of the Company, any of their respective directors or officers (with regard to their actions in their capacities as such), and (b) neither the Company nor any of its Subsidiaries or, to the Knowledge of the Company, their respective properties or assets is subject to any continuing Governmental Order, except in the case of clauses "(a)" and "(b)," as would not be material to the Company and its Subsidiaries, taken as a whole. Except as would not be material to the Company and its Subsidiaries, taken as a whole, (x) there is no audit, examination or investigation by any Governmental Authority (other than ordinary course audits or examinations by an agency or regulating agency) pending or, to the Knowledge of the Company, threatened, of or against the Company or any of its Subsidiaries, and (y) to the Knowledge of the Company, there is no any audit, examination or investigation by any Governmental Authority (other than ordinary course audits or examinations by an agency or regulating agency) pending, or threatened in writing, of or against any of the directors or officers (with regard to their actions in their capacities as such) of the Company or any of its Subsidiaries. As of the date of this Agreement, there is no (i) pending Action or Action threatened by the Company or any of its Subsidiaries against any third party, except as would not be material to the Company and its Subsidiaries, taken as a whole, or (ii) settlement agreement or similar agreement that imposes any material ongoing obligation or restriction on the Company or any of its Subsidiaries.

Section 4.10     Compliance with Laws; Permits.

(a)     The Company and each of its Subsidiaries is, and since January 1, 2018, has been in compliance with all applicable Laws and applicable requirements thereof, except where failure to be in such compliance as would not reasonably be expected to be material to the

15

Company and its Subsidiaries, taken as a whole. Since January 1, 2018, the Company has not been sanctioned, fined or penalized for any violation of or failure to comply with any applicable Law, except for such sanctions, fines or penalties as would not be material to the Company and its Subsidiaries, taken as a whole. To the Knowledge of the Company, neither the Company nor any of its Subsidiaries has received any written notice from any Governmental Authority alleging a violation of any applicable Law by the Company nor any of its Subsidiaries at any time since January 1, 2018, except as would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

(b)        (i) Each of the Company and its Subsidiaries is in possession of all Permits necessary for the Company or such Subsidiary, as applicable, to own, lease and operate its properties or to carry on its business as it is now being conducted (the "Company Permits") in compliance with all applicable Laws, except where the failure to have such Company Permits would not be material to the Company and its Subsidiaries, taken as a whole, (ii) all such Company Permits are valid and in full force and effect and (iii) there are no proceedings pending, or, to the Knowledge of the Company, threatened, that seek the revocation, cancellation, suspension or adverse modification of any Company Permit, in each case, except for such revocation, cancellation, suspension or adverse modification would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

(c)        (i) None of the Company or any of its Subsidiaries, is or has ever been a Sanctioned Person and (ii) to the Knowledge of the Company, since January 1, 2018, none of the Company's or any of its Subsidiaries' respective directors, limited liability company managers (or equivalent governing authority), officers, employees, agents or representatives is or has been a Sanctioned Person. Since January 1, 2018, except as would not be material to the Company and its Subsidiaries, taken as a whole, the operations of the Company and its Subsidiaries have been conducted in compliance with all Sanctions. None of the Company or any of its Subsidiaries, or any of their respective directors, limited liability company managers (or equivalent governing authority), officers, or employees is or has been the subject of any enforcement proceedings or, to the Knowledge of the Company, any investigation or inquiry by any Governmental Authority with respect to Sanctions, and there is no such enforcement proceeding or, to the Knowledge of the Company, investigation or inquiry pending or to the Knowledge of the Company, threatened. The Company and its Subsidiaries have in place controls and systems reasonably designed to ensure compliance with Sanctions in each of the jurisdictions in which the Company and its Subsidiaries operate or do business.

Section 4.11    Material Contracts.

(a)        Schedule 4.11(a) contains a true, accurate and complete list, as of the date of this Agreement, of each of the following Contracts (other than any Company Benefit Plan or lease or license for real property) to which the Company or any of its Subsidiaries is a party or otherwise bound (each such Contract required to be set forth on Schedule 4.11(a) collectively, the "Material Contracts"):

(i)        each Contract evidencing outstanding Indebtedness of the Company or any of its Subsidiaries (other than guarantees or surety Contracts in respect of obligations

16

under real property leases), in each case in an aggregate amount thereunder in excess of $1,000,000;

(ii)     each partnership or joint venture (which includes the sharing of the Company's and/or any of the its Subsidiaries' profits);

(iii)     each Contract that involves the acquisition or disposition of capital stock or other equity interests of another Person (other than the Company or any of its Subsidiaries, to the extent such entity was a Subsidiary at the time such Contract was entered into), whether by merger, consolidation or otherwise, in each case, which has been entered into since January 1, 2018;

(iv)     any Contract that contains an existing obligation (contingent or otherwise) to pay any material amounts with respect to indemnification obligations, purchase price adjustment, earn-outs, backend payment or similar obligations, in all cases in connection with any completed acquisition or disposition by the Company;

(v)     each Contract with any Material Payor or Material Supplier, other than any work orders, purchase orders, invoices and similar documents issued in the Ordinary Course of Business;

(vi)     each Contract with any physician, physician practice, surgery center, home health agency, hospital or other referral source (A) involving consideration in excess of $100,000 in any twelve-month period or (B) from whom the Company or any of its Subsidiaries (on a consolidated basis) have received referrals generating more than $250,000 during the year ended December 31, 2019;

(vii)     any Contract (other than those made in the Ordinary Course of Business) providing for: (A) the grant of any preferential rights to purchase or lease any asset of the Company or any of its Subsidiaries or (B) any right (exclusive or non-exclusive) to sell or distribute any material product or service of the Company or any of its Subsidiaries;

(viii)     each Contract with any Governmental Authority (other than payor or provider Contracts in respect of any Federal Health Care Program or Contracts for athletic training services provided to any middle school, high school, college or university);

(ix)     each Contract requiring any capital commitment or capital expenditures (including any series of related expenditures in excess of $1,000,000);

(x)     each Contract providing for "most favored customer" or similar terms that limit the Company's or one of its Subsidiaries' right to determine pricing for products or services;

(xi)     each Contract that limits, or purports to limit, in any material respect the ability of the Company or any Subsidiary of the Company (A) to compete in any material line of business or with any Person or entity or in any geographic area or during any period of time or (B) from soliciting customers; and

17

(xii) each collective bargaining agreement or other Contract with a trade union or other labor organization.

(b) (i) Each Material Contract is a legal, valid and binding obligation of the Company or a Subsidiary of the Company and, to the Knowledge of the Company, the other parties thereto; and (ii) except as would not be material to the Company and its Subsidiaries, taken as a whole: (A) neither the Company nor any of the Subsidiaries of the Company is in breach or violation of, or default under, any Material Contract, nor has any Material Contract been cancelled by the other party; (B) to the Knowledge of the Company, no other party is (with or without notice or lapse of time or both) in breach or violation of, or default under, any Material Contract; and (C) since January 1, 2018, neither the Company nor any of the Subsidiaries of the Company has received any written claim of default or breach under any Material Contract. The Company has Made Available to Acquiror true, correct and complete copies of all Material Contracts, including any and all exhibits, schedules and amendments thereto (other than any work orders, purchase orders, invoices and similar documents issued in the Ordinary Course of Business).

Section 4.12   Real Property.

(a)     Neither the Company nor any of its Subsidiaries owns a fee interest in any real property.

(b)     Schedule 4.12(b) lists (i) a true, correct and complete list of each material parcel of real property leased or subleased by the Company or any of its Subsidiaries as of the date hereof by street address and (ii) each material lease or sublease with respect to the 30 clinic sites with the highest aggregate annual payments under the terms of the applicable material lease, and each material non-clinic lease of the Company or any of its Subsidiaries, including with respect to the Company's corporate headquarters (such documents in clause "(ii)", the "Leases"). True, correct and complete copies of all Leases have been Made Available to Acquiror (the underlying properties, collectively, the "Leased Real Property"). Except as would not be reasonably expected to curtail or interfere, in any materially adverse respect to the current use and operation of the Leased Real Property: (i) each Lease is in full force and effect, is valid and effective in accordance with its respective terms, subject to any applicable Bankruptcy and Equity Exception, (ii) there is not, under any Lease, any existing material default or event of default (or event which, with notice or lapse of time, or both, would constitute a material default) by the Company or any of its Subsidiaries or, to the Knowledge of the Company, by the other party to such Lease or sublease, (iii) no action, suit, investigation, arbitration or administrative or other proceeding is pending or, to the Knowledge of the Company, threatened with respect to the Leased Real Property and (iv) neither the Company nor any of its Subsidiaries have received any written notice of a material violation applicable to any building, zoning, health or other Law with respect of the use or occupation of any Leased Real Property.

Section 4.13   Employee Benefits.

(a)     Schedule 4.13(a) sets forth a true, correct and complete list of all material Company Benefit Plans, excluding any employment, restrictive covenant, consulting, or equity award agreement, offer letter or other agreement which does not materially deviate from the applicable Company form, which is included on Schedule 4.13(a) ("Individualized Agreements").

18

With respect to each material Company Benefit Plan, the Company has Made Available to Acquiror a current, true, correct and complete copy of each such Company Benefit Plan other than Individualized Agreements (or if no such copy exists, a written description of the material terms thereof) and, to the extent material and applicable, (i) any amendments, (ii) the most recent summary plan description as well as any summary of material modifications thereof, (iii) trust agreement or other funding instrument, (iv) the most recent Form 5500 series and (v) copies of the most recently received Internal Revenue Service determination, opinion or advisory letter for each such Company Benefit Plan.

(b)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, all contributions and/or payments owed by the Company under the terms of any Company Benefit Plan have been timely accrued for or paid in full when and as required to be paid.

(c)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, each Company Benefit Plan has been established, maintained, administered and operated in accordance with its terms and in compliance with the applicable terms of ERISA, the Code, and any other applicable Law.

(d)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received, or is based on a form of plan that has received, a favorable determination or opinion letter from the Internal Revenue Service, and, to the Knowledge of the Company, nothing has occurred, whether by action or failure to act, that would reasonably be expected to cause such determination letter to be revoked.

(e)     Neither the Company nor any of its ERISA Affiliates has within the past six years maintained, established, participated in or contributed to, been obligated to contribute to, or incurred any obligation or liability (including any contingent liability) under, an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (including any "multiemployer plan" within the meaning of Section (3)(37) of ERISA).

(f)     With respect to any Company Benefit Plan, except as would not be material to the Company and its Subsidiaries, taken as a whole, (i) no Actions (other than routine claims for benefits in the ordinary course) are pending or, to the Knowledge of the Company, threatened, (ii) no audit or other administrative proceeding by the United States Department of Labor, the Internal Revenue Service or other Governmental Authority is pending, or, to the Knowledge of the Company, threatened and (iii) there has been no non-exempt "prohibited transaction" within the meaning of Section 4975(c) of the Code or Section 406 of ERISA involving the assets of any Company Benefit Plan.

(g)     Neither the Company nor any Subsidiary has any obligation to gross-up or reimburse any individual for any tax or related interest or penalties incurred by such individual, under Sections 409A or 4999 of the Code.

19

(h)     Neither the execution and delivery of this Agreement nor the consummation of the Transactions will, either alone or in connection with any other event(s): (i) result in any payment or benefit becoming due to any current or former employee, contractor or director of the Company or any Subsidiary under any Company Benefit Plan; (ii) increase any amount of compensation or benefits otherwise payable to any current or former employee, contractor or director of the Company or any Subsidiary under any Company Benefit Plan; or (iii) result in the acceleration of the time of payment, funding or vesting of any benefits to any current or former employee, contractor or director of the Company or any Subsidiary under any Company Benefit Plan.

Section 4.14     Labor and Employment.

(a)     (i) Neither the Company nor any Subsidiary of the Company is a party to any collective bargaining agreement or other Contract with a union or other labor organization, (ii) there is no union organizing effort pending, or to the Knowledge of the Company, threatened with respect to any employees of the Company or any Subsidiary of the Company and (iii) since January 1, 2018, there has been no actual, or to the Knowledge of the Company, threatened strike, organized slowdown, work stoppage, lockout, arbitration, picketing, hand-billing or other material labor dispute with respect to any employees of the Company or any Subsidiary of the Company.

(b)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company and its Subsidiaries are in compliance with all applicable Laws regarding employment and employment practices, including, without limitation, all Laws respecting terms and conditions of employment, health and safety, employee classification, non-discrimination, wages and hours, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, pay equity, overtime pay, employee leave issues, the proper classification of employees and independent contractors, the proper classification of exempt and non-exempt employees, immigration and employment authorization (including Form I-9 compliance) and unemployment insurance.

(c)     To the Knowledge of the Company, since January 1, 2018, no allegations of sexual or other unlawful harassment or discrimination have been made against (i) any officer of the Company or its Subsidiaries, or (ii) any employee of the Company or its Subsidiaries at the level of vice-president or above.

(d)     To the Knowledge of the Company, no employee of the Company or its Subsidiaries at the level of vice-president or above is in material violation of any term of any employment agreement, nondisclosure agreement, non-competition agreement, restrictive covenant or other obligation (i) to the Company or its Subsidiaries, or (ii) to a former employer of any such employee relating (A) to the right of any such employee to be employed by the Company or its Subsidiaries or (B) to the knowledge or use of trade secrets or proprietary information.

(e)     Since January 1, 2018, neither the Company nor any of its Subsidiaries has engaged in layoffs, furloughs or employment terminations, whether temporary or permanent, and neither the Company nor any of its Subsidiaries has plans to engage in any layoffs, furloughs or employment terminations, whether temporary or permanent, within the next six months. The

20

Company and its Subsidiaries, taken as a whole, has sufficient employees to operate the Business as currently conducted.

(f)    The Company and its Subsidiaries and are not themselves direct government contractors required to comply with Executive Order 11246 and, except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company and its Subsidiaries are in compliance with Executive Order 11246 and other applicable Laws requiring affirmative action or other employment related actions for government contractors or subcontractors.

Section 4.15    Taxes.

(a)    All income and other material Tax Returns required by Law to be filed by the Company or its Subsidiaries have been duly and timely filed (after giving effect to any valid extensions of time in which to make such filings) and all such Tax Returns are true, correct and complete in all material respects. All Taxes shown due on such Tax Returns and all other material amounts of Taxes owed by the Company and its Subsidiaries (whether or not shown due on any Tax Return) have been timely paid. The Company and each of its Subsidiaries have established reserves in accordance with GAAP on the Financial Statements that, as of the dates of the applicable Financial Statements, were adequate for the payment of all material Taxes not yet due and payable with respect to the Company and each of its Subsidiaries.

(b)    Each of the Company and its Subsidiaries has (i) withheld all material amounts of Taxes required to have been withheld by it in connection with amounts paid to any employee, independent contractor, creditor, stockholder or any other third party and (ii) remitted such amounts required to have been remitted to the appropriate Governmental Authority and has otherwise complied in all material respects with all applicable Laws relating to the withholding, collection, payment and reporting of such Taxes.

(c)    Neither the Company nor any of its Subsidiaries is currently engaged in any audit, examination, investigation, administrative, judicial or similar proceeding with a Governmental Authority with respect to material Taxes, and, to the Knowledge of the Company, no such proceeding has been threatened. Neither the Company nor its Subsidiaries has been assessed any deficiency for material Taxes that has not been paid or settled in full, and, to the Knowledge of the Company, no such deficiency has been threatened. No written claim has been made by any Governmental Authority in a jurisdiction where the Company or any of its Subsidiaries does not file a Tax Return that such entity is or may be subject to material Taxes or material Tax Return filing obligations in that jurisdiction.

(d)    Neither the Company nor its Subsidiaries (or any predecessor thereof) has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying or intended to qualify for tax-free treatment under Section 355 of the Code in the prior two years.

(e)    Neither the Company nor its Subsidiaries has been a party to any "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

21

(f)     There are no Liens with respect to unpaid Taxes on any of the assets of the Company or its Subsidiaries, other than Permitted Liens.

(g)     Neither the Company nor any of its Subsidiaries is or has been a member of any consolidated, combined or unitary group (other than a group the common parent of which is the Company or any of its Subsidiaries). Neither the Company nor its Subsidiaries has any liability for the Taxes of any Person (other than the Company or its Subsidiaries) (i) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Law), (ii) as a transferee or successor or by operation of law, or (iii) by Contract (other than pursuant to customary Tax gross-up or indemnity provisions in credit agreements or in other commercial Contracts not primarily relating to Taxes).

(h)     Neither the Company nor any of its Subsidiaries is a party to, or bound by, or has any obligation to, any Governmental Authority or other Person under any Tax Sharing Agreements, except, in each case, (i) for any customary Tax gross-up or indemnity provisions in credit agreements or in other commercial contracts not primarily relating to Taxes, or (ii) for any such agreement exclusively between or among the Company and its Subsidiaries.

(i)     Except for extensions resulting from the extension of the time to file any applicable Tax Return, there are no outstanding agreements extending or waiving the statute of limitations applicable to any material Tax or material Tax Return with respect to the Company or any of its Subsidiaries or extending a period of collection, assessment or deficiency for material Taxes due from or with respect to the Company or any of its Subsidiaries, which period (after giving effect to such extension or waiver) has not yet expired, and no written request for any such waiver or extension is currently pending. None of the Company or any of its Subsidiaries is the beneficiary of any extension of time within which to file any material Tax Return not previously filed (other than a validly obtained extension of time not requiring the consent of the applicable Governmental Authority). No private letter ruling, administrative relief, closing agreement, technical advice or other similar ruling or request therefor has been granted or issued by, or is pending with, any Governmental Authority with respect to material Taxes of the Company or any of its Subsidiaries.

(j)     To the Knowledge of the Company, there are no facts, circumstances or plans that, either alone or in combination, would reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment.

(k)     Neither the Company nor any of its Subsidiaries will be required to include any material item of income, or exclude any material item of deduction, for any taxable period (or portion thereof) beginning on or after the Closing Date as a result of: (i) an installment sale transaction occurring on or before the date hereof governed by Code Section 453 (or any similar provision of state, local or foreign Laws); (ii) a disposition occurring on or before the date hereof reported as an open transaction for U.S. federal income Tax purposes (or any similar doctrine under state, local, or foreign Laws); (iii) any prepaid amounts received on or prior to the date hereof or deferred revenue realized, accrued or received on or prior to the date hereof outside of the ordinary course of business; (iv) a change in method of accounting with respect to Taxes that occurred or was requested on or prior to the date hereof (or as a result of the use of an impermissible method of accounting prior to the date hereof); (v) an agreement entered into with any

22

Governmental Authority (including a "closing agreement" under Code Section 7121 or similar provision of state, local, or foreign law) on or prior to the date hereof; or (vi) intercompany transactions or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign Tax law) occurring or created on or prior to the date hereof.

(l)     Neither the Company nor any of its Subsidiaries has deferred any "applicable employment taxes" under Section 2302 of the CARES Act.

(m)     Neither the Company nor any of its Subsidiaries has any unpaid liability under Code Section 965 or any similar provision of U.S. state or local or non-U.S. Tax Law.

(n)     Other than the representations and warranties set forth in Section 4.13 (insofar as it relates to Taxes), this Section 4.15 contains the exclusive representations and warranties of the Company with respect to Tax matters.

Section 4.16     Intellectual Property.

(a)     Schedule 4.16(a) sets forth a list of all Intellectual Property registrations and applications for registration of Intellectual Property owned by the Company and its Subsidiaries as of the date of this Agreement.

(b)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company or one of its Subsidiaries owns or has the valid right to use all material Intellectual Property necessary for, or used in, the operation of the business of the Company as currently conducted (all such Intellectual Property that is owned by the Company and the Company's Subsidiaries collectively, the "Company Owned Intellectual Property"), free and clear of all Liens (other than Permitted Liens). Schedule 4.16(c) sets forth a non-exhaustive list of material Company Owned Intellectual Property, other than the Intellectual Property registrations and applications for registration set forth in Schedule 4.16(a).

(c)     Except as would not be material to the Company and its Subsidiaries, taken as a whole: (i) there are no claims against the Company or any of its Subsidiaries that are presently pending, or to the Knowledge of the Company, threatened, (A) contesting the validity, use, ownership or enforceability of any of the Company Owned Intellectual Property, or (B) alleging any infringement, misappropriation or other violation of any Intellectual Property rights of any other Persons; (ii) to the Knowledge of the Company, the operation of the Company's business as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person; and (iii) to the Knowledge of the Company, no Person is infringing, misappropriating or otherwise violating any material Company Owned Intellectual Property.

(d)     The Company and its Subsidiaries have taken commercially reasonable actions to maintain and protect the secrecy and confidentiality of the material trade secrets included in the Company Owned Intellectual Property. Except as would not be material to the Company and its Subsidiaries, taken as a whole, no such material trade secret has been authorized by the Company or any of its Subsidiaries to be disclosed to any Person other than pursuant to a non-disclosure agreement restricting the disclosure of such trade secret.

23

(e)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company or one of its Subsidiaries owns, or has a valid right to access and use all computer systems, networks, hardware, software, and equipment used in connection with the business of the Company as currently conducted ("Company IT Systems"). The Company IT Systems (i) are adequate for, and operate and perform in all material respects as required in connection with, the operation of the business of the Company as currently conducted and (ii) do not, to the Knowledge of the Company, contain any viruses, worms, trojan horses, bugs, faults or other devices, errors, contaminants or effects that: (A) materially disrupt or adversely affect the functionality of any Company IT Systems, except as disclosed in their documentation; or (B) enable or assist any Person to access without authorization any Company IT Systems. To the Knowledge of the Company, since January 1, 2018, there have been no security breaches of the Company IT Systems and there have been no adverse events affecting any Company IT Systems that adversely affected the Company's and its Subsidiaries' business or operations, in each case, except as would not be material to the Company and its Subsidiaries, taken as a whole.

Section 4.17     Compliance with Healthcare Laws and Information Privacy and Security Laws.

(a)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, none of the Company or any of its Subsidiaries or any of their respective directors, limited liability company managers (or equivalent governing authority), officers or, to the Knowledge of the Company, employees or independent contractors (with respect to their activities on behalf of the Company or its Subsidiaries) (i) is, or since January 1, 2018, has been, in violation of, conducting its business or operations in violation of, or using or occupying its properties or assets in violation of any Healthcare Laws, (ii) has, since January 1, 2018, received any written notice of any alleged violation of, or any citation, suspension, revocation, limitation, warning, claim or request for repayment or refund issued by a Governmental Authority that alleges or asserts that the Company or any of its Subsidiaries have violated any Healthcare Laws or which requires or seeks to adjust, modify or alter any of the Company's or its Subsidiaries' operations, activities, services or financial condition, in each case that has not been fully and finally resolved to the Governmental Authority's satisfaction without further liability to the Company or any Company Subsidiary or (iii) is subject to or has entered into any written agreement, including any individual or corporate integrity agreement, settlement or Government Order related to any actual or alleged violation of any applicable Healthcare Law.

(b)     Since January 1, 2018, except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company and each of its Subsidiaries have prepared, submitted and implemented timely and effective responses and, as applicable, any corrective action plans required to be prepared and submitted in response to all (i) internal or third-party audits, inspections, investigations or examinations of the Company and its Subsidiaries and (ii) investigations, subpoenas, investigations, demands, complaints or allegations by customers, patients, Governmental Authorities or other Persons.

(c)     The Company and each of its Subsidiaries (i) has in place healthcare regulatory compliance programs including policies, procedures and training programs reasonably designed to cause the Company, each Company Subsidiary and their respective directors, limited liability company managers (or equivalent governing authority), officers, employees, contractors

24

and vendors to be in compliance with all applicable Healthcare Laws, including the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), the federal Physician Self-Referral Law, 42 U.S.C. § 1395nn, and all applicable billing and claims requirements and (ii) is operating in compliance in all material respects with such compliance programs, including with respect to training of workforce members when hired and periodically thereafter.

(d)     Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any of their respective directors, limited liability company managers (or equivalent governing authority), officers, employees, contractors or vendors, have on behalf of the Company or any of its Subsidiaries directly or indirectly solicited, received, made or offered to make any contribution, gift, bribe, rebate, payoff, influence payment or kickback to any person, regardless of form: (i) in violation of the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), the federal Physician Self-Referral Law, 42 U.S.C. § 1395nn or any other state or federal anti-bribery, anti-kickback, anti-inducement, anti-corruption or anti-fraud Laws; or (ii) to obtain or maintain any referral or favorable treatment in securing business in violation of any applicable Healthcare Law.

(e)     The Company and each of its Subsidiaries that participates in any Third Party Payor Program is qualified to participate in such Third Party Payor Program and is duly enrolled and certified therein, and has the requisite provider and supplier numbers to bill the Medicare program, the respective Medicaid program in the state or states in which such entity operates, and all other Third Party Payor Programs that each of such Subsidiaries of the Company currently bills to. To the Knowledge of the Company, the Company and each of its Subsidiaries is operating, and since January 1, 2018 has operated, in compliance with all Third Party Payor Program rules and regulations and all provisions of each Third Party Payor Program contract to which it is party or by which it is bound, except as would not be material to the Company and its Subsidiaries, taken as a whole. There is no Action pending or, to the Knowledge of the Company, threatened, which has resulted in or could reasonably be expected to result in any material revocation, suspension, termination, probation, restriction, limitation, non-renewal or other material adverse modification of the participation by the Company or any of its Subsidiaries in any Third Party Payor Program or of any supplier or provider number, or result in the Company's or any of its Subsidiaries' or any of the Leases' exclusion from any Third Party Payor Program.

(f)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, since January 1, 2018, the Company and each of its Subsidiaries has, (i) timely filed all reports and billings required to be filed with respect to each Third Party Payor Program, all of which were prepared and filed in compliance with applicable Laws and applicable Payor requirements and (ii) paid all known and undisputed refunds, overpayments, discounts and adjustments due with respect to any such report or billing (except, with respect to Payors other than any Federal Health Care Program, for credit balances set forth in the Financial Statements or arising since the date of the most recent Financial Statements in the Ordinary Course of Business). All Claims submitted by or on behalf of the Company or any of its Subsidiaries since January 1, 2018 have been submitted in material compliance with applicable Laws and the rules, regulations, policies and procedures of the applicable third party Payors and there are no material pending or, to the Knowledge of the Company, threatened, audits (including written notice of an intent to audit), investigations, appeals, adjustments or Actions for or relating to such Claims, except as would not be material to the Company and its Subsidiaries, taken as a whole. All material Claims submitted by the Company or its Subsidiaries were for goods actually sold or services actually

performed by the billing Company or Subsidiary of the Company to eligible patients, properly coded and, except for clerical errors, otherwise true and correct, and, to the Knowledge of the Company, there are no facts or circumstances that would give rise to any disallowance, recoupment, denial of payment, suspension of payment, overpayment, or penalty action or proceeding against the Company or any of its Subsidiaries.

(g)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company and each of its Subsidiaries has, since January 1, 2018, taken, commercially reasonable steps to verify that and, to the Knowledge of the Company, each of the physical therapists and other health care professionals currently employed or engaged by the Company or any of its Subsidiaries to provide professional services, has, since January 1, 2018 (or such earlier date as such Person has been employed or engaged by the Company or applicable Subsidiary of the Company) been at all applicable times duly licensed, certified and registered to provide such services and in good standing with all applicable Governmental Authorities (including the board of physical therapy in the state in which he or she practices), and duly enrolled and credentialed with each Third Party Payor Program that requires such enrollment or credentialing for Claims submitted by the Company or applicable Subsidiary of the Company.

(h)     None of the Company or any of its Subsidiaries, or, to the Knowledge of the Company, any of their respective current directors, limited liability company managers (or equivalent governing authority), officers, employees or other health care professionals, is, or since January 1, 2018, has been (i) debarred, excluded or suspended from participating in any Federal Health Care Program, (ii) subject to a civil monetary penalty assessed under Section 1128A of the Social Security Act, or sanctioned, indicted or convicted of a crime, or pled nolo contendere or to sufficient facts in connection with any allegation of a violation of any Federal Health Care Program requirement or Healthcare Law or (iii) listed on the General Services Administrative ("GSA") published list of parties excluded from federal procurement programs and non-procurement programs. The Company and each of its Subsidiaries maintains and since January 1, 2018 has maintained, policies and procedures to screen its officers, employees and other health care professionals for Federal Health Care Program, GSA and Office of Foreign Asset Control of the U.S. Department of Treasury ("OFAC") exclusion or debarment prior to their association with the Company or its Subsidiary and on a regular basis thereafter.

(i)     Each of the Company and its Subsidiaries is in compliance in all material respects with all applicable Information Privacy and Security Laws, including with respect to the collection, use, storage, transfer and disclosure of any Protected Health Information (as defined at 45 CFR § 160.103). Since January 1, 2018, the Company and each of its Subsidiaries has maintained privacy and security policies, procedures and safeguards that comply in all material respects with then-applicable requirements of HIPAA (collectively, "HIPAA Policies and Procedures"). The Company has Made Available to Acquiror true, correct and complete copies of all such HIPAA Policies and Procedures. The Company and its Subsidiaries have executed current and valid Business Associate Agreements (as described by HIPAA) with all persons or entities that provide business associate services on behalf of the Company or any of its Subsidiaries ("Business Associates"). Except as would not be material to the Company and its Subsidiaries, taken as a whole, (i) the Company and its Subsidiaries are in compliance with the terms of all such Business Associate Agreements and (ii) neither the Company nor any of its Subsidiaries has

26

received any written notice from any Governmental Authority or other Person relating to any alleged violation or non-compliance with HIPAA.

(j)     To the Knowledge of the Company, since January 1, 2018 there has not been any breach (as defined by applicable Information Privacy and Security Laws) involving Personal Information in the possession or control of the Company, and no breach (as defined by applicable Information Privacy and Security Laws) has occurred that would require notification by, on behalf of or as a result of the Company under any applicable Information Privacy or Security Law, except as would not be material to the Company and its Subsidiaries, taken as a whole. Since January 1, 2018, the Company has been in material compliance with all of the Company's policies and contractual obligations with respect to the collection, use, storage, sharing or transfer of Personal Information. The Company has reasonable safeguards in place and takes commercially reasonable measures to protect Personal Information in its possession or under its control against loss, theft, or unauthorized disclosure. Since January 1, 2018, the Company has not received any written notice of any claims of, or been charged with, the violation of any Information Privacy and Security Laws.

Section 4.18     Material Payor and Material Supplier Relations.

(a)     Schedule 4.18(a)(i) contains a true, correct and complete list of (i) the identity of the ten largest non-Governmental Authority Payors of the Company and its Subsidiaries, as measured by net revenue generated by the Company and its Subsidiaries from such Payors on an aggregate basis during the twelve-month period ended December 31, 2020 (each, a "Material Payor") and (ii) the net revenue generated by the Company and its Subsidiaries with respect to such Material Payors, during such period. During the twelve-month period ended December 31, 2020, no Material Payor has (A) cancelled, suspended or terminated its relationship with the Company or its Subsidiaries, (B) materially reduced its business with the Company or any of its Subsidiaries or otherwise materially adversely modified its relationship or terms with the Company or any of its Subsidiaries or (C) notified the Company of its intention to take any such action and, to the Knowledge of the Company, no such Material Payor is contemplating such action or (D) to the Knowledge of the Company, become insolvent or subject to bankruptcy proceedings. Except as would not be material to the Company and its Subsidiaries, taken as a whole, there is no pending dispute between the Company or any of its Subsidiaries, on the one hand, and any Material Payor, on the other hand.

(b)     Schedule 4.18(b)(i) contains a true, correct and complete list of (i) the identity of the five largest suppliers of the Company and its Subsidiaries as measured by the Company's and its Subsidiaries' purchases of goods and services from such suppliers on an aggregate basis during the twelve-month period ended December 31, 2020 (each, a "Material Supplier") and (ii) the total payments by the Company and its Subsidiaries to such Material Suppliers, during such period. During the twelve-month period ended December 31, 2020, no Material Supplier has (A) cancelled, suspended or terminated its relationship with the Company or its Subsidiaries, (B) materially reduced its business with the Company or any of its Subsidiaries or otherwise materially adversely modified its relationship or terms with the Company or any of its Subsidiaries, (C) notified the Company of its intention to take any such action and, to the Knowledge of the Company, no such Material Supplier is contemplating such action, (D) notified the Company or any of its Subsidiaries of any violations of such Material Supplier's user, usage

27

or advertising policies (as applicable), or (E) to the Knowledge of the Company, become insolvent or subject to bankruptcy proceedings. There is no pending material dispute between the Company or any of its Subsidiaries, on the one hand, and any Material Supplier, on the other hand.

Section 4.19    <u>Environmental Matters</u>.

(a)    Except as would not be material to the Company and its Subsidiaries, taken as a whole, (i) the Company is and, since January 1, 2016, has been in compliance with Environmental Laws, including obtaining, maintaining and complying with all Permits required under Environmental Laws, (ii) since January 1, 2016, no Governmental Authority or other Person has commenced or, to the Knowledge of the Company, threatened to commence, any contribution action or other proceeding against the Company in connection with any asserted violation of, or liability under, Environmental Laws and (iii) there are no circumstances, facts, conditions, events or incidents, including the presence of any Hazardous Material, which would be reasonably likely to result in the Company incurring liability under any Environmental Law.

(b)    The Company has Made Available true copies and results of any material reports, investigations, audits, assessments (including Phase I environmental site assessments and Phase II environmental site assessments), analyses, tests or monitoring in the possession of, or reasonably available to, the Company or any of its Subsidiaries pertaining to any material unresolved liabilities under or material noncompliance with any Environmental Law.

Section 4.20    <u>Insurance</u>. To the Knowledge of the Company: (a) all of the policies of property, fire and casualty, liability, workers' compensation, directors and officers and other forms of insurance (collectively, the "<u>Policies</u>") held by, or for the benefit of, the Company or any of its Subsidiaries with respect to policy periods that precede and include the date of this Agreement are in full force and effect; and (b) neither the Company nor any of its Subsidiaries has received a written notice of cancellation of any of the Policies or of any material changes that are required in the conduct of the business of the Company or any of its Subsidiaries as a condition to the continuation of coverage under, or renewal of, any of the Policies.

Section 4.21    <u>Absence of Changes</u>. Except for any COVID-19 Response, since the Balance Sheet Date through the date hereof, (a) the Company and its Subsidiaries have operated their respective businesses in the Ordinary Course of Business in all material respects, (b) there has not been any change, effect, condition, circumstance or development relating to the Company and its Subsidiaries that has resulted in, or would reasonably be expected to result in, a Company Material Adverse Effect, and (c) neither the Company nor any of its Subsidiaries has:

(i)    made any material change in or amendment to any of the Company Organizational Documents;

(ii)    made, declared, set aside, or paid any dividend or distribution to any equityholder other than dividends or distributions between or among the Company and any of its wholly-owned Subsidiaries;

(iii)    incurred, guaranteed or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness;

(iv)     acquired by merger or consolidation with, or merged or consolidated with, or purchased substantially all of the assets of, any corporation, partnership, association, joint venture or other business organization or division thereof or Person;

(v)     made any change in financial accounting methods, principles or practices, except insofar as may have been required by a change in GAAP, including pursuant to standards, guidelines and interpretations of the Financial Accounting Standards Board or any similar organization, or applicable Law;

(vi)     other than in the Ordinary Course of Business consistent with past practice, (i) granted or acquired, agreed to grant to or acquired from any Person, disposed of, or permitted to lapse any rights to any Company Owned Intellectual Property and (ii) not disclosed or agreed to disclose to any Person, other than Acquiror (or representatives designated by Acquiror), any trade secret or other material proprietary information; or

(vii)     made any change in the auditors of the Company,

other than, in each case, any action taken in connection with any document or agreement entered into pursuant to the terms of this Agreement.

Section 4.22     Interested Party Transactions. No director, manager, officer or Affiliate of the Company or any of its Subsidiaries is a party to any Contract with the Company or any of its Subsidiaries, other than (a) the payment of compensation and provision of benefits to, and the entering into of compensatory arrangements, benefit plans and similar transactions, agreements or Contracts with, or with respect to, officers, managers, employees and independent contractors of the Company or any Company Subsidiary, including equity compensation, (b) Contracts in connection with any such manager's, officer's or Affiliate's direct or indirect ownership of equity interests in the Company or any of its Subsidiaries (or any securities that are convertible into, or exercisable or exchangeable for, any such equity interests), including distributions by the Company upon its equity interests, or (c) as otherwise contemplated by this Agreement.

Section 4.23     Proxy Statement. The information supplied by the Company for inclusion in the Proxy Statement will not, at (a) the time the definitive Proxy Statement is filed with the SEC, (b) the time the Proxy Statement (or any amendment thereof or supplement thereto) is first mailed to the holders of Acquiror Common Stock and (c) the time of the Special Meeting, contain any untrue statement of a material fact or fail to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 4.24     No Brokers' Fees. Except for Barclays Capital Inc. and Citigroup Global Markets Inc., no broker, finder, investment banker or other Person acting on behalf of the Company is, or shall be, entitled to any brokerage fee, finders' fee or other commission in connection with this Agreement or the Transactions based upon arrangements made by the Company or any of its Affiliates.

Section 4.25     No Additional Representations and Warranties; Non-Reliance of the Company. The Company acknowledges and agrees that the Company has made its own investigation of Acquiror and Merger Sub and, except for the representations and warranties

29

expressly made by Acquiror or Merger Sub in ARTICLE V (as modified by the Disclosure Schedules), none of Acquiror nor Merger Sub nor any other Person has made, is making or shall be deemed to make any express or implied representation or warranty with respect to Acquiror and Merger Sub or any other Person or their respective businesses, operations, assets, liabilities, condition (financial or otherwise) or prospects, including any representation or warranty as to condition, value, quality, merchantability, usage, suitability, fitness for a particular purpose, future results, proposed businesses or future plans, and the Company is not relying on any representation or warranty of Acquiror, Merger Sub or any other Person except for those expressly set forth in ARTICLE V (as modified by the Disclosure Schedules).

<div align="center">

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF**
**ACQUIROR AND MERGER SUB**

</div>

Except as set forth on the Disclosure Schedules or in the SEC Reports (to the extent the qualifying nature of such disclosure is readily apparent from the content of such SEC Reports, but excluding disclosures referred to in "Forward Looking Statements," "Risk Factors" and any other disclosures therein to the extent they are of a predictive or cautionary nature or related to forward looking statements), each of Acquiror and Merger Sub represents and warrants to the Company as follows:

Section 5.1    Organization and Authority.

(a)    Acquiror is a corporation duly incorporated, validly existing and in good standing under the Laws of Delaware and has all requisite corporate power and authority to own, lease or operate its properties and assets and to conduct its business as it is now being conducted and contemplated to be conducted, except where the failure to have such power and authority would not be material to Acquiror and Merger Sub, taken together. True, correct and complete copies of the Acquiror Organizational Documents have been delivered to the Company prior to the date of this Agreement. Acquiror is duly licensed or qualified to do business and in good standing in all jurisdictions in which its ownership of property or assets or the character of its activities is such as to require it to be so licensed or qualified, except where failure to be so licensed or qualified and in good standing has not had, individually or in the aggregate, an Acquiror Material Adverse Effect.

(b)    Merger Sub is a corporation duly organized, validly existing and in good standing under the Laws of Delaware, with full corporate power and authority to enter into this Agreement and perform its obligations hereunder.

Section 5.2    Authorization and Enforceability.

(a)    Each of Acquiror and Merger Sub has all requisite corporate power and authority to execute, deliver and perform this Agreement and each of the Ancillary Agreements to which it is a party, and to carry out its obligations hereunder and thereunder and to consummate the Transactions, in each case, subject to receipt of the Acquiror Stockholder Approval. At the Closing, Acquiror will have full corporate power and authority to enter into and perform its obligations under each other agreement, document or certificate to be executed by Acquiror at the

<div align="center">30</div>

Closing and to consummate the transactions contemplated thereby. The execution, delivery and performance of this Agreement and each Ancillary Agreement in effect as of the date of this Agreement and the consummation of the Transactions have been duly and validly authorized and approved by the Acquiror Board, the Merger Sub Board and, except for the Acquiror Stockholder Approval, no other proceeding on the part of Acquiror or Merger Sub is necessary to authorize this Agreement or Acquiror's or Merger Sub's performance hereunder. Acquiror, as the sole stockholder of Merger Sub, substantially concurrently with the execution and delivery of this Agreement (but deemed to occur a moment thereafter), has adopted this Agreement and approved the Transactions. This Agreement has been duly and validly executed and delivered by Acquiror and Merger Sub and, assuming due authorization and execution by each other Party hereto, constitutes a legal, valid and binding obligation of Acquiror and Merger Sub, enforceable against Acquiror and Merger Sub in accordance with its terms, except as such enforceability may be limited by or subject to any applicable Bankruptcy and Equity Exception. Each Ancillary Agreement to be executed by Acquiror and Merger Sub at the Closing will be, when executed and delivered by Acquiror and Merger Sub, duly and validly executed and delivered, and assuming due authorization and execution by each other Party thereto and consummation of the Closing, will constitute a legal, valid and binding obligation of Acquiror, enforceable against Acquiror in accordance with its terms, except as such enforceability may be limited by or subject to any applicable Bankruptcy and Equity Exception.

(b)      The affirmative vote of (i) holders of a majority of the outstanding shares of Acquiror Common Stock, voting together as a single class, cast at the Special Meeting is required to approve the Merger Proposal, (ii) holders of a majority of the outstanding shares of Acquiror Common Stock, voting together as a single class, cast at the Special Meeting is required to approve the Issuance Proposal, (iii) (A) holders of a majority of the outstanding shares of Acquiror Common Stock, voting together as a single class, and (B) holders of a majority of the outstanding shares of Acquiror Class F Common Stock voting separately as a single class, in each case cast at the Special Meeting, is required to approve the Amendment Proposal (it being understood, for the avoidance of doubt, that the separate approval of any non-binding advisory proposal(s) relating to the Amendment Proposal shall not constitute a part of the Acquiror Stockholder Approval (as defined below) and shall not be required to satisfy the closing condition set forth in Section 7.1(c)), (iv) holders of a majority of the outstanding shares of Acquiror Common Stock, voting together as a single class, cast at the Special Meeting is required to approve the Incentive Plan Proposal and (v) a plurality of the votes cast at the Special Meeting by holders of outstanding shares of Acquiror Common Stock, voting together as a single class, is required to approve the Director Election Proposal, in each case, assuming a quorum is present, are the only votes of any of Acquiror's capital stock necessary in connection with the entry into this Agreement by Acquiror, and the consummation of the Transactions, including the Closing (the approval by Acquiror stockholders of the proposals set forth in clauses "(i)," "(ii)" and "(iii)," collectively, the "Acquiror Stockholder Approval"). The Acquiror Stockholder Approval is the only vote of the holders of any class or series of capital stock of Acquiror required to adopt this Agreement and approve the Transactions.

(c)      At a meeting duly called and held on or prior to the date hereof, the Acquiror Board unanimously: (i) determined that this Agreement and the Transactions are fair to and in the best interests of Acquiror and its stockholders; (ii) determined that the fair market value of the Company is equal to at least 80% of the amount held in the Trust Account (excluding any deferred

underwriting commissions and Taxes payable on interest earned on the Trust Account) as of the date of this Agreement; (iii) approved the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is or will be a party and the consummation of the Transactions; (iv) approved the Transactions as a Business Combination; and (v) recommended to the holders of Acquiror Common Stock the approval of the Transactions and each of the Transaction Proposals.

(d)     The approval of Acquiror, as the sole stockholder of Merger Sub, is the only vote of holders of any class or series of capital stock of Merger Sub required to adopt this Agreement.

Section 5.3    Noncontravention. The execution, delivery and performance of this Agreement and the other Ancillary Agreements to which Acquiror or Merger Sub are party, by Acquiror and Merger Sub, as applicable, and, upon receipt of Acquiror Stockholder Approval, the consummation or performance of the Transactions do not, and will not, (a) conflict with or violate any provision of, or result in the breach of the Acquiror Organizational Documents or any Organizational Documents of Merger Sub, (b) conflict with or result in any violation of any provision of any Law applicable to Acquiror, Merger Sub or any of their respective properties or assets, (c) violate, conflict with, result in a breach of, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in a right of termination, cancellation, modification, acceleration or amendment under, any of the terms, conditions or provisions of any Contract to which Acquiror or Merger Sub is a party or by which Acquiror, Merger Sub or any of their respective assets or properties may be bound or affected or (d) result in the creation of any Lien upon any of the material properties or assets of Acquiror or Merger Sub, except with respect to clauses "(b)", "(c)" and "(d)" above, where such violations, conflicts, breaches, defaults or rights which would not, reasonably be expected to be material to Acquiror and Merger Sub, taken together.

Section 5.4    Governmental Authorities; Consents. The execution and delivery of this Agreement, and the other Ancillary Agreements to which Acquiror or Merger Sub is a party, by Acquiror and Merger Sub, as applicable, does not, and the consummation or performance of this Agreement by Acquiror and Merger Sub will not, require any consent, approval, authorization or Permit of, or filing with or notification to, any Governmental Authority, except (a) applicable requirements of the Securities Act and the Exchange Act, (b) applicable requirements of Blue Sky Laws, (c) applicable requirements of the HSR Act, (d) the filing of the Certificate of Merger in accordance with the DGCL and (e) such consents, approvals, authorizations, permissions, filings or notifications which are made or obtained or, if not made or obtained, would not reasonably be expected to be material to Acquiror and Merger Sub, taken together.

Section 5.5    Capitalization.

(a)     The authorized capital stock of Acquiror consists of (i) 200,000,000 shares of Acquiror Class A Common Stock, (ii) 20,000,000 shares of Acquiror Class F Common Stock and (iii) 1,000,000 shares of Acquiror Preferred Stock. There are (i) 34,500,000 shares of Acquiror Class A Common Stock issued and outstanding, (ii) 8,625,000 shares of Acquiror Class F Common Stock issued and outstanding, (iii) no shares of Acquiror Preferred Stock issued and outstanding, (iv) warrants to purchase 6,900,000 shares of Acquiror Class A Common Stock at a price of $11.50

32

per share (the "Public Warrants") and (v) warrants to purchase 5,933,333 shares of Acquiror Class A Common Stock at a price of $11.50 per share (the "Private Placement Warrants"). Except pursuant to the Subscription Agreements, there are no other shares of common stock, preferred stock or other equity interests of Acquiror authorized, reserved, issued (or planned to be issued) or outstanding. No issued and outstanding shares of any of the capital stock of Acquiror are held in treasury.

(b)     The authorized capital stock of Merger Sub consists of 100 shares of common stock, par value $0.01 per share (the "Merger Sub Common Stock"). There are 100 shares of Merger Sub Common Stock issued and outstanding. All outstanding shares of Merger Sub Common Stock have been duly authorized, validly issued, fully paid and are non-assessable and are not subject to preemptive rights, and are held by Acquiror.

(c)     All of the outstanding shares of Acquiror capital stock (including the Public Warrants and the Private Placement Warrants) and Merger Sub Common Stock have been duly authorized and are validly issued, fully paid and non-assessable and have been issued in accordance with all applicable Laws. The Acquiror Class A Common Stock to be issued at Closing in accordance with this Agreement, when issued, will be duly authorized, validly issued, fully paid and non-assessable, free and clear of any preemptive rights and all Liens, other than Permitted Liens and Securities Liens, and in compliance with all applicable Laws and without contravention of any other Person's rights therein or with respect thereto. Acquiror does not have any outstanding bonds, debentures, notes or other obligations the holders of which have the right to vote (or are convertible into or exercisable for securities having the right to vote) with the stockholders of Acquiror on any matter.

(d)     Except for the Subscription Agreements, the Private Placement Warrants and the Public Warrants, there are no outstanding options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other Contracts or commitments that would require Acquiror to issue, sell or otherwise cause to become outstanding any of its equity securities. There are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to the equity securities of Acquiror. There are no voting trusts or other agreements or understandings to which Acquiror is a party with respect to the voting of the capital stock or other equity interests of Acquiror.

Section 5.6     SEC Reports; Financial Statements.

(a)     Acquiror has timely filed or furnished, as applicable, all required registration statements, reports, schedules, forms, statements and other documents, including any exhibits thereto, required to be filed by it with the SEC from August 14, 2020 to the date of this Agreement (collectively, as they have been amended since the time of their filing and including all exhibits or schedules thereto and any other information incorporated therein, the "SEC Reports"), and will have filed all such registration statements, reports, schedules, forms, statements and other documents required to be filed subsequent to the date of this Agreement through the Closing Date (the "Additional SEC Reports"). All SEC Reports, Additional SEC Reports, any correspondence from or to the SEC or the Stock Exchange (other than such correspondence in connection with the initial public offering of Acquiror) and all certifications and statements required by: (i) Rule 13a-14 or 15d-14 under the Exchange Act; or (ii) 18 U.S.C. § 1350

33

(Section 906) of the Sarbanes-Oxley Act with respect to any of the foregoing (collectively, the "Certifications") are available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system (EDGAR) in full without redaction. The Certifications are true and correct. Acquiror has delivered to the Company true and correct copies of all amendments and modifications to the exhibits filed with the SEC Reports that have not been filed by Acquiror with the SEC and are currently in effect. Each of the SEC Reports at the time of its filing or being furnished to the SEC complied, and the Additional SEC Reports will comply, in all material respects, with the applicable requirements of the Securities Act, the Exchange Act, the Sarbanes-Oxley Act and any rules and regulations promulgated thereunder applicable to the SEC Reports in effect as of the respective dates thereof. None of the SEC Reports, as of their respective dates (or if amended or superseded by a filing prior to the date of this Agreement, then on the date of such filing), contained, and no Additional SEC Report will contain, any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. As of the date of this Agreement, there are no outstanding or unresolved comments in comment letters received from the SEC with respect to the SEC Reports. The audited financial statements and unaudited interim financial statements (including, in each case, the notes and schedules thereto) included in the SEC Reports, and that will be included in the Additional SEC Reports (the "Acquiror Financial Statements"), (x) complied or will comply, as the case may be, as to form in all material respects with the published rules and regulations of the SEC, the Exchange Act and the Securities Act in effect as of the respective dates thereof with respect thereto, (y) were prepared or will be prepared, as the case may be, in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto and except with respect to unaudited statements as permitted by Form 10-Q of the SEC) and (z) fairly present or will fairly present (subject, in the case of the unaudited interim financial statements included therein, to normal year-end adjustments and the absence of complete footnotes), as the case may be, in all material respects, the financial position, results of operations, stockholders' equity and cash flows of Acquiror as of the respective dates thereof and the results of their operations, stockholders' equity and cash flows for the respective periods then ended.

(b)  Acquiror maintains a system of "internal controls over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) sufficient to provide reasonable assurances: (i) that records are maintained that in reasonable detail accurately and fairly reflect the transactions and dispositions of assets of Acquiror and Merger Sub; (ii) that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of Acquiror and Merger Sub are being made only in accordance with the authorizations of management and directors of Acquiror; and (iii) regarding prevention or timely detection of the unauthorized acquisition, use or disposition of Acquiror's properties or assets that could have a material effect on the financial statements. Acquiror maintains a system of "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) sufficient to ensure that all material information concerning Acquiror is made known on a timely basis to the individuals responsible for the preparation of Acquiror's filings with the SEC and other public disclosure documents, and otherwise ensure that information required to be disclosed by Acquiror in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules, to allow timely decisions regarding required disclosure and to make the Certifications. As of the date hereof, Acquiror has not identified or been made aware of, and has not received from

34

its independent auditors any notification of, any (x) "significant deficiency" in the internal controls over financial reporting of Acquiror, (y) "material weakness" in the internal controls over financial reporting of Acquiror or (z) fraud, whether or not material, that involves management or other employees of the Acquiror who have a role in the internal controls over financial reporting of Acquiror.

(c)    Each director and executive officer of Acquiror has filed with the SEC on a timely basis all statements required by Section 16(a) of the Exchange Act and the rules and regulations promulgated thereunder. Acquiror has not taken any action prohibited by Section 402 of the Sarbanes-Oxley Act.

(d)    Except as disclosed in the SEC Reports, no current officer or director of Acquiror or, to the Knowledge of Acquiror, any current stockholder or employee, or any "affiliate" or "associate" (as those terms are defined in Rule 405 promulgated under the Securities Act) of any such Person, has had, either directly or indirectly, a material interest in any Contract to which Acquiror is a party or by which it may be bound.

Section 5.7    Actions. Except as would not be material to Acquiror and Merger Sub, taken together, (a) there are no pending Actions or, to the Knowledge of Acquiror, Actions threatened in writing, against Acquiror or Merger Sub and (b) neither Acquiror nor Merger Sub is subject to any continuing Governmental Order. Except as would not be material to Acquiror and Merger Sub, taken together, (x) there is no audit, examination or investigation by any Governmental Authority (other than ordinary course audits or examinations by an agency or regulating agency) pending or, to the Knowledge of Acquiror, threatened in writing, of or against the Acquiror or Merger Sub, and (y) to the Knowledge of Acquiror, there is no audit, examination or investigation by any Governmental Authority (other than ordinary course audits or examinations by an agency or regulating agency) that is pending, or threatened, of or against any of the directors or officers (with regard to their actions in their capacities as such) of Acquiror or Merger Sub. As of the date of this Agreement, there is no (A) pending Action or Action threatened by Acquiror or Merger Sub against any third party or (B) settlement agreement or similar agreement that imposes any ongoing obligation or restriction on Acquiror or Merger Sub.

Section 5.8    Compliance with Laws; Permits. Acquiror and Merger Sub are, and since August 14, 2020, have been, in compliance with all applicable Laws and applicable requirements thereof, except where failure to be in such compliance as would not reasonably be expected to be material to Acquiror and Merger Sub, taken together. Since August 14, 2020, Acquiror has not been sanctioned, fined or penalized for any violation of or failure to comply with any applicable Law. To the Knowledge of Acquiror, neither Acquiror nor Merger Sub has received any written notice from any Governmental Authority of a violation of any applicable Law by Acquiror or Merger Sub at any time since August 14, 2020. Acquiror is in possession of all Permits necessary for Acquiror to own, lease and operate its properties or to carry on its business as it is now being conducted, except where the failure to have such Permits would not be material to the Acquiror and Merger Sub, taken together.

Section 5.9    Financial Ability; Trust Account; PIPE Investment Amount.

35

(a)　　　There is at least $345,000,000 (less, as of the Closing, the Redemption Amount payable to the holders of Acquiror Class A Common Stock who have validly exercised their right to receive payment pursuant to the Acquiror Stock Redemption, if any) invested in a trust account (the "Trust Account"), maintained by Continental Stock Transfer & Trust Company, acting as trustee (the "Trustee"), pursuant to that certain Investment Management Trust Agreement, dated August 11, 2020, by and between Acquiror and the Trustee (the "Trust Agreement"). Since August 14, 2020, Acquiror has not released any money from the Trust Account, except in accordance with the Trust Agreement and Acquiror Organizational Documents. Amounts in the Trust Account are invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act, having a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act. Acquiror has performed all material obligations required to be performed by it to date under, and is not in material default or delinquent in performance or any other respect (claimed or actual) in connection with, the Trust Agreement, and no event has occurred that, with due notice or lapse of time or both, would constitute such a default thereunder. There are no Actions pending with or, to the Knowledge of Acquiror, threatened in writing by any Governmental Authority with respect to the Trust Account. As of the Closing, the obligations of Acquiror to dissolve or liquidate pursuant to the Acquiror Organizational Documents shall terminate, and as of the Closing, Acquiror shall have no obligation whatsoever pursuant to the Acquiror Organizational Documents to dissolve and liquidate the assets of Acquiror by reason of the consummation of the Transactions. The Trust Agreement is valid and in full force and effect and enforceable in accordance with its terms and has not been amended or modified. There are no separate Contracts, side letters or other arrangements or understandings (whether written or unwritten, express or implied) that would cause the description of the Trust Agreement in the SEC Reports to be inaccurate or that would entitle any Person (other than pursuant to an Acquiror Stock Redemption, if any) to any portion of the proceeds in the Trust Account.

(b)　　　Schedule 5.9(c) sets forth true, correct and complete copies of each of the Subscription Agreements entered into by Acquiror with the applicable investors named therein (collectively, the "PIPE Investors"), pursuant to which the PIPE Investors have committed to provide equity financing to Acquiror in an aggregate amount equal to the PIPE Investment Amount. The PIPE Investment Amount, together with the amount in the Trust Account at the Closing, are in the aggregate sufficient to enable Acquiror to: (i) pay all cash amounts required to be paid by Acquiror or Merger Sub under or in connection with this Agreement; and (ii) pay any and all fees, prepayment premiums, costs (including breakage costs and termination amounts) and expenses required to be paid by Acquiror in connection with the Transactions. With respect to each PIPE Investor, the Subscription Agreements are in full force and effect and have not been withdrawn or terminated, or otherwise amended or modified, in any respect, and no withdrawal, termination, amendment or modification is contemplated by Acquiror. Each Subscription Agreement is a legal, valid and binding obligation of Acquiror and, to Acquiror's knowledge, each PIPE Investor, except insofar as enforceability may be limited by applicable Bankruptcy and Equity Exceptions. There are no other agreements, side letters, or arrangements between Acquiror and any PIPE Investor relating to any Subscription Agreement that could affect the obligation of the PIPE Investors to contribute to Acquiror the applicable portion of the PIPE Investment Amount set forth in the Subscription Agreements, and Acquiror is not aware of any facts or circumstances that may reasonably be expected to result in any of the conditions set forth in any Subscription Agreement not being satisfied or the PIPE Investment Amount not being available to Acquiror on

36

the Closing Date. No event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of Acquiror under any material term or condition of any Subscription Agreement and Acquiror has no reason to believe that it will be unable to satisfy in all material respects on a timely basis any term or condition of closing to be satisfied by it contained in any Subscription Agreement. The Subscription Agreements contain all of the conditions precedent (other than the conditions contained in the other Ancillary Agreements) to the obligations of the PIPE Investors to contribute to Acquiror the applicable portion of the PIPE Investment Amount set forth in the Subscription Agreements on the terms therein.

(c)     Acquiror does not have, or have any present intention, agreement, arrangement or understanding to enter into or incur any obligations with respect to or under any Indebtedness (other than, to the extent applicable, the Debt Financing).

Section 5.10    No Brokers' Fees. No broker, finder, investment banker or other Person acting on behalf of Acquiror or any of its Affiliates is entitled to any brokerage fee, finders' fee or other commission in connection with the Transactions based upon arrangements made by Acquiror, Merger Sub or any of their respective Affiliates, including the Sponsor.

Section 5.11    Business Activities.

(a)     Since its incorporation, Acquiror has not conducted any business activities other than activities directed toward completing a Business Combination. Except as set forth in the Acquiror Organizational Documents, there is no agreement, commitment, or Governmental Order binding upon Acquiror or to which Acquiror is a party that has or would reasonably be expected to have the effect of prohibiting or impairing any business practice of Acquiror.

(b)     Except for Merger Sub, Acquiror does not own, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other Person. Except for this Agreement and the Transactions, Acquiror has no interests, rights, obligations or liabilities with respect to, and is not party to, bound by or has its assets or property subject to, in each case whether directly or indirectly, any Contract or transaction which is, or could reasonably be interpreted as constituting, a Business Combination.

(c)     Merger Sub does not own or have a right to acquire, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity.

(d)     Merger Sub was formed solely for the purpose of effecting the Merger and has not engaged in any business activities or conducted any operations other than in connection with the Merger and has no, and at all times prior to the Effective Time except as contemplated by this Agreement or the Ancillary Agreements, will have no, assets, liabilities or obligations of any kind or nature whatsoever other than those incident to its formation.

Section 5.12    Material Contracts. The SEC Reports include true, correct and complete copies of each "material contract" (as such term is defined in Regulation S-K of the SEC) to which Acquiror is party (the "Acquiror Material Contracts"). Each Acquiror Material Contract is in full force and effect and, to the Knowledge of Acquiror, is valid and binding upon and enforceable against each of the parties thereto, except insofar as enforceability may be limited by the

37

Bankruptcy and Equity Exceptions. True, correct and complete copies of all Acquiror Material Contracts have been delivered to the Company.

Section 5.13    Employees; Acquiror Benefit Plans. Other than as described in the SEC Reports, Acquiror has never had any employees. Other than reimbursement of any out-of-pocket expenses incurred by Acquiror's officers and directors in connection with activities on Acquiror's behalf in an aggregate amount not in excess of the amount of cash held by Acquiror outside of the Trust Account, there is no Acquiror Benefit Plan and Acquiror has no unsatisfied material liability with respect to any employee. Neither the execution and delivery of this Agreement or the other Ancillary Agreements nor the consummation of the Transactions alone or with any other event will (a) result in any payment (including severance, unemployment compensation, golden parachute, bonus or otherwise) becoming due to any current or former director, officer, employee or other individual service provider of Acquiror, or (b) result in the acceleration of the time of payment or vesting of any such benefits.

Section 5.14    No Acquiror Material Adverse Effect. Since August 14, 2020, there has not been any change, effect, condition, circumstance or development relating to Acquiror or its Subsidiaries that has resulted or would reasonably be expected to result in an Acquiror Material Adverse Effect.

Section 5.15    Undisclosed Liabilities/Transaction Expenses.

(a)    Except for the Transaction Expenses of Acquiror, there is no liability, debt or obligation of any nature (whether accrued, absolute, contingent or otherwise) of Acquiror that would be required to be set forth or reserved for on a balance sheet of Acquiror (and the notes thereto) prepared in accordance with GAAP consistently applied and in accordance with past practice, except for liabilities and obligations reflected or reserved for on the Acquiror Financial Statements or disclosed in the notes thereto (if any) (other than any such liabilities not reflected, reserved or disclosed as are not and would not be, in the aggregate, material to Acquiror), or that have arisen since the date of the most recent balance sheet included in the Acquiror Financial Statements in the ordinary course of business consistent with past practice and which are not material.

(b)    Set forth on Schedule 5.15(b) is a good faith estimate of the expected Transaction Expenses of Acquiror and to whom such Transaction Expenses are to be paid.

Section 5.16    Reporting Company. Acquiror is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Exchange Act, and the Acquiror Class A Common Stock, Public Warrants and Acquiror Units are registered pursuant to Section 12(b) of the Exchange Act.

Section 5.17    Listing. The Acquiror Class A Common Stock is listed on the Stock Exchange under the symbol "FAII". The Public Warrants are listed on the Stock Exchange under the symbol "FAII WS". The Acquiror Units are listed on the Stock Exchange under the symbol "FAII.U". Acquiror has not received any oral or written notice that the Acquiror Class A Common Stock, the Public Warrants or the Acquiror Units are ineligible or will become ineligible for listing on the Stock Exchange nor that the Acquiror Class A Common Stock, Public Warrants or Acquiror

Units do not meet all requirements for the continuation of such listing. Acquiror has not taken any action that is intended to terminate the registration of the Acquiror Class A Common Stock, Public Warrants or Acquiror Units under the Exchange Act. Acquiror satisfies all of the requirements for the continued listing of the Acquiror Class A Common Stock, Public Warrants and Acquiror Units on the Stock Exchange. Acquiror is in compliance with all applicable Stock Exchange listing and corporate governance rules and has been in such compliance since August 14, 2020.

Section 5.18   Sarbanes-Oxley Act. Acquiror is in compliance with applicable requirements of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") and applicable rules and regulations promulgated by the SEC thereunder.

Section 5.19   Investment Company. Acquiror is not an "investment company" within the meaning of the Investment Company Act.

Section 5.20   Taxes.

(a)   Acquiror (i) has duly and timely filed (taking into account any extension of time within which to file) all income and other material Tax Returns required to be filed by it and all such filed Tax Returns are true, correct and complete in all material respects and (ii) has timely paid all Taxes that are shown as due on such filed Tax Returns and any other material Taxes that it is otherwise obligated to pay (whether or not such Taxes have been reported on any Tax Returns).

(b)   To the Knowledge of Acquiror, there are no facts, circumstances or plans that, either alone or in combination, would reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment.

Section 5.21   Sponsor Letter Agreement. Acquiror has delivered to the Company a true, correct and complete copy of the Sponsor Letter Agreement. The Sponsor Letter Agreement is in full force and effect and has not been withdrawn or terminated, or otherwise amended or modified, in any respect, and no withdrawal, termination, amendment or modification is contemplated by Acquiror. The Sponsor Letter Agreement is a legal, valid and binding obligation of Acquiror and, to the Knowledge of Acquiror, each other party thereto, and neither the execution nor delivery by any party thereto, nor the performance of any party's obligations under, the Sponsor Letter Agreement violates any provision of, or results in the breach of or default under, or require any filing, registration or qualification under, any applicable Law. No event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of Acquiror under any material term or condition of the Sponsor Letter Agreement.

Section 5.22   No Additional Representations and Warranties; Non-Reliance of Acquiror and Merger Sub. Each of Acquiror and Merger Sub acknowledges and agrees that Acquiror has made its own investigation of the Company and, except for the representations and warranties expressly made by the Company in ARTICLE IV (as modified by the Disclosure Schedules), none of the Company nor any Subsidiary or Affiliate thereof nor any other Person has made any express or implied representation or warranty with respect to the Company or its Subsidiaries or any other Person or their respective businesses, operations, assets, liabilities, condition (financial or otherwise) or prospects, including any representation or warranty as to condition, value, quality, merchantability, usage, suitability, fitness for a particular purpose, future results, proposed

businesses or future plans, and neither Acquiror nor Merger Sub is relying on any representation or warranty of the Company or any other Person except for those expressly set forth in ARTICLE IV (as modified by the Disclosure Schedules).

<div align="center">

**ARTICLE VI**
**COVENANTS**

</div>

Section 6.1    Conduct of Business by the Company. The Company agrees that, during the period commencing on the date of this Agreement and ending as of the earlier of (x) the Closing, and (y) termination of this Agreement in accordance with ARTICLE VIII (such period, the "Pre-Closing Period"), each of the Company and its Subsidiaries shall, except as (A) otherwise required or expressly permitted by this Agreement (including by any Ancillary Agreement), (B) consented to in writing by Acquiror, which consent shall not be unreasonably withheld, conditioned or delayed, (C) required by or in response to any Law or other directive by a Governmental Authority (including the implementation of any COVID-19 Measures) or (D) set forth on Schedule 6.1:

(a)    use commercially reasonable efforts to conduct its business in the Ordinary Course of Business; provided, that, in the case of a COVID-19 Response, the Company and its Subsidiaries shall not be deemed to be acting outside of the Ordinary Course of Business;

(b)    not, directly or indirectly:

(i)    make any change in or amendment to any of the Company Organizational Documents that would be adverse to Acquiror, or, other than in the Ordinary Course of Business, form or establish any Subsidiary;

(ii)    (A) make, declare or pay any dividend or distribution (whether in cash, stock, equity securities or property), other than dividends or distributions between or among the Company and any of its wholly-owned Subsidiaries, (B) effect any recapitalization, reclassification, split or other change in the Company's or its Subsidiaries' capitalization or (C) authorize for issuance, issue, sell, transfer, pledge, encumber, dispose of or deliver any shares of its capital stock or securities (including debt securities) convertible into or exchangeable for shares of its capital stock or voting interests, or issue, sell, transfer, pledge, encumber or grant any right, option or other commitment for the issuance of shares of its capital stock, or split, combine or reclassify any shares of its capital stock;

(iii)    (A) except in the Ordinary Course of Business, amend, modify or terminate, prior to the expiration of its term or the completion of performance of any obligations of the Company, any Material Contract or any Lease, (B) waive, delay the exercise of, release or assign any material rights or claims under any Material Contract or any Lease, or (C) enter into any Contract of a type required to be listed on Schedule 4.11(a);

(iv)    issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any of its Subsidiaries or guaranty any debt securities or incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness for borrowed money in excess of $10,000,000, other than (A) in connection with borrowings, extensions of credit and other financial accommodations

<div align="center">40</div>

under the Company's and its Subsidiaries' existing credit facilities, notes and other existing Indebtedness, (B) in connection with refinancings of existing Indebtedness for borrowed money upon market terms and conditions (as determined by the Company in good faith) (C) for drawdowns of credit facilities available as of the date hereof and/or (D) in connection with the Debt Financing, if consummated prior to the Closing;

(v)     (A) enter into any collective bargaining agreement or other Contract with a trade union or other labor organization, or (B) recognize or certify any trade union, other labor organization or group of employees of the Company or its Subsidiaries as the bargaining representative for any employees of the Company or its Subsidiaries;

(vi)     terminate the service or employment (other than for cause) of any executive officer of the Company;

(vii)     except as otherwise required pursuant to any Company Benefit Plan in effect on the date of this Agreement, grant any material increase in compensation, benefits or severance to any director or officer of the Company, other than (A) annual increases in compensation, benefits or severance made in the Ordinary Course of Business and (B) severance payable in accordance with a Company Benefit Plan in effect on the date of this Agreement;

(viii)     engage in any material new line of business;

(ix)     except for a Permitted Company Acquisition, (1) acquire or agree to acquire by merger or consolidation with, or merge, consolidate or combine with, or purchase substantially all of the assets of, any business or any corporation, partnership, association, joint venture or other business organization or division thereof or Person (2) purchase or otherwise acquire (by merger, consolidation, acquisition of stock or assets or otherwise), directly or indirectly, any securities, properties or businesses or (3) adopt or enter into a plan of complete or partial liquidation, dissolution or winding up, restructuring, recapitalization or other reorganization (other than the Transactions);

(x)     other than (x) in the Ordinary Course of Business and (y) between or among the Company and any of its wholly-owned Subsidiaries, make any loans, advances or capital contributions to, or investments in, any other Person (including to any of the Company's or its Subsidiaries' officers, directors, agents or consultants), make any change in its existing borrowing or lending arrangements for or on behalf of such Persons, or enter into any "keep well" or similar agreement to maintain the financial condition of any other Person;

(xi)     (A) make any change in financial accounting methods, principles or practices, except insofar as may have been required by a change in GAAP, including pursuant to standards, guidelines and interpretations of the Financial Accounting Standards Board or any similar organization, or applicable Law or (B) make any change in the auditors of the Company;

(xii)     waive, release, compromise, settle, pay or satisfy any claim, or any claim threatened (which shall include any pending litigation or threatened litigation), in

41

each case, for amounts in excess of $5,000,000 in the aggregate, other than in the Ordinary Course of Business and as would not prohibit or materially restrict the Company or its Subsidiaries from operating their respective businesses substantially as currently conducted; provided that, for the avoidance of doubt, any stockholder litigation related to this Agreement, any Ancillary Agreement or the Transactions shall be subject to the provisions of Section 6.18; or

(xiii)   enter into any binding agreement or otherwise making a binding commitment to take any of the foregoing actions.

Acquiror acknowledges and agrees that: (x) nothing contained in this Agreement, including the restrictions set forth in this Section 6.1, shall give Acquiror, directly or indirectly, the right to control or direct the operations of the Company or any of its Subsidiaries prior to the Closing, and (y) prior to the Closing, the Company and its Subsidiaries shall exercise, subject to the terms and conditions of this Agreement, complete control and supervision over its operations.

Section 6.2    Conduct of Business by Acquiror. Each of Acquiror and Merger Sub agrees that, during the Pre-Closing Period, each of Acquiror and Merger Sub shall, except as (A) otherwise required or expressly permitted by this Agreement (including the issuance of shares of Acquiror Class A Common Stock pursuant to the Subscription Agreements or as required or expressly permitted by any Ancillary Agreement), (B) consented to in writing by the Company, which consent shall not be unreasonably withheld, conditioned or delayed, except with respect to clause "(b)(i)," (C) required by or in response to any Law or other directive by a Governmental Authority (including any COVID-19 Measures), or (D) set forth on Schedule 6.2:

(a)     use commercially reasonable efforts to conduct its business in the ordinary course of business consistent with past practice;

(b)     not, directly or indirectly:

(i)     take any action that would reasonably be expected to prevent or materially delay the consummation of the Transactions;

(ii)     make any change in or amendment to any of the Acquiror Organizational Documents or form or establish any Subsidiary;

(iii)     (A) make, declare or pay any dividend or distribution to any equityholder, (B) effect any recapitalization, reclassification, split or other change in its capitalization, (C) authorize for issuance, issue, sell, transfer, pledge, encumber, dispose of or deliver any additional shares of its capital stock or securities (including debt securities) convertible into or exchangeable for shares of its capital stock or voting interests, or issue, sell, transfer, pledge, encumber or grant any right, option or other commitment for the issuance of shares of its capital stock, or split, combine or reclassify any shares of its capital stock, other than in connection with the exercise of any Public Warrants or Private Placement Warrants outstanding on the date hereof or (D) amend, modify or waive any of the material terms or rights set forth in any Public Warrant or Private Placement Warrant or any related agreement governing such warrants, including any amendment, modification or reduction of the warrant price set forth therein;

42

(iv)    issue or sell any debt securities or warrants or other rights to acquire any debt securities of Acquiror or Merger Sub or guaranty any debt securities or incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness;

(v)    amend, modify or consent to the termination of any Acquiror Material Contract;

(vi)    enter into, renew or amend in any material respect, any transaction or Contract with an Affiliate of Acquiror or Merger Sub (including, for the avoidance of doubt, (A) the Sponsor and (B) any Person in which the Sponsor has a direct or indirect legal, contractual or beneficial ownership interest of 5% or greater);

(vii)    (A) effect an Alternative Business Combination, or (B) adopt or enter into a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization (other than the Transactions);

(viii)    except as contemplated by the Incentive Plan Proposal, (A) adopt or amend any Acquiror Benefit Plan, (B) enter into any employment contract or collective bargaining agreement or (C) hire any employee;

(ix)    make any loans, advances or capital contributions to, or investments in, any other Person (including to any of Acquiror or Merger Sub's officers, directors, agents or consultants), make any change in its existing borrowing or lending arrangements for or on behalf of such Persons, or enter into any "keep well" or similar agreement to maintain the financial condition of any other Person; provided, however, that Acquiror shall be permitted to incur Indebtedness (which shall constitute a Transaction Expense of Acquiror) of up to $1,500,000 in the aggregate from its Affiliates and stockholders in order to meet its reasonable capital requirements, with any such loans to be made only as reasonably required by the operation of Acquiror in due course on a non-interest basis and otherwise on arm's-length terms and conditions and which shall be repaid in connection with the Closing;

(x)    make any change in financial accounting methods, principles or practices, except insofar as may have been required by a change in GAAP, including pursuant to standards, guidelines and interpretations of the Financial Accounting Standards Board or any similar organization, or applicable Law; or

(xi)    enter into any binding agreement or otherwise making a binding commitment to take any of the foregoing actions.

Section 6.3    <u>Proxy Statement; Proxy Solicitation; Other Actions</u>.

(a)    As promptly as reasonably practicable following the execution and delivery of this Agreement, Acquiror shall use reasonable best efforts to prepare, with the assistance of the Company reasonably necessary in connection therewith, and, within ten Business Days after receipt by Acquiror from the Company of all the information relating to the Company as reasonably necessary for the preparation and filing thereof pursuant to Section 6.3(b) (including

43

the financial statements referenced in <u>Section 6.3(b)(i)</u>), cause to be filed with the SEC a proxy statement in connection with the Special Meeting and Acquiror Stock Redemption (such Proxy Statement, together with any exhibits, supplements or amendments thereto, the "<u>Proxy Statement</u>") in preliminary form with the SEC. Each of Acquiror and the Company shall use its reasonable best efforts to cause the Proxy Statement to comply with the applicable provisions of the Exchange Act and the rules and regulations thereunder and any other applicable Law.

(b)     Each of Acquiror and the Company shall furnish all required information concerning it as may reasonably be requested by the other Party in connection with the preparation, filing, and distribution, as applicable, of the Proxy Statement and any other filing required to be made by Acquiror in respect of the Transactions. Without limiting the foregoing, the Company shall (i) use reasonable best efforts to provide Acquiror, as promptly as practicable after the date hereof, (A) audited financial statements, including consolidated balance sheets, statements of income (loss), statements of cash flows, and statements of stockholders equity of the Company and its Subsidiaries as of and for the years ended December 31, 2020, December 31, 2019 and December 31, 2018, together with all related notes and schedules thereto, prepared in accordance with Regulation S-X and GAAP applied on a consistent basis throughout the covered periods and audited in accordance with the auditing standards of the PCAOB, accompanied by an unqualified report of the Company's independent auditor with respect thereto, and (B) unaudited interim financial statements, including consolidated balance sheets, statements of income (loss), statements of cash flows, and statements of stockholders equity of the Company and its Subsidiaries, together with all related notes and schedules thereto, prepared in accordance with Regulation S-X and GAAP applied on a consistent basis throughout the covered periods (subject to normal recurring year-end and quarter-end adjustments (the effect of which will not, individually or in the aggregate, be material to such financial statements) and the absence of notes to such statements) covering the applicable periods required to be included in the Proxy Statement and (ii) reasonably cooperate with Acquiror in connection with the preparation of pro forma financial statements required to be included in the Proxy Statement. Each of Acquiror and the Company shall, as promptly as practicable after the receipt thereof, provide the other Party with copies of any written comments and advise the other Party of any oral comments with respect to the Proxy Statement received by such Party from the SEC or its staff, including any request from the SEC or its staff for amendments or supplements to the Proxy Statement, and shall provide the other Party with copies of all correspondence between it and its Representatives, on the one hand, and the SEC or its staff, on the other hand. Notwithstanding the foregoing, prior to filing the Proxy Statement (including any amendments and supplements thereto) or responding to any comments of the SEC or its staff with respect thereto, each of Acquiror and the Company (x) shall provide the other with a reasonable opportunity to review and comment on such document or response (including the proposed final version of such document or response) and (y) shall cooperate and mutually agree upon (such agreement not to be unreasonably withheld, conditioned or delayed), any such document or response and any amendment to the Proxy Statement filed in response to such comments of the SEC or its staff.

(c)     As promptly as reasonably practicable following the earlier to occur of: (i) in the event the preliminary Proxy Statement is not reviewed by the staff of the SEC, the expiration of the waiting period in Rule 14a-6(a) under the Exchange Act and (ii) in the event the preliminary Proxy Statement is reviewed by the staff of the SEC, receipt of oral or written notification of the completion of the review by the staff of the SEC (such earlier date, the "<u>Proxy Clearance Date</u>"),

44

Acquiror will cause the Proxy Statement to be filed in definitive form with the SEC as promptly as reasonably practicable and will cause the definitive Proxy Statement to be mailed to stockholders of Acquiror in compliance with applicable Law (and in no event later than five Business Days after the Proxy Clearance Date).

(d)     Acquiror will notify the Company, promptly after it receives notice thereof, of the Proxy Clearance Date or of any supplement or amendment that has been filed, of the issuance of any stop order, or of the suspension of the qualification of the Acquiror Common Stock to be issued or issuable pursuant to this Agreement for offering or sale in any jurisdiction. Each of Acquiror and the Company shall use its reasonable best efforts to have such stop order or suspension lifted, reversed or otherwise terminated.

(e)     If Acquiror or the Company becomes aware that any information contained in the Proxy Statement shall have become false or misleading in any material respect, or that the Proxy Statement is required to be amended in order to comply with applicable Law, then (i) such Party shall promptly inform the other Parties and (ii) Acquiror, on the one hand, and the Company, on the other hand, shall cooperate and mutually agree upon (such agreement not to be unreasonably withheld, conditioned or delayed) an amendment or supplement to the Proxy Statement. Acquiror and the Company shall use reasonable best efforts to cause the Proxy Statement as so amended or supplemented, to be filed with the SEC and Acquiror shall cause such Proxy Statement to be disseminated to the holders of shares of Acquiror Common Stock, as applicable, in each case pursuant to applicable Law and subject to the terms and conditions of this Agreement and the Acquiror Organizational Documents.

Section 6.4     Acquiror Special Meeting.

(a)     Acquiror, commencing upon the initial submission to the SEC of the preliminary Proxy Statement in accordance with Section 6.3(a), shall on a weekly basis, run a broker search for a deemed record date of 20 Business Days after the date of such search. Promptly following the Proxy Clearance Date, Acquiror shall (i) by resolutions of the Acquiror Board, establish the earliest practicable Acquiror Record Date, (ii) by resolutions of the Acquiror Board, establish the earliest practicable date for a special meeting of the Acquiror stockholders (the "Special Meeting") in accordance with the Acquiror Organizational Documents for the purposes of obtaining the Acquiror Stockholder Approval and, if applicable, any approvals related thereto and providing its stockholders with the opportunity to effect an Acquiror Stock Redemption and (iii) solicit proxies to obtain the Acquiror Stockholder Approval at the Special Meeting. In connection therewith, the Acquiror Board shall duly call, give notice of, convene and hold the Special Meeting within 30 days after the definitive Proxy Statement is mailed to stockholders of Acquiror; provided, however, that (A) Acquiror may postpone, and if requested by the Company in writing, shall postpone, the Special Meeting in compliance with applicable requirements under Delaware Law if (1) there are holders of an insufficient number of shares of Acquiror Class A Common Stock or Acquiror Class F Common Stock present or represented by proxy at the Special Meeting to constitute a quorum at such meeting (in which case Acquiror shall, and shall cause its proxy solicitor to use reasonable best efforts to, solicit as promptly as practicable the presence, in person or by proxy of a quorum), but only until there are a sufficient number of shares of Acquiror Class A Common Stock and Acquiror Class F Common Stock present or represented by proxy at the Special Meeting to obtain such a quorum or (2) on a date for which the Special Meeting is

45

scheduled, Acquiror has not received proxies representing a sufficient number of shares of Acquiror Class A Common Stock and Acquiror Class F Common Stock to obtain the Acquiror Stockholder Approval, in order to solicit additional proxies from stockholders for the purposes of obtaining the Acquiror Stockholder Approval, but only until there are a sufficient number of shares of Acquiror Class A Common Stock and Acquiror Class F Common Stock present or represented by proxy at the Special Meeting to obtain the Acquiror Stockholder Approval; provided, however, that (A) with respect to postponement in the case of clauses "(1)" and "(2)," Acquiror shall not change the record date for the Special Meeting without the Company's prior written consent and (B) Acquiror may postpone or adjourn the Special Meeting with the Company's prior written consent. Notwithstanding the foregoing, in the event Acquiror postpones or adjourns the Special Meeting pursuant to the foregoing sentence, Acquiror shall use its reasonable best efforts to reconvene and hold a Special Meeting as promptly as reasonably practicable.

(b)      Acquiror shall, through the Acquiror Board, recommend to the Acquiror Common Stockholders the (i) adoption and approval of this Agreement, the Merger contemplated hereby and the other Transactions in accordance with applicable Law and exchange rules and regulations (the "Merger Proposal"), (ii) approval of the issuance of shares of Acquiror Class A Common Stock in connection with the PIPE Investment and the Merger, if required under exchange rules and regulations (the "Issuance Proposal"), (iii) adoption and approval of the Acquiror A&R Charter (the "Amendment Proposal"), (iv) approval of the adoption of the Incentive Plan (the "Incentive Plan Proposal"), (v) approval of each change to the Acquiror A&R Charter that is required by federal securities Law to be separately approved, (vi) adoption and approval of any other proposals as the SEC (or staff member thereof) may indicate are necessary in its comments to the Proxy Statement or correspondence related thereto, (vii) adoption and approval of any other proposals as reasonably agreed by Acquiror and the Company to be necessary or appropriate in connection with the Transactions and (ix) the adjournment of the Special Meeting, if necessary, to permit further solicitation of proxies because there are not sufficient votes to approve and adopt any of the foregoing (such proposals in clauses "(i)" through "(ix)," collectively, the "Transaction Proposals," and such recommendation of the Acquiror Board, the "Acquiror Board Recommendation"), and include such Acquiror Board Recommendation in the Proxy Statement. Acquiror covenants that none of the Acquiror Board nor any committee thereof shall withdraw or modify, or propose publicly or by formal action of the Acquiror Board to withdraw or modify, in a manner adverse to the Company, the Acquiror Board Recommendation or any other recommendation by the Acquiror Board of the Transaction Proposals (any such action a "Change in Recommendation") except in accordance with Section 6.4(c).

(c)      Notwithstanding anything in this Agreement to the contrary, if, at any time prior to obtaining the Acquiror Stockholder Approval, the Acquiror Board determines in good faith, in response to an Intervening Event, after consultation with its outside legal counsel, that the failure to make a Change in Recommendation would reasonably be expected to constitute a breach by the Acquiror Board of its fiduciary obligations to Acquiror's stockholders under applicable Law, the Acquiror Board may, prior to obtaining the Acquiror Stockholder Approval, make a Change in Recommendation; provided, however, that Acquiror Board will not be entitled to make, or agree or resolve to make, a Change in Recommendation unless (i) Acquiror delivers to the Company a written notice (an "Intervening Event Notice") advising the Company that the Acquiror Board proposes to take such action and containing the material facts underlying the Acquiror Board's determination that an Intervening Event has occurred (it being acknowledged that such

46

Intervening Event Notice shall not itself constitute a breach of this Agreement), and (ii) at or after 5:00 p.m., New York City time, on the fifth Business Day immediately following the day on which Acquiror delivered the Intervening Event Notice (such period from the time the Intervening Event Notice is provided until 5:00 p.m. New York City time on the fifth Business Day immediately following the day on which Acquiror delivered the Intervening Event Notice (it being understood that any material development with respect to an Intervening Event shall require a new notice but with an additional four Business Day (instead of a five Business Day) period from the date of such notice), the "Intervening Event Notice Period"), the Acquiror Board reaffirms in good faith (after consultation with its outside legal counsel) that the failure to make a Change in Recommendation would be inconsistent with its fiduciary duties under applicable Law. If requested by the Company, Acquiror will, and will cause its Subsidiaries to, and will use its reasonable best efforts to cause its or their Representatives to, during the Intervening Event Notice Period, engage in good faith negotiations with the Company and its Representatives to make such adjustments in the terms and conditions of this Agreement so as to obviate the need for a Change in Recommendation.

Section 6.5    Company Written Consents. As promptly as practicable following the execution and delivery of this Agreement, the Company shall seek the Company Requisite Approval by irrevocable written consent, in form and substance acceptable to Acquiror, from one or more Company Stockholders. The Company shall deliver or cause to be delivered to Acquiror copies of such written consents within one Business Day of the Company's receipt of the executed written consents from such Company Stockholders. Promptly following the delivery of the written consents sufficient to constitute the Company Requisite Approval, the Company will prepare and deliver to its stockholders who have not delivered written consents, the notice required by Section 228(e) of the DGCL.

Section 6.6    Access to Information. From time to time during the Pre-Closing Period, each of Acquiror and the Company (each in such capacity, a "Disclosing Party") shall (i) afford to the other Parties and their respective Representatives reasonable access, during normal business hours and with reasonable advance notice, in such manner as to not interfere with the normal operation of such Disclosing Party, to the officers, employees, agents, properties, offices and other facilities of the Disclosing Party and to the books and records thereof, and (ii) furnish promptly to the other Parties such information concerning the business, properties, contracts, assets, liabilities, personnel and other aspects of the Disclosing Party as such other Party or its Representatives may reasonably request, in each case (A) subject to restrictions under applicable Law and any confidentiality obligations or similar restrictions that may be applicable to information furnished by third parties that may be in the possession of such Disclosing Party, and (B) except for any information that, in the good faith reasonable belief of the Disclosing Party, would result in the loss of attorney-client privilege or other privilege from disclosure. All information obtained by a Party pursuant to this Section 6.6 shall remain subject to the Nondisclosure Agreement. No investigation pursuant to this Section 6.6 shall affect or be deemed to modify any representation made by the Company or Acquiror, as applicable, herein.

Section 6.7    Efforts; Consents.

(a)    Without limiting any covenant contained in this ARTICLE VI, including the obligations of the Company and Acquiror with respect to the notifications, filings, reaffirmations and applications described in Section 6.7(b) and 6.7(c), which obligations shall

control to the extent of any conflict with the succeeding provisions of this Section 6.7(a), each of the Parties shall cooperate, and use their respective reasonable best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate the Transactions as soon as reasonably practicable after the date hereof, and to fulfill the conditions to consummation of the Transactions set forth in ARTICLE VII; provided, however, that in no event shall the Company be required to pay any material fee, penalty or other consideration to obtain any license, Permit, consent, approval, authorization, qualification or waiver required under any Contract for the consummation of the Transactions.

(b) In connection with the Transactions, without limiting the generality of the foregoing, each Party shall promptly after execution of this Agreement (but in no event later than ten Business Days after the date hereof) make all such filings or submissions as are required under the HSR Act. Each Party shall promptly furnish to the other such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act and will take all other reasonable actions necessary to cause the expiration or termination of the applicable waiting periods as soon as practicable. Each Party shall promptly provide the other with copies of all written communications (and memoranda setting forth the substance of all oral communications) between each of them, any of their Affiliates or any of its or their Representatives, on the one hand, and any Governmental Authority, on the other hand, with respect to this Agreement or the Transactions. Without limiting the generality of the foregoing, and subject to applicable Law, in connection with its efforts to obtain all requisite approvals and authorizations for the Transactions under the HSR Act, each Party shall use its reasonable best efforts to: (i) cooperate in all respects with each other Party or its Affiliates in connection with any filing or submission with any Governmental Authority, with respect to this Agreement or the Transactions; (ii) keep the other Parties reasonably informed of any communication received by such Party or its Representatives from, or given by such Party or its Representatives to, any Governmental Authority regarding any of the Transactions; (iii) permit a Representative of the other Parties to review any communication given by it to, and consult with each other in advance of any meeting or conference with, any Governmental Authority, and to the extent permitted by such Governmental Authority, give a Representative or Representatives of the other Parties the opportunity to attend and participate in such meetings and conferences; (iv) in the event a Party's Representative is prohibited from participating in or attending any meetings or conferences, keep such Party promptly and reasonably apprised with respect thereto; and (v) cooperate in the filing of any memoranda, white papers, filings, correspondence or other written communications explaining or defending the Transactions, articulating any regulatory or competitive argument, and/or responding to requests or objections made by any Governmental Authority, provided, that the Parties may, as they deem advisable and necessary, reasonably designate any information or communication shared with the any other Party under this Section 6.7 as "outside counsel only."

(c) The Parties shall supply as promptly as reasonably practicable any additional information and documentary material that may be requested by a Governmental Authority pursuant to the HSR Act and to take all other actions necessary, proper or advisable to cause the expiration or termination of the applicable waiting periods or obtain required approvals, as applicable under the HSR Act as soon as practicable, including by requesting early termination of the waiting period provided for under the HSR Act.

(d)     Acquiror shall not take any action that could reasonably be expected to impair or delay the approval of any Governmental Authority of any of the aforementioned filings.

(e)     The Parties further covenant and agree, with respect to a pending preliminary or permanent injunction or preliminary or permanent injunction threatened or other order, decree or ruling or statute, rule, regulation or executive order that would adversely affect the ability of the Parties to consummate the Transactions, to use reasonable best efforts to prevent or lift the entry, enactment or promulgation thereof, as the case may be.

Section 6.8     Publicity.

(a)     As promptly as practicable following the date of this Agreement, the Company and Acquiror shall jointly issue a mutually agreeable press release announcing the execution of this Agreement, and Acquiror shall prepare and file a Current Report on Form 8-K pursuant to the Exchange Act to report the execution of this Agreement, the form and substance of which shall be approved (which approval shall not be unreasonably withheld, conditioned or delayed) in advance in writing by the Company.

(b)     The Company shall prepare a draft Current Report on Form 8-K in connection with and announcing the Closing, together with, or incorporating by reference, such financial statements prepared by the Company and their respective accountants and such other information that is required to be included or disclosed with respect to the Transactions pursuant to a Current Report on Form 8-K, the form and substance of which shall be approved (which approval shall not be unreasonable withheld, conditioned or delayed) in advance in writing by Acquiror. Prior to the Closing, the Company and Acquiror shall prepare a mutually agreeable press release announcing the consummation of the Transactions ("Closing Press Release"). Concurrently with the Closing, Acquiror shall distribute the Closing Press Release.

(c)     Without limitation to clauses "(a)" and "(b)" of this Section 6.8, none of the Parties shall, and each Party shall cause its Representatives not to, make or issue any public announcement or press release to the general public with respect to this Agreement or the Transactions without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that no such consent or prior notice shall be required in connection with any public announcement or press release the content of which is consistent with that of any prior or contemporaneous public announcement or press release by any Party in compliance with this Section 6.8. Notwithstanding anything else contained herein, nothing in this Section 6.8 shall limit any Party from: (i) making any announcements, statements or acknowledgements that such Party is required by applicable Law or the requirements of any national securities exchange to make, issue or release, (ii) making any announcements regarding this Agreement and the Transactions to its respective directors, officers, managers or employees , (iii) making any public statements regarding this Agreement and the Transactions containing information or events already publicly known other than as a result of a breach of this Section 6.8 or (iv) communicating with third parties to the extent necessary for the purpose of seeking any third-party consent required in connection with the Transactions; provided, (A) in the case of clause "(i)," to the extent practicable, that such Party provides reasonable advance written notice to the other Party prior to the taking of such action and (B) in the case of clauses "(iii)" and "(iv)," that Acquiror or the Company, as applicable, obtains the prior written consent of the Company, in

49

the case of Acquiror, or Acquiror, in the case of the Company, in each case, such consent not to be unreasonably withheld, conditioned or delayed.

(d)     At a reasonable time prior to the filing, issuance or other submission or public disclosure of any reports to be filed with the SEC by either Acquiror or Merger Sub (for the avoidance of doubt, including the Current Report on Form 8-K referenced in clause "(a)" of this Section 6.8), the Company shall be given an opportunity to review and comment upon such filing, issuance or other submission and give its prior written consent to the form thereof, such consent not to be unreasonably withheld, conditioned or delayed, and Acquiror and Merger Sub shall accept and incorporate all reasonable comments from the Company with respect thereto prior to filing, issuance, submission or disclosure thereof.

(e)     Acquiror acknowledges that the information being provided to it in connection with this Agreement and the consummation of the transactions contemplated hereby is subject to the terms of the Nondisclosure Agreement.

Section 6.9     Non-Solicitation.

(a)     During the Pre-Closing Period, each of Acquiror and Merger Sub agrees that it shall not, and shall not authorize or permit any of its Representatives acting on its behalf (including investment bankers, attorneys and accountants), to, directly or indirectly, (i) initiate, solicit, knowingly facilitate, make or respond to any offer or proposal concerning, or related to, any Alternative Business Combination, (ii) enter into, engage in or continue any discussions or negotiations concerning, or related to, any Alternative Business Combination; (iii) provide any non-public information, data or access to employees to any Person that has made, or that is considering making, a proposal with respect to an Alternative Business Combination, (iv) approve, endorse or recommend any Alternative Business Combination, or (v) enter into any agreement, letter of intent, memorandum of understanding, term sheet or other Contract relating to an Alternative Business Combination. Acquiror shall promptly notify the Company of any submissions, proposals or offers made with respect to an Alternative Business Combination as soon as practicable following Acquiror's awareness thereof (but in any event within 24 hours). Acquiror, Merger Sub and their respective officers and directors shall, and shall instruct and cause their respective Affiliates and Representatives, in each case, to the extent acting on behalf of Acquiror or Merger Sub, as applicable, to, immediately cease and terminate all discussions and negotiations with any Person with respect to, or which is reasonably likely to give rise to or result in, a possible Alternative Business Combination.

(b)     During the Pre-Closing Period, the Company agrees that it shall not, and shall not authorize or permit any of its Representatives acting on its behalf (including investment bankers, attorneys and accountants) or any of the Company's Subsidiaries to, directly or indirectly, (i) initiate, solicit, knowingly encourage, knowingly facilitate or make or respond to an Acquisition Proposal, (ii) engage in or continue any discussions or negotiations with respect to an Acquisition Proposal, (iii) provide any non-public information or data or access to employees to, any Person that has made, or informs the Company that it is considering making, an Acquisition Proposal, (iv) approve, endorse or recommend any Acquisition Proposal or (v) enter into any agreement, letter of intent, memorandum of understanding, term sheet or other Contract relating to an Acquisition Proposal. The Company shall promptly notify Acquiror of any submissions, proposals

50

or offers made with respect to an Acquisition Proposal as soon as practicable following the Knowledge of the Company thereof (but in any event within two Business Days). The Company and its officers and directors shall, and shall instruct and cause its respective Affiliates and Representatives, in each case, to the extent acting on behalf of the Company to, immediately cease and terminate all discussions and negotiations with any Person with respect to, or which is reasonably likely to give rise to or result in, a possible Acquisition Proposal.

Section 6.10 <u>Pre-Closing Structuring</u>. The Parties, may, upon mutual written agreement prior to the Effective Time, change the method or structure of effecting the Transactions, if and to the extent Acquiror and the Company both deem such change to be necessary, appropriate and desirable, and the Parties shall cooperate and use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to effect any such change, including forming, or causing to be formed, new Subsidiaries and executing and causing to be delivered to any other Party hereto such instruments and other documents as may be reasonably requested.

Section 6.11 <u>Directors' and Officers' Indemnification; Insurance</u>.

(a) From and after the Effective Time, Acquiror and the Surviving Company shall indemnify and hold harmless each present and former director and officer of the Company and each of its Subsidiaries against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities incurred in connection with any Action, whether civil, criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, to the fullest extent that the Company or its Subsidiaries, as the case may be, would have been permitted under applicable Law and its certificate of incorporation, bylaws or other organizational documents to indemnify such Person (including the advancing of expenses as incurred to the fullest extent permitted under applicable Law). Without limiting the foregoing, Acquiror shall, and shall cause the Surviving Company and its Subsidiaries to, (i) maintain for a period of not less than six years from the Effective Time provisions in its certificate of incorporation, bylaws and other organizational documents concerning the indemnification and exoneration (including provisions relating to expense advancement) of officers and directors that are no less favorable to those Persons than the provisions of such organizational documents as of the date of this Agreement and (ii) not amend, repeal or otherwise modify such provisions in any respect that would adversely affect the rights of those Persons thereunder, in each case, except as required by Law. Acquiror shall assume, and be liable for, and shall cause the Surviving Company and their respective Subsidiaries to honor, each of the covenants in this <u>Section 6.11</u>.

(b) Prior to the Closing, Acquiror will procure "tail" directors' and officers' liability insurance policies covering those Persons who are currently covered by Acquiror's directors' and officers' liability insurance policies with a claims reporting or discovery period of at least six years from the Effective Time placed with insurance companies having the same or better AM Best Financial rating as Acquiror's current directors' and officers' liability insurance companies with terms and conditions providing retentions, limits and other material terms no less favorable than the current directors' and officers' liability insurance policies maintained by Acquiror with respect to matters, acts or omissions existing or occurring at or prior to the Effective

Time; provided, however, that Acquiror may not spend more than 200% of the last annual premium paid by Acquiror prior to the date hereof for the six years of coverage under such "tail" policies.

(c)     Notwithstanding anything contained in this Agreement to the contrary, clauses "(a)," "(b)" and "(c)" of this Section 6.11 shall survive the consummation of the Transactions and shall be binding on Acquiror and the Surviving Company and all successors and assigns of Acquiror and the Surviving Company. In the event that Acquiror, the Surviving Company or any of their respective successors or assigns consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, Acquiror and the Surviving Company shall ensure that proper provision shall be made so that the successors and assigns of Acquiror or the Surviving Company, as the case may be, shall succeed to the obligations set forth in clauses "(a)," "(b)" and "(c)" of this Section 6.11. The obligations of Acquiror and the Surviving Company under clauses "(a)," "(b)" and "(c)" of this Section 6.11 shall not be terminated or modified in such a manner as to materially and adversely affect any present or former director or officer of the Company or any of its Subsidiaries to whom clauses "(a)," "(b)" and "(c)" of this Section 6.11 applies without the consent of the affected Person.

(d)     Prior to the Closing, the Company shall obtain directors' and officers' liability insurance that shall be effective as of Closing and will cover those Persons who will be the directors and officers of Acquiror and its Subsidiaries (including the directors and officers of the Surviving Company and its Subsidiaries) at and after the Closing. The directors' and officers' liability insurance shall have a scope of coverage, terms and limits that are reasonably appropriate for a company of similar characteristics (including the line of business, market capitalization and revenues) as Acquiror and its Subsidiaries (including the Surviving Company and its Subsidiaries).

(e)     Notwithstanding anything contained in this Agreement to the contrary, prior to the Closing, the Company may procure "tail" directors' and officers' liability, employment practices liability and fiduciary liability insurance policies covering those Persons who are currently covered by the Company's directors' and officers' liability, employment practices liability and fiduciary liability insurance policies (as applicable) with a claims reporting or discovery period of at least six years from the Effective Time (or, such shorter period of time, as determined by the Company in its sole discretion) placed with insurance companies having the same or better AM Best Financial rating as the Company's current directors' and officers' liability, employment practices liability and fiduciary liability insurance companies with terms and conditions providing retentions, limits and other material terms no less favorable than the current directors' and officers' liability, employment practices liability and fiduciary liability insurance policies maintained by the Company with respect to matters, acts or omissions existing or occurring at or prior to the Effective Time.

Section 6.12    Trust Account.

(a)     During the Pre-Closing Period, Acquiror shall not amend the Trust Agreement, make or enter into any other agreement related to the Trust Account, or make any distribution of the funds held in the Trust Account, in each case, without the prior written consent of the Company, except in accordance with the terms of the Trust Agreement and the Acquiror

Organizational Documents. Upon satisfaction or waiver of the conditions set forth in ARTICLE VII and provision of notice thereof to the Trustee (which notice Acquiror shall provide to the Trustee in accordance with the terms of the Trust Agreement), (i) in accordance with and pursuant to the Trust Agreement, at the Closing, Acquiror shall (A) cause the documents, opinions and notices required to be delivered to the Trustee pursuant to the Trust Agreement to be so delivered, and (B) use commercially reasonable efforts to cause the Trustee to (1) pay as and when due all amounts payable to Acquiror Common Stockholders who shall have previously validly elected to redeem their shares of Acquiror Class A Common Stock in the Acquiror Stock Redemption, and (2) immediately thereafter, pay all remaining amounts then available in the Trust Account in accordance with this Agreement and the Trust Agreement, and (ii) thereafter, the Trust Account shall terminate, except as otherwise provided therein.

(b)      The Company agrees that, notwithstanding any other provision contained in this Agreement, the Company and its Subsidiaries do not now have, and shall not at any time prior to the Closing have, any claim to, or make any claim against, the Trust Account, regardless of whether such claim arises as a result of, in connection with or relating in any way to, the business relationship between the Company or its Subsidiaries, on the one hand, and Acquiror, on the other hand, this Agreement, or any other agreement or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (any and all such claims are collectively referred to in this Section 6.12(b) as the "Trust Account Claims"). Notwithstanding any other provision contained in this Agreement, the Company hereby irrevocably waives any right, title, interest or Trust Account Claim it may have, now or in the future in or to the Trust Account and agrees not to seek recourse against the Trust Account or any funds distributed therefrom as a result of, or arising out of, this Agreement and any negotiations, contracts or agreements with Acquiror, and will not seek recourse against the Trust Account for any reason whatsoever in respect thereof; provided, however, that the foregoing waiver will not limit or prohibit the Company from (i) pursuing a claim against Acquiror pursuant to this Agreement for specific performance or other equitable relief in connection with the Transactions or (ii) pursuing any claims that the Company may have against Acquiror's assets or funds that are not held in the Trust Account. In the event the Company or any of its Subsidiaries commences any Action based upon, in connection with, relating to or arising out of any matter relating to Acquiror, which Action seeks, in whole or in part, relief against the Trust Account in violation of the foregoing, Acquiror shall be entitled to recover from the Company the associated legal fees and costs in connection with any such Action in the event Acquiror prevails in such Action.

Section 6.13    Intended Tax Treatment.

(a)      This Agreement is intended to constitute, and the Parties hereby adopt this Agreement as, a "plan of reorganization" within the meaning of Treasury Regulation Sections 1.368-2(g) and 1.368-3(a). The Parties agree and acknowledge that, for U.S. federal income tax purposes and applicable state and local tax purposes, the Merger shall qualify as a reorganization within the meaning of Section 368(a) of the Code or, together with the PIPE Investment, as an exchange to which Section 351(a) of the Code applies (or both). Unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any similar determination under state or local Law) or by a change in Law, the Parties agree to file all U.S. federal, state, local and non-U.S. Tax Returns consistent with this Section 6.13 and shall not take any position before or after the Closing that is inconsistent with the foregoing treatment.

(b)      The Parties shall use reasonable best efforts to cause the Merger to qualify for the Intended Tax Treatment and not to take, or fail to take, any action before or after the Closing to the extent that such action or failure to act would reasonably be expected to prevent or impede the Merger from qualifying for the Intended Tax Treatment; provided, however, that nothing in this Section 6.13 shall require any of the Parties to effect more redemptions of Acquiror stock or raise more money in respect of the PIPE Investment than is otherwise required by this Agreement, alter the terms of any shares of the Acquiror (including the Acquiror Class F Common Stock) or the rights of any shareholder thereof, or agree to any revisions or amendments to, or to waive any provisions of, this Agreement or any Ancillary Agreement. For the avoidance of doubt, for purposes of Section 4.15(j), Section 5.20(b) and this Section 6.13, qualification for the Intended Tax Treatment shall not require qualification under both Section 368(a) of the Code and Section 351(a) of the Code, but shall be satisfied by either of such Code sections.

Section 6.14      FIRPTA Certificate. At the Closing, the Company shall deliver to Acquiror, in a form reasonably acceptable to Acquiror, a properly executed certification, dated as of the Closing Date, that shares of Company Stock are not "United States real property interests" in accordance with Treasury Regulation Section 1.1445-2(c)(3), together with a notice to the Internal Revenue Service (which shall be filed by Acquiror with the Internal Revenue Service at or following the Closing) in accordance with the provisions of Treasury Regulation Section 1.897-2(h)(2).

Section 6.15      Incentive Plan. The Parties shall cooperate to establish the Incentive Plan and Acquiror Board shall adopt such plan to be effective as of the Closing, which shall provide for an aggregate share reserve thereunder equal to 10% of the shares Acquiror Class A Common Stock issued and outstanding immediately following the Closing. Subject to stockholder approval of the Incentive Plan Proposal, promptly following the expiration of the 60 day period following the date Acquiror has filed current Form 10 information with the SEC reflecting its status as an entity that is not a shell company, Acquiror shall file an effective registration statement on Form S-8 (or other applicable form) with respect to the Acquiror Class A Common Stock issuable under the Incentive Plan and shall maintain the effectiveness of such Form S-8 registration statement for so long as awards granted pursuant to the Incentive Plan remain outstanding.

Section 6.16      Section 16(b) Exemption. Acquiror shall take all actions reasonably necessary to cause the Transactions and any other dispositions of equity securities of Acquiror (including derivative securities) in connection with the Transactions by each individual who is subject to the reporting requirements of Section 16(a) of the Exchange Act, with respect to Acquiror or who will (or is reasonably expected to) become subject to such reporting requirements with respect to Acquiror to be exempt under Rule 16b-3 under the Exchange Act.

Section 6.17      Stock Exchange Matters.

(a)      Prior to the Closing, Acquiror shall apply for a mutually agreed upon new ticker symbol with the Stock Exchange that reflects the name "ATI Physical Therapy" contingent on obtaining Acquiror Stockholder Approval. Acquiror shall use its reasonable best efforts to maintain its listing on the Stock Exchange. On or prior to the Closing, if Acquiror receives any written or, to the Knowledge of Acquiror, oral notice from the Stock Exchange that Acquiror has failed, or would reasonably be expected to fail, to meet the Stock Exchange listing requirements

as of the Closing for any reason (such notice a "Stock Exchange Notice"), then Acquiror shall give prompt written notice of such Stock Exchange Notice to the Company, including a copy of any written Stock Exchange Notice or a summary of any oral Stock Exchange Notice. Acquiror further covenants and agrees, with respect to any Stock Exchange Notice, to use reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to (i) remedy any and all issues set forth in the Stock Exchange Notice regarding Acquiror's listing on the Stock Exchange and (ii) in the event Acquiror is unable to remedy such issues set forth in the Stock Exchange Notice after using such reasonable best efforts as described in clause "(i)," to cause the Acquiror Common Stock to be issued in connection with the Transactions to be approved for listing on an Alternate Exchange.

(b)     Prior to the Closing Date, Acquiror shall use reasonable best efforts to cause the Acquiror Common Stock to be issued in connection with the Transactions (including the Earn Out Shares, in the event such Earn Out Shares become issuable pursuant to ARTICLE III) to be approved for listing on the Stock Exchange as promptly as practicable following the issuance thereof, subject to official notice of issuance.

Section 6.18     Stockholder Litigation.

(a)     In the event that any stockholder litigation related to this Agreement, any Ancillary Agreement or the Transactions is brought, or, to the Knowledge of Acquiror or the Knowledge of the Company, as the case may be, threatened in writing, against such party or the members of each respective parties' board of directors prior to the Closing, Acquiror and the Company shall promptly notify the other party of any such actual or threatened stockholder litigation and shall keep the other reasonably informed with respect to the status thereof.

(b)     Acquiror shall control the defense of any such Action brought against Acquiror or members of the Acquiror Board, provided that Acquiror give the Company the reasonable opportunity to participate in any response to and, if applicable, in the defense or settlement of any stockholder claim or litigation (including any purported claim or litigation and any class action or derivative litigation) against Acquiror or its officers or directors relating to this Agreement and the Transactions, and no such response to, or any settlement of shall be made or be agreed to without the prior written consent of the Company (not to be unreasonably withheld, conditioned or delayed). Acquiror shall cooperate, and shall use its reasonable best efforts to cause its Representatives to cooperate with the Company, in the defense against such claim or litigation or purported claim or litigation.

(c)     The Company shall control the defense of any such Action brought against the Company or members of the Company Board, provided that the Company give Acquiror the reasonable opportunity to participate in any response to and, if applicable, in the defense or settlement of any stockholder claim or litigation (including any purported claim or litigation and any class action or derivative litigation) against the Company or its officers or directors relating to this Agreement and the Transactions, and no such response to, or any settlement of shall be made or be agreed to without the prior written consent of Acquiror (not to be unreasonably withheld, conditioned or delayed). The Company shall cooperate, and shall use its reasonable best efforts to cause its Representatives to cooperate with Acquiror, in the defense against such claim or litigation or purported claim or litigation.

Section 6.19    Subscription Agreements. Acquiror shall not permit any amendment or modification to be made to, or any waiver of any provision or remedy under, or any replacements of, the Subscription Agreements, without the prior written consent of the Company, except for any assignments or transfers expressly permitted by the Subscription Agreements. Acquiror shall use its reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated by the Subscription Agreements on the terms and conditions described therein, including maintaining in effect the Subscription Agreements and using its reasonable best efforts to: (i) satisfy in all material respects on a timely basis all conditions and covenants applicable to Acquiror in the Subscription Agreements and otherwise comply with its obligations thereunder; (ii) in the event that all conditions in the Subscription Agreements (other than conditions that Acquiror or any of its Affiliates control the satisfaction of and other than those conditions that by their nature are to be satisfied at the Closing) have been satisfied, consummate the transactions contemplated by the Subscription Agreements at or prior to Closing; and (iii) enforce its rights under the Subscription Agreements in the event that all conditions in the Subscription Agreements (other than conditions that Acquiror or any of its Affiliates control the satisfaction of and other than those conditions that by their nature are to be satisfied at the Closing) have been satisfied, to cause the applicable PIPE Investors to contribute to Acquiror the applicable portion of the PIPE Investment Amount set forth in the Subscription Agreements at or prior to the Closing. Without limiting the generality of the foregoing, Acquiror shall give the Company, prompt (and, in any event within two Business Days) written notice: (A) of any amendment to any Subscription Agreement (together with a copy of such amendment) that may be made with the prior written consent of the Company (other than such amendments permitted in this Section 6.19); (B) of any breach or default (or any event or circumstance that, with or without notice, lapse of time or both, could give rise to any breach or default) by any party to any Subscription Agreement known to Acquiror; (C) of the receipt of any written notice or other written communication from any party to any Subscription Agreement with respect to any actual, potential or claimed expiration, lapse, withdrawal, breach, default, termination or repudiation by any party to any Subscription Agreement or any provisions of any Subscription Agreement; and (D) if Acquiror does not expect to receive all or any portion of the PIPE Investment Amount on the terms, in the manner or from the sources contemplated by the Subscription Agreements.

Section 6.20    Sponsor Letter Agreement. Acquiror shall enforce the terms and conditions of the Sponsor Letter Agreement, including the obligations of the parties thereto (a) to vote all of the shares of the capital stock of Acquiror that they hold to approve the Transaction Proposals at the Special Meeting and (b) not to redeem such shares in connection with the consummation of the Transactions.

Section 6.21    Debt Financing. Acquiror shall, and shall use its commercially reasonable efforts to cause its Representatives to, use their respective commercially reasonable efforts to cooperate with the Company in connection with the Debt Financing, including by providing any documentation and/or other information as may be (a) required under applicable "know your customer," beneficial ownership and/or anti-money laundering rules and regulations and (b) reasonably requested by the Company in connection with the Debt Financing; provided, however, that the Acquiror, its Affiliates and their respective Representatives shall be indemnified and held harmless by the Company from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection

56

with the Debt Financing to the fullest extent permitted by Law and with appropriate contribution to the extent such indemnification is not available, other than to the extent any such liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments or penalties are the result of the gross negligence, bad faith or willful misconduct of the Acquiror, its Affiliates or their respective Representatives, or such Person's material breach of this Agreement. Notwithstanding anything to the contrary in this Agreement, the Acquiror's breach of the covenant required to be performed by it under this Section 6.21 will not be considered in determining the satisfaction of the condition set forth in Section 7.3(c) or whether any right of termination arises under Section 8.1(e).

**ARTICLE VII**
**CONDITIONS TO CLOSING**

Section 7.1    Conditions to Obligations of all Parties. The obligations of Acquiror, Merger Sub and the Company to consummate the Transactions are subject to the satisfaction of the following conditions at the Closing, any one or more of which may be waived (if legally permitted) in writing by all of such Parties:

(a)    HSR Act. Any waiting period (or any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or been terminated (to the extent that early termination is available under the HSR Act at such time).

(b)    No Prohibition. There shall not have been enacted or promulgated any Law in the United States which is then in effect and has the effect of making consummation of the Transactions illegal or otherwise enjoining or prohibiting the consummation of the Transactions.

(c)    Acquiror Stockholder Approval. The Acquiror Stockholder Approval shall have been obtained.

(d)    Company Stockholder Approval. The Company Requisite Approval shall have been obtained.

(e)    Listing. The Acquiror Class A Common Stock to be issued in connection with the Transactions shall have been approved for listing on the Stock Exchange, subject only to official notice of issuance thereof, and, as of immediately following the Effective Time, Acquiror shall be in compliance, in all material respects, with applicable initial and continuing listing requirements of the Stock Exchange, and Acquiror shall not have received any notice of non-compliance therewith from the Stock Exchange that has not been cured or would not be cured at or immediately following the Effective Time.

(f)    Acquiror Net Tangible Assets. After giving effect to the Acquiror Stock Redemption, if any, Acquiror shall have at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act).

(g)    Amendment to Certificate of Incorporation. The Acquiror A&R Charter shall have been filed with the Secretary of State of the State of Delaware in accordance with Section 2.3(d) and the Acquiror A&R Bylaws shall have been adopted.

57

(h)     Minimum Cash Balance. After giving effect to the Acquiror Stock Redemption, if any, the Available Cash as of immediately prior to the Closing shall equal or exceed the Minimum Cash Balance.

Section 7.2     Conditions to Obligations of Acquiror. The obligations of Acquiror to consummate the Transactions are subject to the satisfaction of the following additional conditions at the Closing, any one or more of which may be waived in writing by Acquiror:

(a)     Representations and Warranties.

(i)     Each of the representations and warranties of the Company contained in Section 4.1, Section 4.2 and Section 4.24 shall be accurate in all material respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date (except for any such representations and warranties made as of a specific date, which shall have been accurate in all material respects as of such date); provided, however, that, for purposes of determining the accuracy of such representations and warranties as of the foregoing dates, all "Company Material Adverse Effect" and/or similar materiality qualifications limiting the scope of such representations and warranties shall be disregarded;

(ii)     each of the representations and warranties of the Company contained in Section 4.6(a) shall be accurate in all respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date (other than any such representation and warranty made as of a specific earlier date, which shall have been accurate in all respects as of such earlier date), except that any inaccuracies in such representations and warranties that are *de minimis* in nature will be disregarded;

(iii)     Section 4.21(b) shall have been accurate in all respects as of the date of this Agreement; and

(iv)     each of the representations and warranties of the Company (other than Section 4.1, Section 4.2, Section 4.6(a), Section 4.21(b) and Section 4.24) shall be accurate in all respects as of the date hereof and as of the Closing Date (except for any such representations and warranties made as of a specific date, which shall have been accurate in all respects as of such date); provided, however, that: (A) for purposes of determining the accuracy of such representations and warranties as of the foregoing dates, all "Company Material Adverse Effect" and/or similar materiality qualifications limiting the scope of such representations and warranties shall be disregarded; and (B) any inaccuracies in such representations and warranties shall be disregarded if the circumstances giving rise to all such inaccuracies, individually or in the aggregate, do not constitute, and would not reasonably be expected to have a Company Material Adverse Effect.

(b)     Performance of Obligations. The Company shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing.

(c)     No Company Material Adverse Effect. Since the date of this Agreement, there shall not have occurred a Company Material Adverse Effect.

58

(d)　　Closing Deliverables. The Company shall have delivered to Acquiror the Closing deliverables set forth in Section 2.2(a).

Section 7.3　　Conditions to Obligations of Company. The obligations of the Company to consummate the Transactions are subject to the satisfaction of the following additional conditions at the Closing, any one or more of which may be waived in writing by the Company:

(a)　　Representations and Warranties.

(i)　　Each of the representations and warranties of Acquiror contained in Section 5.1, Section 5.2, Section 5.5(c) and Section 5.10 shall be accurate in all material respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date (except for any such representations and warranties made as of a specific date, which shall have been accurate in all material respects as of such date); provided, however, that, for purposes of determining the accuracy of such representations and warranties as of the foregoing dates, all "Acquiror Material Adverse Effect" and/or similar materiality qualifications limiting the scope of such representations and warranties shall be disregarded;

(ii)　　each of the representations and warranties of Acquiror contained in Section 5.5(a), Section 5.5(b) and Section 5.5(d) shall be accurate in all respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date (other than any such representation and warranty made as of a specific earlier date, which shall have been accurate in all respects as of such earlier date), except that any inaccuracies in such representations and warranties that are *de minimis* in nature will be disregarded;

(iii)　　Section 5.14 shall have been accurate in all respects as of the date of this Agreement; and

(iv)　　each of the representations and warranties of Acquiror (other than Section 5.1, Section 5.2, Section 5.5 and Section 5.10) shall be accurate in all respects as of the Closing Date as if made on and as of the date hereof and as of Closing Date (except for any such representations and warranties made as of a specific date, which shall have been accurate in all respects as of such date); provided, however, that: (A) for purposes of determining the accuracy of such representations and warranties as of the foregoing dates, all "Acquiror Material Adverse Effect" and/or similar materiality or qualifications limiting the scope of such representations and warranties shall be disregarded; and (B) any inaccuracies in such representations and warranties shall be disregarded if the circumstances giving rise to all such inaccuracies, individually or in the aggregate, do not constitute, and would not reasonably be expected to have an Acquiror Material Adverse Effect.

(b)　　Performance of Obligations. Acquiror shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing.

(c)　　No Acquiror Material Adverse Effect. Since the date of this Agreement, there shall not have occurred an Acquiror Material Adverse Effect.

59

(d)     Board Composition.   As of immediately following the Effective Time, the Acquiror Board shall consist of the number of directors, and be otherwise constituted in accordance with Section 1.12.

(e)     Trust Account. Acquiror shall have made appropriate arrangements to have the Trust Account, less amounts paid and to be paid pursuant to the Acquiror Stock Redemption, available to Acquiror at the Closing.

(f)     Closing Deliverables. Acquiror shall have delivered to the Company the Closing deliverables set forth in Section 2.2(b).

Section 7.4     Frustration of Closing Conditions. No Party may rely on the failure of any condition set forth in this ARTICLE VII to be satisfied to excuse such Party's obligation to effect the Closing if such failure was caused by such Party's breach of any representation or warranty or covenant contained in this Agreement.

**ARTICLE VIII**
**TERMINATION**

Section 8.1     Termination. This Agreement may be terminated and the Transactions abandoned:

(a)     by mutual written consent of Acquiror and the Company;

(b)     by written notice from either the Company or Acquiror to the other Party if, the Closing has not occurred on or prior to August 23, 2021 (the "Outside Date"); provided, however, that this Agreement may not be terminated under this Section 8.1(b) by or on behalf of any Party that is in breach of any representation, warranty or covenant contained herein and such breach results in the failure of a condition set forth in ARTICLE VII to be satisfied on or prior to the Outside Date;

(c)     by written notice from either the Company or Acquiror to the other Party, if any Governmental Authority in the United States shall have enacted, issued, promulgated, enforced or entered any Law which has become final and nonappealable and has the effect of permanently making consummation of the Transactions illegal or otherwise permanently preventing or prohibiting consummation of the Transactions;

(d)     by written notice from Acquiror to the Company, if there has been a breach of any representation, warranty or covenant made by the Company in this Agreement, or any representation or warranty contained in this Agreement shall have become untrue or inaccurate after the date of this Agreement, in each case which breach, untruth or inaccuracy (i) would cause Section 7.2(a) or Section 7.2(b) not to be satisfied as of the Closing Date (a "Terminating Company Breach"), and (ii) shall not have been cured within 30 days after written notice from Acquiror of such Terminating Company Breach is delivered to the Company (which notice shall describe such Terminating Company Breach in reasonable detail), or which breach, untruth or inaccuracy, by its nature, cannot be cured prior to the Outside Date; provided, however, that Acquiror shall not be entitled to terminate this Agreement pursuant to this Section 8.1(d) if (A) Acquiror has waived such Terminating Company Breach or (B) Acquiror or Merger Sub is then in

60

breach of any representation, warranty or covenant such that the conditions set forth in Section 7.3(a) or Section 7.3(b) would not reasonably be expected to be satisfied;

(e)     by written notice from the Company to Acquiror, if there has been a breach of any representation, warranty or covenant made by Acquiror in this Agreement, or any representation or warranty contained in this Agreement shall have become untrue or inaccurate after the date of this Agreement, in each case which breach, untruth or inaccuracy (i) would cause Section 7.3(a) or Section 7.3(b) not to be satisfied as of the Closing Date (a "Terminating Acquiror Breach"), and (ii) shall not have been cured within 30 days after written notice from the Company of such Terminating Acquiror Breach is delivered to Acquiror (which notice shall describe such Terminating Acquiror Breach in reasonable detail), or which breach, untruth or inaccuracy, by its nature, cannot be cured prior to the Outside Date; provided, however, that the Company shall not be entitled to terminate this Agreement pursuant to this Section 8.1(e) if (A) the Company has waived such Terminating Acquiror Breach or (B) the Company is then in breach of any representation, warranty or covenant such that the conditions set forth in Section 7.2(a) or Section 7.2(b) would not reasonably be expected to be satisfied;

(f)     by written notice from the Company to Acquiror prior to obtaining the Acquiror Stockholder Approval, if the Acquiror Board (i) shall have made a Change in Recommendation or (ii) shall have failed to include the Acquiror Board Recommendation in the Proxy Statement distributed to the stockholders of Acquiror;

(g)     by written notice from Acquiror to the Company, if the Company Requisite Approval has not been obtained within one Business Day of the execution and delivery of this Agreement;

(h)     by written notice from either the Company or Acquiror to the other Party, if the Special Meeting shall have been held and the Acquiror Stockholder Approval is not obtained at the Special Meeting (subject to any postponement or adjournment of the Special Meeting), provided, however, that the right to terminate this Agreement under this Section 8.1(h) shall not be available from and after the time that Acquiror obtains the Acquiror Stockholder Approval; and

(i)     by written notice from the Company to Acquiror, if, after giving effect to the Acquiror Stock Redemption, if any, the Available Cash would be less than the Minimum Cash Balance immediately prior to the Closing.

Section 8.2     Effect of Termination. Except as set forth in this Section 8.2, in the event of the termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and have no effect, without any liability on the part of any Party or its respective Affiliates, officers, directors or stockholders, other than liability of any Party for Fraud or willful breach of this Agreement by such Party occurring prior to such termination. The provisions of this Section 8.2, Section 9.8 (No Third-Party Beneficiaries), Section 9.9 (Governing Law), Section 9.11 (Waiver of Trial by Jury), Section 9.13 (Fees and Expenses), Section 9.1 (Non Survival of Representations, Warranties and Agreements) and Section 9.15 (Non-Recourse) (collectively, the "Surviving Provisions") and the Nondisclosure Agreement, and any other Section or Article of this Agreement referenced in the Surviving Provisions that are required to survive in

61

order to give appropriate effect to the Surviving Provisions, shall in each case survive any termination of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1 <u>Non Survival of Representations, Warranties and Agreements</u>. The representations, warranties, agreements and covenants in this Agreement shall terminate at the Closing; <u>provided</u> that, notwithstanding the foregoing, the covenants and agreements in <u>ARTICLE III</u>, <u>Sections 6.8</u>, <u>6.11</u>, <u>6.13</u> and <u>6.18,</u> this <u>ARTICLE IX</u> and <u>Article X</u> shall survive the Closing.

Section 9.2 <u>Modification or Amendment</u>. This Agreement may be amended or modified in whole or in part only by a duly authorized agreement in writing which makes reference to this Agreement. The adoption of this Agreement by the stockholders of any of the Parties shall not restrict the ability of the board of directors (or comparable body) of any of the Parties to terminate this Agreement in accordance with <u>Section 8.1</u> or to cause such Party to enter into an amendment to this Agreement pursuant to this <u>Section 9.2</u>; <u>provided</u>, <u>however</u>, that (a) after any such adoption of this Agreement by the Company Stockholders, no amendment or supplement to the provisions of this Agreement shall be made which by applicable requirement of Law requires further approval of the Company Stockholders without the further approval of such Company Stockholders, and (b) after any such approval of the Agreement by Acquiror's stockholders, no amendment or supplement to the provisions of this Agreement shall be made which by applicable requirement of Law requires further approval of the stockholders of Acquiror without the further approval of such stockholders.

Section 9.3 <u>Extension; Waiver</u>. Acquiror (on behalf of itself or Merger Sub) may, and the Company (on behalf of itself) may, at any time prior to the Closing, by action taken by its board of directors (or comparable body) or officers thereunto duly authorized, (a) extend the time for the performance of any of the obligations or other acts of the other Parties, (b) waive any inaccuracies in the representations and warranties contained herein by any other Party or in any document, certificate or writing delivered pursuant hereto by such other Party, or (c) to the extent permitted by Law, waive compliance with any of the terms or conditions of this Agreement, in each case, by an agreement in writing executed in the same manner as this Agreement. The failure or delay of any Party to this Agreement to exercise any of its rights under this Agreement shall not impair such right or be construed as a waiver by such Party of such right.

Section 9.4 <u>Notices</u>. To be valid for purposes hereof, any notice, request, demand, waiver, consent or approval (any of the foregoing, a "<u>Notice</u>") that is required hereunder shall be in writing. A Notice shall be deemed given only as follows: (a) on the date delivered personally or by email; (b) three Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or (c) one Business Day following deposit with a nationally recognized overnight courier service for next day delivery, charges prepaid, and, in each case, addressed to the intended recipient as set forth below:

(a)     If to Acquiror:

Fortress Value Acquisition Corp. II
1345 Avenue of the Americas
46th Floor
New York, New York
Attention:     Alexander Gillette
E-mail:     agillette@fortress.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Attention:     Joseph A. Coco
               Blair T. Thetford
Email:     Joseph.Coco@skadden.com
           Blair.Thetford@skadden.com

(b)     If to the Company:

ATI Physical Therapy
790 Remington Blvd.

Bolingbrook, Illinois 60440
Attention:     Diana M. Chafey
E-mail:     diana.chafey@atipt.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
100 Federal Street, 34th Floor
Boston, MA 02110
Attention:     Marilyn French Shaw
E-mail:     MarilynFrench.Shaw@weil.com

and

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention:     James R. Griffin
Email:     james.griffin@weil.com

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by providing Notice to the other Parties.

63

Section 9.5     Entire Agreement. This Agreement (including the Disclosure Schedules and Exhibits hereto) and the Ancillary Agreements (including the Nondisclosure Agreement) constitute the entire agreement among the Parties relating to the Transactions and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof.

Section 9.6     Assignment. No Party shall assign this Agreement or any part hereof without the prior written consent of the other Parties. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. Any attempted assignment in violation of the terms of this Section 9.6 shall be null and void ab initio.

Section 9.7     Counterparts. This Agreement may be executed in multiple counterparts, each of which when executed and delivered shall thereby be deemed to be an original and all of which taken together shall constitute one and the same instrument. Any Party may deliver signed counterparts of this Agreement to the other Parties by means of facsimile, portable document format (.PDF) signature or electronic transmission.

Section 9.8     No Third-Party Beneficiaries. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties, any right or remedies under or by reason of this Agreement; provided, however, that, notwithstanding the foregoing, in the event the Closing occurs, the present and former officers and directors of the Company (and their successors, heirs and Representatives) are intended third-party beneficiaries of, and may enforce, Section 6.11. The representations and warranties in this Agreement are the product of negotiations among the Parties hereto and are for the sole benefit of the parties hereto, and may represent an allocation of risk among the Parties hereto associated with particular matters regardless of the knowledge of any of the Parties hereto. Persons other than the Parties hereto may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 9.9     Governing Law. This Agreement, and all claims or causes of action (whether in contract, tort or otherwise) based upon, arising out of, or related to this Agreement or the Transactions, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

Section 9.10    Exclusive Jurisdiction. In any Action between any of the Parties arising out of or relating to this Agreement or any of the Transactions, each of the Parties: (a) irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Action or proceeding, in any state court of Delaware (unless the federal courts have exclusive jurisdiction over the matter, in which case each of the Parties irrevocably and unconditionally consents and submits to the jurisdiction of the United States District Court for the District of Delaware); (b) agrees that it will not attempt to deny or defeat such jurisdiction by motion or other request for leave from such court; and (c) agrees that it will not bring any such Action in any court other than such courts. Service of any process,

summons, notice or document to any party's address and in the manner set forth in Section 9.4 shall be effective service of process for any such action. Each of the Parties agrees that the mailing of process or other papers in connection with any Action or proceeding in the manner provided in Section 9.4 or such other manner as may be permitted by requirement of Law shall be valid and sufficient service of process. Notwithstanding the foregoing in this Section 9.10, a Party may commence any Action or proceeding in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts. Each party hereto further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.

Section 9.11 WAIVER OF TRIAL BY JURY. TO THE EXTENT PERMITTED BY LAW, EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES (AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE) THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE OTHER PARTIES TO ENTER INTO THIS AGREEMENT.

Section 9.12 Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party. Upon determination by a court of competent jurisdiction that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Transactions be consummated as originally contemplated to the fullest extent possible.

Section 9.13 Fees and Expenses. Except as otherwise provided in this Agreement, each Party shall bear its own expenses incurred in connection with this Agreement and the Transactions, whether or not the Transactions are consummated, including all fees of its legal counsel, financial advisers and accountants; provided, however, that if the Closing shall occur, Acquiror shall (a) pay or cause to be paid, the Transaction Expenses in accordance with Section 2.3(b). For the avoidance of doubt, any payments to be made (or to cause to be made) by Acquiror pursuant to this Section 9.13 shall be paid upon consummation of the Merger and release of proceeds from the Trust Account.

Section 9.14 Specific Performance. The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any Party does not perform its obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate the Transactions) in accordance with its specified terms or otherwise breach such provisions. The Parties acknowledge and agree that (a) the Parties shall be entitled to an injunction, specific performance, or other equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and

provisions of this Agreement, each without proof of damages, prior to the valid termination of this Agreement in accordance with Section 8.1, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific enforcement is an integral part of the Transactions and without that right, none of the Parties would have entered into this Agreement. Each Party agrees that it shall not oppose the granting of specific performance and other equitable relief on the basis that the other Parties have an adequate remedy at Law or that an award of specific performance is not an appropriate remedy for any reason at Law or equity. The Parties acknowledge and agree that any Party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 9.14 shall not be required to provide any bond or other security in connection with any such injunction.

Section 9.15  Non-Recourse. This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of or related to this Agreement or the Transactions, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), and any remedies in respect thereof, may only be brought against, the entities that are expressly named as Parties, and then only with respect to the specific obligations set forth herein with respect to such Party. Except to the extent a named Party to this Agreement (and then only to the extent of the specific obligations undertaken by such named Party in this Agreement), (a) no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney, advisor or Representative of any named Party to this Agreement and (b) no past, present or future director, officer, employee, incorporator, member, partner, stockholder, agent, attorney, advisor or Representative of any of the foregoing (collectively, as to both clause "(a)" and "(b)," "Non-Party Affiliates") shall have any liability (whether in contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any one or more of Acquiror or the Company under this Agreement of or for any claim based on, arising out of, or related to this Agreement or the Transactions, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement by any Non-Party Affiliate, as to which the Parties disclaim any reliance).

Section 9.16  Legal Representation.

(a)  Acquiror hereby agrees, on behalf of its directors, members, partners, officers, employees and Affiliates and each of their respective successors and assigns (including after the Closing, the Surviving Company) (all such parties, the "Weil Waiving Parties"), that Weil, Gotshal and Manges LLP ("Weil") may represent the stockholders or holders of other equity interests of the Company or any of its Subsidiaries or their respective directors, members, partners, officers, employees or Affiliates (collectively, but for the avoidance of doubt, excluding the Surviving Company, the "Weil WP Group"), in each case, solely in connection with any Action or obligation arising out of or relating to this Agreement, any Ancillary Agreement or the Transactions, notwithstanding its prior representation of the Company and its Subsidiaries or other Weil Waiving Parties, and Acquiror on behalf of itself and the Weil Waiving Parties hereby consents thereto and irrevocably waives (and will not assert) any conflict of interest, breach of duty or any other objection arising from or relating to Weil's prior representation of the Company,

66

its Subsidiaries or of Weil Waiving Parties. Acquiror, for itself and the Weil Waiving Parties, hereby further irrevocably acknowledges and agrees that all privileged communications, written or oral, between the Company and its Subsidiaries or any member of the Weil WP Group and Weil, made in connection with the negotiation, preparation, execution, delivery and performance under, or any dispute or Action arising out of or relating to, this Agreement, any Ancillary Agreements or Transactions, or any matter relating to any of the foregoing, are privileged communications that do not pass to the Surviving Company notwithstanding the Merger, and instead survive, remain with and are controlled by the Weil WP Group (the "Weil Privileged Communications"), without any waiver thereof. Acquiror, together with any of its Affiliates, Subsidiaries, successors or assigns, agree that no Person may use or rely on any of the Weil Privileged Communications, whether located in the records or email server of the Surviving Company and its Subsidiaries, in any Action against or involving any of the parties after the Closing, and Acquiror agrees not to assert that any privilege has been waived as to the Weil Privileged Communications, by virtue of the Merger.

(b)     The Company hereby agrees on behalf of its directors, members, partners, officers, employees and Affiliates and each of their respective successors and assigns (including after the Closing, the Surviving Company) (all such parties, the "Skadden Waiving Parties"), that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") may represent the stockholders or holders of other equity interests of the Sponsor or of Acquiror or any of their respective directors, members, partners, officers, employees or Affiliates (collectively, but for the avoidance of doubt, excluding the Surviving Company, the "Skadden WP Group"), in each case, solely in connection with any Action or obligation arising out of or relating to this Agreement, any Ancillary Agreement or Transactions, notwithstanding its prior representation of the Sponsor, Acquiror and its Subsidiaries, or other Skadden Waiving Parties. The Company, on behalf of itself and the Skadden Waiving Parties, hereby consents thereto and irrevocably waives (and will not assert) any conflict of interest, breach of duty or any other objection arising from or relating to Skadden's prior representation of the Sponsor, Acquiror and its Subsidiaries, or other Skadden Waiving Parties. The Company, for itself and the Skadden Waiving Parties, hereby further irrevocably acknowledges and agrees that all privileged communications, written or oral, between the Sponsor, Acquiror, or its Subsidiaries, or any other member of the Skadden WP Group, on the one hand, and Skadden, on the other hand, made prior to the Closing, in connection with the negotiation, preparation, execution, delivery and performance under, or any dispute or Action arising out of or relating to, this Agreement, any Ancillary Agreements or the Transactions, or any matter relating to any of the foregoing, are privileged communications that do not pass to the Surviving Company notwithstanding the Merger, and instead survive, remain with and are controlled by the Skadden WP Group (the "Skadden Privileged Communications"), without any waiver thereof. The Company, together with any of its Affiliates, Subsidiaries, successors or assigns, agree that no Person may use or rely on any of the Skadden Privileged Communications, whether located in the records or email server of the Surviving Company and its Subsidiaries, in any Action against or involving any of the parties after the Closing, and the Company agrees not to assert that any privilege has been waived as to the Skadden Privileged Communications, by virtue of the Merger.

Section 9.17    Release.

(a)     Each of the Company and its Subsidiaries, on behalf of itself and its Affiliates, hereby irrevocably waives, releases and discharges, effective as of the Closing, the

Company Stockholders, and their respective predecessors, successors, Subsidiaries and Affiliates, and any of their respective current and former officers, directors, employees, consultants, agents, representatives and advisors, in each case from any and all liabilities and obligations of any kind or nature whatsoever that such Person or its Affiliates has or may have, now or in the future, arising out of, relating to, or resulting from any matter or cause whatsoever arising prior to the Closing, in each case whether known or unknown, absolute or contingent, liquidated or unliquidated, and whether arising under any agreement or understanding or otherwise, at law or equity, arising out of or in connection with the ownership by the holders of Company Common Stock or Company Preferred Stock, as applicable, any Person's service as a director of the Company or a director or manager of any of its Subsidiaries and any acts or omissions of any Person on behalf of the Company or any of its Subsidiaries.

(b)     Each of Acquiror and Merger Sub, on behalf of itself and its Affiliates, hereby irrevocably waives, releases and discharges, effective as of the Closing, the Acquiror stockholders, including the Sponsor, and their respective predecessors, successors, Subsidiaries and Affiliates, and any of their respective current and former officers, directors, employees, consultants, agents, representatives and advisors, in each case from any and all liabilities and obligations of any kind or nature whatsoever that such Person or its Affiliates has or may have, now or in the future, arising out of, relating to, or resulting from any matter or cause whatsoever arising prior to the Closing, in each case whether known or unknown, absolute or contingent, liquidated or unliquidated, and whether arising under any agreement or understanding or otherwise, at law or equity, arising out of or in connection with the ownership by the holders of Acquiror Common Stock, any Person's service as a director of Acquiror or a director or manager of Merger Sub and any acts or omissions of any Person on behalf of Acquiror or the Merger Sub.

## ARTICLE X
## DEFINITIONS

Section 10.1    Definitions. Capitalized terms used in this Agreement have the meanings set forth below.

"Acceleration Event" has the meaning set forth in Section 3.2.

"Accreted Value" means an aggregate accrued amount, calculated based on the Preferred Stock Adjusted Base, at the Dividend Rate (as defined in the Company Certificate of Incorporation) from the Closing Date through the date that is 180 days from the Closing Date.

"Acquiror" has the meaning set forth in the Preamble.

"Acquiror A&R Bylaws" has the meaning set forth in the Recitals.

"Acquiror A&R Charter" has the meaning set forth in the Recitals.

"Acquiror Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA) and each other employment, consulting, bonus, deferred compensation, incentive compensation, equity, phantom-equity, or equity-based award, retention, relocation, vacation, change in control, transaction bonus, salary continuation, severance or termination pay, hospitalization, medical, dental, vision, life insurance, disability or sick leave benefit, profit-

68

sharing, pension or retirement or other fringe benefit or compensatory plan, policy, program, agreement or arrangement, whether or not in writing and whether or not funded, in each case (a) that is maintained, sponsored, or contributed to, or is required to be maintained, sponsored, or contributed to, by the Acquiror or Merger Sub in respect of any current or former directors, officers, consultants, independent contractors, or employees of Acquiror or Merger Sub or (b) to which Acquiror or Merger Sub has any obligation or liability.

"Acquiror Board" means the board of directors of Acquiror.

"Acquiror Board Recommendation" has the meaning set forth in Section 6.4(b).

"Acquiror Class A Common Stock" means Acquiror's Class A common stock, par value $0.0001 per share.

"Acquiror Class F Common Stock" means Acquiror's Class F common stock, par value $0.0001 per share.

"Acquiror Common Stock" means, collectively, (a) prior to the Closing, the Acquiror Class A Common Stock and the Acquiror Class F Common Stock, and (b) from and after the Closing, the Acquiror Class A Common Stock, following the conversion of all shares of Acquiror Class F Common Stock into shares of Acquiror Class A Common Stock in connection with the Closing pursuant to the Acquiror Organizational Documents.

"Acquiror Common Stockholders" means the holders of Acquiror Common Stock.

"Acquiror Financial Statements" has the meaning set forth in Section 5.6(a).

"Acquiror Financing Certificate" has the meaning set forth in Section 2.2(b)(i).

"Acquiror Material Adverse Effect" means any change, effect, condition, circumstance or development that, individually or in the aggregate with all other changes, effects, conditions, circumstances or developments, is or is reasonably likely to (a) be materially adverse to the business, condition (financial or otherwise), assets or liabilities of Acquiror and Merger Sub, taken together or (b) prevent or delay consummation of any of the Transactions or otherwise prevent or delay Acquiror from performing its obligations under this Agreement; provided, however, that that in no event will any changes in general economic conditions or changes in securities markets in general be taken into account in determining whether there has been, is reasonably likely to be, an Acquiror Material Adverse Effect.

"Acquiror Material Contracts" has the meaning set forth in Section 5.12.

"Acquiror Organizational Documents" means the Organizational Documents of Acquiror.

"Acquiror Preferred Stock" means Acquiror' preferred stock, par value $0.0001 per share.

"Acquiror Record Date" means the record date established by the Acquiror Board and used for determining the Acquiror Common Stockholders entitled to vote at the Special Meeting.

"Acquiror Stock Redemption" means the election of an eligible holder of Acquiror Class A Common Stock (as determined in accordance with the Acquiror Organizational Documents and the Trust Agreement) to redeem all or a portion of such holder's shares of Acquiror Class A Common Stock, at the per-share price, payable in cash, equal to such holder's pro rata share of the Trust Account (as determined in accordance with the Acquiror Organizational Documents and the Trust Agreement) in connection with the Acquiror Stockholder Approval.

"Acquiror Stockholder Approval" has the meaning set forth in Section 5.2(b).

"Acquiror Transaction Expense Certificate" has the meaning set forth in Section 2.2(b)(ii).

"Acquiror Unit" means one share of Acquiror Class A Common Stock and one-third of one Public Warrant.

"Acquisition Proposal" means, as to any Person, other than the transactions contemplated hereby and other than the acquisition or disposition of equipment or other tangible personal property in the ordinary course of business, any offer or proposal relating to: (a) any acquisition or purchase, direct or indirect, of (i) 20% or more of the consolidated assets of such Person and its Subsidiaries or (ii) 20% or more of any class of equity or voting securities of (x) such Person or (y) one or more Subsidiaries of such Person holding assets constituting, individually or in the aggregate, 20% or more of the consolidated assets of such Person and its Subsidiaries; (b) any tender offer (including a self-tender offer) or exchange offer that, if consummated, would result in any Person beneficially owning 20% or more of any class of equity or voting securities of (i) such Person or (ii) one or more Subsidiaries of such Person holding assets constituting, individually or in the aggregate, 20% or more of the consolidated assets of such Person and its Subsidiaries; or (c) a merger, consolidation, share exchange, business combination, sale of substantially all the assets, reorganization, recapitalization, liquidation, dissolution or other similar transaction involving (i) such Person or (ii) one or more Subsidiaries of such Person holding assets constituting, individually or in the aggregate, 20% or more of the consolidated assets of such Person and its Subsidiaries.

"Action" means any action, suit, charge, litigation, arbitration or other proceeding at law or in equity (whether civil, criminal or administrative) by or before any Governmental Authority.

"Additional SEC Reports" has the meaning set forth in Section 5.6(a).

"Adjusted Preferred Stock Ratio" means the number equal to (a) 1.00 *minus* (b) the quotient, rounded to the nearest ten-thousandth, equal to (i) the Aggregate Preferred Cash Consideration *divided by* (ii) the Cash Liquidation Amount.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by, or under common control with, such specified Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided that in no event shall Acquiror or Merger Sub be considered

70

an Affiliate of SoftBank Group Corp. nor shall Softbank Group Corp. be considered to be an Affiliate of Acquiror or Merger Sub.

"Aggregate Common Stock Consideration" means a number of shares of Acquiror Class A Common Stock (with each share valued at $10.00) with an aggregate value equal to $1,303,000,000.

"Aggregate Preferred Cash Consideration" means $59,000,000.

"Aggregate Preferred Stock Consideration" means the number of shares of Acquiror Class A Common Stock (with each share valued at $10.00) with an aggregate value equal to the Aggregate Preferred Stock Consideration Amount.

"Aggregate Preferred Stock Consideration Amount" means (a) the Preferred Stock Adjusted Base, plus the Accreted Value, multiplied by (b) 1.05.

"Agreement" means this Agreement and Plan of Merger, as the same may be amended from time to time, and all schedules, exhibits and annexes hereto (including the Disclosure Schedules, as defined herein).

"Alternate Exchange" means the Nasdaq Capital Market, the Nasdaq Global Market or the Nasdaq Global Select Market, as may be applicable.

"Alternative Business Combination" means any Business Combination with respect to Acquiror, other than the Transactions.

"Amendment Proposal" has the meaning set forth in Section 6.4(b).

"Ancillary Agreements" means the Registration Rights Agreement, the Stockholders Agreement, the Sponsor Letter Agreement, the Acquiror A&R Charter, the Acquiror A&R Bylaws, the Subscription Agreements and all other agreements, certificates and instruments executed and delivered by the Parties in connection with the Transactions.

"Available Cash" means the amount equal to (a) the total available funds contained in the Trust Account, *minus* (b) the aggregate amount of cash proceeds that will be required to complete the Acquiror Stock Redemption, *plus* (c) the PIPE Investment Amount, *plus* (d) all funds held by Acquiror outside of the Trust Account and immediately available to Acquiror.

"Balance Sheet Date" means September 30, 2020.

"Bankruptcy and Equity Exceptions" has the meaning set forth in Section 4.2.

"Blue Sky Laws" has the meaning set forth in Section 4.5.

"Business" has the meaning set forth in the Recitals.

"Business Associates" has the meaning set forth in Section 4.17(i).

71

"Business Combination" means, with respect to any Party, any merger, consolidation, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

"Business Day" means a day except a Saturday, a Sunday or other day on which the SEC or banks in the City of New York or the State of Delaware are authorized or required by Law to be closed.

"CARES Act" means the Coronavirus Aid, Relief and Economic Security Act, as signed into law by the President of the United States on March 27, 2020.

"Certificate of Merger" has the meaning set forth in Section 2.2(a)(iii).

"Certifications" has the meaning set forth in Section 5.6(a).

"Change in Recommendation" has the meaning set forth in Section 6.4(b).

"Change of Control" means any transaction or series of transactions the result of which is: (a) the acquisition by any Person or "group" (as defined in the Exchange Act) of Persons of direct or indirect beneficial ownership of securities representing 50% or more of the combined voting power of the then outstanding securities of Acquiror; (b) a merger, consolidation, reorganization or other business combination, however effected, resulting in any Person or "group" (as defined in the Exchange Act) acquiring at least 50% of the combined voting power of the then outstanding securities of Acquiror or the surviving Person outstanding immediately after such combination; or (c) a sale of all or substantially all of the assets of Acquiror.

"Claim" means (a) any right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (b) the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

"Closing" has the meaning set forth in Section 2.1.

"Closing Cash Liquidation Amount" means the aggregate Liquidation Amount (as defined in the Company Certificate of Incorporation) as of the Closing Date with respect to all shares of Company Preferred Stock outstanding immediately prior to the Effective Time. For the avoidance of doubt, the Closing Cash Liquidation Amount, would be $174,285,078.35 if the Closing Date were June 30, 2021 and $186,633,382.91 if the Closing Date were December 31, 2021.

"Closing Date" has the meaning set forth in Section 2.1.

"Closing Press Release" has the meaning set forth in Section 6.8(b).

"Code" means the Internal Revenue Code of 1986, as amended.

72

"Common Share Price" means the share price equal to the volume weighted average closing sale price of one share of Acquiror Class A Common Stock as reported on the Stock Exchange (or any other exchange on which the shares of Acquiror Class A Common Stock are then listed) for at least 5 days out of a period of 10 consecutive trading days ending on the trading day immediately prior to the date of determination (as adjusted as appropriate to reflect any stock splits, reverse stock splits, stock dividends (including any dividend or distribution of securities convertible into Acquiror Class A Common Stock), extraordinary cash dividend, reorganization, recapitalization, reclassification, combination, exchange of shares or other like change or transaction with respect to Acquiror Class A Common Stock).

"Company" has the meaning set forth in the Preamble.

"Company Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA) and each other employment, consulting, bonus, deferred compensation, incentive compensation, equity, phantom-equity, or equity-based award, retention, relocation, vacation, change in control, transaction bonus, salary continuation, severance or termination pay, hospitalization, medical, dental, vision, life insurance, disability or sick leave benefit, profit-sharing, pension or retirement or other fringe benefit or compensatory plan, policy, program, agreement or arrangement, whether or not in writing and whether or not funded, in each case (a) that is maintained, sponsored, or contributed to, or is required to be maintained, sponsored, or contributed to, by the Company or its Subsidiaries in respect of any current or former directors, officers, consultants, independent contractors, or employees of the Company or (b) to which the Company or its Subsidiaries has any obligation or liability.

"Company Board" has the meaning set forth in the Recitals.

"Company Board Approval" has the meaning set forth in the Recitals.

"Company Certificate of Incorporation" means the Second Amended and Restated Certificate of Incorporation of the Company, as filed with the Secretary of State of Delaware on August 31, 2016.

"Company Common Stock" means a share of the Company's common stock, par value $0.01 per share.

"Company Common Stockholder" means Wilco Acquisition, LP or its designees.

"Company IT Systems" has the meaning set forth in Section 4.16(e).

"Company Material Adverse Effect" means any change, effect, event, fact, occurrence, condition, circumstance or development that, individually or in the aggregate with all other changes, effects, events, facts, occurrences, conditions, circumstances or developments, has had, or would reasonably be expected to have, a material adverse effect on the business, condition (financial or otherwise) or results of operation, of the Company and its Subsidiaries, taken as a whole; provided, however, that, in no event will any of the following be deemed, either alone or in combination, to constitute, or be taken into account in determining whether there has been or will be, a Company Material Adverse Effect: (a) operating, business, regulatory or other conditions (financial or otherwise) generally effecting the industries in which the Company or its Subsidiaries

73

operate (including, for the avoidance of doubt, any loss of customers, suppliers, orders, Contracts or other business relationships resulting from, or in connection with COVID-19); (b) general economic conditions, including changes or developments in the credit, securities, currency, banking, exchange, debt, financial or capital markets (including changes in interest or exchange rates) including any suspension of trading in securities (whether equity, debt, derivative or hybrid securities) generally on any securities exchange or over-the-counter market; (c) the announcement or consummation of the Transactions, including the impact thereof on relationships with customers, suppliers, distributors, partners or employees or others having relationships with the Company or any of its Subsidiaries or the taking of any action required, expressly permitted or otherwise expressly contemplated by this Agreement and the Ancillary Agreements, including the completion of the Transactions, including any action taken at the prior written request, or with the prior written consent, of Acquiror; (d) changes in GAAP or other accounting requirements or principles, as applied to the Company and its Subsidiaries or otherwise, or any changes in applicable Laws, in each case, after the date hereof; (e) the failure of the Company or any of its Subsidiaries to meet or achieve the results set forth in any internal or published budget, plan, projection, prediction or forecast (it being understood that the underlying facts giving rise to such failure may be taken into account); (f) global, national or regional political, financial, economic or business conditions, including government required shutdowns, a presidential election, hostilities, acts of war, sabotage or terrorism or military actions or any escalation, worsening or diminution of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway; (g) effects arising from or relating to epidemics, pandemics, widespread occurrences of infectious diseases or disease outbreaks, including COVID-19 or any COVID-19 Measures; (h) hurricanes, earthquakes, floods, tsunamis, tornadoes, changes in (or effects in) weather, meteorological conditions or climate, mudslides, explosions, wild fires, or other natural disasters and other force majeure events in the United States or any other country or region in the world and (i) any matter described in the Disclosure Schedules, except, in each case of any of the foregoing clauses "(a)," "(b)," "(d)," "(f)," "(g)" and "(h)" to the extent that such condition has a materially disproportionate impact on the Company, taken as a whole, relative to other companies in the industries in which the Company and its Subsidiaries operate (it being understood and agreed that only such incremental disproportionate impact shall be taken into account in determining whether there has been or will be a "Company Material Adverse Effect").

"Company Owned Intellectual Property" has the meaning set forth in Section 4.16(b).

"Company Organizational Documents" means the Organizational Documents of the Company.

"Company Owned Intellectual Property" has the meaning set forth in Section 4.16(b).

"Company Permits" has the meaning set forth in Section 4.10(b).

"Company Preferred Consideration Certificate" has the meaning set forth in Section 2.2(a)(ii).

"Company Preferred Stock" means, collectively, the Company Series A-1 Preferred Stock and the Company Series A-2 Preferred Stock.

74

"Company Requisite Approval" has the meaning set forth in Section 4.2.

"Company Series A-1 Preferred Stock" means the shares of the Company's Series A-1 Preferred Stock, par value $0.01 per share.

"Company Series A-2 Preferred Stock" means the shares of the Company's Series A-2 Preferred Stock, par value $0.01 per share.

"Company Stock" means, collectively, the Company Common Stock and the Company Preferred Stock.

"Company Stock Certificate" means certificates of Company Stock that were outstanding immediately prior to the Effective Time.

"Company Stockholder" means the holder of either a share of Company Common Stock or a share of Company Preferred Stock.

"Company Transaction Expense Certificate" has the meaning set forth in Section 2.2(a)(i).

"Contract" means any written contract, agreement, arrangement (excluding any regulatory tariff), note, bond, mortgage, lease, sublease, license or other agreement legally binding on a Party hereto or a Subsidiary thereof.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof or related health condition or related or associated epidemics, pandemic or disease outbreaks.

"COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, face covering, personal protective equipment, social distancing, delay, shut down (including, the shutdown of air cargo routes, shut down of supply chains or certain business activities), closure, sequester, safety or similar Law, directive, guidelines or recommendations promulgated by any Governmental Authority, including with respect to the United States, the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to COVID-19, including the CARES Act Families First Act and any future Law, directive, guidelines or recommendations enacted or promulgated by any Governmental Authority, in each case, in connection with or in response to COVID-19.

"COVID-19 Response" means any (i) deviation from the Ordinary Course of Business or (ii) actions, inactions, activities or conduct of the Company or any of its Subsidiaries (whether or not in the Ordinary Course of Business), in each case, reasonably necessary (in the Company's or applicable Subsidiary's reasonable discretion), to mitigate, remedy, respond to or otherwise address the effects or impact of COVID-19, including (a) suspending some or all operations of or related to their respective businesses and related activities and (b) implementing or responding to any COVID-19 Measures so long as, in each case, such actions or omissions are reasonably designed to protect the health or welfare of any Person.

"Debt Financing" means a debt financing on terms determined by the Company in good faith in an amount not to exceed (a) the amount necessary to refinance the Indebtedness outstanding under the Existing Credit Agreements and pay any unpaid accrued interest, penalties

75

and premiums (including tender premiums) thereon plus the amount of any reasonable and customary fees, commissions and expenses (including upfront fees, original issue discount or yield payments) incurred in connection with the Debt Financing plus (b) the amount of a revolving credit facility determined by the Company in good faith.

"DGCL" has the meaning set forth in the Recitals.

"Disclosing Party" has the meaning set forth in Section 6.6.

"Disclosure Schedules" means the Disclosure Schedules delivered by the Company and Acquiror concurrently with the execution and delivery of this Agreement.

"Dissenting Shares" has the meaning set forth in Section 1.7(a).

"Earn Out Period" means the time period between the Closing and the ten-year anniversary of the Closing Date.

"Earn Out Shares" has the meaning set forth in Section 3.1(a).

"Effective Time" has the meaning set forth in Section 2.3(e).

"Employment Agreement" has the meaning set forth in the Recitals.

"Environmental Laws" means any Law relating to the protection of the environment or natural resources, or the protection of human health and safety from the presence of Hazardous Materials, including Laws relating to: (i) the exposure to, or releases or threatened releases of, Hazardous Materials; (ii) the generation, processing, distribution, use, treatment, containment, disposal, storage, transport or handling of Hazardous Materials; or (iii) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity (whether or not incorporated) which together with the Company would be treated as a "single employer" under Section 414(b), (c), (m), or (o) of the Code.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Exchange Agent" has the meaning set forth in Section 1.8(a).

"Exchange Fund" has the meaning set forth in Section 1.8(a).

"Excluded Share" has the meaning set forth in Section 1.5(a).

"Existing Credit Agreements" means (a) the First Lien Credit Agreement, dated as of May 10, 2016, by and among, inter alios, Wilco Purchaser, Inc., as borrower, the lenders from time to time party thereto and Barclays Bank PLC, as administrative agent, and (b) the Second Lien Credit Agreement, dated as of May 10, 2016, by and among, inter alios, Wilco Purchaser, Inc., as borrower, the lenders from time to time party thereto and Wilmington Trust, National Association,

as administrative agent, in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Families First Act" means the Families First Coronavirus Response Act, as signed into law by the President of the United States on March 18, 2020.

"Federal Health Care Program" means any "federal health care program" as defined in 42 U.S.C. §1320a-7b(f), including Medicare, state Medicaid programs, state CHIP programs, TRICARE, federal employee health benefit programs, and similar or successor programs with or for the benefit of any Governmental Authority.

"Federal Securities Laws" means the Exchange Act, the Securities Act and the rules and regulations promulgated thereunder.

"Financial Statements" has the meaning set forth in Section 4.7(b).

"Fraud" means a claim for Delaware common law fraud in the making of a representation brought in respect of a representation made in ARTICLE IV or ARTICLE V of this Agreement; provided, that at the time such representation was made (i) such representation was false or inaccurate, (ii) the Party making such representation had actual knowledge of the falsity or inaccuracy of such representation, (iii) such Party had the intent to deceive another Party hereto or to induce such other Party to act or refrain from acting, and (iv) the other Party acted in reliance on such false or inaccurate representation and suffered monetary loss as a result. For the avoidance of doubt, "Fraud" does not include any claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts (including a claim for fraud) based on negligence or recklessness.

"Fully Diluted Basis" means the number of shares of Acquiror Common Stock issued and outstanding at the Closing on a fully diluted basis, including any shares reserved for issuance under the Private Placement Warrants, the Public Warrants and the Incentive Plan.

"GAAP" means United States generally accepted accounting principles, as in effect on the date of this Agreement.

"Governmental Authority" means any federal, state, provincial, municipal or local government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, arbitrator, court or tribunal of (a) the United States or (b) any state, commonwealth, province, territory or possession of the United States and any political subdivision thereof (including counties and municipalities).

"Governmental Order" means any ruling, order, judgment, injunction, edict, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"GSA" has the meaning set forth in Section 4.17(h).

"Hazardous Materials" means: (a) any material, substance, chemical, or waste (or combination thereof) that (i) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, or words of similar meaning or effect under any Law relating to pollution, waste, or the environment or (ii) can form the basis of liability

77

under any Environmental Law; and (b) any petroleum, petroleum products, oil, per- and polyfluoroalkyl substances (including PFAs, PFOA, PFOS, Gen X, and PFBs), polychlorinated biphenyls (PCBs), asbestos and asbestos-containing materials.

"Healthcare Laws" means all applicable Laws and Governmental Orders relating to health care providers and facilities, participation in Federal Health Care Programs, the practice of physical therapy, or otherwise relating to the regulation, provision or administration of, or payment for, healthcare products or services, including (i) all Laws related to the billing or submission of claims, reimbursement or fraud and abuse, including the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(b)), the federal Physician Self-Referral Prohibition (commonly referred to as the "Stark Law") (42 U.S.C. §1395nn), the Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812), the federal False Claims Act (31 U.S.C. §3729 et seq.), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code, the regulations promulgated pursuant to each of the foregoing statutes, and all applicable counterpart state Laws to any of the foregoing; (ii) Medicare (Title XVIII of the Social Security Act), as amended and the regulations promulgated thereunder, including all conditions of participation; (iii) Medicaid (Title XIX of the Social Security Act), as amended and the regulations promulgated thereunder, including all conditions of participation; (iv) TRICARE (10 U.S.C. Section 1071 et seq.), as amended and the regulations promulgated thereunder; (v) the Patient Protection and Affordable Care Act (Pub. L. 111−148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111−152), and the regulations promulgated pursuant to each of the foregoing; (vi) quality, safety and medical necessity Laws relating to the regulation, provision or administration of, or payment for, healthcare products or services; (vii) workers compensation Laws; (viii) Laws relating to the regulation of the corporate practice of physical therapy; and (ix) licensure, permit or authorization Laws relating to the regulation, provision or administration of, or payment for, healthcare products or services, including physical therapy Laws, home health Laws and durable medical equipment and home medical equipment Laws. Healthcare Laws do not include any Information Privacy and Security Laws.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104 191), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (Pub. L. No. 111-5, 123 Stat. 226), and its implementing regulations (including the Standards for Electronic Transaction and Code Set, the Standards for Privacy of Individually Identifiable Health Information, the Security Standards for the Protection of Electronic Protected Health Information, and Breach Notification for Unsecured Protected Health Information Rules promulgated thereunder).

"HIPAA Policies and Procedures" has the meaning set forth in Section 4.17(i).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"Incentive Plan" means an equity incentive plan mutually agreeable to the Company and Acquiror.

"Incentive Plan Proposal" has the meaning set forth in Section 6.4(b).

78

"Indebtedness" means with respect to any Person, any of the following: (a) all obligations for borrowed money and all obligations evidenced by notes, bonds, debentures or other similar instruments, and, in each case, including any interest accrued thereon; (b) all obligations as lessee under capitalized leases; (c) all obligations to pay the deferred purchase price of assets, property or services, except trade accounts payable and other current liabilities arising in the Ordinary Course of Business, including "earnout" payments and "seller notes"; (d) all obligations created or arising under any conditional sale or other title retention agreement with respect to acquired property; (e) all obligations, contingent or otherwise, under bankers' acceptances, letters of credit or similar facilities only to the extent drawn as of the date in question; (f) all obligations under any interest rate, currency or similar hedging agreement or other derivative agreement; (g) all unpaid prepayment or similar penalties, premiums, costs, fees, expenses, indemnity and other amounts that arise as a result of the prepayment or discharge of obligations of the kind referred to in clauses "(a)" through "(g)" of this definition or other similar amounts; and (h) all guarantees of such Person with respect to any of the foregoing. For the avoidance of doubt, Indebtedness shall not include (i) trade payables, (ii) any obligations under any performance bond or letter of credit to the extent undrawn, (iii) any intercompany Indebtedness, (iv) any deferred revenue or (v) all liabilities under any agreement between the Company and any of its Subsidiaries, on the one hand, and Acquiror, on the other hand.

"Individualized Agreements" has the meaning set forth in Section 4.13(a).

"Information Privacy and Security Laws" means all applicable Laws that govern the collection, use, storage, sharing, transfer, disclosure and security of Personal Information, including, without limitation, HIPAA and other medical record and patient privacy and security Laws.

"Intellectual Property" all worldwide rights, title and interests associated with or arising out of any intellectual property including: (a) patents and patent applications, together with all reissuances, divisionals, continuations, continuations-in-part, revisions, renewals, extensions and re-examinations thereof; (b) all trademarks, service marks, logos, trade names, brand names, corporate names, Internet domain names and all other identifiers indicating the business or source of goods or services (whether registered, arising under common law or statutory law, or otherwise), and all registrations and applications to register, and renewals of, the foregoing anywhere in the world, and all goodwill associated with any of the foregoing; (c) all trade secrets and rights in confidential or proprietary information; (d) all copyrights and copyrightable works, and all database and design rights, whether or not registered or published, copyright registrations and applications therefor and corresponding rights in works of authorship; and (e) any and all similar, corresponding, or equivalent intellectual property rights anywhere in the world.

"Intended Tax Treatment" has the meaning set forth in the Recitals.

"Interim Financial Statements" has the meaning set forth in Section 4.7(b).

"Intervening Event" means an event, fact, development, circumstance or occurrence that materially and adversely affects the business, assets or operations of the Company and its Subsidiaries, taken as a whole, that is consequential to the Company's earning power over a long-term duration, and, in each case, that was not known and was not reasonably foreseeable to the

Acquiror or the Acquiror Board as of the date hereof (or the consequences of which were not reasonably foreseeable to the Acquiror Board as of the date hereof), and that becomes known to the Acquiror Board after the date of this Agreement, but specifically excluding, in each case, (x) any event, fact, development, circumstance or occurrence that relates to or is reasonably likely to give rise to or result in any offer, inquiry, proposal or indication of interest, written or oral relating to any Alternative Business Combination, (y) general economic conditions, changes in capital markets or any declines or improvements in financial markets and (z) any event, fact, development, circumstance or occurrence arising from, or related to epidemics, disease outbreaks or pandemics (including, for the avoidance of doubt, any event, fact, development, circumstance or occurrence arising from or related to COVID-19 or any COVID-19 Measures).

"Intervening Event Notice" has the meaning set forth in Section 6.4(c).

"Intervening Event Notice Period" has the meaning set forth in Section 6.4(c).

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Issuance Proposal" has the meaning set forth in Section 6.4(b).

"Key Employees" means Labeed Diab and Joseph Jordan.

"Knowledge of Acquiror" or similar phrases, means the actual knowledge of each of Drew McKnight, Micah Kaplan, Dan Bass and Alex Gillette.

"Knowledge of the Company," or similar phrases, means the actual knowledge of each of Labeed Diab, Joseph Jordan, Diana Chafey, Erik Kantz, Jaime Lewis, Joanne Fong and Brent Rhodes.

"Law" means any common law, statutes, constitution, treaty, resolutions, rules, codes, regulations, ordinances, restrictions or Governmental Orders of, or issued by, a Governmental Authority.

"Lease" has the meaning set forth in Section 4.12(b).

"Leased Real Property" has the meaning set forth in Section 4.12(b).

"Letter of Transmittal" has the meaning set forth in Section 1.8(b).

"Lien" means any mortgage, pledge, hypothecation, deed of trust, lease, sublease, restriction, easement, security interest, charge, claim, license, option, conditional sale or other title retention agreement, lien or other encumbrance or right of any third party, or any agreement to create any of the foregoing.

"Made Available." A document or other item of information shall be deemed to have been "Made Available" only if (a) such document or other item of information was included in the Intralinks virtual data room established by the Company in connection with the contemplated Transactions at least one Business Day prior to the date hereof and remained available to Acquiror

through the Closing, and (b) Acquiror's Representatives had access to such document or other item prior to such time, subject to any applicable "clean room" and similar restrictions.

"Material Contracts" has the meaning set forth in Section 4.11(a).

"Material Payor" has the meaning set forth in Section 4.18(a).

"Maximum Amount" has the meaning set forth in Section 6.11(b).

"Merger Proposal" has the meaning set forth in Section 6.4(b).

"Material Supplier" has the meaning set forth in Section 4.18(b).

"Merger" has the meaning set forth in the Recitals.

"Merger Sub" has the meaning set forth in the Preamble.

"Merger Sub Board" means the board of directors of Merger Sub.

"Merger Sub Common Stock" has the meaning set forth in Section 5.5(b).

"Minimum Cash Balance" means an amount equal to $472,500,000.

"Nondisclosure Agreement" means that certain Nondisclosure Agreement, dated as of December 13, 2020, by and between ATI Holdings Acquisition, Inc. and Acquiror.

"Non-Party Affiliates" has the meaning set forth in Section 9.15.

"Notice" has the meaning set forth in Section 9.4.

"OFAC" has the meaning set forth in Section 4.17(h).

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice of the Company, the Company's Subsidiaries, or the Business, as applicable.

"Organizational Documents" means: (a) in the case of a Person that is a corporation or a company, its articles or certificate of incorporation and its bylaws, memorandum of association, articles of association, regulations or similar governing instruments required by the Laws of its jurisdiction of formation or organization; (b) in the case of a Person that is a partnership, its articles or certificate of partnership, formation or association, and its partnership agreement (in each case, limited, limited liability, general or otherwise); (c) in the case of a Person that is a limited liability company, its articles or certificate of formation or organization, and its limited liability company agreement or operating agreement; and (d) in the case of a Person that is none of a corporation, partnership (limited, limited liability, general or otherwise), limited liability company or natural Person, its governing instruments as required or contemplated by the Laws of its jurisdiction of organization, and in each case, as in effect as of the date hereof.

"Outside Date" has the meaning set forth in Section 8.1(b).

81

"Party" means, individually, each of Acquiror, Merger Sub and the Company. Acquiror, Merger Sub and the Company are referred herein collectively as the "Parties."

"Payor" means any insurer, health maintenance organization, health care benefit plan, third party administrator, employer, union, trust, governmental program (including any Federal Health Care Program), preferred provider organization, managed care program, or other consumer or customer of health care services that has authorized the Company or any of its Subsidiaries as a provider or supplier of health care services to its members, beneficiaries, participants or the like thereof, or to whom the Company or any of its Subsidiaries has submitted a claim for, or received reimbursement for, health care products or services.

"PCAOB" means the United States Public Company Accounting Oversight Board.

"Per Share Common Stock Consideration" means the Aggregate Common Stock Consideration *divided by* the number of shares of Company Common Stock outstanding immediately prior to the Effective Time.

"Per Share Consideration" has the meaning set forth in Section 1.5(b).

"Per Share Preferred Cash Consideration" means the Aggregate Preferred Cash Consideration *divided by* the number of shares of Company Preferred Stock outstanding immediately prior to the Effective Time.

"Per Share Preferred Consideration" means, collectively, the Per Share Preferred Cash Consideration and the Per Share Preferred Stock Consideration.

"Per Share Preferred Stock Consideration" means the Aggregate Preferred Stock Consideration Amount *divided by* the number of shares of Company Preferred Stock outstanding immediately prior to the Effective Time.

"Permits" means all permits, licenses, franchises, accreditations, classifications, grants, exceptions, certificates of authority, authorizations, approvals, registrations and other similar documents and authorizations issued by or obtained from a Governmental Authority.

"Permitted Company Acquisition" means any acquisition by the Company of any corporation, partnership, association, joint venture or other business organization or division thereof or Person (i) by merger or consolidation with such Person or (ii) by the purchase of substantially all of the assets of such Person, in each case so long as such acquisition(s) do not, individually or in the aggregate, exceed $15,000,000.

"Permitted Liens" means (a) warehousemen's, mechanic's, materialmen's, carriers', repairers', builders', suppliers', construction and other Liens arising or incurred in the Ordinary Course of Business for amounts that are not yet delinquent or are being contested in good faith, (b) Liens for Taxes, assessments, utilities or other governmental charges not yet delinquent and payable as of the Closing Date or which are being contested in good faith, (c) encumbrances and restrictions on real property (including easements, covenants, conditions, rights of way, servitudes, restrictive covenants, reciprocal agreements, cost-sharing agreements and similar restrictions affecting title to the real property and other title defects) to the extent that such encumbrance or

restriction does not affect the operations of the Company or materially impair the value of the property affected thereby, (d) Liens securing the obligations of the Company and the Company Subsidiaries under any existing credit or other finance agreement to the extent permitted or not restricted under the terms of this Agreement (including any Existing Credit Agreement), (e) Liens securing any Indebtedness to the extent permitted under the terms of this Agreement, (f) Liens granted to any lender at the Closing in connection with any financing by Acquiror of the Transactions, (g) zoning, building codes and other land use Laws, by-laws, regulations and ordinances regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; provided that neither the operations of the Company and its Subsidiaries taken as a whole nor the value of the Company's property affected is materially adversely affected thereby, (h) any right, interest, Lien or title of a lessor or sublessor under any lease or other similar agreement or in the property being leased, (i) development agreements, subdivision agreements, site plan control agreements, servicing agreements and other similar agreements with any Governmental Authority or utility company affecting the development, servicing use or operation of any real property and any Liens in respect of security given to any Governmental Authority or utility company in connection therewith; provided that neither the operations of the Company and its Subsidiaries taken as a whole nor the value of the Company's property affected is materially adversely affected thereby, (j) non-exclusive licenses of Intellectual Property entered in the Ordinary Course of Business, (k) purchase money Liens and Liens securing rental payments under capital lease arrangements, (l) restrictions in joint venture agreements on the applicable joint venture granting Liens on its assets or the equity interests of such joint venture, (m) Liens incurred or pledges or deposits made in the Ordinary Course of Business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefit, and (n) such other Liens which arise in the Ordinary Course of Business that are not material in amount and/or do not materially impair the value or the continued use and operation of the property affected thereby.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including, without limitation, a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association or entity or government, political subdivision, agency or instrumentality of a government.

"Personal Information" means, in addition to any definition for any similar term (e.g., "personal data" or "personally identifiable information" or "protected health information") provided by applicable Law, all information that identifies an individual person.

"PIPE Investment" has the meaning set forth in the Recitals.

"PIPE Investment Amount" has the meaning set forth in the Recitals.

"PIPE Investors" has the meaning set forth in Section 5.9(b).

"Policies" has the meaning set forth in Section 4.20.

"Pre-Closing Period" has the meaning set forth in Section 6.1.

"Preferred Stock Adjusted Base" equals the Closing Cash Liquidation Amount *less* the Aggregate Preferred Cash Consideration.

83

"Private Placement Warrants" has the meaning set forth in Section 5.5(a).

"Proxy Clearance Date" has the meaning set forth in Section 6.3(c).

"Proxy Statement" has the meaning set forth in Section 6.3(a).

"Public Warrants" has the meaning set forth in Section 5.5(a).

"Redemption Amount" means any amounts paid to Acquiror Common Stockholders in connection with the Acquiror Stock Redemption.

"Reference Time" means 5:00 p.m. Eastern Time on the date that is two Business Days immediately prior to the Closing Date.

"Registration Rights Agreement" has the meaning set forth in the Recitals.

"Representatives" means, with respect to any Person, such Person's Affiliates and its and their respective directors, officers, employees, managers, members, stockholders, partners, incorporators, trustees, counsel, financial advisors, auditors and other agents or authorized representatives acting on the behalf of such Person.

"Sanctioned Jurisdiction" means, at any time, a country, region or territory which is itself the subject of comprehensive Sanctions (as of the date hereof, Cuba, Iran, North Korea, Syria, and the Crimea Region).

"Sanctioned Person" shall mean (a) any Person named on any Sanctions-related list maintained by the government of the United States, including the OFAC or the U.S. Department of State, (b) any Person organized or resident in a Sanctioned Jurisdiction or (c) any Person owned fifty percent or more or controlled by any such Person or Persons described in the preceding clauses "(a)" or "(b)."

"Sanctions" shall mean economic or financial sanctions or trade embargoes administered or enforced from time to time by the United States government (including OFAC and the U.S. Department of State).

"Sarbanes-Oxley Act" has the meaning set forth in Section 5.18.

"SEC" the United States Securities and Exchange Commission.

"SEC Reports" has the meaning set forth in Section 5.6(a).

"Securities Act" means the United States Securities Act of 1933, as amended.

"Securities Liens" means Liens arising out of, under or in connection with (a) applicable Federal Securities Laws and, state and local securities Laws and (b) restrictions on transfer, hypothecation or similar actions contained in any Organizational Documents.

"Skadden" has the meaning set forth in Section 9.16(b).

84

"Skadden Privileged Communications" has the meaning set forth in Section 9.16(b).

"Skadden Waiving Parties" has the meaning set forth in Section 9.16(b).

"Skadden WP Group" has the meaning set forth in Section 9.16(b).

"Special Meeting" has the meaning set forth in Section 6.4(a).

"Sponsor" means Fortress Acquisition Sponsor II LLC.

"Sponsor Letter Agreement" has the meaning set forth in the Recitals.

"Stock Exchange" means the New York Stock Exchange.

"Stock Exchange Notice" has the meaning set forth in Section 6.17(a).

"Stockholders Agreement" has the meaning set forth in the Recitals.

"Subscription Agreements" has the meaning set forth in the Recitals.

"Subsidiary" means, with respect to a Person, any corporation or other organization (including a limited liability company or a partnership), whether incorporated or unincorporated, of which such Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization or any organization of which such Person or any of its Subsidiaries is, directly or indirectly, a general partner or managing member.

"Surviving Company" has the meaning set forth in the Recitals.

"Surviving Provisions" has the meaning set forth in Section 8.2.

"Tax" or "Taxes" means any federal, state, provincial, territorial, local, foreign and other net income, alternative or add-on minimum, franchise, gross income, adjusted gross income or gross receipts, employment, unemployment, compensation, social security (or similar), withholding, payroll, ad valorem, transfer, windfall profits, excise, severance, stamp, occupation, premium, personal property, real property, capital stock, registration, value added, capital gains, goods and services, sales, use, or other tax, charge, duty, fee, levy or other governmental charge in the nature of a tax, however denominated, together with any interest, penalty or any other additional amount imposed with respect thereto by (or otherwise payable to) a Governmental Authority.

"Tax Returns" means any return, report, declaration, report, claim for refund, election, disclosure, statement, estimate, information return or other document (including schedules, attachments or any related or supporting information and any amendments thereof) filed or required to be filed with any Governmental Authority in connection with or related to the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax.

"Tax Sharing Agreement" means any Tax allocation, Tax sharing, Tax indemnification agreement or any other agreement or arrangement (including any provision of a Contract) pursuant to which any Person is or may be obligated to indemnify any Person for, or otherwise pay, any Tax of or imposed on another Person, or pay over to, any other Person any amount determined by reference to actual or deemed Tax benefits, Tax assets, or Tax savings.

"Terminating Company Breach" has the meaning set forth in Section 8.1(d).

"Terminating Acquiror Breach" has the meaning set forth in Section 8.1(e).

"Third Party Payor Program" means all third party Payor programs (including Medicare, Medicaid, TRICARE, workers compensation, or any other federal or state health care programs, as well as Blue Cross and/or Blue Shield, managed care plans, or any other private insurance program).

"Transaction Expenses" means the fees, costs and expenses incurred, accrued, paid or payable by Acquiror, Merger Sub, the Company or any of the Company's Subsidiaries, as the case may be, in connection with the Transactions, including any financing fees, legal, accounting, financial advisory, investment banking, underwriting (including deferred underwriting fees) and other advisory, transaction or consulting fees, costs and expenses.

"Transaction Proposals" has the meaning set forth in Section 6.4(b).

"Transactions" has the meaning set forth in the Recitals.

"Treasury Regulations" means the regulations promulgated under the Code.

"Triggering Event I" means the date on which the Common Share Price is greater than $12.00 after the Closing Date, but within the Earn Out Period.

"Triggering Event II" means the date on which the Common Share Price is greater than $14.00 after the Closing Date, but within the Earn Out Period.

"Triggering Event III" means the date on which the Common Share Price is greater than $16.00 after the Closing Date, but within the Earn Out Period.

"Triggering Event" means, collectively, Triggering Event I, Triggering Event II, and Triggering Event III.

"Trust Account" has the meaning set forth in Section 5.9(a).

"Trust Account Claims" has the meaning set forth in Section 6.12(b).

"Trust Agreement" has the meaning set forth in Section 5.9(a).

"Trustee" has the meaning set forth in Section 5.9(a).

"Updated Financial Statements" has the meaning set forth in Section 6.3(b).

86

"Updated Quarterly Financial Statements" has the meaning set forth in Section 6.3(b).

"Weil" has the meaning set forth in Section 9.16(a).

"Weil Privileged Communications" has the meaning set forth in Section 9.16(a).

"Weil Waiving Parties" has the meaning set forth in Section 9.16(a).

"Weil WP Group" has the meaning set forth in Section 9.16(a).

"Year-End Financial Statements" has the meaning set forth in Section 4.7(a).

Section 10.2    Construction. The Parties have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement. The section headings contained in this Agreement are inserted for convenience or reference only and shall not affect in any way the meaning or interpretation of this Agreement. Further, in this Agreement:

(a)      References to particular sections and subsections, schedules, and exhibits not otherwise specified are cross-references to sections and subsections, schedules, and exhibits of this Agreement.

(b)      The words "herein," "hereof," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.

(c)      Any use of the singular or plural, or the masculine, feminine, or neuter gender, includes the others, unless the context otherwise requires; "including" means "including without limitation;" "or" means "and/or;" "any" means "any one, more than one, or all."

(d)      Unless otherwise specified, any reference to any reference to a statute or other Law includes any rule, regulation, ordinance, or the like promulgated thereunder, in each case, as amended, restated, supplemented, or otherwise modified from time to time.

(e)      Any reference to a numbered schedule means the same-numbered section of the Disclosure Schedules. Any reference in a schedule contained in the Disclosure Schedules shall be deemed to be an exception to (or, as applicable, a disclosure for purposes of) the applicable representations and warranties (or applicable covenants) that are contained in the section or subsection of this Agreement that corresponds to such schedule and any other representations and warranties (or applicable covenants) contained in this Agreement to which the relevance of such item thereto is reasonably apparent. The mere inclusion of an item in a schedule as an exception to (or, as applicable, a disclosure for purposes of) a representation or warranty (or applicable covenants) shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item would reasonably be expected to have a Company Material Adverse Effect or establish any standard of materiality to define further the meaning of such terms for purposes of this Agreement. Any capitalized terms used in any Disclosure Schedule or Exhibit attached hereto and not otherwise defined therein shall have the

87

meanings set forth in this Agreement (or, in the absence of any ascribed meaning, the meaning customarily ascribed to any such term in the applicable industry or in general commercial usage).

(f)　　If any action is required to be taken or notice is required to be given within a specified number of days following a specific date or event, the day of such date or event is not counted in determining the last day for such action or notice. If any action is required to be taken or notice is required to be given on or before a particular day which is not a Business Day, such action or notice shall be considered timely if it is taken or given on or before the next Business Day.

(g)　　References to "$" or Dollars means United States Dollars.

(h)　　Captions are not a part of this Agreement, but are included for convenience, only.

(i)　　Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether the action in question is taken directly or indirectly by such Person.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties hereto have each executed and delivered this Agreement as of the day and year first above written.

**FORTRESS VALUE ACQUISITION CORP. II**

By: _____
　　　Name:
　　　Title:


**FVAC MERGER CORP. II**

By: _____
　　　Name:
　　　Title:

*[Signature Page to Agreement and Plan of Merger]*

**WILCO HOLDCO, INC.**

By: _____
      Name:
      Title:

*[Signature Page to Agreement and Plan of Merger]*

**EXHIBIT A**

**Acquiror A&R Charter**

**Exhibit A**

**FORM OF**
**SECOND AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**FORTRESS VALUE ACQUISITION CORP. II**

[●], 2021

Fortress Value Acquisition Corp. II, a corporation organized and existing under the laws of the State of Delaware (the "*Corporation*"), DOES HEREBY CERTIFY AS FOLLOWS:

1.      The name of the Corporation is "*Fortress Value Acquisition Corp. II*."  The original certificate of incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on June 10, 2020 (the "*Original Certificate*"). The Corporation filed an Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware on August 11, 2020 (as amended from time to time, the "*First Amended and Restated Certificate*").

2.      This Second Amended and Restated Certificate of Incorporation (the "*Second Amended and Restated Certificate*"), which both restates and amends the provisions of the First Amended and Restated Certificate, was duly adopted in accordance with Sections 228, 242 and 245 of the General Corporation Law of the State of Delaware, as amended from time to time (the "*DGCL*").

3.      This Second Amended and Restated Certificate restates, integrates, and amends the provisions of the First Amended and Restated Certificate. Certain capitalized terms used in this Second Amended and Restated Certificate are defined where appropriate herein.

4.      This Second Amended and Restated Certificate shall become effective on the date of filing with the Secretary of State of the State of Delaware.

5.      The text of the First Amended and Restated Certificate is hereby restated and amended in its entirety to read as follows:

**ARTICLE I**
**NAME**

The name of the corporation is ATI Physical Therapy, Inc. (the "*Corporation*").

**ARTICLE II**
**PURPOSE**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.  In addition to the powers and privileges conferred upon the Corporation by law and those incidental thereto, the Corporation shall possess and may exercise all the powers and privileges that are necessary or convenient to the conduct, promotion or attainment of the business or purposes of the Corporation.

## ARTICLE III
## REGISTERED AGENT

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, and the name of the Corporation's registered agent at such address is The Corporation Trust Company.

## ARTICLE IV
## CAPITALIZATION

Section 4.1    Authorized Capital Stock.  The total number of shares of all classes of capital stock, each with a par value of $0.0001 per share, which the Corporation is authorized to issue is 471,000,000 shares, consisting of (a) 450,000,000 shares of Class A common stock (the "***Common Stock***"), (b) 20,000,000 shares of Class F common stock (the "***Class F Common Stock***") and (c) 1,000,000 shares of preferred stock (the "***Preferred Stock***").

Section 4.2    Class F Common Stock. Upon the filing of the Certificate of Merger (the "Certificate of Merger") with the Secretary of State of the State of Delaware as contemplated by the Agreement and Plan of Merger, dated as of February 21, 2021, by and among the Corporation, FVAC Merger Corp. II and Wilco Holdco, Inc., each share of Class F Common Stock outstanding immediately prior to the filing of the Certificate of Merger shall automatically be converted into one share of Common Stock without any action on the part of any person, including the Corporation, and concurrently with such conversion, the number of authorized shares of Class F Common Stock shall be reduced to zero. It is intended that the conversion of Class F Common Stock into Common Stock will be treated as a reorganization within the meaning of Section 368(a)(1)(E) of the Internal Revenue Code of 1986, as amended.

Section 4.3    Preferred Stock. The Board of Directors of the Corporation (the "***Board***") is hereby expressly authorized to provide out of the unissued shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board providing for the issuance of such series and included in a certificate of designation (a "***Preferred Stock Designation***") filed pursuant to the DGCL, and the Board is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions. Without limiting the generality of the foregoing, the resolution or resolutions providing for the creation and issuance of any series of Preferred Stock may provide that such series shall be superior or rank equally or be junior to any other series of Preferred Stock to the extent permitted by law and this Second Amended and Restated Certificate (including any Preferred Stock Designation). Except as otherwise required by law, holders of any series of Preferred Stock shall be entitled only to such voting rights, if any, as shall expressly be granted thereto by this Second Amended and Restated Certificate (including any Preferred Stock Designation).

Section 4.4    Common Stock.

(a)    *Voting.*

(i)    Except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), the holders of the Common Stock shall exclusively possess all voting power with respect to the Corporation.

(ii)    Except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), the holders of shares of Common Stock shall be entitled to one vote for each such share on each matter properly submitted to the stockholders on which the holders of the Common Stock are entitled to vote.

(iii)    Except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), at any annual or special meeting of the stockholders of the Corporation, holders of the Common Stock shall have the exclusive right to vote for the election of directors and on all other matters properly submitted to a vote of the stockholders. Notwithstanding the foregoing, except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), holders of Common Stock shall not be entitled to vote on any amendment to this Second Amended and Restated Certificate (including any amendment to any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series of Preferred Stock are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Second Amended and Restated Certificate (including any Preferred Stock Designation) or the DGCL.

(b)    *Dividends.* Subject to applicable law and the rights, if any, of the holders of any outstanding series of the Preferred Stock, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the Board from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions.

(c)    *Liquidation, Dissolution or Winding Up of the Corporation.* Subject to applicable law and the rights, if any, of the holders of any outstanding series of the Preferred Stock, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of shares of Common Stock shall be entitled to receive all the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by them.

(d)    *Transfer Rights*. Subject to applicable law and the transfer restrictions set forth in Article VII of the Amended and Restated Bylaws of the Corporation (as such may be amended from time to time, the "***Bylaws***"), shares of Common Stock and the rights and obligations associated therewith shall be fully transferable to any transferee.

Section 4.5    Rights and Options. The Corporation has the authority to create and issue rights, warrants and options entitling the holders thereof to acquire from the Corporation any

shares of its capital stock of any class or classes, with such rights, warrants and options to be evidenced by or in instrument(s) approved by the Board. The Board is empowered to set the exercise price, duration, times for exercise and other terms and conditions of such rights, warrants or options; provided, however, that the consideration to be received for any shares of capital stock issuable upon exercise thereof may not be less than the par value thereof.

Section 4.6    No Class Vote on Changes in Authorized Number of Shares of Stock. Subject to the rights of the holders of any outstanding series of Preferred Stock, the number of authorized shares of any class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of at least a majority of the voting power of the stock of the Corporation entitled to vote thereon irrespective of the provisions of Section 242(b)(2) of the DGCL.

<div align="center">

**ARTICLE V**
**BOARD OF DIRECTORS**

</div>

Section 5.1    Board Powers. The business and affairs of the Corporation shall be managed by, or under the direction of, the Board. In addition to the powers and authority expressly conferred upon the Board by statute, this Second Amended and Restated Certificate or the Bylaws, the Board is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the DGCL, and this Second Amended and Restated Certificate and any Bylaws adopted by the stockholders.

Section 5.2    Number, Election and Term.

(a)    The number of directors of the Corporation, shall be fixed from time to time in the manner provided in the Bylaws.

(b)    Subject to Section 5.5 hereof, the Board shall be divided into three classes, as nearly equal in number as possible and designated Class I, Class II and Class III. The term of the initial Class I Directors shall expire at the first annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate; the term of the initial Class II Directors shall expire at the second annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate; and the term of the initial Class III Directors shall expire at the third annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate. At each succeeding annual meeting of the stockholders of the Corporation, beginning with the first annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate, successors to the class of directors whose term expires at that annual meeting shall be elected for a three-year term or until the election and qualification of their respective successors in office, subject to their earlier death, resignation or removal. Subject to Section 5.5 hereof, if the number of directors is changed, any increase or decrease shall be apportioned by the Board among the classes so as to maintain the number of directors in each class as nearly equal as possible, but in no case shall a decrease in the number of directors shorten the term of any incumbent director. Subject to the rights of the holders of one or more series of Preferred Stock, voting separately by class or series,

<div align="center">4</div>

to elect directors pursuant to the terms of one or more series of Preferred Stock, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon. The Board is hereby expressly authorized, by resolution or resolutions thereof, to assign members of the Board already in office to the aforesaid classes at the time this Second Amended and Restated Certificate (and therefore such classification) becomes effective in accordance with the DGCL.

(c)    Subject to Section 5.5 hereof, a director shall hold office until the annual meeting for the year in which his or her term expires and until his or her successor has been duly elected and qualified, subject, however, to such director's earlier death, resignation or removal. There shall be no limit on the number of terms a director may serve on the Board.

(d)    Unless and except to the extent that the Bylaws shall so require, the election of directors need not be by written ballot.

Section 5.3    Newly Created Directorships and Vacancies.  Subject to Section 5.5 hereof, newly created directorships resulting from an increase in the number of directors and any vacancies on the Board resulting from death, resignation or removal may be filled solely and exclusively by a majority vote of the remaining directors then in office, even if less than a quorum, or by a sole remaining director (and not by stockholders), and any director so chosen shall hold office for the remainder of the full term of the director to which the new directorship was added or in which the vacancy occurred and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation or removal.

Section 5.4    Removal.  Subject to Section 5.5 hereof and except as otherwise required by law, any or all of the directors may be removed from office at any time, but only for "cause" and only by the affirmative vote of holders of a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class. For purposes of this Section 5.4, "cause" shall mean (a) conduct by a director constituting an act of willful misconduct or gross negligence in connection with the performance of his/her duties as a director of the Corporation; (b) the commission or any conviction by a director of any felony or a misdemeanor involving moral turpitude, deceit, dishonesty, harassment or fraud, or any conduct by the director that would reasonably be expected to result in material injury to the Corporation or any of its subsidiaries or affiliates if he/she were retained in his/her position; or (c) continued non-performance by a director of his/her duties to the Corporation (other than by reason of the director's physical or mental illness, incapacity, or disability) which has continued for more than 30 days following written notice of such non-performance from the Board.

Section 5.5    Preferred Stock - Directors. Notwithstanding any other provision of this *Article V*, and except as otherwise required by law, whenever the holders of one or more series of the Preferred Stock shall have the right, voting separately by class or series, to elect one or more directors, the term of office, the filling of vacancies, the removal from office and other features of such directorships shall be governed by the terms of such series of the Preferred Stock as set forth in this Second Amended and Restated Certificate (including any Preferred Stock Designation) and such directors shall not be included in any of the classes created pursuant to this *Article V* unless expressly provided by such terms.

# ARTICLE VI
# BYLAWS

In furtherance and not in limitation of the powers conferred upon it by law, the Board shall have the power and is expressly authorized to adopt, amend, alter or repeal the Bylaws. The affirmative vote of a majority of the Board shall be required to adopt, amend, alter or repeal the Bylaws. The Bylaws also may be adopted, amended, altered or repealed by the stockholders; provided, however, that in addition to any vote of the holders of any class or series of capital stock of the Corporation required by law or by this Second Amended and Restated Certificate (including any Preferred Stock Designation), the affirmative vote of the holders of at least a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders to adopt, amend, alter or repeal the Bylaws; provided further, however, amendments or repeals of Article VIII of the Bylaws shall require the affirmative vote of the stockholders holding at least 65% of the voting power of all outstanding shares of capital stock of the Corporation; and, provided further, however, that no Bylaws hereafter adopted by the stockholders shall invalidate any prior act of the Board that would have been valid if such Bylaws had not been adopted.

# ARTICLE VII
# MEETINGS OF STOCKHOLDERS; ACTION BY WRITTEN CONSENT

Section 7.1    Meetings. Subject to the rights, if any, of the holders of any outstanding series of the Preferred Stock, and to the requirements of applicable law, special meetings of stockholders of the Corporation may be called only by the Chairman of the Board, the Chief Executive Officer of the Corporation, or the Board pursuant to a resolution adopted by a majority of the Board, and the ability of the stockholders to call a special meeting is hereby specifically denied. Except as provided in the foregoing sentence, special meetings of stockholders may not be called by another person or persons. Any such special meeting so called may be postponed, adjourned, rescheduled or cancelled by the Board or other person calling the meeting.

Section 7.2    Advance Notice. Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws.

Section 7.3    Action by Written Consent. Except as may be otherwise provided for or fixed pursuant to this Second Amended and Restated Certificate (including any Preferred Stock Designation), any action required or permitted to be taken by the stockholders of the Corporation must be effected by a duly called annual or special meeting of such stockholders and may not be effected by written consent of the stockholders.

# ARTICLE VIII
# LIMITED LIABILITY; INDEMNIFICATION

Section 8.1    Limitation of Director Liability.  A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director, except to the extent such exemption from liability or

6

limitation thereof is not permitted under the DGCL as the same exists or may hereafter be amended unless they violated their duty of loyalty to the Corporation or its stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived improper personal benefit from their actions as directors. If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any amendment, modification or repeal of the foregoing sentence shall not adversely affect any right or protection of a director of the Corporation hereunder in respect of any act or omission occurring prior to the time of such amendment, modification or repeal.

Section 8.2    Indemnification and Advancement of Expenses.

(a)    To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify, defend and hold harmless each person who is or was made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit, or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation to procure a judgment in its favor (each, a "*proceeding*") by reason of the fact that he or she is or was a director or officer of the Corporation or any of its subsidiaries or, while a director or officer of the Corporation or any of its subsidiaries or, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (an "*indemnitee*"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, against all liability and loss suffered and expenses (including, without limitation, attorneys' fees and disbursements, judgments, fines, Employment Retirement Income Security Act of 1974 excise taxes, damages, claims and penalties and amounts paid in settlement) reasonably incurred by such indemnitee in connection with such proceeding.  The Corporation shall, to the fullest extent not prohibited by applicable law, pay as incurred the expenses (including attorneys' fees) incurred by an indemnitee in defending or otherwise participating in any proceeding in advance of its final disposition (including by making payment directly to applicable third parties if requested by the indemnitee); provided, however, that, to the extent required by applicable law, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such indemnitee including, without limitation, service to an employee benefit plan), shall be made only upon the Corporation's receipt of an undertaking, by or on behalf of the indemnitee, to repay all amounts so advanced if it shall ultimately be determined that the indemnitee is not entitled to be indemnified under this Section 8.2 or otherwise.  The rights to indemnification and advancement of expenses conferred by this Section 8.2 shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators.  Notwithstanding the foregoing provisions of this Section 8.2(a), except for proceedings to enforce rights to indemnification (which are, for the avoidance of doubt, indemnified proceedings) and advancement of expenses, the Corporation shall indemnify and advance expenses to an

7

indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was, or is, authorized by the Board.

(b)     The rights to indemnification and advancement of expenses conferred on any indemnitee by this Section 8.2 shall not be exclusive of any other rights that any indemnitee may have or hereafter acquire under law, this Second Amended and Restated Certificate, the Bylaws, an agreement, vote of stockholders or disinterested directors, or otherwise.

(c)     Any repeal or amendment of this Section 8.2 by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Second Amended and Restated Certificate inconsistent with this Section 8.2, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

(d)     This Section 8.2 shall not limit the right of the Corporation, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other than indemnitees.

### ARTICLE IX
### CORPORATE OPPORTUNITY

Section 9.1     The doctrine of corporate opportunity, or any other analogous doctrine, shall not apply with respect to the Corporation or any of its officers or directors, or any of their respective affiliates, in circumstances where the application of any such doctrine would conflict with any fiduciary duties or contractual obligations they may have as of the date of this Second Amended and Restated Certificate or in the future. In addition to the foregoing, the doctrine of corporate opportunity shall not apply to any other corporate opportunity with respect to any of the directors or officers of the Corporation unless such corporate opportunity is offered to such person solely in his or her capacity as a director or officer of the Corporation and such opportunity is one the Corporation is legally and contractually permitted to undertake and would otherwise be reasonable for the Corporation to pursue.

Section 9.2     Without limiting the foregoing, to the extent permitted by applicable law, each of Advent International Corporation and its successors and Affiliates (as defined in Section 10.3) and any of their respective managed investment funds and portfolio companies (but excluding the Corporation and its subsidiaries) and their respective partners, members, directors, employees, stockholders, agents and any successor by operation of law (including by merger) of any such Person  (each, an "*Exempted Person*") shall not have any fiduciary duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Corporation or any of its subsidiaries, except as otherwise expressly provided in any agreement entered into between the Corporation and such Exempted Person. To the fullest extent permitted by applicable law and subject to Section 9.1, the Corporation, on behalf of itself and its

8

subsidiaries, renounces any interest or expectancy of the Corporation and its subsidiaries in, or in being offered an opportunity to participate in, business opportunities that are from time to time available to the Exempted Persons, even if the opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and each such Exempted Person shall have no duty to communicate or offer such business opportunity to the Corporation (and there shall be no restriction on the Exempted Persons using the general knowledge and understanding of the industry in which the Corporation operates which it has gained as an Exempted Person in considering and pursuing such opportunities or in making investment, voting, monitoring, governance or other decisions relating to other entities or securities) and, to the fullest extent permitted by applicable law and subject to Section 9.1, shall not be liable to the Corporation or any of its subsidiaries or stockholders for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such Exempted Person pursues or acquires such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Corporation or its subsidiaries, or uses such knowledge and understanding in the manner described herein, in each case, except as otherwise expressly provided in any agreement entered into between the Corporation and such Exempted Person. In addition to and notwithstanding the foregoing, a corporate opportunity shall not be deemed to belong to the Corporation if it is a business opportunity that the Corporation is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Corporation's business or is of no practical advantage to it or that is one in which the Corporation has no interest or reasonable expectancy. Any person or entity purchasing or otherwise acquiring any interest in any shares of stock of the Corporation shall be deemed to have notice of the provisions of this *Article IX*.

Section 9.3     Neither the alteration, amendment, addition to or repeal of this *Article IX*, nor the adoption of any provision of this Second Amended and Restated Certificate (including any Preferred Stock Designation) inconsistent with this *Article IX*, shall eliminate or reduce the effect of this *Article IX* in respect of any business opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this *Article IX*, would accrue or arise, prior to such alteration, amendment, addition, repeal or adoption.  This *Article IX* shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Second Amended and Restated Certificate, the Bylaws or applicable law.

### ARTICLE X
### BUSINESS COMBINATIONS

Section 10.1     Opt Out of DGCL 203. The Corporation shall not be governed by Section 203 of the DGCL.

Section 10.2     Limitations on Business Combinations. Notwithstanding the foregoing, from the time that the opt-out in Section 10.1 becomes effective, the Corporation shall not engage in any business combination, at any point in time at which the Common Stock is registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended, with any interested stockholder for a period of three years following the time that such stockholder became an interested stockholder, unless:

9

(a) prior to such time, the Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

(b) upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the Corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding (but not the outstanding voting stock owned by the interested stockholder) those shares owned by: (i) persons who are directors and also officers; or (ii) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

(c) at or subsequent to such time, the business combination is approved by the Board and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least two-thirds of the outstanding voting stock of the Corporation which is not owned by the interested stockholder.

Section 10.3    Definitions. For purposes of this *Article X*, the term:

(a) "*Affiliate*" means, with respect to any person, any other person that controls, is controlled by, or is under common control with such person.

(b) "*associate*," when used to indicate a relationship with any person, means: (i) any corporation, partnership, unincorporated association or other entity of which such person is a director, officer or partner or is, directly or indirectly, the owner of 20% or more of any class of voting stock; (ii) any trust or other estate in which such person has at least a 20% beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity; and (iii) any relative or spouse of such person, or any relative of such spouse, who has the same residence as such person.

(c) "*business combination*," when used in reference to the Corporation and any interested stockholder of the Corporation, means:

(i) any merger or consolidation of the Corporation or any direct or indirect majority-owned subsidiary of the Corporation: (A) with the interested stockholder; or (B) with any other corporation, partnership, unincorporated association or other entity if the merger or consolidation is caused by the interested stockholder and as a result of such merger or consolidation Section 10.2 is not applicable to the surviving entity;

(ii) any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), except proportionately as a stockholder of the Corporation, to or with the interested stockholder, whether as part of a dissolution or otherwise, of assets of the Corporation or of any direct or indirect majority-owned subsidiary of the Corporation which assets have an aggregate market value equal to 10% or more of either the aggregate market value of all the assets of the Corporation determined on a consolidated basis or the aggregate market value of all the outstanding stock of the Corporation;

10

(iii)     any transaction which results in the issuance or transfer by the Corporation or by any direct or indirect majority-owned subsidiary of the Corporation of any stock of the Corporation or of such subsidiary to the interested stockholder, except: (A) pursuant to the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of the Corporation or any such subsidiary which securities were outstanding prior to the time that the interested stockholder became such; (B) pursuant to a merger under Section 251(g) of the DGCL; (C) pursuant to a dividend or distribution paid or made, or the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of the Corporation or any such subsidiary which security is distributed, pro rata to all holders of a class or series of stock of the Corporation subsequent to the time the interested stockholder became such; (D) pursuant to an exchange offer by the Corporation to purchase stock made on the same terms to all holders of said stock; or (E) any issuance or transfer of stock by the Corporation; provided, however, that in no case under items (C) – (E) of this subsection (iii) shall there be an increase in the interested stockholder's proportionate share of the stock of any class or series of the Corporation or of the voting stock of the Corporation (except as a result of immaterial changes due to fractional share adjustments);

(iv)     any transaction involving the Corporation or any direct or indirect majority-owned subsidiary of the Corporation which has the effect, directly or indirectly, of increasing the proportionate share of the stock of any class or series, or securities convertible into the stock of any class or series, of the Corporation or of any such subsidiary which is owned by the interested stockholder, except as a result of immaterial changes due to fractional share adjustments or as a result of any purchase or redemption of any shares of stock not caused, directly or indirectly, by the interested stockholder; or

(v)     any receipt by the interested stockholder of the benefit, directly or indirectly (except proportionately as a stockholder of the Corporation), of any loans, advances, guarantees, pledges, or other financial benefits (other than those expressly permitted in subsections "(i)"-"(iv)" above) provided by or through the Corporation or any direct or indirect majority-owned subsidiary.

(d)     "*control*," including the terms "*controlling*," "*controlled by*" and "*under common control with*," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract, or otherwise. A person who is the owner of 20% or more of the outstanding voting stock of the Corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary. Notwithstanding the foregoing, a presumption of control shall not apply where such person holds voting stock, in good faith and not for the purpose of circumventing this *Article X*, as an agent, bank, broker, nominee, custodian or trustee for one or more owners who do not individually or as a group have control of such entity.

(e)     "*Exempt Transferee*" means (i) any person that acquires (other than in an Excluded Transfer) directly from Advent International Corporation or any of its Affiliates or successors, ownership of voting stock of the Corporation, and is designated in writing by the transferor as an "Exempt Transferee" for the purpose of this *Article X*; and (ii) any person that acquires (other than in an Excluded Transfer) directly from a person described in clause "(i)" of

11

this definition or from any other Exempt Transferee ownership of voting stock of the Corporation, and is designated in writing by the transferor as an "Exempt Transferee" for the purpose of this *Article X*.

(f)     "*Excluded Transfer*" means (i) a transfer to a person that is not an Affiliate of the transferor, which transfer is by gift or otherwise not for value, including a transfer by dividend or distribution by the transferor, (ii) a transfer in a public offering that is registered under the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) a transfer to one or more broker-dealers or their affiliates pursuant to a firm commitment purchase agreement for an offering that is exempt from registration under the Securities Act, (iv) a transfer made through the facilities of a registered securities exchange or automated inter-dealer quotation system and (v) a transfer made in compliance with the manner of sale limitations of Rule 144(f) under the Securities Act or any successor rule or provision.

(g)     "*interested stockholder*" means any person (other than the Corporation or any direct or indirect majority-owned subsidiary of the Corporation) that: (i) is the owner of 15% or more of the outstanding voting stock of the Corporation; or (ii) is an Affiliate or associate of the Corporation and was the owner of 15% or more of the outstanding voting stock of the Corporation at any time within the three year period immediately prior to the date on which it is sought to be determined whether such person is an interested stockholder; or (iii) an Affiliate or associate of any such person described in clauses "(i)" and "(ii)"; provided, however, that the term "interested stockholder" shall not include: (A) Sponsor Holders or their transferees, any Exempt Transferee or any of their respective Affiliates or successors or any "group", or any member of any such group, to which such persons are a party under Rule 13d-5 of the Exchange Act; or (B) any person whose ownership of shares in excess of the 15% limitation set forth herein is the result of (x) any action taken solely by the Corporation, or (y) share redemptions by existing stockholders; provided, that such person specified in this clause "(B)" shall be an interested stockholder if thereafter such person acquires additional shares of voting stock of the Corporation, except as a result of further corporate action not caused, directly or indirectly, by such person. For the purpose of determining whether a person is an interested stockholder, the voting stock of the Corporation deemed to be outstanding shall include stock deemed to be owned by the person through application of the definition of "owner" below but shall not include any other unissued stock of the Corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(h)     "*owner*," including the terms "*own*" and "*owned*," when used with respect to any stock, means a person that individually or with or through any of its Affiliates or associates:

(i)     beneficially owns such stock, directly or indirectly; or

(ii)     has: (A) the right to acquire such stock (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise; provided, however, that a person shall not be deemed the owner of stock tendered pursuant to a tender or exchange offer made by such person or any of

12

such person's Affiliates or associates until such tendered stock is accepted for purchase or exchange; or (B) the right to vote such stock pursuant to any agreement, arrangement or understanding; provided, however, that a person shall not be deemed the owner of any stock because of such person's right to vote such stock if the agreement, arrangement or understanding to vote such stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made to 10 or more persons; or

(iii)     has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting (except voting pursuant to a revocable proxy or consent as described in item (B) of subsection "(ii)" above), or disposing of such stock with any other person that beneficially owns, or whose Affiliates or associates beneficially own, directly or indirectly, such stock.

(i)     "*person*" means any individual, corporation, partnership, unincorporated association or other entity.

(j)     "*stock*" means, with respect to any corporation, capital stock and, with respect to any other entity, any equity interest.

(k)     "*Sponsor Holders*" means the investment funds affiliated with Advent International Corporation and their successors and Affiliates.

(l)     "*voting stock*" means stock of any class or series entitled to vote generally in the election of directors.

## ARTICLE XI
## AMENDMENT OF SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

The Corporation reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Second Amended and Restated Certificate (including any Preferred Stock Designation), and other provisions authorized by the laws of the State of Delaware at the time in force that may be added or inserted**,** in the manner now or hereafter prescribed by this Second Amended and Restated Certificate and the DGCL; and, except as set forth in *Article VIII*, all rights, preferences and privileges of whatever nature herein conferred upon stockholders, directors or any other persons by and pursuant to this Second Amended and Restated Certificate in its present form or as hereafter amended are granted subject to the right reserved in this *Article XI*. Notwithstanding any other provisions of this Second Amended and Restated Certificate of Incorporation or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any particular class or series of the Corporation required by law or by this Certificate of Incorporation or any certificate of designation filed with respect to a series of Preferred Stock, the affirmative vote of the holders at least 66.7% of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to alter, amend or repeal *Article V*.

13

IN WITNESS WHEREOF, Fortress Value Acquisition Corp. II has caused this Second Amended and Restated Certificate to be duly executed and acknowledged in its name and on its behalf by an authorized officer as of the date first set forth above.

FORTRESS VALUE ACQUISITION CORP. II

By: _____

Name: Andrew A. McKnight

Title: Chief Executive Officer

**EXHIBIT B**

**Acquiror A&R Bylaws**

**Exhibit B**

**FORM OF**
**AMENDED AND RESTATED BYLAWS**
**OF**
**FORTRESS VALUE ACQUISITION CORP. II**
**(THE "CORPORATION")**

**ARTICLE I**

**OFFICES**

      **Section 1.1.** **Registered Office**.  The registered office of the Corporation within the State of Delaware shall be located at either (a) the principal place of business of the Corporation in the State of Delaware or (b) the office of the corporation or individual acting as the Corporation's registered agent in Delaware.

      **Section 1.2.** **Additional Offices**.  The Corporation may, in addition to its registered office in the State of Delaware, have such other offices and places of business, both within and outside the State of Delaware, as the Board of Directors of the Corporation (the "**Board**") may from time to time determine or as the business and affairs of the Corporation may require.

**ARTICLE II**

**STOCKHOLDERS MEETINGS**

      **Section 2.1.** **Annual Meetings**.  The annual meeting of stockholders shall be held at such place, either within or without the State of Delaware, and time and on such date as shall be determined by the Board and stated in the notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a).  At each annual meeting, the stockholders entitled to vote on such matters shall elect those directors of the Corporation to fill any term of a directorship that expires on the date of such annual meeting and may transact any other business as may properly be brought before the meeting.

      **Section 2.2.** **Special Meetings**.  Subject to the rights of the holders of any outstanding series of the Preferred Stock (as defined below) and to the requirements of applicable law, special meetings of stockholders, for any purpose or purposes, may be called only by the Chairman of the Board, the Chief Executive Officer, or the Board pursuant to a resolution adopted by a majority of the Board, and may not be called by any other person. Special meetings of stockholders shall be held at such place, either within or without the State of Delaware, and at such time and on such date as shall be determined by the Board and stated in the Corporation's notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a).

      **Section 2.3.** **Notices**.  Written notice of each stockholders meeting stating the place, if any, date, and time of the meeting, and the means of remote communication, if any, by

which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, shall be given in the manner permitted by Section 9.3 to each stockholder entitled to vote thereat as of the record date for determining the stockholders entitled to notice of the meeting, by the Corporation not less than 10 nor more than 60 days before the date of the meeting unless otherwise required by the General Corporation Law of the State of Delaware (the "**DGCL**").  If said notice is for a stockholders meeting other than an annual meeting, it shall in addition state the purpose or purposes for which the meeting is called, and the business transacted at such meeting shall be limited to the matters so stated in the Corporation's notice of meeting (or any supplement thereto).  Any meeting of stockholders as to which notice has been given may be postponed, and any meeting of stockholders as to which notice has been given may be cancelled, by the Board upon public announcement (as defined in Section 2.7(c)) given before the date previously scheduled for such meeting.

**Section 2.4.    Quorum**.  Except as otherwise provided by applicable law, the Corporation's Certificate of Incorporation, as the same may be amended or restated from time to time (the "**Certificate of Incorporation**") or these Bylaws, the presence, in person or by proxy, at a stockholders meeting of the holders of shares of outstanding capital stock of the Corporation representing a majority of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote at such meeting shall constitute a quorum for the transaction of business at such meeting, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of shares representing a majority of the voting power of the outstanding shares of such class or series shall constitute a quorum of such class or series for the transaction of such business.  If a quorum shall not be present or represented by proxy at any meeting of the stockholders of the Corporation, the chairman of the meeting may postpone the meeting or may adjourn the meeting from time to time in the manner provided in Section 2.6 until a quorum shall attend.  The stockholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.  Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the voting power of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation or any such other corporation to vote shares held by it in a fiduciary capacity.

**Section 2.5.    Voting of Shares**.

(a)    Voting Lists.  The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders of record entitled to vote at such meeting, arranged in alphabetical order and showing the address and the number of shares registered in the name of each stockholder.  Nothing contained in this Section 2.5(a) shall require the Corporation to include electronic mail addresses or other electronic contact information on such list.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access

2

to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  If a meeting of stockholders is to be held solely by means of remote communication as permitted by Section 9.5(a), the list shall be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of meeting.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list required by this Section 2.5(a) or to vote in person or by proxy at any meeting of stockholders.

(b)     Manner of Voting.  At any stockholders meeting, every stockholder entitled to vote may vote in person or by proxy.  If authorized by the Board, the voting by stockholders or proxy holders at any meeting conducted by remote communication may be effected by a ballot submitted by electronic transmission (as defined in Section 9.3), provided that any such electronic transmission must either set forth or be submitted with information from which the Corporation can determine that the electronic transmission was authorized by the stockholder or proxy holder.  The Board, in its discretion, or the chairman of the meeting of stockholders, in such person's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(c)     Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  Proxies need not be filed with the Secretary of the Corporation until the meeting is called to order, but shall be filed with the Secretary before being voted. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, either of the following shall constitute a valid means by which a stockholder may grant such authority.

(i)     A stockholder, or such stockholder's authorized officer, director, employee or agent, may execute a document authorizing another person or persons to act for such stockholder as proxy.

(ii)     A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder.

Any copy, facsimile telecommunication or other reliable reproduction of the document (including any electronic transmission) created pursuant to Section 2.5(C) may be substituted or

3

used in lieu of the original document for any and all purposes for which the original document could be used; provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original document.

(d)     Required Vote.  Subject to the rights of the holders of one or more series of preferred stock of the Corporation ("**Preferred Stock**"), voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, at all meetings of stockholders at which a quorum is present, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon.  All other matters presented to the stockholders at a meeting at which a quorum is present shall be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which, by applicable law, the Certificate of Incorporation, these Bylaws or applicable stock exchange rules, a different vote is required, in which case such provision shall govern and control the decision of such matter.

(e)     Inspectors of Election.  The Board may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more persons as inspectors of election, who may be employees of the Corporation or otherwise serve the Corporation in other capacities, to act at such meeting of stockholders or any adjournment thereof and to make a written report thereof.  The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspectors of election or alternates are appointed by the Board, the chairman of the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall (i) ascertain and report the number of outstanding shares and the voting power of each, (ii) determine the number of shares present in person or represented by proxy at the meeting and the validity of proxies and ballots, (iii) count all votes and ballots and report the results, (iv) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (v) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  No person who is a candidate for an office at an election may serve as an inspector at such election.  Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting.  If there is more than one inspector, the report of a majority shall be the report of the inspectors.

**Section 2.6.    Adjournments**.  Any meeting of stockholders, annual or special, may be adjourned by the chairman of the meeting, from time to time, whether or not there is a quorum, to reconvene at the same or some other place.  Notice need not be given of any such adjourned meeting if the date, time, and place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the stockholders, or the holders of any class or series of stock entitled to vote separately as a class, as the case may be, may transact any business that might have been transacted at the original meeting.  If the adjournment is for more than 30 days, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for stockholders

4

entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of such adjourned meeting in accordance with Section 9.2, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

### Section 2.7. Advance Notice for Business.

(a) Annual Meetings of Stockholders. No business may be transacted at an annual meeting of stockholders, other than business that is either (i) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board, (ii) otherwise properly brought before the annual meeting by or at the direction of the Board or (iii) otherwise properly brought before the annual meeting by any stockholder of the Corporation (x) who is a stockholder of record entitled to vote at such annual meeting on the date of the giving of the notice provided for in this Section 2.7(a) and on the record date for the determination of stockholders entitled to vote at such annual meeting and (y) who complies with the notice procedures set forth in this Section 2.7(a). Notwithstanding anything in this Section 2.7(a) to the contrary, only persons nominated for election as a director to fill any term of a directorship that expires on the date of the annual meeting pursuant to Section 3.2 will be considered for election at such meeting.

(i) In addition to any other applicable requirements, for business (other than nominations) to be properly brought before an annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation and such business must otherwise be a proper matter for stockholder action. Subject to Section 2.7(a)(iii), a stockholder's notice to the Secretary with respect to such business, to be timely, must be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 90th day nor earlier than the close of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting is first made by the Corporation. The public announcement of an adjournment or postponement of an annual meeting shall not commence a new time period (or extend any time period) for the giving of a stockholder's notice as described in this Section 2.7(a).

(ii) To be in proper written form, a stockholder's notice to the Secretary with respect to any business (other than nominations) must set forth as to each such matter such stockholder proposes to bring before the annual meeting (A) a brief description of the business desired to be brought before the annual meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event such business includes a proposal to amend these Bylaws, the language of the proposed amendment) and the reasons for conducting such business at the annual meeting, (B) the name and record address of such stockholder and the name and address of the beneficial owner, if any, on whose behalf the proposal is made, (C) the class or series and number of shares of capital stock of the Corporation

5

that are owned beneficially and of record by such stockholder and by the beneficial owner, if any, on whose behalf the proposal is made, (D) a description of all arrangements or understandings between such stockholder and the beneficial owner, if any, on whose behalf the proposal is made and any other person or persons (including their names) in connection with the proposal of such business by such stockholder, (E) any material interest of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made in such business and (F) a representation that such stockholder (or a qualified representative of such stockholder) intends to appear in person or by proxy at the annual meeting to bring such business before the meeting.

(iii)     The foregoing notice requirements of this Section 2.7(a) shall be deemed satisfied by a stockholder as to any proposal (other than nominations) if the stockholder has notified the Corporation of such stockholder's intention to present such proposal at an annual meeting in compliance with Rule 14a-8 (or any successor thereof) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), and such stockholder has complied with the requirements of such Rule for inclusion of such proposal in a proxy statement prepared by the Corporation to solicit proxies for such annual meeting.  No business shall be conducted at the annual meeting of stockholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 2.7(a), provided, however, that once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this Section 2.7(a) shall be deemed to preclude discussion by any stockholder of any such business.  If the Board or the chairman of the annual meeting determines that any stockholder proposal was not made in accordance with the provisions of this Section 2.7(a) or that the information provided in a stockholder's notice does not satisfy the information requirements of this Section 2.7(a), such proposal shall not be presented for action at the annual meeting.  Notwithstanding the foregoing provisions of this Section 2.7(a), if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the Corporation to present the proposed business, such proposed business shall not be transacted, notwithstanding that proxies in respect of such matter may have been received by the Corporation.

(iv)     In addition to the provisions of this Section 2.7(a), a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein.  Nothing in this Section 2.7(a) shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(b)     Special Meetings of Stockholders.  Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting.  Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting only pursuant to Section 3.2.

(c)     Public Announcement.  For purposes of these Bylaws, "**public announcement**" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press, Business Wire or PR Newswire or comparable national news service or in a document publicly filed by the Corporation with the U.S. Securities and Exchange

6

Commission pursuant to Section 13, Section 14 or Section 15(d) of the Exchange Act (or any successor thereto).

**Section 2.8. Conduct of Meetings**. The chairman of each annual and special meeting of stockholders shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the President or if the President is not a director, such other person as shall be appointed by the Board. The Board may adopt such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate. Except to the extent inconsistent with these Bylaws or such rules and regulations as adopted by the Board, the chairman of any meeting of stockholders shall have the right and authority to convene and to adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) rules and procedures for maintaining order at the meeting and the safety of those present; (c) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (d) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (e) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure. The secretary of each annual and special meeting of stockholders shall be the Secretary or, in the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary so appointed to act by the chairman of the meeting. In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

**Section 2.9. Consents in Lieu of Meeting**. Except as may be otherwise provided for or fixed pursuant to the Certificate of Incorporation (including any certificate of designations relating to the Preferred Stock), any action required or permitted to be taken by the stockholders of the Corporation must be effected by a duly called annual or special meeting of such holders and may not be effected by written consent of the stockholders of the Corporation.

## ARTICLE III

## DIRECTORS

**Section 3.1. Powers; Number**. The business and affairs of the Corporation shall be managed by or under the direction of the Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these Bylaws required to be exercised or done by the stockholders. Directors need not be stockholders or residents of the State of Delaware. Subject to the Certificate of Incorporation, the number of directors shall be fixed exclusively by resolution of the Board.

**Section 3.2.     Advance Notice for Nomination of Directors**.

(a)      Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided by the terms of one or more series of Preferred Stock with respect to the rights of holders of one or more series of Preferred Stock to elect directors.  Nominations of persons for election to the Board at any annual meeting of stockholders, or at any special meeting of stockholders called for the purpose of electing directors as set forth in the Corporation's notice of such special meeting, may be made (i) by or at the direction of the Board or (ii) by any stockholder of the Corporation (x) who is a stockholder of record entitled to vote in the election of directors on the date of the giving of the notice provided for in this Section 3.2 and on the record date for the determination of stockholders entitled to vote at such meeting and (y) who complies with the notice procedures set forth in this Section 3.2.

(b)      In addition to any other applicable requirements, for a nomination to be made by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.  To be timely, a stockholder's notice to the Secretary must be received by the Secretary at the principal executive offices of the Corporation (i) in the case of an annual meeting, not later than the close of business on the 90th day nor earlier than the close of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so received not earlier than the close of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting was first made by the Corporation; and (ii) in the case of a special meeting of stockholders called for the purpose of electing directors, not later than the close of business on the 10th day following the day on which public announcement of the date of the special meeting is first made by the Corporation.  In no event shall the public announcement of an adjournment or postponement of an annual meeting or special meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described in this Section 3.2.

(c)      Notwithstanding anything in paragraph (b) to the contrary, in the event that the number of directors to be elected to the Board at an annual meeting is greater than the number of directors whose terms expire on the date of the annual meeting and there is no public announcement by the Corporation naming all of the nominees for the additional directors to be elected or specifying the size of the increased Board before the close of business on the 90th day prior to the anniversary date of the immediately preceding annual meeting of stockholders, a stockholder's notice required by this Section 3.2 shall also be considered timely, but only with respect to nominees for the additional directorships created by such increase that are to be filled by election at such annual meeting, if it shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the date on which such public announcement was first made by the Corporation.

(d)      To be in proper written form, a stockholder's notice to the Secretary must set forth: (i) as to each person whom the stockholder proposes to nominate for election as a

8

director (A) the name, age, business address and residence address of the person, (B) the principal occupation or employment of the person, (C) the class or series and number of shares of capital stock of the Corporation, if any, that are owned beneficially or of record by the person, (D) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, without regard to the application of the Exchange Act to either the nomination or the Corporation; and (ii) as to the stockholder giving the notice (A) the name and record address of such stockholder as they appear on the Corporation's books and the name and address of the beneficial owner, if any, on whose behalf the nomination is made, (B) the class or series and number of shares of capital stock of the Corporation that are owned beneficially and of record by such stockholder and the beneficial owner, if any, on whose behalf the nomination is made, (C) a description of all arrangements or understandings relating to the nomination to be made by such stockholder among such stockholder, the beneficial owner, if any, on whose behalf the nomination is made, each proposed nominee and any other person or persons (including their names), (D) a representation that such stockholder (or a qualified representative of such stockholder) intends to appear in person or by proxy at the meeting to nominate the persons named in its notice and (E) any other information relating to such stockholder and the beneficial owner, if any, on whose behalf the nomination is made that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder. Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

(e)     If the Board or the chairman of the meeting of stockholders determines that any nomination was not made in accordance with the provisions of this Section 3.2 or that the information provided in a stockholder's notice does not satisfy the information requirements of this Section 3.2, then such nomination shall not be considered at the meeting in question. Notwithstanding the foregoing provisions of this Section 3.2, if the stockholder (or a qualified representative of the stockholder) does not appear at the meeting of stockholders of the Corporation to present the nomination, such nomination shall be disregarded, notwithstanding that proxies in respect of such nomination may have been received by the Corporation.

(f)     In addition to the provisions of this Section 3.2, a stockholder shall also comply with all of the applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein. Nothing in this Section 3.2 shall be deemed to affect any rights of the holders of Preferred Stock to elect directors pursuant to the Certificate of Incorporation.

Section 3.3.    Compensation.  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board shall have the authority to fix the compensation of directors, including for service on a committee of the Board and may be paid either a fixed sum for attendance at each meeting of the Board or other compensation as director. The directors may be reimbursed their expenses, if any, of attendance at each meeting of the Board. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of committees of the Board may be allowed like compensation and reimbursement of expenses for service on the committee.

9

## ARTICLE IV

## BOARD MEETINGS

**Section 4.1. Annual Meetings**. The Board shall meet as soon as practicable after the adjournment of each annual stockholders meeting at the place of the annual stockholders meeting unless the Board shall fix another time and place and give notice thereof in the manner required herein for special meetings of the Board. No notice to the directors shall be necessary to legally convene this meeting, except as provided in this Section 4.1.

**Section 4.2. Regular Meetings**. Regularly scheduled, periodic meetings of the Board may be held without notice at such times, dates and places (within or without the State of Delaware) as shall from time to time be determined by the Board.

**Section 4.3. Special Meetings**. Special meetings of the Board (a) may be called by the Chairman of the Board, the Chief Executive Officer or President and (b) shall be called by the Chairman of the Board, the Chief Executive Officer, President or Secretary on the written request of at least a majority of directors then in office, or the sole director, as the case may be, and shall be held at such time, date and place (within or without the State of Delaware) as may be determined by the person calling the meeting or, if called upon the request of directors or the sole director, as specified in such written request. Notice of each special meeting of the Board shall be given, as provided in Section 9.3, to each director (i) at least 24 hours before the meeting if such notice is oral notice given personally or by telephone or written notice given by hand delivery or by means of a form of electronic transmission and delivery, (ii) at least two days before the meeting if such notice is sent by a nationally recognized overnight delivery service, and (iii) at least five days before the meeting if such notice is sent through the United States mail. If the Secretary shall fail or refuse to give such notice, then the notice may be given by the officer who called the meeting or the directors who requested the meeting. Any and all business that may be transacted at a regular meeting of the Board may be transacted at a special meeting. Except as may be otherwise expressly provided by applicable law, the Certificate of Incorporation, or these Bylaws, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting. A special meeting may be held at any time without notice if all the directors are present or if those not present waive notice of the meeting in accordance with Section 9.4.

**Section 4.4. Quorum; Required Vote**. A majority of the Board shall constitute a quorum for the transaction of business at any meeting of the Board, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by applicable law, the Certificate of Incorporation or these Bylaws. If a quorum shall not be present at any meeting, a majority of the directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

**Section 4.5. Consent In Lieu of Meeting**. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing (including by electronic

signature within the meaning of Section 116(a)(2) of the DGCL) or by electronic transmission, and the writing or writings or electronic transmission or transmissions (or paper reproductions thereof) are filed with the minutes of proceedings of the Board or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

       **Section 4.6.**   **Organization**.  The chairman of each meeting of the Board shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or in the absence (or inability or refusal to act) of the President or if the President is not a director, a chairman elected from the directors present.  The Secretary shall act as secretary of all meetings of the Board.  In the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary shall perform the duties of the Secretary at such meeting.  In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

<div align="center">

**ARTICLE V**

**COMMITTEES OF DIRECTORS**

</div>

       **Section 5.1.**   **Establishment**.  The Board may by resolution of the Board designate one or more committees, including, but not limited to, an Audit Committee, a Compensation Committee, a Compliance Committee and a Nominating and Corporate Governance Committee, each committee to consist of one or more of the directors of the Corporation.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  Each committee shall keep regular minutes of its meetings and report the same to the Board when required by the resolution designating such committee.  The Board shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.  The Board may abolish any such committee at any time.

       **Section 5.2.**   **Available Powers**.  Any committee established pursuant to Section 5.1 hereof, to the extent permitted by applicable law and by resolution of the Board, shall have and may exercise all of the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it.

       **Section 5.3.**   **Alternate Members**.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.

       **Section 5.4.**   **Procedures**.  Unless the Board otherwise provides, the time, date, place, if any, and notice of meetings of a committee shall be determined by such committee.  At meetings of a committee, a majority of the number of members of the committee (but not including any alternate member, unless such alternate member has replaced any absent or

<div align="center">11</div>

disqualified member at the time of, or in connection with, such meeting) shall constitute a quorum for the transaction of business. The act of a majority of the members present at any meeting at which a quorum is present shall be the act of the committee, except as otherwise specifically provided by applicable law, the Certificate of Incorporation, these Bylaws or the Board. If a quorum is not present at a meeting of a committee, the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. Unless the Board otherwise provides and except as provided in these Bylaws, each committee designated by the Board may make, alter, amend and repeal rules for the conduct of its business. In the absence of such rules each committee shall conduct its business in the same manner as the Board is authorized to conduct its business pursuant to Article IV of these Bylaws.

<center>

**ARTICLE VI**

**OFFICERS**

</center>

**Section 6.1.** **Officers**. The officers of the Corporation elected by the Board shall be a Chief Executive Officer, a Chief Operating Officer, a Chief Financial Officer, a Secretary and such other officers (including without limitation, a Chairman, Presidents, Vice Presidents, Assistant Secretaries and a Treasurer) as the Board from time to time may determine. Officers elected by the Board shall each have such powers and duties as generally pertain to their respective offices, subject to the specific provisions of this ARTICLE VI. Such officers shall also have such powers and duties as from time to time may be conferred by the Board. The Chief Executive Officer or President may also appoint such other officers (including without limitation one or more Vice Presidents and Controllers) as may be necessary or desirable for the conduct of the business of the Corporation. Such other officers shall have such powers and duties and shall hold their offices for such terms as may be provided in these Bylaws or as may be prescribed by the Board or, if such officer has been appointed by the Chief Executive Officer or President, as may be prescribed by the appointing officer.

(a) Chairman of the Board. The Chairman of the Board shall preside when present at all meetings of the stockholders and the Board. The Chairman of the Board shall have general supervision and control of the acquisition activities of the Corporation subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board with respect to such matters. In the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The powers and duties of the Chairman of the Board shall not include supervision or control of the preparation of the financial statements of the Company (other than through participation as a member of the Board). The position of Chairman of the Board and Chief Executive Officer may be held by the same person.

(b) Chief Executive Officer. The Chief Executive Officer shall be the chief executive officer of the Corporation, shall have general supervision of the affairs of the Corporation and general control of all of its business subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board with respect to such matters, except to the extent any such powers and duties have been prescribed to the Chairman of the Board pursuant to Section 6.1(a) above. In the absence (or inability or refusal to act) of the

<center>12</center>

Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The position of Chief Executive Officer and President may be held by the same person.

(c) President. The President shall make recommendations to the Chief Executive Officer on all operational matters that would normally be reserved for the final executive responsibility of the Chief Executive Officer. In the absence (or inability or refusal to act) of the Chairman of the Board and Chief Executive Officer, the President (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The President shall also perform such duties and have such powers as shall be designated by the Board. The position of President and Chief Executive Officer may be held by the same person.

(d) Chief Operating Officer. The Chief Operating Officer shall be the chief operating officer of the Corporation and shall, subject to the authority of the Chief Executive Officer, the President and the Board, have general management and control of the day-to-day business operations of the Corporation and shall consult with and report to the Chief Executive Officer. The Chief Operating Officer shall put into operation the business policies of the Corporation as determined by the Chief Executive Officer and the Board and as communicated to the Chief Operating Officer by the Chief Executive Officer and the Board.

(e) Vice Presidents. In the absence (or inability or refusal to act) of the President, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board) shall perform the duties and have the powers of the President. Any one or more of the Vice Presidents may be given an additional designation of rank or function.

(f) Secretary.

(i) The Secretary shall attend all meetings of the stockholders, the Board and (as required) committees of the Board and shall record the proceedings of such meetings in books to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, Chief Executive Officer or President. The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or any Assistant Secretary, shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary. The Board may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing thereof by his or her signature.

(ii) The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, if one has been appointed, a stock ledger, or duplicate stock ledger, showing the names of the stockholders and their addresses, the number and classes of shares held by each and, with respect to certificated shares, the number and date of certificates issued for the same and the number and date of certificates cancelled.

13

(g)  Assistant Secretaries.  The Assistant Secretary or, if there be more than one, the Assistant Secretaries in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Secretary, perform the duties and have the powers of the Secretary.

(h)  Chief Financial Officer.  The Chief Financial Officer shall perform all duties commonly incident to that office (including, without limitation, the care and custody of the funds and securities of the Corporation, which from time to time may come into the Chief Financial Officer's hands and the deposit of the funds of the Corporation in such banks or trust companies as the Board, the Chief Executive Officer or the President may authorize).

(i)  Treasurer.  The Treasurer shall, in the absence (or inability or refusal to act) of the Chief Financial Officer, perform the duties and exercise the powers of the Chief Financial Officer.

**Section 6.2.  Term of Office; Removal; Vacancies**.  The elected officers of the Corporation shall be appointed by the Board and shall hold office until their successors are duly elected and qualified or until their earlier death, resignation, retirement, disqualification, or removal from office.  Any officer may be removed, with or without cause, at any time by the Board.  Any officer appointed by the Chief Executive Officer or President may also be removed, with or without cause, by the Chief Executive Officer or President, as the case may be, unless the Board otherwise provides.  Any vacancy occurring in any elected office of the Corporation may be filled by the Board.  Any vacancy occurring in any office appointed by the Chief Executive Officer or President may be filled by the Chief Executive Officer, or President, as the case may be, unless the Board then determines that such office shall thereupon be elected by the Board, in which case the Board shall elect such officer.

**Section 6.3.  Other Officers.** The Board may delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove same, as it shall from time to time deem necessary or desirable.

**Section 6.4.  Multiple Officeholders; Stockholder and Director Officers**.  Any number of offices may be held by the same person unless the Certificate of Incorporation or these Bylaws otherwise provide.  Officers need not be stockholders or residents of the State of Delaware.

## ARTICLE VII

## SHARES

**Section 7.1.  Certificated and Uncertificated Shares**.  The shares of the Corporation may be certificated or uncertificated, subject to the sole discretion of the Board and the requirements of the DGCL.

**Section 7.2.  Multiple Classes of Stock**.  If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the Corporation shall (a) cause the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or

14

restrictions of such preferences and/or rights to be set forth in full or summarized on the face or back of any certificate that the Corporation issues to represent shares of such class or series of stock or (b) in the case of uncertificated shares, within a reasonable time after the issuance or transfer of such shares, send to the registered owner thereof a written notice containing the information required to be set forth on certificates as specified in clause (a) above; provided, however, that, except as otherwise provided by applicable law, in lieu of the foregoing requirements, there may be set forth on the face or back of such certificate or, in the case of uncertificated shares, on such written notice a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights.

Section 7.3.    **Signatures**.  Each certificate representing capital stock of the Corporation shall be signed by or in the name of the Corporation by the Chairman of the Board, the Chief Executive Officer, the President, Vice President, the Chief Financial Officer, the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Corporation or any other authorized officers of the Corporation.  Any or all of the signatures on the certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar on the date of issue.

Section 7.4.    **Consideration and Payment for Shares**.

(a)    Subject to applicable law and the Certificate of Incorporation, shares of stock may be issued for such consideration, having in the case of shares with par value a value not less than the par value thereof, and to such persons, as determined from time to time by the Board.  The consideration may consist of any tangible or intangible property or any benefit to the Corporation, including cash, promissory notes, services performed, contracts for services to be performed or other securities, or any combination thereof.

(b)    Subject to applicable law and the Certificate of Incorporation, shares may not be issued until the full amount of the consideration has been paid, unless upon the face or back of each certificate issued to represent any partly paid shares of capital stock or upon the books and records of the Corporation in the case of partly paid uncertificated shares, there shall have been set forth the total amount of the consideration to be paid therefor and the amount paid thereon up to and including the time said certificate representing certificated shares or said uncertificated shares are issued.

Section 7.5.    **Lost, Destroyed or Wrongfully Taken Certificates**.

(a)    If an owner of a certificate representing shares claims that such certificate has been lost, destroyed or wrongfully taken, the Corporation shall issue a new certificate representing such shares or such shares in uncertificated form if the owner: (i) requests such a new certificate before the Corporation has notice that the certificate representing such shares has been acquired by a protected purchaser; (ii) if requested by the Corporation, delivers to the

15

Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, wrongful taking or destruction of such certificate or the issuance of such new certificate or uncertificated shares; and (iii) satisfies other reasonable requirements imposed by the Corporation.

(b)  If a certificate representing shares has been lost, apparently destroyed or wrongfully taken, and the owner fails to notify the Corporation of that fact within a reasonable time after the owner has notice of such loss, apparent destruction or wrongful taking and the Corporation registers a transfer of such shares before receiving notification, the owner shall be precluded from asserting against the Corporation any claim for registering such transfer or a claim to a new certificate representing such shares or such shares in uncertificated form.

**Section 7.6.  Transfer of Stock**.

(a)  If a certificate representing shares of the Corporation is presented to the Corporation with an endorsement requesting the registration of transfer of such shares or an instruction is presented to the Corporation requesting the registration of transfer of uncertificated shares, the Corporation shall register the transfer as requested if:

(i)  in the case of certificated shares, the certificate representing such shares has been surrendered;

(ii)  (A) with respect to certificated shares, the endorsement is made by the person specified by the certificate as entitled to such shares; (B) with respect to uncertificated shares, an instruction is made by the registered owner of such uncertificated shares; or (C) with respect to certificated shares or uncertificated shares, the endorsement or instruction is made by any other appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(iii)  the Corporation has received a guarantee of signature of the person signing such endorsement or instruction or such other reasonable assurance that the endorsement or instruction is genuine and authorized as the Corporation may request;

(iv)  the transfer does not violate any restriction on transfer imposed by the Corporation that is enforceable in accordance with Section 7.8(a); and

(v)  such other conditions for such transfer as shall be provided for under applicable law have been satisfied.

(b)  Whenever any transfer of shares shall be made for collateral security and not absolutely, the Corporation shall so record such fact in the entry of transfer if, when the certificate for such shares is presented to the Corporation for transfer or, if such shares are uncertificated, when the instruction for registration of transfer thereof is presented to the Corporation, both the transferor and transferee request the Corporation to do so.

**Section 7.7.  Registered Stockholders**.  Before due presentment for registration of transfer of a certificate representing shares of the Corporation or of an instruction requesting registration of transfer of uncertificated shares, the Corporation may treat the registered owner as

16

the person exclusively entitled to inspect for any proper purpose the stock ledger and the other books and records of the Corporation, vote such shares, receive dividends or notifications with respect to such shares and otherwise exercise all the rights and powers of the owner of such shares, except that a person who is the beneficial owner of such shares (if held in a voting trust or by a nominee on behalf of such person) may, upon providing documentary evidence of beneficial ownership of such shares and satisfying such other conditions as are provided under applicable law, may also so inspect the books and records of the Corporation.

**Section 7.8.    Effect of the Corporation's Restriction on Transfer**.

(a)    A written restriction on the transfer or registration of transfer of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, if permitted by the DGCL and noted conspicuously on the certificate representing such shares or, in the case of uncertificated shares, contained in a notice, offering circular or prospectus sent by the Corporation to the registered owner of such shares within a reasonable time prior to or after the issuance or transfer of such shares, may be enforced against the holder of such shares or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

(b)    A restriction imposed by the Corporation on the transfer or the registration of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, even if otherwise lawful, is ineffective against a person without actual knowledge of such restriction unless: (i) the shares are certificated and such restriction is noted conspicuously on the certificate; or (ii) the shares are uncertificated and such restriction was contained in a notice, offering circular or prospectus sent by the Corporation to the registered owner of such shares within a reasonable time prior to or after the issuance or transfer of such shares.

**Section 7.9.    Regulations**.  The Board shall have power and authority to make such additional rules and regulations, subject to any applicable requirement of law, as the Board may deem necessary and appropriate with respect to the issue, transfer or registration of transfer of shares of stock or certificates representing shares.  The Board may appoint one or more transfer agents or registrars and may require for the validity thereof that certificates representing shares bear the signature of any transfer agent or registrar so appointed.

## ARTICLE VIII

## INDEMNIFICATION

**Section 8.1.    Right to Indemnification**.  To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify, defend and hold harmless each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit, or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation to procure a judgment in its favor (hereinafter a "**proceeding**"), by reason of the fact that he or she is or was a director or officer of the Corporation or any of its

17

subsidiaries or, while a director or officer of the Corporation or any of its subsidiaries or, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (hereinafter an "**Indemnitee**"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, against all liability and loss suffered and expenses (including, without limitation, attorneys' fees and disbursements, judgments, fines, Employment Retirement Income Security Act of 1974 excise taxes, damages, claims and penalties and amounts paid in settlement) reasonably incurred by such Indemnitee in connection with such proceeding; provided, however, that, except as provided in Section 8.3 with respect to proceedings to enforce rights to indemnification (which are, for the avoidance of doubt, indemnified proceedings) and advancement of expenses, the Corporation shall indemnify an Indemnitee in connection with a proceeding (or part thereof) initiated by such Indemnitee only if such proceeding (or part thereof) was, or is, authorized by the Board.

> **Section 8.2.     Right to Advancement of Expenses**.  In addition to the right to indemnification conferred in Section 8.1, the Corporation shall to the fullest extent not prohibited by applicable law pay as incurred the expenses (including, without limitation, attorneys' fees) incurred by an Indemnitee in defending or otherwise participating in any such proceeding in advance of its final disposition, including by making payment directly to applicable third parties if requested by the Indemnitee (hereinafter an "**advancement of expenses**"); provided, however, that to the extent required by applicable law, an advancement of expenses incurred by an Indemnitee in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon the Corporation's receipt of an undertaking (hereinafter an "**undertaking**"), by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined that such Indemnitee is not entitled to be indemnified under this Article VIII or otherwise.

> **Section 8.3.     Right of Indemnitee to Bring Suit**.  If a claim under Section 8.1 or Section 8.2 is not paid in full by the Corporation within 60 days after a written claim therefor has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnitee shall also be entitled to be paid the expense of prosecuting or defending such suit.  In (a) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by an Indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (b) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final judicial decision from which there is no further right to appeal (hereinafter a "**final adjudication**") that, the Indemnitee has not met any applicable standard for indemnification set forth in the DGCL. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is

18

proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including a determination by its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, shall be a defense to such suit. In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE VIII or otherwise shall be on the Corporation.

Section 8.4.    **Non-Exclusivity of Rights**.  The rights provided to any Indemnitee pursuant to this ARTICLE VIII shall not be exclusive of any other right, which such Indemnitee may have or hereafter acquire under applicable law, the Certificate of Incorporation, these Bylaws, an agreement, a vote of stockholders or disinterested directors, or otherwise.

Section 8.5.    **Insurance**.  The Corporation may secure and maintain insurance, at its expense, to protect itself and/or any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

Section 8.6.    **Indemnification of Other Persons**.  This ARTICLE VIII shall not limit the right of the Corporation to the extent and in the manner authorized or permitted by law to indemnify and to advance expenses to persons other than Indemnitees.  Without limiting the foregoing, the Corporation may, to the extent authorized from time to time by the Board, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation and to any other person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, to the fullest extent of the provisions of this ARTICLE VIII with respect to the indemnification and advancement of expenses of Indemnitees under this ARTICLE VIII.

Section 8.7.    **Amendments**.  Any repeal or amendment of this ARTICLE VIII by the Board or the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of these Bylaws inconsistent with this ARTICLE VIII, will, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide broader indemnification rights to Indemnitees on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision; provided however, that amendments or repeals of this ARTICLE VIII shall require the affirmative vote of the stockholders holding at least 65% of the voting power of all outstanding shares of capital stock of the Corporation.

**Section 8.8.    Certain Definitions**.  For purposes of this <u>ARTICLE VIII</u>, (a) references to "other enterprise" shall include any employee benefit plan; (b) references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; (c) references to "serving at the request of the Corporation" shall include any service that imposes duties on, or involves services by, a person with respect to any employee benefit plan, its participants, or beneficiaries; and (d) a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Corporation" for purposes of Section 145 of the DGCL.

**Section 8.9.    Contract Rights**.  The rights provided to Indemnitees pursuant to this <u>ARTICLE VIII</u> shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, agent or employee and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.1.    Place of Meetings**.  If the place of any meeting of stockholders, the Board or committee of the Board for which notice is required under these Bylaws is not designated in the notice of such meeting, such meeting shall be held at the principal business office of the Corporation; provided, however, if the Board has, in its sole discretion, determined that a meeting shall not be held at any place, but instead shall be held by means of remote communication pursuant to <u>Section 9.5</u> hereof, then such meeting shall not be held at any place.

**Section 9.2.    Fixing Record Dates**.

(a)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this <u>Section 9.2(a)</u> at the adjourned meeting.

20

(b)      In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

**Section 9.3.    Means of Giving Notice**.

(a)      Notice to Directors.  Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any director, such notice shall be given either (i) in writing, given by hand delivery, or sent by mail, or by a nationally recognized delivery service, (ii) by means of facsimile telecommunication or other form of electronic transmission, or (iii) by oral notice given personally or by telephone.  A notice to a director will be deemed given as follows: (i) if given by hand delivery, orally, or by telephone, when actually received by the director, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iv) if sent by facsimile telecommunication, when sent to the facsimile transmission number for such director appearing on the records of the Corporation, (v) if sent by electronic mail, when sent to the electronic mail address for such director appearing on the records of the Corporation, or (vi) if sent by any other form of electronic transmission, when sent to the address, location or number (as applicable) for such director appearing on the records of the Corporation.

(b)      Notice to Stockholders. Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any stockholder, such notice may be given (i) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (ii) by means of a form of electronic transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in Section 232 of the DGCL. A notice to a stockholder shall be deemed given as follows: (i) if given by hand delivery, when actually received by the stockholder, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, (iv) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by Section 232(e) of the DGCL, and (v) if given by a form of electronic transmission consented to by the stockholder to whom the notice is given and otherwise meeting the requirements set forth above, (A) if by facsimile telecommunication, when directed to a number

21

at which the stockholder has consented to receive notice, (B) if by a posting on an electronic network together with separate notice to the stockholder of such specified posting, upon the later of (1) such posting and (2) the giving of such separate notice, and (C) if by any other form of electronic transmission, when directed to the stockholder. A stockholder may revoke such stockholder's consent to receiving notice by means of electronic transmission by giving written notice or electronic transmission of such revocation to the Corporation. Any such consent shall be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or an Assistant Secretary or to the Corporation's transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.

(c)     Electronic Transmission.  The term "**electronic transmission**" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process, including but not limited to transmission by telex, facsimile telecommunication, electronic mail or messaging, telegram and cablegram.

(d)     Notice to Stockholders Sharing Same Address.  Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given.  A stockholder may revoke such stockholder's consent by delivering written notice of such revocation to the Corporation.  Any stockholder who fails to object in writing to the Corporation within 60 days of having been given written notice by the Corporation of its intention to send such a single written notice shall be deemed to have consented to receiving such single written notice.

(e)     Exceptions to Notice Requirements.  Whenever notice is required to be given, under the DGCL, the Certificate of Incorporation or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person.  Any action or meeting that shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.  In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Whenever notice is required to be given by the Corporation, under any provision of the DGCL, the Certificate of Incorporation or these Bylaws, to any stockholder to whom (1) notice of two consecutive annual meetings of stockholders and all notices of stockholder meetings to such

22

stockholder during the period between such two consecutive annual meetings, or (2) all, and at least two payments (if sent by first-class mail) of dividends or interest on securities during a 12-month period, have been mailed addressed to such stockholder at such stockholder's address as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required.  Any action or meeting that shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given.  If any such stockholder shall deliver to the Corporation a written notice setting forth such stockholder's then current address, the requirement that notice be given to such stockholder shall be reinstated.  In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to Section 230 (b) of the DGCL.  The exception in subsection (1) of the first sentence of this paragraph to the requirement that notice be given shall not be applicable to any notice returned as undeliverable if the notice was given by electronic transmission.

Section 9.4.    **Waiver of Notice**.  Whenever any notice is required to be given under applicable law, the Certificate of Incorporation, or these Bylaws, a written waiver of such notice, signed (including by electronic signature within the meaning of Section 116(a)(2) of the DGCL) by the person or persons entitled to said notice, or a waiver by electronic transmission by the person entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to such required notice. All such waivers shall be kept with the books of the Corporation. Attendance at a meeting shall constitute a waiver of notice of such meeting, except where a person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 9.5.    **Meeting Attendance via Remote Communication Equipment**.

(a)    Stockholder Meetings.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders entitled to vote at such meeting and proxy holders not physically present at a meeting of stockholders may, by means of remote communication:

(i)    participate in a meeting of stockholders; and

(ii)    be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxy holder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxy holders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxy holder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

23

(b)      Board Meetings.  Unless otherwise restricted by applicable law, the Certificate of Incorporation or these Bylaws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 9.6.   **Dividends**.  The Board may from time to time declare, and the Corporation may pay, dividends (payable in cash, property or shares of the Corporation's capital stock) on the Corporation's outstanding shares of capital stock, subject to applicable law and the Certificate of Incorporation.

Section 9.7.   **Reserves**.  The Board may set apart out of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

Section 9.8.   **Contracts and Negotiable Instruments**.  Except as otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws, any contract, bond, deed, lease, mortgage or other instrument may be executed and delivered in the name and on behalf of the Corporation by such officer or officers or other employee or employees of the Corporation as the Board may from time to time authorize.  Such authority may be general or confined to specific instances as the Board may determine.  The Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer or any Vice President may execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation.  Subject to any restrictions imposed by the Board, the Chairman of the Board Chief Executive Officer, President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer or any Vice President may delegate powers to execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation to other officers or employees of the Corporation under such person's supervision and authority, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

Section 9.9.   **Fiscal Year**.  The fiscal year of the Corporation shall be fixed by the Board.

Section 9.10.  **Seal**.  The Board may adopt a corporate seal, which shall be in such form as the Board determines.  The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 9.11.  **Books and Records**.  The books and records of the Corporation may be kept within or outside the State of Delaware at such place or places as may from time to time be designated by the Board.

24

**Section 9.12. Resignation**. Any director, committee member or officer may resign by giving notice thereof in writing or by electronic transmission to the Chairman of the Board, the Chief Executive Officer, the President or the Secretary. The resignation shall take effect at the time it is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 9.13. Surety Bonds**. Such officers, employees and agents of the Corporation (if any) as the Chairman of the Board, Chief Executive Officer, President or the Board may direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chairman of the Board, Chief Executive Officer, President or the Board may determine. The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

**Section 9.14. Securities of Other Corporations**. Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chairman of the Board, Chief Executive Officer, President, or any officers authorized by the Board. Any such officer, may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed. The Board may from time to time confer like powers upon any other person or persons.

**Section 9.15. Amendments**. The Board shall have the power to adopt, amend, alter or repeal the Bylaws. The affirmative vote of a majority of the Board shall be required to adopt, amend, alter or repeal the Bylaws. The Bylaws also may be adopted, amended, altered or repealed by the stockholders; provided, however, that in addition to any vote of the holders of any class or series of capital stock of the Corporation required by applicable law or the Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting (except as otherwise provided in Section 8.7) power of all outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders to adopt, amend, alter or repeal the Bylaws.

**Section 9.16. Exclusive Jurisdiction**. Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring: (a) any derivative action or proceeding brought on behalf of the Corporation; (b) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders; (c) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any

25

provision of the DGCL or the Corporation's certificate of incorporation or bylaws; or (d) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of "(a)" through "(d)" above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933. To the fullest extent permitted by law, any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 9.16. If any provision or provisions of this Section 9.16 shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Section 9.16 (including, without limitation, each portion of any sentence of this Section 9.16 containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

Section 9.17.  **Severability**.  If any provision or provisions of these Bylaws shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of these Bylaws shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of these Bylaws (including, without limitation, each such portion of these Bylaws containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

**EXHIBIT C**

**Form of Subscription Agreement**

EXECUTION VERSION

## FORM OF SUBSCRIPTION AGREEMENT

This SUBSCRIPTION AGREEMENT (this "**Subscription Agreement**") is entered into this 21st day of February, 2021, by and between Fortress Value Acquisition Corp. II, a Delaware corporation (the "**Company**"), and the undersigned ("**Subscriber**" or "**you**"). Defined terms used but not otherwise defined herein shall have the respective meanings ascribed thereto in the Transaction Agreement (as defined below).

WHEREAS, the Company and the other parties named therein are, substantially concurrently with the execution of this Subscription Agreement, entering into that certain Agreement and Plan of Merger, dated as of February 21st, 2021 (the "**Transaction Agreement**"), pursuant to which the Company will acquire Wilco Holdco, Inc., a Delaware corporation (the "**Target**"), on the terms and subject to the conditions set forth therein (the "**Transaction**");

WHEREAS, in connection with the Transaction, Subscriber desires to subscribe for and purchase from the Company that number of the Company's Class A common stock, par value $0.0001 per share (the "**Common Stock**"), set forth on the signature page hereto (the "**Shares**") for a purchase price of $10.00 per share (the "**Per Share Price**"), or the aggregate purchase price set forth on the signature page hereto (the "**Purchase Price**"), and the Company desires to issue and sell to Subscriber the Shares in consideration of the payment of the Purchase Price by or on behalf of Subscriber to the Company on or prior to the Closing (as defined below); and

WHEREAS, in connection with the Transaction, certain other institutional "accredited investors" (within the meaning of Rule 501(a) under the Securities Act of 1933, as amended (the "**Securities Act**")) have entered into separate subscription agreements (each such other accredited investor, an "**Other Subscriber**" and each such separate subscription agreement, an "**Other Subscription Agreement**") with the Company, pursuant to which such investors have, together with the Subscriber pursuant to this Subscription Agreement, agreed to purchase an aggregate of 30,000,000 shares of Common Stock at the Per Share Price.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties and covenants, and subject to the conditions, herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1.      Subscription. Subject to the terms and conditions hereof, Subscriber hereby agrees to subscribe for and purchase, and the Company hereby agrees to issue and sell to Subscriber, upon the payment of the Purchase Price, the Shares (such subscription and issuance, the "**Subscription**").

2.      Representations, Warranties and Agreements.

2.1      Subscriber's Representations, Warranties and Agreements. To induce the Company to issue the Shares to Subscriber, Subscriber hereby represents and warrants to the Company and the Placement Agents (as defined herein) and agrees with the Company and the Placement Agents as follows:

2.1.1     If Subscriber is not an individual, Subscriber has been duly formed or incorporated and is validly existing in good standing under the laws of its jurisdiction of

incorporation or formation, with power and authority to enter into, deliver and perform its obligations under this Subscription Agreement. If Subscriber is an individual, Subscriber has the authority to enter into, deliver and perform its obligations under this Subscription Agreement.

2.1.2   If Subscriber is not an individual, this Subscription Agreement has been duly authorized, executed and delivered by Subscriber. If Subscriber is an individual, the signature on this Subscription Agreement is genuine, and Subscriber has legal competence and capacity to execute the same. Assuming that this Subscription Agreement constitutes the valid and binding agreement of the Company, this Subscription Agreement is enforceable against Subscriber in accordance with its terms, except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

2.1.3   The execution, delivery and performance by Subscriber of this Subscription Agreement and the consummation of the transactions contemplated herein will not (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of Subscriber or any of its subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which Subscriber or any of its subsidiaries is a party or by which Subscriber or any of its subsidiaries is bound or to which any of the property or assets of Subscriber or any of its subsidiaries is subject, which would reasonably be expected to have a material adverse effect on the Subscriber's ability or legal authority of the Subscriber to timely comply in all material respects with the terms of this Subscription Agreement (a "**Subscriber Material Adverse Effect**"); (ii) if Subscriber is not an individual, result in any violation of the provisions of the organizational documents of Subscriber or any of its subsidiaries; or (iii) result in any violation of any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over Subscriber or any of its subsidiaries or any of their respective properties that would reasonably be expected to have a Subscriber Material Adverse Effect.

2.1.4   Subscriber (i) is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an institutional "accredited investor" (within the meaning of Rule 501(a) under the Securities Act) satisfying the applicable requirements set forth on Schedule A. (ii) is acquiring the Shares only for its own account and not for the account of others, or if Subscriber is subscribing for the Shares as a fiduciary or agent for one or more investor accounts, each owner of such account is an "accredited investor" and Subscriber has full investment discretion with respect to each such account, and the full power and authority to make the acknowledgements, representations and agreements herein on behalf of each owner of each such account, and (iii) is not acquiring the Shares with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act or any other securities laws of the United States or any other jurisdiction (and shall provide the requested information on Schedule A following the signature page hereto). Subscriber is not an entity formed for the specific purpose of acquiring the Shares. Subscriber understands and acknowledges that the purchase of the Shares pursuant to this Subscription Agreement meets the exemptions from filing under FINRA Rule 5123(b)(1)(C) or (J).

2.1.5    Subscriber understands that the Shares are being offered in a transaction not involving any public offering within the meaning of the Securities Act and that the Shares have not been registered under the Securities Act or any other securities laws of the United States or any other jurisdiction. Subscriber understands that the Shares may not be resold, transferred, pledged or otherwise disposed of by Subscriber absent an effective registration statement under the Securities Act with respect to the Shares or where an applicable exemption from the registration requirements of the Securities Act is available, and that any certificates or book entries representing the Shares shall contain a legend to such effect. Subscriber acknowledges that the Shares will not be eligible for resale pursuant to Rule 144A promulgated under the Securities Act. Subscriber understands and agrees that the Shares will be subject to transfer restrictions and, as a result of these transfer restrictions, Subscriber may not be able to readily resell the Shares and may be required to bear the financial risk of an investment in the Shares for an indefinite period of time. Subscriber understands that it has been advised to consult legal counsel prior to making any offer, resale, pledge or transfer of any of the Shares.

2.1.6    Subscriber understands and agrees that Subscriber is purchasing the Shares directly from the Company. Subscriber further acknowledges that there have been no representations, warranties, covenants and agreements made to Subscriber by the Company or any of its officers, directors or representatives, expressly or by implication, other than those representations, warranties, covenants and agreements included in this Subscription Agreement.

2.1.7    Subscriber represents and warrants that (i) it is not a Benefit Plan Investor as contemplated by the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or (ii) its acquisition and holding of the Shares will not constitute or result in a non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended, Section 4975 of the Internal Revenue Code of 1986, as amended, or any applicable similar law.

2.1.8    In making its decision to purchase the Shares, Subscriber represents that it has relied solely upon independent investigation made by Subscriber and the Company's representations in Section 2.2. The Subscriber acknowledges and agrees that the Subscriber has received and has had an adequate opportunity to review, such financial and other information as the Subscriber deems necessary in order to make an investment decision with respect to the Shares and made its own assessment and is satisfied concerning the relevant tax and other economic considerations relevant to the Subscriber's investment in the Shares. Without limiting the generality of the foregoing, the Subscriber acknowledges that it has had an adequate opportunity to review the documents provided to the Subscriber by or on behalf of the Company. The Subscriber represents and agrees that the Subscriber and the Subscriber's professional advisor(s), if any, have had the opportunity to ask such questions, receive such answers and obtain such information as the Subscriber and such Subscriber's professional advisor(s), if any, have deemed necessary to make an investment decision with respect to the Shares. The Subscriber acknowledges that no disclosure or any information received by the Subscriber has been prepared by any of Barclays Capital Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc. and/or BofA Securities, Inc. (collectively, the "**Placement Agents**") and that the Placement Agents and their respective directors, officers, employees, representatives and controlling persons have made no independent investigation with respect to the Company, the Target or the Shares or the accuracy, completeness or adequacy of any information supplied to the Subscriber by the Company. The

3

Subscriber acknowledges that it has not relied on any statements or other information provided by the Placement Agents or any of the Placement Agents' affiliates with respect to its decision to invest in the Shares, including information related to the Company, the Shares and the offer and sale of the Shares. The information provided to the Subscriber is preliminary and subject to change, and any changes to such information, including, without limitation, any changes based on updated information or changes in terms of the Transaction, shall in no way affect the Subscriber's obligation to purchase the Shares hereunder, except as otherwise set forth in this Subscription Agreement.

2.1.9    Subscriber became aware of this offering of the Shares solely by means of direct contact from the Placement Agents or directly from the Company as a result of a pre-existing, substantial relationship with the Company, and the Shares were offered to Subscriber solely by direct contact between Subscriber and any of the Placement Agents or the Company. Subscriber did not become aware of this offering of the Shares, nor were the Shares offered to Subscriber, by any other means. Subscriber acknowledges that the Placement Agents have not acted as its financial advisor or fiduciary. Subscriber acknowledges that the Company represents and warrants that the Shares were not offered by any form of advertising, or, to the Subscriber's knowledge, general solicitation (within the meaning of Regulation D).

2.1.10   Subscriber acknowledges that it is aware that there are substantial risks incident to the purchase and ownership of the Shares, including those set forth in the forms, reports, registration statements and other documents filed by the Company with the Securities and Exchange Commission (the "**SEC**") prior to the date of this Subscription Agreement. Subscriber has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares, and Subscriber has sought such accounting, legal and tax advice as Subscriber has considered necessary to make an informed investment decision. Subscriber understands and acknowledges that the purchase and sale of the Shares hereunder meets (i) the exemptions from filing under FINRA Rule 5123(b)(1)(A) and (ii) the institutional customer exemption under FINRA Rule 2111(b).

2.1.11   Alone, or together with any professional advisor(s), Subscriber represents and acknowledges that Subscriber has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the investment in the Shares, has adequately analyzed and fully considered the risks of an investment in the Shares and determined that the Shares are a suitable investment for Subscriber and that Subscriber is able at this time and in the foreseeable future to bear the economic risk of a total loss of Subscriber's investment in the Company. Subscriber further acknowledges specifically that a possibility of total loss of investment exists and that it is able to fend for itself in the transactions contemplated herein.

2.1.12   Subscriber understands and agrees that no federal or state agency has passed upon or endorsed the merits of the offering of the Shares or made any findings or determination as to the fairness of this investment.

2.1.13   Subscriber represents and warrants that Subscriber is not (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or in any Executive Order issued by the President of the United States and administered by OFAC ("**OFAC**

4

**List**"), or a person or entity prohibited by any OFAC sanctions program, (ii) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (iii) a non-U.S. shell bank or providing banking services indirectly to a non-U.S. shell bank. Subscriber represents that if it is a financial institution subject to the Bank Secrecy Act (31 U.S.C. Section 5311 et seq.) (the "**BSA**"), as amended by the USA PATRIOT Act of 2001 (the "**PATRIOT Act**"), and its implementing regulations (collectively, the "**BSA/PATRIOT Act**"), that Subscriber maintains policies and procedures reasonably designed to comply with applicable obligations under the BSA/PATRIOT Act. Subscriber also represents that, to the extent required by applicable law and regulation, it maintains policies and procedures reasonably designed for the screening of its investors against the OFAC sanctions programs, including the OFAC List. Subscriber further represents and warrants that, to the extent required by applicable law and regulation, it maintains policies and procedures reasonably designed to ensure that the funds held by Subscriber and used to purchase the Shares were legally derived.

2.1.14  Subscriber has, and at the Closing, will have sufficient funds to pay the Purchase Price pursuant to Section 3.1.

2.1.15  Without limitation of the foregoing, the Subscriber hereby further acknowledges and agrees that (i) the Placement Agent is acting solely as placement agent in connection with the transactions contemplated hereby and is not acting as an underwriter, initial purchaser, dealer or in any other such capacity and is not and shall not be construed as a fiduciary for the Subscriber, the Company or any other person or entity in connection with the transactions contemplated hereby, (ii) the Placement Agent has not made and will not make any representation or warranty, whether express or implied, of any kind or character and have not provided any advice or recommendation in connection with the transactions contemplated hereby, and (iii) the Placement Agent will have no responsibility with respect to (A) any representations, warranties or agreements made by any person or entity under or in connection with the transactions contemplated hereby or any of the documents furnished pursuant thereto or in connection therewith, or the execution, legality, validity or enforceability (with respect to any person) of any thereof, or (B) the financial condition, business, or any other matter concerning the Company or the transactions contemplated hereby.  The Subscriber will not look to the Placement Agents for all or part of any such loss or losses the Subscriber may suffer and is able to sustain a complete loss on its investment in the Shares. The Subscriber (for itself and for each account for which the Subscriber is acquiring the Shares) acknowledges that such Subscriber is aware that Citigroup Global Markets Inc. and Barclays Capital Inc. are acting as the Company's Placement Agents in connection with this Subscription Agreement and are also acting as financial advisors to the Target in connection with the Transaction.

2.1.16  Subscriber has no binding arrangement in place to sell, transfer or otherwise dispose of any of the Shares.

2.2     Company's Representations, Warranties and Agreements. To induce Subscriber to purchase the Shares, the Company hereby represents and warrants to Subscriber and the Placement Agents and agrees with Subscriber and the Placement Agents as follows:

2.2.1    The Company has been duly incorporated and is validly existing as a corporation in good standing under the Delaware General Corporation Law (the "**DGCL**"), with

5

corporate power and authority to own, lease and operate its properties and conduct its business as presently conducted and to enter into, deliver and perform its obligations under this Subscription Agreement.

2.2.2    The Shares have been duly authorized and, when issued and delivered to Subscriber against full payment for the Shares in accordance with the terms of this Subscription Agreement, the Shares will be validly issued, fully paid and non-assessable and the Shares will not have been authorized in violation of or subject to any preemptive or similar rights created under the Company's amended and restated certificate of incorporation or under the DGCL.

2.2.3    This Subscription Agreement, the Other Subscription Agreements and the Transaction Agreement have been duly authorized, executed and delivered by the Company and are enforceable against it in accordance with their terms, except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

2.2.4    The execution, delivery and performance of this Subscription Agreement (including compliance by the Company with all of the provisions hereof), the issuance and sale of the Shares and the compliance by the Company with all of the provisions of this Subscription Agreement and the consummation of the certain other transactions contemplated herein will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute (i) a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of the Company pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which the Company is a party or by which the Company is bound or to which any of the property or assets of the Company is subject, which would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, properties, financial condition, stockholders' equity or results of operations of the Company and its subsidiaries, if any, or on the validity of the Shares or the ability or legal authority of the Company to timely comply in all material respects with the terms of this Subscription Agreement (a "**Material Adverse Effect**"); (ii) result in any violation of the provisions of the organizational documents of the Company; or (iii) result in any violation of any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its properties that would reasonably be expected to have a Material Adverse Effect.

2.2.5    The issued and outstanding Common Stock is registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), and are listed for trading on the New York Stock Exchange (the "**NYSE**"). There is no suit, action, proceeding or investigation pending against the Company by the NYSE or the SEC with respect to any intention by such entity to deregister the Common Stock or prohibit or terminate the listing of the Common Stock on the NYSE. The Company has taken no action that is designed to terminate the registration of the Common Stock under the Exchange Act.

2.2.6    As of the date hereof and as of immediately prior to the Closing, the authorized capital stock of the Company is 221,000,000 shares, consisting of (a) 200,000,000 Class

6

A Common Stock, (b) 20,000,000 shares of Class F common stock, par value $0.0001 per share, and (c) 1,000,000 shares of preferred stock, par value $0.0001 per share. As of the date hereof: (i) no shares of preferred stock are issued and outstanding; (ii) 34,500,000 shares of Class A Common Stock are issued and outstanding; (iii) 8,625,000 shares of Class F common stock are issued and outstanding; (iv) 5,933,333 private placement warrants to purchase 5,933,333 shares of Class A Common Stock are outstanding and (v) 6,900,000 public warrants to purchase 6,900,000 shares of Class A Common Stock are outstanding. All (A) issued and outstanding shares of Class A Common Stock and shares of Class F common stock have been duly authorized and validly issued, are fully paid and are non-assessable and are not subject to preemptive rights and (B) outstanding private placement warrants and public warrants have been duly authorized and validly issued, are fully paid and are not subject to preemptive rights. Except as set forth above and pursuant to the Other Subscription Agreements, that certain letter agreement, dated the date hereof, by and among the Company, the Sponsor and the other parties named therein (the "**Sponsor Letter Agreement**"), and the Transaction Agreement, there are no outstanding options, warrants or other rights to subscribe for, purchase or acquire from the Company any shares of Class A Common Stock or other equity interests in the Company, or securities convertible into or exchangeable or exercisable for such equity interests.

2.2.7    The Company is not, and immediately after receipt of payment for the Shares will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.2.8    Assuming the accuracy of the representations and warranties of Subscriber, the Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority, self-regulatory organization (including the New York Stock Exchange (the "**Stock Exchange**")) or other person in connection with the execution, delivery and performance of this Subscription Agreement (including, without limitation, the issuance of the Shares), other than (i) filings required by applicable federal or state securities laws, (ii) the filing of the Registration Statement pursuant to Section 4 below, (iii) the filing of a Notice of Exempt Offering of Securities on Form D with the SEC under Regulation D of the Securities Act, if applicable, (iv) those required by the Stock Exchange, including with respect to obtaining stockholder approval, (v) those required to consummate the Transaction as provided under the Transaction Agreement, and (vi) the failure of which to obtain would not be reasonably likely to have a Material Adverse Effect.

2.2.9    The Company has made available to Subscriber (including via the SEC EDGAR system) a true, correct and complete copy of each form, report, statement, schedule, prospectus, proxy, registration statement and other documents filed by the Company with the SEC prior to the date of this Subscription Agreement (the "**SEC Documents**"), which SEC Documents, as of their respective filing dates, complied in all material respects with the requirements of the Exchange Act and the applicable rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the SEC with respect thereto as in effect at the time of filing and fairly present in all material respects the financial position of the Company as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited

7

statements, to normal, year-end audit adjustments. The Company has timely filed each report, statement, schedule, prospectus, and registration statement that the Company was required to file with the SEC since its initial registration of the Common Stock under the Exchange Act. As of the date of this Subscription Agreement, there are no material outstanding or unresolved comments in comment letters from the staff of the Division of Corporation Finance of the SEC with respect to any of the SEC Documents.

2.2.10 Assuming the accuracy of Subscriber's representations and warranties set forth in Section 2.1 of this Subscription Agreement, no registration under the Securities Act is required for the offer and sale of the Shares by the Company to Subscriber in the manner contemplated by this Subscription Agreement.

2.2.11 Neither the Company, nor any person acting on its or their behalf has, directly or indirectly, made any offers or sales of any Company security or solicited any offers to buy any security, under circumstances that would adversely affect reliance by the Company on Section 4(a)(2) of the Securities Act for the exemption from registration for the transactions contemplated hereby or would require registration of the Shares under the Securities Act.

2.2.12 The Company has provided Subscriber an opportunity to ask questions regarding the Company and made available to Subscriber all the information reasonably available to the Company that Subscriber has requested for deciding whether to acquire the Shares.

2.2.13 Except for the Placement Agents, no broker or finder is entitled to any brokerage or finder's fee or commission solely in connection with the sale of the Shares to Subscriber.

2.2.14 Upon consummation of the Transaction, the issued and outstanding Common Stock will continue to be registered pursuant to Section 12(b) of the Exchange Act and will be listed for trading on the Stock Exchange or the Nasdaq Capital Market, the Nasdaq Global Market or the Nasdaq Global Select Market.

2.2.15 No Other Subscription Agreement includes terms and conditions that are materially more advantageous to any such Other Subscriber than Subscriber hereunder, in each case, other than terms particular to the regulatory requirements of such subscriber or its affiliates or related funds. The Other Subscription Agreements have not been amended in any material respect following the date of this Subscription Agreement and reflect the same purchase price per share and terms that are not materially more advantageous to any such Other Subscriber thereunder than the terms of this Subscription Agreement other than terms particular to the regulatory requirements of such subscriber or its affiliates or related funds.

3. Settlement Date and Delivery.

3.1 Closing. The closing of the Subscription contemplated hereby (the "**Closing**") is contingent upon the substantially concurrent consummation of the Transaction. The Closing shall occur on the closing date of the Transaction (the "**Closing Date**"). Upon not less than three (3) business days' written notice from (or on behalf of) the Company to Subscriber (the "**Closing Notice**") that the Company reasonably expects all conditions to the closing of the Transaction to be satisfied on a date that is not less than three (3) business days from the date of

the Closing Notice, Subscriber shall deliver to the Company at least two (2) business days' prior to the Closing Date or such other date prior to the Closing Date as otherwise agreed to by the Company and the Subscriber, to be held in escrow until the Closing, the Purchase Price for the Shares by wire transfer of United States dollars in immediately available funds to the account specified by the Company in the Closing Notice against delivery by the Company to Subscriber of the Shares in book-entry form on the Closing Date. On the Closing Date, the Company shall deliver to Subscriber (i) at the Closing, the Shares in book entry form, free and clear of any liens or other restrictions (other than those arising under this Subscription Agreement or applicable securities laws), in the name of Subscriber (or its nominee in accordance with its delivery instructions), and (ii) as promptly as practicable after the Closing, evidence from the Company's transfer agent of the issuance to Subscriber of the Shares on and as of the Closing Date. In the event the Closing does not occur on the Closing Date, the Company shall promptly (but not later than two (2) business days thereafter) return the Purchase Price to Subscriber by wire transfer in immediately available funds to the account specified in writing by Subscriber. Notwithstanding anything herein to the contrary, in the event the parties to the Transaction Agreement agree to postpone the Closing Date, the Company shall have the right to change the Closing Date from the date specified in the Closing Notice to such Closing Date after giving effect to such postponement.

3.2     Conditions to Closing of Both Parties. The Closing shall be subject to the conditions that, on the Closing Date:

3.2.1    No suspension of the qualification of the Shares for offering or sale or trading in any jurisdiction in the United States, or suspension of listing, or qualification of the Shares for listing, on the NYSE, or initiation or threatening in writing of any proceedings for any of such purposes, shall have occurred and be continuing.

3.2.2    No governmental authority in the United States shall have enacted, issued, promulgated, enforced or entered any judgment, order, rule or regulation (whether temporary, preliminary or permanent) which is then in effect and has the effect of making consummation of the transactions contemplated hereby illegal or otherwise preventing or prohibiting consummation of the transactions contemplated hereby.

3.2.3    All conditions precedent to the closing of the Transaction set forth in the Transaction Agreement shall have been satisfied or waived in the sole determination of the parties to the Transaction Agreement (other than those conditions that, by their nature, may only be satisfied at the consummation of the Transaction, but subject to satisfaction of such conditions as of the consummation of the Transaction), and the closing of the Transaction shall be scheduled to occur on the Closing Date substantially concurrently with or immediately following the Closing.

3.3     Conditions to Closing of the Company. The obligations of the Company to consummate the Subscription shall be subject to the following conditions, any one or more of which may be waived in writing by the Company:

3.3.1    All representations and warranties of Subscriber contained in this Subscription Agreement shall be true and correct in all material respects as of the Closing Date, and consummation of the Closing shall constitute a reaffirmation by Subscriber of each of its representations and warranties contained in this Subscription Agreement as of the Closing Date.

3.3.2    Subscriber shall have performed or complied in all material respects with all conditions, agreements and covenants required by this Subscription Agreement.

3.4    Conditions to Closing of Subscriber. The obligations of Subscriber to consummate the Subscription shall be subject to the following conditions, any one or more of which may be waived in writing by Subscriber:

3.4.1    All representations and warranties of the Company contained in this Subscription Agreement shall be true and correct in all material respects as of the Closing Date.

3.4.2    The Company shall have performed or complied in all material respects with all conditions, agreements and covenants required by this Subscription Agreement.

3.4.3    The terms of the Transaction Agreement shall not have been amended in a manner that would reasonably be expected to materially and adversely affect the economic benefits Subscriber is to receive under this Subscription Agreement unless Subscriber has consented in writing to such amendment.

4.    Registration Rights.

4.1    The Company and Subscriber agree that, within fifteen (15) business days after the consummation of the Transaction, the Company will file with the SEC (at the Company's sole cost and expense) a registration statement registering the resale of the Shares (the "**Registration Statement**"), and the Company shall use its commercially reasonable efforts to have the Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the earlier of (i) the 60th calendar day (or 90th calendar day if the Commission notifies the Company that it will "review" the Registration Statement) following the Closing Date; provided, however, that the Company's obligations to include the Shares and those other Shares of the Company held by Subscriber in the Registration Statement are contingent upon Subscriber furnishing in writing to the Company such information regarding Subscriber, the securities of the Company held by Subscriber and the intended method of disposition of the Shares as shall be reasonably requested by the Company to effect the registration of the Shares, and shall execute such documents in connection with such registration as the Company may reasonably request that are customary of a selling stockholder in similar situations; provided, however, that Subscriber shall not in connection with the foregoing be required to execute any lock-up or similar agreement or otherwise be subject to any contractual restriction on the ability to transfer the Shares. The Company shall use its commercially reasonable efforts to maintain the continuous effectiveness of the Registration Statement until the earliest of (i) the date on which the Shares may be resold without volume or manner of sale limitations pursuant to Rule 144 promulgated under the Securities Act ("**Rule 144**"), (ii) the date on which such Shares have actually been sold and (iii) the date which is three years after the Closing. The Company will use its commercially reasonable efforts to provide a draft of the Registration Statement to Subscriber for review (but not comment) at least two (2) Business Days in advance of filing the Registration Statement; provided that, for the avoidance of doubt, in no event shall the Company be required to delay or postpone the filing of such Registration Statement as a result of or in connection with Subscriber's review. Unless otherwise agreed to in writing by the Subscriber, the Subscriber shall not be identified as a statutory underwriter in the Registration Statement unless requested by the SEC or another regulatory

10

agency; provided, that if the SEC requests that a Subscriber be identified as a statutory underwriter in the Registration Statement, Subscriber will have the opportunity to withdraw from the Registration Statement upon its prompt written request to the Company. Notwithstanding the foregoing, if the SEC prevents the Company from including any or all of the shares proposed to be registered under the Registration Statement due to limitations on the use of Rule 415 of the Securities Act for the resale of the Shares by the applicable stockholders or otherwise, such Registration Statement shall register for resale such number of Shares which is equal to the maximum number of Shares as is permitted by the SEC. In such event, the number of Shares to be registered for each selling stockholder named in the Registration Statement shall be reduced pro rata among all such selling stockholders and as promptly as practicable after being permitted to register additional Shares under Rule 415 under the Securities Act, the Company shall amend the Registration Statement or file a new Registration Statement to register such Shares not included in the initial Registration Statement and cause such amendment or Registration Statement to become effective as promptly as practicable. For as long as the Subscriber holds Shares, the Company will use commercially reasonable efforts to file all reports for so long as the condition in Rule 144(c)(1) (or Rule 144(i)(2), if applicable) is required to be satisfied, and provide all customary and reasonable cooperation, necessary to enable the undersigned to resell the Shares pursuant to Rule 144 of the Securities Act (in each case, when Rule 144 of the Securities Act becomes available to the Subscriber).

4.2     Notwithstanding anything to the contrary in this Subscription Agreement, the Company shall be entitled to delay or postpone the effectiveness of the Registration Statement, and from time to time to require any Subscriber not to sell under the Registration Statement or to suspend the effectiveness thereof, if the negotiation or consummation of a transaction by the Company or its subsidiaries is pending or an event has occurred, which negotiation, consummation or event, the Company's board of directors reasonably believes, upon the advice of legal counsel, would require additional disclosure by the Company in the Registration Statement of material information that the Company has a bona fide business purpose for keeping confidential and the non-disclosure of which in the Registration Statement would be expected, in the reasonable determination of the Company's board of directors, upon the advice of legal counsel, to cause the Registration Statement to fail to comply with applicable disclosure requirements (each such circumstance, a "**Suspension Event**"); *provided, however,* that the Company may not delay or suspend the Registration Statement on more than two occasions or for more than sixty (60) consecutive calendar days, or more than ninety (90) total calendar days, in each case during any twelve-month period. Upon receipt of any written notice from the Company of the happening of any Suspension Event (which notice shall not contain material non-public information and which notice shall not be subject to any duty of confidentiality) during the period that the Registration Statement is effective or if as a result of a Suspension Event the Registration Statement or related prospectus contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made (in the case of the prospectus) not misleading, Subscriber agrees that it will promptly discontinue offers and sales of the Shares under the Registration Statement (excluding, for the avoidance of doubt, sales conducted pursuant to Rule 144) until such Subscriber receives copies of a supplemental or amended prospectus (which the Company agrees to promptly prepare) that corrects the misstatement(s) or omission(s) referred to above and receives notice that any post-effective amendment has become effective or unless otherwise notified by the Company that it may resume such offers and sales (which notice shall

11

not contain material non-public information and which notice shall not be subject to any duty of confidentiality). If so directed by the Company, each Subscriber will deliver to the Company or, in such Subscriber's sole discretion destroy, all copies of the prospectus covering the Shares in such Subscriber's possession; *provided, however,* that this obligation to deliver or destroy all copies of the prospectus covering the Shares shall not apply (i) to the extent such Subscriber is required to retain a copy of such prospectus (a) in order to comply with applicable legal, regulatory, self-regulatory or professional requirements or (b) in accordance with a bona fide pre-existing document retention policy or (ii) to copies stored electronically on archival servers as a result of automatic data back-up.

4.3     Subscriber may deliver written notice (including via email in accordance with Section 6.2 of this Subscription Agreement) (an "**Opt-Out Notice**") to the Company requesting that Subscriber not receive notices from the Company otherwise required by Section 4.2; provided, however, that Subscriber may later revoke any such Opt-Out Notice in writing. Following receipt of an Opt-Out Notice from Subscriber (unless subsequently revoked), (i) the Company shall not deliver any such notices to Subscriber and Subscriber shall no longer be entitled to the rights associated with any such notice and (ii) each time prior to Subscriber's intended use of an effective registration statement, Subscriber will notify the Company in writing at least two (2) business days in advance of such intended use, and if a notice of a Suspension Event was previously delivered (or would have been delivered but for the provisions of this Section 4.3) and the related suspension period remains in effect, the Company will so notify Subscriber, within one (1) business day of Subscriber's notification to the Company, by delivering to Subscriber a copy of such notice of Suspension Event that would have been provided, and thereafter will provide Subscriber with the related notice of the conclusion of such Suspension Event immediately upon its availability, and Subscriber shall comply with any restrictions on using such Registration Statement during such Suspension Event.

4.4     In the case of the registration, qualification, exemption or compliance effected by the Company pursuant to this Subscription Agreement, the Company shall, upon reasonable request, inform Subscriber as to the status of such registration, qualification, exemption and compliance.  At its expense the Company shall:

4.4.1   advise Subscriber within five (5) business days:

(a)     when a Registration Statement or any amendment thereto has been filed with the SEC and when such Registration Statement or any post-effective amendment thereto has become effective;

(b)     of any request by the SEC for amendments or supplements to the Registration Statement or the prospectus included therein or for additional information;

(c)     of the issuance by the SEC of any stop order suspending the effectiveness of the Registration Statement or the initiation of any proceedings for such purpose;

(d)     of the receipt by the Company of any notification with respect to the suspension of the qualification of the Shares included therein for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; and

12

(e)     of the occurrence of any event that requires the making of any changes in the Registration Statement or prospectus so that, as of such date, the Registration Statement does not contain an untrue statement of a material fact or does not omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or any prospectus does not include an untrue statement of a material fact or does not omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Notwithstanding anything to the contrary set forth herein, the Company shall not, when so advising Subscriber of such events, provide Subscriber with any material, nonpublic information regarding the Company other than to the extent that providing notice to Subscriber of the occurrence of the events listed in (a) through (e) above constitutes material, nonpublic information regarding the Company;

4.4.2    use its commercially reasonable efforts to obtain the withdrawal of any stop order suspending the effectiveness of the Registration Statement as soon as reasonably practicable;

4.4.3    upon the occurrence of any event contemplated pursuant to Section 4.4.1(e) above, except for such times as the Company is permitted hereunder to suspend, and has suspended, the use of a prospectus forming part of a Registration Statement, the Company shall use its commercially reasonable efforts to as soon as reasonably practicable prepare a post-effective amendment to such Registration Statement or a supplement to the related prospectus, or file any other required document so that, as thereafter delivered to purchasers of the Shares included therein, such prospectus will not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

4.4.4    use its commercially reasonable efforts to cause all Shares to be listed on each securities exchange or market, if any, on which the shares of Common Stock issued by the Company have been listed; and

4.4.5    use its commercially reasonable efforts to take all other steps necessary to effect the registration of the Shares contemplated hereby.

4.5     The Company shall, notwithstanding any termination of this Subscription Agreement, indemnify, defend and hold harmless Subscriber (to the extent a seller under the Registration Statement), its directors, officers, employees and agents, and each person who controls Subscriber (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable attorneys' fees) and expenses (collectively, "**Losses**"), as incurred, that arise out of or are based upon (i) any untrue or alleged untrue statement of a material fact contained in the Registration Statement, any prospectus included in the Registration Statement or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus or form of prospectus or supplement thereto, in

13

light of the circumstances under which they were made) not misleading, or (ii) any violation or alleged violation by the Company of the Securities Act, Exchange Act or any state securities law or any rule or regulation thereunder, in connection with the performance of its obligations under this Section 4, except to the extent, but only to the extent, that such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding such Subscriber furnished in writing to the Company by such Subscriber expressly for use therein or such Subscriber has omitted a material fact from such information or otherwise violated the Securities Act, Exchange Act or any state securities law or any rule or regulation thereunder; *provided, however,* that the indemnification contained in this Section 4 shall not apply to amounts paid in settlement of any Losses if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall the Company be liable for any Losses to the extent they arise out of or are based upon a violation which occurs (A) in reliance upon and in conformity with written information furnished by or on behalf of the Subscriber expressly for use in the Registration Statement, (B) in connection with any failure of the Subscriber to deliver or cause to be delivered a prospectus made available by the Company in a timely manner (unless exempted therefrom), (C) as a result of offers or sales effected by or on behalf of any person by means of a "free writing prospectus" (as defined in Rule 405 under the Securities Act) that was not authorized in writing by the Company, or (D) in connection with any offers or sales effected by or on behalf of the Subscriber in violation of Section 4.2 hereof. The Company shall notify the Subscriber promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this Section 4 of which the Company is aware. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an indemnified party and shall survive the transfer of the Shares by such Subscriber.

4.6 The Subscriber shall, severally and not jointly with any Other Subscriber, indemnify and hold harmless the Company, its directors, officers, agents and employees, and each person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or are based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any prospectus included in the Registration Statement, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus, or any form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading to the extent, but only to the extent, that such untrue statements or omissions are based upon information regarding the Subscriber furnished in writing to the Company by or on behalf of the Subscriber expressly for use therein; *provided, however,* that the indemnification contained in this Section 4 shall not apply to amounts paid in settlement of any Losses if such settlement is effected without the consent of the Subscriber (which consent shall not be unreasonably withheld, conditioned or delayed). In no event shall the liability of any Subscriber be greater in amount than the dollar amount of the net proceeds received by such Subscriber upon the sale of the Shares giving rise to such indemnification obligation. The Subscriber shall notify the Company promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this Section 4 of which the Subscriber is aware. Such indemnity shall remain in full force and effect regardless of

14

any investigation made by or on behalf of an indemnified party and shall survive the transfer of the Shares by the Subscriber.

4.7 Any person or entity entitled to indemnification herein shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any person's or entity's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent. An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement), which settlement shall not include a statement or admission of fault and culpability on the part of such indemnified party, and which settlement shall include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

4.8 If the indemnification provided under this Section 4 from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any Losses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations; provided, however, that the liability of the Subscriber shall be limited to the net proceeds received by such Subscriber from the sale of Shares giving rise to such indemnification obligation. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by (or not made by, in the case of an omission), or relates to information supplied by (or not supplied by, in the case of an omission), such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party as a result of the Losses referred to above shall be deemed to include, subject to the limitations set forth in this Section 4, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this Section 4.6 from any person or entity who was not guilty of such fraudulent misrepresentation.

4.9 For purposes of this Section 4, (i) "Shares" shall mean, as of any date of determination, the Shares (as defined in the recitals to this Subscription Agreement) and any other

15

equity security issued or issuable with respect to the Shares by way of share split, dividend, distribution, recapitalization, merger, exchange, or replacement, and (ii) "Subscriber" shall include any affiliate of the Subscriber to which the rights under this Section 4 shall have been duly assigned.

5. Termination. This Subscription Agreement shall terminate and be void and of no further force and effect, and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party in respect thereof, upon the earlier to occur of (i) such date and time as the Transaction Agreement is validly terminated in accordance with its terms, (ii) the mutual written agreement of each of the parties hereto to terminate this Subscription Agreement, (iii) if any of the conditions to Closing set forth in this Subscription Agreement are not satisfied or waived by the party entitled to grant such waiver on or prior to the Closing Date and, as a result thereof, the transactions contemplated by this Subscription Agreement are not consummated at the Closing Date, or (iv) at Subscriber's election, on or after the "Outside Date" (as defined in the Transaction Agreement), if the Closing has not occurred by such date; *provided,* that, subject to the limitations set forth in Section 8, nothing herein will relieve any party from liability for any willful breach hereof prior to the time of termination, and each party will be entitled to any remedies at law or in equity to recover losses, liabilities or damages arising from such breach. The Company shall promptly notify Subscriber of the termination of the Transaction Agreement promptly after the termination of such agreement. Upon the termination of this Subscription Agreement in accordance with this Section 5, any monies paid by Subscriber to the Company in connection herewith shall be promptly (and in any event within two (2) Business Days after such termination) returned to Subscriber.

6. Miscellaneous.

6.1 Further Assurances. At the Closing, the parties hereto shall execute and deliver such additional documents and take such additional actions as the parties reasonably may deem to be practical and necessary in order to consummate the Subscription as contemplated by this Subscription Agreement.

6.1.1 Subscriber acknowledges that the Company and the Placement Agents will rely on the acknowledgments, understandings, agreements, representations and warranties made by Subscriber contained in Section 2, this Section 6.1.1, Section 6.1.2 and Section 6.4 of this Subscription Agreement (the "**Agent Sections**"). Prior to the Closing, Subscriber agrees to promptly notify the Company and the Placement Agents if any of the acknowledgments, understandings, agreements, representations and warranties made by Subscriber set forth in the Agent Sections are no longer accurate in all material respects. Subscriber further acknowledges and agrees that the Placement Agents are third-party beneficiaries of the representations and warranties of the Subscriber contained in Section 2.1 of this Subscription Agreement. The Company acknowledges that the Subscriber and the Placement Agents will rely on the acknowledgments, understandings, agreements, representations and warranties contained in this Subscription Agreement. The Company further acknowledges and agrees that the Placement Agents are third-party beneficiaries of the representations and warranties of the Subscriber contained in Section 2.1 of this Subscription Agreement. This paragraph shall survive any termination of this Subscription Agreement.

16

6.1.2    Each of the Company, the Subscriber and the Placement Agents are entitled to rely upon this Subscription Agreement and are irrevocably authorized to produce this Subscription Agreement or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

6.1.3    The Company may request from Subscriber such additional information as the Company may deem reasonably necessary to evaluate the eligibility of Subscriber to acquire the Shares, and Subscriber shall provide such information as may be reasonably requested, to the extent readily available and to the extent consistent with its internal policies and procedures.

6.1.4    Each of the Subscriber and the Company shall pay all of its own expenses in connection with this Subscription Agreement and the transactions contemplated herein.

6.1.5    The Company acknowledges that, notwithstanding anything herein to the contrary, the Shares may be pledged by Subscriber in connection with a bona fide margin agreement, provided such pledge shall be (i) pursuant to an available exemption from the registration requirements of the Securities Act or (ii) pursuant to, and in accordance with, a registration statement that is effective under the Securities Act at the time of such pledge, and Subscriber effecting a pledge of Shares shall not be required to provide the Company with any notice thereof; provided, however, that neither the Company or its counsel shall be required to take any action (or refrain from taking any action) in connection with any such pledge, other than providing any such lender of such margin agreement with an acknowledgment that the Shares are not subject to any contractual prohibition on pledging or lock up, the form of such acknowledgment to be subject to review and comment by Company in all respects.

6.2    <u>Notices</u>. Any notice or communication required or permitted hereunder shall be in writing and either delivered personally, emailed or sent by overnight mail via a reputable overnight carrier, or sent by certified or registered mail, postage prepaid, and shall be deemed to be given and received (i) when so delivered personally, (ii) when sent, with no mail undeliverable or other rejection notice, if sent by email, or (iii) three (3) business days after the date of mailing to the address below or to such other address or addresses as such person may hereafter designate by notice given hereunder:

(i)    if to Subscriber, to such address or addresses set forth on the signature page hereto;

(ii)    if to the Company (prior to the Transaction closing), to:

Fortress Value Acquisition Corp. II
1345 Avenue of the Americas, 46th Floor
New York, New York 10105
Attention: Alexander Gillette
Email: agillette@fortress.com

with a required copy to (which copy shall not constitute notice):

17

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Attention: Joseph A. Coco
   Michael J. Zeidel
   Blair T. Thetford
Email: joseph.coco@skadden.com
   michael.zeidel@skadden.com
   blair.thetford@skadden.com

(iii)  if to the Company (following the Transaction closing), to:

ATI Physical Therapy
790 Remington Blvd
Bolingbrook, Illinois 60440
Attention: Diana M. Chafey
Email: diana.chafey@atipt.com

with a required copy to (which copy shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Alexander Lynch
Email: alex.lynch@weil.com

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: James R. Griffin
Email: james.griffin@weil.com

6.3   Entire Agreement. This Subscription Agreement constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof. Except as otherwise expressly set forth in Section 6.1.1, this Subscription Agreement shall not confer rights or remedies upon any person other than the parties hereto and their respective successors and assigns, and Wilco Holdco, Inc. ("**ATI**"), which shall be a third-party beneficiary to this Subscription Agreement and shall be entitled to the rights and benefits hereunder and may enforce the provisions hereof as if it were a party hereto.

6.4   Modifications and Amendments. This Subscription Agreement may not be amended, modified or terminated (other than as set forth in Section 5) except by an instrument in writing, signed by both ATI and the party against whom enforcement of such amendment, modification or termination is sought; provided that Section 2, Section 6.1.1, Section 6.1.2 and this Section 6.4 of this Subscription Agreement may not be modified or terminated in a manner

18

that is material and adverse to the Placement Agents without the prior written consent of the Placement Agents.

6.5     Waivers and Consents. The terms and provisions of this Subscription Agreement may be waived, or consent for the departure therefrom granted, only by a written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Subscription Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

6.6     Assignment. Neither this Subscription Agreement nor any rights that may accrue to Subscriber hereunder (other than the Shares acquired hereunder and the rights set forth in Section 4) may be transferred or assigned without the prior written consent of the Company; *provided, however,* Subscriber may transfer its rights and obligations hereunder to, without the prior written consent of the Company, an affiliate or to another investment fund or account managed or advised by the same manager as Subscriber (or a related party or affiliate), *provided,* that no such transfer shall release Subscriber of its obligations hereunder without prior written consent of the Company.  Neither this Subscription Agreement nor any rights that may accrue to the Company hereunder may be transferred or assigned by the Company (provided, that, for the avoidance of doubt, the Company may transfer the Subscription Agreement and its rights hereunder in connection with the consummation of the Transaction).

6.7     Benefit. Except as otherwise provided herein, this Subscription Agreement shall be binding upon, and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns, and the agreements, representations, warranties, covenants and acknowledgments contained herein shall be deemed to be made by, and be binding upon, such heirs, executors, administrators, successors, legal representatives and permitted assigns.

6.8     Governing Law. This Subscription Agreement, and any claim or cause of action hereunder based upon, arising out of or related to this Subscription Agreement (whether based on law, in equity, in contract, in tort or any other theory) or the negotiation, execution, performance or enforcement of this Subscription Agreement, shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

6.9     Consent to Jurisdiction; WAIVER OF JURY TRIAL. Each of the parties irrevocably consents to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware, provided, that if subject matter jurisdiction over the matter that is the subject of the legal proceeding is vested exclusively in the U.S. federal courts, such legal proceeding shall be heard in the U.S. District Court for the District of Delaware (together with the Court of Chancery of the State of Delaware "**Chosen Courts**"), in connection with any matter based upon or arising out of this Subscription Agreement and each other document executed in connection with the Transaction, and the consummation thereof, agrees that process may be served upon them in any manner authorized by the laws of the State of Delaware for such persons and waives and covenants not to assert or plead any objection which they might otherwise have to such manner of service of

19

process. Each party hereby waives, and shall not assert as a defense in any legal dispute, that (i) such person is not personally subject to the jurisdiction of the Chosen Courts for any reason, (ii) such legal proceeding may not be brought or is not maintainable in the Chosen Courts, (iii) such person's property is exempt or immune from execution, (iv) such legal proceeding is brought in an inconvenient forum or (v) the venue of such legal proceeding is improper. Each party hereby agrees not to commence or prosecute any such action, claim, cause of action or suit other than before the Chosen Courts, nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit to any court other than the Chosen Courts, whether on the grounds of inconvenient forum or otherwise. Each Party hereby consents to service of process in any such proceeding in any manner permitted by Delaware law, and further consents to service of process by nationally recognized overnight courier service guaranteeing overnight delivery, or by registered or certified mail, return receipt requested, at its address specified pursuant to Section 6.2. Notwithstanding the foregoing in this Section 6.9, a party may commence any action, claim, cause of action or suit in a court other than the Chosen Courts solely for the purpose of enforcing an order or judgment issued by the Chosen Courts. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH OF THE PARTIES MAY DO SO ONLY IF HE, SHE OR IT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIMS OR COUNTERCLAIMS ASSERTED IN ANY LEGAL DISPUTE RELATING TO THIS SUBSCRIPTION AGREEMENT AND EACH OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE TRANSACTIONS, AND THE CONSUMMATION THEREOF, AND FOR ANY COUNTERCLAIM RELATING THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. IF THE SUBJECT MATTER OF ANY SUCH LEGAL DISPUTE IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NO PARTY SHALL ASSERT IN SUCH LEGAL DISPUTE A NONCOMPULSORY COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT AND EACH OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE TRANSACTION, AND THE CONSUMMATION THEREOF. FURTHERMORE, NO PARTY SHALL SEEK TO CONSOLIDATE ANY SUCH LEGAL DISPUTE WITH A SEPARATE ACTION OR OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT BE WAIVED.

6.10    Specific Performance.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Subscription Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties (for the avoidance of doubt, including ATI) shall be entitled to an injunction or injunctions to prevent breaches of this Subscription Agreement and to enforce specifically the terms and provisions of this Subscription Agreement, this being in addition to any other remedy to which such party is entitled at law, in equity, in contract, in tort or otherwise.

6.11    Severability. If any provision of this Subscription Agreement shall be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Subscription Agreement shall not in any way be affected or impaired thereby and shall continue in full force and effect

6.12    No Waiver of Rights, Powers and Remedies. No failure or delay by a party hereto in exercising any right, power or remedy under this Subscription Agreement, and no course

20

of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of such party. No single or partial exercise of any right, power or remedy under this Subscription Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies. No notice to or demand on a party not expressly required under this Subscription Agreement shall entitle the party receiving such notice or demand to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the party giving such notice or demand to any other or further action in any circumstances without such notice or demand.

6.13    Survival of Representations and Warranties. All representations and warranties made by the parties hereto in this Subscription Agreement or in any other agreement, certificate or instrument provided for or contemplated hereby, shall survive the execution and delivery hereof and any investigations made by or on behalf of the parties.

6.14    No Broker or Finder: Expenses. Each of the parties hereto represents and warrants to the other that no broker, finder or other financial consultant has acted on its behalf in connection with this Subscription Agreement or the transactions contemplated hereby in such a way as to create any liability on the other. Each of the parties hereto shall pay all of its own expenses in connection with this Subscription Agreement and the transactions contemplated hereby.

6.15    Headings and Captions. The headings and captions of the various subdivisions of this Subscription Agreement are for convenience of reference only and shall in no way modify or affect the meaning or construction of any of the terms or provisions hereof.

6.16    Counterparts. This Subscription Agreement may be executed and delivered in one or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or any other form of electronic delivery (including .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com or other transmission method), such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

6.17    Construction. The words *"include," "includes,"* and *"including"* will be deemed to be followed by *"without limitation."* Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words *"this Subscription Agreement," "herein," "hereof," "hereby," "hereunder,"* and words of similar import refer to this Subscription Agreement as a whole and not to any particular subdivision unless expressly so limited. The parties hereto intend that each representation, warranty, and covenant contained herein will have independent significance. If any party hereto has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the

21

relative levels of specificity) which such party hereto has not breached will not detract from or mitigate the fact that such party hereto is in breach of the first representation, warranty, or covenant.

6.18 Mutual Drafting. This Subscription Agreement is the joint product of Subscriber and the Company and each provision hereof has been subject to the mutual consultation, negotiation and agreement of such parties and shall not be construed for or against any party hereto.

6.19 Limited Recourse. Except as expressly set forth in this Subscription Agreement or as otherwise required by law, no former, current or future equity holders, controlling persons, directors, officers, employees, agents, affiliates, members, managers, general or limited partners, representatives or assignees of Subscriber or any former, current or future equity holder, controlling person, director, officer, employee, agent, affiliate, member, manager, general or limited partner, representative or assignee of any of the foregoing, shall have any obligation to the Company or to any other person hereunder in connection with the transactions contemplated hereby.

7. Disclosure. The Company shall, by 9:00 a.m., New York City time, on the first (1st) business day immediately following the date of this Subscription Agreement, issue one or more press releases or file with the SEC a Current Report on Form 8-K (collectively, the "**Disclosure Document**") disclosing all material terms of the transactions contemplated hereby, the Transaction and any other material, nonpublic information that the Company has provided to Subscriber at any time prior to the filing of the Disclosure Document (including, for the avoidance of doubt, the filing of a form of this Subscription Agreement as an exhibit thereto, and except as otherwise agreed between the Subscriber and the Company and/or the Target). From and after the issuance of the Disclosure Document, to the Company's knowledge, Subscriber shall not be in possession of any material, nonpublic information received from the Company or any of its officers, directors or employees (except as otherwise agreed between Subscriber and the Company and/or the Target). Notwithstanding anything in this Subscription Agreement to the contrary, the Company shall not publicly disclose the name of Subscriber or any of its affiliates, or include the name of Subscriber or any of its affiliates in any press release or in any filing with the SEC or any regulatory agency or trading market, without the prior written consent of Subscriber, except (i) as required by the federal securities law in connection with the Registration Statement, (ii) in a Current Report on Form 8-K (including, for the avoidance of doubt, the filing of a form of this Subscription Agreement as an exhibit thereto), a press release or other marketing materials of the Company in connection with the Transaction to the extent any such disclosure is substantially equivalent to the information that has previously been made public without breach of the obligation under this Section 7 if agreeable by Subscriber and in a manner acceptable to Subscriber, and (iii) to the extent such disclosure is required by law, at the request of the Staff of the SEC or regulatory agency or under the regulations of the NYSE or by any other governmental authority, in which case the Company shall provide Subscriber with prior written notice of such disclosure permitted under this subclause (iii).

8. Trust Account Waiver. Subscriber acknowledges that the Company is a blank check company with the powers and privileges to effect a merger, asset acquisition, reorganization or similar business combination involving the Company and one or more businesses or assets.

22

Subscriber further acknowledges that, as described in the Company's prospectus relating to its initial public offering dated August 11, 2020 (the "**Prospectus**") available at www.sec.gov, substantially all of the Company's assets consist of the cash proceeds of Company's initial public offering and private placements of its securities, and substantially all of those proceeds have been deposited in a trust account (the "**Trust Account**") for the benefit of Company, its public shareholders and the underwriters of Company's initial public offering. Except with respect to interest earned on the funds held in the Trust Account that may be released to Company to pay its tax obligations, if any, the cash in the Trust Account may be disbursed only for the purposes set forth in the Prospectus. For and in consideration of the Company entering into this Subscription Agreement, the receipt and sufficiency of which are hereby acknowledged, Subscriber, on behalf of itself and its representatives, hereby irrevocably waives any and all right, title and interest, or any claim of any kind they have or may have in the future, in or to any monies held in the Trust Account, and agrees not to seek recourse against the Trust Account or make or bring any action, suit, claim or other proceeding against the Trust Account as a result of, or arising out of, this Subscription Agreement, the transactions contemplated hereby or the Shares, regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability. Subscriber acknowledges and agrees that it shall not have any redemption rights with respect to the Shares pursuant to the Company's certificate of incorporation in connection with the Transaction or any other business combination, any subsequent liquidation of the Trust Account or the Company or otherwise. In the event Subscriber has any claim against the Company as a result of, or arising out of, this Subscription Agreement, the transactions contemplated hereby or the Shares, it shall pursue such claim solely against the Company and its assets outside the Trust Account and not against the Trust Account or any monies or other assets in the Trust Account. This paragraph shall survive any termination of this Subscription Agreement. Notwithstanding the foregoing, nothing in this Section 8 shall be deemed to limit any of Subscriber's right, title, interest or claim to the Trust Account by virtue of such Subscriber's record or beneficial ownership of securities of the Company acquired by any means other than pursuant to this Subscription Agreement, including, but not limited to, any redemption right with respect to any such securities of the Company.

9.     Stock Splits, etc. If any change in the Common Stock shall occur between the date hereof and immediately prior to the Closing by reason of any reclassification, recapitalization, stock split (including reverse stock split) or combination, exchange or readjustment of shares, or any stock dividend, the number and type of Shares issued to the Subscriber and the Purchase Price shall be appropriately adjusted to reflect such change.

[*Signature Page Follows*]

23

**IN WITNESS WHEREOF,** each of the Company and Subscriber has executed or caused this Subscription Agreement to be executed by its duly authorized representative as of the date set forth below.

**FORTRESS VALUE ACQUISITION CORP. II**

By: _____

Name:

Title:

Accepted and agreed this _____st day of _____, 2021.

SUBSCRIBER:

Signature of Subscriber:

By: _____

Name:

Title

Signature of Joint Subscriber, if applicable:

By: _____

Name:

Title

**Date:** _____, 2021

Name of Subscriber:

_____

(Please print. Please indicate name and capacity of person signing above)

Name of Joint Subscriber, if applicable:

_____

(Please Print. Please indicate name and capacity of person signing above)

_____

Name in which securities are to be registered (if different from the name of Subscriber listed directly above):

Email Address:

If there are joint investors, please check one:

☐    Joint Tenants with Rights of Survivorship

☐    Tenants-in-Common

☐    Community Property

Subscriber's EIN:_____

Business Address-Street:

_____

_____

City, State, Zip:

Attn:

Telephone No.:_____

Facsimile No.:_____

Joint Subscriber's EIN:_____

Mailing Address-Street (if different):

_____

_____

City, State, Zip:

Attn:

Telephone No.:_____

Facsimile No.:_____

Aggregate Number of Shares subscribed for: _____

Aggregate Purchase Price:    $_____.

You must pay the Purchase Price by wire transfer of U.S. dollars in immediately available funds to the account specified by the Company in the Closing Notice.

**SCHEDULE A**
**ELIGIBILITY REPRESENTATIONS OF SUBSCRIBER**

A.  QUALIFIED INSTITUTIONAL BUYER STATUS
(Please check the applicable subparagraphs):

    1.  ❑ We are a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act") (a "QIB")).

    2.  ❑ We are subscribing for the Shares as a fiduciary or agent for one or more investor accounts, and each owner of such account is a QIB.

\*\*\* OR \*\*\*

B.  INSTITUTIONAL ACCREDITED INVESTOR STATUS
(Please check the applicable subparagraphs):

    1.  ❑ We are an "accredited investor" (within the meaning of Rule 501(a) under the Securities Act) or an entity in which all of the equity holders are accredited investors within the meaning of Rule 501(a) under the Securities Act, and have marked and initialed the appropriate box on the following page indicating the provision under which we qualify as an "accredited investor."

    2.  ❑ We are not a natural person.

\*\*\* AND \*\*\*

C.  AFFILIATE STATUS
(Please check the applicable box) SUBSCRIBER:

    ❑    is:

    ❑    is not:

an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company or acting on behalf of an affiliate of the Company.

*This page should be completed by Subscriber and constitutes a part of the Subscription Agreement*

Rule 501(a), in relevant part, states that an "accredited investor" shall mean any person who comes within any of the below listed categories, or who the issuer reasonably believes comes within any of the below listed categories, at the time of the sale of the securities to that person. Subscriber has indicated, by marking and initialing the appropriate box below, the provision(s) below which apply to Subscriber and under which Subscriber accordingly qualifies as an "accredited investor."

❑ Any bank, registered broker or dealer, insurance company, registered investment company, business development company, or small business investment company; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

❑ Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

❑ Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

❑ Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

❑ Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000. For purposes of calculating a natural person's net worth: (i) the person's primary residence shall not be included as an asset; (ii) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (iii) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

❑ Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of

*This page should be completed by Subscriber and constitutes a part of the Subscription Agreement*

$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

❑ Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person; or

❑ Any entity in which all of the equity owners are accredited investors meeting one or more of the above tests.

*This page should be completed by Subscriber and constitutes a part of the Subscription Agreement*

# EXHIBIT D

## Stockholders Agreement

<div align="right"><b>Execution Version</b></div>

<div align="center"><b>STOCKHOLDERS AGREEMENT</b></div>

**THIS STOCKHOLDERS AGREEMENT** (this "Agreement") is made as of the 21st day of February, 2021, and shall be effective as of the Effective Time, by and among Fortress Value Acquisition Corp. II, a Delaware corporation (the "Company"), and each of the investors listed on Schedule A hereto and any additional investor that becomes a party to this Agreement in accordance with Section 4.1.

<div align="center"><b><u>RECITALS</u></b></div>

**WHEREAS**, the Company and Wilco Holdco, Inc., a Delaware corporation ("Legacy ATI"), are party to that certain Agreement and Plan of Merger, dated as of February 21, 2021 (as it may be amended, supplemented, restated or otherwise modified from time to time, the "Merger Agreement"), by and among the Company, Legacy ATI, and FVAC Merger Corp. II, a Delaware corporation and a wholly owned subsidiary of the Company ("Merger Sub"), pursuant to which Merger Sub will merge with and into Legacy ATI, with Legacy ATI being the surviving entity and a wholly-owned subsidiary of the Company (the "Merger");

**WHEREAS**, as a result of the consummation of the transactions contemplated by the Merger Agreement, the Advent Stockholders will become stockholders of the Company and will cease to be stockholders of Legacy ATI; and

**WHEREAS**, contemporaneously with the execution and delivery of the Merger Agreement, the parties hereto desire to enter into this Agreement, to be effective upon the Effective Time.

**NOW**, **THEREFORE**, in consideration of the foregoing, and the mutual agreements and understandings set forth herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Definitions. For purposes of this Agreement:

"Advent Director" shall mean an individual elected to the Board of Directors that has been designated, nominated or appointed by the Advent Stockholders pursuant to this Agreement. For the avoidance of doubt, the "Advent Designated Directors" shall be deemed to have been designated, nominated or appointed, as applicable, by the Advent Stockholders pursuant to this Agreement.

"Advent Stockholders" shall mean the Advent Stockholders listed on Schedule A, together with their respective successors and any Permitted Transferee that becomes a party hereto pursuant to Section 4.1.

"Affiliate" shall mean, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including any general partner, managing member, officer or director of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing

<div align="center">1</div>

members of, or shares the same management company with, such Person; <u>provided</u>, that "<u>Affiliate</u>" with respect to the Advent Stockholders shall not include the Company or its Subsidiaries. As used in this definition, the term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Applicable Governance Rules</u>" means applicable federal and state securities Law and the rules of the NYSE relating to the Board and the corporate governance of the Company, including, without limitation, Rule 10A-3 of the Exchange Act and Rule 303A of the NYSE Listed Company Manual.

"<u>Beneficially Own</u>" shall have the meaning set forth in Rule 13d-3 of the rules and regulations under the Exchange Act. For the avoidance of doubt, the beneficial ownership of the Advent Stockholders shall be aggregated together along with the beneficial ownership of their Affiliates.

"<u>Certificate of Incorporation</u>" shall mean the Acquiror A&R Charter (as defined in the Merger Agreement) as in effect upon the Filing and thereafter from time to time amended in accordance with the terms hereof and thereof and pursuant to applicable Law.

"<u>Common Stock</u>" shall mean Class A Common Stock, par value $0.0001 per share, of the Company.

"<u>Company Shares</u>" shall mean shares of Common Stock and any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly), shares of Common Stock, including options and warrants.

"<u>Disqualified Director</u>" means any Person prohibited or disqualified from serving as a Director of the Company pursuant to any rule or regulation of the SEC or the rules of the securities exchange on which the Company's securities are listed or by applicable Law.

"<u>Director</u>" shall mean a member of the Board of Directors of the Company.

"<u>Effective Time</u>" shall have the meaning set forth in the Merger Agreement.

"<u>Exchange Act</u>" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"<u>Filing</u>" shall mean the filing of the Certificate of Incorporation with the Secretary of State of the State of Delaware.

"<u>Governmental Authority</u>" means any federal, state, provincial, municipal or local government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, arbitrator, court or tribunal of (a) the United States or (b) any state, commonwealth, province, territory or possession of the United States and any political subdivision thereof (including counties and municipalities).

<p style="text-align:center">2</p>

"Governmental Order" means any ruling, order, judgment, injunction, edict, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"Independent Director" means a Director who is, as of the date of such Director's election or appointment and as of any other date on which the determination is being made, an NYSE Independent Director and an SEC Independent Director.

"Law" means any common law, statutes, constitution, treaty, resolutions, rules, codes, regulations, ordinances, restrictions or Governmental Orders of, or issued by, a Governmental Authority.

"Majority Advent Stockholders" means the affirmative vote of the Advent Stockholders who hold a number of Company Shares representing more than fifty percent (50%) of the aggregate number of Company Shares held by the Advent Stockholders.

"Necessary Action" shall mean, with respect to a specified result, all actions (to the extent such actions are permitted by Law, within such party's control and do not conflict with the terms of this Agreement) reasonably necessary to cause such result, including (a) voting or providing a written consent or proxy with respect to the Company Shares, (b) causing the adoption of stockholders' resolutions and amendments to the Certificate of Incorporation, (c) executing agreements and instruments, (d) causing the members of the Board of Directors to take such actions (to the extent allowed by Delaware Law) and/or (e) making, or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations, publications or similar actions that are required to achieve such result.

"NYSE Independent Director" means a Director who qualifies, as of the date of such Director's election or appointment to the Board of Directors and as of any other date on which the determination is being made, as an "Independent Director" under the listing requirements of the NYSE, as amended from time to time, as determined by the Board of Directors without the vote of such Director.

"Permitted Transferee" shall mean, with respect to any Person, (a) any Affiliate of such Person, (b) with respect to any Person that is an investment fund, vehicle or similar entity, (i) any other investment fund, vehicle or similar entity of which such Person or an Affiliate, advisor or manager of such Person serves as the general partner, manager or advisor and (ii) any direct or indirect limited partner or investor in such investment fund, vehicle or similar entity or any direct or indirect limited partner or investor in any other investment fund, vehicle or similar entity of which such Person or an Affiliate, advisor or manager of such Person serves as the general partner, manager or advisor (provided, however, that in no event shall any "portfolio companies" (as such term is customarily used in the private equity industry) of any such Person or any entity that is controlled by a "portfolio company" of any such Person constitute a Permitted Transferee) and (c) in the case of any Person who is an individual, (i) any successor by death or (ii) any trust, partnership, limited liability company or similar entity solely for the benefit of such individual or such individual's spouse or lineal descendants, provided that such individual acts as trustee, general partner or managing member and retains the sole power to direct the voting and disposition of the transferred Company Shares.

"Person" shall mean any individual, corporation, partnership, trust, limited liability company, association or other entity.

"SEC" means the United States Securities and Exchange Commission.

"SEC Independent Director" means a Director who qualifies, as of the date of such Director's election or appointment to the Board of Directors and as of any other date on which the determination is being made, as an "Independent Director" under Rule 10A-3 under the Exchange Act, as determined by the Board of Directors without the vote of such Director.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Subsidiary" means, with respect to a Person, any corporation or other organization (including a limited liability company or a partnership), whether incorporated or unincorporated, of which such Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization or any organization of which such Person or any of its Subsidiaries is, directly or indirectly, a general partner or managing member.

2. Board of Directors.

2.1 The Company shall take all Necessary Action such that as of the Effective Time:

(a) the size of the Board of Directors shall be set at eight Directors;

(b) the members of the Board of Directors shall be constituted as follows: (i) the seven individuals identified on Schedule B as Advent Designated Directors (the "Advent Designated Directors"), at least five of whom shall (A) not be Affiliates of the Advent Stockholders or any other holder of equity interests of Legacy ATI immediately prior to the Effective Time, and (B) be Independent Directors; and (ii) the individual identified on Schedule B as the Additional Designated Director (the "Additional Designated Director," and together with the Advent Designated Directors, the "Designated Directors"); provided, however, that, if the Additional Designated Director qualifies as an Independent Director, only four of the seven Advent Designated Directors must be persons satisfying the criteria described in subclauses "(A)" and "(B)" of clause "(i)" of this Section 2.1(b);

(c) one of the Advent Designated Directors shall serve as Chairman of the Board of Directors, who shall initially be the individual identified on Schedule B as the Chairman of the Board of Directors;

(d) three Advent Designated Directors shall be appointed as Class III Directors as set forth on Schedule B with terms ending at the third Annual Meeting of Stockholders following the Effective Time;

4

(e)     two Advent Designated Directors shall be appointed as Class II Directors as set forth on Schedule B with terms ending at the second Annual Meeting of Stockholders following the Effective Time; and

(f)     two Advent Designated Directors and the Additional Designated Director as set forth on Schedule B shall be appointed as Class I Directors with terms ending at the first Annual Meeting of Stockholders following the Effective Time.

2.2     (a)     Following the Effective Time, the Advent Stockholders shall be entitled to designate for nomination to the Board of Directors a number of persons (the "Advent Nominees") (and such persons shall be included in any proxy statement prepared by the Company in connection with soliciting proxies for any meeting of the stockholders of the Company called with respect to the election of Directors, and at any adjournment or postponement thereof (the "Company Proxy Statement"), and on any action or approval of the stockholders of the Company with respect to the election of Directors), based on (x) the number of continuing Advent Directors on the Board of Directors following the applicable action, and (y) the aggregate number of Company Shares held by the Advent Stockholders as of the date of receipt of the Company Notice provided in accordance with Section 2.2(b).  The number of Advent Nominees that the Advent Stockholders shall be entitled to designate for nomination to the Board of Directors shall be as follows:

(i)     if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is equal to or greater than 50% of the outstanding Company Shares, such number of Advent Nominees to ensure that, following the applicable action, the Board of Directors includes at least five Advent Directors;

(ii)     if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 50% and equal to or greater than 38% of the outstanding Company Shares, such number of Advent Nominees to ensure that, following the applicable action, the Board of Directors includes at least four Advent Directors;

(iii)     if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 38% and equal to or greater than 26% of the outstanding Company Shares, such number of Advent Nominees to ensure that, following the applicable action, the Board of Directors includes at least three Advent Directors;

(iv)     if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 26% and equal to or greater than 13% of the outstanding Company Shares, such number of Advent

5

Nominees to ensure that, following the applicable action, the Board of Directors includes at least two Advent Directors;

(v)     if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 13% and equal to or greater than 5% of the outstanding Company Shares, such number of Advent Nominees to ensure that, following the applicable action, the Board of Directors includes at least one Advent Director; and

(vi)    if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 5% of the outstanding Company Shares, Advent Stockholders shall not be entitled to designate any Advent Nominees to the Board of Directors.

(b)     The Company shall provide the Advent Stockholders with written notice of the date on which the Company expects to file any Company Proxy Statement pursuant to which action to elect Directors is to be taken (the "Company Notice") at least 30 days prior to such filing date. The Advent Stockholders shall designate the Advent Nominees for nomination to the Board of Directors by giving written notice to the Company setting forth the name and address of the Advent Nominee promptly following receipt of the Company Notice, and in any event, within 10 business days following receipt of the Company Notice.

(c)     Subject to Section 2.2(d), the Company shall take all Necessary Action to (i) (x) ensure that each of the Advent Nominees that are properly nominated pursuant to this Section 2.2 are included in the nominees to the Board of Directors on each slate of nominees for election of Directors proposed by the Board of Directors and (y) recommend the election of the Advent Nominees that are properly nominated pursuant to this Section 2.2 to the stockholders of the Company; and (ii) ensure that each of the Advent Nominees that are properly nominated pursuant to this Section 2.2  is included as a nominee to the Board of Directors in any Company Proxy Statement, and on every action or approval by written resolution of the stockholders of the Company or the Board of Directors with respect to the election of Directors, as applicable.

(d)     Any nominated Director shall be subject to customary due diligence process, including a review of a completed questionnaire and a customary background check. Based on the foregoing, the Company may reasonably object to any such nominee within 15 days of receiving such completed questionnaire and background check authorization, (i) provided it does so in good faith and (ii) solely to the extent such objection is based upon any of the following: (A) such nominee was convicted in a criminal proceeding (excluding traffic violations and other minor offenses); or (B) such nominee was the subject of any order, judgment or decree not subsequently reversed, suspended or vacated of any court of competent jurisdiction or any administrative body (including the SEC), permanently or temporarily enjoining, or otherwise limiting in a material way, such proposed Director from engaging in any business activity as a result of any violation by such proposed Director of federal or state securities Laws. In the event the Board of Directors reasonably finds any such nominee to be unsuitable based upon one or more of the foregoing clauses "(A)" or "(B)" and reasonably objects to such nominated Director, the

6

Advent Stockholders that nominated such Director shall be entitled to propose a different nominee to the Board of Directors within 15 days of the Company's notice to the Advent Stockholders of its objection to such nominee and such replacement nominee shall be subject to the review process outlined in this Section 2.2(d). The Advent Stockholders shall not nominate a Disqualified Director.

2.3     Board Size.  For so long as the Advent Stockholders shall have the right to designate an Advent Nominee, the Company shall not, directly or indirectly, without the prior written consent of the Majority Advent Stockholders, increase the size of the Board of Directors in excess of eight members.  In the event that the size of the Board of Directors is increased, the number of Advent Nominees that the Advent Stockholders shall be entitled to designate for nomination to the Board of Directors set forth in Section 2.2 shall be proportionately adjusted to provide the same effect as contemplated by such Section 2.2 prior to such action.

2.4     Removal; Resignation.  Any Director may resign at any time upon written notice to the Company. If the Advent Stockholders notify the Company that the Advent Stockholders desire to remove an Advent Director with cause, then such Director shall be removed from the Board of Directors and the Company shall take all Necessary Action to cause such removal of such Director.

2.5     Vacancies. In the event that a vacancy is created on the Board of Directors at any time by the death, disability, retirement, resignation or removal of any Advent Director, each party shall take all Necessary Action to elect or appoint an Advent Designated Director to replace the Advent Director whose death, disability, retirement, resignation or removal resulted in such vacancy on the Board of Directors. Notwithstanding anything to the contrary, the director position for such Advent Director shall not be filled pending such designation and appointment, unless the Advent Stockholders fail to designate an Advent Nominee for more than 15 days, after which the Company may appoint a successor Director until the Advent Stockholders make such designation.

2.6     Expenses. The Company shall cause the Advent Directors to be reimbursed for all reasonable out-of-pocket expenses incurred in connection with their attendance at meetings of the Board of Directors and any committees thereof, including travel, lodging and meal expenses.

2.7     Committees of the Board. Immediately following the Effective Time, the Company shall establish and, following the Effective Time, maintain, in accordance with the Bylaws, an audit committee, a compensation committee, a compliance committee and a nominating and corporate governance committee.  The committees shall have such duties and responsibilities as are customary for such committees, subject to the provisions of this Agreement and Applicable Governance Rules, and shall be composed as follows:

(a)     The audit committee shall consist of three Independent Directors (at least one of whom shall satisfy the "audit committee financial expert" requirements as such term is defined by Item 407(d)(5) of Regulation S-K). The members of the audit committee shall be determined by the Board of Directors (upon the recommendation of the nominating and corporate governance committee); provided, that the Company shall take all Necessary Action such that the audit committee members and the audit committee chairperson immediately following the

7

Effective Time shall be as set forth on Schedule B; provided, further, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors on the Board of Directors, take all necessary steps to cause at least a majority of the members of the audit committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules and (ii) for so long as there is one Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of the audit committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

(b)     The compensation committee shall consist of three Directors. The members of the compensation committee shall be determined by the Board of Directors (upon the recommendation of the nominating and corporate governance committee); provided, that the Company shall take all Necessary Action such that the compensation committee members and the compensation committee chairperson immediately following the Effective Time shall be as set forth on Schedule B shall be; provided, further, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors on the Board of Directors, take all necessary steps to cause at least a majority of the members of the compensation committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules, and (ii) for so long as there is one Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of the compensation committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

(c)     The compliance committee shall consist of three Directors. The members of the compliance committee shall be determined by the Board of Directors (upon the recommendation of the nominating and corporate governance committee); provided, that the Company shall take all Necessary Action such that the compliance committee members and the compliance committee chairperson immediately following the Effective Time shall be as set forth on Schedule B; provided, further, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors on the Board of Directors, take all necessary steps to cause at least a majority of the members of the compliance committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules and (ii) for so long as there is one Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of the compliance committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

(d)     The nominating and corporate governance committee shall consist of three Directors. The members of the nominating and corporate governance committee shall be determined by the Board of Directors; provided, that the Company shall take all Necessary Action such that the nominating and corporate governance committee members and the nominating and corporate governance committee chairperson immediately following the Effective Time shall be as set forth on Schedule B; provided, further, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors on the Board of Directors, take all necessary steps to cause at least a majority of the members of the nominating and corporate governance committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules and (ii) for so long as there is one

8

Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of the nominating and corporate governance committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

(e)     To the extent that the Board of Directors forms any other committees of the Board of Directors, then such members shall be determined by the Board of Directors (upon the recommendation of the nominating and governance committee); provided, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors, take all necessary steps to cause at least a majority of the members of such committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules and (ii) for so long as there is one Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of such committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

2.8     D&O Insurance. The Company shall obtain directors' and officers' liability insurance that shall be effective as of the Effective Time and will cover the directors and officers of the Company (including the Directors) and its Subsidiaries at and after the date hereof in an amount and upon terms typical and reasonable for a directors' and officers' liability insurance policy for a company whose equity is listed on the NYSE. The directors' and officers' liability insurance policy shall have a scope of coverage terms and limits that are reasonably appropriate for a company of similar characteristics (including the line of business, market capitalization and revenues) as the Company and its Subsidiaries.

3.     Right to Conduct Activities. The Company expressly acknowledges and agrees that: (a) the Advent Stockholders and each Advent Director who is an employee of an Advent Stockholder or any Affiliate thereof shall have the right to, and shall have no duty (contractual or otherwise) not to, directly or indirectly, engage in the same or similar business activities or lines of business as the Company or its Subsidiaries, including those deemed to be competing with the Company or its Subsidiaries; and (b) in the event that an Advent Stockholder or any Advent Director or any of their respective Affiliates acquires knowledge of a potential transaction or matter that may be a corporate opportunity for both the Company or its Subsidiaries and such Advent Stockholder, Advent Director or any other Person, the Advent Stockholder, Advent Director or Affiliate thereof, as applicable, shall have no duty (contractual or otherwise) to communicate or present such corporate opportunity to the Company or its Subsidiaries, as the case may be, and, notwithstanding any provision of this Agreement to the contrary, shall not be liable to the Company or its Subsidiaries or their respective Affiliates or equityholders for breach of any duty (contractual or otherwise) by reason of the fact that such Advent Stockholder, Advent Director or Affiliate, as applicable, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to the Company or its Subsidiaries, unless, in the case of this clause "(b)," such potential transaction or matter that may be a corporate opportunity is expressly offered or presented to, acquired, created or developed by, or otherwise comes into the possession of, an Advent Director in his or her capacity as a Director or through his or her services to, or pursuant to a contract with, the Company or any of its Subsidiaries; provided, that the Advent Stockholders and each Advent Director shall not use any confidential information of the Company or its Subsidiaries for any purpose in connection with any of the foregoing.

9

4. <u>Miscellaneous</u>.

4.1 <u>Successors and Assigns</u>. No party shall assign this Agreement or any part hereof without the prior written consent of the other parties; <u>provided</u>, <u>however</u>, that the rights under this Agreement may be assigned (but only with all related obligations) by an Advent Stockholder to a Permitted Transferee of such Advent Stockholder; <u>provided</u>, that (a) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such Permitted Transferee and the Company Shares with respect to which such rights are being transferred and (b) such Permitted Transferee agrees in a written instrument delivered to the Company to be bound by and subject to the terms and conditions of this Agreement. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

4.2 <u>Effectiveness; Termination</u>. This Agreement shall not be effective until the Effective Time. In the event the Merger Agreement is terminated in accordance with its terms, this Agreement shall automatically terminate and be of no further force or effect. In addition, this Agreement shall terminate and be of no further force and effect upon the earlier of (a) the written agreement to terminate this Agreement of the Company and the Advent Stockholders who, as of the date of such written agreement, hold the majority of the Company Shares held by all Advent Stockholders and (b) the date on which the Advent Stockholders no longer hold Company Shares; <u>provided</u>, <u>however</u>, that such termination shall not release any party of any liability for any breach of this Agreement occurring prior to such termination.

4.3 <u>Governing Law</u>. This Agreement, and all claims or causes of action (whether in contract, tort or otherwise) based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

4.4 <u>Consent to Jurisdiction</u>. In any action between any of the parties arising out of or relating to this Agreement or any of the transactions contemplated hereby, each of the parties: (a) irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in any state court of Delaware (unless the federal courts have exclusive jurisdiction over the matter, in which case each of the Parties irrevocably and unconditionally consents and submits to the jurisdiction of the United States District Court for the District of Delaware); (b) agrees that it will not attempt to deny or defeat such jurisdiction by motion or other request for leave from such court; and (c) agrees that it will not bring any such action in any court other than such courts. Service of any process, summons, notice or document to any party's address and in the manner set forth in <u>Section 4.7</u> shall be effective service of process for any such action. Each of the parties agrees that the mailing of process or other papers in connection with any action or proceeding in the manner provided in <u>Section 4.7</u> or such other manner as may be permitted by requirement of Law shall be valid and

sufficient service of process. Notwithstanding the foregoing in this Section 4.4, a party may commence any action or proceeding in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts. Each party hereto further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.

        4.5     Waiver of Jury Trial. TO THE EXTENT PERMITTED BY LAW, EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES (AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE) THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE OTHER PARTIES TO ENTER INTO THIS AGREEMENT.

        4.6     Captions; Counterparts. The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement. This Agreement may be executed in multiple counterparts, each of which when executed and delivered shall thereby be deemed to be an original and all of which taken together shall constitute one and the same instrument. Any party may deliver signed counterparts of this Agreement to the other parties by means of facsimile, portable document format (.PDF) signature or electronic transmission.

        4.7     Notices. To be valid for purposes hereof, any notice, request, demand, waiver, consent or approval (any of the foregoing, a "Notice") that is required hereunder shall be in writing. A Notice shall be deemed given only as follows: (a) on the date delivered personally or by email (provided that the email is not bounced back); (b) three business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or (c) one business day following deposit with a nationally recognized overnight courier service for next day delivery, charges prepaid, and, in each case, addressed to the intended recipient as set forth below:

        If to the Company (prior to the Effective Time):

            Fortress Value Acquisition Corp. II
            1345 Avenue of the Americas
            46th Floor
            New York, New York
            Attention:     Alexander Gillette
            E-mail:         agillette@fortress.com

            with a copy (which will not constitute notice) to:

            Skadden, Arps, Slate, Meagher & Flom LLP
            One Manhattan West
             New York, New York 10001

11

> Attention: Joseph A. Coco
> Blair T. Thetford
> Email: Joseph.Coco@skadden.com
> Blair.Thetford@skadden.com

If to Legacy ATI (and, following the Effective Time, the Company):

> ATI Physical Therapy
> 790 Remington Blvd.
> Bolingbrook, Illinois 60440
> Attention: Diana M. Chafey
> Email: diana.chafey@atipt.com

with a copy (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 100 Federal Street, 34th Floor
> Boston, Massachusetts 02110
> Attention: Marilyn French Shaw
> Email: MarilynFrench.Shaw@weil.com

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas 75201
> Attention: James R. Griffin
> Email: James.Griffin@weil.com

If to an Advent Stockholder, to the address set forth below such Advent Stockholder's name on Schedule A hereto. Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by providing Notice to the other parties.

4.8    Amendments and Waivers. This Agreement may be amended or modified in whole or in part only by a duly authorized agreement in writing duly executed by the Company and the Advent Stockholders that then hold Company Shares that makes reference to this Agreement; provided, however, that Schedule A to this Agreement may be amended at any time by the Company to add as a party hereto any Person that acquires any Company Shares in compliance with the terms of this Agreement and executes a supplemental signature page. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

4.9    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon determination by a court of competent jurisdiction that any term or other

12

provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

4.10 Conflict with Certificate of Incorporation. In the event of a conflict between the Certificate of Incorporation and this Agreement, it is expressly agreed that, to the extent not inconsistent with Delaware Law, as between the Advent Stockholders this Agreement shall prevail and the parties shall use reasonable best efforts to amend the Certificate of Incorporation to be consistent with this Agreement. For the avoidance of doubt, nothing contained in this Agreement shall be deemed to constitute an amendment of the Certificate of Incorporation or of any previous certificate of incorporation of the Company. Notwithstanding any other provisions of this Agreement, to the extent not inconsistent with Delaware Law, the Company undertakes to be bound by and comply with the terms and conditions of this Agreement insofar as the same relates to the Company and any Subsidiaries of the Company and to act in all respects as contemplated by this Agreement.

4.11 Entire Agreement. This Agreement constitutes the entire agreement among the parties relating to the transactions contemplated hereby and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof. No representations, warranties, covenants, understandings or agreements, oral or otherwise, relating to the transactions contemplated hereby exist between the parties hereto except as expressly set forth or referenced in this Agreement.

4.12 Delays or Omissions. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by Law or otherwise afforded to any party, shall be cumulative and not alternative.

4.13 Construction. Any use of the singular or plural, or the masculine, feminine, or neuter gender, includes the others, unless the context otherwise requires; "*including*" means "*including without limitation*;" "*or*" means "*and/or*;" "*any*" means "*any one, more than one, or all*.". The words "*this Agreement*," "*herein*," "hereof," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.. The parties hereto intend that each representation, warranty and covenant contained herein will have independent significance. If any party hereto has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which such party has not breached will not detract from or mitigate the fact that such party is in breach of the first representation, warranty or covenant. All references in this Agreement to numbers of shares, per share amounts and purchase prices shall be appropriately adjusted to reflect any stock split, reverse stock split, stock dividend, reorganization, recapitalization, reclassification, combination, exchange of shares or other like change or transaction occurring after the date hereof.

13

*[Remainder of Page Intentionally Left Blank]*

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Stockholders Agreement as of the date first written above.

**FORTRESS VALUE ACQUISITION CORP. II**

By: _____

Name:

Title:

[SIGNATURE PAGE TO STOCKHOLDERS AGREEMENT]

[●]

By: _____
Name:
Title:

[SIGNATURE PAGE TO STOCKHOLDERS AGREEMENT]

**Schedule A**
**Advent Stockholders**

| | |
|---|---|
| Wilco Acquisition, LP | c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street Wilmington, DE 19801 |
| WILCO GP, INC. | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-A Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-B Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-C Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-D Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-E Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-F Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-G Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-H Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent Partners GPE VII Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent Partners GPE VII – A Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |

| | |
|---|---|
| Advent Partners GPE VII Cayman Limited Partnership | c/o Advent International Corporation<br>75 State Street<br>Boston, MA, 02109 |
| Advent Partners GPE VII – A Cayman Limited Partnership | c/o Advent International Corporation<br>75 State Street<br>Boston, MA, 02109 |
| Advent Partners GPE VII – B Cayman Limited Partnership | c/o Advent International Corporation<br>75 State Street<br>Boston, MA, 02109 |
| ADVENT PARTNERS GPE VII 2014 LIMITED PARTNERSHIP | c/o Advent International Corporation<br>75 State Street<br>Boston, MA, 02109 |
| ADVENT PARTNERS GPE VII 2014 CAYMAN LIMITED PARTNERSHIP | c/o Advent International Corporation<br>75 State Street<br>Boston, MA, 02109 |
| ADVENT PARTNERS GPE VII-A 2014 LIMITED PARTNERSHIP | c/o Advent International Corporation<br>75 State Street<br>Boston, MA, 02109 |
| ADVENT PARTNERS GPE VII-A 2014 CAYMAN LIMITED PARTNERSHIP | c/o Advent International Corporation<br>75 State Street<br>Boston, MA, 02109 |
| GPE VII ATI Co-Investment (Delaware) Limited Partnership | c/o Advent International Corporation<br>75 State Street<br>Boston, MA, 02109 |

**Schedule B**
**Directors**

| Designation | Director Appointees | Class | Committee membership (including any chairperson designation) |
|---|---|---|---|
| Additional Designated Director | Drew McKnight | I | Compliance |
| Advent Designated Director | John Maldonado | II | Compliance Nominating and Corporate Governance |
| Advent Designated Director | Carmine Petrone | III | Compensation (Chair) |
| Advent Designated Director | Chris Krubert | III | Compensation Compliance (Chair) |
| Advent Designated Director | John Larsen (Chairman of the Board of Directors) | III | Audit Nominating and Corporate Governance (Chair) |
| Advent Designated Director | Labeed Diab | I | |
| Advent Designated Director | Joanne Burns | II | Audit Compensation |
| Advent Designated Director | Jamie Parisi | II | Audit (Chair) Nominating and Corporate Governance |

**EXHIBIT E**

**Registration Rights Agreement**

*Execution Version*

## AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT

THIS AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT (this "***Agreement***"), dated as of February 21, 2021, is made and entered into by and among Fortress Value Acquisition Corp. II, a Delaware corporation (the "***Company***"), Fortress Acquisition Sponsor II LLC, a Delaware limited liability company (the "***Sponsor***"), the undersigned parties listed under Existing Holders on the signature page hereto (each such party, together with the Sponsor and any person or entity deemed an "Existing Holder" , an "***Existing Holder***" and collectively the "***Existing Holders***") and the undersigned parties listed under New Holders on the signature page hereto (each such party, together with any person or entity deemed a "New Holder" who hereafter becomes a party to this Agreement pursuant to Section 6.2 of this Agreement, a "***New Holder***" and collectively the "***New Holders***"). Capitalized terms used but not otherwise defined in this Agreement shall have the meaning ascribed to such term in the Merger Agreement (as defined below).

## RECITALS

**WHEREAS,** the Company and the Existing Holders are party to that certain Registration Rights Agreement dated August 11, 2020 (the "***Existing Registration Rights Agreement***"), pursuant to which the Company granted the Existing Holders certain registration rights with respect to certain securities of the Company;

**WHEREAS,** the New Holders and Wilco Holdco, Inc. ("**ATI**") are party to that certain Amended and Restated Stockholders Agreement dated August 31, 2016 (the "**ATI Stockholders Agreement**"), which may be terminated by agreement of each of the New Holders, pursuant to the terms of thereof;

**WHEREAS**, the Company has entered into that certain Agreement and Plan of Merger (the "***Merger Agreement***"), dated as of February 21, 2021, by and among the Company, FVAC Merger Corp. II, a Delaware corporation and a direct, wholly-owned subsidiary of the Company, and ATI, a Delaware corporation;

**WHEREAS**, pursuant to the transactions contemplated by the Merger Agreement and subject to the terms and conditions set forth therein, the New Holders will receive shares of common stock, par value $0.0001, of the Company ("***Company Stock***"), upon the Closing (as defined in the Merger Agreement);

**WHEREAS**, certain New Holders may receive additional shares of Company Stock (the "***Earn Out Shares***") pursuant to the earn out provisions in the Merger Agreement;

**WHEREAS**, the Company and the Sponsor have entered into that certain Securities Subscription Agreement, dated as of June 15, 2020, pursuant to which the Sponsor purchased an aggregate of 8,625,000 shares (the "***Founder Shares***") of the Company's Class F common stock, par value $0.0001 per share (the "***Class F Common Stock***"), and the Sponsor subsequently transferred an aggregate of 100,000 Founder Shares to the other Existing Holders;

WHEREAS, the Sponsor purchased an aggregate of 5,933,333 warrants to purchase one share of Common Stock (each, a "***Placement Warrant***" and collectively, the "***Placement Warrants***") pursuant to that certain Private Placement Warrants Purchase Agreement between the Company and the Sponsor, dated as of August 11, 2020, in a private placement transaction exempt from registration under the Securities Act (the "Private Placement") occurring simultaneously with the closing of the Company's initial public offering;

**WHEREAS**, the Company and certain Holders have entered into that certain Amended & Restated Letter Agreement (the "***Sponsor Agreement***"), dated as of February 21, 2021, wherein the Sponsor and such Holders agreed, in connection with the Closing, to subject the Founder Shares held by the Sponsor to certain vesting requirements, in accordance with the terms of the Sponsor Agreement;

**WHEREAS**, pursuant to Section 5.5 of the Existing Registration Rights Agreement, the provisions, covenants and conditions set forth therein may be amended or modified upon the written consent of the Company and the Existing Holders of a majority-in-interest of the "Registrable Securities" (as such term was defined in the Existing Registration Rights Agreement) at the time in question; and

**WHEREAS**, the Company and all of the Existing Holders desire to amend and restate the Existing Registration Rights Agreement in order to provide the Existing Holders and the New Holders certain registration rights with respect to certain securities of the Company, as set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the representations, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
DEFINITIONS

1.1     Definitions. The terms defined in this *Article I* shall, for all purposes of this Agreement, have the respective meanings set forth below:

"***Adverse Disclosure***" shall mean any public disclosure of material non-public information, which disclosure, in the good faith judgment of the Board, the Chief Executive Officer or the Chief Financial Officer of the Company, after consultation with counsel to the Company, (i) would be required to be made in any Registration Statement or Prospectus in order for the applicable Registration Statement or Prospectus not to contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein (in the case of any prospectus and any preliminary prospectus, in the light of the circumstances under which they were made) not misleading, (ii) would not be required to be made at such time if the Registration Statement were not being filed, and (iii) the Company has a bona fide business purpose for not making such information public.

"***Agreement***" shall have the meaning given in the Preamble.

"***Block Trade***" means an offering and/or sale of Registrable Securities by any Holder on a block trade or underwritten basis (whether firm commitment or otherwise) without substantial marketing efforts prior to pricing, including, without limitation, a same day trade, overnight trade or similar transaction.

"***Board***" shall mean the Board of Directors of the Company.

"***Class F Common Stock***" shall have the meaning given in the Recitals hereto.

"***Commission***" shall mean the United States Securities and Exchange Commission.

"***Commission Guidance***" means (i) any publicly-available written or oral guidance of the Commission staff, or any comments, requirements or requests of the Commission staff and (ii) the Securities Act.

"***Company***" shall have the meaning given in the Preamble.

"***Company Stock***" shall have the meaning given in the Recitals hereto.

"***Company Shelf Takedown Notice***" shall have the meaning given in subsection 2.1.3.

"***Demand Registration***" shall have the meaning given in subsection 2.2.1.

"***Demanding Holders***" shall have the meaning given in subsection 2.2.1.

"***Earn Out Shares***" shall have the meaning given in the Recitals hereto.

"***Effectiveness Deadline***" shall have the meaning given in subsection 2.1.1.

"***Exchange Act***" shall mean the Securities Exchange Act of 1934, as it may be amended from time to time, and the rules and regulations promulgated thereunder.

2

"*Existing Holders*" shall have the meaning in the Preamble.

"*Existing Registration Rights Agreement*" shall have the meaning given in the Recitals hereto.

"*Form S-1 Shelf*" shall have the meaning given in subsection 2.1.1.

"*Form S-3 Shelf*" shall have the meaning given in subsection 2.1.2.

"*Founder Shares*" shall have the meaning given in the Recitals hereto and shall be deemed to include the Company Stock issued upon conversion thereof.

"*Founder Shares Lock-Up Period*" shall mean, with respect to the Founder Shares, from the date hereof until the earlier to occur of (A) 180 days after the date hereof; and (B) the date on which the Company completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of the Company's public stockholders having the right to exchange their Company Stock for cash, securities or other property.

"*Holders*" shall mean the Existing Holders and the New Holders and any person or entity who hereafter becomes a party to this Agreement pursuant to Section 6.2.

"*Lock-Up Periods*" shall mean the Founder Shares Lock-Up Period and the New Holder Lock-Up Period.

"*Maximum Number of Securities*" shall have the meaning given in subsection 2.2.4.

"*Merger Agreement*" shall have the meaning given in the Recitals hereto.

"*Misstatement*" shall mean an untrue statement of a material fact or an omission to state a material fact required to be stated in a Registration Statement or Prospectus, or necessary to make the statements in a Registration Statement or Prospectus (in the case of the Prospectus, in the light of the circumstances under which they were made) not misleading.

"*New Holders*" shall have the meaning given in the Preamble.

"*New Holder Lock-Up Period*" shall mean, with respect to the Company Stock held by the New Holders or their Permitted Transferees, from the date hereof until the earlier to occur of (A) 180 days after the date hereof; and (B) the date on which the Company completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of the Company's public stockholders having the right to exchange their Company Stock for cash, securities or other property.

"*Permitted Transferees*" shall mean (i) prior to the expiration of the Founder Shares Lock-Up Period and the New Holder Lock-Up Period, as the case may be, any person or entity to whom a Holder of Registrable Securities is permitted to transfer such Registrable Securities pursuant to Section 3.6.3, (ii) following the expiration of the Founder Shares Lock-Up Period and the New Holder Lock-Up Period, as the case may be, to any stockholder, partner, member or affiliate of such Holder and, if the Holder is an individual, to any of the persons or entities described in Section 3.6.3, and (iii) with respect to the Sponsor and the other Holders party to the Sponsor Agreement, at any time as provided under the Sponsor Agreement.

"*Piggyback Registration*" shall have the meaning given in subsection 2.3.1.

"*Pro Rata*" shall have the meaning given in subsection 2.2.4.

"*Prospectus*" shall mean the prospectus included in any Registration Statement, as supplemented by any and all prospectus supplements and as amended by any and all post-effective amendments and including all material incorporated by reference in such prospectus.

"**_Registrable Security_**" shall mean (a) the shares of Company Stock issued upon the conversion of the Founder Shares, (b) any issued and outstanding shares of Company Stock or any other equity security (including the shares of Company Stock issued or issuable upon the exercise, exchange or conversion of any other equity security) of the Company held by an Existing Holder as of the date of this Agreement, (c) any outstanding shares of Company Stock or any other equity security of the Company held by a New Holder as of the date of this Agreement (including shares transferred to a Permitted Transferee and the shares of Company Stock issued or issuable upon the exercise of any such other equity security), (d) the Placement Warrants (including any shares of Common Stock issued or issuable upon the exercise of any such Placement Warrants), (e) any shares of Company Stock issued or issuable as Earn Out Shares to a New Holder and (f) any other equity security of the Company issued or issuable with respect to any such share of Company Stock described in the foregoing clauses (a) through (f) by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation, reorganization, stock exchange, stock reconstruction and amalgamation or contractual control arrangement with, purchasing all or substantially all of the assets of, or engagement in any other similar transaction; provided, however, that, as to any particular Registrable Security, such securities shall cease to be Registrable Securities when: (A) a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been sold, transferred, disposed of or exchanged in accordance with such Registration Statement; (B) such securities shall have been otherwise transferred, new certificates or book entries for such securities not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent public distribution of such securities shall not require registration under the Securities Act; (C) such securities shall have ceased to be outstanding; or (D) with respect to any Holder, at such time as (1) all remaining shares of Company Stock held by such Holder do not exceed 0.5% of the then-outstanding shares of Company Stock and (2) may be sold without registration and without any limitations, including or restrictions on volume, manner of sale or other limitations or restrictions pursuant to Rule 144 promulgated under the Securities Act (or any successor rule promulgated thereafter by the Commission) ("**_Rule 144_**").

"**_Registration_**" shall mean a registration effected by preparing and filing a registration statement or similar document in compliance with the requirements of the Securities Act, and the applicable rules and regulations promulgated thereunder, and such registration statement becoming effective.

"**_Registration Expenses_**" shall mean the out-of-pocket expenses of a Registration, including, without limitation, the following:

(A) all registration and filing fees (including fees with respect to filings required to be made with the Financial Industry Regulatory Authority, Inc.) and any securities exchange on which the Company Stock is then listed;

(B) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel for the Underwriters in connection with blue sky qualifications of Registrable Securities);

(C) printing, messenger, telephone and delivery expenses;

(D) reasonable fees and disbursements of counsel for the Company;

(E) reasonable fees and disbursements of all independent registered public accountants of the Company incurred specifically in connection with such Registration; and

(F) reasonable fees and expenses of one (1) legal counsel selected by the majority-in-interest of the Demanding Holders initiating a Demand Registration to be registered for offer and sale in the applicable Registration.

"**_Registration Statement_**" shall mean any registration statement that covers the Registrable Securities pursuant to the provisions of this Agreement, including the Prospectus included in such registration statement, amendments (including post-effective amendments) and supplements to such registration statement, and all exhibits to and all material incorporated by reference in such registration statement.

4

"***Removed Shares***" shall have the meaning given in Section 2.6.

"***Requesting Holder***" shall have the meaning given in subsection 2.2.1.

"***Restricted Securities***" shall have the meaning given in subsection 3.6.1.

"***Rule 144***" shall have the meaning given in the definition of "Registrable Security."

"***Rule 415***" shall have the meaning given in subsection 2.1.1.

"***Securities Act***" shall mean the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder.

"***Shelf Takedown Notice***" shall have the meaning given in subsection 2.1.3.

"***Shelf Underwritten Offering***" shall have the meaning given in subsection 2.1.3.

"***Sponsor***" shall have the meaning given in the Preamble hereto.

"***Sponsor Agreement***" shall have the meaning given in the Recitals hereto.

"***Target Filing Date***" has the meaning set forth in subsection 2.1.2.

"***Underwriter***" shall mean a securities dealer who purchases any Registrable Securities as principal in an Underwritten Offering and not as part of such dealer's market-making activities.

"***Underwritten Registration***" or "***Underwritten Offering***" shall mean a Registration in which securities of the Company are sold to an Underwriter in a firm commitment underwriting for distribution to the public.

**ARTICLE II**
REGISTRATIONS

2.1     Shelf Registration.

2.1.1     Initial Registration. The Company shall, as soon as practicable, but in no event later than fifteen (15) business days after the consummation of the transactions contemplated by the Merger Agreement, use its reasonable best efforts to file (or confidentially submit) a Registration Statement under the Securities Act to permit the public resale of all the Registrable Securities held by the Holders from time to time as permitted by Rule 415 under the Securities Act (or any successor or similar provision adopted by the Commission then in effect) ("***Rule 415***") on the terms and conditions specified in this subsection 2.1.1 and shall use its reasonable best efforts to cause such Registration Statement to be declared effective as soon as practicable after the filing (or confidential submission) thereof, but in no event later than the earlier of (i) sixty (60) days following the filing (or confidential submission) deadline; provided, that such sixty (60)-day period shall be extended to ninety (90) days after the filing (or confidential submission) deadline if the Registration Statement is reviewed by, and receives comments from, the Commission and (ii) the tenth (10th) Business Day after the date the Company is notified (orally or in writing) by the Commission that such Registration Statement will not be "reviewed" or will not be subject to further review (such effectiveness due date, the "***Effectiveness Deadline***"). The Registration Statement filed with the Commission pursuant to this subsection 2.1.1 shall be a shelf registration statement on Form S-1 (a "***Form S-1 Shelf***") or such other form of registration statement as is then available to effect a registration for resale of such Registrable Securities, covering such Registrable Securities, and shall contain a Prospectus in such form as to permit any Holder to sell such Registrable Securities pursuant to Rule 415 at any time beginning on the effective date for such Registration Statement. A Registration Statement filed pursuant to this subsection 2.1.1 shall provide for the resale pursuant to any method or combination of methods legally available to, and requested by, the Holders. The Company shall use its reasonable best efforts to cause a Registration Statement filed pursuant to this subsection 2.1.1 to remain effective, and to be supplemented and amended to the extent necessary to ensure that such

5

Registration Statement is available or, if not available, that another Registration Statement is available, for the resale of all the Registrable Securities held by the Holders until all such Registrable Securities have ceased to be Registrable Securities. As soon as practicable following the effective date of a Registration Statement filed pursuant to this underline{subsection 2.1.1}, but in any event within one (1) business day of such date, the Company shall notify the Holders of the effectiveness of such Registration Statement. When effective, a Registration Statement filed pursuant to this underline{subsection 2.1.1} (including the documents incorporated therein by reference) will comply as to form in all material respects with all applicable requirements of the Securities Act and the Exchange Act and will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any Prospectus contained in such Registration Statement, in the light of the circumstances under which such statement is made).

2.1.2    Form S-3 Shelf. The Company shall use its reasonable best efforts to qualify and remain qualified to register the offer and sale of securities under the Securities Act pursuant to a Registration Statement on Form S-3 or any successor form thereto. As soon as practicable after the date hereof, but not later than the Target Filing Date, the Company shall (i) prepare and file with (or confidentially submit to) the Commission a Registration Statement on Form S-3 or the then appropriate form for an offering to be made on a delayed or continuous basis pursuant to Rule 415 under the Securities Act or any successor rule thereto (a "*Form S-3 Shelf*") that covers all Registrable Securities then outstanding for an offering to be made on a delayed or continuous basis pursuant to Rule 415 under the Securities Act or any successor rule thereto and (ii) use its reasonable best efforts to cause such Form S-3 Shelf to be declared effective by the Commission as soon as practicable thereafter. In addition, the Company shall use its reasonable best efforts to cause a Form S-3 Shelf filed pursuant to this subsection 2.1.2 to remain effective, and to be supplemented and amended to the extent necessary to ensure that such Form S-3 Shelf is available or, if not available, that another Form S-3 Shelf (if the Company is eligible to file a Form S-3 Shelf) or other Registration Statement (if the Company is not so eligible) is continuously available, for the resale of all the Registrable Securities held by the Holders until all such Registrable Securities have ceased to be Registrable Securities. For purposes hereof, "*Target Filing Date*" shall mean the date which is 30 days after the Company becomes qualified to register the offer and sale of securities under the Securities Act pursuant to a Form S-3 Shelf. If the Company files a Form S-3 Shelf and thereafter the Company becomes ineligible to use Form S-3 for secondary sales, the Company shall use its reasonable best efforts to file a Form S-1 Shelf as promptly as practicable to replace the shelf registration statement that is a Form S-3 Shelf and have the Form S-1 Shelf declared effective as promptly as practicable and to cause such Form S-1 Shelf to remain effective, and to be supplemented and amended to the extent necessary to ensure that such Registration Statement is available or, if not available, that another Registration Statement is available, for the resale of all the Registrable Securities held by the Holders until all such Registrable Securities have ceased to be Registrable Securities. When effective, a Registration Statement filed pursuant to this underline{subsection 2.1.2} (including the documents incorporated therein by reference) will comply as to form in all material respects with all applicable requirements of the Securities Act and the Exchange Act and will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any Prospectus contained in such Registration Statement, in the light of the circumstances under which such statement is made).

2.1.3    Shelf Takedown. At any time and from time to time following the effectiveness of the shelf registration statement required by underline{subsection 2.1.1} or underline{2.1.2}, any Holder may request to sell all or a portion of their Registrable Securities in an underwritten offering that is registered pursuant to such shelf registration statement, including a Block Trade (a "*Shelf Underwritten Offering*"), provided that such Holder(s) (a) reasonably expects aggregate gross proceeds in excess of $50,000,000 from such Shelf Underwritten Offering or (b) reasonably expects to sell all of the Registrable Securities held by such Holder in such Shelf Underwritten Offering but in no event less than $10,000,000. All requests for a Shelf Underwritten Offering shall be made by giving written notice to the Company (the "*Shelf Takedown Notice*"). Each Shelf Takedown Notice shall specify the approximate number of Registrable Securities proposed to be sold in the Shelf Underwritten Offering and the expected price range (net of underwriting discounts and commissions) of such Shelf Underwritten Offering. Within five (5) days after receipt of any Shelf Takedown Notice (or within one (1) business day with respect to a request for a Block Trade), the Company shall give written notice of such requested Shelf Underwritten Offering to all other Holders of Registrable Securities (the "*Company Shelf Takedown Notice*") and, subject to reductions consistent with the Pro Rata calculations in underline{Section 2.2.4}, shall include in such Shelf Underwritten Offering all Registrable Securities with respect to which the Company has received written requests for inclusion therein, within five (5) days after sending the Company Shelf Takedown Notice, or, in the case of a Block Trade, within one (1) business day after sending the

Company Shelf Takedown Notice. The Company shall enter into an underwriting agreement in a form as is customary in Underwritten Offerings of securities by the Company with the managing Underwriter or Underwriters selected by the initiating Holders after consultation with the Company and shall take all such other reasonable actions as are requested by the managing Underwriter or Underwriters in order to expedite or facilitate the disposition of such Registrable Securities. In connection with any Shelf Underwritten Offering contemplated by this subsection 2.1.3, subject to Section 3.3 and Article IV, the underwriting agreement into which each Holder and the Company shall enter shall contain such representations, covenants, indemnities and other rights and obligations of the Company and the selling stockholders as are customary in underwritten offerings of securities by the Company.

2.1.4 Holder Information Required for Participation in Shelf Registration. At least ten (10) business days prior to the first anticipated filing date (or any earlier confidential submission date, to the extent the information contemplated by this subsection 2.1.4 is anticipated to be included such Registration Statement on such date) of a Registration Statement pursuant to this Article II, the Company shall use reasonable efforts to notify each Holder in writing (which may be by email) of the information reasonably necessary about the Holder to include such Holder's Registrable Securities in such Registration Statement. Notwithstanding anything else in this Agreement, the Company shall not be obligated to include such Holder's Registrable Securities to the extent the Company has not received such information, and received any other reasonably requested agreements or certificates, on or prior to the fifth business day prior to the first anticipated filing date of a Registration Statement pursuant to this Article II.

2.2 Demand Registration.

2.2.1 Request for Registration. Subject to the provisions of subsection 2.2.4 hereof and provided that the Company does not have an effective Registration Statement pursuant to subsection 2.1.1 or subsection 2.1.2 outstanding covering Registrable Securities, (a) the Existing Holders of at least a majority-in-interest of the then-outstanding number of Registrable Securities held by the Existing Holders or (b) the New Holders of at least a majority-in-interest of the then-outstanding number of Registrable Securities held by the New Holders (the "*Demanding Holders*"), in each case, may make a written demand for Registration of all or part of their Registrable Securities, which written demand shall describe the amount and type of securities to be included in such Registration and the intended method(s) of distribution thereof (such written demand a "*Demand Registration*"). The Company shall, within five (5) days of the Company's receipt of the Demand Registration (other than with respect to a Block Trade), notify, in writing, all other Holders of Registrable Securities of such demand, and each Holder of Registrable Securities who thereafter wishes to include all or a portion of such Holder's Registrable Securities in a Registration pursuant to a Demand Registration (each such Holder that includes all or a portion of such Holder's Registrable Securities in such Registration, a "*Requesting Holder*") shall so notify the Company, in writing, within five (5) days after the receipt by the Holder of the notice from the Company. Upon receipt by the Company of any such written notification from a Requesting Holder(s) to the Company, such Requesting Holder(s) shall be entitled to have their Registrable Securities included in a Registration pursuant to a Demand Registration and the Company shall effect, as soon thereafter as practicable, but not more than thirty (30) days immediately after the Company's receipt of the Demand Registration, the Registration of all Registrable Securities requested by the Demanding Holders and Requesting Holders pursuant to such Demand Registration. Under no circumstances shall the Company be obligated to effect more than an aggregate of three (3) Registrations pursuant to a Demand Registration by the Existing Holders under this subsection 2.2.1 with respect to any or all Registrable Securities held by such Existing Holders; provided, however, that a Registration pursuant to a Demand Registration shall not be counted for such purposes unless a Registration Statement that may be available at such time has become effective and all of the Registrable Securities requested by the Requesting Holders and the Demanding Holders to be registered on behalf of the Requesting Holders and the Demanding Holders in such Registration Statement have been sold, in accordance with Section 3.1 of this Agreement.

2.2.2 Effective Registration. Notwithstanding the provisions of subsection 2.2.1 above or any other part of this Agreement, a Registration pursuant to a Demand Registration shall not count as a Registration unless and until (i) the Registration Statement filed with the Commission with respect to a Registration pursuant to a Demand Registration has been declared effective by the Commission and (ii) the Company has complied with all of its obligations under this Agreement with respect thereto; provided, further, that if, after such Registration Statement has been declared effective, an offering of Registrable Securities in a Registration pursuant to a Demand Registration is subsequently interfered with by any stop order or injunction of the Commission, federal or state court or any other governmental agency, the Registration Statement with respect to such Registration shall be deemed not

to have been declared effective, unless and until, (i) such stop order or injunction is removed, rescinded or otherwise terminated, and (ii) a majority-in-interest of the Demanding Holders initiating such Demand Registration thereafter affirmatively elect to continue with such Registration and accordingly notify the Company in writing, but in no event later than five (5) days, of such election; provided, further, that the Company shall not be obligated or required to file another Registration Statement until the Registration Statement that has been previously filed with respect to a Registration pursuant to a Demand Registration becomes effective or is subsequently terminated.

2.2.3 Underwritten Offering. Subject to the provisions of subsection 2.2.4, if a majority-in-interest of the Demanding Holders so advise the Company as part of their Demand Registration that the offering of the Registrable Securities pursuant to such Demand Registration shall be in the form of an Underwritten Offering, then the right of such Demanding Holder or Requesting Holder (if any) to include its Registrable Securities in such Registration shall be conditioned upon such Holder's participation in such Underwritten Offering and the inclusion of such Holder's Registrable Securities in such Underwritten Offering to the extent provided herein. All such Holders proposing to distribute their Registrable Securities through an Underwritten Offering under this subsection 2.2.3 shall enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Underwritten Offering by the majority-in-interest of the Demanding Holders initiating the Demand Registration, which Underwriter(s) shall be reasonably satisfactory to the Company.

2.2.4 Reduction of Underwritten Offering. If the managing Underwriter or Underwriters in an Underwritten Registration, in good faith, advises the Company, the Demanding Holders and the Requesting Holders (if any) in writing that the dollar amount or number of Registrable Securities that the Demanding Holders and the Requesting Holders (if any) desire to sell, taken together with all other Company Stock or other equity securities that the Company desires to sell and the Company Stock, if any, as to which a Registration has been requested pursuant to separate written contractual piggy-back registration rights held by any other stockholders who desire to sell, exceeds the maximum dollar amount or maximum number of equity securities that can be sold in the Underwritten Offering without adversely affecting the proposed offering price, the timing, the distribution method, or the probability of success of such offering (such maximum dollar amount or maximum number of such securities, as applicable, the "***Maximum Number of Securities***"), then the Company shall include in such Underwritten Offering, as follows: (i) first, the Registrable Securities of the Demanding Holders and the Requesting Holders (if any) (pro rata based on the respective number of Registrable Securities that each such Holder has requested be included in such Underwritten Registration and the aggregate number of Registrable Securities that the Demanding Holders and the Requesting Holders (if any) have requested be included in such Underwritten Registration (such proportion is referred to herein as "***Pro Rata***")) that can be sold without exceeding the Maximum Number of Securities; provided, that any securities thereby allocated to a Holder that exceed such Holder's request shall be reallocated among the remaining Demanding Holders and the Requesting Holders (if any) in like manner; and (ii)second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), the Company Stock  or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the Company Stock or other equity securities of other persons or entities that the Company is obligated to register in a Registration pursuant to separate written contractual arrangements with such persons and that can be sold without exceeding the Maximum Number of Securities.

2.2.5 Demand Registration Withdrawal. Any of the Demanding Holders initiating a Demand Registration or any of the Requesting Holders (if any), pursuant to a Registration under subsection 2.2.1 shall have the right to withdraw from a Registration pursuant to such Demand Registration or a Shelf Underwritten Offering pursuant to subsection 2.1.3 for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of their intention to withdraw from such Registration at least one (1) business day prior to the effectiveness of the Registration Statement filed with the Commission with respect to the Registration of their Registrable Securities pursuant to such Demand Registration (or in the case of an Underwritten Registration pursuant to Rule 415, at least two (2) business days prior to the time of pricing of the applicable offering). Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with a Registration pursuant to a Demand Registration or a Shelf Underwritten Offering prior to its withdrawal under this subsection 2.2.5.

8

2.3     Piggyback Registration.

2.3.1     Piggyback Rights. If the Company proposes to file a Registration Statement under the Securities Act with respect to an offering of equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into, equity securities, for its own account or for the account of stockholders of the Company (or by the Company and by the stockholders of the Company including, without limitation, pursuant to Section 2.2 hereof), other than a Registration Statement (i) filed in connection with any employee stock option or other benefit plan, (ii) for a rights offering or an exchange offer or offering of securities solely to the Company's existing stockholders, (iii) for an offering of debt that is convertible into equity securities of the Company or (iv) for a dividend reinvestment plan, then the Company shall give written notice of such proposed filing to all of the Holders of Registrable Securities as soon as practicable but not less than ten (10) days before the anticipated filing date of such Registration Statement, which notice shall (A) describe the amount and type of securities to be included in such offering, the intended method(s) of distribution, and the name of the proposed managing Underwriter or Underwriters, if any, in such offering, and (B) offer to all of the Holders of Registrable Securities the opportunity to register the sale of such number of Registrable Securities as such Holders may request in writing within five (5) days after receipt of such written notice (such Registration a "*Piggyback Registration*"). The Company shall, in good faith, cause such Registrable Securities to be included in such Piggyback Registration and shall use its best efforts to cause the managing Underwriter or Underwriters of a proposed Underwritten Offering to permit the Registrable Securities requested by the Holders pursuant to this subsection 2.3.1 to be included in a Piggyback Registration on the same terms and conditions as any similar securities of the Company included in such Registration and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method(s) of distribution thereof. All such Holders proposing to distribute their Registrable Securities through an Underwritten Offering under this subsection 2.3.1 shall enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Underwritten Offering by the Company.

2.3.2     Reduction of Piggyback Registration. If the managing Underwriter or Underwriters in an Underwritten Registration that is to be a Piggyback Registration, in good faith, advises the Company and the Holders of Registrable Securities participating in the Piggyback Registration in writing that the dollar amount or number of Company Stock that the Company desires to sell, taken together with (i) the Company Stock, if any, as to which Registration has been demanded pursuant to separate written contractual arrangements with persons or entities other than the Holders of Registrable Securities hereunder (ii) the Registrable Securities as to which registration has been requested pursuant to Section 2.3 hereof, and (iii) the Company Stock, if any, as to which Registration has been requested pursuant to separate written contractual piggy-back registration rights of other stockholders of the Company, exceeds the Maximum Number of Securities, then:

(a)     If the Registration is undertaken for the Company's account, the Company shall include in any such Registration (A) first, the Company Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to subsection 2.3.1 hereof, Pro Rata, which can be sold without exceeding the Maximum Number of Securities; provided, that any securities thereby allocated to a Holder that exceed such Holder's request shall be reallocated among the remaining Holders in like manner; and (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the Company Stock, if any, as to which Registration has been requested or demanded pursuant to written contractual piggy-back registration rights of other stockholders of the Company, which can be sold without exceeding the Maximum Number of Securities;

(b)     If the Registration is pursuant to a request by persons or entities other than the Holders of Registrable Securities, then the Company shall include in any such Registration (A) first, the Company Stock or other equity securities, if any, of such requesting persons or entities, other than the Holders of Registrable Securities, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to subsection 2.3.1, Pro Rata, which can be sold without exceeding the Maximum Number of Securities; provided, that any securities thereby allocated to a Holder that exceed such Holder's request shall be reallocated among the remaining Holders in like manner; (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing

9

clauses (A) and (B), the Company Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (D) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A), (B) and (C), the Company Stock or other equity securities for the account of other persons or entities that the Company is obligated to register pursuant to separate written contractual arrangements with such persons or entities, which can be sold without exceeding the Maximum Number of Securities.

2.3.3    Piggyback Registration Withdrawal. Any Holder of Registrable Securities shall have the right to withdraw from a Piggyback Registration for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of his, her or its intention to withdraw from such Piggyback Registration prior to the effectiveness of the Registration Statement filed with the Commission with respect to such Piggyback Registration (or in the case of an Underwritten Registration pursuant to Rule 415, at least two (2) business days prior to the time of pricing of the applicable offering). The Company (whether on its own good faith determination or as the result of a request for withdrawal by persons pursuant to separate written contractual obligations) may withdraw a Registration Statement filed with the Commission in connection with a Piggyback Registration at any time prior to the effectiveness of such Registration Statement. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with the Piggyback Registration prior to its withdrawal under this subsection 2.3.3.

2.3.4    Unlimited Piggyback Registration Rights. For purposes of clarity, any Registration effected pursuant to Section 2.3 hereof shall not be counted as a Registration pursuant to a Demand Registration effected under Section 2.2 hereof or a Shelf Underwritten Offering effected under subsection 2.1.3.

2.4    Restrictions on Registration Rights. If (A) during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of the filing of, and ending on a date one hundred and twenty (120) days after the effective date of, a Company initiated Registration and provided that the Company has delivered written notice to the Holders prior to receipt of a Demand Registration pursuant to subsection 2.2.1 and it continues to actively employ, in good faith, all reasonable efforts to cause the applicable Registration Statement to become effective; (B) the Holders have requested an Underwritten Registration and the Company and the Holders are unable to obtain the commitment of underwriters to firmly underwrite the offer; or (C) in the good faith judgment of the Board such Registration would be detrimental to the Company and the Board concludes as a result that it is essential to defer the filing of such Registration Statement at such time, then in each case the Company shall furnish to such Holders a certificate signed by the Chairman of the Board, the Chief Executive Officer, the Chief Financial Officer, the President or Secretary of the Company stating that in the good faith judgment of the Board it would be detrimental to the Company for such Registration Statement to be filed in the near future and that it is therefore essential to defer the filing of such Registration Statement. In such event, the Company shall have the right to defer such filing for a period of not more than ninety (90) days; provided, however, that the Company shall not defer its obligation in this manner more than twice in any 12-month period (the "**Aggregate Blocking Period**").

2.5    Block Trades. Subject to Sections 2.4 and 3.4, if the Holders request to effect a Block Trade by delivering a Shelf Takedown Notice pursuant to subsection 2.1.3 or a Demand Registration pursuant to subsection 2.2.1, the Company shall, as expeditiously as possible, use its reasonable best efforts to facilitate such Block Trade. The Holders shall use reasonable best efforts to work with the Company and the Underwriter(s) (including by disclosing the maximum number of Registrable Securities proposed to be the subject of such Block Trade) in order to facilitate preparation of the Registration Statement, Prospectus and other offering documentation related to the Block Trade and any related due diligence and comfort procedures.

2.6    Rule 415; Removal. If at any time the Commission takes the position that the offering of some or all of the Registrable Securities in a Registration Statement filed pursuant to this Section 2 is not eligible to be made on a delayed or continuous basis under the provisions of Rule 415 under the Securities Act (provided, however, the Company shall be obligated to use diligent efforts to advocate with the Commission for the registration of all of the Registrable Securities in accordance with the Commission Guidance, including without limitation, Compliance and Disclosure Interpretation 612.09) or requires a Holder to be named as an "underwriter," the Company shall (i) promptly notify each holder of Registrable Securities thereof (or in the case of the Commission requiring a Holder to be named as an "underwriter," the Holders) and (ii) use reasonable best efforts to persuade the Commission that the offering contemplated by such Registration Statement is a valid secondary offering and not an offering "by or on

10

behalf of the issuer" as defined in Rule 415 and that none of the Holders is an "underwriter." The Holders shall have the right to select one legal counsel designated by the holders of a majority of the Registrable Securities subject to such Registration Statement to review and oversee any registration or matters pursuant to this Section 2.6, including participation in any meetings or discussions with the Commission regarding the Commission's position and to comment on any written submission made to the Commission with respect thereto. No such written submission with respect to this matter shall be made to the Commission to which the applicable Holders' counsel reasonably objects. In the event that, despite the Company's reasonable best efforts and compliance with the terms of this Section 2.6, the Commission refuses to alter its position, the Company shall (i) remove from such Registration Statement such portion of the Registrable Securities (the "*Removed Shares*") and/or (ii) agree to such restrictions and limitations on the registration and resale of the Registrable Securities as the Commission may require to assure the Company's compliance with the requirements of Rule 415; provided, however, that the Company shall not agree to name any Holder as an "underwriter" in such Registration Statement without the prior written consent of such Holder. In the event of a share removal pursuant to this Section 2.6, the Company shall give the applicable Holders at least five (5) days prior written notice along with the calculations as to such Holder's allotment. Any removal of shares of the Holders pursuant to this Section 2.6 shall be allocated between the Holders on a pro rata basis based on the aggregate amount of Registrable Securities held by the Holders. In the event of a share removal of the Holders pursuant to this Section 2.6, the Company shall promptly register the resale of any Removed Shares pursuant to subsection 2.1.2 hereof and in no event shall the filing of such Registration Statement on Form S-1 or subsequent Registration Statement on Form S-3 filed pursuant to the terms of subsection 2.1.2 be counted as a Demand Registration hereunder. Until such time as the Company has registered all of the Removed Shares for resale pursuant to Rule 415 on an effective Registration Statement, the Company shall not be able to defer the filing of a Registration Statement pursuant to Section 2.4 hereof.

## ARTICLE III
COMPANY PROCEDURES

3.1     General Procedures. If the Company is required to effect the Registration of Registrable Securities, the Company shall use its reasonable best efforts to effect such Registration to permit the sale of such Registrable Securities in accordance with the intended plan of distribution thereof, and pursuant thereto the Company shall, as expeditiously as possible:

3.1.1     prepare and file with the Commission as soon as practicable a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective and remain effective until all Registrable Securities covered by such Registration Statement have been sold;

3.1.2     prepare and file with the Commission such amendments and post-effective amendments to the Registration Statement, and such supplements to the Prospectus, as may be reasonably requested by any majority-in-interest of the Holders with Registrable Securities registered on such Registration Statement or any Underwriter of Registrable Securities or as may be required by the rules, regulations or instructions applicable to the registration form used by the Company or by the Securities Act or rules and regulations thereunder to keep the Registration Statement effective until all Registrable Securities covered by such Registration Statement are sold in accordance with the intended plan of distribution set forth in such Registration Statement or supplement to the Prospectus;

3.1.3     prior to filing a Registration Statement or Prospectus, or any amendment or supplement thereto, furnish without charge to the Underwriters, if any, and each Holder of Registrable Securities included in such Registration, and such Holders' legal counsel, copies of such Registration Statement as proposed to be filed, each amendment and supplement to such Registration Statement (in each case including all exhibits thereto and documents incorporated by reference therein), the Prospectus included in such Registration Statement (including each preliminary Prospectus), and such other documents as the Underwriters and each Holder of Registrable Securities included in such Registration or the legal counsel for any such Holders may request in order to facilitate the disposition of the Registrable Securities owned by such Holders;

3.1.4     prior to any public offering of Registrable Securities, use its reasonable best efforts to (i) register or qualify the Registrable Securities covered by the Registration Statement under such securities or "blue

11

sky" laws of such jurisdictions in the United States as any Holder of Registrable Securities included in such Registration Statement (in light of their intended plan of distribution) may request and (ii) take such action necessary to cause such Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be necessary or advisable to enable the Holders of Registrable Securities included in such Registration Statement to consummate the disposition of such Registrable Securities in such jurisdictions; provided, however, that the Company shall not be required to qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify or take any action to which it would be subject to general service of process or taxation in any such jurisdiction where it is not then otherwise so subject;

3.1.5    cause all such Registrable Securities to be listed on each securities exchange or automated quotation system on which similar securities issued by the Company are then listed;

3.1.6    provide a transfer agent or warrant agent, as applicable, and registrar for all such Registrable Securities no later than the effective date of such Registration Statement;

3.1.7    advise each seller of such Registrable Securities, promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the Commission suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceeding for such purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal if such stop order should be issued;

3.1.8    at least three (3) days prior to the filing of any Registration Statement or Prospectus or any amendment or supplement to such Registration Statement or Prospectus, furnish a copy thereof to each seller of such Registrable Securities and its counsel, including, without limitation, providing copies promptly upon receipt of any comment letters received with respect to any such Registration Statement or Prospectus;

3.1.9    notify the Holders at any time when a Prospectus relating to such Registration Statement is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes a Misstatement, and then to correct such Misstatement as set forth in Section 3.4 hereof;

3.1.10    permit a representative of the Holders (such representative to be selected by a majority of the participating Holders), the Underwriter(s), if any, and any attorney or accountant retained by such Holders or Underwriter(s) to participate, at each such person's own expense (except as provided under Section 3.2), in the preparation of the Registration Statement, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such representative, Underwriter, attorney or accountant in connection with the Registration; provided, however, that such representative or Underwriter enters into a confidentiality agreement or other arrangement, in form and substance reasonably satisfactory to the Company, prior to the release or disclosure of any such information; and provided further, the Company may not include the name of any Holder or Underwriter or any information regarding any Holder or Underwriter in any Registration Statement or Prospectus, any amendment or supplement to such Registration Statement or Prospectus, any document that is to be incorporated by reference into such Registration Statement or Prospectus, or any response to any comment letter, without the prior written consent of such Holder or Underwriter and providing each such Holder or Underwriter a reasonable amount of time to review and comment on such applicable document, which comments the Company shall include unless contrary to applicable law;

3.1.11    obtain a "comfort" letter from the Company's independent registered public accountants in the event of an Underwritten Registration, in customary form and covering such matters of the type customarily covered by "comfort" letters as the managing Underwriter(s) may reasonably request, and reasonably satisfactory to a majority-in-interest of the participating Holders;

3.1.12    on the date the Registrable Securities are delivered for sale pursuant to such Registration, obtain an opinion, dated such date, of counsel representing the Company for the purposes of such Registration, addressed to the Holders, the placement agent or sales agent, if any, and the Underwriter(s), if any, covering such legal matters with respect to the Registration in respect of which such opinion is being given as the Underwriter(s),

12

placement agent(s) or sales agent(s) may reasonably request and as are customarily included in such opinions and negative assurance letters, and reasonably satisfactory to a majority-in-interest of the participating Holders;

3.1.13   in the event of any Underwritten Offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing Underwriter of such offering;

3.1.14   make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months beginning with the first day of the Company's first full calendar quarter after the effective date of the Registration Statement which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any successor rule promulgated thereafter by the Commission);

3.1.15   if the Registration involves the Registration of Registrable Securities involving gross proceeds in excess of $50,000,000, use its reasonable efforts to make available senior executives of the Company to participate in customary "road show" presentations that may be reasonably requested by the Underwriter(s) in any Underwritten Offering; and

3.1.16   otherwise, in good faith, cooperate reasonably with, and take such customary actions as may reasonably be requested by the Holders, in connection with such Registration.

3.2      Registration Expenses. Except as otherwise provided herein, the Registration Expenses of all Registrations shall be borne by the Company. It is acknowledged by the Holders that the Holders shall bear all incremental selling expenses relating to the sale of Registrable Securities, such as Underwriters' commissions and discounts, brokerage fees, Underwriter marketing costs and, other than as set forth in the definition of "Registration Expenses," all reasonable fees and expenses of any legal counsel representing the Holders.

3.3      Requirements for Participation in Underwritten Offerings. No person may participate in any Underwritten Offering for equity securities of the Company pursuant to a Registration initiated by the Company hereunder unless such person (i) agrees to sell such person's securities on the basis provided in any underwriting arrangements approved by the Company and (ii) completes and executes all customary questionnaires, powers of attorney, indemnities, lock-up agreements, underwriting agreements and other customary documents as may be reasonably required under the terms of such underwriting arrangements.

3.4      Suspension of Sales; Adverse Disclosure. Upon receipt of written notice from the Company that a Registration Statement or Prospectus contains a Misstatement, each of the Holders shall forthwith discontinue disposition of Registrable Securities until it has received copies of a supplemented or amended Prospectus correcting the Misstatement (it being understood that the Company hereby covenants to prepare and file such supplement or amendment as soon as practicable after the time of such notice), or until it is advised in writing by the Company that the use of the Prospectus may be resumed. If the filing, initial effectiveness or continued use of a Registration Statement in respect of any Registration at any time would require the Company to make an Adverse Disclosure or would require the inclusion in such Registration Statement of financial statements that are unavailable to the Company for reasons beyond the Company's control, the Company may, upon giving prompt written notice of such action to the Holders, delay the filing or initial effectiveness of, or suspend use of, such Registration Statement for the shortest period of time, but in no event more than forty-five (45) days per suspension, determined in good faith by the Company to be necessary for such purpose; provided, that each day of any such suspension pursuant to this Section 3.4 shall correspondingly decrease the Aggregate Blocking Period available to the Company during any twelve (12) month period pursuant to Section 2.4 hereof. In the event the Company exercises its rights under the preceding sentence, the Holders agree to suspend, immediately upon their receipt of the notice referred to above, their use of the Prospectus relating to any Registration in connection with any sale or offer to sell Registrable Securities. The Company shall immediately notify the Holders of the expiration of any period during which it exercised its rights under this Section 3.4. Notwithstanding anything in this Agreement to the contrary, the Company shall not be permitted to file a registration statement to register for sale, or to conduct any registered securities offerings (including any "take-downs" off of an effective shelf registration statement) of, any of its securities either for its own account or the account of any other person during any deferral or suspension pursuant to this Section 3.4.

3.5      Reporting Obligations. As long as any Holder shall own Registrable Securities, the Company, at all times while it shall be a reporting company under the Exchange Act, covenants to file timely (or obtain

13

extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to Sections 13(a) or 15(d) of the Exchange Act. The Company further covenants that it shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell shares of the Company Stock held by such Holder without registration under the Securities Act within the limitation of the exemptions provided by Rule 144, including providing any legal opinions.

      3.6      Transfer Restrictions.

      3.6.1      During the applicable Lock-Up Periods, no Existing Holder or New Holder, as the case may be, shall offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of or distribute any shares of Company Stock that are subject to an applicable Lock-Up Period or any securities convertible into, exercisable for, exchangeable for or that represent the right to receive shares of Company Stock that are subject to an applicable Lock-Up Period, whether now owned or hereinafter acquired, that is owned directly by such Existing Holder or New Holder (including securities held as a custodian) or with respect to which such Existing Holder or New Holder has beneficial ownership within the rules and regulations of the Commission (such securities that are subject to an applicable Lock-Up Period, the "***Restricted Securities***"), other than any transfer to a Permitted Transferee, as applicable. The foregoing restriction is expressly agreed to preclude each Existing Holder or New Holder, as applicable, from engaging in any hedging or other transaction with respect to Restricted Securities which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of the Restricted Securities even if such Restricted Securities would be disposed of by someone other than such Existing Holder or New Holder. Such prohibited hedging or other transactions include any short sale or any purchase, sale or grant of any right (including any put or call option) with respect to any of the Restricted Securities of the applicable Existing Holder or New Holder, or with respect to any security that includes, relates to, or derives any significant part of its value from such Restricted Securities.

      3.6.2      Each Existing Holder and New Holder hereby represents and warrants that it now has and, except as contemplated by this subsection 3.6.2 for the duration of the applicable Lock-Up Period, will have good and marketable title to its Restricted Securities, free and clear of all liens, encumbrances, and claims that could impact the ability of such Existing Holder or New Holder to comply with the foregoing restrictions. Each Existing Holder and New Holder agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of any Restricted Securities during the applicable Lock-Up Period.

      3.6.3      Notwithstanding the provisions set forth in Section 3.6.1 and Section 3.6.2, transfers of the Registrable Securities that are held by any Existing Holder, any New Holder or any of their Permitted Transferees are permitted to:

      (a)      in the case of an entity, transfer to a stockholder, partner, member or affiliate of such entity;

      (b)      in the case of an individual, transfer by gift to members of the individual's immediate family (as defined below) or to a trust, the beneficiary of which is a member of one of the individual's immediate family, an affiliate of such person or to a charitable organization;

      (c)      in the case of an individual, transfer by virtue of laws of descent and distribution upon death of the individual;

      (d)      in the case of an individual, transfer pursuant to a qualified domestic relations order;

      (e)      in the case of an entity, transfer by virtue of the laws of the state of the entity's organization or the entity's organizational documents upon dissolution of the entity;

14

(f)     exercise any options or warrants to purchase Company Stock (which exercises may be effected on a cashless basis to the extent the instruments representing such options or warrants permit exercises on a cashless basis);

(g)     transfer to the Company to satisfy tax withholding obligations pursuant to the Company's equity incentive plans or arrangements;

(h)     transfer to the Company pursuant to any contractual arrangement in effect at the Closing that provides for the repurchase by the Company or forfeiture of the Holder's Company Stock or other securities convertible into or exercisable or exchangeable for Company Stock in connection with the termination of the Holder's service to the Company;

(i)     enter into, at any time after the Closing, any trading plan providing for the sale of Company Stock by the Holder, which trading plan meets the requirements of Rule 10b5-1(c) under the Exchange Act, provided, however, that such plan does not provide for, or permit, the sale of any Company Stock during the applicable Lock-Up Period and no public announcement or filing is voluntarily made or required regarding such plan during the applicable Lock-Up Period; and

(j)     enter into transactions in the event of completion of a liquidation, merger, stock exchange or other similar transaction which results in all of the Company's Holders having the right to exchange their shares of Company Stock for cash, securities or other property.

*provided, however*, that in the case of clauses (a) through (e), these permitted transferees must enter into a written agreement with the Company agreeing to be bound by the transfer restrictions herein (it being understood that any references to "immediate family" in the agreement executed by such transferee shall expressly refer only to the immediate family of the Holder and not to the immediate family of the transferee), agreeing to be bound by these transfer restrictions. For purposes of this section, "***immediate family***" shall mean a spouse, domestic partner, child, grandchild or other lineal descendant (including by adoption), father, mother, brother or sister of the Holder; and "***affiliate***" shall have the meaning set forth in Rule 405 under the Securities Act.

**ARTICLE IV**
INDEMNIFICATION AND CONTRIBUTION

4.1     Indemnification.

4.1.1     The Company agrees to indemnify, to the extent permitted by law, each Holder of Registrable Securities, its officers and directors and agents and each person who controls such Holder (within the meaning of the Securities Act) against all losses, claims, damages, liabilities and expenses (including attorneys' fees) caused by any untrue or alleged untrue statement of material fact contained in any Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are caused by or contained in any information furnished in writing to the Company by such Holder expressly for use therein. The Company shall indemnify the Underwriters, their officers and directors and each person who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to the indemnification of the Holder.

4.1.2     In connection with any Registration Statement in which a Holder of Registrable Securities is participating, such Holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or Prospectus and, to the extent permitted by law, shall indemnify the Company, its directors and officers and agents and each person who controls the Company (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses (including without limitation reasonable attorneys' fees) resulting from any untrue statement of material fact contained in the Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any

15

information or affidavit so furnished in writing by such Holder expressly for use therein; provided, however, that the obligation to indemnify shall be several, not joint and several, among such Holders of Registrable Securities, and the liability of each such Holder of Registrable Securities shall be in proportion to and limited to the net proceeds received by such Holder from the sale of Registrable Securities pursuant to such Registration Statement. The Holders of Registrable Securities shall indemnify the Underwriters, their officers, directors and each person who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to indemnification of the Company.

4.1.3 Any person entitled to indemnification herein shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any person's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

4.1.4 The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling person of such indemnified party and shall survive the transfer of securities. The Company and each Holder of Registrable Securities participating in an offering also agrees to make such provisions as are reasonably requested by any indemnified party for contribution to such party in the event the Company's or such Holder's indemnification is unavailable for any reason.

4.1.5 If the indemnification provided under Section 4.1 hereof from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by, or relates to information supplied by, such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action and the benefits received by the such indemnifying party or indemnified party; provided, however, that the liability of any Holder under this subsection 4.1.5 shall be limited to the amount of the net proceeds received by such Holder in such offering giving rise to such liability. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in subsections 4.1.1, 4.1.2 and 4.1.3 above, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. The parties hereto agree that it would not be just and equitable if contribution pursuant to this subsection 4.1.5 were determined by Pro Rata allocation or by any other method of allocation, which does not take account of the equitable considerations referred to in this subsection 4.1.5. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this subsection 4.1.5 from any person who was not guilty of such fraudulent misrepresentation.

16

**ARTICLE V**
OTHER AGREEMENTS

5.1     Termination of ATI Stockholders Agreement. Each of the New Holders agrees that, effective as of the Effective Time, the ATI Stockholders Agreement shall terminate with no further outstanding payments, expenses, obligations or liabilities of the parties thereunder. Each of the New Holders (i) waives, effective as of the Effective Time, all rights and obligations of the parties under the ATI Stockholder Agreement; (ii) expressly acknowledges that, from and after the Effective Time, none of the parties under the ATI Stockholder Agreement or any of their respective affiliates shall be bound by (or have any obligations under) the ATI Stockholder Agreement and (iii) agrees to execute and deliver such additional documents and take all such further action as may be reasonably necessary or reasonably requested to in furtherance of clauses "(i)" and "(ii)".

**ARTICLE VI**
MISCELLANEOUS

6.1     Notices. Any notice or communication under this Agreement must be in writing and given by (i) deposit in the United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, (ii) delivery in person or by courier service providing evidence of delivery, or (iii) transmission by hand delivery, electronic mail or facsimile. Each notice or communication that is mailed, delivered, or transmitted in the manner described above shall be deemed sufficiently given, served, sent, and received, in the case of mailed notices, on the third business day following the date on which it is mailed and, in the case of notices delivered by courier service, hand delivery, electronic mail or facsimile, at such time as it is delivered to the addressee (with the delivery receipt or the affidavit of messenger) or at such time as delivery is refused by the addressee upon presentation. Any notice or communication under this Agreement must be addressed, if to the Company, ATI Physical Therapy, 790 Remington Blvd., Bolingbrook, Illinois, 60440, Attention: Diana M. Chafey, Chief Legal Officer and Corporate Secretary and, if to any Holder, at such Holder's address or contact information as set forth in the Company's books and records. Any party may change its address for notice at any time and from time to time by written notice to the other parties hereto (email being sufficient), and such change of address shall become effective ten (10) days after delivery of such notice as provided in this Section 6.1.

6.2     Assignment; No Third Party Beneficiaries.

6.2.1     This Agreement and the rights, duties and obligations of the Company and the Holders of Registrable Securities, as the case may be, hereunder may not be assigned or delegated by the Company or the Holders of Registrable Securities, as the case may be, in whole or in part, except (i) in connection with a transfer of Registrable Securities by such Holder to a Permitted Transferee but only if such Permitted Transferee agrees to become bound by the transfer restrictions set forth in this Agreement or (ii) with the prior written consent of the Company, with respect to an assignment by a Holder, or Holders of at least a majority-in-interest of the Registrable Securities at the time in question, with respect to an assignment by the Company.

6.2.2     This Agreement and the provisions hereof shall be binding upon and shall inure to the benefit of each of the parties and its successors and the permitted assigns of the Holders, which shall include Permitted Transferees.

6.2.3     This Agreement shall not confer any rights or benefits on any persons that are not parties hereto, other than as expressly set forth in this Agreement and Section 6.2 hereof.

6.2.4     No assignment by any party hereto of such party's rights, duties and obligations hereunder shall be binding upon or obligate the Company unless and until the Company shall have received (i) written notice of such assignment as provided in Section 6.1 hereof and (ii) the written agreement of the assignee, in a form reasonably satisfactory to the Company, to be bound by the terms and provisions of this Agreement (which may be accomplished by an addendum or certificate of joinder to this Agreement). Any transfer or assignment made other than as provided in this Section 6.2 shall be null and void.

17

6.3     Counterparts. This Agreement may be executed in multiple counterparts (including facsimile or PDF counterparts), each of which shall be deemed an original, and all of which together shall constitute the same instrument, but only one of which need be produced.

6.4     Governing Law; Venue. NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT MAY BE EXECUTED BY ANY OF THE PARTIES HERETO, THE PARTIES EXPRESSLY AGREE THAT (I) THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK AS APPLIED TO AGREEMENTS AMONG NEW YORK RESIDENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS OF SUCH JURISDICTION AND (II) THE VENUE FOR ANY ACTION TAKEN WITH RESPECT TO THIS AGREEMENT SHALL BE ANY STATE OR FEDERAL COURT IN NEW YORK COUNTY IN THE STATE OF NEW YORK.

6.5     Amendments and Modifications. Upon the written consent of the Company and the Holders of at least a majority-in-interest of the Registrable Securities at the time in question, compliance with any of the provisions, covenants and conditions set forth in this Agreement may be waived, or any of such provisions, covenants or conditions may be amended or modified; provided, however, that notwithstanding the foregoing, any amendment hereto or waiver hereof that adversely affects either the Existing Holders as a group or the New Holders as a group, respectively, in a manner that is materially adversely different from Existing Holders or New Holders, as applicable, shall require the consent of at least a majority-in-interest of the Registrable Securities held by such Existing Holders or a majority-in-interest of the Registrable Securities held by such New Holders, as applicable, at the time in question so affected; provided, further, that notwithstanding the foregoing, any amendment hereto or waiver hereof that adversely affects one Holder or group of affiliated Holders, solely in its capacity as a holder of the shares of capital stock of the Company, in a manner that is materially different from the other Holders (in such capacity) shall require the consent of the Holder or group of affiliated Holders so affected. No course of dealing between any Holder or the Company and any other party hereto or any failure or delay on the part of a Holder or the Company in exercising any rights or remedies under this Agreement shall operate as a waiver of any rights or remedies of any Holder or the Company. No single or partial exercise of any rights or remedies under this Agreement by a party shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder or thereunder by such party. Any discretionary waiver of or amendment to the restrictions of any provision of this Agreement, by the Company or the underwriters with respect to any Holder, including any such waiver or amendment that reduces or eliminates the Lock-Up Period, shall apply to each Holder on a pro-rata basis.

6.6     Other Registration Rights. The Company represents and warrants that no person, other than a (i) a Holder of Registrable Securities, or (ii) the parties to those certain Subscription Agreements, dated as of February 21, 2021, by and between the Company and certain investors, has any right to require the Company to register any securities of the Company for sale or to include such securities of the Company in any Registration filed by the Company for the sale of securities for its own account or for the account of any other person. Further, the Company represents and warrants that this Agreement supersedes any other registration rights agreement or agreement with similar terms and conditions and in the event of a conflict between any such agreement or agreements and this Agreement, the terms of this Agreement shall prevail.

6.7     Term. This Agreement shall be valid and enforceable as of the date of this Agreement and may not be revoked by any party hereto; provided that the provisions herein, other than this *Article VI*, shall not be effective until the Effective Time (as such term is defined in the Merger Agreement). In the event the Merger Agreement is terminated in accordance with its terms, this Agreement shall automatically terminate and be of no further force or effect. This Agreement shall terminate upon the earlier of (i) the tenth anniversary of the date of this Agreement and (ii) the date as of which (A) all of the Registrable Securities have been sold pursuant to a Registration Statement (but in no event prior to the applicable period referred to in Section 4(a)(3) of the Securities Act and Rule 174 thereunder (or any successor rule promulgated thereafter by the Commission)) or (B) the Holders of all Registrable Securities are permitted to sell the Registrable Securities under Rule 144 under the Securities Act without limitation, including with respect to volume or the manner of sale. The provisions of Section 3.5 and *Article IV* shall survive any termination.

**[SIGNATURE PAGES FOLLOW]**

18

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed as of the date first written above.

COMPANY:

FORTRESS VALUE ACQUISITION CORP. II,
a Delaware corporation

By: _____
    Name:  Andrew A. McKnight
    Title:   Chief Executive Officer

**EXISTING HOLDERS:**

FORTRESS ACQUISITION SPONSOR II LLC,
a Delaware limited liability company

By: _____
    Name:  Alexander Gillette
    Title:   Secretary

By: _____
    Name: Sunil Gulati

By: _____
    Name: Rakefet Russak-Aminoach

By: _____
    Name: Aaron F. Hood

By: _____
    Name: Carmen Policy

By: _____
    Name: Daniel N. Bass

By: _____
    Name: Micah B. Kaplan

By: _____
    Name: Joshua A. Pack

By: _____
    Name: Andrew A. McKnight

By: _____
    Name: Marc Furstein

By: _____
    Name: Leslie Cowen

[Signature Page to Amended and Restated Registration Rights Agreement]

**NEW HOLDERS:**

**Dakota HoldCo, LLC**

By: _____
        Name:
        Title:

**GCM Grosvenor Co-Investment Opportunities Fund, LP**

By: _____
        Name:
        Title:

**GCM T&R Holdings, LLC**

By: _____
        Name:
        Title:

**Wilco Acquisition, LP**

By: _____
        Name:
        Title:

[Signature Page to Amended and Restated Registration Rights Agreement]

**EXHIBIT B**

**Section 262 of the Delaware General Corporation Law**

§ 262 Appraisal rights [For application of this section, see § 17; 82 Del. Laws, c. 45, § 23; and 82 Del. Laws, c. 256 § 24].

(a)     Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words; and the words "depository receipt" mean a receipt or other instrument issued by a depository representing an interest in 1 or more shares, or fractions thereof, solely of stock of a corporation, which stock is deposited with the depository.

(b)     Appraisal rights shall be available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation to be effected pursuant to § 251 (other than a merger effected pursuant to § 251(g) of this title), § 252, § 254, § 255, § 256, § 257, § 258, § 263 or § 264 of this title:

(1)     Provided, however, that no appraisal rights under this section shall be available for the shares of any class or series of stock, which stock, or depository receipts in respect thereof, at the record date fixed to determine the stockholders entitled to receive notice of the meeting of stockholders to act upon the agreement of merger or consolidation (or, in the case of a merger pursuant to § 251(h), as of immediately prior to the execution of the agreement of merger), were either: (i) listed on a national securities exchange or (ii) held of record by more than 2,000 holders; and further provided that no appraisal rights shall be available for any shares of stock of the constituent corporation surviving a merger if the merger did not require for its approval the vote of the stockholders of the surviving corporation as provided in § 251(f) of this title.

(2)     Notwithstanding paragraph (b)(1) of this section, appraisal rights under this section shall be available for the shares of any class or series of stock of a constituent corporation if the holders thereof are required by the terms of an agreement of merger or consolidation pursuant to §§ 251, 252, 254, 255, 256, 257, 258, 263 and 264 of this title to accept for such stock anything except:

a.     Shares of stock of the corporation surviving or resulting from such merger or consolidation, or depository receipts in respect thereof;

b.     Shares of stock of any other corporation, or depository receipts in respect thereof, which shares of stock (or depository receipts in respect thereof) or depository

6

receipts at the effective date of the merger or consolidation will be either listed on a national securities exchange or held of record by more than 2,000 holders;

c.      Cash in lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a. and b. of this section; or

d.      Any combination of the shares of stock, depository receipts and cash in lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a., b. and c. of this section.

(3)      In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under § 253 or § 267 of this title is not owned by the parent immediately prior to the merger, appraisal rights shall be available for the shares of the subsidiary Delaware corporation.

(4)      [Repealed.]

(c)      Any corporation may provide in its certificate of incorporation that appraisal rights under this section shall be available for the shares of any class or series of its stock as a result of an amendment to its certificate of incorporation, any merger or consolidation in which the corporation is a constituent corporation or the sale of all or substantially all of the assets of the corporation. If the certificate of incorporation contains such a provision, the provisions of this section, including those set forth in subsections (d), (e), and (g) of this section, shall apply as nearly as is practicable.

(d)      Appraisal rights shall be perfected as follows:

(1)      If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, shall notify each of its stockholders who was such on the record date for notice of such meeting (or such members who received notice in accordance with § 255(c) of this title) with respect to shares for which appraisal rights are available pursuant to subsection (b) or (c) of this section that appraisal rights are available for any or all of the shares of the constituent corporations, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Each stockholder electing to demand the appraisal of such stockholder's shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder's shares; provided that a demand may be delivered to the corporation by electronic transmission if directed to an information processing system (if any) expressly designated for that purpose in such notice. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such stockholder's shares. A proxy or vote against the merger or consolidation shall not constitute such a demand. A stockholder electing to take such action must do so by a separate written demand as herein provided. Within 10 days after the effective date of such merger or consolidation, the surviving or resulting corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and has

7

not voted in favor of or consented to the merger or consolidation of the date that the merger or consolidation has become effective; or

(2) If the merger or consolidation was approved pursuant to § 228, § 251(h), § 253, or § 267 of this title, then either a constituent corporation before the effective date of the merger or consolidation or the surviving or resulting corporation within 10 days thereafter shall notify each of the holders of any class or series of stock of such constituent corporation who are entitled to appraisal rights of the approval of the merger or consolidation and that appraisal rights are available for any or all shares of such class or series of stock of such constituent corporation, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Such notice may, and, if given on or after the effective date of the merger or consolidation, shall, also notify such stockholders of the effective date of the merger or consolidation. Any stockholder entitled to appraisal rights may, within 20 days after the date of giving such notice or, in the case of a merger approved pursuant to § 251(h) of this title, within the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days after the date of giving such notice, demand in writing from the surviving or resulting corporation the appraisal of such holder's shares; provided that a demand may be delivered to the corporation by electronic transmission if directed to an information processing system (if any) expressly designated for that purpose in such notice. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such holder's shares. If such notice did not notify stockholders of the effective date of the merger or consolidation, either (i) each such constituent corporation shall send a second notice before the effective date of the merger or consolidation notifying each of the holders of any class or series of stock of such constituent corporation that are entitled to appraisal rights of the effective date of the merger or consolidation or (ii) the surviving or resulting corporation shall send such a second notice to all such holders on or within 10 days after such effective date; provided, however, that if such second notice is sent more than 20 days following the sending of the first notice or, in the case of a merger approved pursuant to § 251(h) of this title, later than the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days following the sending of the first notice, such second notice need only be sent to each stockholder who is entitled to appraisal rights and who has demanded appraisal of such holder's shares in accordance with this subsection. An affidavit of the secretary or assistant secretary or of the transfer agent of the corporation that is required to give either notice that such notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. For purposes of determining the stockholders entitled to receive either notice, each constituent corporation may fix, in advance, a record date that shall be not more than 10 days prior to the date the notice is given, provided, that if the notice is given on or after the effective date of the merger or consolidation, the record date shall be such effective date. If no record date is fixed and the notice is given prior to the effective date, the record date shall be the close of business on the day next preceding the day on which the notice is given.

(e) Within 120 days after the effective date of the merger or consolidation, the surviving or resulting corporation or any stockholder who has complied with subsections (a) and (d) of this section hereof and who is otherwise entitled to appraisal rights, may commence an appraisal proceeding by filing a petition in the Court of Chancery demanding a determination of the value of the stock of all such stockholders. Notwithstanding the foregoing, at any time within

8

60 days after the effective date of the merger or consolidation, any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party shall have the right to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation. Within 120 days after the effective date of the merger or consolidation, any stockholder who has complied with the requirements of subsections (a) and (d) of this section hereof, upon request given in writing (or by electronic transmission directed to an information processing system (if any) expressly designated for that purpose in the notice of appraisal), shall be entitled to receive from the corporation surviving the merger or resulting from the consolidation a statement setting forth the aggregate number of shares not voted in favor of the merger or consolidation (or, in the case of a merger approved pursuant to § 251(h) of this title, the aggregate number of shares (other than any excluded stock (as defined in § 251(h)(6)d. of this title)) that were the subject of, and were not tendered into, and accepted for purchase or exchange in, the offer referred to in § 251(h)(2)), and, in either case, with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. Such statement shall be given to the stockholder within 10 days after such stockholder's request for such a statement is received by the surviving or resulting corporation or within 10 days after expiration of the period for delivery of demands for appraisal under subsection (d) of this section hereof, whichever is later. Notwithstanding subsection (a) of this section, a person who is the beneficial owner of shares of such stock held either in a voting trust or by a nominee on behalf of such person may, in such person's own name, file a petition or request from the corporation the statement described in this subsection.

(f) Upon the filing of any such petition by a stockholder, service of a copy thereof shall be made upon the surviving or resulting corporation, which shall within 20 days after such service file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached by the surviving or resulting corporation. If the petition shall be filed by the surviving or resulting corporation, the petition shall be accompanied by such a duly verified list. The Register in Chancery, if so ordered by the Court, shall give notice of the time and place fixed for the hearing of such petition by registered or certified mail to the surviving or resulting corporation and to the stockholders shown on the list at the addresses therein stated. Such notice shall also be given by 1 or more publications at least 1 week before the day of the hearing, in a newspaper of general circulation published in the City of Wilmington, Delaware or such publication as the Court deems advisable. The forms of the notices by mail and by publication shall be approved by the Court, and the costs thereof shall be borne by the surviving or resulting corporation.

(g) At the hearing on such petition, the Court shall determine the stockholders who have complied with this section and who have become entitled to appraisal rights. The Court may require the stockholders who have demanded an appraisal for their shares and who hold stock represented by certificates to submit their certificates of stock to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any stockholder fails to comply with such direction, the Court may dismiss the proceedings as to such stockholder. If immediately before the merger or consolidation the shares of the class or series of stock of the constituent corporation as to which appraisal rights are available were listed on a national securities exchange, the Court shall dismiss the proceedings as to all holders of such shares who are otherwise entitled to appraisal rights unless (1) the total number of shares entitled to appraisal

9

exceeds 1% of the outstanding shares of the class or series eligible for appraisal, (2) the value of the consideration provided in the merger or consolidation for such total number of shares exceeds $1 million, or (3) the merger was approved pursuant to § 253 or § 267 of this title.

(h)        After the Court determines the stockholders entitled to an appraisal, the appraisal proceeding shall be conducted in accordance with the rules of the Court of Chancery, including any rules specifically governing appraisal proceedings. Through such proceeding the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors. Unless the Court in its discretion determines otherwise for good cause shown, and except as provided in this subsection, interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment. At any time before the entry of judgment in the proceedings, the surviving corporation may pay to each stockholder entitled to appraisal an amount in cash, in which case interest shall accrue thereafter as provided herein only upon the sum of (1) the difference, if any, between the amount so paid and the fair value of the shares as determined by the Court, and (2) interest theretofore accrued, unless paid at that time. Upon application by the surviving or resulting corporation or by any stockholder entitled to participate in the appraisal proceeding, the Court may, in its discretion, proceed to trial upon the appraisal prior to the final determination of the stockholders entitled to an appraisal. Any stockholder whose name appears on the list filed by the surviving or resulting corporation pursuant to subsection (f) of this section and who has submitted such stockholder's certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until it is finally determined that such stockholder is not entitled to appraisal rights under this section.

(i)        The Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. Payment shall be so made to each such stockholder, in the case of holders of uncertificated stock forthwith, and the case of holders of shares represented by certificates upon the surrender to the corporation of the certificates representing such stock. The Court's decree may be enforced as other decrees in the Court of Chancery may be enforced, whether such surviving or resulting corporation be a corporation of this State or of any state.

(j)        The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon application of a stockholder, the Court may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares entitled to an appraisal.

(k)        From and after the effective date of the merger or consolidation, no stockholder who has demanded appraisal rights as provided in subsection (d) of this section shall be entitled to vote such stock for any purpose or to receive payment of dividends or other distributions on the stock (except dividends or other distributions payable to stockholders of record at a date

10

which is prior to the effective date of the merger or consolidation); provided, however, that if no petition for an appraisal shall be filed within the time provided in subsection (e) of this section, or if such stockholder shall deliver to the surviving or resulting corporation a written withdrawal of such stockholder's demand for an appraisal and an acceptance of the merger or consolidation, either within 60 days after the effective date of the merger or consolidation as provided in subsection (e) of this section or thereafter with the written approval of the corporation, then the right of such stockholder to an appraisal shall cease. Notwithstanding the foregoing, no appraisal proceeding in the Court of Chancery shall be dismissed as to any stockholder without the approval of the Court, and such approval may be conditioned upon such terms as the Court deems just; provided, however that this provision shall not affect the right of any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation within 60 days after the effective date of the merger or consolidation, as set forth in subsection (e) of this section.

(l)     The shares of the surviving or resulting corporation to which the shares of such objecting stockholders would have been converted had they assented to the merger or consolidation shall have the status of authorized and unissued shares of the surviving or resulting corporation.

11



**James Facciolla <jfacciolla@strategicclaims.net>**

# Re: ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents
1 message

**James Facciolla** <jfacciolla@strategicclaims.net>                    Thu, Mar 20, 2025 at 6:13 PM
To: Bob McKenzie
Cc: Claims Analyst <info@strategicclaims.net>

Hello Robert,

I've added both these documents to your claim file.

At this point, we are going to present this, and all other contests, to the Court so that they can make an independent decision regarding these claims and provide guidance on who is and isn't entitled to recovery under the Settlement Agreement and Order. Our correspondence and attachments will be made available to the Court to assist them in their determination.

If the Court chooses to pay these claims in full, we will honor the full value of the claims per the Court's direction.

Thank you,

On Thu, Mar 20, 2025 at 5:48 PM Bob McKenzie                         > wrote:
James -

I write in response to your email below regarding Robert McKenzie, Control #566, and Dakota Holdco, LLC, Control #565.

1.  Dakota Holdco, LLC and I do not believe that any documents regarding prior transactions or tax basis are relevant to determine our eligibility to participate in this class action.  Both Dakota Holdco, LLC and I acquired common stock of the Company trading under the ticker ATIP or FAII, during the relevant class period, at $10/share.  However, in the interests of an amicable resolution, my prior emails on March 20, 2025 included a copy of the Rollover and Contribution Agreement substantiating my individual investment in Wilco Acquisition, LP.  I have also attached a copy of my individual 2016 Schedule K-1 from Wilco Acquisition, LP to this email, which further verifies my investment of $575,000. In addition, I have attached a copy of Dakota Holdco, LLC's 2018 IRS Form 1065, which is the oldest tax document we have been able to locate for Dakota Holdco, LLC in the short time provided by Strategic Claims.  The supporting schedules to the IRS Form 1065 reflect Dakota Holdco, LLC's investment in Wilco Holdco, Inc., ~$23.18M.  Dakota Holdco, LLC's investment in Wilco Holdco, Inc. was its only investment at the time.

2.  Dakota Holdco, LLC and I dispute that acquisition of the shares on the NYSE is required under the terms of the Stipulation and Agreement of Settlement dated May 13, 2024 (the "Settlement Agreement").  The Settlement Agreement defines "ATI Securities" as "ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII."  There is no requirement in the definition of ATI Securities, or elsewhere in the Settlement Agreement, that ATI Securities be acquired on the NYSE.  The Settlement Agreement expressly addresses this question elsewhere: a) "Settlement Class" is defined to include, among others, "all persons and entities who ... purchased or **otherwise acquired** ATI Securities between February 22, 2021 and October 19, 2021, both dates inclusive;" and b) in Section D provides that the Securities Plaintiffs filed the Securities Complaint "on behalf of all persons and entities who: (i) purchase or **otherwise acquired** ATI Securities between February 22, 2022 and October 19, 2021."  While Dakota Holdco, LLC and I may not have purchased the shares at issue through a brokerage, we both undeniably acquired common stock of the Company that traded under the ticker symbol ATIP or FAII during the relevant class period, which meets the requirements of the Settlement Agreement.

-Robert McKenzie
Individually and as Manager of Dakota Holdco, LLC

On Thu, Mar 20, 2025 at 1:22 PM James Facciolla <jfacciolla@strategicclaims.net> wrote:
Thanks Robert, I did get your original response, so we are going through those documents, there is quite a bit there

so please bear with us while we go through them.

My follow up questions remain for the open two items.

(1) Do you have a specific record of payment showing what the true tax basis of the shares are? I understand the agreement has an associated value, the same value you suggested in our call ($10), however I need some supporting documentation that is what you actually paid for the shares. This could be a wire transfer receipt, or something IRS related that shows the cost basis, but it must be substantive that indicates the date, quantity of shares, and total cost of shares associated with the transaction.

(2) Where in either of the agreements, does it indicate that these shares were acquired on the New York Stock Exchange? My understanding of these agreements are that these transactions generally take place off-exchange prior to the IPO, or are performed "upstairs" and involve non-public restricted shares. If that isn't the situation, can you provide something from the brokerage firm or Continental showing the trade venue?

Thank you,

On Thu, Mar 20, 2025 at 2:13 PM Bob McKenzie                     wrote:

> James -
>
> I write to follow-up on our call of March 20, 2025 and my email of March 20, 2025.  I dispute the determination set forth in your email below regarding Robert McKenzie, Control #566, and Dakota Holdco, LLC, Control #565 and request court review.
>
> Strategic Claims' conclusion that Dakota Holdco, LLC and I did not acquire or purchase ATI Securities and, instead, engaged in an equity conversion or continued to hold private shares of "'old' ATI" is incorrect.  As more fully set forth below, Dakota Holdco, LLC and I do not believe that we engaged in an equity conversion or made a claim related to private shares of "'old' ATI," but instead purchased or acquired Company stock.  Had this been a conversion we believe that there would have been no exchange of any prior equity interest for new equity interests, but instead, that Dakota Holdco, LLC and I would have retained our as-converted original equity interests.  That did not happen here as Dakota Holdco, LLC and I gave up our original equity interests and received new, completely different, equity interests in a completely different entity.
>
> Strategic Claims' conclusion that Dakota Holdco, LLC and I acquired shares prior to the settlement period is also incorrect.  As more fully set forth below, Dakota Holdco, LLC and I believe that we acquired shares of the Company in or about June 2021 and that any prior equity interests were not shares of or equity interest in the Company.  We believe that since there was no conversion of shares, but instead Dakota Holdco, LLC and I gave up our original equity interests and received new, completely different, equity interests in a completely different entity, we certainly did not acquire those new equity interests prior to the settlement period.
>
> If Strategic Claims refuses to resolve this amicably, I anticipate that Dakota Holdco, LLC and I will be forced to retain counsel and litigate this matter, which would unfortunately hold up the settlement for the entire class.
>
> **Regarding Dakota Holdco, LLC:**
>
> I have attached a Written Consent In Lieu of A Meeting of Stockholders of Wilco Holdco, Inc. dated February 21, 2021 confirming that prior to the Merger, Dakota Holdco, LLC was the holder of 23,179.19910431 shares of Series A-1 preferred stock of Wilco Holdco, Inc.
>
> I also direct you to the *Amended and Restated Registration Rights Agreement* included in the

Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm (last visited March 20, 2025). Dakota Holdco, LLC was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature page included therewith. The Amended and Restated Registration Rights Agreement provided that New Holders, including Dakota Holdco, LLC, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)." The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of preferred stock of Wilco Holdco, Inc. would receive common stock of the Company: "Each share of [Wilco Holdco, Inc.] preferred stock issued and outstanding immediately prior to the effective time will be converted into the right to receive ... (B) a number of shares of ATI Class A common stock equal in value to (i) the product of (a) (x) the Preferred Stock Adjusted Base plus (y) an aggregate accrued amount, calculated based on the Preferred Stock Adjusted Base, at the Dividend Rate (as defined in the [Wilco Holdco, Inc.'s] current charter) from the closing date through the date that is 180 days from the closing date, multiplied by (b) 1.05, divided by (ii) the number of shares of [Wilco Holdco, Inc.] preferred stock outstanding as of immediately prior to the effective time."

**Thus, Dakota Holdco, LLC, in consideration of agreeing to convert certain of its rights in preferred stock of Wilco Holdco, Inc., then valued at $30,381,970 (which Dakota Holdco, LLC argues is its cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 3,038,197 shares of common stock of Company, valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders."** See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Dakota Holdco, LLC: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

**Regarding Robert McKenzie, Individually:**

As you are aware, I submitted an individual claim related to 85,852 shares of the Company's common stock. In or about May, 2016, I became a limited partner of Wilco Acquisition, LP and through Wilco Acquisition, LP I became a beneficial owner of 85,852 shares of the Company's common stock that were distributed to me in or about November, 2021. *See*, the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021 which provides that "Wilco Acquisition intends to distribute such shares of Common Stock to its limited partners and general partner, each of which will be a permitted transferee under the A&R RRA and is named as a selling securityholder herein." https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

I understand that Wilco Acquisition, LP failed or refused to file a claim in this matter and, as a result, I filed my individual claim as I was the beneficial owner of the shares. I have attached a copy of a Rollover and Contribution Agreement made effective in May, 2016 (Exhibit A redacted), reflecting my initial investment of $575,000 in Wilco Acquisition, LP. Thus, I did not have zero basis in my interest as you assert.

I again direct you to the *Amended and Restated Registration Rights Agreement* included in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm (last visited March 20, 2025).  Wilco Acquisition, LP was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature page included therewith.  The Amended and Restated Registration Rights Agreement provided that New Holders, including Wilco Acquisition, LP, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)."  The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of common stock of Wilco Holdco, Inc. would receive common stock of the Company:  " Each share of [Wilco Holdco, Inc.] common stock issued and outstanding immediately prior to the effective time will be converted into the right to receive (A) a number of shares of ATI Class A common stock equal in value to (1) $1,303,000,000 divided by (2) the number of shares of Company common stock outstanding as of immediately prior to the effective time…"

Thus, Wilco Acquisition, LP, in consideration of agreeing to convert certain of its rights in common stock of Wilco Holdco, Inc. valued at $1,303,0000,000 (which I believe represents Wilco Acquisition, LP's cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 130,300,000 shares of common stock of Company **(of which 85,852 shares, with a cost basis of $858,520, were beneficially owned by Robert McKenzie, individually),** valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders."  See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Wilco Acquisition, LP: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

-Robert McKenzie
Individually and as Manager of Dakota Holdco, LLC

On Thu, Mar 20, 2025 at 11:59 AM James Facciolla <jfacciolla@strategicclaims.net> wrote:
Hello Robert,

Per our earlier phone call, and at request of Pomerantz LLP, I am reaching out to clarify the ineligibility letter you received from Strategic Claims Services, mailed February 27, 2025.

Our final determination is as follows.

**Your claims (see below) remain ineligible for the following reasons.**

| Claim | Name 1 | Name 2 |
|---|---|---|
| 565 | DAKOTA HOLDCO LLC | ROBERT MCKENZIE, MANAGER |
| 566 | ROBERT MCKENZIE | |

(1) Per the definition in the Stipulation of Settlement (https://www.strategicclaims.net/wp-content/uploads/2024/06/FULLY-EXECUTED-ATI-Stipulation-of-Settlement-PDF-00609416xC40C2.pdf), *"ATI Securities" means ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII.* Equity conversions,

or private shares of "old" ATI do not classify as a purchase or acquisition based upon the language of the Stipulation of Settlement.

(2) Your shares were acquired prior to the Settlement Class Period, in order to participate in the Settlement, shares must have been *(a) purchased or otherwise acquired ATI Securities between February 22, 2021 and October 19, 2021, both dates inclusive, and/or beneficially owned and/or held FVAC common stock as of May 24, 2021 and were eligible to vote at FVAC's June 15, 2021 special meeting to vote on the Business Combination (the "Securities Subclass"); and/or (b) beneficially owned and/or held FVAC Class A common stock as of the June 11, 2021 Redemption Date who were entitled to, but did not elect to, redeem their shares (the "Multiplan Subclass").* Per the ATI IPO Filing and Prospectus, these shares were held prior to the Settlement Class Period dates making them ineligible.

If you disagree with our determination please provide us the necessary supporting documentation to allow us to amend or confirm the above. Some examples of supporting documentation could include monthly statements from your financial institution, grant or option agreements, copies of checks, wires or other payment related receipts, etc. We already have your documents from the Transfer Agent, Continental, so you do not need to resend those documents. Any additional documents should be sent directly to me.

If you feel you still have received this notice in error and would like to contest our determination, please respond to this email in writing no later than Tuesday, March 25, 2025 officially requesting for Court review. Please be sure to include your claim number as noted above, your reason for contesting our determination, and documentation supporting your reason. If we do not hear from you by the above date, we will assume you agree with our determination and close out the dispute without Court review.

Thank you,

--
James Facciolla
Institution Relations Manager
Strategic Claims Services, Inc.
600 N. Jackson Street
Suite 205
Media, PA 19063
610-565-9202 x 1013

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

--
James Facciolla
Institution Relations Manager
Strategic Claims Services, Inc.
600 N. Jackson Street
Suite 205
Media, PA 19063
610-565-9202 x 1013

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

--
James Facciolla
Institution Relations Manager
Strategic Claims Services, Inc.
600 N. Jackson Street
Suite 205

Media, PA 19063
610-565-9202 x 1013

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

651113

| | Final K-1 | | Amended K-1 | OMB No. 1545-0123 |
|---|---|---|---|---|

**Schedule K-1**
**(Form 1065)**

**2016**

Department of the Treasury
Internal Revenue Service

For calendar year 2016, or tax
year beginning  03/21  , 2016
ending  12/31  , 20 16

**Partner's Share of Income, Deductions,**
**Credits, etc.**  ▶ **See back of form and separate instructions.**

| **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| | | 19 | Distributions |
| 12 | Section 179 deduction | A | - |
| 13 | Other deductions | | |
| | | 20 | Other information |
| 14 | Self-employment earnings (loss) | | |

| **Part I** | **Information About the Partnership** |
|---|---|

**A**  Partnership's employer identification number

**B**  Partnership's name, address, city, state, and ZIP code

WILCO ACQUISITION, LP
790 REMINGTON BLVD
BOLINGBROOK, IL  60440

**C**  IRS Center where partnership filed return

E-FILE

**D**  ☐ Check if this is a publicly traded partnership (PTP)

| **Part II** | **Information About the Partner** |
|---|---|

**E**  Partner's identifying number

**F**  Partner's name, address, city, state, and ZIP code

ROBERT MCKENZIE

**G**  ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

**H**  ☒ Domestic partner    ☐ Foreign partner

**I1**  What type of entity is this partner?  INDIVIDUAL

**I2**  If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐

**J**  Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | | 0.060947% |
| Loss | | 0.060947% |
| Capital | | 0.060947% |

**K**  Partner's share of liabilities at year end:

Nonrecourse . . . . . . . . . $ _____

Qualified nonrecourse financing . . . $ _____

Recourse . . . . . . . . . . $ _____

**L**  Partner's capital account analysis:

Beginning capital account . . . . . $ _____

Capital contributed during the year . . $ 575,000

Current year increase (decrease) . . $ _____

Withdrawals & distributions . . . . $ _____

Ending capital account . . . . . . $ 575,000

☐ Tax basis    ☐ GAAP    ☒ Section 704(b) book

☐ Other (explain)

**M**  Did the partner contribute property with a built-in gain or loss?

☐ Yes    ☒ No

If "Yes," attach statement (see instructions)

*See attached statement for additional information.

For IRS Use Only

Schedule K-1 (Form 1065) 2016 — Page **2**

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040.
For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.

**1. Ordinary business income (loss).** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows.

| | Report on |
|---|---|
| Passive loss | See the Partner's Instructions |
| Passive income | Schedule E, line 28, column (g) |
| Nonpassive loss | Schedule E, line 28, column (h) |
| Nonpassive income | Schedule E, line 28, column (j) |

**2. Net rental real estate income (loss)** — See the Partner's Instructions

**3. Other net rental income (loss)**

| | |
|---|---|
| Net income | Schedule E, line 28, column (g) |
| Net loss | See the Partner's Instructions |
| | Schedule E, line 28, column (j) |

**4. Guaranteed payments** — Schedule E, line 28, column (j)
**5. Interest income** — Form 1040, line 8a
**6a. Ordinary dividends** — Form 1040, line 9a
**6b. Qualified dividends** — Form 1040, line 9b
**7. Royalties** — Schedule E, line 4
**8. Net short-term capital gain (loss)** — Schedule D, line 5
**9a. Net long-term capital gain (loss)** — Schedule D, line 12
**9b. Collectibles (28%) gain (loss)** — 28% Rate Gain Worksheet, line 4 (Schedule D instructions)
**9c. Unrecaptured section 1250 gain** — See the Partner's Instructions
**10. Net section 1231 gain (loss)** — See the Partner's Instructions

**11. Other income (loss)**

| Code | | Report on |
|---|---|---|
| A | Other portfolio income (loss) | See the Partner's Instructions |
| B | Involuntary conversions | See the Partner's Instructions |
| C | Sec. 1256 contracts & straddles | Form 6781, line 1 |
| D | Mining exploration costs recapture | See Pub. 535 |
| E | Cancellation of debt | Form 1040, line 21 or Form 982 |
| F | Other income (loss) | See the Partner's Instructions |

**12. Section 179 deduction** — See the Partner's Instructions

**13. Other deductions**

| Code | | Report on |
|---|---|---|
| A | Cash contributions (50%) | |
| B | Cash contributions (30%) | |
| C | Noncash contributions (50%) | |
| D | Noncash contributions (30%) | See the Partner's Instructions |
| E | Capital gain property to a 50% organization (30%) | |
| F | Capital gain property (20%) | |
| G | Contributions (100%) | |
| H | Investment interest expense | Form 4952, line 1 |
| I | Deductions—royalty income | Schedule E, line 19 |
| J | Section 59(e)(2) expenditures | See the Partner's Instructions |
| K | Deductions—portfolio (2% floor) | Schedule A, line 23 |
| L | Deductions—portfolio (other) | Schedule A, line 28 |
| M | Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| N | Educational assistance benefits | See the Partner's Instructions |
| O | Dependent care benefits | Form 2441, line 12 |
| P | Preproductive period expenses | See the Partner's Instructions |
| Q | Commercial revitalization deduction from rental real estate activities | See Form 8582 instructions |
| R | Pensions and IRAs | See the Partner's Instructions |
| S | Reforestation expense deduction | See the Partner's Instructions |
| T | Domestic production activities information | See Form 8903 instructions |
| U | Qualified production activities income | Form 8903, line 7b |
| V | Employer's Form W-2 wages | Form 8903, line 17 |
| W | Other deductions | See the Partner's Instructions |

**14. Self-employment earnings (loss)**

Note: If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.

| Code | | Report on |
|---|---|---|
| A | Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| B | Gross farming or fishing income | See the Partner's Instructions |
| C | Gross non-farm income | See the Partner's Instructions |

**15. Credits**

| Code | | Report on |
|---|---|---|
| A | Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| B | Low-income housing credit (other) from pre-2008 buildings | |
| C | Low-income housing credit (section 42(j)(5)) from post-2007 buildings | |
| D | Low-income housing credit (other) from post-2007 buildings | See the Partner's Instructions |
| E | Qualified rehabilitation expenditures (rental real estate) | |
| F | Other rental real estate credits | |
| G | Other rental credits | |
| H | Undistributed capital gains credit | Form 1040, line 73; check box a |
| I | Biofuel producer credit | |
| J | Work opportunity credit | See the Partner's Instructions |
| K | Disabled access credit | |

| Code | | Report on |
|---|---|---|
| L | Empowerment zone employment credit | |
| M | Credit for increasing research activities | |
| N | Credit for employer social security and Medicare taxes | See the Partner's Instructions |
| O | Backup withholding | |
| P | Other credits | |

**16. Foreign transactions**

| Code | | Report on |
|---|---|---|
| A | Name of country or U.S. possession | |
| B | Gross income from all sources | Form 1116, Part I |
| C | Gross income sourced at partner level | |

*Foreign gross income sourced at partnership level*

| | | |
|---|---|---|
| D | Passive category | |
| E | General category | Form 1116, Part I |
| F | Other | |

*Deductions allocated and apportioned at partner level*

| | | |
|---|---|---|
| G | Interest expense | Form 1116, Part I |
| H | Other | Form 1116, Part I |

*Deductions allocated and apportioned at partnership level to foreign source income*

| | | |
|---|---|---|
| I | Passive category | |
| J | General category | Form 1116, Part I |
| K | Other | |

*Other information*

| | | |
|---|---|---|
| L | Total foreign taxes paid | Form 1116, Part II |
| M | Total foreign taxes accrued | Form 1116, Part II |
| N | Reduction in taxes available for credit | Form 1116, line 12 |
| O | Foreign trading gross receipts | Form 8873 |
| P | Extraterritorial income exclusion | Form 8873 |
| Q | Other foreign transactions | See the Partner's Instructions |

**17. Alternative minimum tax (AMT) items**

| Code | | Report on |
|---|---|---|
| A | Post-1986 depreciation adjustment | |
| B | Adjusted gain or loss | See the Partner's Instructions and the Instructions for Form 6251 |
| C | Depletion (other than oil & gas) | |
| D | Oil, gas, & geothermal—gross income | |
| E | Oil, gas, & geothermal—deductions | |
| F | Other AMT items | |

**18. Tax-exempt income and nondeductible expenses**

| Code | | Report on |
|---|---|---|
| A | Tax-exempt interest income | Form 1040, line 8b |
| B | Other tax-exempt income | See the Partner's Instructions |
| C | Nondeductible expenses | See the Partner's Instructions |

**19. Distributions**

| Code | | Report on |
|---|---|---|
| A | Cash and marketable securities | |
| B | Distribution subject to section 737 | See the Partner's Instructions |
| C | Other property | |

**20. Other information**

| Code | | Report on |
|---|---|---|
| A | Investment income | Form 4952, line 4a |
| B | Investment expenses | Form 4952, line 5 |
| C | Fuel tax credit information | Form 4136 |
| D | Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| E | Basis of energy property | See the Partner's Instructions |
| F | Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| G | Recapture of low-income housing credit (other) | Form 8611, line 8 |
| H | Recapture of investment credit | See Form 4255 |
| I | Recapture of other credits | See the Partner's Instructions |
| J | Look-back interest—completed long-term contracts | See Form 8697 |
| K | Look-back interest—income forecast method | See Form 8866 |
| L | Dispositions of property with section 179 deductions | |
| M | Recapture of section 179 deduction | |
| N | Interest expense for corporate partners | |
| O | Section 453(l)(3) information | |
| P | Section 453A(c) information | |
| Q | Section 1260(b) information | |
| R | Interest allocable to production expenditures | See the Partner's Instructions |
| S | CCF nonqualified withdrawals | |
| T | Depletion information—oil and gas | |
| U | Reserved | |
| V | Unrelated business taxable income | |
| W | Precontribution gain (loss) | |
| X | Section 108(i) information | |
| Y | Net investment income | |
| Z | Other information | |

# GrantThornton

DAKOTA HOLDCO, LLC
INSTRUCTIONS FOR FILING
FORM 8879-PE
2018 IRS E-FILE SIGNATURE AUTHORIZATION FOR FORM 1065
FOR THE YEAR ENDED DECEMBER 31, 2018

THE ORIGINAL FORM SHOULD BE SIGNED (USING FULL NAME AND TITLE)
AND DATED BY AN AUTHORIZED GENERAL PARTNER OR LIMITED LIABILITY
COMPANY MEMBER MANAGER OF THE PARTNERSHIP.

THE SIGNED FORM SHOULD BE RETURNED ON OR BEFORE MARCH 15, 2019
TO:

GRANT THORNTON LLP
757 THIRD AVENUE, 4TH FLOOR
NEW YORK, NY  10017

DO NOT SEPARATELY FILE A PAPER FORM 1065 WITH THE INTERNAL
REVENUE SERVICE.  DOING SO WILL DELAY THE PROCESSING OF YOUR
RETURN.

WE MUST RECEIVE YOUR SIGNED FORM BEFORE WE CAN ELECTRONICALLY
TRANSMIT YOUR RETURN.  THE INTERNAL REVENUE SERVICE WILL NOTIFY
US WHEN YOUR RETURN IS ACCEPTED.  PLEASE NOTE THAT THE IRS DOES
NOT CONSIDER YOUR RETURN AS FILED UNTIL THEY CONFIRM ACCEPTANCE
OF THE RETURN.

"Grant Thornton" refers to Grant Thornton LLP, the U.S. member firm of Grant Thornton International Ltd (GTIL), and/or refers to the brand under which the GTIL member firms provide audit, tax and advisory services to their clients, as the context requires. GTIL and each of its member firms are separate legal entities and are not a worldwide partnership. GTIL does not provide services to clients. Services are delivered by the member firms in their respective countries. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. In the United States, visit GT.COM for details.

Form **8879-PE**

**IRS _e-file_ Signature Authorization for Form 1065**

▶ Return completed Form 8879-PE to your ERO. (Don't send to the IRS.)

▶ Go to *www.irs.gov/Form8879PE* for the latest information.

OMB No. 1545-0123

20**18**

Department of the Treasury
Internal Revenue Service

For calendar year 2018, or tax year beginning _____ , 2018, and ending _____ , 20_____ .

Name of partnership

DAKOTA HOLDCO, LLC

Employer identification number

| Part I | Tax Return Information (Whole dollars only) | | |
|---|---|---|---|
| **1** | Gross receipts or sales less returns and allowances (Form 1065, line 1c) | **1** | |
| **2** | Gross profit (Form 1065, line 3) | **2** | |
| **3** | Ordinary business income (loss) (Form 1065, line 22) | **3** | |
| **4** | Net rental real estate income (loss) (Form 1065, Schedule K, line 2) | **4** | |
| **5** | Other net rental income (loss) (Form 1065, Schedule K, line 3c) | **5** | |

**Part II** **Declaration and Signature Authorization of Partner or Member**
**(Be sure to get a copy of the partnership's return)**

Under penalties of perjury, I declare that I am a partner or member of the above partnership and that I have examined a copy of the partnership's 2018 electronic return of partnership income and accompanying schedules and statements and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts shown on the copy of the partnership's electronic return of partnership income. I consent to allow my electronic return originator (ERO), transmitter, or intermediate service provider to send the partnership's return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission and **(b)** the reason for any delay in processing the return. I have selected a personal identification number (PIN) as my signature for the partnership's electronic return of partnership income.

**Partner or Member's PIN: check one box only**

[X] I authorize GRANT THORNTON LLP _____ to enter my PIN [ | | | | | ] as my signature
ERO firm name                                   Don't enter all zeros

on the partnership's 2018 electronically filed return of partnership income.

[ ] As a partner or member of the partnership, I will enter my PIN as my signature on the partnership's 2018 electronically filed return of partnership income.

Partner or member's signature ▶ _____

Title ▶ SECRETARY                                      Date ▶ _____

**Part III** **Certification and Authentication**

**ERO's EFIN/PIN.** Enter your six-digit EFIN followed by your five-digit self-selected PIN. [ | | | | | | | | | | ]
Don't enter all zeros

I certify that the above numeric entry is my PIN, which is my signature on the 2018 electronically filed return of partnership income for the partnership indicated above. I confirm that I am submitting this return in accordance with the requirements of **Pub. 3112,** IRS *e-file* Application and Participation, and **Pub. 4163,** Modernized e-File (MeF) Information for Authorized IRS *e-file* Providers for Business Returns.

ERO's signature ▶ _____  Date ▶ _____

**ERO Must Retain This Form - See Instructions**
**Don't Submit This Form to the IRS Unless Requested To Do So**

For Paperwork Reduction Act Notice, see instructions.

Form **8879-PE** (2018)

JSA
8P8907 1.000

5653LX  700H  03/08/2019 15:55:56

| Form **1065** | | **U.S. Return of Partnership Income** | | OMB No. 1545-0123 |
|---|---|---|---|---|

Department of the Treasury
Internal Revenue Service

For calendar year 2018, or tax year beginning _____, 2018, ending_____, 20_____.

▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

**2018**

| **A** Principal business activity | | Name of partnership | **D** Employer identification number |
|---|---|---|---|
| INVESTMENT | Type or Print | DAKOTA HOLDCO, LLC | |
| **B** Principal product or service | | Number, street, and room or suite no. If a P.O. box, see instructions. | **E** Date business started |
| INVESTMENT | | | 08/31/2016 |
| **C** Business code number | | City or town, state or province, country, and ZIP or foreign postal code | **F** Total assets (see instructions) |
| 523900 | | | $ 23,181,191. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year. ▶ _____ 153

**J** Check if Schedules C and M-3 are attached. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | | |
|---|---|---|---|---|
| **Income** | **1a** | Gross receipts or sales. . . . . . . . . . . . . . . . . . . . | **1a** | |
| | **b** | Returns and allowances . . . . . . . . . . . . . . . . . . | **1b** | |
| | **c** | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . | **1c** | |
| | **2** | Cost of goods sold (attach Form 1125-A). . . . . . . . . . . . . | **2** | |
| | **3** | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . | **3** | |
| | **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement). . . . . . | **4** | |
| | **5** | Net farm profit (loss) (attach Schedule F (Form 1040)). . . . . . . . . | **5** | |
| | **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . | **6** | |
| | **7** | Other income (loss) (attach statement) . . . . . . . . . . . | **7** | |
| | **8** | **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . | **8** | |
| **Deductions (see instructions for limitations)** | **9** | Salaries and wages (other than to partners) (less employment credits) . . . . . . . . . | **9** | |
| | **10** | Guaranteed payments to partners. . . . . . . . . . . . . . | **10** | |
| | **11** | Repairs and maintenance . . . . . . . . . . . . . . . . . | **11** | |
| | **12** | Bad debts. . . . . . . . . . . . . . . . . . . . . . | **12** | |
| | **13** | Rent . . . . . . . . . . . . . . . . . . . . . . . . | **13** | |
| | **14** | Taxes and licenses. . . . . . . . . . . . . . . . . . . | **14** | |
| | **15** | Interest (see instructions) . . . . . . . . . . . . . . . . | **15** | |
| | **16a** | Depreciation (if required, attach Form 4562). . . . . . . . | **16a** | |
| | **b** | Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | **16c** |
| | **17** | Depletion **(Do not deduct oil and gas depletion.)** . . . . . . . . | **17** | |
| | **18** | Retirement plans, etc.. . . . . . . . . . . . . . . . . . | **18** | |
| | **19** | Employee benefit programs . . . . . . . . . . . . . . . | **19** | |
| | **20** | Other deductions (attach statement) . . . . . . . . . . . . | **20** | |
| | **21** | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 . . . | **21** | |
| | **22** | **Ordinary business income (loss).** Subtract line 21 from line 8 . . . . . . . . . . | **22** | |
| **Tax and Payment** | **23** | Interest due under the look-back method - completed long-term contracts (attach Form 8697). | **23** | |
| | **24** | Interest due under the look-back method - income forecast method (attach Form 8866) . . . . | **24** | |
| | **25** | BBA AAR imputed underpayment (see instructions) . . . . . . . . . | **25** | |
| | **26** | Other taxes (see instructions) . . . . . . . . . . . . . . | **26** | |
| | **27** | **Total balance due.** Add lines 23 through 27 . . . . . . . . . . | **27** | |
| | **28** | Payment (see instructions). . . . . . . . . . . . . . . . | **28** | |
| | **29** | Amount owed. If line 28 is smaller than line 27, enter amount owed. . . . . . . . . . | **29** | |
| | **30** | Overpayment. If line 28 is larger than line 27, enter overpayment . . . . . . . . . | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

SECRETARY

ROBERT MCKENZIE

▶ _____     ▶ _____
Signature of partner or limited liability company member                Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| THOMAS KENISON | | | | |
| Firm's name ▶ GRANT THORNTON LLP | | | Firm's EIN ▶ | |
| Firm's address ▶ | | | Phone no. ▶ | |

**For Paperwork Reduction Act Notice, see separate instructions.**

JSA  8P1010 2.000

Form **1065** (2018)

5653LX   700H   03/08/2019 15:55:56

Form 1065 (2018)          Page **2**

## Schedule B    Other Information

| | | Yes | No |
|---|---|---|---|
| **1** | What type of entity is filing this return? Check the applicable box: | | |

| | | | | |
|---|---|---|---|---|
| **a** | ☐ Domestic general partnership | **b** | ☐ Domestic limited partnership | |
| **c** | ☒ Domestic limited liability company | **d** | ☐ Domestic limited liability partnership | |
| **e** | ☐ Foreign partnership | **f** | ☐ Other ▶ | |

| | | Yes | No |
|---|---|---|---|
| **2** | At the end of the tax year: | | |
| **a** | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization, or any foreign government own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership . . . . . . . . . . . . . . . . . . | | X |
| **b** | Did any individual or estate own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership . . . . . . . . . . . . . . . . . . | | X |
| **3** | At the end of the tax year, did the partnership: | | |
| **a** | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (iv) below . . . . . . . . . . . . . . . . . . | | X |

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | Yes | No |
|---|---|---|---|
| **b** | Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below . . . . | | X |

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | Yes | No |
|---|---|---|---|
| **4** | Does the partnership satisfy **all four** of the following conditions? | | |
| **a** | The partnership's total receipts for the tax year were less than $250,000. | | |
| **b** | The partnership's total assets at the end of the tax year were less than $1 million. | | |
| **c** | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | |
| **d** | The partnership is not filing and is not required to file Schedule M-3 . . . . . . . . . . . . . . . . . . | | X |
| | If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; item F on page 1 of Form 1065; or item L on Schedule K-1. | | |
| **5** | Is this partnership a publicly traded partnership, as defined in section 469(k)(2)? . . . . . . . . . . . . . . | | X |
| **6** | During the tax year, did the partnership have any debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . . . . . . . . . . | | X |
| **7** | Has this partnership filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, to provide information on any reportable transaction? . . . . . . . . . . . . . . . . . . . . . | | X |
| **8** | At any time during calendar year 2018, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). If "Yes," enter the name of the foreign country. ▶ | | X |
| **9** | At any time during the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. See instructions . . . . . . . . . . | | X |
| **10 a** | Is the partnership making, or had it previously made (and not revoked), a section 754 election? . . . . . . . | | X |
| | See instructions for details regarding a section 754 election. | | |
| **b** | Did the partnership make for this tax year an optional basis adjustment under section 743(b) or 734(b)? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions . . . . . . . | | X |

JSA          Form **1065** (2018)

8P1020 1.000

5653LX   700H   03/08/2019 15:55:56

Form 1065 (2018)          Page **3**

| Schedule B | Other Information *(continued)* | Yes | No |
|---|---|---|---|
| **c** | Is the partnership required to adjust the basis of partnership assets under section 743(b) or 734(b) because of a substantial built-in loss (as defined under section 743(d)) or substantial basis reduction (as defined under section 734(d))? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions | | X |
| **11** | Check this box if, during the current or prior tax year, the partnership distributed any property received in a like-kind exchange or contributed such property to another entity (other than disregarded entities wholly owned by the partnership throughout the tax year) . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ | | |
| **12** | At any time during the tax year, did the partnership distribute to any partner a tenancy-in-common or other undivided interest in partnership property? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **13** | If the partnership is required to file Form 8858, Information Return of U.S. Persons With Respect To Foreign Disregarded Entities (FDEs) and Foreign Branches (FBs), enter the number of Forms 8858 attached. See instructions . . . . . . . . . . . . . . . . . . . . ▶ | | |
| **14** | Does the partnership have any foreign partners? If "Yes," enter the number of Forms 8805, Foreign Partner's Information Statement of Section 1446 Withholding Tax, filed for this partnership. ▶ | | X |
| **15** | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return. ▶ | | |
| **16a** | Did you make any payments in 2018 that would require you to file Form(s) 1099? See instructions . . . . . . . . . . | | X |
| **b** | If "Yes," did you or will you file required Form(s) 1099? . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **17** | Enter the number of Form(s) 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to this return. ▶ | | |
| **18** | Enter the number of partners that are foreign governments under section 892. ▶ | | |
| **19** | During the partnership's tax year, did the partnership make any payments that would require it to file Form 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474)? . . . . . . . . | | X |
| **20** | Was the partnership a specified domestic entity required to file Form 8938 for the tax year? See the Instructions for Form 8938 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **21** | Is the partnership a section 721(c) partnership, as defined in Treasury Regulations section 1.721(c)-1T(b)(14)? . . . . . | | X |
| **22** | During the tax year, did the partnership pay or accrue any interest or royalty for which the deduction is not allowed under section 267A? See instructions. If "Yes," enter the total amount of the disallowed deductions. ▶ $ | | X |
| **23** | Did the partnership have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year? See instructions . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **24** | Does the partnership satisfy one of the following conditions and the partnership does not own a pass-through entity with current year, or prior year, carryover excess business interest expense? See instructions . . . . . . . . . . | | X |
| **a** | The partnership's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year do not exceed $25 million, and the partnership is not a tax shelter, or | | |
| **b** | The partnership only has business interest expense from (1) an electing real property trade or business, (2) an electing farming business, or (3) certain utility businesses under section 163(j)(7). If "No," complete and attach Form 8990. | | |
| **25** | Is the partnership electing out of the centralized partnership audit regime under section 6221(b)? See instructions. If "Yes," the partnership must complete Schedule B-2 (Form 1065). Enter the total from Schedule B-2, Part III, line 3. ▶ _____ If "No," complete Designation of Partnership Representative below. | | X |

**Designation of Partnership Representative** (see instructions)

Enter below the information for the partnership representative (PR) for the tax year covered by this return.

Name of PR ▶ ROBERT MCKENZIE

U.S. taxpayer identification number of PR ▶ _____

U.S. address of PR _____

U.S. phone number of PR ▶ _____

If the PR is an entity, name of the designated individual for the PR ▶

U.S. taxpayer identification number of the designated individual ▶ _____

U.S. address of designated individual ▶ _____

U.S. phone number of designated individual ▶ _____

| | | Yes | No |
|---|---|---|---|
| **26** | Is the partnership attaching Form 8996 to certify as a Qualified Opportunity Fund? . . . . . . . . . . . . . . . . . . If "Yes," enter the amount from Form 8996, line 13. ▶ $ | | X |

JSA

8P1036 1.000

Form **1065** (2018)

5653LX   700H   03/08/2019 15:55:56

Form 1065 (2018)            Page **4**

| Schedule K | Partners' Distributive Share Items | | Total amount |
|---|---|---|---|

**Income (Loss)**

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (page 1, line 22) | **1** | |
| 2 | Net rental real estate income (loss) (attach Form 8825) | **2** | |
| 3a | Other gross rental income (loss) …… **3a** | | |
| b | Expenses from other rental activities (attach statement) …… **3b** | | |
| c | Other net rental income (loss). Subtract line 3b from line 3a | **3c** | |
| 4 | Guaranteed payments | **4** | |
| 5 | Interest income | **5** | |
| 6 | Dividends and dividend equivalents: **a** Ordinary dividends | **6a** | |
| | **b** Qualified dividends **6b** | | |
| | **c** Dividend equivalents **6c** | | |
| 7 | Royalties | **7** | |
| 8 | Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | **8** | |
| 9a | Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | **9a** | |
| b | Collectibles (28%) gain (loss) …… **9b** | | |
| c | Unrecaptured section 1250 gain (attach statement) …… **9c** | | |
| 10 | Net section 1231 gain (loss) (attach Form 4797) | **10** | |
| 11 | Other income (loss) (see instructions) Type ▶ | **11** | |

**Deductions**

| | | | |
|---|---|---|---|
| 12 | Section 179 deduction (attach Form 4562) | **12** | |
| 13a | Contributions | **13a** | |
| b | Investment interest expense | **13b** | |
| c | Section 59(e)(2) expenditures: **(1)** Type ▶ _____ **(2)** Amount ▶ | **13c(2)** | |
| d | Other deductions (see instructions) Type ▶ | **13d** | |

**Self-Employment**

| | | | |
|---|---|---|---|
| 14a | Net earnings (loss) from self-employment | **14a** | |
| b | Gross farming or fishing income | **14b** | |
| c | Gross nonfarm income | **14c** | |

**Credits**

| | | | |
|---|---|---|---|
| 15a | Low-income housing credit (section 42(j)(5)) | **15a** | |
| b | Low-income housing credit (other) | **15b** | |
| c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) | **15c** | |
| d | Other rental real estate credits (see instructions) Type ▶ | **15d** | |
| e | Other rental credits (see instructions) Type ▶ | **15e** | |
| f | Other credits (see instructions) Type ▶ | **15f** | |

**Foreign Transactions**

| | | | |
|---|---|---|---|
| 16a | Name of country or U.S. possession ▶ | | |
| b | Gross income from all sources | **16b** | |
| c | Gross income sourced at partner level | **16c** | |
| | Foreign gross income sourced at partnership level | | |
| d | Section 951A category ▶ _____ **e** Foreign branch category ▶ | **16e** | |
| f | Passive category ▶ _____ **g** General category ▶ _____ **h** Other (attach statement). ▶ | **16h** | |
| | Deductions allocated and apportioned at partner level | | |
| i | Interest expense ▶ _____ **j** Other ▶ | **16j** | |
| | Deductions allocated and apportioned at partnership level to foreign source income | | |
| k | Section 951A category ▶ _____ **l** Foreign branch category ▶ | **16l** | |
| m | Passive category ▶ _____ **n** General category ▶ _____ **o** Other (attach statement). ▶ | **16o** | |
| p | Total foreign taxes (check one): ▶ Paid ☐ Accrued ☐ | **16p** | |
| q | Reduction in taxes available for credit (attach statement) | **16q** | |
| r | Other foreign tax information (attach statement) | | |

**Alternative Minimum Tax (AMT) Items**

| | | | |
|---|---|---|---|
| 17a | Post-1986 depreciation adjustment | **17a** | |
| b | Adjusted gain or loss | **17b** | |
| c | Depletion (other than oil and gas) | **17c** | |
| d | Oil, gas, and geothermal properties - gross income | **17d** | |
| e | Oil, gas, and geothermal properties - deductions | **17e** | |
| f | Other AMT items (attach statement) | **17f** | |

**Other Information**

| | | | |
|---|---|---|---|
| 18a | Tax-exempt interest income | **18a** | |
| b | Other tax-exempt income | **18b** | |
| c | Nondeductible expenses | **18c** | |
| 19a | Distributions of cash and marketable securities | **19a** | |
| b | Distributions of other property | **19b** | |
| 20a | Investment income | **20a** | |
| b | Investment expenses | **20b** | |
| c | Other items and amounts (attach statement) | | |

JSA
8P1030 1.000                          Form **1065** (2018)

5653LX   700H   03/08/2019 15:55:56

Form 1065 (2018)                                                                                                    Page **5**

## Analysis of Net Income (Loss)

**1** Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16p . . . . . . . . . . . . . . . . . . . . **1**

| 2 Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|
| a General partners | | | | | | |
| b Limited partners | | | | | | |

## Schedule L — Balance Sheets per Books

| Assets | | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | | (a) | (b) | (c) | (d) |
| **1** Cash | | | | | |
| **2a** Trade notes and accounts receivable | | | | | |
| **b** Less allowance for bad debts | | | | | |
| **3** Inventories | | | | | |
| **4** U.S. government obligations | | | | | |
| **5** Tax-exempt securities | | | | | |
| **6** Other current assets (attach statement) | | | | | |
| **7a** Loans to partners (or persons related to partners) | | | | | |
| **b** Mortgage and real estate loans | | | | | |
| **8** Other investments (attach statement) | | | | | |
| **9a** Buildings and other depreciable assets | | | | | |
| **b** Less accumulated depreciation | | | | | |
| **10a** Depletable assets | | | | | |
| **b** Less accumulated depletion | | | | | |
| **11** Land (net of any amortization) | | | | | |
| **12a** Intangible assets (amortizable only) | | | | | |
| **b** Less accumulated amortization | | | | | |
| **13** Other assets (attach statement) | STMT 1 | 23,181,191. | | 23,181,191. | |
| **14** Total assets | | | 23,181,191. | | 23,181,191. |

**Liabilities and Capital**

| | | | | | |
|---|---|---|---|---|---|
| **15** Accounts payable | | | | | |
| **16** Mortgages, notes, bonds payable in less than 1 year | | | | | |
| **17** Other current liabilities (attach statement) | | | | | |
| **18** All nonrecourse loans | | | | | |
| **19a** Loans from partners (or persons related to partners) | | | | | |
| **b** Mortgages, notes, bonds payable in 1 year or more | | | | | |
| **20** Other liabilities (attach statement) | | | | | |
| **21** Partners' capital accounts | | | 23,181,191. | | 23,181,191. |
| **22** Total liabilities and capital | | | 23,181,191. | | 23,181,191. |

## Schedule M-1 — Reconciliation of Income (Loss) per Books With Income (Loss) per Return

**Note:** The partnership may be required to file Schedule M-3. See instructions.

**1** Net income (loss) per books

**2** Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize):

**3** Guaranteed payments (other than health insurance)

**4** Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16p (itemize):
  **a** Depreciation $
  **b** Travel and entertainment $

**5** Add lines 1 through 4

**6** Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize):
  **a** Tax-exempt interest $

**7** Deductions included on Schedule K, lines 1 through 13d, and 16p, not charged against book income this year (itemize):
  **a** Depreciation $

**8** Add lines 6 and 7

**9** Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5

## Schedule M-2 — Analysis of Partners' Capital Accounts

**1** Balance at beginning of year . . . . . . 23,181,191.

**2** Capital contributed: **a** Cash

  **b** Property

**3** Net income (loss) per books

**4** Other increases (itemize):

**5** Add lines 1 through 4 . . . . . . . . 23,181,191.

**6** Distributions: **a** Cash

  **b** Property

**7** Other decreases (itemize):

**8** Add lines 6 and 7

**9** Balance at end of year. Subtract line 8 from line 5 . . . . 23,181,191.

5653LX  700H  03/08/2019 15:55:56

**SCHEDULE C**
**(Form 1065)**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Additional Information for Schedule M-3 Filers

▶ **Attach to Form 1065. See separate instructions.**
▶ **Information about Schedule C (Form 1065) and its instructions is at** *www.irs.gov/form1065***.**

OMB No. 1545-0123

| Name of partnership | Employer identification number |
|---|---|
| DAKOTA HOLDCO, LLC | |

| | | Yes | No |
|---|---|---|---|
| 1 | At any time during the tax year, were there any transfers between the partnership and its partners subject to the disclosure requirements of Regulations section 1.707-8? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| 2 | Does any amount reported on Schedule M-3, Part II, lines 7 or 8, column (d), reflect allocations to this partnership from another partnership of income, gain, loss, deduction, or credit that are disproportionate to this partnership's share of capital in such partnership or its ratio for sharing other items of such partnership? . . . . . . . . . . . . . . . . . | | X |
| 3 | At any time during the tax year, did the partnership sell, exchange, or transfer any interest in an intangible asset to a related person as defined in sections 267(b) and 707(b)(1)? . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| 4 | At any time during the tax year, did the partnership acquire any interest in an intangible asset from a related person as defined in sections 267(b) and 707(b)(1)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| 5 | At any time during the tax year, did the partnership make any change in accounting principle for financial accounting purposes? See instructions for a definition of change in accounting principle . . . . . . . . . . . . . . . . . | | X |
| 6 | At any time during the tax year, did the partnership make any change in a method of accounting for U.S. income tax purposes? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |

**For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**      **Schedule C (Form 1065) (Rev. 12-2014)**

JSA
8P1037 1.000

5653LX   700H   03/08/2019 15:55:56

**SCHEDULE M-3**
**(Form 1065)**

Department of the Treasury
Internal Revenue Service

# Net Income (Loss) Reconciliation
# for Certain Partnerships

▶ Attach to Form 1065.
▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2018**

Name of partnership
DAKOTA HOLDCO, LLC

Employer identification number

**This Schedule M-3 is being filed because (check all that apply):**

**A** [X] The amount of the partnership's total assets at the end of the tax year is equal to $10 million or more.

**B** [X] The amount of the partnership's adjusted total assets for the tax year is equal to $10 million or more. If box B is checked, enter the amount of adjusted total assets for the tax year _____ 23,181,191.

**C** [ ] The amount of total receipts for the tax year is equal to $35 million or more. If box C is checked, enter the total receipts for the tax year _____ .

**D** [ ] An entity that is a reportable entity partner with respect to the partnership owns or is deemed to own an interest of 50% or more in the partnership's capital, profit, or loss on any day during the tax year of the partnership.

| Name of Reportable Entity Partner | Identifying Number | Maximum Percentage Owned or Deemed Owned |
|---|---|---|
|  |  |  |
|  |  |  |

**E** [ ] Voluntary Filer.

**Part I** Financial Information and Net Income (Loss) Reconciliation

**1a** Did the partnership file SEC Form 10-K for its income statement period ending with or within this tax year?

[ ] **Yes.** Skip lines 1b and 1c and complete lines 2 through 11 with respect to that SEC Form 10-K.

[X] **No.** Go to line 1b. See instructions if multiple non-tax-basis income statements are prepared.

**b** Did the partnership prepare a certified audited non-tax-basis income statement for that period?

[ ] **Yes.** Skip line 1c and complete lines 2 through 11 with respect to that income statement.

[X] **No.** Go to line 1c.

**c** Did the partnership prepare a non-tax-basis income statement for that period?

[ ] **Yes.** Complete lines 2 through 11 with respect to that income statement.

[X] **No.** Skip lines 2 through 3b and enter the partnership's net income (loss) per its books and records on line 4a.

**2** Enter the income statement period: Beginning _____ Ending _____

**3a** Has the partnership's income statement been restated for the income statement period on line 2?

[ ] **Yes.** (If "Yes," attach a statement and the amount of each item restated.)

[ ] **No.**

**b** Has the partnership's income statement been restated for any of the five income statement periods immediately preceding the period on line 2?

[ ] **Yes.** (If "Yes," attach a statement and the amount of each item restated.)

[ ] **No.**

| | | |
|---|---|---|
| **4a** Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1 | **4a** | |
| **b** Indicate accounting standard used for line 4a (see instructions). **1** [ ] GAAP **2** [ ] IFRS **3** [ ] Section 704(b) **4** [ ] Tax-basis **5** [ ] Other (Specify) ▶ _____ | | |
| **5a** Net income from nonincludible foreign entities (attach statement) . . . . . . . . . . . . . . . . . . | **5a** | ( ) |
| **b** Net loss from nonincludible foreign entities (attach statement and enter as a positive amount) . . . | **5b** | |
| **6a** Net income from nonincludible U.S. entities (attach statement) . . . . . . . . . . . . . . . . . | **6a** | ( ) |
| **b** Net loss from nonincludible U.S. entities (attach statement and enter as a positive amount) . . . . . | **6b** | |
| **7a** Net income (loss) of other foreign disregarded entities (attach statement) . . . . . . . . . . . . | **7a** | |
| **b** Net income (loss) of other U.S. disregarded entities (attach statement) . . . . . . . . . . . . . . | **7b** | |
| **8** Adjustment to eliminations of transactions between includible entities and nonincludible entities (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | |
| **9** Adjustment to reconcile income statement period to tax year (attach statement) . . . . . . . . . . | **9** | |
| **10** Other adjustments to reconcile to amount on line 11 (attach statement) . . . . . . . . . . . . . | **10** | |
| **11** **Net income (loss) per income statement of the partnership.** Combine lines 4a through 10 . . . . | **11** | |

**Note:** Part I, line 11, must equal Part II, line 26, column (a), or Schedule M-1, line 1. See instructions.

**12** Enter the total amount (not just the partnership's share) of the assets and liabilities of all entities included or removed on the following lines.

| | Total Assets | Total Liabilities |
|---|---|---|
| **a** Included on Part I, line 4 | 23,181,191. | NONE |
| **b** Removed on Part I, line 5 | | |
| **c** Removed on Part I, line 6 | | |
| **d** Included on Part I, line 7 | | |

**For Paperwork Reduction Act Notice, see the instructions for your return.**

Schedule M-3 (Form 1065) 2018

JSA
8P1042 1.000

5653LX    700H    03/08/2019 15:55:56

Schedule M-3 (Form 1065) 2018       Page **2**

| Name of partnership | Employer identification number |
|---|---|
| DAKOTA HOLDCO, LLC | |

**Part II**    Reconciliation of Net Income (Loss) per Income Statement of Partnership With Income (Loss) per Return

| Income (Loss) Items<br>Attach statements for lines 1 through 10. | (a)<br>Income (Loss) per<br>Income Statement | (b)<br>Temporary<br>Difference | (c)<br>Permanent<br>Difference | (d)<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Gross foreign distributions previously taxed | | | | |
| 5 Income (loss) from equity method U.S. corporations | | | | |
| 6 U.S. dividends | | | | |
| 7 Income (loss) from U.S. partnerships | | | | |
| 8 Income (loss) from foreign partnerships | | | | |
| 9 Income (loss) from other pass-through entities | | | | |
| 10 Items relating to reportable transactions | | | | |
| 11 Interest income (see instructions) | | | | |
| 12 Total accrual to cash adjustment | | | | |
| 13 Hedging transactions | | | | |
| 14 Mark-to-market income (loss) | | | | |
| 15 Cost of goods sold (see instructions) | ( ) | | | ( ) |
| 16 Sale versus lease (for sellers and/or lessors) | | | | |
| 17 Section 481(a) adjustments | | | | |
| 18 Unearned/deferred revenue | | | | |
| 19 Income recognition from long-term contracts | | | | |
| 20 Original issue discount and other imputed interest | | | | |
| 21a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach statement) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 22 Other income (loss) items with differences (attach statement) | | | | |
| 23 **Total income (loss) items.** Combine lines 1 through 22 | | | | |
| 24 **Total expense/deduction items.** (From Part III, line 31) (see instructions) | | | | |
| 25 Other items with no differences | | | | |
| 26 **Reconciliation totals.** Combine lines 23 through 25 | | | | |

**Note:** Line 26, column (a), must equal Part I, line 11, and column (d) must equal Form 1065, Analysis of Net Income (Loss), line 1.

Schedule M-3 (Form 1065) 2018

JSA
8P1043 1.000

5653LX   700H   03/08/2019 15:55:56

Schedule M-3 (Form 1065) 2018 | Page **3**

Name of partnership

DAKOTA HOLDCO, LLC

**Employer identification number**

| Part III | Reconciliation of Net Income (Loss) per Income Statement of Partnership With Income (Loss) per Return - Expense/Deduction Items |

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 State and local current income tax expense | | | | |
| 2 State and local deferred income tax expense | | | | |
| 3 Foreign current income tax expense (other than foreign withholding taxes) | | | | |
| 4 Foreign deferred income tax expense | | | | |
| 5 Equity-based compensation | | | | |
| 6 Meals and entertainment | | | | |
| 7 Fines and penalties | | | | |
| 8 Judgments, damages, awards, and similar costs | | | | |
| 9 Guaranteed payments | | | | |
| 10 Pension and profit-sharing | | | | |
| 11 Other post-retirement benefits | | | | |
| 12 Deferred compensation | | | | |
| 13 Charitable contribution of cash and tangible property | | | | |
| 14 Charitable contribution of intangible property | | | | |
| 15 Organizational expenses as per Regulations section 1.709-2(a) | | | | |
| 16 Syndication expenses as per Regulations section 1.709-2(b) | | | | |
| 17 Current year acquisition/reorganization investment banking fees | | | | |
| 18 Current year acquisition/reorganization legal and accounting fees | | | | |
| 19 Amortization/impairment of goodwill | | | | |
| 20 Amortization of acquisition, reorganization, and start-up costs | | | | |
| 21 Other amortization or impairment write-offs | | | | |
| 22 Reserved | | | | |
| 23a Depletion - Oil & Gas | | | | |
| b Depletion - Other than Oil & Gas | | | | |
| 24 Intangible drilling & development costs | | | | |
| 25 Depreciation | | | | |
| 26 Bad debt expense | | | | |
| 27 Interest expense (see instructions) | | | | |
| 28 Purchase versus lease (for purchasers and/ or lessees) | | | | |
| 29 Research and development costs | | | | |
| 30 Other expense/deduction items with differences (attach statement) | | | | |
| 31 **Total expense/deduction items.** Combine lines 1 through 30. Enter here and on Part II, line 24, reporting positive amounts as negative and negative amounts as positive | | | | |

**Schedule M-3 (Form 1065) 2018**

JSA

8P1044 1.000

5653LX  700H  03/08/2019 15:55:56

| Form **8990**<br>(December 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Limitation on Business Interest Expense<br>Under Section 163(j)**<br>▶ **Attach to your tax return.**<br>▶ **Go to** *www.irs.gov/Form8990* **for instructions and the latest information.** | OMB No. 1545-0123 |
|---|---|---|

| Taxpayer name(s) shown on tax return | Identification number |
|---|---|
| DAKOTA HOLDCO, LLC | |

**Part I**    **Computation of Allowable Business Interest Expense**

*Part I is completed by all taxpayers subject to section 163(j). Schedule A and Schedule B need to be completed before Part I when the taxpayer is a partner or shareholder of a pass-through entity subject to 163(j).*

**Section I - Business Interest Expense**

| | | | | |
|---|---|---|---|---|
| 1 | Current year business interest expense (not including floor plan financing interest expense), before the section 163(j) limitation. . . . . | **1** | | |
| 2 | Disallowed business interest expense carryforwards from prior years. (Does not apply to a partnership). . . . . . . . . . . . . . . | **2** | | |
| 3 | Partner's excess business interest expense treated as paid or accrued in current year (Schedule A, line 44, column (h)) . . . . . . . | **3** | | |
| 4 | Floor plan financing interest expense. See instructions . . . . . . . . | **4** | | |
| 5 | **Total business interest expense.** Add lines 1 through 4 . . . . . . . . . . . . . . . . . . . . . . . ▶ | **5** | |

**Section II - Adjusted Taxable Income**

**Taxable Income**

| | | | |
|---|---|---|---|
| 6 | **Taxable income.** See instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6** | |

**Additions** (adjustments to be made if amounts are taken into account on line 6)

| | | | |
|---|---|---|---|
| 7 | Any item of loss or deduction which is not properly allocable to a trade or business of the taxpayer. See instructions. . . . . . . . . . . | **7** | |
| 8 | Any business interest expense not from a pass-through entity. See instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | |
| 9 | Amount of any net operating loss deduction under section 172. . . . . | **9** | |
| 10 | Amount of any qualified business income deduction allowed under section 199A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **10** | |
| 11 | Deduction allowable for depreciation, amortization, or depletion attributable to a trade or business. . . . . . . . . . . . . . . . . . . | **11** | |
| 12 | Amount of any loss or deduction items from a pass-through entity. See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **12** | |
| 13 | Other additions. See instructions . . . . . . . . . . . . . . . . . . | **13** | |
| 14 | Total current year partner's excess taxable income (Schedule A, line 44, column (f)) . . . . . . . . . . . . . . . . . . . . . . . . . . . | **14** | |
| 15 | Total current year S corporation shareholder's excess taxable income (Schedule B, line 46, column (c)). . . . . . . . . . . . . . . | **15** | |
| 16 | **Total.** Add lines 7 through 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | **16** | |

**Reductions** (adjustments to be made if amounts are taken into account on line 6)

| | | | |
|---|---|---|---|
| 17 | Any item of income or gain which is not properly allocable to a trade or business of the taxpayer. See instructions . . . . . . . . . . . . . | **17** ( | ) |
| 18 | Any business interest income not from a pass-through entity. See instructions | **18** ( | ) |
| 19 | Amount of any income or gain items from a pass-through entity. See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **19** ( | ) |
| 20 | Other reductions. See instructions . . . . . . . . . . . . . . . . . . | **20** ( | ) |
| 21 | **Total.** Combine lines 17 through 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | **21** ( | ) |
| 22 | **Adjusted taxable income.** Combine lines 6, 16, and 21. (If zero or less, enter -0-.). . . . . . . . . ▶ | **22** | |

**Section III - Business Interest Income**

| | | | |
|---|---|---|---|
| 23 | Current year business interest income. See instructions . . . . . . . | **23** | |
| 24 | Excess business interest income from pass-through entities (total of Schedule A, line 44, column (g), and Schedule B, line 46, column (d)) . | **24** | |
| 25 | **Total.** Add lines 23 and 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | **25** | |

**For Paperwork Reduction Act Notice, see the instructions.**          Form **8990** (12-2018)

JSA    8X4088 3.000

5653LX   700H   03/08/2019 15:55:56

```
FORM 1065, SUPPORTING SCHEDULES
=================================================================================
SCHEDULE L - LINE 13 - OTHER ASSETS             BEGINNING           ENDING
=================================               --------------   --------------
INVESTMENTS                                         23,181,191.      23,181,191.
                                                --------------   --------------
   TOTAL OTHER ASSETS                               23,181,191.      23,181,191.
                                                ==============   ==============
```

FORM 1065, SUPPORTING SCHEDULES

STATEMENT   1

**EXHIBIT 1**

566

ATI

## Claimant Information

Robert McKenzie

Phone:
Phone:
Email:
SSN/TaxID:
Date Submitted: 2024-06-24 14:41:13
SubmissionTieBack: QH28H0B

## Transaction Information

Beginning Balance: 0

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |
| 6/17/2021 | 85852 | 858520 | | | |
| 10/20/2021 | 18869 | 0 90-Day | | | |

Ending Balance: 104721

Beginning Balance: [BegBalance1]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance1]

Beginning Balance: [BegBalance2]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance2]

Beginning Balance: [BegBalance3]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance3]

## Documentation List

134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\06\Continental-Statement-ATIP-from-ATI.pdf
134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\06\RAM-Jan-2022-Fidelity-Statement.pdf

**Direct Registration / Book Entry Account Statement**



| Account Number | | Statement Date |
|---|---|---|
| | | **12/13/2021** |

F508COMA    ATI PHYSICAL THERAPY

ROBERT MCKENZIE

**Share Transaction Request**

☐ Deposit the enclosed certificate(s) for _____ shares to my account.

**Address and Phone Number change:**

_____

_____

_____

**Signature(s)** All registered owners must sign

_____

_____

---------------------------------------------------------------------------------------------------------------------------

^ FOLD AND DETACH HERE ^

ROBERT MCKENZIE

**Shareholder Account #:**

**Total DRS / Book Shares:** 85,852

**Account Value:** 0.00

**ATI PHYSICAL THERAPY**

**CUSIP:**          00216W109

**Stock Symbol:**   ATIP

**Stock Price:**

**Broker/Dealer Name:**

**Broker/Dealer DTC Participant #:**

**Customer Account #:**

| Total DRS / Book Entry Shares | Total Restricted Book Entry Shares |
|---|---|
| 0 | 85,852 |

| Transaction Date | Transaction Type | Number Shares | Share Balance | Restriction Code(s) |
|---|---|---|---|---|
| 11/24/21 | LOADED TRANSACTION | 85,852 | 85,852 | F508G |

This statement is a record of rights of the shareholder at the time of its issuance. Delivery of this statement of itself conveys no rights to the recipient. This statement is neither a negotiable instrument nor a security.

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
212-509-4000

CSTDRS

**Account Alpha ID:** MCKENZIE,ROBERT

**Account No.:**

## Request a Certificate*

☐ Issue a certificate from my DRS / Book Entry share position. (Please choose one option):

☐☐☐☐☐☐☐ **OR** ☐ (check here) ALL Shares

(Indicate number of whole shares)

*Please Note: A processing fee of $50.00 may apply for certificate issuances. Please contact 212-509-4000 or cstmail@continentalstock.com to determine if the issuer permits the issuance of physical paper certificates and if a fee is required. If a fee is required make your check payable to Continental Stock Transfer & Trust Company. Submit payment together with your certificate request.*

*By requesting a physical stock certificate the shareholder bears the responsibility for safekeeping and any future costs associated with replacing lost or stolen stock certificate(s).*

---

^ FOLD AND DETACH HERE ^

### INSTRUCTIONS FOR TRANSACTION REQUEST

SHARE TRANSACTION REQUEST:
If you have any physical stock certificates in your possession and you wish to deposit them in your account, mark the box on the front of this statement and on the blank line provided write in the number of shares represented by the certificate(s) you are sending to us for deposit.

ADDRESS and PHONE NUMBER CHANGE:
Please write in your new address and telephone number in the available space provided. Note, all registered holders must sign their names exactly as they appear on the front of this statement.

REQUEST A CERTIFICATE:
Mark the box above to receive shares in certificate form from your DRS / Book Entry position. Enter the number of whole shares you wish to receive or check the box provided if you wish to receive all your book entry shares in certificate form. Please print numerals in BLUE or BLACK ink.

Mail requests to: Continental Stock Transfer & Trust Company | Attn. Stock Transfer Department | 1 State Street | 30th Floor | New York, NY |

### About your Statement

This statement is your record of the shares being credited to your account in book entry form and may be part of the Direct Registration System, if applicable. It should be kept with your important documents as a record of your ownership of these securities.

THE CORPORATION WILL FURNISH TO ANY SHAREHOLDERS UPON REQUEST AND WITHOUT CHARGE, A FULL STATEMENT OF THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF THE SHARES OF EACH CLASS OF SHARES, IF MORE THAN ONE, AUTHORIZED TO BE ISSUED AND THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF EACH SERIES OF ANY CLASS OF PREFERRED SHARES AUTHORIZED TO BE ISSUED SO FAR AS THE SAME HAVE BEEN FIXED AND THE AUTHORITY OF THE BOARD OF DIRECTORS TO DESIGNATE AND FIX THE RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF OTHER SERIES.
There may be rights, privileges, restrictions and conditions attached to the securities covered by this statement. A full copy of the text of any rights, privileges, restrictions and conditions can be obtained by contacting Continental Stock Transfer & Trust Company at 800-634-5370 or cstmail@continentalstock.com.

### Transactions Through Your Broker/Dealer

Your broker/dealer may instruct Continental Stock Transfer & Trust Company ("CST") to deliver shares on your behalf.

The Direct Registration System ("DRS"), if applicable, allows you to authorize your broker/dealer to send an electronic instruction to CST to debit shares from your DRS position and deliver them electronically to your account with your broker/dealer. To effect such transactions your broker/dealer will need to include the following information; your CST Account Number, your Social Security or Taxpayer Identification Number, the name of your CST account, and the number of DRS shares to be delivered.

CST will honor such requests from any broker/dealer participating in the Direct Registration System.

While a broker/dealer should have your authorization to debit shares from your CST account, CST will have no way of verifying if you actually authorized the transaction since the instruction is coming directly from the broker/dealer.

CSTDRS

CSTDRS

**Account Alpha ID:** MCKENZIE,ROBERT

**Account No.:**

## Restriction Code Definitions

*Attention: if your Direct Registration/Book Entry shares are not restricted this page will not display any Restriction Code Definitions.*

F508G
"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO LOCKUP PROVISIONS AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED DURING THE TERM OF THE LOCKUP."

**Account Alpha ID:** MCKENZIE,ROBERT

**Account No.:**

This Page Left Intentionally Blank

**Account Alpha ID:** MCKENZIE,ROBERT

**Account No.:**

| FIDELITY PRIVATE CLIENT GROUP®

INVESTMENT REPORT
**January 1, 2022 - January 31, 2022**

Envelope # BLZHSWBBBBBRXR

ROBERT ALEXANDER MCKENZIE



## Your Financial Consultant

Jeff Crum  **Phone:** (800) 521-5650
ext. 54613

\*  *Reflects appreciation or depreciation of your holdings due to price changes, transactions from Other Activity In or Out and Multi-currency transactions, plus any distribution and income earned during the statement period.*
\*\*  *Excludes unpriced securities.*

## Contact Information

| | |
|---|---|
| Online | Fidelity.com |
| FAST®-Automated Telephone | (800) 544-5555 |
| Private Client Group | (800) 544-5704 |

*Brokerage services provided by Fidelity Brokerage Services LLC (FBS), Member NYSE, SIPC (800) 544-6666. Brokerage accounts carried by National Financial Services LLC (NFS), Member NYSE, SIPC.*

P

MR_CE_BLZHSWBBBBBRXR_BBBBB 20220131

M04450653020220131

**FIDELITY INVESTMENTS** | **FIDELITY PRIVATE CLIENT GROUP®**

INVESTMENT REPORT
**January 1, 2022-January 31, 2022**

## Top Holdings

| Description | Value | Percent of Portfolio |
|---|---|---|
| Ati Physical Therapy INC Com Cl A | $330,918 | |

*IMPORTANT: If you have any unsettled trades pending, the asset allocation presented above may be materially impacted and, depending on the size and scope of such unsettled trades, rendered unreliable. Asset allocation includes Other Holdings and Assets Held Away when applicable. Please note that, due to rounding, percentages may not add to 100%. For further details, please see "Frequently Asked Questions" at Fidelity.com/Statements.*

MR_CE_BLZHSWBBBBRXR_BBBBB 20220131

P

**FIDELITY PRIVATE CLIENT GROUP®**

| Description | Beginning Market Value Jan 1, 2022 | Quantity Jan 31, 2022 | Price Per Unit Jan 31, 2022 | Ending Market Value Jan 31, 2022 | Total Cost Basis | Unrealized Gain/Loss Jan 31, 2022 | EAI ($) / EY (%) |
|---|---|---|---|---|---|---|---|
| **Common Stock** | | | | | | | |
| **ATI PHYSICAL THERAPY INC COM CL A** (ATIP) | $355,004.19 | 104,721.000 | $3.1600 | $330,918.36 | unknown | unknown | -<br>- |

MR_CE_BLZHSWBBBBRXR_BBBBB 20220131

P

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street - Suite 205
Media, PA  19063

Phone (866) 274-4004
Fax (610) 565-7985

Email: info@strategicclaims.net

## NOTICE OF INELIGIBILITY

**CONTROL#:**   566
ROBERT MCKENZIE

**February 27, 2025**

**ACCOUNT#:**

Your claim in the above matter is ineligible for the following reason(s):

| Description: | Shares: |
|---|---|
| This claim was filed on behalf of an excluded party and it is not eligible. Pursuant to the Stipulation and Agreement of Settlement, excluded from the Settlement Class are (i) Defendants; (ii) current and former Officers and directors of the Company; (iii) members of the Immediate Family of each of Defendants; (iv) all subsidiaries and affiliates of the Company and the directors and Officers of such subsidiaries or affiliates; (v) all persons, firms, trusts, corporations, Officers, directors, and any other individual or entity in which any of Defendants has a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of all such excluded parties; provided, however, that any Investment Vehicle shall not be excluded from the Settlement Class. | |

**We strongly suggest you contact our office for any question or clarification you may have. It is important that you contact us before any further action is taken in the event that a processing error has occurred.**

If you feel you received this notice in error and would like to contest our determination, please contact our office in writing no later than twenty (20) calendar days after the date of this notice. Please be sure to include your Control number as noted above, your reason for contesting our determination, and documentation supporting your reason. You can also contact our office at 1-866-274-4004 or info@strategicclaims.net. If after contacting us, you still disagree, you can request in writing to Plaintiffs' Counsel to review your claim.

When calling our office, please have ready the Control Number found at the top left-hand corner of this form.

**SUPPORT CENTER**
Support Ticket System

03/06/2025 04:21:47 PM

# Ticket #524998

| | | | |
|---|---|---|---|
| **Status** | Completed | **Name** | Bob McKenzie |
| **Priority** | Normal | **Email** | |
| **Department** | Claims Administrators | **Phone** | |
| **Create Date** | 03/06/2025 03:48:11 PM | **Source** | Email |

| | | | |
|---|---|---|---|
| **Assigned To** | George Allen | **Help Topic** | Claims |
| **SLA Plan** | Default SLA | **Last Response** | 03/06/2025 04:21:38 PM |
| **Due Date** | 03/07/2025 03:48:11 PM | **Last Message** | 03/06/2025 03:48:11 PM |

## Ticket Details

*DISPUTE*

| | |
|---|---|
| **Case:** | ATI |
| **Control Number:** | 565, 566 |

# Notice of Ineligibility / Control #'s 565 and 566

| 03/06/2025 03:48:11 PM Notice of Ineligibility / Control #'s 565 and 566 | Bob McKenzie |
|---|---|

To Whom It May Concern -

I write to follow-up on my call to Strategic Claims Services on March 6, 2025 and to contest your determination that Robert McKenzie, Control #566, and Dakota Holdco, LLC, Control #565, are ineligible to participate in the ATI Class Action Settlement.

Your agent advised me that the basis of your determination is that I previously served as the General Counsel of the Company. This is not correct.

The "Company," as defined in the Notice of (I) Pendency of Class Actions, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice"), is ATI Physical Therapy, Inc. *See*, https://www.strategicclaims.net/wp-content/uploads/2024/06/ATI-Final-Long-Notice-and-Claim-Form2. pdf. ATI Physical Therapy, Inc. was organized as Fortress Value Acquisition Corp. II and was renamed ATI Physical Therapy, Inc. after its subsidiary, FVAC Merger Corp. II merged with Wilco Holdco, Inc. in or about June 2021. *See*, https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm.

# SUPPORT CENTER
### Support Ticket System

03/06/2025 04:21:47 PM

I ceased my employment with a subsidiary of Wilco Holdco, Inc., and resigned any and all roles with Wilco Holdco, Inc. and its affiliates, in 2018. I was succeeded by Diana Chafey.
*See*, https://news.atipt.com/2018-09-19-Legal-Veteran-Diana-Chafey-Joins-ATI-Physical-Therapy-as-Chief-Legal-Counsel. I was never, and could never have been, an officer, director or employee of Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc. because it did not become affiliated with Wilco Holdco, Inc. until more than 30 months after my resignation from all roles with Wilco Holdco, Inc. and/or its affiliates.

In addition:

1) Neither I nor Dakota Holdco, LLC is a Defendant;
2) Neither I nor Dakota Holdco, LLC is a current or former officer or director of the Company, i.e. Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc.;
3) Neither I nor Dakota Holdco, LLC is an immediate family member of a Defendant;
4) Neither I nor Dakota Holdco, LLC is a subsidiary or affiliate of the Company, i.e. Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc., or a director or office of a subsidiary or affiliate of the Company; and
5) No Defendant had or has a controlling interest in Dakota Holdco, LLC or in me, individually.

As set forth above, Dakota Holdco, LLC and I dispute your determination that neither Dakota Holdco, LLC nor I are ineligible to participate in the ATI Class Action Settlement. Please provide your response to this dispute within fourteen (14) days.

-Robert McKenzie, individually and as the Manager of Dakota Holdco, LLC

# SUPPORT CENTER
Support Ticket System

03/06/2025 04:21:47 PM

| 03/06/2025 04:21:38 PM | George Allen |
|---|---|

Good afternoon,

We have received your information and will pass it on for further review.

Thank you.

--

Claims Administrator
Strategic Claims Services, Inc.
600 N. Jackson St. - Suite 205
Media PA 19063
Phone: 610-565-9202
Fax: 610-565-7985
Toll Free: 1-866-274-4004

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

 **Gmail**

**James Facciolla <jfacciolla@strategicclaims.net>**

---

## Re: ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents

1 message

---

**Bob McKenzie**                                                         Thu, Mar 20, 2025 at 2:13 PM
To: James Facciolla <jfacciolla@strategicclaims.net>
Cc: Claims Analyst <info@strategicclaims.net>

James -

I write to follow-up on our call of March 20, 2025 and my email of March 20, 2025. I dispute the determination set forth in your email below regarding Robert McKenzie, Control #566, and Dakota Holdco, LLC, Control #565 and request court review.

Strategic Claims' conclusion that Dakota Holdco, LLC and I did not acquire or purchase ATI Securities and, instead, engaged in an equity conversion or continued to hold private shares of "'old' ATI" is incorrect. As more fully set forth below, Dakota Holdco, LLC and I do not believe that we engaged in an equity conversion or made a claim related to private shares of "'old' ATI," but instead purchased or acquired Company stock. Had this been a conversion we believe that there would have been no exchange of any prior equity interest for new equity interests, but instead, that Dakota Holdco, LLC and I would have retained our as-converted original equity interests. That did not happen here as Dakota Holdco, LLC and I gave up our original equity interests and received new, completely different, equity interests in a completely different entity.

Strategic Claims' conclusion that Dakota Holdco, LLC and I acquired shares prior to the settlement period is also incorrect. As more fully set forth below, Dakota Holdco, LLC and I believe that we acquired shares of the Company in or about June 2021 and that any prior equity interests were not shares of or equity interest in the Company. We believe that since there was no conversion of shares, but instead Dakota Holdco, LLC and I gave up our original equity interests and received new, completely different, equity interests in a completely different entity, we certainly did not acquire those new equity interests prior to the settlement period.

If Strategic Claims refuses to resolve this amicably, I anticipate that Dakota Holdco, LLC and I will be forced to retain counsel and litigate this matter, which would unfortunately hold up the settlement for the entire class.

### Regarding Dakota Holdco, LLC:

I have attached a Written Consent In Lieu of A Meeting of Stockholders of Wilco Holdco, Inc. dated February 21, 2021 confirming that prior to the Merger, Dakota Holdco, LLC was the holder of 23,179.19910431 shares of Series A-1 preferred stock of Wilco Holdco, Inc.

I also direct you to the *Amended and Restated Registration Rights Agreement* included in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/ d121614ddefm14a.htm (last visited March 20, 2025). Dakota Holdco, LLC was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature

---

page included therewith. The Amended and Restated Registration Rights Agreement provided that New Holders, including Dakota Holdco, LLC, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)." The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of preferred stock of Wilco Holdco, Inc. would receive common stock of the Company: "Each share of [Wilco Holdco, Inc.] preferred stock issued and outstanding immediately prior to the effective time will be converted into the right to receive ... (B) a number of shares of ATI Class A common stock equal in value to (i) the product of (a) (x) the Preferred Stock Adjusted Base plus (y) an aggregate accrued amount, calculated based on the Preferred Stock Adjusted Base, at the Dividend Rate (as defined in the [Wilco Holdco, Inc.'s] current charter) from the closing date through the date that is 180 days from the closing date, multiplied by (b) 1.05, divided by (ii) the number of shares of [Wilco Holdco, Inc.] preferred stock outstanding as of immediately prior to the effective time."

**Thus, Dakota Holdco, LLC, in consideration of agreeing to convert certain of its rights in preferred stock of Wilco Holdco, Inc., then valued at $30,381,970 (which Dakota Holdco, LLC argues is its cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 3,038,197 shares of common stock of Company, valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders."** See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Dakota Holdco, LLC: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

**Regarding Robert McKenzie, Individually:**

As you are aware, I submitted an individual claim related to 85,852 shares of the Company's common stock. In or about May, 2016, I became a limited partner of Wilco Acquisition, LP and through Wilco Acquisition, LP I became a beneficial owner of 85,852 shares of the Company's common stock that were distributed to me in or about November, 2021. *See*, the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021 which provides that "Wilco Acquisition intends to distribute such shares of Common Stock to its limited partners and general partner, each of which will be a permitted transferee under the A&R RRA and is named as a selling securityholder herein." https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

I understand that Wilco Acquisition, LP failed or refused to file a claim in this matter and, as a result, I filed my individual claim as I was the beneficial owner of the shares. I have attached a copy of a Rollover and Contribution Agreement made effective in May, 2016 (Exhibit A redacted), reflecting my initial investment of $575,000 in Wilco Acquisition, LP. Thus, I did not have zero basis in my interest as you assert.

I again direct you to the *Amended and Restated Registration Rights Agreement* included in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/

d121614ddefm14a.htm (last visited March 20, 2025).  Wilco Acquisition, LP was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature page included therewith.  The Amended and Restated Registration Rights Agreement provided that New Holders, including Wilco Acquisition, LP, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)."  The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of common stock of Wilco Holdco, Inc. would receive common stock of the Company:  " Each share of [Wilco Holdco, Inc.] common stock issued and outstanding immediately prior to the effective time will be converted into the right to receive (A) a number of shares of ATI Class A common stock equal in value to (1) $1,303,000,000 underline{divided by} (2) the number of shares of Company common stock outstanding as of immediately prior to the effective time…"

Thus, Wilco Acquisition, LP, in consideration of agreeing to convert certain of its rights in common stock of Wilco Holdco, Inc. valued at $1,303,0000,000 (which I believe represents Wilco Acquisition, LP's cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 130,300,000 shares of common stock of Company **(of which 85,852 shares, with a cost basis of $858,520, were beneficially owned by Robert McKenzie, individually),** valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders."  See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Wilco Acquisition, LP: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

-Robert McKenzie
Individually and as Manager of Dakota Holdco, LLC

On Thu, Mar 20, 2025 at 11:59 AM James Facciolla <jfacciolla@strategicclaims.net> wrote:

Hello Robert,

Per our earlier phone call, and at request of Pomerantz LLP, I am reaching out to clarify the ineligibility letter you received from Strategic Claims Services, mailed February 27, 2025.

Our final determination is as follows.

**Your claims (see below) remain ineligible for the following reasons.**

| Claim | Name 1 | Name 2 |
|-------|--------|--------|
| 565 | DAKOTA HOLDCO LLC | ROBERT MCKENZIE, MANAGER |
| 566 | ROBERT MCKENZIE | |

(1) Per the definition in the Stipulation of Settlement (https://www.strategicclaims.net/wp-content/uploads/2024/06/FULLY-EXECUTED-ATI-Stipulation-of-Settlement-PDF-00609416xC40C2.pdf), *"ATI Securities" means ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII.* Equity conversions, or private shares of "old" ATI do not classify as a purchase or acquisition based upon the language of the Stipulation of Settlement.

(2) Your shares were acquired prior to the Settlement Class Period, in order to participate in the Settlement, shares must have been *(a) purchased or otherwise acquired ATI Securities between February 22, 2021 and October 19,*

*2021, both dates inclusive, and/or beneficially owned and/or held FVAC common stock as of May 24, 2021 and were eligible to vote at FVAC's June 15, 2021 special meeting to vote on the Business Combination (the "Securities Subclass"); and/or (b) beneficially owned and/or held FVAC Class A common stock as of the June 11, 2021 Redemption Date who were entitled to, but did not elect to, redeem their shares (the "Multiplan Subclass").* Per the ATI IPO Filing and Prospectus, these shares were held prior to the Settlement Class Period dates making them ineligible.

If you disagree with our determination please provide us the necessary supporting documentation to allow us to amend or confirm the above. Some examples of supporting documentation could include monthly statements from your financial institution, grant or option agreements, copies of checks, wires or other payment related receipts, etc. We already have your documents from the Transfer Agent, Continental, so you do not need to resend those documents. Any additional documents should be sent directly to me.

If you feel you still have received this notice in error and would like to contest our determination, please respond to this email in writing no later than Tuesday, March 25, 2025 officially requesting for Court review. Please be sure to include your claim number as noted above, your reason for contesting our determination, and documentation supporting your reason. If we do not hear from you by the above date, we will assume you agree with our determination and close out the dispute without Court review.

Thank you,

--
James Facciolla
Institution Relations Manager
Strategic Claims Services, Inc.
600 N. Jackson Street
Suite 205
Media, PA 19063
610-565-9202 x 1013

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

**2 attachments**

 **ATI  Rollover and Contribution Agreement (Robert McKenzie)(executed) (2).pdf**
117K

 **Project Skyline - SH Written Consent (Dakota) (Execution Version) (2).PDF**
2084K

## ROLLOVER AND CONTRIBUTION AGREEMENT

This ROLLOVER AND CONTRIBUTION AGREEMENT (this "Agreement"), dated as of May \_\_, 2016, is entered into by and between the undersigned (the "Investor"), and Wilco Acquisition, LP, a Delaware limited partnership ("Parent"). Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, an indirect subsidiary of the Parent, Wilco Purchaser, Inc., a Delaware corporation ("Purchaser"), has entered into that certain Stock Purchase Agreement, dated March 25, 2016 (the "Purchase Agreement"), with ATI Holdings Acquisition, Inc., a Delaware corporation (the "Company"), and ATI Physical Therapy Holdings, LLC, a Delaware limited liability company ("Seller"), pursuant to which Purchaser will acquire all of the issued and outstanding capital stock, other than certain shares of stock (i) being contributed to Parent pursuant to this Agreement and similar agreements, and (ii) being contributed to Parent's subsidiary, Wilco Holdco, Inc. ("Holdco"), in exchange for shares of preferred stock of Holdco, of the Company (the "Stock Purchase");

WHEREAS, the Investor is currently an equity holder of Seller, and immediately prior to the Closing (as defined in the Purchase Agreement), Seller shall distribute to the Investor in lieu of cash in an amount equal to the Investor Rollover Amount (as defined below) that would otherwise be distributed to Investor with respect to his, her or its equity in Seller pursuant to Seller's Amended and Restated Limited Liability Company Agreement, dated as of December 21, 2012, by and among Seller, the KRG Members (as defined therein), and each of the other Members (as defined therein) listed on the signature pages thereto (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Seller LLC Agreement"), that number of shares of common stock, par value $0.001 per share, of the Company (the "Company Common Stock") equal to (i)(A) the Investor Rollover Amount, divided by (B) the Cash Consideration to be received by Seller upon the Closing, assuming the Investor Rollover Amount and the Seller Contribution Amount are equal to zero dollars ($0) for the purposes of calculating Cash Consideration, multiplied by (ii) 100,000 (such number of shares of Company Common Stock resulting from the product of clause (i) and (ii), the "Rollover Shares"); where the "Investor Rollover Amount" means the lesser of (i) the amount set forth on the Investor's signature page hereto and (ii) an amount equal to the portion of the actual Cash Consideration that would, but for such distribution of Company Common Stock, be distributed to the Member pursuant to the Seller LLC Agreement promptly following the Closing;

WHEREAS, subject to the terms and conditions of this Agreement, the Investor desires, immediately prior to the Closing, to contribute the Rollover Shares to Parent (the "Contribution") in exchange for that number of newly issued Class B Common Units of Parent (the "Parent Class B Common Units") equal to (i) the Investor Rollover Amount divided by (ii) the price per unit at which the Advent Investors (defined below) purchase Class A Common Units of Parent at the Closing (such number of Parent Class B Common Units, the "Exchange Units");

WEIL:\95645638\18\11623.0311

WHEREAS, Parent and the Investor agree that the transactions contemplated by this Agreement are intended to, and shall, result in the Investor investing in Parent Class B Common Units through the Contribution at the same price per unit at which the Advent Investors at Closing shall acquire Class A Common Units of Parent at the Closing;

WHEREAS, Parent desires to issue to the Investor such Exchange Units in exchange for the Investor's contribution to Parent of the Rollover Shares;

WHEREAS, subject to the terms and conditions of the Equity Commitment Letter, dated March 25, 2016 by and among affiliated investment funds of Advent International Corporation ("Advent") and Purchaser, substantially simultaneously with the consummation of the Contribution, Advent and/or one or more of its affiliated funds, successors or assigns (together with Advent, the "Advent Investors") will capitalize Parent with up to $887,162,500 in cash (the amount actually contributed pursuant to the Equity Commitment Letter, the "Cash Equity Capitalization"), with such Cash Equity Capitalization to be contributed by Parent indirectly to Purchaser (through intermediate holding companies) immediately prior to the Closing, and Parent will issue to the Advent Investors newly issued Class A Common Units of Parent in consideration for the Cash Equity Capitalization;

WHEREAS, for United States federal income tax purposes, it is intended that the contribution by the Investor of the Rollover Shares to Parent in exchange for the Exchange Units will qualify as a transaction described in Section 721(a) of the Internal Revenue Code of 1986, as amended (the "Code"); and

WHEREAS, concurrently with Closing, Parent, the Investor, the Advent Investors and certain other rollover investors will enter into an Amended and Restated Agreement of Limited Partnership of Parent substantially in the form attached as Exhibit A hereto (the "Partnership Agreement").

NOW, THEREFORE, in order to implement the foregoing and in consideration of the mutual representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

**AGREEMENT**

Section 1.    Contribution of the Rollover Shares.

1.1    Contribution of the Rollover Shares in Exchange for the Exchange Units. On the terms and conditions set forth herein, (i) the Investor agrees, at the closing of the Contribution (the "Contribution Closing"), to contribute to Parent the Rollover Shares, free and clear of any and all Liens (as defined in Section 3.1 below), in exchange for the issuance by Parent to the Investor of the Exchange Units, and (ii) Parent agrees, at the Contribution Closing,

2

to issue to the Investor the Exchange Units in exchange for the contribution by the Investor to Parent of the Rollover Shares.

1.2     Closing.  The Contribution Closing shall occur immediately prior to the consummation of the Stock Purchase on the Closing Date (as defined below).  The Contribution Closing shall take place at the offices of Weil, Gotshal & Manges LLP located at 100 Federal Street, Boston, MA  02110, or such other place as agreed upon by the parties.

1.3     Conditions to Closing.  The Contribution Closing shall be subject to the satisfaction of the following conditions unless waived in writing by Parent and the Investor (in the case of clause (a)), by Parent (in the case of clause (b)) or by the Investor (in the case of clause (c)):

(a)     Purchase Agreement Conditions.  The conditions set forth in Article 7 of the Purchase Agreement (other than those conditions that can be satisfied only by virtue of this Agreement and those conditions that may only be satisfied as of the Closing) shall have been satisfied or waived and the parties to the Purchase Agreement shall have indicated that they intend to consummate the Stock Purchase immediately following the consummation of the Contribution.

(b)     Representations, Warranties and Covenants of the Investor.  All representations and warranties made in this Agreement by the Investor shall be true and correct in all respects on the date when made and on and as of the Contribution Closing with the same effect as if made on and as of the Contribution Closing, and the Investor shall have performed or complied in all material respects with all covenants and agreements to be performed by the Investor under this Agreement at or prior to the date of the Contribution Closing (the "Closing Date").

(c)     Representations, Warranties and Covenants of Parent.  All representations and warranties made in this Agreement by Parent shall be true and correct in all respects on the date when made and on and as of the Contribution Closing with the same effect as if made on and as of the Closing Date, and Parent shall have performed or complied in all material respects with all covenants and agreements to be performed by Parent under this Agreement at or prior to the Closing Date.

1.4     Parent Deliveries.  At the Contribution Closing, Parent shall deliver to the Investor (a) certificates or other documentation representing the Investor's Exchange Units and (b) an executed copy of the Partnership Agreement.

1.5     Investor Deliveries.  At the Contribution Closing, the Investor shall deliver to Parent (a) an executed stock power in form and substance reasonably satisfactory to Parent and (b) a duly executed signature page to the Partnership Agreement.

Section 2.     Representations and Warranties of Parent.  Parent hereby represents and warrants to the Investor as follows:

3

2.1     Organization.  Parent is a limited partnership, duly organized, validly existing and in good standing under the Laws of the State of Delaware.

2.2     Authority.  Parent has the requisite power and authority to enter into and deliver this Agreement, perform its obligations herein, and consummate the transactions contemplated hereby.  Parent has duly executed and delivered this Agreement and, assuming the due authorization, execution and delivery by the Investor, this Agreement is a valid, legal and binding obligation of Parent, enforceable against Parent in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether such enforcement is considered in a proceeding at Law or at equity).

2.3     Shares Duly Authorized.  All of the Class B Common Units of Parent to be issued to the Investor under this Agreement, when issued and delivered in accordance with the terms of this Agreement, will be duly authorized, validly issued, fully paid and non-assessable without being subject to preemptive rights, and shall be free of rights of first refusal or similar rights (except such rights granted to the Investor and the other partners of Parent pursuant to, or limitations set forth in, the Partnership Agreement).  The Investor will acquire good, valid, and marketable title to the Exchange Units, free and clear of all mortgages, liens, pledges, charges, claims, security interests, agreements, and encumbrances whatsoever, other than those imposed by law or contemplated by this Agreement and the Partnership Agreement or those that result from action by the Investor.

2.4     Capitalization.  Following consummation of the transactions contemplated by this Agreement and the Purchase Agreement, the outstanding securities of Parent and the authorized and outstanding securities of Holdco will be as indicated on Exhibit B and Holdco will own, directly or indirectly, all of the issued and outstanding securities of Purchaser.  Except for this Agreement, the Purchase Agreement, the Amended and Restated Limited Partnership Agreement of Parent (the "LP Agreement"), the 2016 Equity Incentive Plan of Parent, any award agreements issued in connection with the profits interests issued at Closing pursuant to the LP Agreement, and that certain Stockholders Agreement by and among Holdco, Seller, Parent and certain other parties thereto (such agreements collectively being referred to herein as the "Transaction Documents"), neither Parent nor any of its Subsidiaries is a party to any option, warrant, purchase right, or other contract or commitment that would require it to sell, transfer, or otherwise dispose of any of its securities or that imposes any Lien on any of its securities.  Except for and as contemplated by the Transaction Documents, there are no outstanding (i) securities convertible into or exchangeable for securities of Parent or any of its Subsidiaries, (ii) subscriptions, options, warrants, calls or rights of any kind to purchase or otherwise acquire securities of Parent or any of its Subsidiaries to which Parent or any of its Subsidiaries is a party, or (iii) contracts of any kind by which Parent or any of its Subsidiaries is bound requiring the issuance after the date hereof of or relating to (x) any securities of Parent or any of its Subsidiaries, (y) any convertible or exchangeable security of the type referred to in clause (i) or (z) any options, warrants, calls or rights of the type referred to in clause (ii).  Except for the

4

Transaction Documents, there are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to Parent or any of its Subsidiaries by which Parent or any of its Subsidiaries is bound. Except for the Transaction Documents, there are no voting trusts, proxies or other contracts, agreements or understandings with respect to the securities of Parent or any of its Subsidiaries or restrictions on the transfer of the securities of Parent or any of its Subsidiaries to which Parent or any of its Subsidiaries is a party.

2.5 No Conflicts; No Consents. The execution and delivery of this Agreement by Parent, the performance by Parent of its obligations hereunder, and the consummation by Parent of the transactions contemplated hereby, do not and will not (a) conflict with Parent's agreement of limited partnership, (b) materially violate or materially conflict with any constitution, law, ordinance, regulation, statute or treaty of any Governmental Authority ("Law") applicable to Parent or any of Parent's assets or properties or (c) violate or conflict with in any material respect, result in any material breach of, or constitute a material default (or event which with the giving of notice or lapse of time, or both, would become a default) under, any agreement to which Parent is a party or by which any of its assets or properties is bound. No consent, approval, authorization, license, order or permit of, or declaration, filing or registration with, or notification to, any Governmental Authority, or any other Person, on the part of Parent is required to be made or obtained in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, other than any filings as may be required under applicable state "Blue Sky" Laws.

2.6 Newly-Formed. Parent was newly formed to facilitate and in contemplation of the transactions contemplated by the Transaction Documents. Other than the Transaction Documents and other agreements, certificates and instruments contemplated thereby and all transactions contemplated by any of the foregoing (including, but not limited to, the financing of the transactions contemplated by the foregoing and all agreements, certificates and instruments entered into in connection therewith), Parent has conducted no business activities and has not entered into any contracts or agreements.

Section 3. Representations and Warranties of Investor. The Investor hereby represents and warrants to Parent as follows:

3.1 Ownership of the Rollover Shares. At the Contribution Closing, the Investor will be the record and beneficial owner of the Rollover Shares, free and clear of all pledges, liens, proxies, claims, charges, security interests, preemptive rights, voting trusts, voting agreements, options, rights of first offer or refusal and any other encumbrances or arrangements whatsoever with respect to the ownership, transfer or other voting of the Rollover Shares ("Liens"). Neither the Investor nor any of his or her Affiliates is a party to, or bound by, any contract, arrangement, agreement, instrument or order (other than this Agreement and the Seller LLC Agreement) (i) relating to the sale, repurchase, assignment or other transfer of any capital stock or equity securities of the Company, (ii) relating to the receipt of dividends, proxy rights or voting rights of any capital stock or other equity securities of the Company or (iii) relating to the rights to registration under the Securities Act of 1933, as amended (the "Securities Act"), or the

5

Securities and Exchange Act of 1934, as amended (the "Exchange Act"), of any capital stock or equity securities of the Company.

3.2     Authority.  The Investor has the requisite power and authority to enter into and deliver this Agreement, perform his or her obligations herein, and consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by the Investor and, assuming the due authorization, execution and delivery by Parent, this Agreement is a valid, legal and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether such enforcement is considered in a proceeding at Law or in equity).

3.3     Investor Intent.  The Investor is acquiring the Exchange Units for the Investor's own account as principal, for investment purposes only, not for any other Person and not for the purposes of resale or distribution. The Investor is not subscribing for the Exchange Units from Parent in a fiduciary capacity.

3.4     Financial Status.  The Investor is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act.  The Investor is able to bear the economic risk of an investment in the Exchange Units for an indefinite period of time, has adequate means of providing for its current financial needs and business contingencies, has no need for liquidity in the investment in the Exchange Units, understands that the Investor may not be able to liquidate the Exchange Units in an emergency, if at all, and can afford a complete loss of the investment. The Investor has received no advice from Parent or any of its Affiliates as to the legal, investment or tax consequences of the Contribution contemplated by this Agreement or the Investor's investment in the Exchange Units.

3.5     Access to Information.  The Investor has been given the opportunity to ask questions of and receive answers from Parent and its representatives concerning (i) the terms and conditions of the issuance of the Exchange Units and the other transactions contemplated in connection with the Contribution and the Purchase Agreement and (ii) the financial condition, operation and prospects of Parent and its subsidiaries after giving effect to the Stock Purchase.

3.6     No Other Representation.  The Investor has received no other representations or warranties from Parent or any other Person acting on behalf of the Company or Parent, other than those contained in Section 2 of this Agreement.

3.7     No Conflicts; No Consents.  The execution and delivery of this Agreement by the Investor, the performance by the Investor of his or her obligations hereunder and the consummation by the Investor of the transactions contemplated hereby do not and will not (a) materially violate or materially conflict with any Law applicable to the Investor or any of the Investor's assets or properties or (b) violate or conflict with in any material respect, result in any material breach of, or constitute a material default (or event which with the giving of notice or lapse of time, or both, would become a default) under, any agreement to which the Investor is a

WEIL:\95645638\18\11623.0311

party or by which any of his or her assets or properties is bound. No consent, approval, authorization, license, order or permit of, or declaration, filing or registration with, or notification to, any Governmental Authority, or any other Person, is required to be made or obtained by the Investor in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby that has not been made or obtained or will not be made or obtained on or prior to the Contribution Closing.

Section 4.      Agreements and Acknowledgements of the Investor.  The Investor hereby agrees and acknowledges to Parent as follows:

4.1      No Registration.  The Investor understands and agrees that the Exchange Units are being acquired by the Investor in a transaction not involving any public offering within the meaning of the Securities Act, in reliance on an exemption therefrom.  The Investor understands that the Exchange Units have not been, and will not be, approved or disapproved by the Securities and Exchange Commission or by any other federal or state agency, and that no such agency has passed on the accuracy or adequacy of disclosures made to the Investor by Parent.  No federal or state governmental agency has passed on or made any recommendation or endorsement of the Exchange Units or an investment in Parent.

4.2      Limitations on Disposition and Resale.  The Investor understands and acknowledges that the Exchange Units have not been and will not be registered under the Securities Act, or the securities laws of any state and, unless the Exchange Units are so registered, they may not be offered, sold, transferred or otherwise disposed of except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable securities laws of any state or foreign jurisdiction.  The Investor agrees not to sell, transfer or otherwise dispose of the Exchange Units unless the Exchange Units have been so registered or an exemption from the requirement of registration is available under the Securities Act and any applicable state securities laws.  The Investor further acknowledges and agrees that his or her ability to dispose of the Exchange Units will be subject to restrictions contained in the Partnership Agreement.  The Investor recognizes that there will not be any public trading market for Parent Class B Common Units and, as a result, the Investor may be unable to sell or dispose of his or her interest in Parent.  The Investor further acknowledges and agrees that, except as may be set forth in the Partnership Agreement, Parent shall have no obligation to register any Parent Class B Common Units.

4.3      Legend.  The Investor acknowledges and agrees that the Exchange Units received in the Contribution, to the extent represented by physical certificates, will bear the following legend (or one to substantially similar effect):

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES OR BLUE SKY LAWS.  THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION

7

THEREFROM UNDER SAID ACT OR LAWS. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO A PARTNERSHIP AGREEMENT DATED AS OF MAY [___], 2016 BY AND AMONG WILCO ACQUISITION, LP ("PARENT") AND THE OTHER PARTIES NAMED THEREIN. THE TERMS OF SUCH PARTNERSHIP AGREEMENT INCLUDE, AMONG OTHER THINGS, RESTRICTIONS ON TRANSFER. A COPY OF SUCH AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY PARENT TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

4.4     Newly Formed Entity.  The Investor recognizes that Parent was only recently formed and, accordingly, has no financial or operating history and that the investment in Parent is extremely speculative and involves a high degree of risk.

4.5     Other Acknowledgments.  The Investor acknowledges that (i) Paul Hastings LLP ("Paul Hastings") is counsel to certain members of Seller; (ii) that Hogan Lovells US LLP ("Hogan Lovells") is counsel to Seller and its direct and indirect subsidiaries; (iii) that Weil, Gotshal & Manges LLP ("Weil") is counsel to Parent and its direct and indirect subsidiaries; and (iii) that unless Investor has signed an engagement letter with the applicable counsel (an "Engagement Letter"),  none of Paul Hastings, Hogan Lovells or Weil represent Investor regarding legal matters concerning an investment in the Exchange Units (or any other matter).  Investor waives any conflict of interest in connection with such representation by any of Paul Hastings, Hogan Lovells or Weil.  Unless Investor has signed an Engagement Letter, Investor further acknowledges that it has been advised to consult with its own tax, legal and other advisors, and not Paul Hastings, Hogan Lovells or Weil, regarding the tax consequences of acquiring the Exchange Units, legal matters concerning Parent or any other action to be taken in connection with the acquisition of the Exchange Units contemplated hereby.

Section 5.     Tax Treatment.  For U.S. federal income tax purposes, the parties hereby agree to treat the contribution of the Rollover Shares solely in exchange for the Exchange Units as a transaction intended by the parties to qualify under Section 721(a) of the Code, and neither of the parties shall take any position inconsistent with such treatment on any tax return except as otherwise required by a change in law following the date of this Agreement or pursuant to a good faith resolution of a tax dispute.

Section 6.     Governing Law, Severability, Consent to Jurisdiction, Waiver of Jury Trial.  This Agreement is governed by and shall be construed in accordance with the Laws of the State of Delaware applicable to contracts made and to be performed entirely in such state, without giving effect to conflicts of Law principles thereunder that would give effect to the Laws of another jurisdiction.  Each of the parties hereto, on behalf of itself and its respective Affiliates, (i) consents to submit to the personal jurisdiction of the Delaware Court of Chancery or the other courts of the State of Delaware, in each case in connection with any action arising out of, in connection with, in respect of, or in any way relating to the negotiation, execution and performance of this Agreement and the transactions contemplated hereby and waives any right to trial by jury with respect to any such matters.  Each party hereto, on behalf of itself and its

8

respective Affiliates, irrevocably and unconditionally waives any objection to the laying of venue of any claim, action or proceeding arising out of, in connection with, or in respect of this Agreement. If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected thereby, and that provision shall be enforced to the greatest extent permitted by Law.

Section 7.    Notices.  All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given when (i) delivered in person, (ii) three (3) days after posting in the United States mail having been sent registered or certified mail return receipt requested, or (iii) delivered by telecopy and promptly confirmed by delivery in person or post as aforesaid in each case, with postage prepaid, addressed as follows:

(a)    If to Parent, then to:

c/o Advent International Corporation
375 Park Avenue
New York, NY 10152
Attention: John Maldonado
Facsimile No.: (617) 951-0566
E-mail: jmaldonado@adventinternational.com

and

c/o Advent International Corporation
75 State Street
Boston, MA 02109
Attention: James Westra
Facsimile No.: (617) 951-0566
E-mail: jwestra@adventinternational.com

and

Weil, Gotshal & Manges LLP
100 Federal Street, 34th Floor
Boston, MA 02210
Attention: Marilyn French Shaw
Facsimile No.: (617) 772-8333
E-mail: marilynfrench.shaw@weil.com

(b)    If to the Investor, then to the address set forth on the Investor's signature page hereto.

9

WEIL:\95645638\18\11623.0311

Section 8.     Assignment.  No party shall have the right or the power to assign or delegate any provision of this Agreement except with the prior written consent of Parent, in the case of an assignment or delegation by the Investor, or with the prior written consent of the Investor, in the case of an assignment or delegation by Parent; provided, however, that Investor may assign any or all of its rights hereunder, without the prior written consent of Parent, to any of Investor's Affiliates who own shares of Company Common Stock; provided further that any such assignee shall agree to be bound by all of the terms of this Agreement, including the representations and warranties hereunder, and shall assume all obligations hereunder. Such assignment shall not release the Investor from liability in the event that such assignee fails to perform its obligations hereunder.  Except as provided in the first sentence of this Section 8, this Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors, assigns, executors and administrators.

Section 9.     Counterparts.  This Agreement may be executed in counterparts, including via facsimile, each of which shall be deemed an original and all of which taken together, shall constitute one and the same document.

Section 10.     Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in a writing executed by the party to be bound thereby.  This Agreement supersedes all prior and contemporaneous agreements of the parties hereto, whether written, oral or otherwise, that directly or indirectly bear on the subject matter hereof.

Section 11.     Termination of this Agreement.  This Agreement shall terminate and no longer have any force or effect upon on the earlier of (i) the mutual written consent of Parent and the Investor and (ii) the termination of the Purchase Agreement pursuant to its terms.

Section 12.     Remedies.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  Accordingly, the parties agree that, in the event of any breach or threatened breach by the other party of any covenant or obligation in this Agreement, such other party shall be entitled (in addition to any other remedy that may be available whether in Law or in equity) to seek and obtain (i) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation, and (ii) an injunction restraining such breach or threatened breach.  The parties agree that neither party shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 12, and each party irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

Section 13.     No Third Party Beneficiaries.  This Agreement shall be binding on the undersigned solely for the benefit of the undersigned parties to this Agreement, and nothing set forth herein shall be construed to confer upon or give to any person other than the parties to this Agreement any benefits, rights, or remedies under or by reason of, or any rights to enforce or cause such parties to enforce, the transactions contemplated hereby or any provision of this Agreement.

10

Section 14.     <u>Further Assurances</u>.  Subject to the terms and conditions provided herein, each party hereto agrees to use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable, whether under applicable Laws or otherwise, in order to consummate and make effective the transactions contemplated by this Agreement.

11

IN WITNESS WHEREOF, the parties have hereby executed this Agreement as of the date first above written.

<div align="center">

**INVESTOR:**

</div>

Signature: _____

        Robert McKenzie

Address: _____

_____

Investor Rollover Amount: $575,000

<div align="center">

[SIGNATURE PAGE TO ROLLOVER AND CONTRIBUTION AGREEMENT]

</div>

**IN WITNESS WHEREOF**, the parties have hereby executed this Rollover Agreement as of the date first above written.

**WILCO ACQUISITION, LP**

By:    WILCO GP, INC.
its general partner

By:

Name: John Maldonado
Title:  President

[SIGNATURE PAGE TO ROLLOVER AND CONTRIBUTION AGREEMENT]

**Execution Version**

**WRITTEN CONSENT
IN LIEU OF A
MEETING OF STOCKHOLDERS
OF
WILCO HOLDCO, INC.**

**February 21, 2021**

The undersigned (the "Stockholder"), being the holder of 23,179.19910431 shares of Series A-1 preferred stock, par value $0.01 per share (the "Preferred Stock" and together with the common stock, par value $0.01 per share, the "Company Stock"), of Wilco Holdco, Inc., a Delaware corporation (the "Company"), as reflected in Schedule 1 attached hereto, acting pursuant to Section 228 and Section 251 of the General Corporation Law of the State of Delaware (the "DGCL") and the Bylaws of the Company, does hereby (i) irrevocably consent to the adoption of, and does hereby adopt, the following resolutions in lieu of a meeting with respect to all of the shares of Company Stock held by the Stockholder, effective as of the date and time set forth herein, and (ii) direct that this written consent (this "Written Consent") be filed with the permanent records of the Company:

MERGER AGREEMENT

WHEREAS, the Company intends to enter into an Agreement and Plan of Merger (the "Merger Agreement"), by and among the Company, Fortress Value Acquisition Corp. II, a Delaware corporation ("Acquiror"), and FVAC Merger Corp. II, a Delaware corporation and a direct, wholly-owned subsidiary of Acquiror ("Merger Sub"), a copy of which is attached hereto as Exhibit A (capitalized terms used herein without definition shall have the respective meaning ascribed to them in the Merger Agreement);

WHEREAS, pursuant to the Merger Agreement, Merger Sub will be merged with and into the Company (the "Merger"), with the Company continuing as the surviving corporation of the Merger, upon the terms and subject to the conditions set forth in the Merger Agreement;

WHEREAS, prior to the due execution of the Merger Agreement by the Company, the board of directors of the Company (the "Company Board") shall (i) determine that it is in the best interests of the Company and its stockholders to enter into the Merger Agreement, each Ancillary Agreement to which it is a party and to consummate the transactions contemplated thereby, including the Merger (such transactions, the "Transactions"), (ii) approve and declare advisable the Merger Agreement, the Ancillary Agreements to which it is a party and the execution, delivery and performance thereof and the consummation of the Transactions, including the Merger, upon the terms and subject to the conditions set forth in the Merger Agreement and each Ancillary Agreement, (iii) recommend the adoption of the Merger Agreement and the approval of the Transactions, including the Merger, by the holders of shares of the Company Stock, upon the terms and subject to the conditions set forth therein (such actions by the Company Board referenced in clauses "(i)" through "(iii)," the "Board Recommendation") and (iv) determine to submit the

Merger Agreement and the Transactions, including the Merger, to the holders of shares of the Company Stock for their adoption and approval;

WHEREAS, following and pursuant to the Board Recommendation, the Company shall duly execute the Merger Agreement and deliver the Merger Agreement to Acquiror; and

WHEREAS, pursuant to the Second Amended and Restated Certificate of Incorporation of the Company, dated as of August 31, 2016 and the DGCL, the affirmative vote by the holders of a majority of the outstanding shares of Company Stock entitled to vote thereon, voting together as a single class, is required to adopt the Merger Agreement and approve the Transactions, including the Merger.

NOW, THEREFORE, BE IT RESOLVED, that, in accordance with Section 228(c) of the DGCL, immediately after (i) the making by the Company Board of the Board Recommendation, and (ii) the execution of the Merger Agreement by the Company and the delivery of the Merger Agreement to Acquiror (such time, the "Effective Time"), the Merger Agreement is hereby adopted and the Transactions, including the Merger, are hereby approved in all respects, and the Stockholder hereby votes all of the shares of Company Stock held by such Stockholder in favor of the adoption of the Merger Agreement and the approval of Transactions, including the Merger;

FURTHER RESOLVED, that the Stockholder hereby waives any and all irregularities of notice, with respect to the time and place of meeting, and consents to the transaction of all business represented by this Written Consent;

FURTHER RESOLVED, that the Stockholder (i) acknowledges and agrees that such Stockholder (a) received and read a copy of Section 262 of the DGCL, which is attached as Exhibit B and (b) is aware of such Stockholder's ability to seek appraisal and request an appraisal of the fair value of shares of the Company Stock held by such Stockholder under Section 262 of the DGCL, (ii) that by signing this Written Consent, such Stockholder adopts and approves in all respects the Merger Agreement and the Transactions, including the Merger, and as a result, (iii) irrevocably and unconditionally waives any appraisal rights, dissenters' rights and any similar rights for such shares under the DGCL and/or other applicable Laws with respect to the Merger Agreement and the Transactions, including the Merger; and

FURTHER RESOLVED, that this Written Consent shall be effective as of the Effective Time, and may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other electronic reproduction of this Written Consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used.

*[Remainder of page intentionally left blank.
Signature page follows.]*

2

In witness whereof, by executing this Written Consent, the undersigned is giving written consent with respect to all shares of the Company Stock held by such Stockholder.

DAKOTA HOLDCO LLC

By
    Name: Gregory Steil
    Title:   Manager and Vice President

*Signature Page to Written Consent in Lieu of a Meeting of Stockholders of Wilco Holdco, Inc.*

## SCHEDULE 1

| Type of Security | Number of Shares |
|---|---|
| Company Common Stock | 0 |
| Company Series A-1 Preferred Stock | 23,179.19910431 |
| Company Series A-2 Preferred Stock | 0 |

# EXHIBIT A

# MERGER AGREEMENT

EXECUTION VERSION

**AGREEMENT AND PLAN OF MERGER**

**by and among**

**FORTRESS VALUE ACQUISITION CORP. II,**

**FVAC MERGER CORP. II,**

**and**

**WILCO HOLDCO, INC.**

**February 21, 2021**

**Table of Contents**

**Page**

**Article I
THE MERGER**

Section 1.1    The Merger ................................................................................................3
Section 1.2    Effect of the Merger ..................................................................................3
Section 1.3    Governing Documents ...............................................................................3
Section 1.4    Directors and Officers of the Surviving Company ....................................3
Section 1.5    Effect of the Merger on the Company Stock ..............................................3
Section 1.6    Fractional Shares ......................................................................................4
Section 1.7    Dissenting Shares .....................................................................................4
Section 1.8    Exchange of Certificates ...........................................................................5
Section 1.9    Adjustments to Per Share Consideration ...................................................7
Section 1.10   Closing of Transfer Books ........................................................................7
Section 1.11   Withholding Rights ...................................................................................7
Section 1.12   Corporate Governance Matters ..................................................................8

**Article II
THE CLOSING**

Section 2.1    Closing .....................................................................................................8
Section 2.2    Deliveries at Closing .................................................................................8
Section 2.3    Closing .....................................................................................................9

**Article III
EARN-OUT**

Section 3.1    Issuance of Earn Out Shares ...................................................................10
Section 3.2    Acceleration Event ..................................................................................11
Section 3.3    Adjustments to Earn Out Shares ..............................................................11
Section 3.4    Tax Treatment of Earn Out Shares ...........................................................11

**Article IV
REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Section 4.1    Organization and Authority .....................................................................11
Section 4.2    Authorization and Enforceability .............................................................12
Section 4.3    Noncontravention ....................................................................................12
Section 4.4    Subsidiaries ............................................................................................13
Section 4.5    Governmental Authorities; Consents .......................................................13
Section 4.6    Capitalization ..........................................................................................13
Section 4.7    Financial Statements ...............................................................................14
Section 4.8    Undisclosed Liabilities ............................................................................15
Section 4.9    Actions. ...................................................................................................15

Section 4.10    Compliance with Laws; Permits ...........................................................................15
Section 4.11    Material Contracts.................................................................................................16
Section 4.12    Real Property ........................................................................................................18
Section 4.13    Employee Benefits ................................................................................................18
Section 4.14    Labor and Employment.........................................................................................20
Section 4.15    Taxes .....................................................................................................................21
Section 4.16    Intellectual Property..............................................................................................23
Section 4.17    Compliance with Healthcare Laws and Information Privacy and Security
                Laws ......................................................................................................................24
Section 4.18    Material Payor and Material Supplier Relations....................................................27
Section 4.19    Environmental Matters...........................................................................................28
Section 4.20    Insurance ...............................................................................................................28
Section 4.21    Absence of Changes...............................................................................................28
Section 4.22    Interested Party Transactions..................................................................................29
Section 4.23    Proxy Statement .....................................................................................................29
Section 4.24    No Brokers' Fees ....................................................................................................29
Section 4.25    No Additional Representations and Warranties; Non-Reliance of the
                Company ................................................................................................................29

**Article V**
**REPRESENTATIONS AND WARRANTIES OF**
**ACQUIROR AND MERGER SUB**

Section 5.1     Organization and Authority ...................................................................................30
Section 5.2     Authorization and Enforceability...........................................................................30
Section 5.3     Noncontravention..................................................................................................32
Section 5.4     Governmental Authorities; Consents.....................................................................32
Section 5.5     Capitalization ........................................................................................................32
Section 5.6     SEC Reports; Financial Statements .......................................................................33
Section 5.7     Actions ..................................................................................................................35
Section 5.8     Compliance with Laws; Permits ............................................................................35
Section 5.9     Financial Ability; Trust Account; PIPE Investment Amount .................................35
Section 5.10    No Brokers' Fees ...................................................................................................37
Section 5.11    Business Activities.................................................................................................37
Section 5.12    Material Contracts.................................................................................................37
Section 5.13    Employees; Acquiror Benefit Plans.......................................................................38
Section 5.14    No Acquiror Material Adverse Effect.....................................................................38
Section 5.15    Undisclosed Liabilities/Transaction Expenses ......................................................38
Section 5.16    Reporting Company ...............................................................................................38
Section 5.17    Listing ...................................................................................................................38
Section 5.18    Sarbanes-Oxley Act ..............................................................................................39
Section 5.19    Investment Company .............................................................................................39
Section 5.20    Taxes .....................................................................................................................39
Section 5.21    Sponsor Letter Agreement .....................................................................................39
Section 5.22    No Additional Representations and Warranties; Non-Reliance of Acquiror
                and Merger Sub......................................................................................................39

**Article VI**
**COVENANTS**

Section 6.1    Conduct of Business by the Company ................................................................40
Section 6.2    Conduct of Business by Acquiror .....................................................................42
Section 6.3    Proxy Statement; Proxy Solicitation; Other Actions ........................................43
Section 6.4    Acquiror Special Meeting ................................................................................45
Section 6.5    Company Written Consents .............................................................................47
Section 6.6    Access to Information ......................................................................................47
Section 6.7    Efforts; Consents .............................................................................................47
Section 6.8    Publicity ..........................................................................................................49
Section 6.9    Non-Solicitation ..............................................................................................50
Section 6.10   Pre-Closing Structuring ...................................................................................51
Section 6.11   Directors' and Officers' Indemnification; Insurance........................................51
Section 6.12   Trust Account...................................................................................................52
Section 6.13   Intended Tax Treatment...................................................................................53
Section 6.14   FIRPTA Certificate ..........................................................................................54
Section 6.15   Incentive Plan..................................................................................................54
Section 6.16   Section 16(b) Exemption .................................................................................54
Section 6.17   Stock Exchange Matters ..................................................................................54
Section 6.18   Stockholder Litigation .....................................................................................55
Section 6.19   Subscription Agreements .................................................................................56
Section 6.20   Sponsor Letter Agreement ...............................................................................56
Section 6.21   Debt Financing.................................................................................................56

**Article VII**
**CONDITIONS TO CLOSING**

Section 7.1    Conditions to Obligations of all Parties ............................................................57
Section 7.2    Conditions to Obligations of Acquiror ............................................................58
Section 7.3    Conditions to Obligations of Company ...........................................................59
Section 7.4    Frustration of Closing Conditions....................................................................60

**Article VIII**
**TERMINATION**

Section 8.1    Termination......................................................................................................60
Section 8.2    Effect of Termination.......................................................................................61

**Article IX**
**MISCELLANEOUS**

Section 9.1    Non Survival of Representations, Warranties and Agreements.............................62
Section 9.2    Modification or Amendment.............................................................................62
Section 9.3    Extension; Waiver............................................................................................62
Section 9.4    Notices .............................................................................................................62
Section 9.5    Entire Agreement .............................................................................................64

Section 9.6     Assignment ...............................................................................................................64
Section 9.7     Counterparts..............................................................................................................64
Section 9.8     No Third-Party Beneficiaries....................................................................................64
Section 9.9     Governing Law .........................................................................................................64
Section 9.10     Exclusive Jurisdiction ..............................................................................................64
Section 9.11     WAIVER OF TRIAL BY JURY ...............................................................................65
Section 9.12     Severability ..............................................................................................................65
Section 9.13     Fees and Expenses ...................................................................................................65
Section 9.14     Specific Performance ...............................................................................................65
Section 9.15     Non-Recourse ..........................................................................................................66
Section 9.16     Legal Representation ...............................................................................................66
Section 9.17     Release .....................................................................................................................67

**Article X**
**DEFINITIONS**

Section 10.1     Definitions................................................................................................................68
Section 10.2     Construction.............................................................................................................87

Exhibit A – Acquiror A&R Charter
Exhibit B – Acquiror A&R Bylaws
Exhibit C – Form of Subscription Agreement
Exhibit D – Stockholders Agreement
Exhibit E – Registration Rights Agreement

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger is made and entered into as of February 21, 2021, by and among Fortress Value Acquisition Corp. II, a Delaware corporation ("Acquiror"), FVAC Merger Corp. II, a Delaware corporation and a direct, wholly-owned subsidiary of Acquiror ("Merger Sub") and Wilco Holdco, Inc., a Delaware corporation (the "Company").

## RECITALS

WHEREAS, Acquiror is a blank check company incorporated for the purpose of effecting a Business Combination;

WHEREAS, Merger Sub is a newly formed, wholly-owned, direct subsidiary of Acquiror, and was formed for the sole purpose of effecting the Merger (as defined below);

WHEREAS, the Company is a healthcare company, specializing in outpatient physical therapy services (the "Business");

WHEREAS, upon the terms and subject to the conditions of this Agreement and in accordance with the General Corporation Law of the State of Delaware (the "DGCL") and other applicable requirements of Law, the Parties wish to enter into a Business Combination transaction by which Merger Sub will merge with and into the Company (the "Merger"), with the Company being the Surviving Company of the Merger (the Company, in its capacity as the Surviving Company of the Merger, is sometimes referred to as the "Surviving Company");

WHEREAS, in connection with the Closing, Acquiror will, (a) subject to obtaining the Acquiror Stockholder Approval, adopt the Amended and Restated Certificate of Incorporation substantially in the form attached hereto as Exhibit A (the "Acquiror A&R Charter"); and (b) adopt the Amended and Restated Bylaws of Acquiror substantially in the form attached hereto as Exhibit B (the "Acquiror A&R Bylaws");

WHEREAS, concurrently with the execution and delivery of this Agreement, the Sponsor and Acquiror and certain officers and directors of Acquiror have entered into an Amended and Restated Letter Agreement (as it may be amended, restated, modified or supplemented from time to time, the "Sponsor Letter Agreement") dated as of the date hereof;

WHEREAS, concurrently with the execution and delivery of this Agreement, certain investors have entered into subscription agreements, in substantially the form attached hereto as Exhibit C (collectively, the "Subscription Agreements"), pursuant to which, at the Closing, such investors have agreed, upon the terms and subject to the conditions set forth therein, to subscribe for and purchase Acquiror Class A Common Stock at a purchase price of $10.00 per share, for an aggregate cash amount of $300,000,000 (such amount, the "PIPE Investment Amount," and, such purchase of Acquiror Class A Common Stock, the "PIPE Investment");

WHEREAS, concurrently with the execution and delivery of this Agreement, Acquiror, certain stockholders of the Company and their Affiliates have entered into a stockholders

agreement attached hereto as Exhibit D (the "Stockholders Agreement"), to be effective upon the Effective Time;

WHEREAS, concurrently with the execution and delivery of this Agreement, Acquiror, the Sponsor, certain stockholders of the Company and their Affiliates have entered into an amended and restated registration rights agreement attached hereto as Exhibit E (the "Registration Rights Agreement"), to be effective upon the Effective Time;

WHEREAS, the Acquiror Board has unanimously (a) determined that the transactions contemplated by this Agreement and the Ancillary Agreements, including the Merger (the "Transactions"), are fair to, advisable and in the best interests of Acquiror and its stockholders, (b) approved and declared advisable this Agreement and the Transactions, including the issuance of shares of Acquiror Class A Common Stock to the stockholders of the Company pursuant to the terms of this Agreement and the adoption of the Acquiror A&R Charter in connection with the Transactions and (c) recommended that the stockholders of Acquiror approve the Transactions and each of the Transaction Proposals;

WHEREAS, the Merger Sub Board has (a) determined that the Transactions are fair to, advisable and in the best interests of Merger Sub and its sole stockholder, (b) approved and declared advisable this Agreement and the Transactions and (c) recommended that the sole stockholder of Merger Sub adopt this Agreement and approve the Transactions;

WHEREAS, effective upon the execution of this Agreement, Acquiror, as the sole stockholder of Merger Sub, has adopted this Agreement in accordance with the DGCL;

WHEREAS, the board of directors of the Company (the "Company Board") has unanimously (a) determined that the Transactions are fair to, advisable and in the best interests of the Company and its stockholders, (b) approved and declared advisable this Agreement and the Transactions and (c) recommended that the stockholders of the Company adopt this Agreement and approve the Transactions (the "Company Board Approval");

WHEREAS, effective upon the Company Board Approval and the subsequent execution and delivery of this Agreement, the Company Stockholders have adopted this Agreement in accordance with the DGCL;

WHEREAS, each of the Key Employees has entered into an employment agreement (or an amendment to an existing agreement), dated as of the date hereof and effective upon the Closing (each, an "Employment Agreement"); and

WHEREAS, each of the Parties intends that, for U.S. federal and applicable state and local income tax purposes, the Merger shall qualify either as a reorganization within the meaning of Section 368(a) of the Code, or an exchange to which Section 351(a) of the Code applies (or both) (the "Intended Tax Treatment").

NOW, THEREFORE, in consideration of the foregoing, and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

2

## ARTICLE I
## THE MERGER

Section 1.1    The Merger. At the Effective Time, upon the terms and subject to the conditions of this Agreement and in accordance with the applicable provisions of the DGCL, Merger Sub and the Company shall consummate the Merger, pursuant to which Merger Sub shall be merged with and into the Company, following which the separate corporate existence of Merger Sub shall cease and the Company shall continue as the Surviving Company after the Merger as a direct, wholly-owned subsidiary of Acquiror.

Section 1.2    Effect of the Merger. At the Effective Time, the effect of the Merger shall be as provided in this Agreement, the Certificate of Merger and the applicable provisions of the DGCL. Without limiting the generality of the foregoing, at the Effective Time, all the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of Merger Sub and the Company shall become the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of the Surviving Company.

Section 1.3    Governing Documents. By virtue of the Merger and without any further action on the part of Acquiror, Merger Sub, the Company, the Company Stockholders or the holders of any of the securities of Acquiror or any other Person, at the Effective Time:

(a)    the certificate of incorporation of the Surviving Company shall remain the same as the certificate of incorporation of the Company as in effect immediately prior to the Effective Time, shall not be amended by the Merger and shall remain the certificate of incorporation of the Surviving Company until thereafter amended as provided therein or as may be required by applicable Law; and

(b)    the bylaws of the Surviving Company shall remain the same as the bylaws of the Company as in effect immediately prior to the Effective Time, shall not be amended by the Merger, and shall remain the bylaws of the Surviving Company until thereafter amended as provided therein or as may be required by applicable Law.

Section 1.4    Directors and Officers of the Surviving Company. The Parties shall take all requisite actions so that, at the Effective Time, until their successors are duly elected or appointed and qualified in accordance with applicable requirements of Law: (i) the directors of the Company immediately prior to the Effective Time shall be the directors of the Surviving Company; and (ii) the officers of the Company immediately prior to the Effective Time shall be the officers of the Surviving Company.

Section 1.5    Effect of the Merger on the Company Stock. Upon the terms and subject to the conditions of this Agreement, at the Effective Time, by virtue of the Merger and without any further action on the part of Acquiror, Merger Sub, the Company, the Company Stockholders or the holders of any of the securities of Acquiror or any other Person, the following shall occur:

(a)    any shares of Company Stock held in the Company's treasury or held, directly or indirectly, by Acquiror, Merger Sub or any direct wholly-owned Subsidiary of the Company immediately prior to the Effective Time (each an "Excluded Share") shall be cancelled and retired, and no consideration shall be paid or payable in respect thereof;

3

(b)      except for Dissenting Shares, if applicable, and subject to Section 1.6 and Section 1.9, (i) each share of Company Preferred Stock issued and outstanding immediately prior to the Effective Time shall be automatically converted into the right to receive the Per Share Preferred Consideration and (ii) each share of Company Common Stock issued and immediately prior to the Effective Time shall be automatically converted into (A) the right to receive the Per Share Common Stock Consideration and (B) the contingent right to receive the Earn Out Shares following the Closing in accordance with, and subject to the vesting conditions provided for in, ARTICLE III (together with the Per Share Common Stock Consideration and the Per Share Preferred Consideration, the "Per Share Consideration"); and

(c)      each share of Merger Sub Common Stock outstanding immediately prior to the Effective Time shall be converted into one fully paid, validly issued and non-assessable share of common stock, par value $0.01 per share, of the Surviving Company.

Section 1.6      Fractional Shares.

(a)      No fractional shares of Acquiror Class A Common Stock shall be issued in connection with the Transactions, and no certificates or scrip for any such fractional shares shall be issued.

(b)      Any holder of shares of Company Stock who would otherwise be entitled to receive a fraction of a share of Acquiror Class A Common Stock (after aggregating all fractional shares of Acquiror Class A Common Stock issuable to such holder) pursuant to Section 1.5 shall, in lieu of such fraction of a share and upon compliance with Section 1.8, be paid in cash the dollar amount (rounded to the nearest whole cent), without interest and subject to any required Tax withholding, equal to the product of (i) the amount of the fractional share interest in a share of Acquiror Class A Common Stock to which such holder otherwise would have been entitled but for this Section 1.6 *multiplied by* (ii) $10.00.

Section 1.7      Dissenting Shares.

(a)      Notwithstanding anything to the contrary contained in this Agreement, shares of Company Stock with respect to which appraisal rights are available under Section 262 of the DGCL, if any (it being understood that nothing set forth in this Agreement shall be deemed to imply, admit or establish the availability of any such appraisal rights in connection with the Transactions), and which are held by a holder who shall have neither voted in favor of the Merger nor consented thereto in writing and, as of the Closing: (i) has made a proper demand for appraisal of such shares of Company Stock in accordance with Section 262 of the DGCL; and (ii) has otherwise complied with all applicable provisions of Section 262 of the DGCL (any such shares being referred to as "Dissenting Shares" until such time as such holder withdraws, fails to perfect or otherwise loses such holder's appraisal rights under Section 262 of the DGCL with respect to such shares) shall not be converted into or represent the right to receive the applicable Per Share Consideration in accordance with Section 1.5, but shall be entitled only to such rights (if any) as are granted by the DGCL to a holder of Dissenting Shares.

(b)      Notwithstanding the provisions of Section 1.7(a), if any Dissenting Shares shall lose their status as such (through failure to perfect, waiver, withdrawal or otherwise), then

4

such shares shall be deemed automatically, as of the Effective Time, to have been converted into, and to represent only, the right to receive the applicable Per Share Consideration in accordance with Section 1.5(b), without interest thereon, upon proper delivery of the Company Stock Certificates in the manner provided in this ARTICLE I.

(c)       The Company shall give Acquiror (i) prompt written notice of (A) any demand for appraisal received from its stockholders prior to the Effective Time pursuant to Section 262 of the DGCL, (B) any withdrawal of such demand pursuant to Section 262 of the DGCL and (C) any other instruments served pursuant to the DGCL received by the Company relating to appraisal demands, and (ii) the opportunity to participate in all negotiations and proceedings with respect to demands for appraisal pursuant to the DGCL. The Company shall not, except with the prior written consent of Acquiror (which consent shall not be unreasonably withheld, conditioned or delayed), make any payment with respect to, or settle or offer to settle, any such demands, or agree to do or commit to do any of the foregoing.

Section 1.8      Exchange of Certificates.

(a)       Prior to the dissemination of the Proxy Statement, Acquiror and the Company shall mutually agree upon a transfer agent or another bank or trust company to act as exchange agent in the Merger (the "Exchange Agent") and Acquiror shall enter into an agreement reasonably acceptable to Acquiror and the Company with the Exchange Agent relating to the services to be performed by the Exchange Agent. Substantially concurrently with the Effective Time, Acquiror shall cause to be deposited with the Exchange Agent: (i) a sufficient number of shares of Acquiror Class A Common Stock (whether represented in certificated or non-certificated direct registration form) to be issued pursuant to Section 1.5; (ii) cash in immediately available funds sufficient to make payments of the Aggregate Preferred Cash Consideration pursuant to Section 1.5 and (iii) cash in immediately available funds sufficient to make payments in lieu of fractional shares in accordance with Section 1.6 and, if applicable, any dividends or other distributions pursuant to Section 1.8(c).  The shares of Acquiror Class A Common Stock and cash amounts so deposited with the Exchange Agent pursuant to this Section 1.8(a), together with any dividends or distributions received by the Exchange Agent with respect to such shares of Acquiror Class A Common Stock, are referred to collectively as the "Exchange Fund." The Exchange Fund shall be held in trust by the Exchange Agent and shall not be used for any purpose other than to pay the Per Share Consideration to holders of Company Stock in accordance with Section 1.5(b), cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c).

(b)       Concurrently with the mailing of the Proxy Statement, Acquiror shall cause the Exchange Agent to mail to each Person who is a holder of record of Company Stock Certificates: (i) a letter of transmittal in customary form to be approved by the Company (the "Letter of Transmittal"), and including a provision confirming that delivery of Company Stock Certificates shall be effected, and risk of loss and title to Company Stock Certificates shall pass, only upon delivery of such Company Stock Certificates to the Exchange Agent (and such other documents as may be reasonably required by the Exchange Agent); and (ii) instructions for use in effecting the surrender of Company Stock Certificates in exchange for the applicable Per Share Consideration that such holder is entitled to receive pursuant to Section 1.5; cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant

5

to Section 1.8(c). Upon surrender of a Company Stock Certificate to the Exchange Agent for exchange, together with a duly executed Letter of Transmittal and such other documents as may be reasonably required by the Exchange Agent: (A) the holder of such Company Stock Certificate shall be entitled to receive in exchange therefor the applicable Per Share Consideration that such holder is entitled to receive pursuant to Section 1.5 (and cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c)); and (B) the Company Stock Certificate so surrendered shall be cancelled. Until surrendered or cancelled as contemplated by this Section 1.8(b), each Company Stock Certificate shall be deemed, from and after the Effective Time, to represent only the right to receive the applicable Per Share Consideration that such holder is entitled to receive pursuant to Section 1.5 (and cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c)). In the event of a transfer of ownership of Company Stock which is not registered in the transfer records of the Company, the applicable Per Share Consideration that such holder is entitled to receive pursuant to Section 1.5 (and cash in lieu of any fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c)) may be issued to or paid to, as applicable, a Person other than the Person in whose name the Company Stock Certificates so surrendered are registered, if such Company Stock Certificates so surrendered are registered, shall be properly endorsed or otherwise be in proper form and with proper evidence for transfer and the Person requesting such issuance shall pay any transfer, stamp or other similar Taxes required by reason of the issuance of or payment of the applicable Per Share Consideration to a Person other than the registered holder of such Company Stock Certificates, or establish to the satisfaction of Acquiror that such Tax has been paid or is not applicable. If any Company Stock Certificate shall have been lost, stolen or destroyed, Acquiror may, in its reasonable discretion and as a condition to the issuance of or payment of the applicable Per Share Consideration require the owner of such lost, stolen or destroyed Company Stock Certificate to provide an appropriate affidavit and to deliver a bond (in such sum as Acquiror may reasonably direct) as indemnity against any claim that may be made against the Exchange Agent, Acquiror or the Surviving Company with respect to such Company Stock Certificate.

(c)     No dividends or other distributions declared or made with respect to Acquiror Class A Common Stock with a record date after the Effective Time shall be paid or otherwise delivered to the holder of any unsurrendered Company Stock Certificate with respect to the shares of Acquiror Class A Common Stock that such holder has the right to receive in the Merger until the later to occur of: (i) the date on which the holder surrenders such Company Stock Certificate in accordance with this Section 1.8 and (ii) the payment date for such dividend or distribution with respect to Acquiror Class A Common Stock (at which time such holder shall be entitled, subject to the effect of applicable abandoned property, escheat or similar laws, to receive all such dividends and distributions, without interest).

(d)     Any portion of the Exchange Fund that remains undistributed to holders of Company Stock Certificates as of the date that is six months after the Closing Date shall be delivered to Acquiror upon written demand. Any holders of Company Stock Certificates who have not theretofore surrendered their Company Stock Certificates in accordance with this Section 1.8 shall thereafter look only to Acquiror for, and be entitled to the applicable Per Share Consideration that such holder has the right to receive pursuant to the provisions of Section 1.5 (and cash in lieu of fractional shares in accordance with Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c)).

6

(e)     Neither Acquiror nor the Surviving Company shall be liable to any holder or former holder of Company Stock or to any other Person with respect to any shares of Acquiror Class A Common Stock (or dividends or distributions with respect thereto), or for any cash amounts, delivered to any public official pursuant to any applicable abandoned property law, escheat law or other similar requirements of Law.

Section 1.9     Adjustments to Per Share Consideration. If, during the period from the date of this Agreement through the Effective Time, the outstanding shares of Acquiror Class A Common Stock are changed into a different number or class of shares by reason of any stock split, division or subdivision of shares, stock dividend, reverse stock split, consolidation of shares, reorganization, reclassification, recapitalization or other similar transaction, or a record date with respect to any such event shall occur during such period, then the Per Share Consideration shall be adjusted to the extent appropriate to provide the same economic effect as contemplated by this Agreement prior to such action; provided, however, that nothing in this Section 1.9 shall be construed as permitting Acquiror to take any action or enter into any transaction otherwise prohibited by this Agreement.

Section 1.10    Closing of Transfer Books.

(a)     All shares of Company Stock outstanding immediately prior to the Effective Time shall automatically be cancelled and retired and shall cease to exist, and all holders of Company Stock Certificate(s) shall cease to have any rights as Company Stockholders, except the right to receive the applicable Per Share Consideration contemplated by Section 1.5, cash in lieu of any fractional share of Acquiror Class A Common Stock pursuant to Section 1.6 and any dividends or other distributions pursuant to Section 1.8(c).

(b)     At the Effective Time, the stock transfer books of the Company shall be closed with respect to all shares of Company Stock outstanding immediately prior to the Effective Time and no further transfer of any such shares of Company Stock shall be made on such stock transfer books after the Effective Time. If, after the Effective Time, a valid Company Stock Certificate is presented to the Exchange Agent or to the Surviving Company or Acquiror, such Company Stock Certificate shall be cancelled and shall be exchanged as provided in Section 1.8.

Section 1.11    Withholding Rights. Each of the Exchange Agent, Acquiror and the Surviving Company shall be entitled to deduct and withhold from any consideration otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld with respect to the making of such payment under the Code, or under any provision of state, local or foreign Tax law; provided, that the Exchange Agent, Acquiror and the Surviving Company, as applicable, shall use commercially reasonable efforts to provide the Company with a written notice of such Person's intention to withhold at least five Business Days prior to any such withholding and shall reasonably cooperate with the applicable payee to minimize any such withholding. To the extent that amounts are so deducted and withheld and timely remitted to the applicable Governmental Authority, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made by the Exchange Agent, Acquiror or the Surviving Company, as the case may be.

Section 1.12 <u>Corporate Governance Matters</u>. At the Effective Time, the Acquiror Board shall be a classified board initially comprised of eight members. Unless otherwise agreed to by Acquiror and the Company prior to the Closing, Acquiror shall cause the Acquiror Board, the committees of the Acquiror Board and the officers of Acquiror at the Effective Time to be comprised of the individuals set forth on <u>Schedule 1.12</u> in accordance with the procedures contemplated thereon, in each case to hold office from and after the Effective Time until the earliest to occur of the appointment or election of his or her respective successor, resignation or proper removal in accordance with applicable requirements of Law. The Acquiror Board shall comply with Stock Exchange requirements applicable to "controlled companies," including with respect to independence and committee composition, and will not be required to comply with certain Stock Exchange governance requirements from which "controlled companies" are exempt.

<div align="center">

**ARTICLE II**
**THE CLOSING**

</div>

Section 2.1 <u>Closing</u>. Upon the terms and subject to the conditions set forth in this Agreement, the closing of the Transactions (the "<u>Closing</u>"), other than the filing of the Certificate of Merger, shall take place remotely by electronic exchange of executed documents, commencing at 9:00 a.m. New York City time on the date that is three Business Days after the date on which all conditions set forth in <u>ARTICLE VII</u> shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof) or at such other time and place as Acquiror and the Company may mutually agree. The date on which the Closing actually occurs is referred to in this Agreement as the "<u>Closing Date</u>." Notwithstanding anything to the contrary contained herein, in no event shall the Closing Date occur prior to the date that is 60 days after the date hereof without the prior written consent of the Company.

Section 2.2 <u>Deliveries at Closing</u>.

(a) Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, except in the case of the Company Transaction Expense Certificate and the Company Preferred Consideration Certificate, which shall be delivered two Business Days prior to Closing, the Company shall deliver to Acquiror:

(i) a written statement setting forth all accrued and unpaid Transaction Expenses of the Company, which shall include the respective amounts and wire transfer instructions for the payment thereof (the "<u>Company Transaction Expense Certificate</u>");

(ii) a written statement setting forth the respective amounts payable to each holder of Company Preferred Stock entitled to receive the Per Share Consideration pursuant to <u>Section 1.5(b)(i)</u> (the "<u>Company Preferred Consideration Certificate</u>");

(iii) a copy of the certificate of merger with respect to the Merger (the "<u>Certificate of Merger</u>"), duly executed by the Company;

(iv) a certificate signed on behalf of the Company by an authorized officer of the Company certifying that, to the knowledge and belief of such officer, and solely in his or her capacity as an officer of the Company, the conditions set forth in

<div align="center">8</div>

Section 7.2(a), Section 7.2(b) and Section 7.2(c) as they relate to the Company have been satisfied;

(v)     the certificate required under Section 6.14; and

(vi)     the other documents, instruments or certificates required to be delivered by the Company at or prior to the Closing pursuant to Section 7.2.

(b)     Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, except in the case of the Acquiror Financing Certificate and Acquiror Transaction Expense Certificate, which shall be delivered two Business Days prior to Closing, Acquiror shall deliver to the Company:

(i)     a certificate (the "Acquiror Financing Certificate"), signed by the secretary of Acquiror, certifying (A) that the Acquiror Stockholder Approval has been obtained and remains in full force and effect, (B) the number of shares of Acquiror Class A Common Stock included in the Acquiror Stock Redemption, if any, and the aggregate amount of cash proceeds that will be required to complete the Acquiror Stock Redemption, (C) the number of shares of Acquiror Class A Common Stock to be outstanding as of the Closing after giving effect to the Acquiror Stock Redemption; (D) the amount of Available Cash as of the Reference Time and (E) that the Available Cash as of immediately prior to the Closing equals or exceeds the Minimum Cash Balance after giving effect to the Acquiror Stock Redemption, if any;

(ii)     a written statement setting forth all accrued Transaction Expenses of Acquiror, which shall include the respective amounts and wire transfer instructions for the payment thereof (the "Acquiror Transaction Expense Certificate");

(iii)     evidence from the Secretary of State of the State of Delaware of the filing of the Acquiror A&R Charter with the Secretary of State of the State of Delaware in accordance with Section 2.3(d) and evidence from Acquiror of the adoption of the Acquiror A&R Bylaws;

(iv)     a certificate signed on behalf of Acquiror by an authorized officer of Acquiror certifying that, to the knowledge and belief of such officer, and solely in his or her capacity as an officer of Acquiror, the conditions set forth in Section 7.3(a), Section 7.3(b) and Section 7.3(c) as they relate to Acquiror have been satisfied;

(v)     the other documents, instruments or certificates required to be delivered by Acquiror at or prior to the Closing pursuant to Schedule 1.12; and

(vi)     the other documents, instruments or certificates required to be delivered by Acquiror at or prior to the Closing pursuant to Section 7.3.

Section 2.3     Closing. At the Closing, the Parties shall cause the consummation of the following transactions in the following order, upon the terms and subject to the conditions of this Agreement:

9

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 607 of 927 PageID #:5487

(a)     Acquiror shall make any payments required to be made by Acquiror in connection with the Acquiror Stock Redemption;

(b)     Acquiror shall pay, or cause to be paid by wire transfer of immediately available funds, (i) all accrued Transaction Expenses of Acquiror as set forth on the Acquiror Transaction Expense Certificate and (ii) all accrued and unpaid Transaction Expenses of the Company as set forth of the Company Transaction Expense Certificate to the applicable payees, to the extent not paid prior to the Closing;

(c)     Acquiror shall contribute to Merger Sub: (i) the amount of cash remaining in the Trust Account and (ii) the PIPE Investment Amount after giving effect to the transactions set forth in clauses "(a)" and "(b);"

(d)     the Acquiror A&R Charter shall be filed by Acquiror with the Secretary of State of the State of Delaware, in accordance with the procedures set forth in Schedule 2.3 and the applicable provisions of the DGCL; and

(e)     the Certificate of Merger shall be filed by the Company with the Secretary of State of the State of Delaware, in accordance with the applicable provisions of the DGCL (the time of such filing, or such later time as may be agreed in writing by the Company and Acquiror and specified in the Certificate of Merger, being the "Effective Time").

## ARTICLE III
## EARN-OUT

Section 3.1     Issuance of Earn Out Shares.

(a)     Following the Closing, and as additional consideration for the Merger and the Transactions, within five Business Days after the occurrence of a Triggering Event, Acquiror shall issue or cause to be issued to the Company Common Stockholder the following shares of Acquiror Class A Common Stock (which may be equitably adjusted in accordance with Section 3.3, the "Earn Out Shares"), upon the terms and subject to the conditions set forth in this Agreement and the Ancillary Agreements:

(i)     upon the occurrence of Triggering Event I, a one-time issuance of 5,000,000 Earn Out Shares;

(ii)     upon the occurrence of Triggering Event II, a one-time issuance of 5,000,000 Earn Out Shares; and

(iii)     upon the occurrence of Triggering Event III, a one-time issuance of 5,000,000 Earn Out Shares.

(b)     For the avoidance of doubt, the Company Common Stockholder shall be entitled to receive Earn Out Shares upon the occurrence of each Triggering Event; provided, however, that each Triggering Event shall only occur once, if at all, and in no event shall the Company Common Stockholder be entitled to receive more than an aggregate of 15,000,000 Earn Out Shares.

Section 3.2    Acceleration Event. If, during the Earn Out Period, there is a Change of Control that will result in the holders of Acquiror Class A Common Stock receiving a per share price in excess of the applicable Common Share Price required in connection with any Triggering Event (an "Acceleration Event"), then immediately prior to the consummation of such Change of Control: (a) any such Triggering Event that has not previously occurred shall be deemed to have occurred; and (b) Acquiror shall issue the applicable Earn Out Shares to the Company Common Stockholder, and the recipients of such issued Earn Out Shares shall be eligible to participate in such Change of Control.

Section 3.3    Adjustments to Earn Out Shares. If, during the period from the Effective Time through the end of the Earn Out Period, the outstanding shares of Acquiror Class A Common Stock are changed into a different number or class of shares by reason of any merger, stock split, division or subdivision of shares, stock dividend, reverse stock split, consolidation of shares, reorganization, reclassification, recapitalization or other similar transaction, or a record date with respect to any such event shall occur during such period, then the number of Earn Out Shares issued pursuant to this ARTICLE III shall be adjusted to the extent appropriate to provide the same economic effect as contemplated by this Agreement prior to such action; provided, however, that nothing in this Section 3.3 shall be construed as permitting Acquiror to take any action or enter into any transaction otherwise prohibited by this Agreement. If, during the period from the Effective Time through the end of the Earn Out Period, Acquiror, the Surviving Company, or any of their respective successors or assigns consolidates with or merges into any other Person (including in connection with a Change of Control) and shall not be the continuing or surviving corporation or entity of such consolidation or merger or transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each case, Acquiror and the Surviving Company shall ensure that proper provision shall be made so that the successors and assigns of Acquiror or the Surviving Company, as the case may be, shall succeed to the obligations set forth in this Article III, provided however, that the forgoing shall not limit Acquiror or the Surviving Company from consummating a Change of Control or entering into an agreement that contemplates a Change of Control.

Section 3.4    Tax Treatment of Earn Out Shares. Any issuance of Earn Out Shares, including any issuance of Earn Out Shares made upon the occurrence of an Acceleration Event pursuant to Section 3.2, shall be treated as an adjustment to the Aggregate Common Stock Consideration by the Parties for U.S. federal and applicable state and local income tax purposes, unless otherwise required by Law.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the Disclosure Schedules prepared in accordance with Section 10.2(e), the Company represents and warrants to Acquiror as follows:

Section 4.1    Organization and Authority. The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to own, lease or operate its properties and assets and to conduct the Business as it is now being conducted and contemplated to be conducted, except where the failure to have such power and authority would not be material to the Company and its

11

Subsidiaries, taken as a whole. True, accurate and complete copies of the Company Organizational Documents have been Made Available to Acquiror. The Company is duly licensed or qualified to do business and in good standing in all jurisdictions in which its ownership of property or assets or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified and in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 4.2    Authorization and Enforceability. The Company has all requisite corporate power and authority to execute, deliver and perform this Agreement and each Ancillary Agreement to which it is a party, and carry out the Company's obligations hereunder and thereunder and to consummate the Transactions, in each case, subject to the consents, approvals, authorizations and other requirements described in Section 4.5 and the adoption of this Agreement by holders of a majority of the voting power represented by all outstanding shares of Company Stock voting together as a single class (the "Company Requisite Approval"). The execution, delivery and performance by the Company of this Agreement and each Ancillary Agreement to which it is a party and the consummation of the Transactions have been duly and validly authorized and approved by the Company Board and, upon receipt of the Company Requisite Approval, no other proceeding on the part of the Company is necessary to consummate the Transactions contemplated by this Agreement or any Ancillary Agreement to which it is or will be a party. This Agreement has been duly and validly executed and delivered by the Company, and assuming due authorization and execution by each other Party, constitutes a legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as such enforceability (x) may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Laws affecting or relating to enforcement of creditors' rights generally and (y) is subject to general principles of equity, regardless of whether enforceability is considered in a proceeding at law or in equity (the "Bankruptcy and Equity Exceptions"). Each Ancillary Agreement to be executed by the Company at or prior to the Closing will be, when executed and delivered by the Company, duly and validly executed and delivered, and assuming due authorization and execution by each other Party thereto and the consummation of the Closing, will constitute a legal, valid and binding obligation of the Company, enforceable against the Company, in accordance with its terms, except as such enforceability may be limited by or subject to any applicable Bankruptcy and Equity Exception. The Company Requisite Approval is the only vote of the holders of any class or series of capital stock of the Company required to adopt this Agreement and approve the Transactions.

Section 4.3    Noncontravention. The execution, delivery and performance of this Agreement and the other Ancillary Agreements to which the Company is a party by the Company do not, and the consummation or performance of the Transactions will not, (a) conflict with or violate any provision, or result in the breach, of the Company Organizational Documents or any Organizational Document of any Subsidiary of the Company, (b) conflict with or result in any violation of any provision of any Law applicable to the Company or any of its Subsidiaries, or any of their respective properties or assets, (c) violate, conflict with, result in a breach of, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in a right of termination, cancellation, modification, acceleration or amendment under, any of the terms, conditions or provisions of any Material Contract or any of the Leases or (d) result in the creation of any Lien upon any of the material properties or assets of the Company, except with respect to clauses "(b)", "(c)" and "(d)" above, where any such violation, conflict,

12

breach, default or right would not, individually or in the aggregate, reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

Section 4.4     Subsidiaries. A true, correct and complete list of all the Company's Subsidiaries, together with the jurisdiction of organization or incorporation of each such Subsidiary, the percentage of the outstanding ownership interest and the names of the record owners of all securities and other equity interests of each such Subsidiary owned by the Company and each other Subsidiary of the Company, in each case, as of the date hereof, is set forth on Schedule 4.4. Each Subsidiary of the Company has been duly formed or organized and is validly existing under the Laws of its jurisdiction of incorporation or organization and has the requisite corporate or entity power and authority to own, lease or operate its assets and to conduct its business as it is now being conducted, except where the failure to have such power and authority would not reasonably be expected to have a Company Material Adverse Effect. True, accurate and complete copies of the Organizational Documents of each of the Company's Subsidiaries have been Made Available to Acquiror. Each Subsidiary of the Company is duly qualified or licensed as a foreign limited liability company, foreign corporation or other organization to do business, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except for such failures to be so qualified or licensed and in good standing that would not reasonably be expected to have a Company Material Adverse Effect. Other than each of the Company's Subsidiaries, the Company does not directly or indirectly own any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity or similar interest in, any Person.

Section 4.5     Governmental Authorities; Consents. The execution and delivery of this Agreement, and the other Ancillary Agreements to which the Company is a party, by the Company does not, and the consummation or performance of the Transactions by the Company will not, require any consent, approval, authorization or Permit of, or filing with or notification to, any Governmental Authority, except (a) for applicable requirements, if any, of the Exchange Act or state securities or "blue sky" laws ("Blue Sky Laws"), (b) applicable requirements of the HSR Act, (c) the filing of the Certificate of Merger in accordance with the DGCL and (d) such consents, approvals, authorizations, permissions, filings or notifications which are made or obtained or, if not made or obtained, would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

Section 4.6     Capitalization.

(a)     Schedule 4.6(a) accurately sets forth, as of the date hereof, the number of equity interests of each class and series of the Company which are authorized (where applicable) and which are issued and outstanding. All such issued and outstanding equity interests of the Company are duly authorized, validly issued, fully paid and non-assessable, and are held of record by the Persons and in the amounts set forth on Schedule 4.6(a).

(b)     (i) No equity interests of the Company are reserved for issuance or are held as treasury securities; (ii) no equity interests of the Company are subject to or were issued in violation of any pre-emptive rights, rights of first refusal, tag-along rights, drag-along rights, transfer restrictions, proxies, voting trusts, stockholder agreements or other agreements or

13

understandings in effect to which the Company is a party with respect to the voting or transfer of such equity interests; (iii) there is no restricted stock or any outstanding subscriptions, options, warrants, rights, calls, conversion rights, rights of exchange, convertible or exchangeable securities or other plans or commitments, contingent or otherwise, relating to the equity interests of the Company other than as contemplated by this Agreement; (iv) there are no outstanding contracts or other agreements to which the Company is a party to purchase, redeem or otherwise acquire any outstanding equity interests of the Company or securities or obligations of any kind convertible into any equity interests of the Company; and (v) there are no outstanding or authorized equity appreciation, phantom equity, equity incentive plans, profits interests or similar rights with respect to the Company.

Section 4.7    Financial Statements.

(a)    The Company has Made Available true, correct and complete copies of the audited consolidated balance sheets and consolidated statements of income (loss), stockholders' equity and cash flows of the Company and its Subsidiaries as of and for the twelve months ended December 31, 2019 and 2018 (collectively, the "Year-End Financial Statements"), together with all related notes and schedules thereto, prepared in accordance with GAAP applied on a consistent basis throughout the covered periods (except as may be indicated in the notes thereto), accompanied by an unqualified report of the Company's independent auditor with respect thereto.

(b)    The Company has Made Available true, correct and complete copies of the unaudited consolidated balance sheets and consolidated statements of income (loss), stockholders' equity and cash flows of the Company and its Subsidiaries as of and for the nine months ended September 30, 2020 and the prior comparable period (the "Interim Financial Statements" and, together with the Year-End Financial Statements, the "Financial Statements"), prepared in accordance with GAAP applied on a consistent basis throughout the covered periods (except as may be indicated in the related notes and schedules and subject, in the case of unaudited financial statements, to normal recurring year-end and quarter-end adjustments (the effect of which will not, individually or in the aggregate, be material to such financial statements) and the absence of notes to such statements).

(c)    The Financial Statements fairly present, in all material respects, the financial position, results of operations and cash flows of the Company and its Subsidiaries for the periods indicated in such Financial Statements and were derived from, and accurately reflect in all material respects, the books and records of the Company and its Subsidiaries.

(d)    As of the Closing, the Company will have established and will maintain a system of "internal controls over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) sufficient to provide reasonable assurances: (i) that records are maintained that in reasonable detail accurately and fairly reflect the transactions and dispositions of assets of the Company and its Subsidiaries; (ii) that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company and its Subsidiaries are being made only in accordance with the authorizations of management and directors of the Company; and (iii) regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's and its Subsidiaries' assets that could have a material effect on the financial statements. As of the date

14

hereof, the Company has not identified or been made aware of, and has not received from its independent auditors any notification of, any (x) "significant deficiency" in the internal controls over financial reporting of the Company and its Subsidiaries, (y) "material weakness" in the internal controls over financial reporting of the Company and its Subsidiaries or (z) fraud, whether or not material, that involves management or other employees of the Company and its Subsidiaries who have a role in the internal controls over financial reporting of the Company and its Subsidiaries.

(e)     There are no outstanding loans or other extensions of credit made by the Company to any executive officer (as defined in Rule 3b-7 under the Exchange Act) or director of the Company.

Section 4.8     Undisclosed Liabilities. There is no liability, debt or obligation of the Company or any of its Subsidiaries that would be required to be set forth or reserved for on a consolidated balance sheet prepared in accordance with GAAP consistently applied and in accordance with past practice, except for liabilities and obligations (a) reflected or reserved for on the Financial Statements or disclosed in the notes thereto (if any), (b) that have arisen since the date of the most recent balance sheet included in the Interim Financial Statements in the Ordinary Course of Business, (c) that have arisen in connection with the Transactions, (d) for future performance under any Contract to which the Company or any of its Subsidiaries is a party or (e) which would not be material to the Company and its Subsidiaries, taken as a whole.

Section 4.9     Actions. As of the date of this Agreement, (a) there are no pending Actions or, to the Knowledge of the Company, Actions threatened, against the Company or any of its Subsidiaries, or, to the Knowledge of the Company, any of their respective directors or officers (with regard to their actions in their capacities as such), and (b) neither the Company nor any of its Subsidiaries or, to the Knowledge of the Company, their respective properties or assets is subject to any continuing Governmental Order, except in the case of clauses "(a)" and "(b)," as would not be material to the Company and its Subsidiaries, taken as a whole. Except as would not be material to the Company and its Subsidiaries, taken as a whole, (x) there is no audit, examination or investigation by any Governmental Authority (other than ordinary course audits or examinations by an agency or regulating agency) pending or, to the Knowledge of the Company, threatened, of or against the Company or any of its Subsidiaries, and (y) to the Knowledge of the Company, there is no any audit, examination or investigation by any Governmental Authority (other than ordinary course audits or examinations by an agency or regulating agency) pending, or threatened in writing, of or against any of the directors or officers (with regard to their actions in their capacities as such) of the Company or any of its Subsidiaries. As of the date of this Agreement, there is no (i) pending Action or Action threatened by the Company or any of its Subsidiaries against any third party, except as would not be material to the Company and its Subsidiaries, taken as a whole, or (ii) settlement agreement or similar agreement that imposes any material ongoing obligation or restriction on the Company or any of its Subsidiaries.

Section 4.10     Compliance with Laws; Permits.

(a)     The Company and each of its Subsidiaries is, and since January 1, 2018, has been in compliance with all applicable Laws and applicable requirements thereof, except where failure to be in such compliance as would not reasonably be expected to be material to the

15

Company and its Subsidiaries, taken as a whole. Since January 1, 2018, the Company has not been sanctioned, fined or penalized for any violation of or failure to comply with any applicable Law, except for such sanctions, fines or penalties as would not be material to the Company and its Subsidiaries, taken as a whole. To the Knowledge of the Company, neither the Company nor any of its Subsidiaries has received any written notice from any Governmental Authority alleging a violation of any applicable Law by the Company nor any of its Subsidiaries at any time since January 1, 2018, except as would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

(b)     (i) Each of the Company and its Subsidiaries is in possession of all Permits necessary for the Company or such Subsidiary, as applicable, to own, lease and operate its properties or to carry on its business as it is now being conducted (the "Company Permits") in compliance with all applicable Laws, except where the failure to have such Company Permits would not be material to the Company and its Subsidiaries, taken as a whole, (ii) all such Company Permits are valid and in full force and effect and (iii) there are no proceedings pending, or, to the Knowledge of the Company, threatened, that seek the revocation, cancellation, suspension or adverse modification of any Company Permit, in each case, except for such revocation, cancellation, suspension or adverse modification would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

(c)     (i) None of the Company or any of its Subsidiaries, is or has ever been a Sanctioned Person and (ii) to the Knowledge of the Company, since January 1, 2018, none of the Company's or any of its Subsidiaries' respective directors, limited liability company managers (or equivalent governing authority), officers, employees, agents or representatives is or has been a Sanctioned Person. Since January 1, 2018, except as would not be material to the Company and its Subsidiaries, taken as a whole, the operations of the Company and its Subsidiaries have been conducted in compliance with all Sanctions. None of the Company or any of its Subsidiaries, or any of their respective directors, limited liability company managers (or equivalent governing authority), officers, or employees is or has been the subject of any enforcement proceedings or, to the Knowledge of the Company, any investigation or inquiry by any Governmental Authority with respect to Sanctions, and there is no such enforcement proceeding or, to the Knowledge of the Company, investigation or inquiry pending or to the Knowledge of the Company, threatened. The Company and its Subsidiaries have in place controls and systems reasonably designed to ensure compliance with Sanctions in each of the jurisdictions in which the Company and its Subsidiaries operate or do business.

Section 4.11    Material Contracts.

(a)     Schedule 4.11(a) contains a true, accurate and complete list, as of the date of this Agreement, of each of the following Contracts (other than any Company Benefit Plan or lease or license for real property) to which the Company or any of its Subsidiaries is a party or otherwise bound (each such Contract required to be set forth on Schedule 4.11(a) collectively, the "Material Contracts"):

(i)     each Contract evidencing outstanding Indebtedness of the Company or any of its Subsidiaries (other than guarantees or surety Contracts in respect of obligations

16

under real property leases), in each case in an aggregate amount thereunder in excess of $1,000,000;

(ii)     each partnership or joint venture (which includes the sharing of the Company's and/or any of the its Subsidiaries' profits);

(iii)     each Contract that involves the acquisition or disposition of capital stock or other equity interests of another Person (other than the Company or any of its Subsidiaries, to the extent such entity was a Subsidiary at the time such Contract was entered into), whether by merger, consolidation or otherwise, in each case, which has been entered into since January 1, 2018;

(iv)     any Contract that contains an existing obligation (contingent or otherwise) to pay any material amounts with respect to indemnification obligations, purchase price adjustment, earn-outs, backend payment or similar obligations, in all cases in connection with any completed acquisition or disposition by the Company;

(v)     each Contract with any Material Payor or Material Supplier, other than any work orders, purchase orders, invoices and similar documents issued in the Ordinary Course of Business;

(vi)     each Contract with any physician, physician practice, surgery center, home health agency, hospital or other referral source (A) involving consideration in excess of $100,000 in any twelve-month period or (B) from whom the Company or any of its Subsidiaries (on a consolidated basis) have received referrals generating more than $250,000 during the year ended December 31, 2019;

(vii)     any Contract (other than those made in the Ordinary Course of Business) providing for: (A) the grant of any preferential rights to purchase or lease any asset of the Company or any of its Subsidiaries or (B) any right (exclusive or non-exclusive) to sell or distribute any material product or service of the Company or any of its Subsidiaries;

(viii)     each Contract with any Governmental Authority (other than payor or provider Contracts in respect of any Federal Health Care Program or Contracts for athletic training services provided to any middle school, high school, college or university);

(ix)     each Contract requiring any capital commitment or capital expenditures (including any series of related expenditures in excess of $1,000,000);

(x)     each Contract providing for "most favored customer" or similar terms that limit the Company's or one of its Subsidiaries' right to determine pricing for products or services;

(xi)     each Contract that limits, or purports to limit, in any material respect the ability of the Company or any Subsidiary of the Company (A) to compete in any material line of business or with any Person or entity or in any geographic area or during any period of time or (B) from soliciting customers; and

17

(xii)     each collective bargaining agreement or other Contract with a trade union or other labor organization.

(b)      (i) Each Material Contract is a legal, valid and binding obligation of the Company or a Subsidiary of the Company and, to the Knowledge of the Company, the other parties thereto; and (ii) except as would not be material to the Company and its Subsidiaries, taken as a whole: (A) neither the Company nor any of the Subsidiaries of the Company is in breach or violation of, or default under, any Material Contract, nor has any Material Contract been cancelled by the other party; (B) to the Knowledge of the Company, no other party is (with or without notice or lapse of time or both) in breach or violation of, or default under, any Material Contract; and (C) since January 1, 2018, neither the Company nor any of the Subsidiaries of the Company has received any written claim of default or breach under any Material Contract. The Company has Made Available to Acquiror true, correct and complete copies of all Material Contracts, including any and all exhibits, schedules and amendments thereto (other than any work orders, purchase orders, invoices and similar documents issued in the Ordinary Course of Business).

Section 4.12    Real Property.

(a)      Neither the Company nor any of its Subsidiaries owns a fee interest in any real property.

(b)      Schedule 4.12(b) lists (i) a true, correct and complete list of each material parcel of real property leased or subleased by the Company or any of its Subsidiaries as of the date hereof by street address and (ii) each material lease or sublease with respect to the 30 clinic sites with the highest aggregate annual payments under the terms of the applicable material lease, and each material non-clinic lease of the Company or any of its Subsidiaries, including with respect to the Company's corporate headquarters (such documents in clause "(ii)", the "Leases"). True, correct and complete copies of all Leases have been Made Available to Acquiror (the underlying properties, collectively, the "Leased Real Property"). Except as would not be reasonably expected to curtail or interfere, in any materially adverse respect to the current use and operation of the Leased Real Property: (i) each Lease is in full force and effect, is valid and effective in accordance with its respective terms, subject to any applicable Bankruptcy and Equity Exception, (ii) there is not, under any Lease, any existing material default or event of default (or event which, with notice or lapse of time, or both, would constitute a material default) by the Company or any of its Subsidiaries or, to the Knowledge of the Company, by the other party to such Lease or sublease, (iii) no action, suit, investigation, arbitration or administrative or other proceeding is pending or, to the Knowledge of the Company, threatened with respect to the Leased Real Property and (iv) neither the Company nor any of its Subsidiaries have received any written notice of a material violation applicable to any building, zoning, health or other Law with respect of the use or occupation of any Leased Real Property.

Section 4.13    Employee Benefits.

(a)      Schedule 4.13(a) sets forth a true, correct and complete list of all material Company Benefit Plans, excluding any employment, restrictive covenant, consulting, or equity award agreement, offer letter or other agreement which does not materially deviate from the applicable Company form, which is included on Schedule 4.13(a) ("Individualized Agreements").

18

With respect to each material Company Benefit Plan, the Company has Made Available to Acquiror a current, true, correct and complete copy of each such Company Benefit Plan other than Individualized Agreements (or if no such copy exists, a written description of the material terms thereof) and, to the extent material and applicable, (i) any amendments, (ii) the most recent summary plan description as well as any summary of material modifications thereof, (iii) trust agreement or other funding instrument, (iv) the most recent Form 5500 series and (v) copies of the most recently received Internal Revenue Service determination, opinion or advisory letter for each such Company Benefit Plan.

(b)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, all contributions and/or payments owed by the Company under the terms of any Company Benefit Plan have been timely accrued for or paid in full when and as required to be paid.

(c)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, each Company Benefit Plan has been established, maintained, administered and operated in accordance with its terms and in compliance with the applicable terms of ERISA, the Code, and any other applicable Law.

(d)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received, or is based on a form of plan that has received, a favorable determination or opinion letter from the Internal Revenue Service, and, to the Knowledge of the Company, nothing has occurred, whether by action or failure to act, that would reasonably be expected to cause such determination letter to be revoked.

(e)     Neither the Company nor any of its ERISA Affiliates has within the past six years maintained, established, participated in or contributed to, been obligated to contribute to, or incurred any obligation or liability (including any contingent liability) under, an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (including any "multiemployer plan" within the meaning of Section (3)(37) of ERISA).

(f)     With respect to any Company Benefit Plan, except as would not be material to the Company and its Subsidiaries, taken as a whole, (i) no Actions (other than routine claims for benefits in the ordinary course) are pending or, to the Knowledge of the Company, threatened, (ii) no audit or other administrative proceeding by the United States Department of Labor, the Internal Revenue Service or other Governmental Authority is pending, or, to the Knowledge of the Company, threatened and (iii) there has been no non-exempt "prohibited transaction" within the meaning of Section 4975(c) of the Code or Section 406 of ERISA involving the assets of any Company Benefit Plan.

(g)     Neither the Company nor any Subsidiary has any obligation to gross-up or reimburse any individual for any tax or related interest or penalties incurred by such individual, under Sections 409A or 4999 of the Code.

19

(h)     Neither the execution and delivery of this Agreement nor the consummation of the Transactions will, either alone or in connection with any other event(s): (i) result in any payment or benefit becoming due to any current or former employee, contractor or director of the Company or any Subsidiary under any Company Benefit Plan; (ii) increase any amount of compensation or benefits otherwise payable to any current or former employee, contractor or director of the Company or any Subsidiary under any Company Benefit Plan; or (iii) result in the acceleration of the time of payment, funding or vesting of any benefits to any current or former employee, contractor or director of the Company or any Subsidiary under any Company Benefit Plan.

Section 4.14     Labor and Employment.

(a)     (i) Neither the Company nor any Subsidiary of the Company is a party to any collective bargaining agreement or other Contract with a union or other labor organization, (ii) there is no union organizing effort pending, or to the Knowledge of the Company, threatened with respect to any employees of the Company or any Subsidiary of the Company and (iii) since January 1, 2018, there has been no actual, or to the Knowledge of the Company, threatened strike, organized slowdown, work stoppage, lockout, arbitration, picketing, hand-billing or other material labor dispute with respect to any employees of the Company or any Subsidiary of the Company.

(b)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company and its Subsidiaries are in compliance with all applicable Laws regarding employment and employment practices, including, without limitation, all Laws respecting terms and conditions of employment, health and safety, employee classification, non-discrimination, wages and hours, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, pay equity, overtime pay, employee leave issues, the proper classification of employees and independent contractors, the proper classification of exempt and non-exempt employees, immigration and employment authorization (including Form I-9 compliance) and unemployment insurance.

(c)     To the Knowledge of the Company, since January 1, 2018, no allegations of sexual or other unlawful harassment or discrimination have been made against (i) any officer of the Company or its Subsidiaries, or (ii) any employee of the Company or its Subsidiaries at the level of vice-president or above.

(d)     To the Knowledge of the Company, no employee of the Company or its Subsidiaries at the level of vice-president or above is in material violation of any term of any employment agreement, nondisclosure agreement, non-competition agreement, restrictive covenant or other obligation (i) to the Company or its Subsidiaries, or (ii) to a former employer of any such employee relating (A) to the right of any such employee to be employed by the Company or its Subsidiaries or (B) to the knowledge or use of trade secrets or proprietary information.

(e)     Since January 1, 2018, neither the Company nor any of its Subsidiaries has engaged in layoffs, furloughs or employment terminations, whether temporary or permanent, and neither the Company nor any of its Subsidiaries has plans to engage in any layoffs, furloughs or employment terminations, whether temporary or permanent, within the next six months. The

20

Company and its Subsidiaries, taken as a whole, has sufficient employees to operate the Business as currently conducted.

(f)     The Company and its Subsidiaries and are not themselves direct government contractors required to comply with Executive Order 11246 and, except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company and its Subsidiaries are in compliance with Executive Order 11246 and other applicable Laws requiring affirmative action or other employment related actions for government contractors or subcontractors.

Section 4.15    Taxes.

(a)     All income and other material Tax Returns required by Law to be filed by the Company or its Subsidiaries have been duly and timely filed (after giving effect to any valid extensions of time in which to make such filings) and all such Tax Returns are true, correct and complete in all material respects. All Taxes shown due on such Tax Returns and all other material amounts of Taxes owed by the Company and its Subsidiaries (whether or not shown due on any Tax Return) have been timely paid. The Company and each of its Subsidiaries have established reserves in accordance with GAAP on the Financial Statements that, as of the dates of the applicable Financial Statements, were adequate for the payment of all material Taxes not yet due and payable with respect to the Company and each of its Subsidiaries.

(b)     Each of the Company and its Subsidiaries has (i) withheld all material amounts of Taxes required to have been withheld by it in connection with amounts paid to any employee, independent contractor, creditor, stockholder or any other third party and (ii) remitted such amounts required to have been remitted to the appropriate Governmental Authority and has otherwise complied in all material respects with all applicable Laws relating to the withholding, collection, payment and reporting of such Taxes.

(c)     Neither the Company nor any of its Subsidiaries is currently engaged in any audit, examination, investigation, administrative, judicial or similar proceeding with a Governmental Authority with respect to material Taxes, and, to the Knowledge of the Company, no such proceeding has been threatened. Neither the Company nor its Subsidiaries has been assessed any deficiency for material Taxes that has not been paid or settled in full, and, to the Knowledge of the Company, no such deficiency has been threatened. No written claim has been made by any Governmental Authority in a jurisdiction where the Company or any of its Subsidiaries does not file a Tax Return that such entity is or may be subject to material Taxes or material Tax Return filing obligations in that jurisdiction.

(d)     Neither the Company nor its Subsidiaries (or any predecessor thereof) has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying or intended to qualify for tax-free treatment under Section 355 of the Code in the prior two years.

(e)     Neither the Company nor its Subsidiaries has been a party to any "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

21

(f)      There are no Liens with respect to unpaid Taxes on any of the assets of the Company or its Subsidiaries, other than Permitted Liens.

(g)      Neither the Company nor any of its Subsidiaries is or has been a member of any consolidated, combined or unitary group (other than a group the common parent of which is the Company or any of its Subsidiaries). Neither the Company nor its Subsidiaries has any liability for the Taxes of any Person (other than the Company or its Subsidiaries) (i) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Law), (ii) as a transferee or successor or by operation of law, or (iii) by Contract (other than pursuant to customary Tax gross-up or indemnity provisions in credit agreements or in other commercial Contracts not primarily relating to Taxes).

(h)      Neither the Company nor any of its Subsidiaries is a party to, or bound by, or has any obligation to, any Governmental Authority or other Person under any Tax Sharing Agreements, except, in each case, (i) for any customary Tax gross-up or indemnity provisions in credit agreements or in other commercial contracts not primarily relating to Taxes, or (ii) for any such agreement exclusively between or among the Company and its Subsidiaries.

(i)      Except for extensions resulting from the extension of the time to file any applicable Tax Return, there are no outstanding agreements extending or waiving the statute of limitations applicable to any material Tax or material Tax Return with respect to the Company or any of its Subsidiaries or extending a period of collection, assessment or deficiency for material Taxes due from or with respect to the Company or any of its Subsidiaries, which period (after giving effect to such extension or waiver) has not yet expired, and no written request for any such waiver or extension is currently pending. None of the Company or any of its Subsidiaries is the beneficiary of any extension of time within which to file any material Tax Return not previously filed (other than a validly obtained extension of time not requiring the consent of the applicable Governmental Authority). No private letter ruling, administrative relief, closing agreement, technical advice or other similar ruling or request therefor has been granted or issued by, or is pending with, any Governmental Authority with respect to material Taxes of the Company or any of its Subsidiaries.

(j)      To the Knowledge of the Company, there are no facts, circumstances or plans that, either alone or in combination, would reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment.

(k)      Neither the Company nor any of its Subsidiaries will be required to include any material item of income, or exclude any material item of deduction, for any taxable period (or portion thereof) beginning on or after the Closing Date as a result of: (i) an installment sale transaction occurring on or before the date hereof governed by Code Section 453 (or any similar provision of state, local or foreign Laws); (ii) a disposition occurring on or before the date hereof reported as an open transaction for U.S. federal income Tax purposes (or any similar doctrine under state, local, or foreign Laws); (iii) any prepaid amounts received on or prior to the date hereof or deferred revenue realized, accrued or received on or prior to the date hereof outside of the ordinary course of business; (iv) a change in method of accounting with respect to Taxes that occurred or was requested on or prior to the date hereof (or as a result of the use of an impermissible method of accounting prior to the date hereof); (v) an agreement entered into with any

22

Governmental Authority (including a "closing agreement" under Code Section 7121 or similar provision of state, local, or foreign law) on or prior to the date hereof; or (vi) intercompany transactions or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign Tax law) occurring or created on or prior to the date hereof.

(l)     Neither the Company nor any of its Subsidiaries has deferred any "applicable employment taxes" under Section 2302 of the CARES Act.

(m)     Neither the Company nor any of its Subsidiaries has any unpaid liability under Code Section 965 or any similar provision of U.S. state or local or non-U.S. Tax Law.

(n)     Other than the representations and warranties set forth in Section 4.13 (insofar as it relates to Taxes), this Section 4.15 contains the exclusive representations and warranties of the Company with respect to Tax matters.

Section 4.16     Intellectual Property.

(a)     Schedule 4.16(a) sets forth a list of all Intellectual Property registrations and applications for registration of Intellectual Property owned by the Company and its Subsidiaries as of the date of this Agreement.

(b)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company or one of its Subsidiaries owns or has the valid right to use all material Intellectual Property necessary for, or used in, the operation of the business of the Company as currently conducted (all such Intellectual Property that is owned by the Company and the Company's Subsidiaries collectively, the "Company Owned Intellectual Property"), free and clear of all Liens (other than Permitted Liens). Schedule 4.16(c) sets forth a non-exhaustive list of material Company Owned Intellectual Property, other than the Intellectual Property registrations and applications for registration set forth in Schedule 4.16(a).

(c)     Except as would not be material to the Company and its Subsidiaries, taken as a whole: (i) there are no claims against the Company or any of its Subsidiaries that are presently pending, or to the Knowledge of the Company, threatened, (A) contesting the validity, use, ownership or enforceability of any of the Company Owned Intellectual Property, or (B) alleging any infringement, misappropriation or other violation of any Intellectual Property rights of any other Persons; (ii) to the Knowledge of the Company, the operation of the Company's business as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person; and (iii) to the Knowledge of the Company, no Person is infringing, misappropriating or otherwise violating any material Company Owned Intellectual Property.

(d)     The Company and its Subsidiaries have taken commercially reasonable actions to maintain and protect the secrecy and confidentiality of the material trade secrets included in the Company Owned Intellectual Property. Except as would not be material to the Company and its Subsidiaries, taken as a whole, no such material trade secret has been authorized by the Company or any of its Subsidiaries to be disclosed to any Person other than pursuant to a non-disclosure agreement restricting the disclosure of such trade secret.

23

(e)      Except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company or one of its Subsidiaries owns, or has a valid right to access and use all computer systems, networks, hardware, software, and equipment used in connection with the business of the Company as currently conducted ("Company IT Systems"). The Company IT Systems (i) are adequate for, and operate and perform in all material respects as required in connection with, the operation of the business of the Company as currently conducted and (ii) do not, to the Knowledge of the Company, contain any viruses, worms, trojan horses, bugs, faults or other devices, errors, contaminants or effects that: (A) materially disrupt or adversely affect the functionality of any Company IT Systems, except as disclosed in their documentation; or (B) enable or assist any Person to access without authorization any Company IT Systems. To the Knowledge of the Company, since January 1, 2018, there have been no security breaches of the Company IT Systems and there have been no adverse events affecting any Company IT Systems that adversely affected the Company's and its Subsidiaries' business or operations, in each case, except as would not be material to the Company and its Subsidiaries, taken as a whole.

Section 4.17      Compliance with Healthcare Laws and Information Privacy and Security Laws.

(a)      Except as would not be material to the Company and its Subsidiaries, taken as a whole, none of the Company or any of its Subsidiaries or any of their respective directors, limited liability company managers (or equivalent governing authority), officers or, to the Knowledge of the Company, employees or independent contractors (with respect to their activities on behalf of the Company or its Subsidiaries) (i) is, or since January 1, 2018, has been, in violation of, conducting its business or operations in violation of, or using or occupying its properties or assets in violation of any Healthcare Laws, (ii) has, since January 1, 2018, received any written notice of any alleged violation of, or any citation, suspension, revocation, limitation, warning, claim or request for repayment or refund issued by a Governmental Authority that alleges or asserts that the Company or any of its Subsidiaries have violated any Healthcare Laws or which requires or seeks to adjust, modify or alter any of the Company's or its Subsidiaries' operations, activities, services or financial condition, in each case that has not been fully and finally resolved to the Governmental Authority's satisfaction without further liability to the Company or any Company Subsidiary or (iii) is subject to or has entered into any written agreement, including any individual or corporate integrity agreement, settlement or Government Order related to any actual or alleged violation of any applicable Healthcare Law.

(b)      Since January 1, 2018, except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company and each of its Subsidiaries have prepared, submitted and implemented timely and effective responses and, as applicable, any corrective action plans required to be prepared and submitted in response to all (i) internal or third-party audits, inspections, investigations or examinations of the Company and its Subsidiaries and (ii) investigations, subpoenas, investigations, demands, complaints or allegations by customers, patients, Governmental Authorities or other Persons.

(c)      The Company and each of its Subsidiaries (i) has in place healthcare regulatory compliance programs including policies, procedures and training programs reasonably designed to cause the Company, each Company Subsidiary and their respective directors, limited liability company managers (or equivalent governing authority), officers, employees, contractors

24

and vendors to be in compliance with all applicable Healthcare Laws, including the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), the federal Physician Self-Referral Law, 42 U.S.C. § 1395nn, and all applicable billing and claims requirements and (ii) is operating in compliance in all material respects with such compliance programs, including with respect to training of workforce members when hired and periodically thereafter.

(d)      Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any of their respective directors, limited liability company managers (or equivalent governing authority), officers, employees, contractors or vendors, have on behalf of the Company or any of its Subsidiaries directly or indirectly solicited, received, made or offered to make any contribution, gift, bribe, rebate, payoff, influence payment or kickback to any person, regardless of form: (i) in violation of the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), the federal Physician Self-Referral Law, 42 U.S.C. § 1395nn or any other state or federal anti-bribery, anti-kickback, anti-inducement, anti-corruption or anti-fraud Laws; or (ii) to obtain or maintain any referral or favorable treatment in securing business in violation of any applicable Healthcare Law.

(e)      The Company and each of its Subsidiaries that participates in any Third Party Payor Program is qualified to participate in such Third Party Payor Program and is duly enrolled and certified therein, and has the requisite provider and supplier numbers to bill the Medicare program, the respective Medicaid program in the state or states in which such entity operates, and all other Third Party Payor Programs that each of such Subsidiaries of the Company currently bills to. To the Knowledge of the Company, the Company and each of its Subsidiaries is operating, and since January 1, 2018 has operated, in compliance with all Third Party Payor Program rules and regulations and all provisions of each Third Party Payor Program contract to which it is party or by which it is bound, except as would not be material to the Company and its Subsidiaries, taken as a whole. There is no Action pending or, to the Knowledge of the Company, threatened, which has resulted in or could reasonably be expected to result in any material revocation, suspension, termination, probation, restriction, limitation, non-renewal or other material adverse modification of the participation by the Company or any of its Subsidiaries in any Third Party Payor Program or of any supplier or provider number, or result in the Company's or any of its Subsidiaries' or any of the Leases' exclusion from any Third Party Payor Program.

(f)      Except as would not be material to the Company and its Subsidiaries, taken as a whole, since January 1, 2018, the Company and each of its Subsidiaries has, (i) timely filed all reports and billings required to be filed with respect to each Third Party Payor Program, all of which were prepared and filed in compliance with applicable Laws and applicable Payor requirements and (ii) paid all known and undisputed refunds, overpayments, discounts and adjustments due with respect to any such report or billing (except, with respect to Payors other than any Federal Health Care Program, for credit balances set forth in the Financial Statements or arising since the date of the most recent Financial Statements in the Ordinary Course of Business). All Claims submitted by or on behalf of the Company or any of its Subsidiaries since January 1, 2018 have been submitted in material compliance with applicable Laws and the rules, regulations, policies and procedures of the applicable third party Payors and there are no material pending or, to the Knowledge of the Company, threatened, audits (including written notice of an intent to audit), investigations, appeals, adjustments or Actions for or relating to such Claims, except as would not be material to the Company and its Subsidiaries, taken as a whole. All material Claims submitted by the Company or its Subsidiaries were for goods actually sold or services actually

25

performed by the billing Company or Subsidiary of the Company to eligible patients, properly coded and, except for clerical errors, otherwise true and correct, and, to the Knowledge of the Company, there are no facts or circumstances that would give rise to any disallowance, recoupment, denial of payment, suspension of payment, overpayment, or penalty action or proceeding against the Company or any of its Subsidiaries.

(g)     Except as would not be material to the Company and its Subsidiaries, taken as a whole, the Company and each of its Subsidiaries has, since January 1, 2018, taken, commercially reasonable steps to verify that and, to the Knowledge of the Company, each of the physical therapists and other health care professionals currently employed or engaged by the Company or any of its Subsidiaries to provide professional services, has, since January 1, 2018 (or such earlier date as such Person has been employed or engaged by the Company or applicable Subsidiary of the Company) been at all applicable times duly licensed, certified and registered to provide such services and in good standing with all applicable Governmental Authorities (including the board of physical therapy in the state in which he or she practices), and duly enrolled and credentialed with each Third Party Payor Program that requires such enrollment or credentialing for Claims submitted by the Company or applicable Subsidiary of the Company.

(h)     None of the Company or any of its Subsidiaries, or, to the Knowledge of the Company, any of their respective current directors, limited liability company managers (or equivalent governing authority), officers, employees or other health care professionals, is, or since January 1, 2018, has been (i) debarred, excluded or suspended from participating in any Federal Health Care Program, (ii) subject to a civil monetary penalty assessed under Section 1128A of the Social Security Act, or sanctioned, indicted or convicted of a crime, or pled nolo contendere or to sufficient facts in connection with any allegation of a violation of any Federal Health Care Program requirement or Healthcare Law or (iii) listed on the General Services Administrative ("GSA") published list of parties excluded from federal procurement programs and non-procurement programs. The Company and each of its Subsidiaries maintains and since January 1, 2018 has maintained, policies and procedures to screen its officers, employees and other health care professionals for Federal Health Care Program, GSA and Office of Foreign Asset Control of the U.S. Department of Treasury ("OFAC") exclusion or debarment prior to their association with the Company or its Subsidiary and on a regular basis thereafter.

(i)     Each of the Company and its Subsidiaries is in compliance in all material respects with all applicable Information Privacy and Security Laws, including with respect to the collection, use, storage, transfer and disclosure of any Protected Health Information (as defined at 45 CFR § 160.103). Since January 1, 2018, the Company and each of its Subsidiaries has maintained privacy and security policies, procedures and safeguards that comply in all material respects with then-applicable requirements of HIPAA (collectively, "HIPAA Policies and Procedures"). The Company has Made Available to Acquiror true, correct and complete copies of all such HIPAA Policies and Procedures. The Company and its Subsidiaries have executed current and valid Business Associate Agreements (as described by HIPAA) with all persons or entities that provide business associate services on behalf of the Company or any of its Subsidiaries ("Business Associates"). Except as would not be material to the Company and its Subsidiaries, taken as a whole, (i) the Company and its Subsidiaries are in compliance with the terms of all such Business Associate Agreements and (ii) neither the Company nor any of its Subsidiaries has

26

received any written notice from any Governmental Authority or other Person relating to any alleged violation or non-compliance with HIPAA.

(j)     To the Knowledge of the Company, since January 1, 2018 there has not been any breach (as defined by applicable Information Privacy and Security Laws) involving Personal Information in the possession or control of the Company, and no breach (as defined by applicable Information Privacy and Security Laws) has occurred that would require notification by, on behalf of or as a result of the Company under any applicable Information Privacy or Security Law, except as would not be material to the Company and its Subsidiaries, taken as a whole. Since January 1, 2018, the Company has been in material compliance with all of the Company's policies and contractual obligations with respect to the collection, use, storage, sharing or transfer of Personal Information. The Company has reasonable safeguards in place and takes commercially reasonable measures to protect Personal Information in its possession or under its control against loss, theft, or unauthorized disclosure. Since January 1, 2018, the Company has not received any written notice of any claims of, or been charged with, the violation of any Information Privacy and Security Laws.

Section 4.18     Material Payor and Material Supplier Relations.

(a)     Schedule 4.18(a)(i) contains a true, correct and complete list of (i) the identity of the ten largest non-Governmental Authority Payors of the Company and its Subsidiaries, as measured by net revenue generated by the Company and its Subsidiaries from such Payors on an aggregate basis during the twelve-month period ended December 31, 2020 (each, a "Material Payor") and (ii) the net revenue generated by the Company and its Subsidiaries with respect to such Material Payors, during such period. During the twelve-month period ended December 31, 2020, no Material Payor has (A) cancelled, suspended or terminated its relationship with the Company or its Subsidiaries, (B) materially reduced its business with the Company or any of its Subsidiaries or otherwise materially adversely modified its relationship or terms with the Company or any of its Subsidiaries or (C) notified the Company of its intention to take any such action and, to the Knowledge of the Company, no such Material Payor is contemplating such action or (D) to the Knowledge of the Company, become insolvent or subject to bankruptcy proceedings. Except as would not be material to the Company and its Subsidiaries, taken as a whole, there is no pending dispute between the Company or any of its Subsidiaries, on the one hand, and any Material Payor, on the other hand.

(b)     Schedule 4.18(b)(i) contains a true, correct and complete list of (i) the identity of the five largest suppliers of the Company and its Subsidiaries as measured by the Company's and its Subsidiaries' purchases of goods and services from such suppliers on an aggregate basis during the twelve-month period ended December 31, 2020 (each, a "Material Supplier") and (ii) the total payments by the Company and its Subsidiaries to such Material Suppliers, during such period. During the twelve-month period ended December 31, 2020, no Material Supplier has (A) cancelled, suspended or terminated its relationship with the Company or its Subsidiaries, (B) materially reduced its business with the Company or any of its Subsidiaries or otherwise materially adversely modified its relationship or terms with the Company or any of its Subsidiaries, (C) notified the Company of its intention to take any such action and, to the Knowledge of the Company, no such Material Supplier is contemplating such action, (D) notified the Company or any of its Subsidiaries of any violations of such Material Supplier's user, usage

27

or advertising policies (as applicable), or (E) to the Knowledge of the Company, become insolvent or subject to bankruptcy proceedings. There is no pending material dispute between the Company or any of its Subsidiaries, on the one hand, and any Material Supplier, on the other hand.

Section 4.19    Environmental Matters.

(a)    Except as would not be material to the Company and its Subsidiaries, taken as a whole, (i) the Company is and, since January 1, 2016, has been in compliance with Environmental Laws, including obtaining, maintaining and complying with all Permits required under Environmental Laws, (ii) since January 1, 2016, no Governmental Authority or other Person has commenced or, to the Knowledge of the Company, threatened to commence, any contribution action or other proceeding against the Company in connection with any asserted violation of, or liability under, Environmental Laws and (iii) there are no circumstances, facts, conditions, events or incidents, including the presence of any Hazardous Material, which would be reasonably likely to result in the Company incurring liability under any Environmental Law.

(b)    The Company has Made Available true copies and results of any material reports, investigations, audits, assessments (including Phase I environmental site assessments and Phase II environmental site assessments), analyses, tests or monitoring in the possession of, or reasonably available to, the Company or any of its Subsidiaries pertaining to any material unresolved liabilities under or material noncompliance with any Environmental Law.

Section 4.20    Insurance. To the Knowledge of the Company: (a) all of the policies of property, fire and casualty, liability, workers' compensation, directors and officers and other forms of insurance (collectively, the "Policies") held by, or for the benefit of, the Company or any of its Subsidiaries with respect to policy periods that precede and include the date of this Agreement are in full force and effect; and (b) neither the Company nor any of its Subsidiaries has received a written notice of cancellation of any of the Policies or of any material changes that are required in the conduct of the business of the Company or any of its Subsidiaries as a condition to the continuation of coverage under, or renewal of, any of the Policies.

Section 4.21    Absence of Changes. Except for any COVID-19 Response, since the Balance Sheet Date through the date hereof, (a) the Company and its Subsidiaries have operated their respective businesses in the Ordinary Course of Business in all material respects, (b) there has not been any change, effect, condition, circumstance or development relating to the Company and its Subsidiaries that has resulted in, or would reasonably be expected to result in, a Company Material Adverse Effect, and (c) neither the Company nor any of its Subsidiaries has:

(i)    made any material change in or amendment to any of the Company Organizational Documents;

(ii)    made, declared, set aside, or paid any dividend or distribution to any equityholder other than dividends or distributions between or among the Company and any of its wholly-owned Subsidiaries;

(iii)    incurred, guaranteed or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness;

28

(iv)     acquired by merger or consolidation with, or merged or consolidated with, or purchased substantially all of the assets of, any corporation, partnership, association, joint venture or other business organization or division thereof or Person;

(v)     made any change in financial accounting methods, principles or practices, except insofar as may have been required by a change in GAAP, including pursuant to standards, guidelines and interpretations of the Financial Accounting Standards Board or any similar organization, or applicable Law;

(vi)     other than in the Ordinary Course of Business consistent with past practice, (i) granted or acquired, agreed to grant to or acquired from any Person, disposed of, or permitted to lapse any rights to any Company Owned Intellectual Property and (ii) not disclosed or agreed to disclose to any Person, other than Acquiror (or representatives designated by Acquiror), any trade secret or other material proprietary information; or

(vii)     made any change in the auditors of the Company,

other than, in each case, any action taken in connection with any document or agreement entered into pursuant to the terms of this Agreement.

Section 4.22    Interested Party Transactions. No director, manager, officer or Affiliate of the Company or any of its Subsidiaries is a party to any Contract with the Company or any of its Subsidiaries, other than (a) the payment of compensation and provision of benefits to, and the entering into of compensatory arrangements, benefit plans and similar transactions, agreements or Contracts with, or with respect to, officers, managers, employees and independent contractors of the Company or any Company Subsidiary, including equity compensation, (b) Contracts in connection with any such manager's, officer's or Affiliate's direct or indirect ownership of equity interests in the Company or any of its Subsidiaries (or any securities that are convertible into, or exercisable or exchangeable for, any such equity interests), including distributions by the Company upon its equity interests, or (c) as otherwise contemplated by this Agreement.

Section 4.23    Proxy Statement. The information supplied by the Company for inclusion in the Proxy Statement will not, at (a) the time the definitive Proxy Statement is filed with the SEC, (b) the time the Proxy Statement (or any amendment thereof or supplement thereto) is first mailed to the holders of Acquiror Common Stock and (c) the time of the Special Meeting, contain any untrue statement of a material fact or fail to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 4.24    No Brokers' Fees. Except for Barclays Capital Inc. and Citigroup Global Markets Inc., no broker, finder, investment banker or other Person acting on behalf of the Company is, or shall be, entitled to any brokerage fee, finders' fee or other commission in connection with this Agreement or the Transactions based upon arrangements made by the Company or any of its Affiliates.

Section 4.25    No Additional Representations and Warranties; Non-Reliance of the Company. The Company acknowledges and agrees that the Company has made its own investigation of Acquiror and Merger Sub and, except for the representations and warranties

29

expressly made by Acquiror or Merger Sub in ARTICLE V (as modified by the Disclosure Schedules), none of Acquiror nor Merger Sub nor any other Person has made, is making or shall be deemed to make any express or implied representation or warranty with respect to Acquiror and Merger Sub or any other Person or their respective businesses, operations, assets, liabilities, condition (financial or otherwise) or prospects, including any representation or warranty as to condition, value, quality, merchantability, usage, suitability, fitness for a particular purpose, future results, proposed businesses or future plans, and the Company is not relying on any representation or warranty of Acquiror, Merger Sub or any other Person except for those expressly set forth in ARTICLE V (as modified by the Disclosure Schedules).

<div align="center">

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF**
**ACQUIROR AND MERGER SUB**

</div>

Except as set forth on the Disclosure Schedules or in the SEC Reports (to the extent the qualifying nature of such disclosure is readily apparent from the content of such SEC Reports, but excluding disclosures referred to in "Forward Looking Statements," "Risk Factors" and any other disclosures therein to the extent they are of a predictive or cautionary nature or related to forward looking statements), each of Acquiror and Merger Sub represents and warrants to the Company as follows:

Section 5.1    Organization and Authority.

(a)    Acquiror is a corporation duly incorporated, validly existing and in good standing under the Laws of Delaware and has all requisite corporate power and authority to own, lease or operate its properties and assets and to conduct its business as it is now being conducted and contemplated to be conducted, except where the failure to have such power and authority would not be material to Acquiror and Merger Sub, taken together. True, correct and complete copies of the Acquiror Organizational Documents have been delivered to the Company prior to the date of this Agreement. Acquiror is duly licensed or qualified to do business and in good standing in all jurisdictions in which its ownership of property or assets or the character of its activities is such as to require it to be so licensed or qualified, except where failure to be so licensed or qualified and in good standing has not had, individually or in the aggregate, an Acquiror Material Adverse Effect.

(b)    Merger Sub is a corporation duly organized, validly existing and in good standing under the Laws of Delaware, with full corporate power and authority to enter into this Agreement and perform its obligations hereunder.

Section 5.2    Authorization and Enforceability.

(a)    Each of Acquiror and Merger Sub has all requisite corporate power and authority to execute, deliver and perform this Agreement and each of the Ancillary Agreements to which it is a party, and to carry out its obligations hereunder and thereunder and to consummate the Transactions, in each case, subject to receipt of the Acquiror Stockholder Approval. At the Closing, Acquiror will have full corporate power and authority to enter into and perform its obligations under each other agreement, document or certificate to be executed by Acquiror at the

<div align="center">30</div>

Closing and to consummate the transactions contemplated thereby. The execution, delivery and performance of this Agreement and each Ancillary Agreement in effect as of the date of this Agreement and the consummation of the Transactions have been duly and validly authorized and approved by the Acquiror Board, the Merger Sub Board and, except for the Acquiror Stockholder Approval, no other proceeding on the part of Acquiror or Merger Sub is necessary to authorize this Agreement or Acquiror's or Merger Sub's performance hereunder. Acquiror, as the sole stockholder of Merger Sub, substantially concurrently with the execution and delivery of this Agreement (but deemed to occur a moment thereafter), has adopted this Agreement and approved the Transactions. This Agreement has been duly and validly executed and delivered by Acquiror and Merger Sub and, assuming due authorization and execution by each other Party hereto, constitutes a legal, valid and binding obligation of Acquiror and Merger Sub, enforceable against Acquiror and Merger Sub in accordance with its terms, except as such enforceability may be limited by or subject to any applicable Bankruptcy and Equity Exception. Each Ancillary Agreement to be executed by Acquiror and Merger Sub at the Closing will be, when executed and delivered by Acquiror and Merger Sub, duly and validly executed and delivered, and assuming due authorization and execution by each other Party thereto and consummation of the Closing, will constitute a legal, valid and binding obligation of Acquiror, enforceable against Acquiror in accordance with its terms, except as such enforceability may be limited by or subject to any applicable Bankruptcy and Equity Exception.

(b) The affirmative vote of (i) holders of a majority of the outstanding shares of Acquiror Common Stock, voting together as a single class, cast at the Special Meeting is required to approve the Merger Proposal, (ii) holders of a majority of the outstanding shares of Acquiror Common Stock, voting together as a single class, cast at the Special Meeting is required to approve the Issuance Proposal, (iii) (A) holders of a majority of the outstanding shares of Acquiror Common Stock, voting together as a single class, and (B) holders of a majority of the outstanding shares of Acquiror Class F Common Stock voting separately as a single class, in each case cast at the Special Meeting, is required to approve the Amendment Proposal (it being understood, for the avoidance of doubt, that the separate approval of any non-binding advisory proposal(s) relating to the Amendment Proposal shall not constitute a part of the Acquiror Stockholder Approval (as defined below) and shall not be required to satisfy the closing condition set forth in Section 7.1(c)), (iv) holders of a majority of the outstanding shares of Acquiror Common Stock, voting together as a single class, cast at the Special Meeting is required to approve the Incentive Plan Proposal and (v) a plurality of the votes cast at the Special Meeting by holders of outstanding shares of Acquiror Common Stock, voting together as a single class, is required to approve the Director Election Proposal, in each case, assuming a quorum is present, are the only votes of any of Acquiror's capital stock necessary in connection with the entry into this Agreement by Acquiror, and the consummation of the Transactions, including the Closing (the approval by Acquiror stockholders of the proposals set forth in clauses "(i)," "(ii)" and "(iii)," collectively, the "Acquiror Stockholder Approval"). The Acquiror Stockholder Approval is the only vote of the holders of any class or series of capital stock of Acquiror required to adopt this Agreement and approve the Transactions.

(c) At a meeting duly called and held on or prior to the date hereof, the Acquiror Board unanimously: (i) determined that this Agreement and the Transactions are fair to and in the best interests of Acquiror and its stockholders; (ii) determined that the fair market value of the Company is equal to at least 80% of the amount held in the Trust Account (excluding any deferred

31

underwriting commissions and Taxes payable on interest earned on the Trust Account) as of the date of this Agreement; (iii) approved the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is or will be a party and the consummation of the Transactions; (iv) approved the Transactions as a Business Combination; and (v) recommended to the holders of Acquiror Common Stock the approval of the Transactions and each of the Transaction Proposals.

(d)     The approval of Acquiror, as the sole stockholder of Merger Sub, is the only vote of holders of any class or series of capital stock of Merger Sub required to adopt this Agreement.

Section 5.3     Noncontravention. The execution, delivery and performance of this Agreement and the other Ancillary Agreements to which Acquiror or Merger Sub are party, by Acquiror and Merger Sub, as applicable, and, upon receipt of Acquiror Stockholder Approval, the consummation or performance of the Transactions do not, and will not, (a) conflict with or violate any provision of, or result in the breach of the Acquiror Organizational Documents or any Organizational Documents of Merger Sub, (b) conflict with or result in any violation of any provision of any Law applicable to Acquiror, Merger Sub or any of their respective properties or assets, (c) violate, conflict with, result in a breach of, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in a right of termination, cancellation, modification, acceleration or amendment under, any of the terms, conditions or provisions of any Contract to which Acquiror or Merger Sub is a party or by which Acquiror, Merger Sub or any of their respective assets or properties may be bound or affected or (d) result in the creation of any Lien upon any of the material properties or assets of Acquiror or Merger Sub, except with respect to clauses "(b)", "(c)" and "(d)" above, where such violations, conflicts, breaches, defaults or rights which would not, reasonably be expected to be material to Acquiror and Merger Sub, taken together.

Section 5.4     Governmental Authorities; Consents. The execution and delivery of this Agreement, and the other Ancillary Agreements to which Acquiror or Merger Sub is a party, by Acquiror and Merger Sub, as applicable, does not, and the consummation or performance of this Agreement by Acquiror and Merger Sub will not, require any consent, approval, authorization or Permit of, or filing with or notification to, any Governmental Authority, except (a) applicable requirements of the Securities Act and the Exchange Act, (b) applicable requirements of Blue Sky Laws, (c) applicable requirements of the HSR Act, (d) the filing of the Certificate of Merger in accordance with the DGCL and (e) such consents, approvals, authorizations, permissions, filings or notifications which are made or obtained or, if not made or obtained, would not reasonably be expected to be material to Acquiror and Merger Sub, taken together.

Section 5.5     Capitalization.

(a)     The authorized capital stock of Acquiror consists of (i) 200,000,000 shares of Acquiror Class A Common Stock, (ii) 20,000,000 shares of Acquiror Class F Common Stock and (iii) 1,000,000 shares of Acquiror Preferred Stock. There are (i) 34,500,000 shares of Acquiror Class A Common Stock issued and outstanding, (ii) 8,625,000 shares of Acquiror Class F Common Stock issued and outstanding, (iii) no shares of Acquiror Preferred Stock issued and outstanding, (iv) warrants to purchase 6,900,000 shares of Acquiror Class A Common Stock at a price of $11.50

32

per share (the "Public Warrants") and (v) warrants to purchase 5,933,333 shares of Acquiror Class A Common Stock at a price of $11.50 per share (the "Private Placement Warrants"). Except pursuant to the Subscription Agreements, there are no other shares of common stock, preferred stock or other equity interests of Acquiror authorized, reserved, issued (or planned to be issued) or outstanding. No issued and outstanding shares of any of the capital stock of Acquiror are held in treasury.

(b) The authorized capital stock of Merger Sub consists of 100 shares of common stock, par value $0.01 per share (the "Merger Sub Common Stock"). There are 100 shares of Merger Sub Common Stock issued and outstanding. All outstanding shares of Merger Sub Common Stock have been duly authorized, validly issued, fully paid and are non-assessable and are not subject to preemptive rights, and are held by Acquiror.

(c) All of the outstanding shares of Acquiror capital stock (including the Public Warrants and the Private Placement Warrants) and Merger Sub Common Stock have been duly authorized and are validly issued, fully paid and non-assessable and have been issued in accordance with all applicable Laws. The Acquiror Class A Common Stock to be issued at Closing in accordance with this Agreement, when issued, will be duly authorized, validly issued, fully paid and non-assessable, free and clear of any preemptive rights and all Liens, other than Permitted Liens and Securities Liens, and in compliance with all applicable Laws and without contravention of any other Person's rights therein or with respect thereto. Acquiror does not have any outstanding bonds, debentures, notes or other obligations the holders of which have the right to vote (or are convertible into or exercisable for securities having the right to vote) with the stockholders of Acquiror on any matter.

(d) Except for the Subscription Agreements, the Private Placement Warrants and the Public Warrants, there are no outstanding options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other Contracts or commitments that would require Acquiror to issue, sell or otherwise cause to become outstanding any of its equity securities. There are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to the equity securities of Acquiror. There are no voting trusts or other agreements or understandings to which Acquiror is a party with respect to the voting of the capital stock or other equity interests of Acquiror.

Section 5.6    SEC Reports; Financial Statements.

(a) Acquiror has timely filed or furnished, as applicable, all required registration statements, reports, schedules, forms, statements and other documents, including any exhibits thereto, required to be filed by it with the SEC from August 14, 2020 to the date of this Agreement (collectively, as they have been amended since the time of their filing and including all exhibits or schedules thereto and any other information incorporated therein, the "SEC Reports"), and will have filed all such registration statements, reports, schedules, forms, statements and other documents required to be filed subsequent to the date of this Agreement through the Closing Date (the "Additional SEC Reports"). All SEC Reports, Additional SEC Reports, any correspondence from or to the SEC or the Stock Exchange (other than such correspondence in connection with the initial public offering of Acquiror) and all certifications and statements required by: (i) Rule 13a-14 or 15d-14 under the Exchange Act; or (ii) 18 U.S.C. § 1350

33

(Section 906) of the Sarbanes-Oxley Act with respect to any of the foregoing (collectively, the "Certifications") are available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system (EDGAR) in full without redaction. The Certifications are true and correct. Acquiror has delivered to the Company true and correct copies of all amendments and modifications to the exhibits filed with the SEC Reports that have not been filed by Acquiror with the SEC and are currently in effect. Each of the SEC Reports at the time of its filing or being furnished to the SEC complied, and the Additional SEC Reports will comply, in all material respects, with the applicable requirements of the Securities Act, the Exchange Act, the Sarbanes-Oxley Act and any rules and regulations promulgated thereunder applicable to the SEC Reports in effect as of the respective dates thereof. None of the SEC Reports, as of their respective dates (or if amended or superseded by a filing prior to the date of this Agreement, then on the date of such filing), contained, and no Additional SEC Report will contain, any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. As of the date of this Agreement, there are no outstanding or unresolved comments in comment letters received from the SEC with respect to the SEC Reports. The audited financial statements and unaudited interim financial statements (including, in each case, the notes and schedules thereto) included in the SEC Reports, and that will be included in the Additional SEC Reports (the "Acquiror Financial Statements"), (x) complied or will comply, as the case may be, as to form in all material respects with the published rules and regulations of the SEC, the Exchange Act and the Securities Act in effect as of the respective dates thereof with respect thereto, (y) were prepared or will be prepared, as the case may be, in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto and except with respect to unaudited statements as permitted by Form 10-Q of the SEC) and (z) fairly present or will fairly present (subject, in the case of the unaudited interim financial statements included therein, to normal year-end adjustments and the absence of complete footnotes), as the case may be, in all material respects, the financial position, results of operations, stockholders' equity and cash flows of Acquiror as of the respective dates thereof and the results of their operations, stockholders' equity and cash flows for the respective periods then ended.

(b)     Acquiror maintains a system of "internal controls over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) sufficient to provide reasonable assurances: (i) that records are maintained that in reasonable detail accurately and fairly reflect the transactions and dispositions of assets of Acquiror and Merger Sub; (ii) that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of Acquiror and Merger Sub are being made only in accordance with the authorizations of management and directors of Acquiror; and (iii) regarding prevention or timely detection of the unauthorized acquisition, use or disposition of Acquiror's properties or assets that could have a material effect on the financial statements. Acquiror maintains a system of "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) sufficient to ensure that all material information concerning Acquiror is made known on a timely basis to the individuals responsible for the preparation of Acquiror's filings with the SEC and other public disclosure documents, and otherwise ensure that information required to be disclosed by Acquiror in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules, to allow timely decisions regarding required disclosure and to make the Certifications. As of the date hereof, Acquiror has not identified or been made aware of, and has not received from

34

its independent auditors any notification of, any (x) "significant deficiency" in the internal controls over financial reporting of Acquiror, (y) "material weakness" in the internal controls over financial reporting of Acquiror or (z) fraud, whether or not material, that involves management or other employees of the Acquiror who have a role in the internal controls over financial reporting of Acquiror.

(c)     Each director and executive officer of Acquiror has filed with the SEC on a timely basis all statements required by Section 16(a) of the Exchange Act and the rules and regulations promulgated thereunder. Acquiror has not taken any action prohibited by Section 402 of the Sarbanes-Oxley Act.

(d)     Except as disclosed in the SEC Reports, no current officer or director of Acquiror or, to the Knowledge of Acquiror, any current stockholder or employee, or any "affiliate" or "associate" (as those terms are defined in Rule 405 promulgated under the Securities Act) of any such Person, has had, either directly or indirectly, a material interest in any Contract to which Acquiror is a party or by which it may be bound.

Section 5.7     Actions. Except as would not be material to Acquiror and Merger Sub, taken together, (a) there are no pending Actions or, to the Knowledge of Acquiror, Actions threatened in writing, against Acquiror or Merger Sub and (b) neither Acquiror nor Merger Sub is subject to any continuing Governmental Order. Except as would not be material to Acquiror and Merger Sub, taken together, (x) there is no audit, examination or investigation by any Governmental Authority (other than ordinary course audits or examinations by an agency or regulating agency) pending or, to the Knowledge of Acquiror, threatened in writing, of or against the Acquiror or Merger Sub, and (y) to the Knowledge of Acquiror, there is no audit, examination or investigation by any Governmental Authority (other than ordinary course audits or examinations by an agency or regulating agency) that is pending, or threatened, of or against any of the directors or officers (with regard to their actions in their capacities as such) of Acquiror or Merger Sub. As of the date of this Agreement, there is no (A) pending Action or Action threatened by Acquiror or Merger Sub against any third party or (B) settlement agreement or similar agreement that imposes any ongoing obligation or restriction on Acquiror or Merger Sub.

Section 5.8     Compliance with Laws; Permits. Acquiror and Merger Sub are, and since August 14, 2020, have been, in compliance with all applicable Laws and applicable requirements thereof, except where failure to be in such compliance as would not reasonably be expected to be material to Acquiror and Merger Sub, taken together. Since August 14, 2020, Acquiror has not been sanctioned, fined or penalized for any violation of or failure to comply with any applicable Law. To the Knowledge of Acquiror, neither Acquiror nor Merger Sub has received any written notice from any Governmental Authority of a violation of any applicable Law by Acquiror or Merger Sub at any time since August 14, 2020. Acquiror is in possession of all Permits necessary for Acquiror to own, lease and operate its properties or to carry on its business as it is now being conducted, except where the failure to have such Permits would not be material to the Acquiror and Merger Sub, taken together.

Section 5.9     Financial Ability; Trust Account; PIPE Investment Amount.

35

(a)        There is at least $345,000,000 (less, as of the Closing, the Redemption Amount payable to the holders of Acquiror Class A Common Stock who have validly exercised their right to receive payment pursuant to the Acquiror Stock Redemption, if any) invested in a trust account (the "Trust Account"), maintained by Continental Stock Transfer & Trust Company, acting as trustee (the "Trustee"), pursuant to that certain Investment Management Trust Agreement, dated August 11, 2020, by and between Acquiror and the Trustee (the "Trust Agreement"). Since August 14, 2020, Acquiror has not released any money from the Trust Account, except in accordance with the Trust Agreement and Acquiror Organizational Documents. Amounts in the Trust Account are invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act, having a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act. Acquiror has performed all material obligations required to be performed by it to date under, and is not in material default or delinquent in performance or any other respect (claimed or actual) in connection with, the Trust Agreement, and no event has occurred that, with due notice or lapse of time or both, would constitute such a default thereunder. There are no Actions pending with or, to the Knowledge of Acquiror, threatened in writing by any Governmental Authority with respect to the Trust Account. As of the Closing, the obligations of Acquiror to dissolve or liquidate pursuant to the Acquiror Organizational Documents shall terminate, and as of the Closing, Acquiror shall have no obligation whatsoever pursuant to the Acquiror Organizational Documents to dissolve and liquidate the assets of Acquiror by reason of the consummation of the Transactions. The Trust Agreement is valid and in full force and effect and enforceable in accordance with its terms and has not been amended or modified. There are no separate Contracts, side letters or other arrangements or understandings (whether written or unwritten, express or implied) that would cause the description of the Trust Agreement in the SEC Reports to be inaccurate or that would entitle any Person (other than pursuant to an Acquiror Stock Redemption, if any) to any portion of the proceeds in the Trust Account.

(b)        Schedule 5.9(c) sets forth true, correct and complete copies of each of the Subscription Agreements entered into by Acquiror with the applicable investors named therein (collectively, the "PIPE Investors"), pursuant to which the PIPE Investors have committed to provide equity financing to Acquiror in an aggregate amount equal to the PIPE Investment Amount. The PIPE Investment Amount, together with the amount in the Trust Account at the Closing, are in the aggregate sufficient to enable Acquiror to: (i) pay all cash amounts required to be paid by Acquiror or Merger Sub under or in connection with this Agreement; and (ii) pay any and all fees, prepayment premiums, costs (including breakage costs and termination amounts) and expenses required to be paid by Acquiror in connection with the Transactions. With respect to each PIPE Investor, the Subscription Agreements are in full force and effect and have not been withdrawn or terminated, or otherwise amended or modified, in any respect, and no withdrawal, termination, amendment or modification is contemplated by Acquiror. Each Subscription Agreement is a legal, valid and binding obligation of Acquiror and, to Acquiror's knowledge, each PIPE Investor, except insofar as enforceability may be limited by applicable Bankruptcy and Equity Exceptions. There are no other agreements, side letters, or arrangements between Acquiror and any PIPE Investor relating to any Subscription Agreement that could affect the obligation of the PIPE Investors to contribute to Acquiror the applicable portion of the PIPE Investment Amount set forth in the Subscription Agreements, and Acquiror is not aware of any facts or circumstances that may reasonably be expected to result in any of the conditions set forth in any Subscription Agreement not being satisfied or the PIPE Investment Amount not being available to Acquiror on

36

the Closing Date. No event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of Acquiror under any material term or condition of any Subscription Agreement and Acquiror has no reason to believe that it will be unable to satisfy in all material respects on a timely basis any term or condition of closing to be satisfied by it contained in any Subscription Agreement. The Subscription Agreements contain all of the conditions precedent (other than the conditions contained in the other Ancillary Agreements) to the obligations of the PIPE Investors to contribute to Acquiror the applicable portion of the PIPE Investment Amount set forth in the Subscription Agreements on the terms therein.

(c)     Acquiror does not have, or have any present intention, agreement, arrangement or understanding to enter into or incur any obligations with respect to or under any Indebtedness (other than, to the extent applicable, the Debt Financing).

Section 5.10    No Brokers' Fees. No broker, finder, investment banker or other Person acting on behalf of Acquiror or any of its Affiliates is entitled to any brokerage fee, finders' fee or other commission in connection with the Transactions based upon arrangements made by Acquiror, Merger Sub or any of their respective Affiliates, including the Sponsor.

Section 5.11    Business Activities.

(a)     Since its incorporation, Acquiror has not conducted any business activities other than activities directed toward completing a Business Combination. Except as set forth in the Acquiror Organizational Documents, there is no agreement, commitment, or Governmental Order binding upon Acquiror or to which Acquiror is a party that has or would reasonably be expected to have the effect of prohibiting or impairing any business practice of Acquiror.

(b)     Except for Merger Sub, Acquiror does not own, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other Person. Except for this Agreement and the Transactions, Acquiror has no interests, rights, obligations or liabilities with respect to, and is not party to, bound by or has its assets or property subject to, in each case whether directly or indirectly, any Contract or transaction which is, or could reasonably be interpreted as constituting, a Business Combination.

(c)     Merger Sub does not own or have a right to acquire, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity.

(d)     Merger Sub was formed solely for the purpose of effecting the Merger and has not engaged in any business activities or conducted any operations other than in connection with the Merger and has no, and at all times prior to the Effective Time except as contemplated by this Agreement or the Ancillary Agreements, will have no, assets, liabilities or obligations of any kind or nature whatsoever other than those incident to its formation.

Section 5.12    Material Contracts. The SEC Reports include true, correct and complete copies of each "material contract" (as such term is defined in Regulation S-K of the SEC) to which Acquiror is party (the "Acquiror Material Contracts"). Each Acquiror Material Contract is in full force and effect and, to the Knowledge of Acquiror, is valid and binding upon and enforceable against each of the parties thereto, except insofar as enforceability may be limited by the

Bankruptcy and Equity Exceptions. True, correct and complete copies of all Acquiror Material Contracts have been delivered to the Company.

Section 5.13    Employees; Acquiror Benefit Plans. Other than as described in the SEC Reports, Acquiror has never had any employees. Other than reimbursement of any out-of-pocket expenses incurred by Acquiror's officers and directors in connection with activities on Acquiror's behalf in an aggregate amount not in excess of the amount of cash held by Acquiror outside of the Trust Account, there is no Acquiror Benefit Plan and Acquiror has no unsatisfied material liability with respect to any employee. Neither the execution and delivery of this Agreement or the other Ancillary Agreements nor the consummation of the Transactions alone or with any other event will (a) result in any payment (including severance, unemployment compensation, golden parachute, bonus or otherwise) becoming due to any current or former director, officer, employee or other individual service provider of Acquiror, or (b) result in the acceleration of the time of payment or vesting of any such benefits.

Section 5.14    No Acquiror Material Adverse Effect. Since August 14, 2020, there has not been any change, effect, condition, circumstance or development relating to Acquiror or its Subsidiaries that has resulted or would reasonably be expected to result in an Acquiror Material Adverse Effect.

Section 5.15    Undisclosed Liabilities/Transaction Expenses.

(a)    Except for the Transaction Expenses of Acquiror, there is no liability, debt or obligation of any nature (whether accrued, absolute, contingent or otherwise) of Acquiror that would be required to be set forth or reserved for on a balance sheet of Acquiror (and the notes thereto) prepared in accordance with GAAP consistently applied and in accordance with past practice, except for liabilities and obligations reflected or reserved for on the Acquiror Financial Statements or disclosed in the notes thereto (if any) (other than any such liabilities not reflected, reserved or disclosed as are not and would not be, in the aggregate, material to Acquiror), or that have arisen since the date of the most recent balance sheet included in the Acquiror Financial Statements in the ordinary course of business consistent with past practice and which are not material.

(b)    Set forth on Schedule 5.15(b) is a good faith estimate of the expected Transaction Expenses of Acquiror and to whom such Transaction Expenses are to be paid.

Section 5.16    Reporting Company. Acquiror is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Exchange Act, and the Acquiror Class A Common Stock, Public Warrants and Acquiror Units are registered pursuant to Section 12(b) of the Exchange Act.

Section 5.17    Listing. The Acquiror Class A Common Stock is listed on the Stock Exchange under the symbol "FAII". The Public Warrants are listed on the Stock Exchange under the symbol "FAII WS". The Acquiror Units are listed on the Stock Exchange under the symbol "FAII.U". Acquiror has not received any oral or written notice that the Acquiror Class A Common Stock, the Public Warrants or the Acquiror Units are ineligible or will become ineligible for listing on the Stock Exchange nor that the Acquiror Class A Common Stock, Public Warrants or Acquiror

38

Units do not meet all requirements for the continuation of such listing. Acquiror has not taken any action that is intended to terminate the registration of the Acquiror Class A Common Stock, Public Warrants or Acquiror Units under the Exchange Act. Acquiror satisfies all of the requirements for the continued listing of the Acquiror Class A Common Stock, Public Warrants and Acquiror Units on the Stock Exchange. Acquiror is in compliance with all applicable Stock Exchange listing and corporate governance rules and has been in such compliance since August 14, 2020.

Section 5.18    Sarbanes-Oxley Act. Acquiror is in compliance with applicable requirements of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") and applicable rules and regulations promulgated by the SEC thereunder.

Section 5.19    Investment Company. Acquiror is not an "investment company" within the meaning of the Investment Company Act.

Section 5.20    Taxes.

(a)    Acquiror (i) has duly and timely filed (taking into account any extension of time within which to file) all income and other material Tax Returns required to be filed by it and all such filed Tax Returns are true, correct and complete in all material respects and (ii) has timely paid all Taxes that are shown as due on such filed Tax Returns and any other material Taxes that it is otherwise obligated to pay (whether or not such Taxes have been reported on any Tax Returns).

(b)    To the Knowledge of Acquiror, there are no facts, circumstances or plans that, either alone or in combination, would reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment.

Section 5.21    Sponsor Letter Agreement. Acquiror has delivered to the Company a true, correct and complete copy of the Sponsor Letter Agreement. The Sponsor Letter Agreement is in full force and effect and has not been withdrawn or terminated, or otherwise amended or modified, in any respect, and no withdrawal, termination, amendment or modification is contemplated by Acquiror. The Sponsor Letter Agreement is a legal, valid and binding obligation of Acquiror and, to the Knowledge of Acquiror, each other party thereto, and neither the execution nor delivery by any party thereto, nor the performance of any party's obligations under, the Sponsor Letter Agreement violates any provision of, or results in the breach of or default under, or require any filing, registration or qualification under, any applicable Law. No event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of Acquiror under any material term or condition of the Sponsor Letter Agreement.

Section 5.22    No Additional Representations and Warranties; Non-Reliance of Acquiror and Merger Sub. Each of Acquiror and Merger Sub acknowledges and agrees that Acquiror has made its own investigation of the Company and, except for the representations and warranties expressly made by the Company in ARTICLE IV (as modified by the Disclosure Schedules), none of the Company nor any Subsidiary or Affiliate thereof nor any other Person has made any express or implied representation or warranty with respect to the Company or its Subsidiaries or any other Person or their respective businesses, operations, assets, liabilities, condition (financial or otherwise) or prospects, including any representation or warranty as to condition, value, quality, merchantability, usage, suitability, fitness for a particular purpose, future results, proposed

businesses or future plans, and neither Acquiror nor Merger Sub is relying on any representation or warranty of the Company or any other Person except for those expressly set forth in ARTICLE IV (as modified by the Disclosure Schedules).

<div align="center">

**ARTICLE VI**
**COVENANTS**

</div>

Section 6.1     Conduct of Business by the Company. The Company agrees that, during the period commencing on the date of this Agreement and ending as of the earlier of (x) the Closing, and (y) termination of this Agreement in accordance with ARTICLE VIII (such period, the "Pre-Closing Period"), each of the Company and its Subsidiaries shall, except as (A) otherwise required or expressly permitted by this Agreement (including by any Ancillary Agreement), (B) consented to in writing by Acquiror, which consent shall not be unreasonably withheld, conditioned or delayed, (C) required by or in response to any Law or other directive by a Governmental Authority (including the implementation of any COVID-19 Measures) or (D) set forth on Schedule 6.1:

(a)     use commercially reasonable efforts to conduct its business in the Ordinary Course of Business; provided, that, in the case of a COVID-19 Response, the Company and its Subsidiaries shall not be deemed to be acting outside of the Ordinary Course of Business;

(b)     not, directly or indirectly:

(i)     make any change in or amendment to any of the Company Organizational Documents that would be adverse to Acquiror, or, other than in the Ordinary Course of Business, form or establish any Subsidiary;

(ii)     (A) make, declare or pay any dividend or distribution (whether in cash, stock, equity securities or property), other than dividends or distributions between or among the Company and any of its wholly-owned Subsidiaries, (B) effect any recapitalization, reclassification, split or other change in the Company's or its Subsidiaries' capitalization or (C) authorize for issuance, issue, sell, transfer, pledge, encumber, dispose of or deliver any shares of its capital stock or securities (including debt securities) convertible into or exchangeable for shares of its capital stock or voting interests, or issue, sell, transfer, pledge, encumber or grant any right, option or other commitment for the issuance of shares of its capital stock, or split, combine or reclassify any shares of its capital stock;

(iii)     (A) except in the Ordinary Course of Business, amend, modify or terminate, prior to the expiration of its term or the completion of performance of any obligations of the Company, any Material Contract or any Lease, (B) waive, delay the exercise of, release or assign any material rights or claims under any Material Contract or any Lease, or (C) enter into any Contract of a type required to be listed on Schedule 4.11(a);

(iv)     issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any of its Subsidiaries or guaranty any debt securities or incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness for borrowed money in excess of $10,000,000, other than (A) in connection with borrowings, extensions of credit and other financial accommodations

<div align="center">40</div>

under the Company's and its Subsidiaries' existing credit facilities, notes and other existing Indebtedness, (B) in connection with refinancings of existing Indebtedness for borrowed money upon market terms and conditions (as determined by the Company in good faith) (C) for drawdowns of credit facilities available as of the date hereof and/or (D) in connection with the Debt Financing, if consummated prior to the Closing;

(v)        (A) enter into any collective bargaining agreement or other Contract with a trade union or other labor organization, or (B) recognize or certify any trade union, other labor organization or group of employees of the Company or its Subsidiaries as the bargaining representative for any employees of the Company or its Subsidiaries;

(vi)       terminate the service or employment (other than for cause) of any executive officer of the Company;

(vii)      except as otherwise required pursuant to any Company Benefit Plan in effect on the date of this Agreement, grant any material increase in compensation, benefits or severance to any director or officer of the Company, other than (A) annual increases in compensation, benefits or severance made in the Ordinary Course of Business and (B) severance payable in accordance with a Company Benefit Plan in effect on the date of this Agreement;

(viii)     engage in any material new line of business;

(ix)       except for a Permitted Company Acquisition, (1) acquire or agree to acquire by merger or consolidation with, or merge, consolidate or combine with, or purchase substantially all of the assets of, any business or any corporation, partnership, association, joint venture or other business organization or division thereof or Person (2) purchase or otherwise acquire (by merger, consolidation, acquisition of stock or assets or otherwise), directly or indirectly, any securities, properties or businesses or (3) adopt or enter into a plan of complete or partial liquidation, dissolution or winding up, restructuring, recapitalization or other reorganization (other than the Transactions);

(x)        other than (x) in the Ordinary Course of Business and (y) between or among the Company and any of its wholly-owned Subsidiaries, make any loans, advances or capital contributions to, or investments in, any other Person (including to any of the Company's or its Subsidiaries' officers, directors, agents or consultants), make any change in its existing borrowing or lending arrangements for or on behalf of such Persons, or enter into any "keep well" or similar agreement to maintain the financial condition of any other Person;

(xi)       (A) make any change in financial accounting methods, principles or practices, except insofar as may have been required by a change in GAAP, including pursuant to standards, guidelines and interpretations of the Financial Accounting Standards Board or any similar organization, or applicable Law or (B) make any change in the auditors of the Company;

(xii)      waive, release, compromise, settle, pay or satisfy any claim, or any claim threatened (which shall include any pending litigation or threatened litigation), in

41

each case, for amounts in excess of $5,000,000 in the aggregate, other than in the Ordinary Course of Business and as would not prohibit or materially restrict the Company or its Subsidiaries from operating their respective businesses substantially as currently conducted; provided that, for the avoidance of doubt, any stockholder litigation related to this Agreement, any Ancillary Agreement or the Transactions shall be subject to the provisions of Section 6.18; or

(xiii)   enter into any binding agreement or otherwise making a binding commitment to take any of the foregoing actions.

Acquiror acknowledges and agrees that: (x) nothing contained in this Agreement, including the restrictions set forth in this Section 6.1, shall give Acquiror, directly or indirectly, the right to control or direct the operations of the Company or any of its Subsidiaries prior to the Closing, and (y) prior to the Closing, the Company and its Subsidiaries shall exercise, subject to the terms and conditions of this Agreement, complete control and supervision over its operations.

Section 6.2     Conduct of Business by Acquiror. Each of Acquiror and Merger Sub agrees that, during the Pre-Closing Period, each of Acquiror and Merger Sub shall, except as (A) otherwise required or expressly permitted by this Agreement (including the issuance of shares of Acquiror Class A Common Stock pursuant to the Subscription Agreements or as required or expressly permitted by any Ancillary Agreement), (B) consented to in writing by the Company, which consent shall not be unreasonably withheld, conditioned or delayed, except with respect to clause "(b)(i)," (C) required by or in response to any Law or other directive by a Governmental Authority (including any COVID-19 Measures), or (D) set forth on Schedule 6.2:

(a)     use commercially reasonable efforts to conduct its business in the ordinary course of business consistent with past practice;

(b)     not, directly or indirectly:

(i)     take any action that would reasonably be expected to prevent or materially delay the consummation of the Transactions;

(ii)     make any change in or amendment to any of the Acquiror Organizational Documents or form or establish any Subsidiary;

(iii)     (A) make, declare or pay any dividend or distribution to any equityholder, (B) effect any recapitalization, reclassification, split or other change in its capitalization, (C) authorize for issuance, issue, sell, transfer, pledge, encumber, dispose of or deliver any additional shares of its capital stock or securities (including debt securities) convertible into or exchangeable for shares of its capital stock or voting interests, or issue, sell, transfer, pledge, encumber or grant any right, option or other commitment for the issuance of shares of its capital stock, or split, combine or reclassify any shares of its capital stock, other than in connection with the exercise of any Public Warrants or Private Placement Warrants outstanding on the date hereof or (D) amend, modify or waive any of the material terms or rights set forth in any Public Warrant or Private Placement Warrant or any related agreement governing such warrants, including any amendment, modification or reduction of the warrant price set forth therein;

42

(iv) issue or sell any debt securities or warrants or other rights to acquire any debt securities of Acquiror or Merger Sub or guaranty any debt securities or incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness;

(v) amend, modify or consent to the termination of any Acquiror Material Contract;

(vi) enter into, renew or amend in any material respect, any transaction or Contract with an Affiliate of Acquiror or Merger Sub (including, for the avoidance of doubt, (A) the Sponsor and (B) any Person in which the Sponsor has a direct or indirect legal, contractual or beneficial ownership interest of 5% or greater);

(vii) (A) effect an Alternative Business Combination, or (B) adopt or enter into a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization (other than the Transactions);

(viii) except as contemplated by the Incentive Plan Proposal, (A) adopt or amend any Acquiror Benefit Plan, (B) enter into any employment contract or collective bargaining agreement or (C) hire any employee;

(ix) make any loans, advances or capital contributions to, or investments in, any other Person (including to any of Acquiror or Merger Sub's officers, directors, agents or consultants), make any change in its existing borrowing or lending arrangements for or on behalf of such Persons, or enter into any "keep well" or similar agreement to maintain the financial condition of any other Person; provided, however, that Acquiror shall be permitted to incur Indebtedness (which shall constitute a Transaction Expense of Acquiror) of up to $1,500,000 in the aggregate from its Affiliates and stockholders in order to meet its reasonable capital requirements, with any such loans to be made only as reasonably required by the operation of Acquiror in due course on a non-interest basis and otherwise on arm's-length terms and conditions and which shall be repaid in connection with the Closing;

(x) make any change in financial accounting methods, principles or practices, except insofar as may have been required by a change in GAAP, including pursuant to standards, guidelines and interpretations of the Financial Accounting Standards Board or any similar organization, or applicable Law; or

(xi) enter into any binding agreement or otherwise making a binding commitment to take any of the foregoing actions.

Section 6.3    Proxy Statement; Proxy Solicitation; Other Actions.

(a) As promptly as reasonably practicable following the execution and delivery of this Agreement, Acquiror shall use reasonable best efforts to prepare, with the assistance of the Company reasonably necessary in connection therewith, and, within ten Business Days after receipt by Acquiror from the Company of all the information relating to the Company as reasonably necessary for the preparation and filing thereof pursuant to Section 6.3(b) (including

43

the financial statements referenced in Section 6.3(b)(i)), cause to be filed with the SEC a proxy statement in connection with the Special Meeting and Acquiror Stock Redemption (such Proxy Statement, together with any exhibits, supplements or amendments thereto, the "Proxy Statement") in preliminary form with the SEC. Each of Acquiror and the Company shall use its reasonable best efforts to cause the Proxy Statement to comply with the applicable provisions of the Exchange Act and the rules and regulations thereunder and any other applicable Law.

(b)　　　Each of Acquiror and the Company shall furnish all required information concerning it as may reasonably be requested by the other Party in connection with the preparation, filing, and distribution, as applicable, of the Proxy Statement and any other filing required to be made by Acquiror in respect of the Transactions. Without limiting the foregoing, the Company shall (i) use reasonable best efforts to provide Acquiror, as promptly as practicable after the date hereof, (A) audited financial statements, including consolidated balance sheets, statements of income (loss), statements of cash flows, and statements of stockholders equity of the Company and its Subsidiaries as of and for the years ended December 31, 2020, December 31, 2019 and December 31, 2018, together with all related notes and schedules thereto, prepared in accordance with Regulation S-X and GAAP applied on a consistent basis throughout the covered periods and audited in accordance with the auditing standards of the PCAOB, accompanied by an unqualified report of the Company's independent auditor with respect thereto, and (B) unaudited interim financial statements, including consolidated balance sheets, statements of income (loss), statements of cash flows, and statements of stockholders equity of the Company and its Subsidiaries, together with all related notes and schedules thereto, prepared in accordance with Regulation S-X and GAAP applied on a consistent basis throughout the covered periods (subject to normal recurring year-end and quarter-end adjustments (the effect of which will not, individually or in the aggregate, be material to such financial statements) and the absence of notes to such statements) covering the applicable periods required to be included in the Proxy Statement and (ii) reasonably cooperate with Acquiror in connection with the preparation of pro forma financial statements required to be included in the Proxy Statement. Each of Acquiror and the Company shall, as promptly as practicable after the receipt thereof, provide the other Party with copies of any written comments and advise the other Party of any oral comments with respect to the Proxy Statement received by such Party from the SEC or its staff, including any request from the SEC or its staff for amendments or supplements to the Proxy Statement, and shall provide the other Party with copies of all correspondence between it and its Representatives, on the one hand, and the SEC or its staff, on the other hand. Notwithstanding the foregoing, prior to filing the Proxy Statement (including any amendments and supplements thereto) or responding to any comments of the SEC or its staff with respect thereto, each of Acquiror and the Company (x) shall provide the other with a reasonable opportunity to review and comment on such document or response (including the proposed final version of such document or response) and (y) shall cooperate and mutually agree upon (such agreement not to be unreasonably withheld, conditioned or delayed), any such document or response and any amendment to the Proxy Statement filed in response to such comments of the SEC or its staff.

(c)　　　As promptly as reasonably practicable following the earlier to occur of: (i) in the event the preliminary Proxy Statement is not reviewed by the staff of the SEC, the expiration of the waiting period in Rule 14a-6(a) under the Exchange Act and (ii) in the event the preliminary Proxy Statement is reviewed by the staff of the SEC, receipt of oral or written notification of the completion of the review by the staff of the SEC (such earlier date, the "Proxy Clearance Date"),

44

Acquiror will cause the Proxy Statement to be filed in definitive form with the SEC as promptly as reasonably practicable and will cause the definitive Proxy Statement to be mailed to stockholders of Acquiror in compliance with applicable Law (and in no event later than five Business Days after the Proxy Clearance Date).

(d)     Acquiror will notify the Company, promptly after it receives notice thereof, of the Proxy Clearance Date or of any supplement or amendment that has been filed, of the issuance of any stop order, or of the suspension of the qualification of the Acquiror Common Stock to be issued or issuable pursuant to this Agreement for offering or sale in any jurisdiction. Each of Acquiror and the Company shall use its reasonable best efforts to have such stop order or suspension lifted, reversed or otherwise terminated.

(e)     If Acquiror or the Company becomes aware that any information contained in the Proxy Statement shall have become false or misleading in any material respect, or that the Proxy Statement is required to be amended in order to comply with applicable Law, then (i) such Party shall promptly inform the other Parties and (ii) Acquiror, on the one hand, and the Company, on the other hand, shall cooperate and mutually agree upon (such agreement not to be unreasonably withheld, conditioned or delayed) an amendment or supplement to the Proxy Statement. Acquiror and the Company shall use reasonable best efforts to cause the Proxy Statement as so amended or supplemented, to be filed with the SEC and Acquiror shall cause such Proxy Statement to be disseminated to the holders of shares of Acquiror Common Stock, as applicable, in each case pursuant to applicable Law and subject to the terms and conditions of this Agreement and the Acquiror Organizational Documents.

Section 6.4     Acquiror Special Meeting.

(a)     Acquiror, commencing upon the initial submission to the SEC of the preliminary Proxy Statement in accordance with Section 6.3(a), shall on a weekly basis, run a broker search for a deemed record date of 20 Business Days after the date of such search. Promptly following the Proxy Clearance Date, Acquiror shall (i) by resolutions of the Acquiror Board, establish the earliest practicable Acquiror Record Date, (ii) by resolutions of the Acquiror Board, establish the earliest practicable date for a special meeting of the Acquiror stockholders (the "Special Meeting") in accordance with the Acquiror Organizational Documents for the purposes of obtaining the Acquiror Stockholder Approval and, if applicable, any approvals related thereto and providing its stockholders with the opportunity to effect an Acquiror Stock Redemption and (iii) solicit proxies to obtain the Acquiror Stockholder Approval at the Special Meeting. In connection therewith, the Acquiror Board shall duly call, give notice of, convene and hold the Special Meeting within 30 days after the definitive Proxy Statement is mailed to stockholders of Acquiror; provided, however, that (A) Acquiror may postpone, and if requested by the Company in writing, shall postpone, the Special Meeting in compliance with applicable requirements under Delaware Law if (1) there are holders of an insufficient number of shares of Acquiror Class A Common Stock or Acquiror Class F Common Stock present or represented by proxy at the Special Meeting to constitute a quorum at such meeting (in which case Acquiror shall, and shall cause its proxy solicitor to use reasonable best efforts to, solicit as promptly as practicable the presence, in person or by proxy of a quorum), but only until there are a sufficient number of shares of Acquiror Class A Common Stock and Acquiror Class F Common Stock present or represented by proxy at the Special Meeting to obtain such a quorum or (2) on a date for which the Special Meeting is

45

scheduled, Acquiror has not received proxies representing a sufficient number of shares of Acquiror Class A Common Stock and Acquiror Class F Common Stock to obtain the Acquiror Stockholder Approval, in order to solicit additional proxies from stockholders for the purposes of obtaining the Acquiror Stockholder Approval, but only until there are a sufficient number of shares of Acquiror Class A Common Stock and Acquiror Class F Common Stock present or represented by proxy at the Special Meeting to obtain the Acquiror Stockholder Approval; provided, however, that (A) with respect to postponement in the case of clauses "(1)" and "(2)," Acquiror shall not change the record date for the Special Meeting without the Company's prior written consent and (B) Acquiror may postpone or adjourn the Special Meeting with the Company's prior written consent. Notwithstanding the foregoing, in the event Acquiror postpones or adjourns the Special Meeting pursuant to the foregoing sentence, Acquiror shall use its reasonable best efforts to reconvene and hold a Special Meeting as promptly as reasonably practicable.

(b)     Acquiror shall, through the Acquiror Board, recommend to the Acquiror Common Stockholders the (i) adoption and approval of this Agreement, the Merger contemplated hereby and the other Transactions in accordance with applicable Law and exchange rules and regulations (the "Merger Proposal"), (ii) approval of the issuance of shares of Acquiror Class A Common Stock in connection with the PIPE Investment and the Merger, if required under exchange rules and regulations (the "Issuance Proposal"), (iii) adoption and approval of the Acquiror A&R Charter (the "Amendment Proposal"), (iv) approval of the adoption of the Incentive Plan (the "Incentive Plan Proposal"), (v) approval of each change to the Acquiror A&R Charter that is required by federal securities Law to be separately approved, (vi) adoption and approval of any other proposals as the SEC (or staff member thereof) may indicate are necessary in its comments to the Proxy Statement or correspondence related thereto, (vii) adoption and approval of any other proposals as reasonably agreed by Acquiror and the Company to be necessary or appropriate in connection with the Transactions and (ix) the adjournment of the Special Meeting, if necessary, to permit further solicitation of proxies because there are not sufficient votes to approve and adopt any of the foregoing (such proposals in clauses "(i)" through "(ix)," collectively, the "Transaction Proposals," and such recommendation of the Acquiror Board, the "Acquiror Board Recommendation"), and include such Acquiror Board Recommendation in the Proxy Statement. Acquiror covenants that none of the Acquiror Board nor any committee thereof shall withdraw or modify, or propose publicly or by formal action of the Acquiror Board to withdraw or modify, in a manner adverse to the Company, the Acquiror Board Recommendation or any other recommendation by the Acquiror Board of the Transaction Proposals (any such action a "Change in Recommendation") except in accordance with Section 6.4(c).

(c)     Notwithstanding anything in this Agreement to the contrary, if, at any time prior to obtaining the Acquiror Stockholder Approval, the Acquiror Board determines in good faith, in response to an Intervening Event, after consultation with its outside legal counsel, that the failure to make a Change in Recommendation would reasonably be expected to constitute a breach by the Acquiror Board of its fiduciary obligations to Acquiror's stockholders under applicable Law, the Acquiror Board may, prior to obtaining the Acquiror Stockholder Approval, make a Change in Recommendation; provided, however, that Acquiror Board will not be entitled to make, or agree or resolve to make, a Change in Recommendation unless (i) Acquiror delivers to the Company a written notice (an "Intervening Event Notice") advising the Company that the Acquiror Board proposes to take such action and containing the material facts underlying the Acquiror Board's determination that an Intervening Event has occurred (it being acknowledged that such

46

Intervening Event Notice shall not itself constitute a breach of this Agreement), and (ii) at or after 5:00 p.m., New York City time, on the fifth Business Day immediately following the day on which Acquiror delivered the Intervening Event Notice (such period from the time the Intervening Event Notice is provided until 5:00 p.m. New York City time on the fifth Business Day immediately following the day on which Acquiror delivered the Intervening Event Notice (it being understood that any material development with respect to an Intervening Event shall require a new notice but with an additional four Business Day (instead of a five Business Day) period from the date of such notice), the "Intervening Event Notice Period"), the Acquiror Board reaffirms in good faith (after consultation with its outside legal counsel) that the failure to make a Change in Recommendation would be inconsistent with its fiduciary duties under applicable Law. If requested by the Company, Acquiror will, and will cause its Subsidiaries to, and will use its reasonable best efforts to cause its or their Representatives to, during the Intervening Event Notice Period, engage in good faith negotiations with the Company and its Representatives to make such adjustments in the terms and conditions of this Agreement so as to obviate the need for a Change in Recommendation.

Section 6.5    Company Written Consents. As promptly as practicable following the execution and delivery of this Agreement, the Company shall seek the Company Requisite Approval by irrevocable written consent, in form and substance acceptable to Acquiror, from one or more Company Stockholders. The Company shall deliver or cause to be delivered to Acquiror copies of such written consents within one Business Day of the Company's receipt of the executed written consents from such Company Stockholders. Promptly following the delivery of the written consents sufficient to constitute the Company Requisite Approval, the Company will prepare and deliver to its stockholders who have not delivered written consents, the notice required by Section 228(e) of the DGCL.

Section 6.6    Access to Information. From time to time during the Pre-Closing Period, each of Acquiror and the Company (each in such capacity, a "Disclosing Party") shall (i) afford to the other Parties and their respective Representatives reasonable access, during normal business hours and with reasonable advance notice, in such manner as to not interfere with the normal operation of such Disclosing Party, to the officers, employees, agents, properties, offices and other facilities of the Disclosing Party and to the books and records thereof, and (ii) furnish promptly to the other Parties such information concerning the business, properties, contracts, assets, liabilities, personnel and other aspects of the Disclosing Party as such other Party or its Representatives may reasonably request, in each case (A) subject to restrictions under applicable Law and any confidentiality obligations or similar restrictions that may be applicable to information furnished by third parties that may be in the possession of such Disclosing Party, and (B) except for any information that, in the good faith reasonable belief of the Disclosing Party, would result in the loss of attorney-client privilege or other privilege from disclosure. All information obtained by a Party pursuant to this Section 6.6 shall remain subject to the Nondisclosure Agreement. No investigation pursuant to this Section 6.6 shall affect or be deemed to modify any representation made by the Company or Acquiror, as applicable, herein.

Section 6.7    Efforts; Consents.

(a)    Without limiting any covenant contained in this ARTICLE VI, including the obligations of the Company and Acquiror with respect to the notifications, filings, reaffirmations and applications described in Section 6.7(b) and 6.7(c), which obligations shall

47

control to the extent of any conflict with the succeeding provisions of this Section 6.7(a), each of the Parties shall cooperate, and use their respective reasonable best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate the Transactions as soon as reasonably practicable after the date hereof, and to fulfill the conditions to consummation of the Transactions set forth in ARTICLE VII; provided, however, that in no event shall the Company be required to pay any material fee, penalty or other consideration to obtain any license, Permit, consent, approval, authorization, qualification or waiver required under any Contract for the consummation of the Transactions.

(b) In connection with the Transactions, without limiting the generality of the foregoing, each Party shall promptly after execution of this Agreement (but in no event later than ten Business Days after the date hereof) make all such filings or submissions as are required under the HSR Act. Each Party shall promptly furnish to the other such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act and will take all other reasonable actions necessary to cause the expiration or termination of the applicable waiting periods as soon as practicable. Each Party shall promptly provide the other with copies of all written communications (and memoranda setting forth the substance of all oral communications) between each of them, any of their Affiliates or any of its or their Representatives, on the one hand, and any Governmental Authority, on the other hand, with respect to this Agreement or the Transactions. Without limiting the generality of the foregoing, and subject to applicable Law, in connection with its efforts to obtain all requisite approvals and authorizations for the Transactions under the HSR Act, each Party shall use its reasonable best efforts to: (i) cooperate in all respects with each other Party or its Affiliates in connection with any filing or submission with any Governmental Authority, with respect to this Agreement or the Transactions; (ii) keep the other Parties reasonably informed of any communication received by such Party or its Representatives from, or given by such Party or its Representatives to, any Governmental Authority regarding any of the Transactions; (iii) permit a Representative of the other Parties to review any communication given by it to, and consult with each other in advance of any meeting or conference with, any Governmental Authority, and to the extent permitted by such Governmental Authority, give a Representative or Representatives of the other Parties the opportunity to attend and participate in such meetings and conferences; (iv) in the event a Party's Representative is prohibited from participating in or attending any meetings or conferences, keep such Party promptly and reasonably apprised with respect thereto; and (v) cooperate in the filing of any memoranda, white papers, filings, correspondence or other written communications explaining or defending the Transactions, articulating any regulatory or competitive argument, and/or responding to requests or objections made by any Governmental Authority, provided, that the Parties may, as they deem advisable and necessary, reasonably designate any information or communication shared with the any other Party under this Section 6.7 as "outside counsel only."

(c) The Parties shall supply as promptly as reasonably practicable any additional information and documentary material that may be requested by a Governmental Authority pursuant to the HSR Act and to take all other actions necessary, proper or advisable to cause the expiration or termination of the applicable waiting periods or obtain required approvals, as applicable under the HSR Act as soon as practicable, including by requesting early termination of the waiting period provided for under the HSR Act.

(d)     Acquiror shall not take any action that could reasonably be expected to impair or delay the approval of any Governmental Authority of any of the aforementioned filings.

(e)     The Parties further covenant and agree, with respect to a pending preliminary or permanent injunction or preliminary or permanent injunction threatened or other order, decree or ruling or statute, rule, regulation or executive order that would adversely affect the ability of the Parties to consummate the Transactions, to use reasonable best efforts to prevent or lift the entry, enactment or promulgation thereof, as the case may be.

Section 6.8     Publicity.

(a)     As promptly as practicable following the date of this Agreement, the Company and Acquiror shall jointly issue a mutually agreeable press release announcing the execution of this Agreement, and Acquiror shall prepare and file a Current Report on Form 8-K pursuant to the Exchange Act to report the execution of this Agreement, the form and substance of which shall be approved (which approval shall not be unreasonably withheld, conditioned or delayed) in advance in writing by the Company.

(b)     The Company shall prepare a draft Current Report on Form 8-K in connection with and announcing the Closing, together with, or incorporating by reference, such financial statements prepared by the Company and their respective accountants and such other information that is required to be included or disclosed with respect to the Transactions pursuant to a Current Report on Form 8-K, the form and substance of which shall be approved (which approval shall not be unreasonable withheld, conditioned or delayed) in advance in writing by Acquiror. Prior to the Closing, the Company and Acquiror shall prepare a mutually agreeable press release announcing the consummation of the Transactions ("Closing Press Release"). Concurrently with the Closing, Acquiror shall distribute the Closing Press Release.

(c)     Without limitation to clauses "(a)" and "(b)" of this Section 6.8, none of the Parties shall, and each Party shall cause its Representatives not to, make or issue any public announcement or press release to the general public with respect to this Agreement or the Transactions without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that no such consent or prior notice shall be required in connection with any public announcement or press release the content of which is consistent with that of any prior or contemporaneous public announcement or press release by any Party in compliance with this Section 6.8. Notwithstanding anything else contained herein, nothing in this Section 6.8 shall limit any Party from: (i) making any announcements, statements or acknowledgements that such Party is required by applicable Law or the requirements of any national securities exchange to make, issue or release, (ii) making any announcements regarding this Agreement and the Transactions to its respective directors, officers, managers or employees , (iii) making any public statements regarding this Agreement and the Transactions containing information or events already publicly known other than as a result of a breach of this Section 6.8 or (iv) communicating with third parties to the extent necessary for the purpose of seeking any third-party consent required in connection with the Transactions; provided, (A) in the case of clause "(i)," to the extent practicable, that such Party provides reasonable advance written notice to the other Party prior to the taking of such action and (B) in the case of clauses "(iii)" and "(iv)," that Acquiror or the Company, as applicable, obtains the prior written consent of the Company, in

the case of Acquiror, or Acquiror, in the case of the Company, in each case, such consent not to be unreasonably withheld, conditioned or delayed.

(d)     At a reasonable time prior to the filing, issuance or other submission or public disclosure of any reports to be filed with the SEC by either Acquiror or Merger Sub (for the avoidance of doubt, including the Current Report on Form 8-K referenced in clause "(a)" of this Section 6.8), the Company shall be given an opportunity to review and comment upon such filing, issuance or other submission and give its prior written consent to the form thereof, such consent not to be unreasonably withheld, conditioned or delayed, and Acquiror and Merger Sub shall accept and incorporate all reasonable comments from the Company with respect thereto prior to filing, issuance, submission or disclosure thereof.

(e)     Acquiror acknowledges that the information being provided to it in connection with this Agreement and the consummation of the transactions contemplated hereby is subject to the terms of the Nondisclosure Agreement.

Section 6.9     Non-Solicitation.

(a)     During the Pre-Closing Period, each of Acquiror and Merger Sub agrees that it shall not, and shall not authorize or permit any of its Representatives acting on its behalf (including investment bankers, attorneys and accountants), to, directly or indirectly, (i) initiate, solicit, knowingly facilitate, make or respond to any offer or proposal concerning, or related to, any Alternative Business Combination, (ii) enter into, engage in or continue any discussions or negotiations concerning, or related to, any Alternative Business Combination; (iii) provide any non-public information, data or access to employees to any Person that has made, or that is considering making, a proposal with respect to an Alternative Business Combination, (iv) approve, endorse or recommend any Alternative Business Combination, or (v) enter into any agreement, letter of intent, memorandum of understanding, term sheet or other Contract relating to an Alternative Business Combination. Acquiror shall promptly notify the Company of any submissions, proposals or offers made with respect to an Alternative Business Combination as soon as practicable following Acquiror's awareness thereof (but in any event within 24 hours). Acquiror, Merger Sub and their respective officers and directors shall, and shall instruct and cause their respective Affiliates and Representatives, in each case, to the extent acting on behalf of Acquiror or Merger Sub, as applicable, to, immediately cease and terminate all discussions and negotiations with any Person with respect to, or which is reasonably likely to give rise to or result in, a possible Alternative Business Combination.

(b)     During the Pre-Closing Period, the Company agrees that it shall not, and shall not authorize or permit any of its Representatives acting on its behalf (including investment bankers, attorneys and accountants) or any of the Company's Subsidiaries to, directly or indirectly, (i) initiate, solicit, knowingly encourage, knowingly facilitate or make or respond to an Acquisition Proposal, (ii) engage in or continue any discussions or negotiations with respect to an Acquisition Proposal, (iii) provide any non-public information or data or access to employees to, any Person that has made, or informs the Company that it is considering making, an Acquisition Proposal, (iv) approve, endorse or recommend any Acquisition Proposal or (v) enter into any agreement, letter of intent, memorandum of understanding, term sheet or other Contract relating to an Acquisition Proposal. The Company shall promptly notify Acquiror of any submissions, proposals

50

or offers made with respect to an Acquisition Proposal as soon as practicable following the Knowledge of the Company thereof (but in any event within two Business Days). The Company and its officers and directors shall, and shall instruct and cause its respective Affiliates and Representatives, in each case, to the extent acting on behalf of the Company to, immediately cease and terminate all discussions and negotiations with any Person with respect to, or which is reasonably likely to give rise to or result in, a possible Acquisition Proposal.

Section 6.10 Pre-Closing Structuring. The Parties, may, upon mutual written agreement prior to the Effective Time, change the method or structure of effecting the Transactions, if and to the extent Acquiror and the Company both deem such change to be necessary, appropriate and desirable, and the Parties shall cooperate and use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to effect any such change, including forming, or causing to be formed, new Subsidiaries and executing and causing to be delivered to any other Party hereto such instruments and other documents as may be reasonably requested.

Section 6.11 Directors' and Officers' Indemnification; Insurance.

(a) From and after the Effective Time, Acquiror and the Surviving Company shall indemnify and hold harmless each present and former director and officer of the Company and each of its Subsidiaries against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities incurred in connection with any Action, whether civil, criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, to the fullest extent that the Company or its Subsidiaries, as the case may be, would have been permitted under applicable Law and its certificate of incorporation, bylaws or other organizational documents to indemnify such Person (including the advancing of expenses as incurred to the fullest extent permitted under applicable Law). Without limiting the foregoing, Acquiror shall, and shall cause the Surviving Company and its Subsidiaries to, (i) maintain for a period of not less than six years from the Effective Time provisions in its certificate of incorporation, bylaws and other organizational documents concerning the indemnification and exoneration (including provisions relating to expense advancement) of officers and directors that are no less favorable to those Persons than the provisions of such organizational documents as of the date of this Agreement and (ii) not amend, repeal or otherwise modify such provisions in any respect that would adversely affect the rights of those Persons thereunder, in each case, except as required by Law. Acquiror shall assume, and be liable for, and shall cause the Surviving Company and their respective Subsidiaries to honor, each of the covenants in this Section 6.11.

(b) Prior to the Closing, Acquiror will procure "tail" directors' and officers' liability insurance policies covering those Persons who are currently covered by Acquiror's directors' and officers' liability insurance policies with a claims reporting or discovery period of at least six years from the Effective Time placed with insurance companies having the same or better AM Best Financial rating as Acquiror's current directors' and officers' liability insurance companies with terms and conditions providing retentions, limits and other material terms no less favorable than the current directors' and officers' liability insurance policies maintained by Acquiror with respect to matters, acts or omissions existing or occurring at or prior to the Effective

51

Time; provided, however, that Acquiror may not spend more than 200% of the last annual premium paid by Acquiror prior to the date hereof for the six years of coverage under such "tail" policies.

(c)     Notwithstanding anything contained in this Agreement to the contrary, clauses "(a)," "(b)" and "(c)" of this Section 6.11 shall survive the consummation of the Transactions and shall be binding on Acquiror and the Surviving Company and all successors and assigns of Acquiror and the Surviving Company. In the event that Acquiror, the Surviving Company or any of their respective successors or assigns consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, Acquiror and the Surviving Company shall ensure that proper provision shall be made so that the successors and assigns of Acquiror or the Surviving Company, as the case may be, shall succeed to the obligations set forth in clauses "(a)," "(b)" and "(c)" of this Section 6.11. The obligations of Acquiror and the Surviving Company under clauses "(a)," "(b)" and "(c)" of this Section 6.11 shall not be terminated or modified in such a manner as to materially and adversely affect any present or former director or officer of the Company or any of its Subsidiaries to whom clauses "(a)," "(b)" and "(c)" of this Section 6.11 applies without the consent of the affected Person.

(d)     Prior to the Closing, the Company shall obtain directors' and officers' liability insurance that shall be effective as of Closing and will cover those Persons who will be the directors and officers of Acquiror and its Subsidiaries (including the directors and officers of the Surviving Company and its Subsidiaries) at and after the Closing. The directors' and officers' liability insurance shall have a scope of coverage, terms and limits that are reasonably appropriate for a company of similar characteristics (including the line of business, market capitalization and revenues) as Acquiror and its Subsidiaries (including the Surviving Company and its Subsidiaries).

(e)     Notwithstanding anything contained in this Agreement to the contrary, prior to the Closing, the Company may procure "tail" directors' and officers' liability, employment practices liability and fiduciary liability insurance policies covering those Persons who are currently covered by the Company's directors' and officers' liability, employment practices liability and fiduciary liability insurance policies (as applicable) with a claims reporting or discovery period of at least six years from the Effective Time (or, such shorter period of time, as determined by the Company in its sole discretion) placed with insurance companies having the same or better AM Best Financial rating as the Company's current directors' and officers' liability, employment practices liability and fiduciary liability insurance companies with terms and conditions providing retentions, limits and other material terms no less favorable than the current directors' and officers' liability, employment practices liability and fiduciary liability insurance policies maintained by the Company with respect to matters, acts or omissions existing or occurring at or prior to the Effective Time.

Section 6.12   Trust Account.

(a)     During the Pre-Closing Period, Acquiror shall not amend the Trust Agreement, make or enter into any other agreement related to the Trust Account, or make any distribution of the funds held in the Trust Account, in each case, without the prior written consent of the Company, except in accordance with the terms of the Trust Agreement and the Acquiror

52

Organizational Documents. Upon satisfaction or waiver of the conditions set forth in ARTICLE VII and provision of notice thereof to the Trustee (which notice Acquiror shall provide to the Trustee in accordance with the terms of the Trust Agreement), (i) in accordance with and pursuant to the Trust Agreement, at the Closing, Acquiror shall (A) cause the documents, opinions and notices required to be delivered to the Trustee pursuant to the Trust Agreement to be so delivered, and (B) use commercially reasonable efforts to cause the Trustee to (1) pay as and when due all amounts payable to Acquiror Common Stockholders who shall have previously validly elected to redeem their shares of Acquiror Class A Common Stock in the Acquiror Stock Redemption, and (2) immediately thereafter, pay all remaining amounts then available in the Trust Account in accordance with this Agreement and the Trust Agreement, and (ii) thereafter, the Trust Account shall terminate, except as otherwise provided therein.

(b)     The Company agrees that, notwithstanding any other provision contained in this Agreement, the Company and its Subsidiaries do not now have, and shall not at any time prior to the Closing have, any claim to, or make any claim against, the Trust Account, regardless of whether such claim arises as a result of, in connection with or relating in any way to, the business relationship between the Company or its Subsidiaries, on the one hand, and Acquiror, on the other hand, this Agreement, or any other agreement or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (any and all such claims are collectively referred to in this Section 6.12(b) as the "Trust Account Claims"). Notwithstanding any other provision contained in this Agreement, the Company hereby irrevocably waives any right, title, interest or Trust Account Claim it may have, now or in the future in or to the Trust Account and agrees not to seek recourse against the Trust Account or any funds distributed therefrom as a result of, or arising out of, this Agreement and any negotiations, contracts or agreements with Acquiror, and will not seek recourse against the Trust Account for any reason whatsoever in respect thereof; provided, however, that the foregoing waiver will not limit or prohibit the Company from (i) pursuing a claim against Acquiror pursuant to this Agreement for specific performance or other equitable relief in connection with the Transactions or (ii) pursuing any claims that the Company may have against Acquiror's assets or funds that are not held in the Trust Account. In the event the Company or any of its Subsidiaries commences any Action based upon, in connection with, relating to or arising out of any matter relating to Acquiror, which Action seeks, in whole or in part, relief against the Trust Account in violation of the foregoing, Acquiror shall be entitled to recover from the Company the associated legal fees and costs in connection with any such Action in the event Acquiror prevails in such Action.

Section 6.13    Intended Tax Treatment.

(a)     This Agreement is intended to constitute, and the Parties hereby adopt this Agreement as, a "plan of reorganization" within the meaning of Treasury Regulation Sections 1.368-2(g) and 1.368-3(a). The Parties agree and acknowledge that, for U.S. federal income tax purposes and applicable state and local tax purposes, the Merger shall qualify as a reorganization within the meaning of Section 368(a) of the Code or, together with the PIPE Investment, as an exchange to which Section 351(a) of the Code applies (or both). Unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any similar determination under state or local Law) or by a change in Law, the Parties agree to file all U.S. federal, state, local and non-U.S. Tax Returns consistent with this Section 6.13 and shall not take any position before or after the Closing that is inconsistent with the foregoing treatment.

53

(b)      The Parties shall use reasonable best efforts to cause the Merger to qualify for the Intended Tax Treatment and not to take, or fail to take, any action before or after the Closing to the extent that such action or failure to act would reasonably be expected to prevent or impede the Merger from qualifying for the Intended Tax Treatment; provided, however, that nothing in this Section 6.13 shall require any of the Parties to effect more redemptions of Acquiror stock or raise more money in respect of the PIPE Investment than is otherwise required by this Agreement, alter the terms of any shares of the Acquiror (including the Acquiror Class F Common Stock) or the rights of any shareholder thereof, or agree to any revisions or amendments to, or to waive any provisions of, this Agreement or any Ancillary Agreement. For the avoidance of doubt, for purposes of Section 4.15(j), Section 5.20(b) and this Section 6.13, qualification for the Intended Tax Treatment shall not require qualification under both Section 368(a) of the Code and Section 351(a) of the Code, but shall be satisfied by either of such Code sections.

Section 6.14      FIRPTA Certificate. At the Closing, the Company shall deliver to Acquiror, in a form reasonably acceptable to Acquiror, a properly executed certification, dated as of the Closing Date, that shares of Company Stock are not "United States real property interests" in accordance with Treasury Regulation Section 1.1445-2(c)(3), together with a notice to the Internal Revenue Service (which shall be filed by Acquiror with the Internal Revenue Service at or following the Closing) in accordance with the provisions of Treasury Regulation Section 1.897-2(h)(2).

Section 6.15      Incentive Plan. The Parties shall cooperate to establish the Incentive Plan and Acquiror Board shall adopt such plan to be effective as of the Closing, which shall provide for an aggregate share reserve thereunder equal to 10% of the shares Acquiror Class A Common Stock issued and outstanding immediately following the Closing. Subject to stockholder approval of the Incentive Plan Proposal, promptly following the expiration of the 60 day period following the date Acquiror has filed current Form 10 information with the SEC reflecting its status as an entity that is not a shell company, Acquiror shall file an effective registration statement on Form S-8 (or other applicable form) with respect to the Acquiror Class A Common Stock issuable under the Incentive Plan and shall maintain the effectiveness of such Form S-8 registration statement for so long as awards granted pursuant to the Incentive Plan remain outstanding.

Section 6.16      Section 16(b) Exemption. Acquiror shall take all actions reasonably necessary to cause the Transactions and any other dispositions of equity securities of Acquiror (including derivative securities) in connection with the Transactions by each individual who is subject to the reporting requirements of Section 16(a) of the Exchange Act, with respect to Acquiror or who will (or is reasonably expected to) become subject to such reporting requirements with respect to Acquiror to be exempt under Rule 16b-3 under the Exchange Act.

Section 6.17      Stock Exchange Matters.

(a)      Prior to the Closing, Acquiror shall apply for a mutually agreed upon new ticker symbol with the Stock Exchange that reflects the name "ATI Physical Therapy" contingent on obtaining Acquiror Stockholder Approval. Acquiror shall use its reasonable best efforts to maintain its listing on the Stock Exchange. On or prior to the Closing, if Acquiror receives any written or, to the Knowledge of Acquiror, oral notice from the Stock Exchange that Acquiror has failed, or would reasonably be expected to fail, to meet the Stock Exchange listing requirements

54

as of the Closing for any reason (such notice a "Stock Exchange Notice"), then Acquiror shall give prompt written notice of such Stock Exchange Notice to the Company, including a copy of any written Stock Exchange Notice or a summary of any oral Stock Exchange Notice. Acquiror further covenants and agrees, with respect to any Stock Exchange Notice, to use reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to (i) remedy any and all issues set forth in the Stock Exchange Notice regarding Acquiror's listing on the Stock Exchange and (ii) in the event Acquiror is unable to remedy such issues set forth in the Stock Exchange Notice after using such reasonable best efforts as described in clause "(i)," to cause the Acquiror Common Stock to be issued in connection with the Transactions to be approved for listing on an Alternate Exchange.

(b)     Prior to the Closing Date, Acquiror shall use reasonable best efforts to cause the Acquiror Common Stock to be issued in connection with the Transactions (including the Earn Out Shares, in the event such Earn Out Shares become issuable pursuant to ARTICLE III) to be approved for listing on the Stock Exchange as promptly as practicable following the issuance thereof, subject to official notice of issuance.

Section 6.18     Stockholder Litigation.

(a)     In the event that any stockholder litigation related to this Agreement, any Ancillary Agreement or the Transactions is brought, or, to the Knowledge of Acquiror or the Knowledge of the Company, as the case may be, threatened in writing, against such party or the members of each respective parties' board of directors prior to the Closing, Acquiror and the Company shall promptly notify the other party of any such actual or threatened stockholder litigation and shall keep the other reasonably informed with respect to the status thereof.

(b)     Acquiror shall control the defense of any such Action brought against Acquiror or members of the Acquiror Board, provided that Acquiror give the Company the reasonable opportunity to participate in any response to and, if applicable, in the defense or settlement of any stockholder claim or litigation (including any purported claim or litigation and any class action or derivative litigation) against Acquiror or its officers or directors relating to this Agreement and the Transactions, and no such response to, or any settlement of shall be made or be agreed to without the prior written consent of the Company (not to be unreasonably withheld, conditioned or delayed). Acquiror shall cooperate, and shall use its reasonable best efforts to cause its Representatives to cooperate with the Company, in the defense against such claim or litigation or purported claim or litigation.

(c)     The Company shall control the defense of any such Action brought against the Company or members of the Company Board, provided that the Company give Acquiror the reasonable opportunity to participate in any response to and, if applicable, in the defense or settlement of any stockholder claim or litigation (including any purported claim or litigation and any class action or derivative litigation) against the Company or its officers or directors relating to this Agreement and the Transactions, and no such response to, or any settlement of shall be made or be agreed to without the prior written consent of Acquiror (not to be unreasonably withheld, conditioned or delayed). The Company shall cooperate, and shall use its reasonable best efforts to cause its Representatives to cooperate with Acquiror, in the defense against such claim or litigation or purported claim or litigation.

55

Section 6.19    Subscription Agreements. Acquiror shall not permit any amendment or modification to be made to, or any waiver of any provision or remedy under, or any replacements of, the Subscription Agreements, without the prior written consent of the Company, except for any assignments or transfers expressly permitted by the Subscription Agreements. Acquiror shall use its reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated by the Subscription Agreements on the terms and conditions described therein, including maintaining in effect the Subscription Agreements and using its reasonable best efforts to: (i) satisfy in all material respects on a timely basis all conditions and covenants applicable to Acquiror in the Subscription Agreements and otherwise comply with its obligations thereunder; (ii) in the event that all conditions in the Subscription Agreements (other than conditions that Acquiror or any of its Affiliates control the satisfaction of and other than those conditions that by their nature are to be satisfied at the Closing) have been satisfied, consummate the transactions contemplated by the Subscription Agreements at or prior to Closing; and (iii) enforce its rights under the Subscription Agreements in the event that all conditions in the Subscription Agreements (other than conditions that Acquiror or any of its Affiliates control the satisfaction of and other than those conditions that by their nature are to be satisfied at the Closing) have been satisfied, to cause the applicable PIPE Investors to contribute to Acquiror the applicable portion of the PIPE Investment Amount set forth in the Subscription Agreements at or prior to the Closing. Without limiting the generality of the foregoing, Acquiror shall give the Company, prompt (and, in any event within two Business Days) written notice: (A) of any amendment to any Subscription Agreement (together with a copy of such amendment) that may be made with the prior written consent of the Company (other than such amendments permitted in this Section 6.19); (B) of any breach or default (or any event or circumstance that, with or without notice, lapse of time or both, could give rise to any breach or default) by any party to any Subscription Agreement known to Acquiror; (C) of the receipt of any written notice or other written communication from any party to any Subscription Agreement with respect to any actual, potential or claimed expiration, lapse, withdrawal, breach, default, termination or repudiation by any party to any Subscription Agreement or any provisions of any Subscription Agreement; and (D) if Acquiror does not expect to receive all or any portion of the PIPE Investment Amount on the terms, in the manner or from the sources contemplated by the Subscription Agreements.

Section 6.20    Sponsor Letter Agreement. Acquiror shall enforce the terms and conditions of the Sponsor Letter Agreement, including the obligations of the parties thereto (a) to vote all of the shares of the capital stock of Acquiror that they hold to approve the Transaction Proposals at the Special Meeting and (b) not to redeem such shares in connection with the consummation of the Transactions.

Section 6.21    Debt Financing. Acquiror shall, and shall use its commercially reasonable efforts to cause its Representatives to, use their respective commercially reasonable efforts to cooperate with the Company in connection with the Debt Financing, including by providing any documentation and/or other information as may be (a) required under applicable "know your customer," beneficial ownership and/or anti-money laundering rules and regulations and (b) reasonably requested by the Company in connection with the Debt Financing; provided, however, that the Acquiror, its Affiliates and their respective Representatives shall be indemnified and held harmless by the Company from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection

56

with the Debt Financing to the fullest extent permitted by Law and with appropriate contribution to the extent such indemnification is not available, other than to the extent any such liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments or penalties are the result of the gross negligence, bad faith or willful misconduct of the Acquiror, its Affiliates or their respective Representatives, or such Person's material breach of this Agreement. Notwithstanding anything to the contrary in this Agreement, the Acquiror's breach of the covenant required to be performed by it under this Section 6.21 will not be considered in determining the satisfaction of the condition set forth in Section 7.3(c) or whether any right of termination arises under Section 8.1(e).

**ARTICLE VII**
**CONDITIONS TO CLOSING**

Section 7.1    Conditions to Obligations of all Parties. The obligations of Acquiror, Merger Sub and the Company to consummate the Transactions are subject to the satisfaction of the following conditions at the Closing, any one or more of which may be waived (if legally permitted) in writing by all of such Parties:

(a)    HSR Act. Any waiting period (or any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or been terminated (to the extent that early termination is available under the HSR Act at such time).

(b)    No Prohibition. There shall not have been enacted or promulgated any Law in the United States which is then in effect and has the effect of making consummation of the Transactions illegal or otherwise enjoining or prohibiting the consummation of the Transactions.

(c)    Acquiror Stockholder Approval. The Acquiror Stockholder Approval shall have been obtained.

(d)    Company Stockholder Approval. The Company Requisite Approval shall have been obtained.

(e)    Listing. The Acquiror Class A Common Stock to be issued in connection with the Transactions shall have been approved for listing on the Stock Exchange, subject only to official notice of issuance thereof, and, as of immediately following the Effective Time, Acquiror shall be in compliance, in all material respects, with applicable initial and continuing listing requirements of the Stock Exchange, and Acquiror shall not have received any notice of non-compliance therewith from the Stock Exchange that has not been cured or would not be cured at or immediately following the Effective Time.

(f)    Acquiror Net Tangible Assets. After giving effect to the Acquiror Stock Redemption, if any, Acquiror shall have at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act).

(g)    Amendment to Certificate of Incorporation. The Acquiror A&R Charter shall have been filed with the Secretary of State of the State of Delaware in accordance with Section 2.3(d) and the Acquiror A&R Bylaws shall have been adopted.

57

(h)     Minimum Cash Balance. After giving effect to the Acquiror Stock Redemption, if any, the Available Cash as of immediately prior to the Closing shall equal or exceed the Minimum Cash Balance.

Section 7.2     Conditions to Obligations of Acquiror. The obligations of Acquiror to consummate the Transactions are subject to the satisfaction of the following additional conditions at the Closing, any one or more of which may be waived in writing by Acquiror:

(a)     Representations and Warranties.

(i)     Each of the representations and warranties of the Company contained in Section 4.1, Section 4.2 and Section 4.24 shall be accurate in all material respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date (except for any such representations and warranties made as of a specific date, which shall have been accurate in all material respects as of such date); provided, however, that, for purposes of determining the accuracy of such representations and warranties as of the foregoing dates, all "Company Material Adverse Effect" and/or similar materiality qualifications limiting the scope of such representations and warranties shall be disregarded;

(ii)     each of the representations and warranties of the Company contained in Section 4.6(a) shall be accurate in all respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date (other than any such representation and warranty made as of a specific earlier date, which shall have been accurate in all respects as of such earlier date), except that any inaccuracies in such representations and warranties that are *de minimis* in nature will be disregarded;

(iii)     Section 4.21(b) shall have been accurate in all respects as of the date of this Agreement; and

(iv)     each of the representations and warranties of the Company (other than Section 4.1, Section 4.2, Section 4.6(a), Section 4.21(b) and Section 4.24) shall be accurate in all respects as of the date hereof and as of the Closing Date (except for any such representations and warranties made as of a specific date, which shall have been accurate in all respects as of such date); provided, however, that: (A) for purposes of determining the accuracy of such representations and warranties as of the foregoing dates, all "Company Material Adverse Effect" and/or similar materiality qualifications limiting the scope of such representations and warranties shall be disregarded; and (B) any inaccuracies in such representations and warranties shall be disregarded if the circumstances giving rise to all such inaccuracies, individually or in the aggregate, do not constitute, and would not reasonably be expected to have a Company Material Adverse Effect.

(b)     Performance of Obligations. The Company shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing.

(c)     No Company Material Adverse Effect. Since the date of this Agreement, there shall not have occurred a Company Material Adverse Effect.

(d)     Closing Deliverables. The Company shall have delivered to Acquiror the Closing deliverables set forth in Section 2.2(a).

Section 7.3     Conditions to Obligations of Company. The obligations of the Company to consummate the Transactions are subject to the satisfaction of the following additional conditions at the Closing, any one or more of which may be waived in writing by the Company:

(a)     Representations and Warranties.

(i)     Each of the representations and warranties of Acquiror contained in Section 5.1, Section 5.2, Section 5.5(c) and Section 5.10 shall be accurate in all material respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date (except for any such representations and warranties made as of a specific date, which shall have been accurate in all material respects as of such date); provided, however, that, for purposes of determining the accuracy of such representations and warranties as of the foregoing dates, all "Acquiror Material Adverse Effect" and/or similar materiality qualifications limiting the scope of such representations and warranties shall be disregarded;

(ii)     each of the representations and warranties of Acquiror contained in Section 5.5(a), Section 5.5(b) and Section 5.5(d) shall be accurate in all respects as of the date hereof and as of the Closing Date as if made on and as of the Closing Date (other than any such representation and warranty made as of a specific earlier date, which shall have been accurate in all respects as of such earlier date), except that any inaccuracies in such representations and warranties that are *de minimis* in nature will be disregarded;

(iii)     Section 5.14 shall have been accurate in all respects as of the date of this Agreement; and

(iv)     each of the representations and warranties of Acquiror (other than Section 5.1, Section 5.2, Section 5.5 and Section 5.10) shall be accurate in all respects as of the Closing Date as if made on and as of the date hereof and as of Closing Date (except for any such representations and warranties made as of a specific date, which shall have been accurate in all respects as of such date); provided, however, that: (A) for purposes of determining the accuracy of such representations and warranties as of the foregoing dates, all "Acquiror Material Adverse Effect" and/or similar materiality or qualifications limiting the scope of such representations and warranties shall be disregarded; and (B) any inaccuracies in such representations and warranties shall be disregarded if the circumstances giving rise to all such inaccuracies, individually or in the aggregate, do not constitute, and would not reasonably be expected to have an Acquiror Material Adverse Effect.

(b)     Performance of Obligations. Acquiror shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing.

(c)     No Acquiror Material Adverse Effect. Since the date of this Agreement, there shall not have occurred an Acquiror Material Adverse Effect.

59

(d)     Board Composition.  As of immediately following the Effective Time, the Acquiror Board shall consist of the number of directors, and be otherwise constituted in accordance with Section 1.12.

(e)     Trust Account. Acquiror shall have made appropriate arrangements to have the Trust Account, less amounts paid and to be paid pursuant to the Acquiror Stock Redemption, available to Acquiror at the Closing.

(f)     Closing Deliverables. Acquiror shall have delivered to the Company the Closing deliverables set forth in Section 2.2(b).

Section 7.4    Frustration of Closing Conditions. No Party may rely on the failure of any condition set forth in this ARTICLE VII to be satisfied to excuse such Party's obligation to effect the Closing if such failure was caused by such Party's breach of any representation or warranty or covenant contained in this Agreement.

<div align="center">

**ARTICLE VIII**
**TERMINATION**

</div>

Section 8.1    Termination. This Agreement may be terminated and the Transactions abandoned:

(a)     by mutual written consent of Acquiror and the Company;

(b)     by written notice from either the Company or Acquiror to the other Party if, the Closing has not occurred on or prior to August 23, 2021 (the "Outside Date"); provided, however, that this Agreement may not be terminated under this Section 8.1(b) by or on behalf of any Party that is in breach of any representation, warranty or covenant contained herein and such breach results in the failure of a condition set forth in ARTICLE VII to be satisfied on or prior to the Outside Date;

(c)     by written notice from either the Company or Acquiror to the other Party, if any Governmental Authority in the United States shall have enacted, issued, promulgated, enforced or entered any Law which has become final and nonappealable and has the effect of permanently making consummation of the Transactions illegal or otherwise permanently preventing or prohibiting consummation of the Transactions;

(d)     by written notice from Acquiror to the Company, if there has been a breach of any representation, warranty or covenant made by the Company in this Agreement, or any representation or warranty contained in this Agreement shall have become untrue or inaccurate after the date of this Agreement, in each case which breach, untruth or inaccuracy (i) would cause Section 7.2(a) or Section 7.2(b) not to be satisfied as of the Closing Date (a "Terminating Company Breach"), and (ii) shall not have been cured within 30 days after written notice from Acquiror of such Terminating Company Breach is delivered to the Company (which notice shall describe such Terminating Company Breach in reasonable detail), or which breach, untruth or inaccuracy, by its nature, cannot be cured prior to the Outside Date; provided, however, that Acquiror shall not be entitled to terminate this Agreement pursuant to this Section 8.1(d) if (A) Acquiror has waived such Terminating Company Breach or (B) Acquiror or Merger Sub is then in

<div align="center">60</div>

breach of any representation, warranty or covenant such that the conditions set forth in Section 7.3(a) or Section 7.3(b) would not reasonably be expected to be satisfied;

(e) by written notice from the Company to Acquiror, if there has been a breach of any representation, warranty or covenant made by Acquiror in this Agreement, or any representation or warranty contained in this Agreement shall have become untrue or inaccurate after the date of this Agreement, in each case which breach, untruth or inaccuracy (i) would cause Section 7.3(a) or Section 7.3(b) not to be satisfied as of the Closing Date (a "Terminating Acquiror Breach"), and (ii) shall not have been cured within 30 days after written notice from the Company of such Terminating Acquiror Breach is delivered to Acquiror (which notice shall describe such Terminating Acquiror Breach in reasonable detail), or which breach, untruth or inaccuracy, by its nature, cannot be cured prior to the Outside Date; provided, however, that the Company shall not be entitled to terminate this Agreement pursuant to this Section 8.1(e) if (A) the Company has waived such Terminating Acquiror Breach or (B) the Company is then in breach of any representation, warranty or covenant such that the conditions set forth in Section 7.2(a) or Section 7.2(b) would not reasonably be expected to be satisfied;

(f) by written notice from the Company to Acquiror prior to obtaining the Acquiror Stockholder Approval, if the Acquiror Board (i) shall have made a Change in Recommendation or (ii) shall have failed to include the Acquiror Board Recommendation in the Proxy Statement distributed to the stockholders of Acquiror;

(g) by written notice from Acquiror to the Company, if the Company Requisite Approval has not been obtained within one Business Day of the execution and delivery of this Agreement;

(h) by written notice from either the Company or Acquiror to the other Party, if the Special Meeting shall have been held and the Acquiror Stockholder Approval is not obtained at the Special Meeting (subject to any postponement or adjournment of the Special Meeting), provided, however, that the right to terminate this Agreement under this Section 8.1(h) shall not be available from and after the time that Acquiror obtains the Acquiror Stockholder Approval; and

(i) by written notice from the Company to Acquiror, if, after giving effect to the Acquiror Stock Redemption, if any, the Available Cash would be less than the Minimum Cash Balance immediately prior to the Closing.

Section 8.2    Effect of Termination. Except as set forth in this Section 8.2, in the event of the termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and have no effect, without any liability on the part of any Party or its respective Affiliates, officers, directors or stockholders, other than liability of any Party for Fraud or willful breach of this Agreement by such Party occurring prior to such termination. The provisions of this Section 8.2, Section 9.8 (No Third-Party Beneficiaries), Section 9.9 (Governing Law), Section 9.11 (Waiver of Trial by Jury), Section 9.13 (Fees and Expenses), Section 9.1 (Non Survival of Representations, Warranties and Agreements) and Section 9.15 (Non-Recourse) (collectively, the "Surviving Provisions") and the Nondisclosure Agreement, and any other Section or Article of this Agreement referenced in the Surviving Provisions that are required to survive in

61

order to give appropriate effect to the Surviving Provisions, shall in each case survive any termination of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    Non Survival of Representations, Warranties and Agreements. The representations, warranties, agreements and covenants in this Agreement shall terminate at the Closing; provided that, notwithstanding the foregoing, the covenants and agreements in ARTICLE III, Sections 6.8, 6.11, 6.13 and 6.18, this ARTICLE IX and Article X shall survive the Closing.

Section 9.2    Modification or Amendment. This Agreement may be amended or modified in whole or in part only by a duly authorized agreement in writing which makes reference to this Agreement. The adoption of this Agreement by the stockholders of any of the Parties shall not restrict the ability of the board of directors (or comparable body) of any of the Parties to terminate this Agreement in accordance with Section 8.1 or to cause such Party to enter into an amendment to this Agreement pursuant to this Section 9.2; provided, however, that (a) after any such adoption of this Agreement by the Company Stockholders, no amendment or supplement to the provisions of this Agreement shall be made which by applicable requirement of Law requires further approval of the Company Stockholders without the further approval of such Company Stockholders, and (b) after any such approval of the Agreement by Acquiror's stockholders, no amendment or supplement to the provisions of this Agreement shall be made which by applicable requirement of Law requires further approval of the stockholders of Acquiror without the further approval of such stockholders.

Section 9.3    Extension; Waiver. Acquiror (on behalf of itself or Merger Sub) may, and the Company (on behalf of itself) may, at any time prior to the Closing, by action taken by its board of directors (or comparable body) or officers thereunto duly authorized, (a) extend the time for the performance of any of the obligations or other acts of the other Parties, (b) waive any inaccuracies in the representations and warranties contained herein by any other Party or in any document, certificate or writing delivered pursuant hereto by such other Party, or (c) to the extent permitted by Law, waive compliance with any of the terms or conditions of this Agreement, in each case, by an agreement in writing executed in the same manner as this Agreement. The failure or delay of any Party to this Agreement to exercise any of its rights under this Agreement shall not impair such right or be construed as a waiver by such Party of such right.

Section 9.4    Notices. To be valid for purposes hereof, any notice, request, demand, waiver, consent or approval (any of the foregoing, a "Notice") that is required hereunder shall be in writing. A Notice shall be deemed given only as follows: (a) on the date delivered personally or by email; (b) three Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or (c) one Business Day following deposit with a nationally recognized overnight courier service for next day delivery, charges prepaid, and, in each case, addressed to the intended recipient as set forth below:

62

    (a)     If to Acquiror:

            Fortress Value Acquisition Corp. II
            1345 Avenue of the Americas
            46th Floor
            New York, New York
            Attention:    Alexander Gillette
            E-mail:       agillette@fortress.com

with a copy (which shall not constitute notice) to:

            Skadden, Arps, Slate, Meagher & Flom LLP
            One Manhattan West
            New York, New York 10001
            Attention:    Joseph A. Coco
                         Blair T. Thetford
            Email:         Joseph.Coco@skadden.com
                         Blair.Thetford@skadden.com

    (b)     If to the Company:

            ATI Physical Therapy
            790 Remington Blvd.

            Bolingbrook, Illinois 60440
            Attention:    Diana M. Chafey
            E-mail:       diana.chafey@atipt.com

with a copy (which shall not constitute notice) to:

            Weil, Gotshal & Manges LLP
            100 Federal Street, 34th Floor
            Boston, MA 02110
            Attention:    Marilyn French Shaw
            E-mail:       MarilynFrench.Shaw@weil.com

            and

            Weil, Gotshal & Manges LLP
            200 Crescent Court, Suite 300
            Dallas, Texas 75201
            Attention:    James R. Griffin
            Email:         james.griffin@weil.com

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by providing Notice to the other Parties.

63

Section 9.5    Entire Agreement. This Agreement (including the Disclosure Schedules and Exhibits hereto) and the Ancillary Agreements (including the Nondisclosure Agreement) constitute the entire agreement among the Parties relating to the Transactions and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof.

Section 9.6    Assignment. No Party shall assign this Agreement or any part hereof without the prior written consent of the other Parties. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. Any attempted assignment in violation of the terms of this Section 9.6 shall be null and void ab initio.

Section 9.7    Counterparts. This Agreement may be executed in multiple counterparts, each of which when executed and delivered shall thereby be deemed to be an original and all of which taken together shall constitute one and the same instrument. Any Party may deliver signed counterparts of this Agreement to the other Parties by means of facsimile, portable document format (.PDF) signature or electronic transmission.

Section 9.8    No Third-Party Beneficiaries. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties, any right or remedies under or by reason of this Agreement; provided, however, that, notwithstanding the foregoing, in the event the Closing occurs, the present and former officers and directors of the Company (and their successors, heirs and Representatives) are intended third-party beneficiaries of, and may enforce, Section 6.11. The representations and warranties in this Agreement are the product of negotiations among the Parties hereto and are for the sole benefit of the parties hereto, and may represent an allocation of risk among the Parties hereto associated with particular matters regardless of the knowledge of any of the Parties hereto. Persons other than the Parties hereto may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 9.9    Governing Law. This Agreement, and all claims or causes of action (whether in contract, tort or otherwise) based upon, arising out of, or related to this Agreement or the Transactions, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

Section 9.10    Exclusive Jurisdiction. In any Action between any of the Parties arising out of or relating to this Agreement or any of the Transactions, each of the Parties: (a) irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Action or proceeding, in any state court of Delaware (unless the federal courts have exclusive jurisdiction over the matter, in which case each of the Parties irrevocably and unconditionally consents and submits to the jurisdiction of the United States District Court for the District of Delaware); (b) agrees that it will not attempt to deny or defeat such jurisdiction by motion or other request for leave from such court; and (c) agrees that it will not bring any such Action in any court other than such courts. Service of any process,

64

summons, notice or document to any party's address and in the manner set forth in Section 9.4 shall be effective service of process for any such action. Each of the Parties agrees that the mailing of process or other papers in connection with any Action or proceeding in the manner provided in Section 9.4 or such other manner as may be permitted by requirement of Law shall be valid and sufficient service of process. Notwithstanding the foregoing in this Section 9.10, a Party may commence any Action or proceeding in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts. Each party hereto further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.

Section 9.11    WAIVER OF TRIAL BY JURY. TO THE EXTENT PERMITTED BY LAW, EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES (AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE) THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE OTHER PARTIES TO ENTER INTO THIS AGREEMENT.

Section 9.12    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party. Upon determination by a court of competent jurisdiction that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Transactions be consummated as originally contemplated to the fullest extent possible.

Section 9.13    Fees and Expenses. Except as otherwise provided in this Agreement, each Party shall bear its own expenses incurred in connection with this Agreement and the Transactions, whether or not the Transactions are consummated, including all fees of its legal counsel, financial advisers and accountants; provided, however, that if the Closing shall occur, Acquiror shall (a) pay or cause to be paid, the Transaction Expenses in accordance with Section 2.3(b). For the avoidance of doubt, any payments to be made (or to cause to be made) by Acquiror pursuant to this Section 9.13 shall be paid upon consummation of the Merger and release of proceeds from the Trust Account.

Section 9.14    Specific Performance. The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any Party does not perform its obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate the Transactions) in accordance with its specified terms or otherwise breach such provisions. The Parties acknowledge and agree that (a) the Parties shall be entitled to an injunction, specific performance, or other equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and

65

provisions of this Agreement, each without proof of damages, prior to the valid termination of this Agreement in accordance with Section 8.1, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific enforcement is an integral part of the Transactions and without that right, none of the Parties would have entered into this Agreement. Each Party agrees that it shall not oppose the granting of specific performance and other equitable relief on the basis that the other Parties have an adequate remedy at Law or that an award of specific performance is not an appropriate remedy for any reason at Law or equity. The Parties acknowledge and agree that any Party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 9.14 shall not be required to provide any bond or other security in connection with any such injunction.

Section 9.15 Non-Recourse. This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of or related to this Agreement or the Transactions, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), and any remedies in respect thereof, may only be brought against, the entities that are expressly named as Parties, and then only with respect to the specific obligations set forth herein with respect to such Party. Except to the extent a named Party to this Agreement (and then only to the extent of the specific obligations undertaken by such named Party in this Agreement), (a) no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney, advisor or Representative of any named Party to this Agreement and (b) no past, present or future director, officer, employee, incorporator, member, partner, stockholder, agent, attorney, advisor or Representative of any of the foregoing (collectively, as to both clause "(a)" and "(b)," "Non-Party Affiliates") shall have any liability (whether in contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any one or more of Acquiror or the Company under this Agreement of or for any claim based on, arising out of, or related to this Agreement or the Transactions, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement by any Non-Party Affiliate, as to which the Parties disclaim any reliance).

Section 9.16 Legal Representation.

(a) Acquiror hereby agrees, on behalf of its directors, members, partners, officers, employees and Affiliates and each of their respective successors and assigns (including after the Closing, the Surviving Company) (all such parties, the "Weil Waiving Parties"), that Weil, Gotshal and Manges LLP ("Weil") may represent the stockholders or holders of other equity interests of the Company or any of its Subsidiaries or their respective directors, members, partners, officers, employees or Affiliates (collectively, but for the avoidance of doubt, excluding the Surviving Company, the "Weil WP Group"), in each case, solely in connection with any Action or obligation arising out of or relating to this Agreement, any Ancillary Agreement or the Transactions, notwithstanding its prior representation of the Company and its Subsidiaries or other Weil Waiving Parties, and Acquiror on behalf of itself and the Weil Waiving Parties hereby consents thereto and irrevocably waives (and will not assert) any conflict of interest, breach of duty or any other objection arising from or relating to Weil's prior representation of the Company,

66

its Subsidiaries or of Weil Waiving Parties. Acquiror, for itself and the Weil Waiving Parties, hereby further irrevocably acknowledges and agrees that all privileged communications, written or oral, between the Company and its Subsidiaries or any member of the Weil WP Group and Weil, made in connection with the negotiation, preparation, execution, delivery and performance under, or any dispute or Action arising out of or relating to, this Agreement, any Ancillary Agreements or Transactions, or any matter relating to any of the foregoing, are privileged communications that do not pass to the Surviving Company notwithstanding the Merger, and instead survive, remain with and are controlled by the Weil WP Group (the "Weil Privileged Communications"), without any waiver thereof. Acquiror, together with any of its Affiliates, Subsidiaries, successors or assigns, agree that no Person may use or rely on any of the Weil Privileged Communications, whether located in the records or email server of the Surviving Company and its Subsidiaries, in any Action against or involving any of the parties after the Closing, and Acquiror agrees not to assert that any privilege has been waived as to the Weil Privileged Communications, by virtue of the Merger.

(b)       The Company hereby agrees on behalf of its directors, members, partners, officers, employees and Affiliates and each of their respective successors and assigns (including after the Closing, the Surviving Company) (all such parties, the "Skadden Waiving Parties"), that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") may represent the stockholders or holders of other equity interests of the Sponsor or of Acquiror or any of their respective directors, members, partners, officers, employees or Affiliates (collectively, but for the avoidance of doubt, excluding the Surviving Company, the "Skadden WP Group"), in each case, solely in connection with any Action or obligation arising out of or relating to this Agreement, any Ancillary Agreement or Transactions, notwithstanding its prior representation of the Sponsor, Acquiror and its Subsidiaries, or other Skadden Waiving Parties. The Company, on behalf of itself and the Skadden Waiving Parties, hereby consents thereto and irrevocably waives (and will not assert) any conflict of interest, breach of duty or any other objection arising from or relating to Skadden's prior representation of the Sponsor, Acquiror and its Subsidiaries, or other Skadden Waiving Parties. The Company, for itself and the Skadden Waiving Parties, hereby further irrevocably acknowledges and agrees that all privileged communications, written or oral, between the Sponsor, Acquiror, or its Subsidiaries, or any other member of the Skadden WP Group, on the one hand, and Skadden, on the other hand, made prior to the Closing, in connection with the negotiation, preparation, execution, delivery and performance under, or any dispute or Action arising out of or relating to, this Agreement, any Ancillary Agreements or the Transactions, or any matter relating to any of the foregoing, are privileged communications that do not pass to the Surviving Company notwithstanding the Merger, and instead survive, remain with and are controlled by the Skadden WP Group (the "Skadden Privileged Communications"), without any waiver thereof. The Company, together with any of its Affiliates, Subsidiaries, successors or assigns, agree that no Person may use or rely on any of the Skadden Privileged Communications, whether located in the records or email server of the Surviving Company and its Subsidiaries, in any Action against or involving any of the parties after the Closing, and the Company agrees not to assert that any privilege has been waived as to the Skadden Privileged Communications, by virtue of the Merger.

Section 9.17    Release.

(a)       Each of the Company and its Subsidiaries, on behalf of itself and its Affiliates, hereby irrevocably waives, releases and discharges, effective as of the Closing, the

67

Company Stockholders, and their respective predecessors, successors, Subsidiaries and Affiliates, and any of their respective current and former officers, directors, employees, consultants, agents, representatives and advisors, in each case from any and all liabilities and obligations of any kind or nature whatsoever that such Person or its Affiliates has or may have, now or in the future, arising out of, relating to, or resulting from any matter or cause whatsoever arising prior to the Closing, in each case whether known or unknown, absolute or contingent, liquidated or unliquidated, and whether arising under any agreement or understanding or otherwise, at law or equity, arising out of or in connection with the ownership by the holders of Company Common Stock or Company Preferred Stock, as applicable, any Person's service as a director of the Company or a director or manager of any of its Subsidiaries and any acts or omissions of any Person on behalf of the Company or any of its Subsidiaries.

(b)     Each of Acquiror and Merger Sub, on behalf of itself and its Affiliates, hereby irrevocably waives, releases and discharges, effective as of the Closing, the Acquiror stockholders, including the Sponsor, and their respective predecessors, successors, Subsidiaries and Affiliates, and any of their respective current and former officers, directors, employees, consultants, agents, representatives and advisors, in each case from any and all liabilities and obligations of any kind or nature whatsoever that such Person or its Affiliates has or may have, now or in the future, arising out of, relating to, or resulting from any matter or cause whatsoever arising prior to the Closing, in each case whether known or unknown, absolute or contingent, liquidated or unliquidated, and whether arising under any agreement or understanding or otherwise, at law or equity, arising out of or in connection with the ownership by the holders of Acquiror Common Stock, any Person's service as a director of Acquiror or a director or manager of Merger Sub and any acts or omissions of any Person on behalf of Acquiror or the Merger Sub.

## ARTICLE X
## DEFINITIONS

Section 10.1    Definitions. Capitalized terms used in this Agreement have the meanings set forth below.

"Acceleration Event" has the meaning set forth in Section 3.2.

"Accreted Value" means an aggregate accrued amount, calculated based on the Preferred Stock Adjusted Base, at the Dividend Rate (as defined in the Company Certificate of Incorporation) from the Closing Date through the date that is 180 days from the Closing Date.

"Acquiror" has the meaning set forth in the Preamble.

"Acquiror A&R Bylaws" has the meaning set forth in the Recitals.

"Acquiror A&R Charter" has the meaning set forth in the Recitals.

"Acquiror Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA) and each other employment, consulting, bonus, deferred compensation, incentive compensation, equity, phantom-equity, or equity-based award, retention, relocation, vacation, change in control, transaction bonus, salary continuation, severance or termination pay, hospitalization, medical, dental, vision, life insurance, disability or sick leave benefit, profit-

sharing, pension or retirement or other fringe benefit or compensatory plan, policy, program, agreement or arrangement, whether or not in writing and whether or not funded, in each case (a) that is maintained, sponsored, or contributed to, or is required to be maintained, sponsored, or contributed to, by the Acquiror or Merger Sub in respect of any current or former directors, officers, consultants, independent contractors, or employees of Acquiror or Merger Sub or (b) to which Acquiror or Merger Sub has any obligation or liability.

"Acquiror Board" means the board of directors of Acquiror.

"Acquiror Board Recommendation" has the meaning set forth in Section 6.4(b).

"Acquiror Class A Common Stock" means Acquiror's Class A common stock, par value $0.0001 per share.

"Acquiror Class F Common Stock" means Acquiror's Class F common stock, par value $0.0001 per share.

"Acquiror Common Stock" means, collectively, (a) prior to the Closing, the Acquiror Class A Common Stock and the Acquiror Class F Common Stock, and (b) from and after the Closing, the Acquiror Class A Common Stock, following the conversion of all shares of Acquiror Class F Common Stock into shares of Acquiror Class A Common Stock in connection with the Closing pursuant to the Acquiror Organizational Documents.

"Acquiror Common Stockholders" means the holders of Acquiror Common Stock.

"Acquiror Financial Statements" has the meaning set forth in Section 5.6(a).

"Acquiror Financing Certificate" has the meaning set forth in Section 2.2(b)(i).

"Acquiror Material Adverse Effect" means any change, effect, condition, circumstance or development that, individually or in the aggregate with all other changes, effects, conditions, circumstances or developments, is or is reasonably likely to (a) be materially adverse to the business, condition (financial or otherwise), assets or liabilities of Acquiror and Merger Sub, taken together or (b) prevent or delay consummation of any of the Transactions or otherwise prevent or delay Acquiror from performing its obligations under this Agreement; provided, however, that that in no event will any changes in general economic conditions or changes in securities markets in general be taken into account in determining whether there has been, is reasonably likely to be, an Acquiror Material Adverse Effect.

"Acquiror Material Contracts" has the meaning set forth in Section 5.12.

"Acquiror Organizational Documents" means the Organizational Documents of Acquiror.

"Acquiror Preferred Stock" means Acquiror' preferred stock, par value $0.0001 per share.

"Acquiror Record Date" means the record date established by the Acquiror Board and used for determining the Acquiror Common Stockholders entitled to vote at the Special Meeting.

"Acquiror Stock Redemption" means the election of an eligible holder of Acquiror Class A Common Stock (as determined in accordance with the Acquiror Organizational Documents and the Trust Agreement) to redeem all or a portion of such holder's shares of Acquiror Class A Common Stock, at the per-share price, payable in cash, equal to such holder's pro rata share of the Trust Account (as determined in accordance with the Acquiror Organizational Documents and the Trust Agreement) in connection with the Acquiror Stockholder Approval.

"Acquiror Stockholder Approval" has the meaning set forth in Section 5.2(b).

"Acquiror Transaction Expense Certificate" has the meaning set forth in Section 2.2(b)(ii).

"Acquiror Unit" means one share of Acquiror Class A Common Stock and one-third of one Public Warrant.

"Acquisition Proposal" means, as to any Person, other than the transactions contemplated hereby and other than the acquisition or disposition of equipment or other tangible personal property in the ordinary course of business, any offer or proposal relating to: (a) any acquisition or purchase, direct or indirect, of (i) 20% or more of the consolidated assets of such Person and its Subsidiaries or (ii) 20% or more of any class of equity or voting securities of (x) such Person or (y) one or more Subsidiaries of such Person holding assets constituting, individually or in the aggregate, 20% or more of the consolidated assets of such Person and its Subsidiaries; (b) any tender offer (including a self-tender offer) or exchange offer that, if consummated, would result in any Person beneficially owning 20% or more of any class of equity or voting securities of (i) such Person or (ii) one or more Subsidiaries of such Person holding assets constituting, individually or in the aggregate, 20% or more of the consolidated assets of such Person and its Subsidiaries; or (c) a merger, consolidation, share exchange, business combination, sale of substantially all the assets, reorganization, recapitalization, liquidation, dissolution or other similar transaction involving (i) such Person or (ii) one or more Subsidiaries of such Person holding assets constituting, individually or in the aggregate, 20% or more of the consolidated assets of such Person and its Subsidiaries.

"Action" means any action, suit, charge, litigation, arbitration or other proceeding at law or in equity (whether civil, criminal or administrative) by or before any Governmental Authority.

"Additional SEC Reports" has the meaning set forth in Section 5.6(a).

"Adjusted Preferred Stock Ratio" means the number equal to (a) 1.00 *minus* (b) the quotient, rounded to the nearest ten-thousandth, equal to (i) the Aggregate Preferred Cash Consideration *divided by* (ii) the Cash Liquidation Amount.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by, or under common control with, such specified Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided that in no event shall Acquiror or Merger Sub be considered

70

an Affiliate of SoftBank Group Corp. nor shall Softbank Group Corp. be considered to be an Affiliate of Acquiror or Merger Sub.

"Aggregate Common Stock Consideration" means a number of shares of Acquiror Class A Common Stock (with each share valued at $10.00) with an aggregate value equal to $1,303,000,000.

"Aggregate Preferred Cash Consideration" means $59,000,000.

"Aggregate Preferred Stock Consideration" means the number of shares of Acquiror Class A Common Stock (with each share valued at $10.00) with an aggregate value equal to the Aggregate Preferred Stock Consideration Amount.

"Aggregate Preferred Stock Consideration Amount" means (a) the Preferred Stock Adjusted Base, plus the Accreted Value, multiplied by (b) 1.05.

"Agreement" means this Agreement and Plan of Merger, as the same may be amended from time to time, and all schedules, exhibits and annexes hereto (including the Disclosure Schedules, as defined herein).

"Alternate Exchange" means the Nasdaq Capital Market, the Nasdaq Global Market or the Nasdaq Global Select Market, as may be applicable.

"Alternative Business Combination" means any Business Combination with respect to Acquiror, other than the Transactions.

"Amendment Proposal" has the meaning set forth in Section 6.4(b).

"Ancillary Agreements" means the Registration Rights Agreement, the Stockholders Agreement, the Sponsor Letter Agreement, the Acquiror A&R Charter, the Acquiror A&R Bylaws, the Subscription Agreements and all other agreements, certificates and instruments executed and delivered by the Parties in connection with the Transactions.

"Available Cash" means the amount equal to (a) the total available funds contained in the Trust Account, *minus* (b) the aggregate amount of cash proceeds that will be required to complete the Acquiror Stock Redemption, *plus* (c) the PIPE Investment Amount, *plus* (d) all funds held by Acquiror outside of the Trust Account and immediately available to Acquiror.

"Balance Sheet Date" means September 30, 2020.

"Bankruptcy and Equity Exceptions" has the meaning set forth in Section 4.2.

"Blue Sky Laws" has the meaning set forth in Section 4.5.

"Business" has the meaning set forth in the Recitals.

"Business Associates" has the meaning set forth in Section 4.17(i).

71

"Business Combination" means, with respect to any Party, any merger, consolidation, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

"Business Day" means a day except a Saturday, a Sunday or other day on which the SEC or banks in the City of New York or the State of Delaware are authorized or required by Law to be closed.

"CARES Act" means the Coronavirus Aid, Relief and Economic Security Act, as signed into law by the President of the United States on March 27, 2020.

"Certificate of Merger" has the meaning set forth in Section 2.2(a)(iii).

"Certifications" has the meaning set forth in Section 5.6(a).

"Change in Recommendation" has the meaning set forth in Section 6.4(b).

"Change of Control" means any transaction or series of transactions the result of which is: (a) the acquisition by any Person or "group" (as defined in the Exchange Act) of Persons of direct or indirect beneficial ownership of securities representing 50% or more of the combined voting power of the then outstanding securities of Acquiror; (b) a merger, consolidation, reorganization or other business combination, however effected, resulting in any Person or "group" (as defined in the Exchange Act) acquiring at least 50% of the combined voting power of the then outstanding securities of Acquiror or the surviving Person outstanding immediately after such combination; or (c) a sale of all or substantially all of the assets of Acquiror.

"Claim" means (a) any right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (b) the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

"Closing" has the meaning set forth in Section 2.1.

"Closing Cash Liquidation Amount" means the aggregate Liquidation Amount (as defined in the Company Certificate of Incorporation) as of the Closing Date with respect to all shares of Company Preferred Stock outstanding immediately prior to the Effective Time. For the avoidance of doubt, the Closing Cash Liquidation Amount, would be $174,285,078.35 if the Closing Date were June 30, 2021 and $186,633,382.91 if the Closing Date were December 31, 2021.

"Closing Date" has the meaning set forth in Section 2.1.

"Closing Press Release" has the meaning set forth in Section 6.8(b).

"Code" means the Internal Revenue Code of 1986, as amended.

72

"Common Share Price" means the share price equal to the volume weighted average closing sale price of one share of Acquiror Class A Common Stock as reported on the Stock Exchange (or any other exchange on which the shares of Acquiror Class A Common Stock are then listed) for at least 5 days out of a period of 10 consecutive trading days ending on the trading day immediately prior to the date of determination (as adjusted as appropriate to reflect any stock splits, reverse stock splits, stock dividends (including any dividend or distribution of securities convertible into Acquiror Class A Common Stock), extraordinary cash dividend, reorganization, recapitalization, reclassification, combination, exchange of shares or other like change or transaction with respect to Acquiror Class A Common Stock).

"Company" has the meaning set forth in the Preamble.

"Company Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA) and each other employment, consulting, bonus, deferred compensation, incentive compensation, equity, phantom-equity, or equity-based award, retention, relocation, vacation, change in control, transaction bonus, salary continuation, severance or termination pay, hospitalization, medical, dental, vision, life insurance, disability or sick leave benefit, profit-sharing, pension or retirement or other fringe benefit or compensatory plan, policy, program, agreement or arrangement, whether or not in writing and whether or not funded, in each case (a) that is maintained, sponsored, or contributed to, or is required to be maintained, sponsored, or contributed to, by the Company or its Subsidiaries in respect of any current or former directors, officers, consultants, independent contractors, or employees of the Company or (b) to which the Company or its Subsidiaries has any obligation or liability.

"Company Board" has the meaning set forth in the Recitals.

"Company Board Approval" has the meaning set forth in the Recitals.

"Company Certificate of Incorporation" means the Second Amended and Restated Certificate of Incorporation of the Company, as filed with the Secretary of State of Delaware on August 31, 2016.

"Company Common Stock" means a share of the Company's common stock, par value $0.01 per share.

"Company Common Stockholder" means Wilco Acquisition, LP or its designees.

"Company IT Systems" has the meaning set forth in Section 4.16(e).

"Company Material Adverse Effect" means any change, effect, event, fact, occurrence, condition, circumstance or development that, individually or in the aggregate with all other changes, effects, events, facts, occurrences, conditions, circumstances or developments, has had, or would reasonably be expected to have, a material adverse effect on the business, condition (financial or otherwise) or results of operation, of the Company and its Subsidiaries, taken as a whole; provided, however, that, in no event will any of the following be deemed, either alone or in combination, to constitute, or be taken into account in determining whether there has been or will be, a Company Material Adverse Effect: (a) operating, business, regulatory or other conditions (financial or otherwise) generally effecting the industries in which the Company or its Subsidiaries

73

operate (including, for the avoidance of doubt, any loss of customers, suppliers, orders, Contracts or other business relationships resulting from, or in connection with COVID-19); (b) general economic conditions, including changes or developments in the credit, securities, currency, banking, exchange, debt, financial or capital markets (including changes in interest or exchange rates) including any suspension of trading in securities (whether equity, debt, derivative or hybrid securities) generally on any securities exchange or over-the-counter market; (c) the announcement or consummation of the Transactions, including the impact thereof on relationships with customers, suppliers, distributors, partners or employees or others having relationships with the Company or any of its Subsidiaries or the taking of any action required, expressly permitted or otherwise expressly contemplated by this Agreement and the Ancillary Agreements, including the completion of the Transactions, including any action taken at the prior written request, or with the prior written consent, of Acquiror; (d) changes in GAAP or other accounting requirements or principles, as applied to the Company and its Subsidiaries or otherwise, or any changes in applicable Laws, in each case, after the date hereof; (e) the failure of the Company or any of its Subsidiaries to meet or achieve the results set forth in any internal or published budget, plan, projection, prediction or forecast (it being understood that the underlying facts giving rise to such failure may be taken into account); (f) global, national or regional political, financial, economic or business conditions, including government required shutdowns, a presidential election, hostilities, acts of war, sabotage or terrorism or military actions or any escalation, worsening or diminution of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway; (g) effects arising from or relating to epidemics, pandemics, widespread occurrences of infectious diseases or disease outbreaks, including COVID-19 or any COVID-19 Measures; (h) hurricanes, earthquakes, floods, tsunamis, tornadoes, changes in (or effects in) weather, meteorological conditions or climate, mudslides, explosions, wild fires, or other natural disasters and other force majeure events in the United States or any other country or region in the world and (i) any matter described in the Disclosure Schedules, except, in each case of any of the foregoing clauses "(a)," "(b)," "(d)," "(f)," "(g)" and "(h)" to the extent that such condition has a materially disproportionate impact on the Company, taken as a whole, relative to other companies in the industries in which the Company and its Subsidiaries operate (it being understood and agreed that only such incremental disproportionate impact shall be taken into account in determining whether there has been or will be a "Company Material Adverse Effect").

"Company Owned Intellectual Property" has the meaning set forth in Section 4.16(b).

"Company Organizational Documents" means the Organizational Documents of the Company.

"Company Owned Intellectual Property" has the meaning set forth in Section 4.16(b).

"Company Permits" has the meaning set forth in Section 4.10(b).

"Company Preferred Consideration Certificate" has the meaning set forth in Section 2.2(a)(ii).

"Company Preferred Stock" means, collectively, the Company Series A-1 Preferred Stock and the Company Series A-2 Preferred Stock.

74

"Company Requisite Approval" has the meaning set forth in Section 4.2.

"Company Series A-1 Preferred Stock" means the shares of the Company's Series A-1 Preferred Stock, par value $0.01 per share.

"Company Series A-2 Preferred Stock" means the shares of the Company's Series A-2 Preferred Stock, par value $0.01 per share.

"Company Stock" means, collectively, the Company Common Stock and the Company Preferred Stock.

"Company Stock Certificate" means certificates of Company Stock that were outstanding immediately prior to the Effective Time.

"Company Stockholder" means the holder of either a share of Company Common Stock or a share of Company Preferred Stock.

"Company Transaction Expense Certificate" has the meaning set forth in Section 2.2(a)(i).

"Contract" means any written contract, agreement, arrangement (excluding any regulatory tariff), note, bond, mortgage, lease, sublease, license or other agreement legally binding on a Party hereto or a Subsidiary thereof.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof or related health condition or related or associated epidemics, pandemic or disease outbreaks.

"COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, face covering, personal protective equipment, social distancing, delay, shut down (including, the shutdown of air cargo routes, shut down of supply chains or certain business activities), closure, sequester, safety or similar Law, directive, guidelines or recommendations promulgated by any Governmental Authority, including with respect to the United States, the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to COVID-19, including the CARES Act Families First Act and any future Law, directive, guidelines or recommendations enacted or promulgated by any Governmental Authority, in each case, in connection with or in response to COVID-19.

"COVID-19 Response" means any (i) deviation from the Ordinary Course of Business or (ii) actions, inactions, activities or conduct of the Company or any of its Subsidiaries (whether or not in the Ordinary Course of Business), in each case, reasonably necessary (in the Company's or applicable Subsidiary's reasonable discretion), to mitigate, remedy, respond to or otherwise address the effects or impact of COVID-19, including (a) suspending some or all operations of or related to their respective businesses and related activities and (b) implementing or responding to any COVID-19 Measures so long as, in each case, such actions or omissions are reasonably designed to protect the health or welfare of any Person.

"Debt Financing" means a debt financing on terms determined by the Company in good faith in an amount not to exceed (a) the amount necessary to refinance the Indebtedness outstanding under the Existing Credit Agreements and pay any unpaid accrued interest, penalties

75

and premiums (including tender premiums) thereon plus the amount of any reasonable and customary fees, commissions and expenses (including upfront fees, original issue discount or yield payments) incurred in connection with the Debt Financing plus (b) the amount of a revolving credit facility determined by the Company in good faith.

"DGCL" has the meaning set forth in the Recitals.

"Disclosing Party" has the meaning set forth in Section 6.6.

"Disclosure Schedules" means the Disclosure Schedules delivered by the Company and Acquiror concurrently with the execution and delivery of this Agreement.

"Dissenting Shares" has the meaning set forth in Section 1.7(a).

"Earn Out Period" means the time period between the Closing and the ten-year anniversary of the Closing Date.

"Earn Out Shares" has the meaning set forth in Section 3.1(a).

"Effective Time" has the meaning set forth in Section 2.3(e).

"Employment Agreement" has the meaning set forth in the Recitals.

"Environmental Laws" means any Law relating to the protection of the environment or natural resources, or the protection of human health and safety from the presence of Hazardous Materials, including Laws relating to: (i) the exposure to, or releases or threatened releases of, Hazardous Materials; (ii) the generation, processing, distribution, use, treatment, containment, disposal, storage, transport or handling of Hazardous Materials; or (iii) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity (whether or not incorporated) which together with the Company would be treated as a "single employer" under Section 414(b), (c), (m), or (o) of the Code.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Exchange Agent" has the meaning set forth in Section 1.8(a).

"Exchange Fund" has the meaning set forth in Section 1.8(a).

"Excluded Share" has the meaning set forth in Section 1.5(a).

"Existing Credit Agreements" means (a) the First Lien Credit Agreement, dated as of May 10, 2016, by and among, inter alios, Wilco Purchaser, Inc., as borrower, the lenders from time to time party thereto and Barclays Bank PLC, as administrative agent, and (b) the Second Lien Credit Agreement, dated as of May 10, 2016, by and among, inter alios, Wilco Purchaser, Inc., as borrower, the lenders from time to time party thereto and Wilmington Trust, National Association,

76

as administrative agent, in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Families First Act" means the Families First Coronavirus Response Act, as signed into law by the President of the United States on March 18, 2020.

"Federal Health Care Program" means any "federal health care program" as defined in 42 U.S.C. §1320a-7b(f), including Medicare, state Medicaid programs, state CHIP programs, TRICARE, federal employee health benefit programs, and similar or successor programs with or for the benefit of any Governmental Authority.

"Federal Securities Laws" means the Exchange Act, the Securities Act and the rules and regulations promulgated thereunder.

"Financial Statements" has the meaning set forth in Section 4.7(b).

"Fraud" means a claim for Delaware common law fraud in the making of a representation brought in respect of a representation made in ARTICLE IV or ARTICLE V of this Agreement; provided, that at the time such representation was made (i) such representation was false or inaccurate, (ii) the Party making such representation had actual knowledge of the falsity or inaccuracy of such representation, (iii) such Party had the intent to deceive another Party hereto or to induce such other Party to act or refrain from acting, and (iv) the other Party acted in reliance on such false or inaccurate representation and suffered monetary loss as a result. For the avoidance of doubt, "Fraud" does not include any claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts (including a claim for fraud) based on negligence or recklessness.

"Fully Diluted Basis" means the number of shares of Acquiror Common Stock issued and outstanding at the Closing on a fully diluted basis, including any shares reserved for issuance under the Private Placement Warrants, the Public Warrants and the Incentive Plan.

"GAAP" means United States generally accepted accounting principles, as in effect on the date of this Agreement.

"Governmental Authority" means any federal, state, provincial, municipal or local government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, arbitrator, court or tribunal of (a) the United States or (b) any state, commonwealth, province, territory or possession of the United States and any political subdivision thereof (including counties and municipalities).

"Governmental Order" means any ruling, order, judgment, injunction, edict, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"GSA" has the meaning set forth in Section 4.17(h).

"Hazardous Materials" means: (a) any material, substance, chemical, or waste (or combination thereof) that (i) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, or words of similar meaning or effect under any Law relating to pollution, waste, or the environment or (ii) can form the basis of liability

77

under any Environmental Law; and (b) any petroleum, petroleum products, oil, per- and polyfluoroalkyl substances (including PFAs, PFOA, PFOS, Gen X, and PFBs), polychlorinated biphenyls (PCBs), asbestos and asbestos-containing materials.

"Healthcare Laws" means all applicable Laws and Governmental Orders relating to health care providers and facilities, participation in Federal Health Care Programs, the practice of physical therapy, or otherwise relating to the regulation, provision or administration of, or payment for, healthcare products or services, including (i) all Laws related to the billing or submission of claims, reimbursement or fraud and abuse, including the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(b)), the federal Physician Self-Referral Prohibition (commonly referred to as the "Stark Law") (42 U.S.C. §1395nn), the Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812), the federal False Claims Act (31 U.S.C. §3729 et seq.), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code, the regulations promulgated pursuant to each of the foregoing statutes, and all applicable counterpart state Laws to any of the foregoing; (ii) Medicare (Title XVIII of the Social Security Act), as amended and the regulations promulgated thereunder, including all conditions of participation; (iii) Medicaid (Title XIX of the Social Security Act), as amended and the regulations promulgated thereunder, including all conditions of participation; (iv) TRICARE (10 U.S.C. Section 1071 et seq.), as amended and the regulations promulgated thereunder; (v) the Patient Protection and Affordable Care Act (Pub. L. 111−148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111−152), and the regulations promulgated pursuant to each of the foregoing; (vi) quality, safety and medical necessity Laws relating to the regulation, provision or administration of, or payment for, healthcare products or services; (vii) workers compensation Laws; (viii) Laws relating to the regulation of the corporate practice of physical therapy; and (ix) licensure, permit or authorization Laws relating to the regulation, provision or administration of, or payment for, healthcare products or services, including physical therapy Laws, home health Laws and durable medical equipment and home medical equipment Laws. Healthcare Laws do not include any Information Privacy and Security Laws.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104 191), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (Pub. L. No. 111-5, 123 Stat. 226), and its implementing regulations (including the Standards for Electronic Transaction and Code Set, the Standards for Privacy of Individually Identifiable Health Information, the Security Standards for the Protection of Electronic Protected Health Information, and Breach Notification for Unsecured Protected Health Information Rules promulgated thereunder).

"HIPAA Policies and Procedures" has the meaning set forth in Section 4.17(i).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"Incentive Plan" means an equity incentive plan mutually agreeable to the Company and Acquiror.

"Incentive Plan Proposal" has the meaning set forth in Section 6.4(b).

78

"Indebtedness" means with respect to any Person, any of the following: (a) all obligations for borrowed money and all obligations evidenced by notes, bonds, debentures or other similar instruments, and, in each case, including any interest accrued thereon; (b) all obligations as lessee under capitalized leases; (c) all obligations to pay the deferred purchase price of assets, property or services, except trade accounts payable and other current liabilities arising in the Ordinary Course of Business, including "earnout" payments and "seller notes"; (d) all obligations created or arising under any conditional sale or other title retention agreement with respect to acquired property; (e) all obligations, contingent or otherwise, under bankers' acceptances, letters of credit or similar facilities only to the extent drawn as of the date in question; (f) all obligations under any interest rate, currency or similar hedging agreement or other derivative agreement; (g) all unpaid prepayment or similar penalties, premiums, costs, fees, expenses, indemnity and other amounts that arise as a result of the prepayment or discharge of obligations of the kind referred to in clauses "(a)" through "(g)" of this definition or other similar amounts; and (h) all guarantees of such Person with respect to any of the foregoing. For the avoidance of doubt, Indebtedness shall not include (i) trade payables, (ii) any obligations under any performance bond or letter of credit to the extent undrawn, (iii) any intercompany Indebtedness, (iv) any deferred revenue or (v) all liabilities under any agreement between the Company and any of its Subsidiaries, on the one hand, and Acquiror, on the other hand.

"Individualized Agreements" has the meaning set forth in Section 4.13(a).

"Information Privacy and Security Laws" means all applicable Laws that govern the collection, use, storage, sharing, transfer, disclosure and security of Personal Information, including, without limitation, HIPAA and other medical record and patient privacy and security Laws.

"Intellectual Property" all worldwide rights, title and interests associated with or arising out of any intellectual property including: (a) patents and patent applications, together with all reissuances, divisionals, continuations, continuations-in-part, revisions, renewals, extensions and re-examinations thereof; (b) all trademarks, service marks, logos, trade names, brand names, corporate names, Internet domain names and all other identifiers indicating the business or source of goods or services (whether registered, arising under common law or statutory law, or otherwise), and all registrations and applications to register, and renewals of, the foregoing anywhere in the world, and all goodwill associated with any of the foregoing; (c) all trade secrets and rights in confidential or proprietary information; (d) all copyrights and copyrightable works, and all database and design rights, whether or not registered or published, copyright registrations and applications therefor and corresponding rights in works of authorship; and (e) any and all similar, corresponding, or equivalent intellectual property rights anywhere in the world.

"Intended Tax Treatment" has the meaning set forth in the Recitals.

"Interim Financial Statements" has the meaning set forth in Section 4.7(b).

"Intervening Event" means an event, fact, development, circumstance or occurrence that materially and adversely affects the business, assets or operations of the Company and its Subsidiaries, taken as a whole, that is consequential to the Company's earning power over a long-term duration, and, in each case, that was not known and was not reasonably foreseeable to the

Acquiror or the Acquiror Board as of the date hereof (or the consequences of which were not reasonably foreseeable to the Acquiror Board as of the date hereof), and that becomes known to the Acquiror Board after the date of this Agreement, but specifically excluding, in each case, (x) any event, fact, development, circumstance or occurrence that relates to or is reasonably likely to give rise to or result in any offer, inquiry, proposal or indication of interest, written or oral relating to any Alternative Business Combination, (y) general economic conditions, changes in capital markets or any declines or improvements in financial markets and (z) any event, fact, development, circumstance or occurrence arising from, or related to epidemics, disease outbreaks or pandemics (including, for the avoidance of doubt, any event, fact, development, circumstance or occurrence arising from or related to COVID-19 or any COVID-19 Measures).

"Intervening Event Notice" has the meaning set forth in Section 6.4(c).

"Intervening Event Notice Period" has the meaning set forth in Section 6.4(c).

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Issuance Proposal" has the meaning set forth in Section 6.4(b).

"Key Employees" means Labeed Diab and Joseph Jordan.

"Knowledge of Acquiror" or similar phrases, means the actual knowledge of each of Drew McKnight, Micah Kaplan, Dan Bass and Alex Gillette.

"Knowledge of the Company," or similar phrases, means the actual knowledge of each of Labeed Diab, Joseph Jordan, Diana Chafey, Erik Kantz, Jaime Lewis, Joanne Fong and Brent Rhodes.

"Law" means any common law, statutes, constitution, treaty, resolutions, rules, codes, regulations, ordinances, restrictions or Governmental Orders of, or issued by, a Governmental Authority.

"Lease" has the meaning set forth in Section 4.12(b).

"Leased Real Property" has the meaning set forth in Section 4.12(b).

"Letter of Transmittal" has the meaning set forth in Section 1.8(b).

"Lien" means any mortgage, pledge, hypothecation, deed of trust, lease, sublease, restriction, easement, security interest, charge, claim, license, option, conditional sale or other title retention agreement, lien or other encumbrance or right of any third party, or any agreement to create any of the foregoing.

"Made Available." A document or other item of information shall be deemed to have been "Made Available" only if (a) such document or other item of information was included in the Intralinks virtual data room established by the Company in connection with the contemplated Transactions at least one Business Day prior to the date hereof and remained available to Acquiror

through the Closing, and (b) Acquiror's Representatives had access to such document or other item prior to such time, subject to any applicable "clean room" and similar restrictions.

"Material Contracts" has the meaning set forth in Section 4.11(a).

"Material Payor" has the meaning set forth in Section 4.18(a).

"Maximum Amount" has the meaning set forth in Section 6.11(b).

"Merger Proposal" has the meaning set forth in Section 6.4(b).

"Material Supplier" has the meaning set forth in Section 4.18(b).

"Merger" has the meaning set forth in the Recitals.

"Merger Sub" has the meaning set forth in the Preamble.

"Merger Sub Board" means the board of directors of Merger Sub.

"Merger Sub Common Stock" has the meaning set forth in Section 5.5(b).

"Minimum Cash Balance" means an amount equal to $472,500,000.

"Nondisclosure Agreement" means that certain Nondisclosure Agreement, dated as of December 13, 2020, by and between ATI Holdings Acquisition, Inc. and Acquiror.

"Non-Party Affiliates" has the meaning set forth in Section 9.15.

"Notice" has the meaning set forth in Section 9.4.

"OFAC" has the meaning set forth in Section 4.17(h).

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice of the Company, the Company's Subsidiaries, or the Business, as applicable.

"Organizational Documents" means: (a) in the case of a Person that is a corporation or a company, its articles or certificate of incorporation and its bylaws, memorandum of association, articles of association, regulations or similar governing instruments required by the Laws of its jurisdiction of formation or organization; (b) in the case of a Person that is a partnership, its articles or certificate of partnership, formation or association, and its partnership agreement (in each case, limited, limited liability, general or otherwise); (c) in the case of a Person that is a limited liability company, its articles or certificate of formation or organization, and its limited liability company agreement or operating agreement; and (d) in the case of a Person that is none of a corporation, partnership (limited, limited liability, general or otherwise), limited liability company or natural Person, its governing instruments as required or contemplated by the Laws of its jurisdiction of organization, and in each case, as in effect as of the date hereof.

"Outside Date" has the meaning set forth in Section 8.1(b).

81

"Party" means, individually, each of Acquiror, Merger Sub and the Company. Acquiror, Merger Sub and the Company are referred herein collectively as the "Parties."

"Payor" means any insurer, health maintenance organization, health care benefit plan, third party administrator, employer, union, trust, governmental program (including any Federal Health Care Program), preferred provider organization, managed care program, or other consumer or customer of health care services that has authorized the Company or any of its Subsidiaries as a provider or supplier of health care services to its members, beneficiaries, participants or the like thereof, or to whom the Company or any of its Subsidiaries has submitted a claim for, or received reimbursement for, health care products or services.

"PCAOB" means the United States Public Company Accounting Oversight Board.

"Per Share Common Stock Consideration" means the Aggregate Common Stock Consideration *divided by* the number of shares of Company Common Stock outstanding immediately prior to the Effective Time.

"Per Share Consideration" has the meaning set forth in Section 1.5(b).

"Per Share Preferred Cash Consideration" means the Aggregate Preferred Cash Consideration *divided by* the number of shares of Company Preferred Stock outstanding immediately prior to the Effective Time.

"Per Share Preferred Consideration" means, collectively, the Per Share Preferred Cash Consideration and the Per Share Preferred Stock Consideration.

"Per Share Preferred Stock Consideration" means the Aggregate Preferred Stock Consideration Amount *divided by* the number of shares of Company Preferred Stock outstanding immediately prior to the Effective Time.

"Permits" means all permits, licenses, franchises, accreditations, classifications, grants, exceptions, certificates of authority, authorizations, approvals, registrations and other similar documents and authorizations issued by or obtained from a Governmental Authority.

"Permitted Company Acquisition" means any acquisition by the Company of any corporation, partnership, association, joint venture or other business organization or division thereof or Person (i) by merger or consolidation with such Person or (ii) by the purchase of substantially all of the assets of such Person, in each case so long as such acquisition(s) do not, individually or in the aggregate, exceed $15,000,000.

"Permitted Liens" means (a) warehousemen's, mechanic's, materialmen's, carriers', repairers', builders', suppliers', construction and other Liens arising or incurred in the Ordinary Course of Business for amounts that are not yet delinquent or are being contested in good faith, (b) Liens for Taxes, assessments, utilities or other governmental charges not yet delinquent and payable as of the Closing Date or which are being contested in good faith, (c) encumbrances and restrictions on real property (including easements, covenants, conditions, rights of way, servitudes, restrictive covenants, reciprocal agreements, cost-sharing agreements and similar restrictions affecting title to the real property and other title defects) to the extent that such encumbrance or

restriction does not affect the operations of the Company or materially impair the value of the property affected thereby, (d) Liens securing the obligations of the Company and the Company Subsidiaries under any existing credit or other finance agreement to the extent permitted or not restricted under the terms of this Agreement (including any Existing Credit Agreement), (e) Liens securing any Indebtedness to the extent permitted under the terms of this Agreement, (f) Liens granted to any lender at the Closing in connection with any financing by Acquiror of the Transactions, (g) zoning, building codes and other land use Laws, by-laws, regulations and ordinances regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; provided that neither the operations of the Company and its Subsidiaries taken as a whole nor the value of the Company's property affected is materially adversely affected thereby, (h) any right, interest, Lien or title of a lessor or sublessor under any lease or other similar agreement or in the property being leased, (i) development agreements, subdivision agreements, site plan control agreements, servicing agreements and other similar agreements with any Governmental Authority or utility company affecting the development, servicing use or operation of any real property and any Liens in respect of security given to any Governmental Authority or utility company in connection therewith; provided that neither the operations of the Company and its Subsidiaries taken as a whole nor the value of the Company's property affected is materially adversely affected thereby, (j) non-exclusive licenses of Intellectual Property entered in the Ordinary Course of Business, (k) purchase money Liens and Liens securing rental payments under capital lease arrangements, (l) restrictions in joint venture agreements on the applicable joint venture granting Liens on its assets or the equity interests of such joint venture, (m) Liens incurred or pledges or deposits made in the Ordinary Course of Business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefit, and (n) such other Liens which arise in the Ordinary Course of Business that are not material in amount and/or do not materially impair the value or the continued use and operation of the property affected thereby.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including, without limitation, a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association or entity or government, political subdivision, agency or instrumentality of a government.

"Personal Information" means, in addition to any definition for any similar term (e.g., "personal data" or "personally identifiable information" or "protected health information") provided by applicable Law, all information that identifies an individual person.

"PIPE Investment" has the meaning set forth in the Recitals.

"PIPE Investment Amount" has the meaning set forth in the Recitals.

"PIPE Investors" has the meaning set forth in Section 5.9(b).

"Policies" has the meaning set forth in Section 4.20.

"Pre-Closing Period" has the meaning set forth in Section 6.1.

"Preferred Stock Adjusted Base" equals the Closing Cash Liquidation Amount *less* the Aggregate Preferred Cash Consideration.

83

"Private Placement Warrants" has the meaning set forth in Section 5.5(a).

"Proxy Clearance Date" has the meaning set forth in Section 6.3(c).

"Proxy Statement" has the meaning set forth in Section 6.3(a).

"Public Warrants" has the meaning set forth in Section 5.5(a).

"Redemption Amount" means any amounts paid to Acquiror Common Stockholders in connection with the Acquiror Stock Redemption.

"Reference Time" means 5:00 p.m. Eastern Time on the date that is two Business Days immediately prior to the Closing Date.

"Registration Rights Agreement" has the meaning set forth in the Recitals.

"Representatives" means, with respect to any Person, such Person's Affiliates and its and their respective directors, officers, employees, managers, members, stockholders, partners, incorporators, trustees, counsel, financial advisors, auditors and other agents or authorized representatives acting on the behalf of such Person.

"Sanctioned Jurisdiction" means, at any time, a country, region or territory which is itself the subject of comprehensive Sanctions (as of the date hereof, Cuba, Iran, North Korea, Syria, and the Crimea Region).

"Sanctioned Person" shall mean (a) any Person named on any Sanctions-related list maintained by the government of the United States, including the OFAC or the U.S. Department of State, (b) any Person organized or resident in a Sanctioned Jurisdiction or (c) any Person owned fifty percent or more or controlled by any such Person or Persons described in the preceding clauses "(a)" or "(b)."

"Sanctions" shall mean economic or financial sanctions or trade embargoes administered or enforced from time to time by the United States government (including OFAC and the U.S. Department of State).

"Sarbanes-Oxley Act" has the meaning set forth in Section 5.18.

"SEC" the United States Securities and Exchange Commission.

"SEC Reports" has the meaning set forth in Section 5.6(a).

"Securities Act" means the United States Securities Act of 1933, as amended.

"Securities Liens" means Liens arising out of, under or in connection with (a) applicable Federal Securities Laws and, state and local securities Laws and (b) restrictions on transfer, hypothecation or similar actions contained in any Organizational Documents.

"Skadden" has the meaning set forth in Section 9.16(b).

"Skadden Privileged Communications" has the meaning set forth in Section 9.16(b).

"Skadden Waiving Parties" has the meaning set forth in Section 9.16(b).

"Skadden WP Group" has the meaning set forth in Section 9.16(b).

"Special Meeting" has the meaning set forth in Section 6.4(a).

"Sponsor" means Fortress Acquisition Sponsor II LLC.

"Sponsor Letter Agreement" has the meaning set forth in the Recitals.

"Stock Exchange" means the New York Stock Exchange.

"Stock Exchange Notice" has the meaning set forth in Section 6.17(a).

"Stockholders Agreement" has the meaning set forth in the Recitals.

"Subscription Agreements" has the meaning set forth in the Recitals.

"Subsidiary" means, with respect to a Person, any corporation or other organization (including a limited liability company or a partnership), whether incorporated or unincorporated, of which such Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization or any organization of which such Person or any of its Subsidiaries is, directly or indirectly, a general partner or managing member.

"Surviving Company" has the meaning set forth in the Recitals.

"Surviving Provisions" has the meaning set forth in Section 8.2.

"Tax" or "Taxes" means any federal, state, provincial, territorial, local, foreign and other net income, alternative or add-on minimum, franchise, gross income, adjusted gross income or gross receipts, employment, unemployment, compensation, social security (or similar), withholding, payroll, ad valorem, transfer, windfall profits, excise, severance, stamp, occupation, premium, personal property, real property, capital stock, registration, value added, capital gains, goods and services, sales, use, or other tax, charge, duty, fee, levy or other governmental charge in the nature of a tax, however denominated, together with any interest, penalty or any other additional amount imposed with respect thereto by (or otherwise payable to) a Governmental Authority.

"Tax Returns" means any return, report, declaration, report, claim for refund, election, disclosure, statement, estimate, information return or other document (including schedules, attachments or any related or supporting information and any amendments thereof) filed or required to be filed with any Governmental Authority in connection with or related to the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax.

"Tax Sharing Agreement" means any Tax allocation, Tax sharing, Tax indemnification agreement or any other agreement or arrangement (including any provision of a Contract) pursuant to which any Person is or may be obligated to indemnify any Person for, or otherwise pay, any Tax of or imposed on another Person, or pay over to, any other Person any amount determined by reference to actual or deemed Tax benefits, Tax assets, or Tax savings.

"Terminating Company Breach" has the meaning set forth in Section 8.1(d).

"Terminating Acquiror Breach" has the meaning set forth in Section 8.1(e).

"Third Party Payor Program" means all third party Payor programs (including Medicare, Medicaid, TRICARE, workers compensation, or any other federal or state health care programs, as well as Blue Cross and/or Blue Shield, managed care plans, or any other private insurance program).

"Transaction Expenses" means the fees, costs and expenses incurred, accrued, paid or payable by Acquiror, Merger Sub, the Company or any of the Company's Subsidiaries, as the case may be, in connection with the Transactions, including any financing fees, legal, accounting, financial advisory, investment banking, underwriting (including deferred underwriting fees) and other advisory, transaction or consulting fees, costs and expenses.

"Transaction Proposals" has the meaning set forth in Section 6.4(b).

"Transactions" has the meaning set forth in the Recitals.

"Treasury Regulations" means the regulations promulgated under the Code.

"Triggering Event I" means the date on which the Common Share Price is greater than $12.00 after the Closing Date, but within the Earn Out Period.

"Triggering Event II" means the date on which the Common Share Price is greater than $14.00 after the Closing Date, but within the Earn Out Period.

"Triggering Event III" means the date on which the Common Share Price is greater than $16.00 after the Closing Date, but within the Earn Out Period.

"Triggering Event" means, collectively, Triggering Event I, Triggering Event II, and Triggering Event III.

"Trust Account" has the meaning set forth in Section 5.9(a).

"Trust Account Claims" has the meaning set forth in Section 6.12(b).

"Trust Agreement" has the meaning set forth in Section 5.9(a).

"Trustee" has the meaning set forth in Section 5.9(a).

"Updated Financial Statements" has the meaning set forth in Section 6.3(b).

86

"Updated Quarterly Financial Statements" has the meaning set forth in Section 6.3(b).

"Weil" has the meaning set forth in Section 9.16(a).

"Weil Privileged Communications" has the meaning set forth in Section 9.16(a).

"Weil Waiving Parties" has the meaning set forth in Section 9.16(a).

"Weil WP Group" has the meaning set forth in Section 9.16(a).

"Year-End Financial Statements" has the meaning set forth in Section 4.7(a).

Section 10.2   Construction. The Parties have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement. The section headings contained in this Agreement are inserted for convenience or reference only and shall not affect in any way the meaning or interpretation of this Agreement. Further, in this Agreement:

(a)   References to particular sections and subsections, schedules, and exhibits not otherwise specified are cross-references to sections and subsections, schedules, and exhibits of this Agreement.

(b)   The words "herein," "hereof," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.

(c)   Any use of the singular or plural, or the masculine, feminine, or neuter gender, includes the others, unless the context otherwise requires; "including" means "including without limitation;" "or" means "and/or;" "any" means "any one, more than one, or all."

(d)   Unless otherwise specified, any reference to any reference to a statute or other Law includes any rule, regulation, ordinance, or the like promulgated thereunder, in each case, as amended, restated, supplemented, or otherwise modified from time to time.

(e)   Any reference to a numbered schedule means the same-numbered section of the Disclosure Schedules. Any reference in a schedule contained in the Disclosure Schedules shall be deemed to be an exception to (or, as applicable, a disclosure for purposes of) the applicable representations and warranties (or applicable covenants) that are contained in the section or subsection of this Agreement that corresponds to such schedule and any other representations and warranties (or applicable covenants) contained in this Agreement to which the relevance of such item thereto is reasonably apparent. The mere inclusion of an item in a schedule as an exception to (or, as applicable, a disclosure for purposes of) a representation or warranty (or applicable covenants) shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item would reasonably be expected to have a Company Material Adverse Effect or establish any standard of materiality to define further the meaning of such terms for purposes of this Agreement. Any capitalized terms used in any Disclosure Schedule or Exhibit attached hereto and not otherwise defined therein shall have the

87

meanings set forth in this Agreement (or, in the absence of any ascribed meaning, the meaning customarily ascribed to any such term in the applicable industry or in general commercial usage).

(f)     If any action is required to be taken or notice is required to be given within a specified number of days following a specific date or event, the day of such date or event is not counted in determining the last day for such action or notice. If any action is required to be taken or notice is required to be given on or before a particular day which is not a Business Day, such action or notice shall be considered timely if it is taken or given on or before the next Business Day.

(g)     References to "$" or Dollars means United States Dollars.

(h)     Captions are not a part of this Agreement, but are included for convenience, only.

(i)     Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether the action in question is taken directly or indirectly by such Person.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties hereto have each executed and delivered this Agreement as of the day and year first above written.

**FORTRESS VALUE ACQUISITION CORP. II**

By: _____
      Name:
      Title:

**FVAC MERGER CORP. II**

By: _____
      Name:
      Title:

*[Signature Page to Agreement and Plan of Merger]*

**WILCO HOLDCO, INC.**

By: _____
      Name:
      Title:

*[Signature Page to Agreement and Plan of Merger]*

**EXHIBIT A**

**Acquiror A&R Charter**

**FORM OF
SECOND AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
FORTRESS VALUE ACQUISITION CORP. II**

[●], 2021

Fortress Value Acquisition Corp. II, a corporation organized and existing under the laws of the State of Delaware (the "***Corporation***"), DOES HEREBY CERTIFY AS FOLLOWS:

1.       The name of the Corporation is "***Fortress Value Acquisition Corp. II***."  The original certificate of incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on June 10, 2020 (the "***Original Certificate***"). The Corporation filed an Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware on August 11, 2020 (as amended from time to time, the "***First Amended and Restated Certificate***").

2.       This Second Amended and Restated Certificate of Incorporation (the "***Second Amended and Restated Certificate***"), which both restates and amends the provisions of the First Amended and Restated Certificate, was duly adopted in accordance with Sections 228, 242 and 245 of the General Corporation Law of the State of Delaware, as amended from time to time (the "***DGCL***").

3.       This Second Amended and Restated Certificate restates, integrates, and amends the provisions of the First Amended and Restated Certificate. Certain capitalized terms used in this Second Amended and Restated Certificate are defined where appropriate herein.

4.       This Second Amended and Restated Certificate shall become effective on the date of filing with the Secretary of State of the State of Delaware.

5.       The text of the First Amended and Restated Certificate is hereby restated and amended in its entirety to read as follows:

**ARTICLE I
NAME**

The name of the corporation is ATI Physical Therapy, Inc. (the "***Corporation***").

**ARTICLE II
PURPOSE**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.  In addition to the powers and privileges conferred upon the Corporation by law and those incidental thereto, the Corporation shall possess and may exercise all the powers and privileges that are necessary or convenient to the conduct, promotion or attainment of the business or purposes of the Corporation.

**ARTICLE III**
**REGISTERED AGENT**

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, and the name of the Corporation's registered agent at such address is The Corporation Trust Company.

**ARTICLE IV**
**CAPITALIZATION**

Section 4.1     Authorized Capital Stock.  The total number of shares of all classes of capital stock, each with a par value of $0.0001 per share, which the Corporation is authorized to issue is 471,000,000 shares, consisting of (a) 450,000,000 shares of Class A common stock (the "*Common Stock*"), (b) 20,000,000 shares of Class F common stock (the "*Class F Common Stock*") and (c) 1,000,000 shares of preferred stock (the "*Preferred Stock*").

Section 4.2     Class F Common Stock. Upon the filing of the Certificate of Merger (the "Certificate of Merger") with the Secretary of State of the State of Delaware as contemplated by the Agreement and Plan of Merger, dated as of February 21, 2021, by and among the Corporation, FVAC Merger Corp. II and Wilco Holdco, Inc., each share of Class F Common Stock outstanding immediately prior to the filing of the Certificate of Merger shall automatically be converted into one share of Common Stock without any action on the part of any person, including the Corporation, and concurrently with such conversion, the number of authorized shares of Class F Common Stock shall be reduced to zero. It is intended that the conversion of Class F Common Stock into Common Stock will be treated as a reorganization within the meaning of Section 368(a)(1)(E) of the Internal Revenue Code of 1986, as amended.

Section 4.3     Preferred Stock. The Board of Directors of the Corporation (the "*Board*") is hereby expressly authorized to provide out of the unissued shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board providing for the issuance of such series and included in a certificate of designation (a "*Preferred Stock Designation*") filed pursuant to the DGCL, and the Board is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions. Without limiting the generality of the foregoing, the resolution or resolutions providing for the creation and issuance of any series of Preferred Stock may provide that such series shall be superior or rank equally or be junior to any other series of Preferred Stock to the extent permitted by law and this Second Amended and Restated Certificate (including any Preferred Stock Designation). Except as otherwise required by law, holders of any series of Preferred Stock shall be entitled only to such voting rights, if any, as shall expressly be granted thereto by this Second Amended and Restated Certificate (including any Preferred Stock Designation).

Section 4.4    Common Stock.

(a)    *Voting.*

(i)    Except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), the holders of the Common Stock shall exclusively possess all voting power with respect to the Corporation.

(ii)    Except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), the holders of shares of Common Stock shall be entitled to one vote for each such share on each matter properly submitted to the stockholders on which the holders of the Common Stock are entitled to vote.

(iii)    Except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), at any annual or special meeting of the stockholders of the Corporation, holders of the Common Stock shall have the exclusive right to vote for the election of directors and on all other matters properly submitted to a vote of the stockholders. Notwithstanding the foregoing, except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), holders of Common Stock shall not be entitled to vote on any amendment to this Second Amended and Restated Certificate (including any amendment to any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series of Preferred Stock are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Second Amended and Restated Certificate (including any Preferred Stock Designation) or the DGCL.

(b)    *Dividends.* Subject to applicable law and the rights, if any, of the holders of any outstanding series of the Preferred Stock, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the Board from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions.

(c)    *Liquidation, Dissolution or Winding Up of the Corporation.* Subject to applicable law and the rights, if any, of the holders of any outstanding series of the Preferred Stock, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of shares of Common Stock shall be entitled to receive all the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by them.

(d)    *Transfer Rights*. Subject to applicable law and the transfer restrictions set forth in Article VII of the Amended and Restated Bylaws of the Corporation (as such may be amended from time to time, the "***Bylaws***"), shares of Common Stock and the rights and obligations associated therewith shall be fully transferable to any transferee.

Section 4.5    Rights and Options. The Corporation has the authority to create and issue rights, warrants and options entitling the holders thereof to acquire from the Corporation any

3

shares of its capital stock of any class or classes, with such rights, warrants and options to be evidenced by or in instrument(s) approved by the Board. The Board is empowered to set the exercise price, duration, times for exercise and other terms and conditions of such rights, warrants or options; provided, however, that the consideration to be received for any shares of capital stock issuable upon exercise thereof may not be less than the par value thereof.

Section 4.6     No Class Vote on Changes in Authorized Number of Shares of Stock. Subject to the rights of the holders of any outstanding series of Preferred Stock, the number of authorized shares of any class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of at least a majority of the voting power of the stock of the Corporation entitled to vote thereon irrespective of the provisions of Section 242(b)(2) of the DGCL.

<div align="center">

**ARTICLE V**
**BOARD OF DIRECTORS**

</div>

Section 5.1     Board Powers. The business and affairs of the Corporation shall be managed by, or under the direction of, the Board. In addition to the powers and authority expressly conferred upon the Board by statute, this Second Amended and Restated Certificate or the Bylaws, the Board is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the DGCL, and this Second Amended and Restated Certificate and any Bylaws adopted by the stockholders.

Section 5.2     Number, Election and Term.

(a)     The number of directors of the Corporation, shall be fixed from time to time in the manner provided in the Bylaws.

(b)     Subject to Section 5.5 hereof, the Board shall be divided into three classes, as nearly equal in number as possible and designated Class I, Class II and Class III. The term of the initial Class I Directors shall expire at the first annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate; the term of the initial Class II Directors shall expire at the second annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate; and the term of the initial Class III Directors shall expire at the third annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate. At each succeeding annual meeting of the stockholders of the Corporation, beginning with the first annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate, successors to the class of directors whose term expires at that annual meeting shall be elected for a three-year term or until the election and qualification of their respective successors in office, subject to their earlier death, resignation or removal. Subject to Section 5.5 hereof, if the number of directors is changed, any increase or decrease shall be apportioned by the Board among the classes so as to maintain the number of directors in each class as nearly equal as possible, but in no case shall a decrease in the number of directors shorten the term of any incumbent director. Subject to the rights of the holders of one or more series of Preferred Stock, voting separately by class or series,

<div align="center">4</div>

to elect directors pursuant to the terms of one or more series of Preferred Stock, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon. The Board is hereby expressly authorized, by resolution or resolutions thereof, to assign members of the Board already in office to the aforesaid classes at the time this Second Amended and Restated Certificate (and therefore such classification) becomes effective in accordance with the DGCL.

(c) Subject to Section 5.5 hereof, a director shall hold office until the annual meeting for the year in which his or her term expires and until his or her successor has been duly elected and qualified, subject, however, to such director's earlier death, resignation or removal. There shall be no limit on the number of terms a director may serve on the Board.

(d) Unless and except to the extent that the Bylaws shall so require, the election of directors need not be by written ballot.

Section 5.3    Newly Created Directorships and Vacancies.  Subject to Section 5.5 hereof, newly created directorships resulting from an increase in the number of directors and any vacancies on the Board resulting from death, resignation or removal may be filled solely and exclusively by a majority vote of the remaining directors then in office, even if less than a quorum, or by a sole remaining director (and not by stockholders), and any director so chosen shall hold office for the remainder of the full term of the director to which the new directorship was added or in which the vacancy occurred and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation or removal.

Section 5.4    Removal.  Subject to Section 5.5 hereof and except as otherwise required by law, any or all of the directors may be removed from office at any time, but only for "cause" and only by the affirmative vote of holders of a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class. For purposes of this Section 5.4, "cause" shall mean (a) conduct by a director constituting an act of willful misconduct or gross negligence in connection with the performance of his/her duties as a director of the Corporation; (b) the commission or any conviction by a director of any felony or a misdemeanor involving moral turpitude, deceit, dishonesty, harassment or fraud, or any conduct by the director that would reasonably be expected to result in material injury to the Corporation or any of its subsidiaries or affiliates if he/she were retained in his/her position; or (c) continued non-performance by a director of his/her duties to the Corporation (other than by reason of the director's physical or mental illness, incapacity, or disability) which has continued for more than 30 days following written notice of such non-performance from the Board.

Section 5.5    Preferred Stock - Directors. Notwithstanding any other provision of this *Article V*, and except as otherwise required by law, whenever the holders of one or more series of the Preferred Stock shall have the right, voting separately by class or series, to elect one or more directors, the term of office, the filling of vacancies, the removal from office and other features of such directorships shall be governed by the terms of such series of the Preferred Stock as set forth in this Second Amended and Restated Certificate (including any Preferred Stock Designation) and such directors shall not be included in any of the classes created pursuant to this *Article V* unless expressly provided by such terms.

## ARTICLE VI
## BYLAWS

In furtherance and not in limitation of the powers conferred upon it by law, the Board shall have the power and is expressly authorized to adopt, amend, alter or repeal the Bylaws. The affirmative vote of a majority of the Board shall be required to adopt, amend, alter or repeal the Bylaws. The Bylaws also may be adopted, amended, altered or repealed by the stockholders; provided, however, that in addition to any vote of the holders of any class or series of capital stock of the Corporation required by law or by this Second Amended and Restated Certificate (including any Preferred Stock Designation), the affirmative vote of the holders of at least a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders to adopt, amend, alter or repeal the Bylaws; provided further, however, amendments or repeals of Article VIII of the Bylaws shall require the affirmative vote of the stockholders holding at least 65% of the voting power of all outstanding shares of capital stock of the Corporation; and, provided further, however, that no Bylaws hereafter adopted by the stockholders shall invalidate any prior act of the Board that would have been valid if such Bylaws had not been adopted.

## ARTICLE VII
## MEETINGS OF STOCKHOLDERS; ACTION BY WRITTEN CONSENT

Section 7.1    Meetings. Subject to the rights, if any, of the holders of any outstanding series of the Preferred Stock, and to the requirements of applicable law, special meetings of stockholders of the Corporation may be called only by the Chairman of the Board, the Chief Executive Officer of the Corporation, or the Board pursuant to a resolution adopted by a majority of the Board, and the ability of the stockholders to call a special meeting is hereby specifically denied. Except as provided in the foregoing sentence, special meetings of stockholders may not be called by another person or persons. Any such special meeting so called may be postponed, adjourned, rescheduled or cancelled by the Board or other person calling the meeting.

Section 7.2    Advance Notice. Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws.

Section 7.3    Action by Written Consent. Except as may be otherwise provided for or fixed pursuant to this Second Amended and Restated Certificate (including any Preferred Stock Designation), any action required or permitted to be taken by the stockholders of the Corporation must be effected by a duly called annual or special meeting of such stockholders and may not be effected by written consent of the stockholders.

## ARTICLE VIII
## LIMITED LIABILITY; INDEMNIFICATION

Section 8.1    Limitation of Director Liability.  A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director, except to the extent such exemption from liability or

6

limitation thereof is not permitted under the DGCL as the same exists or may hereafter be amended unless they violated their duty of loyalty to the Corporation or its stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived improper personal benefit from their actions as directors. If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any amendment, modification or repeal of the foregoing sentence shall not adversely affect any right or protection of a director of the Corporation hereunder in respect of any act or omission occurring prior to the time of such amendment, modification or repeal.

Section 8.2     Indemnification and Advancement of Expenses.

(a)     To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify, defend and hold harmless each person who is or was made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit, or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation to procure a judgment in its favor (each, a "*proceeding*") by reason of the fact that he or she is or was a director or officer of the Corporation or any of its subsidiaries or, while a director or officer of the Corporation or any of its subsidiaries or, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (an "*indemnitee*"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, against all liability and loss suffered and expenses (including, without limitation, attorneys' fees and disbursements, judgments, fines, Employment Retirement Income Security Act of 1974 excise taxes, damages, claims and penalties and amounts paid in settlement) reasonably incurred by such indemnitee in connection with such proceeding.  The Corporation shall, to the fullest extent not prohibited by applicable law, pay as incurred the expenses (including attorneys' fees) incurred by an indemnitee in defending or otherwise participating in any proceeding in advance of its final disposition (including by making payment directly to applicable third parties if requested by the indemnitee); provided, however, that, to the extent required by applicable law, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such indemnitee including, without limitation, service to an employee benefit plan), shall be made only upon the Corporation's receipt of an undertaking, by or on behalf of the indemnitee, to repay all amounts so advanced if it shall ultimately be determined that the indemnitee is not entitled to be indemnified under this Section 8.2 or otherwise.  The rights to indemnification and advancement of expenses conferred by this Section 8.2 shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators.  Notwithstanding the foregoing provisions of this Section 8.2(a), except for proceedings to enforce rights to indemnification (which are, for the avoidance of doubt, indemnified proceedings) and advancement of expenses, the Corporation shall indemnify and advance expenses to an

7

indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was, or is, authorized by the Board.

(b)    The rights to indemnification and advancement of expenses conferred on any indemnitee by this Section 8.2 shall not be exclusive of any other rights that any indemnitee may have or hereafter acquire under law, this Second Amended and Restated Certificate, the Bylaws, an agreement, vote of stockholders or disinterested directors, or otherwise.

(c)    Any repeal or amendment of this Section 8.2 by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Second Amended and Restated Certificate inconsistent with this Section 8.2, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

(d)    This Section 8.2 shall not limit the right of the Corporation, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other than indemnitees.

### ARTICLE IX
### CORPORATE OPPORTUNITY

Section 9.1    The doctrine of corporate opportunity, or any other analogous doctrine, shall not apply with respect to the Corporation or any of its officers or directors, or any of their respective affiliates, in circumstances where the application of any such doctrine would conflict with any fiduciary duties or contractual obligations they may have as of the date of this Second Amended and Restated Certificate or in the future. In addition to the foregoing, the doctrine of corporate opportunity shall not apply to any other corporate opportunity with respect to any of the directors or officers of the Corporation unless such corporate opportunity is offered to such person solely in his or her capacity as a director or officer of the Corporation and such opportunity is one the Corporation is legally and contractually permitted to undertake and would otherwise be reasonable for the Corporation to pursue.

Section 9.2    Without limiting the foregoing, to the extent permitted by applicable law, each of Advent International Corporation and its successors and Affiliates (as defined in Section 10.3) and any of their respective managed investment funds and portfolio companies (but excluding the Corporation and its subsidiaries) and their respective partners, members, directors, employees, stockholders, agents and any successor by operation of law (including by merger) of any such Person  (each, an "*Exempted Person*") shall not have any fiduciary duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Corporation or any of its subsidiaries, except as otherwise expressly provided in any agreement entered into between the Corporation and such Exempted Person. To the fullest extent permitted by applicable law and subject to Section 9.1, the Corporation, on behalf of itself and its

8

subsidiaries, renounces any interest or expectancy of the Corporation and its subsidiaries in, or in being offered an opportunity to participate in, business opportunities that are from time to time available to the Exempted Persons, even if the opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and each such Exempted Person shall have no duty to communicate or offer such business opportunity to the Corporation (and there shall be no restriction on the Exempted Persons using the general knowledge and understanding of the industry in which the Corporation operates which it has gained as an Exempted Person in considering and pursuing such opportunities or in making investment, voting, monitoring, governance or other decisions relating to other entities or securities) and, to the fullest extent permitted by applicable law and subject to Section 9.1, shall not be liable to the Corporation or any of its subsidiaries or stockholders for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such Exempted Person pursues or acquires such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Corporation or its subsidiaries, or uses such knowledge and understanding in the manner described herein, in each case, except as otherwise expressly provided in any agreement entered into between the Corporation and such Exempted Person. In addition to and notwithstanding the foregoing, a corporate opportunity shall not be deemed to belong to the Corporation if it is a business opportunity that the Corporation is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Corporation's business or is of no practical advantage to it or that is one in which the Corporation has no interest or reasonable expectancy. Any person or entity purchasing or otherwise acquiring any interest in any shares of stock of the Corporation shall be deemed to have notice of the provisions of this *Article IX*.

Section 9.3     Neither the alteration, amendment, addition to or repeal of this *Article IX*, nor the adoption of any provision of this Second Amended and Restated Certificate (including any Preferred Stock Designation) inconsistent with this *Article IX*, shall eliminate or reduce the effect of this *Article IX* in respect of any business opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this *Article IX*, would accrue or arise, prior to such alteration, amendment, addition, repeal or adoption.  This *Article IX* shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Second Amended and Restated Certificate, the Bylaws or applicable law.

## ARTICLE X
## BUSINESS COMBINATIONS

Section 10.1     Opt Out of DGCL 203. The Corporation shall not be governed by Section 203 of the DGCL.

Section 10.2     Limitations on Business Combinations. Notwithstanding the foregoing, from the time that the opt-out in Section 10.1 becomes effective, the Corporation shall not engage in any business combination, at any point in time at which the Common Stock is registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended, with any interested stockholder for a period of three years following the time that such stockholder became an interested stockholder, unless:

(a) prior to such time, the Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

(b) upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the Corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding (but not the outstanding voting stock owned by the interested stockholder) those shares owned by: (i) persons who are directors and also officers; or (ii) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

(c) at or subsequent to such time, the business combination is approved by the Board and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least two-thirds of the outstanding voting stock of the Corporation which is not owned by the interested stockholder.

Section 10.3    Definitions. For purposes of this *Article X*, the term:

(a) "*Affiliate*" means, with respect to any person, any other person that controls, is controlled by, or is under common control with such person.

(b) "*associate*," when used to indicate a relationship with any person, means: (i) any corporation, partnership, unincorporated association or other entity of which such person is a director, officer or partner or is, directly or indirectly, the owner of 20% or more of any class of voting stock; (ii) any trust or other estate in which such person has at least a 20% beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity; and (iii) any relative or spouse of such person, or any relative of such spouse, who has the same residence as such person.

(c) "*business combination*," when used in reference to the Corporation and any interested stockholder of the Corporation, means:

(i) any merger or consolidation of the Corporation or any direct or indirect majority-owned subsidiary of the Corporation: (A) with the interested stockholder; or (B) with any other corporation, partnership, unincorporated association or other entity if the merger or consolidation is caused by the interested stockholder and as a result of such merger or consolidation Section 10.2 is not applicable to the surviving entity;

(ii) any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), except proportionately as a stockholder of the Corporation, to or with the interested stockholder, whether as part of a dissolution or otherwise, of assets of the Corporation or of any direct or indirect majority-owned subsidiary of the Corporation which assets have an aggregate market value equal to 10% or more of either the aggregate market value of all the assets of the Corporation determined on a consolidated basis or the aggregate market value of all the outstanding stock of the Corporation;

10

(iii) any transaction which results in the issuance or transfer by the Corporation or by any direct or indirect majority-owned subsidiary of the Corporation of any stock of the Corporation or of such subsidiary to the interested stockholder, except: (A) pursuant to the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of the Corporation or any such subsidiary which securities were outstanding prior to the time that the interested stockholder became such; (B) pursuant to a merger under Section 251(g) of the DGCL; (C) pursuant to a dividend or distribution paid or made, or the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of the Corporation or any such subsidiary which security is distributed, pro rata to all holders of a class or series of stock of the Corporation subsequent to the time the interested stockholder became such; (D) pursuant to an exchange offer by the Corporation to purchase stock made on the same terms to all holders of said stock; or (E) any issuance or transfer of stock by the Corporation; provided, however, that in no case under items (C) – (E) of this subsection (iii) shall there be an increase in the interested stockholder's proportionate share of the stock of any class or series of the Corporation or of the voting stock of the Corporation (except as a result of immaterial changes due to fractional share adjustments);

(iv) any transaction involving the Corporation or any direct or indirect majority-owned subsidiary of the Corporation which has the effect, directly or indirectly, of increasing the proportionate share of the stock of any class or series, or securities convertible into the stock of any class or series, of the Corporation or of any such subsidiary which is owned by the interested stockholder, except as a result of immaterial changes due to fractional share adjustments or as a result of any purchase or redemption of any shares of stock not caused, directly or indirectly, by the interested stockholder; or

(v) any receipt by the interested stockholder of the benefit, directly or indirectly (except proportionately as a stockholder of the Corporation), of any loans, advances, guarantees, pledges, or other financial benefits (other than those expressly permitted in subsections "(i)"-"(iv)" above) provided by or through the Corporation or any direct or indirect majority-owned subsidiary.

(d) "*control*," including the terms "*controlling*," "*controlled by*" and "*under common control with*," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract, or otherwise. A person who is the owner of 20% or more of the outstanding voting stock of the Corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary. Notwithstanding the foregoing, a presumption of control shall not apply where such person holds voting stock, in good faith and not for the purpose of circumventing this *Article X*, as an agent, bank, broker, nominee, custodian or trustee for one or more owners who do not individually or as a group have control of such entity.

(e) "*Exempt Transferee*" means (i) any person that acquires (other than in an Excluded Transfer) directly from Advent International Corporation or any of its Affiliates or successors, ownership of voting stock of the Corporation, and is designated in writing by the transferor as an "Exempt Transferee" for the purpose of this *Article X*; and (ii) any person that acquires (other than in an Excluded Transfer) directly from a person described in clause "(i)" of

11

this definition or from any other Exempt Transferee ownership of voting stock of the Corporation, and is designated in writing by the transferor as an "Exempt Transferee" for the purpose of this *Article X*.

(f)     "*Excluded Transfer*" means (i) a transfer to a person that is not an Affiliate of the transferor, which transfer is by gift or otherwise not for value, including a transfer by dividend or distribution by the transferor, (ii) a transfer in a public offering that is registered under the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) a transfer to one or more broker-dealers or their affiliates pursuant to a firm commitment purchase agreement for an offering that is exempt from registration under the Securities Act, (iv) a transfer made through the facilities of a registered securities exchange or automated inter-dealer quotation system and (v) a transfer made in compliance with the manner of sale limitations of Rule 144(f) under the Securities Act or any successor rule or provision.

(g)     "*interested stockholder*" means any person (other than the Corporation or any direct or indirect majority-owned subsidiary of the Corporation) that: (i) is the owner of 15% or more of the outstanding voting stock of the Corporation; or (ii) is an Affiliate or associate of the Corporation and was the owner of 15% or more of the outstanding voting stock of the Corporation at any time within the three year period immediately prior to the date on which it is sought to be determined whether such person is an interested stockholder; or (iii) an Affiliate or associate of any such person described in clauses "(i)" and "(ii)"; provided, however, that the term "interested stockholder" shall not include: (A) Sponsor Holders or their transferees, any Exempt Transferee or any of their respective Affiliates or successors or any "group", or any member of any such group, to which such persons are a party under Rule 13d-5 of the Exchange Act; or (B) any person whose ownership of shares in excess of the 15% limitation set forth herein is the result of (x) any action taken solely by the Corporation, or (y) share redemptions by existing stockholders; provided, that such person specified in this clause "(B)" shall be an interested stockholder if thereafter such person acquires additional shares of voting stock of the Corporation, except as a result of further corporate action not caused, directly or indirectly, by such person. For the purpose of determining whether a person is an interested stockholder, the voting stock of the Corporation deemed to be outstanding shall include stock deemed to be owned by the person through application of the definition of "owner" below but shall not include any other unissued stock of the Corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(h)     "*owner*," including the terms "*own*" and "*owned*," when used with respect to any stock, means a person that individually or with or through any of its Affiliates or associates:

(i)     beneficially owns such stock, directly or indirectly; or

(ii)     has: (A) the right to acquire such stock (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise; provided, however, that a person shall not be deemed the owner of stock tendered pursuant to a tender or exchange offer made by such person or any of

12

such person's Affiliates or associates until such tendered stock is accepted for purchase or exchange; or (B) the right to vote such stock pursuant to any agreement, arrangement or understanding; provided, however, that a person shall not be deemed the owner of any stock because of such person's right to vote such stock if the agreement, arrangement or understanding to vote such stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made to 10 or more persons; or

(iii)     has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting (except voting pursuant to a revocable proxy or consent as described in item (B) of subsection "(ii)" above), or disposing of such stock with any other person that beneficially owns, or whose Affiliates or associates beneficially own, directly or indirectly, such stock.

(i)     "*person*" means any individual, corporation, partnership, unincorporated association or other entity.

(j)     "*stock*" means, with respect to any corporation, capital stock and, with respect to any other entity, any equity interest.

(k)     "*Sponsor Holders*" means the investment funds affiliated with Advent International Corporation and their successors and Affiliates.

(l)     "*voting stock*" means stock of any class or series entitled to vote generally in the election of directors.

## ARTICLE XI
## AMENDMENT OF SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

The Corporation reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Second Amended and Restated Certificate (including any Preferred Stock Designation), and other provisions authorized by the laws of the State of Delaware at the time in force that may be added or inserted**,** in the manner now or hereafter prescribed by this Second Amended and Restated Certificate and the DGCL; and, except as set forth in *Article VIII*, all rights, preferences and privileges of whatever nature herein conferred upon stockholders, directors or any other persons by and pursuant to this Second Amended and Restated Certificate in its present form or as hereafter amended are granted subject to the right reserved in this *Article XI*. Notwithstanding any other provisions of this Second Amended and Restated Certificate of Incorporation or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any particular class or series of the Corporation required by law or by this Certificate of Incorporation or any certificate of designation filed with respect to a series of Preferred Stock, the affirmative vote of the holders at least 66.7% of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to alter, amend or repeal *Article V*.

13

IN WITNESS WHEREOF, Fortress Value Acquisition Corp. II has caused this Second Amended and Restated Certificate to be duly executed and acknowledged in its name and on its behalf by an authorized officer as of the date first set forth above.

FORTRESS VALUE ACQUISITION CORP. II


By: _____
Name:  Andrew A. McKnight
Title:   Chief Executive Officer

**EXHIBIT B**

**Acquiror A&R Bylaws**

**Exhibit B**

FORM OF
AMENDED AND RESTATED BYLAWS
OF
FORTRESS VALUE ACQUISITION CORP. II
(THE "CORPORATION")

ARTICLE I

OFFICES

Section 1.1.    **Registered Office**.  The registered office of the Corporation within the State of Delaware shall be located at either (a) the principal place of business of the Corporation in the State of Delaware or (b) the office of the corporation or individual acting as the Corporation's registered agent in Delaware.

Section 1.2.    **Additional Offices**.  The Corporation may, in addition to its registered office in the State of Delaware, have such other offices and places of business, both within and outside the State of Delaware, as the Board of Directors of the Corporation (the "**Board**") may from time to time determine or as the business and affairs of the Corporation may require.

ARTICLE II

STOCKHOLDERS MEETINGS

Section 2.1.    **Annual Meetings**.  The annual meeting of stockholders shall be held at such place, either within or without the State of Delaware, and time and on such date as shall be determined by the Board and stated in the notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a).  At each annual meeting, the stockholders entitled to vote on such matters shall elect those directors of the Corporation to fill any term of a directorship that expires on the date of such annual meeting and may transact any other business as may properly be brought before the meeting.

Section 2.2.    **Special Meetings**.  Subject to the rights of the holders of any outstanding series of the Preferred Stock (as defined below) and to the requirements of applicable law, special meetings of stockholders, for any purpose or purposes, may be called only by the Chairman of the Board, the Chief Executive Officer, or the Board pursuant to a resolution adopted by a majority of the Board, and may not be called by any other person. Special meetings of stockholders shall be held at such place, either within or without the State of Delaware, and at such time and on such date as shall be determined by the Board and stated in the Corporation's notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a).

Section 2.3.    **Notices**. Written notice of each stockholders meeting stating the place, if any, date, and time of the meeting, and the means of remote communication, if any, by

which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, shall be given in the manner permitted by Section 9.3 to each stockholder entitled to vote thereat as of the record date for determining the stockholders entitled to notice of the meeting, by the Corporation not less than 10 nor more than 60 days before the date of the meeting unless otherwise required by the General Corporation Law of the State of Delaware (the "**DGCL**"). If said notice is for a stockholders meeting other than an annual meeting, it shall in addition state the purpose or purposes for which the meeting is called, and the business transacted at such meeting shall be limited to the matters so stated in the Corporation's notice of meeting (or any supplement thereto). Any meeting of stockholders as to which notice has been given may be postponed, and any meeting of stockholders as to which notice has been given may be cancelled, by the Board upon public announcement (as defined in Section 2.7(c)) given before the date previously scheduled for such meeting.

          **Section 2.4.    Quorum**. Except as otherwise provided by applicable law, the Corporation's Certificate of Incorporation, as the same may be amended or restated from time to time (the "**Certificate of Incorporation**") or these Bylaws, the presence, in person or by proxy, at a stockholders meeting of the holders of shares of outstanding capital stock of the Corporation representing a majority of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote at such meeting shall constitute a quorum for the transaction of business at such meeting, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of shares representing a majority of the voting power of the outstanding shares of such class or series shall constitute a quorum of such class or series for the transaction of such business. If a quorum shall not be present or represented by proxy at any meeting of the stockholders of the Corporation, the chairman of the meeting may postpone the meeting or may adjourn the meeting from time to time in the manner provided in Section 2.6 until a quorum shall attend. The stockholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum. Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the voting power of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation or any such other corporation to vote shares held by it in a fiduciary capacity.

          **Section 2.5.    Voting of Shares**.

          (a)      Voting Lists. The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders of record entitled to vote at such meeting, arranged in alphabetical order and showing the address and the number of shares registered in the name of each stockholder. Nothing contained in this Section 2.5(a) shall require the Corporation to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access

2

to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  If a meeting of stockholders is to be held solely by means of remote communication as permitted by Section 9.5(a), the list shall be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of meeting.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list required by this Section 2.5(a) or to vote in person or by proxy at any meeting of stockholders.

(b)      Manner of Voting.  At any stockholders meeting, every stockholder entitled to vote may vote in person or by proxy.  If authorized by the Board, the voting by stockholders or proxy holders at any meeting conducted by remote communication may be effected by a ballot submitted by electronic transmission (as defined in Section 9.3), provided that any such electronic transmission must either set forth or be submitted with information from which the Corporation can determine that the electronic transmission was authorized by the stockholder or proxy holder.  The Board, in its discretion, or the chairman of the meeting of stockholders, in such person's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(c)      Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  Proxies need not be filed with the Secretary of the Corporation until the meeting is called to order, but shall be filed with the Secretary before being voted. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, either of the following shall constitute a valid means by which a stockholder may grant such authority.

(i)      A stockholder, or such stockholder's authorized officer, director, employee or agent, may execute a document authorizing another person or persons to act for such stockholder as proxy.

(ii)      A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder.

Any copy, facsimile telecommunication or other reliable reproduction of the document (including any electronic transmission) created pursuant to Section 2.5(C) may be substituted or

3

used in lieu of the original document for any and all purposes for which the original document could be used; provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original document.

(d)     Required Vote.  Subject to the rights of the holders of one or more series of preferred stock of the Corporation ("**Preferred Stock**"), voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, at all meetings of stockholders at which a quorum is present, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon.  All other matters presented to the stockholders at a meeting at which a quorum is present shall be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which, by applicable law, the Certificate of Incorporation, these Bylaws or applicable stock exchange rules, a different vote is required, in which case such provision shall govern and control the decision of such matter.

(e)     Inspectors of Election.  The Board may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more persons as inspectors of election, who may be employees of the Corporation or otherwise serve the Corporation in other capacities, to act at such meeting of stockholders or any adjournment thereof and to make a written report thereof.  The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspectors of election or alternates are appointed by the Board, the chairman of the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall (i) ascertain and report the number of outstanding shares and the voting power of each, (ii) determine the number of shares present in person or represented by proxy at the meeting and the validity of proxies and ballots, (iii) count all votes and ballots and report the results, (iv) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (v) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  No person who is a candidate for an office at an election may serve as an inspector at such election.  Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting.  If there is more than one inspector, the report of a majority shall be the report of the inspectors.

**Section 2.6.    Adjournments**.  Any meeting of stockholders, annual or special, may be adjourned by the chairman of the meeting, from time to time, whether or not there is a quorum, to reconvene at the same or some other place.  Notice need not be given of any such adjourned meeting if the date, time, and place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the stockholders, or the holders of any class or series of stock entitled to vote separately as a class, as the case may be, may transact any business that might have been transacted at the original meeting.  If the adjournment is for more than 30 days, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for stockholders

4

entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of such adjourned meeting in accordance with Section 9.2, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

### Section 2.7.    Advance Notice for Business.

(a)    Annual Meetings of Stockholders.  No business may be transacted at an annual meeting of stockholders, other than business that is either (i) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board, (ii) otherwise properly brought before the annual meeting by or at the direction of the Board or (iii) otherwise properly brought before the annual meeting by any stockholder of the Corporation (x) who is a stockholder of record entitled to vote at such annual meeting on the date of the giving of the notice provided for in this Section 2.7(a) and on the record date for the determination of stockholders entitled to vote at such annual meeting and (y) who complies with the notice procedures set forth in this Section 2.7(a).  Notwithstanding anything in this Section 2.7(a) to the contrary, only persons nominated for election as a director to fill any term of a directorship that expires on the date of the annual meeting pursuant to Section 3.2 will be considered for election at such meeting.

(i)    In addition to any other applicable requirements, for business (other than nominations) to be properly brought before an annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation and such business must otherwise be a proper matter for stockholder action.  Subject to Section 2.7(a)(iii), a stockholder's notice to the Secretary with respect to such business, to be timely, must be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 90th day nor earlier than the close of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting is first made by the Corporation.  The public announcement of an adjournment or postponement of an annual meeting shall not commence a new time period (or extend any time period) for the giving of a stockholder's notice as described in this Section 2.7(a).

(ii)    To be in proper written form, a stockholder's notice to the Secretary with respect to any business (other than nominations) must set forth as to each such matter such stockholder proposes to bring before the annual meeting (A) a brief description of the business desired to be brought before the annual meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event such business includes a proposal to amend these Bylaws, the language of the proposed amendment) and the reasons for conducting such business at the annual meeting, (B) the name and record address of such stockholder and the name and address of the beneficial owner, if any, on whose behalf the proposal is made, (C) the class or series and number of shares of capital stock of the Corporation

5

that are owned beneficially and of record by such stockholder and by the beneficial owner, if any, on whose behalf the proposal is made, (D) a description of all arrangements or understandings between such stockholder and the beneficial owner, if any, on whose behalf the proposal is made and any other person or persons (including their names) in connection with the proposal of such business by such stockholder, (E) any material interest of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made in such business and (F) a representation that such stockholder (or a qualified representative of such stockholder) intends to appear in person or by proxy at the annual meeting to bring such business before the meeting.

(iii)     The foregoing notice requirements of this Section 2.7(a) shall be deemed satisfied by a stockholder as to any proposal (other than nominations) if the stockholder has notified the Corporation of such stockholder's intention to present such proposal at an annual meeting in compliance with Rule 14a-8 (or any successor thereof) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), and such stockholder has complied with the requirements of such Rule for inclusion of such proposal in a proxy statement prepared by the Corporation to solicit proxies for such annual meeting.  No business shall be conducted at the annual meeting of stockholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 2.7(a), provided, however, that once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this Section 2.7(a) shall be deemed to preclude discussion by any stockholder of any such business.  If the Board or the chairman of the annual meeting determines that any stockholder proposal was not made in accordance with the provisions of this Section 2.7(a) or that the information provided in a stockholder's notice does not satisfy the information requirements of this Section 2.7(a), such proposal shall not be presented for action at the annual meeting.  Notwithstanding the foregoing provisions of this Section 2.7(a), if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the Corporation to present the proposed business, such proposed business shall not be transacted, notwithstanding that proxies in respect of such matter may have been received by the Corporation.

(iv)     In addition to the provisions of this Section 2.7(a), a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein.  Nothing in this Section 2.7(a) shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(b)     Special Meetings of Stockholders.  Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting.  Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting only pursuant to Section 3.2.

(c)     Public Announcement.  For purposes of these Bylaws, "**public announcement**" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press, Business Wire or PR Newswire or comparable national news service or in a document publicly filed by the Corporation with the U.S. Securities and Exchange

Commission pursuant to Section 13, Section 14 or Section 15(d) of the Exchange Act (or any successor thereto).

**Section 2.8.    Conduct of Meetings**.  The chairman of each annual and special meeting of stockholders shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the President or if the President is not a director, such other person as shall be appointed by the Board.  The Board may adopt such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate.  Except to the extent inconsistent with these Bylaws or such rules and regulations as adopted by the Board, the chairman of any meeting of stockholders shall have the right and authority to convene and to adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting.  Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) rules and procedures for maintaining order at the meeting and the safety of those present; (c) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (d) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (e) limitations on the time allotted to questions or comments by participants.  Unless and to the extent determined by the Board or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.  The secretary of each annual and special meeting of stockholders shall be the Secretary or, in the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary so appointed to act by the chairman of the meeting.  In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

**Section 2.9.    Consents in Lieu of Meeting**.  Except as may be otherwise provided for or fixed pursuant to the Certificate of Incorporation (including any certificate of designations relating to the Preferred Stock), any action required or permitted to be taken by the stockholders of the Corporation must be effected by a duly called annual or special meeting of such holders and may not be effected by written consent of the stockholders of the Corporation.

## ARTICLE III

## DIRECTORS

**Section 3.1.    Powers; Number**.  The business and affairs of the Corporation shall be managed by or under the direction of the Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these Bylaws required to be exercised or done by the stockholders.  Directors need not be stockholders or residents of the State of Delaware.  Subject to the Certificate of Incorporation, the number of directors shall be fixed exclusively by resolution of the Board.

**Section 3.2.     Advance Notice for Nomination of Directors**.

(a)     Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided by the terms of one or more series of Preferred Stock with respect to the rights of holders of one or more series of Preferred Stock to elect directors.  Nominations of persons for election to the Board at any annual meeting of stockholders, or at any special meeting of stockholders called for the purpose of electing directors as set forth in the Corporation's notice of such special meeting, may be made (i) by or at the direction of the Board or (ii) by any stockholder of the Corporation (x) who is a stockholder of record entitled to vote in the election of directors on the date of the giving of the notice provided for in this Section 3.2 and on the record date for the determination of stockholders entitled to vote at such meeting and (y) who complies with the notice procedures set forth in this Section 3.2.

(b)     In addition to any other applicable requirements, for a nomination to be made by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.  To be timely, a stockholder's notice to the Secretary must be received by the Secretary at the principal executive offices of the Corporation (i) in the case of an annual meeting, not later than the close of business on the 90th day nor earlier than the close of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so received not earlier than the close of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting was first made by the Corporation; and (ii) in the case of a special meeting of stockholders called for the purpose of electing directors, not later than the close of business on the 10th day following the day on which public announcement of the date of the special meeting is first made by the Corporation.  In no event shall the public announcement of an adjournment or postponement of an annual meeting or special meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described in this Section 3.2.

(c)     Notwithstanding anything in paragraph (b) to the contrary, in the event that the number of directors to be elected to the Board at an annual meeting is greater than the number of directors whose terms expire on the date of the annual meeting and there is no public announcement by the Corporation naming all of the nominees for the additional directors to be elected or specifying the size of the increased Board before the close of business on the 90th day prior to the anniversary date of the immediately preceding annual meeting of stockholders, a stockholder's notice required by this Section 3.2 shall also be considered timely, but only with respect to nominees for the additional directorships created by such increase that are to be filled by election at such annual meeting, if it shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the date on which such public announcement was first made by the Corporation.

(d)     To be in proper written form, a stockholder's notice to the Secretary must set forth: (i) as to each person whom the stockholder proposes to nominate for election as a

8

director (A) the name, age, business address and residence address of the person, (B) the principal occupation or employment of the person, (C) the class or series and number of shares of capital stock of the Corporation, if any, that are owned beneficially or of record by the person, (D) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, without regard to the application of the Exchange Act to either the nomination or the Corporation; and (ii) as to the stockholder giving the notice (A) the name and record address of such stockholder as they appear on the Corporation's books and the name and address of the beneficial owner, if any, on whose behalf the nomination is made, (B) the class or series and number of shares of capital stock of the Corporation that are owned beneficially and of record by such stockholder and the beneficial owner, if any, on whose behalf the nomination is made, (C) a description of all arrangements or understandings relating to the nomination to be made by such stockholder among such stockholder, the beneficial owner, if any, on whose behalf the nomination is made, each proposed nominee and any other person or persons (including their names), (D) a representation that such stockholder (or a qualified representative of such stockholder) intends to appear in person or by proxy at the meeting to nominate the persons named in its notice and (E) any other information relating to such stockholder and the beneficial owner, if any, on whose behalf the nomination is made that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder. Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

(e) If the Board or the chairman of the meeting of stockholders determines that any nomination was not made in accordance with the provisions of this Section 3.2 or that the information provided in a stockholder's notice does not satisfy the information requirements of this Section 3.2, then such nomination shall not be considered at the meeting in question. Notwithstanding the foregoing provisions of this Section 3.2, if the stockholder (or a qualified representative of the stockholder) does not appear at the meeting of stockholders of the Corporation to present the nomination, such nomination shall be disregarded, notwithstanding that proxies in respect of such nomination may have been received by the Corporation.

(f) In addition to the provisions of this Section 3.2, a stockholder shall also comply with all of the applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein. Nothing in this Section 3.2 shall be deemed to affect any rights of the holders of Preferred Stock to elect directors pursuant to the Certificate of Incorporation.

**Section 3.3. Compensation**. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board shall have the authority to fix the compensation of directors, including for service on a committee of the Board and may be paid either a fixed sum for attendance at each meeting of the Board or other compensation as director. The directors may be reimbursed their expenses, if any, of attendance at each meeting of the Board. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of committees of the Board may be allowed like compensation and reimbursement of expenses for service on the committee.

9

## ARTICLE IV

## BOARD MEETINGS

**Section 4.1.**    **Annual Meetings**.  The Board shall meet as soon as practicable after the adjournment of each annual stockholders meeting at the place of the annual stockholders meeting unless the Board shall fix another time and place and give notice thereof in the manner required herein for special meetings of the Board.  No notice to the directors shall be necessary to legally convene this meeting, except as provided in this Section 4.1.

**Section 4.2.**    **Regular Meetings**.  Regularly scheduled, periodic meetings of the Board may be held without notice at such times, dates and places (within or without the State of Delaware) as shall from time to time be determined by the Board.

**Section 4.3.**    **Special Meetings**.  Special meetings of the Board (a) may be called by the Chairman of the Board, the Chief Executive Officer or President and (b) shall be called by the Chairman of the Board, the Chief Executive Officer, President or Secretary on the written request of at least a majority of directors then in office, or the sole director, as the case may be, and shall be held at such time, date and place (within or without the State of Delaware) as may be determined by the person calling the meeting or, if called upon the request of directors or the sole director, as specified in such written request.  Notice of each special meeting of the Board shall be given, as provided in Section 9.3, to each director (i) at least 24 hours before the meeting if such notice is oral notice given personally or by telephone or written notice given by hand delivery or by means of a form of electronic transmission and delivery, (ii) at least two days before the meeting if such notice is sent by a nationally recognized overnight delivery service, and (iii) at least five days before the meeting if such notice is sent through the United States mail.  If the Secretary shall fail or refuse to give such notice, then the notice may be given by the officer who called the meeting or the directors who requested the meeting.  Any and all business that may be transacted at a regular meeting of the Board may be transacted at a special meeting.  Except as may be otherwise expressly provided by applicable law, the Certificate of Incorporation, or these Bylaws, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting. A special meeting may be held at any time without notice if all the directors are present or if those not present waive notice of the meeting in accordance with Section 9.4.

**Section 4.4.**    **Quorum; Required Vote**.  A majority of the Board shall constitute a quorum for the transaction of business at any meeting of the Board, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by applicable law, the Certificate of Incorporation or these Bylaws.  If a quorum shall not be present at any meeting, a majority of the directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

**Section 4.5.**    **Consent In Lieu of Meeting**.  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing (including by electronic

10

signature within the meaning of Section 116(a)(2) of the DGCL) or by electronic transmission, and the writing or writings or electronic transmission or transmissions (or paper reproductions thereof) are filed with the minutes of proceedings of the Board or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 4.6.    **Organization**.  The chairman of each meeting of the Board shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or in the absence (or inability or refusal to act) of the President or if the President is not a director, a chairman elected from the directors present.  The Secretary shall act as secretary of all meetings of the Board.  In the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary shall perform the duties of the Secretary at such meeting.  In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

## ARTICLE V

## COMMITTEES OF DIRECTORS

Section 5.1.    **Establishment**.  The Board may by resolution of the Board designate one or more committees, including, but not limited to, an Audit Committee, a Compensation Committee, a Compliance Committee and a Nominating and Corporate Governance Committee, each committee to consist of one or more of the directors of the Corporation.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  Each committee shall keep regular minutes of its meetings and report the same to the Board when required by the resolution designating such committee.  The Board shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.  The Board may abolish any such committee at any time.

Section 5.2.    **Available Powers**.  Any committee established pursuant to Section 5.1 hereof, to the extent permitted by applicable law and by resolution of the Board, shall have and may exercise all of the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it.

Section 5.3.    **Alternate Members**.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.

Section 5.4.    **Procedures**.  Unless the Board otherwise provides, the time, date, place, if any, and notice of meetings of a committee shall be determined by such committee.  At meetings of a committee, a majority of the number of members of the committee (but not including any alternate member, unless such alternate member has replaced any absent or

11

disqualified member at the time of, or in connection with, such meeting) shall constitute a quorum for the transaction of business.  The act of a majority of the members present at any meeting at which a quorum is present shall be the act of the committee, except as otherwise specifically provided by applicable law, the Certificate of Incorporation, these Bylaws or the Board.  If a quorum is not present at a meeting of a committee, the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  Unless the Board otherwise provides and except as provided in these Bylaws, each committee designated by the Board may make, alter, amend and repeal rules for the conduct of its business.  In the absence of such rules each committee shall conduct its business in the same manner as the Board is authorized to conduct its business pursuant to Article IV of these Bylaws.

## ARTICLE VI

## OFFICERS

**Section 6.1.**    **Officers**.  The officers of the Corporation elected by the Board shall be a Chief Executive Officer, a Chief Operating Officer, a Chief Financial Officer, a Secretary and such other officers (including without limitation, a Chairman, Presidents, Vice Presidents, Assistant Secretaries and a Treasurer) as the Board from time to time may determine.  Officers elected by the Board shall each have such powers and duties as generally pertain to their respective offices, subject to the specific provisions of this ARTICLE VI.  Such officers shall also have such powers and duties as from time to time may be conferred by the Board.  The Chief Executive Officer or President may also appoint such other officers (including without limitation one or more Vice Presidents and Controllers) as may be necessary or desirable for the conduct of the business of the Corporation.  Such other officers shall have such powers and duties and shall hold their offices for such terms as may be provided in these Bylaws or as may be prescribed by the Board or, if such officer has been appointed by the Chief Executive Officer or President, as may be prescribed by the appointing officer.

(a)      Chairman of the Board.  The Chairman of the Board shall preside when present at all meetings of the stockholders and the Board.  The Chairman of the Board shall have general supervision and control of the acquisition activities of the Corporation subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board with respect to such matters.  In the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board.  The powers and duties of the Chairman of the Board shall not include supervision or control of the preparation of the financial statements of the Company (other than through participation as a member of the Board).  The position of Chairman of the Board and Chief Executive Officer may be held by the same person.

(b)      Chief Executive Officer.  The Chief Executive Officer shall be the chief executive officer of the Corporation, shall have general supervision of the affairs of the Corporation and general control of all of its business subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board with respect to such matters, except to the extent any such powers and duties have been prescribed to the Chairman of the Board pursuant to Section 6.1(a) above.  In the absence (or inability or refusal to act) of the

12

Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The position of Chief Executive Officer and President may be held by the same person.

(c) <u>President</u>. The President shall make recommendations to the Chief Executive Officer on all operational matters that would normally be reserved for the final executive responsibility of the Chief Executive Officer. In the absence (or inability or refusal to act) of the Chairman of the Board and Chief Executive Officer, the President (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The President shall also perform such duties and have such powers as shall be designated by the Board. The position of President and Chief Executive Officer may be held by the same person.

(d) <u>Chief Operating Officer.</u> The Chief Operating Officer shall be the chief operating officer of the Corporation and shall, subject to the authority of the Chief Executive Officer, the President and the Board, have general management and control of the day-to-day business operations of the Corporation and shall consult with and report to the Chief Executive Officer. The Chief Operating Officer shall put into operation the business policies of the Corporation as determined by the Chief Executive Officer and the Board and as communicated to the Chief Operating Officer by the Chief Executive Officer and the Board.

(e) <u>Vice Presidents</u>. In the absence (or inability or refusal to act) of the President, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board) shall perform the duties and have the powers of the President. Any one or more of the Vice Presidents may be given an additional designation of rank or function.

(f) <u>Secretary</u>.

(i) The Secretary shall attend all meetings of the stockholders, the Board and (as required) committees of the Board and shall record the proceedings of such meetings in books to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, Chief Executive Officer or President. The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or any Assistant Secretary, shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary. The Board may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing thereof by his or her signature.

(ii) The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, if one has been appointed, a stock ledger, or duplicate stock ledger, showing the names of the stockholders and their addresses, the number and classes of shares held by each and, with respect to certificated shares, the number and date of certificates issued for the same and the number and date of certificates cancelled.

13

(g)    <u>Assistant Secretaries</u>.  The Assistant Secretary or, if there be more than one, the Assistant Secretaries in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Secretary, perform the duties and have the powers of the Secretary.

(h)    <u>Chief Financial Officer</u>.  The Chief Financial Officer shall perform all duties commonly incident to that office (including, without limitation, the care and custody of the funds and securities of the Corporation, which from time to time may come into the Chief Financial Officer's hands and the deposit of the funds of the Corporation in such banks or trust companies as the Board, the Chief Executive Officer or the President may authorize).

(i)    <u>Treasurer</u>.  The Treasurer shall, in the absence (or inability or refusal to act) of the Chief Financial Officer, perform the duties and exercise the powers of the Chief Financial Officer.

**Section 6.2.  Term of Office; Removal; Vacancies**.  The elected officers of the Corporation shall be appointed by the Board and shall hold office until their successors are duly elected and qualified or until their earlier death, resignation, retirement, disqualification, or removal from office.  Any officer may be removed, with or without cause, at any time by the Board.  Any officer appointed by the Chief Executive Officer or President may also be removed, with or without cause, by the Chief Executive Officer or President, as the case may be, unless the Board otherwise provides.  Any vacancy occurring in any elected office of the Corporation may be filled by the Board.  Any vacancy occurring in any office appointed by the Chief Executive Officer or President may be filled by the Chief Executive Officer, or President, as the case may be, unless the Board then determines that such office shall thereupon be elected by the Board, in which case the Board shall elect such officer.

**Section 6.3.  Other Officers.** The Board may delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove same, as it shall from time to time deem necessary or desirable.

**Section 6.4.  Multiple Officeholders; Stockholder and Director Officers**.  Any number of offices may be held by the same person unless the Certificate of Incorporation or these Bylaws otherwise provide.  Officers need not be stockholders or residents of the State of Delaware.

<center>**ARTICLE VII**</center>

<center>**SHARES**</center>

**Section 7.1.  Certificated and Uncertificated Shares**.  The shares of the Corporation may be certificated or uncertificated, subject to the sole discretion of the Board and the requirements of the DGCL.

**Section 7.2.  Multiple Classes of Stock**.  If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the Corporation shall (a) cause the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or

<center>14</center>

restrictions of such preferences and/or rights to be set forth in full or summarized on the face or back of any certificate that the Corporation issues to represent shares of such class or series of stock or (b) in the case of uncertificated shares, within a reasonable time after the issuance or transfer of such shares, send to the registered owner thereof a written notice containing the information required to be set forth on certificates as specified in clause (a) above; provided, however, that, except as otherwise provided by applicable law, in lieu of the foregoing requirements, there may be set forth on the face or back of such certificate or, in the case of uncertificated shares, on such written notice a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights.

Section 7.3.    **Signatures**.  Each certificate representing capital stock of the Corporation shall be signed by or in the name of the Corporation by the Chairman of the Board, the Chief Executive Officer, the President, Vice President, the Chief Financial Officer, the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Corporation or any other authorized officers of the Corporation.  Any or all of the signatures on the certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar on the date of issue.

Section 7.4.    **Consideration and Payment for Shares**.

(a)    Subject to applicable law and the Certificate of Incorporation, shares of stock may be issued for such consideration, having in the case of shares with par value a value not less than the par value thereof, and to such persons, as determined from time to time by the Board.  The consideration may consist of any tangible or intangible property or any benefit to the Corporation, including cash, promissory notes, services performed, contracts for services to be performed or other securities, or any combination thereof.

(b)    Subject to applicable law and the Certificate of Incorporation, shares may not be issued until the full amount of the consideration has been paid, unless upon the face or back of each certificate issued to represent any partly paid shares of capital stock or upon the books and records of the Corporation in the case of partly paid uncertificated shares, there shall have been set forth the total amount of the consideration to be paid therefor and the amount paid thereon up to and including the time said certificate representing certificated shares or said uncertificated shares are issued.

Section 7.5.    **Lost, Destroyed or Wrongfully Taken Certificates**.

(a)    If an owner of a certificate representing shares claims that such certificate has been lost, destroyed or wrongfully taken, the Corporation shall issue a new certificate representing such shares or such shares in uncertificated form if the owner: (i) requests such a new certificate before the Corporation has notice that the certificate representing such shares has been acquired by a protected purchaser; (ii) if requested by the Corporation, delivers to the

15

Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, wrongful taking or destruction of such certificate or the issuance of such new certificate or uncertificated shares; and (iii) satisfies other reasonable requirements imposed by the Corporation.

(b) If a certificate representing shares has been lost, apparently destroyed or wrongfully taken, and the owner fails to notify the Corporation of that fact within a reasonable time after the owner has notice of such loss, apparent destruction or wrongful taking and the Corporation registers a transfer of such shares before receiving notification, the owner shall be precluded from asserting against the Corporation any claim for registering such transfer or a claim to a new certificate representing such shares or such shares in uncertificated form.

Section 7.6. **Transfer of Stock**.

(a) If a certificate representing shares of the Corporation is presented to the Corporation with an endorsement requesting the registration of transfer of such shares or an instruction is presented to the Corporation requesting the registration of transfer of uncertificated shares, the Corporation shall register the transfer as requested if:

(i) in the case of certificated shares, the certificate representing such shares has been surrendered;

(ii) (A) with respect to certificated shares, the endorsement is made by the person specified by the certificate as entitled to such shares; (B) with respect to uncertificated shares, an instruction is made by the registered owner of such uncertificated shares; or (C) with respect to certificated shares or uncertificated shares, the endorsement or instruction is made by any other appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(iii) the Corporation has received a guarantee of signature of the person signing such endorsement or instruction or such other reasonable assurance that the endorsement or instruction is genuine and authorized as the Corporation may request;

(iv) the transfer does not violate any restriction on transfer imposed by the Corporation that is enforceable in accordance with Section 7.8(a); and

(v) such other conditions for such transfer as shall be provided for under applicable law have been satisfied.

(b) Whenever any transfer of shares shall be made for collateral security and not absolutely, the Corporation shall so record such fact in the entry of transfer if, when the certificate for such shares is presented to the Corporation for transfer or, if such shares are uncertificated, when the instruction for registration of transfer thereof is presented to the Corporation, both the transferor and transferee request the Corporation to do so.

Section 7.7. **Registered Stockholders**. Before due presentment for registration of transfer of a certificate representing shares of the Corporation or of an instruction requesting registration of transfer of uncertificated shares, the Corporation may treat the registered owner as

16

the person exclusively entitled to inspect for any proper purpose the stock ledger and the other books and records of the Corporation, vote such shares, receive dividends or notifications with respect to such shares and otherwise exercise all the rights and powers of the owner of such shares, except that a person who is the beneficial owner of such shares (if held in a voting trust or by a nominee on behalf of such person) may, upon providing documentary evidence of beneficial ownership of such shares and satisfying such other conditions as are provided under applicable law, may also so inspect the books and records of the Corporation.

**Section 7.8.    Effect of the Corporation's Restriction on Transfer**.

(a)    A written restriction on the transfer or registration of transfer of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, if permitted by the DGCL and noted conspicuously on the certificate representing such shares or, in the case of uncertificated shares, contained in a notice, offering circular or prospectus sent by the Corporation to the registered owner of such shares within a reasonable time prior to or after the issuance or transfer of such shares, may be enforced against the holder of such shares or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

(b)    A restriction imposed by the Corporation on the transfer or the registration of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, even if otherwise lawful, is ineffective against a person without actual knowledge of such restriction unless: (i) the shares are certificated and such restriction is noted conspicuously on the certificate; or (ii) the shares are uncertificated and such restriction was contained in a notice, offering circular or prospectus sent by the Corporation to the registered owner of such shares within a reasonable time prior to or after the issuance or transfer of such shares.

**Section 7.9.    Regulations**.  The Board shall have power and authority to make such additional rules and regulations, subject to any applicable requirement of law, as the Board may deem necessary and appropriate with respect to the issue, transfer or registration of transfer of shares of stock or certificates representing shares.  The Board may appoint one or more transfer agents or registrars and may require for the validity thereof that certificates representing shares bear the signature of any transfer agent or registrar so appointed.

**ARTICLE VIII**

**INDEMNIFICATION**

**Section 8.1.    Right to Indemnification**.  To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify, defend and hold harmless each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit, or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation to procure a judgment in its favor (hereinafter a "**proceeding**"), by reason of the fact that he or she is or was a director or officer of the Corporation or any of its

17

subsidiaries or, while a director or officer of the Corporation or any of its subsidiaries or, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (hereinafter an "**Indemnitee**"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, against all liability and loss suffered and expenses (including, without limitation, attorneys' fees and disbursements, judgments, fines, Employment Retirement Income Security Act of 1974 excise taxes, damages, claims and penalties and amounts paid in settlement) reasonably incurred by such Indemnitee in connection with such proceeding; provided, however, that, except as provided in Section 8.3 with respect to proceedings to enforce rights to indemnification (which are, for the avoidance of doubt, indemnified proceedings) and advancement of expenses, the Corporation shall indemnify an Indemnitee in connection with a proceeding (or part thereof) initiated by such Indemnitee only if such proceeding (or part thereof) was, or is, authorized by the Board.

Section 8.2.    **Right to Advancement of Expenses**.  In addition to the right to indemnification conferred in Section 8.1, the Corporation shall to the fullest extent not prohibited by applicable law pay as incurred the expenses (including, without limitation, attorneys' fees) incurred by an Indemnitee in defending or otherwise participating in any such proceeding in advance of its final disposition, including by making payment directly to applicable third parties if requested by the Indemnitee (hereinafter an "**advancement of expenses**"); provided, however, that to the extent required by applicable law, an advancement of expenses incurred by an Indemnitee in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon the Corporation's receipt of an undertaking (hereinafter an "**undertaking**"), by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined that such Indemnitee is not entitled to be indemnified under this Article VIII or otherwise.

Section 8.3.    **Right of Indemnitee to Bring Suit**.  If a claim under Section 8.1 or Section 8.2 is not paid in full by the Corporation within 60 days after a written claim therefor has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnitee shall also be entitled to be paid the expense of prosecuting or defending such suit.  In (a) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by an Indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (b) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final judicial decision from which there is no further right to appeal (hereinafter a "**final adjudication**") that, the Indemnitee has not met any applicable standard for indemnification set forth in the DGCL. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is

18

proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including a determination by its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, shall be a defense to such suit. In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE VIII or otherwise shall be on the Corporation.

Section 8.4.   **Non-Exclusivity of Rights**.  The rights provided to any Indemnitee pursuant to this ARTICLE VIII shall not be exclusive of any other right, which such Indemnitee may have or hereafter acquire under applicable law, the Certificate of Incorporation, these Bylaws, an agreement, a vote of stockholders or disinterested directors, or otherwise.

Section 8.5.   **Insurance**.  The Corporation may secure and maintain insurance, at its expense, to protect itself and/or any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

Section 8.6.   **Indemnification of Other Persons**.  This ARTICLE VIII shall not limit the right of the Corporation to the extent and in the manner authorized or permitted by law to indemnify and to advance expenses to persons other than Indemnitees.  Without limiting the foregoing, the Corporation may, to the extent authorized from time to time by the Board, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation and to any other person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, to the fullest extent of the provisions of this ARTICLE VIII with respect to the indemnification and advancement of expenses of Indemnitees under this ARTICLE VIII.

Section 8.7.   **Amendments**.  Any repeal or amendment of this ARTICLE VIII by the Board or the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of these Bylaws inconsistent with this ARTICLE VIII, will, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide broader indemnification rights to Indemnitees on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision; provided however, that amendments or repeals of this ARTICLE VIII shall require the affirmative vote of the stockholders holding at least 65% of the voting power of all outstanding shares of capital stock of the Corporation.

19

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 723 of 927 PageID #:5603

**Section 8.8.    Certain Definitions**.  For purposes of this ARTICLE VIII, (a) references to "other enterprise" shall include any employee benefit plan; (b) references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; (c) references to "serving at the request of the Corporation" shall include any service that imposes duties on, or involves services by, a person with respect to any employee benefit plan, its participants, or beneficiaries; and (d) a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Corporation" for purposes of Section 145 of the DGCL.

**Section 8.9.    Contract Rights**.  The rights provided to Indemnitees pursuant to this ARTICLE VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, agent or employee and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.1.    Place of Meetings**.  If the place of any meeting of stockholders, the Board or committee of the Board for which notice is required under these Bylaws is not designated in the notice of such meeting, such meeting shall be held at the principal business office of the Corporation; provided, however, if the Board has, in its sole discretion, determined that a meeting shall not be held at any place, but instead shall be held by means of remote communication pursuant to Section 9.5 hereof, then such meeting shall not be held at any place.

**Section 9.2.    Fixing Record Dates**.

(a)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 9.2(a) at the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

### Section 9.3.    Means of Giving Notice.

(a)     Notice to Directors.  Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any director, such notice shall be given either (i) in writing, given by hand delivery, or sent by mail, or by a nationally recognized delivery service, (ii) by means of facsimile telecommunication or other form of electronic transmission, or (iii) by oral notice given personally or by telephone.  A notice to a director will be deemed given as follows: (i) if given by hand delivery, orally, or by telephone, when actually received by the director, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iv) if sent by facsimile telecommunication, when sent to the facsimile transmission number for such director appearing on the records of the Corporation, (v) if sent by electronic mail, when sent to the electronic mail address for such director appearing on the records of the Corporation, or (vi) if sent by any other form of electronic transmission, when sent to the address, location or number (as applicable) for such director appearing on the records of the Corporation.

(b)     Notice to Stockholders. Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any stockholder, such notice may be given (i) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (ii) by means of a form of electronic transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in Section 232 of the DGCL. A notice to a stockholder shall be deemed given as follows: (i) if given by hand delivery, when actually received by the stockholder, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, (iv) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by Section 232(e) of the DGCL, and (v) if given by a form of electronic transmission consented to by the stockholder to whom the notice is given and otherwise meeting the requirements set forth above, (A) if by facsimile telecommunication, when directed to a number

21

at which the stockholder has consented to receive notice, (B) if by a posting on an electronic network together with separate notice to the stockholder of such specified posting, upon the later of (1) such posting and (2) the giving of such separate notice, and (C) if by any other form of electronic transmission, when directed to the stockholder. A stockholder may revoke such stockholder's consent to receiving notice by means of electronic transmission by giving written notice or electronic transmission of such revocation to the Corporation. Any such consent shall be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or an Assistant Secretary or to the Corporation's transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.

(c)     Electronic Transmission.  The term "**electronic transmission**" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process, including but not limited to transmission by telex, facsimile telecommunication, electronic mail or messaging, telegram and cablegram.

(d)     Notice to Stockholders Sharing Same Address.  Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given.  A stockholder may revoke such stockholder's consent by delivering written notice of such revocation to the Corporation.  Any stockholder who fails to object in writing to the Corporation within 60 days of having been given written notice by the Corporation of its intention to send such a single written notice shall be deemed to have consented to receiving such single written notice.

(e)     Exceptions to Notice Requirements.  Whenever notice is required to be given, under the DGCL, the Certificate of Incorporation or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person.  Any action or meeting that shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.  In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Whenever notice is required to be given by the Corporation, under any provision of the DGCL, the Certificate of Incorporation or these Bylaws, to any stockholder to whom (1) notice of two consecutive annual meetings of stockholders and all notices of stockholder meetings to such

22

stockholder during the period between such two consecutive annual meetings, or (2) all, and at least two payments (if sent by first-class mail) of dividends or interest on securities during a 12-month period, have been mailed addressed to such stockholder at such stockholder's address as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required.  Any action or meeting that shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given.  If any such stockholder shall deliver to the Corporation a written notice setting forth such stockholder's then current address, the requirement that notice be given to such stockholder shall be reinstated.  In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to Section 230 (b) of the DGCL.  The exception in subsection (1) of the first sentence of this paragraph to the requirement that notice be given shall not be applicable to any notice returned as undeliverable if the notice was given by electronic transmission.

**Section 9.4.    Waiver of Notice**.  Whenever any notice is required to be given under applicable law, the Certificate of Incorporation, or these Bylaws, a written waiver of such notice, signed (including by electronic signature within the meaning of Section 116(a)(2) of the DGCL) by the person or persons entitled to said notice, or a waiver by electronic transmission by the person entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to such required notice. All such waivers shall be kept with the books of the Corporation. Attendance at a meeting shall constitute a waiver of notice of such meeting, except where a person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

**Section 9.5.    Meeting Attendance via Remote Communication Equipment**.

(a)    <u>Stockholder Meetings</u>.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders entitled to vote at such meeting and proxy holders not physically present at a meeting of stockholders may, by means of remote communication:

(i)    participate in a meeting of stockholders; and

(ii)    be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxy holder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxy holders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxy holder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

23

(b)     Board Meetings.  Unless otherwise restricted by applicable law, the Certificate of Incorporation or these Bylaws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 9.6.    **Dividends**.  The Board may from time to time declare, and the Corporation may pay, dividends (payable in cash, property or shares of the Corporation's capital stock) on the Corporation's outstanding shares of capital stock, subject to applicable law and the Certificate of Incorporation.

Section 9.7.    **Reserves**.  The Board may set apart out of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

Section 9.8.    **Contracts and Negotiable Instruments**.  Except as otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws, any contract, bond, deed, lease, mortgage or other instrument may be executed and delivered in the name and on behalf of the Corporation by such officer or officers or other employee or employees of the Corporation as the Board may from time to time authorize.  Such authority may be general or confined to specific instances as the Board may determine.  The Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer or any Vice President may execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation.  Subject to any restrictions imposed by the Board, the Chairman of the Board Chief Executive Officer, President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer or any Vice President may delegate powers to execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation to other officers or employees of the Corporation under such person's supervision and authority, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

Section 9.9.    **Fiscal Year**.  The fiscal year of the Corporation shall be fixed by the Board.

Section 9.10.  **Seal**.  The Board may adopt a corporate seal, which shall be in such form as the Board determines.  The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 9.11.  **Books and Records**.  The books and records of the Corporation may be kept within or outside the State of Delaware at such place or places as may from time to time be designated by the Board.

24

**Section 9.12.  Resignation**.  Any director, committee member or officer may resign by giving notice thereof in writing or by electronic transmission to the Chairman of the Board, the Chief Executive Officer, the President or the Secretary.  The resignation shall take effect at the time it is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events.  Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 9.13.  Surety Bonds**.  Such officers, employees and agents of the Corporation (if any) as the Chairman of the Board, Chief Executive Officer, President or the Board may direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chairman of the Board, Chief Executive Officer, President or the Board may determine.  The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

**Section 9.14.  Securities of Other Corporations**.  Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chairman of the Board, Chief Executive Officer, President, or any officers authorized by the Board.  Any such officer, may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed.  The Board may from time to time confer like powers upon any other person or persons.

**Section 9.15.  Amendments**.  The Board shall have the power to adopt, amend, alter or repeal the Bylaws.  The affirmative vote of a majority of the Board shall be required to adopt, amend, alter or repeal the Bylaws.  The Bylaws also may be adopted, amended, altered or repealed by the stockholders; provided, however, that in addition to any vote of the holders of any class or series of capital stock of the Corporation required by applicable law or the Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting (except as otherwise provided in Section 8.7) power of all outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders to adopt, amend, alter or repeal the Bylaws.

**Section 9.16.  Exclusive Jurisdiction**.  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring: (a) any derivative action or proceeding brought on behalf of the Corporation; (b) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders; (c) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any

25

provision of the DGCL or the Corporation's certificate of incorporation or bylaws; or (d) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of "(a)" through "(d)" above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933. To the fullest extent permitted by law, any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 9.16. If any provision or provisions of this Section 9.16 shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Section 9.16 (including, without limitation, each portion of any sentence of this Section 9.16 containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

Section 9.17.  **Severability**.  If any provision or provisions of these Bylaws shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of these Bylaws shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of these Bylaws (including, without limitation, each such portion of these Bylaws containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

**EXHIBIT C**

**Form of Subscription Agreement**

<div align="right">**EXECUTION VERSION**</div>

## FORM OF SUBSCRIPTION AGREEMENT

This SUBSCRIPTION AGREEMENT (this "**Subscription Agreement**") is entered into this 21st day of February, 2021, by and between Fortress Value Acquisition Corp. II, a Delaware corporation (the "**Company**"), and the undersigned ("**Subscriber**" or "**you**"). Defined terms used but not otherwise defined herein shall have the respective meanings ascribed thereto in the Transaction Agreement (as defined below).

WHEREAS, the Company and the other parties named therein are, substantially concurrently with the execution of this Subscription Agreement, entering into that certain Agreement and Plan of Merger, dated as of February 21st, 2021 (the "**Transaction Agreement**"), pursuant to which the Company will acquire Wilco Holdco, Inc., a Delaware corporation (the "**Target**"), on the terms and subject to the conditions set forth therein (the "**Transaction**");

WHEREAS, in connection with the Transaction, Subscriber desires to subscribe for and purchase from the Company that number of the Company's Class A common stock, par value $0.0001 per share (the "**Common Stock**"), set forth on the signature page hereto (the "**Shares**") for a purchase price of $10.00 per share (the "**Per Share Price**"), or the aggregate purchase price set forth on the signature page hereto (the "**Purchase Price**"), and the Company desires to issue and sell to Subscriber the Shares in consideration of the payment of the Purchase Price by or on behalf of Subscriber to the Company on or prior to the Closing (as defined below); and

WHEREAS, in connection with the Transaction, certain other institutional "accredited investors" (within the meaning of Rule 501(a) under the Securities Act of 1933, as amended (the "**Securities Act**")) have entered into separate subscription agreements (each such other accredited investor, an "**Other Subscriber**" and each such separate subscription agreement, an "**Other Subscription Agreement**") with the Company, pursuant to which such investors have, together with the Subscriber pursuant to this Subscription Agreement, agreed to purchase an aggregate of 30,000,000 shares of Common Stock at the Per Share Price.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties and covenants, and subject to the conditions, herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1. Subscription. Subject to the terms and conditions hereof, Subscriber hereby agrees to subscribe for and purchase, and the Company hereby agrees to issue and sell to Subscriber, upon the payment of the Purchase Price, the Shares (such subscription and issuance, the "**Subscription**").

2. Representations, Warranties and Agreements.

2.1 Subscriber's Representations, Warranties and Agreements. To induce the Company to issue the Shares to Subscriber, Subscriber hereby represents and warrants to the Company and the Placement Agents (as defined herein) and agrees with the Company and the Placement Agents as follows:

2.1.1 If Subscriber is not an individual, Subscriber has been duly formed or incorporated and is validly existing in good standing under the laws of its jurisdiction of

incorporation or formation, with power and authority to enter into, deliver and perform its obligations under this Subscription Agreement. If Subscriber is an individual, Subscriber has the authority to enter into, deliver and perform its obligations under this Subscription Agreement.

2.1.2   If Subscriber is not an individual, this Subscription Agreement has been duly authorized, executed and delivered by Subscriber. If Subscriber is an individual, the signature on this Subscription Agreement is genuine, and Subscriber has legal competence and capacity to execute the same. Assuming that this Subscription Agreement constitutes the valid and binding agreement of the Company, this Subscription Agreement is enforceable against Subscriber in accordance with its terms, except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

2.1.3   The execution, delivery and performance by Subscriber of this Subscription Agreement and the consummation of the transactions contemplated herein will not (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of Subscriber or any of its subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which Subscriber or any of its subsidiaries is a party or by which Subscriber or any of its subsidiaries is bound or to which any of the property or assets of Subscriber or any of its subsidiaries is subject, which would reasonably be expected to have a material adverse effect on the Subscriber's ability or legal authority of the Subscriber to timely comply in all material respects with the terms of this Subscription Agreement (a "**Subscriber Material Adverse Effect**"); (ii) if Subscriber is not an individual, result in any violation of the provisions of the organizational documents of Subscriber or any of its subsidiaries; or (iii) result in any violation of any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over Subscriber or any of its subsidiaries or any of their respective properties that would reasonably be expected to have a Subscriber Material Adverse Effect.

2.1.4   Subscriber (i) is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an institutional "accredited investor" (within the meaning of Rule 501(a) under the Securities Act) satisfying the applicable requirements set forth on Schedule A. (ii) is acquiring the Shares only for its own account and not for the account of others, or if Subscriber is subscribing for the Shares as a fiduciary or agent for one or more investor accounts, each owner of such account is an "accredited investor" and Subscriber has full investment discretion with respect to each such account, and the full power and authority to make the acknowledgements, representations and agreements herein on behalf of each owner of each such account, and (iii) is not acquiring the Shares with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act or any other securities laws of the United States or any other jurisdiction (and shall provide the requested information on Schedule A following the signature page hereto). Subscriber is not an entity formed for the specific purpose of acquiring the Shares. Subscriber understands and acknowledges that the purchase of the Shares pursuant to this Subscription Agreement meets the exemptions from filing under FINRA Rule 5123(b)(1)(C) or (J).

2

2.1.5    Subscriber understands that the Shares are being offered in a transaction not involving any public offering within the meaning of the Securities Act and that the Shares have not been registered under the Securities Act or any other securities laws of the United States or any other jurisdiction. Subscriber understands that the Shares may not be resold, transferred, pledged or otherwise disposed of by Subscriber absent an effective registration statement under the Securities Act with respect to the Shares or where an applicable exemption from the registration requirements of the Securities Act is available, and that any certificates or book entries representing the Shares shall contain a legend to such effect. Subscriber acknowledges that the Shares will not be eligible for resale pursuant to Rule 144A promulgated under the Securities Act. Subscriber understands and agrees that the Shares will be subject to transfer restrictions and, as a result of these transfer restrictions, Subscriber may not be able to readily resell the Shares and may be required to bear the financial risk of an investment in the Shares for an indefinite period of time. Subscriber understands that it has been advised to consult legal counsel prior to making any offer, resale, pledge or transfer of any of the Shares.

2.1.6    Subscriber understands and agrees that Subscriber is purchasing the Shares directly from the Company. Subscriber further acknowledges that there have been no representations, warranties, covenants and agreements made to Subscriber by the Company or any of its officers, directors or representatives, expressly or by implication, other than those representations, warranties, covenants and agreements included in this Subscription Agreement.

2.1.7    Subscriber represents and warrants that (i) it is not a Benefit Plan Investor as contemplated by the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or (ii) its acquisition and holding of the Shares will not constitute or result in a non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended, Section 4975 of the Internal Revenue Code of 1986, as amended, or any applicable similar law.

2.1.8    In making its decision to purchase the Shares, Subscriber represents that it has relied solely upon independent investigation made by Subscriber and the Company's representations in Section 2.2. The Subscriber acknowledges and agrees that the Subscriber has received and has had an adequate opportunity to review, such financial and other information as the Subscriber deems necessary in order to make an investment decision with respect to the Shares and made its own assessment and is satisfied concerning the relevant tax and other economic considerations relevant to the Subscriber's investment in the Shares. Without limiting the generality of the foregoing, the Subscriber acknowledges that it has had an adequate opportunity to review the documents provided to the Subscriber by or on behalf of the Company. The Subscriber represents and agrees that the Subscriber and the Subscriber's professional advisor(s), if any, have had the opportunity to ask such questions, receive such answers and obtain such information as the Subscriber and such Subscriber's professional advisor(s), if any, have deemed necessary to make an investment decision with respect to the Shares. The Subscriber acknowledges that no disclosure or any information received by the Subscriber has been prepared by any of Barclays Capital Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc. and/or BofA Securities, Inc. (collectively, the "**Placement Agents**") and that the Placement Agents and their respective directors, officers, employees, representatives and controlling persons have made no independent investigation with respect to the Company, the Target or the Shares or the accuracy, completeness or adequacy of any information supplied to the Subscriber by the Company. The

3

Subscriber acknowledges that it has not relied on any statements or other information provided by the Placement Agents or any of the Placement Agents' affiliates with respect to its decision to invest in the Shares, including information related to the Company, the Shares and the offer and sale of the Shares. The information provided to the Subscriber is preliminary and subject to change, and any changes to such information, including, without limitation, any changes based on updated information or changes in terms of the Transaction, shall in no way affect the Subscriber's obligation to purchase the Shares hereunder, except as otherwise set forth in this Subscription Agreement.

2.1.9    Subscriber became aware of this offering of the Shares solely by means of direct contact from the Placement Agents or directly from the Company as a result of a pre-existing, substantial relationship with the Company, and the Shares were offered to Subscriber solely by direct contact between Subscriber and any of the Placement Agents or the Company. Subscriber did not become aware of this offering of the Shares, nor were the Shares offered to Subscriber, by any other means. Subscriber acknowledges that the Placement Agents have not acted as its financial advisor or fiduciary. Subscriber acknowledges that the Company represents and warrants that the Shares were not offered by any form of advertising, or, to the Subscriber's knowledge, general solicitation (within the meaning of Regulation D).

2.1.10  Subscriber acknowledges that it is aware that there are substantial risks incident to the purchase and ownership of the Shares, including those set forth in the forms, reports, registration statements and other documents filed by the Company with the Securities and Exchange Commission (the "**SEC**") prior to the date of this Subscription Agreement. Subscriber has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares, and Subscriber has sought such accounting, legal and tax advice as Subscriber has considered necessary to make an informed investment decision. Subscriber understands and acknowledges that the purchase and sale of the Shares hereunder meets (i) the exemptions from filing under FINRA Rule 5123(b)(1)(A) and (ii) the institutional customer exemption under FINRA Rule 2111(b).

2.1.11  Alone, or together with any professional advisor(s), Subscriber represents and acknowledges that Subscriber has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the investment in the Shares, has adequately analyzed and fully considered the risks of an investment in the Shares and determined that the Shares are a suitable investment for Subscriber and that Subscriber is able at this time and in the foreseeable future to bear the economic risk of a total loss of Subscriber's investment in the Company. Subscriber further acknowledges specifically that a possibility of total loss of investment exists and that it is able to fend for itself in the transactions contemplated herein.

2.1.12  Subscriber understands and agrees that no federal or state agency has passed upon or endorsed the merits of the offering of the Shares or made any findings or determination as to the fairness of this investment.

2.1.13  Subscriber represents and warrants that Subscriber is not (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or in any Executive Order issued by the President of the United States and administered by OFAC ("**OFAC**

4

List"), or a person or entity prohibited by any OFAC sanctions program, (ii) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (iii) a non-U.S. shell bank or providing banking services indirectly to a non-U.S. shell bank. Subscriber represents that if it is a financial institution subject to the Bank Secrecy Act (31 U.S.C. Section 5311 et seq.) (the "**BSA**"), as amended by the USA PATRIOT Act of 2001 (the "**PATRIOT Act**"), and its implementing regulations (collectively, the "**BSA/PATRIOT Act**"), that Subscriber maintains policies and procedures reasonably designed to comply with applicable obligations under the BSA/PATRIOT Act. Subscriber also represents that, to the extent required by applicable law and regulation, it maintains policies and procedures reasonably designed for the screening of its investors against the OFAC sanctions programs, including the OFAC List. Subscriber further represents and warrants that, to the extent required by applicable law and regulation, it maintains policies and procedures reasonably designed to ensure that the funds held by Subscriber and used to purchase the Shares were legally derived.

2.1.14  Subscriber has, and at the Closing, will have sufficient funds to pay the Purchase Price pursuant to Section 3.1.

2.1.15  Without limitation of the foregoing, the Subscriber hereby further acknowledges and agrees that (i) the Placement Agent is acting solely as placement agent in connection with the transactions contemplated hereby and is not acting as an underwriter, initial purchaser, dealer or in any other such capacity and is not and shall not be construed as a fiduciary for the Subscriber, the Company or any other person or entity in connection with the transactions contemplated hereby, (ii) the Placement Agent has not made and will not make any representation or warranty, whether express or implied, of any kind or character and have not provided any advice or recommendation in connection with the transactions contemplated hereby, and (iii) the Placement Agent will have no responsibility with respect to (A) any representations, warranties or agreements made by any person or entity under or in connection with the transactions contemplated hereby or any of the documents furnished pursuant thereto or in connection therewith, or the execution, legality, validity or enforceability (with respect to any person) of any thereof, or (B) the financial condition, business, or any other matter concerning the Company or the transactions contemplated hereby.  The Subscriber will not look to the Placement Agents for all or part of any such loss or losses the Subscriber may suffer and is able to sustain a complete loss on its investment in the Shares. The Subscriber (for itself and for each account for which the Subscriber is acquiring the Shares) acknowledges that such Subscriber is aware that Citigroup Global Markets Inc. and Barclays Capital Inc. are acting as the Company's Placement Agents in connection with this Subscription Agreement and are also acting as financial advisors to the Target in connection with the Transaction.

2.1.16  Subscriber has no binding arrangement in place to sell, transfer or otherwise dispose of any of the Shares.

2.2     Company's Representations, Warranties and Agreements. To induce Subscriber to purchase the Shares, the Company hereby represents and warrants to Subscriber and the Placement Agents and agrees with Subscriber and the Placement Agents as follows:

2.2.1    The Company has been duly incorporated and is validly existing as a corporation in good standing under the Delaware General Corporation Law (the "**DGCL**"), with

corporate power and authority to own, lease and operate its properties and conduct its business as presently conducted and to enter into, deliver and perform its obligations under this Subscription Agreement.

2.2.2    The Shares have been duly authorized and, when issued and delivered to Subscriber against full payment for the Shares in accordance with the terms of this Subscription Agreement, the Shares will be validly issued, fully paid and non-assessable and the Shares will not have been authorized in violation of or subject to any preemptive or similar rights created under the Company's amended and restated certificate of incorporation or under the DGCL.

2.2.3    This Subscription Agreement, the Other Subscription Agreements and the Transaction Agreement have been duly authorized, executed and delivered by the Company and are enforceable against it in accordance with their terms, except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

2.2.4    The execution, delivery and performance of this Subscription Agreement (including compliance by the Company with all of the provisions hereof), the issuance and sale of the Shares and the compliance by the Company with all of the provisions of this Subscription Agreement and the consummation of the certain other transactions contemplated herein will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute (i) a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of the Company pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which the Company is a party or by which the Company is bound or to which any of the property or assets of the Company is subject, which would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, properties, financial condition, stockholders' equity or results of operations of the Company and its subsidiaries, if any, or on the validity of the Shares or the ability or legal authority of the Company to timely comply in all material respects with the terms of this Subscription Agreement (a "**Material Adverse Effect**"); (ii) result in any violation of the provisions of the organizational documents of the Company; or (iii) result in any violation of any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its properties that would reasonably be expected to have a Material Adverse Effect.

2.2.5    The issued and outstanding Common Stock is registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), and are listed for trading on the New York Stock Exchange (the "**NYSE**"). There is no suit, action, proceeding or investigation pending against the Company by the NYSE or the SEC with respect to any intention by such entity to deregister the Common Stock or prohibit or terminate the listing of the Common Stock on the NYSE. The Company has taken no action that is designed to terminate the registration of the Common Stock under the Exchange Act.

2.2.6    As of the date hereof and as of immediately prior to the Closing, the authorized capital stock of the Company is 221,000,000 shares, consisting of (a) 200,000,000 Class

6

A Common Stock, (b) 20,000,000 shares of Class F common stock, par value $0.0001 per share, and (c) 1,000,000 shares of preferred stock, par value $0.0001 per share. As of the date hereof: (i) no shares of preferred stock are issued and outstanding; (ii) 34,500,000 shares of Class A Common Stock are issued and outstanding; (iii) 8,625,000 shares of Class F common stock are issued and outstanding; (iv) 5,933,333 private placement warrants to purchase 5,933,333 shares of Class A Common Stock are outstanding and (v) 6,900,000 public warrants to purchase 6,900,000 shares of Class A Common Stock are outstanding. All (A) issued and outstanding shares of Class A Common Stock and shares of Class F common stock have been duly authorized and validly issued, are fully paid and are non-assessable and are not subject to preemptive rights and (B) outstanding private placement warrants and public warrants have been duly authorized and validly issued, are fully paid and are not subject to preemptive rights. Except as set forth above and pursuant to the Other Subscription Agreements, that certain letter agreement, dated the date hereof, by and among the Company, the Sponsor and the other parties named therein (the "**Sponsor Letter Agreement**"), and the Transaction Agreement, there are no outstanding options, warrants or other rights to subscribe for, purchase or acquire from the Company any shares of Class A Common Stock or other equity interests in the Company, or securities convertible into or exchangeable or exercisable for such equity interests.

2.2.7   The Company is not, and immediately after receipt of payment for the Shares will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.2.8   Assuming the accuracy of the representations and warranties of Subscriber, the Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority, self-regulatory organization (including the New York Stock Exchange (the "**Stock Exchange**")) or other person in connection with the execution, delivery and performance of this Subscription Agreement (including, without limitation, the issuance of the Shares), other than (i) filings required by applicable federal or state securities laws, (ii) the filing of the Registration Statement pursuant to Section 4 below, (iii) the filing of a Notice of Exempt Offering of Securities on Form D with the SEC under Regulation D of the Securities Act, if applicable, (iv) those required by the Stock Exchange, including with respect to obtaining stockholder approval, (v) those required to consummate the Transaction as provided under the Transaction Agreement, and (vi) the failure of which to obtain would not be reasonably likely to have a Material Adverse Effect.

2.2.9   The Company has made available to Subscriber (including via the SEC EDGAR system) a true, correct and complete copy of each form, report, statement, schedule, prospectus, proxy, registration statement and other documents filed by the Company with the SEC prior to the date of this Subscription Agreement (the "**SEC Documents**"), which SEC Documents, as of their respective filing dates, complied in all material respects with the requirements of the Exchange Act and the applicable rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the SEC with respect thereto as in effect at the time of filing and fairly present in all material respects the financial position of the Company as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited

statements, to normal, year-end audit adjustments. The Company has timely filed each report, statement, schedule, prospectus, and registration statement that the Company was required to file with the SEC since its initial registration of the Common Stock under the Exchange Act. As of the date of this Subscription Agreement, there are no material outstanding or unresolved comments in comment letters from the staff of the Division of Corporation Finance of the SEC with respect to any of the SEC Documents.

2.2.10 Assuming the accuracy of Subscriber's representations and warranties set forth in Section 2.1 of this Subscription Agreement, no registration under the Securities Act is required for the offer and sale of the Shares by the Company to Subscriber in the manner contemplated by this Subscription Agreement.

2.2.11 Neither the Company, nor any person acting on its or their behalf has, directly or indirectly, made any offers or sales of any Company security or solicited any offers to buy any security, under circumstances that would adversely affect reliance by the Company on Section 4(a)(2) of the Securities Act for the exemption from registration for the transactions contemplated hereby or would require registration of the Shares under the Securities Act.

2.2.12 The Company has provided Subscriber an opportunity to ask questions regarding the Company and made available to Subscriber all the information reasonably available to the Company that Subscriber has requested for deciding whether to acquire the Shares.

2.2.13 Except for the Placement Agents, no broker or finder is entitled to any brokerage or finder's fee or commission solely in connection with the sale of the Shares to Subscriber.

2.2.14 Upon consummation of the Transaction, the issued and outstanding Common Stock will continue to be registered pursuant to Section 12(b) of the Exchange Act and will be listed for trading on the Stock Exchange or the Nasdaq Capital Market, the Nasdaq Global Market or the Nasdaq Global Select Market.

2.2.15 No Other Subscription Agreement includes terms and conditions that are materially more advantageous to any such Other Subscriber than Subscriber hereunder, in each case, other than terms particular to the regulatory requirements of such subscriber or its affiliates or related funds. The Other Subscription Agreements have not been amended in any material respect following the date of this Subscription Agreement and reflect the same purchase price per share and terms that are not materially more advantageous to any such Other Subscriber thereunder than the terms of this Subscription Agreement other than terms particular to the regulatory requirements of such subscriber or its affiliates or related funds.

3.     Settlement Date and Delivery.

3.1     Closing. The closing of the Subscription contemplated hereby (the "**Closing**") is contingent upon the substantially concurrent consummation of the Transaction. The Closing shall occur on the closing date of the Transaction (the "**Closing Date**"). Upon not less than three (3) business days' written notice from (or on behalf of) the Company to Subscriber (the "**Closing Notice**") that the Company reasonably expects all conditions to the closing of the Transaction to be satisfied on a date that is not less than three (3) business days from the date of

8

the Closing Notice, Subscriber shall deliver to the Company at least two (2) business days' prior to the Closing Date or such other date prior to the Closing Date as otherwise agreed to by the Company and the Subscriber, to be held in escrow until the Closing, the Purchase Price for the Shares by wire transfer of United States dollars in immediately available funds to the account specified by the Company in the Closing Notice against delivery by the Company to Subscriber of the Shares in book-entry form on the Closing Date. On the Closing Date, the Company shall deliver to Subscriber (i) at the Closing, the Shares in book entry form, free and clear of any liens or other restrictions (other than those arising under this Subscription Agreement or applicable securities laws), in the name of Subscriber (or its nominee in accordance with its delivery instructions), and (ii) as promptly as practicable after the Closing, evidence from the Company's transfer agent of the issuance to Subscriber of the Shares on and as of the Closing Date. In the event the Closing does not occur on the Closing Date, the Company shall promptly (but not later than two (2) business days thereafter) return the Purchase Price to Subscriber by wire transfer in immediately available funds to the account specified in writing by Subscriber. Notwithstanding anything herein to the contrary, in the event the parties to the Transaction Agreement agree to postpone the Closing Date, the Company shall have the right to change the Closing Date from the date specified in the Closing Notice to such Closing Date after giving effect to such postponement.

3.2 <u>Conditions to Closing of Both Parties</u>. The Closing shall be subject to the conditions that, on the Closing Date:

3.2.1 No suspension of the qualification of the Shares for offering or sale or trading in any jurisdiction in the United States, or suspension of listing, or qualification of the Shares for listing, on the NYSE, or initiation or threatening in writing of any proceedings for any of such purposes, shall have occurred and be continuing.

3.2.2 No governmental authority in the United States shall have enacted, issued, promulgated, enforced or entered any judgment, order, rule or regulation (whether temporary, preliminary or permanent) which is then in effect and has the effect of making consummation of the transactions contemplated hereby illegal or otherwise preventing or prohibiting consummation of the transactions contemplated hereby.

3.2.3 All conditions precedent to the closing of the Transaction set forth in the Transaction Agreement shall have been satisfied or waived in the sole determination of the parties to the Transaction Agreement (other than those conditions that, by their nature, may only be satisfied at the consummation of the Transaction, but subject to satisfaction of such conditions as of the consummation of the Transaction), and the closing of the Transaction shall be scheduled to occur on the Closing Date substantially concurrently with or immediately following the Closing.

3.3 <u>Conditions to Closing of the Company</u>. The obligations of the Company to consummate the Subscription shall be subject to the following conditions, any one or more of which may be waived in writing by the Company:

3.3.1 All representations and warranties of Subscriber contained in this Subscription Agreement shall be true and correct in all material respects as of the Closing Date, and consummation of the Closing shall constitute a reaffirmation by Subscriber of each of its representations and warranties contained in this Subscription Agreement as of the Closing Date.

9

3.3.2   Subscriber shall have performed or complied in all material respects with all conditions, agreements and covenants required by this Subscription Agreement.

3.4   <u>Conditions to Closing of Subscriber</u>. The obligations of Subscriber to consummate the Subscription shall be subject to the following conditions, any one or more of which may be waived in writing by Subscriber:

3.4.1   All representations and warranties of the Company contained in this Subscription Agreement shall be true and correct in all material respects as of the Closing Date.

3.4.2   The Company shall have performed or complied in all material respects with all conditions, agreements and covenants required by this Subscription Agreement.

3.4.3   The terms of the Transaction Agreement shall not have been amended in a manner that would reasonably be expected to materially and adversely affect the economic benefits Subscriber is to receive under this Subscription Agreement unless Subscriber has consented in writing to such amendment.

4.   <u>Registration Rights</u>.

4.1   The Company and Subscriber agree that, within fifteen (15) business days after the consummation of the Transaction, the Company will file with the SEC (at the Company's sole cost and expense) a registration statement registering the resale of the Shares (the "**Registration Statement**"), and the Company shall use its commercially reasonable efforts to have the Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the earlier of (i) the 60th calendar day (or 90th calendar day if the Commission notifies the Company that it will "review" the Registration Statement) following the Closing Date; provided, however, that the Company's obligations to include the Shares and those other Shares of the Company held by Subscriber in the Registration Statement are contingent upon Subscriber furnishing in writing to the Company such information regarding Subscriber, the securities of the Company held by Subscriber and the intended method of disposition of the Shares as shall be reasonably requested by the Company to effect the registration of the Shares, and shall execute such documents in connection with such registration as the Company may reasonably request that are customary of a selling stockholder in similar situations; provided, however, that Subscriber shall not in connection with the foregoing be required to execute any lock-up or similar agreement or otherwise be subject to any contractual restriction on the ability to transfer the Shares. The Company shall use its commercially reasonable efforts to maintain the continuous effectiveness of the Registration Statement until the earliest of (i) the date on which the Shares may be resold without volume or manner of sale limitations pursuant to Rule 144 promulgated under the Securities Act ("**Rule 144**"), (ii) the date on which such Shares have actually been sold and (iii) the date which is three years after the Closing. The Company will use its commercially reasonable efforts to provide a draft of the Registration Statement to Subscriber for review (but not comment) at least two (2) Business Days in advance of filing the Registration Statement; <u>provided</u> that, for the avoidance of doubt, in no event shall the Company be required to delay or postpone the filing of such Registration Statement as a result of or in connection with Subscriber's review. Unless otherwise agreed to in writing by the Subscriber, the Subscriber shall not be identified as a statutory underwriter in the Registration Statement unless requested by the SEC or another regulatory

10

agency; <u>provided</u>, that if the SEC requests that a Subscriber be identified as a statutory underwriter in the Registration Statement, Subscriber will have the opportunity to withdraw from the Registration Statement upon its prompt written request to the Company. Notwithstanding the foregoing, if the SEC prevents the Company from including any or all of the shares proposed to be registered under the Registration Statement due to limitations on the use of Rule 415 of the Securities Act for the resale of the Shares by the applicable stockholders or otherwise, such Registration Statement shall register for resale such number of Shares which is equal to the maximum number of Shares as is permitted by the SEC. In such event, the number of Shares to be registered for each selling stockholder named in the Registration Statement shall be reduced pro rata among all such selling stockholders and as promptly as practicable after being permitted to register additional Shares under Rule 415 under the Securities Act, the Company shall amend the Registration Statement or file a new Registration Statement to register such Shares not included in the initial Registration Statement and cause such amendment or Registration Statement to become effective as promptly as practicable. For as long as the Subscriber holds Shares, the Company will use commercially reasonable efforts to file all reports for so long as the condition in Rule 144(c)(1) (or Rule 144(i)(2), if applicable) is required to be satisfied, and provide all customary and reasonable cooperation, necessary to enable the undersigned to resell the Shares pursuant to Rule 144 of the Securities Act (in each case, when Rule 144 of the Securities Act becomes available to the Subscriber).

4.2     Notwithstanding anything to the contrary in this Subscription Agreement, the Company shall be entitled to delay or postpone the effectiveness of the Registration Statement, and from time to time to require any Subscriber not to sell under the Registration Statement or to suspend the effectiveness thereof, if the negotiation or consummation of a transaction by the Company or its subsidiaries is pending or an event has occurred, which negotiation, consummation or event, the Company's board of directors reasonably believes, upon the advice of legal counsel, would require additional disclosure by the Company in the Registration Statement of material information that the Company has a bona fide business purpose for keeping confidential and the non-disclosure of which in the Registration Statement would be expected, in the reasonable determination of the Company's board of directors, upon the advice of legal counsel, to cause the Registration Statement to fail to comply with applicable disclosure requirements (each such circumstance, a "**Suspension Event**"); *provided, however,* that the Company may not delay or suspend the Registration Statement on more than two occasions or for more than sixty (60) consecutive calendar days, or more than ninety (90) total calendar days, in each case during any twelve-month period. Upon receipt of any written notice from the Company of the happening of any Suspension Event (which notice shall not contain material non-public information and which notice shall not be subject to any duty of confidentiality) during the period that the Registration Statement is effective or if as a result of a Suspension Event the Registration Statement or related prospectus contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made (in the case of the prospectus) not misleading, Subscriber agrees that it will promptly discontinue offers and sales of the Shares under the Registration Statement (excluding, for the avoidance of doubt, sales conducted pursuant to Rule 144) until such Subscriber receives copies of a supplemental or amended prospectus (which the Company agrees to promptly prepare) that corrects the misstatement(s) or omission(s) referred to above and receives notice that any post-effective amendment has become effective or unless otherwise notified by the Company that it may resume such offers and sales (which notice shall

11

not contain material non-public information and which notice shall not be subject to any duty of confidentiality). If so directed by the Company, each Subscriber will deliver to the Company or, in such Subscriber's sole discretion destroy, all copies of the prospectus covering the Shares in such Subscriber's possession; *provided, however,* that this obligation to deliver or destroy all copies of the prospectus covering the Shares shall not apply (i) to the extent such Subscriber is required to retain a copy of such prospectus (a) in order to comply with applicable legal, regulatory, self-regulatory or professional requirements or (b) in accordance with a bona fide pre-existing document retention policy or (ii) to copies stored electronically on archival servers as a result of automatic data back-up.

4.3     Subscriber may deliver written notice (including via email in accordance with Section 6.2 of this Subscription Agreement) (an "**Opt-Out Notice**") to the Company requesting that Subscriber not receive notices from the Company otherwise required by Section 4.2; provided, however, that Subscriber may later revoke any such Opt-Out Notice in writing. Following receipt of an Opt-Out Notice from Subscriber (unless subsequently revoked), (i) the Company shall not deliver any such notices to Subscriber and Subscriber shall no longer be entitled to the rights associated with any such notice and (ii) each time prior to Subscriber's intended use of an effective registration statement, Subscriber will notify the Company in writing at least two (2) business days in advance of such intended use, and if a notice of a Suspension Event was previously delivered (or would have been delivered but for the provisions of this Section 4.3) and the related suspension period remains in effect, the Company will so notify Subscriber, within one (1) business day of Subscriber's notification to the Company, by delivering to Subscriber a copy of such notice of Suspension Event that would have been provided, and thereafter will provide Subscriber with the related notice of the conclusion of such Suspension Event immediately upon its availability, and Subscriber shall comply with any restrictions on using such Registration Statement during such Suspension Event.

4.4     In the case of the registration, qualification, exemption or compliance effected by the Company pursuant to this Subscription Agreement, the Company shall, upon reasonable request, inform Subscriber as to the status of such registration, qualification, exemption and compliance.  At its expense the Company shall:

4.4.1   advise Subscriber within five (5) business days:

(a)     when a Registration Statement or any amendment thereto has been filed with the SEC and when such Registration Statement or any post-effective amendment thereto has become effective;

(b)     of any request by the SEC for amendments or supplements to the Registration Statement or the prospectus included therein or for additional information;

(c)     of the issuance by the SEC of any stop order suspending the effectiveness of the Registration Statement or the initiation of any proceedings for such purpose;

(d)     of the receipt by the Company of any notification with respect to the suspension of the qualification of the Shares included therein for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; and

12

(e)       of the occurrence of any event that requires the making of any changes in the Registration Statement or prospectus so that, as of such date, the Registration Statement does not contain an untrue statement of a material fact or does not omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or any prospectus does not include an untrue statement of a material fact or does not omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Notwithstanding anything to the contrary set forth herein, the Company shall not, when so advising Subscriber of such events, provide Subscriber with any material, nonpublic information regarding the Company other than to the extent that providing notice to Subscriber of the occurrence of the events listed in (a) through (e) above constitutes material, nonpublic information regarding the Company;

4.4.2    use its commercially reasonable efforts to obtain the withdrawal of any stop order suspending the effectiveness of the Registration Statement as soon as reasonably practicable;

4.4.3    upon the occurrence of any event contemplated pursuant to Section 4.4.1(e) above, except for such times as the Company is permitted hereunder to suspend, and has suspended, the use of a prospectus forming part of a Registration Statement, the Company shall use its commercially reasonable efforts to as soon as reasonably practicable prepare a post-effective amendment to such Registration Statement or a supplement to the related prospectus, or file any other required document so that, as thereafter delivered to purchasers of the Shares included therein, such prospectus will not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

4.4.4    use its commercially reasonable efforts to cause all Shares to be listed on each securities exchange or market, if any, on which the shares of Common Stock issued by the Company have been listed; and

4.4.5    use its commercially reasonable efforts to take all other steps necessary to effect the registration of the Shares contemplated hereby.

4.5       The Company shall, notwithstanding any termination of this Subscription Agreement, indemnify, defend and hold harmless Subscriber (to the extent a seller under the Registration Statement), its directors, officers, employees and agents, and each person who controls Subscriber (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable attorneys' fees) and expenses (collectively, "**Losses**"), as incurred, that arise out of or are based upon (i) any untrue or alleged untrue statement of a material fact contained in the Registration Statement, any prospectus included in the Registration Statement or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus or form of prospectus or supplement thereto, in

13

light of the circumstances under which they were made) not misleading, or (ii) any violation or alleged violation by the Company of the Securities Act, Exchange Act or any state securities law or any rule or regulation thereunder, in connection with the performance of its obligations under this Section 4, except to the extent, but only to the extent, that such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding such Subscriber furnished in writing to the Company by such Subscriber expressly for use therein or such Subscriber has omitted a material fact from such information or otherwise violated the Securities Act, Exchange Act or any state securities law or any rule or regulation thereunder; *provided, however,* that the indemnification contained in this Section 4 shall not apply to amounts paid in settlement of any Losses if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall the Company be liable for any Losses to the extent they arise out of or are based upon a violation which occurs (A) in reliance upon and in conformity with written information furnished by or on behalf of the Subscriber expressly for use in the Registration Statement, (B) in connection with any failure of the Subscriber to deliver or cause to be delivered a prospectus made available by the Company in a timely manner (unless exempted therefrom), (C) as a result of offers or sales effected by or on behalf of any person by means of a "free writing prospectus" (as defined in Rule 405 under the Securities Act) that was not authorized in writing by the Company, or (D) in connection with any offers or sales effected by or on behalf of the Subscriber in violation of Section 4.2 hereof. The Company shall notify the Subscriber promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this Section 4 of which the Company is aware. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an indemnified party and shall survive the transfer of the Shares by such Subscriber.

4.6     The Subscriber shall, severally and not jointly with any Other Subscriber, indemnify and hold harmless the Company, its directors, officers, agents and employees, and each person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or are based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any prospectus included in the Registration Statement, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus, or any form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading to the extent, but only to the extent, that such untrue statements or omissions are based upon information regarding the Subscriber furnished in writing to the Company by or on behalf of the Subscriber expressly for use therein; *provided, however,* that the indemnification contained in this Section 4 shall not apply to amounts paid in settlement of any Losses if such settlement is effected without the consent of the Subscriber (which consent shall not be unreasonably withheld, conditioned or delayed). In no event shall the liability of any Subscriber be greater in amount than the dollar amount of the net proceeds received by such Subscriber upon the sale of the Shares giving rise to such indemnification obligation. The Subscriber shall notify the Company promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this Section 4 of which the Subscriber is aware. Such indemnity shall remain in full force and effect regardless of

14

any investigation made by or on behalf of an indemnified party and shall survive the transfer of the Shares by the Subscriber.

4.7 Any person or entity entitled to indemnification herein shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any person's or entity's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent. An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement), which settlement shall not include a statement or admission of fault and culpability on the part of such indemnified party, and which settlement shall include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

4.8 If the indemnification provided under this Section 4 from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any Losses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations; provided, however, that the liability of the Subscriber shall be limited to the net proceeds received by such Subscriber from the sale of Shares giving rise to such indemnification obligation. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by (or not made by, in the case of an omission), or relates to information supplied by (or not supplied by, in the case of an omission), such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party as a result of the Losses referred to above shall be deemed to include, subject to the limitations set forth in this Section 4, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this Section 4.6 from any person or entity who was not guilty of such fraudulent misrepresentation.

4.9 For purposes of this Section 4, (i) "Shares" shall mean, as of any date of determination, the Shares (as defined in the recitals to this Subscription Agreement) and any other

15

equity security issued or issuable with respect to the Shares by way of share split, dividend, distribution, recapitalization, merger, exchange, or replacement, and (ii) "Subscriber" shall include any affiliate of the Subscriber to which the rights under this Section 4 shall have been duly assigned.

5.      Termination. This Subscription Agreement shall terminate and be void and of no further force and effect, and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party in respect thereof, upon the earlier to occur of (i) such date and time as the Transaction Agreement is validly terminated in accordance with its terms, (ii) the mutual written agreement of each of the parties hereto to terminate this Subscription Agreement, (iii) if any of the conditions to Closing set forth in this Subscription Agreement are not satisfied or waived by the party entitled to grant such waiver on or prior to the Closing Date and, as a result thereof, the transactions contemplated by this Subscription Agreement are not consummated at the Closing Date, or (iv) at Subscriber's election, on or after the "Outside Date" (as defined in the Transaction Agreement), if the Closing has not occurred by such date; *provided,* that, subject to the limitations set forth in Section 8, nothing herein will relieve any party from liability for any willful breach hereof prior to the time of termination, and each party will be entitled to any remedies at law or in equity to recover losses, liabilities or damages arising from such breach. The Company shall promptly notify Subscriber of the termination of the Transaction Agreement promptly after the termination of such agreement. Upon the termination of this Subscription Agreement in accordance with this Section 5, any monies paid by Subscriber to the Company in connection herewith shall be promptly (and in any event within two (2) Business Days after such termination) returned to Subscriber.

6.      Miscellaneous.

6.1     Further Assurances. At the Closing, the parties hereto shall execute and deliver such additional documents and take such additional actions as the parties reasonably may deem to be practical and necessary in order to consummate the Subscription as contemplated by this Subscription Agreement.

6.1.1   Subscriber acknowledges that the Company and the Placement Agents will rely on the acknowledgments, understandings, agreements, representations and warranties made by Subscriber contained in Section 2, this Section 6.1.1, Section 6.1.2 and Section 6.4 of this Subscription Agreement (the "**Agent Sections**"). Prior to the Closing, Subscriber agrees to promptly notify the Company and the Placement Agents if any of the acknowledgments, understandings, agreements, representations and warranties made by Subscriber set forth in the Agent Sections are no longer accurate in all material respects. Subscriber further acknowledges and agrees that the Placement Agents are third-party beneficiaries of the representations and warranties of the Subscriber contained in Section 2.1 of this Subscription Agreement. The Company acknowledges that the Subscriber and the Placement Agents will rely on the acknowledgments, understandings, agreements, representations and warranties contained in this Subscription Agreement. The Company further acknowledges and agrees that the Placement Agents are third-party beneficiaries of the representations and warranties of the Subscriber contained in Section 2.1 of this Subscription Agreement. This paragraph shall survive any termination of this Subscription Agreement.

16

6.1.2    Each of the Company, the Subscriber and the Placement Agents are entitled to rely upon this Subscription Agreement and are irrevocably authorized to produce this Subscription Agreement or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

6.1.3    The Company may request from Subscriber such additional information as the Company may deem reasonably necessary to evaluate the eligibility of Subscriber to acquire the Shares, and Subscriber shall provide such information as may be reasonably requested, to the extent readily available and to the extent consistent with its internal policies and procedures.

6.1.4    Each of the Subscriber and the Company shall pay all of its own expenses in connection with this Subscription Agreement and the transactions contemplated herein.

6.1.5    The Company acknowledges that, notwithstanding anything herein to the contrary, the Shares may be pledged by Subscriber in connection with a bona fide margin agreement, provided such pledge shall be (i) pursuant to an available exemption from the registration requirements of the Securities Act or (ii) pursuant to, and in accordance with, a registration statement that is effective under the Securities Act at the time of such pledge, and Subscriber effecting a pledge of Shares shall not be required to provide the Company with any notice thereof; provided, however, that neither the Company or its counsel shall be required to take any action (or refrain from taking any action) in connection with any such pledge, other than providing any such lender of such margin agreement with an acknowledgment that the Shares are not subject to any contractual prohibition on pledging or lock up, the form of such acknowledgment to be subject to review and comment by Company in all respects.

6.2    Notices. Any notice or communication required or permitted hereunder shall be in writing and either delivered personally, emailed or sent by overnight mail via a reputable overnight carrier, or sent by certified or registered mail, postage prepaid, and shall be deemed to be given and received (i) when so delivered personally, (ii) when sent, with no mail undeliverable or other rejection notice, if sent by email, or (iii) three (3) business days after the date of mailing to the address below or to such other address or addresses as such person may hereafter designate by notice given hereunder:

(i)    if to Subscriber, to such address or addresses set forth on the signature page hereto;

(ii)    if to the Company (prior to the Transaction closing), to:

Fortress Value Acquisition Corp. II
1345 Avenue of the Americas, 46th Floor
New York, New York 10105
Attention: Alexander Gillette
Email: agillette@fortress.com

with a required copy to (which copy shall not constitute notice):

17

> Skadden, Arps, Slate, Meagher & Flom LLP
> One Manhattan West
> New York, New York 10001
> Attention: Joseph A. Coco
>          Michael J. Zeidel
>          Blair T. Thetford
> Email: joseph.coco@skadden.com
>        michael.zeidel@skadden.com
>        blair.thetford@skadden.com

(iii)   if to the Company (following the Transaction closing), to:

> ATI Physical Therapy
> 790 Remington Blvd
> Bolingbrook, Illinois 60440
> Attention: Diana M. Chafey
> Email: diana.chafey@atipt.com

> with a required copy to (which copy shall not constitute notice):

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Alexander Lynch
> Email: alex.lynch@weil.com

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas 75201
> Attention: James R. Griffin
> Email: james.griffin@weil.com

6.3   Entire Agreement. This Subscription Agreement constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof. Except as otherwise expressly set forth in Section 6.1.1, this Subscription Agreement shall not confer rights or remedies upon any person other than the parties hereto and their respective successors and assigns, and Wilco Holdco, Inc. ("ATI"), which shall be a third-party beneficiary to this Subscription Agreement and shall be entitled to the rights and benefits hereunder and may enforce the provisions hereof as if it were a party hereto.

6.4   Modifications and Amendments. This Subscription Agreement may not be amended, modified or terminated (other than as set forth in Section 5) except by an instrument in writing, signed by both ATI and the party against whom enforcement of such amendment, modification or termination is sought; provided that Section 2, Section 6.1.1, Section 6.1.2 and this Section 6.4 of this Subscription Agreement may not be modified or terminated in a manner

18

that is material and adverse to the Placement Agents without the prior written consent of the Placement Agents.

6.5     Waivers and Consents. The terms and provisions of this Subscription Agreement may be waived, or consent for the departure therefrom granted, only by a written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Subscription Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

6.6     Assignment. Neither this Subscription Agreement nor any rights that may accrue to Subscriber hereunder (other than the Shares acquired hereunder and the rights set forth in Section 4) may be transferred or assigned without the prior written consent of the Company; *provided, however,* Subscriber may transfer its rights and obligations hereunder to, without the prior written consent of the Company, an affiliate or to another investment fund or account managed or advised by the same manager as Subscriber (or a related party or affiliate), *provided,* that no such transfer shall release Subscriber of its obligations hereunder without prior written consent of the Company.  Neither this Subscription Agreement nor any rights that may accrue to the Company hereunder may be transferred or assigned by the Company (provided, that, for the avoidance of doubt, the Company may transfer the Subscription Agreement and its rights hereunder in connection with the consummation of the Transaction).

6.7     Benefit. Except as otherwise provided herein, this Subscription Agreement shall be binding upon, and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns, and the agreements, representations, warranties, covenants and acknowledgments contained herein shall be deemed to be made by, and be binding upon, such heirs, executors, administrators, successors, legal representatives and permitted assigns.

6.8     Governing Law. This Subscription Agreement, and any claim or cause of action hereunder based upon, arising out of or related to this Subscription Agreement (whether based on law, in equity, in contract, in tort or any other theory) or the negotiation, execution, performance or enforcement of this Subscription Agreement, shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

6.9     Consent to Jurisdiction; WAIVER OF JURY TRIAL. Each of the parties irrevocably consents to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware, provided, that if subject matter jurisdiction over the matter that is the subject of the legal proceeding is vested exclusively in the U.S. federal courts, such legal proceeding shall be heard in the U.S. District Court for the District of Delaware (together with the Court of Chancery of the State of Delaware "**Chosen Courts**"), in connection with any matter based upon or arising out of this Subscription Agreement and each other document executed in connection with the Transaction, and the consummation thereof, agrees that process may be served upon them in any manner authorized by the laws of the State of Delaware for such persons and waives and covenants not to assert or plead any objection which they might otherwise have to such manner of service of

19

process. Each party hereby waives, and shall not assert as a defense in any legal dispute, that (i) such person is not personally subject to the jurisdiction of the Chosen Courts for any reason, (ii) such legal proceeding may not be brought or is not maintainable in the Chosen Courts, (iii) such person's property is exempt or immune from execution, (iv) such legal proceeding is brought in an inconvenient forum or (v) the venue of such legal proceeding is improper. Each party hereby agrees not to commence or prosecute any such action, claim, cause of action or suit other than before the Chosen Courts, nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit to any court other than the Chosen Courts, whether on the grounds of inconvenient forum or otherwise. Each Party hereby consents to service of process in any such proceeding in any manner permitted by Delaware law, and further consents to service of process by nationally recognized overnight courier service guaranteeing overnight delivery, or by registered or certified mail, return receipt requested, at its address specified pursuant to Section 6.2. Notwithstanding the foregoing in this Section 6.9, a party may commence any action, claim, cause of action or suit in a court other than the Chosen Courts solely for the purpose of enforcing an order or judgment issued by the Chosen Courts. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH OF THE PARTIES MAY DO SO ONLY IF HE, SHE OR IT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIMS OR COUNTERCLAIMS ASSERTED IN ANY LEGAL DISPUTE RELATING TO THIS SUBSCRIPTION AGREEMENT AND EACH OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE TRANSACTIONS, AND THE CONSUMMATION THEREOF, AND FOR ANY COUNTERCLAIM RELATING THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. IF THE SUBJECT MATTER OF ANY SUCH LEGAL DISPUTE IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NO PARTY SHALL ASSERT IN SUCH LEGAL DISPUTE A NONCOMPULSORY COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT AND EACH OTHER DOCUMENT EXECUTED IN CONNECTION WITH THE TRANSACTION, AND THE CONSUMMATION THEREOF. FURTHERMORE, NO PARTY SHALL SEEK TO CONSOLIDATE ANY SUCH LEGAL DISPUTE WITH A SEPARATE ACTION OR OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT BE WAIVED.

6.10   Specific Performance.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Subscription Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties (for the avoidance of doubt, including ATI) shall be entitled to an injunction or injunctions to prevent breaches of this Subscription Agreement and to enforce specifically the terms and provisions of this Subscription Agreement, this being in addition to any other remedy to which such party is entitled at law, in equity, in contract, in tort or otherwise.

6.11   Severability. If any provision of this Subscription Agreement shall be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Subscription Agreement shall not in any way be affected or impaired thereby and shall continue in full force and effect

6.12   No Waiver of Rights, Powers and Remedies. No failure or delay by a party hereto in exercising any right, power or remedy under this Subscription Agreement, and no course

20

of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of such party. No single or partial exercise of any right, power or remedy under this Subscription Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies. No notice to or demand on a party not expressly required under this Subscription Agreement shall entitle the party receiving such notice or demand to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the party giving such notice or demand to any other or further action in any circumstances without such notice or demand.

6.13    Survival of Representations and Warranties. All representations and warranties made by the parties hereto in this Subscription Agreement or in any other agreement, certificate or instrument provided for or contemplated hereby, shall survive the execution and delivery hereof and any investigations made by or on behalf of the parties.

6.14    No Broker or Finder: Expenses. Each of the parties hereto represents and warrants to the other that no broker, finder or other financial consultant has acted on its behalf in connection with this Subscription Agreement or the transactions contemplated hereby in such a way as to create any liability on the other. Each of the parties hereto shall pay all of its own expenses in connection with this Subscription Agreement and the transactions contemplated hereby.

6.15    Headings and Captions. The headings and captions of the various subdivisions of this Subscription Agreement are for convenience of reference only and shall in no way modify or affect the meaning or construction of any of the terms or provisions hereof.

6.16    Counterparts. This Subscription Agreement may be executed and delivered in one or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or any other form of electronic delivery (including .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com or other transmission method), such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

6.17    Construction. The words *"include," "includes,"* and *"including"* will be deemed to be followed by *"without limitation."* Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words *"this Subscription Agreement," "herein," "hereof," "hereby," "hereunder,"* and words of similar import refer to this Subscription Agreement as a whole and not to any particular subdivision unless expressly so limited. The parties hereto intend that each representation, warranty, and covenant contained herein will have independent significance. If any party hereto has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the

21

relative levels of specificity) which such party hereto has not breached will not detract from or mitigate the fact that such party hereto is in breach of the first representation, warranty, or covenant.

6.18    Mutual Drafting. This Subscription Agreement is the joint product of Subscriber and the Company and each provision hereof has been subject to the mutual consultation, negotiation and agreement of such parties and shall not be construed for or against any party hereto.

6.19    Limited Recourse. Except as expressly set forth in this Subscription Agreement or as otherwise required by law, no former, current or future equity holders, controlling persons, directors, officers, employees, agents, affiliates, members, managers, general or limited partners, representatives or assignees of Subscriber or any former, current or future equity holder, controlling person, director, officer, employee, agent, affiliate, member, manager, general or limited partner, representative or assignee of any of the foregoing, shall have any obligation to the Company or to any other person hereunder in connection with the transactions contemplated hereby.

7.    Disclosure. The Company shall, by 9:00 a.m., New York City time, on the first (1st) business day immediately following the date of this Subscription Agreement, issue one or more press releases or file with the SEC a Current Report on Form 8-K (collectively, the "**Disclosure Document**") disclosing all material terms of the transactions contemplated hereby, the Transaction and any other material, nonpublic information that the Company has provided to Subscriber at any time prior to the filing of the Disclosure Document (including, for the avoidance of doubt, the filing of a form of this Subscription Agreement as an exhibit thereto, and except as otherwise agreed between the Subscriber and the Company and/or the Target). From and after the issuance of the Disclosure Document, to the Company's knowledge, Subscriber shall not be in possession of any material, nonpublic information received from the Company or any of its officers, directors or employees (except as otherwise agreed between Subscriber and the Company and/or the Target). Notwithstanding anything in this Subscription Agreement to the contrary, the Company shall not publicly disclose the name of Subscriber or any of its affiliates, or include the name of Subscriber or any of its affiliates in any press release or in any filing with the SEC or any regulatory agency or trading market, without the prior written consent of Subscriber, except (i) as required by the federal securities law in connection with the Registration Statement, (ii) in a Current Report on Form 8-K (including, for the avoidance of doubt, the filing of a form of this Subscription Agreement as an exhibit thereto), a press release or other marketing materials of the Company in connection with the Transaction to the extent any such disclosure is substantially equivalent to the information that has previously been made public without breach of the obligation under this Section 7 if agreeable by Subscriber and in a manner acceptable to Subscriber, and (iii) to the extent such disclosure is required by law, at the request of the Staff of the SEC or regulatory agency or under the regulations of the NYSE or by any other governmental authority, in which case the Company shall provide Subscriber with prior written notice of such disclosure permitted under this subclause (iii).

8.    Trust Account Waiver. Subscriber acknowledges that the Company is a blank check company with the powers and privileges to effect a merger, asset acquisition, reorganization or similar business combination involving the Company and one or more businesses or assets.

22

Subscriber further acknowledges that, as described in the Company's prospectus relating to its initial public offering dated August 11, 2020 (the "**Prospectus**") available at www.sec.gov, substantially all of the Company's assets consist of the cash proceeds of Company's initial public offering and private placements of its securities, and substantially all of those proceeds have been deposited in a trust account (the "**Trust Account**") for the benefit of Company, its public shareholders and the underwriters of Company's initial public offering. Except with respect to interest earned on the funds held in the Trust Account that may be released to Company to pay its tax obligations, if any, the cash in the Trust Account may be disbursed only for the purposes set forth in the Prospectus. For and in consideration of the Company entering into this Subscription Agreement, the receipt and sufficiency of which are hereby acknowledged, Subscriber, on behalf of itself and its representatives, hereby irrevocably waives any and all right, title and interest, or any claim of any kind they have or may have in the future, in or to any monies held in the Trust Account, and agrees not to seek recourse against the Trust Account or make or bring any action, suit, claim or other proceeding against the Trust Account as a result of, or arising out of, this Subscription Agreement, the transactions contemplated hereby or the Shares, regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability. Subscriber acknowledges and agrees that it shall not have any redemption rights with respect to the Shares pursuant to the Company's certificate of incorporation in connection with the Transaction or any other business combination, any subsequent liquidation of the Trust Account or the Company or otherwise. In the event Subscriber has any claim against the Company as a result of, or arising out of, this Subscription Agreement, the transactions contemplated hereby or the Shares, it shall pursue such claim solely against the Company and its assets outside the Trust Account and not against the Trust Account or any monies or other assets in the Trust Account. This paragraph shall survive any termination of this Subscription Agreement. Notwithstanding the foregoing, nothing in this Section 8 shall be deemed to limit any of Subscriber's right, title, interest or claim to the Trust Account by virtue of such Subscriber's record or beneficial ownership of securities of the Company acquired by any means other than pursuant to this Subscription Agreement, including, but not limited to, any redemption right with respect to any such securities of the Company.

9.      Stock Splits, etc. If any change in the Common Stock shall occur between the date hereof and immediately prior to the Closing by reason of any reclassification, recapitalization, stock split (including reverse stock split) or combination, exchange or readjustment of shares, or any stock dividend, the number and type of Shares issued to the Subscriber and the Purchase Price shall be appropriately adjusted to reflect such change.

[*Signature Page Follows*]

23

**IN WITNESS WHEREOF,** each of the Company and Subscriber has executed or caused this Subscription Agreement to be executed by its duly authorized representative as of the date set forth below.

**FORTRESS VALUE ACQUISITION CORP. II**

By: _____
      Name:
      Title:

Accepted and agreed this _____st day of _____, 2021.

SUBSCRIBER:

Signature of Subscriber:                          Signature of Joint Subscriber, if applicable:

By: _____                      By: _____
Name:                                             Name:
Title                                             Title

**Date:** _____, 2021

Name of Subscriber:                               Name of Joint Subscriber, if applicable:

_____                          _____
(Please print. Please indicate name and          (Please Print. Please indicate name and
capacity of person signing above)                 capacity of person signing above)

_____
Name in which securities are to be registered
(if different from the name of Subscriber
listed directly above):

Email Address:

If there are joint investors, please check one:

☐       Joint Tenants with Rights of Survivorship

☐       Tenants-in-Common

☐       Community Property

Subscriber's EIN:_____                 Joint Subscriber's EIN:_____

Business Address-Street:                          Mailing Address-Street (if different):

_____                          _____

_____                          _____
City, State, Zip:                                 City, State, Zip:

Attn:                                             Attn:

Telephone No.:_____                    Telephone No.:_____

Facsimile No.:_____                    Facsimile No.:_____

Aggregate Number of Shares subscribed for: _____

Aggregate Purchase Price:    $_____.

You must pay the Purchase Price by wire transfer of U.S. dollars in immediately available funds to the account specified by the Company in the Closing Notice.

**SCHEDULE A**
**ELIGIBILITY REPRESENTATIONS OF SUBSCRIBER**

A.  QUALIFIED INSTITUTIONAL BUYER STATUS
    (Please check the applicable subparagraphs):

    1.   ❑ We are a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act") (a "QIB")).

    2.   ❑ We are subscribing for the Shares as a fiduciary or agent for one or more investor accounts, and each owner of such account is a QIB.

*** OR ***

B.  INSTITUTIONAL ACCREDITED INVESTOR STATUS
    (Please check the applicable subparagraphs):

    1.   ❑ We are an "accredited investor" (within the meaning of Rule 501(a) under the Securities Act) or an entity in which all of the equity holders are accredited investors within the meaning of Rule 501(a) under the Securities Act, and have marked and initialed the appropriate box on the following page indicating the provision under which we qualify as an "accredited investor."

    2.   ❑ We are not a natural person.

*** AND ***

C.  AFFILIATE STATUS
    (Please check the applicable box) SUBSCRIBER:

    ❑      is:

    ❑      is not:

    an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company or acting on behalf of an affiliate of the Company.

*This page should be completed by Subscriber and constitutes a part of the Subscription Agreement*

Rule 501(a), in relevant part, states that an "accredited investor" shall mean any person who comes within any of the below listed categories, or who the issuer reasonably believes comes within any of the below listed categories, at the time of the sale of the securities to that person. Subscriber has indicated, by marking and initialing the appropriate box below, the provision(s) below which apply to Subscriber and under which Subscriber accordingly qualifies as an "accredited investor."

❑ Any bank, registered broker or dealer, insurance company, registered investment company, business development company, or small business investment company; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

❑ Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

❑ Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

❑ Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

❑ Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000. For purposes of calculating a natural person's net worth: (i) the person's primary residence shall not be included as an asset; (ii) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (iii) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

❑ Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of

*This page should be completed by Subscriber and constitutes a part of the Subscription Agreement*

$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

❑        Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person; or

❑        Any entity in which all of the equity owners are accredited investors meeting one or more of the above tests.

*This page should be completed by Subscriber and constitutes a part of the Subscription Agreement*

**EXHIBIT D**

**Stockholders Agreement**

## STOCKHOLDERS AGREEMENT

**THIS STOCKHOLDERS AGREEMENT** (this "Agreement") is made as of the 21st day of February, 2021, and shall be effective as of the Effective Time, by and among Fortress Value Acquisition Corp. II, a Delaware corporation (the "Company"), and each of the investors listed on Schedule A hereto and any additional investor that becomes a party to this Agreement in accordance with Section 4.1.

## RECITALS

**WHEREAS**, the Company and Wilco Holdco, Inc., a Delaware corporation ("Legacy ATI"), are party to that certain Agreement and Plan of Merger, dated as of February 21, 2021 (as it may be amended, supplemented, restated or otherwise modified from time to time, the "Merger Agreement"), by and among the Company, Legacy ATI, and FVAC Merger Corp. II, a Delaware corporation and a wholly owned subsidiary of the Company ("Merger Sub"), pursuant to which Merger Sub will merge with and into Legacy ATI, with Legacy ATI being the surviving entity and a wholly-owned subsidiary of the Company (the "Merger");

**WHEREAS**, as a result of the consummation of the transactions contemplated by the Merger Agreement, the Advent Stockholders will become stockholders of the Company and will cease to be stockholders of Legacy ATI; and

**WHEREAS**, contemporaneously with the execution and delivery of the Merger Agreement, the parties hereto desire to enter into this Agreement, to be effective upon the Effective Time.

**NOW**, **THEREFORE**, in consideration of the foregoing, and the mutual agreements and understandings set forth herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Definitions. For purposes of this Agreement:

"Advent Director" shall mean an individual elected to the Board of Directors that has been designated, nominated or appointed by the Advent Stockholders pursuant to this Agreement. For the avoidance of doubt, the "Advent Designated Directors" shall be deemed to have been designated, nominated or appointed, as applicable, by the Advent Stockholders pursuant to this Agreement.

"Advent Stockholders" shall mean the Advent Stockholders listed on Schedule A, together with their respective successors and any Permitted Transferee that becomes a party hereto pursuant to Section 4.1.

"Affiliate" shall mean, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including any general partner, managing member, officer or director of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing

1

members of, or shares the same management company with, such Person; provided, that "Affiliate" with respect to the Advent Stockholders shall not include the Company or its Subsidiaries. As used in this definition, the term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Applicable Governance Rules" means applicable federal and state securities Law and the rules of the NYSE relating to the Board and the corporate governance of the Company, including, without limitation, Rule 10A-3 of the Exchange Act and Rule 303A of the NYSE Listed Company Manual.

"Beneficially Own" shall have the meaning set forth in Rule 13d-3 of the rules and regulations under the Exchange Act. For the avoidance of doubt, the beneficial ownership of the Advent Stockholders shall be aggregated together along with the beneficial ownership of their Affiliates.

"Certificate of Incorporation" shall mean the Acquiror A&R Charter (as defined in the Merger Agreement) as in effect upon the Filing and thereafter from time to time amended in accordance with the terms hereof and thereof and pursuant to applicable Law.

"Common Stock" shall mean Class A Common Stock, par value $0.0001 per share, of the Company.

"Company Shares" shall mean shares of Common Stock and any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly), shares of Common Stock, including options and warrants.

"Disqualified Director" means any Person prohibited or disqualified from serving as a Director of the Company pursuant to any rule or regulation of the SEC or the rules of the securities exchange on which the Company's securities are listed or by applicable Law.

"Director" shall mean a member of the Board of Directors of the Company.

"Effective Time" shall have the meaning set forth in the Merger Agreement.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Filing" shall mean the filing of the Certificate of Incorporation with the Secretary of State of the State of Delaware.

"Governmental Authority" means any federal, state, provincial, municipal or local government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, arbitrator, court or tribunal of (a) the United States or (b) any state, commonwealth, province, territory or possession of the United States and any political subdivision thereof (including counties and municipalities).

"Governmental Order" means any ruling, order, judgment, injunction, edict, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"Independent Director" means a Director who is, as of the date of such Director's election or appointment and as of any other date on which the determination is being made, an NYSE Independent Director and an SEC Independent Director.

"Law" means any common law, statutes, constitution, treaty, resolutions, rules, codes, regulations, ordinances, restrictions or Governmental Orders of, or issued by, a Governmental Authority.

"Majority Advent Stockholders" means the affirmative vote of the Advent Stockholders who hold a number of Company Shares representing more than fifty percent (50%) of the aggregate number of Company Shares held by the Advent Stockholders.

"Necessary Action" shall mean, with respect to a specified result, all actions (to the extent such actions are permitted by Law, within such party's control and do not conflict with the terms of this Agreement) reasonably necessary to cause such result, including (a) voting or providing a written consent or proxy with respect to the Company Shares, (b) causing the adoption of stockholders' resolutions and amendments to the Certificate of Incorporation, (c) executing agreements and instruments, (d) causing the members of the Board of Directors to take such actions (to the extent allowed by Delaware Law) and/or (e) making, or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations, publications or similar actions that are required to achieve such result.

"NYSE Independent Director" means a Director who qualifies, as of the date of such Director's election or appointment to the Board of Directors and as of any other date on which the determination is being made, as an "Independent Director" under the listing requirements of the NYSE, as amended from time to time, as determined by the Board of Directors without the vote of such Director.

"Permitted Transferee" shall mean, with respect to any Person, (a) any Affiliate of such Person, (b) with respect to any Person that is an investment fund, vehicle or similar entity, (i) any other investment fund, vehicle or similar entity of which such Person or an Affiliate, advisor or manager of such Person serves as the general partner, manager or advisor and (ii) any direct or indirect limited partner or investor in such investment fund, vehicle or similar entity or any direct or indirect limited partner or investor in any other investment fund, vehicle or similar entity of which such Person or an Affiliate, advisor or manager of such Person serves as the general partner, manager or advisor (provided, however, that in no event shall any "portfolio companies" (as such term is customarily used in the private equity industry) of any such Person or any entity that is controlled by a "portfolio company" of any such Person constitute a Permitted Transferee) and (c) in the case of any Person who is an individual, (i) any successor by death or (ii) any trust, partnership, limited liability company or similar entity solely for the benefit of such individual or such individual's spouse or lineal descendants, provided that such individual acts as trustee, general partner or managing member and retains the sole power to direct the voting and disposition of the transferred Company Shares.

"Person" shall mean any individual, corporation, partnership, trust, limited liability company, association or other entity.

"SEC" means the United States Securities and Exchange Commission.

"SEC Independent Director" means a Director who qualifies, as of the date of such Director's election or appointment to the Board of Directors and as of any other date on which the determination is being made, as an "Independent Director" under Rule 10A-3 under the Exchange Act, as determined by the Board of Directors without the vote of such Director.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Subsidiary" means, with respect to a Person, any corporation or other organization (including a limited liability company or a partnership), whether incorporated or unincorporated, of which such Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization or any organization of which such Person or any of its Subsidiaries is, directly or indirectly, a general partner or managing member.

2.      Board of Directors.

2.1     The Company shall take all Necessary Action such that as of the Effective Time:

(a)     the size of the Board of Directors shall be set at eight Directors;

(b)     the members of the Board of Directors shall be constituted as follows: (i) the seven individuals identified on Schedule B as Advent Designated Directors (the "Advent Designated Directors"), at least five of whom shall (A) not be Affiliates of the Advent Stockholders or any other holder of equity interests of Legacy ATI immediately prior to the Effective Time, and (B) be Independent Directors; and (ii) the individual identified on Schedule B as the Additional Designated Director (the "Additional Designated Director," and together with the Advent Designated Directors, the "Designated Directors"); provided, however, that, if the Additional Designated Director qualifies as an Independent Director, only four of the seven Advent Designated Directors must be persons satisfying the criteria described in subclauses "(A)" and "(B)" of clause "(i)" of this Section 2.1(b);

(c)     one of the Advent Designated Directors shall serve as Chairman of the Board of Directors, who shall initially be the individual identified on Schedule B as the Chairman of the Board of Directors;

(d)     three Advent Designated Directors shall be appointed as Class III Directors as set forth on Schedule B with terms ending at the third Annual Meeting of Stockholders following the Effective Time;

4

(e)      two Advent Designated Directors shall be appointed as Class II Directors as set forth on Schedule B with terms ending at the second Annual Meeting of Stockholders following the Effective Time; and

(f)      two Advent Designated Directors and the Additional Designated Director as set forth on Schedule B shall be appointed as Class I Directors with terms ending at the first Annual Meeting of Stockholders following the Effective Time.

2.2      (a)      Following the Effective Time, the Advent Stockholders shall be entitled to designate for nomination to the Board of Directors a number of persons (the "Advent Nominees") (and such persons shall be included in any proxy statement prepared by the Company in connection with soliciting proxies for any meeting of the stockholders of the Company called with respect to the election of Directors, and at any adjournment or postponement thereof (the "Company Proxy Statement"), and on any action or approval of the stockholders of the Company with respect to the election of Directors), based on (x) the number of continuing Advent Directors on the Board of Directors following the applicable action, and (y) the aggregate number of Company Shares held by the Advent Stockholders as of the date of receipt of the Company Notice provided in accordance with Section 2.2(b). The number of Advent Nominees that the Advent Stockholders shall be entitled to designate for nomination to the Board of Directors shall be as follows:

(i)      if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is equal to or greater than 50% of the outstanding Company Shares, such number of Advent Nominees to ensure that, following the applicable action, the Board of Directors includes at least five Advent Directors;

(ii)      if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 50% and equal to or greater than 38% of the outstanding Company Shares, such number of Advent Nominees to ensure that, following the applicable action, the Board of Directors includes at least four Advent Directors;

(iii)      if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 38% and equal to or greater than 26% of the outstanding Company Shares, such number of Advent Nominees to ensure that, following the applicable action, the Board of Directors includes at least three Advent Directors;

(iv)      if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 26% and equal to or greater than 13% of the outstanding Company Shares, such number of Advent

5

Nominees to ensure that, following the applicable action, the Board of Directors includes at least two Advent Directors;

(v)     if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 13% and equal to or greater than 5% of the outstanding Company Shares, such number of Advent Nominees to ensure that, following the applicable action, the Board of Directors includes at least one Advent Director; and

(vi)     if, as of the date of receipt of the Company Notice provided by the Company in accordance with Section 2.2(b), the aggregate number of Company Shares held by the Advent Stockholders is less than 5% of the outstanding Company Shares, Advent Stockholders shall not be entitled to designate any Advent Nominees to the Board of Directors.

(b)     The Company shall provide the Advent Stockholders with written notice of the date on which the Company expects to file any Company Proxy Statement pursuant to which action to elect Directors is to be taken (the "Company Notice") at least 30 days prior to such filing date. The Advent Stockholders shall designate the Advent Nominees for nomination to the Board of Directors by giving written notice to the Company setting forth the name and address of the Advent Nominee promptly following receipt of the Company Notice, and in any event, within 10 business days following receipt of the Company Notice.

(c)     Subject to Section 2.2(d), the Company shall take all Necessary Action to (i) (x) ensure that each of the Advent Nominees that are properly nominated pursuant to this Section 2.2 are included in the nominees to the Board of Directors on each slate of nominees for election of Directors proposed by the Board of Directors and (y) recommend the election of the Advent Nominees that are properly nominated pursuant to this Section 2.2 to the stockholders of the Company; and (ii) ensure that each of the Advent Nominees that are properly nominated pursuant to this Section 2.2 is included as a nominee to the Board of Directors in any Company Proxy Statement, and on every action or approval by written resolution of the stockholders of the Company or the Board of Directors with respect to the election of Directors, as applicable.

(d)     Any nominated Director shall be subject to customary due diligence process, including a review of a completed questionnaire and a customary background check. Based on the foregoing, the Company may reasonably object to any such nominee within 15 days of receiving such completed questionnaire and background check authorization, (i) provided it does so in good faith and (ii) solely to the extent such objection is based upon any of the following: (A) such nominee was convicted in a criminal proceeding (excluding traffic violations and other minor offenses); or (B) such nominee was the subject of any order, judgment or decree not subsequently reversed, suspended or vacated of any court of competent jurisdiction or any administrative body (including the SEC), permanently or temporarily enjoining, or otherwise limiting in a material way, such proposed Director from engaging in any business activity as a result of any violation by such proposed Director of federal or state securities Laws. In the event the Board of Directors reasonably finds any such nominee to be unsuitable based upon one or more of the foregoing clauses "(A)" or "(B)" and reasonably objects to such nominated Director, the

6

Advent Stockholders that nominated such Director shall be entitled to propose a different nominee to the Board of Directors within 15 days of the Company's notice to the Advent Stockholders of its objection to such nominee and such replacement nominee shall be subject to the review process outlined in this Section 2.2(d). The Advent Stockholders shall not nominate a Disqualified Director.

2.3     Board Size.  For so long as the Advent Stockholders shall have the right to designate an Advent Nominee, the Company shall not, directly or indirectly, without the prior written consent of the Majority Advent Stockholders, increase the size of the Board of Directors in excess of eight members.  In the event that the size of the Board of Directors is increased, the number of Advent Nominees that the Advent Stockholders shall be entitled to designate for nomination to the Board of Directors set forth in Section 2.2 shall be proportionately adjusted to provide the same effect as contemplated by such Section 2.2 prior to such action.

2.4     Removal; Resignation.  Any Director may resign at any time upon written notice to the Company. If the Advent Stockholders notify the Company that the Advent Stockholders desire to remove an Advent Director with cause, then such Director shall be removed from the Board of Directors and the Company shall take all Necessary Action to cause such removal of such Director.

2.5     Vacancies. In the event that a vacancy is created on the Board of Directors at any time by the death, disability, retirement, resignation or removal of any Advent Director, each party shall take all Necessary Action to elect or appoint an Advent Designated Director to replace the Advent Director whose death, disability, retirement, resignation or removal resulted in such vacancy on the Board of Directors. Notwithstanding anything to the contrary, the director position for such Advent Director shall not be filled pending such designation and appointment, unless the Advent Stockholders fail to designate an Advent Nominee for more than 15 days, after which the Company may appoint a successor Director until the Advent Stockholders make such designation.

2.6     Expenses. The Company shall cause the Advent Directors to be reimbursed for all reasonable out-of-pocket expenses incurred in connection with their attendance at meetings of the Board of Directors and any committees thereof, including travel, lodging and meal expenses.

2.7     Committees of the Board. Immediately following the Effective Time, the Company shall establish and, following the Effective Time, maintain, in accordance with the Bylaws, an audit committee, a compensation committee, a compliance committee and a nominating and corporate governance committee.  The committees shall have such duties and responsibilities as are customary for such committees, subject to the provisions of this Agreement and Applicable Governance Rules, and shall be composed as follows:

(a)     The audit committee shall consist of three Independent Directors (at least one of whom shall satisfy the "audit committee financial expert" requirements as such term is defined by Item 407(d)(5) of Regulation S-K). The members of the audit committee shall be determined by the Board of Directors (upon the recommendation of the nominating and corporate governance committee); provided, that the Company shall take all Necessary Action such that the audit committee members and the audit committee chairperson immediately following the

7

Effective Time shall be as set forth on Schedule B; provided, further, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors on the Board of Directors, take all necessary steps to cause at least a majority of the members of the audit committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules and (ii) for so long as there is one Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of the audit committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

(b)     The compensation committee shall consist of three Directors. The members of the compensation committee shall be determined by the Board of Directors (upon the recommendation of the nominating and corporate governance committee); provided, that the Company shall take all Necessary Action such that the compensation committee members and the compensation committee chairperson immediately following the Effective Time shall be as set forth on Schedule B shall be; provided, further, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors on the Board of Directors, take all necessary steps to cause at least a majority of the members of the compensation committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules, and (ii) for so long as there is one Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of the compensation committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

(c)     The compliance committee shall consist of three Directors. The members of the compliance committee shall be determined by the Board of Directors (upon the recommendation of the nominating and corporate governance committee); provided, that the Company shall take all Necessary Action such that the compliance committee members and the compliance committee chairperson immediately following the Effective Time shall be as set forth on Schedule B; provided, further, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors on the Board of Directors, take all necessary steps to cause at least a majority of the members of the compliance committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules and (ii) for so long as there is one Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of the compliance committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

(d)     The nominating and corporate governance committee shall consist of three Directors. The members of the nominating and corporate governance committee shall be determined by the Board of Directors; provided, that the Company shall take all Necessary Action such that the nominating and corporate governance committee members and the nominating and corporate governance committee chairperson immediately following the Effective Time shall be as set forth on Schedule B; provided, further, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors on the Board of Directors, take all necessary steps to cause at least a majority of the members of the nominating and corporate governance committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules and (ii) for so long as there is one

8

Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of the nominating and corporate governance committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

(e)     To the extent that the Board of Directors forms any other committees of the Board of Directors, then such members shall be determined by the Board of Directors (upon the recommendation of the nominating and governance committee); provided, that the Board of Directors shall, (i) for so long as there are two or more Advent Directors, take all necessary steps to cause at least a majority of the members of such committee to be composed of Advent Directors, unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules and (ii) for so long as there is one Advent Director, take all necessary steps to cause the Advent Director to be appointed as a member of such committee unless such designation would violate any legal restriction on such committee's composition or Applicable Governance Rules.

2.8     D&O Insurance. The Company shall obtain directors' and officers' liability insurance that shall be effective as of the Effective Time and will cover the directors and officers of the Company (including the Directors) and its Subsidiaries at and after the date hereof in an amount and upon terms typical and reasonable for a directors' and officers' liability insurance policy for a company whose equity is listed on the NYSE. The directors' and officers' liability insurance policy shall have a scope of coverage terms and limits that are reasonably appropriate for a company of similar characteristics (including the line of business, market capitalization and revenues) as the Company and its Subsidiaries.

3.     Right to Conduct Activities. The Company expressly acknowledges and agrees that: (a) the Advent Stockholders and each Advent Director who is an employee of an Advent Stockholder or any Affiliate thereof shall have the right to, and shall have no duty (contractual or otherwise) not to, directly or indirectly, engage in the same or similar business activities or lines of business as the Company or its Subsidiaries, including those deemed to be competing with the Company or its Subsidiaries; and (b) in the event that an Advent Stockholder or any Advent Director or any of their respective Affiliates acquires knowledge of a potential transaction or matter that may be a corporate opportunity for both the Company or its Subsidiaries and such Advent Stockholder, Advent Director or any other Person, the Advent Stockholder, Advent Director or Affiliate thereof, as applicable, shall have no duty (contractual or otherwise) to communicate or present such corporate opportunity to the Company or its Subsidiaries, as the case may be, and, notwithstanding any provision of this Agreement to the contrary, shall not be liable to the Company or its Subsidiaries or their respective Affiliates or equityholders for breach of any duty (contractual or otherwise) by reason of the fact that such Advent Stockholder, Advent Director or Affiliate, as applicable, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to the Company or its Subsidiaries, unless, in the case of this clause "(b)," such potential transaction or matter that may be a corporate opportunity is expressly offered or presented to, acquired, created or developed by, or otherwise comes into the possession of, an Advent Director in his or her capacity as a Director or through his or her services to, or pursuant to a contract with, the Company or any of its Subsidiaries; provided, that the Advent Stockholders and each Advent Director shall not use any confidential information of the Company or its Subsidiaries for any purpose in connection with any of the foregoing.

9

4. Miscellaneous.

4.1 Successors and Assigns. No party shall assign this Agreement or any part hereof without the prior written consent of the other parties; provided, however, that the rights under this Agreement may be assigned (but only with all related obligations) by an Advent Stockholder to a Permitted Transferee of such Advent Stockholder; provided, that (a) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such Permitted Transferee and the Company Shares with respect to which such rights are being transferred and (b) such Permitted Transferee agrees in a written instrument delivered to the Company to be bound by and subject to the terms and conditions of this Agreement. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

4.2 Effectiveness; Termination. This Agreement shall not be effective until the Effective Time. In the event the Merger Agreement is terminated in accordance with its terms, this Agreement shall automatically terminate and be of no further force or effect. In addition, this Agreement shall terminate and be of no further force and effect upon the earlier of (a) the written agreement to terminate this Agreement of the Company and the Advent Stockholders who, as of the date of such written agreement, hold the majority of the Company Shares held by all Advent Stockholders and (b) the date on which the Advent Stockholders no longer hold Company Shares; provided, however, that such termination shall not release any party of any liability for any breach of this Agreement occurring prior to such termination.

4.3 Governing Law. This Agreement, and all claims or causes of action (whether in contract, tort or otherwise) based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

4.4 Consent to Jurisdiction. In any action between any of the parties arising out of or relating to this Agreement or any of the transactions contemplated hereby, each of the parties: (a) irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in any state court of Delaware (unless the federal courts have exclusive jurisdiction over the matter, in which case each of the Parties irrevocably and unconditionally consents and submits to the jurisdiction of the United States District Court for the District of Delaware); (b) agrees that it will not attempt to deny or defeat such jurisdiction by motion or other request for leave from such court; and (c) agrees that it will not bring any such action in any court other than such courts. Service of any process, summons, notice or document to any party's address and in the manner set forth in Section 4.7 shall be effective service of process for any such action. Each of the parties agrees that the mailing of process or other papers in connection with any action or proceeding in the manner provided in Section 4.7 or such other manner as may be permitted by requirement of Law shall be valid and

10

sufficient service of process. Notwithstanding the foregoing in this <u>Section 4.4</u>, a party may commence any action or proceeding in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts. Each party hereto further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.

        4.5     <u>Waiver of Jury Trial</u>. TO THE EXTENT PERMITTED BY LAW, EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES (AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE) THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE OTHER PARTIES TO ENTER INTO THIS AGREEMENT.

        4.6     <u>Captions; Counterparts</u>. The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement. This Agreement may be executed in multiple counterparts, each of which when executed and delivered shall thereby be deemed to be an original and all of which taken together shall constitute one and the same instrument. Any party may deliver signed counterparts of this Agreement to the other parties by means of facsimile, portable document format (.PDF) signature or electronic transmission.

        4.7     <u>Notices</u>. To be valid for purposes hereof, any notice, request, demand, waiver, consent or approval (any of the foregoing, a "<u>Notice</u>") that is required hereunder shall be in writing. A Notice shall be deemed given only as follows: (a) on the date delivered personally or by email (provided that the email is not bounced back); (b) three business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or (c) one business day following deposit with a nationally recognized overnight courier service for next day delivery, charges prepaid, and, in each case, addressed to the intended recipient as set forth below:

        If to the Company (prior to the Effective Time):

            Fortress Value Acquisition Corp. II
            1345 Avenue of the Americas
            46th Floor
            New York, New York
            Attention:    Alexander Gillette
            E-mail:       agillette@fortress.com

            with a copy (which will not constitute notice) to:

            Skadden, Arps, Slate, Meagher & Flom LLP
            One Manhattan West
            New York, New York 10001

Attention:    Joseph A. Coco
                  Blair T. Thetford
Email:         Joseph.Coco@skadden.com
                  Blair.Thetford@skadden.com

If to Legacy ATI (and, following the Effective Time, the Company):

ATI Physical Therapy
790 Remington Blvd.
Bolingbrook, Illinois 60440
Attention:    Diana M. Chafey
Email:         diana.chafey@atipt.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
100 Federal Street, 34th Floor
Boston, Massachusetts 02110
Attention:    Marilyn French Shaw
Email:         MarilynFrench.Shaw@weil.com

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention:    James R. Griffin
Email:         James.Griffin@weil.com

If to an Advent Stockholder, to the address set forth below such Advent Stockholder's name on <u>Schedule A</u> hereto. Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by providing Notice to the other parties.

4.8    <u>Amendments and Waivers</u>. This Agreement may be amended or modified in whole or in part only by a duly authorized agreement in writing duly executed by the Company and the Advent Stockholders that then hold Company Shares that makes reference to this Agreement; <u>provided</u>, <u>however</u>, that <u>Schedule A</u> to this Agreement may be amended at any time by the Company to add as a party hereto any Person that acquires any Company Shares in compliance with the terms of this Agreement and executes a supplemental signature page. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

4.9    <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon determination by a court of competent jurisdiction that any term or other

12

provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

4.10    Conflict with Certificate of Incorporation. In the event of a conflict between the Certificate of Incorporation and this Agreement, it is expressly agreed that, to the extent not inconsistent with Delaware Law, as between the Advent Stockholders this Agreement shall prevail and the parties shall use reasonable best efforts to amend the Certificate of Incorporation to be consistent with this Agreement. For the avoidance of doubt, nothing contained in this Agreement shall be deemed to constitute an amendment of the Certificate of Incorporation or of any previous certificate of incorporation of the Company. Notwithstanding any other provisions of this Agreement, to the extent not inconsistent with Delaware Law, the Company undertakes to be bound by and comply with the terms and conditions of this Agreement insofar as the same relates to the Company and any Subsidiaries of the Company and to act in all respects as contemplated by this Agreement.

4.11    Entire Agreement. This Agreement constitutes the entire agreement among the parties relating to the transactions contemplated hereby and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof. No representations, warranties, covenants, understandings or agreements, oral or otherwise, relating to the transactions contemplated hereby exist between the parties hereto except as expressly set forth or referenced in this Agreement.

4.12    Delays or Omissions. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by Law or otherwise afforded to any party, shall be cumulative and not alternative.

4.13    Construction. Any use of the singular or plural, or the masculine, feminine, or neuter gender, includes the others, unless the context otherwise requires; "*including*" means "*including without limitation*;" "*or*" means "*and/or*;" "*any*" means "*any one, more than one, or all*.". The words "*this Agreement*," "*herein*," "hereof," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.. The parties hereto intend that each representation, warranty and covenant contained herein will have independent significance. If any party hereto has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which such party has not breached will not detract from or mitigate the fact that such party is in breach of the first representation, warranty or covenant. All references in this Agreement to numbers of shares, per share amounts and purchase prices shall be appropriately adjusted to reflect any stock split, reverse stock split, stock dividend, reorganization, recapitalization, reclassification, combination, exchange of shares or other like change or transaction occurring after the date hereof.

13

*[Remainder of Page Intentionally Left Blank]*

14

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Stockholders Agreement as of the date first written above.

**FORTRESS VALUE ACQUISITION CORP. II**

By: _____

Name:

Title:

[SIGNATURE PAGE TO STOCKHOLDERS AGREEMENT]

[●]

By: _____
Name:
Title:

[Signature Page to Stockholders Agreement]

**Schedule A**
**Advent Stockholders**

| | |
|---|---|
| Wilco Acquisition, LP | c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street Wilmington, DE 19801 |
| WILCO GP, INC. | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-A Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-B Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-C Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-D Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-E Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-F Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-G Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent International GPE VII-H Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent Partners GPE VII Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent Partners GPE VII – A Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |

| | |
|---|---|
| Advent Partners GPE VII Cayman Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent Partners GPE VII – A Cayman Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| Advent Partners GPE VII – B Cayman Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| ADVENT PARTNERS GPE VII 2014 LIMITED PARTNERSHIP | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| ADVENT PARTNERS GPE VII 2014 CAYMAN LIMITED PARTNERSHIP | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| ADVENT PARTNERS GPE VII-A 2014 LIMITED PARTNERSHIP | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| ADVENT PARTNERS GPE VII-A 2014 CAYMAN LIMITED PARTNERSHIP | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |
| GPE VII ATI Co-Investment (Delaware) Limited Partnership | c/o Advent International Corporation 75 State Street Boston, MA, 02109 |

**Schedule B**
**Directors**

| Designation | Director Appointees | Class | Committee membership (including any chairperson designation) |
|---|---|---|---|
| Additional Designated Director | Drew McKnight | I | Compliance |
| Advent Designated Director | John Maldonado | II | Compliance Nominating and Corporate Governance |
| Advent Designated Director | Carmine Petrone | III | Compensation (Chair) |
| Advent Designated Director | Chris Krubert | III | Compensation Compliance (Chair) |
| Advent Designated Director | John Larsen (Chairman of the Board of Directors) | III | Audit Nominating and Corporate Governance (Chair) |
| Advent Designated Director | Labeed Diab | I | |
| Advent Designated Director | Joanne Burns | II | Audit Compensation |
| Advent Designated Director | Jamie Parisi | II | Audit (Chair) Nominating and Corporate Governance |

**EXHIBIT E**

**Registration Rights Agreement**

*Execution Version*

## AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT

THIS AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT (this "*Agreement*"), dated as of February 21, 2021, is made and entered into by and among Fortress Value Acquisition Corp. II, a Delaware corporation (the "*Company*"), Fortress Acquisition Sponsor II LLC, a Delaware limited liability company (the "*Sponsor*"), the undersigned parties listed under Existing Holders on the signature page hereto (each such party, together with the Sponsor and any person or entity deemed an "Existing Holder" , an "*Existing Holder*" and collectively the "*Existing Holders*") and the undersigned parties listed under New Holders on the signature page hereto (each such party, together with any person or entity deemed a "New Holder" who hereafter becomes a party to this Agreement pursuant to Section 6.2 of this Agreement, a "*New Holder*" and collectively the "*New Holders*"). Capitalized terms used but not otherwise defined in this Agreement shall have the meaning ascribed to such term in the Merger Agreement (as defined below).

## RECITALS

**WHEREAS,** the Company and the Existing Holders are party to that certain Registration Rights Agreement dated August 11, 2020 (the "*Existing Registration Rights Agreement*"), pursuant to which the Company granted the Existing Holders certain registration rights with respect to certain securities of the Company;

**WHEREAS,** the New Holders and Wilco Holdco, Inc. ("**ATI**") are party to that certain Amended and Restated Stockholders Agreement dated August 31, 2016 (the "**ATI Stockholders Agreement**"), which may be terminated by agreement of each of the New Holders, pursuant to the terms of thereof;

**WHEREAS**, the Company has entered into that certain Agreement and Plan of Merger (the "*Merger Agreement*"), dated as of February 21, 2021, by and among the Company, FVAC Merger Corp. II, a Delaware corporation and a direct, wholly-owned subsidiary of the Company, and ATI, a Delaware corporation;

**WHEREAS**, pursuant to the transactions contemplated by the Merger Agreement and subject to the terms and conditions set forth therein, the New Holders will receive shares of common stock, par value $0.0001, of the Company ("*Company Stock*"), upon the Closing (as defined in the Merger Agreement);

**WHEREAS**, certain New Holders may receive additional shares of Company Stock (the "*Earn Out Shares*") pursuant to the earn out provisions in the Merger Agreement;

**WHEREAS**, the Company and the Sponsor have entered into that certain Securities Subscription Agreement, dated as of June 15, 2020, pursuant to which the Sponsor purchased an aggregate of 8,625,000 shares (the "*Founder Shares*") of the Company's Class F common stock, par value $0.0001 per share (the "*Class F Common Stock*"), and the Sponsor subsequently transferred an aggregate of 100,000 Founder Shares to the other Existing Holders;

WHEREAS, the Sponsor purchased an aggregate of 5,933,333 warrants to purchase one share of Common Stock (each, a "*Placement Warrant*" and collectively, the "*Placement Warrants*") pursuant to that certain Private Placement Warrants Purchase Agreement between the Company and the Sponsor, dated as of August 11, 2020, in a private placement transaction exempt from registration under the Securities Act (the "Private Placement") occurring simultaneously with the closing of the Company's initial public offering;

**WHEREAS**, the Company and certain Holders have entered into that certain Amended & Restated Letter Agreement (the "*Sponsor Agreement*"), dated as of February 21, 2021, wherein the Sponsor and such Holders agreed, in connection with the Closing, to subject the Founder Shares held by the Sponsor to certain vesting requirements, in accordance with the terms of the Sponsor Agreement;

**WHEREAS**, pursuant to Section 5.5 of the Existing Registration Rights Agreement, the provisions, covenants and conditions set forth therein may be amended or modified upon the written consent of the Company and the Existing Holders of a majority-in-interest of the "Registrable Securities" (as such term was defined in the Existing Registration Rights Agreement) at the time in question; and

**WHEREAS**, the Company and all of the Existing Holders desire to amend and restate the Existing Registration Rights Agreement in order to provide the Existing Holders and the New Holders certain registration rights with respect to certain securities of the Company, as set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the representations, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
DEFINITIONS

1.1      Definitions. The terms defined in this *Article I* shall, for all purposes of this Agreement, have the respective meanings set forth below:

"***Adverse Disclosure***" shall mean any public disclosure of material non-public information, which disclosure, in the good faith judgment of the Board, the Chief Executive Officer or the Chief Financial Officer of the Company, after consultation with counsel to the Company, (i) would be required to be made in any Registration Statement or Prospectus in order for the applicable Registration Statement or Prospectus not to contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein (in the case of any prospectus and any preliminary prospectus, in the light of the circumstances under which they were made) not misleading, (ii) would not be required to be made at such time if the Registration Statement were not being filed, and (iii) the Company has a bona fide business purpose for not making such information public.

"***Agreement***" shall have the meaning given in the Preamble.

"***Block Trade***" means an offering and/or sale of Registrable Securities by any Holder on a block trade or underwritten basis (whether firm commitment or otherwise) without substantial marketing efforts prior to pricing, including, without limitation, a same day trade, overnight trade or similar transaction.

"***Board***" shall mean the Board of Directors of the Company.

"***Class F Common Stock***" shall have the meaning given in the Recitals hereto.

"***Commission***" shall mean the United States Securities and Exchange Commission.

"***Commission Guidance***" means (i) any publicly-available written or oral guidance of the Commission staff, or any comments, requirements or requests of the Commission staff and (ii) the Securities Act.

"***Company***" shall have the meaning given in the Preamble.

"***Company Stock***" shall have the meaning given in the Recitals hereto.

"***Company Shelf Takedown Notice***" shall have the meaning given in subsection 2.1.3.

"***Demand Registration***" shall have the meaning given in subsection 2.2.1.

"***Demanding Holders***" shall have the meaning given in subsection 2.2.1.

"***Earn Out Shares***" shall have the meaning given in the Recitals hereto.

"***Effectiveness Deadline***" shall have the meaning given in subsection 2.1.1.

"***Exchange Act***" shall mean the Securities Exchange Act of 1934, as it may be amended from time to time, and the rules and regulations promulgated thereunder.

"*Existing Holders*" shall have the meaning in the Preamble.

"*Existing Registration Rights Agreement*" shall have the meaning given in the Recitals hereto.

"*Form S-1 Shelf*" shall have the meaning given in subsection 2.1.1.

"*Form S-3 Shelf*" shall have the meaning given in subsection 2.1.2.

"*Founder Shares*" shall have the meaning given in the Recitals hereto and shall be deemed to include the Company Stock issued upon conversion thereof.

"*Founder Shares Lock-Up Period*" shall mean, with respect to the Founder Shares, from the date hereof until the earlier to occur of (A) 180 days after the date hereof; and (B) the date on which the Company completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of the Company's public stockholders having the right to exchange their Company Stock for cash, securities or other property.

"*Holders*" shall mean the Existing Holders and the New Holders and any person or entity who hereafter becomes a party to this Agreement pursuant to Section 6.2.

"*Lock-Up Periods*" shall mean the Founder Shares Lock-Up Period and the New Holder Lock-Up Period.

"*Maximum Number of Securities*" shall have the meaning given in subsection 2.2.4.

"*Merger Agreement*" shall have the meaning given in the Recitals hereto.

"*Misstatement*" shall mean an untrue statement of a material fact or an omission to state a material fact required to be stated in a Registration Statement or Prospectus, or necessary to make the statements in a Registration Statement or Prospectus (in the case of the Prospectus, in the light of the circumstances under which they were made) not misleading.

"*New Holders*" shall have the meaning given in the Preamble.

"*New Holder Lock-Up Period*" shall mean, with respect to the Company Stock held by the New Holders or their Permitted Transferees, from the date hereof until the earlier to occur of (A) 180 days after the date hereof; and (B) the date on which the Company completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of the Company's public stockholders having the right to exchange their Company Stock for cash, securities or other property.

"*Permitted Transferees*" shall mean (i) prior to the expiration of the Founder Shares Lock-Up Period and the New Holder Lock-Up Period, as the case may be, any person or entity to whom a Holder of Registrable Securities is permitted to transfer such Registrable Securities pursuant to Section 3.6.3, (ii) following the expiration of the Founder Shares Lock-Up Period and the New Holder Lock-Up Period, as the case may be, to any stockholder, partner, member or affiliate of such Holder and, if the Holder is an individual, to any of the persons or entities described in Section 3.6.3, and (iii) with respect to the Sponsor and the other Holders party to the Sponsor Agreement, at any time as provided under the Sponsor Agreement.

"*Piggyback Registration*" shall have the meaning given in subsection 2.3.1.

"*Pro Rata*" shall have the meaning given in subsection 2.2.4.

"*Prospectus*" shall mean the prospectus included in any Registration Statement, as supplemented by any and all prospectus supplements and as amended by any and all post-effective amendments and including all material incorporated by reference in such prospectus.

3

"*Registrable Security*" shall mean (a) the shares of Company Stock issued upon the conversion of the Founder Shares, (b) any issued and outstanding shares of Company Stock or any other equity security (including the shares of Company Stock issued or issuable upon the exercise, exchange or conversion of any other equity security) of the Company held by an Existing Holder as of the date of this Agreement, (c) any outstanding shares of Company Stock or any other equity security of the Company held by a New Holder as of the date of this Agreement (including shares transferred to a Permitted Transferee and the shares of Company Stock  issued or issuable upon the exercise of any such other equity security), (d) the Placement Warrants (including any shares of Common Stock issued or issuable upon the exercise of any such Placement Warrants), (e) any shares of Company Stock issued or issuable as Earn Out Shares to a New Holder and (f) any other equity security of the Company issued or issuable with respect to any such share of Company Stock described in the foregoing clauses (a) through (f) by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation, reorganization, stock exchange, stock reconstruction and amalgamation or contractual control arrangement with, purchasing all or substantially all of the assets of, or engagement in any other similar transaction; provided, however, that, as to any particular Registrable Security, such securities shall cease to be Registrable Securities when: (A) a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been sold, transferred, disposed of or exchanged in accordance with such Registration Statement; (B) such securities shall have been otherwise transferred, new certificates or book entries for such securities not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent public distribution of such securities shall not require registration under the Securities Act; (C) such securities shall have ceased to be outstanding; or (D) with respect to any Holder, at such time as (1) all remaining shares of Company Stock held by such Holder do not exceed 0.5% of the then-outstanding shares of Company Stock and (2) may be sold without registration and without any limitations, including or restrictions on volume, manner of sale or other limitations or restrictions pursuant to Rule 144 promulgated under the Securities Act (or any successor rule promulgated thereafter by the Commission) ("*Rule 144*").

"*Registration*" shall mean a registration effected by preparing and filing a registration statement or similar document in compliance with the requirements of the Securities Act, and the applicable rules and regulations promulgated thereunder, and such registration statement becoming effective.

"*Registration Expenses*" shall mean the out-of-pocket expenses of a Registration, including, without limitation, the following:

(A) all registration and filing fees (including fees with respect to filings required to be made with the Financial Industry Regulatory Authority, Inc.) and any securities exchange on which the Company Stock is then listed;

(B) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel for the Underwriters in connection with blue sky qualifications of Registrable Securities);

(C) printing, messenger, telephone and delivery expenses;

(D) reasonable fees and disbursements of counsel for the Company;

(E) reasonable fees and disbursements of all independent registered public accountants of the Company incurred specifically in connection with such Registration; and

(F) reasonable fees and expenses of one (1) legal counsel selected by the majority-in-interest of the Demanding Holders initiating a Demand Registration to be registered for offer and sale in the applicable Registration.

"*Registration Statement*" shall mean any registration statement that covers the Registrable Securities pursuant to the provisions of this Agreement, including the Prospectus included in such registration statement, amendments (including post-effective amendments) and supplements to such registration statement, and all exhibits to and all material incorporated by reference in such registration statement.

4

"***Removed Shares***" shall have the meaning given in <u>Section 2.6</u>.

"***Requesting Holder***" shall have the meaning given in <u>subsection 2.2.1</u>.

"***Restricted Securities***" shall have the meaning given in <u>subsection 3.6.1</u>.

"***Rule 144***" shall have the meaning given in the definition of "Registrable Security."

"***Rule 415***" shall have the meaning given in <u>subsection 2.1.1</u>.

"***Securities Act***" shall mean the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder.

"***Shelf Takedown Notice***" shall have the meaning given in <u>subsection 2.1.3</u>.

"***Shelf Underwritten Offering***" shall have the meaning given in <u>subsection 2.1.3</u>.

"***Sponsor***" shall have the meaning given in the Preamble hereto.

"***Sponsor Agreement***" shall have the meaning given in the Recitals hereto.

"***Target Filing Date***" has the meaning set forth in <u>subsection 2.1.2</u>.

"***Underwriter***" shall mean a securities dealer who purchases any Registrable Securities as principal in an Underwritten Offering and not as part of such dealer's market-making activities.

"***Underwritten Registration***" or "***Underwritten Offering***" shall mean a Registration in which securities of the Company are sold to an Underwriter in a firm commitment underwriting for distribution to the public.

**ARTICLE II**
REGISTRATIONS

2.1     <u>Shelf Registration</u>.

2.1.1     <u>Initial Registration</u>. The Company shall, as soon as practicable, but in no event later than fifteen (15) business days after the consummation of the transactions contemplated by the Merger Agreement, use its reasonable best efforts to file (or confidentially submit) a Registration Statement under the Securities Act to permit the public resale of all the Registrable Securities held by the Holders from time to time as permitted by Rule 415 under the Securities Act (or any successor or similar provision adopted by the Commission then in effect) ("***Rule 415***") on the terms and conditions specified in this <u>subsection 2.1.1</u> and shall use its reasonable best efforts to cause such Registration Statement to be declared effective as soon as practicable after the filing (or confidential submission) thereof, but in no event later than the earlier of (i) sixty (60) days following the filing (or confidential submission) deadline; provided, that such sixty (60)-day period shall be extended to ninety (90) days after the filing (or confidential submission) deadline if the Registration Statement is reviewed by, and receives comments from, the Commission and (ii) the tenth (10th) Business Day after the date the Company is notified (orally or in writing) by the Commission that such Registration Statement will not be "reviewed" or will not be subject to further review (such effectiveness due date, the "***Effectiveness Deadline***"). The Registration Statement filed with the Commission pursuant to this <u>subsection 2.1.1</u> shall be a shelf registration statement on Form S-1 (a "***Form S-1 Shelf***") or such other form of registration statement as is then available to effect a registration for resale of such Registrable Securities, covering such Registrable Securities, and shall contain a Prospectus in such form as to permit any Holder to sell such Registrable Securities pursuant to Rule 415 at any time beginning on the effective date for such Registration Statement. A Registration Statement filed pursuant to this <u>subsection 2.1.1</u> shall provide for the resale pursuant to any method or combination of methods legally available to, and requested by, the Holders. The Company shall use its reasonable best efforts to cause a Registration Statement filed pursuant to this <u>subsection 2.1.1</u> to remain effective, and to be supplemented and amended to the extent necessary to ensure that such

5

Registration Statement is available or, if not available, that another Registration Statement is available, for the resale of all the Registrable Securities held by the Holders until all such Registrable Securities have ceased to be Registrable Securities. As soon as practicable following the effective date of a Registration Statement filed pursuant to this underline{subsection 2.1.1}, but in any event within one (1) business day of such date, the Company shall notify the Holders of the effectiveness of such Registration Statement. When effective, a Registration Statement filed pursuant to this underline{subsection 2.1.1} (including the documents incorporated therein by reference) will comply as to form in all material respects with all applicable requirements of the Securities Act and the Exchange Act and will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any Prospectus contained in such Registration Statement, in the light of the circumstances under which such statement is made).

2.1.2    underline{Form S-3 Shelf}. The Company shall use its reasonable best efforts to qualify and remain qualified to register the offer and sale of securities under the Securities Act pursuant to a Registration Statement on Form S-3 or any successor form thereto. As soon as practicable after the date hereof, but not later than the Target Filing Date, the Company shall (i) prepare and file with (or confidentially submit to) the Commission a Registration Statement on Form S-3 or the then appropriate form for an offering to be made on a delayed or continuous basis pursuant to Rule 415 under the Securities Act or any successor rule thereto (a "***Form S-3 Shelf***") that covers all Registrable Securities then outstanding for an offering to be made on a delayed or continuous basis pursuant to Rule 415 under the Securities Act or any successor rule thereto and (ii) use its reasonable best efforts to cause such Form S-3 Shelf to be declared effective by the Commission as soon as practicable thereafter. In addition, the Company shall use its reasonable best efforts to cause a Form S-3 Shelf filed pursuant to this subsection 2.1.2 to remain effective, and to be supplemented and amended to the extent necessary to ensure that such Form S-3 Shelf is available or, if not available, that another Form S-3 Shelf (if the Company is eligible to file a Form S-3 Shelf) or other Registration Statement (if the Company is not so eligible) is continuously available, for the resale of all the Registrable Securities held by the Holders until all such Registrable Securities have ceased to be Registrable Securities. For purposes hereof, "***Target Filing Date***" shall mean the date which is 30 days after the Company becomes qualified to register the offer and sale of securities under the Securities Act pursuant to a Form S-3 Shelf. If the Company files a Form S-3 Shelf and thereafter the Company becomes ineligible to use Form S-3 for secondary sales, the Company shall use its reasonable best efforts to file a Form S-1 Shelf as promptly as practicable to replace the shelf registration statement that is a Form S-3 Shelf and have the Form S-1 Shelf declared effective as promptly as practicable and to cause such Form S-1 Shelf to remain effective, and to be supplemented and amended to the extent necessary to ensure that such Registration Statement is available or, if not available, that another Registration Statement is available, for the resale of all the Registrable Securities held by the Holders until all such Registrable Securities have ceased to be Registrable Securities. When effective, a Registration Statement filed pursuant to this underline{subsection 2.1.2} (including the documents incorporated therein by reference) will comply as to form in all material respects with all applicable requirements of the Securities Act and the Exchange Act and will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any Prospectus contained in such Registration Statement, in the light of the circumstances under which such statement is made).

2.1.3    underline{Shelf Takedown}. At any time and from time to time following the effectiveness of the shelf registration statement required by underline{subsection 2.1.1} or underline{2.1.2}, any Holder may request to sell all or a portion of their Registrable Securities in an underwritten offering that is registered pursuant to such shelf registration statement, including a Block Trade (a "***Shelf Underwritten Offering***"), provided that such Holder(s) (a) reasonably expects aggregate gross proceeds in excess of $50,000,000 from such Shelf Underwritten Offering or (b) reasonably expects to sell all of the Registrable Securities held by such Holder in such Shelf Underwritten Offering but in no event less than $10,000,000. All requests for a Shelf Underwritten Offering shall be made by giving written notice to the Company (the "***Shelf Takedown Notice***"). Each Shelf Takedown Notice shall specify the approximate number of Registrable Securities proposed to be sold in the Shelf Underwritten Offering and the expected price range (net of underwriting discounts and commissions) of such Shelf Underwritten Offering. Within five (5) days after receipt of any Shelf Takedown Notice (or within one (1) business day with respect to a request for a Block Trade), the Company shall give written notice of such requested Shelf Underwritten Offering to all other Holders of Registrable Securities (the "***Company Shelf Takedown Notice***") and, subject to reductions consistent with the Pro Rata calculations in underline{Section 2.2.4}, shall include in such Shelf Underwritten Offering all Registrable Securities with respect to which the Company has received written requests for inclusion therein, within five (5) days after sending the Company Shelf Takedown Notice, or, in the case of a Block Trade, within one (1) business day after sending the

6

Company Shelf Takedown Notice. The Company shall enter into an underwriting agreement in a form as is customary in Underwritten Offerings of securities by the Company with the managing Underwriter or Underwriters selected by the initiating Holders after consultation with the Company and shall take all such other reasonable actions as are requested by the managing Underwriter or Underwriters in order to expedite or facilitate the disposition of such Registrable Securities. In connection with any Shelf Underwritten Offering contemplated by this subsection 2.1.3, subject to Section 3.3 and Article IV, the underwriting agreement into which each Holder and the Company shall enter shall contain such representations, covenants, indemnities and other rights and obligations of the Company and the selling stockholders as are customary in underwritten offerings of securities by the Company.

2.1.4    Holder Information Required for Participation in Shelf Registration. At least ten (10) business days prior to the first anticipated filing date (or any earlier confidential submission date, to the extent the information contemplated by this subsection 2.1.4 is anticipated to be included such Registration Statement on such date) of a Registration Statement pursuant to this Article II, the Company shall use reasonable efforts to notify each Holder in writing (which may be by email) of the information reasonably necessary about the Holder to include such Holder's Registrable Securities in such Registration Statement.  Notwithstanding anything else in this Agreement, the Company shall not be obligated to include such Holder's Registrable Securities to the extent the Company has not received such information, and received any other reasonably requested agreements or certificates, on or prior to the fifth business day prior to the first anticipated filing date of a Registration Statement pursuant to this Article II.

2.2    Demand Registration.

2.2.1    Request for Registration. Subject to the provisions of subsection 2.2.4 hereof and provided that the Company does not have an effective Registration Statement pursuant to subsection 2.1.1 or subsection 2.1.2 outstanding covering Registrable Securities, (a) the Existing Holders of at least a majority-in-interest of the then-outstanding number of Registrable Securities held by the Existing Holders or (b) the New Holders of at least a majority-in-interest of the then-outstanding number of Registrable Securities held by the New Holders (the "**Demanding Holders**"), in each case, may make a written demand for Registration of all or part of their Registrable Securities, which written demand shall describe the amount and type of securities to be included in such Registration and the intended method(s) of distribution thereof (such written demand a "**Demand Registration**"). The Company shall, within five (5) days of the Company's receipt of the Demand Registration (other than with respect to a Block Trade), notify, in writing, all other Holders of Registrable Securities of such demand, and each Holder of Registrable Securities who thereafter wishes to include all or a portion of such Holder's Registrable Securities in a Registration pursuant to a Demand Registration (each such Holder that includes all or a portion of such Holder's Registrable Securities in such Registration, a "**Requesting Holder**") shall so notify the Company, in writing, within five (5) days after the receipt by the Holder of the notice from the Company. Upon receipt by the Company of any such written notification from a Requesting Holder(s) to the Company, such Requesting Holder(s) shall be entitled to have their Registrable Securities included in a Registration pursuant to a Demand Registration and the Company shall effect, as soon thereafter as practicable, but not more than thirty (30) days immediately after the Company's receipt of the Demand Registration, the Registration of all Registrable Securities requested by the Demanding Holders and Requesting Holders pursuant to such Demand Registration. Under no circumstances shall the Company be obligated to effect  more than an aggregate of three (3) Registrations pursuant to a Demand Registration by the Existing Holders under this subsection 2.2.1 with respect to any or all Registrable Securities held by such Existing Holders; provided, however, that a Registration pursuant to a Demand Registration shall not be counted for such purposes unless a Registration Statement that may be available at such time has become effective and all of the Registrable Securities requested by the Requesting Holders and the Demanding Holders to be registered on behalf of the Requesting Holders and the Demanding Holders in such Registration Statement have been sold, in accordance with Section 3.1 of this Agreement.

2.2.2    Effective Registration. Notwithstanding the provisions of subsection 2.2.1 above or any other part of this Agreement, a Registration pursuant to a Demand Registration shall not count as a Registration unless and until (i) the Registration Statement filed with the Commission with respect to a Registration pursuant to a Demand Registration has been declared effective by the Commission and (ii) the Company has complied with all of its obligations under this Agreement with respect thereto; provided, further, that if, after such Registration Statement has been declared effective, an offering of Registrable Securities in a Registration pursuant to a Demand Registration is subsequently interfered with by any stop order or injunction of the Commission, federal or state court or any other governmental agency, the Registration Statement with respect to such Registration shall be deemed not

7

to have been declared effective, unless and until, (i) such stop order or injunction is removed, rescinded or otherwise terminated, and (ii) a majority-in-interest of the Demanding Holders initiating such Demand Registration thereafter affirmatively elect to continue with such Registration and accordingly notify the Company in writing, but in no event later than five (5) days, of such election; provided, further, that the Company shall not be obligated or required to file another Registration Statement until the Registration Statement that has been previously filed with respect to a Registration pursuant to a Demand Registration becomes effective or is subsequently terminated.

2.2.3    Underwritten Offering. Subject to the provisions of subsection 2.2.4, if a majority-in-interest of the Demanding Holders so advise the Company as part of their Demand Registration that the offering of the Registrable Securities pursuant to such Demand Registration shall be in the form of an Underwritten Offering, then the right of such Demanding Holder or Requesting Holder (if any) to include its Registrable Securities in such Registration shall be conditioned upon such Holder's participation in such Underwritten Offering and the inclusion of such Holder's Registrable Securities in such Underwritten Offering to the extent provided herein. All such Holders proposing to distribute their Registrable Securities through an Underwritten Offering under this subsection 2.2.3 shall enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Underwritten Offering by the majority-in-interest of the Demanding Holders initiating the Demand Registration, which Underwriter(s) shall be reasonably satisfactory to the Company.

2.2.4    Reduction of Underwritten Offering. If the managing Underwriter or Underwriters in an Underwritten Registration, in good faith, advises the Company, the Demanding Holders and the Requesting Holders (if any) in writing that the dollar amount or number of Registrable Securities that the Demanding Holders and the Requesting Holders (if any) desire to sell, taken together with all other Company Stock or other equity securities that the Company desires to sell and the Company Stock, if any, as to which a Registration has been requested pursuant to separate written contractual piggy-back registration rights held by any other stockholders who desire to sell, exceeds the maximum dollar amount or maximum number of equity securities that can be sold in the Underwritten Offering without adversely affecting the proposed offering price, the timing, the distribution method, or the probability of success of such offering (such maximum dollar amount or maximum number of such securities, as applicable, the "*Maximum Number of Securities*"), then the Company shall include in such Underwritten Offering, as follows: (i) first, the Registrable Securities of the Demanding Holders and the Requesting Holders (if any) (pro rata based on the respective number of Registrable Securities that each such Holder has requested be included in such Underwritten Registration and the aggregate number of Registrable Securities that the Demanding Holders and the Requesting Holders (if any) have requested be included in such Underwritten Registration (such proportion is referred to herein as "*Pro Rata*")) that can be sold without exceeding the Maximum Number of Securities; provided, that any securities thereby allocated to a Holder that exceed such Holder's request shall be reallocated among the remaining Demanding Holders and the Requesting Holders (if any) in like manner; and (ii)second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), the Company Stock  or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the Company Stock or other equity securities of other persons or entities that the Company is obligated to register in a Registration pursuant to separate written contractual arrangements with such persons and that can be sold without exceeding the Maximum Number of Securities.

2.2.5    Demand Registration Withdrawal. Any of the Demanding Holders initiating a Demand Registration or any of the Requesting Holders (if any), pursuant to a Registration under subsection 2.2.1 shall have the right to withdraw from a Registration pursuant to such Demand Registration or a Shelf Underwritten Offering pursuant to subsection 2.1.3 for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of their intention to withdraw from such Registration at least one (1) business day prior to the effectiveness of the Registration Statement filed with the Commission with respect to the Registration of their Registrable Securities pursuant to such Demand Registration (or in the case of an Underwritten Registration pursuant to Rule 415, at least two (2) business days prior to the time of pricing of the applicable offering). Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with a Registration pursuant to a Demand Registration or a Shelf Underwritten Offering prior to its withdrawal under this subsection 2.2.5.

8

2.3     Piggyback Registration.

2.3.1     Piggyback Rights. If the Company proposes to file a Registration Statement under the Securities Act with respect to an offering of equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into, equity securities, for its own account or for the account of stockholders of the Company (or by the Company and by the stockholders of the Company including, without limitation, pursuant to Section 2.2 hereof), other than a Registration Statement (i) filed in connection with any employee stock option or other benefit plan, (ii) for a rights offering or an exchange offer or offering of securities solely to the Company's existing stockholders, (iii) for an offering of debt that is convertible into equity securities of the Company or (iv) for a dividend reinvestment plan, then the Company shall give written notice of such proposed filing to all of the Holders of Registrable Securities as soon as practicable but not less than ten (10) days before the anticipated filing date of such Registration Statement, which notice shall (A) describe the amount and type of securities to be included in such offering, the intended method(s) of distribution, and the name of the proposed managing Underwriter or Underwriters, if any, in such offering, and (B) offer to all of the Holders of Registrable Securities the opportunity to register the sale of such number of Registrable Securities as such Holders may request in writing within five (5) days after receipt of such written notice (such Registration a "***Piggyback Registration***"). The Company shall, in good faith, cause such Registrable Securities to be included in such Piggyback Registration and shall use its best efforts to cause the managing Underwriter or Underwriters of a proposed Underwritten Offering to permit the Registrable Securities requested by the Holders pursuant to this subsection 2.3.1 to be included in a Piggyback Registration on the same terms and conditions as any similar securities of the Company included in such Registration and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method(s) of distribution thereof. All such Holders proposing to distribute their Registrable Securities through an Underwritten Offering under this subsection 2.3.1 shall enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Underwritten Offering by the Company.

2.3.2     Reduction of Piggyback Registration. If the managing Underwriter or Underwriters in an Underwritten Registration that is to be a Piggyback Registration, in good faith, advises the Company and the Holders of Registrable Securities participating in the Piggyback Registration in writing that the dollar amount or number of Company Stock that the Company desires to sell, taken together with (i) the Company Stock, if any, as to which Registration has been demanded pursuant to separate written contractual arrangements with persons or entities other than the Holders of Registrable Securities hereunder (ii) the Registrable Securities as to which registration has been requested pursuant to Section 2.3 hereof, and (iii) the Company Stock, if any, as to which Registration has been requested pursuant to separate written contractual piggy-back registration rights of other stockholders of the Company, exceeds the Maximum Number of Securities, then:

(a)     If the Registration is undertaken for the Company's account, the Company shall include in any such Registration (A) first, the Company Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to subsection 2.3.1 hereof, Pro Rata, which can be sold without exceeding the Maximum Number of Securities; provided, that any securities thereby allocated to a Holder that exceed such Holder's request shall be reallocated among the remaining Holders in like manner; and (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the Company Stock, if any, as to which Registration has been requested or demanded pursuant to written contractual piggy-back registration rights of other stockholders of the Company, which can be sold without exceeding the Maximum Number of Securities;

(b)     If the Registration is pursuant to a request by persons or entities other than the Holders of Registrable Securities, then the Company shall include in any such Registration (A) first, the Company Stock or other equity securities, if any, of such requesting persons or entities, other than the Holders of Registrable Securities, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to subsection 2.3.1, Pro Rata, which can be sold without exceeding the Maximum Number of Securities; provided, that any securities thereby allocated to a Holder that exceed such Holder's request shall be reallocated among the remaining Holders in like manner; (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing

9

clauses (A) and (B), the Company Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (D) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A), (B) and (C), the Company Stock or other equity securities for the account of other persons or entities that the Company is obligated to register pursuant to separate written contractual arrangements with such persons or entities, which can be sold without exceeding the Maximum Number of Securities.

2.3.3    Piggyback Registration Withdrawal. Any Holder of Registrable Securities shall have the right to withdraw from a Piggyback Registration for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of his, her or its intention to withdraw from such Piggyback Registration prior to the effectiveness of the Registration Statement filed with the Commission with respect to such Piggyback Registration (or in the case of an Underwritten Registration pursuant to Rule 415, at least two (2) business days prior to the time of pricing of the applicable offering). The Company (whether on its own good faith determination or as the result of a request for withdrawal by persons pursuant to separate written contractual obligations) may withdraw a Registration Statement filed with the Commission in connection with a Piggyback Registration at any time prior to the effectiveness of such Registration Statement. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with the Piggyback Registration prior to its withdrawal under this subsection 2.3.3.

2.3.4    Unlimited Piggyback Registration Rights. For purposes of clarity, any Registration effected pursuant to Section 2.3 hereof shall not be counted as a Registration pursuant to a Demand Registration effected under Section 2.2 hereof or a Shelf Underwritten Offering effected under subsection 2.1.3.

2.4    Restrictions on Registration Rights. If (A) during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of the filing of, and ending on a date one hundred and twenty (120) days after the effective date of, a Company initiated Registration and provided that the Company has delivered written notice to the Holders prior to receipt of a Demand Registration pursuant to subsection 2.2.1 and it continues to actively employ, in good faith, all reasonable efforts to cause the applicable Registration Statement to become effective; (B) the Holders have requested an Underwritten Registration and the Company and the Holders are unable to obtain the commitment of underwriters to firmly underwrite the offer; or (C) in the good faith judgment of the Board such Registration would be detrimental to the Company and the Board concludes as a result that it is essential to defer the filing of such Registration Statement at such time, then in each case the Company shall furnish to such Holders a certificate signed by the Chairman of the Board, the Chief Executive Officer, the Chief Financial Officer, the President or Secretary of the Company stating that in the good faith judgment of the Board it would be detrimental to the Company for such Registration Statement to be filed in the near future and that it is therefore essential to defer the filing of such Registration Statement. In such event, the Company shall have the right to defer such filing for a period of not more than ninety (90) days; provided, however, that the Company shall not defer its obligation in this manner more than twice in any 12-month period (the "**Aggregate Blocking Period**").

2.5    Block Trades. Subject to Sections 2.4 and 3.4, if the Holders request to effect a Block Trade by delivering a Shelf Takedown Notice pursuant to subsection 2.1.3 or a Demand Registration pursuant to subsection 2.2.1, the Company shall, as expeditiously as possible, use its reasonable best efforts to facilitate such Block Trade. The Holders shall use reasonable best efforts to work with the Company and the Underwriter(s) (including by disclosing the maximum number of Registrable Securities proposed to be the subject of such Block Trade) in order to facilitate preparation of the Registration Statement, Prospectus and other offering documentation related to the Block Trade and any related due diligence and comfort procedures.

2.6    Rule 415; Removal. If at any time the Commission takes the position that the offering of some or all of the Registrable Securities in a Registration Statement filed pursuant to this Section 2 is not eligible to be made on a delayed or continuous basis under the provisions of Rule 415 under the Securities Act (provided, however, the Company shall be obligated to use diligent efforts to advocate with the Commission for the registration of all of the Registrable Securities in accordance with the Commission Guidance, including without limitation, Compliance and Disclosure Interpretation 612.09) or requires a Holder to be named as an "underwriter," the Company shall (i) promptly notify each holder of Registrable Securities thereof (or in the case of the Commission requiring a Holder to be named as an "underwriter," the Holders) and (ii) use reasonable best efforts to persuade the Commission that the offering contemplated by such Registration Statement is a valid secondary offering and not an offering "by or on

10

behalf of the issuer" as defined in Rule 415 and that none of the Holders is an "underwriter." The Holders shall have the right to select one legal counsel designated by the holders of a majority of the Registrable Securities subject to such Registration Statement to review and oversee any registration or matters pursuant to this Section 2.6, including participation in any meetings or discussions with the Commission regarding the Commission's position and to comment on any written submission made to the Commission with respect thereto. No such written submission with respect to this matter shall be made to the Commission to which the applicable Holders' counsel reasonably objects. In the event that, despite the Company's reasonable best efforts and compliance with the terms of this Section 2.6, the Commission refuses to alter its position, the Company shall (i) remove from such Registration Statement such portion of the Registrable Securities (the "*Removed Shares*") and/or (ii) agree to such restrictions and limitations on the registration and resale of the Registrable Securities as the Commission may require to assure the Company's compliance with the requirements of Rule 415; provided, however, that the Company shall not agree to name any Holder as an "underwriter" in such Registration Statement without the prior written consent of such Holder. In the event of a share removal pursuant to this Section 2.6, the Company shall give the applicable Holders at least five (5) days prior written notice along with the calculations as to such Holder's allotment. Any removal of shares of the Holders pursuant to this Section 2.6 shall be allocated between the Holders on a pro rata basis based on the aggregate amount of Registrable Securities held by the Holders. In the event of a share removal of the Holders pursuant to this Section 2.6, the Company shall promptly register the resale of any Removed Shares pursuant to subsection 2.1.2 hereof and in no event shall the filing of such Registration Statement on Form S-1 or subsequent Registration Statement on Form S-3 filed pursuant to the terms of subsection 2.1.2 be counted as a Demand Registration hereunder. Until such time as the Company has registered all of the Removed Shares for resale pursuant to Rule 415 on an effective Registration Statement, the Company shall not be able to defer the filing of a Registration Statement pursuant to Section 2.4 hereof.

**ARTICLE III**
COMPANY PROCEDURES

3.1     General Procedures. If the Company is required to effect the Registration of Registrable Securities, the Company shall use its reasonable best efforts to effect such Registration to permit the sale of such Registrable Securities in accordance with the intended plan of distribution thereof, and pursuant thereto the Company shall, as expeditiously as possible:

3.1.1     prepare and file with the Commission as soon as practicable a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective and remain effective until all Registrable Securities covered by such Registration Statement have been sold;

3.1.2     prepare and file with the Commission such amendments and post-effective amendments to the Registration Statement, and such supplements to the Prospectus, as may be reasonably requested by any majority-in-interest of the Holders with Registrable Securities registered on such Registration Statement or any Underwriter of Registrable Securities or as may be required by the rules, regulations or instructions applicable to the registration form used by the Company or by the Securities Act or rules and regulations thereunder to keep the Registration Statement effective until all Registrable Securities covered by such Registration Statement are sold in accordance with the intended plan of distribution set forth in such Registration Statement or supplement to the Prospectus;

3.1.3     prior to filing a Registration Statement or Prospectus, or any amendment or supplement thereto, furnish without charge to the Underwriters, if any, and each Holder of Registrable Securities included in such Registration, and such Holders' legal counsel, copies of such Registration Statement as proposed to be filed, each amendment and supplement to such Registration Statement (in each case including all exhibits thereto and documents incorporated by reference therein), the Prospectus included in such Registration Statement (including each preliminary Prospectus), and such other documents as the Underwriters and each Holder of Registrable Securities included in such Registration or the legal counsel for any such Holders may request in order to facilitate the disposition of the Registrable Securities owned by such Holders;

3.1.4     prior to any public offering of Registrable Securities, use its reasonable best efforts to (i) register or qualify the Registrable Securities covered by the Registration Statement under such securities or "blue

11

sky" laws of such jurisdictions in the United States as any Holder of Registrable Securities included in such Registration Statement (in light of their intended plan of distribution) may request and (ii) take such action necessary to cause such Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be necessary or advisable to enable the Holders of Registrable Securities included in such Registration Statement to consummate the disposition of such Registrable Securities in such jurisdictions; provided, however, that the Company shall not be required to qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify or take any action to which it would be subject to general service of process or taxation in any such jurisdiction where it is not then otherwise so subject;

3.1.5    cause all such Registrable Securities to be listed on each securities exchange or automated quotation system on which similar securities issued by the Company are then listed;

3.1.6    provide a transfer agent or warrant agent, as applicable, and registrar for all such Registrable Securities no later than the effective date of such Registration Statement;

3.1.7    advise each seller of such Registrable Securities, promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the Commission suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceeding for such purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal if such stop order should be issued;

3.1.8    at least three (3) days prior to the filing of any Registration Statement or Prospectus or any amendment or supplement to such Registration Statement or Prospectus, furnish a copy thereof to each seller of such Registrable Securities and its counsel, including, without limitation, providing copies promptly upon receipt of any comment letters received with respect to any such Registration Statement or Prospectus;

3.1.9    notify the Holders at any time when a Prospectus relating to such Registration Statement is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes a Misstatement, and then to correct such Misstatement as set forth in Section 3.4 hereof;

3.1.10    permit a representative of the Holders (such representative to be selected by a majority of the participating Holders), the Underwriter(s), if any, and any attorney or accountant retained by such Holders or Underwriter(s) to participate, at each such person's own expense (except as provided under Section 3.2), in the preparation of the Registration Statement, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such representative, Underwriter, attorney or accountant in connection with the Registration; provided, however, that such representative or Underwriter enters into a confidentiality agreement or other arrangement, in form and substance reasonably satisfactory to the Company, prior to the release or disclosure of any such information; and provided further, the Company may not include the name of any Holder or Underwriter or any information regarding any Holder or Underwriter in any Registration Statement or Prospectus, any amendment or supplement to such Registration Statement or Prospectus, any document that is to be incorporated by reference into such Registration Statement or Prospectus, or any response to any comment letter, without the prior written consent of such Holder or Underwriter and providing each such Holder or Underwriter a reasonable amount of time to review and comment on such applicable document, which comments the Company shall include unless contrary to applicable law;

3.1.11    obtain a "comfort" letter from the Company's independent registered public accountants in the event of an Underwritten Registration, in customary form and covering such matters of the type customarily covered by "comfort" letters as the managing Underwriter(s) may reasonably request, and reasonably satisfactory to a majority-in-interest of the participating Holders;

3.1.12    on the date the Registrable Securities are delivered for sale pursuant to such Registration, obtain an opinion, dated such date, of counsel representing the Company for the purposes of such Registration, addressed to the Holders, the placement agent or sales agent, if any, and the Underwriter(s), if any, covering such legal matters with respect to the Registration in respect of which such opinion is being given as the Underwriter(s),

12

placement agent(s) or sales agent(s) may reasonably request and as are customarily included in such opinions and negative assurance letters, and reasonably satisfactory to a majority-in-interest of the participating Holders;

3.1.13    in the event of any Underwritten Offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing Underwriter of such offering;

3.1.14    make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months beginning with the first day of the Company's first full calendar quarter after the effective date of the Registration Statement which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any successor rule promulgated thereafter by the Commission);

3.1.15    if the Registration involves the Registration of Registrable Securities involving gross proceeds in excess of $50,000,000, use its reasonable efforts to make available senior executives of the Company to participate in customary "road show" presentations that may be reasonably requested by the Underwriter(s) in any Underwritten Offering; and

3.1.16    otherwise, in good faith, cooperate reasonably with, and take such customary actions as may reasonably be requested by the Holders, in connection with such Registration.

3.2    Registration Expenses. Except as otherwise provided herein, the Registration Expenses of all Registrations shall be borne by the Company. It is acknowledged by the Holders that the Holders shall bear all incremental selling expenses relating to the sale of Registrable Securities, such as Underwriters' commissions and discounts, brokerage fees, Underwriter marketing costs and, other than as set forth in the definition of "Registration Expenses," all reasonable fees and expenses of any legal counsel representing the Holders.

3.3    Requirements for Participation in Underwritten Offerings. No person may participate in any Underwritten Offering for equity securities of the Company pursuant to a Registration initiated by the Company hereunder unless such person (i) agrees to sell such person's securities on the basis provided in any underwriting arrangements approved by the Company and (ii) completes and executes all customary questionnaires, powers of attorney, indemnities, lock-up agreements, underwriting agreements and other customary documents as may be reasonably required under the terms of such underwriting arrangements.

3.4    Suspension of Sales; Adverse Disclosure. Upon receipt of written notice from the Company that a Registration Statement or Prospectus contains a Misstatement, each of the Holders shall forthwith discontinue disposition of Registrable Securities until it has received copies of a supplemented or amended Prospectus correcting the Misstatement (it being understood that the Company hereby covenants to prepare and file such supplement or amendment as soon as practicable after the time of such notice), or until it is advised in writing by the Company that the use of the Prospectus may be resumed. If the filing, initial effectiveness or continued use of a Registration Statement in respect of any Registration at any time would require the Company to make an Adverse Disclosure or would require the inclusion in such Registration Statement of financial statements that are unavailable to the Company for reasons beyond the Company's control, the Company may, upon giving prompt written notice of such action to the Holders, delay the filing or initial effectiveness of, or suspend use of, such Registration Statement for the shortest period of time, but in no event more than forty-five (45) days per suspension, determined in good faith by the Company to be necessary for such purpose; provided, that each day of any such suspension pursuant to this Section 3.4 shall correspondingly decrease the Aggregate Blocking Period available to the Company during any twelve (12) month period pursuant to Section 2.4 hereof. In the event the Company exercises its rights under the preceding sentence, the Holders agree to suspend, immediately upon their receipt of the notice referred to above, their use of the Prospectus relating to any Registration in connection with any sale or offer to sell Registrable Securities. The Company shall immediately notify the Holders of the expiration of any period during which it exercised its rights under this Section 3.4. Notwithstanding anything in this Agreement to the contrary, the Company shall not be permitted to file a registration statement to register for sale, or to conduct any registered securities offerings (including any "take-downs" off of an effective shelf registration statement) of, any of its securities either for its own account or the account of any other person during any deferral or suspension pursuant to this Section 3.4.

3.5    Reporting Obligations. As long as any Holder shall own Registrable Securities, the Company, at all times while it shall be a reporting company under the Exchange Act, covenants to file timely (or obtain

13

extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to Sections 13(a) or 15(d) of the Exchange Act. The Company further covenants that it shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell shares of the Company Stock held by such Holder without registration under the Securities Act within the limitation of the exemptions provided by Rule 144, including providing any legal opinions.

      3.6        Transfer Restrictions.

      3.6.1      During the applicable Lock-Up Periods, no Existing Holder or New Holder, as the case may be, shall offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of or distribute any shares of Company Stock that are subject to an applicable Lock-Up Period or any securities convertible into, exercisable for, exchangeable for or that represent the right to receive shares of Company Stock that are subject to an applicable Lock-Up Period, whether now owned or hereinafter acquired, that is owned directly by such Existing Holder or New Holder (including securities held as a custodian) or with respect to which such Existing Holder or New Holder has beneficial ownership within the rules and regulations of the Commission (such securities that are subject to an applicable Lock-Up Period, the "***Restricted Securities***"), other than any transfer to a Permitted Transferee, as applicable. The foregoing restriction is expressly agreed to preclude each Existing Holder or New Holder, as applicable, from engaging in any hedging or other transaction with respect to Restricted Securities which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of the Restricted Securities even if such Restricted Securities would be disposed of by someone other than such Existing Holder or New Holder. Such prohibited hedging or other transactions include any short sale or any purchase, sale or grant of any right (including any put or call option) with respect to any of the Restricted Securities of the applicable Existing Holder or New Holder, or with respect to any security that includes, relates to, or derives any significant part of its value from such Restricted Securities.

      3.6.2      Each Existing Holder and New Holder hereby represents and warrants that it now has and, except as contemplated by this subsection 3.6.2 for the duration of the applicable Lock-Up Period, will have good and marketable title to its Restricted Securities, free and clear of all liens, encumbrances, and claims that could impact the ability of such Existing Holder or New Holder to comply with the foregoing restrictions. Each Existing Holder and New Holder agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of any Restricted Securities during the applicable Lock-Up Period.

      3.6.3      Notwithstanding the provisions set forth in Section 3.6.1 and Section 3.6.2, transfers of the Registrable Securities that are held by any Existing Holder, any New Holder or any of their Permitted Transferees are permitted to:

      (a)      in the case of an entity, transfer to a stockholder, partner, member or affiliate of such entity;

      (b)      in the case of an individual, transfer by gift to members of the individual's immediate family (as defined below) or to a trust, the beneficiary of which is a member of one of the individual's immediate family, an affiliate of such person or to a charitable organization;

      (c)      in the case of an individual, transfer by virtue of laws of descent and distribution upon death of the individual;

      (d)      in the case of an individual, transfer pursuant to a qualified domestic relations order;

      (e)      in the case of an entity, transfer by virtue of the laws of the state of the entity's organization or the entity's organizational documents upon dissolution of the entity;

(f)      exercise any options or warrants to purchase Company Stock (which exercises may be effected on a cashless basis to the extent the instruments representing such options or warrants permit exercises on a cashless basis);

(g)      transfer to the Company to satisfy tax withholding obligations pursuant to the Company's equity incentive plans or arrangements;

(h)      transfer to the Company pursuant to any contractual arrangement in effect at the Closing that provides for the repurchase by the Company or forfeiture of the Holder's Company Stock or other securities convertible into or exercisable or exchangeable for Company Stock in connection with the termination of the Holder's service to the Company;

(i)      enter into, at any time after the Closing, any trading plan providing for the sale of Company Stock by the Holder, which trading plan meets the requirements of Rule 10b5-1(c) under the Exchange Act, provided, however, that such plan does not provide for, or permit, the sale of any Company Stock during the applicable Lock-Up Period and no public announcement or filing is voluntarily made or required regarding such plan during the applicable Lock-Up Period; and

(j)      enter into transactions in the event of completion of a liquidation, merger, stock exchange or other similar transaction which results in all of the Company's Holders having the right to exchange their shares of Company Stock for cash, securities or other property.

*provided, however*, that in the case of clauses (a) through (e), these permitted transferees must enter into a written agreement with the Company agreeing to be bound by the transfer restrictions herein (it being understood that any references to "immediate family" in the agreement executed by such transferee shall expressly refer only to the immediate family of the Holder and not to the immediate family of the transferee), agreeing to be bound by these transfer restrictions. For purposes of this section, "***immediate family***" shall mean a spouse, domestic partner, child, grandchild or other lineal descendant (including by adoption), father, mother, brother or sister of the Holder; and "***affiliate***" shall have the meaning set forth in Rule 405 under the Securities Act.

**ARTICLE IV**
INDEMNIFICATION AND CONTRIBUTION

    4.1    <u>Indemnification</u>.

    4.1.1    The Company agrees to indemnify, to the extent permitted by law, each Holder of Registrable Securities, its officers and directors and agents and each person who controls such Holder (within the meaning of the Securities Act) against all losses, claims, damages, liabilities and expenses (including attorneys' fees) caused by any untrue or alleged untrue statement of material fact contained in any Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are caused by or contained in any information furnished in writing to the Company by such Holder expressly for use therein. The Company shall indemnify the Underwriters, their officers and directors and each person who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to the indemnification of the Holder.

    4.1.2    In connection with any Registration Statement in which a Holder of Registrable Securities is participating, such Holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or Prospectus and, to the extent permitted by law, shall indemnify the Company, its directors and officers and agents and each person who controls the Company (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses (including without limitation reasonable attorneys' fees) resulting from any untrue statement of material fact contained in the Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any

15

information or affidavit so furnished in writing by such Holder expressly for use therein; provided, however, that the obligation to indemnify shall be several, not joint and several, among such Holders of Registrable Securities, and the liability of each such Holder of Registrable Securities shall be in proportion to and limited to the net proceeds received by such Holder from the sale of Registrable Securities pursuant to such Registration Statement. The Holders of Registrable Securities shall indemnify the Underwriters, their officers, directors and each person who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to indemnification of the Company.

4.1.3    Any person entitled to indemnification herein shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any person's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

4.1.4    The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling person of such indemnified party and shall survive the transfer of securities. The Company and each Holder of Registrable Securities participating in an offering also agrees to make such provisions as are reasonably requested by any indemnified party for contribution to such party in the event the Company's or such Holder's indemnification is unavailable for any reason.

4.1.5    If the indemnification provided under Section 4.1 hereof from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by, or relates to information supplied by, such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action and the benefits received by the such indemnifying party or indemnified party; provided, however, that the liability of any Holder under this subsection 4.1.5 shall be limited to the amount of the net proceeds received by such Holder in such offering giving rise to such liability. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in subsections 4.1.1, 4.1.2 and 4.1.3 above, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. The parties hereto agree that it would not be just and equitable if contribution pursuant to this subsection 4.1.5 were determined by Pro Rata allocation or by any other method of allocation, which does not take account of the equitable considerations referred to in this subsection 4.1.5. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this subsection 4.1.5 from any person who was not guilty of such fraudulent misrepresentation.

16

**ARTICLE V**
OTHER AGREEMENTS

5.1     Termination of ATI Stockholders Agreement. Each of the New Holders agrees that, effective as of the Effective Time, the ATI Stockholders Agreement shall terminate with no further outstanding payments, expenses, obligations or liabilities of the parties thereunder. Each of the New Holders (i) waives, effective as of the Effective Time, all rights and obligations of the parties under the ATI Stockholder Agreement; (ii) expressly acknowledges that, from and after the Effective Time, none of the parties under the ATI Stockholder Agreement or any of their respective affiliates shall be bound by (or have any obligations under) the ATI Stockholder Agreement and (iii) agrees to execute and deliver such additional documents and take all such further action as may be reasonably necessary or reasonably requested to in furtherance of clauses "(i)" and "(ii)".

**ARTICLE VI**
MISCELLANEOUS

6.1     Notices. Any notice or communication under this Agreement must be in writing and given by (i) deposit in the United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, (ii) delivery in person or by courier service providing evidence of delivery, or (iii) transmission by hand delivery, electronic mail or facsimile. Each notice or communication that is mailed, delivered, or transmitted in the manner described above shall be deemed sufficiently given, served, sent, and received, in the case of mailed notices, on the third business day following the date on which it is mailed and, in the case of notices delivered by courier service, hand delivery, electronic mail or facsimile, at such time as it is delivered to the addressee (with the delivery receipt or the affidavit of messenger) or at such time as delivery is refused by the addressee upon presentation. Any notice or communication under this Agreement must be addressed, if to the Company, ATI Physical Therapy, 790 Remington Blvd., Bolingbrook, Illinois, 60440, Attention: Diana M. Chafey, Chief Legal Officer and Corporate Secretary and, if to any Holder, at such Holder's address or contact information as set forth in the Company's books and records. Any party may change its address for notice at any time and from time to time by written notice to the other parties hereto (email being sufficient), and such change of address shall become effective ten (10) days after delivery of such notice as provided in this Section 6.1.

6.2     Assignment; No Third Party Beneficiaries.

6.2.1     This Agreement and the rights, duties and obligations of the Company and the Holders of Registrable Securities, as the case may be, hereunder may not be assigned or delegated by the Company or the Holders of Registrable Securities, as the case may be, in whole or in part, except (i) in connection with a transfer of Registrable Securities by such Holder to a Permitted Transferee but only if such Permitted Transferee agrees to become bound by the transfer restrictions set forth in this Agreement or (ii) with the prior written consent of the Company, with respect to an assignment by a Holder, or Holders of at least a majority-in-interest of the Registrable Securities at the time in question, with respect to an assignment by the Company.

6.2.2     This Agreement and the provisions hereof shall be binding upon and shall inure to the benefit of each of the parties and its successors and the permitted assigns of the Holders, which shall include Permitted Transferees.

6.2.3     This Agreement shall not confer any rights or benefits on any persons that are not parties hereto, other than as expressly set forth in this Agreement and Section 6.2 hereof.

6.2.4     No assignment by any party hereto of such party's rights, duties and obligations hereunder shall be binding upon or obligate the Company unless and until the Company shall have received (i) written notice of such assignment as provided in Section 6.1 hereof and (ii) the written agreement of the assignee, in a form reasonably satisfactory to the Company, to be bound by the terms and provisions of this Agreement (which may be accomplished by an addendum or certificate of joinder to this Agreement). Any transfer or assignment made other than as provided in this Section 6.2 shall be null and void.

17

6.3     Counterparts. This Agreement may be executed in multiple counterparts (including facsimile or PDF counterparts), each of which shall be deemed an original, and all of which together shall constitute the same instrument, but only one of which need be produced.

6.4     Governing Law; Venue. NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT MAY BE EXECUTED BY ANY OF THE PARTIES HERETO, THE PARTIES EXPRESSLY AGREE THAT (I) THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK AS APPLIED TO AGREEMENTS AMONG NEW YORK RESIDENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS OF SUCH JURISDICTION AND (II) THE VENUE FOR ANY ACTION TAKEN WITH RESPECT TO THIS AGREEMENT SHALL BE ANY STATE OR FEDERAL COURT IN NEW YORK COUNTY IN THE STATE OF NEW YORK.

6.5     Amendments and Modifications. Upon the written consent of the Company and the Holders of at least a majority-in-interest of the Registrable Securities at the time in question, compliance with any of the provisions, covenants and conditions set forth in this Agreement may be waived, or any of such provisions, covenants or conditions may be amended or modified; provided, however, that notwithstanding the foregoing, any amendment hereto or waiver hereof that adversely affects either the Existing Holders as a group or the New Holders as a group, respectively, in a manner that is materially adversely different from Existing Holders or New Holders, as applicable, shall require the consent of at least a majority-in-interest of the Registrable Securities held by such Existing Holders or a majority-in-interest of the Registrable Securities held by such New Holders, as applicable, at the time in question so affected; provided, further, that notwithstanding the foregoing, any amendment hereto or waiver hereof that adversely affects one Holder or group of affiliated Holders, solely in its capacity as a holder of the shares of capital stock of the Company, in a manner that is materially different from the other Holders (in such capacity) shall require the consent of the Holder or group of affiliated Holders so affected. No course of dealing between any Holder or the Company and any other party hereto or any failure or delay on the part of a Holder or the Company in exercising any rights or remedies under this Agreement shall operate as a waiver of any rights or remedies of any Holder or the Company. No single or partial exercise of any rights or remedies under this Agreement by a party shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder or thereunder by such party. Any discretionary waiver of or amendment to the restrictions of any provision of this Agreement, by the Company or the underwriters with respect to any Holder, including any such waiver or amendment that reduces or eliminates the Lock-Up Period, shall apply to each Holder on a pro-rata basis.

6.6     Other Registration Rights. The Company represents and warrants that no person, other than a (i) a Holder of Registrable Securities, or (ii) the parties to those certain Subscription Agreements, dated as of February 21, 2021, by and between the Company and certain investors, has any right to require the Company to register any securities of the Company for sale or to include such securities of the Company in any Registration filed by the Company for the sale of securities for its own account or for the account of any other person. Further, the Company represents and warrants that this Agreement supersedes any other registration rights agreement or agreement with similar terms and conditions and in the event of a conflict between any such agreement or agreements and this Agreement, the terms of this Agreement shall prevail.

6.7     Term. This Agreement shall be valid and enforceable as of the date of this Agreement and may not be revoked by any party hereto; provided that the provisions herein, other than this *Article VI*, shall not be effective until the Effective Time (as such term is defined in the Merger Agreement). In the event the Merger Agreement is terminated in accordance with its terms, this Agreement shall automatically terminate and be of no further force or effect. This Agreement shall terminate upon the earlier of (i) the tenth anniversary of the date of this Agreement and (ii) the date as of which (A) all of the Registrable Securities have been sold pursuant to a Registration Statement (but in no event prior to the applicable period referred to in Section 4(a)(3) of the Securities Act and Rule 174 thereunder (or any successor rule promulgated thereafter by the Commission)) or (B) the Holders of all Registrable Securities are permitted to sell the Registrable Securities under Rule 144 under the Securities Act without limitation, including with respect to volume or the manner of sale. The provisions of Section 3.5 and *Article IV* shall survive any termination.

**[SIGNATURE PAGES FOLLOW]**

18

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed as of the date first written above.

**COMPANY:**

FORTRESS VALUE ACQUISITION CORP. II,
a Delaware corporation

By: _____
    Name:  Andrew A. McKnight
    Title:   Chief Executive Officer

**EXISTING HOLDERS:**

FORTRESS ACQUISITION SPONSOR II LLC,
a Delaware limited liability company

By: _____
    Name:  Alexander Gillette
    Title:   Secretary

By: _____
    Name: Sunil Gulati

By: _____
    Name: Rakefet Russak-Aminoach

By: _____
    Name: Aaron F. Hood

By: _____
    Name: Carmen Policy

By: _____
    Name: Daniel N. Bass

By: _____
    Name: Micah B. Kaplan

By: _____
    Name: Joshua A. Pack

By: _____
    Name: Andrew A. McKnight

By: _____
    Name: Marc Furstein

By: _____
    Name: Leslie Cowen

[Signature Page to Amended and Restated Registration Rights Agreement]

**NEW HOLDERS:**

**Dakota HoldCo, LLC**

By: _____
       Name:
       Title:

**GCM Grosvenor Co-Investment Opportunities Fund, LP**

By: _____
       Name:
       Title:

**GCM T&R Holdings, LLC**

By: _____
       Name:
       Title:

**Wilco Acquisition, LP**

By: _____
       Name:
       Title:

[Signature Page to Amended and Restated Registration Rights Agreement]

**EXHIBIT B**

**Section 262 of the Delaware General Corporation Law**

§ 262 Appraisal rights [For application of this section, see § 17; 82 Del. Laws, c. 45, § 23; and 82 Del. Laws, c. 256 § 24].

(a)      Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words; and the words "depository receipt" mean a receipt or other instrument issued by a depository representing an interest in 1 or more shares, or fractions thereof, solely of stock of a corporation, which stock is deposited with the depository.

(b)      Appraisal rights shall be available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation to be effected pursuant to § 251 (other than a merger effected pursuant to § 251(g) of this title), § 252, § 254, § 255, § 256, § 257, § 258, § 263 or § 264 of this title:

(1)      Provided, however, that no appraisal rights under this section shall be available for the shares of any class or series of stock, which stock, or depository receipts in respect thereof, at the record date fixed to determine the stockholders entitled to receive notice of the meeting of stockholders to act upon the agreement of merger or consolidation (or, in the case of a merger pursuant to § 251(h), as of immediately prior to the execution of the agreement of merger), were either: (i) listed on a national securities exchange or (ii) held of record by more than 2,000 holders; and further provided that no appraisal rights shall be available for any shares of stock of the constituent corporation surviving a merger if the merger did not require for its approval the vote of the stockholders of the surviving corporation as provided in § 251(f) of this title.

(2)      Notwithstanding paragraph (b)(1) of this section, appraisal rights under this section shall be available for the shares of any class or series of stock of a constituent corporation if the holders thereof are required by the terms of an agreement of merger or consolidation pursuant to §§ 251, 252, 254, 255, 256, 257, 258, 263 and 264 of this title to accept for such stock anything except:

a.      Shares of stock of the corporation surviving or resulting from such merger or consolidation, or depository receipts in respect thereof;

b.      Shares of stock of any other corporation, or depository receipts in respect thereof, which shares of stock (or depository receipts in respect thereof) or depository

6

receipts at the effective date of the merger or consolidation will be either listed on a national securities exchange or held of record by more than 2,000 holders;

c. Cash in lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a. and b. of this section; or

d. Any combination of the shares of stock, depository receipts and cash in lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a., b. and c. of this section.

(3) In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under § 253 or § 267 of this title is not owned by the parent immediately prior to the merger, appraisal rights shall be available for the shares of the subsidiary Delaware corporation.

(4) [Repealed.]

(c) Any corporation may provide in its certificate of incorporation that appraisal rights under this section shall be available for the shares of any class or series of its stock as a result of an amendment to its certificate of incorporation, any merger or consolidation in which the corporation is a constituent corporation or the sale of all or substantially all of the assets of the corporation. If the certificate of incorporation contains such a provision, the provisions of this section, including those set forth in subsections (d), (e), and (g) of this section, shall apply as nearly as is practicable.

(d) Appraisal rights shall be perfected as follows:

(1) If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, shall notify each of its stockholders who was such on the record date for notice of such meeting (or such members who received notice in accordance with § 255(c) of this title) with respect to shares for which appraisal rights are available pursuant to subsection (b) or (c) of this section that appraisal rights are available for any or all of the shares of the constituent corporations, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Each stockholder electing to demand the appraisal of such stockholder's shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder's shares; provided that a demand may be delivered to the corporation by electronic transmission if directed to an information processing system (if any) expressly designated for that purpose in such notice. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such stockholder's shares. A proxy or vote against the merger or consolidation shall not constitute such a demand. A stockholder electing to take such action must do so by a separate written demand as herein provided. Within 10 days after the effective date of such merger or consolidation, the surviving or resulting corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and has

7

not voted in favor of or consented to the merger or consolidation of the date that the merger or consolidation has become effective; or

(2)     If the merger or consolidation was approved pursuant to § 228, § 251(h), § 253, or § 267 of this title, then either a constituent corporation before the effective date of the merger or consolidation or the surviving or resulting corporation within 10 days thereafter shall notify each of the holders of any class or series of stock of such constituent corporation who are entitled to appraisal rights of the approval of the merger or consolidation and that appraisal rights are available for any or all shares of such class or series of stock of such constituent corporation, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Such notice may, and, if given on or after the effective date of the merger or consolidation, shall, also notify such stockholders of the effective date of the merger or consolidation. Any stockholder entitled to appraisal rights may, within 20 days after the date of giving such notice or, in the case of a merger approved pursuant to § 251(h) of this title, within the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days after the date of giving such notice, demand in writing from the surviving or resulting corporation the appraisal of such holder's shares; provided that a demand may be delivered to the corporation by electronic transmission if directed to an information processing system (if any) expressly designated for that purpose in such notice. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such holder's shares. If such notice did not notify stockholders of the effective date of the merger or consolidation, either (i) each such constituent corporation shall send a second notice before the effective date of the merger or consolidation notifying each of the holders of any class or series of stock of such constituent corporation that are entitled to appraisal rights of the effective date of the merger or consolidation or (ii) the surviving or resulting corporation shall send such a second notice to all such holders on or within 10 days after such effective date; provided, however, that if such second notice is sent more than 20 days following the sending of the first notice or, in the case of a merger approved pursuant to § 251(h) of this title, later than the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days following the sending of the first notice, such second notice need only be sent to each stockholder who is entitled to appraisal rights and who has demanded appraisal of such holder's shares in accordance with this subsection. An affidavit of the secretary or assistant secretary or of the transfer agent of the corporation that is required to give either notice that such notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. For purposes of determining the stockholders entitled to receive either notice, each constituent corporation may fix, in advance, a record date that shall be not more than 10 days prior to the date the notice is given, provided, that if the notice is given on or after the effective date of the merger or consolidation, the record date shall be such effective date. If no record date is fixed and the notice is given prior to the effective date, the record date shall be the close of business on the day next preceding the day on which the notice is given.

(e)     Within 120 days after the effective date of the merger or consolidation, the surviving or resulting corporation or any stockholder who has complied with subsections (a) and (d) of this section hereof and who is otherwise entitled to appraisal rights, may commence an appraisal proceeding by filing a petition in the Court of Chancery demanding a determination of the value of the stock of all such stockholders. Notwithstanding the foregoing, at any time within

8

60 days after the effective date of the merger or consolidation, any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party shall have the right to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation. Within 120 days after the effective date of the merger or consolidation, any stockholder who has complied with the requirements of subsections (a) and (d) of this section hereof, upon request given in writing (or by electronic transmission directed to an information processing system (if any) expressly designated for that purpose in the notice of appraisal), shall be entitled to receive from the corporation surviving the merger or resulting from the consolidation a statement setting forth the aggregate number of shares not voted in favor of the merger or consolidation (or, in the case of a merger approved pursuant to § 251(h) of this title, the aggregate number of shares (other than any excluded stock (as defined in § 251(h)(6)d. of this title)) that were the subject of, and were not tendered into, and accepted for purchase or exchange in, the offer referred to in § 251(h)(2)), and, in either case, with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. Such statement shall be given to the stockholder within 10 days after such stockholder's request for such a statement is received by the surviving or resulting corporation or within 10 days after expiration of the period for delivery of demands for appraisal under subsection (d) of this section hereof, whichever is later. Notwithstanding subsection (a) of this section, a person who is the beneficial owner of shares of such stock held either in a voting trust or by a nominee on behalf of such person may, in such person's own name, file a petition or request from the corporation the statement described in this subsection.

(f)     Upon the filing of any such petition by a stockholder, service of a copy thereof shall be made upon the surviving or resulting corporation, which shall within 20 days after such service file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached by the surviving or resulting corporation. If the petition shall be filed by the surviving or resulting corporation, the petition shall be accompanied by such a duly verified list. The Register in Chancery, if so ordered by the Court, shall give notice of the time and place fixed for the hearing of such petition by registered or certified mail to the surviving or resulting corporation and to the stockholders shown on the list at the addresses therein stated. Such notice shall also be given by 1 or more publications at least 1 week before the day of the hearing, in a newspaper of general circulation published in the City of Wilmington, Delaware or such publication as the Court deems advisable. The forms of the notices by mail and by publication shall be approved by the Court, and the costs thereof shall be borne by the surviving or resulting corporation.

(g)     At the hearing on such petition, the Court shall determine the stockholders who have complied with this section and who have become entitled to appraisal rights. The Court may require the stockholders who have demanded an appraisal for their shares and who hold stock represented by certificates to submit their certificates of stock to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any stockholder fails to comply with such direction, the Court may dismiss the proceedings as to such stockholder. If immediately before the merger or consolidation the shares of the class or series of stock of the constituent corporation as to which appraisal rights are available were listed on a national securities exchange, the Court shall dismiss the proceedings as to all holders of such shares who are otherwise entitled to appraisal rights unless (1) the total number of shares entitled to appraisal

9

exceeds 1% of the outstanding shares of the class or series eligible for appraisal, (2) the value of the consideration provided in the merger or consolidation for such total number of shares exceeds $1 million, or (3) the merger was approved pursuant to § 253 or § 267 of this title.

(h)  After the Court determines the stockholders entitled to an appraisal, the appraisal proceeding shall be conducted in accordance with the rules of the Court of Chancery, including any rules specifically governing appraisal proceedings. Through such proceeding the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors. Unless the Court in its discretion determines otherwise for good cause shown, and except as provided in this subsection, interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment. At any time before the entry of judgment in the proceedings, the surviving corporation may pay to each stockholder entitled to appraisal an amount in cash, in which case interest shall accrue thereafter as provided herein only upon the sum of (1) the difference, if any, between the amount so paid and the fair value of the shares as determined by the Court, and (2) interest theretofore accrued, unless paid at that time. Upon application by the surviving or resulting corporation or by any stockholder entitled to participate in the appraisal proceeding, the Court may, in its discretion, proceed to trial upon the appraisal prior to the final determination of the stockholders entitled to an appraisal. Any stockholder whose name appears on the list filed by the surviving or resulting corporation pursuant to subsection (f) of this section and who has submitted such stockholder's certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until it is finally determined that such stockholder is not entitled to appraisal rights under this section.

(i)  The Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. Payment shall be so made to each such stockholder, in the case of holders of uncertificated stock forthwith, and the case of holders of shares represented by certificates upon the surrender to the corporation of the certificates representing such stock. The Court's decree may be enforced as other decrees in the Court of Chancery may be enforced, whether such surviving or resulting corporation be a corporation of this State or of any state.

(j)  The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon application of a stockholder, the Court may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares entitled to an appraisal.

(k)  From and after the effective date of the merger or consolidation, no stockholder who has demanded appraisal rights as provided in subsection (d) of this section shall be entitled to vote such stock for any purpose or to receive payment of dividends or other distributions on the stock (except dividends or other distributions payable to stockholders of record at a date

10

which is prior to the effective date of the merger or consolidation); provided, however, that if no petition for an appraisal shall be filed within the time provided in subsection (e) of this section, or if such stockholder shall deliver to the surviving or resulting corporation a written withdrawal of such stockholder's demand for an appraisal and an acceptance of the merger or consolidation, either within 60 days after the effective date of the merger or consolidation as provided in subsection (e) of this section or thereafter with the written approval of the corporation, then the right of such stockholder to an appraisal shall cease. Notwithstanding the foregoing, no appraisal proceeding in the Court of Chancery shall be dismissed as to any stockholder without the approval of the Court, and such approval may be conditioned upon such terms as the Court deems just; provided, however that this provision shall not affect the right of any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation within 60 days after the effective date of the merger or consolidation, as set forth in subsection (e) of this section.

(l)     The shares of the surviving or resulting corporation to which the shares of such objecting stockholders would have been converted had they assented to the merger or consolidation shall have the status of authorized and unissued shares of the surviving or resulting corporation.

11



James Facciolla <jfacciolla@strategicclaims.net>

---

## Re: ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents

1 message

---

**James Facciolla** <jfacciolla@strategicclaims.net>                Thu, Mar 20, 2025 at 6:13 PM
To: Bob McKenzie
Cc: Claims Analyst <info@strategicclaims.net>

Hello Robert,

I've added both these documents to your claim file.

At this point, we are going to present this, and all other contests, to the Court so that they can make an independent decision regarding these claims and provide guidance on who is and isn't entitled to recovery under the Settlement Agreement and Order. Our correspondence and attachments will be made available to the Court to assist them in their determination.

If the Court chooses to pay these claims in full, we will honor the full value of the claims per the Court's direction.

Thank you,

On Thu, Mar 20, 2025 at 5:48 PM Bob McKenzie                          > wrote:

James -

I write in response to your email below regarding Robert McKenzie, Control #566, and Dakota Holdco, LLC, Control #565.

1.  Dakota Holdco, LLC and I do not believe that any documents regarding prior transactions or tax basis are relevant to determine our eligibility to participate in this class action.  Both Dakota Holdco, LLC and I acquired common stock of the Company trading under the ticker ATIP or FAII, during the relevant class period, at $10/share.  However, in the interests of an amicable resolution, my prior emails on March 20, 2025 included a copy of the Rollover and Contribution Agreement substantiating my individual investment in Wilco Acquisition, LP.  I have also attached a copy of my individual 2016 Schedule K-1 from Wilco Acquisition, LP to this email, which further verifies my investment of $575,000. In addition, I have attached a copy of Dakota Holdco, LLC's 2018 IRS Form 1065, which is the oldest tax document we have been able to locate for Dakota Holdco, LLC in the short time provided by Strategic Claims.  The supporting schedules to the IRS Form 1065 reflect Dakota Holdco, LLC's investment in Wilco Holdco, Inc., ~$23.18M.  Dakota Holdco, LLC's investment in Wilco Holdco, Inc. was its only investment at the time.

2.  Dakota Holdco, LLC and I dispute that acquisition of the shares on the NYSE is required under the terms of the Stipulation and Agreement of Settlement dated May 13, 2024 (the "Settlement Agreement").  The Settlement Agreement defines "ATI Securities" as "ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII."  There is no requirement in the definition of ATI Securities, or elsewhere in the Settlement Agreement, that ATI Securities be acquired on the NYSE.  The Settlement Agreement expressly addresses this question elsewhere: a) "Settlement Class" is defined to include, among others, "all persons and entities who ... purchased or **otherwise acquired** ATI Securities between February 22, 2021 and October 19, 2021, both dates inclusive;" and b) in Section D provides that the Securities Plaintiffs filed the Securities Complaint "on behalf of all persons and entities who: (i) purchase or **otherwise acquired** ATI Securities between February 22, 2022 and October 19, 2021."  While Dakota Holdco, LLC and I may not have purchased the shares at issue through a brokerage, we both undeniably acquired common stock of the Company that traded under the ticker symbol ATIP or FAII during the relevant class period, which meets the requirements of the Settlement Agreement.

-Robert McKenzie
Individually and as Manager of Dakota Holdco, LLC

On Thu, Mar 20, 2025 at 1:22 PM James Facciolla <jfacciolla@strategicclaims.net> wrote:
Thanks Robert, I did get your original response, so we are going through those documents, there is quite a bit there

so please bear with us while we go through them.

My follow up questions remain for the open two items.

(1) Do you have a specific record of payment showing what the true tax basis of the shares are? I understand the agreement has an associated value, the same value you suggested in our call ($10), however I need some supporting documentation that is what you actually paid for the shares. This could be a wire transfer receipt, or something IRS related that shows the cost basis, but it must be substantive that indicates the date, quantity of shares, and total cost of shares associated with the transaction.

(2) Where in either of the agreements, does it indicate that these shares were acquired on the New York Stock Exchange? My understanding of these agreements are that these transactions generally take place off-exchange prior to the IPO, or are performed "upstairs" and involve non-public restricted shares. If that isn't the situation, can you provide something from the brokerage firm or Continental showing the trade venue?

Thank you,

On Thu, Mar 20, 2025 at 2:13 PM Bob McKenzie                        wrote:

> James -
>
> I write to follow-up on our call of March 20, 2025 and my email of March 20, 2025.  I dispute the determination set forth in your email below regarding Robert McKenzie, Control #566, and Dakota Holdco, LLC, Control #565 and request court review.
>
> Strategic Claims' conclusion that Dakota Holdco, LLC and I did not acquire or purchase ATI Securities and, instead, engaged in an equity conversion or continued to hold private shares of "'old' ATI" is incorrect.  As more fully set forth below, Dakota Holdco, LLC and I do not believe that we engaged in an equity conversion or made a claim related to private shares of "'old' ATI," but instead purchased or acquired Company stock.  Had this been a conversion we believe that there would have been no exchange of any prior equity interest for new equity interests, but instead, that Dakota Holdco, LLC and I would have retained our as-converted original equity interests.  That did not happen here as Dakota Holdco, LLC and I gave up our original equity interests and received new, completely different, equity interests in a completely different entity.
>
> Strategic Claims' conclusion that Dakota Holdco, LLC and I acquired shares prior to the settlement period is also incorrect.  As more fully set forth below, Dakota Holdco, LLC and I believe that we acquired shares of the Company in or about June 2021 and that any prior equity interests were not shares of or equity interest in the Company.  We believe that since there was no conversion of shares, but instead Dakota Holdco, LLC and I gave up our original equity interests and received new, completely different, equity interests in a completely different entity, we certainly did not acquire those new equity interests prior to the settlement period.
>
> If Strategic Claims refuses to resolve this amicably, I anticipate that Dakota Holdco, LLC and I will be forced to retain counsel and litigate this matter, which would unfortunately hold up the settlement for the entire class.
>
> **Regarding Dakota Holdco, LLC:**
>
> I have attached a Written Consent In Lieu of A Meeting of Stockholders of Wilco Holdco, Inc. dated February 21, 2021 confirming that prior to the Merger, Dakota Holdco, LLC was the holder of 23,179.19910431 shares of Series A-1 preferred stock of Wilco Holdco, Inc.
>
> I also direct you to the *Amended and Restated Registration Rights Agreement* included in the

Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm (last visited March 20, 2025).  Dakota Holdco, LLC was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature page included therewith.  The Amended and Restated Registration Rights Agreement provided that New Holders, including Dakota Holdco, LLC, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)."  The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of preferred stock of Wilco Holdco, Inc. would receive common stock of the Company:  "Each share of [Wilco Holdco, Inc.] preferred stock issued and outstanding immediately prior to the effective time will be converted into the right to receive ... (B) a number of shares of ATI Class A common stock equal in value to (i) the product of (a) (x) the Preferred Stock Adjusted Base plus (y) an aggregate accrued amount, calculated based on the Preferred Stock Adjusted Base, at the Dividend Rate (as defined in the  [Wilco Holdco, Inc.'s] current charter) from the closing date through the date that is 180 days from the closing date, multiplied by (b) 1.05, divided by (ii) the number of shares of  [Wilco Holdco, Inc.]  preferred stock outstanding as of immediately prior to the effective time."

**Thus, Dakota Holdco, LLC, in consideration of agreeing to convert certain of its rights in preferred stock of Wilco Holdco, Inc., then valued at $30,381,970 (which Dakota Holdco, LLC argues is its cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 3,038,197 shares of common stock of Company, valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders."**  See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Dakota Holdco, LLC: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

**Regarding Robert McKenzie, Individually:**

As you are aware, I submitted an individual claim related to 85,852 shares of the Company's common stock.  In or about May, 2016, I became a limited partner of Wilco Acquisition, LP and through Wilco Acquisition, LP I became a beneficial owner of 85,852 shares of the Company's common stock that were distributed to me in or about November, 2021.  *See*, the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021 which provides that "Wilco Acquisition intends to distribute such shares of Common Stock to its limited partners and general partner, each of which will be a permitted transferee under the A&R RRA and is named as a selling securityholder herein." https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

I understand that Wilco Acquisition, LP failed or refused to file a claim in this matter and, as a result, I filed my individual claim as I was the beneficial owner of the shares.  I have attached a copy of a Rollover and Contribution Agreement made effective in May, 2016 (Exhibit A redacted), reflecting my initial investment of $575,000 in Wilco Acquisition, LP.  Thus, I did not have zero basis in my interest as you assert.

I again direct you to the *Amended and Restated Registration Rights Agreement* included in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm (last visited March 20, 2025).  Wilco Acquisition, LP was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature page included therewith.  The Amended and Restated Registration Rights Agreement provided that New Holders, including Wilco Acquisition, LP, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)."  The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of common stock of Wilco Holdco, Inc. would receive common stock of the Company:  " Each share of [Wilco Holdco, Inc.] common stock issued and outstanding immediately prior to the effective time will be converted into the right to receive (A) a number of shares of ATI Class A common stock equal in value to (1) $1,303,000,000 divided by (2) the number of shares of Company common stock outstanding as of immediately prior to the effective time…"

Thus, Wilco Acquisition, LP, in consideration of agreeing to convert certain of its rights in common stock of Wilco Holdco, Inc. valued at $1,303,0000,000 (which I believe represents Wilco Acquisition, LP's cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 130,300,000 shares of common stock of Company **(of which 85,852 shares, with a cost basis of $858,520, were beneficially owned by Robert McKenzie, individually),** valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders."  See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Wilco Acquisition, LP: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

-Robert McKenzie
Individually and as Manager of Dakota Holdco, LLC

On Thu, Mar 20, 2025 at 11:59 AM James Facciolla <jfacciolla@strategicclaims.net> wrote:
> Hello Robert,
>
> Per our earlier phone call, and at request of Pomerantz LLP, I am reaching out to clarify the ineligibility letter you received from Strategic Claims Services, mailed February 27, 2025.
>
> Our final determination is as follows.
>
> **Your claims (see below) remain ineligible for the following reasons.**

| Claim | Name 1 | Name 2 |
|-------|--------|--------|
| 565 | DAKOTA HOLDCO LLC | ROBERT MCKENZIE, MANAGER |
| 566 | ROBERT MCKENZIE | |

> (1) Per the definition in the Stipulation of Settlement (https://www.strategicclaims.net/wp-content/uploads/2024/06/FULLY-EXECUTED-ATI-Stipulation-of-Settlement-PDF-00609416xC40C2.pdf), *"ATI Securities" means ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII.* Equity conversions,

or private shares of "old" ATI do not classify as a purchase or acquisition based upon the language of the Stipulation of Settlement.

(2) Your shares were acquired prior to the Settlement Class Period, in order to participate in the Settlement, shares must have been *(a) purchased or otherwise acquired ATI Securities between February 22, 2021 and October 19, 2021, both dates inclusive, and/or beneficially owned and/or held FVAC common stock as of May 24, 2021 and were eligible to vote at FVAC's June 15, 2021 special meeting to vote on the Business Combination (the "Securities Subclass"); and/or (b) beneficially owned and/or held FVAC Class A common stock as of the June 11, 2021 Redemption Date who were entitled to, but did not elect to, redeem their shares (the "Multiplan Subclass").* Per the ATI IPO Filing and Prospectus, these shares were held prior to the Settlement Class Period dates making them ineligible.

If you disagree with our determination please provide us the necessary supporting documentation to allow us to amend or confirm the above. Some examples of supporting documentation could include monthly statements from your financial institution, grant or option agreements, copies of checks, wires or other payment related receipts, etc. We already have your documents from the Transfer Agent, Continental, so you do not need to resend those documents. Any additional documents should be sent directly to me.

If you feel you still have received this notice in error and would like to contest our determination, please respond to this email in writing no later than Tuesday, March 25, 2025 officially requesting for Court review. Please be sure to include your claim number as noted above, your reason for contesting our determination, and documentation supporting your reason. If we do not hear from you by the above date, we will assume you agree with our determination and close out the dispute without Court review.

Thank you,

--
James Facciolla
Institution Relations Manager
Strategic Claims Services, Inc.
600 N. Jackson Street
Suite 205
Media, PA 19063
610-565-9202 x 1013

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

--
James Facciolla
Institution Relations Manager
Strategic Claims Services, Inc.
600 N. Jackson Street
Suite 205
Media, PA 19063
610-565-9202 x 1013

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

--
James Facciolla
Institution Relations Manager
Strategic Claims Services, Inc.
600 N. Jackson Street
Suite 205

Media, PA 19063
610-565-9202 x 1013

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

651113

| | | |
|---|---|---|
| ☐ Final K-1 | ☐ Amended K-1 | OMB No. 1545-0123 |

**Schedule K-1**
**(Form 1065)**

**2016**

Department of the Treasury
Internal Revenue Service

For calendar year 2016, or tax
year beginning  03/21  , 2016
ending  12/31  , 20 16

**Partner's Share of Income, Deductions,**
**Credits, etc.** ▶ **See back of form and separate instructions.**

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | | |
|---|---|---|---|---|
| **1** | Ordinary business income (loss) | | **15** | Credits |
| **2** | Net rental real estate income (loss) | | | |
| **3** | Other net rental income (loss) | | **16** | Foreign transactions |
| **4** | Guaranteed payments | | | |
| **5** | Interest income | | | |
| **6a** | Ordinary dividends | | | |
| **6b** | Qualified dividends | | | |
| **7** | Royalties | | | |
| **8** | Net short-term capital gain (loss) | | | |
| **9a** | Net long-term capital gain (loss) | | **17** | Alternative minimum tax (AMT) items |
| **9b** | Collectibles (28%) gain (loss) | | | |
| **9c** | Unrecaptured section 1250 gain | | | |
| **10** | Net section 1231 gain (loss) | | **18** | Tax-exempt income and nondeductible expenses |
| **11** | Other income (loss) | | | |

| Part I | Information About the Partnership |
|---|---|

**A**  Partnership's employer identification number

**B**  Partnership's name, address, city, state, and ZIP code

WILCO ACQUISITION, LP
790 REMINGTON BLVD
BOLINGBROOK, IL 60440

**C**  IRS Center where partnership filed return
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |
|---|---|

**E**  Partner's identifying number

**F**  Partner's name, address, city, state, and ZIP code
ROBERT MCKENZIE

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1**  What type of entity is this partner?  INDIVIDUAL
**I2**  If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . . . . . . . . . . . . . . . . . . . ☐

**J**  Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | | 0.060947% |
| Loss | | 0.060947% |
| Capital | | 0.060947% |

**K**  Partner's share of liabilities at year end:
Nonrecourse . . . . . . . . . $ _____
Qualified nonrecourse financing . . . $ _____
Recourse . . . . . . . . . . $ _____

**L**  Partner's capital account analysis:
Beginning capital account . . . . . $ _____
Capital contributed during the year . . $ 575,000
Current year increase (decrease) . . $ _____
Withdrawals & distributions . . . . $ _____
Ending capital account . . . . . . $ 575,000

☐ Tax basis  ☐ GAAP  ☒ Section 704(b) book
☐ Other (explain)

**M**  Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If "Yes," attach statement (see instructions)

| | | | | |
|---|---|---|---|---|
| **12** | Section 179 deduction | | **19** | Distributions |
| | | | A | - |
| **13** | Other deductions | | **20** | Other information |
| **14** | Self-employment earnings (loss) | | | |

\*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.    IRS.gov/form1065    41    Schedule K-1 (Form 1065) 2016

Schedule K-1 (Form 1065) 2016

Page **2**

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.

| | | Report on |
|---|---|---|
| 1. | Ordinary business income (loss). Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | |
| | Passive loss | See the Partner's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| 2. | Net rental real estate income (loss) | See the Partner's Instructions |
| 3. | Other net rental income (loss) | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Partner's Instructions |
| 4. | Guaranteed payments | Schedule E, line 28, column (j) |
| 5. | Interest income | Form 1040, line 8a |
| 6a. | Ordinary dividends | Form 1040, line 9a |
| 6b. | Qualified dividends | Form 1040, line 9b |
| 7. | Royalties | Schedule E, line 4 |
| 8. | Net short-term capital gain (loss) | Schedule D, line 5 |
| 9a. | Net long-term capital gain (loss) | Schedule D, line 12 |
| 9b. | Collectibles (28%) gain (loss) | 28% Rate Gain Worksheet, line 4 (Schedule D instructions) |
| 9c. | Unrecaptured section 1250 gain | See the Partner's Instructions |
| 10. | Net section 1231 gain (loss) | See the Partner's Instructions |
| 11. | Other income (loss) | |
| | *Code* | |
| | A Other portfolio income (loss) | See the Partner's Instructions |
| | B Involuntary conversions | See the Partner's Instructions |
| | C Sec. 1256 contracts & straddles | Form 6781, line 1 |
| | D Mining exploration costs recapture | See Pub. 535 |
| | E Cancellation of debt | Form 1040, line 21 or Form 982 |
| | F Other income (loss) | See the Partner's Instructions |
| 12. | Section 179 deduction | See the Partner's Instructions |
| 13. | Other deductions | |
| | A Cash contributions (50%) | |
| | B Cash contributions (30%) | |
| | C Noncash contributions (50%) | |
| | D Noncash contributions (30%) | See the Partner's Instructions |
| | E Capital gain property to a 50% organization (30%) | |
| | F Capital gain property (20%) | |
| | G Contributions (100%) | |
| | H Investment interest expense | Form 4952, line 1 |
| | I Deductions—royalty income | Schedule E, line 19 |
| | J Section 59(e)(2) expenditures | See the Partner's Instructions |
| | K Deductions—portfolio (2% floor) | Schedule A, line 23 |
| | L Deductions—portfolio (other) | Schedule A, line 28 |
| | M Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| | N Educational assistance benefits | See the Partner's Instructions |
| | O Dependent care benefits | Form 2441, line 12 |
| | P Preproductive period expenses | See the Partner's Instructions |
| | Q Commercial revitalization deduction from rental real estate activities | See Form 8582 instructions |
| | R Pensions and IRAs | See the Partner's Instructions |
| | S Reforestation expense deduction | See the Partner's Instructions |
| | T Domestic production activities information | See Form 8903 instructions |
| | U Qualified production activities income | Form 8903, line 7b |
| | V Employer's Form W-2 wages | Form 8903, line 17 |
| | W Other deductions | See the Partner's Instructions |
| 14. | Self-employment earnings (loss) | |

Note: If you have a section 179 deduction or any partner-level deductions, see the the Partner's Instructions before completing Schedule SE.

| | | |
|---|---|---|
| | A Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| | B Gross farming or fishing income | See the Partner's Instructions |
| | C Gross non-farm income | See the Partner's Instructions |
| 15. | Credits | |
| | A Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| | B Low-income housing credit (other) from pre-2008 buildings | |
| | C Low-income housing credit (section 42(j)(5)) from post-2007 buildings | |
| | D Low-income housing credit (other) from post-2007 buildings | See the Partner's Instructions |
| | E Qualified rehabilitation expenditures (rental real estate) | |
| | F Other rental real estate credits | |
| | G Other rental credits | |
| | H Undistributed capital gains credit | Form 1040, line 73; check box a |
| | I Biofuel producer credit | |
| | J Work opportunity credit | See the Partner's Instructions |
| | K Disabled access credit | |

| | | Report on |
|---|---|---|
| | *Code* | |
| | L Empowerment zone employment credit | |
| | M Credit for increasing research activities | |
| | N Credit for employer social security and Medicare taxes | See the Partner's Instructions |
| | O Backup withholding | |
| | P Other credits | |
| 16. | Foreign transactions | |
| | A Name of country or U.S. possession | |
| | B Gross income from all sources | Form 1116, Part I |
| | C Gross income sourced at partner level | |
| | *Foreign gross income sourced at partnership level* | |
| | D Passive category | |
| | E General category | Form 1116, Part I |
| | F Other | |
| | *Deductions allocated and apportioned at partner level* | |
| | G Interest expense | Form 1116, Part I |
| | H Other | Form 1116, Part I |
| | *Deductions allocated and apportioned at partnership level to foreign source income* | |
| | I Passive category | |
| | J General category | Form 1116, Part I |
| | K Other | |
| | *Other information* | |
| | L Total foreign taxes paid | Form 1116, Part II |
| | M Total foreign taxes accrued | Form 1116, Part II |
| | N Reduction in taxes available for credit | Form 1116, line 12 |
| | O Foreign trading gross receipts | Form 8873 |
| | P Extraterritorial income exclusion | Form 8873 |
| | Q Other foreign transactions | See the Partner's Instructions |
| 17. | Alternative minimum tax (AMT) items | |
| | A Post-1986 depreciation adjustment | |
| | B Adjusted gain or loss | See the Partner's Instructions and the Instructions for Form 6251 |
| | C Depletion (other than oil & gas) | |
| | D Oil, gas, & geothermal—gross income | |
| | E Oil, gas, & geothermal—deductions | |
| | F Other AMT items | |
| 18. | Tax-exempt income and nondeductible expenses | |
| | A Tax-exempt interest income | Form 1040, line 8b |
| | B Other tax-exempt income | See the Partner's Instructions |
| | C Nondeductible expenses | See the Partner's Instructions |
| 19. | Distributions | |
| | A Cash and marketable securities | |
| | B Distribution subject to section 737 | See the Partner's Instructions |
| | C Other property | |
| 20. | Other information | |
| | A Investment income | Form 4952, line 4a |
| | B Investment expenses | Form 4952, line 5 |
| | C Fuel tax credit information | Form 4136 |
| | D Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| | E Basis of energy property | See the Partner's Instructions |
| | F Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| | G Recapture of low-income housing credit (other) | Form 8611, line 8 |
| | H Recapture of investment credit | See Form 4255 |
| | I Recapture of other credits | See the Partner's Instructions |
| | J Look-back interest—completed long-term contracts | See Form 8697 |
| | K Look-back interest—income forecast method | See Form 8866 |
| | L Dispositions of property with section 179 deductions | |
| | M Recapture of section 179 deduction | |
| | N Interest expense for corporate partners | |
| | O Section 453(l)(3) information | |
| | P Section 453A(c) information | |
| | Q Section 1260(b) information | |
| | R Interest allocable to production expenditures | See the Partner's Instructions |
| | S CCF nonqualified withdrawals | |
| | T Depletion information—oil and gas | |
| | U Reserved | |
| | V Unrelated business taxable income | |
| | W Precontribution gain (loss) | |
| | X Section 108(i) information | |
| | Y Net investment income | |
| | Z Other information | |

**Grant Thornton**

```
             DAKOTA HOLDCO, LLC
           INSTRUCTIONS FOR FILING
                FORM 8879-PE
  2018 IRS E-FILE SIGNATURE AUTHORIZATION FOR FORM 1065
       FOR THE YEAR ENDED DECEMBER 31, 2018
```

THE ORIGINAL FORM SHOULD BE SIGNED (USING FULL NAME AND TITLE) AND DATED BY AN AUTHORIZED GENERAL PARTNER OR LIMITED LIABILITY COMPANY MEMBER MANAGER OF THE PARTNERSHIP.

THE SIGNED FORM SHOULD BE RETURNED ON OR BEFORE MARCH 15, 2019 TO:

```
                GRANT THORNTON LLP
           757 THIRD AVENUE, 4TH FLOOR
             NEW YORK, NY  10017
```

DO NOT SEPARATELY FILE A PAPER FORM 1065 WITH THE INTERNAL REVENUE SERVICE.  DOING SO WILL DELAY THE PROCESSING OF YOUR RETURN.

WE MUST RECEIVE YOUR SIGNED FORM BEFORE WE CAN ELECTRONICALLY TRANSMIT YOUR RETURN.  THE INTERNAL REVENUE SERVICE WILL NOTIFY US WHEN YOUR RETURN IS ACCEPTED.  PLEASE NOTE THAT THE IRS DOES NOT CONSIDER YOUR RETURN AS FILED UNTIL THEY CONFIRM ACCEPTANCE OF THE RETURN.

"Grant Thornton" refers to Grant Thornton LLP, the U.S. member firm of Grant Thornton International Ltd (GTIL), and/or refers to the brand under which the GTIL member firms provide audit, tax and advisory services to their clients, as the context requires. GTIL and each of its member firms are separate legal entities and are not a worldwide partnership. GTIL does not provide services to clients. Services are delivered by the member firms in their respective countries. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. In the United States, visit GT.COM for details.

Form **8879-PE**

**IRS *e-file* Signature Authorization for Form 1065**

▶ **Return completed Form 8879-PE to your ERO. (Don't send to the IRS.)**

▶ **Go to *www.irs.gov/Form8879PE* for the latest information.**

OMB No. 1545-0123

20**18**

Department of the Treasury
Internal Revenue Service

For calendar year 2018, or tax year beginning _____ , 2018, and ending _____ , 20 _____ .

| Name of partnership | Employer identification number |
|---|---|
| DAKOTA HOLDCO, LLC | |

### Part I — Tax Return Information (Whole dollars only)

| | | |
|---|---|---|
| 1 | Gross receipts or sales less returns and allowances (Form 1065, line 1c) . . . . . . . . . . . . . . | **1** |
| 2 | Gross profit (Form 1065, line 3) . . . . . . . . . . . . . . . . . . . . . . . . . . | **2** |
| 3 | Ordinary business income (loss) (Form 1065, line 22) . . . . . . . . . . . . . . . . . . . | **3** |
| 4 | Net rental real estate income (loss) (Form 1065, Schedule K, line 2) . . . . . . . . . . . . . | **4** |
| 5 | Other net rental income (loss) (Form 1065, Schedule K, line 3c) . . . . . . . . . . . . . . | **5** |

### Part II — Declaration and Signature Authorization of Partner or Member (Be sure to get a copy of the partnership's return)

Under penalties of perjury, I declare that I am a partner or member of the above partnership and that I have examined a copy of the partnership's 2018 electronic return of partnership income and accompanying schedules and statements and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts shown on the copy of the partnership's electronic return of partnership income. I consent to allow my electronic return originator (ERO), transmitter, or intermediate service provider to send the partnership's return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission and **(b)** the reason for any delay in processing the return. I have selected a personal identification number (PIN) as my signature for the partnership's electronic return of partnership income.

**Partner or Member's PIN: check one box only**

[X] I authorize GRANT THORNTON LLP to enter my PIN [ | | | | | ] as my signature
    ERO firm name                                    Don't enter all zeros

on the partnership's 2018 electronically filed return of partnership income.

[ ] As a partner or member of the partnership, I will enter my PIN as my signature on the partnership's 2018 electronically filed return of partnership income.

Partner or member's signature ▶ _____

Title ▶ SECRETARY                                    Date ▶ _____

### Part III — Certification and Authentication

**ERO's EFIN/PIN.** Enter your six-digit EFIN followed by your five-digit self-selected PIN. [ | | | | | | | | | | | ]

Don't enter all zeros

I certify that the above numeric entry is my PIN, which is my signature on the 2018 electronically filed return of partnership income for the partnership indicated above. I confirm that I am submitting this return in accordance with the requirements of **Pub. 3112,** IRS *e-file* Application and Participation, and **Pub. 4163,** Modernized e-File (MeF) Information for Authorized IRS *e-file* Providers for Business Returns.

ERO's signature ▶ _____    Date ▶ _____

**ERO Must Retain This Form - See Instructions**
**Don't Submit This Form to the IRS Unless Requested To Do So**

For Paperwork Reduction Act Notice, see instructions.                    Form **8879-PE** (2018)

JSA
8P8907 1.000

5653LX   700H   03/08/2019 15:55:56

| Form **1065** | | | | | | | |
|---|---|---|---|---|---|---|---|

Form **1065**
Department of the Treasury
Internal Revenue Service

# U.S. Return of Partnership Income

For calendar year 2018, or tax year beginning _____, 2018, ending _____, 20 _____.
▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2018**

| | | |
|---|---|---|
| **A** Principal business activity<br><br>INVESTMENT | Name of partnership<br><br>DAKOTA HOLDCO, LLC | **D** Employer identification number |
| **B** Principal product or service<br><br>INVESTMENT | **Type**<br>**or**<br>**Print**    Number, street, and room or suite no. If a P.O. box, see instructions. | **E** Date business started<br><br>08/31/2016 |
| **C** Business code number<br><br>523900 | City or town, state or province, country, and ZIP or foreign postal code | **F** Total assets (see instructions)<br><br>$   23,181,191. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year. ▶ _____ 153

**J** Check if Schedules C and M-3 are attached. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | |
|---|---|---|---|
| **Income** | **1a** Gross receipts or sales. . . . . . . . . . . . . . . . . . . . | **1a** | |
| | **b** Returns and allowances . . . . . . . . . . . . . . . . . . . | **1b** | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . | **1c** | |
| | **2** Cost of goods sold (attach Form 1125-A). . . . . . . . . . . . . . . . . . | **2** | |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . | **3** | |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement). . . . . | **4** | |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040)). . . . . . . . . . . . . . | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . . . | **6** | |
| | **7** Other income (loss) (attach statement) . . . . . . . . . . . . . . . | **7** | |
| | **8** **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . . . . . . | **8** | |
| **Deductions** (see instructions for limitations) | **9** Salaries and wages (other than to partners) (less employment credits) . . . . . . . . . . . | **9** | |
| | **10** Guaranteed payments to partners. . . . . . . . . . . . . . . . . . . | **10** | |
| | **11** Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . | **11** | |
| | **12** Bad debts. . . . . . . . . . . . . . . . . . . . . . . . . . | **12** | |
| | **13** Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | |
| | **14** Taxes and licenses. . . . . . . . . . . . . . . . . . . . . . . | **14** | |
| | **15** Interest (see instructions) . . . . . . . . . . . . . . . . . . . . | **15** | |
| | **16a** Depreciation (if required, attach Form 4562). . . . . . . . | **16a** | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | **16c** |
| | **17** Depletion **(Do not deduct oil and gas depletion.)** . . . . . . . . . . . . . | **17** | |
| | **18** Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . | **18** | |
| | **19** Employee benefit programs . . . . . . . . . . . . . . . . . . . | **19** | |
| | **20** Other deductions (attach statement) . . . . . . . . . . . . . . . . | **20** | |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 . . . | **21** | |
| | **22** **Ordinary business income (loss).** Subtract line 21 from line 8 . . . . . . . . . . . | **22** | |
| **Tax and Payment** | **23** Interest due under the look-back method - completed long-term contracts (attach Form 8697). | **23** | |
| | **24** Interest due under the look-back method - income forecast method (attach Form 8866) . . . . | **24** | |
| | **25** BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . . . . | **25** | |
| | **26** Other taxes (see instructions) . . . . . . . . . . . . . . . . . . . | **26** | |
| | **27** **Total balance due.** Add lines 23 through 27 . . . . . . . . . . . . . . . | **27** | |
| | **28** Payment (see instructions). . . . . . . . . . . . . . . . . . . . | **28** | |
| | **29** **Amount owed.** If line 28 is smaller than line 27, enter amount owed. . . . . . . . . . | **29** | |
| | **30** **Overpayment.** If line 28 is larger than line 27, enter overpayment . . . . . . . . . . | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

SECRETARY
ROBERT MCKENZIE

▶ _____
Signature of partner or limited liability company member

▶ _____ Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name<br><br>THOMAS KENISON | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| Firm's name ▶   GRANT THORNTON LLP | | | Firm's EIN ▶ | |
| Firm's address ▶ | | | Phone no. | |

**For Paperwork Reduction Act Notice, see separate instructions.**

Form **1065** (2018)

JSA   8P1010 2.000
5653LX   700H   03/08/2019 15:55:56

Form 1065 (2018) Page **2**

## Schedule B    Other Information

| | | Yes | No |
|---|---|---|---|
| **1** | What type of entity is filing this return? Check the applicable box: | | |

| | | | | |
|---|---|---|---|---|
| **a** | ☐ Domestic general partnership | **b** | ☐ Domestic limited partnership | |
| **c** | ☒ Domestic limited liability company | **d** | ☐ Domestic limited liability partnership | |
| **e** | ☐ Foreign partnership | **f** | ☐ Other ▶ | |

| | | Yes | No |
|---|---|---|---|
| **2** | At the end of the tax year: | | |
| **a** | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization, or any foreign government own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership . . . . . . . . . . . . | | X |
| **b** | Did any individual or estate own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership . . . . . . . . . . . . | | X |
| **3** | At the end of the tax year, did the partnership: | | |
| **a** | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (iv) below . . . . . . . . . . . . | | X |

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | Yes | No |
|---|---|---|---|
| **b** | Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below . . . . | | X |

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | Yes | No |
|---|---|---|---|
| **4** | Does the partnership satisfy **all four** of the following conditions? | | |
| **a** | The partnership's total receipts for the tax year were less than $250,000. | | |
| **b** | The partnership's total assets at the end of the tax year were less than $1 million. | | |
| **c** | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | |
| **d** | The partnership is not filing and is not required to file Schedule M-3 . . . . . . . . . . . . | | X |
| | If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; item F on page 1 of Form 1065; or item L on Schedule K-1. | | |
| **5** | Is this partnership a publicly traded partnership, as defined in section 469(k)(2)? . . . . . . . . . . . | | X |
| **6** | During the tax year, did the partnership have any debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . . | | X |
| **7** | Has this partnership filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, to provide information on any reportable transaction? . . . . . . . . . . . . | | X |
| **8** | At any time during calendar year 2018, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR).  If "Yes," enter the name of the foreign country. ▶ | | X |
| **9** | At any time during the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. See instructions . . . . . . . . . . . . | | X |
| **10 a** | Is the partnership making, or had it previously made (and not revoked), a section 754 election? . . . . . . . . . . . | | X |
| | See instructions for details regarding a section 754 election. | | |
| **b** | Did the partnership make for this tax year an optional basis adjustment under section 743(b) or 734(b)? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions . . . . . . . . | | X |

JSA                                                                                         Form **1065** (2018)

8P1020 1.000

5653LX   700H   03/08/2019 15:55:56

Form 1065 (2018)  Page **3**

| **Schedule B** | **Other Information** *(continued)* | **Yes** | **No** |
|---|---|---|---|

| | | Yes | No |
|---|---|---|---|
| **c** | Is the partnership required to adjust the basis of partnership assets under section 743(b) or 734(b) because of a substantial built-in loss (as defined under section 743(d)) or substantial basis reduction (as defined under section 734(d))? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions | | X |
| **11** | Check this box if, during the current or prior tax year, the partnership distributed any property received in a like-kind exchange or contributed such property to another entity (other than disregarded entities wholly owned by the partnership throughout the tax year) . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ | | |
| **12** | At any time during the tax year, did the partnership distribute to any partner a tenancy-in-common or other undivided interest in partnership property? . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **13** | If the partnership is required to file Form 8858, Information Return of U.S. Persons With Respect To Foreign Disregarded Entities (FDEs) and Foreign Branches (FBs), enter the number of Forms 8858 attached. See instructions . . . . . . . . . . . . . . . . . . . . . . . ▶ | | |
| **14** | Does the partnership have any foreign partners? If "Yes," enter the number of Forms 8805, Foreign Partner's Information Statement of Section 1446 Withholding Tax, filed for this partnership. ▶ | | X |
| **15** | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return. ▶ | | |
| **16a** | Did you make any payments in 2018 that would require you to file Form(s) 1099? See instructions . . . . . . . . . . | | X |
| **b** | If "Yes," did you or will you file required Form(s) 1099? . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **17** | Enter the number of Form(s) 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to this return. ▶ | | |
| **18** | Enter the number of partners that are foreign governments under section 892. ▶ | | |
| **19** | During the partnership's tax year, did the partnership make any payments that would require it to file Form 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474)? . . . . . . . . | | X |
| **20** | Was the partnership a specified domestic entity required to file Form 8938 for the tax year? See the Instructions for Form 8938 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **21** | Is the partnership a section 721(c) partnership, as defined in Treasury Regulations section 1.721(c)-1T(b)(14)? . . . . . | | X |
| **22** | During the tax year, did the partnership pay or accrue any interest or royalty for which the deduction is not allowed under section 267A? See instructions. If "Yes," enter the total amount of the disallowed deductions. ▶ $ | | X |
| **23** | Did the partnership have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year? See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **24** | Does the partnership satisfy one of the following conditions and the partnership does not own a pass-through entity with current year, or prior year, carryover excess business interest expense? See instructions . . . . . . . . . . | | X |
| **a** | The partnership's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year do not exceed $25 million, and the partnership is not a tax shelter, or | | |
| **b** | The partnership only has business interest expense from (1) an electing real property trade or business, (2) an electing farming business, or (3) certain utility businesses under section 163(j)(7). If "No," complete and attach Form 8990. | | |
| **25** | Is the partnership electing out of the centralized partnership audit regime under section 6221(b)? See instructions. If "Yes," the partnership must complete Schedule B-2 (Form 1065). Enter the total from Schedule B-2, Part III, line 3. ▶ _____ If "No," complete Designation of Partnership Representative below. | | X |

**Designation of Partnership Representative**  (see instructions)

Enter below the information for the partnership representative (PR) for the tax year covered by this return.

| | | | |
|---|---|---|---|
| Name of PR ▶ | ROBERT MCKENZIE | U.S. taxpayer identification number of PR ▶ | |
| U.S. address of PR | | U.S. phone number of PR ▶ | |
| If the PR is an entity, name of the designated individual for the PR ▶ | | U.S. taxpayer identification number of the designated individual ▶ | |
| U.S. address of designated individual ▶ | | U.S. phone number of designated individual ▶ | |

| | | | Yes | No |
|---|---|---|---|---|
| **26** | Is the partnership attaching Form 8996 to certify as a Qualified Opportunity Fund? . . . . . . . . . . . . . . . . . . If "Yes," enter the amount from Form 8996, line 13. ▶ $ | | | X |

JSA

8P1036 1.000

Form **1065** (2018)

5653LX  700H  03/08/2019 15:55:56

Form 1065 (2018)　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page **4**

| Schedule K | Partners' Distributive Share Items | | Total amount |
|---|---|---|---|

**Income (Loss)**

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (page 1, line 22) | 1 | |
| 2 | Net rental real estate income (loss) (attach Form 8825) | 2 | |
| 3a | Other gross rental income (loss) | 3a | |
| b | Expenses from other rental activities (attach statement) | 3b | |
| c | Other net rental income (loss). Subtract line 3b from line 3a | 3c | |
| 4 | Guaranteed payments | 4 | |
| 5 | Interest income | 5 | |
| 6 | Dividends and dividend equivalents: **a** Ordinary dividends | 6a | |
| | **b** Qualified dividends | 6b | |
| | **c** Dividend equivalents | 6c | |
| 7 | Royalties | 7 | |
| 8 | Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | 8 | |
| 9a | Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | 9a | |
| b | Collectibles (28%) gain (loss) | 9b | |
| c | Unrecaptured section 1250 gain (attach statement) | 9c | |
| 10 | Net section 1231 gain (loss) (attach Form 4797) | 10 | |
| 11 | Other income (loss) (see instructions) Type ▶ | 11 | |

**Deductions**

| | | | |
|---|---|---|---|
| 12 | Section 179 deduction (attach Form 4562) | 12 | |
| 13a | Contributions | 13a | |
| b | Investment interest expense | 13b | |
| c | Section 59(e)(2) expenditures: **(1)** Type ▶ _____ **(2)** Amount ▶ | 13c(2) | |
| d | Other deductions (see instructions) Type ▶ | 13d | |

**Self-Employment**

| | | | |
|---|---|---|---|
| 14a | Net earnings (loss) from self-employment | 14a | |
| b | Gross farming or fishing income | 14b | |
| c | Gross nonfarm income | 14c | |

**Credits**

| | | | |
|---|---|---|---|
| 15a | Low-income housing credit (section 42(j)(5)) | 15a | |
| b | Low-income housing credit (other) | 15b | |
| c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) | 15c | |
| d | Other rental real estate credits (see instructions) Type ▶ | 15d | |
| e | Other rental credits (see instructions) Type ▶ | 15e | |
| f | Other credits (see instructions) Type ▶ | 15f | |

**Foreign Transactions**

| | | | |
|---|---|---|---|
| 16a | Name of country or U.S. possession ▶ | | |
| b | Gross income from all sources | 16b | |
| c | Gross income sourced at partner level | 16c | |
| | Foreign gross income sourced at partnership level | | |
| d | Section 951A category ▶ _____ **e** Foreign branch category ▶ | 16e | |
| f | Passive category ▶ _____ **g** General category ▶ _____ **h** Other (attach statement) ▶ | 16h | |
| | Deductions allocated and apportioned at partner level | | |
| i | Interest expense ▶ _____ **j** Other ▶ | 16j | |
| | Deductions allocated and apportioned at partnership level to foreign source income | | |
| k | Section 951A category ▶ _____ **l** Foreign branch category ▶ | 16l | |
| m | Passive category ▶ _____ **n** General category ▶ _____ **o** Other (attach statement) ▶ | 16o | |
| p | Total foreign taxes (check one): ▶ Paid ☐ Accrued ☐ | 16p | |
| q | Reduction in taxes available for credit (attach statement) | 16q | |
| r | Other foreign tax information (attach statement) | | |

**Alternative Minimum Tax (AMT) Items**

| | | | |
|---|---|---|---|
| 17a | Post-1986 depreciation adjustment | 17a | |
| b | Adjusted gain or loss | 17b | |
| c | Depletion (other than oil and gas) | 17c | |
| d | Oil, gas, and geothermal properties - gross income | 17d | |
| e | Oil, gas, and geothermal properties - deductions | 17e | |
| f | Other AMT items (attach statement) | 17f | |

**Other Information**

| | | | |
|---|---|---|---|
| 18a | Tax-exempt interest income | 18a | |
| b | Other tax-exempt income | 18b | |
| c | Nondeductible expenses | 18c | |
| 19a | Distributions of cash and marketable securities | 19a | |
| b | Distributions of other property | 19b | |
| 20a | Investment income | 20a | |
| b | Investment expenses | 20b | |
| c | Other items and amounts (attach statement) | | |

JSA
8P1030 1.000

Form **1065** (2018)

5653LX　700H　03/08/2019 15:55:56

Form 1065 (2018)          Page **5**

## Analysis of Net Income (Loss)

| | | |
|---|---|---|
| 1 | Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16p . . . . . . . . . . . . . . . . . . . . . | 1 |

**2 Analysis by partner type:**

| | | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|---|
| a | General partners | | | | | | |
| b | Limited partners | | | | | | |

## Schedule L   Balance Sheets per Books

| | Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|---|
| 1 | Cash | | | | |
| 2a | Trade notes and accounts receivable | | | | |
| b | Less allowance for bad debts | | | | |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets (attach statement) | | | | |
| 7a | Loans to partners (or persons related to partners) | | | | |
| b | Mortgage and real estate loans | | | | |
| 8 | Other investments (attach statement) | | | | |
| 9a | Buildings and other depreciable assets | | | | |
| b | Less accumulated depreciation | | | | |
| 10a | Depletable assets | | | | |
| b | Less accumulated depletion | | | | |
| 11 | Land (net of any amortization) | | | | |
| 12a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | | | | |
| 13 | Other assets (attach statement) | STMT 1 | 23,181,191. | | 23,181,191. |
| 14 | Total assets | | 23,181,191. | | 23,181,191. |
| | **Liabilities and Capital** | | | | |
| 15 | Accounts payable | | | | |
| 16 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 | Other current liabilities (attach statement) | | | | |
| 18 | All nonrecourse loans | | | | |
| 19a | Loans from partners (or persons related to partners) | | | | |
| b | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 20 | Other liabilities (attach statement) | | | | |
| 21 | Partners' capital accounts | | 23,181,191. | | 23,181,191. |
| 22 | Total liabilities and capital | | 23,181,191. | | 23,181,191. |

## Schedule M-1   Reconciliation of Income (Loss) per Books With Income (Loss) per Return

**Note:** The partnership may be required to file Schedule M-3. See instructions.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | | 6 | Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | a | Tax-exempt interest $ _____ | |
| 3 | Guaranteed payments (other than health insurance) | | 7 | Deductions included on Schedule K, lines 1 through 13d, and 16p, not charged against book income this year (itemize): | |
| 4 | Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16p (itemize): | | a | Depreciation $ _____ | |
| a | Depreciation $ _____ | | | | |
| b | Travel and entertainment $ _____ | | 8 | Add lines 6 and 7 | |
| | | | 9 | Income (loss) (Analysis of Net Income (Loss), line 1. Subtract line 8 from line 5 | |
| 5 | Add lines 1 through 4 | | | | |

## Schedule M-2   Analysis of Partners' Capital Accounts

| | | | | | |
|---|---|---|---|---|---|
| 1 | Balance at beginning of year | 23,181,191. | 6 | Distributions: a Cash | |
| 2 | Capital contributed: a Cash | | | b Property | |
| | b Property | | 7 | Other decreases (itemize): _____ | |
| 3 | Net income (loss) per books | | | | |
| 4 | Other increases (itemize): _____ | | 8 | Add lines 6 and 7 | |
| 5 | Add lines 1 through 4 | 23,181,191. | 9 | Balance at end of year. Subtract line 8 from line 5 | 23,181,191. |

5653LX   700H   03/08/2019 15:55:56

**SCHEDULE C**
**(Form 1065)**

(Rev. December 2014)

Department of the Treasury
Internal Revenue Service

# Additional Information for Schedule M-3 Filers

▶ **Attach to Form 1065. See separate instructions.**
▶ **Information about Schedule C (Form 1065) and its instructions is at** *www.irs.gov/form1065*.

OMB No. 1545-0123

| Name of partnership | Employer identification number |
|---|---|
| DAKOTA HOLDCO, LLC | |

| | | Yes | No |
|---|---|---|---|
| **1** | At any time during the tax year, were there any transfers between the partnership and its partners subject to the disclosure requirements of Regulations section 1.707-8? . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **2** | Does any amount reported on Schedule M-3, Part II, lines 7 or 8, column (d), reflect allocations to this partnership from another partnership of income, gain, loss, deduction, or credit that are disproportionate to this partnership's share of capital in such partnership or its ratio for sharing other items of such partnership? . . . . . . . . . . . . . . . . | | X |
| **3** | At any time during the tax year, did the partnership sell, exchange, or transfer any interest in an intangible asset to a related person as defined in sections 267(b) and 707(b)(1)? . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **4** | At any time during the tax year, did the partnership acquire any interest in an intangible asset from a related person as defined in sections 267(b) and 707(b)(1)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **5** | At any time during the tax year, did the partnership make any change in accounting principle for financial accounting purposes? See instructions for a definition of change in accounting principle . . . . . . . . . . . . . . . . . | | X |
| **6** | At any time during the tax year, did the partnership make any change in a method of accounting for U.S. income tax purposes? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |

**For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**                  **Schedule C (Form 1065) (Rev. 12-2014)**

JSA

8P1037 1.000

5653LX  700H  03/08/2019 15:55:56

**SCHEDULE M-3**
**(Form 1065)**

Department of the Treasury
Internal Revenue Service

# Net Income (Loss) Reconciliation
## for Certain Partnerships
▶ Attach to Form 1065.
▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2018**

| Name of partnership | Employer identification number |
|---|---|
| DAKOTA HOLDCO, LLC | |

**This Schedule M-3 is being filed because (check all that apply):**

**A** [X] The amount of the partnership's total assets at the end of the tax year is equal to $10 million or more.

**B** [X] The amount of the partnership's adjusted total assets for the tax year is equal to $10 million or more. If box B is checked, enter the amount of adjusted total assets for the tax year _____ 23,181,191.

**C** [ ] The amount of total receipts for the tax year is equal to $35 million or more. If box C is checked, enter the total receipts for the tax year _____ .

**D** [ ] An entity that is a reportable entity partner with respect to the partnership owns or is deemed to own an interest of 50% or more in the partnership's capital, profit, or loss on any day during the tax year of the partnership.

| Name of Reportable Entity Partner | Identifying Number | Maximum Percentage Owned or Deemed Owned |
|---|---|---|
| | | |
| | | |

**E** [ ] Voluntary Filer.

**Part I**     **Financial Information and Net Income (Loss) Reconciliation**

**1a** Did the partnership file SEC Form 10-K for its income statement period ending with or within this tax year?

    [ ] **Yes.** Skip lines 1b and 1c and complete lines 2 through 11 with respect to that SEC Form 10-K.

    [X] **No.** Go to line 1b. See instructions if multiple non-tax-basis income statements are prepared.

**b** Did the partnership prepare a certified audited non-tax-basis income statement for that period?

    [ ] **Yes.** Skip line 1c and complete lines 2 through 11 with respect to that income statement.

    [X] **No.** Go to line 1c.

**c** Did the partnership prepare a non-tax-basis income statement for that period?

    [ ] **Yes.** Complete lines 2 through 11 with respect to that income statement.

    [X] **No.** Skip lines 2 through 3b and enter the partnership's net income (loss) per its books and records on line 4a.

**2** Enter the income statement period: Beginning _____ Ending _____

**3a** Has the partnership's income statement been restated for the income statement period on line 2?

    [ ] **Yes.** (If "Yes," attach a statement and the amount of each item restated.)

    [ ] **No.**

**b** Has the partnership's income statement been restated for any of the five income statement periods immediately preceding the period on line 2?

    [ ] **Yes.** (If "Yes," attach a statement and the amount of each item restated.)

    [ ] **No.**

**4a** Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1    **4a** |

**b** Indicate accounting standard used for line 4a (see instructions).

   **1** [ ] GAAP    **2** [ ] IFRS    **3** [ ] Section 704(b)

   **4** [ ] Tax-basis    **5** [ ] Other (Specify) ▶ _____

**5a** Net income from nonincludible foreign entities (attach statement) . . . . . . . . . . . . . . . . . **5a** ( )

**b** Net loss from nonincludible foreign entities (attach statement and enter as a positive amount) . . . **5b**

**6a** Net income from nonincludible U.S. entities (attach statement) . . . . . . . . . . . . . . . . **6a** ( )

**b** Net loss from nonincludible U.S. entities (attach statement and enter as a positive amount). . . . . **6b**

**7a** Net income (loss) of other foreign disregarded entities (attach statement) . . . . . . . . . . . . **7a**

**b** Net income (loss) of other U.S. disregarded entities (attach statement) . . . . . . . . . . . . . **7b**

**8** Adjustment to eliminations of transactions between includible entities and nonincludible entities (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

**9** Adjustment to reconcile income statement period to tax year (attach statement). . . . . . . . . . **9**

**10** Other adjustments to reconcile to amount on line 11 (attach statement) . . . . . . . . . . . . . **10**

**11** **Net income (loss) per income statement of the partnership.** Combine lines 4a through 10 . . . . **11**

**Note:** Part I, line 11, must equal Part II, line 26, column (a), or Schedule M-1, line 1. See instructions.

**12** Enter the total amount (not just the partnership's share) of the assets and liabilities of all entities included or removed on the following lines.

| | Total Assets | Total Liabilities |
|---|---|---|
| **a** Included on Part I, line 4 | 23,181,191. | NONE |
| **b** Removed on Part I, line 5 | | |
| **c** Removed on Part I, line 6 | | |
| **d** Included on Part I, line 7 | | |

JSA
8P1042 1.000

5653LX   700H   03/08/2019 15:55:56

Schedule M-3 (Form 1065) 2018                                              Page **2**

| Name of partnership | Employer identification number |
|---|---|
| DAKOTA HOLDCO, LLC | |

**Part II** — Reconciliation of Net Income (Loss) per Income Statement of Partnership With Income (Loss) per Return

| Income (Loss) Items | (a) Income (Loss) per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Income (Loss) per Tax Return |
|---|---|---|---|---|
| Attach statements for lines 1 through 10. | | | | |
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Gross foreign distributions previously taxed | | | | |
| 5 Income (loss) from equity method U.S. corporations | | | | |
| 6 U.S. dividends | | | | |
| 7 Income (loss) from U.S. partnerships | | | | |
| 8 Income (loss) from foreign partnerships | | | | |
| 9 Income (loss) from other pass-through entities | | | | |
| 10 Items relating to reportable transactions | | | | |
| 11 Interest income (see instructions) | | | | |
| 12 Total accrual to cash adjustment | | | | |
| 13 Hedging transactions | | | | |
| 14 Mark-to-market income (loss) | | | | |
| 15 Cost of goods sold (see instructions) | ( ) | | | ( ) |
| 16 Sale versus lease (for sellers and/or lessors) | | | | |
| 17 Section 481(a) adjustments | | | | |
| 18 Unearned/deferred revenue | | | | |
| 19 Income recognition from long-term contracts | | | | |
| 20 Original issue discount and other imputed interest | | | | |
| 21a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach statement) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 22 Other income (loss) items with differences (attach statement) | | | | |
| 23 **Total income (loss) items.** Combine lines 1 through 22 | | | | |
| 24 **Total expense/deduction items.** (From Part III, line 31) (see instructions) | | | | |
| 25 Other items with no differences | | | | |
| 26 **Reconciliation totals.** Combine lines 23 through 25 | | | | |

**Note:** Line 26, column (a), must equal Part I, line 11, and column (d) must equal Form 1065, Analysis of Net Income (Loss), line 1.

Schedule M-3 (Form 1065) 2018

JSA
8P1043 1.000

5653LX   700H   03/08/2019 15:55:56

Schedule M-3 (Form 1065) 2018          Page **3**

| Name of partnership | Employer identification number |
|---|---|
| DAKOTA HOLDCO, LLC | |

**Part III**   **Reconciliation of Net Income (Loss) per Income Statement of Partnership With Income (Loss) per Return - Expense/Deduction Items**

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 State and local current income tax expense | | | | |
| 2 State and local deferred income tax expense | | | | |
| 3 Foreign current income tax expense (other than foreign withholding taxes) | | | | |
| 4 Foreign deferred income tax expense | | | | |
| 5 Equity-based compensation | | | | |
| 6 Meals and entertainment | | | | |
| 7 Fines and penalties | | | | |
| 8 Judgments, damages, awards, and similar costs | | | | |
| 9 Guaranteed payments | | | | |
| 10 Pension and profit-sharing | | | | |
| 11 Other post-retirement benefits | | | | |
| 12 Deferred compensation | | | | |
| 13 Charitable contribution of cash and tangible property | | | | |
| 14 Charitable contribution of intangible property | | | | |
| 15 Organizational expenses as per Regulations section 1.709-2(a) | | | | |
| 16 Syndication expenses as per Regulations section 1.709-2(b) | | | | |
| 17 Current year acquisition/reorganization investment banking fees | | | | |
| 18 Current year acquisition/reorganization legal and accounting fees | | | | |
| 19 Amortization/impairment of goodwill | | | | |
| 20 Amortization of acquisition, reorganization, and start-up costs | | | | |
| 21 Other amortization or impairment write-offs | | | | |
| 22 Reserved | | | | |
| 23a Depletion - Oil & Gas | | | | |
| b Depletion - Other than Oil & Gas | | | | |
| 24 Intangible drilling & development costs | | | | |
| 25 Depreciation | | | | |
| 26 Bad debt expense | | | | |
| 27 Interest expense (see instructions) | | | | |
| 28 Purchase versus lease (for purchasers and/or lessees) | | | | |
| 29 Research and development costs | | | | |
| 30 Other expense/deduction items with differences (attach statement) | | | | |
| 31 **Total expense/deduction items.** Combine lines 1 through 30. Enter here and on Part II, line 24, reporting positive amounts as negative and negative amounts as positive | | | | |

Schedule M-3 (Form 1065) 2018

JSA
8P1044 1.000

5653LX 700H 03/08/2019 15:55:56

| Form **8990**<br>(December 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Limitation on Business Interest Expense<br>Under Section 163(j)**<br>▶ Attach to your tax return.<br>▶ Go to *www.irs.gov/Form8990* for instructions and the latest information. | OMB No. 1545-0123 |
|---|---|---|

| Taxpayer name(s) shown on tax return | Identification number |
|---|---|
| DAKOTA HOLDCO, LLC | |

### Part I — Computation of Allowable Business Interest Expense

*Part I is completed by all taxpayers subject to section 163(j). Schedule A and Schedule B need to be completed before Part I when the taxpayer is a partner or shareholder of a pass-through entity subject to 163(j).*

**Section I - Business Interest Expense**

| | | | |
|---|---|---|---|
| 1 | Current year business interest expense (not including floor plan financing interest expense), before the section 163(j) limitation. | 1 | |
| 2 | Disallowed business interest expense carryforwards from prior years. (Does not apply to a partnership). | 2 | |
| 3 | Partner's excess business interest expense treated as paid or accrued in current year (Schedule A, line 44, column (h)) | 3 | |
| 4 | Floor plan financing interest expense. See instructions | 4 | |
| 5 | **Total business interest expense.** Add lines 1 through 4 ▶ | 5 | |

**Section II - Adjusted Taxable Income**

**Taxable Income**

| | | | |
|---|---|---|---|
| 6 | **Taxable income.** See instructions | 6 | |

**Additions** (adjustments to be made if amounts are taken into account on line 6)

| | | | |
|---|---|---|---|
| 7 | Any item of loss or deduction which is not properly allocable to a trade or business of the taxpayer. See instructions. | 7 | |
| 8 | Any business interest expense not from a pass-through entity. See instructions. | 8 | |
| 9 | Amount of any net operating loss deduction under section 172 | 9 | |
| 10 | Amount of any qualified business income deduction allowed under section 199A. | 10 | |
| 11 | Deduction allowable for depreciation, amortization, or depletion attributable to a trade or business. | 11 | |
| 12 | Amount of any loss or deduction items from a pass-through entity. See instructions | 12 | |
| 13 | Other additions. See instructions | 13 | |
| 14 | Total current year partner's excess taxable income (Schedule A, line 44, column (f)). | 14 | |
| 15 | Total current year S corporation shareholder's excess taxable income (Schedule B, line 46, column (c)). | 15 | |
| 16 | **Total.** Add lines 7 through 15 ▶ | 16 | |

**Reductions** (adjustments to be made if amounts are taken into account on line 6)

| | | | |
|---|---|---|---|
| 17 | Any item of income or gain which is not properly allocable to a trade or business of the taxpayer. See instructions | 17 | ( ) |
| 18 | Any business interest income not from a pass-through entity. See instructions | 18 | ( ) |
| 19 | Amount of any income or gain items from a pass-through entity. See instructions | 19 | ( ) |
| 20 | Other reductions. See instructions | 20 | ( ) |
| 21 | **Total.** Combine lines 17 through 20 ▶ | 21 | ( ) |
| 22 | **Adjusted taxable income.** Combine lines 6, 16, and 21. (If zero or less, enter -0-.) ▶ | 22 | |

**Section III - Business Interest Income**

| | | | |
|---|---|---|---|
| 23 | Current year business interest income. See instructions | 23 | |
| 24 | Excess business interest income from pass-through entities (total of Schedule A, line 44, column (g), and Schedule B, line 46, column (d)) | 24 | |
| 25 | **Total.** Add lines 23 and 24 ▶ | 25 | |

**For Paperwork Reduction Act Notice, see the instructions.** Form **8990** (12-2018)

JSA   8X4088 3.000

5653LX   700H   03/08/2019 15:55:56

```
FORM 1065, SUPPORTING SCHEDULES
================================================================================
SCHEDULE L - LINE 13 - OTHER ASSETS               BEGINNING          ENDING
=================================               ---------------   ---------------
INVESTMENTS                                          23,181,191.       23,181,191.
                                                ---------------   ---------------
   TOTAL OTHER ASSETS                                23,181,191.       23,181,191.
                                                ===============   ===============
```

```
FORM 1065, SUPPORTING SCHEDULES
```

```
8XX063 1.000
      5653LX  700H  03/08/2019 15:55:56
```

**EXHIBIT J**

220
ATI

## Claimant Information

The Gregory F. Steil Descendants Trust

Phone:
Phone:
Email:
SSN/TaxID:
Date Submitted: 2024-10-14 14:13:27
SubmissionTieBack: 1TXDYRC

## Transaction Information

Beginning Balance: 0

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |
| 6/16/2021 | 808483 | 8084830 | | | |
| 10/20/2021 | 0 | 0 90-Day | | | |

Ending Balance: 808483

Beginning Balance: [BegBalance1]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance1]

Beginning Balance: [BegBalance2]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance2]

Beginning Balance: [BegBalance3]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance3]

# Documentation List

134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\10\steiltust-808483.pdf

**Direct Registration / Book Entry Account Statement**



|  | **Account Number** | **Statement Date** |
|---|---|---|
| F508COMA  ATI PHYSICAL THERAPY |  | **01/21/2022** |

**Share Transaction Request**

☑ Deposit the enclosed certificate(s) for __808,483__ shares to my account.

**Address and Phone Number change:**

_____

_____

_____

_____        _____

CHRISTINA G. STEIL TRUSTEE
THE GREGORY F. STEIL DESCENDANTS TRUST

---------------------------------------------------------------------------------------------------------------------------------
^ FOLD AND DETACH HERE ^

CHRISTINA G. STEIL TRUSTEE
THE GREGORY F. STEIL DESCENDANTS TRUST

**Shareholder Account #:**

**Total DRS / Book Shares:** 808,483

**Account Value:** 0.00

**ATI PHYSICAL THERAPY**

**CUSIP:**          00216W109        **Broker/Dealer Name:**

**Stock Symbol:**  ATIP              **Broker/Dealer DTC Participant #:**

**Stock Price:**                     **Customer Account #:**

| Total DRS / Book Entry Shares | Total Restricted Book Entry Shares |
|---|---|
| 808,483 | 0 |

| Transaction Date | Transaction Type | Number Shares | Share Balance | Restriction Code(s) |
|---|---|---|---|---|

This statement is a record of rights of the shareholder at the time of its issuance. Delivery of this statement of itself conveys no rights to the recipient. This statement is neither a negotiable instrument nor a security.

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
212-509-4000

CSTDRS

221                                                    ATI

## Claimant Information

Willowbrook Holdings Inc.                        Phone:
                                                 Phone:
                                                 Email:
                                                 SSN/TaxID:
                                                 Date Submitted: 2024-10-14 14:06:37
                                                 SubmissionTieBack: JAZJZAP

## Transaction Information

Beginning Balance: 0

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |
| 6/16/2021 | 134747 | 1347470 | | | |
| 10/20/2021 | 0 | 0 90-Day | | | |

Ending Balance: 241397

Beginning Balance: [BegBalance1]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance1]

Beginning Balance: [BegBalance2]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance2]

Beginning Balance: [BegBalance3]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance3]

# Documentation List

134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\10\willowbrook-ATIP-134747.pdf

**Account Alpha ID:** CHRISTINA G. STEIL T

**Account No.:**

**Request a Certificate\***

☐ Issue a certificate from my DRS / Book Entry share position. (Please choose one option):

☐☐☐☐☐☐☐ **OR** ☐ (check here) ALL Shares

(Indicate number of whole shares)

*\*Please Note: A processing fee of $50.00 may apply for certificate issuances. Please contact 212-509-4000 or cstmail@continentalstock.com to determine if the issuer permits the issuance of physical paper certificates and if a fee is required. If a fee is required make your check payable to Continental Stock Transfer & Trust Company. Submit payment together with your certificate request.*

*By requesting a physical stock certificate the shareholder bears the responsibility for safekeeping and any future costs associated with replacing lost or stolen stock certificate(s).*

--------------------------------------------------------------------------------------------------------------------------------

^ FOLD AND DETACH HERE ^

**INSTRUCTIONS FOR TRANSACTION REQUEST**

SHARE TRANSACTION REQUEST:
If you have any physical stock certificates in your possession and you wish to deposit them in your account, mark the box on the front of this statement and on the blank line provided write in the number of shares represented by the certificate(s) you are sending to us for deposit.

ADDRESS and PHONE NUMBER CHANGE:
Please write in your new address and telephone number in the available space provided. Note, all registered holders must sign their names exactly as they appear on the front of this statement.

REQUEST A CERTIFICATE:
Mark the box above to receive shares in certificate form from your DRS / Book Entry position. Enter the number of whole shares you wish to receive or check the box provided if you wish to receive all your book entry shares in certificate form. Please print numerals in BLUE or BLACK ink.

Mail requests to: Continental Stock Transfer & Trust Company | Attn. Stock Transfer Department | 1 State Street | 30th Floor | New York, NY |

**About your Statement**

This statement is your record of the shares being credited to your account in book entry form and may be part of the Direct Registration System, if applicable. It should be kept with your important documents as a record of your ownership of these securities.

THE CORPORATION WILL FURNISH TO ANY SHAREHOLDERS UPON REQUEST AND WITHOUT CHARGE, A FULL STATEMENT OF THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF THE SHARES OF EACH CLASS OF SHARES, IF MORE THAN ONE, AUTHORIZED TO BE ISSUED AND THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF EACH SERIES OF ANY CLASS OF PREFERRED SHARES AUTHORIZED TO BE ISSUED SO FAR AS THE SAME HAVE BEEN FIXED AND THE AUTHORITY OF THE BOARD OF DIRECTORS TO DESIGNATE AND FIX THE RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF OTHER SERIES.
There may be rights, privileges, restrictions and conditions attached to the securities covered by this statement. A full copy of the text of any rights, privileges, restrictions and conditions can be obtained by contacting Continental Stock Transfer & Trust Company at 800-634-5370 or cstmail@continentalstock.com.

**Transactions Through Your Broker/Dealer**

Your broker/dealer may instruct Continental Stock Transfer & Trust Company ("CST") to deliver shares on your behalf.

The Direct Registration System ("DRS"), if applicable, allows you to authorize your broker/dealer to send an electronic instruction to CST to debit shares from your DRS position and deliver them electronically to your account with your broker/dealer. To effect such transactions your broker/dealer will need to include the following information; your CST Account Number, your Social Security or Taxpayer Identification Number, the name of your CST account, and the number of DRS shares to be delivered.

CST will honor such requests from any broker/dealer participating in the Direct Registration System.

While a broker/dealer should have your authorization to debit shares from your CST account, CST will have no way of verifying if you actually authorized the transaction since the instruction is coming directly from the broker/dealer.

CSTDRS

CSTDRS

**Account Alpha ID:** CHRISTINA G. STEIL T

**Account No.:**

**Restriction Code Definitions**

*Attention: if your Direct Registration/Book Entry shares are not restricted this page will not display any Restriction Code Definitions.*

CSTDRS

**Account Alpha ID:** CHRISTINA G. STEIL T

**Account No.:**

This Page Left Intentionally Blank

**Direct Registration / Book Entry Account Statement**



## CONTINENTAL
STOCK TRANSFER & TRUST

F508COMA    ATI PHYSICAL THERAPY

| **Account Number** | | **Statement Date** |
|---|---|---|
| | | **01/21/2022** |

**Share Transaction Request**

☑ Deposit the enclosed certificate(s) for __241,397__ shares to my account.

**Address and Phone Number change:**

_____

_____

_____

WILLOWBROOK HOLDINGS INC.

---------------------------------------------------------------------    ------

^ FOLD AND DETACH HERE ^

WILLOWBROOK HOLDINGS INC.

**Shareholder Account #:**

**Total DRS / Book Shares:** 241,397

**ATI PHYSICAL THERAPY**

**Account Value:** 0.00

**CUSIP:**          00216W109

**Broker/Dealer Name:**

**Stock Symbol:**    ATIP

**Broker/Dealer DTC Participant #:**

**Stock Price:**

**Customer Account #:**

| Total DRS / Book Entry Shares | Total Restricted Book Entry Shares |
|---|---|
| 241,397 | 0 |

| Transaction Date | Transaction Type | Number Shares | Share Balance | Restriction Code(s) |
|---|---|---|---|---|
| | | | | |

This statement is a record of rights of the shareholder at the time of its issuance. Delivery of this statement of itself conveys no rights to the recipient. This statement is neither a negotiable instrument nor a security.

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
212-509-4000

CSTDRS

**Account Alpha ID:** WILLOWBROOK

**Account No.:**

**Request a Certificate***

☐ Issue a certificate from my DRS / Book Entry share position. (Please choose one option):

☐☐☐☐☐☐☐ **OR** ☐ (check here) ALL Shares

(Indicate number of whole shares)

*\*Please Note: A processing fee of $50.00 may apply for certificate issuances. Please contact 212-509-4000 or cstmail@continentalstock.com to determine if the issuer permits the issuance of physical paper certificates and if a fee is required. If a fee is required make your check payable to Continental Stock Transfer & Trust Company. Submit payment together with your certificate request.*

*By requesting a physical stock certificate the shareholder bears the responsibility for safekeeping and any future costs associated with replacing lost or stolen stock certificate(s).*

-------------------------------------------------------------------------------------------------------------------------------
^ FOLD AND DETACH HERE ^

### INSTRUCTIONS FOR TRANSACTION REQUEST

SHARE TRANSACTION REQUEST:
If you have any physical stock certificates in your possession and you wish to deposit them in your account, mark the box on the front of this statement and on the blank line provided write in the number of shares represented by the certificate(s) you are sending to us for deposit.

ADDRESS and PHONE NUMBER CHANGE:
Please write in your new address and telephone number in the available space provided. Note, all registered holders must sign their names exactly as they appear on the front of this statement.

REQUEST A CERTIFICATE:
Mark the box above to receive shares in certificate form from your DRS / Book Entry position. Enter the number of whole shares you wish to receive or check the box provided if you wish to receive all your book entry shares in certificate form. Please print numerals in BLUE or BLACK ink.

Mail requests to: Continental Stock Transfer & Trust Company | Attn. Stock Transfer Department | 1 State Street | 30th Floor | New York, NY |

### About your Statement

This statement is your record of the shares being credited to your account in book entry form and may be part of the Direct Registration System, if applicable. It should be kept with your important documents as a record of your ownership of these securities.

THE CORPORATION WILL FURNISH TO ANY SHAREHOLDERS UPON REQUEST AND WITHOUT CHARGE, A FULL STATEMENT OF THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF THE SHARES OF EACH CLASS OF SHARES, IF MORE THAN ONE, AUTHORIZED TO BE ISSUED AND THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF EACH SERIES OF ANY CLASS OF PREFERRED SHARES AUTHORIZED TO BE ISSUED SO FAR AS THE SAME HAVE BEEN FIXED AND THE AUTHORITY OF THE BOARD OF DIRECTORS TO DESIGNATE AND FIX THE RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF OTHER SERIES.
There may be rights, privileges, restrictions and conditions attached to the securities covered by this statement. A full copy of the text of any rights, privileges, restrictions and conditions can be obtained by contacting Continental Stock Transfer & Trust Company at 800-634-5370 or cstmail@continentalstock.com.

### Transactions Through Your Broker/Dealer

Your broker/dealer may instruct Continental Stock Transfer & Trust Company ("CST") to deliver shares on your behalf.

The Direct Registration System ("DRS"), if applicable, allows you to authorize your broker/dealer to send an electronic instruction to CST to debit shares from your DRS position and deliver them electronically to your account with your broker/dealer. To effect such transactions your broker/dealer will need to include the following information; your CST Account Number, your Social Security or Taxpayer Identification Number, the name of your CST account, and the number of DRS shares to be delivered.

CST will honor such requests from any broker/dealer participating in the Direct Registration System.

While a broker/dealer should have your authorization to debit shares from your CST account, CST will have no way of verifying if you actually authorized the transaction since the instruction is coming directly from the broker/dealer.

CSTDRS

CSTDRS

**Account Alpha ID:** WILLOWBROOK

**Account No.:**

### Restriction Code Definitions

*Attention: if your Direct Registration/Book Entry shares are not restricted this page will not display any Restriction Code Definitions.*

CSTDRS

**Account Alpha ID:** WILLOWBROOK

**Account No.:**

This Page Left Intentionally Blank

222                                                          ATI

## Claimant Information

Gregory F. Steil

Phone:
Phone:
Email:
SSN/TaxID:
Date Submitted: 2024-10-14 14:01:13
SubmissionTieBack: H431R6X

## Transaction Information

Beginning Balance: 0

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |
| 6/16/2021 | 134747 | 1347470 | | | |
| 10/20/2021 | 10 | 0 90-Day | | | |

Ending Balance: 134757

Beginning Balance: [BegBalance1]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance1]

Beginning Balance: [BegBalance2]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance2]

Beginning Balance: [BegBalance3]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance3]

# Documentation List

134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\10\greg-steil-atip-134747.pdf

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 842 of 927 PageID #:5722


**CONTINENTAL**
STOCK TRANSFER & TRUST

ATI PHYSICAL THERAPY

| Account Number | Statement Date |
|---|---|
| | 01/21/2022 |

GREG STEIL

**Share Transaction Request**

☐ Deposit the enclosed certificate(s) for __134,747__ shares to my account.

**Address and Phone Number change:**

_____

_____

_____

---------------------------------------------------------------------- ^ FOLD AND DETACH HERE ^ ----

GREG STEIL

**Shareholder Account #:**

**ATI PHYSICAL THERAPY**
**CUSIP:**  00216W109
**Stock Symbol:**  ATIP
**Stock Price:**

**Total DRS / Book Shares:** 134,747

**Account Value:** 0.00

**Broker/Dealer Name:**

**Broker/Dealer DTC Participant #:**

**Customer Account #:**

| Total DRS / Book Entry Shares | Total Restricted Book Entry Shares |
|---|---|
| 134,747 | 0 |

| Transaction Date | Transaction Type | Number Shares | Share Balance | Restriction Code(s) |
|---|---|---|---|---|

This statement is a record of rights of the shareholder at the time of its issuance. Delivery of this statement of itself conveys no rights to the recipient. This statement is neither a negotiable instrument nor a security.

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
212-509-4000

CSTDRS

**Account Alpha ID:** STEIL,GREG

**Account No.:**

## Request a Certificate*

☐ Issue a certificate from my DRS / Book Entry share position. (Please choose one option):

☐☐☐☐☐☐☐ **OR** ☐ (check here) ALL Shares

(Indicate number of whole shares)

*Please Note: A processing fee of $50.00 may apply for certificate issuances. Please contact 212-509-4000 or cstmail@continentalstock.com to determine if the issuer permits the issuance of physical paper certificates and if a fee is required. If a fee is required make your check payable to Continental Stock Transfer & Trust Company. Submit payment together with your certificate request.*

*By requesting a physical stock certificate the shareholder bears the responsibility for safekeeping and any future costs associated with replacing lost or stolen stock certificate(s).*

------------------------------------------------------------------------------------------------------------------------

^ FOLD AND DETACH HERE ^

### INSTRUCTIONS FOR TRANSACTION REQUEST

SHARE TRANSACTION REQUEST:
If you have any physical stock certificates in your possession and you wish to deposit them in your account, mark the box on the front of this statement and on the blank line provided write in the number of shares represented by the certificate(s) you are sending to us for deposit.

ADDRESS and PHONE NUMBER CHANGE:
Please write in your new address and telephone number in the available space provided. Note, all registered holders must sign their names exactly as they appear on the front of this statement.

REQUEST A CERTIFICATE:
Mark the box above to receive shares in certificate form from your DRS / Book Entry position. Enter the number of whole shares you wish to receive or check the box provided if you wish to receive all your book entry shares in certificate form. Please print numerals in BLUE or BLACK ink.

Mail requests to: Continental Stock Transfer & Trust Company | Attn. Stock Transfer Department | 1 State Street | 30th Floor | New York, NY |

### About your Statement

This statement is your record of the shares being credited to your account in book entry form and may be part of the Direct Registration System, if applicable. It should be kept with your important documents as a record of your ownership of these securities.

THE CORPORATION WILL FURNISH TO ANY SHAREHOLDERS UPON REQUEST AND WITHOUT CHARGE, A FULL STATEMENT OF THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF THE SHARES OF EACH CLASS OF SHARES, IF MORE THAN ONE, AUTHORIZED TO BE ISSUED AND THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF EACH SERIES OF ANY CLASS OF PREFERRED SHARES AUTHORIZED TO BE ISSUED SO FAR AS THE SAME HAVE BEEN FIXED AND THE AUTHORITY OF THE BOARD OF DIRECTORS TO DESIGNATE AND FIX THE RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF OTHER SERIES.
There may be rights, privileges, restrictions and conditions attached to the securities covered by this statement. A full copy of the text of any rights, privileges, restrictions and conditions can be obtained by contacting Continental Stock Transfer & Trust Company at 800-634-5370 or cstmail@continentalstock.com.

### Transactions Through Your Broker/Dealer

Your broker/dealer may instruct Continental Stock Transfer & Trust Company ("CST") to deliver shares on your behalf.

The Direct Registration System ("DRS"), if applicable, allows you to authorize your broker/dealer to send an electronic instruction to CST to debit shares from your DRS position and deliver them electronically to your account with your broker/dealer. To effect such transactions your broker/dealer will need to include the following information; your CST Account Number, your Social Security or Taxpayer Identification Number, the name of your CST account, and the number of DRS shares to be delivered.

CST will honor such requests from any broker/dealer participating in the Direct Registration System.

While a broker/dealer should have your authorization to debit shares from your CST account, CST will have no way of verifying if you actually authorized the transaction since the instruction is coming directly from the broker/dealer.

CSTDRS

CSTDRS

**Account Alpha ID:** STEIL,GREG

**Account No.:**

### Restriction Code Definitions

*Attention: if your Direct Registration/Book Entry shares are not restricted this page will not display any Restriction Code Definitions.*

**Account Alpha ID:** STEIL,GREG

**Account No.:**

This Page Left Intentionally Blank

**Account Alpha ID:** STEIL,GREG

**Account No.:**

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street - Suite 205
Media, PA  19063

Phone (866) 274-4004
Fax (610) 565-7985

Email: info@strategicclaims.net

## NOTICE OF INELIGIBILITY

**CONTROL#:**  220

**February 27, 2025**

THE GREGORY F. STEIL DESCENDANTS TRUST
CHRISTINA G. STEIL, TRUSTEE

**ACCOUNT#:**

Your claim in the above matter is ineligible for the following reason(s):

| Description: | Shares: |
| --- | --- |
| This claim was filed on behalf of an excluded party and it is not eligible. Pursuant to the Stipulation and Agreement of Settlement, excluded from the Settlement Class are (i) Defendants; (ii) current and former Officers and directors of the Company; (iii) members of the Immediate Family of each of Defendants; (iv) all subsidiaries and affiliates of the Company and the directors and Officers of such subsidiaries or affiliates; (v) all persons, firms, trusts, corporations, Officers, directors, and any other individual or entity in which any of Defendants has a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of all such excluded parties; provided, however, that any Investment Vehicle shall not be excluded from the Settlement Class. | |

**We strongly suggest you contact our office for any question or clarification you may have. It is important that you contact us before any further action is taken in the event that a processing error has occurred.**

If you feel you received this notice in error and would like to contest our determination, please contact our office in writing no later than twenty (20) calendar days after the date of this notice. Please be sure to include your Control number as noted above, your reason for contesting our determination, and documentation supporting your reason. You can also contact our office at 1-866-274-4004 or info@strategicclaims.net. If after contacting us, you still disagree, you can request in writing to Plaintiffs' Counsel to review your claim.

When calling our office, please have ready the Control Number found at the top left-hand corner of this form.

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street - Suite 205
Media, PA  19063

Phone (866) 274-4004
Fax (610) 565-7985

Email: info@strategicclaims.net

## NOTICE OF INELIGIBILITY

**CONTROL#:**   221

**February 27, 2025**

WILLOWBROOK HOLDINGS INC.
GREGORY F. STEIL, PRESIDENT

**ACCOUNT#:**

Your claim in the above matter is ineligible for the following reason(s):

| Description: | Shares: |
|---|---|
| This claim was filed on behalf of an excluded party and it is not eligible. Pursuant to the Stipulation and Agreement of Settlement, excluded from the Settlement Class are (i) Defendants; (ii) current and former Officers and directors of the Company; (iii) members of the Immediate Family of each of Defendants; (iv) all subsidiaries and affiliates of the Company and the directors and Officers of such subsidiaries or affiliates; (v) all persons, firms, trusts, corporations, Officers, directors, and any other individual or entity in which any of Defendants has a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of all such excluded parties; provided, however, that any Investment Vehicle shall not be excluded from the Settlement Class. | |

**We strongly suggest you contact our office for any question or clarification you may have. It is important that you contact us before any further action is taken in the event that a processing error has occurred.**

If you feel you received this notice in error and would like to contest our determination, please contact our office in writing no later than twenty (20) calendar days after the date of this notice. Please be sure to include your Control number as noted above, your reason for contesting our determination, and documentation supporting your reason. You can also contact our office at 1-866-274-4004 or info@strategicclaims.net. If after contacting us, you still disagree, you can request in writing to Plaintiffs' Counsel to review your claim.

When calling our office, please have ready the Control Number found at the top left-hand corner of this form.

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street - Suite 205
Media, PA  19063

Phone (866) 274-4004
Fax (610) 565-7985

Email: info@strategicclaims.net

## NOTICE OF INELIGIBILITY

**CONTROL#:**   222
GREGORY F. STEIL

**February 27, 2025**

**ACCOUNT#:**

Your claim in the above matter is ineligible for the following reason(s):

| Description: | Shares: |
| --- | --- |
| This claim was filed on behalf of an excluded party and it is not eligible. Pursuant to the Stipulation and Agreement of Settlement, excluded from the Settlement Class are (i) Defendants; (ii) current and former Officers and directors of the Company; (iii) members of the Immediate Family of each of Defendants; (iv) all subsidiaries and affiliates of the Company and the directors and Officers of such subsidiaries or affiliates; (v) all persons, firms, trusts, corporations, Officers, directors, and any other individual or entity in which any of Defendants has a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of all such excluded parties; provided, however, that any Investment Vehicle shall not be excluded from the Settlement Class. | |

**We strongly suggest you contact our office for any question or clarification you may have. It is important that you contact us before any further action is taken in the event that a processing error has occurred.**

If you feel you received this notice in error and would like to contest our determination, please contact our office in writing no later than twenty (20) calendar days after the date of this notice. Please be sure to include your Control number as noted above, your reason for contesting our determination, and documentation supporting your reason. You can also contact our office at 1-866-274-4004 or info@strategicclaims.net. If after contacting us, you still disagree, you can request in writing to Plaintiffs' Counsel to review your claim.

When calling our office, please have ready the Control Number found at the top left-hand corner of this form.

**SUPPORT CENTER**
Support Ticket System

03/18/2025 11:04:11 AM

# Ticket #790926

| | | | | |
|---|---|---|---|---|
| **Status** | Completed | | **Name** | Christina Steil |
| **Priority** | Normal | | **Email** | |
| **Department** | Claims Administrators | | **Phone** | |
| **Create Date** | 03/18/2025 12:48:04 AM | | **Source** | Email |

| | | | | |
|---|---|---|---|---|
| **Assigned To** | George Allen | | **Help Topic** | Claims |
| **SLA Plan** | Default SLA | | **Last Response** | 03/18/2025 11:04:04 AM |
| **Due Date** | 03/19/2025 12:48:04 AM | | **Last Message** | 03/18/2025 12:48:05 AM |

**Ticket Details**

*dispute*

**Case:** ATI

**Control Number:**

# Notice of Ineligibility Control Number

| | |
|---|---|
| 03/18/2025 12:48:05 AM Notice of Ineligibility Control Number | Christina Steil |

To Whom It May Concern -

I write to follow-up on your letter dated February 27, 2025 and to contest your determination that The Gregory F. Steil Descendants Trust, Control #     , is ineligible to participate in the ATI Class Action Settlement.

The "Company," as defined in the Notice of (I) Pendency of Class Actions, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice"), is ATI Physical Therapy, Inc. *See*, https://www.strategicclaims.net/wp-content/uploads/2024/06/ATI-Final-Long-Notice-and-Claim-Form2.pdf. ATI Physical Therapy, Inc. was organized as Fortress Value Acquisition Corp. II and was renamed ATI Physical Therapy, Inc. after its subsidiary, FVAC Merger Corp. II merged with Wilco Holdco, Inc. in or about June 2021. *See*, https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm.

Gregory F. Steil ceased his employment with the ATI Physical Therapy Family of companies,

Ticket #790926 printed by gallen on 03/18/2025 11:04:11 AM                    Page 1

# SUPPORT CENTER
### Support Ticket System

03/18/2025 11:04:11 AM

and resigned any and all roles, prior to the ATI Physical Therapy Family of companies being acquired by Wilco Holdco, Inc. in 2016.
https://www.prnewswire.com/news-releases/advent-international-to-acquire-majority-stake-in-ati-physical-therapy-300242385.html. Gregory F. Steil was never, and could never have been, an officer, director or employee of Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc. because it did not become affiliated with Wilco Holdco, Inc. until more than 5 years after his resignation from all roles with the ATI Physical Therapy Family of companies. Neither I nor The Gregory F. Steil Descendants Trust was ever an officer, director or employee of Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc.

In addition:

1) Neither Gregory F. Steil, Christan G. Steil nor The Gregory F. Steil Descendants Trust is a Defendant;
2) Neither Gregory F. Steil, Christan G. Steil nor The Gregory F. Steil Descendants Trust is a current or former officer or director of the Company, i.e. Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc.;
3) Neither Gregory F. Steil, Christan G. Steil nor The Gregory F. Steil Descendants Trust is an immediate family member of a Defendant;
4) Neither Gregory F. Steil, Christan G. Steil nor The Gregory F. Steil Descendants Trust is a subsidiary or affiliate of the Company, i.e. Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc., or a director or officer of a subsidiary or affiliate of the Company;
5) No Defendant had or has a controlling interest in Gregory F. Steil, Christan G. Steil or The Gregory F. Steil Descendants Trust; and
6) Neither Gregory F. Steil, Christan G. Steil nor The Gregory F. Steil Descendants Trust is a legal representative, agent, affiliate, heir, succor-in-interest or assign of any excluded party.

As set forth above, The Gregory F. Steil Descendants Trust disputes your determination that The Gregory F. Steil Descendants Trust is ineligible to participate in the ATI Class Action Settlement. Please provide your response to this dispute within fourteen (14) days.

-Christina G. Steil, Trustee of The Gregory F. Steil Descendants Trust

# SUPPORT CENTER
### Support Ticket System

03/18/2025 11:04:11 AM

| 03/18/2025 11:04:04 AM | George Allen |
|---|---|

Good morning,

We have received your information and will pass it on for further review.

Thank you.

--
Claims Administrator
Strategic Claims Services, Inc.
600 N. Jackson St. - Suite 205
Media PA 19063
Phone: 610-565-9202
Fax: 610-565-7985
Toll Free: 1-866-274-4004

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

 Gmail

**James Facciolla <jfacciolla@strategicclaims.net>**

## Fwd: ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents

1 message

**James Facciolla** <jfacciolla@strategicclaims.net>                                    Tue, Mar 25, 2025 at 2:56 PM
To: Josephine Bravata <jbravata@strategicclaims.net>

---------- Forwarded message ---------
From: **James Facciolla** <jfacciolla@strategicclaims.net>
Date: Tue, Mar 25, 2025, 2:55 PM
Subject: Re: ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents
To: Gregory Steil
Cc: Christina Steil (Steil Dermatology)                                    , Claims Analyst <info@strategicclaims.net>

Hi Gregory,

We are presenting your claims directly to the Court, but are not changing our determination unless directed by the Court to do so.

Thank you,

On Tue, Mar 25, 2025, 2:51 PM Gregory Steil                                    wrote:

> James -
>
>
> I write in response to your email below regarding The Gregory F. Steil Descendants Trust, Account        ,
> Willowbrook Holdings, Inc., Account        , and Gregory F. Steil, Account #     (Collectively the "Steil Parties") and to
> request court review.
>
>
> Strategic Claims' conclusion that Steil Parties did not purchase or otherwise acquire ATI Securities and, instead,
> engaged in an equity conversion or continued to hold private shares of "'old' ATI" is incorrect.  As more fully set forth
> below, The Steil Parties do not believe that we engaged in an equity conversion or made a claim related to private
> shares of "'old' ATI," but instead purchased or acquired Company stock.  Had this been a conversion we believe
> that there would have been no exchange of any prior equity interest for new equity interests, but instead, that the
> Steil Parties would have retained their as-converted original equity interests.  That did not happen here as Steil
> Parties gave up their original equity interests and received new, completely different, equity interests in a completely
> different entity.
>
>
> Strategic Claims' conclusion that the Steil Parties acquired shares prior to the settlement period is also incorrect.
> As more fully set forth below, The Steil Parties believe that we acquired shares of the Company in or about June
> 2021 and that any prior equity interests were not shares of or equity interest in the Company.  We believe that since
> there was no conversion of shares, but instead the Steil Parties gave up their original equity interests and received
> new, completely different, equity interests in a completely different entity, they certainly did not acquire those new
> equity interests prior to the settlement period.
>
>
> In or about May, 2016, the Steil Parties became a limited partners of Wilco Acquisition, LP and through Wilco
> Acquisition, LP the Steil Parties became beneficial owners of shares of the Company's common stock that were

distributed to them in or about November, 2021. *See*, the attached. *See also*, the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021 which provides that "Wilco Acquisition intends to distribute such shares of Common Stock to its limited partners and general partner, each of which will be a permitted transferee under the A&R RRA and is named as a selling securityholder herein." https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

The Steil Parties understand that Wilco Acquisition, LP failed or refused to file a claim in this matter and, as a result, filed their claims as the beneficial owners of their respective shares of the Company's common stock. I have attached a copy of the Steil Parties 2019 IRS Form K-1's from Wilco Acquisition, LP reflecting their respective investments. The 2019 IRS Form K-1's are the oldest tax documents the Steil Parties were able to locate within the limited amount of time that Strategic Claims allotted; in the event your team requires additional documentation, the Steil Parties will require additional time to locate the same.

I direct you to the *Amended and Restated Registration Rights Agreement* included in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm (last visited March 20, 2025). Wilco Acquisition, LP was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature page included therewith. The Amended and Restated Registration Rights Agreement provided that New Holders, including Wilco Acquisition, LP, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)." The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of common stock of Wilco Holdco, Inc. would receive common stock of the Company: " Each share of [Wilco Holdco, Inc.] common stock issued and outstanding immediately prior to the effective time will be converted into the right to receive (A) a number of shares of ATI Class A common stock equal in value to (1) $1,303,000,000 <u>divided by</u> (2) the number of shares of Company common stock outstanding as of immediately prior to the effective time…"

Thus, Wilco Acquisition, LP, in consideration of agreeing to convert certain of its rights in common stock of Wilco Holdco, Inc. valued at $1,303,0000,000 (which I believe represents Wilco Acquisition, LP's cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 130,300,000 shares of common stock of Company **(certain of which were beneficially owned by the Steil Parties),** valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders." See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Wilco Acquisition, LP: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

-Gregory F. Steil

**From:** James Facciolla <jfacciolla@strategicclaims.net>
**Sent:** Thursday, March 20, 2025 12:15 PM

**To:** Gregory Steil <
**Cc:** Claims Analyst <info@strategicclaims.net>
**Subject:** ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents

Hello Gregory,

I am reaching out to clarify the ineligibility letters you received from Strategic Claims Services, mailed February 27, 2025.

Our final determination is as follows.

**Your claims (see below) remain ineligible for the following reasons.**

| Claim | Name 1 | Name 2 | Account |
|---|---|---|---|
| 220 | THE GREGORY F. STEIL DESCENDANTS TRUST | CHRISTINA G. STEIL, TRUSTEE | |
| 221 | WILLOWBROOK HOLDINGS INC. | GREGORY F. STEIL, PRESIDENT | |
| 222 | GREGORY F. STEIL | | |

(1) Per the definition in the Stipulation of Settlement (https://www.strategicclaims.net/wp-content/uploads/2024/06/FULLY-EXECUTED-ATI-Stipulation-of-Settlement-PDF-00609416xC40C2.pdf), *"ATI Securities" means ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII.* Equity conversions, or private shares of "old" ATI do not classify as a purchase or acquisition based upon the language of the Stipulation of Settlement.

(2) Your shares were acquired prior to the Settlement Class Period, in order to participate in the Settlement, shares must have been *(a) purchased or otherwise acquired ATI Securities between February 22, 2021 and October 19, 2021, both dates inclusive, and/or beneficially owned and/or held FVAC common stock as of May 24, 2021 and were eligible to vote at FVAC's June 15, 2021 special meeting to vote on the Business Combination (the "Securities Subclass"); and/or (b) beneficially owned and/or held FVAC Class A common stock as of the June 11, 2021 Redemption Date who were entitled to, but did not elect to, redeem their shares (the "Multiplan Subclass").* Per the ATI IPO Filing and Prospectus, these shares were held prior to the Settlement Class Period dates making them ineligible.

If you disagree with our determination please provide us the necessary supporting documentation to allow us to amend or confirm the above. Some examples of supporting documentation could include monthly statements from your financial institution, grant or option agreements, copies of checks, wires or other payment related receipts, etc. We already have your documents from the Transfer Agent, Continental, so you do not need to resend those documents. Any additional documents should be sent directly to me.

If you feel you still have received this notice in error and would like to contest our determination, please respond to this email in writing no later than Tuesday, March 25, 2025 officially requesting for Court review. Please be sure to

include your claim number as noted above, your reason for contesting our determination, and documentation supporting your reason. If we do not hear from you by the above date, we will assume you agree with our determination and close out the dispute without Court review.


Thank you,


--

James Facciolla

Institution Relations Manager

Strategic Claims Services, Inc.

600 N. Jackson Street

Suite 205

Media, PA 19063

610-565-9202 x 1013


*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

**SUPPORT CENTER**
Support Ticket System

03/18/2025 11:01:34 AM

# Ticket #934209

| | | | |
|---|---|---|---|
| **Status** | Completed | **Name** | Gregory Steil |
| **Priority** | Normal | **Email** | |
| **Department** | Claims Administrators | **Phone** | |
| **Create Date** | 03/17/2025 06:24:05 PM | **Source** | Email |

| | | | |
|---|---|---|---|
| **Assigned To** | George Allen | **Help Topic** | Claims |
| **SLA Plan** | Default SLA | **Last Response** | 03/18/2025 11:00:04 AM |
| **Due Date** | 03/18/2025 06:24:05 PM | **Last Message** | 03/17/2025 06:24:06 PM |

**Ticket Details**

*disputes*

**Case:** ATI

**Control Number:**

## Notice of Ineligibility Control Number

03/17/2025 06:24:06 PM Notice of Ineligibility Control Number                                        Gregory Steil

To Whom It May Concern -

I write to follow-up on your letters dated February 27, 2025 and to contest your determination that Gregory F. Steil, Control #    , and Willowbrook Holdings, Inc., Control #    , are ineligible to participate in the ATI Class Action Settlement.

The "Company," as defined in the Notice of (I) Pendency of Class Actions, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice"), is ATI Physical Therapy, Inc. *See*, https://www.strategicclaims.net/wp-content/uploads/2024/06/ATI-Final-Long-Notice-and-Claim-Form2. pdf. ATI Physical Therapy, Inc. was organized as Fortress Value Acquisition Corp. II and was renamed ATI Physical Therapy, Inc. after its subsidiary, FVAC Merger Corp. II merged with Wilco Holdco, Inc. in or about June 2021. *See*, https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm.

**SUPPORT CENTER**
Support Ticket System

03/18/2025 11:01:34 AM

I ceased my employment the ATI Physical Therapy Family of companies, and resigned any and all roles, prior to the ATI Physical Therapy Family of companies being acquired by Wilco Holdco, Inc. in 2016. https://www.prnewswire.com/news-releases/advent-international-to-acquire-majority-stake-in-ati-physical-therapy-300242385.html. I was never, and could never have been, an officer, director or employee of Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc. because it did not become affiliated with Wilco Holdco, Inc. until more than 5 years after my resignation from all roles with the ATI Physical Therapy Family of companies.

In addition:

1) Neither I nor Willowbrook Holdings, Inc. is a Defendant;

2) Neither I nor Willowbrook Holdings, Inc. is a current or former officer or director of the Company, i.e. Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc.;

3) Neither I nor Willowbrook Holdings, Inc. is an immediate family member of a Defendant;

4) Neither I nor Willowbrook Holdings, Inc. is a subsidiary or affiliate of the Company, i.e. Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc., or a director or officer of a subsidiary or affiliate of the Company;

5) No Defendant had or has a controlling interest in Willowbrook Holdings, Inc. or in me, individually; and

6) Neither I nor Willowbrook Holdings, Inc. is a legal representative, agent, affiliate, heir, succor-in-interest or assign of any excluded party.

As set forth above, Willowbrook Holdings, Inc. and I dispute your determination that neither Willowbrook Holdings, Inc. nor I are eligible to participate in the ATI Class Action Settlement. Please provide your response to this dispute within fourteen (14) days.

-Gregory Steil, Individually and as President of Willowbrook Holdings, Inc.

**SUPPORT CENTER**
Support Ticket System

03/18/2025 11:01:34 AM

| 03/18/2025 11:00:04 AM | George Allen |
|---|---|

Good morning,

We have received your information and will pass it on for further review.

Thank you.

--

Claims Administrator
Strategic Claims Services, Inc.
600 N. Jackson St. - Suite 205
Media PA 19063
Phone: 610-565-9202
Fax: 610-565-7985
Toll Free: 1-866-274-4004

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*



James Facciolla <jfacciolla@strategicclaims.net>

## Fwd: ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents

1 message

**James Facciolla** <jfacciolla@strategicclaims.net>                                    Tue, Mar 25, 2025 at 2:56 PM
To: Josephine Bravata <jbravata@strategicclaims.net>

---------- Forwarded message ---------
From: **James Facciolla** <jfacciolla@strategicclaims.net>
Date: Tue, Mar 25, 2025, 2:55 PM
Subject: Re: ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents
To: Gregory Steil                                        >
Cc: Christina Steil (Steil Dermatology)                                        , Claims Analyst <info@strategicclaims.net>

Hi Gregory,

We are presenting your claims directly to the Court, but are not changing our determination unless directed by the Court to do so.

Thank you,

On Tue, Mar 25, 2025, 2:51 PM Gregory Steil <gsteil@steilgroup.com> wrote:

> James -
>
> I write in response to your email below regarding The Gregory F. Steil Descendants Trust, Account #      , Willowbrook Holdings, Inc., Account #      , and Gregory F. Steil, Account #      (Collectively the "Steil Parties") and to request court review.
>
> Strategic Claims' conclusion that Steil Parties did not purchase or otherwise acquire ATI Securities and, instead, engaged in an equity conversion or continued to hold private shares of "'old' ATI" is incorrect.  As more fully set forth below, The Steil Parties do not believe that we engaged in an equity conversion or made a claim related to private shares of "'old' ATI," but instead purchased or acquired Company stock.  Had this been a conversion we believe that there would have been no exchange of any prior equity interest for new equity interests, but instead, that the Steil Parties would have retained their as-converted original equity interests.  That did not happen here as Steil Parties gave up their original equity interests and received new, completely different, equity interests in a completely different entity.
>
> Strategic Claims' conclusion that the Steil Parties acquired shares prior to the settlement period is also incorrect.  As more fully set forth below, The Steil Parties believe that we acquired shares of the Company in or about June 2021 and that any prior equity interests were not shares of or equity interest in the Company.  We believe that since there was no conversion of shares, but instead the Steil Parties gave up their original equity interests and received new, completely different, equity interests in a completely different entity, they certainly did not acquire those new equity interests prior to the settlement period.
>
> In or about May, 2016, the Steil Parties became a limited partners of Wilco Acquisition, LP and through Wilco Acquisition, LP the Steil Parties became beneficial owners of shares of the Company's common stock that were

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 860 of 927 PageID #:5740

distributed to them in or about November, 2021.  *See*, the attached.  *See also*, the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021 which provides that "Wilco Acquisition intends to distribute such shares of Common Stock to its limited partners and general partner, each of which will be a permitted transferee under the A&R RRA and is named as a selling securityholder herein."  https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

The Steil Parties understand that Wilco Acquisition, LP failed or refused to file a claim in this matter and, as a result, filed their claims as the beneficial owners of their respective shares of the Company's common stock.  I have attached a copy of the Steil Parties 2019 IRS Form K-1's from Wilco Acquisition, LP reflecting their respective investments.  The 2019 IRS Form K-1's are the oldest tax documents the Steil Parties were able to locate within the limited amount of time that Strategic Claims allotted; in the event your team requires additional documentation, the Steil Parties will require additional time to locate the same.

I direct you to the *Amended and Restated Registration Rights Agreement* included in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021. https://www.sec.gov/Archives/edgar/data/1815849/000119312521161982/d121614ddefm14a.htm (last visited March 20, 2025).  Wilco Acquisition, LP was a "New Holder" under the Amended and Restated Registration Rights Agreement, as confirmed by its signature page included therewith.  The Amended and Restated Registration Rights Agreement provided that New Holders, including Wilco Acquisition, LP, would receive "shares of common stock, par value $0.0001, of the Company ("Company Stock"), upon the Closing (as defined in the Merger Agreement)."  The Amended and Restated Registration Rights Agreement defined "Company" as Fortress Value Acquisition Corp. II.

In addition, the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021 provided the following description of how holders of common stock of Wilco Holdco, Inc. would receive common stock of the Company:  " Each share of [Wilco Holdco, Inc.] common stock issued and outstanding immediately prior to the effective time will be converted into the right to receive (A) a number of shares of ATI Class A common stock equal in value to (1) $1,303,000,000 <u>divided by</u> (2) the number of shares of Company common stock outstanding as of immediately prior to the effective time…"

Thus, Wilco Acquisition, LP, in consideration of agreeing to convert certain of its rights in common stock of Wilco Holdco, Inc. valued at $1,303,0000,000 (which I believe represents Wilco Acquisition, LP's cost basis, but not necessarily tax basis, in the common stock), purchased or otherwise acquired 130,300,000 shares of common stock of Company **(certain of which were beneficially owned by the Steil Parties),** valued at $10.00 per share, upon the Closing, as set forth in the Definitive proxy statement relating to merger or acquisition filed with the SEC on or about May 14, 2021: "the remaining amount of merger consideration will constitute FAII Class A common stock valued at $10.00 per share to [Wilco Holdco, Inc.] stockholders."  See also the Company's General form for registration of securities under the Securities Act of 1933 filed on or about July 9, 2021, which confirms the number of shares issued to Wilco Acquisition, LP: https://www.sec.gov/Archives/edgar/data/1815849/000119312521211848/d122377ds1.htm.

-Gregory F. Steil

**From:** James Facciolla <jfacciolla@strategicclaims.net>
**Sent:** Thursday, March 20, 2025 12:15 PM

**To:** Gregory Steil
**Cc:** Claims Analyst <info@strategicclaims.net>
**Subject:** ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents

Hello Gregory,

I am reaching out to clarify the ineligibility letters you received from Strategic Claims Services, mailed February 27, 2025.

Our final determination is as follows.

**Your claims (see below) remain ineligible for the following reasons.**

| Claim | Name 1 | Name 2 | Account |
|-------|--------|--------|---------|
| 220 | THE GREGORY F. STEIL DESCENDANTS TRUST | CHRISTINA G. STEIL, TRUSTEE | |
| 221 | WILLOWBROOK HOLDINGS INC. | GREGORY F. STEIL, PRESIDENT | |
| 222 | GREGORY F. STEIL | | |

(1) Per the definition in the Stipulation of Settlement (https://www.strategicclaims.net/wp-content/uploads/2024/06/FULLY-EXECUTED-ATI-Stipulation-of-Settlement-PDF-00609416xC40C2.pdf), *"ATI Securities" means ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII.* Equity conversions, or private shares of "old" ATI do not classify as a purchase or acquisition based upon the language of the Stipulation of Settlement.

(2) Your shares were acquired prior to the Settlement Class Period, in order to participate in the Settlement, shares must have been *(a) purchased or otherwise acquired ATI Securities between February 22, 2021 and October 19, 2021, both dates inclusive, and/or beneficially owned and/or held FVAC common stock as of May 24, 2021 and were eligible to vote at FVAC's June 15, 2021 special meeting to vote on the Business Combination (the "Securities Subclass"); and/or (b) beneficially owned and/or held FVAC Class A common stock as of the June 11, 2021 Redemption Date who were entitled to, but did not elect to, redeem their shares (the "Multiplan Subclass").* Per the ATI IPO Filing and Prospectus, these shares were held prior to the Settlement Class Period dates making them ineligible.

If you disagree with our determination please provide us the necessary supporting documentation to allow us to amend or confirm the above. Some examples of supporting documentation could include monthly statements from your financial institution, grant or option agreements, copies of checks, wires or other payment related receipts, etc. We already have your documents from the Transfer Agent, Continental, so you do not need to resend those documents. Any additional documents should be sent directly to me.

If you feel you still have received this notice in error and would like to contest our determination, please respond to this email in writing no later than Tuesday, March 25, 2025 officially requesting for Court review. Please be sure to

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 862 of 927 PageID #:5742

include your claim number as noted above, your reason for contesting our determination, and documentation supporting your reason. If we do not hear from you by the above date, we will assume you agree with our determination and close out the dispute without Court review.

Thank you,

--

James Facciolla

Institution Relations Manager

Strategic Claims Services, Inc.

600 N. Jackson Street

Suite 205

Media, PA 19063

610-565-9202

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

**EXHIBIT K**

277                                                                                    ATI

## Claimant Information

lisa d gutierrez

Phone:
Phone:
Email:
SSN/TaxID:
Date Submitted: 2024-09-23 15:49:39
SubmissionTieBack: 86ZXQ0A

## Transaction Information

Beginning Balance: 0

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |
| 10/20/2021 | 22626 | 0 90-Day | | | |

Ending Balance: 22626

Beginning Balance: [BegBalance1]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance1]

Beginning Balance: [BegBalance2]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance2]

Beginning Balance: [BegBalance3]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance3]

# Documentation List

134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\09\2021-YE-statement-ATI.pdf

SHSTMT



Shareholder of:

F508UNX1

**ATI PHYSICAL THERAPY**

**Account Number:**
**Statement Date:** 12/31/2021
**CUSIP:** 00216W109
**Symbol:**

**Save this Statement for Tax Purposes**

*Special Investor Message:*

LISA GUTIERREZ

**Telephone: 800-509-5586**
**Email: cstmail@continentalstock.com**

## Account Summary

| FOR PERIOD ENDING | TOTAL DIVIDENDS RECEIVED DURING YEAR | CERTIFICATED BALANCE |
|---|---|---|
| 12/31/2021 | $0.00 | 0.0000 |
| **BOOK BALANCE** | **TOTAL PLAN BALANCE** | **TOTAL HOLDINGS END OF PERIOD** |
| 22,626.0000 | 0.000000 | 22,626.000000 |

| Price as of Statement Date: | $0.0000 | Account Value: | $0.00 |
|---|---|---|---|

## Transaction History

*BALANCE FORWARD* *0.00000*

| DATE | TRANSACTION | AMOUNT | AMOUNT IN/AMOUNT OUT | HOLDINGS BALANCE |
|---|---|---|---|---|
| 12/03/21 | RSTR LOADED TRANSACTION | | 22,626 | 22,626.000000 |
| 12/13/21 | RSTR LOADED TRANSACTION | | -22,626 | 0.000000 |
| 12/13/21 | DRS LOADED TRANSACTION | | 22,626 | 22,626.000000 |

## Cost Basis Information

| ACQUISITION DATE | SALE DATE | LOT SHARES | LOT COST | FAIR MARKET VALUE | CERTIFICATE NO. | COVERED |
|---|---|---|---|---|---|---|
| | | 22,626 | UNKNOWN | | | UNCOVERED |

# Address Change (including city, state and ZIP code)
(Please Print)

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
800-509-5586 | cstmail@continentalstock.com

*New Address:*

_____

_____

_____

Daytime Telephone Number:  _____

Signature:  _____  Date:  _____

Signature:  _____  Date:  _____

**All registered owners must sign.**

**LISA GUTIERREZ**

Shareholder of:

| ATI PHYSICAL THERAPY |
|---|

**Account Number:**

**CUSIP:**  00216W109

**Symbol:**

**Telephone:  800-509-5586**

**Email:  cstmail@continentalstock.com**

## Direct Registration System

The company for which you own securities in may participate in the Direct Registration System (DRS), which allows for electronic movement of your book entry holdings between your broker account and your account with Continental Stock Transfer & Trust Company, ("CST"). For information on electronically moving your holdings, please contact your broker to initiate the transfer. To initiate electronic transfer, your broker will need to provide the information listed to the right of this paragraph.

1) your CST account number shown on the front of this statement;

2) your Social Security or taxpayer identification number;

3) the registered name(s) on your account exactly as they appear on this statement; and;

4) the number of securities to be delivered.

*CST will honor such requests from any broker participating in the DRS. While a broker should have your authorization to move securities from your CST shareholder account, CST will have no way of stopping the transaction since the instruction is coming directly from the broker.*

## Definitions

**ACCOUNT SUMMARY:**

| | |
|---|---|
| **For Period Ending -** | Ending date of data capture for the statement. |
| **Total Dividends Received During Year -** | Lists cumulative dividend payment information up to the period ending date. |
| **Certificated Balance -** | Lists the total number of holdings represented by physical securities certificates that have been issued and are in your possession. |
| **Book Balance -** | Lists the total number of book-entry/DRS holdings held for you in your account at CST. |
| **Total Plan Balance -** | Lists the total number of holdings held in your Dividend Reinvestment/Direct Stock Purchase/Employee Stock Purchase or other Plan that may be offered by the issuer of the securities you own to which you are enrolled. |
| **Total Holdings End of Period -** | Lists the overall total number of holdings you hold for the period ending date. |

**TRANSACTION HISTORY:**

| | |
|---|---|
| **Balance Forward -** | Lists the starting balance of holdings for the statement period. |
| **Date -** | Transaction date. |
| **Transaction -** | Description of transaction. |
| **Amount In/Amount Out -** | Lists the number of denomination for the transaction. |
| **Holdings Balance -** | Lists the running/cumulative holdings balance as each transaction is processed. |

**COST BASIS INFORMATION:**

| | |
|---|---|
| **Acquisition Date -** | Date the holdings were acquired, if available. |
| **Lot Denomination -** | Lists denomination specific to the cost basis, if available. |
| **Lot Cost -** | Lists the cost of the securities in the lot, if available. |
| **Fair Market Value -** | Lists the Fair Market Value at the time the securities were acquired, if available. |

SHSTMNT

ATI Class Actions Settlement
c/o Strategic Claims Services
600 N. Jackson Street - Suite 205
Media, PA  19063

Phone (866) 274-4004
Fax (610) 565-7985

Email: info@strategicclaims.net

## NOTICE OF INELIGIBILITY

**CONTROL#:**   277
LISA D GUTIERREZ

**February 27, 2025**

**ACCOUNT#:**

Your claim in the above matter is ineligible for the following reason(s):

| Description: | Shares: |
|---|---|
| This claim was filed on behalf of an excluded party and it is not eligible. Pursuant to the Stipulation and Agreement of Settlement, excluded from the Settlement Class are (i) Defendants; (ii) current and former Officers and directors of the Company; (iii) members of the Immediate Family of each of Defendants; (iv) all subsidiaries and affiliates of the Company and the directors and Officers of such subsidiaries or affiliates; (v) all persons, firms, trusts, corporations, Officers, directors, and any other individual or entity in which any of Defendants has a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of all such excluded parties; provided, however, that any Investment Vehicle shall not be excluded from the Settlement Class. | |

**We strongly suggest you contact our office for any question or clarification you may have. It is important that you contact us before any further action is taken in the event that a processing error has occurred.**

If you feel you received this notice in error and would like to contest our determination, please contact our office in writing no later than twenty (20) calendar days after the date of this notice. Please be sure to include your Control number as noted above, your reason for contesting our determination, and documentation supporting your reason. You can also contact our office at 1-866-274-4004 or info@strategicclaims.net. If after contacting us, you still disagree, you can request in writing to Plaintiffs' Counsel to review your claim.

When calling our office, please have ready the Control Number found at the top left-hand corner of this form.

**SUPPORT CENTER**
Support Ticket System

03/18/2025 06:31:09 PM

# Ticket #550861

| | | | | |
|---|---|---|---|---|
| **Status** | Completed | | **Name** | Lisa Gutierrez |
| **Priority** | Normal | | **Email** | |
| **Department** | Claims Administrators | | **Phone** | |
| **Create Date** | 03/17/2025 11:40:08 AM | | **Source** | Email |

| | | | | |
|---|---|---|---|---|
| **Assigned To** | James Facciolla | | **Help Topic** | Claims |
| **SLA Plan** | | | **Last Response** | 03/18/2025 06:30:29 PM |
| **Due Date** | | | **Last Message** | 03/17/2025 06:16:05 PM |

**Ticket Details**

## Lisa Gutierrez

Created by **Lisa Gutierrez** 03/17/2025 11:40:08 AM

**SUPPORT CENTER**
Support Ticket System

03/18/2025 06:31:09 PM

| 03/17/2025 11:40:09 AM Lisa Gutierrez | Lisa Gutierrez |
|---|---|

To Whom It May Concern -

I write to follow-up on my call to Strategic Claims Services on March 6, 2025 and to contest your determination that Lisa Gutierrez, Account #      is ineligible to participate in the ATI Class Action Settlement.

Although I did work for the Company overseeing the HR Department, I left in 2006.

I was never, and could never have been, an officer, director or employee of Fortress Value Acquisition Corp. II n/k/a ATI Physical Therapy, Inc. because it did not become affiliated with Wilco Holdco, Inc. until years after my resignation.

As set forth above,  I dispute your determination that I am ineligible to participate in the ATI Class Action Settlement.

I look forward to your response within the next few weeks.

Lisa Gutierrez

**James Facciolla** claimed this 03/17/2025 11:53:52 AM

# SUPPORT CENTER
Support Ticket System

03/18/2025 06:31:09 PM

| 03/17/2025 12:17:52 PM | James Facciolla |
|---|---|

Hello Lisa,

Per the Stipulation Agreement, ATI Securities are defined as "ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII." Furthermore, claimants needed to purchase or otherwise acquire ATI securities between February 22, 2021 and October 19, 2021; and/or (ii) beneficially own and/or hold FVAC Class A common stock as of May 24, 2021 and be eligible to vote at FVAC's June 15, 2021 special meeting (the "Securities Subclass Settlement Class Period").

Based on your documentation (see attached) neither of these requirements were met. Per your supporting documents, your shares were restricted and did not enter the account until after the Class Period. If you have additional documentation showing you purchased the common stock during the Class Period, you will need to provide that supporting documentation along with proof of payment for the shares as it isn't clear what you paid for the 22,626 shares.

Thank you,

277.pdf (337.5 kb)

**James Facciolla** changed the status to **Replied - Awaiting Reply** 03/17/2025 12:17:52 PM

| 03/17/2025 12:48:09 PM | Lisa Gutierrez |
|---|---|

Hi
the claim was not denied on that reason- these shares were owned through initial grant when I became employed in 2026- and then changed in ownership

the claim was denied in the letter stating I was an owner or director- which is incorrect

On Mon, Mar 17, 2025 at 11:17 AM Claims Administrator reply@strategicclaims.net> wrote:

**SUPPORT CENTER**
Support Ticket System

03/18/2025 06:31:09 PM

| 03/17/2025 03:30:29 PM | James Facciolla |
|---|---|

Hi Lisa,

Thank you for the confirmation.

For clarity sake, we want to confirm that for the 22,626 shares granted, was there a cost basis associated with these lots or were the shares part of a compensation package or other related means of acquisition? Do you know when the shares vested, if at all? The grant date is not so important as when the shares vested and became actual common stock. If this event happened during the Class Period and there is a cost basis associated with some or all of the lots, we may be able to re-review the claim. I would need supporting documentation for these transactions, however.

Please let me know how you want us to proceed further.

Thank you,

-James

| 03/17/2025 03:56:11 PM | Lisa Gutierrez |
|---|---|

Hi

these all would have been granted pre 2006 as part of employment- when i first started. Then, just "rolled over" units based on transactions- that is it. I left in 2006 so anything would have been prior and given as part of my employment package. but i know there was a value to them, based on cost basis as part of the transaction- i just don't know what it is writing this email- i'd probably have to go through all my paperwork from that time.

On Mon, Mar 17, 2025 at 2:30 PM Claims Administrator reply@strategicclaims.net> wrote:

## SUPPORT CENTER
Support Ticket System

03/18/2025 06:31:09 PM

| 03/17/2025 04:16:59 PM | James Facciolla |
|---|---|

Hi Lisa,

Thank you for elaborating, your insight is very helpful.

If you would like to go through your paperwork and confirm the cost basis and date of the common stock acquisition that will help us in our final determination.

The response deadline is approaching quickly, so if you could send us the documents at your earliest convenience that would be much appreciated.

Best regards,

-James

| 03/17/2025 06:16:05 PM | Lisa Gutierrez |
|---|---|

These were the last grants I received.  my term date was May 2016.

On Mon, Mar 17, 2025 at 3:17 PM Claims Administrator reply@strategicclaims.net> wrote:

Gutierrez, Lisa_Class B.pdf (0.9 mb)
Gutierrez, Lisa_Class D.pdf (0.9 mb)

Flagged as overdue by the system 03/18/2025 11:40:26 AM

**SUPPORT CENTER**
Support Ticket System

03/18/2025 06:31:09 PM

| 03/18/2025 06:30:29 PM | James Facciolla |
|---|---|

Hi Lisa,

Thank you for the additional information. Based on the documents provided it does appear the cost basis for these B and D units are zero regardless of the market value at the time of ATI's IPO.

We are going to uphold the ineligibility determination based on the price and type of units acquired as they do not fall under the definition of the Class per the Stipulation Agreement, as noted in my prior email.

If you feel you received this notice in error and would still like to contest our determination, please contact our office in writing no later than twenty (20) calendar days after the date of this notice. Please be sure to include your Control number (#277) as noted above, your reason for contesting our determination, and documentation supporting your reason. You can also contact our office at 1-866-274-4004 or info@strategicclaims.net. If after contacting us, you still disagree, you can request in writing to Plaintiffs' Counsel to review your claim.

Thank you,

Closed by **James Facciolla** with status of Completed 03/18/2025 06:30:29 PM

Grant No.: B-12

## ATI PHYSICAL THERAPY HOLDINGS, LLC

### CLASS B UNIT AWARD AGREEMENT

ATI Physical Therapy Holdings, LLC, a Delaware limited liability company (the "Company"), hereby grants Class B Units (the "Units") to the Grantee named below, subject to the vesting conditions set forth in the attachment. Additional terms and conditions of the grant are set forth in this cover sheet, in the attachment and in the Company's 2012 Equity Incentive Plan (the "Plan").

Grant Date: May 14, 2013

Vesting Start Date: May 14, 2013

Name of Grantee: Lisa Gutierrez

Grantee's Social Security Number

Number of Units Covered by Grant: 4,809

Grantee's principal place of residence is in the state of _____

*By signing this cover sheet, you agree to all of the terms and conditions described in the attached Agreement and in the Plan, a copy of which is also attached. You acknowledge that you have carefully reviewed the Plan, and agree that, unless otherwise specified in the Plan, the Plan will control in the event any provision of this Agreement should appear to be inconsistent.*

Grantee: _____

Company: _____

Name: Christopher S.L. Pusey
Title: Vice President and Assistant Secretary

Attachment

This is not a unit certificate or a negotiable instrument.

## LIMITED LIABILITY COMPANY AGREEMENT JOINDER

By execution of this Joinder, the undersigned agrees to become a party to that certain Amended and Restated Limited Liability Company Agreement dated as of December 21, 2012, by and among each of the Members which are parties thereto (as the same may be amended, restated or otherwise modified from time-to-time). The undersigned shall have all the rights, and shall observe all the obligations, applicable to a Class B Member thereunder.

Name:  Lisa Gutierrez

Signature:

Address for
Notices:

with copies
to:

_____

_____

_____          _____

_____          _____

**GRANTEE ELECTION UNDER SECTION 83(b) OF
THE INTERNAL REVENUE CODE**

The undersigned Grantee hereby makes an election pursuant to Section 83(b) of the Internal Revenue Code with respect to the property described below and supplies the following information in accordance with the regulations promulgated thereunder:

1.  The name, address and social security number of the undersigned:

    Name: LISA Gutierrez

    Address:

    Social Security No. :

2.  Description of property with respect to which the election is being made:

    The election is being made with respect to 4809 Class B Units (the "Units") in ATI Physical Therapy Holdings, LLC (the "LLC").

3.  The date on which the property was transferred is May 14 , 2013.

4.  The taxable year to which this election relates is calendar year 2013.

5.  Nature of restrictions to which the property is subject:

    The Units are subject to the provisions of a Class B Unit Award Agreement between the undersigned and the Company. The Units are subject to forfeiture under the terms of the Agreement.

6.  The fair market value at time of transfer (determined without regard to any restrictions other than restrictions which by their terms will never lapse) of the Units with respect to which this election is being made was $0 per Unit.

7.  The amount paid by the Taxpayer for the Units was $0 per Unit.

8.  A copy of this statement has been furnished to the LLC.

Dated: 5/21 , 2013

Name: Lisa Gutierrez

## ATI PHYSICAL THERAPY HOLDINGS, LLC

### CLASS B UNIT AWARD AGREEMENT

**Nontransferability**

This grant is an award of Units in the number set forth on the cover sheet, subject to the vesting conditions described below (the "Incentive Units"). Other than by will or the laws of descent and distribution, your Incentive Units (regardless of whether vested or unvested) may not be transferred, assigned, pledged or hypothecated, whether by operation of law or otherwise, nor may the Incentive Units be made subject to execution, attachment or similar process, except in strict accordance with the LLC Agreement (as defined below).

**Issuance and Vesting**

The Company will issue your Incentive Units in your name as of the Grant Date.

Your Incentive Units vest as to 20% of the total number of Incentive Units covered by this grant, as shown on the cover sheet, on each of the first through fifth anniversaries of the Grant Date (each, an "Anniversary Date"), provided you continue in Service on each applicable Anniversary Date.

Notwithstanding the foregoing, 100% of the total number of Incentive Units covered by this grant, as shown on the cover sheet (subject to adjustment as provided herein), shall immediately vest upon any Qualifying IPO, Change in Ownership, Fundamental Change, Approved Sale (as defined in the LLC Agreement) or Sale (as defined in the LLC Agreement) of the Company.

As used herein, the term "Service" shall have the meaning given such term in the LLC Agreement (as defined below).

**Termination of Service due to death or Disability**

In the event that your Service with the Company terminates due to your death or Disability, a portion of your Incentive Units equal to the number of Incentive Units that would otherwise have vested on the Anniversary Date immediately following your death or Disability will vest and all remaining unvested Incentive Units will automatically be forfeited.

As used herein, the term "Disability" shall have the meaning set forth from time to time in your employment agreement, if any, with the Company or its Subsidiaries and, if no employment agreement exists, means the Grantee is unable to perform each of the essential duties of such Grantee's position by reason of a medically determinable physical or mental impairment which is potentially permanent in character or which can be expected to last for a continuous period of not less than six months.

**Termination of Service due to Retirement**

In the event that your Service with the Company terminates due to your Retirement, a portion of your Incentive Units equal to the number of Incentive Units that would otherwise have vested on the

2

\\DE - 040717/000001 - 620180 v1

Anniversary Date immediately following your Retirement will vest and all remaining unvested Incentive Units will automatically be forfeited.

As used herein, the term "Retirement" means a permanent cessation of all Service under circumstances not constituting Cause after attainment of age 55 and ten years of Service or attainment of age 60 and five years of Service, or such other conditions as determined by the Board in its sole discretion.

As used herein, the term "Cause" shall have the meaning set forth from time to time in your employment agreement, if any, with the Company or its Subsidiaries and, if no employment agreement exists, means engaging in any of the following forms of misconduct: (A) commission of any felony or of any misdemeanor involving dishonesty or moral turpitude; (B) theft, fraud, deceit, embezzlement, or misappropriation or misuse of the Company's or its Subsidiaries' property or time, including any unauthorized disclosure, use or infringement of any confidential information, copyrights, trademarks, mailing lists or other property; (C) use of alcohol or illegal gambling on the Company's or its Subsidiaries' premises or appearing on such premises while intoxicated, other than the use of alcohol in connection with a Company-sponsored social event; (D) illegal use of any controlled substance; (E) discriminatory or harassing behavior, whether or not illegal under federal, state or local law, or any inappropriate treatment of or relations with any employee, agent or consultant of the Company or its Subsidiaries or any other person with whom the Company or its Subsidiaries has a business relationship in each case that would be materially offensive to a reasonable person; (F) intentional insubordination or willful misconduct; (G) falsifying any document or making any false or misleading statement relating to the Company or its Subsidiaries or such Grantee's employment by the Company or its Subsidiaries; (H) malfeasance, misfeasance, misconduct or inattention to the Grantee's duties and responsibilities that has the potential to result in any material injury to the economic or ethical welfare or the public image of the Company or its Subsidiaries; or (I) after notification of the Company's reasonable performance expectations, any material failure to comply with those expectations.

**Forfeiture of Units**

In the event that your Service terminates for any reason other than for death, Disability, Retirement or Cause, you will forfeit to the Company all of the Incentive Units subject to this grant that have not yet vested as of your termination date. In the event that your Service terminates for Cause, you will forfeit to the Company all of the Incentive Units subject to this grant that are vested or unvested.

**Leaves of Absence**

For purposes of this award of Incentive Units, your Service does not terminate when you go on a bona fide employee leave of absence that is approved by the Company in writing, if the terms of the leave provide for continued Service crediting, or when continued Service crediting is required by applicable law. However, your Service will be

3

\\DE - 040717/000001 - 620180 v1

treated as terminating 90 days after you went on employee leave, unless your right to return to active work is guaranteed by law or by a contract. Your Service terminates in any event when the approved leave ends unless you immediately return to Service.

The Company determines, in its sole discretion and consistent with applicable Company policy and applicable law, which leaves count for this purpose, and when your Service terminates for all purposes under the Plan and this Agreement.

**Withholding Taxes**

You agree, as a condition of this grant, that you will make acceptable arrangements to pay any withholding or other taxes that may be due as a result of the vesting of Incentive Units acquired under this grant. In the event that the Company determines that any federal, state, local or foreign tax or withholding payment is required relating to the vesting of units arising from this grant, the Company shall have the right to require such payments from you, or withhold such amounts from other payments due to you from the Company or any Affiliate.

**Code Section 83(b) Election**

You hereby agree to make an election to include in gross income in the year of transfer the Incentive Units pursuant to Section 83(b) of the Code substantially in the form attached hereto as Exhibit A and to supply the necessary information in accordance with the regulations promulgated thereunder.

**YOU ACKNOWLEDGE THAT IT IS YOUR SOLE RESPONSIBILITY, AND NOT THE COMPANY'S, TO FILE A TIMELY ELECTION UNDER SECTION 83(b), EVEN IF YOU REQUEST THE COMPANY OR ITS REPRESENTATIVES TO MAKE THIS FILING ON YOUR BEHALF. YOU ARE RELYING SOLELY ON YOUR OWN ADVISORS WITH RESPECT TO THE DECISION AS TO WHETHER TO FILE ANY 83(b) ELECTION AND REGARDING THE ACCURACY AND TIMELINESS OF SUCH FILING.**

**Investment Representation**

You hereby agree and represent, as a condition of this grant of Incentive Units, that (i) you are acquiring the Incentive Units for investment for your own account and not with a view to, or intention of, or otherwise for resale in connection with, any distribution to any person or entity, (ii) neither the offer nor sale of the Incentive Units hereunder, or the Incentive Units themselves, have been registered under the Securities Act or registered or qualified under any applicable state securities laws and that the Incentive Units are being offered and sold to you by reason of and in reliance upon a specific exemption from the registration provisions of the Securities Act and exemptions from registration or qualification provisions of such applicable state or other jurisdiction's securities laws which depend upon, among other things, the bona fide nature of the investment intent as expressed herein and the truth and accuracy of your representations, warranties, agreements, acknowledgments and understandings as set forth herein, (iii) no public market now exists for any of the securities issued by the

4

Company and that there can be no assurance that a public market will ever exist for the Incentive Units, (iv) you must, and are able to, bear the economic risk of your investment in the Incentive Units for an indefinite period of time and can afford a complete loss of your investment in the Incentive Units, (v) you are sophisticated in financial matters and have such knowledge and experience in financial and business matters as to be capable of evaluating the risks and benefits of your investment in the Incentive Units, (vi) your principal place of residence is set forth on the cover sheet, and (vii) the Company has made available to you all documents that you have requested relating to the Company, the Incentive Units and your purchase of the Incentive Units, and you have had an opportunity to ask questions and receive answers concerning the Company and the terms and conditions of the offering and sale of the Incentive Units pursuant to this Agreement and have had full access to such other information concerning the Company and the Incentive Units as you deemed necessary or desirable.

**Repurchase Rights**

The Company has certain rights to repurchase all or any portion of the Units held by you on the terms and pursuant to the conditions set forth in the LLC Agreement.

**Retention Rights**

This Agreement does not give you the right to be retained by the Company (or any parent, Subsidiaries or Affiliates) in any capacity. The Company (and any parent, Subsidiaries or Affiliates) reserves the right to terminate your Service at any time and for any reason subject to the terms of any employment or consulting agreement between you and the Company.

**Rights of holders of Units**

The Incentive Units shall be non-voting except as otherwise required by applicable law.

**Applicable Law**

This Agreement will be interpreted and enforced under the laws of the State of Delaware, other than any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction.

**The Plan, the LLC Agreement and Other Agreements**

The text of the Plan is incorporated in this Agreement by reference. Certain capitalized terms used in this Agreement are defined in the Plan, and have the meaning set forth in the Plan. As a condition to receiving the Incentive Units granted under the terms of this Agreement, you agree to be bound by the Company's Amended and Restated Limited Liability Company Agreement (the "LLC Agreement") by execution of a joinder thereto. The form of the joinder is attached hereto as Exhibit B. In addition, in connection with the grant of the Incentive Units, you will execute such document(s) as necessary to become a party to any other agreement as the Company may reasonably require to effect the terms of this Agreement.

This Agreement, the Plan and the LLC Agreement constitute the entire understanding between you and the Company regarding this grant of

5

\\DE - 040717/000001 - 620180 v1

Incentive Units. Any prior agreements, commitments or negotiations concerning this grant are superseded.

**Data Privacy**

In order to administer the Plan, the Company may process personal data about you. Such data includes, but is not limited to, the information provided in this Agreement and any changes thereto, other appropriate personal and financial data about you such as home address and business addresses and other contact information, payroll information and any other information that might be deemed appropriate by the Company to facilitate the administration of the Plan.

By accepting this grant, you give explicit consent to the Company to process any such personal data but only to the extent necessary for the administration of the Plan. You also give explicit consent to the Company to transfer any such personal data outside the country in which you work or are employed, including, with respect to non-U.S. resident Grantees, to the United States, to transferees who shall include the Company and other persons who are designated by the Company to administer the Plan but only to the extent necessary for the administration of the Plan.

**Section 280G**

If you are a "disqualified individual," as defined in Section 280G(c) of the Code, you agree to execute and deliver to the Company any documents or agreements that the Company requests in connection with obtaining any required approvals of any payment or benefit to you that would be considered a "parachute payment" within the meaning of Section 280G(b)(2) of the Code as then in effect, including, without limitation, any waiver of your right to receive all or any portion of such payment or benefit if such approval is not obtained.

*By signing the cover sheet of this Agreement, you agree to all of the terms and conditions described above and in the Plan.*

6

**EXHIBIT A**

**GRANTEE ELECTION UNDER SECTION 83(b) OF
THE INTERNAL REVENUE CODE**

The undersigned Grantee hereby makes an election pursuant to Section 83(b) of the Internal Revenue Code with respect to the property described below and supplies the following information in accordance with the regulations promulgated thereunder:

1. The name, address and social security number of the undersigned:

    Name:_____

    Address:_____

    _____

    Social Security No. :_____

2. Description of property with respect to which the election is being made:

    The election is being made with respect to _____ Class B Units (the "Units") in ATI Physical Therapy Holdings, LLC (the "LLC").

3. The date on which the property was transferred is _____, 2013.

4. The taxable year to which this election relates is calendar year 2013.

5. Nature of restrictions to which the property is subject:

    The Units are subject to the provisions of a Class B Unit Award Agreement between the undersigned and the Company. The Units are subject to forfeiture under the terms of the Agreement.

6. The fair market value at time of transfer (determined without regard to any restrictions other than restrictions which by their terms will never lapse) of the Units with respect to which this election is being made was $0 per Unit.

7. The amount paid by the Taxpayer for the Units was $0 per Unit.

8. A copy of this statement has been furnished to the LLC.

Dated: _____, 2013

_____
Name:

## PROCEDURES FOR MAKING ELECTION
## UNDER INTERNAL REVENUE CODE SECTION 83(b)

The following procedures **must** be followed with respect to the attached form for making an election under Internal Revenue Code section 83(b) in order for the election to be effective:

1.     You must file one copy of the completed election form with the IRS Service Center where you file your federal income tax returns within <u>30 days</u> after the Grant Date of your Incentive Units.

2.     At the same time you file the election form with the IRS, you must also give a copy of the election form to the Secretary of the Company.

*3.     You must file another copy of the election form with your federal income tax return (generally, Form 1040) for the taxable year in which the units are transferred to you.*

\\DE - 040717/000001 - 620180 v1

## **EXHIBIT B**

### LIMITED LIABILITY COMPANY AGREEMENT JOINDER

By execution of this Joinder, the undersigned agrees to become a party to that certain Amended and Restated Limited Liability Company Agreement dated as of December 21, 2012, by and among each of the Members which are parties thereto (as the same may be amended, restated or otherwise modified from time-to-time). The undersigned shall have all the rights, and shall observe all the obligations, applicable to a Class B Member thereunder.

Name: Lisa Gutierrez

Signature: _____

Address for
Notices:

with copies
to:

_____        _____

_____        _____

_____        _____

_____        _____

## ATI PHYSICAL THERAPY HOLDINGS, LLC
### 2012 EQUITY INCENTIVE PLAN

### ARTICLE I

### IDENTIFICATION OF THE PLAN

1.1     <u>Identification of the Plan</u>.  This plan shall be known as the ATI Physical Therapy Holdings, LLC 2012 Equity Incentive Plan (the "<u>Plan</u>").

1.2     <u>Purpose</u>.  The purpose of this Plan is (i) to advance the best interests of the Company by providing directors, officers, executives and other key employees of, and consultants and other service providers to the Company (including its subsidiaries) who have a substantial responsibility for its management and growth with a significant additional incentive to promote the financial success of the Company and (ii) to provide an incentive which may be used to induce able persons to enter into, or remain in, the employ of the Company (including its subsidiaries).  All Incentive Units (as defined below) granted under the Plan are intended to qualify for an exemption from the registration requirements under the Securities Act of 1933, as amended, pursuant to Rule 701 (the "<u>Federal Exemption</u>") and under analogous provisions of applicable state securities laws.  In the event that any provision of the Plan would cause any Incentive Units granted under the Plan to not qualify for the Federal Exemption, the Plan shall be deemed to be automatically amended to the extent necessary to cause all Incentive Units granted under the Plan to qualify for the Federal Exemption.

### ARTICLE II

### DEFINITIONS

For purposes of this Plan, the following terms shall have the meanings set forth below:

"<u>Board</u>" shall mean the Board of Directors of the Company.

"<u>Change in Ownership</u>" means any sale, transfer or issuance or series of sales, transfers and/or issuances of units by the Company or any holders thereof which results in any Person or group of Persons (as the term "group" is used under the Securities Exchange Act of 1934, as amended), other than the holders of units immediately prior to such sale, transfer or issuance, owning units of the Company possessing the voting power to elect a majority of the Board.

"<u>Company</u>" shall mean ATI Physical Therapy Holdings, LLC, a Delaware limited liability company.

"<u>Control</u>" (including the terms "<u>Controlling</u>," "<u>Controlled by</u>" and "<u>under common Control with</u>") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended, and any successor statute.

"Fundamental Change" means: (i) any sale or transfer of more than 50% of the assets (including goodwill and intangible assets) of the Company and its Subsidiaries on a consolidated basis (measured either by book value in accordance with generally accepted accounting principles consistently applied or by fair market value determined in the reasonable good faith judgment of the Board) in any transaction or series of transactions (other than sales in the ordinary course of business); or (ii) any merger or consolidation to which the Company is a party, except for a merger in which the Company is the surviving entity, the terms of the Class A Units are not changed and are not exchanged for cash, securities or other property, and after giving effect to such merger, the holders of the Company's outstanding units possessing a majority of the voting power (under ordinary circumstances) to elect a majority of the Board immediately prior to the merger shall continue to own the Company's outstanding Units possessing the voting power (under ordinary circumstances) to elect a majority of the Board.

"Incentive Units" shall mean the Class B Units and the Class D Units (each as defined in the LLC Agreement) of the Company issued to Participants pursuant to the Plan.

"LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of the Company, dated on or about December 21, 2012, as amended from time to time in accordance with its terms.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Qualifying IPO" means a sale in an underwritten public offering registered under the Securities Act of equity securities of the Company or a corporate successor to the Company or of any Subsidiary.

"Units" shall have the meaning set forth in the LLC Agreement.

"Securities Act" shall mean the Securities Act of 1933 and the rules and regulations promulgated thereunder, as amended, and any successor statute.

"Subsidiary" means any corporation, trust, general or limited partnership, limited liability company, limited liability partnership, firm, company or other business enterprise which is Controlled by the Company through direct ownership of the stock or other proprietary interests of such business enterprise or indirectly through the ownership of stock or other proprietary interests in one or more other business enterprises which are connected with the Company by means of one or more chains of business enterprises that are connected by ownership of stock or other proprietary interests.

\\DE - 040717/000001 - 620180 v1

## ARTICLE III

## ADMINISTRATION OF THE PLAN

The Plan shall be administered by the Board. Subject to the limitations of the Plan, the Board shall have the sole and complete authority to: (i) select Participants to participate in the Plan, (ii) sell or grant Incentive Units to Participants in such forms and amounts as it shall determine, (iii) impose such limitations, restrictions and conditions upon such Incentive Units as it shall deem appropriate, (iv) interpret the Plan and adopt, amend and rescind administrative guidelines and other rules and regulations relating to this Plan, (v) correct any defect or omission or reconcile any inconsistency in the Plan or in any Incentive Units granted hereunder and (vi) make all other determinations and take all other actions necessary or advisable for the implementation and administration of the Plan. The Board's determinations on matters within its authority hereunder shall be conclusive and binding upon the Participants, the Company and all other Persons. All expenses associated with the administration of the Plan shall be borne by the Company. The Board may, to the extent permitted by law, delegate any of its authority hereunder to a committee of the Board or such other Persons as it deems appropriate.

## ARTICLE IV

## PARTICIPATION

An individual shall be eligible to be granted Incentive Units under the Plan only if on the proposed Grant Date for such Incentive Units, such individual is a director, officer, manager, executive, key employee, consultant, adviser or other service provider of the Company (including any Subsidiary) as determined by the Board in its sole discretion. Individuals selected for Incentive Unit grants by the Board shall be known as "Participants" for the purposes of the Plan. No Person shall have a right to be selected as a Participant under the Plan or having been so selected to be selected again as a Participant under the Plan.

## ARTICLE V

## INCENTIVE UNIT GRANTS

5.1     Power to Grant Incentive Units. The Board shall have the right and the power to sell or grant Incentive Units at any time to any Participant on or prior to the date that is the tenth anniversary of the adoption by the Board of the Plan. The date on which any Incentive Units are sold or granted to any Participant shall be the "Grant Date" with respect to such Incentive Units.

5.2     Vesting. The Board shall determine the date on which each Incentive Unit shall vest. Incentive Units may vest immediately, in one or more installments, upon the happening of certain events, upon the passage of a specified period of time, upon the fulfillment of certain conditions or upon the achievement by the Company of certain performance goals, as the Board shall determine in each case when the Incentive Units are sold or granted and as set forth in the applicable Incentive Unit Agreement.

- 3 -

\\DE - 040717/000001 - 620180 v1

5.3     Code §409A. All Incentive Units issued under the Plan are intended to avoid the inclusion of amounts with respect to any Incentive Unit as deferred compensation of any Participant under Code §409A. However, neither the Company nor any of its affiliates shall make any representations or warranties with respect to the application of Code §409A to the Incentive Units, and by the acceptance of any Incentive Unit, each Participant shall agree to accept the potential application of Code §409A to the Incentive Units and any other tax consequences of the issuance, vesting, ownership, exercise, modification, adjustment and disposition of the Incentive Units.

## ARTICLE VI

## GENERAL PROVISIONS

6.1     Written Agreement. Each Incentive Unit sold or granted hereunder to a Participant shall be embodied in a written agreement (an "Incentive Unit Award Agreement") which shall be signed by the Participant and by an authorized officer of the Company for and in the name and on behalf of the Company. Each Incentive Unit Agreement shall contain provisions setting forth the terms and conditions of such Incentive Units and shall be subject to the terms and conditions of the Plan. In addition, each Participant shall, as a condition to the issuance of any Incentive Units pursuant to this Plan, execute and deliver a joinder to the LLC Agreement and agree to be bound by and subject to the same, which may be set forth in the Incentive Unit Award Agreement.

6.2     Rights of Participants. Nothing in the Plan shall interfere with or limit in any way the right of the Company to terminate any Participant's employment at any time (with or without cause), nor confer upon any Participant any right to continue in the employ of the Company for any period of time or to continue his present (or any other) rate of compensation.

6.3     Amendment, Suspension and Termination of this Plan. The Board may suspend or terminate this Plan or any portion hereof at any time and may amend it from time to time in such respects as the Board may deem advisable; provided that no such amendment, suspension or termination shall materially impair the rights of Participants with respect to outstanding Incentive Units without the consent of the Participants affected thereby. For the avoidance of doubt, the foregoing consent right of the Participants shall not restrict in any manner the LLC Agreement from being amended in accordance with its terms.

6.4     Amendment, Modification and Cancellation. The Board may amend or modify any Incentive Unit Award Agreement in any manner to the extent that the Board would have had the authority under this Plan initially to grant such Incentive Unit; provided that no such amendment or modification shall materially impair the rights of any Participant under such Incentive Unit Award Agreement without the consent of such Participant. For the avoidance of doubt, the foregoing consent right of the Participants shall not restrict in any manner the LLC Agreement from being amended in accordance with its terms. With the Participant's written consent, the Board may cancel any Incentive Unit and issue a new Incentive Unit to such Participant.

\\DE - 040717/000001 - 620180 v1

6.5     Limitation on Aggregate Units.  Notwithstanding anything else in this Plan to the contrary, the number of Class B Units which may be issued under the Plan shall not exceed 940,020, and the number of Class D Units which may be issued under the Plan shall not exceed 1,148,914; provided that the aggregate number of Incentive Units shall be subject to adjustment in accordance with Section 6.6 below.

6.6     Adjustments.  The number of Incentive Units allocated to any Participant under the Plan shall be adjusted proportionately in the event of any unit split, reverse unit split, unit dividend, recapitalization, combination, reclassification or other distribution of Units without the receipt of consideration by the Company, of or on the Incentive Units.

6.7     Nontransferability.  All Incentive Units issued pursuant to the terms of this Plan shall constitute "restricted securities," as that term is defined in Rule 144 promulgated by the Securities and Exchange Commission pursuant to the Securities Act, and may not be transferred other than by will or the laws of descent and distribution, to a revocable trust or in compliance with the registration requirements of the Securities Act or an exemption therefrom. In addition, no Incentive Units may be transferred unless permitted by and in accordance with the terms and conditions of the Incentive Unit Award Agreement and the LLC Agreement.

6.8     Indemnification.  In addition to such other rights of indemnification as they may have as members of the Board, the members of the Board shall be indemnified by the Company against all costs and expenses reasonably incurred by them in connection with any action, suit or proceeding to which they are or any of them may be party by reason of any action taken or failure to act under or in connection with this Plan or any Incentive Unit granted hereunder, and against all amounts paid by them in settlement thereof (provided such settlement is approved by independent legal counsel selected by the Company) or paid by them in satisfaction of a judgment in any such action, suit or proceeding; provided that any such Board member shall be entitled to the indemnification rights set forth in this Section 6.8 only if such member has acted in good faith and in a manner that such member reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such conduct was unlawful; and further provided that upon the institution of any such action, suit or proceeding a Board member shall give the Company written notice thereof and an opportunity, at its own expense, to handle and defend the same before such Board member undertakes to handle and defend it on his own behalf.

6.9     Withholding of Taxes.  The Company and its affiliates shall be entitled, if necessary or desirable, to deduct and withhold from any amounts due and payable by the Company or any affiliate to any Participant (or secure payment from such Participant in lieu of withholding), the amount of any withholding or other tax due from the Company or any of its affiliates in connection with the issuance, vesting, ownership, modification, adjustment, disposition, exercise or otherwise with respect to the Incentive Units issued hereunder.

6.10    Listing, Registration, and Compliance with Laws and Regulations. Incentive Units shall be subject to the requirement that, if at any time the Board shall determine, in its discretion, that the listing, registration, or qualification of the Incentive Units upon any securities exchange or under any state or federal securities or other law or regulation, or the

-5-

consent or approval of any Governmental Authority (as defined in the LLC Agreement), is necessary or desirable as a condition to or in connection with the issuance or purchase of Incentive Units thereunder, then no Incentive Units may be issued or purchased, in whole or in part, unless such listing, registration, qualification, consent, or approval shall have been effected or obtained free of any conditions not acceptable to the Board. The holders of Incentive Units shall supply the Company with such certificates, representations, and information as the Company shall request and shall otherwise cooperate with the Company in obtaining such listing, registration, qualification, consent, or approval. In the case of officers and other Persons subject to Section 16(b) of the Securities Exchange Act of 1934, as amended, the Board may at any time impose any limitations upon the issuance of any Incentive Unit that, in the Board's discretion, are necessary or desirable in order to comply with such Section 16(b) and the rules and regulations thereunder.

6.11    Construction.    References herein to this Plan or any agreement shall be references to this Plan or such agreement as amended, modified, supplemented or waived from time to time.

<p style="text-align:center">*        *        *        *        *</p>

-6-

\\DE - 040717/000001 - 620180 v1

Grant No.:  D-12

## ATI PHYSICAL THERAPY HOLDINGS, LLC

### CLASS D UNIT AWARD AGREEMENT

ATI Physical Therapy Holdings, LLC, a Delaware limited liability company (the "Company"), hereby grants Class D Units (the "Units") to the Grantee named below, subject to the vesting conditions set forth in the attachment. Additional terms and conditions of the grant are set forth in this cover sheet, in the attachment and in the Company's 2012 Equity Incentive Plan (the "Plan").

Grant Date:  May 14, 2013

Vesting Start Date:  May 14, 2013

Name of Grantee:  Lisa Gutierrez

Grantee's Social Security Number:

Number of Units Covered by Grant:  8,320

Grantee's principal place of residence is in the state of:                    _____

*By signing this cover sheet, you agree to all of the terms and conditions described in the attached Agreement and in the Plan, a copy of which is also attached. You acknowledge that you have carefully reviewed the Plan, and agree that, unless otherwise specified in the Plan, the Plan will control in the event any provision of this Agreement should appear to be inconsistent.*

Grantee:

Company:

> Name:  Christopher S.L. Pusey
> Title:    Vice President and Assistant Secretary

Attachment

This is not a unit certificate or a negotiable instrument.

**LIMITED LIABILITY COMPANY AGREEMENT JOINDER**

By execution of this Joinder, the undersigned agrees to become a party to that certain Amended and Restated Limited Liability Company Agreement dated as of December 21, 2012, by and among each of the Members which are parties thereto (as the same may be amended, restated or otherwise modified from time-to-time). The undersigned shall have all the rights, and shall observe all the obligations, applicable to a Class D Member thereunder.

Name: Lisa Gutierrez

Signature:


Address for                                           with copies
Notices:                                              to:

**GRANTEE ELECTION UNDER SECTION 83(b) OF**
**THE INTERNAL REVENUE CODE**

The undersigned Grantee hereby makes an election pursuant to Section 83(b) of the Internal Revenue Code with respect to the property described below and supplies the following information in accordance with the regulations promulgated thereunder:

1. The name, address and social security number of the undersigned:

   Name: *LISA Gutierrez*

   Address:

   Social Security No. :

2. Description of property with respect to which the election is being made:

   The election is being made with respect to *8320* Class D Units (the "Units") in ATI Physical Therapy Holdings, LLC (the "LLC").

3. The date on which the property was transferred is *May 14*, 2013.

4. The taxable year to which this election relates is calendar year 2013.

5. Nature of restrictions to which the property is subject:

   The Units are subject to the provisions of a Class D Unit Award Agreement between the undersigned and the Company. The Units are subject to forfeiture under the terms of the Agreement.

6. The fair market value at time of transfer (determined without regard to any restrictions other than restrictions which by their terms will never lapse) of the Units with respect to which this election is being made was $0 per Unit.

7. The amount paid by the Taxpayer for the Units was $0 per Unit.

8. A copy of this statement has been furnished to the LLC.

Dated: *5/21*, 2013

Name: *Lisa Gutierrez*

**ATI PHYSICAL THERAPY HOLDINGS, LLC**

**CLASS D UNIT AWARD AGREEMENT**

| | |
|---|---|
| **Nontransferability** | This grant is an award of Units in the number set forth on the cover sheet, subject to the vesting conditions described below (the "Incentive Units"). Other than by will or the laws of descent and distribution, your Incentive Units (regardless of whether vested or unvested) may not be transferred, assigned, pledged or hypothecated, whether by operation of law or otherwise, nor may the Incentive Units be made subject to execution, attachment or similar process, except in strict accordance with the LLC Agreement (as defined below). |
| **Issuance and Vesting** | The Company will issue your Incentive Units in your name as of the Grant Date. |
| | Your Incentive Units vest as to 20% of the total number of Incentive Units covered by this grant, as shown on the cover sheet, on each of the first through fifth anniversaries of the Grant Date (each, an "Anniversary Date"), provided you continue in Service on each applicable Anniversary Date. |
| | Notwithstanding the foregoing, 100% of the total number of Incentive Units covered by this grant, as shown on the cover sheet (subject to adjustment as provided herein), shall immediately vest upon any Qualifying IPO, Change in Ownership, Fundamental Change, Approved Sale (as defined in the LLC Agreement) or Sale (as defined in the LLC Agreement) of the Company. |
| | As used herein, the term "Service" shall have the meaning given such term in the LLC Agreement (as defined below). |
| **Termination of Service due to death or Disability** | In the event that your Service with the Company terminates due to your death or Disability, a portion of your Incentive Units equal to the number of Incentive Units that would otherwise have vested on the Anniversary Date immediately following your death or Disability will vest and all remaining unvested Incentive Units will automatically be forfeited. |
| | As used herein, the term "Disability" shall have the meaning set forth from time to time in your employment agreement, if any, with the Company or its Subsidiaries and, if no employment agreement exists, means the Grantee is unable to perform each of the essential duties of such Grantee's position by reason of a medically determinable physical or mental impairment which is potentially permanent in character or which can be expected to last for a continuous period of not less than six months. |
| **Termination of Service due to Retirement** | In the event that your Service with the Company terminates due to your Retirement, a portion of your Incentive Units equal to the number of Incentive Units that would otherwise have vested on the |

2

Anniversary Date immediately following your Retirement will vest and all remaining unvested Incentive Units will automatically be forfeited.

As used herein, the term "Retirement" means a permanent cessation of all Service under circumstances not constituting Cause after attainment of age 55 and ten years of Service or attainment of age 60 and five years of Service, or such other conditions as determined by the Board in its sole discretion.

As used herein, the term "Cause" shall have the meaning set forth from time to time in your employment agreement, if any, with the Company or its Subsidiaries and, if no employment agreement exists, means engaging in any of the following forms of misconduct: (A) commission of any felony or of any misdemeanor involving dishonesty or moral turpitude; (B) theft, fraud, deceit, embezzlement, or misappropriation or misuse of the Company's or its Subsidiaries' property or time, including any unauthorized disclosure, use or infringement of any confidential information, copyrights, trademarks, mailing lists or other property; (C) use of alcohol or illegal gambling on the Company's or its Subsidiaries' premises or appearing on such premises while intoxicated, other than the use of alcohol in connection with a Company-sponsored social event; (D) illegal use of any controlled substance; (E) discriminatory or harassing behavior, whether or not illegal under federal, state or local law, or any inappropriate treatment of or relations with any employee, agent or consultant of the Company or its Subsidiaries or any other person with whom the Company or its Subsidiaries has a business relationship in each case that would be materially offensive to a reasonable person; (F) intentional insubordination or willful misconduct; (G) falsifying any document or making any false or misleading statement relating to the Company or its Subsidiaries or such Grantee's employment by the Company or its Subsidiaries; (H) malfeasance, misfeasance, misconduct or inattention to the Grantee's duties and responsibilities that has the potential to result in any material injury to the economic or ethical welfare or the public image of the Company or its Subsidiaries; or (I) after notification of the Company's reasonable performance expectations, any material failure to comply with those expectations.

**Forfeiture of Units**

In the event that your Service terminates for any reason other than for death, Disability, Retirement or Cause, you will forfeit to the Company all of the Incentive Units subject to this grant that have not yet vested as of your termination date. In the event that your Service terminates for Cause, you will forfeit to the Company all of the Incentive Units subject to this grant that are vested or unvested.

**Leaves of Absence**

For purposes of this award of Incentive Units, your Service does not terminate when you go on a bona fide employee leave of absence that is approved by the Company in writing, if the terms of the leave provide for continued Service crediting, or when continued Service crediting is required by applicable law. However, your Service will be

3

treated as terminating 90 days after you went on employee leave, unless your right to return to active work is guaranteed by law or by a contract. Your Service terminates in any event when the approved leave ends unless you immediately return to Service.

The Company determines, in its sole discretion and consistent with applicable Company policy and applicable law, which leaves count for this purpose, and when your Service terminates for all purposes under the Plan and this Agreement.

**Withholding Taxes**

You agree, as a condition of this grant, that you will make acceptable arrangements to pay any withholding or other taxes that may be due as a result of the vesting of Incentive Units acquired under this grant. In the event that the Company determines that any federal, state, local or foreign tax or withholding payment is required relating to the vesting of units arising from this grant, the Company shall have the right to require such payments from you, or withhold such amounts from other payments due to you from the Company or any Affiliate.

**Code Section 83(b) Election**

You hereby agree to make an election to include in gross income in the year of transfer the Incentive Units pursuant to Section 83(b) of the Code substantially in the form attached hereto as Exhibit A and to supply the necessary information in accordance with the regulations promulgated thereunder.

**YOU ACKNOWLEDGE THAT IT IS YOUR SOLE RESPONSIBILITY, AND NOT THE COMPANY'S, TO FILE A TIMELY ELECTION UNDER SECTION 83(b), EVEN IF YOU REQUEST THE COMPANY OR ITS REPRESENTATIVES TO MAKE THIS FILING ON YOUR BEHALF. YOU ARE RELYING SOLELY ON YOUR OWN ADVISORS WITH RESPECT TO THE DECISION AS TO WHETHER TO FILE ANY 83(b) ELECTION AND REGARDING THE ACCURACY AND TIMELINESS OF SUCH FILING.**

**Investment Representation**

You hereby agree and represent, as a condition of this grant of Incentive Units, that (i) you are acquiring the Incentive Units for investment for your own account and not with a view to, or intention of, or otherwise for resale in connection with, any distribution to any person or entity, (ii) neither the offer nor sale of the Incentive Units hereunder, or the Incentive Units themselves, have been registered under the Securities Act or registered or qualified under any applicable state securities laws and that the Incentive Units are being offered and sold to you by reason of and in reliance upon a specific exemption from the registration provisions of the Securities Act and exemptions from registration or qualification provisions of such applicable state or other jurisdiction's securities laws which depend upon, among other things, the bona fide nature of the investment intent as expressed herein and the truth and accuracy of your representations, warranties, agreements, acknowledgments and understandings as set forth herein, (iii) no public market now exists for any of the securities issued by the

4

Company and that there can be no assurance that a public market will ever exist for the Incentive Units, (iv) you must, and are able to, bear the economic risk of your investment in the Incentive Units for an indefinite period of time and can afford a complete loss of your investment in the Incentive Units, (v) you are sophisticated in financial matters and have such knowledge and experience in financial and business matters as to be capable of evaluating the risks and benefits of your investment in the Incentive Units, (vi) your principal place of residence is set forth on the cover sheet, and (vii) the Company has made available to you all documents that you have requested relating to the Company, the Incentive Units and your purchase of the Incentive Units, and you have had an opportunity to ask questions and receive answers concerning the Company and the terms and conditions of the offering and sale of the Incentive Units pursuant to this Agreement and have had full access to such other information concerning the Company and the Incentive Units as you deemed necessary or desirable.

**Repurchase Rights**

The Company has certain rights to repurchase all or any portion of the Units held by you on the terms and pursuant to the conditions set forth in the LLC Agreement.

**Retention Rights**

This Agreement does not give you the right to be retained by the Company (or any parent, Subsidiaries or Affiliates) in any capacity. The Company (and any parent, Subsidiaries or Affiliates) reserves the right to terminate your Service at any time and for any reason subject to the terms of any employment or consulting agreement between you and the Company.

**Rights of holders of Units**

The Incentive Units shall be non-voting except as otherwise required by applicable law.

**Applicable Law**

This Agreement will be interpreted and enforced under the laws of the State of Delaware, other than any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction.

**The Plan, the LLC Agreement and Other Agreements**

The text of the Plan is incorporated in this Agreement by reference. Certain capitalized terms used in this Agreement are defined in the Plan, and have the meaning set forth in the Plan. As a condition to receiving the Incentive Units granted under the terms of this Agreement, you agree to be bound by the Company's Amended and Restated Limited Liability Company Agreement (the "LLC Agreement") by execution of a joinder thereto. The form of the joinder is attached hereto as Exhibit B. In addition, in connection with the grant of the Incentive Units, you will execute such document(s) as necessary to become a party to any other agreement as the Company may reasonably require to effect the terms of this Agreement.

This Agreement, the Plan and the LLC Agreement constitute the entire understanding between you and the Company regarding this grant of

5

Incentive Units. Any prior agreements, commitments or negotiations concerning this grant are superseded.

**Data Privacy**

In order to administer the Plan, the Company may process personal data about you. Such data includes, but is not limited to, the information provided in this Agreement and any changes thereto, other appropriate personal and financial data about you such as home address and business addresses and other contact information, payroll information and any other information that might be deemed appropriate by the Company to facilitate the administration of the Plan.

By accepting this grant, you give explicit consent to the Company to process any such personal data but only to the extent necessary for the administration of the Plan. You also give explicit consent to the Company to transfer any such personal data outside the country in which you work or are employed, including, with respect to non-U.S. resident Grantees, to the United States, to transferees who shall include the Company and other persons who are designated by the Company to administer the Plan but only to the extent necessary for the administration of the Plan.

**Section 280G**

If you are a "disqualified individual," as defined in Section 280G(c) of the Code, you agree to execute and deliver to the Company any documents or agreements that the Company requests in connection with obtaining any required approvals of any payment or benefit to you that would be considered a "parachute payment" within the meaning of Section 280G(b)(2) of the Code as then in effect, including, without limitation, any waiver of your right to receive all or any portion of such payment or benefit if such approval is not obtained.

*By signing the cover sheet of this Agreement, you agree to all of the terms and conditions described above and in the Plan.*

6

\\DE - 040717/000001 - 620182 v1

**EXHIBIT A**

**GRANTEE ELECTION UNDER SECTION 83(b) OF
THE INTERNAL REVENUE CODE**

The undersigned Grantee hereby makes an election pursuant to Section 83(b) of the Internal Revenue Code with respect to the property described below and supplies the following information in accordance with the regulations promulgated thereunder:

1.  The name, address and social security number of the undersigned:

    Name:_____

    Address:_____

    _____

    Social Security No. :_____

2.  Description of property with respect to which the election is being made:

    The election is being made with respect to _____ Class D Units (the "Units") in ATI Physical Therapy Holdings, LLC (the "LLC").

3.  The date on which the property was transferred is _____, 2013.

4.  The taxable year to which this election relates is calendar year 2013.

5.  Nature of restrictions to which the property is subject:

    The Units are subject to the provisions of a Class D Unit Award Agreement between the undersigned and the Company. The Units are subject to forfeiture under the terms of the Agreement.

6.  The fair market value at time of transfer (determined without regard to any restrictions other than restrictions which by their terms will never lapse) of the Units with respect to which this election is being made was $0 per Unit.

7.  The amount paid by the Taxpayer for the Units was $0 per Unit.

8.  A copy of this statement has been furnished to the LLC.

Dated: _____, 2013

_____
Name:

## PROCEDURES FOR MAKING ELECTION
## UNDER INTERNAL REVENUE CODE SECTION 83(b)

The following procedures **must** be followed with respect to the attached form for making an election under Internal Revenue Code section 83(b) in order for the election to be effective:

1.   You must file one copy of the completed election form with the IRS Service Center where you file your federal income tax returns within <u>30 days</u> after the Grant Date of your Incentive Units.

2.   At the same time you file the election form with the IRS, you must also give a copy of the election form to the Secretary of the Company.

3.   *You must file another copy of the election form with your federal income tax return (generally, Form 1040) for the taxable year in which the units are transferred to you.*

\\DE - 040717/000001 - 620182 v1

## EXHIBIT B

## LIMITED LIABILITY COMPANY AGREEMENT JOINDER

By execution of this Joinder, the undersigned agrees to become a party to that certain Amended and Restated Limited Liability Company Agreement dated as of December 21, 2012, by and among each of the Members which are parties thereto (as the same may be amended, restated or otherwise modified from time-to-time). The undersigned shall have all the rights, and shall observe all the obligations, applicable to a Class D Member thereunder.

Name:  Lisa Gutierrez

Signature:  _____

Address for                                         with copies
Notices:                                            to:

_____         _____

_____         _____

_____         _____

_____         _____

\\DE - 040717/000001 - 620182 v1

## ATI PHYSICAL THERAPY HOLDINGS, LLC
## 2012 EQUITY INCENTIVE PLAN

### ARTICLE I

### IDENTIFICATION OF THE PLAN

1.1     Identification of the Plan.  This plan shall be known as the ATI Physical Therapy Holdings, LLC 2012 Equity Incentive Plan (the "Plan").

1.2     Purpose.  The purpose of this Plan is (i) to advance the best interests of the Company by providing directors, officers, executives and other key employees of, and consultants and other service providers to the Company (including its subsidiaries) who have a substantial responsibility for its management and growth with a significant additional incentive to promote the financial success of the Company and (ii) to provide an incentive which may be used to induce able persons to enter into, or remain in, the employ of the Company (including its subsidiaries).  All Incentive Units (as defined below) granted under the Plan are intended to qualify for an exemption from the registration requirements under the Securities Act of 1933, as amended, pursuant to Rule 701 (the "Federal Exemption") and under analogous provisions of applicable state securities laws.  In the event that any provision of the Plan would cause any Incentive Units granted under the Plan to not qualify for the Federal Exemption, the Plan shall be deemed to be automatically amended to the extent necessary to cause all Incentive Units granted under the Plan to qualify for the Federal Exemption.

### ARTICLE II

### DEFINITIONS

For purposes of this Plan, the following terms shall have the meanings set forth below:

"Board" shall mean the Board of Directors of the Company.

"Change in Ownership" means any sale, transfer or issuance or series of sales, transfers and/or issuances of units by the Company or any holders thereof which results in any Person or group of Persons (as the term "group" is used under the Securities Exchange Act of 1934, as amended), other than the holders of units immediately prior to such sale, transfer or issuance, owning units of the Company possessing the voting power to elect a majority of the Board.

"Company" shall mean ATI Physical Therapy Holdings, LLC, a Delaware limited liability company.

"Control" (including the terms "Controlling," "Controlled by" and "under common Control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended, and any successor statute.

"Fundamental Change" means: (i) any sale or transfer of more than 50% of the assets (including goodwill and intangible assets) of the Company and its Subsidiaries on a consolidated basis (measured either by book value in accordance with generally accepted accounting principles consistently applied or by fair market value determined in the reasonable good faith judgment of the Board) in any transaction or series of transactions (other than sales in the ordinary course of business); or (ii) any merger or consolidation to which the Company is a party, except for a merger in which the Company is the surviving entity, the terms of the Class A Units are not changed and are not exchanged for cash, securities or other property, and after giving effect to such merger, the holders of the Company's outstanding units possessing a majority of the voting power (under ordinary circumstances) to elect a majority of the Board immediately prior to the merger shall continue to own the Company's outstanding Units possessing the voting power (under ordinary circumstances) to elect a majority of the Board.

"Incentive Units" shall mean the Class B Units and the Class D Units (each as defined in the LLC Agreement) of the Company issued to Participants pursuant to the Plan.

"LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of the Company, dated on or about December 21, 2012, as amended from time to time in accordance with its terms.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Qualifying IPO" means a sale in an underwritten public offering registered under the Securities Act of equity securities of the Company or a corporate successor to the Company or of any Subsidiary.

"Units" shall have the meaning set forth in the LLC Agreement.

"Securities Act" shall mean the Securities Act of 1933 and the rules and regulations promulgated thereunder, as amended, and any successor statute.

"Subsidiary" means any corporation, trust, general or limited partnership, limited liability company, limited liability partnership, firm, company or other business enterprise which is Controlled by the Company through direct ownership of the stock or other proprietary interests of such business enterprise or indirectly through the ownership of stock or other proprietary interests in one or more other business enterprises which are connected with the Company by means of one or more chains of business enterprises that are connected by ownership of stock or other proprietary interests.

-2-

ARTICLE III

ADMINISTRATION OF THE PLAN

The Plan shall be administered by the Board. Subject to the limitations of the Plan, the Board shall have the sole and complete authority to: (i) select Participants to participate in the Plan, (ii) sell or grant Incentive Units to Participants in such forms and amounts as it shall determine, (iii) impose such limitations, restrictions and conditions upon such Incentive Units as it shall deem appropriate, (iv) interpret the Plan and adopt, amend and rescind administrative guidelines and other rules and regulations relating to this Plan, (v) correct any defect or omission or reconcile any inconsistency in the Plan or in any Incentive Units granted hereunder and (vi) make all other determinations and take all other actions necessary or advisable for the implementation and administration of the Plan. The Board's determinations on matters within its authority hereunder shall be conclusive and binding upon the Participants, the Company and all other Persons. All expenses associated with the administration of the Plan shall be borne by the Company. The Board may, to the extent permitted by law, delegate any of its authority hereunder to a committee of the Board or such other Persons as it deems appropriate.

ARTICLE IV

PARTICIPATION

An individual shall be eligible to be granted Incentive Units under the Plan only if on the proposed Grant Date for such Incentive Units, such individual is a director, officer, manager, executive, key employee, consultant, adviser or other service provider of the Company (including any Subsidiary) as determined by the Board in its sole discretion. Individuals selected for Incentive Unit grants by the Board shall be known as "Participants" for the purposes of the Plan. No Person shall have a right to be selected as a Participant under the Plan or having been so selected to be selected again as a Participant under the Plan.

ARTICLE V

INCENTIVE UNIT GRANTS

5.1     Power to Grant Incentive Units. The Board shall have the right and the power to sell or grant Incentive Units at any time to any Participant on or prior to the date that is the tenth anniversary of the adoption by the Board of the Plan. The date on which any Incentive Units are sold or granted to any Participant shall be the "Grant Date" with respect to such Incentive Units.

5.2     Vesting. The Board shall determine the date on which each Incentive Unit shall vest. Incentive Units may vest immediately, in one or more installments, upon the happening of certain events, upon the passage of a specified period of time, upon the fulfillment of certain conditions or upon the achievement by the Company of certain performance goals, as the Board shall determine in each case when the Incentive Units are sold or granted and as set forth in the applicable Incentive Unit Agreement.

- 3 -

5.3     Code §409A.  All Incentive Units issued under the Plan are intended to avoid the inclusion of amounts with respect to any Incentive Unit as deferred compensation of any Participant under Code §409A.  However, neither the Company nor any of its affiliates shall make any representations or warranties with respect to the application of Code §409A to the Incentive Units, and by the acceptance of any Incentive Unit, each Participant shall agree to accept the potential application of Code §409A to the Incentive Units and any other tax consequences of the issuance, vesting, ownership, exercise, modification, adjustment and disposition of the Incentive Units.

## ARTICLE VI

## GENERAL PROVISIONS

6.1     Written Agreement.  Each Incentive Unit sold or granted hereunder to a Participant shall be embodied in a written agreement (an "Incentive Unit Award Agreement") which shall be signed by the Participant and by an authorized officer of the Company for and in the name and on behalf of the Company.  Each Incentive Unit Agreement shall contain provisions setting forth the terms and conditions of such Incentive Units and shall be subject to the terms and conditions of the Plan.  In addition, each Participant shall, as a condition to the issuance of any Incentive Units pursuant to this Plan, execute and deliver a joinder to the LLC Agreement and agree to be bound by and subject to the same, which may be set forth in the Incentive Unit Award Agreement.

6.2     Rights of Participants.  Nothing in the Plan shall interfere with or limit in any way the right of the Company to terminate any Participant's employment at any time (with or without cause), nor confer upon any Participant any right to continue in the employ of the Company for any period of time or to continue his present (or any other) rate of compensation.

6.3     Amendment, Suspension and Termination of this Plan.  The Board may suspend or terminate this Plan or any portion hereof at any time and may amend it from time to time in such respects as the Board may deem advisable; provided that no such amendment, suspension or termination shall materially impair the rights of Participants with respect to outstanding Incentive Units without the consent of the Participants affected thereby.  For the avoidance of doubt, the foregoing consent right of the Participants shall not restrict in any manner the LLC Agreement from being amended in accordance with its terms.

6.4     Amendment, Modification and Cancellation.  The Board may amend or modify any Incentive Unit Award Agreement in any manner to the extent that the Board would have had the authority under this Plan initially to grant such Incentive Unit; provided that no such amendment or modification shall materially impair the rights of any Participant under such Incentive Unit Award Agreement without the consent of such Participant. For the avoidance of doubt, the foregoing consent right of the Participants shall not restrict in any manner the LLC Agreement from being amended in accordance with its terms.  With the Participant's written consent, the Board may cancel any Incentive Unit and issue a new Incentive Unit to such Participant.

- 4 -

6.5     Limitation on Aggregate Units.  Notwithstanding anything else in this Plan to the contrary, the number of Class B Units which may be issued under the Plan shall not exceed 940,020, and the number of Class D Units which may be issued under the Plan shall not exceed 1,148,914; provided that the aggregate number of Incentive Units shall be subject to adjustment in accordance with Section 6.6 below.

6.6     Adjustments.  The number of Incentive Units allocated to any Participant under the Plan shall be adjusted proportionately in the event of any unit split, reverse unit split, unit dividend, recapitalization, combination, reclassification or other distribution of Units without the receipt of consideration by the Company, of or on the Incentive Units.

6.7     Nontransferability.  All Incentive Units issued pursuant to the terms of this Plan shall constitute "restricted securities," as that term is defined in Rule 144 promulgated by the Securities and Exchange Commission pursuant to the Securities Act, and may not be transferred other than by will or the laws of descent and distribution, to a revocable trust or in compliance with the registration requirements of the Securities Act or an exemption therefrom. In addition, no Incentive Units may be transferred unless permitted by and in accordance with the terms and conditions of the Incentive Unit Award Agreement and the LLC Agreement.

6.8     Indemnification.  In addition to such other rights of indemnification as they may have as members of the Board, the members of the Board shall be indemnified by the Company against all costs and expenses reasonably incurred by them in connection with any action, suit or proceeding to which they are or any of them may be party by reason of any action taken or failure to act under or in connection with this Plan or any Incentive Unit granted hereunder, and against all amounts paid by them in settlement thereof (provided such settlement is approved by independent legal counsel selected by the Company) or paid by them in satisfaction of a judgment in any such action, suit or proceeding; provided that any such Board member shall be entitled to the indemnification rights set forth in this Section 6.8 only if such member has acted in good faith and in a manner that such member reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such conduct was unlawful; and further provided that upon the institution of any such action, suit or proceeding a Board member shall give the Company written notice thereof and an opportunity, at its own expense, to handle and defend the same before such Board member undertakes to handle and defend it on his own behalf.

6.9     Withholding of Taxes.  The Company and its affiliates shall be entitled, if necessary or desirable, to deduct and withhold from any amounts due and payable by the Company or any affiliate to any Participant (or secure payment from such Participant in lieu of withholding), the amount of any withholding or other tax due from the Company or any of its affiliates in connection with the issuance, vesting, ownership, modification, adjustment, disposition, exercise or otherwise with respect to the Incentive Units issued hereunder.

6.10    Listing, Registration, and Compliance with Laws and Regulations. Incentive Units shall be subject to the requirement that, if at any time the Board shall determine, in its discretion, that the listing, registration, or qualification of the Incentive Units upon any securities exchange or under any state or federal securities or other law or regulation, or the

- 5 -

consent or approval of any Governmental Authority (as defined in the LLC Agreement), is necessary or desirable as a condition to or in connection with the issuance or purchase of Incentive Units thereunder, then no Incentive Units may be issued or purchased, in whole or in part, unless such listing, registration, qualification, consent, or approval shall have been effected or obtained free of any conditions not acceptable to the Board. The holders of Incentive Units shall supply the Company with such certificates, representations, and information as the Company shall request and shall otherwise cooperate with the Company in obtaining such listing, registration, qualification, consent, or approval. In the case of officers and other Persons subject to Section 16(b) of the Securities Exchange Act of 1934, as amended, the Board may at any time impose any limitations upon the issuance of any Incentive Unit that, in the Board's discretion, are necessary or desirable in order to comply with such Section 16(b) and the rules and regulations thereunder.

6.11    Construction. References herein to this Plan or any agreement shall be references to this Plan or such agreement as amended, modified, supplemented or waived from time to time.

<div align="center">*       *       *       *       *</div>

<div align="center">- 6 -</div>

 Gmail

**James Facciolla <jfacciolla@strategicclaims.net>**

## Re: ATI Physical Therapy, Inc. Securities Litigation - Final Determination and Request for Documents

1 message

**Lisa Gutierrez** < >               Mon, Mar 24, 2025 at 10:38 AM
To: James Facciolla <jfacciolla@strategicclaims.net>
Cc: Claims Analyst <info@strategicclaims.net>

Hi
I do not agree with the determination and request the court review.

Kind Regards,


Lisa Gutierrez


On Thu, Mar 20, 2025 at 12:06 PM James Facciolla <jfacciolla@strategicclaims.net> wrote:

Hello Lisa,

I am reaching out to clarify the ineligibility letter you received from Strategic Claims Services, mailed February 27, 2025.

Our final determination is as follows.

**Your claim (see below) remains ineligible for the following reasons.**

| Claim | Name 1 |
|-------|--------|
| 277 | LISA D GUTIERREZ |

(1) Per the definition in the Stipulation of Settlement (https://www.strategicclaims.net/wp-content/uploads/2024/06/FULLY-EXECUTED-ATI-Stipulation-of-Settlement-PDF-00609416xC40C2.pdf), *"ATI Securities" means ATI Physical Therapy, Inc.'s common stock trading on the New York Stock Exchange ("NYSE") under the ticker symbol "ATIP" or FVAC common stock that traded on the NYSE under the ticker symbol FAII.* Equity conversions, or private shares of "old" ATI do not classify as a purchase or acquisition based upon the language of the Stipulation of Settlement.

(2) Your shares were acquired prior to the Settlement Class Period, in order to participate in the Settlement, shares must have been *(a) purchased or otherwise acquired ATI Securities between February 22, 2021 and October 19, 2021, both dates inclusive, and/or beneficially owned and/or held FVAC common stock as of May 24, 2021 and were eligible to vote at FVAC's June 15, 2021 special meeting to vote on the Business Combination (the "Securities Subclass"); and/or (b) beneficially owned and/or held FVAC Class A common stock as of the June 11, 2021 Redemption Date who were entitled to, but did not elect to, redeem their shares (the "Multiplan Subclass").* Per the ATI IPO Filing and Prospectus, these shares were held prior to the Settlement Class Period dates making them ineligible.

If you disagree with our determination please provide us the necessary supporting documentation to allow us to amend or confirm the above. Some examples of supporting documentation could include monthly statements from your financial institution, grant or option agreements, copies of checks, wires or other payment related receipts, etc. We already have your documents from the Transfer Agent, Continental, so you do not need to resend those

documents. Any additional documents should be sent directly to me.

If you feel you still have received this notice in error and would like to contest our determination, please respond to this email in writing no later than Tuesday, March 25, 2025 officially requesting for Court review. Please be sure to include your claim number as noted above, your reason for contesting our determination, and documentation supporting your reason. If we do not hear from you by the above date, we will assume you agree with our determination and close out the dispute without Court review.

Thank you,

--
James Facciolla
Institution Relations Manager
Strategic Claims Services, Inc.
600 N. Jackson Street
Suite 205
Media, PA 19063
610-565-9202

*IMPORTANT: The information contained in this message is confidential and is intended only for the named addressee(s). If the reader of this message is not an intended recipient (or the individual responsible for the delivery of this message to an intended recipient), please be advised that any re-use, dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please reply to the sender that you have received the message in error and then delete it. Thank you.*

**EXHIBIT L**

305

ATI

## Claimant Information

Jason Hafner

Phone:
Phone:
Email:
SSN/TaxID:
Date Submitted: 2024-09-12 12:09:10
SubmissionTieBack: IWLG4D5

## Transaction Information

Beginning Balance: 0

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |
| 6/17/2021 | 195597 | 1955970 | | | |
| 10/20/2021 | 0 | 0 90-Day | | | |

Ending Balance: 195597

Beginning Balance: [BegBalance1]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance1]

Beginning Balance: [BegBalance2]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance2]

Beginning Balance: [BegBalance3]

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Buy Date | Shares | Net Amount | SaleDate | Shares | Net Amount |

Ending Balance: [EndBalance3]

## Documentation List

134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\09\June-2024_statement.pdf
134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\09\July-2023_statement.pdf
134-f70bb1fb72c1b125fbfaf7985e2064b8\2024\09\Continental-account-2.0.pdf

**Direct Registration / Book Entry Account Statement**



CONTINENTAL
STOCK TRANSFER & TRUST

ATI PHYSICAL THERAPY

| Account Number | | Statement Date |
|---|---|---|
| | | **02/11/2022** |

**Share Transaction Request**

☐ Deposit the enclosed certificate(s) for _____shares to my account.

**Address and Phone Number change:**

_____

_____

_____

**Signature(s)** All registered owners must sign

_____

_____

JASON HAFNER

---------------------------------------------------------------------------------------------------------------------------------

^ FOLD AND DETACH HERE ^

JASON HAFNER

**Shareholder Account #:**

**ATI PHYSICAL THERAPY**

| | |
|---|---|
| **CUSIP:** | 00216W109 |
| **Stock Symbol:** | ATIP |
| **Stock Price:** | $2.94 |

**Total DRS / Book Shares:** 195,597

**Account Value:** 575,055.18

**Broker/Dealer Name:**

**Broker/Dealer DTC Participant #:**

**Customer Account #:**

| Total DRS / Book Entry Shares | Total Restricted Book Entry Shares |
|---|---|
| 195,597 | 0 |

| Transaction Date | Transaction Type | Number Shares | Share Balance | Restriction Code(s) |
|---|---|---|---|---|

This statement is a record of rights of the shareholder at the time of its issuance. Delivery of this statement of itself conveys no rights to the recipient. This statement is neither a negotiable instrument nor a security.

CONTINENTAL STOCK TRANSFER & TRUST COMPANY
1 State Street | 30th Floor | New York, NY | 10004
800-509-5586

CSTDRS

**Account Alpha ID:** HAFNER,JASON

**Account No.:**

**Request a Certificate***

☐ Issue a certificate from my DRS / Book Entry share position. (Please choose one option):

☐☐☐☐☐☐☐ **OR** ☐ (check here) ALL Shares

(Indicate number of whole shares)

*\*Please Note: A processing fee of $50.00 may apply for certificate issuances. Please contact 800-509-5586 or cstmail@continentalstock.com to determine if the issuer permits the issuance of physical paper certificates and if a fee is required. If a fee is required make your check payable to Continental Stock Transfer & Trust Company. Submit payment together with your certificate request.*

*By requesting a physical stock certificate the shareholder bears the responsibility for safekeeping and any future costs associated with replacing lost or stolen stock certificate(s).*

-------------------------------------------------------------------------------------------------------------------------------------

^ FOLD AND DETACH HERE ^

## INSTRUCTIONS FOR TRANSACTION REQUEST

SHARE TRANSACTION REQUEST:
If you have any physical stock certificates in your possession and you wish to deposit them in your account, mark the box on the front of this statement and on the blank line provided write in the number of shares represented by the certificate(s) you are sending to us for deposit.

ADDRESS and PHONE NUMBER CHANGE:
Please write in your new address and telephone number in the available space provided. Note, all registered holders must sign their names exactly as they appear on the front of this statement.

REQUEST A CERTIFICATE:
Mark the box above to receive shares in certificate form from your DRS / Book Entry position. Enter the number of whole shares you wish to receive or check the box provided if you wish to receive all your book entry shares in certificate form. Please print numerals in BLUE or BLACK ink.

Mail requests to: Continental Stock Transfer & Trust Company | Attn. Stock Transfer Department | 1 State Street | 30th Floor | New York, NY |

### About your Statement

This statement is your record of the shares being credited to your account in book entry form and may be part of the Direct Registration System, if applicable. It should be kept with your important documents as a record of your ownership of these securities.

THE CORPORATION WILL FURNISH TO ANY SHAREHOLDERS UPON REQUEST AND WITHOUT CHARGE, A FULL STATEMENT OF THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF THE SHARES OF EACH CLASS OF SHARES, IF MORE THAN ONE, AUTHORIZED TO BE ISSUED AND THE DESIGNATION, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF EACH SERIES OF ANY CLASS OF PREFERRED SHARES AUTHORIZED TO BE ISSUED SO FAR AS THE SAME HAVE BEEN FIXED AND THE AUTHORITY OF THE BOARD OF DIRECTORS TO DESIGNATE AND FIX THE RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS OF OTHER SERIES.
There may be rights, privileges, restrictions and conditions attached to the securities covered by this statement. A full copy of the text of any rights, privileges, restrictions and conditions can be obtained by contacting Continental Stock Transfer & Trust Company at 800-509-5586 or cstmail@continentalstock.com.

### Transactions Through Your Broker/Dealer

Your broker/dealer may instruct Continental Stock Transfer & Trust Company ("CST") to deliver shares on your behalf.

The Direct Registration System ("DRS"), if applicable, allows you to authorize your broker/dealer to send an electronic instruction to CST to debit shares from your DRS position and deliver them electronically to your account with your broker/dealer. To effect such transactions your broker/dealer will need to include the following information; your CST Account Number, your Social Security or Taxpayer Identification Number, the name of your CST account, and the number of DRS shares to be delivered.

CST will honor such requests from any broker/dealer participating in the Direct Registration System.

While a broker/dealer should have your authorization to debit shares from your CST account, CST will have no way of verifying if you actually authorized the transaction since the instruction is coming directly from the broker/dealer.

CSTDRS

**Account Alpha ID:** HAFNER,JASON

**Account No.:**

### Restriction Code Definitions

*Attention: if your Direct Registration/Book Entry shares are not restricted this page will not display any Restriction Code Definitions.*

CSTDRS

**Account Alpha ID:** HAFNER,JASON

**Account No.:**

This Page Left Intentionally Blank

Case: 1:21-cv-04349 Document #: 202-1 Filed: 04/25/25 Page 915 of 927 PageID #:5795

**Northwestern Mutual**
Northwestern Mutual Investment Services, LLC
Northwestern Mutual Wealth Management Company
720 E. Wisconsin Avenue, Milwaukee, WI 53202-4797
1-866-950-4644

# Brokerage
## Account Statement

June 28, 2023 - July 31, 2023
Account Number:

JASON HAFNER

**Your Financial Representative:**

**Risk Tolerance:**
VERY AGGRESSIVE

## Portfolio at a Glance

|  | This Period |
|---|---|
| **BEGINNING ACCOUNT VALUE** | $0.00 |
| Deposits (Cash & Securities) | 42,738.00 |
| **Net Change in Portfolio**[1] | -9,384.00 |
| **ENDING ACCOUNT VALUE** | **$33,354.00** |

[1] *Net Change in Portfolio is the difference between the ending account value and beginning account value after activity.*

## Client Service Information

| Your Financial Representative: | Contact Information | Client Service Information |
|---|---|---|
|  |  | **Web Site:** WWW.NORTHWESTERNMUTUAL.COM |

## Your Account Information

**INVESTMENT OBJECTIVE**
Investment Objective:   AGGRESSIVE GROWTH
Please review your investment objective. If you wish to make a change or have any questions please contact your Financial Representative.

A002848ICSF30020-SD   GOPAPERLESS ASK ABOUT EDELIVERY   STATEMENT   Rated Excellent Every Year Since 2007 DALBAR RATED COMMUNICATIONS EXCELLENCE   Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon) Pershing LLC, member FINRA, NYSE, SIPC

## Your Account Information *(continued)*

**TAX LOT DEFAULT DISPOSITION METHOD**

| | |
|---|---|
| Default Method for Mutual Funds: | Average Cost (Using First In First Out) |
| Default Method for Stocks in a Dividend Reinvestment Plan: | First In First Out |
| Default Method for all Other Securities: | First In First Out |

**BOND AMORTIZATION ELECTIONS**

| | |
|---|---|
| Amortize premium on taxable bonds based on Constant Yield Method: | Yes |
| Accrual market discount method for all other bond types: | Constant Yield Method |
| Include market discount in income annually: | No |

**ELECTRONIC DELIVERY**

You have **not** enrolled any documents for electronic delivery. The following documents are available for electronic delivery:

| | | |
|---|---|---|
| Statements and Reports | Notifications | Tax Documents |
| Trade Confirmations | Prospectus | Proxy/Shareholder Communications |

Please log in to your account or contact your Financial Representative to make any changes to your electronic delivery preferences .

## Portfolio Holdings

| Date Acquired | Quantity | Unit Cost | Current Cost Basis | Market Price | Market Value | Unrealized Gain/Loss |
|---|---|---|---|---|---|---|
| **EQUITIES 100.00% of Portfolio** | | | | | | |
| **Common Stocks** | | | | | | |
| [5]ATI PHYSICAL THERAPY INC CL A NEW | | | | Security Identifier: ATIP | | |
| Dividend Option: Cash | | | | CUSIP: 00216W208 | | |
| Please Provide[*] | 3,912.0000 | N/A | Please Provide | 6.5400 | 25,584.48 | N/A |
| Please Provide[*] | 1,188.0000 | N/A | Please Provide | 6.5400 | 7,769.52 | N/A |
| Total Unallocated | 5,100.0000 | | Please Provide | | 33,354.00 | N/A |
| Total | 5,100.0000 | | N/A | | $33,354.00 | N/A |
| **Total Common Stocks** | | | $0.00 | | $33,354.00 | $0.00 |
| **TOTAL EQUITIES** | | | $0.00 | | $33,354.00 | $0.00 |

| | Current Cost Basis | Market Value | Unrealized Gain/Loss | Accrued Interest |
|---|---|---|---|---|
| **Total Portfolio Holdings** | $0.00 | $33,354.00 | $0.00 | $0.00 |

[*] *Noncovered under the cost basis rules as defined below.*

Generally, securities acquired before 2011, in retirement accounts or held by Non-U.S. entities are not subject to the cost basis reporting rules set forth in the Internal Revenue Code of 1986, as amended by the Emergency Economic Stabilization Act of 2008, and are marked as "noncovered". Securities marked as "covered", were identified as securities potentially subject to the cost basis reporting rules and may be reported to the IRS on form 1099-B for the applicable tax year in which the securities are disposed.

Note: In the event where we cannot easily determine the taxability of an account, we may mark the account as noncovered. However, if the account does not receive a 1099B, the cost basis will not be reported to the IRS.

[5] *Unrealized gains and losses are not reported for securities for which cost basis or market value is not available.*

**Account Number**

A002848ICSF30020-SD



GOPAPERLESS
ASK ABOUT EDELIVERY

STATEMENT

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned
subsidiary of The Bank of New York Mellon
Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC

**Northwestern Mutual**
Northwestern Mutual Investment Services, LLC
Northwestern Mutual Wealth Management Company
720 E. Wisconsin Avenue, Milwaukee, WI 53202-4797
1-866-950-4644

June 28, 2023 - July 31, 2023
JASON HAFNER

## Portfolio Holdings Disclosures

### Pricing
This section includes the net market value of the securities in your account on a settlement date basis, including short positions, at the close of the statement period. The market prices, unless otherwise noted, have been obtained from independent vendor services, which we believe to be reliable. In some cases the pricing vendor may provide prices quoted by a single broker or market maker. Market prices do not constitute a bid or an offer, and may differ from the actual sale price. Securities for which a price is not available are marked "N/A" and are omitted from the Total.
THE AS OF PRICE DATE ONLY APPEARS WHEN THE PRICE DATE DOES NOT EQUAL THE STATEMENT DATE.

### Estimated Annual Figures
The estimated annual income (EAI) and estimated annual yield (EAY) figures are estimates and for informational purposes only. These figures are not considered to be a forecast or guarantee of future results. These figures are computed using information from providers believed to be reliable; however, no assurance can be made as to the accuracy. Since interest and dividend rates are subject to change at any time, and may be affected by current and future economic, political, and business conditions, they should not be relied on for making investment, trading, or tax decisions. These figures assume that the position quantities, interest and dividend rates, and prices remain constant. A capital gain or return of principal may be included in the figures for certain securities, thereby overstating them. Refer to www.pershing.com/disclosures for specific details as to formulas used to calculate the figures. Accrued interest represents interest earned but not yet received.

### Reinvestment
The dollar amount of Mutual Fund distributions, Money Market Fund dividend income, Bank Deposit interest income, or dividends for other securities shown on your statement may have been reinvested. You will not receive confirmation of these reinvestments. Upon written request to your financial institution, information pertaining to these transactions, including the time of execution and the name of the person from whom your security was purchased, may be obtained. In dividend reinvestment transactions, Pershing acts as your agent and receives payment for order flow.

### Option Disclosure
Information with respect to commissions and other charges incurred in connection with the execution of option transactions has been included in confirmations previously furnished to you. A summary of this information is available to you promptly upon your written request directed to your introducing firm. In order to assist your introducing firm in maintaining current background and financial information concerning your option accounts, please promptly advise them in writing of any material change in your investment objectives or financial situation. Expiring options which are valuable are exercised automatically pursuant to the exercise by exception procedure of the Options Clearing Corporation. Additional information regarding this procedure is available upon written request to your introducing firm.

### Foreign Currency Transactions
Pershing will execute foreign currency transactions as principal for your account. Pershing may automatically convert foreign currency to or from U.S. dollars for dividends and similar corporate action transactions unless you instruct your financial organization otherwise. Pershing's currency conversion rate will not exceed the highest interbank conversion rate identified from customary banking sources on the conversion date or the prior business day, increased by up to 1%, unless a particular rate is required by applicable law. Your financial organization may also increase the currency conversion rate. This conversion rate may differ from rates in effect on the date you executed a transaction, incurred a charge, or received a credit. Transactions converted by agents (such as depositories) will be billed at the rates such agents use.

### Proxy Vote
Securities not fully paid for in your margin account may be lent by Pershing to itself or others in accordance with the terms outlined in the Margin Agreement. The right to vote your shares held on margin may be reduced by the amount of shares on loan. The Proxy Voting Instruction Form sent to you may reflect a smaller number of shares entitled to vote than the number of shares in your margin account.

**Account Number:**
A002848ICSF300ZU-SD

GOPAPERLESS
ASK ABOUT EDELIVERY

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC

## Messages

Although a money market mutual fund (money fund) seeks to preserve the value of your investment at $1 per share, it is possible to lose money by investing in a money fund. Shares of a money fund or the balance of a bank deposit product held in your brokerage account may be liquidated upon request with the proceeds credited to your brokerage account. Please see the money fund's prospectus or the bank deposit product's disclosure document or contact your advisor for additional information. Pursuant to SEC Rule 10b-10(b)(1) confirmations are not sent for purchases into money funds processed on the sweep platform. Pursuant to applicable regulation, account statements will be produced monthly or quarterly. Balances in Federal Deposit Insurance Corporation (FDIC)-insured bank deposit sweep products are not protected by Securities Investor Protection Corporation (SIPC).

## Activity Summary *(All amounts shown are in base currency)*

|  | Credits This Period | Debits This Period | Net This Period | Credits Year-to-Date | Debits Year-to-Date | Net Year-to-Date |
|---|---|---|---|---|---|---|
| **Securities** |  |  |  |  |  |  |
| Securities Deposited | 42,738.00 | 0.00 | 42,738.00 | 42,738.00 | 0.00 | 42,738.00 |
| **Total Securities** | **$42,738.00** | **$0.00** | **$42,738.00** | **$42,738.00** | **$0.00** | **$42,738.00** |
| **Totals** | **$42,738.00** | **$0.00** | **$42,738.00** | **$42,738.00** | **$0.00** | **$42,738.00** |

## Transactions in Date Sequence

| Process/ Settlement Date | Activity Type | Description | Quantity | Price | Accrued Interest | Amount | Currency |
|---|---|---|---|---|---|---|---|
| 07/06/23 | SECURITY RECEIVED ATIP | ATI PHYSICAL THERAPY INC CL A NEW | 3,912.0000 |  |  | 32,782.56 | USD |
| 07/06/23 | SECURITY RECEIVED ATIP | ATI PHYSICAL THERAPY INC CL A NEW | 1,188.0000 |  |  | 9,955.44 | USD |
| **Total Value of Transactions** |  |  |  |  | **$0.00** | **$42,738.00** | **USD** |

The price and quantity displayed may have been rounded.

## Important Information and Disclosures

The Role of Pershing
- **Pershing LLC, member FINRA, NYSE, carries your account as clearing broker pursuant to a clearing agreement with your financial institution.** Pershing is not responsible or liable for any acts or omissions of your financial institution or its employees and it does not supervise them. Pershing provides no investment advice nor does it assess the suitability of any transaction or order. Pershing acts as the agent of your financial institution and you agree that you will not hold Pershing or any person controlling or under common control with it liable for any investment losses incurred by you.
- Pershing performs several key functions at the direction of your financial institution. It acts as custodian for funds and securities you may deposit with it directly or through your financial institution or that it receives as the result of securities transactions it processes.
- Your financial institution is responsible for adherence to the securities laws, regulations and rules which apply to it regarding its own operations and the supervision of your account, its sales representatives and other personnel. Your financial institution is also responsible for approving the opening of accounts and obtaining account documents; the acceptance and, in certain instances, execution of securities orders; the assessment of the suitability of those transactions, where applicable; the rendering of investment advice, if any, to you and in general, for the ongoing relationship that it has with you.
- Inquiries concerning the positions and balances in your account may be directed to the **Pershing Customer Service Department at (201) 413-3333.** All other inquiries regarding your account or activity should be directed to your financial institution. Your financial organization's contact information can be found on the first page of this statement.
- For a description of other functions performed by Pershing please consult the Disclosure Statement provided to you upon the opening of your account. This notice is not meant

**Account Number**
A002848ICSF30020-SD

GOPAPERLESS
ASK ABOUT EDELIVERY

STATEMENT

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC

**Northwestern Mutual**
Northwestern Mutual Investment Services, LLC
Northwestern Mutual Wealth Management Company
720 E. Wisconsin Avenue, Milwaukee, WI 53202-4797
1-866-950-4644

June 28, 2023 - July 31, 2023
JASON HAFNER

## Important Information and Disclosures *(continued)*

### The Role of Pershing *(continued)*

as a definitive enumeration of every possible circumstance, but as a general disclosure. If you have any questions regarding this notice or if you would like additional copies of the Disclosure Statement, please contact your financial institution.

- Pershing is a member of the Securities Investor Protection Corporation (SIPC®). Please note that SIPC does not protect against loss due to market fluctuation. In addition to SIPC protection, Pershing provides coverage in excess of SIPC limits. For more detailed information please visit: www.pershing.com/about/strength-and-stability.
- This statement will be deemed conclusive. You are advised to report any inaccuracy or discrepancy (including unauthorized trading) promptly, but no later than ten days after receipt of this statement, to your financial organization and Pershing. Please be advised that any oral communication should be re-confirmed in writing to further protect your rights, including your rights under the Securities Investor Protection Act.
- Your financial organization's contact information can be found on the first page of this statement. Pershing's contact information is as follows: **Pershing LLC, Legal Department, One Pershing Plaza, Jersey City, New Jersey 07399; (201) 413-3330.** Errors and Omissions excepted.

### Important Arbitration Disclosures

- All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.
- Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.
- The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.
- The arbitrators do not have to explain the reason(s) for their award, unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.
- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.
- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

### Important Arbitration Agreement

Any controversy between you and Pershing LLC shall be submitted to arbitration before the Financial Industry Regulatory Authority. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action, who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until; (I) the class certification is denied; (II) the class is decertified; or (III) the client is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein. The laws of the State of New York govern.

Pershing's contact information is as follows:  **Pershing LLC, Legal Department, One Pershing Plaza, Jersey City, New Jersey 07399; (201) 413-3330.**

**Account Number:**
A002848ICSF30020-SD



Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC

**Northwestern Mutual**®
Northwestern Mutual Investment Services, LLC
Northwestern Mutual Wealth Management Company
720 E. Wisconsin Avenue, Milwaukee, WI 53202-4797
1-866-950-4644

# **Brokerage**
## Account Statement

June 1, 2024 - June 30, 2024
Account Number:

JASON HAFNER

## Portfolio at a Glance

| | This Period |
|---|---|
| **BEGINNING ACCOUNT VALUE** | $24,276.00 |
| **Net Change in Portfolio**[1] | -1,486.14 |
| **ENDING ACCOUNT VALUE** | **$22,789.86** |

[1] *Net Change in Portfolio is the difference between the ending account value and beginning account value after activity.*

**Your Financial Representative:**

**Risk Tolerance:**
VERY AGGRESSIVE

## Client Service Information

| Your Financial Representative: | Contact Information | Client Service Information |
|---|---|---|
| | | **Web Site:** WWW.NORTHWESTERNMUTUAL.COM |

## Your Account Information

**INVESTMENT OBJECTIVE**
Investment Objective:   AGGRESSIVE GROWTH
Please review your investment objective. If you wish to make a change or have any questions please contact your Financial Representative.

A0140895CSF108DP-SD

GOPAPERLESS
ASK ABOUT EDELIVERY

STATEMENT

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC

## Your Account Information *(continued)*

**TAX LOT DEFAULT DISPOSITION METHOD**

| | |
|---|---|
| Default Method for Mutual Funds: | Average Cost (Using First In First Out) |
| Default Method for Stocks in a Dividend Reinvestment Plan: | First In First Out |
| Default Method for all Other Securities: | First In First Out |

**BOND AMORTIZATION ELECTIONS**

| | |
|---|---|
| Amortize premium on taxable bonds based on Constant Yield Method: | Yes |
| Accrual market discount method for all other bond types: | Constant Yield Method |
| Include market discount in income annually: | No |

**ELECTRONIC DELIVERY**

You have **not** enrolled any documents for electronic delivery. The following documents are available for electronic delivery:

| | | |
|---|---|---|
| Statements and Reports | Notifications | Tax Documents |
| Trade Confirmations | Prospectus | Proxy/Shareholder Communications |

Please log in to your account or contact your Financial Representative to make any changes to your electronic delivery preferences.

## Portfolio Holdings

| Date Acquired | Quantity | Unit Cost | Current Cost Basis | Market Price | Market Value | Unrealized Gain/Loss | |
|---|---|---|---|---|---|---|---|
| **EQUITIES 100.00% of Portfolio** | | | | | | | |
| **Common Stocks** | | | | | | | |
| [5]ATI PHYSICAL THERAPY INC CL A NEW | | | | Security Identifier: ATIP | | | |
| Dividend Option: Cash | | | | CUSIP: 00216W208 | | | |
| Please Provide[*] | 3,912.0000 | N/A | Please Provide | 4.4686 | 17,481.16 | N/A | |
| Please Provide[*] | 1,188.0000 | N/A | Please Provide | 4.4686 | 5,308.70 | N/A | |
| Total Unallocated | 5,100.0000 | | Please Provide | | 22,789.86 | N/A | |
| Total | 5,100.0000 | | N/A | | $22,789.86 | N/A | |
| **Total Common Stocks** | | | $0.00 | | $22,789.86 | $0.00 | |
| **TOTAL EQUITIES** | | | $0.00 | | $22,789.86 | $0.00 | |

| | Current Cost Basis | | Market Value | Unrealized Gain/Loss | Accrued Interest |
|---|---|---|---|---|---|
| **Total Portfolio Holdings** | $0.00 | | $22,789.86 | $0.00 | $0.00 |

[*] *Noncovered under the cost basis rules as defined below.*

Generally, securities acquired before 2011, in retirement accounts or held by Non-U.S. entities are not subject to the cost basis reporting rules set forth in the Internal Revenue Code of 1986, as amended by the Emergency Economic Stabilization Act of 2008, and are marked as "noncovered". Securities marked as "covered", were identified as securities potentially subject to the cost basis reporting rules and may be reported to the IRS on form 1099-B for the applicable tax year in which the securities are disposed.

Note: In the event where we cannot easily determine the taxability of an account, we may mark the account as noncovered. However, if the account does not receive a 1099B, the cost basis will not be reported to the IRS.

[5] *Unrealized gains and losses are not reported for securities for which cost basis or market value is not available.*

**Account Number:**
A0140895CSFIU8DP-SD

GOPAPERLESS
ASK ABOUT EDELIVERY

STATEMENT

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC

Northwestern Mutual®
Northwestern Mutual Investment Services, LLC
Northwestern Mutual Wealth Management Company
720 E. Wisconsin Avenue, Milwaukee, WI 53202-4797
1-866-950-4644

June 1, 2024 - June 30, 2024
JASON HAFNER

## Portfolio Holdings Disclosures

### Pricing
This section includes the net market value of the securities in your account on a settlement date basis, including short positions, at the close of the statement period. The market prices, unless otherwise noted, have been obtained from independent vendor services, which we believe to be reliable. In some cases the pricing vendor may provide prices quoted by a single broker or market maker. Market prices do not constitute a bid or an offer, and may differ from the actual sale price. Securities for which a price is not available are marked "N/A" and are omitted from the Total.
THE AS OF PRICE DATE ONLY APPEARS WHEN THE PRICE DATE DOES NOT EQUAL THE STATEMENT DATE.

### Estimated Annual Figures
The estimated annual income (EAI) and estimated annual yield (EAY) figures are estimates and for informational purposes only. These figures are not considered to be a forecast or guarantee of future results. These figures are computed using information from providers believed to be reliable; however, no assurance can be made as to the accuracy. Since interest and dividend rates are subject to change at any time, and may be affected by current and future economic, political, and business conditions, they should not be relied on for making investment, trading, or tax decisions. These figures assume that the position quantities, interest and dividend rates, and prices remain constant. A capital gain or return of principal may be included in the figures for certain securities, thereby overstating them. Refer to  www.pershing.com/disclosures for specific details as to formulas used to calculate the figures. Accrued interest represents interest earned but not yet received.

### Reinvestment
The dollar amount of Mutual Fund distributions, Money Market Fund dividend income, Bank Deposit interest income, or dividends for other securities shown on your statement may have been reinvested. You will not receive confirmation of these reinvestments. Upon written request to your financial institution, information pertaining to these transactions, including the time of execution and the name of the person from whom your security was purchased, may be obtained. In dividend reinvestment transactions, Pershing acts as your agent and receives payment for order flow.

### Option Disclosure
Information with respect to commissions and other charges incurred in connection with the execution of option transactions has been included in confirmations previously furnished to you.  A summary of this information is available to you promptly upon your written request directed to your introducing firm.  In order to assist your introducing firm in maintaining current background and financial information concerning your option accounts, please promptly advise them in writing of any material change in your investment objectives or financial situation.  Expiring options which are valuable are exercised automatically pursuant to the exercise by exception procedure of the Options Clearing Corporation. Additional information regarding this procedure is available upon written request to your introducing firm.

### Foreign Currency Transactions
Pershing will execute foreign currency transactions as principal for your account.  Pershing may automatically convert foreign currency to or from U.S. dollars for dividends and similar corporate action transactions unless you instruct your financial organization otherwise.  Pershing's currency conversion rate will not exceed the highest interbank conversion rate identified from customary banking sources on the conversion date or the prior business day, increased by up to 1%, unless a particular rate is required by applicable law.  Your financial organization may also increase the currency conversion rate.  This conversion rate may differ from rates in effect on the date you executed a transaction, incurred a charge, or received a credit.  Transactions converted by agents (such as depositories) will be billed at the rates such agents use.

### Proxy Vote
Securities not fully paid for in your margin account may be lent by Pershing to itself or others in accordance with the terms outlined in the Margin Agreement. The right to vote your shares held on margin may be reduced by the amount of shares on loan. The Proxy Voting Instruction Form sent to you may reflect a smaller number of shares entitled to vote than the number of shares in your margin account.

Account Number
A0140895CSHU8DP-SD

GOPAPERLESS
ASK ABOUT EDELIVERY

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC

## Portfolio Holdings Disclosures *(continued)*

### Variable Rate Securities

Interest rate data for certain complex and/or variable rate securities is provided to Pershing by third-party data service providers pursuant to contractual arrangements. Although we seek to use reliable sources of information, the accuracy, reliability, timeliness, and completeness of interest rate data may vary sometimes, particularly for complex and/or variable rate securities and those with limited or no secondary market. As a result, we can offer no assurance as to the accuracy, reliability, timeliness, or completeness of interest rate data for such securities. Pershing may also occasionally make interest rate updates and adjustments based on its reasonable efforts to obtain accurate, reliable, timely, and/or complete interest rate data from other data sources, but we can similarly provide no assurance that those rates or adjustments will be accurate, reliable, timely, or complete.

When updated interest rate data is received from a third-party data service provider or adjusted by Pershing, the updated data will be reflected in various sources where interest rate data is used or viewed, including both paper and electronic communications and data sources. Prior use or communication of interest rate-related data will not be revised. Since variable interest rates may be subject to change at any time and are only as accurate as the data received from third-party data service providers or otherwise obtained by Pershing, interest rate data should not be relied on for making investment, trading, or tax decisions. All interest rate data and other information derived from and/or calculated using interest rates are not warranted as to accuracy, reliability, timeliness, or completeness and are subject to change without notice. Pershing disclaims any responsibility or liability to the fullest extent permitted by applicable law for any loss or damage arising from any reliance on or use of the interest rate data or other information derived from and/or calculated using interest rates in any way. You should request a current valuation for your securities from your financial adviser or broker prior to making a financial decision or placing an order or requesting a transaction in these securities.

### Structured Products

Structured products in this section are complex products and may be subject to special risks, which may include, but are not limited to: loss of initial investment; issuer credit risk; limited or no appreciation; risks associated with the underlying reference asset(s); no periodic payments; call prior to maturity (a redemption could affect the yield represented); early redemption fees or other applicable fees; price volatility resulting from issuer's and/or guarantor's credit quality; lower interest rates and/or yield compared to conventional debt with a comparable maturity; unique tax implications; concentration risk of owning the related security; limited or no secondary market; restrictions on transferability; conflicts of interest; and limits on participation in appreciation of underlying asset(s). To review a complete list of risks, please refer to the offering documents for the structured product. For more information about the risks specific to your structured products, you should contact your financial institution or advisor. Certain structured products are designed to make periodic distributions to you and any such structured product distributions you receive will be listed in the Transactions section of your statement. Structured product distributions may be listed there as "Bond Interest Received"; however, this description is not intended to reflect a determination as to either the asset classification of the product or the U.S. tax treatment of such distributions.

## Messages

### Transition to Trade Date plus One (T1) Settlements

*The U.S. will adopt a shortened settlement timeframe beginning with trade date May 28, 2024, for equities, corporate, municipal bonds and unit investment trusts. Moving from a T2 to a T1 settlement cycle will provide faster access to sale proceeds, but it also means that funds will be due on purchase transactions earlier.*

Although a money market mutual fund (money fund) seeks to preserve the value of your investment at $1 per share, it is possible to lose money by investing in a money fund. Shares of a money fund or the balance of a bank deposit product held in your brokerage account may be liquidated upon request with the proceeds credited to your brokerage account. Please see the money fund's prospectus or the bank deposit product's disclosure document or contact your advisor for additional information. Pursuant to SEC Rule 10b-10(b)(1) confirmations are not sent for purchases into money funds processed on the sweep platform. Pursuant to applicable regulation, account statements will be produced monthly or quarterly. Balances in Federal Deposit Insurance Corporation (FDIC)-insured bank deposit sweep products are not protected by Securities Investor Protection Corporation (SIPC).

The Estimated Annual Income, Estimated Yield and Accrued Interest columns in your Portfolio Holdings section will not display values for variable rate securities. The optional Estimated Annual Income and Accrued Interest fields in the Portfolio at a Glance section of your statement will not include values for these securities.

Northwestern Mutual Investment Services, LLC ("NMIS") is making a change to the **Client General Account Agreement** (the "Brokerage Account Agreement") for your account(s)

Account Number:
A0140895CSF108DP-SD

GOPAPERLESS
ASK ABOUT EDELIVERY

STATEMENT

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC

**Northwestern Mutual** ®
Northwestern Mutual Investment Services, LLC
Northwestern Mutual Wealth Management Company
720 E. Wisconsin Avenue, Milwaukee, WI 53202-4797
1-866-950-4644

June 1, 2024 - June 30, 2024
JASON HAFNER

## Messages (continued)

which impacts all NMIS brokerage or Northwestern Mutual Wealth Management Company ("NMWMC") advisory accounts held through NMIS. The change reflects that the $50 portion of the Account Maintenance Fee can be waived by your financial representative for any account.

**Brokerage Accounts – Agreement Changes**

Effective 12/01/2024 we are amending the Brokerage Account Agreement for your account(s) to change the Account Maintenance Fee .

**Revisions to the <u>Client General Account Agreement ("Brokerage Account Agreement")</u>**

The following reflects the updated paragraph within Section 8 – Account Maintenance Fee

The following accounts are exempt from the $50 per year portion of the fee, but are subject to the 0.0079% portion of the fee (which is expected to be offset): accounts greater than $250,000, accounts in households at NMIS greater than $250,000, NMWMC Private Client Services advisory accounts, NMWMC Signature Annuities advisory accounts, NMWMC Signature Managed Accounts advisory accounts, 529 Plan accounts held through the Clearing Firm, direct-to-fund held accounts, non-profit entity accounts, retirement plan manager facilitation accounts, zero-balance accounts and NMIS employee/employee-related accounts. The $50.00 Account Maintenance Fee may also be waived by your financial representative for any account.

**PERSHING LLC ANNUAL DISCLOSURE OF IMPORTANT INFORMATION**

Pershing LLC (Pershing), as the custodian for your accounts, is required to disclose certain information to you on an annual basis. This document contains those disclosures.

MONEY FUND AND BANK DEPOSIT PROGRAM FEES AND REVENUE SHARING

Money fund and bank deposit sweep product processing fees and revenue sharing arrangements are a source of revenue for Pershing and, where applicable, a source of revenue for your firm. For the money funds supported on its sweep platform available to all clients, Pershing receives remuneration paid out of the total operating expenses of the fund, some of which include SEC Rule 12b-1 fees. If your firm selects a sweep product available to all clients that pays Pershing remuneration, in most cases a portion of the fees Pershing receives from money fund and bank deposit sweep product providers will be shared with your firm. In addition, Pershing receives fees for providing access to its platform from money funds and bank deposit sweep product providers. In most cases, these fees are paid based on assets in the products. In certain circumstances, Pershing shares these fees with your firm. Some firms have unique sweep products, where Pershing does not receive fees from the sweep product provider. When Pershing receives fees, a portion is applied against costs associated with providing services, including maintaining cash sweep systems, sub-accounting, dividend and interest calculations, posting, reconciliation, client statement preparation and distribution, tax statement preparation and distribution, marketing and distribution related support and other services. For a listing of money funds and bank deposit products that pay Pershing revenue-sharing and processing fees, refer to www.pershing.com/disclosures.

FEES RECEIVED BY AFFILIATES

The Dreyfus money funds supported as sweep options by Pershing, which may be offered to you by your firm, are managed by Dreyfus Cash Investment Strategies, a division of BNY Mellon Investment Adviser, Inc. (BNYMIA) and distributed through Dreyfus Cash Solutions, a division of BNY Mellon Securities Corporation (BNYMSC). BNYMSC and BNYMIA are affiliates of Pershing and BNYMSC receives compensation for delivering services to the Dreyfus money funds. The Dreyfus Insured Deposits products, are bank deposit sweep

**Account Number**
A0140895CSF108DP-SD

GOPAPERLESS
ASK ABOUT EDELIVERY

STATEMENT

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC

## Messages (continued)

products that automatically deposit swept funds into FDIC member participating banks (Program Banks), where swept balances receive pass through FDIC insurance coverage through those Program Banks. The Dreyfus Insured Deposits products are supported by Pershing, and may be offered to you by your firm, operate through a private labelling arrangement with Dreyfus Cash Solutions. Pershing has appointed Dreyfus Cash Solutions to provide certain services with respect to the operation of the Dreyfus Insured Deposits products. The Bank of New York Mellon is a state-chartered bank and BNY Mellon, National Association (BNY Mellon, N.A.) is a national banking association, both of which may act as Program Banks by participating in the bank deposit sweep products that Pershing supports on its sweep platform. BNYMSC is a registered investment adviser and broker-dealer, and a subsidiary of BNYMIA. Pershing, Pershing Advisor Solutions, BNYMSC, BNYMIA, The Bank of New York Mellon and BNY Mellon, N.A. are BNY Mellon companies. BNY Mellon is the corporate brand for The Bank of New York Mellon Corporation. Pershing, Pershing Advisor Solutions and BNYMSC earn fees (which may or may not be account- based) based on the amount of money in the Dreyfus Money Funds and Dreyfus Insured Deposits products. Depending on the specific terms of the products offered, Pershing and Pershing Advisor Solutions may earn a higher fee on balances in any of the bank deposit sweep products supported on the platform than in other sweep products, such as money funds. Based on the agreement between Pershing and your firm, Pershing, in its sole discretion, will share a portion of the fees it earns from the support of these sweep products with your firm, in which case your firm would earn fees on balances in these products, which may be higher than fees earned on other money market products. The Bank of New York Mellon and BNY Mellon, N.A may participate in bank deposit sweep products that Pershing supports on its sweep platform. If they participate, the Bank of New York Mellon and BNY Mellon, N.A. will realize an economic benefit from balances received through the bank deposit sweep products on the Pershing platform. The Program Banks, including the Bank of New York Mellon and BNY Mellon, N.A., do not have a duty to offer the highest rates available or rates that are comparable to money funds or those offered by other depository institutions.

SPONSORSHIP FEES

Third-party product and service providers (e.g., mutual fund companies, annuity companies, ETF providers, money market fund companies, money managers, technology and business solution providers) offer marketing support in the form of sponsorship fee payments to Pershing (or third parties at Pershing's direction) in connection with educational conferences, events, seminars and workshops for broker-dealers or advisers. These payments can include the expenses of educational materials or other conference-related expenses.

ADDITIONAL INFORMATION

Further detailed information regarding a number of the above topics can be found on our website at www.pershing.com/disclosures

**PERSHING LLC ANNUAL DISCLOSURE OF IMPORTANT INFORMATION**

Pershing LLC (Pershing), as the custodian for your accounts, is required to disclose certain information to you on an annual basis. This document contains those disclosures.

PERSHING'S IMPARTIAL LOTTERY PROCESS: PARTIAL CALLS

Information about Pershing's impartial lottery process can be found at www.pershing.com/disclosures. A printed copy of this information is available by calling (888) 367-2563, option 3 then option 5.

When a security is subject to a partial redemption, Pershing has procedures to treat you fairly. When an issuer initiates a partial call of securities, the depository holding such securities (typically, the Depository Trust and Clearing Corporation, or DTCC) conducts an impartial, computerized lottery using an incremental random number technique to determine the allocation of called securities to participants for which it holds securities on deposit (including Pershing). Because DTCC's lottery is random and impartial, participants may or may not receive an allocation of securities selected for redemption

Pershing conducts a similar, computer- generated random lottery. The lottery determines the accounts that will be selected and the number of securities in the account that will be redeemed. Allocations are based on the number of trading units held in the account. The probability of any trading unit held by an account being selected as called in a partial call is proportional to the total number of trading units held through Pershing.

Once the lottery is complete, Pershing notifies your firm which accounts have received an allocation. Securities registered in the client's name, either in transit or held in custody, are excluded from the Pershing lottery process.

Pershing initiates the lottery process by identifying the accounts holding the called security, the total par value of the called securities held, and the trading unit of the security.

Account Number

A0140895CSH08DP-SD

GOPAPERLESS
ASK ABOUT EDELIVERY

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC



Northwestern Mutual Investment Services, LLC
Northwestern Mutual Wealth Management Company
720 E. Wisconsin Avenue, Milwaukee, WI 53202-4797
1-866-950-4644

June 1, 2024 - June 30, 2024
JASON HAFNER

## Messages (continued)

For example (unit of trade = $25,000):

| Client Account | Par Value | Number of Trading Units |
|---|---|---|
| | $100,000 | 4 |
| | $75,000 | 3 |
| | $150,000 | 6 |
| | $50,000 | 2 |
| | $25,000 | 1 |
| | $25,000 | 1 |
| | $75,000 | 3 |

In brief, the allocation process involves the following steps:
- The number of trading units held in each account is identified.
- A sequential number is assigned to each trading unit (e.g., account EDR-567433 would be assigned six numbers).
- A random number is generated that will result in one of these trading units being the first unit in the selection process.
- Thereafter, the trading units participating in the allocation are based on an incremental random number technique until the number of trading units allocated to Pershing is exhausted.
- Additional Information
- The allocation of called securities is not made on a pro-rata basis. Therefore, it is possible that a client may receive a full or partial redemption of shares held. Conversely, it is also possible that a client may not have any securities selected for redemption.
- When a partial call is deemed favorable to the holders of the called security, Pershing will exclude certain accounts from the lottery. Excluded accounts will include Pershing's proprietary and employee accounts, as well as proprietary and employee accounts of your firm (if Pershing carries and clears those accounts). No allocation will be made to these proprietary and employee accounts until all other client positions at Pershing in such securities have been called. When a partial call is deemed unfavorable to holders of the called security, Pershing will not exclude any accounts from the lottery.
- If the partial call is made at a price above the current market price as captured in Pershing's price reporting system, Pershing will generally categorize the partial call as one that is favorable to the holders of such security. If the partial call is made at a price that is equal to or below the current market price of the security as captured in Pershing's price reporting system, Pershing will generally categorize that call as one that is unfavorable to holders of the security.
- Clients have the right to withdraw uncalled, fully paid securities from Pershing at any time prior to the cut-off date and time established by the issuer, transfer agent and/or depository with respect to the partial call. Clients also have the right to withdraw excess margin securities, provided that the client account is not subject to restriction under Regulation T or that such withdrawal will not cause an under-margined condition.
- Impartial lottery is conducted based on settled positions as of the close of business the day prior to the publication date.

**Account Number**
A0140895CSF108DP-SD

GOPAPERLESS
ASK ABOUT EDELIVERY

Rated Excellent
Every Year Since 2007
DALBAR RATED COMMUNICATIONS
EXCELLENCE

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon)
Pershing LLC, member FINRA, NYSE, SIPC